**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| HORNBLOWER HOLDINGS LLC, *et al.*,[1] | ) Case No. 24-90061 (MI) |
| | ) |
| Debtors. | ) (Joint Administration Requested) |
| | ) (Emergency Hearing Requested) |

**DEBTORS' <u>EMERGENCY</u> MOTION FOR ENTRY
OF INTERIM AND FINAL ORDERS (I) AUTHORIZING
THE DEBTORS TO PAY CERTAIN PREPETITION CLAIMS OF
(A) CRITICAL VENDORS, (B) LIEN CLAIMANTS, (C) CERTAIN
CRITICAL FOREIGN CLAIMANTS, AND (D) 503(B)(9) CLAIMANTS,
(II) CONFIRMING ADMINISTRATIVE EXPENSE PRIORITY
OF OUTSTANDING ORDERS, AND (III) GRANTING RELATED RELIEF**

> **Emergency relief has been requested. Relief is requested not later than 5:00 p.m. (prevailing Central Time) on February 21, 2024.**
>
> **If you object to the relief requested or you believe that emergency consideration is not warranted, you must appear at the hearing if one is set, or file a written response prior to the date that relief is requested in the preceding paragraph. Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.**
>
> **A hearing will be conducted on this matter on February 21, 2024, at 5:00 p.m. (prevailing Central Time) in Courtroom 404, 4th Floor, 515 Rusk Street, Houston, Texas 77002.**
>
> **Participation at the hearing will only be permitted by an audio and video connection.**
>
> **Audio communication will be by use of the Court's dial-in facility. You may access the facility at (832) 917-1510. Once connected, you will be asked to enter the conference room number. Judge Isgur's conference room number is 954554. Video communication will be by use of the GoToMeeting platform. Connect via the free GoToMeeting application or click the link on Judge Isgur's homepage. The meeting code is "judgeisgur". Click the settings icon in the upper right corner and enter your name under the personal information setting.**
>
> **Hearing appearances must be made electronically in advance of both electronic and in-person hearings. To make your appearance, click the "Electronic Appearance" link on Judge Isgur's homepage. Select the case name, complete the required fields, and click "Submit" to complete your appearance.**

---

[1]   The last four digits of Debtor Hornblower Holdings LLC's tax identification number are 6035. Due to the large number of debtor entities in these chapter 11 cases, for which the Debtors have requested joint administration, a complete list of the debtor entities and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' proposed claims and noticing agent at https://omniagentsolutions.com/Hornblower. The location of the Debtors' service address for purposes of these chapter 11 cases is: Pier 3 on The Embarcadero, San Francisco, CA 94111.

The above-captioned debtors and debtors in possession (collectively, the "<u>Debtors</u>") respectfully state as follows in support of this motion ("<u>Motion</u>"):

**<u>Relief Requested</u>**[2]

1.　The Debtors seek entry of interim and final orders, substantially in the forms attached hereto (respectively, the "<u>Interim Order</u>" and the "<u>Final Order</u>"), (a) authorizing, but not directing, the Debtors to pay in the ordinary course of business certain prepetition claims held by (i) certain essential vendors and service providers (each, a "<u>Critical Vendor</u>"), (ii) shippers, warehousemen, maritime, and other lien claimants (each, a <u>Lien Claimant</u>), (iii) certain critical foreign claimants, including in the United Kingdom (the "<u>Critical Foreign Claimants</u>"), and (iv) vendors whose claims may be entitled to priority under section 503(b)(9) of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "<u>Bankruptcy Code</u>") (each, a "<u>503(b)(9) Claimant</u>" and, collectively with the Critical Vendors, the Lien Claimants, and the Critical Foreign Claimants, the "<u>Trade Claimants</u>"); (b) confirming the administrative expense priority status of Outstanding Orders; and (c) granting related relief.

2.　In addition, the Debtors request that the Court schedule a final hearing within approximately 30 days of the commencement of these chapter 11 cases to consider entry of the Final Order.

**<u>Jurisdiction and Venue</u>**

3.　The United States Bankruptcy Court for the Southern District of Texas (the "<u>Court</u>") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the *Amended Standing Order of Reference from the United States District Court for the Southern District of*

---

[2]　Capitalized terms used but not immediately defined shall have the meanings ascribed to such terms elsewhere in this Motion or the First Day Declaration.

2

*Texas*, dated May 24, 2012 (the "Amended Standing Order"). This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b). The Debtors confirm their consent to the entry of a final order by the Court.

4.      Venue is proper pursuant to 28 U.S.C. § 1408.

5.      The statutory bases for the relief requested herein are sections 105(a), 363, 503(b), 507, 1107(a), and 1129 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"), rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and rules 1075-1 and 9013-1 of the Bankruptcy Local Rules for the Southern District of Texas (the "Bankruptcy Local Rules").

## Background

6.      On February 21, 2024 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code. The Debtors are operating their businesses and managing their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. The Debtors have filed a motion requesting procedural consolidation and joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b) substantially contemporaneously herewith. No request for the appointment of a trustee or examiner has been made in these chapter 11 cases, and no committees have been appointed or designated.

7.      A detailed description of the Debtors and their businesses, including the facts and circumstances giving rise to the Debtors' chapter 11 cases, is set forth in the *Declaration of Jonathan Hickman in Support of Chapter 11 Petitions and First Day Motions* (the "First Day Declaration"), filed substantially contemporaneously herewith and incorporated herein by reference.

### Trade Claims Overview

8.     The Debtors, along with their non-Debtor affiliates, are a global leader in world-class experiences, tourism, and transportation with offerings including, land- and water-based experiences, overnight cruising, extended rail journeys, ferry and transportation services, and marine consulting services, serving more than 30 million guests annually.  To maintain their operations and provide these services to their valuable customers, the Debtors rely heavily on continuing access to, and relationships with, the Trade Claimants, which provide a variety of essential goods and services that cannot be replaced without risking the continued viability of the Debtors' business enterprise and impairing their going concern value.

9.     In many cases, the Debtors have limited alternatives to the Trade Claimants when going to the market for requisite goods and services.  Even where alternative vendors exist, the costs and time associated with switching from one vendor to another could be significant and detrimental to the Debtors' estates.  In light of the customer-centric nature of the Debtors' businesses, even a temporary halt or disruption of only a few hours, let alone days, could be sufficient to cause an immediate and irreparable impact to the Debtors' ability to honor their customer obligations and retain their customer base.

10.     Furthermore, the failure to make payments to certain Trade Creditors would likely result in assertion of maritime liens against the Debtors' estates, which would undermine the continued operation of the Debtors' businesses.[3]  As such, any disruption in the Debtors' access to critical goods and services would have far-reaching and adverse economic and operational impact on the Debtors' businesses.

---

[3]     The Debtors do not concede that any potential liens described in this Motion, including contractual liens, mechanics' liens, maritime liens, artisan liens, statutory liens, and liens asserted by Trade Claimants, are valid and enforceable, and the Debtors expressly reserve the right to contest the extent, validity, and perfection of all such liens to the extent any are asserted.

11.     Given that the Debtors' business operations are largely dependent on their relationships with their vendors and customers, the loss of these relationships would immediately harm the Debtors' business, thus irreparably jeopardizing the value of the estates.  The Debtors, therefore, request authorization to pay certain outstanding prepetition claims of the Critical Vendors, Lien Claimants, Critical Foreign Claimants, and 503(b)(9) Claimants (the claims of such Trade Claimants, the "Trade Claims"), subject to the limitations set forth in the Interim Order and the Final Order.  The Debtors intend to apply their business judgment and discretion on a case-by-case basis and pay only those Trade Claims that are crucial for the orderly and efficient operations of the Debtors' businesses and provide the Debtors with favorable postpetition terms.  The following table summarizes the types of claimants that the Debtors request authority to pay pursuant to this Motion.

| Category | Description of Claims | Relief Requested During the Interim Period Before Entry of the Final Order (Interim Order) | Relief Requested Upon Entry of the Final Order[4] |
|---|---|---|---|
| Critical Vendors | Specialized suppliers of goods and services that are critical to maintain the Debtors' day-to-day operations, or which are sole or limited-source providers of the goods and services necessary for the uninterrupted operations of the Debtors' businesses | $3 million | $4 million |
| Lien Claimants | Suppliers of goods and services that may assert mechanic's, possessory, maritime or other similar liens | $17 million | $22 million |
| Critical Foreign Claimants | Suppliers of goods or services that are based outside of the United States, including the United Kingdom | $2 million | $3 million |
| 503(b)(9) Claimants | Suppliers that provided goods to the Debtors that were received within twenty days before the Petition Date | $1 million | $2 million |
| **Total Relief Requested** | | **$23 million** | **$31  million** |

---

[4]     The amounts listed in this column include amounts approved under the Interim Order.

## I.   The Critical Vendors

12.    The Debtors rely on suppliers, service providers, and other vendors who are critical to the Debtors' operations (collectively, the "Critical Vendors") to supply essential goods and services (the "Critical Vendor Goods and Services"), without which the Debtors' businesses would suffer serious disruption.  More specifically, the Critical Vendor Goods and Services generally fall into the following categories: (a) Operational Products and Services, (b) Information Technology Services, (c) Tour Guides and Attractions, and (d) Booking Agencies.

13.    The Critical Vendors, in many cases, are the only source of the Critical Vendor Goods and Services needed for the Debtors' uninterrupted operations.  Even where alternative vendors may exist, the time and costs associated with switching from one vendor to another would likely impose a severe strain on the Debtors' business operations and result in significant revenue loss given the extensive planning that goes into the Debtors' smooth day-to-day operations ensuring world-class experiences to hundreds of thousands of customers weekly.

14.    Even a temporary interruption of the provision of Critical Vendor Goods and Services would impede the Debtors' operations.  It is therefore essential to the success of the Debtors' restructuring efforts that they be able to maintain the level of service that customers have come to expect from the Debtors.

15.    Prior to the Petition Date, as their liquidity situation worsened, the Debtors delayed payments on outstanding invoices for many of the Critical Vendor Goods and Services.  As such, the Debtors believe that many of the Critical Vendors have already reached their limits and, if the Debtors further delay payments for the Critical Vendor Goods and Services, the Critical Vendors may cease to supply the Critical Vendor Goods and Services altogether.  Accordingly, in light of the potential for immediate irreparable consequences if the Critical Vendors do not continue to provide uninterrupted and timely deliveries of goods and services, the Debtors have determined,

in the exercise of their business judgment, that payment of the prepetition claims of Critical Vendors (the "Critical Vendor Claims") is essential to avoid costly disruptions to their operations.

## II. Critical Vendor Goods and Services

### a. Operational Products and Services

16.     Certain of the Critical Vendors supply operational goods and services that are vital to the Debtors' ability to effectively and efficiently serve their customers and generate revenue. Specifically, a significant portion of the Debtors' business is derived from consistent customers who have come to expect quality customer service from the Debtors' tourism and transportation offerings which also requires certain daily, third-party goods and services.  Additionally, with many of these Critical Vendors the Debtors have had a long standing relationship that has enabled the Debtors to obtain favorable pricing terms.  Certain of the Debtors' suppliers, service providers, and other vendors provide, among other things, port operations services required by applicable regulation and certain of the Debtors' material contracts with other third-parties, critical marketing services that drive customer bookings, logistics and transportation, accommodations, and shore excursion services essential for the Debtors' uninterrupted day-to-day operations (the "Operational Products and Services").  In some instances the Critical Vendors providing such Operational Products and Services are so intertwined with the Debtors' operations and there is no other vendor capable of providing such goods and services to the Debtors, and in other instances replacing such Critical Vendor would likely cause (a) a temporary dislocation in the Debtors' ability to provide services forcing the Debtors to provide refunds to customers, and/or (b) the Debtors to lose the favorable pricing terms enjoyed with current Critical Vendors due to existing long standing relationships.

17.     In addition, there are several Critical Vendors with whom the Debtors have a contractual relationship.  The Debtors have generally narrowly tailored their inclusion of contract

parties within the universe of Critical Vendors to vendors providing Operational Products and Services whose goods or services are required pursuant to the terms of the Debtors' key concession and/or ferry contracts.  As to these vendors, their inclusion is warranted because the Debtors are concerned that any disruption in service by such Critical Vendors may jeopardize the Debtors' relationships and existing agreements with counterparties under these key concession and ferry agreements.  Further, while applicable law requires a non-debtor counterparty to continue performing postpetition pending the debtor's decision to assume or reject, notwithstanding that such counterparty is owed prepetition amounts, *see, e.g.*, *In re Mirant Corp.*, 303 B.R. 319 (Bankr. N.D. Tex. 2003), the Debtors, for their part, would be required to cure any such prepetition defaults as a condition to assuming these contracts later in the chapter 11 cases and, thus, these contract parties will be made whole in the context of any assumption.  Although the Debtors are not seeking authority to assume any of such contracts at this time, the Debtors will likely assume many, if not all, of the applicable contracts in conjunction with a plan confirmation, which will require curing any outstanding prepetition amounts.  The Debtors accordingly believe it is necessary to have the flexibility to continue paying these Critical Vendors on a timely basis.

18.     The Operational Products and Services are essential for the Debtors to meet the demands of their customers and maintain their business operations uninterrupted.  Any discontinuity of the Operational Products and Services could have a detrimental effect on the customers' experience as well as their demand for future services which in turn could lead to a material negative impact on the Debtors' reputation with their customers, significant loss of business, and deterioration in the value of the Debtors' operations to the detriment of the Debtors' stakeholders.

### b. **Information Technology Services**

19.     Additionally, the Debtors' businesses require certain information technology services in order to meet the needs of their customers.  Specifically, the Debtors rely on a number of information technology service providers (the "Information Technology Service Providers") which include, among other things, a cloud-based system, a payment platform, and a system that allows consumers to make online bookings (the "Information Technology Services").  Disruptions to the Information Technology Services—however brief—would result in significant damage to the Debtors' business operations.

20.     Without the functions provided by the Information Technology Service Providers, the Debtors would not be able to meet the demands of customers or maintain their business operations, and the Debtors could lose the sensitive and vital information that they have accumulated during their many years of operation.  Furthermore, the costs that the Debtors would incur to replace these systems could be significant.  Replacement of the current cloud data system would require a technical, extensive, and time-consuming process as the Debtors would need to coordinate among many departments and develop new software to set up these systems and rebuild them from the ground up.

### c. **Tour Guides and Attractions**

21.     The Debtors' land-based experiences are dependent on local, third-party tour guides and experiential service providers and locations (the "Tour Guides and Attractions") to fulfill the Debtors' obligations to their customers for booked excursions.  Without access to the Tour Guides and Attractions, the Debtors' excursion offerings would diminish and become

problematic to current customers and unattractive to prospective customers, thus eroding the value of the Debtors' businesses.

22.     The Debtors believe that jeopardizing their relationships with the Tour Guides and Attractions and even an attempt to delay payment would impose a severe strain on their business operations and ability to serve their customers, resulting in significant revenue loss.

### d. **Booking Agencies**

23.     The Debtors' businesses are critically dependent on third-party sales channels for their land-based experiences.  These channels include travel and booking agencies (the "Booking Agencies") that actively sell to prospective customers or direct prospective customers to the Debtors.  Specifically, relationships with the Booking Agencies span business segments, whereby the Booking Agencies seek to promote, sell and direct customers to various experiences offered across the Debtors' offerings.  Historically, nearly all of the Debtors' land-based experiences businesses have been sourced through Booking Agencies.

24.     The Debtors believe that any material negative change in their relationships with the Booking Agencies would cause the Debtors to experience a substantial loss of bookings which would result in irreparable harm to the value of the Debtors' businesses.  The harm to the Debtors' estates as a result of not having access to the Booking Agencies would far outweigh the cost of payment of such vendors.  Prior to the Petition Date, the Debtors suffered material decreases in bookings, negatively affecting revenue due to the non-payment of amounts owed to the Booking Agencies, who have the ability to direct potential customers to the Debtors' competitors.

## II.     The Critical Vendor Analysis

25.     In keeping with their fiduciary duties and in the exercise of their sound business judgment, the Debtors, their management team, and their advisors have spent significant time reviewing and analyzing their books and records, consulting operations managers and purchasing

personnel, reviewing contracts and supply agreements, and analyzing applicable law, regulations, and historical practice to identify certain critical business relationships and suppliers of goods and services—the loss of which would immediately and irreparably harm their businesses, by, *inter alia*, shrinking their market share, reducing enterprise value, and ultimately impairing the Debtors' viability as a going-concern.  In this process, the Debtors considered a variety of factors, including:

- whether certain specifications or contract requirements prevent, directly or indirectly, the Debtors from obtaining goods or services from alternate sources;

- whether a vendor is a sole-source, limited-source, or high-volume supplier of goods or services critical to the Debtors' business operations;

- whether an agreement exists by which the Debtors could compel a vendor to continue performing on prepetition terms;

- whether alternate vendors are available that can provide requisite volumes of similar goods or services on equal (or better) terms and, if so, whether the Debtors would be able to continue operating while transitioning business thereto;

- the degree to which replacement costs (including, pricing, transition expenses, professional fees, and lost sales or future revenue) exceed the amount of a vendor's prepetition claim;

- whether the Debtors' inability to pay all or part of the vendor's prepetition claim could trigger financial distress for the applicable vendor;

- the likelihood that a temporary break in the vendor's relationship with the Debtors could be remedied through use of the tools available in these chapter 11 cases;

- whether failure to pay all or part of a particular vendor's claim could cause the vendor to hold goods owned by the Debtors, or refuse to ship inventory or to provide critical services on a postpetition basis;

- the location and nationality of the vendor and its connections to the United States; and

- whether failure to pay a particular vendor could result in contraction of trade terms as a matter of applicable non-bankruptcy law or regulation.

26.    Based on this evaluation, the Debtors believe they owe the Critical Vendors approximately $4 million as of the Petition Date, of which $3 million will come due during the

interim period before entry of the Final Order. Accordingly, the Debtors request authorization, but not direction, to pay all outstanding prepetition obligations on account of Critical Vendor Claims, in an aggregate amount up to $4 million, but only as such amounts come due in the ordinary course of business or as may be necessary to secure a Critical Vendor's agreement to continue business with the Debtors on Customary Trade Terms.

27.     Any material interruption in the provision of the Critical Vendor Goods and Services—however brief—would disrupt the Debtors' operations and could cause irreparable harm to the Debtors' go-forward businesses, goodwill, employees, customer base, and market share. Such harm would likely far outweigh the cost of payment of the Critical Vendor Claims.[5] Accordingly, to maintain stability during this critical stage of these chapter 11 cases and to avoid jeopardizing the Debtors' business operations going forward, the Debtors request authority, but not direction, to pay the Critical Vendors as described herein.

### III.    Lien Claimants

28.     As a result of the commencement of these chapter 11 cases, certain Trade Claimants who hold goods for delivery to or from the Debtors may refuse to release the goods pending receipt of payment for their prepetition services. Under certain non-bankruptcy laws, Trade Claimants that provide shipping, warehousing, and logistics services and supplies (collectively, the "Shippers and Warehousemen") may have a lien on goods in its possession to secure the charges or expenses incurred for the transportation or storage of goods.[6]

---

[5]    Notwithstanding the relief requested herein, the Debtors reserve all of their rights and remedies under the Bankruptcy Code and other applicable law to pursue any cause of action against any Critical Vendor on account of, among other things, any violation of the automatic stay pursuant to section 362(a)(6) of the Bankruptcy Code.

[6]    For example, section 7-307 of the Uniform Commercial Code provides, in pertinent part, that "[a] carrier has a lien on the goods covered by a bill of lading or on the proceeds thereof in its possession for charges after the date of the carrier's receipt of the goods for storage or transportation, including demurrage and terminal charges, and for expenses necessary for preservation of the goods incident to their transportation or reasonably incurred in their sale pursuant to law." See U.C.C. § 7-307(a) (2003).

29.    Accordingly, in the event these claims remain unpaid, the Lien Claimants could attempt to assert such possessory liens and refuse to deliver or release goods in their possession until their claims are satisfied and their liens redeemed.  The Lien Claimants' possession (and retention) of the Debtors' goods and supplies would disrupt the Debtors' operations and affect the Debtors' ability to efficiently administer these chapter 11 cases.  The cost of such disruption to the Debtors' estates in many cases would likely be greater than the applicable Lien Claims.  Further, pursuant to section 363(e) of the Bankruptcy Code, the Lien Claimants may be entitled to adequate protection of any valid possessory lien, which would drain estate assets.

30.    The refusal of these Trade Claimants to deliver or return the Debtors' goods as a result of not being paid would severely disrupt the Debtors' operations and potentially cost the Debtors a substantial amount of revenue and future business.  Additionally, the Debtors do not operate under long-term contracts with certain of their shippers.  Instead, the Debtors pay spot prices for their shipping needs.  This practice allows the Debtors to take advantage of the best rates available to ship goods; however, it also means that the shippers may not have a long-term interest in doing business with the Debtors and may therefore look to exercise their liens for short-term benefit.

31.    Certain Trade Claimants may also be able to assert maritime liens on the Debtors' vessels in the event the Debtors fail to satisfy outstanding obligations owed thereto (the "Maritime Vendors" and, together with the Shippers and Warehousemen, collectively, "Lien Claimants").  Specifically, the Maritime Vendors may be entitled to assert maritime liens under United States federal law and Canadian law, which grants maritime liens on vessels to "a person providing necessaries to a vessel on the order of the owner or a person authorized by the owner." *See* 46

U.S.C. § 31342(a)[7]; *see also* section 86 of the *Canada Shipping Act*, 2001 (S.C. 2001, c. 26) for

Canadian flagged vessels and section 139 of the *Marine Liability Act* (S.C. 2001, c. 6) for foreign

flagged vessels.[8]   Accordingly, to the extent that authorized payments for necessaries remain

unpaid as of the Petition Date, the relevant Maritime Vendors may attempt to assert liens against

the Debtors' vessels and hinder the Debtors' use of property that is necessary to operate the

Debtors' businesses.[9]

32.     Further, the U.S. and Canadian maritime laws recognize the rights of maritime lien

claimants to enforce their liens *in rem* by arresting a vessel.[10] *See, e.g.*, *World Fuel Servs. Sing.

PTE v. M/V AS Varesia*, 727 F. App'x 811, 814 (5th Cir. 2018) ("When a party has a maritime

---

[7]   "Necessaries" include repairs, supplies, towage, and the use of a dry dock or marine railway." 46 U.S.C. § 31301(4).
Moreover, courts have defined "necessaries" broadly as reaching any good or service that a prudent owner would
deem reasonably necessary for her vessel's successful operation. *See Ventura Packers, Inc. v. F/V Jeanine
Kathleen*, 305 F.3d 913, 923 (9th Cir. 2002) (noting that "modern admiralty jurisprudence interprets 'necessaries'
broadly, as anything that facilitates or enables a vessel to perform its mission or occupation") (citing *Equilease
Corp. v. M/V Sampson*, 793 F.2d 598, 603 (5th Cir. 1986)).

[8]   Note for Canadian flagged vessels, the lien vests in the master of a Canadian vessel.  Necessaries are not defined
in the *Marine Liability Act* (S.C. 2001, c. 6) or the *Canada Shipping Act, 2001* (S.C. 2001, c. 26), however, they
are generally accepted to include "goods, materials or services" supplied to a ship required "for the operation or
maintenance" and the "construction, repair or equipping of a ship" as set out in sections 22(2)(m) and (n) of the
*Federal Courts Act* (R.S.C., 1985, c. F-7). *See Doris v. "Ferdinand" (The)*, 155 F.T.R. 236, 1998 CarswellNat
1861 (Federal Court – Trial Division).

[9]   *See, e.g.*, *La. Int'l Marine, L.L.C. v. Drilling Rig Atlas Century*, No. C-11-186, 2012 U.S. Dist. LEXIS 147699,
at *18 (S.D. Tex. Aug. 21, 2012) (noting that 46 U.S.C. § 31301(4) "expressly includes 'towage' services"); *USL
Capital v. New York 30*, 975 F. Supp. 382 (D. Mass. 1996) (finding that towing company was entitled to a
maritime lien on barge for payment of its towing fees).

[10]   This applies to both Canadian and foreign vessels. With respect to Canadian flagged vessels, the liens of the
master, and each crew member, of a vessel can be enforced *in rem* per section 86(3) of the *Canada Shipping Act*,
2001 (S.C. 2001, c. 26). For foreign vessels, section 43(2) and (8) of the *Federal Courts Act* provides that the
jurisdiction conferred on the Federal Court by section 22 may be exercised *in rem* against the ship that is the
subject of the action, or against any proceeds from its sale that have been paid into court, which includes the arrest
of the vessel. Section 22(2)(m) and (n) of the *Federal Courts Act* includes any claim in respect of goods, materials
or services wherever supplied to a ship for the operation or maintenance of the ship, including, without restricting
the generality of the foregoing, claims in respect of stevedoring and lighterage and any claim arising out of a
contract relating to the construction, repair or equipping of a ship. *See* for *example Kirgan Holdings S.A.* v.
*"Panamax Leader" (The)*, 2002 FTC 1235 in relation to a claim for supply of bunker fuel.

lien, the mechanism of enforcement is an *in rem* action commenced by the arrest of the vessel."); *Bay Casino, LLC v. M/V Royal Empress*, 20 F. Supp. 2d 440, 448 (E.D.N.Y. 1998) ("It is well-settled that although arrest of maritime property is a remedy available within the maritime jurisdiction, it requires an underlying maritime cause of action supporting a maritime lien in the property arrested."). Holders of maritime liens can take action to arrest a vessel notwithstanding their security rank or the existence of other liens on the vessel. *See* Fed. R. Civ. P. Supp. Adm. Rule C; *see also RSDC Holdings, LLC v. M.G. Mayer Yacht Servs.*, No. 16-3573, 2019 U.S. Dist. LEXIS 16991, at *27-28 (E.D. La. Feb. 1, 2019) (noting that "maritime liens are secret liens that are perfected when they arise" and because the filing of a notice of lien is permissive and not mandatory, "the lien's status and rank are in no way affected by failure to file" such a notice) (citing Grant Gilmore & Charles L. Blank, Jr., *The Law of Admiralty* § 9-72 (2d ed. 1975)). Thus, the exercise of remedies related to maritime liens could allow the lienholder to arrest a vessel and hold it as security until a court can enforce a judgment on the merits or until alternative security is posted from which the maritime claim may be satisfied. *See* Fed. R. Civ. P. Supp. Adm. Rule E(5). It is therefore essential that the Debtors be permitted to pay their Maritime Vendors in the ordinary course so as to avoid potential disruption to their business operations.

33. The Debtors are not seeking to pay these amounts immediately or in one lump sum. Rather, the Debtors intend to pay these amounts as they become due and payable in the ordinary course of the Debtors' business. As of the Petition Date, the Debtors estimate that they owe an aggregate amount of approximately $22 million on account of Lien Claims, approximately $17 million of which will come due during the interim period before entry of the Final Order. For the avoidance of doubt, the Debtors seek authority to pay only those amounts that they determine, in their sole discretion, are necessary or appropriate to (a) obtain release of critical or valuable goods,

(b) maintain a reliable, efficient, and smooth distribution system, and (c) induce the Lien Claimants to continue performing and otherwise supporting the Debtors' operations on a postpetition basis.

## IV.    Critical Foreign Claimants

34.    Certain Debtors organized under the laws of the United Kingdom (the "UK Debtors") owe approximately $2 million on account of prepetition claims (the "Critical UK Claims") to their vendors and other unsecured creditors (the "Critical UK Claimants").  Upon the commencement of these cases with respect to the UK Debtors, prepetition unsecured creditors of the UK Debtors may exercise remedies against the UK Debtors up to and including the winding up of the UK Debtors as operating entities.  Further, if any of the UK Debtors' creditors are unpaid, there is risk that enforcement actions in that jurisdiction can materiality impair the U.S. Debtors' operations.  The forced liquidation of the UK Debtors would cause irreparable harm to the Debtors' overall business because the UK Debtors generate approximately $30 million in annual gross sales for the Debtors.  Losing that presence and stronghold in the UK would not only be detrimental to the City Cruises brand, but to the Debtors as a whole.  Unlike a chapter 11 filing under the Bankruptcy Code, a wind up under English insolvency law is a terminal process, and the UK Debtors may become subject to a validation order under which EAUK would not be able to make any payments or dispose of any assets without the permission of the English court.

35.    While the commencement of recognition proceedings in the UK may prevent that outcome, the cost of those proceedings would be far more than paying the approximate $2 million to satisfy the outstanding prepetition obligations owed to the UK Debtors' vendors.  All funds paid to the UK Debtors' creditors will be paid by the UK Debtors.  By this Motion, the Debtors seek authority, but not direction, to satisfy these claims in full upon entry of the proposed Interim Order.

36.    In addition to the Critical UK Claimants, the Debtors transact with certain other foreign claimants ("Other Foreign Claimants" and, collectively with the Critical UK Claimants,

the "Critical Foreign Claimants") that supply goods and services to the Debtors that are crucial for the continuation of their business in the ordinary course during these chapter 11 cases. Due to the international reach of the Debtors' businesses, it is often logistically impracticable—and significantly more cost prohibitive—for the Debtors to purchase goods and services from a U.S.-based vendor rather than Other Foreign Claimants. Moreover, many of the Debtors' Other Foreign Claimants are irreplaceable due to the specialized and customized nature of their products and services specific to the Debtors' international operations. Failure to pay prepetition claims held by certain Other Foreign Claimants and accrued in the ordinary course of business (the "Other Foreign Claims" and collectively with the Critical UK Claims, the "Critical Foreign Claims") could cause such Other Foreign Claimants to refuse to provide the goods and services necessary for the Debtors to continue business operations.

37.     Many of the Other Foreign Claimants lack meaningful, if any, contacts with the United States. Thus, the Other Foreign Claimants may consider themselves beyond the jurisdiction of the Court and, therefore, may disregard the automatic stay, notwithstanding the automatic stay's global effect. Lawsuits in non-U.S. courts and efforts to exercise other remedies in non-U.S. jurisdictions, including the assertion of liens by the Other Foreign Claimants, could result from a failure to make payment to such parties in the ordinary course, including on account of prepetition claims. It would be unduly time-consuming and burdensome for the Debtors to seek to enforce an order of the Court in the creditor's home country in many instances, thereby compounding the loss and disruption in services.

38.     For the twelve months before the Petition Date, on average, the Debtors paid the Other Foreign Claimants approximately $250,000 per month. The Debtors estimate that, as of the Petition Date, approximately $200,000 is outstanding on account of Other Foreign Claims,

approximately $150,000 of which is due or will become due during the interim period before entry of the Final Order.  To maintain access to the critical goods and services provided by the Other Foreign Claimants, the Debtors request authority to pay the prepetition Other Foreign Claims as they become due and payable and to continue paying the Other Foreign Claims in the ordinary course of business.  For the avoidance of doubt, the Debtors intend to pay prepetition Other Foreign Claims only where they believe, in their business judgment, that the benefits to their estates from making such payments will exceed the costs.

**V.      503(b)(9) Claimants**

39.     The Debtors may have received certain inventory, goods, and/or materials from various vendors within the twenty-day period immediately preceding the Petition Date, thereby giving rise to claims that are accorded administrative priority under section 503(b)(9) of the Bankruptcy Code (the "503(b)(9) Claims").  Many of the Debtors' relationships with the 503(b)(9) Claimants are not governed by long-term contracts.  Rather, the Debtors obtain inventory, goods, and other materials from such claimants on an order-by-order basis.  As a result, a 503(b)(9) Claimant may refuse to supply new orders without payment of its 503(b)(9) Claims.  Such refusal could negatively affect the Debtors' estates as the Debtors' businesses are dependent on uninterrupted and steady delivery of certain goods and services.

40.     Certain of the 503(b)(9) Claimants supply goods or materials to the Debtors that are crucial to the Debtors' ongoing operations.  Even though the manufacture and supply of certain manufacturing inputs and inventory may be completed, the 503(b)(9) Claimants may refuse to ship postpetition unless the Debtors pay some or all of the claims owing to such vendors.  Any interruption in the flow of these goods and materials would be highly disruptive to the Debtors' operations and would be value-destructive for the Debtors' businesses.  In light of these

consequences, the Debtors concluded that payment of the 503(b)(9) Claimants is essential to avoid disruptions to the Debtors' operations.

41.     The estimated amounts owing to the 503(b)(9) Claimants pale in comparison to the potential damage to the Debtors' businesses if the Debtors' operations were to experience significant disruption.  The Debtors believe that as of the Petition Date, they owe approximately $2 million on account of goods and materials delivered within the twenty days immediately preceding the Petition Date, the value of which may be entitled to administrative priority under section 503(b)(9) of the Bankruptcy Code, approximately $1 million of which will come due during the interim period before entry of the Final Order.

**VI.     Customary Trade Terms Condition**

42.     Subject to the Court's approval, the Debtors intend to pay the Trade Claims only to the extent necessary to preserve the value of their estates.  To that end, in exchange for paying the Trade Claims either in full or in part, the Trade Claimants shall be required to provide favorable trade terms for the postpetition procurement of their goods and services.  Specifically, the Debtors seek authorization to condition payment of any Trade Claim upon such Trade Claimant's agreement to (a) continue—or recommence—providing goods and/or services to the Debtors in accordance with trade terms (including credit limits, pricing, timing of payments, availability, and other terms) at least as favorable to the Debtors as those in place during the twelve months prior to the Petition Date, or as otherwise agreed by the Debtors in their reasonable business judgment (the "Customary Trade Terms") and (b) not cancel any contract, agreement, or arrangement pursuant to which they provide such goods and/or services to the Debtors during the course of these chapter 11 cases.

43.     In addition, the Debtors request that if any party accepts payment pursuant to the relief requested by this Motion and thereafter ceases to provide goods and services in accordance

with the Customary Trade Terms: (a) the Debtors may take any and all appropriate steps to recover from such Trade Claimant any payments made to it on account of its prepetition claim to the extent that such payments exceed the postpetition amounts then owing to such party; (b) upon recovery by the Debtors, any prepetition claim of such party shall be reinstated as if the payment on account thereof had not been made; and (c) if any outstanding postpetition balance is due from the Debtors to such party, (i) the Debtors may elect to recharacterize and apply any payment made pursuant to the relief requested by this Motion to such outstanding postpetition balance and (ii) such party will be required to repay to the Debtors such paid amounts that exceed the postpetition obligations then outstanding without the right of any setoffs, claims, provisions for payment of any claims, or otherwise.

### VII.   Outstanding Orders

44.     Before the Petition Date and in the ordinary course of business, the Debtors may have ordered goods that will not be delivered until after the Petition Date (collectively, the "Outstanding Orders").  To avoid becoming general unsecured creditors of the Debtors' estates with respect to such goods, certain suppliers may refuse to ship or transport such goods (or may recall such shipments) with respect to such Outstanding Orders unless the Debtors issue substitute purchase orders postpetition.  To prevent any disruption to the Debtors' business operations, and given that goods delivered after the Petition Date are afforded administrative expense priority under section 503(b) of the Bankruptcy Code, the Debtors seek an order (a) granting administrative expense priority under section 503(b) of the Bankruptcy Code to all undisputed obligations of the Debtors arising from the acceptance of goods subject to Outstanding Orders and (b) authorizing the Debtors to satisfy such obligations in the ordinary course of business.

### Basis for Relief

**I.   The Court Should Authorize the Debtors to Pay Trade Claims**

45.     Courts have recognized that it is appropriate to authorize the payment of prepetition obligations where necessary to protect and preserve the estate, including a business's going-concern value. *See, e.g.*, *In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002) ("Cases cited by Debtors that refer to necessity of payment to preserve going concern value imply such a rule, and this Court is prepared to apply the Doctrine of Necessity to authorize payment of prepetition claims in appropriate cases."); *see also In re Scotia Dev., LLC*, 2007 WL 2788840, at *2 (Bankr. S.D. Tex. Sep. 21, 2007) (outlining the factors for when a critical vendor payment is necessary); *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) ("The ability of a Bankruptcy Court to authorize the payment of pre-petition debt when such payment is needed to facilitate the rehabilitation of the debtor is not a novel concept."). In so doing, these courts acknowledge that several legal theories rooted in sections 105(a), 363(b), and 1107(a) of the Bankruptcy Code support the payment of prepetition claims as provided herein.

46.     Section 363(b) of the Bankruptcy Code permits a debtor, subject to court approval, to pay prepetition obligations where a sound business purpose exists for doing so. *See Ionosphere Clubs*, 98 B.R. at 175 (noting that section 363(b) provides "broad flexibility" to authorize a debtor to honor prepetition claims where supported by an appropriate business justification). In addition, under section 1107(a) of the Bankruptcy Code, a debtor in possession is given the same rights and powers as a trustee appointed in a bankruptcy case, including the "implied duty of the debtor-in-possession to 'protect and preserve the estate, including an operating business' going-concern value.'" *See, e.g.*, *In re CEI Roofing, Inc.*, 315 B.R. 50, 59 (Bankr. N.D. Tex. 2004) (quoting *CoServ. L.L.C.*, 273 B.R. at 497). Moreover, under section 105(a) of the Bankruptcy Code, "[t]he Court may issue any order, process, or judgment that is necessary or appropriate to carry out the

provisions of [the Bankruptcy Code]."   11 U.S.C. § 105(a); *CoServ, L.L.C.*, 273 B.R. at 497 ("These are simply examples of claims that may require satisfaction for the debtor in possession to perform its fiduciary obligations.  In such instances, it is only logical that the bankruptcy court be able to use Section 105(a) of the [Bankruptcy] Code to authorize satisfaction of the prepetition claim in aid of preservation or enhancement of the estate."); *In re CEI Roofing, Inc.*, 315 B.R. at 56 (citing *In re Mirant Corp.*, 296 B.R. 427 (Bankr. N.D. Tex. 2003)).   No provision of the Bankruptcy Code expressly prohibits the postpetition payment of prepetition trade claims.  Indeed, the above-referenced sections of the Bankruptcy Code authorize such payments when the payments are critical to preserving the going-concern value of the debtor's estate, as is the case here.

47.     Moreover, courts have noted that there are instances in which debtors in possession can fulfill their fiduciary duties "only . . . by the preplan satisfaction of a prepetition claim." *CoServ, L.L.C.*, 273 B.R. at 497.  The *CoServ* court specifically noted that the preplan satisfaction of prepetition claims would be a valid exercise of a debtor's fiduciary duty when the payment "is the only means to effect a substantial enhancement of the estate," *id.*, and also when the payment was to "sole suppliers of a given product."  *Id.* at 498.  Courts in the Fifth Circuit, including the Southern District of Texas, have followed *CoServ*'s three-part test to determine whether a prepetition claim of a "critical vendor" may be paid outside of the plan process on a postpetition basis:

> First, it must be critical that the debtor deal with the claimant.  Second, unless it deals with the claimant, the debtor risks the probability of harm, or, alternatively, loss of economic advantage to the estate or the debtor's going concern value, which is disproportionate to the amount of the claimant's pre-petition claim. Third, there is no practical or legal alternative by which the debtor can deal with the claimant other than by payment of the claim.

*CoServ, L.L.C.*, 273 B.R. at 498; *see also In re Scotia Dev., LLC*, 2007 WL 2788840, at *2; *In re Mirant Corp.*, 296 B.R. at 429–30.

48.     Moreover, allowing the Debtors to pay the Trade Claims is especially appropriate where, as here, doing so is consistent with the "two recognized policies" of chapter 11 of the Bankruptcy Code—preserving the going concern value for the Debtors' business and maximizing the value of property available to satisfy creditors.  *See Bank of Am. Nat'l Trust & Savs. Ass'n* v. *203 N. LaSalle St. P'Ship*, 526 U.S. 434, 453 (1999) (describing a reconciliation of "the two recognized policies underlying Chapter 11 . . . preserving going concerns and maximizing property available to satisfy creditors").  Indeed, reflecting the recognition that payment of prepetition claims of certain essential suppliers and vendors is, in fact, both critical to a debtor's ability to preserve going-concerns and maximize creditor recovery, courts regularly grant relief consistent with that which the Debtors are seeking in this Motion.  *See CoServ, L.L.C.*, 273 B.R. at 497 (noting that "it is only logical that the bankruptcy court be able to use [s]ection 105(a) of the [Bankruptcy] Code to authorize satisfaction of the prepetition claim in aid of preservation or enhancement of the estate").

## A.  The Court Should Authorize Payment of the Critical Vendor Claims and Critical UK Claims

49.     The Debtors require a steady provision of the Critical Vendor Goods and Services, as well as the products and services provide by the Critical UK Claimants, to maintain operational stability.  The Debtors' failure to pay the Critical Vendors and Critical UK Claimants as set forth herein could harm the Debtors' ability to obtain necessary supplies or services, including critical utilities services, prevent the Debtors from preserving favorable trade terms, and increase the likelihood for significant disruptions to the Debtors' operations.  This failure could, in turn,

jeopardize numerous customer relationships and could significantly impair the value of the Debtors' businesses.

50.     Without the Critical Vendor Goods and Services, the Debtors could be forced to unexpectedly halt operations while they search for substitute vendors and service providers, impacting current customers and turning away future customers, and the Debtors may have to forego existing favorable trade terms as a result in their haste to find new vendors, thereby preventing the Debtors from capturing revenue.  Importantly, any disruption to the Debtors' supply chain or the discontinuance of services provided to the Debtors and their customers by Critical Vendors or Critical UK Claimants could result in a significant loss of operational efficiency, operational dislocations, negative impacts on customer satisfaction and confidence, and decreases in bookings, which will deplete revenues and impair stakeholder value at the outset of these chapter 11 cases.

**B.     The Court Should Authorize Payment of the Lien Claims**

51.     As noted above, certain Lien Claimants may be entitled under applicable non-bankruptcy law to assert certain possessory liens on the Debtors' goods or equipment in their possession (notwithstanding the automatic stay under section 362 of the Bankruptcy Code) in an attempt to secure payment of their prepetition claim.  Under section 362(b)(3) of the Bankruptcy Code, the act of perfecting such liens, to the extent consistent with section 546(b) of the Bankruptcy Code, is expressly excluded from the automatic stay.[11]  As a result, the Debtors anticipate that certain of the Lien Claimants may assert or perfect liens, simply refuse to turn over goods in their possession, or stop performing their ongoing obligations.  Even absent a valid lien,

---

[11]  *See* 11 U.S.C. § 546(b)(1)(A) (providing that a debtor's lien avoidance powers "are subject to any generally applicable law that . . . permits perfection of an interest in property to be effective against an entity that acquires rights in such property before the date of perfection").

to the extent certain Lien Claimants have possession of the Debtors' inventory, equipment, or products, mere possession or retention could disrupt the Debtors' operations.

52.     Furthermore, paying the Lien Claims should not impair unsecured creditor recoveries in these chapter 11 cases.  In instances where the amount owed to a Lien Claimant is less than the value of the goods that could be held to secure a Lien Claimant's claim, such party may be a fully-secured creditor of the Debtors' estates.  In such instances, payment provides such party with what they might be entitled to receive under a plan of reorganization, without any interest costs that might otherwise accrue during these chapter 11 cases.  Conversely, all creditors will benefit from the seamless transition of the Debtors' operations into bankruptcy and the uninterrupted continuation of the Debtors' business.

53.     With respect to the Maritime Vendors, the failure to make timely payment of these claims could subject the Debtors' assets to the assertion of liens and/or result in the arrest of their vessels, as described above.  The laws of many foreign jurisdictions recognize that the claims of vendors who supply goods or services in connection with the operation of vessels are "maritime claims." *International Convention Relating to the Arrest of Sea-Going Ships*, Brussels 1952, Art 1(1); *International Convention on the Arrest of Ships*, Geneva 1999, Art 1(1).  The maritime laws of such foreign jurisdictions provide that maritime claimants may seek the arrest of vessels in connection with maritime claims in order to obtain security for the payment of such claims. *International Convention Relating to the Arrest of Sea-Going Ships*, Brussels 1952, Art 2; *International Convention on the Arrest of Ships*, Geneva 1999, Art 2.  The laws of the United States recognize similar rights whereby a maritime lien claimant can seek to attach and arrest a vessel should it come to port.  Supplemental Rules for Certain Admiralty and Maritime Claims,

Fed. R. Civ. P. Supp. Rule C; *see also* 46 U.S.C. § 31342 (creditors alleging claims for necessaries under United States maritime law may claim a maritime lien against the debtors' vessels).

54. Regardless of the jurisdiction, maritime liens are internationally recognized as giving the lienor the ability to arrest a vessel and hold it as security until an admiralty court can enforce a judgment on the merits. Edward M. Keech, *Problems in the Liquidation and Reorganization of International Steamship Companies in Bankruptcy*, 59 Tul. L. Rev. 1239, 1255-56 (1985). Based on the foregoing principles, it is therefore critical that the Debtors be allowed to pay their Maritime Vendors in the ordinary course as to avoid the potential disruption to their operations that will result if one or more of their Vessels is arrested.

55. Indeed, the arrest of a Vessel completely halts the operation of such Vessel until only after the claims of the maritime lienors are satisfied. For this reason, numerous courts, including in this district, have readily granted, in the critical vendor context, relief to debtors with shipping operations. See, e.g., *American Commercial Lines Inc.,* No. 20-30982 (MI) (Bankr. S.D. Tex. Feb. 10, 2020) ECF No. 79; *In re EMAS Chiyoda Subsea Ltd.*, No. 17-31146 (MI) (Bankr. S.D. Tex. Feb. 28, 2017), ECF No. 271; *In re Overseas Shipholding Group, Inc.*, Case No. 12-20000 (Bankr. D. Del. Dec. 7, 2012), ECF No. 147; *In re TBS Shipping Service Inc.*, Case No. 12-22224 (Bankr. S.D.N.Y. Feb. 29, 2012), ECF No. 87; *In re General Maritime Corp.*, Case No. 11-15285 (Bankr. S.D.N.Y. Dec. 15, 2011), ECF No. 138.

### C. The Court Should Authorize the Payment of Other Foreign Claims

56. Each of the Other Foreign Claimants are based outside the United States. The Other Foreign Claimants may, and likely do, lack minimum contacts with the United States. Thus, there is significant risk that the Other Foreign Claimants consider themselves beyond the jurisdiction of the Court and therefore may disregard the automatic stay, notwithstanding the automatic stay's global effect. Failure to make payment to such parties in the ordinary course could lead to a

proliferation of lawsuits in foreign courts and efforts to exercise other detrimental remedies overseas. In many instances, it would be unduly time-consuming and expensive to seek to enforce an order of the Court in the creditor's home country.

57.     Accordingly, non-payment of any claims owing to Other Foreign Claimants could lead to immediate and significant disruption to the Debtors' businesses that would heavily outweigh the cost of paying such parties in connection with their prepetition claims, and continuing to pay them on a postpetition basis, in the ordinary course of business. The Debtors believe that paying prepetition claims of Other Foreign Claimants is necessary to protect the Debtors' business and ensure that the Debtors are able to maximize the value of their estates during these chapter 11 cases.

### D.     The Court Should Authorize the Payment of 503(b)(9) Claims

58.     Additionally, section 503(b)(9) provides administrative priority for the "value of any goods received by the debtor within twenty days before the date of commencement of a case under this title in which goods have been sold to the debtor in the ordinary course of such debtor's business." The 503(b)(9) Claims must be paid in full for the Debtors to confirm a chapter 11 plan. *See* 11 U.S.C. § 1129(a)(9)(A). Consequently, payment of such claims now only provides such parties with what they would be entitled to receive under a chapter 11 plan unless they consented otherwise. Moreover, the timing of such payments also lies squarely within the Court's discretion. *See In re Global Home Prods., LLC*, 2006 WL 3791955, at *3 (Bankr. D. Del. Dec. 21, 2006) (agreeing with parties that "the timing of the payment of that administrative expense claim is left to the discretion of the Court"). The Debtors' ongoing ability to obtain inventory and other goods as provided herein is key to their survival and necessary to preserve the value of their estates. Absent payment of the 503(b)(9) Claims at the outset of these chapter 11 cases—which merely accelerates the timing of payment and not the ultimate treatment of such claims—the Debtors

could be denied access to the inventory and other goods necessary to maintain the Debtors' business operations and maximize the value of the Debtors' estates.

## II.     The Court Should Confirm that Outstanding Orders are Administrative Expense Priority Claims and that Payment of Such Claims is Authorized

59.     Pursuant to section 503(b)(1) of the Bankruptcy Code, obligations that arise in connection with the postpetition delivery of goods and services, including goods ordered prepetition, are administrative expense priority claims because they benefit the estates postpetition. *See* 11 U.S.C. § 503(b)(1)(A) (providing that the "actual [and] necessary costs and expenses of preserving the estate" are administrative expenses); *see also In re John Clay & Co.*, 43 B.R. 797, 809–10 (Bankr. D. Utah 1984) (holding that goods ordered prepetition but delivered postpetition are entitled to administrative priority).  Thus, the granting of the relief sought herein with respect to the Outstanding Orders will not afford such claimants any greater priority than they otherwise would have if the relief requested herein were not granted and will not prejudice any other party in interest.

60.     Absent such relief, however, the Debtors may be required to expend substantial time and effort reissuing the Outstanding Orders to provide certain suppliers with assurance of such administrative priority status.  The disruption to the timely and frequent delivery of Critical Goods and Services to the Debtors would interrupt the Debtors' operations, damage the Debtors' business reputation, erode the Debtors' customer base, and ultimately lead to a loss of revenue, all to the detriment of the Debtors and their creditors.  Accordingly, the Debtors submit that the Court should confirm the administrative expense priority status of the Outstanding Orders and should authorize the Debtors to pay the Outstanding Orders in the ordinary course of business.

### The Court Should Authorize the Debtors' Financial Institutions to Honor and Process the Debtors' Payments

61.     The Debtors have sufficient funds to pay the amounts described herein in the ordinary course of business by virtue of expected cash flows from ongoing business operations, anticipated access to cash collateral, and proceeds of the DIP Facilities.  Additionally, under the Debtors' existing cash management system, the Debtors can readily identify checks or wire transfer requests as relating to an authorized payment in respect of the relief requested herein. Accordingly, the Debtors believe that checks or wire transfer requests, other than those relating to authorized payments, will not be honored inadvertently.   Therefore, the Debtors respectfully request that the Court authorize and direct all applicable financial institutions, when requested by the Debtors, to receive, process, honor, and pay any and all checks or wire transfer requests in respect of the relief requested in this Motion.

### Emergency Consideration

62.     Pursuant to Bankruptcy Rule 6003, which empowers a court to grant relief within the first 21 days after the commencement of a chapter 11 case "to the extent that relief is necessary to avoid immediate and irreparable harm," and Bankruptcy Local Rule 9013-1(i), the Debtors respectfully request emergency consideration of this Motion.  An immediate and orderly transition into chapter 11 is critical to the viability of the Debtors' operations.  Failure to obtain the requested relief during the first 21 days of these chapter 11 cases would imperil the Debtors' restructuring. The Debtors have satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 and, therefore, respectfully request that the Court approve the relief requested in this Motion on an emergency basis.

## Waiver of Bankruptcy Rules 6004(a) and 6004(h)

63.     The Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

## Reservation of Rights

64.     Nothing contained herein is intended to be or should be construed as: (a) an admission as to the amount of, basis for, or validity of any claim against a Debtor entity under the Bankruptcy Code or other applicable nonbankruptcy law; (b) a waiver of the Debtors' or any other party in interest's right to dispute any claim on any grounds; (c) a promise or requirement to pay any claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Motion or any order granting the relief requested by this Motion or a finding that any particular claim is an administrative expense claim or other priority claim; (e) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; (g) a waiver or limitation of the Debtors', or any other party in interest's, rights under the Bankruptcy Code or any other applicable law; or (h) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) that may be satisfied pursuant to the relief requested in this Motion are valid, and the rights of all parties in interest are expressly reserved to contest the extent, validity, or perfection or seek avoidance of all such liens.  If the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended and should not be construed as an admission as to the validity of any particular claim or a waiver of the Debtors' or any other party in interest's rights to subsequently dispute such claim.

### Notice

65.     The Debtors will provide notice of this motion to the following parties or their respective counsel: (a) the Office of the U.S. Trustee for the Southern District of Texas; (b) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) counsel to the Ad Hoc Group, Milbank LLP, 55 Hudson Yards, New York, NY 10001; (d) counsel to Crestview, Davis Polk & Wardwell LLP, 450 Lexington Avenue, New York, NY 10017; (e) counsel to the Senior DIP Lenders, White & Case LLP, 1221 Avenue of the Americas, New York, NY 10020; (f) counsel to Alter Domus (US) LLC, as agent under the Superpriority Credit Agreement, Norton Rose Fulbright US LLP, 1301 6th Avenue, New York, NY 10019; (g) counsel to GLAS Trust Company LLC, as agent under the Senior DIP Facility, Seward & Kissel LLP, One Battery Park Plaza, New York, NY 10004; (h) counsel to GLAS Trust Company LLC, as agent under the Junior DIP Facility and under the First Lien Credit Agreement, ArentFox Schiff LLP, 1301 Avenue of the Americas, 42nd Floor, New York, NY 10019; (i) counsel to UBS AG, Stamford Branch, as agent under the Revolving Credit Agreement, Cahill Gordon & Reindel LLP, 32 Old Slip, New York, NY 10005; (j) the United States Attorney's Office for the Southern District of Texas; (k) the Internal Revenue Service; (l) the United States Securities and Exchange Commission; (m) the state attorneys general for states in which the Debtors conduct business; (n) other regulatory agencies having a regulatory or statutory interest in these cases; and (o) any party that has requested notice pursuant to Bankruptcy Rule 2002.

66.     The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

67.     A copy of this motion is available on (a) the Court's website, at www.txs.uscourts.gov, and (b) the website maintained by the Debtors' proposed claims and noticing agent, Omni Agent Solutions, Inc., at https://omniagentsolutions.com/Hornblower.

WHEREFORE, the Debtors respectfully request that the Court enter an order granting the relief requested herein and such other relief as the Court deems appropriate under the circumstances.

February 21, 2024

Respectfully submitted,

By: */s/ John F. Higgins*

**PORTER HEDGES LLP**
John F. Higgins (TX Bar No. 09597500)
M. Shane Johnson (TX Bar No. 24083263)
Megan Young-John (TX Bar No. 24088700)
1000 Main St., 36th Floor
Houston, Texas 77002
Telephone: (713) 226-6000
Facsimile:  (713) 226-6248
jhiggins@porterhedges.com
sjohnson@porterhedges.com
myoung-john@porterhedges.com

- and -

**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
Paul M. Basta (pending *pro hac vice*)
Jacob A. Adlerstein (pending *pro hac vice*)
Kyle J. Kimpler (pending *pro hac vice*)
Sarah Harnett (pending *pro hac vice*)
Neda Davanipour (pending *pro hac vice*)
1285 Avenue of the Americas
New York, New York 10019
Telephone: (212) 373-3000
Facsimile: (212) 757-3990
pbasta@paulweiss.com
jadlerstein@paulweiss.com
sharnett@paulweiss.com
ndavanipour@paulweiss.com

*Proposed Counsel to the Debtors and the Debtors in Possession*

## Certificate of Accuracy

I certify that the facts and circumstances described in the above pleading giving rise to the emergency request for relief are true and correct to the best of my knowledge, information, and belief.  This statement is made pursuant to Bankruptcy Local Rule 9013-1(i).

*/s/ Jonathan Hickman*
Jonathan Hickman

## Certificate of Service

I certify that on February 21, 2024, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ John F. Higgins*
John F. Higgins