**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| HORNBLOWER HOLDINGS LLC, *et al.*,[1] | ) | Case No. 24-90061 (MI) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | (Emergency Hearing Requested) |

**DEBTORS' EMERGENCY MOTION FOR ENTRY OF AN ORDER (A) APPROVING (I) BIDDING PROCEDURES FOR THE SALE OF THE AQV DEBTORS' ASSETS, (II) PROCEDURES REGARDING BID PROTECTIONS, (III) THE SCHEDULING OF CERTAIN DATES WITH RESPECT THERETO, (IV) THE FORM AND MANNER OF NOTICE THEREOF, (V) CONTRACT ASSUMPTION, ASSIGNMENT, AND REJECTION PROCEDURES, AND (VI) CERTAIN PROCEDURES TO OTHERWISE DISPOSE OF THE AQV ASSETS, AND (B) AUTHORIZING THE DEBTORS TO ENTER INTO AGREEMENTS FOR THE SALE OF THEIR ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, AND ENCUMBRANCES**

**Emergency relief has been requested. Relief is requested not later than 5:00 p.m. (prevailing Central Time) on February 21, 2024.**

**If you object to the relief requested or you believe that emergency consideration is not warranted, you must appear at the hearing if one is set, or file a written response prior to the date that relief is requested in the preceding paragraph. Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.**

**A hearing will be conducted on this matter on February 21, 2024, at 5:00 p.m. (prevailing Central Time) in Courtroom 404, 4th Floor, 515 Rusk, Houston, Texas 77002.**

**Participation at the hearing will only be permitted by an audio and video connection.**

**Audio communication will be by use of the Court's dial-in facility. You may access the facility at 832-917-1510. Once connected, you will be asked to enter the conference room number. Judge Isgur's conference room number is 954554. Video communication will be by use of the GoToMeeting platform. Connect via the free GoToMeeting application or click the link on Judge Isgur's home page. The meeting code is "judgeisgur." Click the settings icon in the upper right corner and enter your name under the personal information setting.**

**Hearing appearances must be made electronically in advance of both electronic and in-person hearings. To make your appearance, click the "Electronic Appearance" link on Judge Isgur's home page. Select the case name, complete the required fields and click "submit" to complete your appearance.**

---

[1] The last four digits of Debtor Hornblower Holdings LLC's tax identification number are 6035. Due to the large number of debtor entities in these chapter 11 cases, for which the Debtors have requested joint administration, a complete list of the debtor entities and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' proposed claims and noticing agent at https://omniagentsolutions.com/Hornblower. The location of the Debtors' service address for purposes of these chapter 11 cases is: Pier 3 on The Embarcadero, San Francisco, CA 94111.

The above-captioned debtors and debtors in possession (collectively, the "Debtors") respectfully state the following in support of this motion (the "Motion"):

## Preliminary Statement[2]

1. The Debtors are a global leader in world-class experiences and transportation. Prior to the Petition Date, the Debtors operated primarily through three business lines: (a) City Experiences (representing the Debtors' portfolio of water and land-based experiences that includes the sub-brands City Cruises, City Ferry, and Walks), (b) American Queen Voyages ("AQV")[3] (the overnight cruise division of the Debtors providing luxury river and lake cruises across prominent United States rivers (the "AQV Business")) and (c) Journey Beyond (an Australian travel group headquartered in Adelaide, South Australia). In connection with the AQV Business, the AQV Debtors operated a seven vessel fleet (six owned and one leased or chartered), comprised of four river vessels, two lake / ocean vessels and one expedition vessel (the "AQV Vessels") offering (a) all-inclusive luxury voyages along the Ohio, Mississippi, Tennessee, Illinois, Cumberland, Columbia, and Snake Rivers, (b) all-inclusive luxury cruising along the Great Lakes, Canada, New England, the Southeast United States, Alaska, Mexico, and the Yucatan Peninsula, and (c) an all-inclusive luxury expedition experience in Alaska and Central America, as well as ports in between.

2. As with numerous other participants in the tourism and transportation sectors, the COVID-19 pandemic had a direct and profoundly adverse impact on the Debtors' financial condition and operating performance. Government imposed travel restrictions caused the Debtors' operations to come to an immediate halt, precipitating a liquidity crisis. While the Debtors were

---

[2] Unless otherwise noted, capitalized terms used but not defined herein have the meanings ascribed to them in the Bidding Procedures or the First Day Declaration (each as defined below), as applicable.

[3] References to the "AQV Debtors" herein refer to, collectively, American Queen Holdco, LLC and its direct and indirect subsidiaries.

able to generate sufficient liquidity to stay afloat during the pandemic through a series of transactions the Debtors entered into with its largest lenders, and, in certain instances, funds managed by its largest shareholder, the AQV Business has not returned to pre-pandemic operating levels. The AQV Business has continued to significantly underperform expectations causing a substantial drain on the Debtors' liquidity.

3. In connection with the Debtors' prepetition evaluation of strategic alternatives with its key stakeholders, the Debtors engaged in extensive marketing efforts for the sale of the AQV Business as a going concern, or alternatively, the sale or disposition of all or a portion of the AQV Vessels and other assets related to the AQV Business (the "AQV Assets"). While the Debtors' marketing efforts in the first half of 2023 did not yield any actionable bids, the Debtors, with the assistance of their proposed investment banker, Guggenheim Securities, LLC ("Guggenheim Securities"), launched a subsequent marking process on December 14, 2023 for the sale of all or substantially all of the AQV Assets or a portion thereof. The Debtors did not receive any actionable indications of interest for a going concern sale of the AQV Business, and were unable to enter into a purchase agreement with a Stalking Horse Bidder (as defined below) for any of the AQV Assets prior to the Petition Date. The Debtors, with the assistance of their advisors, are currently continuing discussions with certain parties who indicated an interest in purchasing the AQV Assets in connection with the AQV Debtors' chapter 11 cases.

4. By this Motion, the Debtors seek to continue the sale process for the AQV Business or some, all, or substantially all of the AQV Assets by establishing court-approved bidding procedures, giving appropriate notice to creditors and parties in interest, and conducting an auction, if any, and sale hearing. The Debtors also seek to establish procedures and obtain approval and authority to potentially enter into one or more Stalking Horse Agreements (as defined below)

with one or more Stalking Horse Bidders, as applicable, and to potentially grant bid protections in advance of the Auction, subject to the conditions set forth in the Bidding Procedures Order. Upon conclusion of the Auction and selection of the highest or otherwise best bid(s), the Debtors request that the Court enter the Sale Order authorizing and approving one or more Sale(s) free and clear of all claims, liens, and encumbrances to the extent permitted by section 363 of the Bankruptcy Code.

5. It is critical that the AQV Debtors' sale process proceed expeditiously. As described in the First Day Declaration, given the significant costs associated with operating the AQV Business and maintaining the AQV Vessels, the Debtors began to limit operation of the AQV Business before the Petition Date and will continue to do so during these chapter 11 cases. After careful consideration and in consultation with the Debtors' key stakeholders, before the Petition Date, the AQV Debtors cancelled certain scheduled cruises and terminated the employment of substantially all of their employees. The AQV Debtors anticipate cancelling all additional scheduled cruises during these chapter 11 cases. Moreover, the "layup" costs associated with maintaining the AQV Vessels while not in operation are also substantial. For this reason, the Debtors believe delaying a sale beyond the deadlines set forth in this Motion would likely result in the Debtors' incurring carrying costs during such extended sale process that may exceed the proceeds of any sale. Indeed, the indications of interest the Debtors received for the AQV Assets before the Petition Date suggest that the Debtors must act quickly to sell the AQV Assets to ensure that the net sale proceeds for the AQV Assets are greater than the interim costs necessary to maintain such assets.

6. While the Debtors still seek going concern bids for the AQV Business, the Debtors are also seeking by this Motion to establish procedures to reject executory contracts and/or

unexpired leases related to the AQV Business; *provided*, *however*, that to the extent the Debtors receive any qualified going concern bids for the AQV Business, the Debtors will file a supplemental notice to contract parties of certain agreements identified by such bidder for assumption along with applicable Cure Amounts (rather than rejection). To the extent the Successful Bid is for a going concern sale of the AQV Business, the Debtors will seek approval pursuant to section 365 of the Bankruptcy Code of the assumption and assignment of the relevant executory contracts and/or unexpired leases to the Successful Bidder(s) at the Sale Hearing.

7. The proposed timeline for the postpetition marketing process, though expeditious, is more than sufficient when viewed in the context of the Debtors' prepetition marketing process and the circumstances of these cases. Speed is critical here because, even with the additional liquidity provided by the DIP Facilities to support the Debtors' operations, the DIP Budget only provides for the maintenance of the AQV Assets through an in-court sale process on the timeline contemplated herein based on the expected sale values (as informed by prepetition marketing process) weighed against the expected maintenance costs of the AQV Vessels. With this in mind, the Debtors developed the Bidding Procedures, which are designed to preserve flexibility in this sale process, facilitate a quick but fair process, and generate the highest or otherwise best value for the AQV Assets. The proposed deadlines in the Bidding Procedures create an appropriate timetable for the Sale(s), and are consistent with the Debtors' current liquidity position and the milestones under the Restructuring Support Agreement and DIP Facilities.

8. Finally, the Debtors also seek to establish certain procedures to dispose of the AQV Assets (including, if necessary, the AQV Vessels) to the extent there are any remaining AQV Assets not sold at the conclusion of the Sale process.

**Relief Requested**

9. The Debtors hereby seek entry of an order, substantially in the form attached hereto (the "Bidding Procedures Order"):

a. authorizing and approving bidding procedures, attached to the Bidding Procedures Order as Exhibit 1 (the "Bidding Procedures"), by which the Debtors will solicit and select the highest or otherwise best offer for the sale (or sales) of some, all, or substantially all of the AQV Assets, potentially at an auction, if needed (the "Auction");

b. scheduling the Auction, to the extent required, in connection with the sale of the AQV Assets in the event the Debtors receive one or more Qualified Bids;

c. scheduling a hearing to approve the sale or sales of the AQV Assets (the "Sale Hearing") to the Successful Bidder(s) pursuant to the terms of the Successful Bid(s) (or, if applicable, to the Backup Successful Bidder(s) pursuant to the terms of the Backup Successful Bid(s));

d. authorizing the Debtors, in their discretion, to (i) select one or more bidders to act as stalking horse bidders (each, a "Stalking Horse Bidder") and enter into a purchase agreement with such Stalking Horse Bidder (each such agreement, a "Stalking Horse Agreement") and (ii) in connection with any Stalking Horse Agreement, provide appropriate and customary Bid Protections (as defined below), subject to notice and later approval by the Court, to the extent the Debtors determine that the provision of such protections would be an actual and necessary cost of preserving the value of the Debtors' estates;

e. approving the form and manner of notice of the Auction and Sale Hearing with respect to the sale or sales of some, all, or substantially all of the AQV Assets free and clear of liens, claims, encumbrances, and other interests (any such sale, a "Sale"), attached as Exhibit 2 to the Bidding Procedures Order (the "Sale Notice");

f. approving procedures for (i) the rejection of certain executory contracts and unexpired leases (collectively, the "Contracts") in connection with any Sale (the "Rejection Procedures"), and approving the form and manner of the notice thereof, attached as Exhibit 3 to the Bidding Procedures Order (the "Rejection Notice") and (ii) alternatively, to the extent the Debtors receive any Qualified Bids for the AQV Business or any AQV Vessel on a full or partial going concern basis (each, a "Qualified AQV Going Concern Bid"), as determined in the Debtors' sole discretion, the procedures for the assumption and assignment of certain Contracts (the "Assumption and

Assignment Procedures"), and approving the form and manner of the notice thereof, attached as Exhibit 4 to the Bidding Procedures Order (the "Potential Cure Notice");

g. approving certain procedures to dispose of any remaining AQV Assets (including any AQV Vessels) not purchased by the Successful Bidder(s) or Backup Successful Bidder(s) (the "AQV Asset Wind-Down Procedures"), to be implemented contemporaneously with any Sale(s); and

h. granting related relief.

10. The Debtors also seek entry of an order or orders (each such order, a "Sale Order"), in each case approving the Debtors' entry into a definitive purchase agreement substantially in the form that shall be attached to a given Sale Order (each such agreement with respect to particular AQV Assets, a "Definitive Purchase Agreement"). The Debtors will file a proposed form of Sale Order and related Definitive Purchase Agreement with the Court in advance of the Sale Hearing.

## Jurisdiction and Venue

11. The United States Bankruptcy Court for the Southern District of Texas (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the Amended Standing Order of Reference from the United States District Court for the Southern District of Texas, dated May 24, 2012 (the "Amended Standing Order"). This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b). The Debtors confirm their consent to the entry of a final order by the Court.

12. Venue is proper pursuant to 28 U.S.C. § 1408.

13. The statutory bases for the relief requested herein are sections 105, 363, 365, 503, and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"), rules 2002, 6004, 6006, 9007, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## Background

### I. The Debtors' Businesses

14. On February 21, 2024 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code. The Debtors are operating their businesses and managing their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. The Debtors have filed a motion requesting procedural consolidation and joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b) substantially contemporaneously herewith. No request for the appointment of a trustee or examiner has been made in these chapter 11 cases, and no committees have been appointed or designated.

15. A detailed description of the Debtors and their businesses, including the facts and circumstances giving rise to the Debtors' chapter 11 cases, is set forth in the *Declaration of Jonathan Hickman in Support of Chapter 11 Petitions and First Day Motions* (the "First Day Declaration"), filed substantially contemporaneously herewith and incorporated herein by reference.

### II. Prepetition Marketing Process

16. On March 30, 2023, the Debtors engaged UBS Securities LLC ("UBS") to conduct a sale process for the AQV Business. UBS contacted approximately 22 prospective purchasers, 5 of whom entered into non-disclosure agreements, and one of whom submitted an indication of interest. Ultimately, no bidder submitted a binding offer that the Debtors believed was actionable, and therefore the Debtors terminated that sale process on or about October 26, 2023.

17. As described in the First Day Declaration, in connection with the extensions of the Incremental Superpriority Facility, the Debtors engaged with the Ad Hoc Group regarding a comprehensive restructuring, including consideration of both a going concern sale of the AQV

Business and potential wind down of operations and the sale of assets of the AQV Debtors. The Debtors, in consultation with their advisors and the Ad Hoc Group, ultimately decided that marketing all of the AQV Assets or a portion thereof or the AQV Business as a going concern was in the best interests of their stakeholders.

18. The Debtors, with the assistance of Guggenheim Securities, formally launched a marketing process concerning the AQV Assets on December 14, 2023. In connection with the marketing process, the Debtors, with the aid of Guggenheim Securities, contacted 18 parties to solicit initial non-binding indications of interest, including two operators and/or brokers. As of the Petition Date, 12 of these parties had entered into non-disclosure agreements and received access to a confidential information memorandum, a financial model, and a comprehensive virtual data room. As of the Petition Date, the Debtors received two non-binding indications of interest for certain AQV Assets, with no actionable indications of interest for a going concern sale. Despite the Debtors' efforts, further discussions with these parties did not yield a stalking horse bid.

## III. Prepetition Actions to Reduce AQV Operating Costs and Subsequent Layup Costs

19. As set forth in the First Day Declaration, the AQV Business has never fully recovered from the COVID-19 pandemic and has become a significant drain on the Debtors' overall liquidity that has required numerous capital infusions. Given the significant operating costs of the AQV Business, and the lack of actionable bids in the prepetition marketing processes, the Debtors made the difficult decision to begin limiting the AQV Debtors' operations in January 2024 and ultimately to terminate substantially all of the AQV Debtors' workforce on February 20, 2024. While these measures have significantly reduced the AQV Debtors' operational costs going forward, the AQV Debtors nonetheless will continue to incur significant "lay-up" costs associated with maintaining the AQV Vessels. "Lay-up" costs refer to the costs of maintaining a vessel that

is not in active service, and includes costs associated with a minimal crew on the vessel, security for the vessel, and general safety, maintenance and fueling costs. The Debtors estimate that the lay-up costs for the AQV Vessels is approximately $300,000 per week. Given the significant layup costs, extending the proposed sale process for the AQV Assets therefore entails significant additional layup costs, which also raises the sale proceeds hurdle that the Debtors must clear for any sale to maximize value for the AQV Debtors' estates. Given the Debtors' experience with the prepetition marketing processes, the Debtors are concerned that the AQV Vessel layup costs could potentially exceed the expected sale proceeds of the AQV Assets in the absence of an expeditious sale process.

## The Proposed Sale Process and Bidding Procedures

### I. Proposed Timeline

20. The Bidding Procedures seek to maximize the value of the AQV Debtors' estates by facilitating an open and competitive sale of the AQV Assets. The Bidding Procedures set forth the process by which the Debtors are authorized to conduct the Auction, if any, for the sale of some, all, or substantially all of the AQV Assets or any combination thereof.

21. The Debtors' proposed timeline with respect to the Bidding Procedures, the Auction, the Sale Hearing, and the Sale(s) is as follows (all times referenced below refer to prevailing Central Time and are subject to the Court's availability):

| Event or Deadline | Date and Time |
|---|---|
| **Service of Sale Notice** | 3 business days after entry of Bidding Procedures Order, or as soon as reasonably practicable thereafter |
| **Publication of Sale Notice** | 5 business days after entry of Bidding Procedures Order, or as soon as reasonably practicable thereafter |
| **Deadline to Designate Stalking Horse Bidder(s)** | March 15, 2024, at 4:00 p.m. |

| | |
|---|---|
| **Rejection Objection Deadline**[4] | 21 days after the date of service of the Rejection Notices, which date will be set forth in the Rejection Notice |
| **Sale Objection Deadline** | March 20, 2024, at 4:00 p.m. |
| **Deadline to Object to Stalking Horse Bidder(s) and Bid Protections** | Earlier of (i) five days after filing of Stalking Horse Designation Notice and (ii) March 20, 2024, at 4:00 p.m. |
| **Hearing to Approve Stalking Horse Bidder(s) and Bid Protections (if necessary)** | March 21, 2024 |
| **Qualified Bid Deadline** | March 25, 2024, at 4:00 p.m. |
| **Auction (if necessary)** | March 27, 2024, at 9:00 a.m. |
| **Identification of Successful Bidder and Backup Bidder, if any,**[5] **and/or Notification to Otherwise Dispose of any Remaining AQV Assets, including the AQV Vessels** | If no Auction is held, March 27, 2024<br><br>If an Auction is held, March 28, 2024 |
| **Deadline for Objections to Approval of any Successful Bid** (including Backup Bids), including objections based on the manner in which the Auction was conducted and the identity of the Successful Bidder, whether submitted prior to, on, or after the Bid Deadline | April 1, 2024, at 4:00 p.m. |
| **Sale Hearing**[6] | April 2, 2024 |
| **Deadline for Objections to AQV Asset Disposition Notice(s)** | 7 days after the date of service of the AQV Asset Disposition Notice(s), which date will be set forth in such notice |
| **Cure Objection Deadline (if any)** | 14 days after service of Cure Notices[7] |
| **Closing Date** | As soon as reasonably practicable following entry of a Sale Order |

22. The proposed timeline will provide the Debtors with an opportunity to conclude their marketing process and proceed expeditiously towards confirmation of one or more Sale(s),

---

4 The Debtors will serve Rejection Notices as soon as reasonably practicable after entry of the Bidding Procedures Order.

5 The Debtors also anticipate filing a proposed form of Sale Order at this time.

6 The Debtors reserve the right to adjourn the Sale Hearing to, among other things, comply with the Assumption and Assignment Procedures to the extent the Debtors receive a Qualified Bid for the AQV Business as a going concern.

7 The Debtors will provide notice of proposed Cure Amounts as soon as reasonably practicable after the Debtors have determined that any going concern bid for the AQV Business is a Qualified Bid.

or otherwise promptly dispose of the AQV Assets (including the AQV Vessels) to the extent there are any AQV Assets remaining at the conclusion of the Sale process. The Debtors believe the proposed schedule is in the best interests of their creditors, other stakeholders, and all other parties in interest, and should be approved.

## II. The Bidding Procedures

23. To optimally and expeditiously solicit, receive, and evaluate Bids in a fair and accessible manner, the Debtors have developed and proposed the Bidding Procedures. Because the Bidding Procedures are attached to the proposed Bidding Procedures Order, they are not restated fully in this Motion. The following summary describes the salient features of the Bidding Procedures. All interested bidders should read the Bidding Procedures in their entirety.

24. Generally, the Bidding Procedures establish, among other things:[8]

- the process by which the Debtors will provide the Bidding Procedures Order, the Bidding Procedures, the Sale Notice, the Rejection Notice, and the Cure Notice (if any) to interested parties as soon as practicable after entry of the Bidding Procedures Order;

- the requirements that Potential Bidders must satisfy to participate in the bidding process and become Qualified Bidders, including, with respect to Qualified AQV Going Concern Bids, confirmation in writing that the Potential Bidder will pay any incremental costs and expenses related to operating the AQV Business (or applicable AQV Asset(s)), on terms and conditions acceptable to the Debtors, during the period required to comply with the Assumption and Assignment Procedures with respect to the Contracts to be assumed and assigned with the proposed Sale.

- the means by which access to due diligence materials will be made available to Potential Bidders;

- the deadlines and requirements for submitting Bids, as well as the method and criteria by which such Bids are deemed to be Qualified Bids sufficient to trigger

[8] This summary is qualified in its entirety by the Bidding Procedures. All capitalized terms that are used in this summary but not otherwise defined herein shall have the meanings given to such terms in the Bidding Procedures. To the extent there are any conflicts between this summary and the Bidding Procedures, the terms of the Bidding Procedures shall govern.

the Auction and participate in the Auction, including the minimum consideration that must be provided, the terms and conditions that must be satisfied, and the deadline that must be met, for any bidder (other than a Stalking Horse Bidder) to be considered a Qualified Bidder, which shall be determined by the Debtors;

- the manner in which Qualified Bids will be evaluated by the Debtors to determine the Starting Bid (or Starting Bids) for the Auction;
- the conditions for having an Auction and procedures for conducting the Auction, if any;
- the criteria by which the Successful Bidder will be selected by the Debtors; and
- various other matters relating to the sale process generally, including the designation of the Backup Bid (as defined herein), return of any Good Faith Deposits, and certain reservations of rights.

25. Importantly, the Bidding Procedures do not impair the Debtors' ability to consider all Qualified Bid proposals, and, as noted, preserve the Debtors' right to modify the Bidding Procedures as necessary or appropriate to maximize value for the Debtors' estates. As such, the Bidding Procedures uphold and comply with the Debtors' fiduciary obligations to maximize value.

26. Following conclusion of the Auction, if any, and/or the selection of a Successful Bidder, the Debtors shall present the results of the Auction and identity of the Successful Bidder at the Sale Hearing and shall seek entry of the Sale Order (or Sale Orders). Each Sale Order shall authorize the Debtors to enter into and perform under the applicable Definitive Purchase Agreement and deem the Debtors' selection of the applicable Successful Bid final.

## III. Stalking Horse Bidder and Bid Protections

27. By this Motion and in connection with the Bidding Procedures, the Debtors request authority, but not direction, to enter into one or more Stalking Horse Agreements with bidders that elect to serve as the Stalking Horse Bidder for some or all of the AQV Assets.

28. The Stalking Horse Agreement(s) may contain (a) an expense reimbursement for the reasonable, documented out-of-pocket expenses incurred by the Stalking Horse Bidder(s) in connection with the Stalking Horse Agreement in an aggregate amount not to exceed the greater of (i) two percent (2%) of the cash portion of the purchase price under the Stalking Horse Agreement, and (ii) $50,000; and (b) a break-up fee for the Stalking Horse Bidder in an amount not to exceed three percent (3%) of the cash portion of the purchase price under the Stalking Horse Agreement ((a) and (b) of this sentence, collectively, the "Bid Protections"), payable only from the proceeds of a Sale with a Qualified Bidder other than the Stalking Horse. The Bid Protections, once approved by the Court, shall be an allowed administrative expense.

29. The Bidding Procedures provide that in the event that the Debtors select one or more parties to serve as the Stalking Horse Bidder(s), upon such selection, the Debtors shall, by March 15, 2024, file with the Court a notice (a "Stalking Horse Designation Notice") (a) identifying the Stalking Horse Bidder, the material terms of the Stalking Horse Bid (including the Purchase Price and AQV Assets subject to such Stalking Horse Bid), and the amount and terms of any Bid Protections offered to the Stalking Horse Bidder and (b) attaching a copy of the Stalking Horse Agreement, and provide the Sale Notice Parties notice of and an opportunity to object within five (5) days of filing the Stalking Horse Designation Notice (a "Stalking Horse Objection Deadline") to the designation of such Stalking Horse Bidder(s) and the Bid Protections set forth in the Stalking Horse Agreement.

30. Any party may file an objection by the Stalking Horse Objection Deadline, in which case the Debtors shall be entitled to set an expedited hearing on such objection, subject to the availability of the Court. If no objections are filed by the Stalking Horse Objection Deadline, the

Debtors may submit an order to the Court under certificate of no objection approving the selection of such Stalking Horse Bidder(s) and the Bid Protections (the "Stalking Horse Order").

## IV. Form and Manner of Sale Notice

31. In accordance with Bankruptcy Rule 2002(a) and (c), within three (3) business days after entry of the Bidding Procedures Order, the Debtors will cause the Sale Notice, substantially in the form attached as Exhibit 2 to the Bidding Procedures Order, to be served on the following parties or their respective counsel, if known (collectively, the "Sale Notice Parties"): (a) the U.S. Trustee; (b) counsel to any statutory committee appointed in these chapter 11 cases; (c) the advisors to the Ad Hoc Group; (d) the advisors to Crestview; (e) counsel to the Senior DIP Lenders; (f) counsel to the agent under the Superpriority Credit Agreement; (g) counsel to the agent under the Senior DIP Facility; (h) counsel to the agent under the Junior DIP Facility and under the First Lien Credit Agreement; (i) counsel to the agent under the Revolving Credit Agreement; (j) the United States Attorney's Office for the Southern District of Texas; (k) the Internal Revenue Service; (l) the United States Securities and Exchange Commission; (m) the Environmental Protection Agency and similar state environmental agencies for states in which the Debtors conduct business; (n) the state attorneys general for states in which the Debtors conduct business; (o) all parties who have expressed a written interest in the AQV Assets; (p) all known holders of liens, claims, and other encumbrances secured by the AQV Assets; (q) all known vendors or suppliers providing goods to, and services for, the AQV Vessels; (r) the captain of each AQV Vessel; (s) each governmental agency that is an interested party with respect to the Sale(s) and transactions proposed thereunder; (t) any party that has requested notice pursuant to Bankruptcy Rule 2002; and (u) any other party entitled to notice pursuant to Bankruptcy Local Rule 9013-1(d).

32. In addition, within five (5) business days after entry of the Bidding Procedures Order (or as soon thereafter as reasonably practicable), the Debtors will publish the Sale Notice, with any modifications necessary for ease of publication, on one occasion in each of *The New York Times* (national edition) and *TradeWinds* to provide notice to any other potential interested parties.

33. The Sale Notice is reasonably calculated to provide all interested parties with timely and proper notice of any proposed Sale(s), including the date, time, and place of the Auction, if any, and the Bidding Procedures and the dates and deadlines related thereto. Accordingly, the Debtors request that the form and manner of the Sale Notice be approved and no other or further notice of the Sale(s) or the Auction (in each case, if any) be required.

**V. Summary of Rejection Procedures**

34. The Debtors are also seeking approval of the following Rejection Procedures to facilitate the fair and orderly disposition of the Contracts related to the AQV Business:

a. **Rejection Notice**. As soon as reasonably practicable after entry of the Bidding Procedures Order, the Debtors shall file with the Court and serve via first-class mail, electronic mail, or overnight delivery, the Rejection Notice, attached as Exhibit 3 to the proposed Bidding Procedures Order, on certain Contract Counterparties related to any of the AQV Assets which are designated for rejection, and post the Rejection Notice to the website maintained by the Debtors' proposed claims and noticing agent, Omni Agent Solutions, Inc.

b. **Content of Rejection Notice**. The Rejection Notice shall notify the applicable Contract Counterparties that the Contracts are to be rejected, and contain the following information: (i) the list of applicable Contracts to be rejected (the "Rejected Contracts"); (ii) the Contract Counterparties; (iii) the names and addresses of the applicable Contract Counterparties, listed in alphabetical order; (iv) the proposed effective date of rejection for the Rejected Contracts (the "Rejection Date"), which, for non-residential real property leases, shall be the later of (A) the proposed effective date of the rejection for such lease as set forth in the Rejection Notice; (B) the date upon which the Debtors surrender the premises to the landlord and return the keys, key codes, or security codes, as applicable; and (C) such other date to which the Debtors and the applicable Contract Counterparty have agreed

or as the Court may order; and (v) the deadlines and procedures for filing objections to the Rejection Notice (as set forth below).

c. **Rejection Objection**. Rejection Objections, if any, must: (i) comply with the applicable provisions of the Bankruptcy Rules, the Bankruptcy Local Rules, and any order governing the administration of these chapter 11 cases; and (ii) be filed with the Court prior to **4:00 p.m. (prevailing Central Time) on the date that is 21 days following the date of service of such Rejection Notice (the "Rejection Objection Deadline"), which date will be set forth in the Rejection Notice;** *provided* that the Debtors, in their discretion, may modify the Rejection Objection Deadline by filing a notice of such modification on the Court's docket.

d. **Supplemental Rejection Notice**. If the Debtors discover Contracts inadvertently omitted from the Rejection Notice or determine any Contracts included on the Rejection Notice should not be rejected, the Debtors reserve the right to file one or more additional Rejection Notices to add or remove any such Contracts (the "Supplemental Rejection Notice").

e. **Objection to the Supplemental Rejection Notice**. Any Contract Counterparty listed on the Supplemental Rejection Notice may file an objection thereto (a "Supplemental Rejection Objection") only if such objection is to the rejection of one or more previously omitted Rejected Contract(s). All Supplemental Rejection Objections must: (i) comply with the applicable provisions of the Bankruptcy Rules, the Bankruptcy Local Rules, and any order governing the administration of these chapter 11 cases; and (ii) be filed no later than 4:00 p.m. (prevailing Central Time) on the date that is 21 days following the date of service of such Supplemental Rejection Notice, which date will be set forth in the Supplemental Rejection Notice.

f. **No Rejection Objections**. If there are no Rejection Objections or Supplemental Rejection Objections, as applicable, or if a Contract Counterparty does not file and serve such an objection in a manner that is consistent with the requirements set forth above, each Rejected Contract listed in the applicable Rejection Notice shall be rejected as of the applicable Rejection Date set forth in the Rejection Notice or such other date to which the Debtors and the applicable Rejection Counterparty agree; *provided* that the Rejection Date for a rejection of a non-residential real property lease shall not occur until the later of (i) the proposed effective date of the rejection for such lease as set forth in the Rejection Notice; (ii) the date upon which the Debtors surrender the premises to the landlord and return the keys, key codes, or security codes, as applicable; and (iii) such other date to which the Debtors and the applicable Rejection Counterparty have agreed or as the Court may order. If no objection is filed and served by the Rejection Objection Deadline, the Debtors shall seek authorization in the Sale Order (if any) to reject such Rejected Contracts

effective as of the Rejection Date, or alternatively, by submitting a proposed order filed with the Court under a certificate of no objection. If a Contract Counterparty does not file and serve such an objection in a manner that is consistent with the requirements set forth above, such party shall be forever barred from objecting to the rejection of such Contract.

g. **Unresolved Timely Objection**. If a Rejection Objection is timely filed and properly served as specified above and not withdrawn or resolved, after consultation with the applicable Contract Counterparty, the Debtors shall request that the Court either hear the objection at the Sale Hearing (if any), or schedule a hearing on such objection and provide at least ten (10) days' notice of such hearing to the applicable Contract Counterparty. If such objection is overruled or withdrawn, then such Rejected Contract shall be rejected as of (i) the applicable Rejection Date set forth in the applicable Rejection Notice; (ii) such other date to which the Debtors and the applicable Rejection Counterparty have agreed; or (iii) such other date as is ordered by the Court. In the case of a rejection of a non-residential real property lease, such rejection shall not occur until the later of (i) the proposed effective date of the rejection for such lease as set forth in the Rejection Notice; (ii) the date upon which the Debtors surrender the premises to the landlord and return the keys, key codes, or security codes, as applicable; and (iii) such other date to which the Debtors and the applicable Rejection Counterparty have agreed or as the Court may order.

## VI. Summary of the Assumption and Assignment Procedures

35. Alternatively, as described above, the Debtors are also seeking approval of the Assumption and Assignment Procedures set forth below to facilitate the fair and orderly assumption and assignment of certain of the Debtors' Contracts to the extent the Debtors receive any Qualified AQV Going Concern Bids (as determined by the Debtors in their sole discretion). The proposed Assumption and Assignment Procedures are as follows:

a. **Cure Notice**. As soon as reasonably practicable after the Debtors have determined they have received a Qualified AQV Going Concern Bid, the Debtors shall file with the Court and serve via first-class mail, electronic mail, or overnight delivery, the Cure Notice, attached as Exhibit 4 to the proposed Bidding Procedures Order, on certain non-Debtor Contract counterparties (collectively, the "Contract Counterparties," and each, a "Contract Counterparty") party to Contracts related to any of the AQV Assets which may be assumed or assumed and assigned, and post the Cure Notice to the website maintained by the Debtors' proposed claims and noticing agent, Omni Agent Solutions, Inc.

b. **Content of Cure Notice**. The Cure Notice shall notify the applicable Contract Counterparties that the Contracts may be subject to assumption and assignment in connection with the Sale(s), and contain the following information: (i) a list of the applicable Contracts that may be assumed and assigned in connection with the Sale(s) (the "Assigned Contracts," and each individually, an "Assigned Contract"); (ii) the names and addresses of the applicable Contract Counterparties, listed in alphabetical order; (iii) the Debtors' good faith estimate of the proposed amount necessary, if any, to cure all monetary defaults, if any, under each Assigned Contract (the "Cure Amount"); and (iv) the deadline by which any Contract Counterparty to an Assigned Contract must file an objection to the proposed assumption, assignment, Cure Amount, and/or adequate assurance and the procedures relating thereto (the "Cure Objection"); *provided* that service of a Cure Notice does not constitute an admission that such Assigned Contract is an executory contract or unexpired lease or that such Assigned Contract will be assumed at any point by the Debtors or assumed and assigned pursuant to any Successful Bid.

c. **Cure Objection**. Cure Objections, if any, must: (i) comply with the applicable provisions of the Bankruptcy Rules, the Bankruptcy Local Rules, and any order governing the administration of these chapter 11 cases; and (ii) be filed with the Court by **4:00 p.m. (prevailing Central Time) on the date that is 14 days following the date of service of the Cure Notice** (the "Cure Objection Deadline"), which date will be set forth in the Cure Notice; *provided* that the Debtors, in their discretion, may modify the Cure Objection Deadline by filing a notice of such modification on the Court's docket.

d. **Effects of Filing a Cure Objection**. A properly filed Cure Objection will reserve such objecting party's rights against the Debtors only with respect to the assumption and assignment of and/or Cure Amount under the Assigned Contract at issue, as set forth in the Cure Objection, but will not constitute an objection to the remaining relief requested in this Motion.

e. **Dispute Resolution**. Any Cure Objection to the proposed assumption and assignment of or Cure Amount under an Assigned Contract that remains unresolved after the Sale Hearing shall be heard at such later date as may be agreed upon by the parties or fixed by the Court. To the extent that any Cure Objection cannot be resolved by the parties, such Contract shall be assumed and assigned only upon satisfactory resolution of the Cure Objection, to be determined in the Successful Bidder's reasonable discretion. To the extent a Cure Objection remains unresolved, the Contract may be conditionally assumed and assigned, subject to the consent of the Successful Bidder, pending a resolution of the Cure Objection after notice and a hearing. If a Cure Objection is not satisfactorily resolved, the Successful Bidder may determine that such Contract should be rejected and

not assigned, in which case the Successful Bidder will not be responsible for any Cure Amount in respect of such Contract. Notwithstanding the foregoing, if a Cure Objection relates solely to the Cure Amount (any such objection, a "Cure Dispute"), the applicable Assigned Contract may be assumed by the Debtors and assigned to the Successful Bidder; *provided* that the Debtors shall pay the undisputed portion of the Cure Amount, and will deposit the remaining amount that the Contract Counterparty asserts is required to be paid under Bankruptcy Code section 365(b)(1)(A) and (B) (or such lower amount as agreed to by the Contract Counterparty) in a segregated account pending the Court's adjudication of the Cure Dispute or the parties' consensual resolution of the Cure Dispute.

f. **Supplemental Cure Notice**. If the Debtors discover Contracts inadvertently omitted from the Cure Notice or the Successful Bidder identifies other Contracts that it desires to assume or assume and assign in connection with the Sale(s), the Debtors may, after consultation with the Successful Bidder, at any time before the closing of the Sale(s), supplement the Cure Notice with previously omitted Contracts or modify a previously filed Cure Notice, including by modifying the previously stated Cure Amount associated with any Contracts (the "Supplemental Cure Notice").

g. **Objection to the Supplemental Cure Notice**. Any Contract Counterparty listed on the Supplemental Cure Notice may file an objection thereto (a "Supplemental Cure Objection") only if such objection is to either the proposed assumption and assignment of or Cure Amount under previously omitted Contracts. All Supplemental Cure Objections must: (i) comply with the applicable provisions of the Bankruptcy Rules, the Bankruptcy Local Rules, and any order governing the administration of these chapter 11 cases; and (ii) be filed no later than **4:00 p.m. (prevailing Central Time) on the date that is 14 days following the date of service of such Supplemental Cure Notice**, which date will be set forth in the Supplemental Cure Notice.

h. **Dispute Resolution of Supplemental Cure Objection**. If a Contract Counterparty files a Supplemental Cure Objection in a manner that is consistent with the requirements set forth above, and the parties are unable to consensually resolve the dispute, the Debtors shall seek an expedited hearing before the Court to determine the Cure Amount, if any, and approve the assumption and assignment of the relevant Contracts. If there is no such objection, then the Debtors shall obtain an order of this Court fixing the Cure Amount and approving the assumption of any Contract listed on a Supplemental Cure Notice. Notwithstanding the foregoing, if a Supplemental Cure Objection relates solely to a Cure Dispute, the applicable Assigned Contract may be assumed by the Debtors and assigned to the Successful Bidder; *provided* that the Debtors shall pay the undisputed portion of the Cure Amount, and will deposit the remaining amount that the

Contract Counterparty asserts is required to be paid under Bankruptcy Code section 365(b)(1)(A) and (B) (or such lower amount as agreed to by the Contract Counterparty) in a segregated account pending the Court's adjudication of the Cure Dispute or the parties' consensual resolution of the Cure Dispute.

i. **No Cure Objections**. If there are no Cure Objections or Supplemental Cure Objections, or if a Contract Counterparty does not file and serve such an objection in a manner that is consistent with the requirements set forth above, and absent a subsequent order of the Court establishing an alternative Cure Amount, (i) the Cure Amount, if any, set forth in the Cure Notice (or Supplemental Cure Notice) shall be controlling, notwithstanding anything to the contrary in any Contract or any other document, and (ii) the Contract Counterparty will be deemed to have consented to the assumption or assumption and assignment of the Contract and the Cure Amount, if any, and will be forever barred from objecting to the assumption or assumption and assignment of such Contract and rights thereunder, including the Cure Amount, if any, and from asserting any other claims related to such Contract against the Debtors or the Successful Bidder, or the property of the Debtors or the Successful Bidder.

j. **Conditions Precedent to Assumption and Assignment**. The Debtors' assumption and assignment of any Contract is subject to approval by the Court and is contingent upon consummation of the applicable Sale. Absent entry of a Sale Order approving the assumption and assignment of the Contracts and consummation of the Sale, the Contracts shall be deemed neither assumed nor assigned, and shall in all respects be subject to subsequent assumption or rejection by the Debtors, in their discretion.

## VII. Request to Set a Date for the Sale Hearing and Sale Objection Deadline

36. The Debtors intend to present the Successful Bid(s) for Court approval at the Sale Hearing currently proposed for April 2, 2024, or such later date and time as selected by the Debtors in accordance with the Bidding Procedures, in each case pending the Court's availability. The Debtors shall be deemed to have accepted a Bid only when the Bid has been approved by the Court at the applicable Sale Hearing.

37. Subject to entry of the Bidding Procedures Order, all objections to any Sale (a "Sale Objection") must be filed with the Court and served so as to be received by the Debtors by **4:00 p.m. (prevailing Central Time) on April 2, 2024** (the "Sale Objection Deadline"). In addition, any Sale Objection must be served on the Sale Notice Parties so as to be received on or before the Sale Objection Deadline.

**Proposed AQV Asset Wind-Down Procedures**

38. As described above, the Debtors do not have sufficient liquidity to continue to bear the cost of maintaining the AQV Assets (including the AQV Vessels) to the extent not all of the AQV Assets are purchased through the Sale process. Thus, to the extent the Debtors do not receive any Qualified Bids for all of the AQV Assets and/or any Qualified AQV Going Concern Bids, the Debtors, in their sole discretion, seek authorization to dispose of any remaining AQV Assets, including the AQV Vessels, potentially by, among other things, recycling the AQV Vessels as a source of parts which can be sold for re-use, participation in the U.S. Department of Transportation's Maritime Administration's ship recycling programs, or selling any remaining AQV Assets to a liquidator, subject, in the case of the AQV Vessels, to all applicable nonbankruptcy regulations and directives, including those of the United States Environmental Protection Agency, the United States Maritime Administration, and the United States Coast Guard.

39. In connection therewith, the Debtors shall file a notice of their intent to dispose of any remaining AQV Assets on (i) March 27, 2024 if no Auction is held or (ii) March 28, 2024 if an Auction is held. Thereafter, with regard to a disposition of remaining AQV Assets in any individual transaction or series of related transactions to or from a single buyer or seller or group of related buyers or sellers with a sale price less than or equal to $250,000, the Debtors seek authorization to consummate such transactions if the Debtors determine in their reasonable

exercise of business judgment that such transactions are in the best interest of the estates, without further order of the Court or notice to any party, and such sale shall be free and clear of all liens, claims, and encumbrances, with any valid and properly perfected liens attaching only to the sale proceeds with the same validity, extent, and priority as immediately prior to such transaction to the extent permitted under section 363 of the Bankruptcy Code.

40. Further, to the extent the Debtors propose to sell or otherwise dispose of any remaining AQV Assets in any individual transaction or series of related transactions to or from a single buyer or seller or group of related buyers or sellers with a sale price in excess of $250,000, the Debtors will file a subsequent notice of such transaction (the "AQV Asset Disposition Notice"), with a proposed form of order approving such disposition (the "AQV Asset Disposition Order") and provide the Sale Notice Parties with notice of and an opportunity to object within seven (7) days of the filing of such notice. After such notice and absent objection, the Debtors may submit the AQV Asset Disposition Order under certificate of no objection for Court approval. To the extent necessary, the Debtors shall be entitled to set an expedited hearing on any objection to an AQV Asset Disposition Notice promptly following the expiration of any such objection deadline, subject to the availability of the Court.

## Basis for Relief

### I. The Bidding Procedures Are Fair and Reasonable

41. In accordance with Bankruptcy Rule 6004(f)(1), sales of property outside the ordinary course of business may be by private sale or by auction. The Debtors believe that the Bidding Procedures are appropriate under sections 105 and 363 of the Bankruptcy Code to ensure that the bidding and sale process is conducted fairly and will yield the highest or otherwise best value for their estates and stakeholders. Further, the Debtors submit that compelling business

justifications exist for the proposed Sale(s), and that therefore, the Sale(s) should be approved as a sound exercise of the Debtors' business judgment.

42. Section 363 of the Bankruptcy Code provides that "[t]he [debtor-in-possession], after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate . . ." 11 U.S.C. § 363(b)(1). The paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate. *See In re Edwards*, 228 B.R. 552, 561 (Bankr. E.D. Pa. 1998) ("The purpose of procedural bidding orders is to facilitate an open and fair public sale designed to maximize value for the estate."); *In re Food Barn Stores, Inc.*, 107 F.3d 558, 564–65 (8th Cir. 1997) (in bankruptcy sales, "a primary objective of the [Bankruptcy] Code [is] to enhance the value of the estate at hand"); *In re Integrated Res., Inc.*, 147 B.R. 650, 659 (S.D.N.Y. 1992) ("[I]t is a well-established principle of bankruptcy law that the objective of the bankruptcy rules and the trustee's duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate.") (internal citations omitted).

43. Courts have made clear that a debtor's business judgment is entitled to substantial deference with respect to the procedures to be used in selling an estate's assets. *See, e.g.*, *In re Continental Air Lines, Inc.*, 780 F.2d 1223, 1226 (5th Cir. 1986) ("[F]or a debtor-in-possession or trustee to satisfy its fiduciary duty to the debtor, creditors and equity holders, there must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business."); *In re Crutcher Resources Corp.*, 72 B.R. 628, 631 (Bankr. N.D. Tex. 1987) ("A Bankruptcy Judge has considerable discretion in approving a § 363(b) sale of property of the estate other than in the ordinary course of business but the movant must articulate some business justification for the sale.").

44. To that end, courts uniformly recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and, therefore, are appropriate in the context of bankruptcy transactions. *See, e.g.*, *In re Integrated Res., Inc.*, 147 B.R. at 659 (bidding procedures "are important tools to encourage bidding and to maximize the value of the debtor's assets"); *In re Fin. News Network, Inc.*, 126 B.R. 152, 156 (Bankr. S.D.N.Y. 1991) ("court-imposed rules for the disposition of assets . . . [should] provide an adequate basis for comparison of offers, and [should] provide for a fair and efficient resolution of bankrupt estates").

45. Here, the Debtors have sound business justifications for seeking approval of the Bidding Procedures. The Debtors are commencing a bidding process immediately, as the Debtors have limited funds with which to maintain ownership of the AQV Assets and believe the process is in the best interests of the estates and creditors. The Debtors seek approval of the Bidding Procedures in an effort to obtain a bid(s) for the AQV Assets which maximizes their value.

46. The Bidding Procedures are the result of good-faith, arm's length negotiations between the Debtors and their key stakeholders. The Bidding Procedures provide an appropriate framework for soliciting offers and will enable the Debtors to analyze and compare all bids received to determine which bid is in the best interest of the Debtors' estates and creditors.

47. The Bidding Procedures provide potential Bidders with sufficient notice and opportunity for interested parties to acquire the information necessary to submit a timely and informed bid. The Debtors' deteriorating financial position precludes a more extended process, and the Debtors believe that the period between the date of entrance of the Bidding Procedures Order and the Bid Deadline provides a reasonable means for maximizing the return from the sale of the AQV Assets. Additionally, to help facilitate and expedite a Potential Bidder's evaluation

of the AQV Assets, the Debtors have established an electronic dataroom, which contains the information necessary for a Potential Bidder to perform the due diligence before submitting a bid.

48. Further, the Bidding Procedures provide the Debtors with sufficient opportunity to consider all competing offers and to select the highest or best offer for the completion of a Transaction. To the extent that the Debtors enter into a Stalking Horse Agreement, such entry ensures fair value by setting a minimum purchase price that is acceptable to the Debtors while exposing bids to the marketplace. Accordingly, the Debtors and all parties in interest can be assured that the ultimate consideration paid for the AQV Assets if a Sale (or Sales) is pursued will be fair, reasonable, and in the best interest of the Debtors' estates and creditors, and sound business reasons exist to approve the Bidding Procedures.

49. Moreover, it is well-settled that, where there is a court-approved auction process, a full and fair price is presumed obtained for the assets sold, as the best way to determine value is exposure to the market. *See Bank of Am. Nat'l Trust & Sav. Ass'n.* v. *LaSalle St. P'ship*, 526 U.S. 434, 457 (1999); *see also In re Trans World Airlines, Inc.*, 2001 WL 1820326, at *4 (Bankr. D. Del. 2001) (while a "sale transaction does not require an auction procedure," "the auction procedure has developed over the years as an effective means for producing an arm's length fair value transaction"). This is especially true here, where any Sale or Sales of the AQV Assets and related transactions will have been subjected to an extensive prepetition marketing process and intensively scrutinized by the Debtors, with the assistance of their advisors. Further, the Bidding Procedures preserve the Debtors' ability to decline to sell any particular AQV Asset at an amount below its market value. As a result, the Debtors and their creditors can be assured that, taking into account current macroeconomic and industry conditions, the consideration obtained will be fair and reasonable and at or above market.

50. The Debtors submit that the proposed Bidding Procedures will encourage competitive bidding and are appropriate under the relevant standards governing auction proceedings and bidding incentives in bankruptcy proceedings. Accordingly, the Court should enter the Bidding Procedures Order.

## II. The Bid Protections and Expense Reimbursement Have a Sound Business Purpose and Should Be Approved

51. The Debtors are also seeking authority to designate one or more Stalking Horse Bidders and offer customary Bid Protections and Expense Reimbursement to each such Stalking Horse Bidder. The terms of any Bid Protections shall be subject to Court approval pursuant to a Stalking Horse Order after five (5) days' notice to all relevant parties as set forth in the Bidding Procedures.

52. The use of a stalking horse in a public auction process for dispositions pursuant to section 363 of the Bankruptcy Code is a customary practice in chapter 11 cases, as the use of a stalking horse bid is, in many circumstances, the best way to maximize value in an auction process by "establish[ing] a framework for competitive bidding and facilitat[ing] a realization of that value." *Official Comm. of Unsecured Creditors* v. *Interforum Holding LLC*, 2011 WL 2671254, at *1 (E.D. Wis. July 7, 2011); *see also In re Tama Beef Packing, Inc.*, 321 B.R. 496, 497–98 (B.A.P. 8th Cir. 2005). As a result, stalking horse bidders virtually always require break-up fees and, in many cases, other forms of bidding protections as an inducement for "setting the floor at auction, exposing [their] bid[s] to competing bidders, and providing other bidders with access to the due diligence necessary to enter into an asset purchase agreement." *Id.* (citation omitted). Thus, the use of bidding protections has become an established practice in chapter 11 cases.

53. Indeed, break-up fees and other forms of bidding protections are a normal and, in many cases, necessary component of significant sales conducted in chapter 11: "Break-up fees are important tools to encourage bidding and to maximize the value of the debtor's assets . . . In fact, because the directors of a corporation have a duty to encourage bidding, break-up fees can be *necessary* to discharge the directors' duties to maximize value." *Integrated Res.*, 147 B.R. at 659–60 (emphasis in original). Specifically, bid protections "may be legitimately necessary to convince a 'white knight' to enter the bidding by providing some form of compensation for the risks it is undertaking." *In re 995 Fifth Ave. Assocs., L.P.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (citation and quotations omitted); *see also Integrated Res.*, 147 B.R. at 660–61 (noting bid protections can prompt bidders to commence negotiations and "ensure that a bidder does not retract its bid").

54. As a result, courts routinely approve such bidding protections in connection with proposed bankruptcy sales where a proposed fee or reimbursement provides a benefit to the estate. *See In re O'Brien Envtl. Energy, Inc.*, 181 F.3d 527, 535 (3d Cir. 1999) ("In other words, the allowability of break-up fees, like that of other administrative expenses, depends upon the requesting party's ability to show that the fees were actually necessary to preserve the value of the estate."). The allowance of Bid Protections, in the event that the Debtors execute Stalking Horse Agreement(s), is in the best interests of the Debtors' estates and their creditors, as any Stalking Horse Agreement will establish a floor for further bidding that may increase the consideration given in exchange for the AQV Assets that are the subject of such Stalking Horse Agreement, which consideration will inure to the benefit of the Debtors' estates.

55. Courts in the Fifth Circuit analyze the appropriateness of bidding incentives under the "business judgment" standard, and the law is well established in this district that courts consider

whether (a) the incentive encourages bidding and (b) the amount of the incentive is reasonable relative to the proposed purchase price. *See In re ASARCO, L.L.C.*, 650 F.3d 593 (5th Cir. 2011) (affirming bankruptcy court's decision to apply the business judgment rule to evaluate whether an expense reimbursement bid protection was permissible); *see also In re ASARCO LLC*, 441 B.R. 813, 826 (S.D. Tex. 2010) (explaining the three-part test used to determine whether expense reimbursement was permissible under business judgment rule); *Integrated Res., Inc.*, 147 B.R. at 657-58 (explaining that to evaluate bid protections, courts should employ the business judgment rule).

56. Here, the flexibility to offer Bid Protections is a critical component of the Debtors' ability to potentially obtain the commitment of one or more Stalking Horse Bidders. To qualify as a Stalking Horse Bidder, a bidder will need to have expended and will continue to expend time and resources negotiating, drafting, and performing due diligence activities necessitated by the Sale transactions, despite the fact that its Bid will be subject not only to Court approval, but also to overbidding by third parties at the Auction. Any Bid Protections offered to a Stalking Horse Bidder will have been negotiated in good faith and at arm's length. As a result, by preserving the flexibility to offer Bid Protections, the Debtors ensure that their estates can realize the benefit of a transaction with a Stalking Horse Bidder without sacrificing the potential for interested parties to submit overbids at the Auction.

57. The Bid Protections to be provided to any Stalking Horse Bidder under the circumstances described herein will be: (a) actual and necessary costs and expenses of preserving the Debtors' estates within the meaning of sections 503(b) and 507(a)(2) of the Bankruptcy Code, (b) commensurate to the real and material benefits conferred upon the Debtors' estates by the Stalking Horse Bidder, (c) fair, reasonable, and appropriate, including in light of the size and

nature of the proposed sale transactions and comparable transactions, the commitments that have been made, and the efforts that have been made, and will be expended by any Stalking Horse Bidder, (d) necessary to induce the Stalking Horse Bidder(s) to continue to pursue the Sale and to continue to be bound by any Stalking Horse Agreement, and (e) subject to all parties in interests' rights to object and be heard with respect to approval of such Bid Protections. The Bid Protections are necessary to induce a Stalking Horse Bidder to pursue a Sale and enter into a Stalking Horse Agreement.

58. Finally, payment of the Bid Protections in the context of a Sale to another purchaser that outbids a Stalking Horse Bidder will not diminish the Debtors' estates to the extent they become payable, as the Bidding Procedures require that any competing bid must exceed a Stalking Horse Bid by an amount in excess of the break-up fee and expense reimbursement. For the foregoing reasons, any Bid Protections reflect a sound business purpose, are fair and appropriate under the circumstances, and should be approved.

59. "A break-up fee should constitute a fair and reasonable percentage of the proposed purchase price, and should be reasonably related to the risk, effort, and expenses of the prospective purchaser. When reasonable in relation to the bidder's efforts and to the magnitude of the transaction, break-up fees are generally permissible." *Integrated Res.*, 147 B.R. at 662. *See, e.g., In re Rupari Holding Corp.*, 2017 WL 5434561, at *119 (Bankr. D. Del. Jun. 7, 2017) (authorizing a break-up fee of 4%); *In re Edge Petroleum Corp.*, *et al.*, Case No. 09-20644 (Bankr. S.D. Tex.) [Docket No. 57] (finding a break-up fee of 3.14% plus expenses was reasonable); *In re Erickson Retirement Cmtys., LLC*, Case No. 09-37010-SGJ (Bankr. N.D. Tex.) [Docket No. 272] (finding break-up fee and expenses equal to 3.5% of purchase price reasonable). Here, any break-up fee

requested by the Debtors will be a fair, reasonable percentage of the purchase price and therefore appropriate in light of the size and nature of the transaction.

## III. The Court Should Approve the Debtors' Entry into One or More Definitive Purchase Agreements as a Sound Exercise of Business Judgment

60. As above, in order for a court to authorize a debtor's use, sale, or lease of property other than in the ordinary course of business, the court must find "some articulated business justification for using, selling, or leasing the property outside the ordinary course of business." *Continental Air Lines, Inc.*, 780 F.2d at 1226; *see also In re Glover*, 2010 WL 5239918, at *3 (Bankr. E.D. Va. Mar. 31, 2010) ("Debtors have been permitted to conduct pre-confirmation sales of their assets provided that a 'sound business purpose' exists for the sale."); *In re Gulf Coast Oil Corp.*, 404 B.R. 407, 415 (Bankr. S.D. Tex. 2009) (noting that a debtor in possession has the discretionary authority to exercise business judgment given to an officer or director of a corporation). As noted above, the business judgment rule shields a debtor's management's decisions—such as whether to enter into a Definitive Purchase Agreement for the sale of AQV Assets—from judicial second-guessing. *See In re Johns-Manville Corp.*, 60 B.R. 612, 615–16 (Bankr. S.D.N.Y. 1986) (a "presumption of reasonableness attaches to a debtor's management decisions" and courts generally will not entertain objections to the debtor's conduct after a reasonable basis is set forth); *see also Richmond Leasing Co.* v. *Capital Bank, N.A.*, 762 F. 2d 1303, 1311 (5th Cir. 1985) ("More exacting scrutiny would slow the administration of the debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially."). Thus, if a debtor's actions satisfy the business judgment rule, then the transaction in question should be approved under section 363(b)(1) of the Bankruptcy Code.

**A. A Sound Business Purpose Exists for the Sale(s)**

61. The Debtors have a sound business justification for selling the AQV Assets. As described above, the AQV Business has not recovered from the impacts of the COVID-19 pandemic. As a result, its continued operations have become a drain on the resources of the Debtors' other, healthier businesses. Recognizing this issue, the Debtors implemented extensive marketing processes for the sale of the AQV Business as a going concern, but did not receive any actionable offers. Accordingly, after extensive analysis and consideration of a multitude of factors, the Debtors have proposed a fair and open process for achieving the goal of obtaining the highest or best offer in a sale of the Assets for the benefit of the Debtors' estates and creditors.

62. Additionally, pursuant to the Bidding Procedures, any Stalking Horse Bidder(s) and Stalking Horse Agreement(s) will be subject to competing Bids, enhancing the Debtors' ability to receive the highest or otherwise best value for the AQV Assets. Consequently, the Successful Bid, likely after being subject to a further "market check" in the form of the Auction, will constitute, in the Debtors' reasonable business judgment, the highest or otherwise best offer for the AQV Assets and will provide a greater recovery for their estates than any known or practicably available alternative. *See, e.g.*, *Trans World Airlines, Inc.*, 2001 WL 1820326, at *4 (while a "section 363(b) sale transaction does not require an auction procedure . . . the auction procedure has developed over the years as an effective means for producing an arm's length fair value transaction."). Further, the Debtors are reserving their rights not to enter into a Sale if the Debtors believe, in their reasonable business judgment, that entry into such Sale will not maximize the value of the AQV Assets being considered.

63. Thus, the Definitive Purchase Agreements of any Successful Bidders will constitute the highest or otherwise best offer for the applicable AQV Assets, which will provide a greater

recovery for the Debtors' estates than would be provided by any other available alternative. As such, the Debtors' determination to sell the AQV Assets through an Auction process and to enter into Definitive Purchase Agreements with one or more Successful Bidders will be a valid and sound exercise of the Debtors' business judgment. Therefore, the Debtors request that the Court authorize the proposed Sale(s) as a proper exercise of the Debtors' business judgment.

**B. The Sale (or Sales) Should Be Approved "Free and Clear" under Section 363(f) of the Bankruptcy Code**

64. Section 363(f) of the Bankruptcy Code permits a debtor to sell property free and clear of another party's interest in the property if: (a) applicable non-bankruptcy law permits such a free and clear sale; (b) the holder of the interest consents; (c) the interest is a lien and the sale price of the property exceeds the value of all liens on the property; (d) the interest is the subject of a bona fide dispute; or (e) the holder of the interest could be compelled in a legal or equitable proceeding to accept a monetary satisfaction of its interest. *See* 11 U.S.C. § 363(f).

65. This section of the Bankruptcy Code is drafted in the disjunctive. Thus, satisfaction of any of the requirements enumerated therein will suffice to warrant the sale of the AQV Assets free and clear of all liens, security interests, pledges, charges, defects, or similar encumbrances (collectively, "Encumbrances"), except with respect to any Encumbrances that may be assumed Encumbrances under the applicable Definitive Purchase Agreement of the Successful Bidder. *See In re Kellstrom Indus., Inc.*, 282 B.R. 787, 793 (Bankr. D. Del. 2002) ("[I]f any of the five conditions are met, the debtor has the authority to conduct the sale free and clear of all liens.").

66. Further, section 363(f) permits the sale of a vessel free and clear of all Encumbrances, including those that comprise maritime liens. Under applicable non-bankruptcy (i.e., admiralty) law, maritime liens are extinguished by a judicial sale of the subject vessel in a

proceeding *in rem*. *See U.S.* v. *Steel Tank Barge H 1651*, 272 F. Supp. 658, 662 (E.D. La. 1967) ("Judicial sales in admiralty in rem proceedings are effective against the whole world even as to those without notice. Thus, in a properly-conducted proceeding in rem, a judgment and sale will operate to execute and extinguish all liens and claims against the vessel, even where the lienholders have absolutely no notice of the proceeding."). The Fifth Circuit "has held that judicial sale of a vessel pursuant to a valid *in rem* proceeding by a court of competent jurisdiction extinguishes all pre-existing maritime liens." *Crescent Towing & Salvage Co., Inc.* v. *M/V Anax*, 40 F.3d 741, 744 (5th Cir. 1994) (citing cases).

67. Where, as here, the Debtors are proposing to provide notice "reasonably calculated, under all the circumstances, to apprise interested parties of the action and afford them an opportunity to present their objections," including notice consistent with the federal admiralty rules, the Sale(s) should be approved free and clear of Encumbrances, including maritime liens. *Mullane* v. *Central Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950); *see also* Fed. R. Civ. P. C(4) (requiring prompt "public notice of the action and arrest in a newspaper designated by court order and having general circulation in the district"). The competency of this Court's jurisdiction over the AQV Assets is beyond reasonable dispute. *See* 11 U.S.C. § 541. Thus, section 363(f)(1) permits a sale of vessel AQV Assets free and clear of maritime liens.

68. Accordingly, the Sale of any AQV Assets subject to an Encumbrance that will not be an assumed liability satisfies or will satisfy at least one of the five conditions of section 363(f) of the Bankruptcy Code, and any such Encumbrance will be adequately protected by either being paid in full at the time of the closing of such Sale or by attaching to the net proceeds of the Sale, subject to any claims and defenses the Debtors may possess with respect thereto. The Debtors accordingly request authority to convey the AQV Assets to the Successful Bidder free and clear

of all Encumbrances, with any such Encumbrances to attach to the proceeds of the Sale where applicable.

## IV. The Form and Manner of the Sale Notice Should Be Approved

69. Pursuant to Bankruptcy Rule 2002(a), the Debtors are required to provide creditors with 21 days' notice of a hearing where the Debtors will seek to use, lease, or sell property of the estate outside the ordinary course of business. Bankruptcy Rule 2002(c) requires any such notice to include the time and place of the Auction, the Sale Hearing, and the deadline for filing any objections to the Auction and/or the Sale. As required under Bankruptcy Rule 2002(b), the Debtors seek approval of the Sale Notice as proper notice of the Auction, if any. Notice of this Motion and the related hearing to consider entry of the Bidding Procedures Order, coupled with service of the Sale Notice, as provided for herein, constitutes good and adequate notice of the Auction and the proceedings with respect thereto in compliance with, and satisfaction of, the applicable requirements of Bankruptcy Rule 2002. Accordingly, the Debtors request that this Court approve the form and manner of the Sale Notice.

## V. The Bidding Procedures Were Designed to Prevent Collusion among Parties in Interest

70. The Bidding Procedures require each Qualified Bidder participating in the Auction to confirm that it has not engaged in any collusion with respect to the bidding. Thus, section 363(n) of the Bankruptcy Code governing collusive sales is inapplicable to any sale of the Debtors' Assets pursuant to the Bidding Procedures. 11 U.S.C. § 363(n).

## VI. The Successful Bidder Should Be Entitled to the Protections of Section 363(m)

71. Pursuant to section 363(m) of the Bankruptcy Code, a good faith purchaser is one who purchases assets for value, in good faith, and without notice of adverse claims. *See In re O'Dwyer*, 611 Fed. App'x 195, 200 (5th Cir. 2015); *In re Mark Bell Furniture Warehouse, Inc.*,

992 F.2d 7, 9 (1st Cir. 1993); *In re Abbotts Dairies of Pa.*, 788 F.2d 143, 147 (3d Cir. 1986); *Willemain* v. *Kivitz*, 764 F.2d 1019, 1023 (4th Cir. 1985); *In re Hereford Biofuels, LP*, 466 B.R. 841, 860 (Bankr. N.D. Tex. 2012). To the extent the Debtors seek Court approval of a Sale, the Debtors will adduce facts at the Sale Hearing demonstrating that any bidder who is deemed the Successful Bidder for the AQV Assets had negotiated at arm's length, with all parties represented by their own counsel.

72. Accordingly, any sale order entered will include a provision that the Successful Bidder for the Assets is a "good faith" purchaser within the meaning of section 363(m) of the Bankruptcy Code. The Debtors believe that providing the Successful Bidder with such protection will ensure that the Debtors will receive the maximum price for the AQV Assets and that any Sale will close promptly.

## VII. The Rejection of Contracts Constitutes a Sound Exercise of the Debtors' Reasonable Business Judgment

73. Section 365(a) of the Bankruptcy Code provides that a debtor in possession, "subject to the court's approval, may . . . reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). "This provision allows a trustee to relieve the bankruptcy estate of burdensome agreements which have not been completely performed." *Stewart Title Guar. Co.* v. *Old Republic Nat'l Title Ins. Co.*, 83 F.3d 735, 741 (5th Cir. 1996) (citing *In re Murexco Petroleum, Inc.*, 15 F.3d 60, 62 (5th Cir. 1994)); *see also In re Orion Pictures Corp.*, 4 F.3d 1095, 1098 (2d Cir. 1993) (noting that the purpose of rejection of executory contracts is to permit the debtor in possession to renounce title to and abandon burdensome property). A debtor's rejection of an executory contract or unexpired lease is ordinarily governed by the "business judgment" standard. *See Richmond Leasing*, 762 F.2d at 1309 ("It is well established that 'the question

whether a lease should be rejected . . . is one of business judgment.'") (quoting *Grp. of Institutional Invs.* v. *Chi., M., St. P. & P. R. Co.*, 318 U.S. 523, 550 (1943)); *see also In re Tex. Sheet Metals, Inc.*, 90 B.R. 260, 264 (Bankr. S.D. Tex. 1988) ("The traditional business judgment standard governs the rejection of ordinary executory contracts."). The business judgment standard requires a court to approve a debtor's business decision unless that decision is the product of "bad faith, or whim or caprice." *See In re Pisces Energy, LLC*, 2009 WL 7227880, at *6 (Bankr. S.D. Tex. Dec. 21, 2009) ("In the absence of a showing of bad faith . . . the debtor's business judgment will not be altered."); *see also In re Trans World Airlines, Inc.*, 261 B.R. 103, 121 (Bankr. D. Del. 2001) (quoting *In re Wheeling-Pittsburgh Steel Corp.*, 72 B.R. 845, 849–50 (Bankr. W.D. Pa. 1987)).

74. Rejection of an executory contract or unexpired lease is appropriate where such rejection would benefit the estate. *See Pisces Energy, LLC*, 2009 WL 7227880, at *6 ("Courts apply the 'business judgment test,' which requires a showing that the proposed course of action will be advantageous to the estate and the decision be based on sound business judgment."); *see also Orion Pictures*, 4 F.3d at 1098–99 (stating that section 365 of the Bankruptcy Code permits a debtor in possession, subject to court approval, to decide which executory contracts would be beneficial to reject). Upon finding that a debtor exercised its sound business judgment in determining that rejection of certain contracts or leases is in the best interests of its creditors and all parties in interest, a court should approve the rejection under section 365(a) of the Bankruptcy Code. *See In re Summit Land Co.*, 13 B.R. 310, 315 (Bankr. D. Utah 1981) (holding that absent extraordinary circumstances, court approval of a debtor's decision to assume or reject an executory contract "should be granted as a matter of course").

75. The Debtors' decision to reject the AQV Contracts is well within their business judgment and is in the best interest of their estates. Because the Debtors have already curtailed

the AQV Business' operations and have not received any actionable bids for the AQV Business as a going concern to date, the Debtors no longer have any need to maintain the Contracts to be rejected. In fact, in order to maximize the value of their estates, the Debtors must reject the Contracts to avoid the incurrence of any additional, unnecessary expenses related thereto. Accordingly, rejecting all Contracts is appropriate under the circumstances and reflects the Debtors' sound business judgment.

## VIII. Alternatively, the Assumption and Assignment Procedures Are Appropriate and Should Be Approved if the Successful Bid Is a Bid for the AQV Business as a Going Concern

76. As described above, to the extent the Debtors receive any Qualified AQV Going Concern Bids, the Debtors will seek authority to assign or transfer the Assigned Contracts if such bidder is the Successful Bidder. Section 365 of the Bankruptcy Code authorizes a debtor to assume and/or assign its executory contracts and unexpired leases, subject to the approval of the court, *provided* that the defaults under such contracts and leases are cured and adequate assurance of future performance is provided. The Debtors' decision to assume or reject a Contract must only satisfy the "business judgment rule" and will not be subject to review unless such decision is clearly an unreasonable exercise of such judgment. *See, e.g.*, *Richmond Leasing*, 762 F.2d at 1309 (applying a business judgment standard to debtor's determination to assume unexpired lease).

77. As set forth in the Bidding Procedures Order, the Debtors also request that any party that fails to object to the proposed assumption and assignment of any Assigned Contract be deemed to consent to the assumption and assignment of the applicable Assigned Contract pursuant to section 365 of the Bankruptcy Code on the terms set forth in the Sale Order, along with the Cure Amounts identified in the Cure Notice. *See, e.g.*, *Matter of Tabone, Inc.*, 175 B.R. 855, 858

(Bankr. D.N.J. 1994) (by not objecting to sale motion, creditor deemed to consent); *In re Gabel*, 61 B.R. 661, 667 (Bankr. W.D. La. 1985) (same).

78. Courts must evaluate whether the assumption meets the requirements of section 365(b) of the Bankruptcy Code, specifically that a debtor (a) cure, or provide adequate assurance of promptly curing, prepetition defaults in the executory contract, (b) compensate parties for pecuniary losses arising therefrom, and (c) provide adequate assurance of future performance thereunder. This section "attempts to strike a balance between two sometimes competing interests, the right of the contracting non-debtor to get the performance it bargained for and the right of the debtor's creditors to get the benefit of the debtor's bargain." *In re Luce Indus., Inc.*, 8 B.R. 100, 107 (Bankr. S.D.N.Y. 1980).

79. The statutory requirements of section 365(b)(1)(A) of the Bankruptcy Code will be satisfied because the Assumption and Assignment Procedures provide a clear process by which to resolve disputes over cure amounts or other defaults. The Debtors are confident that if defaults exist that must be cured, such cure will be achieved fairly, efficiently, and properly, consistent with the Bankruptcy Code and with due respect to the rights of non-Debtor parties.

80. Similarly, the third requirement of section 365(b) of the Bankruptcy Code—adequate assurance of future performance—is also satisfied given the facts and circumstances present here. "The phrase 'adequate assurance of future performance' adopted from section 2-609(1) of the Uniform Commercial Code, is to be given a practical, pragmatic construction based upon the facts and circumstances of each case." *Matter of U.L. Radio Corp.*, 19 B.R. 537, 542 (Bankr. S.D.N.Y. 1982). Although no single solution will satisfy every case, "the required assurance will fall considerably short of an absolute guarantee of performance." *In re Prime Motor Inns, Inc.*, 166 B.R. 993, 997 (Bankr. S.D. Fla. 1994). Among other things, adequate assurance

may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. *See In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance present where a prospective assignee has financial resources and has expressed a willingness to devote sufficient funding to a business to give it a strong likelihood of succeeding).

81. The Debtors expect to be able to demonstrate that the requirements for assumption and assignment of the Assigned Contracts to the Successful Bidder will be satisfied. As required by the Bidding Procedures, the Debtors will evaluate the financial wherewithal of Potential Bidders before designating such party a Qualified Bidder or Successful Bidder (e.g., financial credibility, willingness, and ability of the interested party to perform under the Assigned Contracts), including as it relates to such Qualified Bidder's willingness and ability to perform under the Assigned Contracts assigned to the Successful Bidder. Further, the Assumption and Assignment Procedures provide the Court and other interested parties opportunity to evaluate and, if necessary, challenge the ability of the Successful Bidder to provide adequate assurance of future performance and object to the assumption of the Assigned Contracts or Cure Amounts. The Court, therefore, will have a sufficient basis to authorize the Debtors to reject or assume and assign the Assigned Contracts as set forth in the Definitive Purchase Agreement of the Successful Bidder.

## IX. The Disposition of Any Remaining AQV Assets at the Conclusion of the Sale Process Should Be Approved

82. As described above, it is well-settled that, where there is a court-approved auction process, a full and fair price is presumed to have been obtained for the assets sold, as the best way to determine value is exposure to the market. To the extent the Debtors do not receive any actionable bids for any AQV Assets (including the AQV Vessels) through the sale and auction

process, the market value for such AQV Assets is likely *de minimis*, while the costs of maintaining such assets are substantial. Thus, the Debtors submit that the AQV Asset Wind-Down Procedures reflect a reasonable exercise of their business judgment under section 363(b). The AQV Asset Wind-Down Procedures also afford those creditors with an interest in any transaction of more than $250,000 the opportunity to object to the sale or transfer of such assets and obtain a hearing if necessary.

**Emergency Consideration**

83. Pursuant to Bankruptcy Local Rule 9013-1(i) and Bankruptcy Rule 6003, the Debtors request emergency consideration of this Motion. Bankruptcy Rule 6003 provides that the relief requested in this Motion may be granted if the "relief is necessary to avoid immediate and irreparable harm." FED. R. BANKR. P. 6003. The requested relief will save costs and avoid undue administrative burden and confusion only if granted immediately. In addition, the milestones under the DIP Facilities require entry of the Sale Order no later than 45 days after the Petition Date (*i.e.*, by April 6, 2024). Accordingly, the Debtors submit that they have satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 because in order to provide sufficient notice of the Auction and Sale Hearing and to allow interested parties sufficient time to diligence the Debtors' assets, entry of the Bidding Procedures Order is necessary on an emergency basis. Therefore, the Debtors respectfully request that the Court approve the relief requested in this Motion on an emergency basis.

**Waiver of Bankruptcy Rule 6004(a) and 6004(h)**

84. To implement the foregoing successfully, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and

that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

**Reservation of Rights**

85. Nothing contained herein is intended to be or should be construed as: (a) an admission as to the amount of, basis for, or validity of any claim against a Debtor entity under the Bankruptcy Code or other applicable nonbankruptcy law; (b) a waiver of the Debtors' or any other party in interest's right to dispute any claim on any grounds; (c) a promise or requirement to pay any claim; (d) an implication or admission that any particular claim is of a type specified or defined in this motion or any order granting the relief requested by this motion or a finding that any particular claim is an administrative expense claim or other priority claim; (e) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; (g) a waiver or limitation of the Debtors', or any other party in interest's, rights under the Bankruptcy Code or any other applicable law; or (h) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) that may be satisfied pursuant to the relief requested in this motion are valid, and the rights of all parties in interest are expressly reserved to contest the extent, validity, or perfection or seek avoidance of all such liens. If the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended and should not be construed as an admission as to the validity of any particular claim or a waiver of the Debtors' or any other party in interest's rights to subsequently dispute such claim.

**Notice**

86. The Debtors will provide notice of this Motion to the following parties or their respective counsel: (a) the U.S. Trustee; (b) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) counsel to the Ad Hoc Group, Milbank LLP, 55 Hudson Yards, New York, NY 10001; (d) counsel to Crestview, Davis Polk & Wardwell LLP, 450 Lexington Avenue, New York, NY 10017; (e) counsel to the Senior DIP Lenders, White & Case LLP, 1221 Avenue of the Americas, New York, NY 10020; (f) counsel to Alter Domus (US) LLC, as agent under the Superpriority Credit Agreement, Norton Rose Fulbright US LLP, 1301 6th Avenue, New York, NY 10019; (g) counsel to GLAS Trust Company LLC, as agent under the Senior DIP Facility, Seward & Kissel LLP, One Battery Park Plaza, New York, NY 10004; (h) counsel to GLAS Trust Company LLC, as agent under the Junior DIP Facility and under the First Lien Credit Agreement, ArentFox Schiff LLP, 1301 Avenue of the Americas, 42nd Floor, New York, NY 10019; (i) counsel to UBS AG, Stamford Branch, as agent under the Revolving Credit Agreement, Cahill Gordon & Reindel LLP, 32 Old Slip, New York, NY 10005; (j) the United States Attorney's Office for the Southern District of Texas; (k) the Internal Revenue Service; (l) the United States Securities and Exchange Commission; (m) the state attorneys general for states in which the Debtors conduct business; (n) the Environmental Protection Agency; (o) other regulatory agencies having a regulatory or statutory interest in these cases; and (p) any party that has requested notice pursuant to Bankruptcy Rule 2002.

87. The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

88. A copy of this Motion is available on (a) the Court's website, at www.txs.uscourts.gov, and (b) the website maintained by the Debtors' proposed claims and noticing agent, Omni Agent Solutions, at https://omniagentsolutions.com/Hornblower.

[*Remainder of page intentionally left blank*]

WHEREFORE, the Debtors respectfully request that the Court enter an order granting the relief requested herein and such other relief as the Court deems appropriate under the circumstances.

February 21, 2024

Respectfully submitted,

By: */s/ John F. Higgins*

**PORTER HEDGES LLP**
John F. Higgins (TX Bar No. 09597500)
M. Shane Johnson (TX Bar No. 24083263)
Megan Young-John (TX Bar No. 24088700)
1000 Main St., 36th Floor
Houston, Texas 77002
Telephone: (713) 226-6000
Facsimile: (713) 226-6248
jhiggins@porterhedges.com
sjohnson@porterhedges.com
myoung-john@porterhedges.com

- and -

**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
Paul M. Basta (pending *pro hac vice*)
Jacob A. Adlerstein (pending *pro hac vice*)
Kyle J. Kimpler (pending *pro hac vice*)
Sarah Harnett (pending *pro hac vice*)
Neda Davanipour (pending *pro hac vice*)
1285 Avenue of the Americas
New York, New York 10019
Telephone: (212) 373-3000
Facsimile: (212) 757-3990
pbasta@paulweiss.com
jadlerstein@paulweiss.com
kkimpler@paulweiss.com
sharnett@paulweiss.com
ndavanipour@paulweiss.com

*Proposed Counsel to the Debtors and the Debtors in Possession*

**Certificate of Accuracy**

I certify that the facts and circumstances described in the above pleading giving rise to the emergency request for relief are true and correct to the best of my knowledge, information, and belief. This statement is made pursuant to Bankruptcy Local Rule 9013-1(i).

*/s/ Jonathan Hickman*
Jonathan Hickman

**Certificate of Service**

I certify that on February 21, 2024, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ John F. Higgins*
John F. Higgins