**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| HORNBLOWER HOLDINGS LLC, *et al.*,[1] | ) | Case No. 24-90061 (MI) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**DECLARATION OF JONATHAN HICKMAN
IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

I, Jonathan Hickman, pursuant to section 1746 of title 28 of the United States Code, hereby declare that the following is true to the best of my knowledge, information, and belief:

1. I am the Chief Restructuring Office of Hornblower Holdings LLC and certain of its affiliates. Hornblower Holdings LLC and its debtor affiliates are debtors and debtors in possession in the above-captioned cases (collectively, "Debtors" and, together with their non-Debtor affiliates, the "Company").

2. I am a Managing Director at Alvarez & Marsal North America LLC ("A&M") and co-Head of A&M's North American Restructuring practice for the Southern Region. A&M is the Debtor's proposed financial and restructuring advisor in these chapter 11 cases (the "Chapter 11 Cases"). I have over 25 years of management and restructuring experience across a range of industries, including retail, oil and gas, manufacturing, distribution, automotive, mining, financial services and construction. I have served in numerous interim management roles,

---

[1] The last four digits of Debtor Hornblower Holdings LLC's tax identification number are 6035. Due to the large number of debtor entities in these chapter 11 cases, for which the Debtors have requested joint administration, a complete list of the debtor entities and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' proposed claims and noticing agent at https://omniagentsolutions.com/Hornblower. The location of the Debtors' service address for purposes of these chapter 11 cases is: Pier 3 on The Embarcadero, San Francisco, CA 94111.

including as Chief Restructuring Officer for each of GT Real Estate Holdings, GST Autoleather, Allens, Inc., and a global manufacturer of heat transfer equipment, among others.  Additionally, I was the Chief Executive Officer of Piney Woods Resources, a coal mining company headquartered in Alabama, and have extensive experience as a financial advisor to distressed companies, including Belk, Sanchez Energy, Sable Permian Resources, Seventy Seven Energy, Sidewinder Drilling, and The Merit Group, among others.  I was appointed as Chief Restructuring Officer of the Debtors on November 16, 2023.

3.      On the date hereof (the "Petition Date"), each of the Debtors commenced these Chapter 11 Cases for relief under title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of Texas (the "Court").  As Chief Restructuring Officer, I have independently reviewed, have become generally familiar with, and have personal knowledge regarding the Debtors' day-to-day operations, businesses, financial affairs, books and records, and the circumstances leading up to these Chapter 11 Cases.  As discussed in further detail below, these Chapter 11 Cases were necessitated by, among other things, a trough in operating liquidity caused by a prolonged recovery from the COVID-19 pandemic and its aftermath resulting in the need for a substantial increase in leverage, coupled with inflationary pressures and an unprecedented increase in interest rates.  A list of the Debtors is attached as **Exhibit A**, and a chart reflecting the Debtors' corporate structure is attached as **Exhibit B**.

4.      I submit this declaration (this "Declaration") in support of the Debtors' voluntary petitions (the "Petitions"), and the Debtors' related requests for initial relief in the motions and applications filed contemporaneously herewith (the "First Day Motions"), as well as to assist the Court and parties in interest in understanding the circumstances that led the Debtors to commence

2

these Chapter 11 Cases.  To that end, this Declaration provides background information about the Company's corporate history, business operations, capital structure, and recent challenges, and supports the Debtors' Petitions and the relief requested in the First Day Motions.

5.      Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my discussions with other members of the Debtors' senior management and other personnel, my discussions with the Debtor's non-legal advisors, my review of business records maintained in the regular course of business and other relevant documents, or my opinion based on my professional experience.  In making this Declaration, I have relied in part on information and materials that the Debtor, my colleagues at A&M, and the Debtor's non-legal advisors have gathered, prepared, verified, and provided to me, in each case under my ultimate supervision, at my direction, and for my benefit in preparing this Declaration.  Unless otherwise indicated, any financial information contained in this Declaration is unaudited and subject to change, but is accurate to the best of my knowledge.  If called to testify, I could and would testify competently as to the facts set forth herein.  I am authorized to submit this Declaration on behalf of the Debtors.

## Preliminary Statement[2]

6.      Spanning a 100-year history, the Company is a global leader in world-class experiences and transportation.  Prior to the Petition Date, it operated primarily through three business lines[3]:  City Experiences[4] (including City Cruises, City Ferry, and Walks), American

---

[2]      Capitalized terms used but not immediately defined shall have the meanings ascribed to such terms elsewhere in this Declaration.

[3]      These three business lines are discrete corporate silos; however, references to the Hornblower silo herein refer collectively to the City Experiences and American Queen Voyages business units and related entities.

[4]      Previously known as Hornblower Cruises & Events; more commonly known simply as "Hornblower". References to the Hornblower business division herein refer to the City Experiences division of the Company.

Queen Voyages ("AQV"),[5] and Journey Beyond.[6]  The Company's business includes overnight cruising, land- and water-based experiences, ferry and transportation services, and an experiential travel group in Australia.  With approximately 6,000[7] employees as of the Petition Date and more than 30 million guest trips across 111 countries annually, the Company is one of the largest and most diversified providers of tourism and transportation services globally.

7.      Prior to the COVID-19 pandemic, the Company experienced years of significant growth and profitability, with revenues reaching a peak of $690 million in 2019.  However, as with numerous other participants in the tourism and transportation sectors, the COVID-19 pandemic had a direct and profoundly adverse impact on the Company's financial condition and operating performance.  Government imposed travel restrictions caused the Company's operations to come to an immediate halt, precipitating a liquidity crisis.

8.      Fortunately, the Company was able to navigate through the depths of the pandemic by engaging in a series of liquidity enhancing transactions that it negotiated with its largest lenders and, in certain instances, funds managed by Crestview Advisors, L.L.C. (collectively, "Crestview" or "Sponsor"), its largest shareholder.  These financing transactions and the equity infusions provided by Crestview were a critical lifeline for the Company, allowing it to stabilize and continue its operations through the pandemic.  However, they did not come without a cost, as the Company's aggregate debt load increased from $630 million in 2019 to $1.2 billion in 2023, and its annual

---

[5]     References to AQV entities herein refer to, collectively, American Queen Holdco, LLC and its direct and indirect subsidiaries, and references to AQV business refer to their related business units.

[6]     References to the Journey Beyond silo herein refer to the Journey Beyond business units and related entities that are not Debtors in these Chapter 11 Cases, except for Journey Beyond Holdings, LLC.

[7]     This figure includes 1,300 Journey Beyond employees and is reflective of employee terminations at AQV (as further described below).

cash interest expense grew from approximately $38 million to $115 million over the same time period.

9.       This substantial increase in leverage and debt service has proven difficult for the Company to shoulder, especially in light of the highly seasonal and cyclical nature of the Company's business.  And while most of the Company's businesses have since returned to pre-COVID profitability, one important exception has been the American Queen Voyages overnight cruise business, which has continued to significantly underperform expectations, causing a substantial drain on the Company's liquidity.

10.      In light of these challenges, in July 2023, the Company commenced a sale process for its Journey Beyond business, with the hope that a successful sale could generate sufficient proceeds in excess of the Journey Beyond silo level debt to fund anticipated liquidity shortfalls within the Hornblower silo.  However, in late September 2023, it became apparent that a Journey Beyond sale process was unlikely to generate sufficient excess proceeds to solve the Company's long-term liquidity needs.  It also became further apparent that absent a deleveraging transaction, the Debtors' current capital structure within the Hornblower silo was unsustainable.

11.      As a result, beginning in October 2023, the Company, with the assistance of its advisors, quickly commenced negotiations with an ad hoc group of lenders under the Debtors' secured debt facilities (the "Ad Hoc Group") represented by Milbank LLP, Perella Weinberg Partners LP, and FTI Consulting, Inc. (collectively, the "AHG Advisors"), as counsel, investment banker, and financial advisor, respectively, around the terms of a comprehensive recapitalization that would deleverage the Company's balance sheet.

12.      In light of the Company's deteriorating liquidity, the Company also engaged in extensive arms' length negotiations with the Ad Hoc Group and other key stakeholders to identify

ways to raise immediate incremental liquidity.  Fortunately, the discussions with the Ad Hoc Group around the terms of a bridge financing solution proved successful, culminating in a bridge financing facility that initially provided the Company with $60 million in incremental liquidity pursuant to the Incremental Superpriority Facility.  Without the critical funding provided by the Incremental Superpriority Facility, the Company would have been unable to fund its operations beyond mid-November.  The Incremental Superpriority Facility was a critical lifeline that provided the necessary breathing room for the parties to further engage and progress discussions on the terms of a comprehensive value-maximizing restructuring transaction, and otherwise avoid a value destructive, free-fall bankruptcy filing.

13.     In December 2023, as discussions amongst the Company and the Ad Hoc Group around a comprehensive restructuring transaction remained ongoing and the maturity date on the Incremental Superpriority Facility was imminent, the Company successfully negotiated an extension and upsize of the Incremental Superpriority Facility pursuant to which, the Ad Hoc Group committed to, among other things, provide an additional $110 million in incremental liquidity to provide the Company essential breathing room as it continued to engage with the Ad Hoc Group and certain other key prepetition stakeholders on the terms of a more comprehensive solution.  This incremental liquidity allowed the Company to meet its financing needs through mid-February 2024 and provided the necessary runway to continue its efforts to chart a value-maximizing path forward.

14.     The Company utilized this incremental time to continue discussions with the Ad Hoc Group around the terms of a value-maximizing recapitalization transaction.  As part of these discussions, the Company, with the assistance of its advisors, also explored a sale of the American

Queen Voyages business as a going concern, or in the alternative, a sale of individual vessels and assets (the "AQV Sale Transaction"), including through a section 363 asset sale process.

15.     The Company, with the assistance of Guggenheim Securities, LLC ("Guggenheim Securities"), formally launched a marketing process concerning the AQV Sale Transaction, on December 14, 2023.   As of the Petition Date, the Company received two (2) non-binding indications of interest for certain assets of AQV, with no actionable indications of interest for a going concern sale.  Despite the Company's best efforts, further discussions with these two parties did not result in a binding stalking horse bid as of the Petition Date.

16.     Based on the feedback the Company received in the prepetition marketing process, in consultation with the Ad Hoc Group, the Company, with the assistance of its advisors, determined that utilizing the chapter 11 process to continue the prepetition marketing process and effectuate the sale of, some, all, or substantially all of the AQV assets and to otherwise wind-down AQV's business operations was in the best interest of the Debtors' estates and would maximize value for the benefit of all stakeholders.

17.     Throughout this process, the Company has been keenly focused on maximizing value and recoveries for all stakeholders, including its customers.  Once a prepetition going-concern sale was deemed unlikely, and continuing the prepetition process to sell and otherwise wind-down AQV's business operations through a chapter 11 process was determined to be in the interest of the Debtors' estates, the Company, with the assistance of its advisors, took immediate action to ensure that customer deposits would remain protected, even in these Chapter 11 Cases. This included closely monitoring incoming deposits, while working cooperatively with the lenders and their advisors to accelerate customer refunds, all with a view toward remaining under the surety bond coverage limit the Company had obtained as required by the Federal Maritime

Commission pursuant to 46 CFR § 540.9.  The surety bond is specifically required to ensure customers recover any deposits in the event of nonperformance, along with any allowed fees or costs associated with any cancelled cruises.  In addition, the Company took additional operational steps to discontinue acceptance of inbound customer deposits and expedite the return of refunds.

18.    The Company has also established a website (AQVrefunds.com) and process by which AQV cruise passengers can apply for deposit refunds with the goal of ultimately expediting the cruise passengers' refunds.[8]  Upon submission of a customer claim form, cruise passengers will be directed to enter in their cruise deposit information, information about the cruise booked, and upload supporting documentation such as boarding passes, proof of payment, and cruise confirmation correspondence.  Once the Company has received the cruise passengers' information, the Company intends to work cooperatively with its surety provider and the Federal Maritime Commission to expedite cruise deposit refunds.

19.    Notwithstanding these efforts, the Company expects that certain customers may continue, post-petition, to send the Debtors deposits for upcoming cruises that have been cancelled. The Company estimates that such post-petition deposits would not exceed $500,000.  Further, the Company's Approved Budget (as defined in the DIP Motion)[9] does not contemplate any future

---

[8]    AQV cruise passengers can submit their claims via the electronic customer claim form available on: aqvrefunds.com.

[9]    The Debtors seek approval of the proposed DIP Facilities pursuant to the *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Senior Secured Postpetition Financing and (B) Use Cash Collateral, (II) Granting Adequate Protection to Certain Prepetition Secured Parties, (III) Scheduling a Final Hearing, and (IV) Granting Related Relief* (the "DIP Motion").

deposits, such that the prompt return of post-petition deposits will not impact the Debtors' compliance with their obligations under the DIP Facilities (as defined below).

20.     Following months of extensive, arm's-length negotiations between the Company's key stakeholders, on February 14, 2024, these negotiations resulted in a deal in principle amongst the Ad Hoc Group and certain other key prepetition stakeholders on the key terms of a restructuring transaction.  In light of the February 15, 2024 maturity date on the Incremental Superpriority Facility, the Company immediately amended the Incremental Superpriority Credit Agreement on February 15, 2024 in order to extend the maturity of the Incremental Superpriority Facility in an effort to avoid a default and obtain sufficient time to enter into a restructuring support agreement with its key stakeholders.

21.     Ultimately, on February 21, 2024, the Debtors, the Ad Hoc Group, and certain other key prepetition stakeholders entered into that certain restructuring support agreement (the "Restructuring Support Agreement"), which contemplates an in-court restructuring of the Hornblower entities through a prearranged chapter 11 plan, the equitization of the Company's existing First Lien Term Facility, the sale or wind-down of the AQV business through the AQV Sale Transaction, as well as the separation of the Journey Beyond business from the Debtors.  As such, contemporaneously with the filing of this Declaration, the Debtors have filed the AQV Sale Motion[10] to seek approval of the AQV bidding procedures, which supplements the prepetition

---

[10]     The Debtors seek approval of the proposed AQV Sale Transaction pursuant to the *Debtors' Emergency Motion for Entry of an Order (A) Approving (I) Bidding Procedures for the Sale of the AQV Debtors' Assets, (II) Procedures Regarding Bid Protections, (III) The Scheduling of Certain Dates with Respect Thereto, (IV) the Form and Manner of Notice Thereof, (V) Contract Assumption, Assignment, and Rejection Procedures, and (VI) Certain Procedures to Otherwise Dispose of the AQV Assets, and (B) Authorizing the Debtors to Enter into Agreements for the Sale of Their Assets Free and Clear of All Liens, Claims, And Encumbrances* (the "AQV Sale Motion") Docket No. 21.

auction process, and authorization for the AQV Sale Transaction pursuant to section 363 of the Bankruptcy Code.

22.    To facilitate the restructuring efforts of the Debtors, the Ad Hoc Group, the Sponsor, and the Senior DIP Lenders (as defined in the DIP Motion) have committed to provide the Debtors with the necessary financing to implement the Debtors' restructuring through these Chapter 11 Cases and ensure a successful go-forward path for the Debtors' businesses.  Pursuant to the DIP Motion filed contemporaneously herewith, the Debtors seek approval of two debtor-in-possession senior secured term loan financing facilities: (1) a senior facility in an aggregate principal amount of $300 million, which provides for the refinancing of the Prepetition Superpriority Loans and a further commitment to provide a new $50 million senior secured first lien revolving credit facility to provide working capital for the Debtors upon emergence from bankruptcy (the "Senior DIP Facility"), which will be provided by Deutsche Bank AG New York Branch; and (2) a junior facility in an aggregate principal amount of $285[11] million, which consists of up to $121 million in DIP Loans to provide incremental liquidity to fund the Chapter 11 Cases, and $164 million in DIP Loans to refinance previously-funded emergency prepetition loans under the Incremental Superpriority Facility (the "Junior DIP Facility" and, together with the Senior DIP Facility, the "DIP Facilities", and the loans incurred under the DIP Facilities, the "DIP Loans"). The proceeds of the Senior DIP Facility will be used to refinance all amounts owed under the prepetition Superpriority Facility and related fees. The funding provided by the Senior DIP Facility provides for a net liquidity benefit of approximately $13 million after refinancing the Superpriority Facility and related fees.

---

[11]    Excludes accrued financing costs which are payable-in-kind at emergence.

23.     The DIP Facilities will provide critically needed liquidity to support the Debtors'
continued operations, provide confidence to parties-in-interest that the Debtors have sufficient
capital to support post-petition obligations and implement their restructuring, as well as fulfill
commitments to the Debtors' valued team members, customers, and suppliers.[12]  Without access
to the DIP Facilities, the Company has limited liquidity to pay employee wages or operate at any
level.  The Debtors require immediate access to the DIP Facilities to continue operations and avoid
a value destructive liquidation.  The use of the proceeds of the DIP Facilities is governed by the
Approved Budget (as defined in the DIP Motion).  It is my view, in consultation with the
Company's advisors, that the Approved Budget is sufficient and provides the Debtors with the
necessary liquidity, as well as flexibility, to implement the restructuring as contemplated under the
Restructuring Support Agreement.

24.     In conjunction with the commencement of these Chapter 11 Cases, the Debtors,
through Hornblower Group Inc., as the proposed Foreign Representative, are simultaneously
commencing Canadian recognition proceedings pursuant to Part IV of the *Companies' Creditors
Arrangement Act* ("CCAA") seeking a stay of proceedings in respect of the Debtors' Canadian
subsidiaries, Hornblower Cruises and Events Canada Ltd., Hornblower Canada Co., and
Hornblower Canada Entertainment Limited (collectively, the "Canadian Debtors").  The Debtors'
U.K. entities, namely, Hornblower UK Holdings Limited, City Cruises Limited, York River Boat
Cruises Limited, Yardarm Club (The) Limited, Cruising Excursions Transport Limited, and

---

[12]     For more facts in support of the DIP Facilities, *See Declaration of Matthew Scheidemann in Support of Debtors'
Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Senior
Secured Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Provide Superpriority
Administrative Expense Claims, (II) Granting Adequate Protection to Certain Prepetition Secured Parties, (III)
Scheduling a Final Hearing, and (IV) Granting Related Relief* (the "Scheidemann Declaration").

Cruising Excursions Limited (the "UK Debtors") have also commenced Chapter 11 Cases, but at this time are not seeking to commence ancillary or parallel proceedings in the United Kingdom. The recognition proceedings by the Canadian Debtors are particularly necessary to protect and preserve the value of the enterprise, as the Company's Canadian operations are key revenue generators for the Company and an essential part of any reorganized business.

25. Importantly, the Company's Australian-based Journey Beyond business is not part of these Chapter 11 Cases, and the Debtors expect that the Journey Beyond operations will continue unaffected by the commencement or continuation of these cases.

26. To familiarize the Court with the Debtors, their businesses, the circumstances leading to these Chapter 11 Cases, and the relief the Debtors are seeking in the First Day Motions, I have organized the rest of this Declaration as follows:

- **Part I** provides a general overview of the Company's business and operations;

- **Part II** provides an overview of the Company's prepetition capital structure;

- **Part III** describes the events leading to the filing of the Chapter 11 Cases and the Company's prepetition restructuring efforts; and

- **Part IV** summarizes the relief requested in the First Day Motions.

I.     <u>**Overview of the Company's Business and Operations**</u>

27. With a brand heritage that dates back nearly 100 years, the Company, with its headquarters in San Francisco, California, is a global leader in world-class experiences, tourism and transportation that serves more than 30 million guests annually. The Debtors' and their non-Debtor affiliates' business spans 111 countries and territories, and 125 U.S. cities, with offerings including water-based experiences, land-based experiences, overnight cruise experiences, extended rail journeys, ferry and transportation services, and marine consulting and services.



28.     Prior to the Petition Date, the Company comprised three main divisions, namely, the City Experiences, American Queen Voyages, and Journey Beyond.



29.     **City Experiences**.  City Experiences represents the Company's portfolio of water and land-based experiences which includes sub-brands (1) City Cruises, (2) Ferry and Transportation Services, and (3) Walks.

30.     *City Cruises*.  City Cruises operates public dining and sightseeing cruises and private charters for corporate events, birthday parties, weddings, and other special occasions across 22 destinations in the U.S. as well as abroad in Canada and the U.K., both of which contribute meaningful revenue for the Company.  City Cruises also operates cruises on behalf of the National Park Service and the Niagara Parks Commission.  The Company currently holds exclusive long-

term concession contracts to provide ferry transportation services to the Statue of Liberty National Monument and Ellis Island Immigration Museum in New York City, Alcatraz Island in San Francisco, California, and Niagara Falls in Ontario, Canada, welcoming over 8 million visitors annually.



31.     Given the Company's impressive history of best-in-class service and safety, strong competitive positioning, ancillary service offering, and track record of winning concession contracts, as evidenced by the recent renewal of Alcatraz in 2019 and New York City Ferry in 2023, the Company was most recently awarded a 10-year renewal of the Statute of Liberty contract through February 2034.  The Company is also the exclusive provider of cruise services on the Canadian side of Niagara Falls through 2043—making the operations of the Canadian Debtors an essential aspect of this restructuring.  These contracts provide steady demand and predictable financial profiles as well as long-term, contracted revenue visibility.

32.     With a fleet of over 20 vessels in the U.K., City Cruises is recognized as the U.K.'s largest tour boat operator, carrying 3 million guests annually with offerings including dining, sightseeing and charter cruises, alongside speedboat rides, as well as cruise experiences on the River Ouse in York, River Thames in London, and Poole on the south coast.  City Cruises is one

of the fastest growing cruise operations in the U.K. and remains an essential part of the Company's future business.



33.     ***Ferry & Transportation Services***.  The Company is the largest private operator of high-speed passenger and vehicle ferries in the U.S., including marine transportation, vessel management and maintenance services offering specialized knowledge and expertise required to transport passengers, vehicles, and other cargo safely across inland and coastal waterways.  Given its extensive history, the Company has an unrivaled knowledge base that serves as a key competitive advantage during RFP processes.  Current ferry routes include: New York City Ferry, connecting Manhattan to the outer boroughs; Puerto Rico Ferry, with lines between Cataño and San Juan and between Ceiba, Vieques, and Culebra; Cross Bay Ferry, which connects the St. Pete downtown waterfront with Tampa's downtown waterfront in Florida; Gee's Bend Ferry, which runs between Camden and Gee's Bend in Boykin, Alabama; Mobile Bay Ferry, connecting Dauphin Island and Mobile Point in Alabama; Oklahoma River Cruises, a sightseeing tour on the Oklahoma River in Oklahoma City, Oklahoma; Pensacola Bay Cruises, which operates between City of Pensacola, Pensacola Beach, and Fort Pickens in Florida; Pierce County Ferry, a passenger

and vehicle ferry connecting Steilacoom, Ketron, and Anderson Island in Washington State; and Johns River Ferry, connecting Mayport Village and Fort George Island in Jacksonville, Florida.

34.     Amongst others, the Company is the exclusive service provider and operator for New York City Ferry and Puerto Rico Ferry which offers steady demand and predictable financial profiles, long-term, contracted revenue visibility, and diversified geographic exposure.   The Company was recently awarded an extension for the New York City Ferry through 2034, which is a 5-year contract renewal with two optional extensions of 3-years each.   This extension provides strong visibility into future earnings.   The Puerto Rico Ferry contract runs through 2043[13].

35.     Through Seaward Services, Inc., the Company also offers full-service shipping, waterfront logistics and management services specializing in the operation and maintenance of government and commercial vessels, including high-speed craft, range craft, training craft, experimental craft, research vessels, cable-laying vessels, and unmanned surface and sub-surface vessels.

36.     The Company also operates a shipyard in Bridgeport, Connecticut, that provides vessel repair and maintenance, and other services internally as well as to third-party customers.

37.     ***Walks***.  Having hosted over one million guests since 2009, Walks is a global leader in tours and activities and one of the most recent additions to the Company's growing portfolio of land-based experience companies.  Walks' tours and activities include operating sightseeing tours, food tours, and day trips in 18 cities around the world, including Rome, Paris, Barcelona, London, New York City, San Francisco, Dublin, Washington D.C., Amsterdam, Niagara Falls, Pompeii, Milan, Florence, Athens, Venice, Madrid, Chicago, and Boston.  Specializing in small group,

---

[13]     The Puerto Rico Ferry contract includes two phases for a total of 23 years with phase one being three years. The Company recently executed a 5-month extension to phase one that extends the first phase through June 2024.

special access tours, Walks works closely with many of Europe's top attractions and, more recently, with major U.S. attractions such as the Statue of Liberty and Alcatraz. Walks' tours are thoughtfully designed to offer a deeper insight into the culture, food, and history of their destinations. In 2020, Walks began offering virtual tours known as *Tours from Home,* receiving widespread recognition. Additionally, Walks includes Devour Tours, which is a food and drink focused excursion service.

38.     ***Venture Ashore***. The Company offers additional land-based experiences through Venture Ashore, a shore excursion offering to passengers of third-party cruise operators.

39.     ***Anchor***. To support its various businesses, the Company internally developed a reservation and operations platform called Anchor Operating System ("Anchor") with capabilities such as dynamic pricing. Anchor is also offered to third-party customers and has the potential to create a substantial software-as-a-service revenue stream.

40.     **American Queen Voyages**. American Queen Voyages[14] operated the overnight cruise division of the Company and was a leading provider of luxury river and lake cruises across prominent United States rivers. American Queen Voyages operated a seven-vessel fleet. Operations within this division included (a) all-inclusive luxury voyages along the Ohio, Mississippi, Tennessee, Illinois, Cumberland, Columbia and Snake river, (b) all-inclusive luxury cruising along the Great Lakes, Canada and New England, Southeast U.S., Alaska, and Mexico and the Yucatan Peninsula, and (c) all-inclusive luxury expedition experience in Alaska and Central America, as well as ports in between.

---

[14]     Formerly known as American Queen Steamboat Company. The American Queen Voyages merged American Queen Steamboat Company and Victory Cruise Lines in September 2021.



41.    **Journey Beyond**.  Journey Beyond, an Australian travel group headquartered in Adelaide, South Australia, was formed in 2016 and is one of the Company's most recent acquisitions to its growing portfolio.  The entities comprising the Company's Journey Beyond operations are not Debtors in these Chapter 11 Cases, and the Journey Beyond business should not be affected by the Chapter 11 Cases and such operations will continue in the ordinary course. Additionally, the Journey Beyond business has its own capital structure, which will not be impacted by the Debtors' filings.

42.    Journey Beyond is Australia's largest and most diversified experiential travel group operating in 60 destinations Australia-wide, with 13 Australian brands and experiences in four core divisions, including rail expeditions, touring and lodges, marine and aviation, and attractions and dining.  Journey Beyond provides unparalleled access to remote locations, helping achieve the Company's mission of creating amazing experiences through its various tourism brands including: iconic trains, The Ghan; Indian Pacific, Great Southern, and The Overland; premium small-group outback operator, Outback Spirit; eco-luxe lodge, Sal Salis Ningaloo Reef; aquatic adventures, Cruise Whitsundays, Rottnest Express, Horizontal Falls Seaplane Adventures, Darwin Harbour

Cruises, and Journey Beyond Cruise Sydney; and its tallest members, Melbourne Skydeck and Eureka 89.

## II.      **The Debtors' Prepetition Capital Structure**

43.     The organizational chart attached hereto as **Exhibit B** depicts the Debtors' current corporate structure.  As of the Petition Date, the Debtors have approximately $1.2 billion in total funded-debt obligations, consisting of approximately $148.5[15] million under the Incremental Superpriority Facility, $282.9 million under the Superpriority Facility, $641.8 million under the First Lien Term Facility, $26.4 million under the Revolver Term-Out Facility and $53.7 million under the Revolver Facility.

44.     The following table[16] summarizes the Debtors' outstanding third-party funded-debt obligations as of the Petition Date:

| Funded Debt | Maturity | Approximate Outstanding Principal Amount as of the Petition Date |
|---|---|---|
| **Secured Debt** | | |
| Incremental Superpriority Facility | February 2024 | $148.5 million |
| Superpriority Facility | November 2025 | $282.9 million |
| First Lien Term Facility | April 2025 | $641.8 million |
| Revolver Term-Out Facility | April 2024 | $53.7 million |
| Revolver Facility | April 2024 | $26.4 million |
| | **Total Funded Debt** | $1.153 billion |

---

[15]      Such amount excludes any interest and fees which will accrue to the principal balance.

[16]      The following tables exclude intercompany claims, including, among others, the JBH-AQV Intercompany Note, the JBIH-HB TopCo Intercompany Note, and the JB OpCo HB Term Note.

45.     The following table summarizes certain outstanding funded-debt obligations of the

Debtors' non-Debtor affiliates as of the Petition Date:

| Secured Debt | | |
|---|---|---|
| JB OpCo Term Facility[17] | February 2025 | $262.6 million |
| JBIH Term Facility | November 2024 | $175.1 million |
| | **Total Funded Debt** | $437.6 million |

A.  **Secured Debt**

   i.  **Superpriority Facility**

46.     Hornblower Sub, LLC and American Queen Sub, LLC, as borrowers, Hornblower

Holdco, LLC and American Queen Holdco, LLC, as holdings, Alter Domus (US) LLC, as

administrative agent and collateral agent (the "Superpriority Agent"), and the guarantors and

lenders party thereto are parties to that certain *Superpriority Credit Agreement*, dated as of

November 10, 2020 (as amended pursuant to that certain *Amendment No. 1* dated as of December

16, 2020, *Amendment No. 2* dated as of March 18, 2021, *Incremental Assumption and Amendment*

*Agreement No. 3* dated as of March 26, 2021, *Incremental Assumption and Amendment Agreement*

*No. 4* dated as of November 3, 2022, *Amendment Agreement No. 5* dated as of November 17, 2023,

and *Amendment Agreement No. 6* dated as of December 28, 2023, and as may be further amended,

restated, supplemented, waived, or otherwise modified from time to time, the "Superpriority Credit

Agreement" and, collectively with all certificates, agreements, intercreditor agreements, collateral

documents, mortgages, vessel mortgages, security agreements, documents, and instruments

---

[17]     Converted from AUD to USD at 0.6483 spot rate.

(including any amendments, restatements, supplements, or modifications of any of the foregoing) related to or executed in connection with the Superpriority Credit Agreement, the "Superpriority Credit Documents"). The Superpriority Credit Documents provide for a $277.0 million term loan facility (the "Superpriority Facility").

47.     The maturity date on the Superpriority Facility is November 10, 2025, with a springing maturity to the date 30 days prior to the latest maturity date applicable to the term loans under the First Lien Term Facility, if the First Lien Credit Documents remain in effect on such date. The obligations under the Superpriority Credit Documents are secured by liens on, and security interest in, substantially all assets of the Debtors, subject to certain exceptions (the "Prepetition Collateral" and, such liens and security interests on the Prepetition Collateral, the "Superpriority Liens"). As of the Petition Date, approximately $282.9 million in principal amount is outstanding under the Superpriority Facility.

**ii.     First Lien Term Facility and Revolver Term-Out Facility**

48.     Hornblower Sub, LLC and American Queen Sub, LLC, as borrowers, Hornblower Holdco, LLC and American Queen Holdco, LLC, as holdings, and GLAS Trust Company LLC, as administrative agent and collateral agent (the "First Lien Agent"), and the guarantors and lenders party thereto are parties to that certain *First Lien Credit Agreement*, dated as of April 27, 2018 (as amended pursuant to that certain *Incremental Assumption and Amendment Agreement* dated as of January 2, 2019, *Incremental Assumption and Amendment Agreement No. 2*, dated as of April 18, 2019, *Incremental Assumption and Amendment Agreement No. 3*, dated as of March 3, 2020, *Amendment Agreement No. 4*, dated as of July 21, 2020, *Amendment Agreement No. 5*, dated as of November 10, 2020, *Amendment Agreement No. 6*, dated as of December 16, 2020, *Amendment Agreement No. 7*, dated as of March 18, 2021, *Amendment Agreement No. 8*, dated as

of November 3, 2022, *Amendment Agreement No. 9*, dated as of November 17, 2023, *Resignation, Appointment and Acceptance an Amendment Agreement No. 10*, dated as of December 15, 2023, *Amendment Agreement No. 11*, dated as of December 28, 2023, *Amendment Agreement No. 12*, dated as of February 15, 2024, and as may be further amended, restated, supplemented, waived, or otherwise modified from time to time, the "First Lien Credit Agreement" and, collectively with all certificates, agreements, intercreditor agreements, collateral documents, mortgages, vessel mortgages, security agreements, documents, and instruments (including any amendments, restatements, supplements, or modifications of any of the foregoing) related to or executed in connection with the First Lien Credit Agreement, the "First Lien Credit Documents").  The First Lien Credit Documents provide for a $675.0 million term loan facility (the "First Lien Term Facility") and $53.7 million converted term loan facility (the "Revolver Term-Out Facility").

49.     The maturity date on the First Lien Term Facility is April 27, 2025 and the maturity date on the Revolver Term-Out Facility is April 29, 2024.  The obligations under the First Lien Credit Documents are secured by liens on, and security interests in, the Prepetition Collateral (such liens and security interests, the "1L Term Loan Liens").  The 1L Term Loan Liens on the Prepetition Collateral other than the Pari Passu Collateral (as defined in the First Lien Intercreditor Agreement) are subordinate and junior in priority to the Superpriority Liens on such Prepetition Collateral. The 1L Term Loan Liens on the Pari Passu Collateral (as defined in the First Lien Intercreditor Agreement) are pari passu in priority to the Superpriority Liens on the Pari Passu Collateral.  As of the Petition Date, approximately $641.8 million in principal amount is outstanding under the First Lien Term Facility and $53.7 million in principal amount is outstanding under the Revolver Term-Out Facility.

### iii.    Revolver Facility

50.    Hornblower Sub, LLC and American Queen Sub, LLC, as borrowers, Hornblower Holdco, LLC and American Queen Holdco, LLC, as holdings, and UBS AG, Stamford Branch, as administrative agent and collateral agent (the "Revolving Agent"), are parties to that certain *Credit Agreement*, dated as of May 13, 2020, as amended pursuant to that certain *Amendment Agreement No. 1*, dated as of November 10, 2020, *Amendment Agreement No. 2*, dated as of December 16, 2020, *Amendment Agreement No. 3*, dated as of March 18, 2021, *Amendment Agreement No. 4*, dated as of November 12, 2021, *Amendment Agreement No. 5*, dated as of November 3, 2022, *Amendment Agreement No. 6*, dated as of October 19, 2023,  *Amendment Agreement No. 7*, dated as of November 17, 2023, and *Amendment Agreement No. 8*, dated as of December 28, 2023, and as may be further amended, restated, supplemented, waived, or otherwise modified from time to time (the "Revolving Credit Agreement" and, collectively with all certificates, agreements, intercreditor agreements, collateral documents, mortgages, vessel mortgages, security agreements, documents, letters of credit and instruments (including any amendments, restatements, supplements, or modifications of any of the foregoing) related to or executed in connection with the Superpriority Credit Agreement, the Revolving Credit Agreement, the "Revolving Credit Documents").  The Revolving Credit Documents provide for a $22.5 million converted termed out revolving credit facility (the "Revolver Facility").

51.    The Revolver Facility matures on April 29, 2024.  The obligations under the Revolving Credit Documents are secured by liens on, and security interests in, the Prepetition Collateral, which rank *pari passu* with the 1L Term Loan Liens; provided, that the liens granted under the Revolver Facility do not incumber the assets of Debtor Journey Beyond Holdings, LLC. As additional credit support for the Revolver Facility, Crestview previously caused a $28 million

letter of credit to be issued by Bank of America, N.A. for the benefit of the Revolving Agent.  As of the Petition Date, Crestview now owns 100% of the outstanding loans under the Revolver Facility and the letter of credit is no longer pledged as collateral for the Revolver Facility.  As of the Petition Date, approximately $26.4 million in principal amount under the Revolver Facility is outstanding.

### iv.    Incremental Superiority Facility

52.    Hornblower Holdco, LLC and American Queen Holdco, LLC, as parents, Hornblower Sub, LLC and American Queen Sub, LLC, as borrowers, Journey Beyond Holdings, LLC, Alter Domus (US) LLC, as administrative agent, collateral agent, and incremental term loan representative (the "Incremental Superpriority Agent"), and the guarantors and lenders party thereto are parties to that certain *Incremental Superpriority Credit Agreement*, dated November 17, 2023 (as amended pursuant to that certain *Incremental Assumption and Amendment Agreement No. 1,* dated as of December 27, 2023, *Amendment Agreement No. 2,* dated as of February 15, 2024, and as further amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "Incremental Superpriority Credit Agreement" and, collectively with all certificates, agreements, intercreditor agreements, collateral documents, mortgages, vessel mortgages, security agreements, documents, and instruments (including any amendments, restatements, supplements, or modifications of any of the foregoing) related to or executed in connection with the Incremental Superpriority Credit Agreement, the "Incremental Superpriority Credit Documents" and collectively with the Superpriority Credit Documents, First Lien Credit Documents, and the Revolving Credit Documents, the "Prepetition Secured Debt Documents"). The Incremental Superiority Credit Documents provide for a $170.0 million delayed draw term loan facility (the "Incremental Superiority Facility").

53.     The maturity date on the Incremental Superpriority Facility is February 20, 2024. The obligations under the Incremental Superpriority Credit Agreement are secured by liens on, and security interests in, the Prepetition Collateral (such liens and security interests on the Prepetition Collateral, the "Incremental Superpriority Liens").   The obligations under the Incremental Superpriority Credit Agreement are subordinated in right of payment to the obligations under the Superpriority Credit Agreement.   As of the Petition Date, approximately $148.5 million[18] in principal amount is outstanding under the Incremental Superiority Facility.

### v.   Intercreditor Agreements

54.     Alter Domus (US) LLC, as Superpriority Agent and incremental superpriority loan representative, the First Lien Agent and the Revolving Agent, together with each of the Debtors party thereto, entered into that certain *Amended and Restated Superpriority Intercreditor Agreement*, dated as of November 17, 2023 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "Superpriority Intercreditor Agreement").   The Superpriority Intercreditor Agreement sets forth the agreements between the Superpriority Agent, the Incremental Superpriority Agent, the First Lien Agent, and the Revolving Agent with respect to the priority of liens on, and security interests in, the portion of the Prepetition Collateral which does not constitute Pari Passu Collateral (as defined in the Superpriority Intercreditor Agreement), and the respective rights and remedies of the various lenders, among other things.

55.     The Superpriority Agent, the First Lien Agent, and the Revolving Agent, together with each of the Debtors party thereto, entered into that certain *Amended and Restated First*

---

[18]     Such amount excludes any interest and fees which will accrue to the principal balance.

*Lien/First Lien Intercreditor Agreement*, dated as of November 12, 2020 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "<u>First Lien Intercreditor Agreement</u>").   The First Lien Intercreditor Agreement sets forth the agreements between the Incremental Superpriority Agent, the Superpriority Agent, the First Lien Agent, and the Revolving Agent with respect to the priority of liens on, and security interests in, the Prepetition Collateral, and the respective rights and remedies of the various lenders, among other things. Pursuant to the First Lien Intercreditor Agreement, the parties thereto agreed that (a) any lien on the Common Collateral (as defined in the First Lien Intercreditor Agreement) securing obligations under the First Lien Credit Agreement or obligations under the Revolving Credit Agreement shall be *pari passu* and (b) any lien on the Pari Passu Collateral (as defined in the First Lien Intercreditor Agreement) securing obligations under the First Lien Credit Agreement, Revolving Credit Agreement, Incremental Superpriority Credit Agreement or Superpriority Credit Agreement shall be *pari passu*.

      **B.**   **<u>Journey Beyond Debt</u>**

     56.    On February 15, 2022, HB AcquisitionCo Pty Ltd, an Australian proprietary limited company ("<u>JB OpCo</u>"), and non-Debtor subsidiary of Hornblower Holdings LLC, as borrower, HB HoldCo Pty Ltd, an Australian proprietary limited company ("<u>HB HoldCo</u>"), as holdings, and certain guarantors entered into a syndicated facility agreement with Global Loan Agency Services Australia Pty Ltd, as administrative agent, and Global Loan Agency Services Australia Nominees Pty Limited, as collateral agent (as amended, restated, supplemented, waived, or otherwise

modified from time to time, the "JB OpCo Credit Agreement").  The JB OpCo Credit Agreement provides for a $262.6[19] million term loan facility (the "JB OpCo Facility").

57.    None of the Debtors' assets are pledged as collateral under the JB OpCo Facility, however, on February 15, 2022, Debtor Hornblower Holdings LP provided a limited guarantee under that certain *Parent Guarantee and Contribution Agreement* between Hornblower Holdings LP, as parent, HB TopCo Pty Ltd. ("HB TopCo"), as intermediate parent, and the parties to the JB OpCo Credit Agreement (each in their respective capacities thereunder) (as amended, restated, supplemented, waived, or otherwise modified from time to time, the "Parent Guarantee").  The Parent Guarantee provides for a limited guarantee by Hornblower Holdings LP of the excess, if any, of (i) $56.5 million over (ii) (A) the amount of cash contributed by Hornblower Holdings LP to HB TopCo at any time after the date of the Parent Guarantee, minus (B) any payment made by Hornblower Holdings LP in respect of the obligations under the JB OpCo Credit Agreement.  As of the Petition Date, approximately $262.6[20] million in principal amount is outstanding under the JB OpCo Facility.

58.    On November 18, 2022, Journey Beyond Intermediate Holdings, LLC ("JBIH") (a non-Debtor indirect subsidiary of Hornblower Holdings LLC ("TopCo")), as borrower, and Journey Beyond Holdings, Ltd. ("JBHL"), as holdings, entered into a revolving credit agreement with UBS AG, Stamford Branch, as administrative agent and collateral agent (as amended on February 13, 2023 by that certain *Amendment Agreement No. 1*, on September 28, 2023 by that certain *Amendment Agreement No. 2*, and as may be further amended, restated, supplemented, waived, or otherwise modified from time to time, the "JBIH Credit Agreement").  The JBIH Credit

---

[19]    Converted from AUD to USD at 0.6483 spot rate.
[20]    Converted from AUD to USD at 0.6483 spot rate.

Agreement provides for a $200 million loan facility (the "<u>JBIH Term Facility</u>").  Journey Beyond Holdings, Ltd. and Hornblower Group, LLC guarantee the obligations under the JBIH Credit Agreement, and the JBIH Term Facility is secured by substantially all of the assets of JBHL and JBIH, including JBIH's interest in the JBIH-HB TopCo Intercompany Note (as defined below).

59.     None of the Debtors provide credit support for the JBIH Credit Agreement, except that Debtor Hornblower Group Holdco, LLC has pledged the equity interests of its wholly-owned subsidiary, Debtor Hornblower Group, LLC as collateral for the obligations under the JBIH Credit Agreement and Debtor Hornblower Group, LLC guarantees the obligations under the JBIH Credit Agreement.   As of the Petition Date, approximately $175.1 million in principal amount is outstanding under the JBIH Term Facility.

### C.  <u>Intercompany Debt</u>

60.     Certain proceeds of borrowings under the JBIH Term Facility have been used to, among other things, fund unsecured intercompany loans to HB TopCo pursuant to an amended and restated subordinated intercompany note (the "<u>JBIH-HB TopCo Intercompany Note</u>").  The JBIH-HB TopCo Intercompany Note is an unsecured obligation of HB TopCo, matures on January 31, 2029, bears interest at a rate of 17.0%, which is payable-in-kind and, in the event of a repayment prior to September 28, 2026, would be subject to payment of the Applicable Make-Whole Amount (as defined in the JBIH-JB TopCo Intercompany Note).  As of the Petition Date, approximately $132.7 million in principal amount was outstanding under the JBIH-HB TopCo Intercompany Note.[21]

---

[21]     Excludes accrued interest paid-in-kind.

61.     Through a series of equity contributions from HB TopCo and HB HoldCo with the proceeds of the JBIH-HB TopCo Intercompany Note, JB OpCo provided a loan of $100.8 million to Journey Beyond Holdings, LLC ("JBH") in the form of an unsecured note.  JBH in turn provided a loan on an unsecured basis to American Queen Sub, LLC in the form of an unsecured note (as amended, restated, supplemented, waived, or otherwise modified from time to time, the "JBH-AQV Intercompany Note").  As of the Petition Date, approximately $100.8[22] million in principal amount is outstanding under the JBH AQV Intercompany Note.

62.     Certain proceeds of borrowings under the JBIH Term Facility were also used on November 18, 2022 to fund an unsecured intercompany loan in an aggregate principal amount of $10.0 million from JBIH to American Queen Sub, LLC on a subordinated unsecured basis.

63.     Further, on January 17, 2023, Hornblower Sub, LLC issued a $3.40 million unsecured term promissory note to JB OpCo (the "JB OpCo HB Term Note").  As of the Petition Date, approximately $3.40 million in principal amount is outstanding under the JB OpCo HB Term Note.

### D.  **Equity Interests**

64.     Each of the Debtors, other than Hornblower Holdings LLC, Hornblower Holdings LP, Hornblower HoldCo, LLC, and American Queen Holdings, LLC is 100% owned by its direct parent.

65.     Hornblower Holdings LLC is the general partner of Hornblower Holdings LP.  The Sponsor holds, in the aggregate, approximately 81.63% of the equity interests in Hornblower Holdings LLC, with the remainder being held by members of the Debtors' current management

---

[22]     Excludes accrued interest paid-in-kind.

team and former owners of the Company prior to the Sponsor's acquisition (the "Rollover Holders").

66.     Hornblower Holdings LP is the ultimate parent of each of the Debtors and its partnership interests are privately held.  The Sponsor holds, in the aggregate, approximately 78% of the common and preferred limited partnership interests in Hornblower Holdings LP, and the remaining interests are held by members of the Debtors' current management team and the Rollover Holders.

## III.    Events Leading to the Filing of these Chapter 11 Cases and the Company's Prepetition Restructuring Efforts

### A.    Crestview's Initial Acquisition of the Company

67.     Following years of growth and a number of acquisitions, in early 2018, the Company was acquired by the Sponsor.  On April 27, 2018, the Debtors entered into the First Lien Credit Agreement, which provided for a $330 million term loan facility and a $60 million revolving credit facility.  Since that time, the Company has amended the First Lien Credit Agreement on multiple occasions to provide for incremental term loans to finance growth acquisitions, including certain vessels and related assets, and other businesses.[23]

---

[23]     The First Lien Credit Agreement was amended on January 2, 2019 to provide for $42.5 million in incremental term loans to finance the acquisition of certain vessels and related assets, including the Victory I and Victory II vessels.  The First Lien Credit Agreement was further amended on April 18, 2019 to provide for $227.5 million in incremental term loans that was used together with a $59.3 million equity contribution from the Sponsor to finance the acquisition of Entertainment Cruises Inc. as well as $92.5 million in refinancing term loans which were used to refinance the incremental term loans incurred on January 2, 2019 and the then outstanding revolving loans under the First Lien Credit Agreement. On March 3, 2020, the First Lien Credit Agreement was further amended to provide for $25 million in incremental term loans to be used for general corporate purposes.

**B.** **Extended Pandemic Impacts, 2020 Unrestricted Subsidiary Financing, and Sponsor Equity Contribution**

68. As was the case throughout the hospitality industry, the COVID-19 pandemic and related shutdown orders throughout the world had a substantial and negative impact on the Debtors' operations. The Company was forced to cease operations virtually overnight due to the pandemic. Comparable revenues declined from $690 million in 2019 to $175 million in 2020—a decline of over 75 percent. At the same time, the Company's losses in 2020 alone exceeded $287 million on a net income basis.

69. To address these liquidity concerns, the Debtors pursued a series of transactions to bolster liquidity during the shutdowns and provide the Company the means to survive and continue operating at a time when there was great uncertainty regarding the future of the Company's business and the Company's industry at large. Set forth below is a summary of the multiple liquidity enhancing transactions the Company implemented to stay afloat through the hardships caused by the pandemic. The transactions described below resulted in the Company's current capital structure.

70. In the very early days of the COVID-19 pandemic, on May 13, 2020, the Company first sought to supplement its liquidity by entering into the Revolving Credit Documents, which provided a $45 million revolving credit facility. A few months later, in August 2020, the Sponsor provided a $30 million equity contribution to further bolster the Company's liquidity. While these capital injections provided much needed relief, by the fall of 2020, with COVID-19 cases again surging around the world, the Company's financial and operational underperformance continued, and it became clear that a more significant capital infusion was required.

31

71.     In response to these continued and unprecedented circumstances, on October 2, 2020, the Debtors pursued a "drop-down" financing transaction to raise additional liquidity. Specifically, the Company contributed certain entities with boat tour operations in Niagara Falls, Canada, to Hornblower Freedom, LLC, a newly created unrestricted subsidiary under the First Lien Credit Agreement and the Revolving Credit Agreement (the "UnSub Borrower"), which entered into a $90 million term loan credit agreement (the "UnSub Credit Agreement"), and the UnSub Borrower distributed $60 million of the loan proceeds to Hornblower Group, Inc. to bolster the Company's available liquidity.

**C.  The Superpriority Facility and Refinancing of the Unrestricted Subsidiary Financing**

72.     Immediately after entry into the UnSub Credit Agreement, the Company engaged in extensive negotiations with certain lenders under the First Lien Credit Documents regarding the terms of an alternative financing structure that would refinance the UnSub Credit Agreement and bring the Niagara Falls assets back into the credit group.  After weeks of arm's length negotiations, the Company entered into the Superpriority Credit Agreement on November 10, 2020, which provided for a new $190 million super-senior term loan.  The proceeds of the Superpriority Facility were used to repay all amounts due under the UnSub Credit Agreement and a portion of the then-outstanding revolving loans under the First Lien Credit Agreement, as well as to provide incremental liquidity to the Company.  The modifications to the applicable Prepetition Secured Debt Documents in connection with the Debtors' incurrence of the Superpriority Facility also brought the Niagara Falls collateral that previously secured the obligations under the UnSub Credit Agreement back within the Prepetition Collateral securing the obligations under the applicable Prepetition Secured Debt Documents.

73.     In August and October 2021, the Company received grants under the Coronavirus Economic Relief for Transportation Services program for a total of $114.7 million  to support payroll and other operational expenses of the Company.

**D.  Journey Beyond Acquisition and Upsizing the Superpriority Facility**

74.     In February 2022, as tourism activity started to show signs of material rebound, the Company completed the acquisition of Journey Beyond, a growing Australian-based experiential travel operator.  The Journey Beyond acquisition was a significant milestone in the Company's history and growth trajectory, and it was facilitated through a substantial $191.9[24] million new money equity contribution to the Company by the Sponsor.  Importantly, the Journey Beyond acquisition was structured to exist as an affiliated sister company to the Hornblower silo, with its own separate capital structure.

75.     The Company expected that the original Superpriority Facility would provide sufficient liquidity, together with an anticipated rebound in tourism and travel related revenue, to allow the Hornblower silo to return to its pre-pandemic financial performance.  Unfortunately, while the Company's revenue rebounded modestly in 2021, it remained well short of achieving its pre-pandemic profitability, particularly within the American Queen overnight cruise business, resulting in continuing losses.  As the Company's liquidity pressures continued through mid-2022, the Company approached its lenders about the potential for an additional upsize of the Superpriority Facility.  After months of good faith negotiations, the Company and its lenders agreed on the terms for a $62 million further upsize of the Superpriority Facility.  In connection with this incremental financing, the Sponsor agreed to also contribute $43 million of incremental

---

[24] Converted from AUD to USD at 0.7255 spot rate.

liquidity (largely in the form of equity contributions into the Hornblower silo).  In addition, Journey Beyond Holdings, LLC, an indirect holding company of the Journey Beyond business, provided a secured guaranty of both the Superpriority and 1L Term Loan Facilities.

### E.  The Precipitous Rise in Interest Expense

76.     Since late 2021, in an effort to curb inflation, central banks around the world have continuously raised interest rates.  Policymakers in advanced economies have raised rates by approximately 400 basis points on average.[25]  In the U.S., the Federal Reserve raised its benchmark short-term rate 11 times since March 2022, reaching 5.5 percent in July 2023, its highest level since 2001.[26]

77.     The rapid rise in interest rates, in combination with the inability to reach pre-pandemic operational levels, have made servicing the Company's funded debt obligations significantly more challenging.  Specifically, between 2021 and 2023, the Company's cost of indebtedness rose by 350 basis points from 6.5% to 10%.  Consequently, the annualized interest expense on the Debtors' funded debt facilities, all of which are variable interest rate facilities, rose from approximately $62 million in 2021 to $115 million in 2023.  Such significant interest rate increases resulted in an excess of $53 million of annual interest expense which materially depleted the Debtors' liquidity.

---

[25]     *See* Tobias Adrian, *Higher-for-Longer Interest Rate Environment is Squeezing More Borrowers*, INT'L MONETARY FUND (Oct. 10, 2023), https://www.imf.org/en/Blogs/Articles/2023/10/10/higher-for-longer-interest-rate-environment-is-squeezing-more-borrowers#:~:text=Policymakers%20have%20raised%20rates%20by

[26]     *See* Christopher Rugaber, *Federal Reserve Raises Rates for 11th Time to Fight Inflation but Gives No Clear Sign of Next Move*, A.P. NEWS (July 26, 2023), https://apnews.com/article/federal-reserve-inflation-interest-rateseconomy-jobs-47a78ceb285ac50217ef39e2441112ee; Ben Eisen & Gina Heeb, *Mortgage Rates Hit 7.23%, Highest Since 2001*, W.S.J. (Aug. 24, 2023), https://www.wsj.com/economy/housing/mortgage-rates-hit-7-23-percent-72688ccd.

**F.   The 2023 HB TopCo Capital Raises**

78.    Through the end of 2022 and into early 2023, while most of the Company's businesses returned to pre-COVID profitability, the American Queen Voyages overnight cruise business continued to underperform expectations.  Coupled with the continuing rise in interest rates, the Hornblower silo was faced with substantial liquidity constraints.  In addition, within the Journey Beyond silo, HB TopCo was required to make a $31 million deferred consideration payment to the sellers of the Journey Beyond business, as a component of the original purchase price for the Journey Beyond business.  To help address these funding obligations and further shore up the Company's liquidity, over the course of 2023 JBIH borrowed funds under the JBIH Term Facility and extended a series of intercompany loans to HB TopCo pursuant to the JBIH-HB TopCo Intercompany Note.  Of these amounts, $31.0 million was used to pay the deferred consideration owed by HB TopCo to the sellers under the Journey Beyond acquisition agreement and the remaining $97.75 million was contributed to HB HoldCo and subsequently to JB OpCo as equity.  JB OpCo then loaned the $97.75[27] million it received through these transactions to JBH in the form of an unsecured note, which JBH in turn loaned to American Queen Sub, LLC through the JBH-AQV Intercompany Note.  This series of intercompany transactions provided the Hornblower silo the necessary liquidity to continue operations of the American Queen Voyages business and obtain the aforementioned 10-year renewal of the Statue of Liberty contract as well as the aforementioned 5-year renewal of the New York City Ferry contract.

**G.   Pursuit of All Strategic Alternatives**

79.    On March 30, 2023, the Company engaged UBS Securities LLC ("UBS") to conduct a sale process for AQV.  Over the course of 7 months, UBS contacted approximately 22

---

[27] Excluding original issue discount of approximately $3 million, which is included in total loan amount.

prospective purchasers, 5 of whom entered into non-disclosure agreements, and 1 of whom submitted an indication of interest. Ultimately, no bidder submitted a binding offer that the Company believed was actionable, and therefore the Company terminated that sale process on or about October 26, 2023.

80.     In light of these challenges, in July 2023, the Company commenced a sale process for its Journey Beyond business, with the hope that a successful sale could generate sufficient proceeds in excess of the Journey Beyond silo level debt to fund anticipated liquidity shortfalls within the Hornblower silo. However, in late September 2023 it became apparent that a Journey Beyond sale process was unlikely to generate sufficient excess proceeds to solve Hornblower silo's long-term liquidity needs and that absent a deleveraging transaction, the Debtors' current capital structure was unsustainable.

81.     By late October, with no actionable sale transaction for the Journey Beyond business, continued underperformance of the American Queen Voyages business with no potential purchaser, and significant increases in debt service obligations, the Debtors determined that, notwithstanding their efforts to improve liquidity, further steps were needed to allow the Debtors to successfully address the liquidity constraints and avoid eventual defaults under certain Prepetition Secured Debt Documents.

82.     Accordingly, the Company retained Paul, Weiss, Rifkind, Wharton & Garrison, LLP and Porter Hedges, LLP, as legal advisors, Guggenheim Securities, as investment banker, and A&M, as financial and restructuring advisor, to explore strategic alternatives. Together, the Debtors, with the assistance of their advisors, analyzed the Debtors' capital structure, potential sources of liquidity, and available financial runway in order to address the Debtors' balance sheet and its ability to service its debts as they became due.

83.     The Debtors' management team, with the assistance of its advisors, soon began discussions with the Company's key stakeholders.  In late September 2023, the Company, in consultation with its advisors, commenced negotiations with the Ad Hoc Group Advisors (and, following execution of non-disclosure agreements, certain members of the Ad Hoc Group) around a potential recapitalization transaction and new money financing, and provided extensive diligence materials in furtherance thereof.  The Company simultaneously began contingency planning for a potential chapter 11 filing in the event the Ad Hoc Group was unwilling to fund incremental liquidity or, alternatively, if a consensual out-of-court recapitalization transaction could not be negotiated and executed with the Ad Hoc Group.

84.     Around the same time, in early November 2023, in recognition of the importance of the Company's independent review of their strategic alternatives, the board of directors of Hornblower Holdings LLC (the "Board") established an independent special committee of the Board (the "Special Committee") and appointed Ms. Carol Flaton, Ms. Ceci Kurzman, and Mr. Bill Poston as members of the Special Committee (collectively, the "Independent Directors").  The Special Committee was delegated the exclusive authority to consider, assess, negotiate, and approve (a) any transactions that presented any conflict of interest between the Company and its equity holders and (b) any restructuring transactions.  The Special Committee was also delegated the authority to conduct an independent investigation into potential claims against the Debtors' insiders and equity holders if the Special Committee determines such investigation is appropriate, and whether any claims against insiders or equity holders should be pursued.  The Special Committee met regularly from November 10, 2023 to February 20, 2024 with the Company's management and advisors to evaluate, consider, assess, and direct the

Company with respect to conflict and restructuring matters—conducting approximately 26 Special Committee meetings during this period.

85.     As part of the Debtors' efforts to chart a value-maximizing path forward, the Debtors continued discussions with the Ad Hoc Group with a focus to raise incremental financing to provide the necessary breathing room for the parties to continue their discussions regarding a comprehensive value-maximizing deleveraging transaction.  Ultimately, in late November 2023, the Ad Hoc Group provided the Company with a $60 million incremental superpriority financing pursuant to the Incremental Superpriority Facility to bridge the Company's financing needs through December 31, 2023.  Without the critical funding provided by the Incremental Superpriority Facility, the Company would have been unable to fund its operations beyond mid-November.  Additionally, on November 16, 2023, as contemplated by the Incremental Superpriority Facility, I was appointed as the Debtors' Chief Restructuring Officer.

86.     In December 2023, with negotiations still ongoing between the Company and the Ad Hoc Group regarding a comprehensive restructuring transaction, the Company focused its efforts on extending the near-term Incremental Superpriority Facility maturity beyond January 3, 2023.  On December 28, 2023, the Company successfully negotiated an extension of the maturity date under the Incremental Superpriority Facility.  Among other things, the Ad Hoc Group committed to provide an additional $110 million in incremental liquidity to provide the Company essential breathing room as it continued to engage with the Ad Hoc Group and certain other key prepetition stakeholders on the terms of a more comprehensive solution.

87.     The Company utilized the incremental time to engage in discussions with the Ad Hoc Group around the terms of a comprehensive restructuring.  In parallel with these prepetition initiatives, the Company, with the assistance of its advisors, also explored and analyzed both a

going concern sale and potential wind-down of operations and the sale of assets of the AQV business, including through a section 363 asset sale process.

88.     The Company, with the assistance of Guggenheim Securities, formally launched a marketing process concerning the AQV Sale Transaction.  In connection with the marketing process, the Debtors, with the assistance of Guggenheim Securities, contacted 18 parties to solicit initial non-binding indications of interest, including two operators and/or brokers.  As of the Petition Date, 12 of these parties had entered into non-disclosure agreements and received access to a confidential information memorandum, a financial model, and a comprehensive virtual data room.  As noted above, while these efforts have not yet resulted in an actionable and binding bid, the Company is hopeful that the postpetition marketing efforts will yield a value-maximizing transaction.

89.     Given the significant costs associated with operating the AQV business and maintaining the AQV vessels, the Company made the difficult decision immediately prior to filing to commence efforts to limit operation of the AQV business and will continue to do so during these chapter 11 cases.  Moreover, the "layup" costs[28] associated with maintaining the AQV vessels while not in operation are also substantial.  Given the significant layup costs, an extended sale process for the AQV Sale Transaction would entail significant additional layup costs, which also raises the sale proceeds hurdle that the Company must clear for any sale to maximize value for the Debtors' estates.

---

[28]     "Lay up" costs refer to the costs of maintaining a vessel that is not in active service, and includes costs associated with a minimal crew on the vessel, security for the vessel, and general safety, maintenance and fueling costs.   The Debtors estimate that the lay up costs for the AQV vessels are approximately $650,000 per week on average over a 10-week period.

90.     As a result, and after careful consideration and in consultation with the Company's key stakeholders, the Company cancelled certain scheduled cruises in January 2024, terminated the employment of a substantially all of their employees on February 20, 2024 and anticipates cancelling all additional scheduled cruises during these Chapter 11 Cases.

### H. The Debtors' Need for Liquidity and the Proposed DIP Financings

91.     As described above and pursuant to the DIP Motion filed contemporaneously herewith, in connection with the Restructuring Support Agreement, certain of the Consenting Lenders committed to provide the Debtors with the necessary financing to implement the Debtors' restructuring through these Chapter 11 Cases through the DIP Facilities.

92.     As set forth in the Scheidemann Declaration, the Debtors marketed the opportunity to finance the Debtors and provide the necessary liquidity for the administration of these Chapter 11 Cases and the Debtors' efforts to implement a comprehensive restructuring transaction. Notwithstanding this marketing effort, the only actionable proposals for DIP financings were the ones offered by the Ad Hoc Group, the Sponsor, and the Senior DIP Lenders, presented to this Court for approval in the DIP Motion.

93.     I personally participated in the negotiation and analysis of the DIP Facilities, specifically the sizing and initial draw components of the DIP Facilities, along with the lenders' adequate protection packages contemplated in the proposed Interim DIP Order (as defined in the DIP Motion). These negotiations were hard-fought and at arm's-length. Without the proceeds of the DIP Facilities and access to Cash Collateral, the Debtors lack the liquidity necessary to continue operations. The DIP Facilities provide the Debtors with access to Cash Collateral and sufficient liquidity to operate their business, administer these Chapter 11 Cases to pursue a restructuring that will significantly deleverage the balance sheet and implement operational

initiatives that will put the Debtors in a position to succeed upon emergence from chapter 11.  I believe that the terms of the DIP Facilities and Interim DIP Order are fair and reasonable under the circumstances, and the best available to the Debtors.  Furthermore, the milestones established under the Restructuring Support Agreement and incorporated into the DIP Facilities are reasonable and obtainable, while also ensuring the Debtors' restructuring will be implemented in an efficient and timely fashion.

94.     The DIP Facilities enable the Debtors to reduce their interest expense, as the Senior DIP Facility refinancing the existing Superpriority Facility is at a lower interest rate than the Superpriority Facility, which would otherwise need to be paid as adequate protection to the lenders under that facility.  Further, the DIP Facilities will provide committed exit financing for the Debtors at the commencement of these Chapter 11 Cases, including a new money $50 million revolving credit facility to fund the Debtors' go-forward business after emergence.  Finally, and perhaps most important, as stated above, the Debtors require immediate access to the DIP Facilities and Cash Collateral to continue operations and avoid a value destructive liquidation.  The use of the proceeds of the DIP Facilities is governed by the Approved Budget (as defined in the DIP Motion).  It is my view, in consultation with the Company's advisors, that the Approved Budget is sufficient and provides the Debtors with the necessary liquidity, as well as flexibility, to implement the restructuring.  Without this Court's approval of the DIP Facilities, the Debtors will have no alternative other than to consider liquidation.

## III.     <u>First Day Motions</u>

95.     Contemporaneously herewith, the Debtors have filed a number of First Day Motions in these Chapter 11 Cases seeking various forms of relief intended to stabilize the

Debtors' business operations, facilitate the efficient administration of these Chapter 11 Cases, and

expedite a swift and smooth restructuring process.  The First Day Motions include:

### A. **Administrative Motions**

(i)      Notice of Designation as Complex Chapter 11 Bankruptcy Case ("Complex Case Designation");

(ii)     Debtors' Emergency Motion for Entry of an Order (I) Directing Joint Administration of Related Chapter 11 Cases and (II) Granting Related Relief ("Joint Administration Motion");

(iii)    Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to (A) File a Consolidated List of Creditors, (B) File a Consolidated List of the 30 Largest Unsecured Creditors, and (C) Redact Certain Personal Identification Information; (II) Waiving or Modifying the Requirement to File a List of Equity Security Holders; (III) Approving the Form and Manner of Notifying Creditors of the Commencement of these Chapter 11 Cases; and (IV) Granting Related Relief ("Creditor Matrix Motion");

(iv)    Debtors' Emergency Motion for Entry of an Order (I) Extending Time to File (A) Schedules of Assets and Liabilities, (B) Schedules of Current Income and Expenditures, (C) Schedules of Executory Contracts and Unexpired Leases, (D) Statements of Financial Affairs, and (E) Rule 2015.3 Financial Reports and (II) Granting Related Relief ("SOFAs / Schedules Extension Motion");

(v)     Debtors' Emergency Motion for Entry of an Order (I) Authorizing Hornblower Group, Inc. to Act as Foreign Representative, and (II) Granting Related Relief ("Foreign Representative Motion"); and

(vi)    Emergency *Ex Parte* Application for Entry of an Order Authorizing the Employment and Retention of Omni Agent Solutions, Inc. as Claims, Noticing, and Solicitation Agent ("Claims Agent Retention Application").

### B. **Operational Motions Requesting Immediate Relief**

(i)      Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate Their Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Maintain Existing Business Forms and Books and Records,

and (D) Continue to Perform Intercompany Transactions and (II) Granting Related Relief ("<u>Cash Management Motion</u>");

(ii)     Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to (A) Pay Prepetition Wages, Salaries, Other Compensation, and Reimbursable Expenses and (B) Continue Employee Benefits Programs, and (II) Granting Related Relief ("<u>Wages Motion</u>");

(iii)    Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Certain Prepetition Claims of (A) Critical Vendors, (B) Lien Claimants, (C) Certain Critical Foreign Claimants, and (D) 503(b)(9) Claimants, (II) Confirming Administrative Expense Priority of Outstanding Orders, and (III) Granting Related Relief ("<u>Critical Vendors Motion</u>");

(iv)     Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Payment of Certain Taxes and Fees and (II) Granting Related Relief ("<u>Taxes Motion</u>");

(v)      Debtors' Emergency Motion for Entry of an Order (I) Approving the Debtors' Proposed Adequate Assurance of Payment for Future Utility Services, (II) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Services, (III) Approving the Debtors' Proposed Procedures for Resolving Additional Assurance Requests, and (IV) Granting Related Relief ("<u>Utilities Motion</u>");

(vi)     Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Establishing Notification and Hearing Procedures for Certain Transfers of Interests of Hornblower Group Holdco, LLC and American Queen Holdco, LLC and Claims Against Debtors and (II) Granting Related Relief ("<u>NOL Motion</u>");

(vii)    Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to Maintain and Administer Their Existing Customer Programs and Honor Certain Prepetition Obligations Related Thereto and (II) Granting Related Relief ("<u>Customer Programs Motion</u>");

(viii)   Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to (A) Continue Prepetition Insurance Coverage and Satisfy Prepetition Obligations Related Thereto, (B) Renew, Amend, Supplement, Extend, or Purchase Insurance Policies, (C) Continue to Pay Brokerage Fees, and (D) Maintain Their Surety Bond Program, and (II) Granting Related Relief ("<u>Insurance Motion</u>"); and

(ix)     Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Senior Secured Postpetition

Financing and (B) Use Cash Collateral, (II) Granting Adequate Protection to Certain Prepetition Secured Parties, (III) Scheduling a Final Hearing, and (IV) Granting Related Relief (the "<u>DIP Motion</u>").

**C.  <u>Sale Motion</u>**

(i)    Debtors' Emergency Motion for Entry of an Order (A) Approving (I) Bidding Procedures for the Sale of the AQV Debtors' Assets, (II) Procedures Regarding Bid Protections, (III) The Scheduling of Certain Dates with Respect Thereto, (IV) the Form and Manner of Notice Thereof, (V) Contract Assumption, Assignment, and Rejection Procedures, and (VI) Certain Procedures to Otherwise Dispose of the AQV Assets, and (B) Authorizing the Debtors to Enter into Agreements for the Sale of Their Assets Free and Clear of All Liens, Claims, And Encumbrances (the "<u>AQV Sale Motion</u>").

96.    The First Day Motions seek authority to, among other things, obtain debtor-in-possession financing and use cash collateral on an interim basis, honor employee-related wage and benefits obligations, pay certain prepetition accounts payable claims in the ordinary course of business, and ensure the continuation of the Debtors' cash management systems and other business operations without interruption.  I believe that the relief requested in the First Day Motions is necessary to allow the Debtors to preserve the value of their enterprise and successfully implement their restructuring.

97.    Several of the First Day Motions request authority to pay certain prepetition claims. I understand that Rule 6003 of the Federal Rules of Bankruptcy Procedures provides, in relevant part, that the Court shall not consider motions to pay prepetition claims during the first twenty days following the filing of a chapter 11 petition, "except to the extent relief is necessary to avoid immediate and irreparable harm."  In light of this requirement, the Debtors have narrowly tailored their requests for immediate authority to pay certain prepetition claims to those circumstances where the failure to pay such claims would cause immediate and irreparable harm to the Debtors and their estates.

98.     I am familiar with the content and substance of the First Day Motions.  The facts stated therein are true and correct to the best of my knowledge, information, and belief, and such facts shall be deemed incorporated herein by reference as if fully stated herein.  I believe that the relief sought in each of the First Day Motions is necessary to enable the Debtors to operate in chapter 11 with minimal disruption to their business operations and constitutes a critical element in successfully restructuring the Debtors' businesses.

99.     For the reasons stated herein and in each of the First Day Motions filed concurrently or in connection with the commencement of these Chapter 11 Cases, I respectfully request that each of the First Day Motions be granted in its entirety, together with such other and further relief as this Court deems just and proper.

*[Remainder of Page Intentionally Blank]*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated: February 21, 2024

*/s/ Jonathan Hickman*

Jonathan Hickman
Chief Restructuring Officer
Hornblower Holdings LLC