# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

|  |  |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| HORNBLOWER HOLDINGS LLC *et al.*,[1] | ) Case No. 24-90061 (MI) |
| | ) |
| Debtors. | ) (Joint Administration Requested) |
| | ) (Emergency Hearing Requested) |

## DEBTORS' EMERGENCY MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO (A) OBTAIN SENIOR SECURED POSTPETITION FINANCING AND (B) USE CASH COLLATERAL, (II) GRANTING ADEQUATE PROTECTION TO CERTAIN PREPETITION SECURED PARTIES, (III) SCHEDULING A FINAL HEARING, AND (IV) GRANTING RELATED RELIEF

Emergency relief has been requested. Relief is requested not later than 5:00 p.m. (prevailing Central Time) on February 21, 2024.

If you object to the relief requested or you believe that emergency consideration is not warranted, you must appear at the hearing if one is set, or file a written response prior to the date that relief is requested in the preceding paragraph. Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.

A hearing will be conducted on this matter on February 21, 2024 at 5:00 p.m. (prevailing Central Time) in Courtroom 404, 4th Floor, 515 Rusk, Houston, Texas 77002.

Participation at the hearing will only be permitted by an audio and video connection.

Audio communication will be by use of the Court's dial-in facility.  You may access the facility at 832-917-1510. Once connected, you will be asked to enter the conference room number.  Judge Isgur's conference room number is 954554. Video communication will be by use of the GoToMeeting platform.  Connect via the free GoToMeeting application or click the link on Judge Isgur's home page.  The meeting code is "judgeisgur." Click the settings icon in the upper right corner and enter your name under the personal information setting.

Hearing appearances must be made electronically in advance of both electronic and in-person hearings.  To make your appearance, click the "Electronic Appearance" link on Judge Isgur's home page. Select the case name, complete the required fields and click "submit" to complete your appearance.

---

[1] The last four digits of Debtor Hornblower Holdings LLC's tax identification number are 6035.  Due to the large number of debtor entities in these chapter 11 cases, for which the Debtors have requested joint administration, a complete list of the debtor entities and the last four digits of their federal tax identification numbers is not provided herein.  A complete list of such information may be obtained on the website of the Debtors' proposed claims and noticing agent at https://omniagentsolutions.com/Hornblower.  The location of the Debtors' service address for purposes of these chapter 11 cases is: Pier 3, The Embarcadero, San Francisco, CA 94111.

The above-captioned debtors and debtors in possession (collectively, the "Debtors") respectfully state as follows in support of this motion:

<b>Relief Requested[2]</b>

1.    The Debtors seek entry of an interim order substantially in the form attached hereto (the "Interim Order") and a final order (the "Final Order" and, together with the Interim Order, the "DIP Orders") granting the following relief:[3]

*Senior DIP Facility*:    Authorizing the Debtors to obtain postpetition financing (the "Senior DIP Financing") pursuant to a $300 million senior secured, debtor-in-possession term loan credit facility (the "Senior DIP Facility") as set forth in that certain Senior Secured Superpriority Debtor-in-Possession Credit Agreement, by and among the Borrowers (as defined below), the DIP Guarantors (as defined below) as guarantors, the several financial institutions or other entities from time to time party thereto as "Lenders" (the "Senior DIP Lenders"), GLAS Trust Company LLC ("GLAS"), as administrative agent and collateral agent (the "Senior DIP Agent"), substantially in the form attached as **Exhibit A** to the Interim Order (the "Senior DIP Credit Agreement" and, together with the related security and ancillary documents, the "Senior DIP Documents" and all obligations arising thereunder, the "Senior DIP Obligations"), the entirety of which will be available immediately upon entry of the Interim Order and used to immediately refinance the Debtors' prepetition obligations under the Superpriority Facility (as defined below);

*Junior DIP Facility*:    Authorizing the Debtors to obtain postpetition financing (the "Junior DIP Financing") pursuant to a $285 million junior secured, debtor-in-possession term loan credit facility (the "Junior DIP Facility," and together with the Senior DIP Facility, the "DIP Facilities") as set forth in that certain Junior Secured Superpriority Debtor-in-Possession Credit Agreement, by and among the Borrowers, the DIP Guarantors as guarantors, the several financial institutions or other entities from time to time party thereto as "Lenders" (the "Junior DIP Lenders" and, together with the Senior DIP Lenders, the "DIP Lenders"), GLAS, as administrative agent and collateral agent (the "Junior DIP Agent" and, together with the Senior DIP Agent, the "DIP Agents"), substantially in the form attached as **Exhibit B** to the Interim Order (the "Junior DIP Credit Agreement" and, together with the related security and ancillary documents, the "Junior DIP Documents" and all obligations arising thereunder, the "Junior DIP Obligations"; the Senior DIP Credit Agreement together with the Junior DIP Credit Agreement, the "DIP Credit Agreements"; the Senior DIP Documents together with the Junior DIP Documents, the "DIP Documents"; and the

---

[2]    The Debtors will file the form of Final Order prior to the Final Hearing (as defined herein).

[3]    The summaries contained in this Motion are qualified in their entirety by the provisions of the documents referenced.  To the extent anything in this Motion is inconsistent with such documents, the terms of the applicable documents shall control.

Senior DIP Obligations together with the Junior DIP Obligations, the "DIP Obligations"), of which (i) $224 million will be available immediately upon entry of the Interim Order to provide the Debtors working capital, fund these chapter 11 cases, and immediately refinance the Debtors' prepetition obligations under the Incremental Superpriority Facility (as defined below), and (ii) $61 million will be available immediately upon entry of the Final Order and used thereafter for working capital and to fund these chapter 11 cases. [4]

*Superpriority Claims and DIP Liens*: Granting liens on the DIP Collateral (as defined below) to secure the DIP Obligations and to afford the DIP Obligations with superpriority administrative status, subject to the terms set forth in the DIP Documents and the DIP Orders;

*Cash Collateral*: Authorizing the Debtors to use Prepetition Collateral (as defined below), including Cash Collateral (as such term is defined in Section 363(a) of the Bankruptcy Code) of the Prepetition Secured Parties (as defined below), subject to the terms set forth in the DIP Documents and the DIP Orders;

*Adequate Protection*: Authorizing the Debtors to grant adequate protection to the Prepetition Secured Parties as set forth in the DIP Orders;

*Automatic Stay*: Modifying the automatic stay under section 362 of the Bankruptcy Code (the "Automatic Stay") to the extent necessary to implement and effectuate the terms and conditions of the DIP Orders; and

*Final Hearing*: Scheduling a hearing (the "Final Hearing") to consider final approval of the Motion.

2.     In support of this Motion, the Debtors rely on the (a) *Declaration of Jonathan Hickman in Support of Chapter 11 Petitions and First Day Motions* (the "First Day Declaration") and (b) *Declaration of Matthew Scheidemann in Support of Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors To (A) Obtain Postpetition Financing and (B) Use Cash Collateral, (II) Granting Adequate Protection to Certain Prepetition Secured Parties, (III) Scheduling a Final Hearing, and (IV) Granting Related Relief*

---

[4]     The Debtors also seek authorization to enter into, and perform under, those certain Agent Fee Letters, Lender Fee Letter, and the Exit Facilities Commitment Letter (each as defined in the DIP Credit Agreements and collectively, the "Fee Letters"), substantially in the form attached as **Exhibit C** to the Interim Order.

(the "<u>Scheidemann Declaration</u>" and, together with the First Day Declaration, the "<u>Declarations</u>").  Each of the Declarations is incorporated herein by reference.

<u>**Jurisdiction and Venue**</u>

3.      The United States Bankruptcy Court for the Southern District of Texas (the "<u>Court</u>") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the *Amended Standing Order of Reference from the United States District Court for the Southern District of Texas*, dated May 24, 2012 (the "<u>Amended Standing Order</u>").  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b).  The Debtors confirm their consent to the entry of a final order by the Court.

4.      Venue is proper pursuant to 28 U.S.C. § 1408.

5.      The statutory bases for the relief requested herein are sections 105, 361, 362, 363, 364, 503, 506, and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "<u>Bankruptcy Code</u>"), rules 2002, 4001, 6003, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), rules 4002-1 and 9013-1 of the Bankruptcy Local Rules for the Southern District of Texas (the "<u>Bankruptcy Local Rules</u>"), and the *Procedures for Complex Cases in the Southern District of Texas* (the "<u>Complex Case Procedures</u>").

6.      On February 20, 2024 (the "<u>Petition Date</u>"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  The Debtors are operating their businesses and managing their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  The Debtors have filed a motion requesting procedural consolidation and joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b) substantially contemporaneously herewith.  No request for the appointment of a trustee or examiner has been made in these chapter 11 cases, and no committees have been appointed or designated.

7.     A detailed description of the Debtors and their businesses, including the facts and circumstances giving rise to the Debtors' chapter 11 cases, is set forth in the First Day Declaration, filed substantially contemporaneously herewith and incorporated herein by reference.

**Concise Statement Pursuant to Bankruptcy Rule 4001**

8.     In accordance with Bankruptcy Rules 4001(b), 4001(c) and 4001(d), the following is a concise statement and summary of the proposed material terms of the DIP Facilities as provided in the DIP Documents and the DIP Orders:[5]

| | **DIP Facilities** |
|---|---|
| **DIP Facilities**<br><br>**(Bankruptcy Rule 4001(c)(1)(B))**<br><br>*Interim Order, Preamble* | <u>Senior DIP Facility:</u><br><br>A senior secured, superpriority debtor-in-possession term loan credit facility, consisting of new money term loans (the "<u>Senior DIP Loans</u>") in an aggregate principal amount of $300 million, the entirety of which will be available immediately upon entry of the Interim Order and used by the Debtors to immediately refinance the Superpriority Facility.<br><br><u>Junior DIP Facility:</u><br><br>A junior secured, superpriority debtor-in-possession term loan credit facility, consisting of term loans (the "<u>Junior DIP Loans</u>") in an aggregate principal amount of $285 million, of which (i) $224 million will be available immediately upon entry of the Interim Order to provide the Debtors working capital, fund these chapter 11 cases, and immediately refinance the Debtors' prepetition obligations under the Incremental Superpriority Facility (as defined below), and (ii) $61 million will be available immediately upon entry of the Final Order and used thereafter for working capital and to fund these chapter 11 cases. |
| **Borrowers**<br><br>**(Bankruptcy Rule** | <u>Senior DIP Facility:</u> |

---

[5]     This summary is intended only to assist the Court by reference to the DIP Credit Agreement and the DIP Orders, and is qualified in its entirety by the terms of the DIP Documents, each as may be modified by the DIP Orders. Capitalized terms used in this statement but not otherwise defined herein shall have the meanings ascribed to such terms in the DIP Credit Agreement or Interim Order, as applicable.

| | **DIP Facilities** |
|---|---|
| **4001(c)(1)(B))** <br><br> *Senior DIP Credit Agreement, Preamble* <br><br> *Junior DIP Credit Agreement, Preamble* <br><br> *Interim Order, Preamble* | Hornblower Sub, LLC and American Queen Sub, LLC <br><br> <u>Junior DIP Facility:</u> <br> Same. |
| **DIP Guarantors** <br><br> **(Bankruptcy Rule 4001(c)(1)(B))** <br><br> *Senior DIP Credit Agreement, "Guarantors"; "Subsidiary Guarantor"* <br><br> *Junior DIP Credit Agreement, "Guarantors"; "Subsidiary Guarantor"* <br><br> *Interim Order, Preamble* | <u>Senior DIP Facility:</u> <br> All the Debtors in these chapter 11 cases <br> <u>Junior DIP Facility:</u> <br> Same. |
| **DIP Lenders** <br><br> **(Bankruptcy Rule 4001(c)(1)(B))** <br><br> *Senior DIP Credit Agreement, "Lenders"* <br><br> *Junior DIP Credit Agreement, "Lenders"* <br><br> *Interim Order, Preamble* | <u>Senior DIP Facility:</u> <br> GLAS Trust Company LLC, various banks, financial institutions and other entities party to the Senior DIP Credit Agreement from time to time as lenders.  Deutsche Bank AG New York Branch shall be the sole Senior DIP Lender. <br><br> <u>Junior DIP Facility:</u> <br> GLAS Trust Company LLC, various banks, financial institutions and other entities party to the Junior DIP Credit Agreement from time to time as lenders.  The Junior DIP Lenders are also Prepetition Lenders to the Borrowers. |
| **Term** <br><br> **Bankruptcy Rule 4001(b)(l)(B)(iii), 4001(c)(1)(B)** <br><br> *Senior DIP Credit Agreement, "Maturity Date"* <br><br> *Junior DIP Credit* | <u>Senior DIP Facility:</u> <br> The earliest to occur of (i) the date that is nine months after the Petition Date; (ii) if the Final DIP Order has not been entered by the Bankruptcy Court on or before the applicable Milestone (as defined below), the date of the applicable Milestone; (iii) the date the Bankruptcy Court orders  conversion of the Chapter 11 Cases to a chapter 7 liquidation or the dismissal of the chapter 11 case of any Debtor; (iv) the consummation of a sale or other disposition of all or substantially all of the assets of the Debtors |

| | **DIP Facilities** |
|---|---|
| *Agreement, "Maturity Date"* | under section 363 of the Bankruptcy Code; (v) the date that is 30 calendar days after the entry of the Interim Order if the Final DIP Order Entry Date shall not have occurred by such date; and (vi) the substantial consummation (as defined in 11 U.S.C. § 1101(2)) of a Plan of Reorganization, which has been confirmed by an order entered by the Bankruptcy Court.<br><br>Junior DIP Facility:<br>Same. |
| **Material Conditions to Closing and Borrowing**<br>**(Bankruptcy Rule 4001(c)(1)(B))**<br>*Senior DIP Credit Agreement § 4*<br>*Junior DIP Credit Agreement § 4* | Senior DIP Facility:<br>The Senior DIP Facility includes customary conditions, the satisfaction of which are a condition precedent to the obligations of each Senior DIP Lender to make Senior DIP Loans, including entry of the Interim Order.<br>Junior DIP Facility:<br>The Junior DIP Facility includes customary conditions, the satisfaction of which are a condition precedent to the obligations of each Junior DIP Lender to make Junior DIP Loans, including entry of the Interim Order. |
| **Fees and Expenses**<br>**(Bankruptcy Rule 4001(c)(1)(B))**<br>*Senior DIP Credit Agreement, §2.12*<br>*Junior DIP Credit Agreement, §§2.12* | Senior DIP Facility:<br>• Exit Premium: 1.50% of aggregate principal amount of Term Loans (as defined therein) repaid or refinanced, and payable upon retirement of the DIP Facilities.<br>• Extension Fee: 1.00% of aggregate principal amount of Term Loans (as defined therein) outstanding eight (8) months after the Closing Date (as defined therein)<br>Junior DIP Facility:<br>• Closing Fee: 4.00% of the Commitments in effect on the Closing Date, payable in kind.<br>• DDTL Commitment Fee: 1.00% on undrawn amounts of Delayed Draw Term Loans.<br>• Exit Premium: 4.00% of aggregate principal amount of Term Loans (as defined therein) repaid or refinanced, and payable upon retirement of the DIP Facilities. |
| **Interest Rate**<br>**(Bankruptcy Rule 4001(c)(1)(B))** | Senior DIP Facility:<br>ABR Borrowing: greatest of (i) Prime Rate in effect on such day, (ii) Federal Funds Effective Rate in effect on such date *plus* 1/2 of 1.00%, and (iii) Adjusted Term SOFR *plus* 1.00%, *plus* |

| | **DIP Facilities** |
|---|---|
| *Senior DIP Credit Agreement, §2.13 "Alternate Base Rate" "Applicable Margin," "Adjusted Term SOFR" "Term SOFR"*<br><br>*Junior DIP Credit Agreement, §2.13 "Alternate Base Rate" "Applicable Margin," "Adjusted Term SOFR" "Term SOFR"* | 5.50% (increased to 6.00% if a PIK Election has been made) (provided that 3.00% shall be payable-in-kind on each Interest Payment Date (as defined therein) unless timely elected to be paid in cash)<br><br>Term SOFR Borrowing: Adjusted Term SOFR (as defined therein) *plus* 6.50% (increased to 7.00% if a PIK Election has been made) (provided that 3.50% shall be payable-in-kind on each Interest Payment Date (as defined therein unless timely elected to be paid in cash)<br><br>Junior DIP Facility:<br><br>ABR Borrowing: greatest of (i) Prime Rate in effect on such day, (ii) Federal Funds Effective Rate in effect on such date *plus* 1/2 of 1.00% and (iii) Adjusted Term SOFR *plus* 1.00%, *plus* 8.00%<br><br>Term SOFR Borrowing: Adjusted Term SOFR (as defined therein) (*plus* 9.00%) |

| | **DIP Facilities** |
|---|---|
| **DIP Liens**<br><br>**(Bankruptcy Rule 4001(c)(1)(B)(i))**<br><br>*Senior DIP Credit Agreement, §§3.22, 3.24*<br><br>*Junior DIP Credit Agreement, §§3.22, 3.24*<br><br>*Interim Order ¶ 6* | Senior DIP Facility:<br><br>The Senior DIP Facility will be secured by senior liens on substantially all assets and property of the Debtors, whether now existing or hereafter acquired and wherever located (the "DIP Collateral"), subject to the Carve-Out, and the Prepetition Superpriority Permitted Senior Liens (as defined in the Interim Order); *provided* that the DIP Collateral shall not include Avoidance Proceeds (as defined in the Interim Order) until entry of the Final Order; *provided*, *further*, that the Avoidance Proceeds shall only be used to satisfy the Senior DIP Obligations in the event that that all other sources of recovery are first exhausted and the DIP Obligations have not been indefeasibly paid in full.<br><br>Junior DIP Facility:<br><br>The Junior DIP Facility will be secured by senior liens on the DIP Collateral, subject to the Carve-Out, the Senior DIP Liens, and the Prepetition Incremental Superpriority Permitted Senior Liens (as defined in the Interim Order); *provided* that the DIP Collateral shall not include Avoidance Proceeds (as defined in the Interim Order) until entry of the Final Order; *provided*, *further*, that the Avoidance Proceeds shall only be used to satisfy the Junior DIP Obligations  in the event that that all other sources of recovery are first exhausted and the DIP Obligations have not been indefeasibly paid in full. |
| **Modification of Non-Bankruptcy Law Relating to Perfection of Liens on Estate Property**<br><br>**(Bankruptcy Rule 4001(c)(1)(B)(vii))**<br><br>*Interim Order ¶ 6* | The Interim Order contains customary provisions providing that entry of the Interim Order shall be sufficient and conclusive evidence of the creation, validity, perfection, and priority of all liens granted therein, including the DIP Liens and the Adequate Protection Liens (as defined below), without the necessity of any filings or recordings under non-bankruptcy law. |
| **Superpriority Administrative Claims**<br><br>**(Bankruptcy Rule 4001(c)(1)(B)(i))**<br><br>*Interim Order ¶ 5* | Subject to the Carve-Out, and the Prepetition Superpriority Permitted Senior Liens (as defined in the Interim Order), the Senior DIP Obligations shall constitute allowed superpriority administrative claims with priority over any and all administrative expenses and unsecured claims, including, administrative expenses of the kinds specified in or ordered pursuant to Bankruptcy Code Sections 105, 326, 328, 330, 331, 364, 503(a), 503(b), 506(c) (subject to the Final Order), 507(a), |

| **DIP Facilities** |
|---|
| 507(b), 546(c), 546(d), 726, 1113 and 1114, and any other provision of the Bankruptcy Code, as provided under Section 364(c)(1) of the Bankruptcy Code. |
| Subject to the Carve-Out, the Senior DIP Obligations, and the Prepetition Superpriority Permitted Senior Liens (as defined in the Interim Order), the Junior DIP Obligations shall constitute allowed superpriority administrative claims with priority over any and all administrative expenses and unsecured claims, including, administrative expenses of the kinds specified in or ordered pursuant to Bankruptcy Code Sections 105, 326, 328, 330, 331, 364, 503(a), 503(b), 506(c) (subject to the Final Order), 507(a), 507(b), 546(c), 546(d), 726, 1113 and 1114, and any other provision of the Bankruptcy Code, as provided under Section 364(c)(1) of the Bankruptcy Code. |

| | **DIP Facilities** |
|---|---|
| **Adequate Protection for Prepetition Secured Parties**<br><br>**(Bankruptcy Rule 4001(c)(1)(B)(ii), (b)(1)(B)(iv))**<br><br>*Interim Order ¶¶12(a), (e), (h), and (k); and 15* | Adequate Protection Liens: Each of the Prepetition First Lien Agent and the Prepetition Revolving Agent, for themselves and for the benefit of the applicable Adequate Protection Parties (each as in the Interim Order), shall be granted (effective and perfected upon the date of entry of the Interim Order and without the necessity of the execution of any mortgages, security agreements, pledge agreements, financing statements or other agreements), on account of their respective Adequate Protection 507(b) Claims (as defined below), a valid, perfected security interest in and lien upon all of the DIP Collateral, subject to the DIP Liens, the Carve-Out, and the Prepetition Permitted Senior Liens.<br><br>Adequate Protection 507(b) Claim: The Prepetition Agents, for themselves and for the benefit of the Secured Parties, shall be granted an allowed superpriority administrative expense claim on account of any Diminution in Value (as defined below) as provided for in section 507(b) of the Bankruptcy Code, subject to the Carve-Out, and the DIP Superpriority Claims.<br><br>Fees and Expenses: As further adequate protection, the Debtors shall reimburse the Prepetition Agents, for the benefit of the Prepetition Secured Parties, for all reasonable and documented prepetition and postpetition out of pocket fees and expenses payable by the Debtors under the Prepetition Credit Agreements, including, but not limited to, the reasonable and documented fees and out-of-pocket expenses of Milbank LLP, Perella Weinberg Partners L.P.; FTI Consulting, Inc.; Haynes & Boone, LLP; Vinson & Elkins LLP (subject to the proviso set forth in the definition of "Crestview Fees and Expenses" in the Restructuring Support Agreement); Seward & Kissel LLP (in its capacity as Jones Act counsel to the Ad Hoc Group); ArentFox Schiff LLP (in its capacity as counsel to the Prepetition First Lien Agent), one legal counsel to address any conflicts issues; one government concessions contracts counsel; one legal counsel in any other foreign jurisdiction that the Ad Hoc Group determines is necessary; any other Crestview Fees and Expenses (as defined in the Restructuring Support Agreement and subject to the limitations set forth therein); Cahill Gordon & Reindel LLP (and, to the extent reasonably necessary, any local counsel) as counsel to the Prepetition Revolving Agent and predecessor to the Prepetition First Lien Agent; UBS AG, Stamford Branch as Prepetition Revolving Agent and predecessor to the Prepetition First Lien Agent; and UBS Securities LLC, for any remaining |

| | **DIP Facilities** |
|---|---|
| | actions needed to be completed in connection with their aforementioned roles as Prepetition Revolving Agent and predecessor to the Prepetition First Lien Agent and for any unpaid fees and expenses related to such roles, subject to the review procedures set forth in the Interim Order. <br><br> Information Rights: The Debtors shall provide the Adequate Protection Parties with all reporting required to be provided to the DIP Agents for the benefit of the DIP Lenders (the DIP Agents and the DIP Lenders, collectively, the "DIP Secured Parties") under the DIP Documents. |
| **Limitations on the DIP Lenders' Obligations to Fund Activities of the Debtors** <br><br> **(Bankruptcy Rule 4001(c)(1)(B))** <br><br> *Interim Order ¶ 19* | Notwithstanding any other provision of the Interim Order or any other order entered by the Court, no DIP Loans, DIP Collateral, Prepetition Collateral (including Cash Collateral) or any portion of the Carve-Out, may be used directly or indirectly, including without limitation through reimbursement of professional fees of any non-Debtor party, in connection with (a) the investigation, threatened initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation (i) against any of the DIP Secured Parties, the Prepetition Secured Parties, or their respective Representatives, or any action purporting to do the foregoing in respect of the DIP Obligations, DIP Liens, DIP Superpriority Claims, Prepetition Secured Obligations, Prepetition Liens, Adequate Protection Liens, or Adequate Protection 507(b) Claims or (ii) challenging the amount, validity, perfection, priority or enforceability of or asserting any defense, counterclaim or offset with respect to the DIP Obligations, the Prepetition Secured Obligations and/or liens, claims, rights, or security interests securing or supporting the DIP Obligations granted under the DIP Orders, the DIP Documents or the Prepetition Loan Documents in respect of the Prepetition Secured Obligations, including, in the case of each (i) and (ii), without limitation, for lender liability or pursuant to section 105, 510, 544, 547, 548, 549, 550 or 552 of the Bankruptcy Code, applicable non-bankruptcy law or otherwise (provided that, notwithstanding anything to the contrary herein, the proceeds of the DIP Loans and DIP Collateral (including Cash Collateral) may be used by the Creditors' Committee to investigate, but not to prosecute, (A) the claims and liens of the Prepetition Secured Parties and (B) potential claims, counterclaims, causes of action or defenses against the Prepetition Secured Parties, up to an aggregate cap of no more than $50,000, (b) other than expressly permitted hereunder, attempts to prevent, hinder, or otherwise delay or interfere with |

| | **DIP Facilities** |
|---|---|
| | the Prepetition Secured Parties' or the DIP Secured Parties', as applicable, enforcement or realization on the Prepetition Secured Obligations, Prepetition Collateral, DIP Obligations, DIP Collateral, and the liens, claims and rights granted to such parties under the DIP Orders; (c) attempts to seek to modify any of the rights and remedies granted to the Prepetition Secured Parties or the DIP Secured Parties under the Interim Order, the Prepetition Loan Documents, or the DIP Documents, as applicable, other than in accordance with the Interim Order; (d) to apply to the Court for authority to approve superpriority claims or grant liens (other than the liens and claims permitted hereunder or by the DIP Documents) or security interests in the DIP Collateral or any portion thereof that are senior to, or on parity with, the DIP Liens, DIP Superpriority Claims, Adequate Protection Liens and Adequate Protection 507(b) Claims; or (e) to pay or to seek to pay any amount on account of any claims arising prior to the Petition Date unless such payments are authorized by the Court, agreed to in writing by the DIP Lenders, expressly permitted under the Interim Order or under the DIP Documents (including the Approved Budget, subject to permitted variances), in each case unless all DIP Obligations granted to the DIP Secured Parties under the Interim Order, and all Prepetition Secured Obligations, Adequate Protection Obligations, and claims granted to the Prepetition Secured Parties under the Interim Order, have been paid in full in cash.. |
| **Events of Default**<br><br>**(Bankruptcy Rule 4001(c)(1)(B))**<br><br>*Senior DIP Credit Agreement § 7.1*<br><br>*Junior DIP Credit Agreement § 7.1* | Senior DIP Facility:<br><br>Usual and customary events of defaults for facilities of this type and purpose, including, among others:<br>• Breach of the budget covenant,<br>• failure to comply with milestones,<br>• nonpayment of obligations,<br>• covenant defaults,<br>• breaches of representations and warranties, and<br>• the occurrence of certain adverse actions or consequences in the chapter 11 cases.<br><br>Junior DIP Facility:<br><br>Same. |
| **Covenants**<br><br>**(Bankruptcy Rule 4001(c)(1)(B))** | Senior DIP Facility:<br><br>• Affirmative Covenants: Usual and customary for financings of this type, including, without limitation, (a) |

| | **DIP Facilities** |
|---|---|
| *Senior DIP Credit Agreement, Articles V and VI*<br><br>*Junior DIP Credit Agreement, Articles V and VI* | reporting requirements, (b) delivery of certain compliance certificates, notices, reports and filings, (c) preservation of existence, (d) compliance with applicable laws, (e) payment of postpetition obligations, (f) maintenance of property and insurance, (g) keeping of books and records, (h) use of proceeds, (i) further assurances regarding collateral and guarantors, (j) compliance with milestones, (k) weekly conference calls and (l) delivery of the updated budgets and variance reporting.<br><br>• Negative Covenants: Usual and customary for financings of this type, including, without limitation, restrictions on: (a) indebtedness, (b) liens and guaranties, (c) investments, (d) disposition of assets, (e) restricted payments and payments in respect of other indebtedness, (f) transactions with affiliates, (g) use of proceeds, (h) postpetition claims, and (i) make any payments not in compliance with the Approved Budget (subject to permitted variances and exclusions).<br><br>Junior DIP Facility:<br>Same. |
| **Reporting**<br><br>**(Bankruptcy Rule 4001(c)(1)(B))**<br><br>*Senior DIP Credit Agreement § 5.01.*<br><br>*Junior DIP Credit Agreement § 5.01.* | The DIP Facilities require compliance with certain periodic reporting covenants, including budget variance reports. |
| **Provisions Providing for the Reaffirmation of Prepetition Debt**<br><br>**(Bankruptcy Rule 4001(c)(1)(B)(iii), (viii))**<br><br>*Interim Order ¶¶ K, 18* | The Interim Order provides stipulations by the Debtor reaffirming the Prepetition Secured Obligations and Prepetition Liens (as defined therein).<br><br>The Debtors' stipulations, admissions, agreements and releases contained in the Interim Order, shall be binding upon the Debtors in all circumstances and for all purposes. The Debtors' stipulations, admissions, agreements and releases contained in the Interim Order shall be binding upon all other parties in interest, including, without limitation, any statutory or non-statutory committees appointed or formed in these cases and any other person or entity acting or seeking to act on behalf of the Debtors' estates, including any chapter 7 or chapter 11 trustee or |

| | **DIP Facilities** |
|---|---|
| | examiner appointed or elected for any of the Debtors, in all circumstances and for all purposes unless: (a) such committee or other party in interest with requisite standing has timely filed an adversary proceeding or contested matter (subject to the limitations contained herein) by no later than (x) as to the Creditors' Committee only, 60 calendar days after the appointment of the Creditors' Committee, (y) if a chapter 7 or a chapter 11 trustee is appointed or elected prior to the end of the Challenge Period (as defined below), the Challenge Period solely for any such chapter 7 trustee or chapter 11 trustee shall be extended to the date that is the later of (1) 60 calendar days after entry of the Interim Order, or (2) the date that is 30 calendar days after their appointment, and (z) for all other parties in interest, 60 calendar days after entry of the Interim Order; and (ii) any such later date as (v) has been agreed to by the Prepetition Superpriority Agent with respect to the Prepetition Superpriority Obligations or the Prepetition Superpriority Liens, (w) has been agreed to by the Prepetition Incremental Superpriority Agent with respect to the Prepetition Incremental Superpriority Obligations or the Prepetition Incremental Superpriority Liens, (x) has been agreed to by the Prepetition First Lien Agent with respect to the Prepetition First Lien Obligations or the Prepetition First Lien Liens, (y) has been agreed to by the Prepetition Revolving Agent with respect to the Prepetition Revolving Obligations or the Prepetition Revolving Liens or (z) has been ordered by the Court for cause upon a motion filed and served within any applicable period (the time period established by the foregoing clauses (i)-(ii), the "Challenge Period"), (A) objecting to or challenging the amount, validity, perfection, enforceability, priority or extent of the Prepetition Secured Obligations, the Prepetition Revolving Obligations, the Prepetition Liens or the Prepetition Revolving Liens, as applicable, or (B) asserting or prosecuting any Avoidance Action or any other claims, counterclaims or causes of action, objections, contests or defenses (collectively, the "Challenges") against any Prepetition Secured Parties or Prepetition Revolving Parties, or their respective subsidiaries, affiliates, officers, directors, managers, principals, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives and other professionals and the respective successors and assigns thereof, in each case in their respective capacity as such (collectively, the "Representatives") in connection with or related to the Prepetition Loan Documents, the Prepetition Secured |

| **DIP Facilities** | |
|---|---|
| | Obligations, the Prepetition Revolving Obligations, the Prepetition Liens, the Prepetition Revolving Liens and/or the Prepetition Collateral; and (b) there is a final non-appealable order in favor of the plaintiff sustaining any such Challenge; provided, however, that any pleadings filed in connection with a Challenge shall set forth with specificity the basis for such Challenge and any Challenges not so specified prior to the expiration of the Challenge Period shall be deemed forever waived, released and barred. |
| **Use of Proceeds and Cash Collateral**<br><br>**(Bankruptcy Rule 4001(c)(1)(B), (b)(1)(B)(ii))**<br><br>*Senior DIP Credit Agreement § 3.17*<br><br>*Junior DIP Credit Agreement § 3.17* | Senior DIP Facility:<br><br>Subject to any additional restrictions in the DIP Orders and the Senior DIP Credit Agreement, the proceeds of the Senior DIP Facility shall be used to (i) refinance the Superpriority Facility, and (ii) to the extent any proceeds remain after such refinancing, to provide the Debtors working capital.<br><br>Junior DIP Credit Facility:<br><br>Subject to any additional restrictions in the DIP Orders and the Junior DIP Credit Agreement, the proceeds of the Junior DIP Facility and Cash Collateral shall be used (i) to refinance the Incremental Superpriority Facility, and (ii) in accordance with and as provided in the Approved Budget (subject to permitted variances) for general corporate purposes and to pay the administrative costs of these chapter 11 cases. |
| **Entities with Interest in Cash Collateral**<br><br>**(Bankruptcy Rule 4001(c)(1)(B), (b)(1)(B)(i))**<br><br>*Interim Order ¶ H (x)* | The Adequate Protection Parties.<br><br>To the extent their consent is required, the requisite Adequate Protection Parties have consented or are deemed to have consented to the use of Prepetition Collateral, including Cash Collateral, and the priming of the Prepetition First Liens, and the Prepetition Revolving Liens by the DIP Liens and the Carve-Out, in each case on the terms set forth in the Interim Order and the DIP Documents |
| **Milestones**<br><br>**(Bankruptcy Rule 4001(c)(1)(B)(vi))**<br><br>*Senior DIP Credit Agreement §5.18*<br><br>*Junior DIP Credit Agreement §5.18* | Senior DIP Facility:<br><br>• obtain entry by the Bankruptcy Court of the Interim DIP Order no later than three (3) Business Days after the Petition Date;<br>• obtain entry of the Interim DIP Recognition Order by the CCAA Court no later than ten (10) calendar days after the entry of the Interim DIP Order;<br>• no later than twenty-one (21) calendar days after the |

| | **DIP Facilities** |
|---|---|
| | Petition Date, file the Plan, Disclosure Statement, Disclosure Statement Motion and Backstop Motion; |
| | <ul><li>obtain entry by the Bankruptcy Court of the AQV Bidding Procedures Order no later than fifteen (15) calendar days after the Petition Date;</li><li>obtain entry by the Bankruptcy Court of the Final DIP Order and the AQV Sale Order no later than forty-five (45) calendar days after the Petition Date;</li><li>obtain entry of the Final DIP Recognition Order by the CCAA Court no later than ten (10) calendar days after the entry of the Final DIP Order;</li><li>obtain entry by the Bankruptcy Court of the Disclosure Statement Order and the Backstop Order no later than sixty (60) calendar days after the Petition Date;</li><li>obtain entry by the Bankruptcy Court of the Confirmation Order no later than one-hundred-twenty (120) calendar days after the Petition Date;</li><li>obtain entry of the Confirmation Recognition Order by the CCAA Court no later than ten (10) calendar days after the entry of the Confirmation Order; and</li><li>cause the Plan Effective Date to occur no later than one-hundred-fifty (150) calendar days after the Petition Date; *provided* that this Milestone may be extended by the Debtors up to thirty (30) days if the purpose of such extension is solely to obtain regulatory approvals.</li></ul>Junior DIP Facility:<br>Same. |
| **Indemnification**<br><br>**(Bankruptcy Rule 4001(c)(1)(B)(ix))**<br><br>*Senior DIP Credit Agreement § 9.03*<br><br>*Junior DIP Credit Agreement § 9.03*<br><br>*Interim Order ¶ H(vi)* | The debtors shall indemnify and hold harmless the DIP Secured Parties in such capacities, in accordance with the DIP Documents, subject to customary exceptions. |
| **Waiver/Modification of the Automatic Stay**<br><br>**(Bankruptcy Rule 4001(c)(1)(B)(iv))** | Pursuant to the DIP Orders, the automatic stay provisions of section 362 of the Bankruptcy Code are modified to the extent necessary to implement and effectuate the terms of the DIP Facilities and the DIP Orders. |

| | **DIP Facilities** |
|---|---|
| *Interim Order ¶ 7(g) and (i)* | |
| **Section 506(c) and 552(b) Waiver** <br><br> **(Bankruptcy Rule 4001(c)(1)(B)(x))** <br><br> *Interim Order ¶¶ H(xii); and 8-10* | Subject to the entry of the Final Order, the Debtors shall waive with respect to the Prepetition Obligations, (a) the "equities of the case" exception under section 552(b) of the Bankruptcy Code and (b) section 506(c) of the Bankruptcy Code. |
| **Liens on Avoidance Proceeds** <br><br> **(Bankruptcy Rule 4001(c)(1)(B)(xi))** <br><br> *Interim Order ¶¶ 5, 6(a), and 12(b)* | Subject to the entry of the Final Order, the Avoidance Proceeds (but not the Avoidance Actions) shall be subject to liens securing the DIP Obligations and Adequate Protection 507(b) Claims; *provided* that the Avoidance Proceeds shall only be used to satisfy the DIP Obligations in the event that that all other sources of recovery are first exhausted and the DIP Obligations have not been indefeasibly paid in full. |

**Significant Provisions under the Complex Case Procedures**

9.      The Interim Order, and the Final Order, as applicable, contain certain of the provisions (the "Significant Provisions") identified in paragraph 8 of the Complex Case Procedures as set forth below.   In addition to the Debtors' specific justifications for the Significant Provisions, provided in the table below, the Debtors believe that each Significant Provision is justifiable because the DIP Lenders will not make the DIP Facilities available to the Debtors, without such provisions and the DIP Facilities, taken as a whole, is fair and reasonable to the Debtors (in the context of these chapter 11 cases and constitutes the best financing option available.

| **Provision** | **Status** |
|---|---|
| **Cross-Collateralization**. | The Interim Order and Final Order do not contemplate cross-collateralization. |
| **Refinancing of Prepetition Obligations** | The Interim Order and Final Order include a refinancing of the Prepetition Superpriority Obligations using the proceeds of the |

| Provision | Status |
|---|---|
| | Senior DIP Facility. |
| | The Interim Order and Final Order include a refinancing of the Prepetition Incremental Superpriority Obligations using the proceeds of the Junior DIP Facility. |
| | Justification |
| | The Senior DIP Facility, which will refinance the Prepetition Superpriority Facility, will allow the Debtors to (1) reduce interest expenses by refinancing their existing Prepetition Superpriority Facility with the new Senior DIP Facility at a lower cost basis, (2) obtain committed exit financing for the Debtors upon emergence from these Chapter 11 Cases pursuant to a committed refinancing of the Senior DIP Facility into a new exit term loan facility, (3) obtain a new $50 million revolving line of credit facility from the Senior DIP Lenders in order to fund working capital expenditures upon emergence from these Chapter 11 Cases, and (4) garner the support of Parties to the RSA whose commitments thereunder are conditioned upon the Debtors' entry into the Senior DIP Facility. |
| | With respect to the Junior DIP Facility, the Consenting HB First Lien Lenders conditioned their willingness to provide the New Money DIP Term Loans which are part of the Junior DIP Facility on refinancing the Prepetition Incremental Superpriority Obligations, which were extended as a form of bridge financing in November 2023, and then again in December 2023, as a form of emergency financing to the allow the Company additional time to prepare for a chapter 11 filing with the express understanding that it would be refinanced through the Junior DIP Facility. |
| | Further, the Bankruptcy Court will retain authority to fashion appropriate relief, including the clawback of repayments, in the event the refinanced obligations are successfully challenged pursuant to the procedures set forth in the DIP Orders. |
| **Non-Consensual Priming Liens** | N/A |
| **Provisions Limiting the Ability of Estate Fiduciaries to Fulfill Their Duties** | The Interim Order and Final Order do not include provisions limiting the abilities of estate fiduciaries to fulfill their duties, except with respect to the Approved Budget as discussed below |
| **Plan Milestones** | Provision: |

| Provision | Status |
|-----------|--------|
|  | The DIP Credit Agreements require the Debtors to comply with the following milestones: |

The DIP Credit Agreements require the Debtors to comply with the following milestones:

- no later than 21 days after the Petition Date, the Debtors shall have filed the Plan of Reorganization and Disclosure Statement with the Bankruptcy Court, that are reasonably acceptable to the DIP Lenders;

- no later than 120 days after the Petition Date, the Bankruptcy Court shall have entered an order confirming such acceptable plan; and

- no later than 140 days after the Petition Date, the effective date of such plan shall have occurred; *provided* that this Milestone may be extended by the Debtors up to thirty (30) days if the purpose of such extension is solely to obtain regulatory approvals.

Justification:

The Debtors believe that these milestones are achievable and will allow them to complete a value-maximizing restructuring on a reasonable but fast-tracked timeline, and believe that the milestones balance the DIP Lenders' justifiable concerns about process costs with the time required for the Debtors to successfully complete their chapter 11 cases.

**Liens on Proceeds of Avoidance Actions**

Provision:

Subject to entry of the Final Order, the DIP Obligations and Adequate Protection Obligations shall be payable from, and have recourse to, all proceeds of claims and causes of action under sections 502(d), 544, 545, 547, 548 and 550 of the Bankruptcy Code, or any other avoidance actions under the Bankruptcy Code (collectively, the "Avoidance Actions", and the proceeds thereof, the "Avoidance Proceeds"); *provided*, that the Avoidance Proceeds shall only be used to satisfy the DIP Obligations in the event that that all other sources of recovery are first exhausted and the DIP Obligations have not been indefeasibly paid in full. *Interim Order ¶¶ 3 and 5*

Justification:

The Debtors believe that providing liens on proceeds of Avoidance Actions, but not the Avoidance Actions themselves, upon entry of the Final Order, is justifiable because (a) the Debtors' will retain control of the Avoidance Actions themselves, (b) the Debtors have minimal unencumbered

| Provision | Status |
|---|---|
| | property to provide as collateral for the DIP Facilities and as adequate protection, and (c) the DIP Lenders shall only be able to recover on Avoidance Proceeds in the event they are not otherwise repaid in full. |
| **Limitations on the Use of Cash Collateral to Pay Fees and Expenses of Advisors to Official Committees or Future Trustees** | Provision<br><br>The proceeds of the DIP Loans, DIP Collateral (including Cash Collateral), and the Carve-Out may be used by the Creditors' Committee to investigate, but not to prosecute, (A) the claims and liens of the Prepetition Secured Parties and (B) potential claims, counterclaims, causes of action or defenses against the Prepetition Secured Parties, up to an aggregate cap of no more than $50,000. *Interim Order ¶ 19*<br><br>Justification:<br><br>Limits on investigation costs are common practice, and the limit in the Interim Order is consistent with similar cases in this district. |
| **Default Provision Potentially Terminating the Automatic Stay Without Further Order** | Provisions:<br><br>Upon the occurrence and during the continuation of an Event of Default that has not been waived by the Required Senior DIP Lenders or the Required Junior DIP Lenders, as applicable, and following delivery of written notice by any of the applicable DIP Agents, acting at the direction of the applicable Required DIP Lenders, (a "Termination Notice") (including by e-mail) to lead restructuring counsel to the Debtors, lead restructuring counsel to each of the Prepetition Agents, lead counsel to the Creditors' Committee, and the U.S. Trustee, (the "Remedies Notice Parties"), the Senior DIP Agent, acting at the direction of the Required Senior DIP Lenders (or, upon the earlier of (A) the indefeasible repayment of the Senior DIP Facility in full in cash and (B) 90 days following the delivery of the Termination Notice if the Senior DIP Agent has not initiated any enforcement action, the Junior DIP Agent, acting at the direction of the Required Junior DIP Lenders) may (and any automatic stay otherwise applicable to the applicable DIP Agent, whether arising under sections 105 or 362 of the Bankruptcy Code or otherwise, but subject to the terms of this Interim Order (including this paragraph) is hereby modified), without further notice to, hearing of, or order from this Court (i) immediately (x) terminate the Debtors' rights under the applicable DIP Facility and any applicable DIP Document to require the applicable DIP Secured Parties to provide any DIP Loans, other financial |

| Provision | Status |
|---|---|
| | accommodations, or any other future liability or obligation of the applicable DIP Secured Parties but without affecting any of the DIP Obligations or the DIP Liens securing such DIP Obligations; and (y) invoke the right to charge interest at the default rate under the applicable DIP Documents, and (ii) on not less than five (5) calendar days' notice, declare all applicable DIP Obligations to be immediately due and payable.  As soon as reasonably practicable following receipt of a Termination Notice, the Debtors shall file a copy of same on the docket. *Interim Order ¶ 7(h)*<br><br>Justification:<br><br>The Debtors believe that the provisions limiting the automatic stay in the Interim Order are justifiable because the DIP Lenders must seek relief from the Court before enforcements rights can be exercised. |
| **Releases of Claims** | Provisions<br><br>Subject to paragraph 17 thereof and entry of the Interim Order, each of the Debtors and their estates, on its own behalf and on behalf of its and their respective predecessors, successors, heirs, and past, present and future subsidiaries and assigns, hereby absolutely, unconditionally and irrevocably releases and forever discharges and acquits the Prepetition Secured Parties, and each of their respective Representatives (in their capacity as such) (collectively, the "Released Parties"), from any and all liability to the Debtors (and their successors and assigns) and from any and all claims, counterclaims, demands, defenses, offsets, debts, accounts, contracts, liabilities, actions and causes of action of any kind, nature and description, whether matured or unmatured, known or unknown, asserted or unasserted, foreseen or unforeseen, accrued or unaccrued, suspected or unsuspected, liquidated or unliquidated, pending or threatened, arising in law or equity, in contract or tort, in each case arising out of or related to, as applicable, the Prepetition Loan Documents and the negotiation thereof and the transactions and agreements reflected thereby, that the Debtors at any time had, now have or may have, or that their predecessors, successors or assigns at any time had or may have against any of the Released Parties for or by reason of any act, omission, matter, or cause arising at any time on or prior to the date of the Interim Order; provided that the release set forth in this section shall not release any claims against or liabilities of a Released Party that a court of competent jurisdiction determines has resulted from such Released Party's |

| Provision | Status |
|---|---|
| | fraud, gross negligence or willful misconduct. *Interim Order ¶ G (xix)*. |

Upon entry of the Interim Order, each of the Debtors and their estates, on its own behalf and on behalf of its and their respective predecessors, successors, heirs, and past, present and future subsidiaries and assigns, hereby absolutely, unconditionally and irrevocably releases and forever discharges and acquits the DIP Secured Parties and their respective Representatives (in their capacity as such), from any and all liability to the Debtors (and their successors and assigns) and from any and all claims, counterclaims, demands, defenses, offsets, debts, accounts, contracts, liabilities, actions and causes of action of any kind, nature and description, whether matured or unmatured, known or unknown, asserted or unasserted, foreseen or unforeseen, accrued or unaccrued, suspected or unsuspected, liquidated or unliquidated, pending or threatened, arising in law or equity, in contract or tort, in each case arising out of or related to, as applicable, the DIP Facilities, the DIP Documents, the New Money DIP Term Loans, the DIP Roll-Up Loans, the negotiation thereof and the transactions and agreements reflected thereby, that the Debtors at any time had, now have or may have, or that their predecessors, successors or assigns at any time had or may have against any of the DIP Secured Parties for or by reason of any act, omission, matter, or cause arising at any time on or prior to the date of the Interim Order; provided that the release set forth in this section shall not release any claims against or liabilities of a DIP Secured Party that a court of competent jurisdiction determines has resulted from such DIP Secured Party's bad faith, fraud, gross negligence or willful misconduct. In determining to make any loan or other extension of credit under the DIP Documents, to permit the use of the DIP Collateral or Prepetition Collateral (including Cash Collateral) or in exercising any rights or remedies as and when permitted pursuant to the Interim Order or the DIP Documents or Prepetition Loan Documents, as applicable, none of the DIP Secured Parties or Prepetition Secured Parties shall (a) have any liability to any third party or be deemed to be in "control" of the operations of the Debtors; (b) owe any fiduciary duty to the Debtors, their respective creditors, shareholders or estates; or (c) be deemed to be acting as a "Responsible Person" or "Owner" or "Operator" or "managing agent" with respect to the operation or management of any of the Debtors (as such terms or similar terms are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 42

| Provision | Status |
|---|---|
| | U.S.C. §§ 9601, et seq., as amended, or any other federal or state statute, including the Internal Revenue Code). Furthermore, nothing in the Interim Order shall in any way be construed or interpreted to impose or allow the imposition upon any of the DIP Secured Parties or Prepetition Secured Parties of any liability for any claims arising from the prepetition or postpetition activities of any of the Debtors and their respective Representatives. *Interim Order ¶ 23.* |
| | <u>Justification:</u> |
| | The Debtors believe that the releases of claims against the Prepetition Secured Parties in the Interim Order are appropriate, because (among other reasons) they are subject to the challenge provisions in compliance with the Complex Case Procedures. As to the DIP Secured Parties, such releases are not only customary, but the Debtors have been provided significant consideration in the form of the DIP Facilities, such that the releases of claims are a fair exchange. |

10.     Each of the DIP Facilities and consensual use of Cash Collateral, the terms of which were negotiated in good faith and at arm's length, are critical to the Debtors' continuing operations and essential to facilitating the restructuring transactions contemplated by the Restructuring Support Agreement (the "**RSA**"). In light of the foregoing, the Significant Provisions are appropriate under the facts and circumstances of these chapter 11 cases, and therefore the Significant Provisions in the DIP Orders should be approved.

**The Debtors' Prepetition Capital Structure**

11.     As of the Petition Date, the Debtors have approximately $1.153 billion in total funded-debt obligations, consisting of approximately $282.9 million under the Superpriority Facility, $695.5 million under the First Lien Facility, $26.4 million under the Revolver Facility,

and $148.5 million[6] under the Incremental Superpriority Facility.  These facilities, as relevant to the DIP Orders, are described below and any other obligations are described further in the First Day Declaration.

## I.    Secured Debt

(a)    <u>Superpriority Facility</u>

12.    Hornblower Sub, LLC and American Queen Sub, LLC, as borrowers, Homblower Holdco, LLC and American Queen Holdco, LLC, as holdings, Alter Domus (US) LLC, as administrative agent and collateral agent (the "<u>Superpriority Agent</u>"), and the guarantors and lenders party thereto are parties to that certain *Superpriority Credit Agreement*, dated as of November 10, 2020 (as amended pursuant to that certain *Amendment No. 1* dated as of December 16, 2020, *Amendment No. 2* dated as of March 18, 2021, *Incremental Assumption and Amendment Agreement No. 3* dated as of March 26, 2021, *Incremental Assumption and Amendment Agreement No. 4* dated as of November 3, 2022, *Amendment Agreement No. 5* dated as of November 17, 2023, and *Amendment Agreement No. 6* dated as of December 28, 2023, and as may be further amended, restated, supplemented, waived, or otherwise modified from time to time, the "<u>Superpriority Credit Agreement</u>" and, collectively with all certificates, agreements, intercreditor agreements, collateral documents, mortgages, vessel mortgages, security agreements, documents, and instruments (including any amendments, restatements, supplements, or modifications of any of the foregoing) related to or executed in connection with the Superpriority Credit Agreement, the "<u>Superpriority Credit Documents</u>").  The Superpriority Credit Documents provide for a $277.0 million term loan facility (the "<u>Superpriority Facility</u>").

---

[6] Reflects principal balances and excludes $15.2 million of accrued interest and fees

13.     The maturity date on the Superpriority Facility is November 10, 2025, with a springing maturity to the date 30 days prior to the latest maturity date applicable to the term loans under the First Lien Term Facility, if the First Lien Credit Documents remain in effect on such date.  The obligations under the Superpriority Credit Documents are secured by liens on, and security interest in, substantially all assets of the Debtors, subject to certain exceptions (the "Prepetition Collateral" and, such liens and security interests on the Prepetition Collateral, the "Superpriority Liens").  As of the Petition Date, approximately $282.9 million in principal amount is outstanding under the Superpriority Facility.

(b)     First Lien Term Facility and Revolver Term-Out Facility

14.     Hornblower Sub, LLC and American Queen Sub, LLC, as borrowers, Hornblower Holdco, LLC and American Queen Holdco, LLC, as holdings, and GLAS Trust Company LLC, as administrative agent and collateral agent (the "First Lien Agent"), and the guarantors and lenders party thereto are parties to that certain *First Lien Credit Agreement*, dated as of April 27, 2018 (as amended pursuant to that certain *Incremental Assumption and Amendment Agreement* dated as of January 2, 2019, *Incremental Assumption and Amendment Agreement No. 2*, dated as of April 18, 2019, *Incremental Assumption and Amendment Agreement No. 3*, dated as of March 3, 2020, *Amendment Agreement No. 4*, dated as of July 21, 2020, *Amendment Agreement No. 5*, dated as of November 10, 2020, *Amendment Agreement No. 6*, dated as of December 16, 2020, *Amendment Agreement No. 7*, dated as of March 18, 2021, *Amendment Agreement No. 8*, dated as of November 3, 2022, *Amendment Agreement No. 9*, dated as of November 17, 2023, *Resignation, Appointment and Acceptance an Amendment Agreement No. 10*, dated as of December 15, 2023, *Amendment Agreement No. 11*, dated as of December 28, 2023, and as may be further amended, restated, supplemented, waived, or otherwise modified from time to time, the "First Lien Credit Agreement" and, collectively with all certificates, agreements, intercreditor

agreements, collateral documents, mortgages, vessel mortgages, security agreements, documents, and instruments (including any amendments, restatements, supplements, or modifications of any of the foregoing) related to or executed in connection with the First Lien Credit Agreement, the "First Lien Credit Documents"). The First Lien Credit Documents provide for a $675.0 million term loan facility (the "First Lien Term Facility") and $53.7 million converted term loan facility (the "Revolver Term-Out Facility").

15.     The maturity date on the First Lien Term Facility is April 27, 2025 and the maturity date on the Revolver Term-Out Facility is April 29, 2024. The obligations under the First Lien Credit Documents are secured by liens on, and security interests in, the Prepetition Collateral (such liens and security interests, the "1L Term Loan Liens"). The 1L Term Loan Liens are subordinate and junior in priority to the Superpriority Liens. As of the Petition Date, approximately $641.8 million in principal amount is outstanding under the First Lien Term Facility and $53.7 million in principal amount is outstanding under the Revolver Term-Out Facility.

(c)     Revolver Facility

16.     Hornblower Sub, LLC and American Queen Sub, LLC, as borrowers, Hornblower Holdco, LLC and American Queen Holdco, LLC, as holdings, and UBS AG, Stamford Branch, as administrative agent and collateral agent (the "Revolving Agent"), are parties to that certain *Credit Agreement*, dated as of May 13, 2020, as amended pursuant to that certain *Amendment Agreement No. 1*, dated as of November 10, 2020, *Amendment Agreement No. 2*, dated as of December 16, 2020, *Amendment Agreement No. 3*, dated as of March 18, 2021, *Amendment Agreement No. 4*, dated as of November 12, 2021, *Amendment Agreement No. 5*, dated as of November 3, 2022, *Amendment Agreement No. 6*, dated as of October 19, 2023,  *Amendment Agreement No. 7*, dated as of November 17, 2023, and *Amendment Agreement No. 8*, dated as of

December 28, 2023, and as may be further amended, restated, supplemented, waived, or otherwise modified from time to time (the "Revolving Credit Agreement" and, collectively with all certificates, agreements, intercreditor agreements, collateral documents, mortgages, vessel mortgages, security agreements, documents, letters of credit and instruments (including any amendments, restatements, supplements, or modifications of any of the foregoing) related to or executed in connection with the Superpriority Credit Agreement, the Revolving Credit Agreement, the "Revolving Credit Documents"). The Revolving Credit Documents provide for a $22.5 million converted termed out revolving credit facility (the "Revolver Facility").

17.     The Revolver Facility matures on April 29, 2024. The obligations under the Revolving Credit Documents are secured by liens on, and security interests in, the Prepetition Collateral, which rank *pari passu* with the 1L Term Loan Liens; provided, that the liens granted under the Revolver Facility do not incumber the assets of Debtor Journey Beyond Holdings, LLC. As additional credit support for the Revolver Facility, Crestview caused a $28 million letter of credit to be issued by Bank of America, N.A. for the benefit of the Revolving Agent. As of the Petition Date, approximately $26.4 million in principal amount under the Revolver Facility is outstanding.

(d)     Incremental Superiority Facility

18.     Hornblower Holdco, LLC and American Queen Holdco, LLC, as parents, Hornblower Sub, LLC and American Queen Sub, LLC, as borrowers, Journey Beyond Holdings, LLC, Alter Domus (US) LLC, as administrative agent, collateral agent, and incremental term loan representative (the "Incremental Superpriority Agent"), and the guarantors and lenders party thereto are parties to that certain *Incremental Superpriority Credit Agreement*, dated November 17, 2023 (as amended pursuant to that certain *Amendment Agreement No. 1*, dated as of December 28, 2023, *Amendment Agreement No. 2*, dated as of February 20, 2024, and as further

amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "Incremental Superpriority Credit Agreement" and, collectively with all certificates, agreements, intercreditor agreements, collateral documents, mortgages, vessel mortgages, security agreements, documents, and instruments (including any amendments, restatements, supplements, or modifications of any of the foregoing) related to or executed in connection with the Incremental Superpriority Credit Agreement, the "Incremental Superpriority Credit Documents" and collectively with the Superpriority Credit Documents, First Lien Credit Documents, and the Revolving Credit Documents, the "Prepetition Secured Debt Documents"). The Incremental Superiority Credit Documents provide for a $170.0 million delayed draw term loan facility (the "Incremental Superiority Facility").

19.     The maturity date on the Incremental Superpriority Facility is February 20, 2024. The obligations under the Incremental Superpriority Credit Agreement are secured by liens on, and security interests in, the Prepetition Collateral (such liens and security interests on the Prepetition Collateral, the "Incremental Superpriority Liens").   The obligations under the Incremental Superpriority Credit Agreement are subordinated in right of payment to the obligations under the Superpriority Credit Agreement.  As of the Petition Date, approximately $148.5 million[7] in principal amount is outstanding under the Incremental Superiority Facility.

(e)     Intercreditor Agreements

20.     Alter Domus (US) LLC, as Superpriority Agent and incremental superpriority loan representative, the First Lien Agent and the Revolving Agent, together with each of the Debtors party thereto, entered into that certain *Amended and Restated Superpriority Intercreditor Agreement*, dated as of November 17, 2023 (as amended, restated, amended and restated,

---

[7] Such amount excludes any interest and fees which accrued to the principal balance.

supplemented, or otherwise modified from time to time, the "Superpriority Intercreditor Agreement"). The Superpriority Intercreditor Agreement sets forth the agreements between the Superpriority Agent, the Incremental Superpriority Agent, the First Lien Agent, and the Revolving Agent with respect to the priority of liens on, and security interests in, the Prepetition Collateral, and the respective rights and remedies of the various lenders, among other things.

21.     The Superpriority Agent, the First Lien Agent, and the Revolving Agent, together with each of the Debtors party thereto, entered into that certain *Amended and Restated First Lien/First Lien Intercreditor Agreement*, dated as of November 12, 2020 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "First Lien Intercreditor Agreement"). The First Lien Intercreditor Agreement sets forth the agreements between the Superpriority Agent, the First Lien Agent, and the Revolving Agent with respect to the priority of liens on, and security interests in, the Prepetition Collateral, and the respective rights and remedies of the various lenders, among other things.

## The Debtors' Need for Use of Cash Collateral and the DIP Facilities, and Development of the Approved Budget

22.     To continue operating in the ordinary course, and to effectuate an efficient and expeditious restructuring, the Debtors need immediate access to liquidity. As described in greater detail in the First Day Declaration, the Debtors, with the assistance of their advisors, analyzed their cash needs in order to determine the liquidity levels necessary to stabilize the Debtors' operations and fund the administration of these chapter 11 cases. In undertaking this analysis, the Debtors, with the assistance of their advisors, considered the Debtors' near-term projected financial performance, including demand for the Debtors' services and the cost of providing such services, along with their current liquidity position. *See* First Day Decl. ¶¶ 92-94

23.     As part of the Debtors' financial review and analysis, the Debtors, with the assistance of their proposed financial advisor, A&M, developed an initial 13-week budget, a copy of which is attached as **Schedule 1** to the Interim Order (the "Initial Budget").  The Initial Budget incorporates a number of factors and reasonable assumptions, including the Debtors' substantial working capital requirements, the effect of filing for chapter 11 on the Debtors' operations, material cash disbursements, including professional fees, vendor relationships and required payments, cash flows from the Debtors' ongoing operations, and the cost of necessary goods and materials.

24.     With the consent of the Prepetition Secured Parties, the Debtors will use Cash Collateral and the proceeds of the DIP Facilities to fund working capital, capital expenditures, case administration expenses, and for other general corporate purposes.  As Cash Collateral alone would be insufficient to fund the costs associated with the Debtors' operations and restructuring the Debtors, with the assistance of their advisors, determined that the additional postpetition financing provided by the DIP Facilities is necessary to allow the Debtors to pay for costs of these chapter 11 cases, fund adequate protection payments, fund working capital, and demonstrate to their stakeholders that they are well-capitalized.  Accordingly, the Debtors believe the DIP Facilities and use of Cash Collateral as contemplated herein are fundamental to the preservation and maintenance of the Debtors' going-concern value during these chapter 11 cases and critical for the Debtors' successful reorganization.  *See* First Day Decl. ¶¶ 92-94

25.     Absent access to Cash Collateral and the DIP Facilities, the Debtors will promptly lack sufficient liquidity to continue their operations in the ordinary course to the material detriment of the Debtors' estates, customers, creditors, employees, and other parties in interest.

*Id*.  Therefore, the Debtors have an immediate and critical need to access the DIP Facilities and Cash Collateral on an interim basis and throughout the pendency of these chapter 11 cases.

**Alternative Sources of Financing Are Not Available on Better Terms**

26.     As explained in the Scheidemann Declaration, notwithstanding the efforts by the Debtors, with the assistance with Guggenheim Securities, to reach out to other potential financing sources, the Debtors have not received any actionable financing proposals that would adequately fund a chapter 11 process on terms that were superior to the proposals provided by Senior DIP Lenders and Junior DIP Lenders.

27.     Since October 2023, the Debtors, with the assistance of Guggenheim Securities, have contacted fifteen (15) existing and new potential investors about both in-court and out-of-court financing alternatives.  Scheidemann Decl. ¶ 10.  Twelve (12) of these parties signed NDAs with the Debtors and conducted due diligence.  *Id*.  Through these efforts, the Debtors received a proposal from the Senior DIP Lenders to provide a senior DIP facility which would, among other things, (1) reduce interest expenses by refinancing the existing Prepetition Superpriority Facility with the new Senior DIP Facility at a lower cost basis, (2) obtain committed exit financing for the Debtors upon emergence from these Chapter 11 Cases pursuant to a committed refinancing of the Senior DIP Facility into a new exit term loan facility, (3) obtain a new $50 million revolving line of credit facility from the Senior DIP Lenders in order to fund working capital expenditures upon emergence from these Chapter 11 Cases.  *Id*. Ultimately, these outreach efforts and subsequent negotiations with the Senior DIP Lenders culminated in the Senior DIP Facility.  *Id*.  However, notwithstanding these outreach efforts, none of these parties expressed any willingness to lend on an unsecured or junior basis and/or engage in a priming fight with any secured lenders.  *Id* at ¶ 11.  Moreover, the Ad Hoc Group would not consent to the Debtors' incurrence of other financing by any other party having priming or *pari*

*passu* liens on the collateral securing the obligations to the Ad Hoc Group, except as contemplated under the DIP Facilities. *Id.*

28.     Thus, despite the Debtors' efforts, the Debtors believe that the proposals provided by the DIP Lenders is the only and best option available to address the Debtors' liquidity needs and create a pathway to exit from chapter 11.

## Use of Cash Collateral

29.     The DIP Facilities contemplate that the Debtors will have immediate access to Cash Collateral on a consensual basis, subject to the terms and conditions of the DIP Documents, the DIP Orders, and the Approved Budget. In advance of the Petition Date, the Debtors undertook an analysis of how much postpetition financing and liquidity would be required to operate the Debtors' business and pay administrative costs during these chapter 11 cases. *See* First Day Decl. ¶¶ 93-94. Coupled with the liquidity provided under the DIP Facilities, immediate access to the Cash Collateral will (a) ensure that the Debtors have sufficient working capital to, among other things, continue their business operations in the ordinary course by paying their employees, vendors, landlords, and service providers, (b) enable the Debtors to honor their prepetition and postpetition obligations under and in accordance with the proposed "first-day" relief if approved by the Court, and (c) satisfy administrative expenses of these chapter 11 cases. Providing the Debtors with immediate access to Cash Collateral, together with the DIP Facilities, ensures that the Debtors avoid unnecessary business disruptions that would otherwise be costly and potentially damaging to their businesses.

## Forms of Adequate Protection

30.     After arm's length, good faith negotiations, the Prepetition Secured Parties consent to the use of the Prepetition Collateral, including Cash Collateral, the Debtors' granting of DIP Liens and the Carve-Out, on the terms set forth in the Interim Order, are subject to the

provision by the Debtors of adequate protection.  Among other things, the adequate protection contemplated by the DIP Orders is designed to protect the Prepetition Secured Parties' respective interests in the Debtors' property from any diminution in value ("Diminution in Value") caused by, among other reasons, imposition of the automatic stay, the Debtors' use of Prepetition Collateral, including Cash Collateral, and Debtors' granting of DIP Liens and the Carve-Out. Specifically, the Debtors have agreed to provide the following forms of adequate protection:

- **Adequate Protection Liens**: As further set forth in the Interim Order, subject to the Carve-Out, the Debtors will grant each of the Prepetition Agents, for the benefit of the applicable Prepetition Secured Parties, a security interest in and lien on the DIP Collateral, with the priorities set forth in the Interim Order.

- **Adequate Protection 507(b) Claims**: As further described in the Interim Order, subject to the Carve-Out, each of the Prepetition Agents, on behalf of the applicable Prepetition Secured Parties, will be granted adequate protection super-priority claims for any Diminution in Value as provided in sections 503(b) and 507(b) of the Bankruptcy Code, with the priorities set forth in the Interim Order.

- **Adequate Protection Payments**: The Debtors will pay the reasonable fees and expenses of the Prepetition Secured Parties, including attorneys' fees, as set forth in the Interim Order.

31.     The Adequate Protection Liens, Adequate Protection Superiority Claims, and Adequate Protection Payments are each conferred separately, as applicable, to each of the Prepetition Superpriority Agent, Prepetition Incremental Superpriority Agent, and the Prepetition 1L Agent for the benefit of the applicable Prepetition Secured Parties.

**The DIP Facilities and Use of Cash Collateral Are Necessary to Preserve the Debtors' Estates**

32.     Given the Debtors' current projections and the absence of sufficient unencumbered assets, immediate access to the DIP Facilities and use of Cash Collateral are necessary for the Debtors to continue operations, including to fund employee-related costs, procure necessary goods and services, maintain trade terms with the Debtors' vendors, pay the Debtors' landlords, finance the costs of these chapter 11 cases, and meet other working capital

needs of the Debtors.  First Day Decl. ¶ 76.  Without immediate access to the DIP Facilities and use of Cash Collateral on the terms requested here, the Debtors will suffer immediate and irreparable harm.  *Id.* ¶ 79.  Consequently, approval of the DIP Facilities and use of Cash Collateral is necessary to preserve the value of and to avoid immediate irreparable harm to the Debtors' estates.

### Basis for Relief

## I.     The Debtors Should Be Authorized To Obtain Postpetition Financing on a Senior Secured and Superpriority Basis

33.     The Debtors have met the requirements for relief under section 364 of the Bankruptcy Code, which permits a debtor to obtain postpetition financing and, in return, to grant superpriority administrative status and liens on its property.  Specifically, section 364(c) of the Bankruptcy Code provides that the court may approve financing "with priority over any or all administrative expenses..." 11 U.S.C. § 364(c).  Further, section 364(d) of the Bankruptcy Code provides that priming liens may be granted to support postpetition financing if the debtor is "unable to obtain such credit otherwise" and the primed lienholders either consent or are otherwise adequately protected.  11 U.S.C. § 364(d).

34.     Provided that an agreement to obtain secured credit is consistent with the provisions of, and policies underlying, the Bankruptcy Code, courts grant considerable deference to a debtor's exercise of its business judgment when evaluating its requests to incur postpetition credit.  *See, e.g., In re N. Bay Gen. Hosp., Inc.*, No. 08-20368 (Bankr. S.D. Tex. July 11, 2008) (order approving postpetition financing on an interim basis as exercise of debtors' business judgment); *see In re Estrada*, No. 16-80003, 2016 WL 745536, at *3 (S.D. Tex. Feb. 24, 2016) ("In determining whether to approve a motion to obtain credit, courts generally permit debtors in possession to exercise their basic business judgment consistent with their fiduciary duties."); *In*

*re Latam Airlines Grp. S.A.*, 2020 WL 5506407 at *27 (Bankr. S.D.N.Y. Sept. 10, 2020) ("Generally, in evaluating the merits of proposed postpetition financing, courts will defer to a debtor's business judgment provided that the financing does not unduly benefit a party in interest at the expense of the estate."); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) (deferring to a debtor's "reasonable business judgment. . . so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in interest").

35.     In determining whether the Debtors have exercised sound business judgment in deciding to enter into the DIP Facilities, this Court may take into consideration non-economic benefits to the Debtors offered by a proposed postpetition facility.  For example, in *In re ION Media Networks, Inc.*, 2009 WL 2902568, at *4 (Bankr. S.D.N.Y. July 6, 2009), the Bankruptcy Court for the Southern District of New York explained that "noneconomic elements such as the timing and certainty of closing, the impact on creditor constituencies and the likelihood of a successful reorganization" may be properly considered by debtors when selecting postpetition financing, because the "business decision to obtain credit from a particular lender is almost never based purely on economic terms" due to the importance of those terms.  *Id.*

36.     Here, given all the facts and circumstances present in these chapter 11 cases, the Debtors have amply satisfied the necessary conditions under sections 364(c) and (d) of the Bankruptcy Code for authority to enter into the DIP Facilities.  The Debtors exercised proper business judgment in securing the DIP Facilities on terms that are fair and reasonable and the best available to them under the circumstances and in the current market.  Moreover, given the circumstances described above, the Debtors could not obtain credit on a junior secured or unsecured basis.  *See* Scheidemann Decl. ¶ 11.  For all the reasons discussed further below, the

Debtors respectfully submit that the Court should grant the Debtors' request to enter into the DIP Facilities pursuant to sections 364(c) and (d) of the Bankruptcy Code.

## I.     The Debtors Exercised Sound and Reasonable Business Judgment in Deciding to Enter the DIP Facilities

37.     Based on the facts and circumstances of these chapter 11 cases, the DIP Facilities represents a proper exercise of the Debtors' business judgment.  As noted above, bankruptcy courts routinely defer to a debtor's business judgment on most business decisions, including decisions about whether and how to borrow money.  *See, e.g., In re Integrated Res., Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992) ("Parties opposing the proposed exercise of a debtor's business judgment have the burden of rebutting the presumption of validity") (citing *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984)); *In re Garrett Motion Inc.*, No. 20-12212 (Bankr. S.D.N.Y. October 23, 2020) (approving postpetition financing as "a sound and prudent exercise of the Debtors' business judgment"); *In re Metaldyne Corp.*, 409 B.R. 661, 667–68 (Bankr. S.D.N.Y. 2009) (noting "decisions in [the Southern District of New York] emphasizing that [bankruptcy courts] should not substitute [their] business judgment for that of the Debtors'") (citations omitted), *aff'd* 421 B.R. 620 (S.D.N.Y. 2009); *In re Ames Dep't Stores, Inc.*, 115 B.R. at 40 ("More exacting scrutiny would slow the administration of the debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially."); *see also (In re ASARCO, L.L.C.)*, 650 F.3d 593 (5th Cir. 2011) (noting that the business judgment standard in the context of section 363 of the Bankruptcy Code "is flexible and encourages discretion").

38.     Specifically, when evaluating whether a debtor's decision to obtain postpetition financing was an exercise of sound business judgment, courts need only "examine whether a reasonable business person would make a similar decision under similar circumstances." *In re*

*Dura Auto. Sys., Inc.*, 2007 WL 7728109, at *97 (Bankr. D. Del. Aug. 15, 2007) (quoting *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006)).  When evaluating whether a debtor's decision to enter into postpetition financing was an exercise of sound business judgment, bankruptcy courts consider the terms of the financing in light of the debtor's circumstances and the market for financing more generally.  *See In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003); *see also Unsecured Creditors' Comm. Mobil Oil Corp.* v. *First Nat'l Bank & Trust Co.* (*In re Ellingsen McLean Oil Co., Inc.*), 65 B.R. 358, 365 n.7 (W.D. Mich. 1986) (recognizing a debtor may have to enter into "hard bargains" to acquire funds for its reorganization).

39.     Prevailing market conditions are also highly relevant to a court's evaluation of a debtor's business judgment regarding the proposed DIP financing.  *See* Hr'g Tr. at 734 35:24, *In re Lyondell Chem. Co.*, Case No. 09-10023 (Bankr. S.D.N.Y. March 5, 2009) (recognizing "the terms that are now available for DIP Financing in the current economic environment aren't as desirable" as in the past).  Businesses generally, and customer-facing businesses in particular, are facing various challenges related to inflation, extended pandemic impacts, and macroeconomic headwinds.  *See* First Day Decl. ¶¶ 3; 76-77.  Despite this economic environment, the Debtors have successfully negotiated financing that provides ample liquidity, attractive pricing, flexible budget covenants, and a path to reorganization.  The proposed DIP Facilities resulted from vigorous negotiation with the Ad Hoc Group and the Senior DIP Lenders supported by experienced, professional advisors and, as set forth in the Scheidemann Declaration, is on terms that are customary and usual for DIP financings of this type.  Accordingly, the Debtors submit that the proposed DIP Facilities should be approved as a sound exercise of their business

judgment.  On this record, the relief requested here is a sound exercise of the Debtors' business judgment and should be approved.

## II.     The Debtors Meet the Conditions Necessary Under Section 364(c) and (d) to Obtain Postpetition Financing on a Senior Secured and Superpriority Basis

40.     The Debtors propose to obtain financing under the DIP Facilities by providing superpriority claims and liens pursuant to sections 364(c) and 364(d)(1) of the Bankruptcy Code. The Debtors propose to provide the DIP Secured Parties with liens on and security interests in all of the DIP Collateral, including priming liens on collateral securing the Prepetition Secured Obligations.  The DIP Collateral includes not only all Prepetition Collateral, but all other assets of the Debtors, including assets that were not subject to any validly perfected liens or security interest as of the Petition Date, and, subject to entry of the Final Order to the extent granted therein, the proceeds of avoidance actions (in each case subject to the Carve-Out).

41.     In evaluating proposed postpetition financing under sections 364(c) and 364(d)(1) of the Bankruptcy Code, courts act in their "informed discretion." *In re Ames Dep't Stores*, 115 B.R. at 37.  Courts perform a qualitative analysis and consider factors including whether (a) the debtor made a reasonable effort to find financing with better terms, (b) the financing is necessary to preserve assets of the estate, and (c) the terms of the credit agreement are fair, reasonable, and adequate. *In re Republic Airways Holdings Inc*., 2016 WL 2616717, at *11 (Bankr. S.D.N.Y. May 4, 2016).

## III.    The Debtors Meet the Conditions Necessary Under Section 363 to Refinance the Prepetition Incremental Superpriority Obligations and the Prepetition Superpriority Obligations

42.     The proposed refinancing of the Prepetition Incremental Superpriority Obligations and the Prepetition Superpriority Obligations with the proceeds of the DIP Facilities is an exercise of the Debtors' sound business judgment.  Section 363(b) of the Bankruptcy Code

permits a debtor to use, sell, or lease property outside of the ordinary course of business, with court approval. Courts in the Fifth Circuit have recognized that the payment of prepetition obligations is appropriate where necessary to protect and preserve the value of the estate, including by preserving an operating business's going-concern value. *See, e.g., In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002) (authorizing payment of certain prepetition claims pursuant to "doctrine of necessity"); *In re Equalnet Commc'ns Corp.*, 258 B.R. 368, 369–70 (Bankr. S.D. Tex. 2000) (business transactions critical to the survival of the business may warrant payment of prepetition claims); *In re Johns-Manville Corp.*, 60 B.R. 612, 615–16 (Bankr. S.D.N.Y. 1986) ("[T]he Code favors the continued operation of a business by a debtor and a presumption of reasonableness attaches to a debtor's management decisions.")

43.    Refinancing (or "rolling-up") a prepetition debt is a common feature in debtor-in-possession financing arrangements where, as here, necessary to induce prospective post-petition lenders to advance debtor-in-possession financing. The importance of roll-ups and refinancings in DIP facilities has been repeatedly recognized by this court. *See, e.g., In re Venator Materials PLC, et. al.*, No. 23-90301 (DRJ) (Bankr. S.D. Tex. May 16, 2023) [Docket No. 98] (interim order authorizing the roll-up of $190 million of prepetition indebtedness and $100 million of new money loans); *In re Oasis Petroleum Inc., et. Al.*, No. 20-34771 (MI) (Bankr. S.D. Tex. Sept. 30, 2023) [Docket No. 73] (interim order authorizing the roll-up of $240 million of prepetition indebtedness and $120 million of new money loans); *In re Sanchez Energy Corp.*, No. 19-34508 (MI) (Bankr. S.D. Tex. Aug. 15, 2019) [Docket No. 144] (interim order authorizing the roll-up of $175 million of prepetition indebtedness and $175 million of new money loans); *In re Legacy Reserves Inc.*, No. 19-33395 (MI) (Bankr. S.D. Tex. July 23, 2019) [Docket No. 255] (interim order authorizing the roll-up of $87.5 million of prepetition indebtedness and $35 million of new

money loans); *In re Gastar Exploration*, Inc., No. 18-36057 (MI) (Bankr. S.D. Tex. Nov. 26, 2018) [Docket No. 213] (authorizing the roll-up of $283 million of certain prepetition indebtedness and $100 million of new money loans); *In re ATP Oil & Gas Corp.*, No. 12-36187 (MI) (Bankr. S.D. Tex. Aug. 21, 2012) [Docket No. 128] (authorizing the roll-up of $368 million in prepetition indebtedness on an interim basis, in addition to $250 million of new money loans, including $80 million on an interim basis).

44.     The Senior DIP Facility will allow the Debtors to (1) reduce interest expenses by refinancing their existing Prepetition Superpriority Facility with the new Senior DIP Facility, (2) provide committed exit financing for the Debtors upon emergence from these Chapter 11 Cases by committing to refinance the Senior DIP Facility into a new exit term loan facility, and (3) obtain a new $50 million revolving line of credit facility from the Senior DIP Lenders in order to fund working capital expenditures upon emergence from these Chapter 11 Cases.   These commitments, in turn, were necessary to obtain the commitments of the Parties to the RSA, and pave the way for consensual and expeditious chapter 11 cases.

45.     Further, refinancing of the Superpriority Facility and Incremental Superpriority Facility was required by the Junior DIP Lenders in exchange for their agreement to provide the Junior DIP Facility that funds these Chapter 11 Cases and provides the Debtors necessary new money financing.   See Scheidemann Decl. ¶ 16.   The Junior DIP Lenders would not have provided the New Money DIP Term Loans without the refinancings.

46.     Accordingly, the refinancing of the Prepetition Incremental Superpriority Obligations and the Prepetition Superpriority Obligations is a sound exercise of the Debtors' business judgment and should be approved.

**IV.     The Debtors Are Unable to Obtain Financing on More Favorable Terms Than the DIP Facilities**

47.     Debtors need to demonstrate that they made a reasonable effort to find alternative financing before a bankruptcy court will order superpriority liens and claims.  *In re Latam Airlines Grp. S.A.*, 2020 WL 5506407, at *26 (Bankr. S.D.N.Y. Sept. 10, 2020); *In re Laffite's Harbor Dev. I, LP*, 2018 WL 272781, at *3 (Bankr. S.D. Tex. Jan. 2, 2018) (denying debtor's request for secured financing because debtor "did not make even a rudimentary effort to comply with section 364(d)(1) before seeking approval of a transaction which would prime [the proposed financer's] lien"); *In re Harborwalk*, 2010 WL 346298, at *2 (Bankr. S.D. Tex. Jan. 29, 2010) ("A debtor must show that it made a reasonable effort to obtain postpetition financing from other potential lenders on less onerous terms and that such financing was unavailable.").  But, the Bankruptcy Code "imposes no duty [on a debtor] to seek credit from every possible lender before concluding that such credit is unavailable."  *Latam Airlines*, at *26 (citing *Bray* v. *Shenandoah Fed. Savs. & Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986)); *see also In re Drillmar Oil & Gas, Inc.*, 2010 WL 5158258, at *2 (Bankr. S.D. Tex. July 12, 2010) (approving debtors' motion granting, among other things, senior liens and security interests where debtor required postpetition financing that could not be obtained on equal or more favorable terms than those presented by the secured financing liens within the time required by the debtors and avoid irreparable harm; *In re Pearl-Phil GMT (Far East) Ltd*. v. *Caldor Corp.*, 266 B.R. 575, 584−85 (S.D.N.Y. 2001) (superpriority administrative expenses authorized where debtor could not obtain credit as an administrative expense); *In re Ames Dep't Stores, Inc.*, 115 B.R. at 40 (approving financing facility and holding that debtor made reasonable efforts to satisfy the standards of section 364(c) to obtain superior terms after

discussing possible postpetition financing with four lenders); *In re Mosello*, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996).

48.     Moreover, when only a few lenders likely can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing."  *In re Sky Valley, Inc*., 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom. Anchor Sav. Bank FSB* v. *Sky Valley, Inc*., 99 B.R. 117, 120 n.4 (N.D. Ga. 1989).

49.     Here, the Debtors do not believe that comparable alternative sources of financing are reasonably available given the realities imposed by the Debtors' existing capital.  Although the Debtors solicited financing proposals from potential new, third-party capital providers, these efforts were unsuccessful.  Consequently, the Debtors ultimately conducted good faith, arm's-length negotiations with the Debtors' existing stakeholders regarding the terms of the DIP Facilities.  Scheidemann Decl. ¶ 17.  Through these negotiations, the Debtors improved the economic and other terms of the DIP Facilities, and believe it is the best financing proposal reasonably available under the circumstances.  *Id.* at ¶¶ 12, 16.

## V.     The DIP Facilities Are Necessary to Preserve the Value of the Debtors' Estates

50.     The Debtors have a fiduciary duty to protect and maximize their estates' assets. *See In re Mushroom Transp. Co*., 382 F.3d 325, 339 (3d Cir. 2004). The Debtors seek access to the DIP Facilities consistent with that duty.  Without access to the DIP Facilities, the Debtors would be unable to fund critical payments that are essential to the Debtors' operational and restructuring viability.  First Day Decl. ¶ 93.

## VI.     The Terms of the DIP Facilities Are Fair, Reasonable, and Adequate under the Circumstances

51.     In considering whether the terms of postpetition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender.  *See In re Farmland Indus., Inc.*, 294 B.R. at 886; *see also In re Ellingsen MacLean Oil Co.*, 65 B.R. at 365.  The appropriateness of a proposed financing facility should also be considered in light of current market conditions.  *See In re Lyondell Chem. Co.*, No. 09-10023 (REG) (Bankr. S.D.N.Y. Feb. 27, 2009), Hr'g Tr. 740:4-6 ("[B]y reason of present market conditions, as disappointing as the [DIP] pricing terms are, I find the provisions [of the DIP] reasonable here and now.").  Here, the terms of the DIP Facilities are fair, appropriate, reasonable, adequate under the circumstances, and in the best interests of the Debtors, their estates, and their creditors.

52.     As noted above and as set forth in the Scheidemann Declaration, the terms of the DIP Facilities were actively negotiated by the Debtors, with the assistance of their advisors. Under the current facts and circumstances of these chapter 11 cases, the pricing, fees, and other economics provided for in the DIP Facilities, taken as a whole, provide the best presently available financing option for Debtors, particularly in light of the absence of any more favorable alternatives.  *See* Scheidemann Decl. ¶ 12.  The DIP Lenders also negotiated for milestones that provide the Debtors with adequate time to negotiate and implement a value-maximizing restructuring such that agreeing to include these milestones as a condition to entering into the DIP Facilities was reasonable and in the Debtors' best interests.

## VII.    DIP Lenders Should Be Deemed Good Faith Lenders under Section 364(e)

53.     Section 364(e) of the Bankruptcy Code protects a good faith lender's right to collect on loans extended to a debtor, and its right to any lien securing those loans, even if the

authority of the debtor to obtain such loans or to grant such liens is later reversed or modified on appeal. Section 364(e) provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal. 11 U.S.C. § 364(e).

54.     Here, the Debtors believe the DIP Facilities embody the most favorable terms on which the Debtors could obtain postpetition financing.   As described in the Scheidemann Declaration, the negotiations of the terms of the DIP Facilities with the DIP Lenders were conducted at arm's length. Under the circumstances, the terms and conditions of the DIP Documents are reasonable, and the proceeds of the DIP Facilities will be used only for purposes that are permissible under the Bankruptcy Code, in accordance with the DIP Orders and the DIP Documents and in accordance with the Approved Budget.   Accordingly, the Court should find that the DIP Lenders are "good faith" lenders within the meaning of section 364(e) of the Bankruptcy Code and that the DIP Lenders thus are entitled to all of the protections afforded by that section.

## VIII.   The Prepetition Secured Parties Are Adequately Protected

55.     Section 362(d)(1) of the Bankruptcy Code provides for adequate protection of interests in property due to, among other things, the imposition of the automatic stay.[8] *See In re*

---

[8]     Section 363(c)(2) of the Bankruptcy Code provides that, absent consent, a debtor may use cash collateral where "the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section." 11 U.S.C. § 363(c)(2)(A)–(B).   Absent consent, section 363(e) of the Bankruptcy Code further conditions the use of collateral upon the debtor providing "adequate protection" of a secured creditor's interest in the property proposed to be used.  11 U.S.C. § 363(e); 3-363 Collier on Bankruptcy ¶ 363.05 (16th ed. 2010).

*Cont'l Airlines*, 91 F.3d 553, 556 (3d Cir. 1996) (en banc). While section 361 of the Bankruptcy Code provides examples of forms of adequate protection, such as granting replacement liens and administrative claims, courts decide what constitutes sufficient adequate protection on a case-by-case basis. *In re Energy Partners Ltd.*, 409 B.R. 211, 236 (Bankr. S.D. Tex. 2009) ("Exactly what constitutes adequate protection must be decided on a case-by-case basis"); *In re Mosello*, 195 B.R. at 289 ("The determination of adequate protection is a fact-specific inquiry . . . left to the vagaries of each case."); *In re Martin*, 761 F.2d 472, 474 (8th Cir. 1985); *In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. Mar. 4, 1986) (the application of adequate protection "is left to the vagaries of each case, but its focus is protection of the secured creditor from diminution in the value of its collateral during the reorganization process") (citation omitted).

56.    After extensive arm's length and good faith negotiations, the Prepetition Secured Parties have consented or are deemed to have consented to the use of their Prepetition Collateral, including Cash Collateral, subject to the provision by the Debtors of adequate protection as set forth in the Interim Order and the DIP Documents. [9]  Among other things, the Adequate Protection Liens and Adequate Protection 507(b) Claims contemplated by the DIP Facilities are designed to protect the Prepetition Secured Parties' interests in the Debtors' property from any diminution in value caused by the Debtors' use of the Prepetition Collateral, including Cash Collateral, during the pendency of these chapter 11 cases. As further adequate protection, the Prepetition Secured Parties are also receiving the benefit of the Adequate Protection 507(b) Claims, and payment of the reasonable and documented prepetition and postpetition fees and out-of-pocket expenses of their advisors, subject to the review procedures set forth in paragraph 16 of the Interim Order.

---

[9]    Interim Order, ¶ H(x)

**IX.     The Use of Cash Collateral Is Warranted and Should Be Approved**

57.     The Debtors' use of property of their estates, including the Cash Collateral, is governed by section 363 of the Bankruptcy Code, which provides in relevant part that if the debtor is authorized to continuing operating its business during its chapter 11 case, the debtor "may use property of the estate in the ordinary course of business without notice or a hearing." 11 U.S.C. § 363(c)(1).

58.     Pursuant to section 363(c)(2) of the Bankruptcy Code, a debtor may not use cash collateral unless "(A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section."   11 U.S.C. § 363(c)(2).   Section 363(e) of the Bankruptcy Code provides for adequate protection of interests in property when a debtor uses Cash Collateral. Further, section 362(d)(1) of the Bankruptcy Code provides for adequate protection of interests in property due to the imposition of the automatic stay.  *See In re Cont'l Airlines*, 91 F.3d 553, 556 (3d Cir. 1996) (en banc).  As discussed above, section 361 of the Bankruptcy Code provides examples of forms of adequate protection, such as granting replacement liens and administrative claims, but courts decide what constitutes sufficient adequate protection on a case-by-case basis. *See, e.g., In re Swedeland Dev. Grp., Inc.*, 16 F.3d 552, 564 (3d Cir. 1994) (explaining that the "determination of whether there is adequate protection is made on a case by c ase basis").

59.     This Court has approved similar adequate protection packages in recent chapter 11 cases, under similar circumstances.  *See, e.g., In re Gastar Exploration Inc.*, No. 18-36057 (MI) (Bankr. S.D. Tex. Nov. 26, 2018) [Docket No. 76] (granting superpriority administrative claims, adequate protection replacement liens, adequate protection payments and fees and expenses on an interim basis to the applicable prepetition secured lenders); *In re LINN Energy, LLC*, No. 16-60040 (DRJ) (Bankr. S.D. Tex. May 13, 2016) [Docket No. 89] (same); *In re*

*Goodrich Petrol. Corp.*, No. 16-31975 (MI) (Bankr. S.D. Tex. Apr. 18, 2016) [Docket No. 45] (same); *In re Midstates Petrol. Co.*, No. 16-32237 (DRJ) (Bankr. S.D. Tex. May 2, 2016) [Docket No. 324] (same).

60. Here, to the extent that their consent is required, the DIP Secured Parties and the Prepetition Secured Parties have consented or are deemed to have consented to the Debtors' use of the Cash Collateral, subject to the terms and limitations set forth in the Interim Order and the DIP Documents. Further, as set forth above, the proposed adequate protection is appropriate, fair, and customary under the circumstances.

## X.     The Scope of the Carve-Out is Appropriate

61. The Interim Order subjects the security interests and administrative expense claims of the DIP Lenders and the Prepetition Secured Parties to a professional fee Carve-Out. Such Carve-Outs for professional fees have been found to be reasonable and necessary to ensure that a debtor's estate and any statutory committee appointed can reimburse their professionals in certain circumstances following an event of default under the terms of the debtor's postpetition financing. *See Ames Dep't Stores*, 115 B.R. at 40. In other words, the Carve-Out protects against administrative insolvency during the course of the chapter 11 cases by ensuring that assets remain for the payment of the U.S. Trustee's fees and estate professional fees notwithstanding the grant of DIP Liens, superpriority claims, and adequate protection liens and claims. Moreover, other than in limited circumstances as noted above, neither the Interim Order nor the DIP Facilities directly or indirectly deprives the Debtors' estates or other parties in interest of possible rights and powers by restricting the services for which professionals may be paid in these cases. *See id.* at 38 (observing that courts insist on carve-outs for professionals representing parties in interest because "[a]bsent such protection, the collective rights and expectations of all parties-in-interest are sorely prejudiced").

62.     This Court has approved similar carve-out provisions in other cases, where the provisions have been agreed to by debtors and their postpetition lenders.  *See, e.g., In re Legacy Reserves Inc.*, Case No. 19-33395 (MI) (Bankr. S.D. Tex. July 23, 2019) [Docket No. 255]; *In re Sanchez Energy Corp.*, Case No. 19-34508 (MI) (Bankr. S.D. Tex. Aug. 15, 2019) [Docket No. 144]; *In re Parker Drilling Co.*, Case No. 18-36958 (MI) (Bankr S.D. Tex. Dec. 13, 2018) [Docket No. 174]; *In re PetroQuest Energy*, Case No. 18-36322 (DRJ) (Bankr. S.D. Tex. Dec. 3, 2018) [Docket No. 328]; *In re Linn Energy, LLC*, Case No. 16-60040 (DRJ) (Bankr. S.D. Tex. May 13, 2016) [Docket No. 89].

## XI.     The Debtors Should Be Authorized to Pay the Fees and Expenses Required by the DIP Agents and the DIP Lenders Under the DIP Documents

1.     In consideration for their commitment to provide the DIP Facilities, the Debtors have agreed, subject to Court approval, to an Exit Premium of 1.50% and an Extension Fee of 1.00% to the Senior DIP Lenders, and a Closing Fee of 4.00% and a DDTL Commitment Fee of 1.00% to the Junior DIP Lenders.  The Debtors have also agreed, subject to Court approval, to pay to the DIP Secured Parties any amendment fees, premiums, servicing fees, audit fees, liquidator fees, structuring fees, administrative agent's, collateral agent's or security trustee's fees, upfront fees, closing fees, commitment premiums, exit fees, closing date fees, prepayment fees or agency fees), and any amounts due in respect of any indemnification and expense reimbursement obligations, including, without limitation, the reasonable fees and expenses of professionals retained by, or on behalf of, any of the DIP Secured Parties (including, without limitation, those of ArentFox Schiff LLP, Milbank LLP, Stikeman Elliott LLP, Holland & Knight LLP, Seward & Kissel LLP, White & Case LLP, Osler, Hoskin & Harcourt LLP, Cox & Palmer LLP, McKinney Bancroft & Hughes, Jones Walker LLP, Perella Weinberg Partners, FTI

Consulting, Inc., and any other advisors as permitted under the DIP Documents), in each case, to the extent provided in the DIP Documents.

2.       In light of the substantial amount of capital that the DIP Lenders have committed to provide to ensure an efficient and value-maximizing chapter 11 process, the Debtors, in consultation with their advisors, believe that the consideration being provided to the DIP Lenders, taken as a whole, in exchange for providing such commitment, is reasonable under the circumstances and necessary to obtain the DIP Facilities.   Accordingly, the Court should authorize the Debtors to pay the fees and expenses provided under the DIP Documents in connection with entering into those agreements.

## XII.   The Automatic Stay Should Be Modified on a Limited Basis

3.       The Interim Order contemplates modification of the automatic stay to (a) permit the Debtors and their affiliates, the DIP Secured Parties, and the Prepetition Secured Parties to implement and effectuate the terms and provisions of the Interim Order and the DIP Documents and (b) permit the DIP Secured Parties to exercise rights and remedies under certain circumstances.   The Debtors believe that these provisions were required for the Debtors' to obtain the DIP Facilities and use Cash Collateral as provided in the Interim Order.   Notably, the exercise of remedies is subject to a five (5) calendar day period to allow the Debtors to cure or seek relief.   Moreover, following the delivery of such notice, the DIP Agent is required to file a Stay Relief Motion with not less than five (5) business days' notice seeking emergency relief from the automatic stay if it intends to exercise remedies, and until such time as the Stay Relief Motion has been adjudicated by the Court, the Debtors may use the proceeds of the DIP Facilities (to the extent drawn prior to the occurrence of Event of Default) or Cash Collateral to fund operations in accordance with the Approved Budget, the DIP Documents, and the DIP Orders.

4.     Stay modifications of this kind are ordinary and common features of debtor-in-possession financing arrangements. *See, e.g., In re Vanguard Natural Resources, Inc.* (DRJ) (Bankr. S.D. Tex. Apr. 30, 2019) [Docket No. 241] (modifying automatic stay as necessary to effectuate the terms of the order); *In re Southcross Holdings LP*, No. 16-20111 (MI) (Bankr. S.D. Tex. Apr. 11, 2016) [Docket No. 200] (modifying automatic stay as necessary to effectuate the terms of the order); *In re Autoseis, Inc.*, No. 14-20130 (RSS) (Bankr. S.D. Tex. Mar. 27, 2014) [Docket No. 234] (same); *In re ATP Oil & Gas Corp.*, No. 12-36187 (MI) (Bankr. S.D. Tex. Aug. 17, 2012) [Docket No. 128] (same).

5.     In the Debtors' business judgment, the stay modifications are reasonable and fair under the circumstances of these chapter 11 cases.

## XIII.   Failure to Obtain Immediate Interim Access to the DIP Facilities and Cash Collateral Would Cause Immediate and Irreparable Harm

6.     Bankruptcy Rules 4001(b) and 4001(c) provide that a final hearing on a motion to obtain credit pursuant to section 364 of the Bankruptcy Code or to use cash collateral pursuant to section 363 of the Bankruptcy Code may not be commenced earlier than 14 days after the service of such motion.  Upon request, however, the Court may conduct a preliminary, expedited hearing on the motion and authorize the obtaining of credit and use of cash collateral on an interim basis to the extent necessary to avoid immediate and irreparable harm to a debtor's estate.  *See* Bankruptcy Rules 4001(b)(2) and 4001(c)(2) & Complex Case Procedures ¶ 5.  Furthermore, section 363(c)(3) of the Bankruptcy Code authorizes the Court to conduct a preliminary hearing and to authorize the use of cash collateral on an interim basis "if there is a reasonable likelihood that the [debtor] will prevail at the final hearing under [section 363(e) of the Bankruptcy Code]." 11 U.S.C. § 363(c)(3).

7.     As set forth in the First Day Declaration, the Debtors would be unable to continue as a going concern if they do not obtain interim approval of the DIP Facilities and access to Cash Collateral, which would cause immediate and irreparable harm to the Debtors and their stakeholders by dramatically diminishing the value of the Debtors' estates.  First Day Decl. ¶ 93. Furthermore, the Debtors require access to additional liquidity provided under the DIP Facilities to stabilize their operations, meet working capital and business operating needs, fund the administration of these chapter 11 cases, provide long-term stability and confidence for the Debtors' stakeholders, obtain go-forward financing upon emergence from these chapter 11 cases, and implement the relief requested in the Debtors' other "first day" motions.  *Id.* ¶¶ 93-94.

8.     Accordingly, pursuant to section 363(c)(3) of the Bankruptcy Code, Bankruptcy Rule 4001(b), and paragraph 5 of the Complex Case Procedures, the Debtors request that the Court conduct an expedited hearing on this DIP Motion, and enter the Interim Order authorizing the Debtors to use Cash Collateral and obtain credit under the DIP Facilities, all on an interim basis, pending approval on a final basis after the Final Hearing (if necessary).

**Emergency Consideration**

9.     Pursuant to Bankruptcy Rule 6003, which empowers a court to grant relief within the first 21 days after the commencement of a chapter 11 case "to the extent that relief is necessary to avoid immediate and irreparable harm," and Bankruptcy Local Rule 9013-1(i), the Debtors respectfully request emergency consideration of this motion.  An immediate and orderly transition into chapter 11 is critical to the viability of the Debtors' operations.  Failure to obtain the requested relief during the first 21 days of these chapter 11 cases would imperil the Debtors' restructuring.  The Debtors have satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 and, therefore, respectfully request that the Court approve the relief requested in this motion on an emergency basis.

**Waiver of Bankruptcy Rules 6004(a) and 6004(h)**

10.     The Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

**Notice**

11.     The Debtors will provide notice of this motion to the following parties or their respective counsel: (a) the Office of the U.S. Trustee for the Southern District of Texas; (b) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) counsel to the Ad Hoc Group, Milbank LLP, 55 Hudson Yards, New York, NY 10001; (d) counsel to Crestview, Davis Polk & Wardwell LLP, 450 Lexington Avenue, New York, NY 10017; (e) counsel to the Senior DIP Lenders, White & Case LLP, 1221 Avenue of the Americas, New York, NY 10020; (f) counsel to Alter Domus (US) LLC, as agent under the Superpriority Credit Agreement, Norton Rose Fulbright US LLP, 1301 6th Avenue, New York, NY 10019; (g) counsel to GLAS Trust Company LLC, as agent under the Senior DIP Facility, Seward & Kissel LLP, One Battery Park Plaza, New York, NY 10004; (h) counsel to GLAS Trust Company LLC, as agent under the Junior DIP Facility and under the First Lien Credit Agreement, ArentFox Schiff LLP, 1301 Avenue of the Americas, 42nd Floor, New York, NY 10019; (i) counsel to UBS AG, Stamford Branch, as agent under the Revolving Credit Agreement, Cahill Gordon & Reindel LLP, 32 Old Slip, New York, NY 10005; (j) the United States Attorney's Office for the Southern District of Texas; (k) the Internal Revenue Service; (l) the United States Securities and Exchange Commission; (m) the state attorneys general for states in which the Debtors conduct business; (n) other regulatory agencies having a regulatory or statutory interest in these cases; (o) counterparties to the Contracts and Leases; and (p) any party

that has requested notice pursuant to Bankruptcy Rule 2002.  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

12.     The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

13.     A copy of this motion is available on (a) the Court's website, at www.txs.uscourts.gov, and (b) the website maintained by the Debtors' proposed claims and noticing agent, Omni Agent Solutions, at https://omniagentsolutions.com/Hornblower.

*[Remainder of page intentionally left blank]*

WHEREFORE, the Debtors respectfully request that the Court enter an interim and final order granting the relief requested herein and such other relief as the Court deems appropriate under the circumstances.

February 21, 2024

Respectfully submitted,

By: */s/ John F. Higgins*
**PORTER HEDGES LLP**
John F. Higgins (TX Bar No. 09597500)
M. Shane Johnson (TX Bar No. 24083263)
Megan Young-John (TX Bar No. 24088700)
1000 Main St., 36th Floor
Houston, Texas 77002
Telephone: (713) 226-6000
Facsimile:  (713) 226-6248
jhiggins@porterhedges.com
sjohnson@porterhedges.com
myoung-john@porterhedges.com

- and -

**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
Paul M. Basta (pending *pro hac vice*)
Jacob A. Adlerstein (pending *pro hac vice*)
Kyle J. Kimpler (pending *pro hac vice*)
Sarah Harnett (pending *pro hac vice*)
Neda Davanipour (pending *pro hac vice*)
1285 Avenue of the Americas
New York, New York 10019
Telephone: (212) 373-3000
Facsimile: (212) 757-3990
pbasta@paulweiss.com
jadlerstein@paulweiss.com
kkimpler@paulweiss.com
sharnett@paulweiss.com
ndavanipour@paulweiss.com

*Proposed Counsel to the Debtors and the Debtors in Possession*

## Certificate of Accuracy

I certify that the facts and circumstances described in the above pleading giving rise to the emergency request for relief are true and correct to the best of my knowledge, information, and belief.  This statement is made pursuant to Bankruptcy Local Rule 9013-1(i).

*/s/ Jonathan Hickman*
Jonathan Hickman

## Certificate of Service

I certify that on February 21, 2024, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ John F. Higgins*
John F. Higgins