IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

|  |  |
|---|---|
| In re: | ) Chapter 11 |
|  | ) |
| HORNBLOWER HOLDINGS LLC, *et al.*,[1] | ) Case No. 24-90061(MI) |
|  | ) |
| Debtors. | ) (Joint Administration Requested) |
|  | ) (Emergency Hearing Requested) |

**DECLARATION OF MATTHEW SCHEIDEMANN
IN SUPPORT OF DEBTORS' <u>EMERGENCY</u> MOTION FOR ENTRY OF
INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO
(A) OBTAIN SENIOR SECURED POSTPETITION FINANCING AND (B) USE CASH
COLLATERAL, (II) GRANTING ADEQUATE PROTECTION TO CERTAIN
PREPETITION SECURED PARTIES, (III) SCHEDULING A FINAL HEARING,
AND (IV) GRANTING RELATED RELIEF**

I, Matthew Scheidemann, pursuant to 28 U.S.C. § 1746, hereby declare that the following is true to the best of my knowledge, information, and belief:

1. I am a Managing Director at Guggenheim Securities, LLC ("**Guggenheim Securities**"), an investment banking firm with principal offices at 330 Madison Avenue, New York, New York 10007. Guggenheim Securities is the proposed investment banker for the debtors and debtors-in-possession (collectively, the "**Debtors**") in the above-captioned chapter 11 cases.[2]

---

[1] The last four digits of Debtor Hornblower Holdings LLC's tax identification number are 6035. Due to the large number of debtor entities in these chapter 11 cases, for which the Debtors have requested joint administration, a complete list of the debtor entities and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' proposed claims and noticing agent at https://omniagentsolutions.com/Hornblower. The location of the Debtors' service address for purposes of these chapter 11 cases is: Pier 3, The Embarcadero, San Francisco, CA 94111.

[2] The Debtors anticipate filing an application to retain Guggenheim Securities as their investment banker, effective as of the commencement of their chapter 11 cases, shortly hereafter.

2. I submit this declaration (the "Declaration")[3] in support of the *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Senior Secured Postpetition Financing and (B) Use Cash Collateral, (II) Granting Adequate Protection to Certain Prepetition Lenders, (III) Scheduling a Final Hearing, and (IV) Granting Related Relief* (the "**DIP Motion**"), which seeks approval of the Debtors' consensual use of Cash Collateral and senior secured superpriority postpetition financing from the DIP Lenders.

3. Although Guggenheim Securities is expected to be compensated for its work as the Debtors' proposed investment banker in these chapter 11 cases, I am not being compensated separately for this Declaration or testimony. Except as otherwise indicated herein, all of the facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, the information provided to me by Guggenheim Securities professionals involved in advising the Debtors in these chapter 11 cases, or information provided to me by the Debtors. If called upon to testify, I could and would testify to the facts set forth herein on that basis. I am over the age of 18 years and am authorized to submit this Declaration.

**I.     Background and Qualifications**

4. I have over ten (10) years of financial advisory experience, which has involved advising debtors, creditors, and equity holders on a wide variety of recapitalization and restructuring transactions. My experience includes procuring, structuring, and negotiating many financings, including debtor-in-possession financing facilities, across a broad range of industries, including healthcare, energy, retail services and transportation. I have been involved in numerous

---

[3] Capitalized terms used but not otherwise defined herein shall have the meanings given to them in the DIP Motion contemporaneously filed herewith or the *Declaration of Jonathan Hickman in Support of Chapter 11 Petitions and First Day Relief* filed contemporaneously herewith (the "**First Day Declaration**"), as applicable.

restructurings, including those of Hertz, Mallinckrodt plc, CxLoyalty (f/k/a Affinion Group), 21st Century Oncology, Ascent Capital Group, Templar Energy and Rite Aid Corporation.  Prior to joining Guggenheim Securities, I was a Vice President at Millstein & Co., LLC, an investment bank focused on corporate restructuring that was acquired by Guggenheim Securities in 2018.  Prior to that, I was an Associate on the turnaround and restructuring team at Zolfo Cooper LLC (now AlixPartners).  I graduated from the University of Virginia with a bachelor's degree in finance.

## II. Guggenheim Securities Retention

5. Since October 2023, Guggenheim Securities has been rendering investment banking advisory services to, and working closely with, the Debtors, in connection with the Debtors' evaluation of potential restructuring and other strategic alternatives, including, as noted below, in connection with the Debtors' discussions with certain of its creditors surrounding the terms of a comprehensive recapitalization.  During this time, Guggenheim Securities has worked with the Debtors' management and other professionals retained by the Debtors, and has become familiar with the Debtors' capital structure, financial condition, liquidity needs, and business operations.

## III. The DIP Facilities

6. As set forth more fully in the First Day Declaration and the DIP Motion, in addition to consenting to the use of Cash Collateral, the DIP Lenders in their respective capacities, have committed to provide the DIP Facilities on the terms and conditions set forth therein.  As noted in the DIP Motion, to continue operating in the ordinary course, and to effectuate an efficient and expeditious restructuring, the Debtors need immediate access to liquidity. Additionally, as noted in the First Day Declaration, the Debtors believe that the proposed DIP Facilities and use of Cash

Collateral will be sufficient to provide the Debtors with the necessary liquidity to fund these chapter 11 cases.

7. As noted in the DIP Motion, the loans to be advanced under the Senior DIP Facility (the "**Senior DIP Loans**") carry, at the Debtors' election, an interest rate of (i) SOFR + 6.50% per annum, payable in cash, or (ii) SOFR + 3.50% per annum, payable in cash, and 3.50% per annum, payable in kind, as well as a 1.50% exit fee payable upon the retirement of the facility. The loans to be advanced under the Junior DIP Facility (the "**Junior DIP Loans**", and together with the loans to be advanced under the Senior DIP Facility, the "**DIP Loans**") carry an interest rate of SOFR + 9.00% per annum, payable in kind, and will also carry a 1.00% ticking fee on undrawn amounts, a 4.00% upfront fee payable upon closing and a 4.00% exit fee payable upon the retirement of the facility.

8. Additionally, as noted in the DIP Motion, the Senior DIP Loans will be secured by senior secured superpriority liens on substantially all assets and property of the Debtors, subject to certain permitted exceptions, permitted senior liens, and a carve-out for professional expenses. The DIP Motion also provides that the Junior DIP Loans will be secured by junior secured superpriority liens on substantially all assets and property of the Debtors, subject to the Senior DIP Liens, certain permitted exceptions, permitted senior liens, and a carve-out for professional expenses. The DIP Facilities shall mature upon the earlier of the nine (9) month anniversary of the financing and the effective date of any in-court restructuring, as noted in the DIP Motion.

### IV. The Debtors' Efforts to Secure Financing

9. As noted in the First Day Declaration, beginning in October 2023, the Debtors, with the assistance of their advisors, commenced negotiations with an ad hoc group of lenders under the Debtors' secured debt facilities (the "**Ad Hoc Group**") around the terms of a comprehensive

4

recapitalization that would deleverage the Debtors' balance sheet. These discussions ultimately resulted in an agreement on the terms of a comprehensive restructuring and the Junior DIP Facility.

10. In addition to negotiating the terms of the Junior DIP Facility, the Debtors also reached out to other potential financing sources to determine if better financing was available. Specifically, prior to the commencement of these chapter 11 cases, the Debtors, with the assistance of Guggenheim Securities, contacted fifteen (15) existing and potential new investors about both in-court and out-of-court financing alternatives. Twelve (12) of these parties signed NDAs with the Debtors and conducted due diligence. Through these efforts, the Debtors received a proposal from the Senior DIP Lenders to provide a senior DIP facility which would, among other things, (1) reduce interest expenses by refinancing the existing Prepetition Superpriority Facility with the new Senior DIP Facility at a lower cost basis, (2) obtain committed exit financing for the Debtors upon emergence from these Chapter 11 Cases pursuant to a committed refinancing of the Senior DIP Facility into a new exit term loan facility, (3) obtain a new $50 million revolving line of credit facility from the Senior DIP Lenders in order to fund working capital expenditures upon emergence from these Chapter 11 Cases. Ultimately, these outreach efforts and subsequent negotiations with the Senior DIP Lenders culminated in the Senior DIP Facility, which, as noted in the DIP Motion, is designed to allow the Debtors to reduce their interest expense and provide confidence and stability for the Debtors' key stakeholders.

11. Importantly, during these outreach efforts, none of these prospective third-party financing sources expressed any willingness to lend on an unsecured or junior basis and/or engage in a priming fight with any secured lenders. Further, I understand that the Ad Hoc Group would not consent to the Debtors' incurrence of other financing by any other party having priming or pari passu liens on the collateral securing the obligations to the Ad Hoc Group, but were supportive of

5

the Senior DIP Facility. Accordingly, the Debtors, with the assistance of their advisors, focused their efforts on the proposed DIP Facilities.

V.      **The DIP Facilities Are the Best Postpetition Financing Option for the Debtors**

12.     Based on my experience with debtor-in-possession financing transactions as well as my involvement in the efforts to secure postpetition financing for the Debtors, I believe that the proposed DIP Facilities, taken together as a whole, represent the best presently available financing option under the facts and circumstances of these chapter 11 cases.

13.     *First*, as noted in the Motion, the proposed DIP Facilities and the use of Cash Collateral are expected to provide the Debtors with access to the amount of capital that the Debtors, in consultation with their relevant advisors, believe is necessary to effectively and efficiently administer these chapter 11 cases.

14.     *Second*, the terms of the proposed DIP Facilities are the result of the negotiations and outreach efforts described above. As noted above, the Debtors, with the assistance of their advisors, solicited other sources of postpetition financing to determine whether the Debtors could obtain such postpetition financing on better terms. However, other than the Junior DIP Lenders, I am not aware of any party that was willing to provide any financing on an unsecured or junior basis and none of the prospective third-party financing sources referred to above seemed willing to engage in a priming fight. The DIP Facilities, on the other hand, avoids any priming fight.

15.     *Third*, I believe that the principal economic terms proposed under the DIP Facilities, such as the contemplated pricing, fees, interest rate, and default rate, are customary and usual for debtor-in-possession financings of this type. In my view, based on the discussions I observed, such economic terms were negotiated at arm's length and are, in aggregate, generally consistent with the cost of debtor-in-possession financings in comparable circumstances.

16. *Fourth*, the DIP Facilities provide for the refinancing of the Prepetition Superpriority Facility and Prepetition Incremental Superpriority Facility. Based on my participation in the discussions and negotiations concerning proposed debtor-in-possession financings for the Debtor, the Ad Hoc Group was unwilling to extend the Junior DIP Loans (which provide new money loans that will enable the Debtors to operate during the chapter 11 cases) unless the DIP Facilities refinanced these prepetition facilities. Further, such refinancings were a critical component to the Ad Hoc Group's willingness to enter into the Restructuring Support Agreement.

### VI. The DIP Facilities Were Negotiated at Arm's Length

17. Negotiations around the proposed DIP Facilities and their terms, including the interest rates and fees, extended for a period of approximately four (4) weeks. In my view, based on the discussions I observed in the course of these negotiations, and my experience negotiating other debtor-in-possession financings, these negotiations were conducted at arm's length. In addition, I understand that the Junior DIP Lenders agreed to provide an opportunity for certain similarly situated creditors to participate in the Junior DIP Facility.

### VII. Conclusion

18. In sum, for the reasons stated above, and based on my experience with debtor-in-possession financing transactions as well as my participation and involvement in the exploration of financing alternatives for the Debtors, I believe that the proposed DIP Facilities, taken as a whole, offer the best presently available financing option for the Debtors under the facts and circumstances of these chapter 11 cases. Additionally, I believe that the principal economic terms proposed under the DIP Facilities (such as the pricing, fees and interest rate), are customary and

usual for DIP financings of this type, were negotiated at arm's length, and are, in the aggregate, generally consistent with terms of DIP financings in comparable circumstances.

[*Remainder of page intentionally left blank*]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

February 21, 2024

*/s/ Matthew Scheidemann*
Matthew Scheidemann
Managing Director
Guggenheim Securities, LLC