# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | |
|---|---|
| In re: | ) |
| | ) Chapter 11 |
| | ) |
| | ) Case No. 24-90061 (MI) |
| HORNBLOWER HOLDINGS LLC, *et al.*,[1] | ) |
| | ) (Jointly Administered) |
| | ) |
| Debtors. | ) |
| | ) |

## DISCLOSURE STATEMENT
## FOR THE JOINT CHAPTER 11 PLAN OF REORGANIZATION
## OF HORNBLOWER HOLDINGS LLC. AND ITS DEBTOR AFFILIATES

**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**

Paul M. Basta (admitted *pro hac vice*)
Jacob A. Adlerstein (admitted *pro hac vice*)
Kyle J. Kimpler (admitted *pro hac vice*)
Sarah Harnett (admitted *pro hac vice*)
Neda Davanipour (admitted *pro hac vice*)
1285 Avenue of the Americas
New York, New York 10019
Telephone: (212) 373-3000
Facsimile: (212) 757-3990
pbasta@paulweiss.com
jadlerstein@paulweiss.com
kkimpler@paulweiss.com
sharnett@paulweiss.com
ndavanipour@paulweiss.com

*Proposed Counsel to the Debtors and Debtors in Possession*

**PORTER HEDGES LLP**

John F. Higgins (TX Bar No. 09597500)
M. Shane Johnson (TX Bar No. 24083263)
Megan Young-John (TX Bar No. 24088700)
1000 Main St., 36th Floor
Houston, Texas 77002
Telephone: (713) 226-6000
Facsimile: (713) 226-6248
jhiggins@porterhedges.com
sjohnson@porterhedges.com
myoung-john@porterhedges.com

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

Dated: March 18, 2024

---

[1] The last four digits of Debtor Hornblower Holdings LLC's tax identification number are 6035. Due to the large number of debtor entities in these chapter 11 cases, for which the Debtors have requested joint administration, a complete list of the debtor entities and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' proposed claims and noticing agent at https://omniagentsolutions.com/Hornblower. The location of the Debtors' service address for purposes of these chapter 11 cases is: Pier 3 on The Embarcadero, San Francisco, CA 94111.

UNLESS EXTENDED BY THE DEBTORS, THE VOTING DEADLINE TO ACCEPT OR REJECT THE PLAN IS <u>4:00 P.M. (PREVAILING CENTRAL TIME) ON MAY 24, 2024</u> (THE "<u>VOTING DEADLINE</u>").  THE RECORD DATE FOR DETERMINING WHICH HOLDERS OF CLAIMS AND INTERESTS MAY VOTE ON THE PLAN IS <u>APRIL 22, 2024</u> (THE "<u>VOTING RECORD DATE</u>").

## DISCLOSURE STATEMENT

## SOLICITATION OF VOTES ON THE JOINT CHAPTER 11 PLAN OF REORGANIZATION OF HORNBLOWER HOLDINGS LLC AND ITS DEBTOR AFFILIATES FROM HOLDERS OF OUTSTANDING:

| VOTING CLASS | NAME OF CLASS UNDER PLAN |
|---|---|
| CLASS 3 | FIRST LIEN CLAIMS |
| CLASS 4 | REVOLVER CLAIMS |
| CLASS 5 | GENERAL UNSECURED CLAIMS |
| CLASS 6 | UNSECURED GO-FORWARD TRADE CLAIMS |

Dated:  March 18, 2024

ONLY HOLDERS OF CLASSES, 3, 4, 5, AND 6 CLAIMS (THE "<u>VOTING CLASSES</u>") ARE ENTITLED TO VOTE ON THE PLAN AND ARE BEING SOLICITED TO VOTE ON THE PLAN (THE "<u>SOLICITATION</u>") UNDER THIS DISCLOSURE STATEMENT.

THE PLAN PROVIDES THAT ALL HOLDERS OF CLAIMS THAT (I) VOTE TO ACCEPT THE PLAN, (II) ARE DEEMED TO ACCEPT THE PLAN AND DO NOT AFFIRMATIVELY OPT OUT OF THE RELEASES PROVIDED IN THE PLAN, (III) ABSTAIN FROM VOTING ON THE PLAN AND DO NOT AFFIRMATIVELY OPT OUT OF THE RELEASES PROVIDED IN THE PLAN, (IV) VOTE TO REJECT THE PLAN OR ARE DEEMED TO REJECT THE PLAN AND DO NOT AFFIRMATIVELY OPT OUT OF THE RELEASES PROVIDED IN THE PLAN, OR (V) DO NOT FILE AN OBJECTION WITH THE BANKRUPTCY COURT THAT EXPRESSLY OBJECTS TO THE INCLUSION OF SUCH HOLDER AS A RELEASING PARTY UNDER THE PROVISIONS CONTAINED IN ARTICLE VIII.D OF THE PLAN AND THAT IS NOT

**CONSENSUALLY RESOLVED PRIOR TO CONFIRMATION OR SUPPORT ANY SUCH OBJECTION OR OBJECTOR (IN EACH CASE ONLY SO LONG AS SUCH HOLDER IS PERMITTED TO OPT OUT) ARE DEEMED TO HAVE GRANTED THE RELEASES THEREIN.**

---

**RECOMMENDATION BY THE DEBTORS
AND KEY STAKEHOLDER SUPPORT**

The Special Committee of the Board of Directors of Hornblower Holdings LLC ("Holdings") and the boards of directors, managers, or members, as applicable, of each of its affiliated and subsidiary Debtors (collectively, the "Debtors" and, together with the Non-Debtor Affiliates, "Hornblower" or the "Company") (as of the date hereof) have approved the transactions contemplated by the Plan (as defined herein) and recommend that all Holders of Claims whose votes are being solicited submit ballots to **accept** the Plan.

As of the date hereof, Holders of over 97% of the First Lien Claims (the "Consenting First Lien Lenders") and 100% of the Revolver Claims (the "Consenting Revolver Lenders") have already agreed, subject to the terms and conditions of the Restructuring Support Agreement to vote in favor of the Plan.

---

## DISCLAIMERS

THE DEBTORS ARE PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT TO HOLDERS OF CERTAIN CLAIMS FOR THE PURPOSE OF SOLICITING VOTES TO ACCEPT OR REJECT THE PLAN.  NOTHING IN THIS DISCLOSURE STATEMENT MAY BE RELIED UPON OR USED BY ANY ENTITY FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN.  BEFORE DECIDING WHETHER TO VOTE FOR OR AGAINST THE PLAN, EACH HOLDER ENTITLED TO VOTE SHOULD CAREFULLY CONSIDER ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING ALL ATTACHED EXHIBITS AND DOCUMENTS INCORPORATED INTO THIS DISCLOSURE STATEMENT, AS WELL AS THE RISK FACTORS DESCRIBED IN ARTICLE X OF THIS DISCLOSURE STATEMENT.

UPON CONFIRMATION OF THE PLAN, CERTAIN OF THE SECURITIES DESCRIBED IN THIS DISCLOSURE STATEMENT WILL BE ISSUED WITHOUT REGISTRATION UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED, TOGETHER WITH THE RULES AND REGULATIONS PROMULGATED THEREUNDER (THE "SECURITIES ACT"), OR SIMILAR U.S. FEDERAL, STATE, OR LOCAL LAWS TO PERSONS RESIDENT OR OTHERWISE LOCATED IN THE UNITED STATES IN RELIANCE ON THE EXEMPTION SET FORTH IN SECTION 1145 OF TITLE 11 OF THE UNITED STATES CODE (THE "BANKRUPTCY CODE"), SECTION 4(A)(2) OF THE SECURITIES ACT OR REGULATION D PROMULGATED THEREUNDER, AND/OR ANOTHER AVAILABLE EXEMPTION UNDER THE SECURITIES LAWS OF THE UNITED STATES.  CERTAIN OTHER SECURITIES WILL BE ISSUED PURSUANT TO OTHER APPLICABLE EXEMPTIONS UNDER THE U.S. FEDERAL AND APPLICABLE STATE AND LOCAL SECURITIES LAWS AND THE LAWS OF FOREIGN JURISDICTIONS, AS APPLICABLE.   TO THE EXTENT EXEMPTIONS FROM REGISTRATION UNDER SECTION 1145 OF THE BANKRUPTCY CODE DO NOT APPLY, THE SECURITIES MAY NOT BE OFFERED OR ISSUED TO PERSONS RESIDENT OR OTHERWISE LOCATED IN THE UNITED STATES EXCEPT PURSUANT TO (I) AN EFFECTIVE REGISTRATION

STATEMENT OR (II) AN EXEMPTION FROM, OR IN A TRANSACTION NOT SUBJECT TO, THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT. IN ACCORDANCE WITH SECTION 1125(e) OF THE BANKRUPTCY CODE, A DEBTOR OR ANY OF ITS AGENTS THAT PARTICIPATES, IN GOOD FAITH AND IN COMPLIANCE WITH THE APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE, IN THE OFFER, ISSUANCE, SALE, OR PURCHASE OF A SECURITY OFFERED OR SOLD UNDER THE PLAN OF THE DEBTOR, OF AN AFFILIATE PARTICIPATING IN A JOINT PLAN WITH THE DEBTOR, OR OF A NEWLY ORGANIZED SUCCESSOR OF THE DEBTOR UNDER THE PLAN IS NOT LIABLE, ON ACCOUNT OF SUCH PARTICIPATION, FOR VIOLATION OF ANY APPLICABLE LAW, RULE, OR REGULATION CONCERNING THE OFFER, ISSUANCE, SALE, OR PURCHASE OF SECURITIES.

NO SECURITIES TO BE ISSUED PURSUANT TO THE PLAN HAVE BEEN APPROVED OR DISAPPROVED BY THE U.S. SECURITIES AND EXCHANGE COMMISSION (THE "SEC") OR BY ANY STATE SECURITIES COMMISSION OR SIMILAR PUBLIC, GOVERNMENTAL, OR REGULATORY AUTHORITY WHETHER IN THE UNITED STATES OR ELSEWHERE. THIS DISCLOSURE STATEMENT HAS NOT BEEN FILED FOR APPROVAL WITH THE SEC OR ANY STATE AUTHORITY AND NEITHER THE SEC NOR ANY STATE AUTHORITY HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THIS DISCLOSURE STATEMENT OR UPON THE MERITS OF THE PLAN. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE IN THE UNITED STATES. NEITHER THE SOLICITATION OF VOTES ON THE PLAN NOR THIS DISCLOSURE STATEMENT CONSTITUTES AN OFFER TO SELL OR THE SOLICITATION OF AN OFFER TO BUY SECURITIES IN ANY STATE OR JURISDICTION IN WHICH SUCH OFFER OR SOLICITATION IS NOT AUTHORIZED.

THIS DISCLOSURE STATEMENT CONTAINS "FORWARD-LOOKING STATEMENTS." SUCH FORWARD-LOOKING STATEMENTS CONSIST OF ANY STATEMENT OTHER THAN A RECITATION OF HISTORICAL FACT AND CAN BE IDENTIFIED BY THE USE OF FORWARD-LOOKING TERMINOLOGY SUCH AS "MAY," "EXPECT," "ANTICIPATE," "ESTIMATE," "FORECAST," "OUTLOOK," "BUDGET," OR "CONTINUE," OR THE NEGATIVE THEREOF, OR OTHER VARIATIONS THEREON OR COMPARABLE TERMINOLOGY. THE DEBTORS CONSIDER ALL STATEMENTS REGARDING ANTICIPATED OR FUTURE MATTERS TO BE FORWARD-LOOKING STATEMENTS.

THE READER IS CAUTIONED THAT ALL FORWARD-LOOKING STATEMENTS ARE NECESSARILY SPECULATIVE AND THERE ARE CERTAIN RISKS AND UNCERTAINTIES THAT COULD CAUSE ACTUAL EVENTS OR RESULTS TO DIFFER MATERIALLY FROM THOSE PRESENTED IN SUCH FORWARD-LOOKING STATEMENTS, INCLUDING, BUT NOT LIMITED TO, RISKS AND UNCERTAINTIES RELATING TO:

- any future effects as a result of the pendency of the Chapter 11 Cases;
- general economic and business conditions and industry trends;
- levels and volatility of certain raw material inputs and fuels which are key to the Company's business operations;

- disruptions to the supply chain and the Company's key vendors;
- the impact of inflation on the Company's operations;
- the ability to execute the Debtors' business plan or to achieve the upside opportunities contemplated therein;
- the Company's exposure to political, social, and economic instability in the Company's markets, acts of insurrection, terrorism, war or other conflict, or pandemics;
- possible adverse impacts of regulatory, legislative, tax, or other judicial developments;
- the political, economic, regulatory, and other uncertainties encountered by the Company's operations;
- the Company's dependence on its senior and qualified personnel, and the Company's possible inability to attract and retain sufficient skilled personnel to meet the Company's operational requirements;
- changes in the policies of various domestic and foreign government and regulatory authorities;
- changes in tax laws or tax rates;
- complaints or litigation initiated by or against the Company;
- trade restrictions or embargoes by the United States and other countries;
- fluctuations in foreign currency exchange rates;
- foreign exchange controls;
- the Company's cash flows and liquidity;
- the Company's business strategy and prospect for growth;
- the outcome of ongoing commercial or other negotiations and disputes with various stakeholders in the Chapter 11 Cases;
- *force majeure* events and the continuing economic impact related to COVID-19;
- the implementation of the Restructuring Transactions (as defined herein); and
- the factors as set out in Article X of this Disclosure Statement—"Certain Risk Factors To Be Considered," and other factors that are not known to the Debtors at this time.

STATEMENTS CONCERNING THESE AND OTHER MATTERS ARE NOT GUARANTEES OF THE REORGANIZED DEBTORS' FUTURE PERFORMANCE. THERE ARE RISKS, UNCERTAINTIES, AND OTHER IMPORTANT FACTORS THAT COULD CAUSE THE REORGANIZED DEBTORS' ACTUAL PERFORMANCE OR ACHIEVEMENTS TO BE DIFFERENT FROM THOSE THEY MAY PROJECT, AND THE DEBTORS UNDERTAKE NO OBLIGATION TO UPDATE THE PROJECTIONS SET FORTH HEREIN, EXCEPT AS MAY BE REQUIRED BY APPLICABLE LAW. THE READER IS CAUTIONED THAT ALL FORWARD-LOOKING STATEMENTS ARE NECESSARILY SPECULATIVE AND THERE ARE CERTAIN RISKS AND UNCERTAINTIES THAT COULD CAUSE ACTUAL EVENTS OR RESULTS TO DIFFER MATERIALLY FROM THOSE PRESENTED IN SUCH FORWARD-LOOKING STATEMENTS. THE LIQUIDATION ANALYSIS, PROJECTIONS, AND OTHER INFORMATION CONTAINED HEREIN AND ATTACHED HERETO ARE ESTIMATES ONLY, AND THE VALUE OF THE PROPERTY DISTRIBUTED TO HOLDERS OF ALLOWED CLAIMS MAY BE AFFECTED BY MANY FACTORS THAT CANNOT BE PREDICTED. THEREFORE, ANY ANALYSES, ESTIMATES, OR RECOVERY PROJECTIONS MAY OR MAY NOT TURN OUT TO BE ACCURATE. FOR MORE INFORMATION REGARDING THE FACTORS THAT MAY

CAUSE ACTUAL RESULTS TO DIFFER FROM THOSE PRESENTED IN THE FORWARD-LOOKING STATEMENTS, PLEASE REFER TO ARTICLE X OF THIS DISCLOSURE STATEMENT—"CERTAIN RISK FACTORS TO BE CONSIDERED."

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016 AND IS NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER SIMILAR LAWS.

THE DEBTORS BELIEVE THAT THE OFFER OF CERTAIN NEW SECURITIES THAT MAY BE DEEMED TO BE MADE PURSUANT TO THE SOLICITATION ARE EXEMPT FROM REGISTRATION UNDER THE SECURITIES ACT AND RELATED STATE STATUTES BY REASON OF THE EXEMPTION PROVIDED BY SECTION 1145(a)(1) OF THE BANKRUPTCY CODE, AND THAT THE OFFER OF CERTAIN OTHER NEW SECURITIES ARE EXEMPT FROM REGISTRATION UNDER THE SECURITIES ACT AND RELATED STATE STATUTES PURSUANT TO SECTION 4(A)(2) OF THE SECURITIES ACT AND/OR RULE 506 OF REGULATION D PROMULGATED THEREUNDER, AND IT IS EXPECTED THAT THE OFFER AND ISSUANCE OF THE SECURITIES UNDER THE PLAN WILL BE EXEMPT FROM REGISTRATION UNDER THE SECURITIES ACT AND RELATED STATE STATUTES BY REASON OF THE APPLICABILITY OF SECTION 1145(a)(1) OF THE BANKRUPTCY CODE AND SECTION 4(A)(2) OF, AND/OR REGULATION D UNDER, THE SECURITIES ACT.

ALL SECURITIES DESCRIBED HEREIN ARE EXPECTED TO BE ISSUED WITHOUT REGISTRATION UNDER THE SECURITIES ACT OR ANY STATE SECURITIES LAWS ("BLUE SKY LAWS").

TO THE EXTENT THAT THE DEBTORS RELY ON A PRIVATE PLACEMENT EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT FOR THE OFFER AND ISSUANCE OF ANY SECURITIES, THOSE SECURITIES WILL BE SUBJECT TO RESTRICTIONS ON TRANSFER UNDER THE SECURITIES ACT AND MAY ONLY BE RESOLD OR OTHERWISE TRANSFERRED PURSUANT TO (I) AN EFFECTIVE REGISTRATION STATEMENT OR (II) AN EXEMPTION FROM, OR IN A TRANSACTION NOT SUBJECT TO, THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT.

NO LEGAL OR TAX ADVICE IS PROVIDED TO YOU BY THIS DISCLOSURE STATEMENT.  THE DEBTORS URGE EACH HOLDER OF A CLAIM OR INTEREST TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX, OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN AND EACH OF THE PROPOSED TRANSACTIONS CONTEMPLATED THEREBY.   FURTHERMORE, THE BANKRUPTCY COURT'S APPROVAL OF THE ADEQUACY OF DISCLOSURES CONTAINED IN THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE MERITS OF THE PLAN OR A GUARANTEE BY THE BANKRUPTCY COURT OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN.  THE DEBTORS RECOMMEND THAT POTENTIAL RECIPIENTS OF ANY SECURITIES ISSUED PURSUANT TO THE PLAN CONSULT THEIR OWN

LEGAL COUNSEL CONCERNING THE SECURITIES LAWS GOVERNING THE TRANSFERABILITY OF ANY SUCH SECURITIES.

THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, A SUMMARY OF THE PLAN, CERTAIN EVENTS LEADING UP TO, DURING, AND EXPECTED TO OCCUR IN THE DEBTORS' CHAPTER 11 CASES, AND CERTAIN DOCUMENTS RELATED TO THE PLAN THAT ARE ATTACHED HERETO AND THERETO, WHICH ARE INCORPORATED HEREIN BY REFERENCE, OR THAT MAY BE FILED LATER WITH THE PLAN SUPPLEMENT.  ALTHOUGH THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THE SUMMARIES DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR RELEVANT STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH EVENTS, BY REFERENCE TO SUCH DOCUMENTS OR STATUTORY PROVISIONS.  IN THE EVENT OF ANY CONFLICT, INCONSISTENCY, OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS, THE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN AND CONTROL FOR ALL PURPOSES.  EXCEPT AS OTHERWISE SPECIFICALLY NOTED, FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT.  THE DEBTORS DO NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY INACCURACY OR OMISSION.

IN PREPARING THIS DISCLOSURE STATEMENT, THE DEBTORS RELIED ON FINANCIAL DATA DERIVED FROM THE DEBTORS' BOOKS AND RECORDS AND ON VARIOUS ASSUMPTIONS REGARDING THE DEBTORS' BUSINESS.  THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF UNLESS OTHERWISE SPECIFIED.  THE DEBTORS' MANAGEMENT HAS REVIEWED THE FINANCIAL INFORMATION PROVIDED IN THIS DISCLOSURE STATEMENT.  ALTHOUGH THE DEBTORS HAVE USED THEIR REASONABLE BUSINESS JUDGMENT TO ENSURE THE ACCURACY OF THIS FINANCIAL INFORMATION AND THE LIQUIDATION ANALYSIS, THE FINANCIAL INFORMATION AND LIQUIDATION ANALYSIS CONTAINED IN, OR INCORPORATED BY REFERENCE INTO, THIS DISCLOSURE STATEMENT HAS NOT BEEN AUDITED (UNLESS OTHERWISE EXPRESSLY PROVIDED HEREIN) AND NO REPRESENTATIONS OR WARRANTIES ARE MADE AS TO THE ACCURACY OF THE FINANCIAL INFORMATION CONTAINED HEREIN OR ASSUMPTIONS REGARDING THE DEBTORS' BUSINESS AND ITS FUTURE RESULTS AND OPERATIONS.  THE DEBTORS EXPRESSLY CAUTION READERS NOT TO PLACE UNDUE RELIANCE ON ANY FORWARD-LOOKING STATEMENTS CONTAINED HEREIN.

NEITHER THIS DISCLOSURE STATEMENT, THE PLAN, THE CONFIRMATION ORDER, NOR THE PLAN SUPPLEMENT WAIVE ANY RIGHTS OF THE DEBTORS WITH RESPECT TO THE HOLDERS OF CLAIMS OR INTERESTS BEFORE THE EFFECTIVE DATE.  RATHER, THIS DISCLOSURE STATEMENT SHALL CONSTITUTE A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS RELATED TO POTENTIAL

CONTESTED MATTERS, POTENTIAL ADVERSARY PROCEEDINGS, AND OTHER PENDING OR THREATENED LITIGATION OR ACTIONS.

NO RELIANCE SHOULD BE PLACED ON THE FACT THAT A PARTICULAR LITIGATION CLAIM OR PROJECTED OBJECTION TO A PARTICULAR CLAIM IS OR IS NOT IDENTIFIED IN THIS DISCLOSURE STATEMENT.  EXCEPT AS PROVIDED UNDER THE PLAN, THE DEBTORS OR THE REORGANIZED DEBTORS MAY SEEK TO INVESTIGATE, FILE, AND PROSECUTE CLAIMS AND CAUSES OF ACTION AND MAY OBJECT TO CLAIMS AFTER CONFIRMATION OR THE EFFECTIVE DATE OF THE PLAN IRRESPECTIVE OF WHETHER THIS DISCLOSURE STATEMENT IDENTIFIES ANY SUCH CLAIMS OR OBJECTIONS TO CLAIMS ON THE TERMS SPECIFIED IN THE PLAN.

THE DEBTORS ARE GENERALLY MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF WHERE FEASIBLE, UNLESS OTHERWISE SPECIFICALLY NOTED.  ALTHOUGH THE DEBTORS MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTORS HAVE NO AFFIRMATIVE DUTY TO DO SO.  HOLDERS OF CLAIMS OR INTERESTS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THIS DISCLOSURE STATEMENT WAS SENT.  INFORMATION CONTAINED HEREIN IS SUBJECT TO COMPLETION, MODIFICATION, OR AMENDMENT.  THE DEBTORS RESERVE THE RIGHT TO FILE AN AMENDED OR MODIFIED PLAN AND RELATED DISCLOSURE STATEMENT FROM TIME TO TIME, SUBJECT TO THE TERMS OF THE RESTRUCTURING SUPPORT AGREEMENT, THE DIP CREDIT AGREEMENTS, AND THE BACKSTOP COMMITMENT AGREEMENT.

THE DEBTORS HAVE NOT AUTHORIZED ANY ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT.  THE DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.

HOLDERS OF CLAIMS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN MUST RELY ON THEIR OWN EVALUATION OF THE COMPANY AND THEIR OWN ANALYSES OF THE TERMS OF THE PLAN IN DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN.  IMPORTANTLY, BEFORE DECIDING WHETHER AND HOW TO VOTE ON THE PLAN, EACH HOLDER OF A CLAIM IN A VOTING CLASS SHOULD REVIEW THE PLAN IN ITS ENTIRETY AND CONSIDER CAREFULLY ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT AND ANY EXHIBITS HERETO.

IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS OR INTERESTS (INCLUDING THOSE HOLDERS OF CLAIMS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN, WHO VOTE TO REJECT THE PLAN, OR WHO ARE NOT ENTITLED

TO VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREBY.

NOTWITHSTANDING ANY RIGHTS OF APPROVAL OR OTHERWISE PURSUANT TO THE RESTRUCTURING SUPPORT AGREEMENT, THE DIP CREDIT AGREEMENTS, THE BACKSTOP COMMITMENT AGREEMENT, OR OTHERWISE AS TO THE FORM OR SUBSTANCE OF THIS DISCLOSURE STATEMENT, THE PLAN, OR ANY OTHER DOCUMENT RELATING TO THE TRANSACTIONS CONTEMPLATED THEREUNDER, NONE OF THE CONSENTING STAKEHOLDERS, DIP LENDERS, COMMITMENT PARTIES, OR ANY OF THEIR RESPECTIVE REPRESENTATIVES, MEMBERS, FINANCIAL OR LEGAL ADVISORS, OR AGENTS, HAVE INDEPENDENTLY VERIFIED THE INFORMATION CONTAINED HEREIN OR TAKES ANY RESPONSIBILITY THEREFOR, AND NONE OF THE FOREGOING ENTITIES OR PERSONS MAKES ANY REPRESENTATIONS OR WARRANTIES WHATSOEVER CONCERNING THE INFORMATION CONTAINED HEREIN.

THE CONFIRMATION AND EFFECTIVENESS OF THE PLAN ARE SUBJECT TO CERTAIN MATERIAL CONDITIONS PRECEDENT DESCRIBED HEREIN AND SET FORTH IN ARTICLE IX OF THE PLAN.  THERE IS NO ASSURANCE THAT THE PLAN WILL BE CONFIRMED, OR IF CONFIRMED, THAT THE CONDITIONS REQUIRED TO BE SATISFIED FOR THE PLAN TO BECOME EFFECTIVE WILL BE SATISFIED (OR WAIVED).

## TABLE OF CONTENTS

**ARTICLE I.** INTRODUCTION ...................................................................................... 1

**ARTICLE II.** OVERVIEW OF THE COMPANY'S BUSINESS AND OPERATIONS ........... 6
    A.    The Company's Business ............................................................... 6
    B.    Debtors' Corporate Organization ................................................... 8
    C.    The Company's Prepetition Capital Structure .................................... 9

**ARTICLE III.** KEY EVENTS LEADING TO COMMENCEMENT OF CHAPTER 11
CASES ................................................................................................................. 13
    A.    Extended Pandemic Impacts, 2020 Unrestricted Subsidiary Financing, and
        Sponsor Equity Contribution ......................................................... 13
    B.    The Superpriority Facility and Refinancing of the Unrestricted Subsidiary
        Financing ................................................................................. 14
    C.    Journey Beyond Acquisition and Upsizing the Superpriority Facility ......... 15
    D.    The Precipitous Rise in Interest Expense ......................................... 15
    E.    The 2023 HB TopCo Capital Raises ............................................... 15
    F.    Pursuit of All Strategic Alternatives ............................................... 16

**ARTICLE IV.** THE CHAPTER 11 CASES ....................................................................... 18
    A.    Commencement of the Chapter 11 Cases .......................................... 18
    B.    First Day Motions ...................................................................... 18
    C.    Retention of Restructuring and Other Professionals ............................. 22
    D.    Appointment of the Official Committee of Unsecured Creditors ................ 23
    E.    AQV Sale Procedures ................................................................. 23
    F.    Section 341 Meeting .................................................................. 23
    G.    Schedules and Statements and 2015.3 Reports ................................... 23
    H.    Bar Date ................................................................................. 24
    I.    CCAA Proceedings .................................................................... 24
    J.    WARN Act Proceedings .............................................................. 25
    K.    Confirmation Hearing ................................................................. 25

**ARTICLE V.** RESTRUCTURING SUPPORT AGREEMENT,  DIP CREDIT
AGREEMENTS, BACKSTOP COMMITMENT AGREEMENT, EXIT TERM
LOANS, AND EXIT REVOLVER ................................................................................ 25
    A.    The Restructuring Support Agreement ............................................. 26
    B.    The DIP Facilities ..................................................................... 26
    C.    Backstop Commitment Agreement and Rights Offering ......................... 27
    D.    Exit Term Loans and Exit Revolver ................................................ 28
    E.    Milestones .............................................................................. 29
    F.    RSA Settlement ........................................................................ 30

**ARTICLE VI.** SUMMARY OF PLAN ............................................................................. 31
    A.    Administrative, Priority Claims, and Statutory Fees ............................. 31
    B.    Classification and Treatment of Claims and Interests ............................ 36
    C.    Means for Implementation of the Plan .............................................. 43

D. Treatment of Executory Contracts and Unexpired Leases ................................. 59
E. Procedures for Resolving Contingent, Unliquidated, and Disputed Claims
and Interests .................................................................................................. 64
F. The AQV Wind-Down Co. Administrator ......................................................... 67
G. Provisions Governing Distribution .................................................................. 68
H. Release, Injunction, and Related Provisions ..................................................... 73
I. Conditions Precedent to Consummation of The Plan ........................................ 81
J. Modification, Revocation, or Withdrawal of the Plan ....................................... 83
K. Retention of Jurisdiction ................................................................................. 84
L. Miscellaneous Provisions ................................................................................ 87

**ARTICLE VII.** VALUATION OF THE REORGANIZED DEBTORS .................................. 93

**ARTICLE VIII.** TRANSFER RESTRICTIONS AND  CONSEQUENCES UNDER
FEDERAL SECURITIES LAWS ......................................................... 93
A. 1145 Securities .............................................................................................. 94
B. Section 4(a)(2) Securities .............................................................................. 96

**ARTICLE IX.** CERTAIN UNITED STATES FEDERAL  INCOME TAX
CONSEQUENCES OF THE PLAN .................................................... 99
A. Introduction .................................................................................................. 99
B. Certain U.S. Federal Income Tax Considerations for the Debtors and
Reorganized Debtors ...................................................................................... 102
C. Certain U.S. Federal Income Tax Consequences to Certain U.S. Holders of
Certain Allowed Claims ................................................................................ 106
D. U.S. Federal Income Tax Consequences of Ownership and Disposition of
New HB Common Equity and Subscription Rights ........................................... 111
E. Certain U.S. Federal Income Tax Consequences to Certain Non-U.S.
Holders of Allowed Claims ............................................................................ 112
G. Information Reporting and Back-Up Withholding ............................................ 116

**ARTICLE X.** CERTAIN RISK FACTORS TO BE CONSIDERED .................................... 117
A. Certain Bankruptcy Law Considerations .......................................................... 117
B. Risks Relating to the Company's Business and Industry .................................... 124
C. Regulatory Risks ............................................................................................ 129
D. Factors Relating to Securities to Be Issued Under the Plan Generally .............. 133
E. Risks Relating to the Reorganized Debtors' Indebtedness ................................. 134
F. Additional Factors .......................................................................................... 135

**ARTICLE XI.** VOTING PROCEDURES AND REQUIREMENTS ..................................... 135
A. Voting Instructions and Voting Deadline .......................................................... 136
B. Voting Procedures ........................................................................................... 137
C. Holders of Claims Entitled to Vote .................................................................. 137
D. Fiduciaries and Other Representatives .............................................................. 138
E. Agreements Upon Furnishing Ballots .............................................................. 138
F. Change of Vote .............................................................................................. 138
G. Waivers of Defects, Irregularities, Etc. ............................................................ 138

      H.      Miscellaneous ................................................................................... 139

**ARTICLE XII.** CONFIRMATION OF THE PLAN ............................................................ 140
      A.      Confirmation Hearing ....................................................................... 140
      B.      Objections to Confirmation .............................................................. 140
      C.      Requirements for Confirmation of the Plan ..................................... 140

**ARTICLE XIII.** ALTERNATIVES TO CONFIRMATION AND CONSUMMATION
      OF THE PLAN ................................................................................................ 145
      A.      Alternative Plan of Reorganization ................................................. 145
      B.      Sale Under Section 363 of the Bankruptcy Code ............................ 145
      C.      Liquidation Under Chapter 7 or Applicable Non-Bankruptcy Law ................. 146

**ARTICLE XIV.** CONCLUSION AND RECOMMENDATION ......................................... 146

**EXHIBITS**

      A.      Joint Chapter 11 Plan of Reorganization of Hornblower Holdings LLC and its Debtor Affiliates

      B.      Restructuring Support Agreement

      C.      Corporate Structure Chart

      D.      Valuation Analysis

      E.      Liquidation Analysis

      F.      Financial Projections

# ARTICLE I.
## INTRODUCTION

The Debtors submit this Disclosure Statement in connection with the solicitation of votes on the *Joint Chapter 11 Plan of Reorganization of Hornblower Holdings LLC. and Its Debtor Affiliates*, dated March 18, 2024, (the "Plan") attached hereto as **Exhibit A**.[2]  The Debtors under the Plan are Holdings and certain of its affiliates and subsidiaries.  The Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (as may be amended from time to time, the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court") on February 21, 2024 (the "Petition Date").  The Debtors' chapter 11 cases (the "Chapter 11 Cases") are jointly administered under Case No. 24-90061 (MI).

Since the onset of the COVID-19 pandemic, the Company has been buffeted by a number of adverse events and conditions—lockdown orders that temporarily reduced demand particularly during the busiest seasons for tourism, employee furloughs, unprecedented supply chain disruptions arising from the pandemic, forty-year high inflationary pressures, and related spikes in interest rates—that ultimately proved to be more than it could bear.  In particular, through the end of 2022 and into early 2023, while most of the Company's businesses returned to pre-COVID profitability, the American Queen Voyages overnight cruise business continued to underperform expectations.  The cumulative effects of these circumstances consumed vital liquidity, thus limiting the Company's ability to adequately fund critical growth initiatives and satisfy its debt service obligations.

Despite equity contributions by funds managed by Crestview Advisors, L.L.C. (collectively "Crestview" or the "Sponsor") and certain liquidity enhancing transactions with its largest lenders and in certain instances, Crestview, in late 2023, the Company, with the assistance of its advisors, began to evaluate and consider several strategic alternatives and transactions aimed at refinancing or restructuring its debt obligations with minimal disruption to its operations.  Among other efforts to combat market and industry headwinds, in October 2023, the Debtors, with the assistance of their advisors, commenced discussions with the Ad Hoc Group and Crestview.  After thoroughly evaluating all available options, the Company determined that a pre-negotiated, in-court restructuring would best position the Company for future success.

These discussions were ultimately successful.  Following extensive negotiations with the Ad Hoc Group and Crestview, on February 21, 2024, the Company entities which would become the Debtors in these Chapter 11 Cases, certain non-Debtor Journey Beyond Entities, certain funds and accounts managed by Strategic Value Partners LLC ("SVP"), who represented, at the time, holders of a majority of the principal amount of First Lien Claims outstanding, and Crestview, the Debtors' ultimate majority equity holder and a significant creditor (who together with SVP, hold approximately 98% of the outstanding HB First Lien Claims), entered into the Restructuring Support Agreement which, among other things, outlined the terms of the Company's proposed restructuring.  Later that day, the Debtors commenced these Chapter 11 Cases to implement an

---

[2]     Capitalized terms used but not otherwise defined in this Disclosure Statement will have the meaning ascribed to such terms in the Plan.  The summary of the Plan provided herein is qualified in its entirety by reference to the Plan.  In the case of any inconsistency between this Disclosure Statement and the Plan, the Plan will govern.

expeditious, pre-negotiated restructuring that will cement the Company's long-term viability. Consistent with the terms of the Restructuring Support Agreement, the Debtors have sought to swiftly advance these Chapter 11 Cases. The Debtors have obtained interim approval of their postpetition financing, and are seeking approval of a fully-backstopped Rights Offering which will provide the Debtors' with sufficient exit liquidity and refinance the Debtors' Junior DIP Facility.

The Restructuring Support Agreement contemplates a significant deleveraging of the Company's balance sheet and that the Company will gain access to significant new capital to fund its going-forward, post-emergence operations through the Rights Offering, the Exit Term Loans, and the Exit Revolver. This reduction in funded debt will allow the Reorganized Debtors to focus on long-term growth and, in turn, strengthen their competitive position in the market. The Debtors and Consenting Stakeholders also agreed in the Restructuring Support Agreement to continue the sale process that commenced prior to the Petition Date for the AQV business pursuant to court-approved bidding procedures. The key terms of the Plan are as follows:

- The full equitization of HB First Lien Claims pursuant to the Plan, under which Holders of Allowed HB First Lien Claims shall collectively receive 100% of the New HB Common Equity, subject to dilution on account of any New HB Common Equity issued in connection with the Rights Offering, the Backstop Commitment Premium, and the MIP Equity;

- The up to $345 million Rights Offering for New HB Common Equity in Reorganized Hornblower (subject to reduction as described in the Rights Offering Procedures and the Restructuring Support Agreement), which is fully backstopped by the Commitment Parties pursuant to the terms of the Backstop Commitment Agreement; and

- Entry into the Exit Credit Documents, which will provide Reorganized Hornblower with first lien term loans of $300 million to refinance the Debtors' senior postpetition financing facilities and a new money revolving credit facility of $50 million to fund working capital expenses.

- The distribution of net proceeds from of the AQV Sale Transaction to the holders of Allowed HB First Lien Claims and the wind down of the AQV Debtors.

Through the Restructuring Transactions, the Hornblower Debtors expect to emerge from chapter 11 with a sustainable capital structure that will position the Reorganized Debtors for future success in the ever-changing transportation and tourism market in which they operate. The Debtors also believe that the Restructuring Transactions will maximize the value of their business and allow them to capitalize on near-term opportunities in a highly competitive industry, ahead of key seasonal tourism windows. Moreover, this restructuring provides a framework for the long-term sustainability of the Debtors' business for the benefit of their employees, vendors, and customers, and ample liquidity to fund the post-emergence business.

The Debtors strongly believe that the Plan is in the best interests of the Debtors' Estates, represents the Debtors' best available alternative, and provides for value-maximizing transactions which will inure to the benefit of all of the Debtors' stakeholders. Given the Debtors' core

strengths, including their experienced management team and employees, the Debtors are confident that they can implement the Plan's value-maximizing restructuring to ensure the long-term viability of their business.

**WHO IS ENTITLED TO VOTE**:  Under the Bankruptcy Code, only holders of claims or interests in "impaired" classes are entitled to vote on a plan of reorganization (unless, for reasons discussed in more detail below, such holders are deemed to reject the plan pursuant to section 1126(g) of the Bankruptcy Code).  Under section 1124 of the Bankruptcy Code, a class of claims or interests is deemed to be "impaired" under a plan unless:  (a) the plan leaves unaltered the legal, equitable, and contractual rights of the holders of such claims or interests; or (b) notwithstanding any legal right to an accelerated payment of such claims or interests, the plan, among other things, cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claims or interests as they existed before the defaults.

There are four Classes entitled to vote on the Plan whose acceptances thereof are being solicited under this Disclosure Statement: First Lien Claims (Class 3), Revolver Claims (Class 4), General Unsecured Claims (Class 5), and Unsecured Go-Forward Trade Claims (Class 6).

**THE PLAN PROVIDES THAT ALL HOLDERS OF CLAIMS THAT (I) VOTE TO ACCEPT THE PLAN, (II) ARE DEEMED TO ACCEPT THE PLAN AND DO NOT AFFIRMATIVELY OPT OUT OF THE RELEASES PROVIDED IN THE PLAN, (III) ABSTAIN FROM VOTING ON THE PLAN AND DO NOT AFFIRMATIVELY OPT OUT OF THE RELEASES PROVIDED IN THE PLAN, (IV) VOTE TO REJECT THE PLAN OR ARE DEEMED TO REJECT THE PLAN AND DO NOT AFFIRMATIVELY OPT OUT OF THE RELEASES PROVIDED IN THE PLAN, OR (V) DO NOT FILE AN OBJECTION WITH THE BANKRUPTCY COURT THAT EXPRESSLY OBJECTS TO THE INCLUSION OF SUCH HOLDER AS A RELEASING PARTY UNDER THE PROVISIONS CONTAINED IN ARTICLE VIII.D OF THE PLAN AND THAT IS NOT CONSENSUALLY RESOLVED PRIOR TO CONFIRMATION OR SUPPORT ANY SUCH OBJECTION OR OBJECTOR (IN EACH CASE ONLY SO LONG AS SUCH HOLDER IS PERMITTED TO OPT OUT) ARE DEEMED TO HAVE GRANTED THE RELEASES THEREIN.**

The following table summarizes: (a) the treatment of Claims and Interests under the Plan; (b) which Classes are Impaired by the Plan; (c) which Classes are entitled to vote on the Plan; and (d) the estimated recoveries for Holders of Claims and Interests.  The following table is qualified in its entirety by reference to the full text of the Plan.  A more detailed summary of the terms and provisions of the Plan is provided in the summary of the Plan set forth in Article VI of this Disclosure Statement.  A detailed discussion of the analysis underlying the estimated recoveries, including the assumptions underlying such analysis, is provided in the Valuation Analysis (as defined below) set forth in Article VII and **Exhibit D** hereof.

| Class | Claims or Interests | Treatment | Impaired or Unimpaired | Entitlement to Vote | Projected Recoveries |
|---|---|---|---|---|---|
| 1 | Other Secured Claims | Each Holder of an Allowed Other Secured Claim shall receive, at the option of the Debtors, Reorganized Hornblower Debtors, or AQV Wind Down Co., as applicable, either:<br><br>i.   payment in full in Cash of the unpaid portion of their Allowed Other Secured Claim, including any interest thereon required to be paid under section 506(b) of the Bankruptcy Code (or if payment is not then due, on the due date of such Allowed Other Secured Claim);<br>ii.  Reinstatement pursuant to section 1124 of the Bankruptcy Code;<br>iii. the return or abandonment of the collateral securing such Claim to such Holder; or<br>iv. such other treatment necessary to satisfy section 1124 of the Bankruptcy Code. | Unimpaired | Not Entitled to Vote (Presumed to Accept) | 100% |
| 2 | Other Priority Claims | Each Holder of an Allowed Other Priority Claim shall receive payment in full, in Cash, of the unpaid portion of its Allowed Other Priority Claim on the Plan Effective Date or as soon thereafter as reasonably practicable (or, if payment is not then due, on the due date of such Other Priority Claim). | Unimpaired | Not Entitled to Vote (Presumed to Accept) | 100% |
| 3 | First Lien Claims | On the Plan Effective Date or as soon thereafter as reasonably practicable, each Holder of an Allowed First Lien Claim shall receive its Pro Rata share of:<br><br>i.   96% of the Rights;<br>ii.  96% of the New HB Common Equity (subject to dilution on account of the New HB Common Equity issued in connection with (A) the Rights Offering, (B) the Backstop Commitment Premium, and (C) the MIP Equity); and<br>iii. the Crestview Cash Contribution; *provided* that such Holder may elect to use its Pro Rata share of the Crestview Cash Contribution as a credit towards the exercise of its Rights, in which case such portion of the Crestview Cash Contribution shall be retained by the Hornblower Debtors; and<br>iv. 96% of the AQV Net Cash Proceeds. | Impaired | Entitled to Vote | [•] |
| 4 | Revolver Claims | On the Plan Effective Date or as soon thereafter as reasonably practicable, each Holder of an Allowed First Lien Claim shall receive its Pro Rata share of:<br><br>i.   4% of the Rights; | Impaired | Entitled to Vote | [•] |

| Class | Claims or Interests | Treatment | Impaired or Unimpaired | Entitlement to Vote | Projected Recoveries |
|---|---|---|---|---|---|
| | | ii.   4% of the New HB Common Equity (subject to dilution on account of the New HB Common Equity issued in connection with (A) the Rights Offering, (B) the Backstop Commitment Premium, and (C) the MIP Equity).<br><br>iii.  4% of the AQV Net Cash Proceeds. | | | |
| 5 | General Unsecured Claims | [●] | Impaired | Entitled to Vote | [•] |
| 6 | Unsecured Go-Forward Trade Claims | [●] | Impaired | Entitled to Vote | [•] |
| 7 | Intercompany Claims | On the Plan Effective Date, all Intercompany Claims will be adjusted, Reinstated, or discharged in the Debtors' discretion, subject to the reasonable consent of, with respect to Intercompany Claims held by another Debtor or against a Hornblower Debtor, the Required Consenting HB First Lien Lenders and, with respect to Intercompany Claims held by any Journey Beyond Entity against Journey Beyond Holdings, LLC, the Consenting JBIH Lenders.  For the avoidance of doubt, on the Plan Effective Date, the JB Intercompany Loans shall be cancelled and discharged. | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept / Deemed to Reject) | N/A |
| 8 | Intercompany Interests | All Intercompany Interests shall be Reinstated or cancelled in the Debtors' discretion, subject to the reasonable consent of, with respect to the Reorganized Hornblower Debtors, the Required Consenting HB First Lien Lenders, and, with respect to the Journey Beyond Entities, the Consenting JBIH Lenders. | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept / Deemed to Reject) | N/A |
| 9 | Section 510(b) Claims | On the Plan Effective Date, all Section 510(b) Claims against the Debtors shall be discharged and released, and the Holders of Section 510(b) Claims shall not receive or retain any distribution, property, or other value on account of their Section 510(b) Claims. | Impaired | Not Entitled to Vote (Deemed to Reject) | N/A |
| 10 | Interests in Hornblower and Hornblower Holdings LLC | On the Plan Effective Date, all Interests in Hornblower and Hornblower Holdings LLC will be cancelled and the Holders of such Interests shall not receive or retain any distribution, property, or other value on account of their Interests in Hornblower or Hornblower Holdings LLC. | Impaired | Not Entitled to Vote (Deemed to Reject) | N/A |

## ARTICLE II.
## OVERVIEW OF THE COMPANY'S BUSINESS AND OPERATIONS

**A.** **The Company's Business**

Hornblower is a global leader in world-class experiences, tourism and transportation that serves more than 30 million guests annually and a brand heritage that dates back nearly 100 years. Hornblower and its non-Debtor affiliates' business spans across 111 countries and territories, and 125 U.S. cities, with offerings including water-based experiences, land-based experiences, overnight cruise experiences, extended rail journeys, ferry and transportation services, and marine consulting and services.

Prior to the Petition Date, the Company comprised three main divisions, namely, the City Experiences, American Queen Voyages, and Journey Beyond:

**1.** **City Experiences**

City Experiences represents the Company's portfolio of water and land-based experiences which includes sub-brands (1) City Cruises, (2) City Ferry, and (3) Walks.

    a.    City Cruises

City Cruises operates public dining and sightseeing cruises and private charters for corporate events, birthday parties, weddings, and other special occasions across 22 destinations in the U.S. as well as abroad in Canada and the U.K., both of which contribute meaningful revenue for the Company.  City Cruises also operates cruises on behalf of the National Park Service and the Niagara Parks Commission.  The Company currently holds exclusive long-term concession contracts to provide ferry transportation services to the Statue of Liberty National Monument and Ellis Island Immigration Museum in New York City, Alcatraz Island in San Francisco, California, and Niagara Falls in Ontario, Canada, welcoming over 8 million visitors annually.

Given the Company's impressive history of best-in-class service and safety, strong competitive positioning, ancillary service offering, and track record of winning concession contracts, as evidenced by the renewals of Alcatraz in 2019 and New York City Ferry in 2023, the Company was most recently awarded a 10-year renewal of the Statute of Liberty contract through February 2034  The Company is also the exclusive provider of cruise services on the Canadian side of Niagara Falls through 2043—making the operations of the Canadian Debtors an essential aspect of this restructuring.  These contracts provide steady demand and predictable financial profiles as well as long-term, contracted revenue visibility.

With a fleet of over 20 vessels in the U.K., City Cruises is the U.K.'s largest tour boat operator, carrying 3 million guests annually with offerings including dining, sightseeing and charter cruises, alongside speedboat rides, as well as cruise experiences on the River Ouse in York, River Thames in London, and Poole on the south coast.  City Cruises is one of the fastest growing cruise operations in the U.K. and remains an essential part of the Company's future business. The Company's operations are subject to significant seasonal variation.  Historically, the Company's business has realized a significant portion of its revenues, cash flow, and net income in the fourth quarter of the year, principally due to Halloween sales in October and, to a lesser extent, year-end

holiday sales. To maximize its seasonal opportunity, the Company operates a chain of temporary Halloween stores under the Halloween City brand during the months of September and October of each year.

      b.    <u>City Ferry & Transportation</u>

The Company is the largest private operator of high-speed passenger and vehicle ferries in the U.S., including marine transportation, vessel management and maintenance services offering specialized knowledge and expertise required to transport passengers, vehicles, and other cargo safely across inland and coastal waterways. Given its extensive history, the Company has an unrivaled knowledge base that serves as a key competitive advantage during RFP processes. Current ferry routes include: New York City Ferry, connecting Manhattan to the outer boroughs; Puerto Rico Ferry, with lines between Cataño and San Juan and between Ceiba, Vieques, and Culebra; Cross Bay Ferry, which connects the St. Pete downtown waterfront with Tampa's downtown waterfront in Florida; Gee's Bend Ferry, which runs between Camden and Gee's Bend in Boykin, Alabama; Mobile Bay Ferry, connecting Dauphin Island and Mobile Point in Alabama; Oklahoma River Cruises, a sightseeing tour on the Oklahoma River in Oklahoma City, Oklahoma; Pensacola Bay Cruises, which operates between City of Pensacola, Pensacola Beach, and Fort Pickens in Florida; Pierce County Ferry, a passenger and vehicle ferry connecting Steilacoom, Ketron, and Anderson Island in Washington State; and Johns River Ferry, connecting Mayport Village and Fort George Island in Jacksonville, Florida.

Amongst others, the Company is the exclusive service provider and operator for New York City Ferry and Puerto Rico Ferry which offers steady demand and predictable financial profiles, long-term, contracted revenue visibility, and diversified geographic exposure. The Company was recently awarded an extension for the New York City Ferry through 2034, which is a 5-year contract renewal with two optional extensions of 3-years each. This extension provides strong visibility into future earnings. The Puerto Rico Ferry contract runs through 2043.

Through Seaward Services, Inc., the Company also offers full-service shipping, waterfront logistics and management services specializing in the operation and maintenance of government and commercial vessels, including high-speed craft, range craft, training craft, experimental craft, research vessels, cable-laying vessels, and unmanned surface and sub-surface vessels.

The Company also operates a shipyard in Bridgeport, Connecticut that provides vessel repair and maintenance, and other services internally as well as to third-party customers.

      c.    <u>Walks</u>

Having hosted over one million guests since 2009, Walks is a global leader in tours and activities and one of the most recent additions to the Company's growing portfolio of land-based experience companies. Walks' tours and activities include operating sightseeing tours, food tours, and day trips in 18 cities around the world, including Rome, Paris, Barcelona, London, New York City, San Francisco, Dublin, Washington D.C., Amsterdam, Niagara Falls, Pompeii, Milan, Florence, Athens, Venice, Madrid, Chicago, and Boston. Specializing in small group, special access tours, Walks works closely with many of Europe's top attractions and, more recently, with major U.S. attractions such as the Statue of Liberty and Alcatraz. Walks' tours are thoughtfully

designed to offer a deeper insight into the culture, food, and history of their destinations. In 2020, Walks began offering virtual tours known as Tours from Home, receiving widespread recognition.

The Company offers additional land-based experiences through Venture Ashore, a shore excursion offering to passengers of third-party cruise operators, and Devour Tours, a food-and-drink-focused excursion service.

To support its various businesses, the Company internally developed a reservation and operations platform called Anchor Operating System ("Anchor") with capabilities such as dynamic pricing. Anchor is also offered to third-party customers and has the potential to create a substantial software-as-a-service revenue stream.

### 2.    American Queen Voyages

American Queen Voyages operated the overnight cruise division of the Company and was a leading provider of luxury river and lake cruises across prominent United States rivers. American Queen Voyages operated a seven-vessel fleet. Operations within this division included (a) all-inclusive luxury voyages along the Ohio, Mississippi, Tennessee, Illinois, Cumberland, Columbia and Snake river, (b) all-inclusive luxury cruising along the Great Lakes, Canada and New England, Southeast U.S., Alaska, and Mexico and the Yucatan Peninsula, and (c) all-inclusive luxury expedition experience in Alaska and Central America, as well as ports in between.

### 3.    Journey Beyond

Journey Beyond, an Australian travel group headquartered in Adelaide, South Australia, was formed in 2016 and is one of the Company's most recent acquisitions to its growing portfolio. The entities comprising the Company's Journey Beyond operations are not Debtors in these Chapter 11 Cases, and the Journey Beyond business should not be affected by the Chapter 11 Cases and such operations will continue in the ordinary course. Additionally, the Journey Beyond business has its own capital structure, which will not be impacted by the Debtors' filings.

Journey Beyond is Australia's largest and most diversified experiential travel group operating in 60 destinations Australia-wide, with 13 Australian brands and experiences in four core divisions, including rail expeditions, touring and lodges, marine and aviation, and attractions and dining. Journey Beyond provides unparalleled access to remote locations, helping achieve the Company's mission of creating amazing experiences through its various tourism brands including: iconic trains, The Ghan; Indian Pacific, Great Southern, and The Overland; premium small-group outback operator, Outback Spirit; eco-luxe lodge, Sal Salis Ningaloo Reef; aquatic adventures, Cruise Whitsundays, Rottnest Express, Horizontal Falls Seaplane Adventures, Darwin Harbour Cruises, and Journey Beyond Cruise Sydney; and its tallest members, Melbourne Skydeck and Eureka 89.

### B.    Debtors' Corporate Organization

Holdings and 103 of its direct and indirect subsidiaries are Debtors in these Chapter 11 Cases. An organizational chart of Company entities is attached to this Disclosure Statement as **Exhibit C**.

C.      **The Company's Prepetition Capital Structure**

As of the Petition Date, the Debtors had approximately $1.2 billion in total funded-debt obligations, consisting of approximately $148.5 million under the Incremental Superpriority Facility, $282.9 million under the Superpriority Facility, $641.8 million under the First Lien Term Facility, $53.7 million under the Revolver Term-Out Facility and $26.4 million under the Revolver Facility.  Additionally, certain Debtors are obligated under the JBIH Term Facility, under which $175.1 million was outstanding as of the Petition Date.

1.      **Secured Debt Obligations**

a.      Superpriority Facility

Hornblower Sub, LLC and American Queen Sub, LLC, as borrowers, Hornblower Holdco, LLC and American Queen Holdco, LLC, as holdings, Alter Domus (US) LLC, as the Superpriority Agent, and the guarantors and lenders party thereto are parties to the Superpriority Credit Agreement (collectively with all certificates, agreements, intercreditor agreements, collateral documents, mortgages, vessel mortgages, security agreements, documents, and instruments (including any amendments, restatements, supplements, or modifications of any of the foregoing) related to or executed in connection with the Superpriority Credit Agreement, the "Superpriority Credit Documents").  The Superpriority Credit Documents provide for the Superpriority Loans, a $277 million term loan facility.

The maturity date on the Superpriority Facility was November 10, 2025, with a springing maturity to the date 30 days prior to the latest maturity date applicable to the term loans under the First Lien Term Facility, if the First Lien Credit Documents remain in effect on such date.  The obligations under the Superpriority Credit Documents were secured by liens on, and security interest in, substantially all assets of the Debtors, subject to certain exceptions (the "Prepetition Collateral" and, such liens and security interests on the Prepetition Collateral, the "Superpriority Liens").  As of the Petition Date, approximately $282.9 million in principal amount was outstanding under the Superpriority Loans.  On February 22, 2024, the Superpriority Loans were refinanced and paid in their entirety through the proceeds of the Senior DIP Facility.

b.      First Lien Term Facility and Revolver Term-Out Facility

Hornblower Sub, LLC and American Queen Sub, LLC, as borrowers, Hornblower Holdco, LLC and American Queen Holdco, LLC, as holdings, and GLAS Trust Company LLC, as the First Lien Agent, and the guarantors and lenders party thereto are parties to the First Lien Credit Agreement (collectively with all certificates, agreements, intercreditor agreements, collateral documents, mortgages, vessel mortgages, security agreements, documents, and instruments (including any amendments, restatements, supplements, or modifications of any of the foregoing) related to or executed in connection with the First Lien Credit Agreement, the "First Lien Credit Documents").  The First Lien Credit Documents provide for the First Lien Loans, including a $675.0 million term loan facility (the "First Lien Term Facility") and $53.7 million converted term loan facility (the "Revolver Term-Out Facility").

The maturity date on the First Lien Term Facility is April 27, 2025 and the maturity date on the Revolver Term-Out Facility is April 29, 2024.  The obligations under the First Lien Credit

Documents are secured by liens on, and security interests in, the Prepetition Collateral (such liens and security interests, the "1L Term Loan Liens"). The 1L Term Loan Liens on the Prepetition Collateral other than the Pari Passu Collateral (as defined in the First Lien Intercreditor Agreement) are subordinate and junior in priority to the Superpriority Liens and Incremental Superpriority Liens (as defined below) on such Prepetition Collateral. The 1L Term Loan Liens on the Pari Passu Collateral (as defined in the First Lien Intercreditor Agreement) are *pari passu* in priority to the Superpriority Liens and Incremental Superpriority Liens on the Pari Passu Collateral. As of the Petition Date, approximately $641.8 million in principal amount is outstanding under the First Lien Term Facility and $53.7 million in principal amount is outstanding under the Revolver Term-Out Facility.

        c.      Revolver Facility

Hornblower Sub, LLC and American Queen Sub, LLC, as borrowers, Hornblower Holdco, LLC and American Queen Holdco, LLC, as holdings, and UBS AG, Stamford Branch, as the Revolver Agent, are parties to the Revolver Credit Agreement (collectively with all certificates, agreements, intercreditor agreements, collateral documents, mortgages, vessel mortgages, security agreements, documents, letters of credit and instruments (including any amendments, restatements, supplements, or modifications of any of the foregoing) related to or executed in connection with the Revolving Credit Agreement, the "Revolving Credit Documents"). The Revolving Credit Documents provide for the Revolver Loan, a $22.5 million converted termed out revolving credit facility.

The Revolver Facility matures on April 29, 2024. The obligations under the Revolving Credit Documents are secured by liens on, and security interests in, the Prepetition Collateral, which rank *pari passu* with the 1L Term Loan Liens; provided, that the liens granted under the Revolver Facility do not incumber the assets of Debtor Journey Beyond Holdings, LLC. As additional credit support for the Revolver Facility, Crestview previously caused a $28 million letter of credit to be issued by Bank of America, N.A. for the benefit of the Revolver Agent. As of the Petition Date, Crestview owned 100% of the outstanding loans under the Revolver Facility and the letter of credit is no longer pledged as collateral for the Revolver Facility. As of the Petition Date, approximately $26.4 million in principal amount was outstanding under the Revolver Facility.

        d.      Incremental Superpriority Facility

Hornblower Holdco, LLC and American Queen Holdco, LLC, as parents, Hornblower Sub, LLC and American Queen Sub, LLC, as borrowers, Journey Beyond Holdings, LLC, Alter Domus (US) LLC, as Incremental Superpriority Agent, and the guarantors and lenders party thereto are parties to Incremental Superpriority Credit Agreement (collectively with all certificates, agreements, intercreditor agreements, collateral documents, mortgages, vessel mortgages, security agreements, documents, and instruments (including any amendments, restatements, supplements, or modifications of any of the foregoing) related to or executed in connection with the Incremental Superpriority Credit Agreement, the "Incremental Superpriority Credit Documents"). The Incremental Superiority Credit Documents provided for a $170.0 million delayed draw term loan facility (the "Incremental Superiority Facility").

The maturity date on the Incremental Superpriority Facility is February 20, 2024.  The obligations under the Incremental Superpriority Credit Agreement were secured by liens on, and security interests in, the Prepetition Collateral (such liens and security interests on the Prepetition Collateral, the "Incremental Superpriority Liens"), senior in priority to the 1L Term Loan Liens. The obligations under the Incremental Superpriority Credit Agreement were subordinated in right of payment to the obligations under the Superpriority Credit Agreement.  As of the Petition Date, approximately $148.5 million in principal amount was outstanding under the Incremental Superpriority Loans.  On February 22, 2024, the Incremental Superpriority Loans were refinanced and paid in their entirety through the proceeds of the Junior DIP Facility.

e.      Intercreditor Agreements

Alter Domus (US) LLC, as Superpriority Agent and incremental superpriority loan representative, the First Lien Agent and the Revolver Agent, together with each of the Debtors party thereto, entered into that certain *Amended and Restated Superpriority Intercreditor Agreement*, dated as of November 17, 2023 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "Superpriority Intercreditor Agreement").  The Superpriority Intercreditor Agreement sets forth the agreements between the Superpriority Agent, the Incremental Superpriority Agent, the First Lien Agent, and the Revolver Agent with respect to the priority of liens on, and security interests in, the Prepetition Collateral, and the respective rights and remedies of the various lenders, among other things.

The Superpriority Agent, the First Lien Agent, and the Revolver Agent, together with each of the Debtors party thereto, entered into that certain *Amended and Restated First Lien/First Lien Intercreditor Agreement*, dated as of November 12, 2020 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "First Lien Intercreditor Agreement").  The First Lien Intercreditor Agreement sets forth the agreements between the Incremental Superpriority Agent, the Superpriority Agent, the First Lien Agent, and the Revolver Agent with respect to the priority of liens on, and security interests in, the Prepetition Collateral, and the respective rights and remedies of the various lenders, among other things.  Pursuant to the First Lien Intercreditor Agreement, the parties thereto agreed that (a) any lien on the Common Collateral (as defined in the First Lien Intercreditor Agreement) securing obligations under the First Lien Credit Agreement or obligations under the Revolving Credit Agreement shall be *pari passu* and (b) any lien on the Pari Passu Collateral (as defined in the First Lien Intercreditor Agreement) securing obligations under the First Lien Credit Agreement, Revolving Credit Agreement, Incremental Superpriority Credit Agreement or Superpriority Credit Agreement shall be *pari passu*.

**2.      Journey Beyond Debt**

On February 15, 2022, HB AcquisitionCo Pty Ltd, an Australian proprietary limited company ("JB OpCo"), and non-Debtor subsidiary of Hornblower Holdings LLC, as borrower, HB HoldCo Pty Ltd, an Australian proprietary limited company ("HB HoldCo"), as holdings, and certain guarantors entered into a syndicated facility agreement with Global Loan Agency Services Australia Pty Ltd, as administrative agent, and Global Loan Agency Services Australia Nominees Pty Limited, as collateral agent (as amended, restated, supplemented, waived, or otherwise

modified from time to time, the "JB OpCo Credit Agreement"). The JB OpCo Credit Agreement provides for the Journey Beyond Term Loans, a $262.6[3] million term loan facility.

None of the Debtors' assets are pledged as collateral under the Journey Beyond Term Loans, however, on February 15, 2022, Debtor Hornblower Holdings LP provided a limited guarantee under that certain *Parent Guarantee and Contribution Agreement* between Hornblower Holdings LP, as parent, HB TopCo Pty Ltd. ("HB TopCo"), as intermediate parent, and the parties to the JB OpCo Credit Agreement (each in their respective capacities thereunder) (as amended, restated, supplemented, waived, or otherwise modified from time to time, the "Parent Guarantee"). The Parent Guarantee provides for a limited guarantee by Hornblower Holdings LP of the excess, if any, of (i) $56.5 million over (ii) (A) the amount of cash contributed by Hornblower Holdings LP to HB TopCo at any time after the date of the Parent Guarantee, minus (B) any payment made by Hornblower Holdings LP in respect of the obligations under the JB OpCo Credit Agreement. As of the Petition Date, approximately $262.6[4] million in principal amount was outstanding under the JB OpCo Facility.

On November 18, 2022, Journey Beyond Intermediate Holdings, LLC ("JBIH") (a non-Debtor indirect subsidiary of Hornblower Holdings LLC, as borrower, and Journey Beyond Holdings, Ltd. ("JBHL"), as holdings, entered into the JBIH Credit Agreement which provides for the JBIH Term Facility, a $200 million loan facility. Journey Beyond Holdings, Ltd. and Hornblower Group, LLC guarantee the obligations under the JBIH Credit Agreement, and the JBIH Term Facility is secured by substantially all of the assets of JBHL and JBIH, including JBIH's interest in the JBIH-HB TopCo Intercompany Note (as defined below).

None of the Debtors provide credit support for the JBIH Credit Agreement, except that Debtor Hornblower Group Holdco, LLC has pledged the equity interests of its wholly-owned subsidiary, Debtor Hornblower Group, LLC as collateral for the obligations under the JBIH Credit Agreement and Debtor Hornblower Group, LLC guarantees the obligations under the JBIH Credit Agreement. As of the Petition Date, approximately $175.1 million in principal amount was outstanding under the JBIH Term Facility.

3.     **Intercompany Debt**

Certain proceeds of borrowings under the JBIH Term Facility have been used to, among other things, fund unsecured intercompany loans to HB TopCo pursuant to an amended and restated subordinated intercompany note (the "JBIH-HB TopCo Intercompany Note"). The JBIH-HB TopCo Intercompany Note is an unsecured obligation of HB TopCo, matures on January 31, 2029, and bears interest at a rate of 17.0%, which is payable-in-kind and, in the event of a repayment prior to September 28, 2026 would be subject to payment of the Applicable Make-Whole Amount (as defined in the JBIH-JB TopCo Intercompany Note). As of the Petition Date,

---

3     Converted from AUD to USD at 0.6483 spot rate.

4     Converted from AUD to USD at 0.6483 spot rate.

approximately $132.7 million in principal amount was outstanding under the JBIH-HB TopCo Intercompany Note.[5]

Through a series of equity contributions from HB TopCo and HB HoldCo with the proceeds of the JBIH-HB TopCo Intercompany Note, JB OpCo provided a loan of $100.8 million to Journey Beyond Holdings, LLC ("JBH") in the form of an unsecured note. JBH in turn provided a loan on an unsecured basis to American Queen Sub, LLC in the form of an unsecured note (as amended, restated, supplemented, waived, or otherwise modified from time to time, the "JBH-AQV Intercompany Note"). As of the Petition Date, approximately $100.8[6] million in principal amount is outstanding under the JBH AQV Intercompany Note.

Certain proceeds of borrowings under the JBIH Term Facility were also used on November 18, 2022 to fund an unsecured intercompany loan in an aggregate principal amount of $10.0 million from JBIH to American Queen Sub, LLC on a subordinated unsecured basis.

Further, on January 17, 2023, Hornblower Sub, LLC issued a $3.40 million unsecured term promissory note to JB OpCo (the "JB OpCo HB Term Note"). As of the Petition Date, approximately $3.40 million in principal amount is outstanding under the JB OpCo HB Term Note.

### 4. Equity Interests

Each of the Debtors, other than Holdings, Hornblower Holdings LP, Hornblower HoldCo, LLC, and American Queen Holdings, LLC is 100% owned by its direct parent.

Holdings is the general partner of Hornblower Holdings LP. The Sponsor holds, in the aggregate, approximately 81.63% of the equity interests in Holdings, with the remainder being held by members of the Debtors' current management team and former owners of the Debtors prior to the Sponsor's acquisition (the "Rollover Holders").

Hornblower Holdings LP is the ultimate parent of each of the other Debtors and its partnership interests are privately held. The Sponsor holds, in the aggregate, approximately 78% of the common and preferred limited partnership interests in Hornblower Holdings LP, and the remaining interests are held by members of the Debtors' current management team and the Rollover Holders.

## ARTICLE III.
## KEY EVENTS LEADING TO COMMENCEMENT OF CHAPTER 11 CASES

### A. Extended Pandemic Impacts, 2020 Unrestricted Subsidiary Financing, and Sponsor Equity Contribution

As was the case throughout the hospitality industry, the COVID-19 pandemic and related shutdown orders throughout the world had a substantial and negative impact on the Debtors' operations. The Company was forced to cease operations virtually overnight due to the pandemic.

---

[5]   Excludes accrued interest paid-in-kind.

[6]   Excludes accrued interest paid-in-kind.

Comparable revenues declined from $690 million in 2019 to $175 million in 2020—a decline of over 75 percent. At the same time, the Company's losses in 2020 alone exceeded $287 million on a net income basis.

To address these liquidity concerns, the Debtors pursued a series of transactions to bolster liquidity during the shutdowns and provide the Company the means to survive and continue operating at a time when there was great uncertainty regarding the future of the Company's business and the Company's industry at large. Set forth below is a summary of the multiple liquidity enhancing transactions the Company implemented to stay afloat through the hardships caused by the pandemic. The transactions described below resulted in the Company's current capital structure.

In the very early days of the COVID-19 pandemic, on May 13, 2020, the Company first sought to supplement its liquidity by entering into the Revolving Credit Documents, which provided a $45 million revolving credit facility. A few months later, in August 2020, the Sponsor provided a $30 million equity contribution to further bolster the Company's liquidity. While these capital injections provided much needed relief, by the fall of 2020, with COVID-19 cases again surging around the world, the Company's financial and operational underperformance continued, and it became clear that a more significant capital infusion was required.

In response to these continued and unprecedented circumstances, on October 2, 2020, the Debtors pursued a "drop-down" financing transaction to raise additional liquidity. Specifically, the Company contributed certain entities with boat tour operations in Niagara Falls, Canada, to Hornblower Freedom, LLC, a newly created unrestricted subsidiary under the First Lien Credit Agreement and the Revolving Credit Agreement (the "UnSub Borrower"), which entered into a $90 million term loan credit agreement (the "UnSub Credit Agreement"), and the UnSub Borrower distributed $60 million of the loan proceeds to Hornblower Group, Inc. to bolster the Company's available liquidity.

**B.**     **The Superpriority Facility and Refinancing of the Unrestricted Subsidiary Financing**

Immediately after entry into the UnSub Credit Agreement, the Company engaged in extensive negotiations with certain lenders under the First Lien Credit Documents regarding the terms of an alternative financing structure that would refinance the UnSub Credit Agreement and bring the Niagara Falls assets back into the credit group. After weeks of arm's length negotiations, the Company entered into the Superpriority Credit Agreement on November 10, 2020, which provided for a new $190 million super-senior term loan. The proceeds of the Superpriority Facility were used to repay all amounts due under the UnSub Credit Agreement and a portion of the then-outstanding revolving loans under the First Lien Credit Agreement, as well as to provide incremental liquidity to the Company. The modifications to the applicable Prepetition Secured Debt Documents in connection with the Debtors' incurrence of the Superpriority Facility also brought the Niagara Falls collateral that previously secured the obligations under the UnSub Credit Agreement back within the Prepetition Collateral securing the obligations under the applicable Prepetition Secured Debt Documents.

In August and October 2021, the Company received grants under the Coronavirus Economic Relief for Transportation Services program for a total of $114.7 million to support payroll and other operational expenses of the Company.

## C.    Journey Beyond Acquisition and Upsizing the Superpriority Facility

In February 2022, as tourism activity started to show signs of material rebound, the Company completed the acquisition of Journey Beyond, a growing Australian-based experiential travel operator. The Journey Beyond acquisition was a significant milestone in the Company's history and growth trajectory, and it was facilitated through a substantial $191.9 million new money equity contribution to the Company by the Sponsor. Importantly, the Journey Beyond acquisition was structured to exist as an affiliated sister company to the Hornblower silo, with its own separate capital structure.

The Company expected that the original Superpriority Facility would provide sufficient liquidity, together with an anticipated rebound in tourism and travel related revenue, to allow the Hornblower silo to return to its pre-pandemic financial performance. Unfortunately, while the Company's revenue rebounded modestly in 2021, it remained well short of achieving its pre-pandemic profitability, particularly within the American Queen overnight cruise business, resulting in continuing losses. As the Company's liquidity pressures continued through mid-2022, the Company approached its lenders about the potential for an additional upsize of the Superpriority Facility. After months of good faith negotiations, the Company and its lenders agreed on the terms for a $62 million further upsize of the Superpriority Facility. In connection with this incremental financing, the Sponsor agreed to also contribute $43 million of incremental liquidity (largely in the form of equity contributions into the Hornblower silo). In addition, Journey Beyond Holdings, LLC, an indirect holding company of the Journey Beyond business, provided a secured guaranty of both the Superpriority and 1L Term Loan Facilities.

## D.    The Precipitous Rise in Interest Expense

In addition to the impacts of the COVID-19 pandemic, the Company has been dramatically affected by the global rise in interest rates. Since late 2021, in an effort to curb inflation, central banks around the world have continuously raised interest rates. Policymakers in advanced economies have raised rates by approximately 400 basis points on average. In the U.S., the Federal Reserve raised its benchmark short-term rate 11 times since March 2022, reaching 5.5 percent in July 2023, its highest level since 2001.

The rapid rise in interest rates, in combination with the inability to reach pre-pandemic operational levels, have made servicing the Company's funded debt obligations significantly more challenging. Specifically, between 2021 and 2023, the Company's cost of indebtedness rose by 350 basis points from 6.5% to 10%. Consequently, the annualized interest expense on the Debtors' funded debt facilities, all of which are variable interest rate facilities, rose from approximately $62 million in 2021 to $115 million in 2023.

## E.    The 2023 HB TopCo Capital Raises

By early 2023, the Hornblower and American Queen silos were facing substantial liquidity constraints coupled with the continuing rise in interest rates. In addition, within the Journey

Beyond silo, HB TopCo was required to make a $31 million deferred consideration payment to the sellers of the Journey Beyond business, as a component of the original purchase price for the Journey Beyond business. To help address these funding obligations and further shore up the Company's liquidity, over the course of 2023 JBIH borrowed funds under the JBIH Term Facility and extended a series of intercompany loans to HB TopCo pursuant to the JBIH-HB TopCo Intercompany Note. Of these amounts, $31.0 million was used to pay the deferred consideration owed by HB TopCo to the sellers under the Journey Beyond acquisition agreement and the remaining $97.75 million was contributed to HB HoldCo and subsequently to JB OpCo as equity. JB OpCo then loaned the $97.75 million it received through these transactions to JBH in the form of an unsecured note, which JBH in turn loaned to American Queen Sub, LLC through the JBH-AQV Intercompany Note. This series of intercompany transactions provided the Hornblower silo the necessary liquidity to continue operations of the American Queen Voyages business and obtain the 10-year renewal of the Statue of Liberty contract as well as the 5-year renewal of the New York City Ferry contract.

## F.   Pursuit of All Strategic Alternatives

On March 30, 2023, the Company engaged UBS Securities LLC ("UBS") to conduct a sale process for AQV. Over the course of 7 months, UBS contacted approximately 22 prospective purchasers, 5 of whom entered into non-disclosure agreements, and 1 of whom submitted an indication of interest. Ultimately, no bidder submitted a binding offer that the Company believed was actionable, and therefore the Company terminated that sale process on or about October 26, 2023. In light of these challenges, in July 2023, the Company commenced a sale process for its Journey Beyond business, with the hope that a successful sale could generate sufficient proceeds in excess of the Journey Beyond silo level debt to fund anticipated liquidity shortfalls within the Hornblower silo. However, in late September 2023 it became apparent that a Journey Beyond sale process was unlikely to generate sufficient proceeds to solve the Hornblower silo's long-term liquidity needs and that absent a deleveraging transaction, the Debtors' current capital structure was unsustainable.

By late October, with no actionable sale transaction for the Journey Beyond business, continued underperformance of the American Queen Voyages business with no potential purchaser, and significant increases in debt service obligations, the Debtors determined that, notwithstanding their efforts to improve liquidity, further steps were needed to allow the Debtors to successfully address the liquidity constraints and avoid eventual defaults under certain Prepetition Secured Debt Documents. Accordingly, the Company retained Paul, Weiss, Rifkind, Wharton & Garrison, LLP ("Paul, Weiss") and Porter Hedges, LLP ("Porter Hedges"), as legal advisors, Guggenheim Securities, LLC, ("Guggenheim Securities") as investment banker, and Alvarez & Marsal North America, LLC ("A&M"), as financial and restructuring advisor, to explore strategic alternatives. Together, the Debtors, with the assistance of their advisors, analyzed the Debtors' capital structure, potential sources of liquidity, and available financial runway in order to address the Debtors' balance sheet and its ability to service its debts as they became due.

The Debtors' management team, with the assistance of its advisors, soon began discussions with the Company's key stakeholders. The Company, in consultation with its advisors, commenced negotiations with the Ad Hoc Group Advisors (and, following execution of non-disclosure agreements, certain members of the Ad Hoc Group) around a potential recapitalization

transaction and new money financing, and provided extensive diligence materials in furtherance thereof. The Company simultaneously began contingency planning for a potential chapter 11 filing in the event the Ad Hoc Group was unwilling to fund incremental liquidity or, alternatively, if a consensual out-of-court recapitalization transaction could not be negotiated and executed with the Ad Hoc Group.

In early November 2023, in recognition of the importance of the Company's independent review of their strategic alternatives, the board of directors of Hornblower Holdings LLC (the "Board") established an independent special committee of the Board (the "Special Committee") and appointed Ms. Carol Flaton, Ms. Ceci Kurzman, and Mr. Bill Poston as members of the Special Committee (collectively, the "Independent Directors"). The Special Committee was delegated the full and exclusive authority to consider, assess, negotiate, and approve (a) any transactions that presented any conflict of interest between the Company and its equity holders and (b) any restructuring transactions. The Special Committee met regularly from November 10, 2023 to February 20, 2024 with the Company's management and advisors to evaluate, consider, assess, and direct the Company with respect to conflict and restructuring matters—conducting approximately 26 Special Committee meetings during this period, and has continued to meet regularly on a postpetition basis.

As part of their mandate, the Special Committee was also delegated the authority to conduct an independent investigation into potential claims against the Debtors' insiders and equity holders if the Special Committee determines such investigation is appropriate, and whether any claims against insiders or equity holders should be pursued. In connection therewith, Ms. Flaton, an Independent Director, working with separate counsel, is overseeing an ongoing independent investigation concerning such potential causes of action against the Company's insiders.

As part of the Debtors' efforts to chart a value-maximizing path forward, the Debtors continued discussions with the Ad Hoc Group with a focus to raise incremental financing to provide the necessary breathing room for the parties to continue their discussions regarding a comprehensive value-maximizing deleveraging transaction. Ultimately, in late November 2023, the Ad Hoc Group provided the Company with $60 million in emergency financing pursuant to the Incremental Superpriority Facility, to bridge the Company's financing needs through January 3, 2024. Without the critical funding provided by the Incremental Superpriority Facility, the Company would have been unable to fund its operations beyond mid-November. Additionally, on November 16, 2023, as contemplated by the Incremental Superpriority Facility, Jonathan Hickman of Alvarez & Marsal North America, LLC was appointed as the Debtors' Chief Restructuring Officer.

In December 2023, with negotiations still ongoing between the Company and the Ad Hoc Group regarding a comprehensive restructuring transaction, the Company focused its efforts on extending the near-term Incremental Superpriority Facility maturity beyond January 3, 2024. On December 28, 2023, the Company successfully negotiated an extension of the maturity date under the Incremental Superpriority Facility. Among other things, the Ad Hoc Group committed to provide an additional $110 million in incremental liquidity to provide the Company essential breathing room as it continued to engage with the Ad Hoc Group and certain other key prepetition stakeholders on the terms of a more comprehensive solution.

The Company utilized the incremental time to engage in discussions with the Ad Hoc Group around the terms of a comprehensive restructuring. In parallel with these prepetition initiatives, the Company, with the assistance of its advisors, also explored and analyzed both a going concern sale and potential wind-down of operations and the sale of assets of the AQV business, including through a section 363 asset sale process.

Further, in connection with the Debtors' evaluation of all strategic alternatives, the Debtors, with the assistance of their proposed investment banker, Guggenheim Securities, engaged in extensive marketing efforts for the sale of the AQV business as a going concern, or alternatively, the sale or disposition of all or a portion of the AQV Assets. The Debtors did not receive any actionable indications of interest for a going concern sale of the AQV business, and were unable to enter into a purchase agreement with a "stalking horse" bidder for any of the AQV Assets prior to the Petition Date.

Given the significant costs associated with operating the AQV business and maintaining the AQV vessels, the Company made the difficult decision immediately prior to filing to commence efforts to limit operation of the AQV business and will continue to do so during these chapter 11 cases. Moreover, the "layup" costs associated with maintaining the AQV vessels while not in operation are also substantial. Given the significant layup costs, an extended sale process for the AQV Sale Transaction would entail significant additional layup costs, which also raises the sale proceeds hurdle that the Company must clear for any sale to maximize value for the Debtors' estates. As a result, and after careful consideration and in consultation with the Company's key stakeholders, the Company cancelled certain scheduled cruises in January 2024, and on February 20, 2024, terminated the employment of substantially all of their employees and subsequently cancelled all additional scheduled cruises during these Chapter 11 Cases.

Ultimately, on February 21, 2024, after extensive, arm's-length negotiations, the Debtors and the Ad Hoc Group entered into the Restructuring Support Agreement, by and between the Debtors and the Consenting Stakeholders, who hold, in the aggregate, approximately 98% of the HB First Lien Claims. The Restructuring Support Agreement contemplates an in-court restructuring of the Hornblower entities through a prearranged chapter 11 plan, as well as the wind-down of the AQV business.

## ARTICLE IV.
## THE CHAPTER 11 CASES

### A.   Commencement of the Chapter 11 Cases

The Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code on February 21, 2024, *i.e.*, the Petition Date, in the Bankruptcy Court. Since the Petition Date, the Debtors have continued to operate their business as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

### B.   First Day Motions

The filing of the petitions commenced the Chapter 11 Cases, at which time the Debtors were afforded the benefits and became subject to the limitations of the Bankruptcy Code. On the Petition Date, the Debtors filed several motions requesting that the Bankruptcy Court grant various

relief designed to ensure a seamless transition between the Debtors' prepetition and postpetition business operations, facilitate a smooth reorganization through the Chapter 11 Cases, and minimize any disruptions to the Debtors' operations (the "Underline First Day Motions"). The Bankruptcy Court granted all of the First Day Motions. The following is a brief overview of the relief granted.[7]

### 1.   Cash Management

As described in detail in the Debtors' cash management motion, the Debtors maintain an integrated cash management system in the ordinary course of their businesses. To lessen the disruption caused by the bankruptcy filings and maximize the value of their Estates in these Chapter 11 Cases, it was vital that the Debtors be permitted to maintain their cash management system and be authorized to, *inter alia*, pay any outstanding bank, processing, and security fees owed in relation to their cash management system, continue utilizing their corporate payment cards, maintain their existing business forms, and continue engaging in ordinary course intercompany transactions. On February 21, 2024, the Bankruptcy Court entered an order approving the Debtors' cash management motion on an interim basis (the "Interim Cash Management Order").[8]

### 2.   Critical Vendors

The Debtors requested authorization through their critical vendors motion to pay the prepetition claims of certain essential vendors and service providers, including foreign vendors, lien claimants, and vendors that delivered goods or provided services to the Debtors in the ordinary course of business within 20 days before the Petition Date, in light of the importance of the products and services provided by such vendors. Because of the nature of their businesses, the Debtors believed that many vendors would make credible and actionable threats to cease supplying the Debtors with the specialized goods and services necessary to maintain the smooth operation of the Debtors' businesses while in chapter 11, unless they were paid on account of their prepetition debt. As a result, the Debtors sought, and the Bankruptcy Court granted, authority for the Debtors to pay prepetition claims of such critical vendors up to an aggregate amount of approximately $31 million on a final basis.[9]

### 3.   Wages

As of the Petition Date, the Debtors employed approximately 4,600 full-time and part-time employees. This workforce relies on the compensation and benefits provided or funded by the

---

[7]   This Disclosure Statement's summary of the First Day Motions and related orders is qualified in its entirety by reference to the First Day Motions and related orders themselves. In the case of any inconsistency between this Disclosure Statement and the First Day Motions and related orders, the First Day Motions and related orders govern.

[8]   *See Interim Order (I) Authorizing the Debtors to (A) Continue to Operate their Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Maintain Existing Business Forms and Books and Records, and (D) Continue to Perform Intercompany Transactions and (II) Granting Related Relief* [Docket No. 58].

[9]   *See Order (I) Authorizing the Debtors to Pay Certain Prepetition Claims of (A) Critical Vendors, (B) Lien Claimants, (C) Foreign Vendors, and (D) 503(b)(9) Claimants, (II) Confirming Administrative Expense Priority of Outstanding Orders, and (III) Granting Related Relief* [Docket No. 59].

Debtors to continue to pay their daily living expenses, and would be exposed to significant financial difficulties if the Debtors were not permitted to pay these obligations. It is essential to the smooth operation of the Debtors' business that their workforce continues to perform in the ordinary course, and so a stable workforce is critical to the uninterrupted continuation of the Debtors' businesses and the preservation and maximization of the value of the Debtors' Estates during these Chapter 11 Case. On this basis, the Debtors sought, and the Bankruptcy Court granted, the Debtors authority to, among other things, (a) pay prepetition wages, salaries, other compensation, and reimbursable expenses to their employees and (b) continue employee benefits programs in the ordinary course of business, including payment of certain prepetition obligations related thereto. [10]

### 4.    Customer Programs

The Debtors provide certain incentives, discounts, promotions, remittances, accommodations, and administer related programs, to attract customers and maintain positive customer relationships. These customer programs promote customer satisfaction and inure to the goodwill of the Debtors' businesses and the value of their brands. Continuing to administer these programs without interruption during the pendency of these Chapter 11 Cases was critical to preserve the value of the Debtors' assets by, most importantly, preserving the Debtors' valuable customer and key concession counterparty relationships, goodwill, and market share. Accordingly, the Debtors sought, and the Bankruptcy Court granted, an order confirming the Debtors' authority to maintain and administer their customer-related programs, policies, and practices and honor certain prepetition obligations related thereto. [11]

### 5.    Taxes

In the ordinary course of business, the Debtors incur various taxes, fees, and similar charges in approximately 140 jurisdictions worldwide. The Debtors' failure to pay certain taxes and fees when due may adversely affect their business operations. Depending on the relevant jurisdiction, tax authorities may have the ability to initiate audits if taxes and fees are not timely paid. Similarly, tax authorities may attempt to suspend the Debtors' operations, seek to lift the automatic stay or even seek to hold the Debtors' directors and officers personally liable for any unpaid amounts. Accordingly, the Debtors sought, and the Bankruptcy Court granted, authority to pay all taxes, fees, assessments, and other charges to applicable taxing authorities in the ordinary course of business that may be due under applicable law after the Petition Date, and any such taxes, fees, assessments, and other charges from periods prior to the Petition Date. [12]

---

[10]    *See Order (I) Authorizing the Debtors to (A) Pay Prepetition Wages, Salaries, Other Compensation, and Reimbursable Expenses and (B) Continue Employee Benefits Programs, and (II) Granting Related Relief* [Docket No. 109].

[11]    *See Order (I) Authorizing the Debtors to Maintain and Administer Their Existing Customer Programs and Honor Certain Prepetition Obligations Related Thereto and (II) Granting Relief* [Docket No. 57].

[12]    *See Order (I) Authorizing the Payment of Certain Taxes and Fees and (II) Granting Related Relief* [Docket No. 61].

### 6.     Insurance and Surety Bonds

In the ordinary course of business, the Debtors maintain a variety of insurance policies and surety arrangements.  The Debtors' existing insurance and surety programs are essential to preserve the value of the Debtors' business, properties, and assets.  In many cases, the insurance coverage provided by the existing insurance policies is required by diverse regulations, laws, and contracts.  Failure to make the payments required to maintain the Debtors' insurance policies could have a significant negative impact on the Debtors' operations.  Absent sufficient and continuing insurance coverage, the Debtors may also be exposed to substantial liability and may be unable to operate in certain key jurisdictions.  As a result, the Debtors sought, and the Bankruptcy Court granted, authority for the Debtors to continue their prepetition insurance and surety arrangements, and pay premiums and other amounts arising thereunder. [13]

### 7.     Utilities

In the ordinary course of business, the Debtors incur certain expenses related to essential utility services including, among others, electricity, natural gas, water and sewage, telephone, internet, and other similar services from several utility providers, either directly or through applicable lease agreements.  The Debtors sought, and the Bankruptcy Court granted, an order (a) prohibiting utility providers from altering, refusing, or discontinuing utility services, (b) deeming the utility providers to be adequately assured of future payment, and (c) establishing procedures for determining adequate assurance of payment. [14]

### 8.     Equity and Claims Trading

The Debtors possess net operating loss ("NOL") carryforwards and other tax attributes.  Under the U.S. Internal Revenue Code, the Debtors' ability to use these NOL carryforwards and other tax attributes may be limited if, among other things, the Debtors experience a change of control.  In order to protect the Debtors' ability to use their tax attributes, the Debtors sought, and the Bankruptcy Court granted on an interim basis, an order approving notification and hearing procedures for certain transfers of and declarations of worthlessness with respect to Holdings' common equity interests and notification, hearing, and sell-down procedures related to claims (as defined in section 101(5) of the Bankruptcy Code) against the Debtors. [15]

---

[13]    *See Order (I) Authorizing the Debtors to (A) Continue Prepetition Insurance Coverage and Satisfy Prepetition Obligations Related Thereto, (B) Renew, Amend, Supplement, Extend, or Purchase Insurance Policies, (C) Continue to Pay Brokerage Fees, and (D) Maintain their Surety Bond Program, and (II) Granting Related Relief* [Docket No. 108].

[14]    *See Order (I) Approving the Debtors' Proposed Adequate Assurance of Payment for Future Utility Services, (II) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Services, (III) Approving the Debtors' Proposed Procedures for Resolving Additional Assurance Requests, and (IV) Granting Related Relief* [Docket No. 107].

[15]    *See Interim Order (I) Establishing Notification and Hearing Procedures for Certain Transfers of Interests of Hornblower Group HoldCo, LLC and American Queen Holdco, LLC and (II) Granting Related Relief* [Docket No. 158].

### 9. Other Procedural Motions

The Debtors filed, and the Bankruptcy Court granted, various other procedural motions that are common to chapter 11 proceedings of similar size and complexity as these Chapter 11 Cases, including authorizing the Debtors to retain Omni Agent Solutions, Inc. as their claims, noticing, and solicitation agent.[16]

### C. Retention of Restructuring and Other Professionals

#### 1. Employment and Compensation of Restructuring Professionals

To assist the Debtors in carrying out their duties as debtors-in-possession and to otherwise represent the Debtors' interests in these Chapter 11 Cases, the Debtors have filed motions seeking orders authorizing the Debtors to retain and employ the following advisors: (a) Paul, Weiss, as counsel to the Debtors;[17] (b) Porter Hedges, as co-counsel to the Debtors;[18] (c) A&M, as financial and restructuring advisor to the Debtors;[19]  Further, the Debtors expect to file motions seeking orders authorizing the Debtors to retain and employ (a) Guggenheim Securities, as investment banker to the Debtors; (b) Selendy Gay PLLC, as special litigation counsel to the Debtors; and (c) RSM US LLP and RSM Canada LLP, as audit and tax services providers to the Debtors.

#### 2. Ordinary Course Professionals

As of the Petition Date, the Debtors employed various professionals in the ordinary course of business, consisting of various law firms, attorneys, auditors, tax professionals, and other non-attorney professionals.  On March 15, 2024, the Debtors filed a motion seeking the authority to retain and compensate such ordinary course professionals.[20]

---

[16]   *See Order Authorizing the Employment and Retention of Omni Agent Solutions, Inc. as Claims, Noticing, and Solicitation Agent* [Docket No. 27].  *See also Notice of Designation as Complex Chapter 11 Bankruptcy Case* [Docket No. 3]; *Order (I) Directing Joint Administration of Related Chapter 11 Cases and (II) Granting Related Relief* [Docket No. 20]; *Order (I) Authorizing the Debtors to (A) File a Consolidated List of Creditors, (B) File a Consolidated List of the 30 Largest Unsecured Creditors, and (C) Redact Certain Personal Identification Information; (II) Approving the Form and Manner of Notifying Creditors of the Commencement of These Chapter 11 Cases; and (III) Granting Related Relief* [Docket No. 62]; *Order (I) Extending Time to File (A) Schedules of Assets and Liabilities, (B) Schedules of Current Income and Expenditures, (C) Schedules of Executory Contracts and Unexpired Leases, (D) Statements of Financial Affairs, and (E) Rule 2015.3 Financial Reports and (II) Granting Related Relief* [Docket No. 63].

[17]   *See Debtors' Application for Entry of an Order Authoring the Retention and Employment of Paul, Weiss, Rifkind, Wharton & Garrison LLP as Attorneys for the Debtors and Debtors in Possession* [Docket No. 257].

[18]   *See Application for Entry of an Order Authoring the Retention and Employment of Porter Hedges LLP as Co-Counsel for the Debtors and Debtors in Possession* [Docket No. 261].

[19]   *See Debtors' Application for Entry of an Order (I) Authoring the Employment and Retention of Alvarez & Marsal North America, LLC, (II) Designation of Jonathan Hickman as Chief Restructuring Officer, and (III) Provision of Additional Personnel for the Debtors* [Docket No. 258].

[20]   *See Debtors' Application for Entry of an Order (I) Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business and (II) Granting Related Relief* [Docket No. 259].

### D.  Appointment of the Official Committee of Unsecured Creditors

On March 5, 2024, the U.S. Trustee appointed the Official Committee of Unsecured Creditors (as reconstituted from time to time, the "Creditors' Committee").[21]  As of the date the Creditors' Committee was appointed, the members of the Creditors' Committee were: Mr. Row LLC (SeaTran Marine), Pleasant Holidays, Easton Coach Co., Vacations to Go Inc., FMC GlobalSat Inc., The Peabody Memphis, and Angela Composto.  The Creditors' Committee has retained Pachulski Stang Ziehl & Jones LLP, as counsel and M3 Advisory Partners, LP, as financial advisor.

### E.  AQV Sale Procedures

On February 28, 2024, the Bankruptcy Court entered an order approving procedures to solicit bids and conduct an auction, if necessary, for the proposed sale of the AQV Assets in order to effectuate the AQV Sale Transaction (the "Bidding Procedures Order").[22]  Pursuant to the Bidding Procedures Order, the Debtors established a deadline of March 25, 2024 at 4:00pm (Prevailing Central Time) for potential purchasers to submit qualified bids, and scheduled an auction to be held (if necessary) on March 27, 2024 at 9:00 a.m. (Prevailing Central Time). The Debtors anticipate conducting a hearing to approve the AQV Sale Transaction on April 4, 2024 at 9:30 a.m. (Prevailing Central Time).

### F.  Section 341 Meeting

On March 28, 2024, the Debtors expect to attend meetings of their creditors pursuant to section 341 of the Bankruptcy Code and addressed inquiries from the U.S. Trustee and certain creditors regarding, among other topics, the Debtors' operations and finances and other issues related to these Chapter 11 Cases.

### G.  Schedules and Statements and 2015.3 Reports

The Debtors will file their Schedules of Assets and Liabilities and Statements of Financial Affairs and their 2015.3 Reports consistent with the deadlines established by the *Order (I) Extending Time to File (A) Schedules of Assets and Liabilities, (B) Schedules of Current Income and Expenditures, (C) Schedules of Executory Contracts and Unexpired Leases, (D) Statements of Financial Affairs, and (E) Rule 2015.3 Financial Reports and (II) Granting Related Relief* [Docket No. 63].

---

[21]   *See Notice of Appointment of Creditors' Committee* [Docket No. 195]; *Corrected Notice of Appointment of Creditors' Committee* [Docket No. 208]

[22]   *See Order (A) Approving (I) Bidding Procedures for the Sale of the AQV Debtors' Assets, (II), Procedures Regarding Bid Protections, (III) the Scheduling of Certain Dates with Respect Thereto, (IV) the Form and Manner of Notice Thereof, (V) Contract Assumption, Assignment, and Rejection Procedures, and (VI) Certain Procedures to Otherwise Dispose of the AQV Assets, and (B) Authorizing the Debtors to Enter into Agreements for the Sale of Their Assets Free and Clear of All Liens, Claims, and Encumbrances* [Docket No. 166].

### H.  Bar Date

The Debtors will file a motion (the "Bar Date Motion") seeking to establish the following:

- **General Bar Date**: The date by which each Person or Entity (as such terms are defined in the Bankruptcy Code) holding a Claim against the Debtor that arose prior to the Petition Date is required to file a proof of claim so that it is actually received by the Notice and Claims Agent (the "**General Bar Date**").

- **Governmental Bar Date**: The date by which each Governmental Unit (as such term is defined in the Bankruptcy Code) holding or asserting a Claim against the Debtor that arose prior to the Petition Date must file a proof of claim so that it is actually received by the Notice and Claims Agent (the "**Governmental Bar Date**").

- **Rejection Damages Bar Date**: With respect to any Claims arising from the Debtor's rejection of Executory Contracts and Unexpired Leases, the Bar Date Motion shall request authority to establish the later of (i) the General Bar Date or the Governmental Bar Date, as applicable, and (ii) a certain time period after the date of entry of the order of the Bankruptcy Court (including the Confirmation Order) approving such rejection of such Executory Contract or Unexpired Lease as the last date and time by which Holders of such Claims based upon such rejection must file proofs of claim against the Debtor (the "**Rejection Damages Bar Date**").

- **Amended Schedules Bar Date**: In the event that the Debtor amends its Schedules (as defined in the Bar Date Motion), the Bar Date Motion shall seek authority to establish the later of (a) the General Bar Date or the Governmental Bar Date, as applicable, and (b) a certain time period after the date on which the Debtor mails notice of the amendment to the Schedules, as the last date and time by which Holders of such Claims affected by such amendment must file a proof of claim against the Debtor (such later date, the "**Amended Schedules Bar Date**").

### I.  CCAA Proceedings

On February 27, 2024, these Chapter 11 Cases were recognized in Canada in a proceeding commenced before the Ontario Superior Court of Justice (Commercial List) (the "Canadian Court") pursuant to the CCAA (the "Canadian Recognition Proceeding"). Recognition of the Chapter 11 Cases was sought to provide for a stay of proceedings against the Debtors in Canada, to keep Canadian creditors informed regarding the Chapter 11 Cases, and to seek to bind Canadian creditors to orders issued in the Chapter 11 Cases for which recognition is sought in Canada.

The orders issued by the Canadian Court on February 27, 2024, among other things: (i) recognized the Chapter 11 Cases as "foreign main proceedings" under the CCAA; (ii) stayed all existing proceedings against the Debtors in Canada; (iii) appointed Grant Thornton LLP, as information officer, to report to the Canadian Court, creditors, and other stakeholders in Canada on the status of the Chapter 11 Cases; (iv) recognized certain interim and final orders entered by

the Bankruptcy Court permitting the Debtors to, among other things, continue operating their respective businesses during the course of the Chapter 11 Cases.

Should the Plan be confirmed, and the Confirmation Order entered by the Bankruptcy Court, the Debtors intend to seek an order from the Canadian Court in the Canadian Recognition Proceeding recognizing the Confirmation Order in Canada.

## J.    WARN Act Proceedings

On February 23, 2024, a putative class action proceeding was commenced before the Bankruptcy Court alleging that certain of the Debtors terminated employees without sufficient advance notice required under the Worker Adjustment and Retraining Notification Act of 1988 29 U.S.C. §§ 2101-2109 *et seq.* and seeking class certification, declaratory relief, and money damages against the Debtors. This putative class action proceeding is currently pending before the Bankruptcy Court in the proceeding captioned, *Theresa Vanburen et al. v. Walks, LLC (Texas) et al.*, Adv. Pro. No. 24-03029 (Bankr. S.D. Tex.) (the "Vanburen Proceedings").

On March 5, 2024, a putative class action proceeding was commenced before the Bankruptcy Court alleging that certain of the Debtors terminated employees, including seamen as defined under the Seaman's Wage Act, 46 U.S. § 10101 *et seq.*, and the Jones Act 46 U.S.C. § 50101 *et seq.* without sufficient advance notice required under the Seaman's Wage Act and the Worker Adjustment and Retraining Notification Act of 1988 29 U.S.C. §§ 2101-2109 *et seq* and seeking class certification, declaratory relief, and money damages against the Debtors. This putative class action proceeding is currently pending before the Bankruptcy Court in the proceeding captioned, *Captain Bertrand M. Suarez et al. v. American Queen Steamboat Operating Company, LLC et al.*, Adv. Pro. No. 24-03037 (Bankr. S.D. Tex.) (the "Suarez Proceedings" and together with the Vanburen Proceedings, the "WARN Act Proceedings").

The WARN Act Proceedings are currently pending before the Bankruptcy Court.

## K.    Confirmation Hearing

The Debtors have requested that the Bankruptcy Court schedule the Confirmation Hearing on June 3, 2024 at 9:00 a.m. (prevailing Central Time) to consider confirmation of the Plan. Any objections to confirmation of the Plan must be filed by May 24, 2024 at 4:00 p.m. (prevailing Central Time).

**ARTICLE V.**
**RESTRUCTURING SUPPORT AGREEMENT,**
**DIP CREDIT AGREEMENTS, BACKSTOP COMMITMENT AGREEMENT,**
**EXIT TERM LOANS, AND EXIT REVOLVER** [23]

On February 21, 2024, the Debtors, the Sponsor, and members of the Ad Hoc Group entered into the Restructuring Support Agreement, attached as **Exhibit B** hereto. Substantially

---

[23]    The following summary is provided for illustrative purposes only and is qualified in its entirety by reference to the Restructuring Support Agreement, the Backstop Commitment Agreement, and the DIP Credit Agreements.

contemporaneously with this Disclosure Statement, the Debtors filed the Plan, which documents the terms of the restructuring as contemplated by the Restructuring Support Agreement. The Debtors believe the Restructuring Transactions contemplated by the Plan will significantly reduce the Debtors' funded debt obligations, result in a stronger balance sheet for the Debtors through the infusion of new capital through the Rights Offering, and maximize value for stakeholders. Entry into the Restructuring Support Agreement and the DIP Credit Agreements, and the substantial progress made with respect to the negotiation of the Backstop Commitment Agreement, the Exit Term Loans, and the Exit Revolver, represent significant steps in the Debtors' restructuring process.

## A.   The Restructuring Support Agreement

As described above, Hornblower, with the assistance of its advisors, began extensive negotiations regarding a potential financial restructuring with advisors to the Ad Hoc Group and the Sponsor in October 2023. On February 21, 2024, those negotiations culminated in the Debtors and members of the Ad Hoc Group entering into the Restructuring Support Agreement. Under the Restructuring Support Agreement, the holders of more than 98% of the aggregate amount of HB First Lien Claims outstanding have agreed to support the Debtors' restructuring, including to vote in favor of the Debtors' Plan.

The Restructuring Support Agreement is anchored by the DIP Facilities, Rights Offering, which is fully backstopped by the Commitment Parties pursuant to the Backstop Commitment Agreement, the Exit Term Loans, and the Exit Revolver.

## B.   The DIP Facilities

The DIP Facilities have provided critically needed liquidity to support the Debtors' continued operations across all channels and fulfill commitments to its valued team members, customers, and suppliers during the restructuring process.

The Senior DIP Facility has a nine-month term (subject to extension under certain terms) and customary covenants and terms for a facility of its size. The Senior DIP Facility provides for a $300 million senior secured, debtor-in-possession term loan credit facility which provides for a complete refinancing of the Debtors' prepetition Superpriority Facility at reduced interest expense. The Senior DIP Facility is integral to the Debtors' consensual access to prepetition cash collateral and the Senior DIP Lenders agreed to provide committed exit financing in the form of the Exit Term Loans and the Exit Revolver. The Senior DIP Facility was fully available upon entry of the Debtors' interim post-petition financing order, which was entered on February 22, 2024.[24] Amounts outstanding under the Senior DIP Facility bear interest at either (a) the ABR Borrowing rate, which is the greatest of (i) the Prime Rate in effect on such day, (ii) the Federal Funds

---

In the event of any inconsistency between this summary and the Restructuring Support Agreement, the Backstop Commitment Agreement, and the DIP Credit Agreements, as applicable, the Restructuring Support Agreement, the Backstop Commitment Agreement, and the DIP Credit Agreements, as applicable, will control in all respects.

[24] *See Interim Order (I) Authorizing the Debtors to (A) Obtain Senior Secured Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Superpriority Administrative Expense Claims, (II) Granting Adequate Protection to Certain Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* [Docket No. 72].

Effective Rate in effect on such date *plus* ½ of 1.00%, and (iii) Adjusted Term SOFR *plus* 1.00%, *plus* 8.00%, or (b) the Term SOFR Borrowing rate which is the Adjusted Term SOFR *plus* 6.50% (increased to 7.00% if a PIK Election has been made) provided that 3.50% shall be payable-in-kind on each Interest Payment Date (each as defined in the Senior DIP Credit Agreement). The Senior DIP Facility provides for certain fees, including an upfront premium of 1.50%, an exit premium of 1.50%, and an extension fee of 1.00%.

The Junior DIP Facility has a nine-month term (subject to extension under certain terms) and customary covenants and terms for a facility of its size. The Junior DIP Facility provides for a $285 million junior secured, debtor-in-possession term loan credit facility which includes new money components of up to $121 million and $164 million of previously-funded emergency prepetition loans under the Incremental Superpriority Facility, which enable the Debtors to fund these Chapter 11 Cases and obtain consensual access to prepetition cash collateral. The Junior DIP Facility is available in two draws—a $224 million initial term loan, available upon entry of the Debtors' interim post-petition financing order, which was entered on February 22, 2024, with the remainder available following entry of the final such order.[25] Amounts outstanding under the Junior DIP Facility bear interest at either (a) the ABR Borrowing rate, which is the greatest of (i) the Prime Rate in effect on such day, (ii) the Federal Funds Effective Rate in effect on such date *plus* ½ of 1.00%, and (iii) Adjusted Term SOFR *plus* 1.00%, *plus* 8.00%, or (b) the Term SOFR Borrowing rate which is the Adjusted Term SOFR *plus* 9.00% (each as defined in the Junior DIP Credit Agreement). The Junior DIP Facility provides for certain fees, including a closing fee of 4.00% payable-in-kind, a DDTL commitment fee of 1.00%, and an exit premium of 4.00%.

As part of the negotiations in connection with the DIP Facility, and as a direct result of the Ad Hoc Group, the DIP Lenders, and the Sponsor's willingness to fund the Debtors during the Chapter 11 Cases, the Debtors' prepetition secured lenders consented to the Debtors' use of their prepetition cash collateral on terms that will ensure the adequate protection of the value of their secured claims and facilitate the Debtors' goal to quickly reorganize and emerge from chapter 11.

## C.   **Backstop Commitment Agreement and Rights Offering**

As more fully described in the Backstop Approval Motion (as defined below), the Debtors will conduct the Rights Offering in accordance with the Rights Offering Procedures. Pursuant to the Rights Offering, the Debtors will conduct any rights offering available to eligible Holders of Allowed HB First Lien Claims for $345 million of New HB Common Equity (subject to any reductions thereto pursuant to the Restructuring Support Agreement), at a discounted price of $7.00 per share. The New HB Common Equity to be issued pursuant to the Rights Offering will be issued on the Effective Date.

To effectuate the Rights Offering, the Debtors have filed a motion seeking approval of the Backstop Commitment Agreement.[26] The Debtors shall distribute the Subscription Rights (as defined below) to all eligible Holders of Allowed HB First Lien Claims as set forth in the Plan and

---

[25]   *Id.*

[26]   *Debtors' Motion for Entry of an Order (I) Authorizing the (A) Debtors' Entry Into, and Performance Under, the Backstop Commitment Agreement and (B) Payment of Related Fees, Premiums, Indemnities, and Expense, and (II) Granting Related Relief*, [Docket No. 243] (the "Backstop Approval Motion").

the Rights Offering Procedures. The procedures and instructions for exercising the Subscription Rights are set forth in the Rights Offering Procedures, which are attached as an exhibit to the motion seeking entry of the Disclosure Statement Order filed substantially contemporaneously with this Disclosure Statement. The Rights Offering Procedures are incorporated herein by reference and should be read in conjunction with this Disclosure Statement in formulating a decision as to whether to exercise the Subscription Rights.

**TO PARTICIPATE IN THE RIGHTS OFFERING, EACH ELIGIBLE HOLDER MUST COMPLETE ALL THE STEPS OUTLINED IN THE RIGHTS OFFERING PROCEDURES. IF ALL OF THE STEPS OUTLINED IN THE RIGHTS OFFERING PROCEDURES ARE NOT COMPLETED BY THE RIGHTS OFFERING EXPIRATION TIME (AS DEFINED IN THE RIGHTS OFFERING PROCEDURES) OR THE SUBSCRIPTION ESCROW FUNDING DATE, AS APPLICABLE, THE ELIGIBLE HOLDER SHALL BE DEEMED TO HAVE <u>FOREVER AND IRREVOCABLY RELINQUISHED AND WAIVED</u> ITS RIGHT TO PARTICIPATE IN THE RIGHTS OFFERING.**

Pursuant to the Backstop Commitment Agreement, each Commitment Party (as defined in the Backstop Commitment Agreement) agreed to backstop the Rights Offering and commit to fully-exercise its Subscription Rights. In exchange for those commitments, and subject to the final terms and conditions of the Backstop Commitment Agreement, the Commitment Parties will receive the Backstop Commitment Premium (as defined in the Backstop Commitment Agreement) equal to 10% of the Aggregate Rights Offering Amount, payable in New HB Common Equity; *provided* that in the event the Rights Offering is not consummated in certain circumstances, the Termination Premium (as defined in the Backstop Commitment Agreement) shall be payable to the Commitment Parties in cash to the extent provided in the Backstop Commitment Agreement.

D.     **Exit Term Loans and Exit Revolver**

In connection with the Senior DIP Facility, the Senior DIP Lenders have agreed to provide the Exit Term Loans in the form of a $300 million senior secured term facility, and the Exit Revolver in the form of a $50 million senior secured revolving credit facility, on terms substantially consistent with that certain Exit Credit Term Sheet attached as an exhibit to the Restructuring Support Agreement. The Exit Term Loans and Exit Revolver, together with the proceeds of the Rights Offering, will enable the Debtors to obtain sufficient exit financing to pay off the DIP Facilities upon emergence from these Chapter 11 Cases and continue to operate with sufficient liquidity.

The Exit Term Loans and the Exit Revolver each have a five-year term and customary covenants and terms for facilities of their size. The Exit Term Loans and the Exit Revolver each bear interest at the Adjusted Term SOFR *plus* 5.75% or the Reference Rate *plus* 4.75%. The Exit Term Loans and Exit Revolver also provide for certain fees which will be disclosed within the Exit Credit Documents, including under seal to the extent necessary.

E.    **Milestones**

The Restructuring Support Agreement, the Backstop Commitment Agreement, and DIP Credit Agreements contemplate that the Debtors will achieve certain milestones (the "Milestones") over the remainder of these Chapter 11 Cases.  The failure to achieve these Milestones as contemplated by the Restructuring Support Agreement would permit the Required Consenting Stakeholders under the Restructuring Support Agreement to terminate their commitments thereunder.  The failure to achieve these Milestones as contemplated by the Backstop Commitment Agreement would permit the Required Commitment Parties to terminate their Backstop Commitments thereunder.  The failure to achieve these Milestones as contemplated by the DIP Credit Agreements would permit the Required DIP Lenders under the respective DIP Credit Agreements to terminate their DIP Commitments thereunder.  These Milestones include the following Milestones that the Debtors have already achieved:

1.    commence the Chapter 11 Cases on or before February 21, 2024;

2.    no later than one (1) day after the Petition Date, file the motions to approve the Debtors postpetition financing facilities and the AQV Sale Transaction;

3.    obtain entry by the Bankruptcy Court of the Interim DIP Order no later than three (3) Business Days after the Petition Date;

4.    obtain entry of the Interim DIP Recognition Order by the CCAA Court no later than ten (10) calendar days after the entry of the Interim DIP Order;

5.    obtain entry by the Bankruptcy Court of the AQV Bidding Procedures Order as soon as reasonably practicable but in no event later than fifteen (15) calendar days after the Petition Date;

6.    no later than twenty-one (21) calendar days after the Petition Date, file the Plan, Disclosure Statement, Disclosure Statement Motion and Backstop Motion.[27]

In addition, the Debtors are subject to the following future Milestones:

1.    obtain entry by the Bankruptcy Court of the Final DIP Order and the AQV Sale Order as soon as reasonably practicable but in no event later than forty-five (45) calendar days after the Petition Date;

2.    obtain entry of the Final DIP Recognition Order by the CCAA Court as soon as reasonably practicable but in no event no later than ten (10) calendar days after the entry of the Final DIP Order;

3.    obtain entry by the Bankruptcy Court of the Disclosure Statement Order and the Backstop Order no later than sixty (60) calendar days after the Petition Date;

4.    obtain entry by the Bankruptcy Court of the Confirmation Order no later than one-hundred-twenty (120) calendar days after the Petition Date;

---

[27]    With the consent of the Consenting Stakeholders, the Milestone to file the Plan, Disclosure Statement, and Disclosure Statement Motion was extended to March 18, 2024.

5.      obtain entry of the Confirmation Recognition Order by the CCAA Court no later than ten (10) calendar days after the entry of the Confirmation Order; and

6.      cause the Plan Effective Date to occur no later than one-hundred-forty (140) days after the Petition Date; *provided* that this Milestone may be extended by the Debtors up to thirty (30) days if the purpose of such extension is solely to obtain regulatory approvals.

## F.      RSA Settlement

Prior to the Petition Date, the Company, the Ad Hoc Group, Crestview, and their respective advisors engaged in vigorous, arm's-length negotiations to consensually resolve issues related to a restructuring of the Company, including any and all issues relating to the JBIH Loans and the JBIH Intercompany Note. On February 21, 2024, the Debtors reached an agreement in principle with Ad Hoc Group and Crestview, as reflected in the Restructuring Support Agreement.  The RSA Settlement is reflected in the Plan and provides, among other things, for:

- The Crestview Cash Contribution and consensual release of the JBIH Claims against Debtors Hornblower Group, LLC and Journey Beyond Holdings, LLC, in each case on the Plan Effective Date;
- The separation of the Journey Beyond Entities from the Hornblower Debtors, including for (i) the Holders of First Lien Claims and Revolver Claims to receive 100% of the New HB Common Equity issued by the Reorganized Hornblower Debtors and 100% of the Rights and (ii) Crestview (or its designee) as holder of the JBIH Loans to receive 100% of the equity in the Journey Beyond Entities;
- All debt and equity investments in connection with the Restructuring Transactions (other than with respect to the Journey Beyond Entities) that are provided by any Initial Consenting Stakeholder (as defined in the Restructuring Support Agreement) shall be offered to each other Initial Consenting Stakeholder according to the Pro Rata Allocation (as defined in the Restructuring Support Agreement);
- The New HB Organizational Documents, and any other applicable Definitive Documents, shall incorporate the agreed-upon governance terms consistent with the Restructuring Support Agreement; and
- The settlement of any and all actual and potential disputes between and among the Company Entities, the Consenting HB First Lien Lenders, Crestview, and each other Consenting Stakeholder and all other disputes that might impact creditor recoveries, including, without limitation, any and all issues relating to the JBIH Loans and the JBIH Intercompany Note.

The RSA Settlement was considered and approved by the Special Committee.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the RSA Settlement without any further notice to or action, Order, or approval of the Bankruptcy Court, as well as a finding by the Bankruptcy Court that such settlement is in the best interests of the Debtors, their Estates, and Holders of Claims or Interests, and is fair, equitable, and within the range of reasonableness.  The compromises and settlements described in the Plan shall be non-severable from each other and from all other terms of the Plan.

## ARTICLE VI.
## SUMMARY OF PLAN

THE FOLLOWING SUMMARIZES CERTAIN OF THE SIGNIFICANT ELEMENTS OF THE PLAN. THIS DISCLOSURE STATEMENT IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE MORE DETAILED INFORMATION SET FORTH IN THE PLAN. IN THE CASE OF ANY INCONSISTENCY BETWEEN THIS DISCLOSURE STATEMENT AND THE PLAN, THE PLAN SHALL GOVERN IN ALL RESPECTS.

### A.    Administrative, Priority Claims, and Statutory Fees

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, DIP Claims, Professional Fee Claims, and Priority Tax Claims have not been classified, and thus are excluded from the Classes of Claims and Interests set forth in Article III of the Plan.

### 1.    Administrative Claims

Unless otherwise agreed to by the Holder of an Allowed Administrative Claim and the Debtors, the Reorganized Debtors, or the AQV Wind Down Co., as applicable, or otherwise provided for under the Plan, to the extent an Allowed Administrative Claim has not already been paid in full or otherwise satisfied during the Chapter 11 Cases, each Holder of an Allowed Administrative Claim (other than Holders of Professional Fee Claims and Claims for fees and expenses pursuant to section 1930 of chapter 123 of the Judicial Code) shall be paid in full in Cash an amount of Cash equal to the amount of the unpaid portion of such Allowed Administrative Claim in full and final satisfaction, compromise, settlement, release, and discharge of such Administrative Claim in accordance with the following: (1) if such Administrative Claim is Allowed on or prior to the Plan Effective Date, on the Plan Effective Date, or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (2) if such Administrative Claim is not Allowed on or prior to the Plan Effective Date, the first Business Day after the date that is thirty (30) days after the date such Administrative Claim is Allowed, or as soon as reasonably practicable thereafter; (3) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business, in accordance with the terms and conditions of the particular transaction or course of business giving rise to such Allowed Administrative Claim; (4) at such time and upon such terms as may be agreed upon by the Holder of such Allowed Administrative Claim and the Debtors, Reorganized Debtors, or the AQV Wind Down Co., as applicable; or (5) at such time and upon such terms as set forth in a Final Order of the Bankruptcy Court.

Except for Claims subject to 11 U.S.C. § 503(b)(9) (for which any Claims Bar Date applies), Claims for fees and expenses pursuant to section 1930 of chapter 123 of the Judicial Code, Professional Fee Claims, Restructuring Expenses, the Backstop Commitment Premium, and Cure Claims, and unless previously Filed or otherwise provided in Article II.A of the Plan, requests for payment of Administrative Claims must be Filed and served pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order no later than the Administrative Claim Bar Date. Holders of undisputed Claims for unpaid invoices that arise in the ordinary course of the Debtors' businesses and which are not due and payable on or before

31

the Plan Effective Date shall be paid in the ordinary course of business in accordance with the terms thereof and need not file requests for payment of Administrative Claims. Objections to such requests must be Filed and served on the Hornblower Debtors or the AQV Wind Down Co., as applicable, and the requesting party by the Claims Objection Deadline. After notice and a hearing in accordance with the procedures established by the Bankruptcy Code, the Bankruptcy Rules, and prior Bankruptcy Court Orders, the Allowed amounts, if any, of Administrative Claims shall be determined by, and satisfied in accordance with an order that becomes a Final Order of the Bankruptcy Court.

**HOLDERS OF ADMINISTRATIVE CLAIMS THAT ARE REQUIRED TO FILE AND SERVE A REQUEST FOR PAYMENT OF SUCH ADMINISTRATIVE CLAIMS THAT DO NOT FILE AND SERVE SUCH A REQUEST BY THE ADMINISTRATIVE CLAIM BAR DATE SHALL BE FOREVER BARRED, ESTOPPED, AND ENJOINED FROM ASSERTING SUCH ADMINISTRATIVE CLAIMS AGAINST THE DEBTORS, THE REORGANIZED DEBTORS, OR THE AQV WIND DOWN CO., AS APPLICABLE, OR THE PROPERTY OF ANY OF THE FOREGOING, AND SUCH ADMINISTRATIVE CLAIMS SHALL BE DEEMED DISCHARGED AS OF THE PLAN EFFECTIVE DATE WITHOUT THE NEED FOR ANY OBJECTION FROM THE REORGANIZED DEBTORS OR ANY NOTICE TO OR ACTION, ORDER, OR APPROVAL OF THE BANKRUPTCY COURT OR ANY OTHER ENTITY.**

       **2.**      **DIP Claims**

           **a.**      <u>Allowance of DIP Claims</u>

All DIP Claims shall be deemed Allowed as of the Plan Effective Date in an amount equal to the aggregate amount of the DIP Obligations (as defined in the DIP Orders), including (i) the principal amount outstanding under the DIP Facilities on such date; (ii) all interest accrued and unpaid thereon through and including the date of payment; and (iii) all accrued and unpaid fees, premiums, expenses, and indemnification obligations payable under the DIP Documents. For the avoidance of doubt, the DIP Claims shall not be subject to any avoidance, reduction, setoff, recoupment, recharacterization, subordination (equitable or contractual or otherwise), counterclaim, defense, disallowance, impairment, objection, or any challenges under applicable law or regulation.

           **b.**      <u>Treatment of DIP Claims</u>

Except to the extent that a Holder of an Allowed DIP Claim agrees to less favorable treatment, on the Plan Effective Date in full and final satisfaction, settlement, release, and discharge of, and in exchange for such Allowed DIP Claim, (i) with respect to Senior DIP Claims, each Holder of an Allowed Senior DIP Claim shall receive payment in full in Cash from the proceeds of the Exit Term Loans or (to the extent provided under the terms of the Senior DIP Credit Agreement) such Senior DIP Claims shall convert into Exit Term Loans in accordance with the terms of the Senior DIP Credit Agreement and the RSA and (ii) with respect to Junior DIP Claims, each Holder of an Allowed Junior DIP Claim shall receive payment in full in Cash from the proceeds of the Rights Offering; *provided* that such Junior DIP Claims may be applied as the purchase price to subscribe for New HB Common Equity in connection with the Rights Offering.

c.  Release of Liens and Discharge of Obligations

Contemporaneously with the effectuation of the final of the foregoing payments, terminations, or otherwise, the DIP Facilities shall be deemed cancelled, all commitments under the DIP Documents shall be deemed terminated, all Liens on property of the Debtors, the Reorganized Debtors, or the AQV Wind Down Co., as applicable, arising out of or related to the DIP Facilities shall automatically terminate, all collateral subject to such Liens shall be automatically released, and all guarantees of the Debtors, the Reorganized Debtors, or the AQV Wind Down Co., as applicable, arising out of or related to the DIP Claims shall be automatically discharged and released, in each case without further action by the DIP Agents or the DIP Lenders. Upon the reasonable request of the Debtors, the Reorganized Debtors, or the AQV Wind Down Co., as applicable, and at such entity's sole cost and expense, the DIP Agents or the DIP Lenders shall take all actions reasonably requested by the Debtors to effectuate and confirm such termination, release, and discharge (in each case, all at the sole cost and expense of the Debtors, and without recourse, representation, or warranty of any kind).  The Debtors, the Reorganized Debtors, or the AQV Wind Down Co., as applicable, shall also be authorized to make any such filings contemplated by the foregoing sentence on behalf of the DIP Agents and/or the DIP Lenders, at the sole cost and expense of the Debtors, the Reorganized Debtors, or the AQV Wind Down Co., as applicable, and the DIP Agents and the DIP Lenders shall have no liabilities related thereto.  Notwithstanding anything to the contrary in the Plan (including Article IX thereof), the Confirmation Order, or the Confirmation Recognition Order, the DIP Facilities and the DIP Documents shall continue in full force and effect (other than, for the avoidance of doubt, any Liens or other security interests terminated pursuant to this paragraph) after the Plan Effective Date with respect to any unsatisfied or contingent obligations thereunder, as applicable, including any provisions relating to the rights of the DIP Agents and the DIP Lenders to expense reimbursement, indemnification, and other similar amounts (either from the Debtors (which rights shall be fully enforceable against the Debtors, the Reorganized Debtors, or the AQV Wind Down Co., as applicable) or the DIP Lenders), in each case, solely to the extent provided under the DIP Documents to the applicable party, and any provisions that may survive termination or maturity of the DIP Facilities in accordance with the terms thereof.

3.  **Restructuring Expenses**

The Restructuring Expenses incurred, or estimated to be incurred, up to and including the Plan Effective Date shall be paid in full in Cash on the Plan Effective Date (to the extent not previously paid during the course of the Chapter 11 Cases on the dates on which such amounts would be required to be paid under the DIP Credit Agreements, the DIP Orders, the Backstop Commitment Agreement, the Backstop Order, or the RSA) without the requirement to file a fee application with the Bankruptcy Court, without the need for time detail, and without any requirement for review or approval by the Bankruptcy Court or any other party.  All Restructuring Expenses to be paid on the Plan Effective Date shall be estimated prior to and as of the Plan Effective Date and such estimates shall be delivered to the Debtors at least two (2) Business Days before the anticipated Plan Effective Date; *provided* that such estimates shall not be considered to be admissions or limitations with respect to such Restructuring Expenses.  In addition, the Debtors and the Reorganized Hornblower Debtors (as applicable) shall continue to pay, when due, all Restructuring Expenses, whether incurred before, on, or after the Plan Effective Date.  Any

Restructuring Expenses that constitute DIP Obligations are entitled to all rights and protections of other DIP Obligations.

**4.     Professional Fee Claims**

      a.     <u>Professional Fee Escrow</u>

As soon as reasonably practicable after the Confirmation Date, and no later than one (1) Business Day prior to the Plan Effective Date, the Debtors shall establish the Professional Fee Escrow. On the Plan Effective Date, the Debtors or Reorganized Hornblower Debtors, as applicable, shall fund the Professional Fee Escrow with Cash equal to the Professional Fee Escrow Amount. The Professional Fee Escrow shall be maintained in trust for the Professionals and for no other Entities until all Allowed Professional Fee Claims have been irrevocably paid in full to the Professionals pursuant to one or more Final Orders of the Bankruptcy Court. No Liens, Claims, or interests shall encumber the Professional Fee Escrow or Cash held on account of the Professional Fee Escrow in any way. Such funds shall not be considered property of the Estates, the Debtors, or the Reorganized Hornblower Debtors, subject to the release of Cash to the Reorganized Hornblower Debtors from the Professional Fee Escrow in accordance with Article II.D.2 of the Plan; *provided*, *however*, that the Reorganized Hornblower Debtors shall have a reversionary interest in the excess, if any, of the amount of the Professional Fee Escrow over the aggregate amount of Allowed Professional Fee Claims of the Professionals to be paid from the Professional Fee Escrow. When such Allowed Professional Fee Claims have been paid in full, any remaining amount in the Professional Fee Escrow shall promptly be paid to the Reorganized Hornblower Debtors without any further action or Order of the Bankruptcy Court.

      b.     <u>Final Fee Applications and Payment of Professional Fee Claims</u>

All final requests for payment of Professional Fee Claims incurred during the period from the Petition Date through the Confirmation Date shall be Filed no later than forty-five (45) calendar days after the Plan Effective Date. After notice (and opportunity for objections) and a hearing, if necessary, in accordance with the procedures established by the Bankruptcy Code, Bankruptcy Rules, and prior Bankruptcy Court Orders, the Allowed amounts of such Professional Fee Claims shall be determined by the Bankruptcy Court. The Reorganized Hornblower Debtors shall pay Professional Fee Claims in Cash in the amount the Bankruptcy Court allows from the Professional Fee Escrow, after taking into account any prior payments to such Professionals, as soon as reasonably practicable following the date when such Professional Fee Claims are Allowed by entry of an Order of the Bankruptcy Court.

To the extent that funds held in the Professional Fee Escrow are unable to satisfy the amount of Allowed Professional Fee Claims owing to the Professionals, each Professional shall have an Allowed Administrative Claim for any such deficiency, which shall be satisfied by the Reorganized Hornblower Debtors in the ordinary course of business in accordance with Article II.A of the Plan and notwithstanding any obligation to File Proofs of Claim or requests for payment on or before the Administrative Claims Bar Date. After all Allowed Professional Fee Claims have been paid in full, the escrow agent shall promptly return any excess amounts held in the Professional Fee Escrow, if any, to the Reorganized Hornblower Debtors, without any further action or Order of the Bankruptcy Court.

c.      Estimation of Fees and Expenses

To receive payment for unbilled fees and expenses incurred through the Confirmation Date, the Professionals shall reasonably estimate their Professional Fee Claims through and including the Confirmation Date, and shall deliver such estimate to the Debtors, the Crestview Advisors and the Ad Hoc Group Advisors (each as defined in the RSA) no later than five (5) days prior to the Plan Effective Date; *provided, however,* that such estimate shall not be considered a representation with respect to the fees and expenses of such Professional, and Professionals are not bound to any extent by the estimates.  If any of the Professionals fails to provide an estimate or does not provide a timely estimate, the Debtors may estimate the unbilled fees and expenses of such Professional.  The total amount so estimated shall be utilized by the Debtors to determine the Professional Fee Escrow Amount.

d.      Post-Confirmation Date Fees and Expenses

Except as otherwise specifically provided in the Plan or the Confirmation Order, from and after the Confirmation Date, the Debtors or the Reorganized Hornblower Debtors, as the case may be, shall, in the ordinary course of business and without any further notice to or action, Order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses incurred by the Debtors or the Reorganized Hornblower Debtors, as applicable.  Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code, or any Order of the Bankruptcy Court governing the retention or compensation of Professionals in seeking retention or compensation for services rendered after such date, shall terminate, and the Debtors may employ and pay any Professionals in the ordinary course of business without any further notice to or action, Order, or approval of the Bankruptcy Court.  For the avoidance of doubt, nothing in the foregoing or otherwise in the Plan shall modify or affect the Debtors' obligations under the DIP Orders, including in respect of the Approved Budget (as defined in the DIP Orders), prior to the Plan Effective Date.

5.      **Priority Tax Claims**

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for, each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall receive treatment in a manner consistent with section 1129(a)(9)(C) of the Bankruptcy Code.  To the extent any Allowed Priority Tax Claim is not due and owing on the Plan Effective Date, such Claim shall be paid in accordance with the terms of any agreement between the Debtors and the Holder of such Claim, or as may be due and payable under applicable non-bankruptcy law, or in the ordinary course of business by the Reorganized Debtors or the AQV Wind Down Co., as applicable.

6.      **Payment of Statutory Fees**

All fees due and payable before the Plan Effective Date pursuant to section 1930(a) of the Judicial Code shall be paid by each of the Debtors, the Reorganized Debtors, or the AQV Wind Down Co., as applicable, for each quarter (including any fraction thereof), until the Chapter 11

Cases are converted, dismissed, or closed, whichever occurs first; *provided* that on and after the Plan Effective Date, the Reorganized Debtors or AQV Wind Down Co., as applicable, shall (1) pay in full in Cash when due and payable, and shall be responsible for paying, any and all such fees and interest with respect to any and all disbursements (and any other actions giving rise to such fees and interest) of the Debtors, the Reorganized Debtors, and the AQV Wind Down Co., as applicable, and (2) File in the Chapter 11 Cases (to the extent they have not yet been closed, dismissed, or converted) quarterly reports as required by the Bankruptcy Code, Bankruptcy Rules, and Bankruptcy Local Rules, as applicable, in connection therewith. The U.S. Trustee shall not be required to file any proof of claim or request for payment for quarterly fees.

**B.      Classification and Treatment of Claims and Interests**

**1.      Classification in General**

Except for the Claims addressed in Article II of the Plan, all Claims and Interests are classified in the Classes set forth below for all purposes, including voting, Confirmation, and distributions pursuant to the Plan and in accordance with sections 1122 and 1123(a)(1) of the Bankruptcy Code. A Claim or an Interest is classified in a particular Class only to the extent that such Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of such Claim or Interest qualifies within the description of such other Classes. A Claim or an Interest is also classified in a particular Class for the purpose of receiving distributions pursuant to the Plan, but only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Plan Effective Date.

**2.      Formation of Debtor Groups for Convenience Only**

The Plan is a separate plan of reorganization for each Debtor. The Plan groups the Debtors together solely for the purpose of describing treatment under the Plan, Confirmation of the Plan, and making Plan distributions in respect of Claims against and Interests in the Debtors under the Plan. Such groupings shall not affect any Debtor's status as a separate legal entity, change the organizational structure of the Debtors' business enterprise, constitute a change of control of any Debtor for any purpose, cause a merger or consolidation of any legal entities, or cause the transfer of any assets. Except as otherwise provided by or permitted under the Plan, all Debtors shall continue to exist as separate legal entities. The Plan is not premised on, and does not provide for, the substantive consolidation of the Debtors with respect to the Classes of Claims or Interests set forth in the Plan, or otherwise.

**3.      Summary of Classification**

The classification of Claims against and Interests in each Debtor (as applicable) pursuant to the Plan is as set forth below. All of the potential Classes for the Debtors are set forth herein. Certain of the Debtors may not have Holders of Claims or Interests in a particular Class or Classes, and such Classes shall be treated as set forth in Article III.H of the Plan.

The following chart summarizes the classification of Claims and Interests pursuant to the Plan:

| Class | Claims and Interests | Status | Voting Rights |
|---|---|---|---|
| 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 3 | First Lien Claims | Impaired | Entitled to Vote |
| 4 | Revolver Claims | Impaired | Entitled to Vote |
| 5 | General Unsecured Claims | Impaired | Entitled to Vote |
| 6 | Unsecured Go-Forward Trade Claims | Impaired | Entitled to Vote |
| 7 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept / Deemed to Reject) |
| 8 | Intercompany Interests | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept / Deemed to Reject) |
| 9 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 10 | Interests in Hornblower and Hornblower Holdings LLC | Impaired | Not Entitled to Vote (Deemed to Reject) |

### 4.      Treatment of Claims and Interests

Subject to Article IV of the Plan, each Holder of an Allowed Claim or Interest, as applicable, shall receive under the Plan the treatment described below in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Holder's Allowed Claim or Interest, except to the extent less favorable treatment is agreed to by the Debtors, the Reorganized Debtors, or the AQV Wind Down Co., as applicable, and the Holder of such Allowed Claim or Interest.   Unless otherwise indicated, the Holder of an Allowed Claim or Interest shall receive such treatment on the later of the Plan Effective Date and the date such Holder's Claim or Interest becomes an Allowed Claim or Interest or as soon as reasonably practicable thereafter.

1.      Class 1 – Other Secured Claims

a.      *Classification*:  Class 1 consists of all Other Secured Claims.

b.      *Treatment*:  Each Holder of an Allowed Other Secured Claim shall receive, at the option of the Debtors, Reorganized Debtors, or AQV Wind Down Co., as applicable, either:

i.      payment in full in Cash of the unpaid portion of their Allowed Other Secured Claim, including any interest thereon required to be paid

under section 506(b) of the Bankruptcy Code (or if payment is not then due, on the due date of such Allowed Other Secured Claim);

ii.   Reinstatement pursuant to section 1124 of the Bankruptcy Code;

iii.   the return or abandonment of the collateral securing such Claim to such Holder; or

iv.   such other treatment necessary to satisfy section 1124 of the Bankruptcy Code.

c.   *Voting*:  Class 1 is Unimpaired under the Plan.  Each Holder of an Other Secured Claim will be conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, each such Holder is not entitled to vote to accept or reject the Plan.

2.   <u>Class 2 – Other Priority Claims</u>

a.   *Classification*:  Class 2 consists of all Other Priority Claims.

b.   *Treatment*:  Each Holder of an Allowed Other Priority Claim shall receive payment in full, in Cash, of the unpaid portion of its Allowed Other Priority Claim on the Plan Effective Date or as soon thereafter as reasonably practicable (or, if payment is not then due, on the due date of such Other Priority Claim).

c.   *Voting*:  Class 2 is Unimpaired under the Plan.  Each Holder of an Other Priority Claim will be conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, each such Holder is not entitled to vote to accept or reject the Plan.

3.   <u>Class 3 – First Lien Claims</u>

a.   *Classification*:  Class 3 consists of all First Lien Claims.

b.   *Allowance*:  On the Plan Effective Date, the First Lien Claims shall be Allowed in an aggregate amount of not less than $726,548,687, representing the aggregate principal amount outstanding under the First Lien Credit Agreement, plus any accrued and unpaid interest, and all accrued and unpaid fees or premiums and other expenses payable under such credit agreement, accrued as of the Petition Date.

c.   *Treatment*:  On the Plan Effective Date or as soon thereafter as reasonably practicable, each Holder of an Allowed First Lien Claim shall receive its Pro Rata share of:

i.   96% of the Rights;

      ii.      96% of the New HB Common Equity (or New Warrants) (subject to dilution on account of the New HB Common Equity (or New Warrants) issued in connection with (A) the Rights Offering, (B) the Backstop Commitment Premium, and (C) the MIP Equity);

      iii.     the Crestview Cash Contribution; *provided* that such Holder (or any Related Fund) may elect to use its Pro Rata share of the Crestview Cash Contribution as a credit towards the exercise of its Rights, in which case such portion of the Crestview Cash Contribution shall be retained by the Hornblower Debtors; and

      iv.     96% of the AQV Net Cash Proceeds.

    d.    *Voting*:  Class 3 is Impaired under the Plan.  Each Holder of a First Lien Claim will be entitled to vote to accept or reject the Plan.

4.    <u>Class 4 – Revolver Claims</u>

    a.    *Classification*:  Class 4 consists of all Revolver Claims.

    b.    *Allowance*:  On the Plan Effective Date, the Revolver Claims shall be Allowed in an aggregate amount of not less than $26,688,288, representing the aggregate principal amount outstanding under the Revolver Credit Agreement, plus any accrued and unpaid interest, and all accrued and unpaid fees and other expenses payable under such credit agreement, accrued as of the Petition Date.

    c.    *Treatment*:  On the Plan Effective Date or as soon thereafter as reasonably practicable, each Holder of an Allowed Revolver Claim shall receive its Pro Rata share of:

      i.      4% of the Rights;

      ii.      4% of the New HB Common Equity (or New Warrants) (subject to dilution on account of the New HB Common Equity (or New Warrants) issued in connection with (A) the Rights Offering, (B) the Backstop Commitment Premium, and (C) the MIP Equity); and

      iii.     4% of the AQV Net Cash Proceeds.

    d.    *Voting*:  Class 4 is Impaired under the Plan.  Each Holder of a Revolver Claim will be entitled to vote to accept or reject the Plan.

5.    <u>Class 5 – General Unsecured Claims</u>

    a.    *Classification*:  Class 5 consists of all General Unsecured Claims.

    b.    *Treatment*:  [●].

      c.     *Voting*:  Class 5 is Impaired under the Plan.  Each Holder of a General Unsecured Claim will be entitled to vote to accept or reject the Plan.

6.     <u>Class 6 – Unsecured Go-Forward Trade Claims</u>

      a.     *Classification*:   Class 6 consists of all Unsecured Go-Forward Trade Claims.

      b.     *Treatment*:  [●].

      c.     *Voting*:  Class 6 is Impaired under the Plan.  Each Holder of an Unsecured Go-Forward Trade Claim will be entitled to vote to accept or reject the Plan.

7.     <u>Class 7 – Intercompany Claims</u>

      a.     *Classification*:  Class 7 consists of all Intercompany Claims.

      b.     *Treatment*:  On the Plan Effective Date, all Intercompany Claims will be adjusted, Reinstated, or discharged in the Debtors' discretion, subject to the reasonable consent of, with respect to Intercompany Claims held by another Debtor or against a Hornblower Debtor, the Required Consenting HB First Lien Lenders and, with respect to Intercompany Claims held by any Journey Beyond Entity against Journey Beyond Holdings, LLC, the Consenting JBIH Lenders.  For the avoidance of doubt, on the Plan Effective Date, the JB Intercompany Loans shall be cancelled and discharged.

      c.     *Voting*:  Class 7 is either deemed Unimpaired under the Plan, and each such Holder of an Intercompany Claim will be conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, or is Impaired, and each such Holder of an Intercompany Claim is deemed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, each such Holder is not entitled to vote to accept or reject the Plan.

8.     <u>Class 8 – Intercompany Interests</u>

      a.     *Classification*:  Class 8 consists of all Intercompany Interests.

      b.     *Treatment*:  All Intercompany Interests shall be Reinstated or cancelled in the Debtors' discretion, subject to the reasonable consent of, with respect to the Reorganized Hornblower Debtors, the Required Consenting HB First Lien Lenders, and, with respect to the Journey Beyond Entities, the Consenting JBIH Lenders.

      c.     *Voting*:  Class 8 is either deemed Unimpaired under the Plan, and each such Holder of an Intercompany Interest will be conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, or is Impaired, and each such Holder of an Intercompany Interest is deemed to

reject the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, each such Holder is not entitled to vote to accept or reject the Plan.

9.   Class 9 – Section 510(b) Claims

   a.   *Classification*:  Class 9 consists of all Section 510(b) Claims.

   b.   *Treatment*:  On the Plan Effective Date, all Section 510(b) Claims against the Debtors shall be discharged and released, and the Holders of Section 510(b) Claims shall not receive or retain any distribution, property, or other value on account of their Section 510(b) Claims.

   c.   *Voting*: Class 9 is Impaired under the Plan. Each Holder of a Section 510(b) Claim is deemed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, each such Holder is not entitled to vote to accept or reject the Plan.

10.   Class 10 – Interests in Hornblower and Hornblower Holdings LLC

   a.   *Classification*:   Class 10 consists of all Interests in Hornblower and Hornblower Holdings LLC.

   b.   *Treatment*:  On the Plan Effective Date, all Interests in Hornblower and Hornblower Holdings LLC will be cancelled and the Holders of such Interests shall not receive or retain any distribution, property, or other value on account of their Interests in Hornblower or Hornblower Holdings LLC.

   c.   *Voting*: Class 10 is Impaired under the Plan. Each Holder of an Interest in Hornblower or Hornblower Holdings LLC is deemed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, each such Holder is not entitled to vote to accept or reject the Plan.

   **5.   Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code**

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by at least one Impaired Class of Claims.  The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests.  The Debtors reserve the right to modify the Plan in accordance with Article XI of the Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

6.      **No Substantive Consolidation**

Although the Plan is presented as a joint plan of reorganization for administrative purposes, the Plan does not provide for the substantive consolidation of the Debtors' Estates, and on the Plan Effective Date, the Debtors' Estates shall not be deemed to be substantively consolidated for any reason.  Except as expressly provided herein, nothing in the Plan, the Confirmation Order, or the Disclosure Statement shall constitute or be deemed to constitute a representation that any one or all of the Debtors is subject to or liable for any Claims or Interests against or in any other Debtor. Notwithstanding the foregoing, in no case shall the aggregate value of all property received or retained under the Plan on account of any Allowed Claim exceed the amount of the Allowed Claim.

7.      **Special Provision Governing Unimpaired Claims or Interests**

Except as otherwise set forth in the Plan or the Confirmation Order, nothing shall affect the Debtors', the Reorganized Debtors', or the AQV Wind Down Co.'s rights in respect of any Unimpaired Claims or Interests, including all rights in respect of legal and equitable defenses to or setoffs or recoupment against any such Unimpaired Claims or Interests.

8.      **Elimination of Vacant Classes**

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court as of the date of the commencement of the Combined Hearing shall be considered vacant and deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

9.      **Acceptance by Impaired Classes**

An Impaired Class of Claims shall have accepted the Plan if, not counting the vote of any Holder designated under section 1126(e) of the Bankruptcy Code, (i) the Holders of at least two-thirds in amount of the Allowed Claims actually voting in the Class have voted to accept the Plan, and (ii) the Holders of more than one-half in number of the Allowed Claims actually voting in the Class have voted to accept the Plan.

10.      **Voting Classes; Presumed Acceptance by Non-Voting Classes**

If a Class contains Claims eligible to vote and no Holders of Claims eligible to vote in such Class vote to accept or reject the Plan, the Holders of such Claims in such Class shall be deemed to have accepted the Plan.

11.      **Controversy Concerning Impairment**

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired or is properly classified under the Plan, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

12.     **Intercompany Interests**

To the extent Reinstated under the Plan, distributions on account of Intercompany Interests are not being received by Holders of such Intercompany Interests on account of their Intercompany Interests but for the purposes of administrative convenience and due to the importance of maintaining the prepetition corporate structure for the ultimate benefit of the Holders of New HB Common Equity, and in exchange for the Debtors', Reorganized Debtors', and AQV Wind Down Co.'s, as applicable, agreement under the Plan to make certain distributions to the Holders of Allowed Claims.  For the avoidance of doubt, any Intercompany Interest in Non-Debtor Affiliates owned by a Debtor shall continue to be owned by the applicable Reorganized Debtor unless provided otherwise by the Plan (including pursuant to the RSA Settlement), any Order of the Bankruptcy Court or the Restructuring Transactions Memorandum.

13.     **Relative Rights and Priorities**

Unless otherwise expressly provided in the Plan or the Confirmation Order, the allowance, classification, and treatment of all Allowed Claims and Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of such Claims or Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510 of the Bankruptcy Code, or otherwise, and any other rights impacting relative lien priority and/or priority in right of payment, and any such rights shall be released pursuant to the Plan.  Pursuant to section 510 of the Bankruptcy Code, the Debtors, the Reorganized Debtors, or the AQV Wind Down Co., as applicable, reserve the right to reclassify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

From and after the Plan Effective Date, the Reorganized Debtors, subject to any applicable limitations set forth in any post-Plan Effective Date agreement, shall have the right and authority without further Order of the Bankruptcy Court to raise additional capital and obtain additional financing, subject to the New HB Organizational Documents or New JB Organizational Documents, as applicable, as the boards of directors of the applicable Reorganized Hornblower Debtors or Journey Beyond Entities deem appropriate.

C.     **Means for Implementation of the Plan**

1.     **Sources of Consideration for Plan Distributions**

The Debtors, the Reorganized Debtors, and the AQV Wind Down Co., as applicable, shall fund distributions under the Plan (including the funding of the AQV Wind Down Co.) to their respective Holders of Claims and Interests with: (1) Cash on hand, including Cash from operations and the proceeds from the DIP Facilities, the Rights Offering, the AQV Cash Proceeds, the Exit Term Loans, and the Exit Revolver and (2) the New HB Common Equity.

2.     **Issuance and Distribution of New HB Common Equity (or New Warrants)**

On the Plan Effective Date, all Interests in Hornblower and Hornblower Holdings LLC shall be cancelled and Reorganized Hornblower shall issue or cause to be issued the New HB

Common Equity (or New Warrants) (including the New HB Common Equity (or New Warrants) issued pursuant to the Rights Offering (including the Unsubscribed Equity issued pursuant to the Backstop Commitment Agreement) and in satisfaction of the Backstop Commitment Premium, and, to the extent applicable, the MIP Equity) in accordance with the terms of the Plan and the Confirmation Order.  All of the New HB Common Equity (and New Warrants) issuable under the Plan and the Confirmation Order, when so issued, shall be duly authorized, validly issued, fully paid, and nonassessable.  Each distribution and issuance referred to in Article IV of the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the New HB Organizational Documents or, as applicable, pursuant to the Rights Offering Documents, the Backstop Documents, and other instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

Any Entity's acceptance of New HB Common Equity (or New Warrants) shall be deemed to constitute its agreement to the New HB Organizational Documents, as the same may be amended or modified from time to time following the Plan Effective Date in accordance with their respective terms, and each such Entity will be bound thereby in all respects.  For the avoidance of doubt, all Holders of Allowed Claims entitled to distribution of New HB Common Equity (or New Warrants) hereunder, or, as applicable, pursuant to the Rights Offering (including in connection with the Backstop Commitment Agreement) shall be deemed to be a party to, and bound by, the New Stockholders' Agreement, if any, regardless of whether such Holder has executed a signature page thereto.

a.    <u>U.S. Coastwise Trade Limitations</u>

Certain of the Debtors' operations are conducted in the U.S. coastwise trade and are governed by the Passenger Vessel Services Act of 1886 and section 27 of the Merchant Marine Act of 1920.  These U.S. Coastwise Trade Laws restrict waterborne transportation of passengers and goods between points in the U.S. to vessels owned and controlled by "citizens of the United States" within the meaning of the U.S. Coastwise Trade Laws (such a person, a "<u>U.S. Citizen</u>").  The Debtors could lose the privilege of owning and operating vessels in the U.S. coastwise trade if non-U.S. Citizens were to own or control, in the aggregate, more than 25% of any class or series of the equity interests in Reorganized Hornblower.  In order to comply with the U.S. Coastwise Trade Laws, Reorganized Hornblower's certificate of incorporation (the "<u>Certificate of Incorporation</u>") will provide that non-U.S. Citizens in the aggregate may not own more than 24% of the New HB Common Equity to be issued and outstanding as of the Plan Effective Date (the "<u>U.S. Coastwise Restrictions</u>").  Therefore, as further described in the Plan and as mutually determined by the Debtors and the Required Consenting HB First Lien Lenders, in order to ensure at least 76% of Reorganized Hornblower's equity interests will be owned by U.S. Citizens, and solely to that extent, Holders of Allowed HB First Lien Claims that are non-U.S. Citizens will receive New Warrants in lieu of all or a portion of the shares of New HB Common Equity to which they would otherwise be entitled under the Plan or pursuant to the Rights Offering in an amount such that, in the aggregate with all other non-U.S. Citizens entitled to receive New HB Common Equity under the Plan, the U.S. Coastwise Restrictions are satisfied.  For the avoidance of doubt, any Eligible Holder (as defined in the Rights Offering Procedures) of Allowed HB First Lien Claims to which New Warrants are issued shall remain obligated to pay the same Purchase Price (as defined in the Rights Offering Procedures) therefor and to make such payment at the same time

and otherwise on the same terms and conditions as if such holder were purchasing shares of New HB Common Equity pursuant hereto. Such New Warrants shall have the terms and be subject to the restrictions as are set forth in the Plan. Furthermore, for the avoidance of doubt, such Eligible Holders are eligible to receive New HB Common Equity subject to compliance with the U.S. Coastwise Restrictions.

In all cases, each Eligible Holder (or its Subscription Nominee (as defined in the Rights Offering Procedures)) shall be required to furnish an affidavit of U.S. citizenship (a "U.S. Citizenship Affidavit") in the form provided with the Subscription Form (as defined in the Rights Offering Procedures) and/or any other documentation as the Debtors deem advisable to fulfill the purpose or implement the provisions of the Certificate of Incorporation in order to maintain compliance with the U.S. Coastwise Trade Laws (together with the U.S. Citizenship Affidavit, the "Requisite Documentation"). If the Requisite Documentation is not completed properly in a manner acceptable to the Debtors, in consultation with the Backstop Parties, and timely provided by the Rights Offering Expiration Time in accordance with the Rights Offering Procedures, then the applicable rights offering subscription is incomplete and will be rejected by the Debtors. To the extent a Holder of Allowed HB First Lien Claims is entitled to receive New HB Common Equity under this Plan, such Holder must either (i) furnish the Requisite Documentation in accordance with the Rights Offering Procedures or (ii) if such Holder elects not to participate in the Rights Offering, furnish the Requisite Documentation to the Debtors in a manner acceptable to the Debtors.

The Debtors shall treat all such documents and information provided by any Eligible Holder (or its Subscription Nominee), including any Requisite Documentation, as confidential and shall limit the distribution of such documents and information to the Debtors' personnel and counsel that have a "need-to-know" the contents thereof (which personnel and counsel shall be bound by the confidentiality obligations contained in this paragraph) and to the U.S. Coast Guard as may be necessary. The Debtors shall (i) claim confidential treatment and exemption from Freedom of Information Act requests (a "FOIA Request") for any such documents and information submitted to the U.S. Coast Guard to the maximum extent legally possible, and (ii) notify the relevant Eligible Holder (or its Subscription Nominee) (x) if any such Eligible Holder/Subscription Nominee's documents and information, including Requisite Documentation, are submitted to the U.S. Coast Guard, and (y) if the Debtors subsequently receives notice from the U.S. Coast Guard that it has received a FOIA Request and that any such document that has been identified by the U.S. Coast Guard as responsive to such a FOIA Request, in which case the Debtors shall allow such Eligible Holder/Subscription Nominee an opportunity to redact any confidential commercial, financial and proprietary business information exempt from Freedom of Information Act disclosure pursuant to 5 U.S.C. § 552(b)(4) that is in any such document, including any Requisite Documentation.

      b.    <u>Rights Offering</u>

Pursuant to the Rights Offering Procedures, on the Plan Effective Date, the Reorganized Hornblower Debtors will offer and sell New HB Common Equity (or New Warrants) in an amount

equal to the Rights Offering Amount for the Purchase Price (as defined in the Rights Offering Procedures).

Subject to the U.S. Coastwise Restrictions, the Debtors or Reorganized Hornblower Debtors, as applicable, shall distribute to each Holder of an Allowed HB First Lien Claim the Rights to purchase up to such Holder's Pro Rata share (based on such Holder's relative share of the total amount of all Allowed HB First Lien Claims) of the New HB Common Equity (or New Warrants) to be offered and sold in the Rights Offering, as set forth in the Plan, the Backstop Commitment Agreement, and the Rights Offering Procedures. The Rights Offering will be backstopped, severally and not jointly, by the Backstop Parties pursuant to the Backstop Commitment Agreement. The Reorganized Hornblower Debtors will pay the Backstop Commitment Premium to the Backstop Parties on the Plan Effective Date in accordance with the terms and conditions set forth in the Backstop Commitment Agreement, the Backstop Order, and the Plan.

All New HB Common Equity (or New Warrants) issued pursuant to the Plan shall be issued based on a price of $10.00 per share; *provided, however*, that the New HB Common Equity (or New Warrants) issued pursuant to the Rights Offering shall be issued at a 30% discount to the foregoing price per share (i.e., $7.00 per share). The aggregate number of New HB Common Equity shares or New Warrants a recipient would otherwise receive shall be rounded down to nearest whole number, and recipients shall not receive any compensation on account of such rounding. The proceeds from the Rights Offering, the Exit Term Loans, and the Exit Revolver shall be used to meet a Projected Minimum Liquidity amount of $25 million on the Plan Effective Date (the "Minimum Liquidity Amount"). "Projected Minimum Liquidity" shall mean (a) the total of the Hornblower Debtors' projected cash and customary cash equivalents (including from the proceeds of the Rights Offering, the Exit Term Loans, and the Exit Revolver, and availability under the Exit Revolver), *plus* (b) any permanent positive change in the projected cash flows of the Hornblower Debtors and their subsidiaries through March 31, 2026. Except as otherwise set forth in the Rights Offering Procedures, to the extent Projected Minimum Liquidity would exceed the Minimum Liquidity Amount, the Rights Offering Amount shall be reduced by the amount of such excess, and the Rights issued to each holder of an Allowed HB First Lien Claim shall be reduced on a Pro Rata basis. The Debtors shall forecast Projected Minimum Liquidity on the expected Plan Effective Date on a date that the Debtors reasonably believe to be no more than 25 days prior to the Plan Effective Date and no less than 20 days prior to the Plan Effective Date. The Debtors shall consult with the Backstop Parties and their advisors in preparing such Projected Minimum Liquidity forecast and shall give the Backstop Parties and their advisors at least two (2) full business days to review and comment on such forecast along with the relevant supporting material. The final determination of the Projected Minimum Liquidity shall be determined by the Debtors with the reasonable consent of the Required Consenting HB First Lien Lenders in consultation with Crestview. Notwithstanding anything herein to the contrary, the Rights Offering Amount shall be in an amount no greater than $345 million regardless of the Projected Minimum Liquidity.

The Rights that a Holder of an Allowed HB First Lien Claim has validly elected to exercise shall be deemed issued and exercised on or about (but in no event after) the Plan Effective Date. Upon exercise of the Rights pursuant to the terms of the Backstop Commitment Agreement and the Rights Offering Procedures, the Reorganized Hornblower Debtors shall be authorized to issue the number of shares of New HB Common Equity (or New Warrants) necessary to satisfy such

exercise. Pursuant to the Backstop Commitment Agreement and Backstop Order (in each case, once approved), if after following the Rights Offering Procedures, there remain any unexercised Rights, the Backstop Parties shall purchase, severally and not jointly, their applicable portion of the shares (and/or New Warrants) of New HB Common Equity associated with such unexercised Rights in accordance with the terms and conditions set forth in the Backstop Commitment Agreement and the Rights Offering Procedures.

The Rights and the shares of New HB Common Equity (or New Warrants) that are issued in connection with the exercise of the Rights and that are purchased by the Backstop Parties in accordance with their backstop obligations under the Backstop Commitment Agreement will be issued in a private placement exempt from registration under Section 5 of the Securities Act pursuant to Section 4(a)(2) and/or Regulation D thereunder and will constitute "restricted securities" for purposes of the Securities Act. The shares of New HB Common Equity (or New Warrants) issued in satisfaction of the Backstop Commitment Premium will be issued in reliance upon Section 1145 of the Bankruptcy Code to the extent permitted under applicable law.

Entry of the Backstop Order and the Confirmation Order shall constitute Bankruptcy Court approval of the Rights Offering (including the transactions contemplated thereby, and all actions to be undertaken, undertakings to be made, and obligations to be incurred by the Debtors and Reorganized Hornblower Debtors in connection therewith). On the Plan Effective Date, as provided in the Restructuring Transactions Memorandum, the rights and obligations of the Debtors under the Backstop Commitment Agreement shall vest in the Reorganized Hornblower Debtors.

Each Holder of Rights that receives New HB Common Equity (or New Warrants) as a result of exercising its Rights shall be subject to the provisions applicable to the Holders of New HB Common Equity (or New Warrants) as set forth in Article IV.A of the Plan. The proceeds of the Rights Offering shall be used by the Debtors or Reorganized Hornblower Debtors, as applicable, to satisfy all outstanding Junior DIP Claims and make other distributions pursuant to the Plan, as well as fund the operations of the Reorganized Hornblower Debtors.

      c.    <u>Exit Term Loans and Exit Revolver</u>

On the Plan Effective Date, the applicable Reorganized Hornblower Debtors shall enter into the Exit Credit Documents. Confirmation of the Plan shall be deemed approval of the Exit Credit Documents, all transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred and fees and expenses to be paid by such Reorganized Hornblower Debtors in connection therewith, and authorization of the applicable Reorganized Hornblower Debtors to enter into, execute, and deliver the Exit Credit Documents, without further notice to or order of the Bankruptcy Court, act or action under applicable Law, regulation, order, or rule or the vote, consent, authorization, or approval of any Entity (other than as expressly required by the Exit Credit Documents). The Exit Credit Documents shall constitute legal, valid, binding, and authorized indebtedness and obligations of the applicable Reorganized Hornblower Debtors, enforceable in accordance with their respective terms, and such indebtedness and obligations shall not be, and shall not be deemed to be, enjoined or subject to discharge, impairment, release, or avoidance under the Plan, the Confirmation Order, or on account of the Confirmation or Consummation of the Plan. On the Plan Effective Date, all of the Liens and security interests to be granted by the applicable Reorganized Hornblower Debtors in accordance

with the Exit Credit Documents (i) shall be deemed to be granted, (ii) shall be legal, binding, and enforceable Liens on, and security interests in, the collateral granted thereunder in accordance with the terms of the Exit Credit Documents (including the relevant rights and priorities of the secured parties thereunder), (iii) shall be deemed automatically perfected on the Plan Effective Date without the need for the taking of any further filing, recordation, approval, consent, or other action, and (iv) shall not be enjoined or subject to discharge, impairment, release, avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever and shall not constitute preferential transfers or fraudulent conveyances under the Bankruptcy Code or any applicable non-bankruptcy law. The applicable Reorganized Hornblower Debtors and the Persons and Entities granted such Liens and security interests (or any designee thereof) shall be authorized to make all filings and recordings, and to obtain all governmental approvals, consents, and take any other actions necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, federal, or other law that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order and any such filings, recordings, approvals, and consents shall not be required), and the applicable Reorganized Hornblower Debtors shall thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

d.    AQV Cash Proceeds and Other Cash on Hand

The Debtors, the Reorganized Hornblower Debtors, or the AQV Wind Down Co., as applicable, shall use their respective Cash on hand, including the AQV Cash Proceeds, to fund distributions to their respective Holders of Claims, as applicable in accordance with the Plan.

3.    AQV Wind Down

a.    AQV Wind Down

On the Plan Effective Date, one or more of the AQV Debtors shall be dissolved without further action under applicable law, regulation, Order, or rule, and the AQV Remaining Assets shall be transferred to, or retained by, the AQV Wind Down Co. The AQV Wind Down Co. may be comprised of one or more of the Reorganized AQV Debtors. Beginning on the Plan Effective Date, the AQV Wind Down Co. Administrator shall effectuate the AQV Remaining Assets Wind Down in accordance with the provisions of the Plan, Confirmation Order, and any other applicable Definitive Documents, including the AQV Sale Order.

b.    Vesting of AQV Wind Down Amount and AQV Remaining Assets in the AQV Wind Down Co.

On the Plan Effective Date, following the Consummation of the AQV Sale Transaction, if any, the AQV Remaining Assets shall vest in the AQV Wind Down Co. On and after the Plan Effective Date, except as otherwise provided in the Plan, the AQV Wind Down Co., at the direction of the AQV Wind Down Co. Administrator, shall effectuate the AQV Remaining Assets Wind Down and compromise or settle the Claims, Interests, or Causes of Action remaining against the

AQV Wind Down Co., if any, without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code, Bankruptcy Rules, or Bankruptcy Local Rules.

After the Plan Effective Date, pursuant to the Plan, and on behalf of the AQV Wind Down Co., the AQV Wind Down Co. Administrator, in its sole discretion, as part of the AQV Remaining Assets Wind Down, shall sell, liquidate, use, or dispose of any asset, property, right, liability, debt, or obligation of the AQV Debtors on terms consistent with the terms of the Plan without approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code, Bankruptcy Rules, or Bankruptcy Local Rules.

        c.      The AQV Wind Down Co. Administrator Effectuating the AQV Remaining Assets Wind Down

On and after the Plan Effective Date, the AQV Wind Down Co. Administrator shall be authorized and directed to implement the Plan and any applicable orders of the Bankruptcy Court, solely in connection with effectuating the AQV Remaining Assets Wind Down. On and after the Plan Effective Date, the AQV Wind Down Co. Administrator shall have any and all power and authority to take any action necessary to effectuate the AQV Remaining Assets Wind Down.

As soon as practicable after the Plan Effective Date, the AQV Wind Down Co. Administrator shall: (a) cause the AQV Wind Down Co. to comply with, and abide by, the terms of the Plan, the Confirmation Order, and any other documents contemplated thereby, including the applicable Definitive Documents; and (b) take such other actions as the AQV Wind Down Co. Administrator may deem necessary or desirable to carry out the purposes of the Plan in connection with the AQV Remaining Assets Wind Down.

The AQV Wind Down Co. Administrator shall accede to such powers as would have been applicable to the AQV Debtors' officers, directors, managers, and equityholders, should those entities have been reorganized pursuant to the Plan, and the AQV Wind Down Co. shall be authorized to be (and, upon the conclusion of the AQV Wind Down, shall be) dissolved by the AQV Wind Down Co. Administrator, as applicable, in accordance with applicable state law. The AQV Wind Down Co. Administrator shall act for the AQV Wind Down Co. in the same capacity and shall have the same rights and powers as are applicable to a manager, managing member, board of managers, board of directors, or equivalent governing body, as applicable, and to officers, subject to the provisions hereof (and all certificates of formation and limited liability company agreements and certificates of incorporation or by-laws, or equivalent governing documents and all other related documents (including membership agreements, stockholders agreements, or other similar instruments), as applicable, are deemed amended pursuant to the Plan to permit and authorize the same). From and after the Plan Effective Date, the AQV Wind Down Co. Administrator shall be the sole representative of, and shall act for, the AQV Wind Down Co.

The AQV Wind Down Co. Administrator shall effectuate the AQV Remaining Assets Wind Down with the amounts reserved therefor in the AQV Wind Down Budget.

All costs, liabilities, and expenses reasonably incurred by the AQV Wind Down Co. Administrator following the Plan Effective Date, including any fees, costs, or expenses of the Notice and Claims Agent in connection with the administration of Administrative Claims, Priority

Tax Claims, and/or General Unsecured Claims asserted against the AQV Debtors as requested by the AQV Wind Down Co. Administrator, and any personnel employed by the AQV Wind Down Co. Administrator in the performance of the AQV Wind Down Co. Administrator's duties, as set forth in Article VII of the Plan, shall be paid from the AQV Wind Down Amount in accordance with the AQV Wind Down Budget.

d.     Cooperation and Access

To the extent applicable with respect to this subsection, the AQV Purchaser shall cooperate in good faith with the AQV Wind Down Co., including by (i) affording the AQV Wind Down Co. Administrator and its representatives reasonable access to its properties, books, and records in connection with the AQV Wind Down Co. Administrator's satisfaction of its duties and responsibilities under the Plan and (ii) using commercially reasonable efforts to make available to the AQV Wind Down Co. Administrator and its representatives the employees or representatives of the AQV Purchaser whose assistance, expertise, testimony, notes, recollections, or presence are reasonably necessary in connection with the AQV Wind Down Co. Administrator's satisfaction of its duties and responsibilities under the Plan.

**4.     General Settlement of Claims and Interests**

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan and the Confirmation Order, upon the Plan Effective Date, the provisions of the Plan and the Confirmation Order shall constitute a good-faith compromise and settlement of all Claims and Interests and controversies relating to the contractual, legal, and subordination rights of Holders with respect to such Allowed Claims and Interests or any distribution to be made on account of such Allowed Claim or Interest, as well as, pursuant to the RSA Settlement, any and all actual and potential disputes between and among the Company (including, with respect to each Debtor, such Debtor's Estate), the Consenting Stakeholders, and each other Releasing Party and all other disputes that might impact creditor recoveries, including, without limitation, any and all issues relating to the JBIH Loans and the JBIH Intercompany Note. For the avoidance of doubt, pursuant to the RSA Settlement, on the Plan Effective Date, in connection with, and subject to, consummation of the RSA Settlement and the other Restructuring Transactions, any and all Claims or Liens in respect of any guarantee under the JBIH Credit Agreement shall be released against any of the Debtors or the property of the Debtors. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise and settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise and settlement is in the best interests of the Debtors, their Estates, and Holders of Claims or Interests, and is fair, equitable, and within the range of reasonableness. Subject to Article VIII of the Plan, all distributions made to Holders of Allowed Claims or Interests in any Class are intended to be and shall be final. In accordance with the provisions of the Plan, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, without any further notice to or action, Order, or approval of the Bankruptcy Court, after the Plan Effective Date, the Reorganized Debtors and the AQV Wind Down Co., as applicable, may compromise and settle Claims against, and Interests in, the Debtors and their Estates and Causes of Action against other Entities.

The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the RSA Settlement without any further notice to or action, Order, or approval of the Bankruptcy Court, as well as a finding by the Bankruptcy Court that such settlement is in the best interests of the Debtors, their Estates, and Holders of Claims or Interests, and is fair, equitable, and within the range of reasonableness.  The compromises and settlements described herein shall be non-severable from each other and from all other terms of the Plan.

### 5.      Restructuring Transactions

On or after the Confirmation Date, the Debtors, the Reorganized Debtors, or the AQV Wind Down Co., as applicable, shall be authorized to enter into any transactions and take other actions consistent with the Plan and the Confirmation Order as may be necessary or appropriate to effectuate the transactions described in, approved by, contemplated by, or necessary to, effectuate the Restructuring Transactions. The applicable Debtors, Reorganized Debtors, and the AQV Wind Down Co. will take any actions as may be necessary or advisable to effect a corporate restructuring of the overall corporate structure of the Debtors, in the Restructuring Transactions Memorandum, or in the Definitive Documents, including the issuance of all Securities, instruments, certificates, and other documents required to be issued pursuant to the Plan, one or more intercompany mergers, consolidations, amalgamations, arrangements, continuances, restructurings, conversions, dissolutions, transfers, liquidations, or other corporate transactions.

The actions to implement the Restructuring Transactions may include: (1) the execution and delivery of appropriate agreements or other documents of merger, consolidation, amalgamation, arrangement, continuance, restructuring, conversion, disposition, dissolution, transfer, liquidation, spinoff, sale, or purchase containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable law and any other terms to which the applicable Entities may agree; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable Entities agree; (3) the filing of the New HB Organizational Documents and any appropriate certificates or articles of incorporation, reincorporation, formation, merger, consolidation, conversion, amalgamation, arrangement, continuance, or dissolution pursuant to applicable state or provincial law; (4) the issuance of the New HB Common Equity (or New Warrants) (including the MIP Equity, any New HB Common Equity (or New Warrants) issued pursuant to the Rights Offering (including Unsubscribed Equity pursuant to the Backstop Commitment Agreement), and any New HB Common Equity (or New Warrants) issued in satisfaction of the Backstop Commitment Premium); (5) the execution and delivery of the New HB Organizational Documents and any certificates or articles of incorporation, bylaws, or such other applicable formation documents (if any) of each Reorganized Debtor (including all actions to be taken, undertakings to be made, and obligations to be incurred and fees and expenses to be paid by the Debtors and/or the Reorganized Debtors, as applicable); (6) the execution and/or delivery, as applicable, of the Rights Offering Documents and the Exit Credit Documents; (7) the AQV Sale Transaction and the AQV Wind Down; (8) the implementation and documentation of the RSA Settlement, including one or more Debtors transferring 100% of the equity in HB TopCo Pty Ltd, or otherwise effectuating the transfer of 100% of the equity in the Journey Beyond Entities, to Crestview's designee; (9) the settlement, reconciliation, repayment, cancellation, discharge, and/or release, as applicable, of Intercompany Claims consistent with the Plan; and

(10) all other actions that the Debtors, the Reorganized Debtors, or the AQV Wind Down Co., as applicable, determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law in connection with the Plan. The Confirmation Order shall, and shall be deemed to, pursuant to sections 363 and 1123 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary to effect any transaction described in, contemplated by, or necessary to effectuate the Plan.

**6.      Reorganized Debtors and the AQV Wind Down Co.**

The Reorganized Debtors and the AQV Wind Down Co. shall be authorized to adopt any other agreements, documents, and instruments and to take any other actions contemplated under the Plan as necessary to consummate the Plan. Cash payments to be made pursuant to the Plan will be made by the Debtors, the Reorganized Debtors, or the AQV Wind Down Co., as applicable to their respective Holders of Claims and Interests.

**7.      Corporate Existence**

Except as otherwise provided in the Plan or the Confirmation Order, any agreement, instrument, or other document incorporated in the Plan, the Confirmation Order, or the Plan Supplement, or as a result of the Restructuring Transactions, on the Plan Effective Date, each Debtor shall continue to exist after the Plan Effective Date as a Reorganized Debtor and as a separate corporation, limited liability company, or other form of Entity under governing law with all the powers of such corporation, limited liability company, or other form of Entity, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other analogous formation documents) in effect before the Plan Effective Date, except to the extent such certificate of incorporation and bylaws (or other analogous formation documents) are amended by the Plan, the Confirmation Order, or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan or the Confirmation Order, and require no further action or approval (other than any requisite filings required under applicable state, provincial, federal, or foreign law). For the avoidance of doubt, nothing in Article IV.F of the Plan prevents, precludes, or otherwise impairs the Reorganized Debtors, or any one of them, from amending or modifying their respective certificate of incorporation and bylaws (or other formation documents), merging, amalgamating, or otherwise restructuring their legal Entity form, without supervision or approval by the Bankruptcy Court and in accordance with applicable non-bankruptcy law after the Plan Effective Date.

**8.      Exemption from Registration**

No registration statement will be filed under the Securities Act, or pursuant to any state securities laws, with respect to the offer and distribution of Securities under the Plan.

**a.      Section 1145 Exemption**

Pursuant to section 1145 of the Bankruptcy Code, the offering, issuance, and distribution of New HB Common Equity (or New Warrants) to (i) the Holders of Allowed HB First Lien Claims on account of their Allowed HB First Lien Claims and (ii) the Backstop Parties on account of the Backstop Commitment Premium under the Backstop Commitment Agreement (a) shall be

exempt from, among other things, the registration requirements of section 5 of the Securities Act and any other applicable U.S. state or local law requiring registration for the offer or sale of a security or registration or licensing of an issuer of, underwriter of, or broker or dealer in, a security, (b)(i) are not "restricted securities" as defined in Rule 144(a)(3) under the Securities Act, and (ii) are freely tradable and transferable by any initial recipient thereof that (w) is not an "affiliate" of the Reorganized Hornblower Debtors as defined in Rule 144(a)(1) under the Securities Act, (x) has not been such an "affiliate" within ninety (90) calendar days of such transfer, (y) has not acquired the New HB Common Equity (or New Warrants) from an "affiliate" of the Reorganized Hornblower Debtors within one year of such transfer, and (z) is not an entity that is an "underwriter" as defined in subsection (b) of Section 1145 of the Bankruptcy Code, and (c) will be freely tradable by the recipients thereof, subject to (i) the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act, (ii) compliance with applicable securities laws and any rules and regulations of the SEC, if any, applicable at the time of any future transfer of such securities or instruments, and (iii) the restrictions in the New HB Organizational Documents.

    b.  <u>Section 4(a)(2) of the Securities Act</u>

    The offering, issuance, and distribution of (i)(a) the subscription rights to participate in the Rights Offering and (b) any New HB Common Equity (or New Warrants) upon exercise of such subscription rights, and (ii) any Unsubscribed Equity to the Backstop Parties in accordance with their Backstop Commitments shall be exempt (including with respect to an entity that is an "underwriter" as defined in subsection (b) of section 1145 of the Bankruptcy Code) from registration under the Securities Act pursuant to Section 4(a)(2) thereof and/or Regulation D thereunder. Therefore, such securities will be "restricted securities" subject to resale restrictions and may be resold, exchanged, assigned, or otherwise transferred only pursuant to registration or an applicable exemption from registration under the Securities Act and other applicable law. In that regard, each of the Holders of Allowed HB First Lien Claims participating in the Rights Offering will be required to make, and each Backstop Party has made, customary representations to the Debtors, including that each is an "accredited investor" (within the meaning of Rule 501(a) of the Securities Act) or a qualified institutional buyer (as defined under Rule 144A promulgated under the Securities Act).

    **9.**  **Vesting of Assets in the Reorganized Debtors or AQV Wind Down Co.**

    Except as otherwise provided in the Plan or the Confirmation Order, any agreement, instrument, or other document incorporated in the Plan, the Confirmation Order, or the Plan Supplement, or pursuant to any other Final Order of the Bankruptcy Court, on the Plan Effective Date, all property (including all interests, rights, and privileges related thereto) in each Estate, all Causes of Action, and any property acquired by any of the Debtors pursuant to the Plan or the Confirmation Order, including Interests held by the Debtors in any Non-Debtor Affiliates, shall vest in each respective Reorganized Debtor or the AQV Wind Down Co., as applicable, free and clear of all Liens, Claims, charges, rights, or other encumbrances subject to and in accordance with the Plan. On and after the Plan Effective Date, except as otherwise provided in the Plan or the Confirmation Order, each Reorganized Debtor or the AQV Wind Down Co., as applicable, may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims or Interests or Causes of Action without supervision or approval by the Bankruptcy Court

and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules. Without limiting the foregoing, the Reorganized Debtors may pay the charges that they incur on or after the Plan Effective Date for professional fees, disbursements, expenses, or related support services without application to the Bankruptcy Court.

**10.    Cancellation of Existing Securities and Agreements**

Except for the purpose of evidencing a right to a distribution under the Plan or as otherwise provided in the Plan, the Confirmation Order or any agreement, instrument, or other document incorporated in the Plan, the Confirmation Order, or the Plan Supplement, on the Plan Effective Date, subject to Article II.B of the Plan, (1) any certificate, security, share, note, bond, partnership unit, credit agreement, indenture, purchase right, option, warrant, or other instrument or document directly or indirectly evidencing, relating to, or creating any indebtedness or obligation of or ownership interest in the Debtors or giving rise to any Claim or Interest or to any rights or obligations relating to any Claims against or Interests in the Debtors (except such certificates, notes, or other instruments or documents evidencing indebtedness or obligation of or ownership interest in the Debtors that are Reinstated pursuant to the Plan) and any rights of any Holder in respect thereof shall be cancelled without any need for a Holder to take further action with respect thereto, and the duties and obligations of all parties thereto, including the Debtors or the Reorganized Debtors, as applicable, and any Non-Debtor Affiliates, thereunder or in any way related thereto shall be deemed satisfied in full, cancelled, released, discharged, and of no force or effect; and (2) the obligations of the Debtors or the Reorganized Debtors pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificate or articles of incorporation or similar documents governing the shares, certificates, notes, bonds, indentures, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors (except such agreements, certificates, notes, or other instruments evidencing indebtedness or obligation of or ownership interest in the Debtors that are specifically Reinstated pursuant to the Plan) shall be released and discharged; *provided*, *however*, that notwithstanding the occurrence of the Confirmation Date or the Plan Effective Date, any such agreement that governs the rights of the Holder of a Claim shall continue in effect for purposes of: (a) enabling Holders of Allowed Claims and Allowed Interests to receive distributions under the Plan as provided herein; (b) allowing the Distribution Agent or the AQV Wind Down Co. Administrator, as applicable, to make distributions under the Plan as provided herein; and (c) preserving any rights of the Agents to payment of fees and expenses as against any money or property distributable to Holders under the relevant credit agreement.

On the Plan Effective Date, each Holder of a certificate or instrument evidencing a Claim or Interest that is discharged by the Plan shall be deemed to have surrendered such certificate or instrument in accordance with the applicable indenture or agreement that governs the rights of such Holder of such Claim of Interest. Such surrendered certificate or instrument shall be deemed cancelled as set forth in, and subject to the exceptions set forth in, Article IV.I of the Plan.

**11.    Corporate Action**

On the Plan Effective Date, all actions contemplated by the Plan or the Confirmation Order, regardless of whether taken before, on, or after the Plan Effective Date, shall be deemed authorized

and approved by the Bankruptcy Court in all respects, including, as applicable: (1) the implementation of the Restructuring Transactions; (2) the adoption of the New HB Organizational Documents and any other new corporate governance documents; (3) the selection of the directors and officers for the Reorganized Hornblower Debtors; (4) the execution and delivery of the applicable Definitive Documents and any related instruments, agreements, guarantees, filings, or other related documents; (5) the issuance of the New HB Common Equity; (6) the incurrence of the Exit Term Loans and the Exit Revolver; (7) the AQV Wind Down; (8) the RSA Settlement; (9) the rejection, assumption, or assumption and assignment, as applicable, of Executory Contracts and Unexpired Leases; and (10) all other acts or actions contemplated or reasonably necessary or appropriate to promptly consummate the Restructuring Transactions contemplated by the Plan (whether to occur before, on, or after the Plan Effective Date).

On the Plan Effective Date, all matters provided for in the Plan or the Confirmation Order involving the corporate structure of the Debtors, the Reorganized Debtors, or the AQV Wind Down Co., as applicable, and any corporate, limited liability company, or related action required by the Debtors, the Reorganized Debtors, or the AQV Wind Down Co., as applicable, in connection with the Plan or the Confirmation Order, shall be deemed to have occurred in accordance with the Plan and shall be in effect, without any requirement of further action by the security interest Holders, members, partners, directors, or officers of the Debtors, the Reorganized Debtors, or the AQV Wind Down Co., as applicable. The authorizations and approvals contemplated by Article IV.J of the Plan shall be effective notwithstanding any requirements under non-bankruptcy law.

### 12.    New HB Organizational Documents

On the Plan Effective Date, the New HB Organizational Documents shall be adopted automatically by the applicable Reorganized Hornblower Debtors. On or promptly after the Plan Effective Date, the Reorganized Hornblower Debtors may file their respective New HB Organizational Documents and other applicable agreements with the applicable Secretaries of State or other applicable authorities in their respective states, provinces, or countries of incorporation or formation in accordance with the corporate laws of the respective states, provinces, or countries of incorporation or formation. Pursuant to section 1123(a)(6) of the Bankruptcy Code, to the extent applicable to these Chapter 11 Cases, the New HB Organizational Documents of the Reorganized Hornblower Debtors will prohibit the issuance of non-voting equity securities.

After the Plan Effective Date, each Reorganized Hornblower Debtor may amend and restate its limited liability company agreement, certificate of incorporation, limited partnership agreement, and other formation and constituent documents as permitted by the laws of its respective jurisdiction of formation and the terms of the New HB Organizational Documents, as applicable.

### 13.    Directors, Managers, and Officers of the Reorganized Hornblower Debtors

As of the Plan Effective Date, the term of the current members of the boards of directors or managers, as applicable, of each Debtor shall expire, and the initial boards of directors or managers, including the New Board and the officers of each of the Reorganized Hornblower

Debtors, as applicable, shall be appointed in accordance with the respective New HB Organizational Documents.

The New Board shall consist of five (5) members, four of which shall be designated by SVP and one of which shall be designated by Crestview or its Related Funds. Directors of the New Board shall be appointed in the manner set forth in the RSA. The identities of the members of the New Board shall be set forth in the Plan Supplement to the extent known at the time of filing.

Except as otherwise provided in the Plan, the Confirmation Order, the Plan Supplement, or the New HB Organizational Documents, the officers of the Debtors immediately before the Plan Effective Date, as applicable, shall serve as the initial officers of the Reorganized Debtors on the Plan Effective Date.

## 14.    Effectuating Documents; Further Transactions

On and after the Plan Effective Date, the Reorganized Debtors, and their respective officers, directors, members, partners, or managers (as applicable), are authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, the Restructuring Transactions, the Exit Credit Documents, the New HB Organizational Documents, the New HB Common Equity (or New Warrants) issued pursuant to the Plan, and any and all other agreements, documents, securities, filings, and instruments relating to the foregoing in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorization, or consents except for those expressly required pursuant to the Plan. The authorizations and approvals contemplated by Article IV of the Plan shall be effective notwithstanding any requirements under non-bankruptcy law.

## 15.    Section 1146 Exemption

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers (whether from a Debtor to a Reorganized Debtor or to any other Person) of property pursuant to the Plan or the Confirmation Order (including under any of the Definitive Documents and related documents) shall not be subject to any stamp tax, document recording tax, conveyance fee, intangibles, or similar tax, mortgage tax, real estate transfer tax, personal property transfer tax, mortgage recording tax, sales or use tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment in the United States, and the Confirmation Order shall direct and be deemed to direct the appropriate state or local governmental officials or agents to forgo the collection of any such tax or governmental assessment and to accept for filing and recordation instruments or other documents pursuant to such transfers of property without the payment of any such tax or governmental assessment. Such exemption specifically applies, without limitation, to (1) the creation, modification, consolidation, or recording of any mortgage, deed of trust, Lien, or other security interest, or the securing of additional indebtedness by such or other means, (2) the making or assignment of any lease or sublease, (3) any Restructuring Transaction authorized by the Plan, (4) the granting of collateral as security for the Reorganized Debtors' obligations under and in connection with the Exit Term

Loans or Exit Revolver, and (5) the making or delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with the Plan, including (a) any merger agreements; (b) agreements of consolidation, restructuring, disposition, liquidation, or dissolution; (c) deeds; (d) bills of sale; (e) assignments executed in connection with any Restructuring Transaction occurring under the Plan; or (f) the other Definitive Documents.

All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(c) of the Bankruptcy Code, shall forgo the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

### 16.    Preservation of Causes of Action

In accordance with section 1123(b) of the Bankruptcy Code, but subject to Article IX of the Plan, each Reorganized Debtor or the AQV Wind Down Co., as applicable, shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action of the Debtors, whether arising before or after the Petition Date, including any actions specifically enumerated in the Schedule of Retained Causes of Action, and the Reorganized Debtors' and AQV Wind Down Co.'s, as applicable, rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Plan Effective Date, other than the Causes of Action released (including, without limitation, by the Debtors) pursuant to the releases and exculpations contained in the Plan, including in Article IX of the Plan, which shall be deemed released and waived by, including, without limitation, the Debtors, the Reorganized Debtors, or the AQV Wind Down Co., as applicable, as of the Plan Effective Date.

The Reorganized Debtors or AQV Wind Down Co., as applicable, may pursue such Causes of Action, as appropriate, in accordance with their best interests, in their respective discretion. **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors, the Reorganized Debtors, or the AQV Wind Down Co., as applicable, will not pursue any and all available Causes of Action of the Debtors against it.  The Debtors and the Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity.**  Unless any Causes of Action of the Debtors against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Final Order, the Reorganized Debtors and AQV Wind Down Co., as applicable, expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

The Reorganized Debtors and AQV Wind Down Co. reserve and shall retain such Causes of Action of the Debtors notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan.  In accordance with section 1123(b)(3) of the Bankruptcy Code, and except as expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or pursuant to a Final Order, any Causes of Action that a Debtor may hold against any Entity shall vest in the Reorganized Debtors or AQV

Wind Down Co, as applicable, except as otherwise expressly provided in the Plan, including Article IX of the Plan. The applicable Reorganized Debtors or the AQV Wind Down Co., through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Reorganized Debtors and the AQV Wind Down Co., as applicable, shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, Order, or approval of the Bankruptcy Court.

17.    **MIP**

The participants in the MIP, the allocations and form of the equity-based compensation to such participants (including the amount of the allocations and the timing of the grant of the equity-based compensation), and the terms and conditions of such equity-based compensation (including vesting, exercise prices, base values, hurdles, forfeiture, repurchase rights, and transferability, as applicable) shall be determined by the New Board within 60 days following the Plan Effective Date (the "Negotiation Period") as detailed in the RSA (*provided*, for the avoidance of doubt, that the New Board may make appropriate changes to such terms for future grants in accordance with the New HB Organizational Documents). For the avoidance of doubt, the New Board will determine the allocation of the MIP Equity to the Key Executives within the Negotiation Period. The Key Executives' employment agreements shall be deemed amended on the Plan Effective Date to reflect the provisions of the RSA with respect to such persons' rights following the Negotiation Period. The MIP Equity will dilute all other New HB Common Equity.

18.    **Employment and Retiree Benefits**

Unless otherwise provided in the Plan or the Confirmation Order (including as modified by the MIP), the Specified Employee Plans in place as of the Plan Effective Date, shall be assumed by the Reorganized Hornblower Debtors and shall remain in place as of the Plan Effective Date, and the Reorganized Hornblower Debtors will continue to honor such agreements, arrangements, programs, and plans; and the Restructuring Transactions shall not constitute a change of control of any Debtor for any purpose under such agreements.

Notwithstanding the foregoing, and unless otherwise provided in the Plan Supplement, all plans or programs calling for stock grants, stock issuances, stock reserves, or stock options shall be deemed rejected with regard to such issuances, grants, reserves, and options. For the avoidance of doubt, no provision in any agreement, plan, or arrangement to be assumed pursuant to the foregoing paragraph relating to the award of equity or equity-like compensation shall be binding on, or honored by, the Reorganized Hornblower Debtors. Nothing in the Plan shall limit, diminish, or otherwise alter the Reorganized Hornblower Debtors' defenses, claims, Causes of Action, or other rights with respect to any such contracts, agreements, policies, programs, and plans. For the avoidance of doubt, pursuant to section 1129(a)(13) of the Bankruptcy Code, from and after the Plan Effective Date, all retiree benefits (as such term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid in accordance with applicable law.

### 19.     Dissolution of Certain Debtors

On or after the Plan Effective Date, certain of the Debtors, including the AQV Debtors, may be dissolved without further action under applicable law, regulation, Order, or rule, including any action by the stockholders, members, the board of directors, or similar governing body of the Debtors, Reorganized Debtors, or the AQV Wind Down Co. Administrator, as applicable. In accordance with the terms of the Plan, the Reorganized Debtors and the AQV Wind Down Co. Administrator, as applicable, shall have the power and authority to take any action necessary to wind down and dissolve the foregoing Debtors, including the AQV Debtors, and may, to the extent applicable: (1) file a certificate of dissolution for such entities, together with all other necessary corporate and company documents, to effect the dissolution of such entities under the applicable laws of their states of formation; (2) complete and file all final or otherwise required federal, state, and local tax returns and pay taxes required to be paid for such Debtors, including the AQV Debtors, and pursuant to section 505(b) of the Bankruptcy Code, request an expedited determination of any unpaid tax liability of any of such Debtors, including the AQV Debtors, as determined under applicable tax laws; and (3) represent the interests of such Debtors, including the AQV Debtors, before any taxing authority in all tax matters, including any action, proceeding or audit.

### 20.     Private Company

The Reorganized Hornblower Debtors shall: (a) emerge from these Chapter 11 Cases as non-publicly reporting companies on the Plan Effective Date and not be subject to SEC reporting requirements under Sections 12 or 15 of the Exchange Act or otherwise; (b) not be voluntarily subjected to any reporting requirements promulgated by the SEC except, in each case, as otherwise may be required pursuant to the New HB Organizational Documents or applicable law; and (c) not be required to list the New HB Common Equity on a U.S. stock exchange.

### 21.     Cashless Transactions

Notwithstanding anything to the contrary set forth herein, the treatment of claims, distributions and other transactions contemplated hereby in respect of the DIP Lenders, Holders of HB First Lien Claims, and Rights Offering participants may, at the election of the applicable participating parties, be effectuated by netting or other form of cashless implementation in order to minimize the actual flows of funds between the relevant parties.

## D.     Treatment of Executory Contracts and Unexpired Leases

### 1.     Assumption, Assumption and Assignment, and Rejection of Executory Contracts and Unexpired Leases

#### a.     Executory Contracts and Unexpired Leases of the Non-AQV Debtors

On the Plan Effective Date, except as otherwise provided in the Plan or in any contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan, all Executory Contracts and Unexpired Leases of the Non-AQV Debtors, shall be deemed assumed, without the need for any further notice to or action, Order, or approval of the Bankruptcy Court, as of the Plan Effective Date under section 365 of the Bankruptcy Code, unless such

Executory Contract or Unexpired Lease:  (1) was previously assumed or rejected by the Debtors, pursuant to an Order of the Bankruptcy Court; (2) previously expired or terminated pursuant to its terms; (3) is the subject of a motion to assume, assume and assign, or reject filed by the Debtors that is pending on or before the date of entry of the Confirmation Order; or (4) is specifically designated as a contract or lease to be rejected on the Schedule of Rejected Executory Contracts and Unexpired Leases.  For the avoidance of doubt, on the Plan Effective Date, each Primary Concession Contract shall be, and shall be deemed to have been, assumed.

All Executory Contracts and Unexpired Leases of the Non-AQV Debtors listed on the Schedule of Rejected Executory Contracts and Unexpired Leases will be deemed rejected as of the Plan Effective Date, unless an alternative effective date of rejection is identified on the Schedule of Rejected Executory Contracts and Unexpired Leases and agreed upon by the Non-AQV Debtors and the applicable counterparties to the applicable Executory Contracts and Unexpired Leases. The Non-AQV Debtors reserve the right to alter, amend, modify, or supplement the Schedule of Rejected Executory Contracts and Unexpired Leases, including to add or remove any Executory Contracts and Unexpired Leases, at any time up to and including 45 days after the Plan Effective Date.

Subject to and upon the occurrence of the Plan Effective Date, entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of the assumptions, assumptions and assignments, or rejections of Executory Contracts and Unexpired Leases provided for in the Plan, the Confirmation Order, or the Schedule of Rejected Executory Contracts and Unexpired Leases, pursuant to sections 365(a) and 1123 of the Bankruptcy Code.  Except as otherwise provided for in the Confirmation Order, each Executory Contract and Unexpired Lease assumed (and not assigned) pursuant to the Plan, the Confirmation Order, or any other Order of the Bankruptcy Court shall re-vest in and be fully enforceable by the applicable contracting Reorganized Debtor in accordance with its terms.  Except as otherwise provided herein or agreed to by the Debtor and the applicable counterparty, each assumed Executory Contract or Unexpired Lease shall include all modifications, amendments, supplements, restatements, or other agreements related thereto, and all rights related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests.

To the maximum extent permitted by law, to the extent any provision in any Executory Contract or Unexpired Lease assumed pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption of such Executory Contract or Unexpired Lease (including any "change of control" provision), then such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other rights with respect thereto.

b.     Executory Contracts and Unexpired Leases of the AQV Debtors

On the Plan Effective Date, expect as otherwise provided in the Plan or in any contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan, all Executory Contracts and Unexpired Leases of the AQV Debtors shall be deemed rejected without the need for any further notice to or action, Order, or approval of the Bankruptcy Court as of the Plan Effective Date under section 365 of the Bankruptcy Code, unless such Executory

Contract or Unexpired Lease: (1) was previously assumed by the Debtors and assigned to the AQV Purchaser, pursuant to an Order of the Bankruptcy Court; (2) is the subject of a proposed AQV Sale Order filed by the Debtors with the Bankruptcy Court that is pending on or before the date of entry of the Confirmation Order; or (3) previously expired or terminated pursuant to its terms. For the avoidance of doubt, the assumption, assumption and assignment, and rejection of each Executory Contract and Unexpired Lease of the AQV Debtors shall be subject to the terms of the AQV Bidding Procedures Order and approved by the Bankruptcy Court pursuant to the AQV Sale Order.

### 2.    Claims Based on Rejection of Executory Contracts and Unexpired Leases

In the event that the Debtors' rejection of an Executory Contract or Unexpired Lease results in damages to the counterparty or counterparties to such Executory Contract or Unexpired Lease, a Claim for such damages shall be Disallowed, forever barred, and shall not be enforceable against the Debtors, the Reorganized Debtors, the AQV Wind Down Co., or their respective properties or interests in property as agents, successors, or assigns, unless a Proof of Claim is Filed with the Notice and Claims Agent no later than fifteen (15) days after the date of entry of a Final Order of the Bankruptcy Court (including the Confirmation Order) approving such rejection of such Executory Contract or Unexpired Lease. Any such Claims, to the extent Allowed, shall be classified as General Unsecured Claims, and shall be treated in accordance with Article III of the Plan.

### 3.    Cure of Defaults for Assumed Executory Contracts and Unexpired Leases

The Debtors or the Reorganized Debtors, as applicable, shall pay undisputed Cure Claims, if any, on (1) the Plan Effective Date or as soon as reasonably practicable thereafter, as dictated by the Debtors' ordinary course of business, for Executory Contracts and Unexpired Leases assumed as of the Plan Effective Date, or (2) the assumption effective date, if different than the Plan Effective Date. Any Cure Claim shall be deemed fully satisfied, released, and discharged upon payment by the Debtors or the Reorganized Debtors, as applicable, of the Cure Claim; *provided* that nothing herein shall prevent the Reorganized Debtors from paying any Cure Claim despite the failure of the relevant counterparty to File such request for payment of such Cure Claim. The Reorganized Debtors also may settle any Cure Claim without any further notice to or action, order, or approval of the Bankruptcy Court. For the avoidance of doubt, any undisputed Cure Claim in connection with the assumption of any Executory Contracts or Unexpired Leases of the AQV Debtors shall be paid subject to the terms of the AQV Sale Order.

Any monetary defaults under each Executory Contract and Unexpired Lease to be assumed pursuant to the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the Cure Claim amount in Cash on the Plan Effective Date, subject to the limitation described below, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree. In the event of a dispute regarding (1) the amount of any payments to cure such a default, (2) the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" (within the meaning of Section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or (3) any other matter pertaining to assumption, the Cure Claim payments required by Section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order or orders of the Bankruptcy

Court resolving the dispute and approving the assumption; *provided* that the Reorganized Debtors may settle any such dispute without any further notice to, or action, Order, or approval of the Bankruptcy Court or any other Entity.

At least 14 days prior to the Combined Hearing, the Debtors shall provide for notices of proposed assumption or assumption and assignment, including proposed Cure Claim amounts, for Executory Contracts and Unexpired Leases to be assumed or assumed and assigned pursuant to the Plan, to be remitted to third parties (with such Cure Claim being $0.00 if no amount is listed in the notice), which notices will include procedures for objecting thereto and resolution of disputes by the Bankruptcy Court.  Any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption or assumption and assignment under the Plan on any grounds or related amount of the Cure Claim must be Filed, served, and actually received by the Debtors no later than the date specified in the notice.  Any counterparty to an Executory Contract or Unexpired Lease that failed to timely object to the proposed assumption or assumption and assignment will be deemed to have assented to such assumption or assumption and assignment and any objection shall be Disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Reorganized Debtor or the AQV Wind Down Co., as applicable, without the need for any objection by the Reorganized Hornblower Debtors, the AQV Wind Down Co., or any other party in interest or any further notice to or action, Order, or approval of the Bankruptcy Court.

If there is a timely Filed objection regarding (1) the amount of any Cure Claim; (2) the ability of the Reorganized Debtors or any assignee, including the AQV Purchaser, to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed; or (3) any other matter pertaining to assumption or the cure amounts required by section 365(b)(1) of the Bankruptcy Code, such dispute shall be resolved by a Final Order of the Bankruptcy Court (which may be the Confirmation Order) or as may be agreed upon by the Debtors, the Reorganized Debtors, the AQV Wind Down Co., and/or the AQV Purchaser, as applicable, and the counterparty to the Executory Contract or Unexpired Lease.  The Debtors, Reorganized Debtors, as applicable, reserve the right to reject any Executory Contract or Unexpired Lease in resolution of any cure disputes.  Notwithstanding anything to the contrary herein, if at any time the Bankruptcy Court determines that the Allowed Cure Claim with respect to any Executory Contract or Unexpired Lease is greater than the amount set forth in the applicable Cure Notice, the Debtors or Reorganized Debtors, as applicable, shall have the right, at such time, to add such Executory Contract or Unexpired Lease to the Schedule of Rejected Executory Contracts and Unexpired Leases, in which case such Executory Contract or Unexpired Lease shall be deemed rejected as the Plan Effective Date.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise, full payment of any applicable Cure Claim, and cure of any nonmonetary defaults pursuant to Article V.C of the Plan shall result in the full release and satisfaction of any Cure Claims, Claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption.  **Any and all Proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed in the Chapter 11 Cases, including pursuant to**

the Confirmation Order, and for which any Cure Claim has been fully paid pursuant to Article V.C of the Plan, in the amount and at the time dictated by the Debtors' ordinary course of business, shall be deemed Disallowed and expunged as of the Plan Effective Date without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court.

4.      **Preexisting Obligations to the Debtors under Executory Contracts and Unexpired Leases**

Notwithstanding any non-bankruptcy law to the contrary, the Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations on goods previously purchased, or services previously received, by the contracting Debtors from counterparties to rejected or repudiated Executory Contracts or Unexpired Leases. For the avoidance of doubt, the rejection of any Executory Contracts or Unexpired Leases pursuant to the Plan or otherwise shall not constitute a termination of preexisting obligations owed to the Debtors under such Executory Contracts or Unexpired Leases.

5.      **Indemnification Obligations**

All indemnification provisions in place as of the date of the RSA (whether in the by-laws, certificates of incorporation or formation, limited liability company agreements, limited partnership agreements, other organizational documents, board resolutions, indemnification agreements, employment contracts, or otherwise) for current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the Debtors, as applicable, shall (1) not be modified, reduced, discharged, impaired, or otherwise affected in any way, including by the Plan, the Plan Supplement, or the Confirmation Order, (2) remain intact, in full force and effect, and irrevocable, (3) not be limited, reduced or terminated after the Plan Effective Date, and (4) survive the effectiveness of the Plan on terms no less favorable to such current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the Debtors than the indemnification provisions in place prior to the Plan Effective Date irrespective of whether such indemnification obligation is owed for an act or event occurring before, on or after the Petition Date; *provided* that the Reorganized Debtors shall not indemnify directors of the Debtors for any claims or Causes of Action arising out of or relating to any act or omission resulting from gross negligence or willful misconduct. All such obligations shall be deemed and treated as Executory Contracts to be assumed by the Debtors under the Plan and shall continue as obligations of the Reorganized Hornblower Debtors. Any Claim based on the Debtors' indemnification obligations under the Plan shall not be a Disputed Claim or subject to any objection, in either case, for any reason, including by reason of section 502(e)(1)(B) of the Bankruptcy Code.

6.      **Insurance Policies**

Unless listed on the Scheduled of Rejected Executory Contracts and Unexpired Leases, all of the Debtors' insurance policies, including D&O Liability Insurance Policies, and any agreements, documents, or instruments relating thereto, are treated as and deemed to be Executory Contracts under the Plan. On the Plan Effective Date, the Debtors shall be deemed to have

assumed all insurance policies and any agreements, documents, and instruments related thereto (and the Debtors or Reorganized Hornblower Debtors, as applicable, shall purchase any related tail policies providing for coverage for at least a six-year period after the Plan Effective Date). No D&O Liability Insurance Policies shall be listed on the Schedule of Rejected Executory Contracts and Unexpired Leases.

Notwithstanding anything to the contrary contained in the Plan or Confirmation Order, Confirmation of the Plan shall not discharge, impair, or otherwise modify any indemnity obligations assumed by the foregoing assumption of the D&O Liability Insurance Policies. Coverage for defense and indemnity under the D&O Liability Insurance Policies shall remain available to all applicable individuals insured thereunder.

In addition, after the Plan Effective Date, none of the Reorganized Hornblower Debtors shall terminate or otherwise reduce the coverage under any D&O Liability Insurance Policies in effect on or after the Petition Date, with respect to conduct or events occurring prior to the Plan Effective Date, and all members, managers, directors, and officers of the Debtors who served in such capacity at any time prior to the Plan Effective Date or any other individuals covered by such policies shall be entitled to the full benefits of any such policy for the full term of such policy, to the extent set forth therein, regardless of whether such members, managers, directors, officers, or other individuals remain in such positions after the Plan Effective Date.

### 7.    Nonoccurrence of Plan Effective Date

In the event that the Plan Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming, assuming and assigning, or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

### 8.    Reservation of Rights

Neither the exclusion nor the inclusion by the Debtors of any contract or lease on any exhibit, schedule, or other annex to the Plan or in the Plan Supplement, nor anything contained in the Plan, shall constitute an admission by the Debtors or any other party that any contract or lease is in fact an Executory Contract or Unexpired Lease or that any Reorganized Debtor has any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors, the Reorganized Debtors, or the AQV Wind Down Co., as applicable, shall have forty-five (45) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

### E.    Procedures for Resolving Contingent, Unliquidated, and Disputed Claims and Interests

### 1.    Allowance of Claims

Except as expressly provided in the Plan or in any Order entered in the Chapter 11 Cases before the Plan Effective Date (including the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed under the Plan or the Bankruptcy Code, or the Bankruptcy Court has entered a Final Order, including the Confirmation Order (when it becomes a Final Order), in the Chapter 11 Cases allowing such Claim. The Debtors, the

Reorganized Debtors, or the AQV Wind Down Co., as applicable, may affirmatively determine to deem Unimpaired Claims Allowed to the same extent such Claims would be allowed under applicable non-bankruptcy law.

### 2. Estimation of Claims and Interests

Before, on, or after the Plan Effective Date, the Debtors, the Reorganized Debtors, or the AQV Wind Down Co., as applicable, may at any time request that the Bankruptcy Court estimate any Disputed Claim that is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party in interest previously has objected to such Claim or Interest or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim or Interest, including during the litigation of any objection to any Claim or Interest or during the appeal relating to such objection. Notwithstanding any provision otherwise in the Plan, a Claim that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court. In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim or Interest, that estimated amount shall constitute a maximum limitation on such Claim or Interest for all purposes under the Plan (including for purposes of distributions), and the relevant Reorganized Debtor or the AQV Wind Down Co., as applicable, may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim or Interest; *provided* that such limitation shall not apply to Claims against any of the Debtors requested by the Debtors to be estimated for voting purposes only.

Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such Holder has Filed a motion requesting the right to seek such reconsideration on or before fourteen (14) calendar days after the date on which such Claim is estimated. All of the aforementioned Claims and objection, estimation, and resolution procedures are cumulative and not exclusive of one another. Claims against any of the Debtors may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

### 3. Adjustment to Claims

Any duplicate Claim or Interest, any Claim or Interest that has been paid or satisfied, or any Claim or Interest that has been amended or superseded, cancelled or otherwise expunged (including pursuant to the Plan or the Confirmation Order), may be adjusted or expunged (including on the Claims Register, to the extent applicable) by the Reorganized Debtors or the AQV Wind Down Co., as applicable, after providing notice and a period of at least thirty (30) days for any party in interest to object, without any further notice to or action, Order, or approval of the Bankruptcy Court.

### 4. Objections to Claims

Except as otherwise specifically provided in the Plan or the Confirmation Order, the Debtors, and after the Plan Effective Date, the Reorganized Debtors or the AQV Wind Down Co.,

as applicable, shall have the sole authority to: (a) File, withdraw, or litigate to judgment objections to Claims or Interests; (b) settle or compromise any Disputed Claim or Interest without any further notice to or action, Order, or approval by the Bankruptcy Court; and (c) administer and adjust the Debtors' Claims Register to reflect any such settlements or compromises without any further notice to or action, Order, or approval by the Bankruptcy Court.  For the avoidance of doubt, except as otherwise provided herein, after the Plan Effective Date, each of the Reorganized Debtors or the AQV Wind Down Co., as applicable, shall have the right to object to Claims and shall retain any and all rights and defenses that the Debtors had with respect to any Claim immediately before the Plan Effective Date, including the Causes of Action retained pursuant to Article IV.O of the Plan.  Any motion to extend the Claims Objection Deadline shall automatically extend the deadline until the Court enters an order on such motion.

### 5.  Disallowance of Claims or Interests

Any Claims held by Entities from which property is recoverable under sections 542, 543, 550, or 553 of the Bankruptcy Code, or that is a transferee of a transfer avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed Disallowed pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims may not receive any distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court Order with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Reorganized Debtors or the AQV Wind Down Co., as applicable.  All Claims Filed on account of an indemnification obligation to a director, manager, officer, or employee of the Debtors as of the Plan Effective Date shall be deemed satisfied and expunged from the Claims Register as of the Plan Effective Date to the extent such indemnification obligation is assumed by the Reorganized Debtors or the AQV Wind Down Co., as applicable, or honored or reaffirmed, as the case may be pursuant to the Plan, without any further notice to or action, Order, or approval of the Bankruptcy Court.

Except as provided herein or otherwise agreed to by the Debtors, the Reorganized Debtors, or the AQV Wind Down Co., as applicable, any and all Proofs of Claim filed after the applicable Claims Bar Date shall be deemed Disallowed and expunged as of the Plan Effective Date without any further notice to or action, Order, or approval of the Bankruptcy Court, and Holders of such Claims may not receive any distributions on account of such Claims, unless on or before the Combined Hearing such late Filed Claim has been deemed timely Filed by a Final Order.

### 6.  No Distributions Pending Allowance

Notwithstanding any other provision of the Plan, if any portion of a Claim is a Disputed Claim, as applicable, no payment or distribution provided hereunder shall be made on account of such Claim or Interest unless and until such Disputed Claim becomes an Allowed Claim.

### 7.  Distributions After Allowance

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions (if any) shall be made to the Holder of such Allowed Claim in accordance with the provisions of the Plan.  As soon as reasonably practicable after the date that the Order or judgment of the

Bankruptcy Court Allowing any Disputed Claim becomes a Final Order, the Distribution Agent or the AQV Wind Down Co. Administrator, as applicable, shall provide to the Holder of such Claim the distribution (if any) to which such Holder is entitled under the Plan as of the Plan Effective Date, without any interest, dividends, or accruals to be paid on account of such Claim.

**F.      The AQV Wind-Down Co. Administrator**

**1.      AQV Wind Down Co. Administrator Rights and Powers**

Upon and following the Plan Effective Date, the AQV Wind Down Co. Administrator shall have any and all powers and authority, without the need for Bankruptcy Court approval (unless otherwise indicated), to carry out and implement all provisions of the Plan and Confirmation Order, effectuate the AQV Remaining Assets Wind Down, and wind down the business and affairs of the AQV Wind Down Co., including:  (1) except to the extent Claims have been previously Allowed, controlling and effectuating the Claims reconciliation process, including objecting to, seeking to subordinate, compromising, or settling any and all Claims against the AQV Debtors or AQV Wind Down Co. (for the avoidance of doubt, the AQV Wind Down Co. Administrator shall be responsible for objecting to, reconciling, or settling (i) Administrative Claims and Priority Tax Claims asserted against the AQV Debtors or AQV Wind Down Co., as applicable, not otherwise Allowed and satisfied as of the Plan Effective Date and (ii) General Unsecured Claims asserted against the AQV Debtors or AQV Wind Down Co., as applicable, not otherwise Allowed and satisfied as of the Plan Effective Date); (2) liquidating the assets of the AQV Wind Down Co.; (3) making distributions to holders of Allowed Claims in accordance with the Plan and taking all steps to execute all instruments and documents necessary to effectuate the distributions to be made under the Plan, each in its capacity as AQV Wind Down Co. Administrator; (4) to the extent not released pursuant to the Plan, including pursuant to Article IV.J of the Plan, prosecuting all Causes of Action on behalf of the AQV Wind Down Co., electing not to pursue any Causes of Action, and determining whether and when to compromise, settle, abandon, dismiss, or otherwise dispose of any such Causes of Action, as the AQV Wind Down Co. Administrator may determine is in the best interests of the AQV Wind Down Co.; (5) establishing and maintaining bank accounts in the name of the AQV Wind Down Co.; (6) maintaining the books, records, and accounts of the AQV Wind Down Co.; (7) paying all reasonable fees, expenses, debts, charges, and liabilities of the AQV Wind Down Co.; (8) administering and paying taxes of the AQV Wind Down Co., including filing tax returns; (9) representing the interests of the AQV Wind Down Co. before any taxing authority in all matters, including any action, suit, proceeding, or audit; and (10) exercising such other powers as may be vested in it pursuant to order of the Bankruptcy Court or pursuant to the Plan, or as it reasonably deems to be necessary and proper to carry out the provisions of the Plan.

The filing of the final monthly report (for the month in which the Plan Effective Date occurs) and all subsequent quarterly reports shall be the responsibility of the AQV Wind Down Co. Administrator, except as otherwise provided herein.

**a.      AQV Wind Down Co. Administrator Expenses**

All reasonable costs, expenses, and obligations incurred by the AQV Wind Down Co. Administrator in administering the Plan, the AQV Wind Down Co., or in any manner connected,

incidental, or related thereto, shall be incurred and paid in accordance with the AQV Wind Down Budget.

### 2.  Tax Returns

After the Plan Effective Date, the AQV Wind Down Co. Administrator shall complete and file all final or otherwise required federal, state, and local tax returns for the AQV Wind Down Co. and, pursuant to section 505(b) of the Bankruptcy Code, may request an expedited determination of any unpaid tax liability of the AQV Wind Down Co., for any tax incurred during the administration of the Chapter 11 Cases of the AQV Debtors, as determined under applicable tax laws.

### G.  **Provisions Governing Distribution**

### 1.  Timing and Calculation of Amounts to Be Distributed

Unless otherwise provided in the Plan or the Confirmation Order, on the Plan Effective Date (or, if a Claim or Interest is not an Allowed Claim on the Plan Effective Date, on the date that such Claim or Interest becomes Allowed or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim shall be entitled to receive the full amount of the distributions that the Plan provides for Allowed Claims in each applicable Class and in the manner provided in the Plan; *provided* that any Holder of Allowed Claims may designate that its distributions are received by one or more of its Affiliates, designees or Related Funds. If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims (which will only be made if and when they become Allowed Claims) shall be made pursuant to the provisions set forth in Article VI of the Plan. Except as otherwise expressly provided in the Plan, Holders of Claims and Interests shall not be entitled to interest, dividends, or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Plan Effective Date. The Debtors, Reorganized Debtors, or AQV Wind Down Co., as applicable, shall have no obligation to recognize any transfer of Claims against any Debtor, as applicable, or privately held Interests occurring on or after the Distribution Record Date.

### 2.  Distribution Agent and AQV Wind Down Co. Administrator

The Distribution Agent shall serve with respect to Claims against the Non-AQV Debtors and matters concerning the Reorganized Debtors. The AQV Wind Down Co. Administrator shall serve the role of distribution agent solely with respect to Claims against the AQV Debtors and matters concerning the AQV Wind Down Co. After the Plan Effective Date, distributions under the Plan shall be made by the Distribution Agent or the AQV Wind Down Co. Administrator, as applicable. Neither the Distribution Agent nor the AQV Wind Down Co. Administrator shall be required to give any bond or surety or other security for the performance of their duties unless otherwise ordered by the Bankruptcy Court.

### 3.  Distribution Record Date

On the Distribution Record Date, the Claims Register shall be closed and the Distribution Agent or the AQV Wind Down Co. Administrator, as applicable, shall be authorized and entitled

to recognize only those record Holders, if any, listed on the Claims Register as of the close of business on the Distribution Record Date. Neither the Distribution Agent nor the AQV Wind Down Co. Administrator shall have any obligation to recognize any transfer of Claims occurring on or after the Distribution Record Date. In addition, with respect to payment of any Cure Claims or disputes over any Cure Claims, neither the Debtors, the Distribution Agent, nor the AQV Wind Down Co. Administrator shall have any obligation to recognize or deal with any party other than the non-Debtor party to the applicable Executory Contract or Unexpired Lease as of the Plan Effective Date, even if such non-Debtor party has sold, assigned, or otherwise transferred its Cure Claim.

4.     **Rights and Powers of Distribution Agent**

a.     Powers of Distribution Agent

The Distribution Agent shall be empowered to: (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Distribution Agent by Order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Distribution Agent to be necessary and proper to implement the provisions thereof.

b.     Expenses Incurred On or After the Plan Effective Date

Except as otherwise provided herein or ordered by the Bankruptcy Court, the amount of any reasonable and documented fees and out-of-pocket expenses incurred by the Distribution Agent on or after the Plan Effective Date (including taxes) and any reasonable compensation and out-of-pocket expense reimbursement claims (including reasonable attorney fees and expenses) made by the Distribution Agent shall be paid in Cash by the Reorganized Hornblower Debtors in the ordinary course.

5.     **Delivery of Distributions and Undeliverable or Unclaimed Distributions**

a.     Delivery of Distributions

Except as otherwise provided herein, the Distribution Agent and the AQV Wind Down Co. Administrator shall make distributions to Holders of Allowed Claims (as applicable) as of the Distribution Record Date at the address for each such Holder as indicated on the Debtors' records as of the date of any such distribution; *provided* that (1) the manner of such distributions shall be determined at the discretion of the Distribution Agent and the AQV Wind Down Co. Administrator, as applicable and (2) any Holder as of the Distribution Record Date may send a written notice to the Distribution Agent and the AQV Wind Down Co. Administrator, as applicable, that the distributions in respect of such Holders' Allowed Claims shall be made to one or more of its Affiliates, designees or Related Funds, which notice shall be in form and substance reasonably satisfactory to the Distribution Agent and the AQV Wind Down Co. Administrator, as applicable.

b.     Minimum Distributions

No fractional shares of New HB Common Equity (or New Warrants) issued under the Plan shall be distributed and no Cash shall be distributed in lieu of such fractional amounts. When any distribution pursuant to the Plan on account of an Allowed Claim would otherwise result in the issuance of a number of shares of New HB Common Equity (or New Warrants) that is not a whole number, the actual distribution of shares of New HB Common Equity (or New Warrants) shall be rounded as follows: (a) fractions of greater than one-half (1/2) shall be rounded to the next higher whole number and (b) fractions of one-half (1/2) or less than one-half (1/2) shall be rounded to the next lower whole number with no further payment therefor. The total number of authorized shares of New HB Common Equity (or New Warrants) to be distributed to Holders of Allowed Claims hereunder may be adjusted by the Debtors, with the consent of the Required Consenting HB First Lien Lenders, as necessary to account for the foregoing rounding.

No payment of fractional cents shall be made pursuant to the Plan, including to Holders of General Unsecured Claims or Unsecured Go-Forward Trade Claims. Whenever any payment of a fraction of a cent under the Plan would otherwise be required, the distribution shall reflect a rounding of such fraction to the nearest whole penny, rounded down to the next lower whole cent. Claimants whose aggregate distributions total less than $100 shall not be entitled to a distribution under the Plan.

c.  Undeliverable Distributions and Unclaimed Property

In the event that any distribution to any Holder of an Allowed Claim is returned as undeliverable, no further distributions shall be made to such Holder unless and until the Distribution Agent or the AQV Wind Down Co. Administrator, as applicable, is notified in writing of such Holder's then-current address or other necessary information for delivery, at which time such distribution shall be made to such Holder without interest; *provided* that such distributions on account of Allowed Claims shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of six (6) months from the later of (a) the Plan Effective Date and (b) the date of the distribution. After such date, all unclaimed property or interests in property shall revert to the Reorganized Hornblower Debtors or AQV Wind Down Co., as applicable, automatically and without need for a further Order by the Bankruptcy Court (notwithstanding any applicable federal, provincial, or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim or Interest of any Holder to such property or interest in property shall be discharged and forever barred. The Reorganized Debtors, Distribution Agent, and the AQV Wind Down Co. Administrator, as applicable, shall have no obligation to attempt to locate any Holder of an Allowed Claim other than by reviewing the Debtors' books and records and the Bankruptcy Court's filings.

Checks issued on account of Allowed Claims shall be null and void if not negotiated within ninety (90) calendar days from and after the date of first issuance thereof. Requests for reissuance of any check must be made directly and in writing to the Distribution Agent or the AQV Wind Down Co. Administrator, as applicable, by the Holder of the relevant Allowed Claim within the 90-calendar day period, as applicable. After such date, the relevant Allowed Claim (and any Claim for reissuance of the original check), as applicable, shall be automatically discharged and forever barred, and such funds shall revert to the Reorganized Debtors or the AQV Wind Down Co. Administrator, as applicable (notwithstanding any applicable federal, provincial, state or other jurisdiction escheat, abandoned, or unclaimed property laws to the contrary).

6.      **Manner of Payment**

At the option of the Distribution Agent or the AQV Wind Down Co. Administrator, as applicable, any Cash distribution to be made hereunder may be made by check, wire transfer, automated clearing house, or credit card, or as otherwise required or provided in applicable agreements.

7.      **No Postpetition Interest on Claims**

Unless otherwise specifically provided for herein or by Order of the Bankruptcy Court, including the DIP Orders, postpetition interest shall not accrue or be paid on Claims, and no Holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim or right. Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any Disputed Claim with respect to the period from the Plan Effective Date to the date a final distribution is made on account of such Disputed Claim, if and when such Disputed Claim becomes an Allowed Claim.

8.      **Compliance with Tax Requirements**

In connection with the Plan, to the extent applicable, the Debtors, the Reorganized Debtors, the Distribution Agent, or the AQV Wind Down Co. Administrator, as applicable, shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Body, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements.  Notwithstanding any provision in the Plan to the contrary, such parties shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distributions to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate.  The Debtors, the Reorganized Debtors, the Distribution Agent, or the AQV Wind Down Co. Administrator, as applicable, reserve the right to allocate all distributions made under the Plan in compliance with applicable wage garnishments, alimony, child support, and other spousal awards, liens, and encumbrances.

Notwithstanding any other provision of the Plan to the contrary, each Holder of an Allowed Claim that is to receive a distribution under the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed on such Holder by any Governmental Body, including income, withholding, and other tax obligations, on account of such distribution.

9.      **Allocations**

Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest.

10.     **Foreign Currency Exchange Rate**

Except as otherwise provided in a Bankruptcy Court Order, as of the Plan Effective Date, any Claim asserted in currency other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the exchange rate for the applicable currency as published in The Wall Street Journal, National Edition, as of the Petition Date.

11.     **Setoffs and Recoupment**

Except as expressly provided in the DIP Orders, the Confirmation Order, and the Plan, each Debtor, Reorganized Debtor, or the AQV Wind Down Co., as applicable, may, pursuant to section 553 of the Bankruptcy Code, set off and/or recoup against any payments or distributions to be made pursuant to the Plan on account of any Allowed Claim, any and all claims, rights, and Causes of Action that such Reorganized Debtor or the AQV Wind Down Co., as applicable, may hold against the Holder of such Allowed Claim; *provided* that neither the failure to effectuate a setoff or recoupment nor the allowance of any Claim hereunder shall constitute a waiver or release by a Debtor, Reorganized Debtor, the AQV Wind Down Co., or its applicable successor of any and all claims, rights, and Causes of Action that such Debtor, Reorganized Debtor, the AQV Wind Down Co., or its applicable successor may possess against the applicable Holder; *provided, further*, that nothing herein shall limit any rights of setoff or recoupment under the Exit Credit Documents with respect to matters occurring after the Plan Effective Date.  In no event shall any Holder of a Claim be entitled to set off any such Claim against any claim, right, or Causes of Action of the Debtors, Reorganized Debtors, or the AQV Wind Down Co., as applicable, unless such Holder has either obtained the consent of the Debtors, Reorganized Debtors, or the AQV Wind Down Co., as applicable, to such setoff, or has otherwise filed a motion with the Bankruptcy Court requesting the authority to perform such setoff on or before the Confirmation Date and a Final Order granting such motion has been entered, and notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to Section 553 of the Bankruptcy Code or otherwise.

12.     **Claims Paid or Payable by Third Parties**

a.     Claims Paid by Third Parties

The Debtors, Reorganized Debtors, or the AQV Wind Down Co., as applicable, shall reduce a Claim, and such Claim (or portion thereof) shall be Disallowed without a Claims objection having to be Filed and without any further notice to or action, Order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment on account of such Claim from a party that is not a Debtor, Reorganized Debtor, or the AQV Wind Down Co.  For the avoidance of doubt, Claims for the refund of customer deposits arising in connection with the AQV Wind Down will be satisfied from the proceeds of the AQV Debtors' surety bonds.  Subject to the last sentence of this paragraph, to the extent a Holder of a Claim receives a distribution on account of such Claim and also receives payment from a party that is not a Debtor, Reorganized Debtor, or the AQV Wind Down Co. on account of such Claim, such Holder shall, within fourteen (14) days of receipt thereof, repay or return the distribution to the applicable Reorganized Debtor or the AQV Wind Down Co., as applicable, to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any

such distribution under the Plan. The failure of such Holder to timely repay or return such distribution shall result in the Holder owing the applicable Reorganized Debtor or the AQV Wind Down Co., as applicable, annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the fourteen (14) day grace period specified above until the amount is repaid.

### b.   Claims Payable by Third Parties

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' or Reorganized Debtors' insurance policies and/or surety bonds, until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy and/or surety bond. To the extent that one or more of the Debtors' insurers or sureties agrees to satisfy in full or in part a Claim against any Debtor, then immediately upon such insurers' or sureties' agreement, the applicable portion of such Claim may be expunged without a Claims objection having to be Filed and without any further notice to or action, Order, or approval of the Bankruptcy Court.

### c.   Applicability of Insurance Policies

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy. Except as otherwise provided in the Plan or Confirmation Order, nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

### 13.   Antitrust and Foreign Investment Approvals

Any New HB Common Equity (or New Warrants) to be distributed under the Plan to an Entity required to obtain any Antitrust and Foreign Investment Approval shall not be distributed until all Antitrust and Foreign Investment Approvals applicable to such Entity have been obtained.

## H.   Release, Injunction, and Related Provisions

### 1.   Discharge of Claims and Termination of Interests

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, the Confirmation Order, or in any contract, instrument, or other agreement or document created pursuant to the Plan or the Confirmation Order, including the Plan Supplement and Definitive Documents, the distributions, rights, and treatments that are provided in the Plan and the Confirmation Order shall be in complete satisfaction, discharge, and release, effective as of the Plan Effective Date, of Claims (including Intercompany Claims that the Debtors resolve or compromise after the Plan Effective Date) against, Interests in, and Causes of Action against the Debtors, the Reorganized Debtors, or the AQV Wind Down Co., as applicable, of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against Liabilities of, Liens on, obligations of, rights against, and interests in, the Debtors or any of their assets or properties, regardless of whether any property

shall have been distributed or retained pursuant to the Plan or the Confirmation Order, on account of such Claims or Interests, including demands, Liabilities, and Causes of Action that arose before the Plan Effective Date, any contingent or non-contingent liability on account of representations or warranties issued on or before the Plan Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case, whether or not (1) a Proof of Claim based upon such debt or right is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code, (2) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code, or (3) the Holder of such a Claim or Interest has accepted the Plan.  Any default or "event of default" by the Debtors or Affiliates with respect to any Claim or Interest that existed immediately before or on account of the Filing of the Chapter 11 Cases shall be deemed cured (and no longer continuing) as of the Plan Effective Date.  The Confirmation Order shall be judicial determinations of the discharge of all Claims against, Causes of Action against, and Interests in the Debtors, the Reorganized Debtors, or the AQV Wind Down Co., as applicable, subject to the occurrence of the Plan Effective Date.

**2.      Release of Liens**

Except as otherwise specifically provided in the Plan, in any Definitive Document, or in any other contract, instrument, release, or other agreement or document amended or created pursuant to the Plan, including the Exit Credit Documents (including, in each case, in connection with any express written amendment of any mortgage, deed of trust, Lien, pledge, or other security interest under the Exit Credit Documents), subject to the distribution of the Plan consideration on account of Allowed Claims, on the Plan Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors or the AQV Wind Down Co., as applicable, and their successors and assigns, in each case, without any further approval or Order of the Bankruptcy Court and without any action or Filing being required to be made by the Debtors.  Any Holder of such a Secured Claim (and the applicable Agents for such Holder, if any) shall be authorized and directed, at the sole cost and expense of the Reorganized Debtors or the AQV Wind Down Co., as applicable, to release any collateral or other property of any Debtor (including any Cash Collateral and possessory collateral) held by such Holder (and the applicable Agents), and to take such actions as may be reasonably requested by the Reorganized Debtors or the AQV Wind Down Co., as applicable, (in each case, without recourse, representation, or warranty) to evidence the release of such Liens and/or security interests, including as required under the laws of other jurisdictions for non-U.S. security interests and including the execution, delivery, and filing or recording of such releases, and shall authorize the Reorganized Debtors or AQV Wind Down Co., as applicable, to file UCC-3 termination statements (to the extent applicable) with respect thereto.  The presentation or filing of the Confirmation Order or the Confirmation Recognition Order, as applicable, to or with any federal, state, provincial, or local agency, records office, or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.

To the extent that any Holder of a Secured Claim that has been satisfied or discharged in full pursuant to the Plan, or any Agent for such Holder, has filed or recorded publicly any Liens and/or security interests to secure such Holder's Secured Claim, then as soon as practicable on or after the Plan Effective Date, such Holder (or the Agent for such Holder) shall take any and all

steps requested by the Debtors, the Reorganized Debtors, or the AQV Wind Down Co., as applicable, that are necessary or desirable to record or effectuate the cancellation and/or extinguishment of such Liens and/or security interests (at the sole cost and expense of the Reorganized Debtors and without any recourse, representation, or warranty of any kind), including the making of any applicable filings or recordings, and the Reorganized Debtors or AQV Wind Down Co., as applicable, shall (a) pay the reasonable and documented fees and expenses of the applicable Agents, in each case including local and foreign counsel, to the extent payable under the DIP Credit Agreements, the First Lien Credit Agreement, the Incremental Superpriority Credit Agreement, the JBIH Credit Agreement, the Revolver Credit Agreement, or the Superpriority Credit Agreement, as applicable, in connection with the foregoing and (b) be entitled to make any such filings or recordings on such Holder's behalf.

**3.     Debtor Release**

Notwithstanding anything else contained herein to the contrary, to the fullest extent permitted by applicable law, pursuant to section 1123(b) of the Bankruptcy Code and Bankruptcy Rule 9019 and in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, on and after the Plan Effective Date, each Released Party is deemed to be, and hereby is conclusively, absolutely, unconditionally, irrevocably, finally, and forever released and discharged by each and all of the Debtors, the Reorganized Debtors, their Estates, and the AQV Wind Down Co., including any successors to the Debtors or any Estate's representative appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Claim or Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all Claims and Causes of Action, including any derivative Claims asserted or assertable on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, asserted or unasserted, matured or unmatured, liquidated or unliquidated, fixed or contingent, accrued or unaccrued, existing or hereafter arising, in law, equity, contract, tort, or otherwise, that the Debtors, the Reorganized Debtors, their Estates, or the AQV Wind Down Co. would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Cause of Action against, or Interest in, a Debtor or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Reorganized Debtors, or their Estates (including the Debtors' capital structure, management, ownership, assets, or operation thereof), the purchase, sale, or rescission of any Security of the Debtors or the Reorganized Debtors, the assertion or enforcement of rights and remedies against the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim, Causes of Action, or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions between or among a Debtor or an Affiliate of a Debtor and another Debtor or an Affiliate of a Debtor, the Chapter 11 Cases, the DIP Facilities, the First Lien Credit Agreement, the Incremental Superpriority Credit Agreement, the JBIH Credit Agreement, the Revolver Credit Agreement, the Superpriority Credit Agreement, the formulation, preparation, dissemination, negotiation, or Filing of the RSA, the Disclosure Statement, the Disclosure Statement Order, the Solicitation Materials, the Confirmation Order, the Confirmation Recognition Order, the Backstop Documents, the Rights Offering Documents, the DIP Documents, the Exit Credit Documents, the New HB Organizational Documents, the New JB Organizational Documents, the AQV Bidding Procedures Order, the AQV Sale Order, the Plan, the Plan

Supplement, or any aspect of the Restructuring Transactions, including the AQV Sale Transaction and any contract, instrument, release, or other agreement or document created or entered into in connection with the RSA, the DIP Facilities, the Disclosure Statement, the Backstop Commitment Agreement, the Rights Offering, the Exit Credit Documents, the Plan, the Plan Supplement, the Confirmation Order, the Confirmation Recognition Order, the Chapter 11 Cases, the Filing of the Chapter 11 Cases, the AQV Sale Transaction, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, any action or actions taken in furtherance of or consistent with the administration of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Plan Effective Date related or relating to any of the foregoing.

Notwithstanding anything contained herein to the contrary, the foregoing release does not release any post-Plan Effective Date obligations of any party or Entity under the Plan, any act occurring after the Plan Effective Date with respect to the Restructuring Transactions, the obligations arising under any Definitive Document to the extent imposing obligations arising after the Plan Effective Date (including those set forth in the Plan Supplement), or other document, instrument, or agreement executed to implement the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the terms by which matters are subject to a compromise and settlement, including the Debtor Releases in Article IX.C of the Plan, which includes by reference each of the related provisions and definitions contained in the Plan, and, further, shall constitute the Bankruptcy Court's finding that the Debtor Releases in Article IX.C of the Plan are: (1) essential to Confirmation of the Plan; (2) an exercise of the Debtors' business judgment; (3) in exchange for the good and valuable consideration provided by the Released Parties, including the Released Parties' contributions to facilitating the Restructuring Transactions and implementing the Plan; (4) a good-faith settlement and compromise of the Claims and Causes of Action released by the Debtor Releases in Article IX.C of the Plan; (5) in the best interests of the Debtors, their Estates, and all Holders of Claims and Interests; (6) fair, equitable, and reasonably given and made after due notice and opportunity for a hearing; and (7) a bar to any of the Debtors, the Reorganized Debtors, the Debtors' Estates, or the AQV Wind Down Co. asserting any Claim or Cause of Action released pursuant to the Debtor Releases in Article IX.C of the Plan.

4.    **Third-Party Release**

Except as otherwise expressly set forth in the Plan or the Confirmation Order, on and after the Plan Effective Date, pursuant to section 1123(b) of the Bankruptcy Code and Bankruptcy Rule 9019 and to the fullest extent permitted by applicable law, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is deemed to be, and hereby is conclusively, absolutely, unconditionally, irrevocably, finally, and forever released and discharged by each Releasing Party (in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Claim or Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities) from any and all Claims and Causes of Action, including any derivative Claims asserted or assertable on behalf of the Debtors, whether known or unknown, foreseen or unforeseen,

asserted or unasserted, matured or unmatured, liquidated or unliquidated, fixed or contingent, accrued or unaccrued, existing or hereafter arising, in law, equity, contract, tort, or otherwise that such Entity would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Cause of Action against, or Interest in, a Debtor based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the Debtors' capital structure, management, ownership, assets, or operation thereof), the purchase, sale, or rescission of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim, Causes of Action, or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions between or among a Debtor or an Affiliate of a Debtor and another Debtor or an Affiliate of a Debtor, the Chapter 11 Cases, the DIP Facilities, the First Lien Credit Agreement, the Incremental Superpriority Credit Agreement, the JBIH Credit Agreement, the Revolver Credit Agreement, the Superpriority Credit Agreement, the formulation, preparation, dissemination, negotiation, or Filing of the RSA, the Disclosure Statement, the Disclosure Statement Order, the Solicitation Materials, the Confirmation Order, the Confirmation Recognition Order, the Backstop Documents, the Rights Offering Documents, the DIP Documents, the Exit Credit Documents, the New HB Organizational Documents, the New JB Organizational Documents, the AQV Bidding Procedures Order, the AQV Sale Order, the Plan, the Plan Supplement, or any aspect of the Restructuring Transactions, including the AQV Sale Transaction and any contract, instrument, release, or other agreement or document created or entered into in connection with the RSA, the DIP Facilities, the Disclosure Statement, the Backstop Commitment Agreement, the Rights Offering, the Exit Credit Documents, the Plan, the Plan Supplement, the Confirmation Order, the Confirmation Recognition Order, the Chapter 11 Cases, the Filing of the Chapter 11 Cases, the AQV Sale Transaction, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, any action or actions taken in furtherance of or consistent with the administration of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Plan Effective Date related or relating to any of the foregoing.

Notwithstanding anything contained herein to the contrary, the foregoing release does not release (1) any post-Plan Effective Date obligations of any party or Entity under the Plan, any act occurring after the Plan Effective Date with respect to the Restructuring Transaction, the obligations arising under any Definitive Document to the extent imposing obligations arising after the Plan Effective Date (including those set forth in the Plan Supplement), or other document, instrument, or agreement executed to implement the Plan, (2) the rights of Holders of Allowed Claims to receive distributions under the Plan, (3) the rights of any current employee of the Debtors under any employment agreement or plan, or (4) the rights of the Debtors with respect to any confidentiality provisions or covenants restricting competition in favor of the Debtors under any employment agreement with a current or former employee of the Debtors.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the terms by which matters are subject to a compromise and settlement, including the Debtor Releases in Article IX.C of the Plan, which includes by reference each of the related provisions and definitions contained in the Plan, and, further, shall constitute the Bankruptcy Court's finding that the Third-Party Releases in Article IX.D of the Plan are:

(1) essential to Confirmation of the Plan; (2) in exchange for the good and valuable consideration provided by the Released Parties, including the Released Parties' contributions to facilitating the Restructuring Transactions and implementing the Plan; (3) a good-faith settlement and compromise of the Claims and Causes of Action released by the Third-Party Releases in Article IX.D of the Plan; (4) in the best interests of the Debtors and their Estates and all Holders of Claims and Interests; (5) fair, equitable, and reasonably given and made after due notice and opportunity for a hearing; and (6) a bar to any of the Releasing Parties asserting any Claim or Causes of Action released pursuant to the Third-Party Releases in Article IX.D of the Plan.

### 5. Exculpation

Except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur liability for, and each Exculpated Party is hereby released and exculpated from, any Causes of Action or Claim whether direct or derivative related to any act or omission in connection with, relating to, or arising out of the Chapter 11 Cases from the Petition Date to the Plan Effective Date, the formulation, preparation, dissemination, negotiation, or Filing of the RSA, the Disclosure Statement, the Disclosure Statement Order, the Solicitation Materials, the Confirmation Order, the Confirmation Recognition Order, the Backstop Documents, the Rights Offering Documents, the DIP Documents, the Exit Credit Documents, the New HB Organizational Documents, the New JB Organizational Documents, the AQV Bidding Procedures Order, the AQV Sale Order, the Plan, the Plan Supplement, or any transaction related to the Restructuring Transactions, including the AQV Sale Transaction and any contract, instrument, release, or other agreement or document created or entered into before or during the Chapter 11 Cases in connection with the Restructuring Transactions, any preference, fraudulent transfer, or other avoidance Claim arising pursuant to chapter 5 of the Bankruptcy Code or other applicable law, the Filing of the Chapter 11 Cases, the AQV Sale Transaction, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Plan Effective Date related or relating to any of the foregoing, except for Claims arising from any act or omission that is determined in a Final Order to have constituted willful misconduct, gross negligence, or actual fraud, but in all respects such Exculpated Parties shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan and the Confirmation Order.

The Exculpated Parties set forth above have, and upon Confirmation of the Plan shall be deemed to have, participated in good faith and in compliance with applicable law with respect to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not and shall not be liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

### 6. Injunction

Upon entry of the Confirmation Order, all Holders of Claims and Interests and other parties in interest, along with their respective present or former employees, agents, officers, directors, principals, and Affiliates, and each of their successors and assigns, shall be enjoined from taking

any actions to interfere with the implementation or Consummation of the Plan in relation to any Claim or Interest that is extinguished, discharged, or released pursuant to the Plan.

Except as otherwise expressly provided in the Plan or the Confirmation Order, or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities who have held, hold, or may hold Claims, Interests, or Causes of Action that have been released, discharged, or are subject to exculpation pursuant to Article IX.E of the Plan, are permanently enjoined, from and after the Plan Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, the AQV Wind Down Co., the Exculpated Parties, and/or the Released Parties:

a.  commencing, conducting, or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action;

b.  enforcing, levying, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or Order against such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action;

c.  creating, perfecting, or enforcing any Lien or encumbrance of any kind against such Entities or the property or the Estates of such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action;

d.  except as otherwise provided under the Plan, asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action unless such Holder has Filed a motion requesting the right to perform such setoff on or before the Plan Effective Date, and notwithstanding an indication of a Claim or Interest or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and

e.  commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action released or settled pursuant to the Plan or the Confirmation Order.

No Person or Entity may commence or pursue a Claim or Cause of Action of any kind against the Debtors, the Reorganized Debtors, the AQV Wind Down Co., the Exculpated Parties, or the Released Parties that relates to or is reasonably likely to relate to any act or omission in connection with, relating to, or arising out of a Claim or Causes of Action related to the Chapter 11 Cases prior to the Plan Effective Date, the formulation, preparation, dissemination, negotiation, or Filing of the RSA, the Disclosure Statement, the Backstop Commitment Agreement, the Rights Offering, the Exit Credit Documents, the Plan, the Plan Supplement, or any transaction related to the Restructuring Transactions, including the AQV Sale Transactions and any contract, instrument, release, or other agreement or document created or entered into before or during the Chapter 11 Cases in connection with the Restructuring Transactions, any preference, fraudulent transfer, or

other avoidance Claim arising pursuant to chapter 5 of the Bankruptcy Code or other applicable law, the Filing of the Chapter 11 Cases, the AQV Sale Transactions, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Plan Effective Date related or relating to any of the foregoing, without regard to whether such Person or Entity is a Releasing Party, without the Bankruptcy Court (1) first determining, after notice and a hearing, that such Claim or Causes of Action represents a colorable Claim of any kind and (2) specifically authorizing such Person or Entity to bring such Claim or Causes of Action against any such Debtor, Reorganized Debtor, the AQV Wind Down Co., Exculpated Party, or Released Party.

The Bankruptcy Court will have sole and exclusive jurisdiction to adjudicate the underlying colorable Claim or Causes of Action.

Notwithstanding anything to the contrary in the foregoing, the injunction does not enjoin any party under the Plan, the Confirmation Order, or under any other Definitive Document or other document, instrument, or agreement (including those attached to the Disclosure Statement or included in the Plan Supplement) executed to implement the Plan or the Confirmation Order, from bringing an action to enforce the terms of the Plan, the Confirmation Order, or such document, instrument, or agreement (including those attached to the Disclosure Statement or included in the Plan Supplement) executed to implement the Plan or the Confirmation Order.  The injunction in the Plan shall extend to any successors and assigns of the Debtors, the Reorganized Debtors, and the AQV Wind Down Co. and their respective property and interests in property.

### 7.    Waiver of Statutory Limitations on Releases

Each Releasing Party in each of the releases contained in the Plan expressly acknowledges that although ordinarily a general release may not extend to Claims that the Releasing Party does not know or suspect to exist in its favor, which if known by it may have materially affected its settlement with the party released, each Releasing Party has carefully considered and taken into account in determining to enter into the above releases the possible existence of such unknown losses or Claims.  Without limiting the generality of the foregoing, each Releasing Party expressly waives any and all rights conferred upon it by any statute or rule of law that provides that a release does not extend to Claims that the claimant does not know or suspect to exist in its favor at the time of executing the release, which if known by it may have materially affected its settlement with the Released Party.  The releases contained in the Plan are effective regardless of whether those released matters are presently known, unknown, suspected or unsuspected, or foreseen or unforeseen.

### 8.    Protection against Discriminatory Treatment

Consistent with section 525 of the Bankruptcy Code and the Supremacy Clause of the U.S. Constitution, all Entities, including Governmental Bodies, shall not discriminate against the Reorganized Debtors or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, or discriminate with respect to such a grant against the Reorganized Debtors, or another Entity with whom the Reorganized Debtors

have been associated, solely because each Debtor has been a debtor under chapter 11 of the Bankruptcy Code, may have been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases, but before the Debtors are granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

### 9.     Document Retention

On and after the Plan Effective Date, the Reorganized Debtors may maintain documents in accordance with their standard document retention policy, as may be altered, amended, modified, or supplemented by the Reorganized Debtors.

### 10.     Reimbursement or Contribution

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the time of Allowance or Disallowance, such Claim shall be forever Disallowed and expunged notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Confirmation Date: (1) such Claim has been adjudicated as non-contingent or (2) the relevant holder of a Claim has Filed a non-contingent Proof of Claim on account of such Claim and a Final Order has been entered prior to the Confirmation Date determining such Claim as no longer contingent.

## I.     Conditions Precedent to Consummation of The Plan

### 1.     Conditions Precedent to the Plan Effective Date

It shall be a condition to Consummation of the Plan that the following conditions shall have been satisfied or waived pursuant to the provisions of Article X.B of the Plan:

(a)     the RSA shall not have terminated as to any of the Initial Consenting Stakeholders (as defined in the RSA) and shall continue to be in full force and effect;

(b)     the DIP Orders shall not have been vacated, stayed, or modified without the prior written consent of the Required Lenders (as defined in the DIP Credit Agreements);

(c)     no Default or Event of Default (each as defined in the DIP Credit Agreements or DIP Order, as applicable) shall have occurred and be continuing under the DIP Credit Agreements or the DIP Order, as applicable, that has not been waived by the DIP Agents or cured by the Debtors in a manner consistent with the DIP Documents

(d)     all of the conditions precedent for consummation of the transactions contemplated by the Backstop Commitment Agreement shall have been satisfied or waived in accordance with the terms thereof;

(e)     the Bankruptcy Court shall have entered the Backstop Order in form and substance consistent in all material respects with the RSA and the consent rights contained therein, which shall not have been stayed, reversed, vacated, amended, supplemented, or otherwise modified, other than in accordance with the RSA;

(f)     the Backstop Commitment Agreement shall not have terminated as to all parties thereto and shall continue to be in full force and effect;

(g)     the Rights Offering shall have been consummated, including the issuance of all New HB Common Equity (or New Warrants) in accordance with the Plan;

(h)     all Restructuring Expenses, to the extent invoiced as provided herein at least two (2) Business Days before the Plan Effective Date, shall have been paid in full in cash in accordance with the terms and conditions set forth in the RSA, the DIP Orders, and the Backstop Order;

(i)     the Professional Fee Escrow shall have been established and funded with Cash in accordance with Article II.D.1 of the Plan;

(j)     the New HB Organizational Documents shall have been adopted in a manner consistent in all respects with the Plan and RSA and the consent rights contained therein;

(k)     all requisite filings with governmental authorities and third parties shall have become effective, and all such governmental authorities and third parties shall have approved or consented to the Restructuring Transactions, to the extent required;

(l)     the Debtors shall have implemented the Restructuring Transactions and all other transactions contemplated by the Plan and the RSA in a manner consistent in all material respects with the Plan and RSA;

(m)     the RSA Settlement and all actions contemplated thereby shall have been (or shall, contemporaneously with the occurrence of the Plan Effective Date, be) consummated in a manner consistent in all respects with the Plan and RSA;

(n)     all documents contemplated by the RSA to be executed and delivered on or before the Plan Effective Date shall have been executed and delivered;

(o)     the Exit Credit Documents shall have been executed and delivered and all conditions precedent to the effectiveness of the Exit Term Loans and Exit Revolver shall have been satisfied or waived in accordance with the Exit Credit Documents;

(p)     the final version of the Plan Supplement and all of the schedules, documents, and exhibits contained therein (and any amendment thereto) shall have been Filed in a manner consistent in all material respects with the RSA and the consent rights contained herein; and

(q)     the Bankruptcy Court shall have entered the Confirmation Order in form and substance consistent in all material respects with the RSA and the consent rights contained therein, which shall not have been stayed, reversed, vacated, amended, supplemented, or otherwise modified, other than in accordance with the RSA.

### 2.     Waiver of Conditions

Any condition to the Plan Effective Date set forth in Article X.A of the Plan may be waived, in whole or in part, by the Debtors, with the prior written consent of the Required Consenting HB First Lien Lenders and, to the extent required under the RSA, Crestview, without notice, leave, or Order of the Bankruptcy Court or any formal action other than proceedings to confirm or consummate the Plan; *provided* that the conditions to the Plan Effective Date contained in Articles X.A.J, L, and M of the Plan may only be waived with the prior written consent of the Consenting JBIH Lenders; *provided, further* that the condition set forth in Article X.A.I of the Plan may be waived only with the consent of the affected Professional(s).

### 3.     Substantial Consummation

"Substantial Consummation" of the Plan, as defined in 11 U.S.C. § 1101(2), shall be deemed to occur on the Plan Effective Date.

### 4.     Effect of Nonoccurrence of a Condition

If the Plan Effective Date does not occur, then: (1) the Plan will be null and void in all respects; and (2) nothing contained in the Plan, the Disclosure Statement, or the RSA shall: (a) constitute a waiver or release of any Claims, Interests, or Causes of Action by any Entity; (b) prejudice in any manner the rights of any Debtor or any other Entity; or (c) constitute an admission, acknowledgment, offer, or undertaking of any sort by any Debtor or any other Entity.

## J.     Modification, Revocation, or Withdrawal of the Plan

### 1.     Modification and Amendments

Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 (as well as those restrictions on modifications set forth in the Plan), the Debtors reserve the right to modify the Plan without additional disclosure pursuant to section 1125 of the Bankruptcy Code prior to the Confirmation Date and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not re-solicit votes on such modified Plan.  After the Confirmation Date and before substantial consummation of the Plan, the Debtors may initiate proceedings in the Bankruptcy Court pursuant to section 1127(b) of the Bankruptcy Code to remedy any defect or omission or reconcile any inconsistencies in the Plan, the Plan Supplement, the Disclosure Statement, or the Confirmation Order, relating to such matters as may be necessary to carry out the purposes and intent of the Plan.

After the Confirmation Date, but before the Plan Effective Date, the Debtors may make appropriate technical adjustments and modifications to the Plan (including the Plan Supplement) without further order or approval of the Bankruptcy Court; *provided* that such adjustments and modifications do not materially and adversely affect the treatment of Holders of Claims or Interests.

2.        **Effect of Confirmation on Modifications**

Entry of the Confirmation Order shall mean that all modifications or amendments to the Plan since the solicitation thereof in accordance are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or re-solicitation under Bankruptcy Rule 3019.

3.        **Revocation or Withdrawal of The Plan**

The Debtors reserve the right to revoke or withdraw the Plan before the Confirmation Date and to File subsequent plans of reorganization.  If the Debtors revoke or withdraw the Plan, or if Confirmation or Consummation does not occur, then, absent further order of the Bankruptcy Court: (1) the Plan shall be null and void in all respects; (2) any settlement or compromise not previously approved by Final Order of the Bankruptcy Court embodied in the Plan (including the fixing or limiting to an amount certain of the Claims or Interests or Classes of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan shall be deemed null and void; and (3) nothing contained in the Plan shall (a) constitute a waiver or release of any Claims or Interests; (b) prejudice in any manner the rights of such Debtor, any Holder, any Person, or any other Entity; or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by such Debtor, any Holder, any Person, or any other Entity.

**K.      Retention of Jurisdiction**

Notwithstanding the entry of the Confirmation Order and the occurrence of the Plan Effective Date, on and after the Plan Effective Date, the Bankruptcy Court shall retain jurisdiction over the Chapter 11 Cases and all matters arising out of, or related to, the Chapter 11 Cases, the Confirmation Order, and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

(a)        allow, disallow, determine, liquidate, classify, estimate, or establish the priority, Secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the Secured or unsecured status, priority, amount, or allowance of Claims or Interests;

(b)        decide and resolve all matters related to the granting and denying, in whole or in part, of any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code, the Confirmation Order, or the Plan;

(c)        resolve any matters related to:  (i) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is a party or with respect to which a Debtor may be liable in any manner and to hear, determine, and, if necessary, liquidate any Claims arising therefrom, including Cure Claims; (ii) any dispute regarding whether a contract or lease is or was executory, expired, or terminated; (iii) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; (iv) any other issue related

to any Executory Contracts and Unexpired Leases; or (v) any dispute regarding whether the Plan or any Restructuring Transactions trigger any cross-default or change of control provision in any contract or agreement;

(d) resolve any disputes concerning whether an Entity had sufficient notice of the Chapter 11 Cases, the Disclosure Statement, any solicitation conducted in connection with the Chapter 11 Cases, any bar date established in the Chapter 11 Cases, or any deadline for responding or objecting to any Cure Claim, in each case, for the purpose of determining whether a Claim or Interest is discharged hereunder or for any other purpose;

(e) ensure that distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Plan and adjudicate any and all disputes arising from or relating to distributions under the Plan or the Confirmation Order;

(f) adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Plan Effective Date;

(g) adjudicate, decide, or resolve any and all matters related to Causes of Action that may arise from or in connection with the Consummation, interpretation, or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

(h) adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

(i) enter and implement such Orders as may be necessary or appropriate to construe, execute, implement, or consummate the provisions of the Plan or the Confirmation Order and all contracts, instruments, releases, indentures, and other agreements or documents created or entered into in connection with the Plan, the Confirmation Order, or the Disclosure Statement;

(j) enter and enforce any Order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

(k) resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of the Plan or the Confirmation Order or any Entity's obligations incurred in connection with the Plan or the Confirmation Order and the administration of the Estates;

(l) hear and determine disputes arising in connection with the interpretation, implementation, effect, or enforcement of the Plan, the Plan Supplement, including disputes arising under agreements, documents, or instruments executed in connection with the Plan;

(m) issue injunctions, enter and implement other Orders, or take such other actions as may be necessary or appropriate in aid of execution, implementation, or

Consummation of the Plan or to restrain interference by any Entity with Consummation or enforcement of the Plan or the Confirmation Order;

(n)   resolve any matters related to the issuance of the New HB Common Equity (or New Warrants) or the incurrence of the Exit Term Loans and the Exit Revolver;

(o)   adjudicate, decide, or resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the settlements, compromises, discharges, releases, injunctions, exculpations, and other provisions contained in Article IX of the Plan, and enter such Orders as may be necessary or appropriate to implement such discharges, releases, injunctions, exculpations, and other provisions;

(p)   adjudicate, decide, or resolve any cases, controversies, suits, disputes or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim for amounts not timely repaid pursuant to Article VIII.L of the Plan;

(q)   enter and implement such Orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

(r)   determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order, the Plan Supplement, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan, or the Disclosure Statement, including the RSA; *provided* that the Bankruptcy Court shall not retain jurisdiction over disputes concerning documents contained in the Plan Supplement that have a jurisdictional, forum selection, or dispute resolution clause that refers disputes to a different court or arbitration forum;

(s)   adjudicate any and all disputes arising from or relating to distributions under the Plan or any transactions contemplated thereby;

(t)   consider any modifications of the Plan to cure any defect or omission or to reconcile any inconsistency in any Bankruptcy Court Order, including the Confirmation Order;

(u)   determine requests for the payment of Claims entitled to priority pursuant to section 507 of the Bankruptcy Code;

(v)   adjudicate, decide, or resolve disputes as to the ownership of any Claim or Interest;

(w)   adjudicate, decide, or resolve all matters related to any subordinated Claim;

(x)   adjudicate, decide, or resolve matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

(y)     grant any consensual request to extend the deadline for assuming or rejecting unexpired leases pursuant to section 365(d)(4) of the Bankruptcy Code;

(z)     enforce all Orders entered by the Bankruptcy Court in connection with the Chapter 11 Cases;

(aa)    hear any other matter not inconsistent with the Bankruptcy Code;

(bb)    enter an Order concluding or closing any or all of the Chapter 11 Cases;

(cc)    enforce all orders, judgments, injunctions, releases, exculpations, indemnifications, and rulings entered in connection with the Chapter 11 Cases with respect to any Person or Entity, and resolve any cases, controversies, suits, or disputes that may arise in connection with any Person or Entity's rights arising from or obligations incurred in connection with the Plan; and

(dd)    hear and determine all disputes involving the existence, nature, scope, or enforcement of any exculpations, discharges, injunctions, and releases granted in the Plan, including under Article IX of the Plan.

Nothing herein limits the jurisdiction of the Bankruptcy Court to interpret and enforce the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan, the Plan Supplement, or the Disclosure Statement, without regard to whether the controversy with respect to which such interpretation or enforcement relates may be pending in any state or other federal court of competent jurisdiction.

If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising in, arising under, or related to the Chapter 11 Cases, including the matters set forth in Article XII of the Plan, the provisions of Article XII of the Plan shall have no effect on and shall not control, limit, or prohibit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

Unless otherwise specifically provided herein or in a prior Order of the Bankruptcy Court, the Bankruptcy Court shall have exclusive jurisdiction to hear and determine disputes concerning Claims against or Interests in the Debtors that arose prior to the Plan Effective Date.

As of the Plan Effective Date, notwithstanding anything in Article XII of the Plan to the contrary, the Bankruptcy Court's retention of jurisdiction pursuant to the Plan shall not govern the enforcement or adjudication of any rights or remedies with respect to or as provided in the Exit Credit Documents, and the jurisdictional provisions of such documents shall control.

## L.     **Miscellaneous Provisions**

### 1.     **Immediate Binding Effect**

Subject to Article X.A of the Plan and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Plan Effective Date, the terms of the Plan and the final versions of the documents contained in the Plan Supplement shall be

immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors, and the AQV Wind Down Co., as applicable, any and all Holders of Claims or Interests (regardless of whether their Claims or Interests are deemed to have accepted or rejected the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan or the Confirmation Order, each Entity acquiring property under the Plan or the Confirmation Order, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.  All Claims and Interests shall be as fixed, adjusted, or compromised, as applicable, pursuant to the Plan and the Confirmation Order, regardless of whether any such Holder of a Claim or Interest has voted on the Plan.

### 2.      Waiver of Stay

The requirements under Bankruptcy Rule 3020(e) that an order confirming a plan is stayed until the expiration of fourteen days after entry of the order shall be waived by the Confirmation Order.  The Confirmation Order shall take effect immediately and shall not be stayed pursuant to the Bankruptcy Code, Bankruptcy Rules 3020(e), 6004(h), 6006(d), or 7062 or otherwise.

### 3.      Additional Documents

On or before the Plan Effective Date, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan and the Confirmation Order.  The Debtors, the Reorganized Debtors, and the AQV Wind Down Co., as applicable, and all Holders of Allowed Claims receiving distributions pursuant to the Plan and the Confirmation Order and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan and the Confirmation Order.

### 4.      Reservation of Rights

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court enters the Confirmation Order, and the Confirmation Order shall have no force or effect if the Plan Effective Date does not occur.  None of the Filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Debtor or any other Entity with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor or any Entity unless and until the Plan Effective Date has occurred.

### 5.      Successors and Assigns

The rights, benefits, and obligations of any Entity named or referred to in the Plan or the Confirmation Order shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign, Affiliate, officer, director, manager, agent, representative, attorney, beneficiary, or guardian, if any, of each Entity.

6. **Notices**

To be effective, all notices, requests, and demands to or upon the Debtors shall be in writing (including by facsimile transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

1. If to the Debtors, the Reorganized Hornblower Debtors, or the AQV Wind Down Co.:

Hornblower Holdings LLC
Pier 3 on The Embarcadero
San Francisco, CA 94111

Attention:    Jonathan Hickman, Chief Restructuring Officer
Email:         jhickman@alvarezandmarsal.com

With copies (which shall not constitute notice) to:

Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, NY 10019-6064

Attention:    Jacob A. Adlerstein, Kyle J. Kimpler, Sarah Harnett,
               and Neda Davanipour
Email:         jadlerstein@paulweiss.com; kkimpler@paulweiss.com;
               sharnett@paulweiss.com; ndavanipour@paulweiss.com

        - and -

Porter Hedges LLP
1000 Main St., 36th Floor
Houston, TX 77002

Attention:    John F. Higgins, M. Shane Johnson, and Megan Young-John
Email:         jhiggins@porterhedges.com; sjohnson@porterhedges.com;
               myoung-john@porterhedges.com

2. If to a Consenting Term Lender (as defined in the RSA), or a transferee thereof: To the address set forth below the Consenting Term Lender's signature page to the RSA (or as directed by any transferee thereof), as the case may be.

With copies (which shall not constitute notice) to:

Milbank LLP
55 Hudson Yards
New York, NY 10001

Attention:    Evan Fleck, Matthew Brod, and Justin Cunningham
Email:        efleck@milbank.com; mbrod@milbank.com; jcunnin1@milbank.com

3.    <u>If to Crestview:</u>

To the address set forth below Crestview's signature page to the RSA.

With copies (which shall not constitute notice) to:

Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, NY 10017

Attention:    Brian M. Resnick, Adam L. Shpeen, and David Kratzer
Email:        brian.resnick@davispolk.com; adam.shpeen@davispolk.com;
             david.kratzer@davispolk.com

After the Plan Effective Date, the Reorganized Debtors and the AQV Wind Down Co. have the authority to send a notice to Entities that, to continue to receive documents pursuant to Bankruptcy Rule 2002, they must File a renewed request to receive documents pursuant to Bankruptcy Rule 2002. After the Plan Effective Date, the Debtors, the Reorganized Debtors, and the AQV Wind Down Co. are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have Filed such renewed requests.

**7.    Term of Injunctions or Stays**

Unless otherwise provided in the Plan or the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to section 105 or 362 of the Bankruptcy Code or any Order of the Bankruptcy Court, and existing on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Plan Effective Date. All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

**8.    Entire Agreement**

Except as otherwise indicated, the Plan, the Confirmation Order, the applicable Definitive Documents, the Plan Supplement, and documents related thereto supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan, the Confirmation Order, the Definitive Documents, the Plan Supplement, and documents related thereto.

**9.    Exhibits**

All exhibits and documents included in the Plan, the Confirmation Order, and the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan. After the exhibits and documents are Filed, copies of such exhibits and documents shall be available

upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the website maintained by the Debtors' Notice and Claims Agent, at https://omniagentsolutions.com/Hornblower, or at the Bankruptcy Court's website at http://www.txs.uscourts.gov/.

### 10.   Deemed Acts

Subject to and conditioned on the occurrence of the Plan Effective Date, whenever an act or event is expressed under the Plan to have been deemed done or to have occurred, it shall be deemed to have been done or to have occurred without any further act by any party by virtue of the Plan and the Confirmation Order.

### 11.   Severability of Plan Provisions

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Debtors, may alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted; *provided* that any such alteration or interpretation shall be consistent with the RSA and the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the consent of the Debtors, the Reorganized Debtors, or the AQV Wind Down Co., as applicable; and (3) non-severable and mutually dependent.

### 12.   Votes Solicited in Good Faith

Upon entry of the Confirmation Order, each of the Released Parties and Exculpated Parties will be deemed to have acted in "good faith" within the meaning of section 1125(e) of the Bankruptcy Code and in compliance with the applicable provisions of the Bankruptcy Code and in a manner consistent with the Disclosure Statement, the Plan, the Bankruptcy Code, the Bankruptcy Rules, and all other applicable rules, laws, and regulations in connection with all of their respective activities relating to support and consummation of the Plan, including the negotiation, execution, delivery, and performance of the RSA and are entitled to the protections of section 1125(e) of the Bankruptcy Code and all other applicable protections and rights provided in the Plan. Without limiting the generality of the foregoing, upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code and other applicable law, and, pursuant to section 1125(e) of the Bankruptcy Code, any person will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of Securities offered and sold under the Plan or the Rights Offering, and, therefore, none of such parties or individuals or the Reorganized Debtors or the AQV Wind Down Co., as applicable, will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan

or the offer, issuance, sale, or purchase of the Securities offered and sold under the Plan and the Rights Offering.

### 13.    Request for Expedited Determination of Taxes

The Debtors shall have the right to request an expedited determination under section 505(b) of the Bankruptcy Code with respect to tax returns filed, or to be filed, for any and all taxable periods ending after the *Petition Date* through the Plan Effective Date.

### 14.    No Waiver or Estoppel

Upon the Plan Effective Date, each Holder of a Claim or Interest shall be deemed to have waived any right to assert that its Claim or Interest should be Allowed in a certain amount, in a certain priority, be secured, or not be subordinated by virtue of an agreement made with the Debtors and/or their counsel, or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, or papers filed with the Bankruptcy Court prior to the Confirmation Date.

### 15.    Dissolution of the Creditors' Committee and Cessation of Fee and Expense Payment

On the Plan Effective Date, the Creditors' Committee and any other statutory committee appointed in the Chapter 11 Cases shall dissolve automatically and the members thereof shall be released and discharged from all rights and duties arising from, or related to, the Chapter 11 Cases, except with respect to final fee applications of the Professionals.  The Reorganized Debtors shall not be responsible for paying any fees or expenses incurred by the members of or advisors to the Creditors' Committee or any other statutory committee appointed in the Chapter 11 Cases after the Plan Effective Date.

### 16.    Closing of Chapter 11 Cases

Upon the occurrence of the Plan Effective Date, the Reorganized Debtors shall be permitted to (1) close all of the Chapter 11 Cases except for one of the Chapter 11 Cases as determined by the Reorganized Debtors, and all contested matters relating to each of the Debtors, including objections to Claims, shall be administered and heard in such Chapter 11 Case and (2) change the name of the remaining Debtor and case caption of the remaining open Chapter 11 Case as desired, in the Reorganized Debtors' sole discretion.

### 17.    Creditor Default

An act or omission by a Holder of a Claim or an Interest in contravention of the provisions of the Plan shall be deemed an event of default under the Plan.  Upon an event of default, the Reorganized Debtors or the AQV Wind Down Co. may seek to hold the defaulting party in contempt of the Confirmation Order and may be entitled to reimbursement for their reasonable attorneys' fees and costs incurred in remedying such default.  Upon the finding of such a default by a Holder of a Claim or Interest, the Bankruptcy Court may:  (1) designate a party to appear, sign, and/or accept the documents required under the Plan on behalf of the defaulting party, in accordance with Bankruptcy Rule 7070; (2) enforce the Plan by order of specific performance;

(3) award judgment against such defaulting Holder of a Claim or Interest in favor of the Reorganized Debtor or the AQV Wind Down Co., as applicable, in an amount, including interest, to compensate the Reorganized Debtors for the damages caused by such default; and (4) make such other Order as may be equitable that does not materially alter the terms of the Plan.

## ARTICLE VII.
## VALUATION OF THE REORGANIZED DEBTORS

In conjunction with formulating the Plan and satisfying its obligations under section 1129 of the Bankruptcy Code, the Debtors determined that it was necessary to estimate the post-confirmation going-concern value of the Debtors, which estimate is attached to this Disclosure Statement as **Exhibit D** (the "Valuation Analysis"). The Valuation Analysis should be considered in conjunction with the risk factors discussed in Section X of this Disclosure Statement, entitled "Certain Risk Factors to be Considered," and the Financial Projections. The Valuation Analysis is dated as of [●], 2024, and is based on data and information as of that date. The Valuation Analysis is subject to various important qualifiers and assumptions that are set forth in **Exhibit D**, and Holders of Claims and Interests should carefully review the information in **Exhibit D** in its entirety. The Debtors believe that the Valuation Analysis demonstrates that the Plan is "fair and equitable" to the non-accepting classes. This valuation is not, and is not to be construed as, (1) a recommendation to any Holder of Claims as to how to vote on, or otherwise act with respect to, the Plan, (2) an opinion as to the fairness from a financial point of view of the consideration to be received pursuant to the Restructuring Transactions, or (3) an appraisal of the assets of the Reorganized Debtors.

## ARTICLE VIII.
## TRANSFER RESTRICTIONS AND
## CONSEQUENCES UNDER FEDERAL SECURITIES LAWS

No registration statement will be filed under the Securities Act or pursuant to any state securities laws with respect to the offer and distribution of New HB Common Equity, New Warrants (if any), and Subscription Rights under or in connection with the Plan. The Debtors believe that the provisions of section 1145(a)(1) of the Bankruptcy Code and/or section 4(a)(2) of, or Regulation D under, the Securities Act will exempt the offer, issuance and distribution of the New HB Common Equity, New Warrants (if any), and the Subscription Rights (and New HB Common Equity (or New Warrants) issuable upon exercise thereof) issued under or in connection with the Plan on account of Allowed Claims from federal and state securities registration requirements. The Debtors believe that the New HB Common Equity (or New Warrants) that will be issued to the Holders of Allowed HB First Lien Claims on account of their Allowed HB First Lien Claims and the Commitment Parties on account of the Backstop Commitment Premium under the Backstop Commitment Agreement will be issued under section 1145(a)(1) of the Bankruptcy Code. The New HB Common Equity (or New Warrants) issued to affiliates of the Company will be treated as issued pursuant to section 1145(a)(1), but will be subject to the restrictions on resale of securities held by affiliates of an issuer. The offer (to the extent applicable), issuance and distribution of the remaining New HB Common Equity, New Warrants (if any), and the Subscription Rights (and New HB Common Equity (or New Warrants) issuable upon exercise thereof) issued under or in connection with the Plan shall be exempt from registration under the Securities Act pursuant to Section 4(a)(2) thereof and/or Regulation D thereunder. To the extent

issued and distributed in reliance on Section 4(a)(2) of the Securities Act or Regulation D thereunder, such securities will be "restricted securities" subject to resale restrictions and may be resold, exchanged, assigned or otherwise transferred only pursuant to registration, or an applicable exemption from registration under the Securities Act and other applicable law. Persons to whom the New HB Common Equity (or New Warrants) is issued are also subject to restrictions on resale to the extent they are deemed an "issuer," an "underwriter," or a "dealer" with respect to such New HB Common Equity (or New Warrants), as further described below.  In addition to the restrictions referred to below, holders of such securities will also be subject to the transfer restrictions contained in the terms thereof, as well as in any New Stockholders' Agreement or similar agreement.

A.    <u>1145 Securities</u>

1.    **Issuance**

The Plan provides for the offer, issuance, sale, or distribution of New HB Common Equity (or New Warrants) that will be issued to the Holders of Allowed HB First Lien Claims on account of their Allowed HB First Lien Claims and the Commitment Parties on account of the Backstop Commitment Premium under the Backstop Commitment Agreement (such New HB Common Equity or New Warrants (if any), the  "<u>Section 1145 Securities</u>").  The offer, issuance, sale, or distribution of the Section 1145 Securities by the Debtors will be exempt from, among other things, the registration requirements of Section 5 of the Securities Act and any other applicable U.S. state or other law requiring registration prior to the offering, issuance, distribution, or sale of securities in accordance with, and pursuant to, section 1145 of the Bankruptcy Code, except with respect to an entity that is an "underwriter", as defined in section 1145(b) of the Bankruptcy Code (as further discussed below).

Section 1145(a)(1) of the Bankruptcy Code exempts the offer and sale of securities under a plan of reorganization from registration under Section 5 of the Securities Act and state or local securities laws if three principal requirements are satisfied:  (i) the securities must be offered and sold under a plan of reorganization and must be securities issued by the debtor, an affiliate participating in a joint plan with the debtor, or a successor to the debtor under the plan; (ii) the recipients of the securities must hold prepetition or administrative expense claims against the debtor or interests in the debtor; and (iii) the securities must be issued entirely in exchange for the recipient's claim against or interest in the debtor, or "principally" in exchange for such claim or interest and "partly" for cash or property.

The offer, issuance and distribution under the Plan to Commitment Parties of shares of New HB Common Equity (or New Warrants) in respect of the Backstop Commitment Premium payable by the Debtors under the Backstop Commitment Agreement will be exempt under Section 1145(a)(1) of the Bankruptcy Code as being issued entirely in exchange for administrative claims against the Debtors and therefore exempt under Section 1145(a)(1) of the Bankruptcy Code.

2.    **Subsequent Transfers**

The Section 1145 Securities may be freely transferred by recipients following the initial issuance under the Plan, and all resales and subsequent transfers of the Section 1145 Securities are

exempt from registration under the Securities Act and state securities laws, unless the Holder is an "underwriter" with respect to such securities, as defined in section 1145(b) of the Bankruptcy Code.  Section 1145(b) of the Bankruptcy Code defines four types of "underwriters", excluding, in each case, with respect to ordinary trading transactions of an entity that is not an issuer:

i.     a person (as defined in section 101(41) of the Bankruptcy Code, a "Person") who purchases a claim against, an interest in, or a claim for an administrative expense against the debtor with a view to distributing any security received in exchange for such claim or interest;

ii.    a Person who offers to sell securities offered or sold under a plan for the holders of such securities;

iii.   a Person who offers to buy securities offered or sold under a plan from the holders of such securities, if the offer to buy is:

     a.     with a view to distributing such securities; and

     b.     under an agreement made in connection with the plan, the consummation of the plan, or with the offer or sale of securities under the plan; and

iv.    a Person who is an "issuer", which includes affiliates of the issuer, defined as persons who are in a relationship of "control" with the issuer (as used in in Section 2(a)(11) of the Securities Act) with respect to the securities.

Under Section 2(a)(11) of the Securities Act, an "issuer" includes any Person directly or indirectly controlling or controlled by the issuer, or any Person under direct or indirect common control of the issuer (or is an "affiliate" of the Reorganized Debtors as defined in Rule 144(a)(1) under the Securities Act).

To the extent that Persons who receive Section 1145 Securities pursuant to the Plan and the Confirmation Order are deemed to be underwriters under section 1145(b) of the Bankruptcy Code, resales by such Persons would not be exempted from registration under the Securities Act or other applicable Law by section 1145 of the Bankruptcy Code.  Persons deemed to be underwriters under section 1145(b) of the Bankruptcy Code may, however, be permitted to resell such Section 1145 Securities without registration pursuant to and in accordance with the provisions of Rule 144 under the Securities Act, which is described in Article IV.F.1 of the Plan, or another available exemption under the Securities Act.  In addition, such Persons will also be entitled to resell their Section 1145 Securities in transactions registered under the Securities Act following the effectiveness of a registration statement.

Holders of Section 1145 Securities who are deemed underwriters may be able to resell Section 1145 Securities pursuant to the limited safe harbor resale provision under Rule 144 of the Securities Act.  Generally, Rule 144 would permit the public sale of securities received by such Person if, at the time of the sale, certain current public information regarding the issuer is available, and only if such Person also complies with the volume, manner of sale, and notice requirements of Rule 144.  If the issuer is not subject to the reporting requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), adequate current public

information as specified under Rule 144 is available if certain company information is made publicly available, as specified in Section (c)(2) of Rule 144. The debtors expect that, after the Effective Date, the issuer of the New HB Common Equity will not be subject to the reporting requirements under Section 13 or 15(d) of the Exchange Act.

Whether or not any particular Person would be deemed to be an underwriter with respect to the Section 1145 Securities or other security to be issued pursuant to the Plan and the Confirmation Order would depend upon various facts and circumstances applicable to that Person. Accordingly, the Debtors express no view as to whether any particular Person receiving Section 1145 Securities or other securities under the Plan and the Confirmation Order would be an underwriter with respect to such Section 1145 Securities or other securities, whether such Person may freely resell such securities or the circumstances under which they may resell such securities.

Notwithstanding the foregoing, the Section 1145 Securities will be subject to any applicable transfer restrictions in the New Stockholders' Agreement, if any.

**B.    Section 4(a)(2) Securities**

**1.    Issuance**

Section 4(a)(2) of the Securities Act provides that the issuance of securities by an issuer in transactions not involving a public offering is exempt from registration under the Securities Act. Rule 506 of Regulation D is a non-exclusive safe harbor from registration promulgated by the SEC under Section 4(a)(2) of the Securities Act.

The Plan provides for the offer, issuance, sale, or distribution of New HB Common Equity, New Warrants (if any), and the Subscription Rights (and New HB Common Equity (or New Warrants) issuable upon exercise thereof) (such Subscription Rights and New HB Common Equity or New Warrants (if any), other than in respect of the Backstop Commitment Premium, the "4(a)(2) Securities"). The Debtors believe that the offer, issuance, sale, or distribution of the 4(a)(2) Securities are issuable without registration under the Securities Act in reliance upon the exemption from registration provided under Section 4(a)(2) of the Securities Act and/or Rule 506 of Regulation D promulgated thereunder, and similar registration exemptions applicable outside of the United States. The 4(a)(2) Securities will be subject to resale restrictions and may be resold, exchanged, assigned, or otherwise transferred only pursuant to registration, or an applicable exemption from registration, under the Securities Act and other applicable Law, as described below.

**2.    Subsequent Transfers**

The 4(a)(2) Securities will be deemed "restricted securities" (as defined in Rule 144(a)(3) of the Securities Act), will bear customary legends and transfer restrictions and may not be offered, sold, exchanged, assigned, or otherwise transferred unless they are registered under the Securities Act, or an exemption from registration under the Securities Act is available. If in the future a Holder of 4(a)(2) Securities decides to offer, resell, pledge or otherwise transfer any 4(a)(2) Securities, such 4(a)(2) Securities may be offered, resold, pledged or otherwise transferred only (i) in the United States to a person whom the seller reasonably believes is a qualified institutional buyer (as defined in Rule 144A promulgated under the Securities Act ("Rule 144A")) in a

transaction meeting the requirements of Rule 144A, (ii) outside the United States in a transaction complying with the provisions of Rule 904 under the Securities Act, (iii) pursuant to an exemption from registration under the Securities Act (including the exemption provided by Rule 144) (to the extent the exemption is available), or (iv) pursuant to an effective registration statement or under an available exemption from the registration requirements of the Securities Act, in each of cases (i)-(iv) in accordance with any applicable securities laws of any state of the United States. Such Holder will, and each subsequent Holder is required to, notify any subsequent acquiror of the 4(a)(2) Securities from it of the resale restrictions referred to above.

Rule 144 provides a limited safe harbor for the resale of restricted securities (such that the seller is not deemed an "underwriter") if certain conditions are met. These conditions vary depending on whether the seller of the restricted securities is an "affiliate" of the issuer. Rule 144 defines an affiliate as "a person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such issuer."

A non-affiliate of an issuer that is not subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act and who has not been an affiliate of the issuer during the ninety (90) days preceding such sale may resell restricted securities pursuant to Rule 144 after a one-year holding period whether or not there is current public information regarding the issuer available and without compliance with the volume, manner of sale, and notice requirements described below.

An affiliate of an issuer that is not subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act may resell restricted securities after the one-year holding period if at the time of the sale certain current public information regarding the issuer is available. An affiliate must also comply with the volume, manner of sale, and notice requirements of Rule 144. *First*, the rule limits the number of restricted securities (plus any unrestricted securities) sold for the account of an affiliate (and related persons) in any three-month period to the greater of 1% of the outstanding securities of the same class being sold, or, if the class is listed on a stock exchange, the average weekly reported volume of trading in such securities during the four weeks preceding the filing of a notice of proposed sale on Form 144 or if no notice is required, the date of receipt of the order to execute the transaction by the broker or the date of execution of the transaction directly with a market maker. (In the case of debt securities, the amount of debt securities sold for the account of an affiliate in any three-month period may not exceed the greater of the limitation set forth in the preceding sentence or 10% of the principal amount of the applicable tranche of debt securities.) *Second*, the manner of sale requirement provides that the restricted securities must be sold in a broker's transaction, directly with a market maker or in a riskless principal transaction (as defined in Rule 144). *Third*, if the amount of securities sold under Rule 144 in any three-month period exceeds 5,000 shares or other units or has an aggregate sale price greater than $50,000, an affiliate must file or cause to be filed with the SEC three copies of a notice of proposed sale on Form 144 and provide a copy to any exchange on which the securities are traded.

The Debtors believe that the Rule 144 exemption will not be available with respect to any 4(a)(2) Securities (whether held by non-affiliates or affiliates) until at least one year after the Effective Date. Accordingly, unless transferred pursuant to an effective registration statement or another available exemption from the registration requirements of the Securities Act, non-affiliate Holders of 4(a)(2) Securities will be required to hold their 4(a)(2) Securities for at least one year

and, thereafter, to sell them only in accordance with the applicable requirements of Rule 144, pursuant to an effective registration statement or pursuant to another available exemption from the registration requirements of applicable securities laws. The debtors expect that, after the Effective Date, the issuer of the New HB Common Equity will not be subject to the reporting requirements under Section 13 or 15(d) of the Exchange Act.

Each certificate representing, or issued in exchange for or upon the transfer, sale or assignment of, any 4(a)(2) Security shall, upon issuance, be stamped or otherwise imprinted with a restrictive legend substantially consistent with the following form:

> THE SECURITIES REPRESENTED BY THIS CERTIFICATE WERE ORIGINALLY ISSUED ON [DATE OF ISSUANCE], HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR ANY OTHER APPLICABLE STATE SECURITIES LAWS, AND MAY NOT BE SOLD OR TRANSFERRED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR AN AVAILABLE EXEMPTION FROM REGISTRATION THEREUNDER.

The Reorganized Debtors reserve the right to require certification, legal opinions or other evidence of compliance with Rule 144 as a condition to the removal of such legend or to any resale of the 4(a)(2) Securities. The Reorganized Debtors also reserve the right to stop the transfer of any 4(a)(2) Securities if such transfer is not in compliance with Rule 144, pursuant to an effective registration statement or pursuant to another available exemption from the registration requirements of applicable securities laws. All persons who receive 4(a)(2) Securities will be required to acknowledge and agree that (i) they will not offer, sell or otherwise transfer any 4(a)(2) Securities except in accordance with an exemption from registration, including under Rule 144 under the Securities Act, if and when available, or pursuant to an effective registration statement, and (ii) the 4(a)(2) Securities will be subject to the other restrictions described above.

In addition to the foregoing restrictions, the 4(a)(2) Securities will also be subject to any applicable transfer restrictions in the New Stockholders' Agreement, if any.

BECAUSE OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A PARTICULAR PERSON MAY BE AN UNDERWRITER OR AN AFFILIATE AND THE HIGHLY FACT-SPECIFIC NATURE OF THE AVAILABILITY OF EXEMPTIONS FROM REGISTRATION UNDER THE SECURITIES ACT, INCLUDING THE EXEMPTIONS AVAILABLE UNDER SECTION 1145 OF THE BANKRUPTCY CODE AND RULE 144 UNDER THE SECURITIES ACT, NONE OF THE DEBTORS MAKE ANY REPRESENTATION CONCERNING THE ABILITY OF ANY PERSON TO DISPOSE OF THE SECURITIES TO BE ISSUED UNDER OR OTHERWISE ACQUIRED PURSUANT TO THE PLAN AND THE CONFIRMATION ORDER.

THE DEBTORS RECOMMEND THAT POTENTIAL RECIPIENTS OF THE SECURITIES TO BE ISSUED UNDER OR OTHERWISE ACQUIRED PURSUANT TO THE PLAN AND THE CONFIRMATION ORDER CONSULT THEIR OWN COUNSEL CONCERNING WHETHER THEY MAY FREELY TRADE SUCH SECURITIES AND THE CIRCUMSTANCES UNDER WHICH THEY MAY RESELL SUCH SECURITIES.

## ARTICLE IX.
## CERTAIN UNITED STATES FEDERAL
## INCOME TAX CONSEQUENCES OF THE PLAN

**A.** **Introduction**

The following discussion summarizes certain U.S. federal income tax consequences of the implementation of the Plan to the Debtors, the Reorganized Debtors, and certain Holders of Allowed Claims. This summary is based on the U.S. Internal Revenue Code of 1986, as amended (the "Tax Code"), the U.S. Treasury regulations promulgated thereunder ("Treasury Regulations") and administrative and judicial interpretations and practice, all as in effect on the date of this Disclosure Statement and all of which are subject to change, with possible retroactive effect. Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below. No opinion of counsel has been sought or obtained with respect to the tax consequences of the Plan described herein. The Debtors have not requested, and do not intend to request, any ruling or determination from the U.S. Internal Revenue Service ("IRS") or any other taxing authority with respect to the tax consequences discussed herein, and the discussion below is not binding upon the IRS or the courts. No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.

This summary does not address all aspects of U.S. federal income taxation that may be relevant to a Holder of an Allowed Claim in light of its individual circumstances or to a Holder that may be subject to special tax rules, such as Persons who are related to the Debtors within the meaning of the Tax Code, broker-dealers, banks, mutual funds, insurance companies, financial institutions, thrifts, real estate investment trusts, retirement plans, individual retirement and other tax-deferred accounts, small business investment companies, regulated investment companies, tax-exempt entities, trusts, governmental authorities or agencies, dealers and traders in securities, subchapter S corporations, partnerships or other entities treated as pass-through vehicles for U.S. federal income tax purposes, controlled foreign corporations, passive foreign investment companies, U.S. Holders (as defined below) whose functional currency is not the U.S. dollar, persons who received their Claims as compensation, non-U.S. Holders (as defined below) that own, actually or constructively, ten percent or more of the total combined voting power of all classes of stock of Holdings, dealers in securities or foreign currencies, U.S. expatriates, persons who hold Claims, or who will hold their recoveries under the Plan, as part of a straddle, hedge, conversion transaction, or other integrated investment, persons using a mark-to-market method of accounting, Holders of Claims who are themselves in bankruptcy and Holders that prepare an "applicable financial statement" (as defined in section 451 of the Tax Code).

Additionally, this discussion does not address the implications of any alternative minimum tax, the base erosion and anti-abuse tax, or the "Medicare" tax on net investment income. Moreover, this summary does not purport to cover all aspects of U.S. federal income taxation that may apply to the Debtors, the Reorganized Debtors, or Holders of Allowed Claims based upon their particular circumstances. This summary does not discuss any tax consequences of the Plan that may arise under any laws other than U.S. federal income tax law, including state, local, or non-U.S. tax law. Furthermore, this summary does not discuss any actions that a Holder may undertake with respect to its Allowed Claims, other than voting such Allowed Claim and receiving the consideration provided under the Plan, or with respect to any actions undertaken by a Holder subsequent to receiving any consideration under the Plan.

Furthermore, this summary assumes that a Holder of an Allowed Claim (other than a Holder of Allowed General Unsecured Claims or Allowed General Go-Forward Trade Claims) holds a Claim only as a "capital asset" (within the meaning of section 1221 of the Tax Code). This summary also assumes that the various debt and other arrangements to which any of the Debtors or Reorganized Debtors are a party, other than the New Warrants, will be respected for U.S. federal income tax purposes in accordance with their form. The Debtors and Reorganized Debtors intend to treat the New Warrants as equity interests for U.S. federal income tax purposes, and, for purposes of this Article IX, references to New HB Common Equity include New Warrants. This summary also assumes that the subscription rights to participate in the Rights Offering (the "Subscription Rights") will be treated as options to acquire New HB Common Equity for U.S. federal income tax purposes, and not as stock of Reorganized Hornblower in and of themselves. This summary also assumes that none of the obligations underlying Claims are "contingent payment debt instruments" within the meaning of Treasury Regulations section 1.1275-4. This summary does not discuss differences in tax consequences to Holders of Claims that act or receive consideration other than the consideration received by each other Holder of a Claim of the same Class or Classes (such as the tax consequences of the receipt of any commitment fee or premium or similar arrangement or the receipt of any equity interest pursuant to the Backstop Commitment Agreement). If the IRS successfully asserts that the New Warrants are not stock or that any other intended treatment of other arrangements is incorrect, the U.S. federal income tax consequences could differ materially from those described below, This summary does not address the U.S. federal income tax consequences to Holders (i) whose Claims are Unimpaired or otherwise entitled to payment in full in Cash under the Plan or (ii) that are deemed to reject the Plan.

For purposes of this discussion, a "U.S. Holder" is a beneficial owner of a Claim that is: (a) an individual citizen or resident of the United States for U.S. federal income tax purposes; (b) a corporation (or other entity treated as a corporation for U.S. federal income tax purposes) created or organized under the laws of the United States, any state thereof or the District of Columbia; (c) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (d) a trust (1) if a court within the United States is able to exercise primary supervision over the trust's administration and one or more U.S. persons have authority to control all substantial decisions of the trust or (2) that has a valid election in effect under applicable Treasury Regulations to be treated as a United States person. For purposes of this discussion, a "non-U.S. Holder" is any beneficial owner of a Claim that is not a U.S. Holder other than any partnership (or other entity or arrangement treated as a partnership or other pass-through entity for U.S. federal income tax purposes).

If a partnership (or other entity or arrangement treated as a partnership or other pass-through entity for U.S. federal income tax purposes) is a beneficial owner of a Claim, the tax treatment of a partner (or other owner) of such entity generally will depend upon the status of the partner (or other owner) and the activities of the entity. Partners (or other owners) of partnerships (or other pass-through entities) that are beneficial owners of a Claim are urged to consult their respective tax advisors regarding the U.S. federal income tax consequences of the Plan.

The following discussion assumes Reorganized Hornblower is treated as a corporation for U.S. federal income tax purposes. If Reorganized Hornblower is not treated as a corporation for U.S. federal income tax purposes, the U.S. federal income tax consequences of the Restructuring Transactions and the ownership and disposition of New HB Common Equity and Subscription Rights could differ materially from those described below. Holders of Allowed First Lien Claims are urged to consult their own tax advisors as to the tax consequences of the ownership and disposition of New HB Common Equity and Subscription Rights if Reorganized Hornblower is not treated as a corporation for U.S. federal income tax purposes.

Debtor Hornblower Sub, LLC and Debtor American Queen Sub, LLC are co-borrowers on the First Lien Claims and Revolver Claims. For U.S. federal income tax purposes, Debtor Hornblower Sub, LLC is disregarded as an entity separate from Debtor Hornblower Group Holdco, LLC, and Debtor American Queen Sub, LLC is disregarded as an entity separate from Debtor American Queen Holdco, LLC. As a result, for U.S. federal income tax purposes, Debtor Hornblower Group Holdco, LLC and Debtor American Queen Holdco, LLC are treated as the borrowers of the First Lien Claims and Revolver Claims. The treatment of a co-borrower arrangement for U.S. federal income tax purposes is uncertain. As a general matter, taxpayers allocate debt relating to a co-borrowing among the co-borrowers based on the use of borrowed funds, and such debt is treated as separate borrowings. Consistent with their historic tax reporting, for U.S. federal income tax purposes the Debtors intend to treat Debtor Hornblower Group Holdco, LLC as the borrower with respect to 80% of the First Lien Term Facility, 80% of the Revolver Term-Out Facility and 100% of the Revolver Facility, and Debtor American Queen Holdco, LLC as the borrower with respect to 20% of the First Lien Term Facility, 20% of the Revolver Term-Out Facility and 0% of the Revolver Facility (such allocation, the "Debt Allocation"). The following discussion assumes the Debt Allocation and related tax treatment is correct and also assumes that, for U.S. federal income tax purposes, each Holder of First Lien Claims and Revolver Claims should be treated as holding each dollar of claims as against each such entity based on the Debt Allocation. No assurance can be given that the IRS will agree with the foregoing Debt Allocation and associated tax treatment. If the Debt Allocation and associated tax treatment for Debtor American Queen Holdco, LLC, Debtor Hornblower Group Holdco, LLC, or the Holders of First Lien Claims or Revolver Claims is different from the Debt Allocation, the tax consequences to the Debtors and Holders of Claims may differ from those described herein. Each Holder of First Lien Claims and Revolver Claims are urged to consult their own tax advisor regarding the tax treatment of the Plan to such Holder as a result of the co-borrower arrangement and the Debt Allocation.

In addition, the Debtors intend to treat (i) the New HB Common Equity and Subscription Rights as being issued in exchange for the portion of Allowed First Lien Claims that is treated as debt of Debtor Hornblower Group Holdco, LLC (as determined for U.S. federal income tax purposes) and Allowed Revolver Claims, (ii) the portion of AQV Net Cash Proceeds, if any,

101

distributed to Holders of Allowed First Lien Claims as being paid by Debtor American Queen Holdco, LLC in exchange for the portion of Allowed First Lien Claims that is treated as debt of Debtor American Queen Holdco, LLC (as determined for U.S. federal income tax purposes), (iii) the portion of AQV Net Cash Proceeds, if any, distributed to Holders of Allowed Revolver Claims as being paid by Debtor American Queen Holdco, LLC as a payment under the Revolver Facility on debt of Debtor Hornblower Group Holdco, LLC (as determined for U.S. federal income tax purposes) and (iv) the Crestview Cash Contribution as a payment under a guarantee of the First Lien Term Facility and Revolver Term-Out Facility. However, no assurance can be given that the IRS will agree with the foregoing apportionment of recoveries. Holders are urged to consult their tax advisors with respect to the consideration received with respect to each Claim for U.S. federal income tax purposes. The following discussion assumes the treatment described in this paragraph is respected for U.S. federal income tax purposes.

THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM. ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL, AND NON-U.S. TAX CONSEQUENCES APPLICABLE UNDER THE PLAN, INCLUDING THE IMPACT OF TAX LEGISLATION.

## B. Certain U.S. Federal Income Tax Considerations for the Debtors and Reorganized Debtors

### 1. General

The tax consequences of the implementation of the Plan to the Debtors will differ depending on whether the Restructuring Transactions include a taxable sale of the Debtors' assets and/or stock. If the transactions undertaken pursuant to the Plan are structured in whole or in part as a taxable sale of the assets (including the assets of any entity that is disregarded as separate from the transferor for U.S. federal income tax purposes) and/or stock of any Debtor (a "Taxable Transaction"), the Debtors would recognize gain or loss upon the transfer in an amount equal to the difference between the fair market value of the consideration issued under the Plan or otherwise in respect of such assets and/or stock and the Debtors' tax basis in such assets or stock. The Debtors expect that the Restructuring Transactions with respect to the AQV Debtors will be treated as a Taxable Transaction, but it has not yet been determined whether or not the Restructuring Transactions with respect to other Debtors will be Taxable Transaction. Such decision will depend on, among other things, whether assets or stock being transferred pursuant to a Taxable Transaction have a fair market value in excess of tax basis (i.e., a "built-in gain") or a fair market value less than tax basis (i.e., a "built-in loss"); in the case of assets or stock with built-in gains, whether sufficient tax attributes are available to offset any such built-in gains; and how the fair market value of such assets or stock compares to the expected tax basis of such assets or stock after their tax basis is reduced for cancellation of debt income recognized in the Restructuring Transactions ("COD Income").

If a Reorganized Debtor purchases, or is treated as purchasing for U.S. federal income tax purposes, assets or stock of any Debtor pursuant to a Taxable Transaction, the Reorganized Debtor

will take a fair market value basis in the transferred assets or stock. If a Taxable Transaction involves a transfer of stock, the entity the stock of which is transferred will, unless the parties make certain tax elections, generally retain its tax basis in its assets.

The Debtors estimate that, as of the filing date of the tax returns for the year ended December 31, 2022, the affiliated group of corporations (and entities taxable as corporations for U.S. federal income tax purposes) that files consolidated federal income tax returns with Debtor Hornblower Group Holdco, LLC as the common parent (such consolidated group, the "Hornblower Group")  had a consolidated net operating loss ("NOL") of approximately $197 million, among other tax attributes, and approximately $120 million of disallowed business interest expense carryforwards and that the affiliated group of corporations (and entities taxable as corporations for U.S. federal income tax purposes) that files consolidated federal income tax returns with Debtor American Queen Holdco, LLC as the common parent (such consolidated group, the "American Queen Group") had a consolidated NOL of approximately $315 million, among other tax attributes, and approximately $20 million of disallowed business interest expense carryforwards. It is estimated that the Hornblower Group utilized a material portion of its NOLs during the 2023 taxable year. The amount of NOLs and other tax attributes of the Hornblower Group and the American Queen Group, as well as the application of any limitations thereon, remains subject to review and adjustment, including by the IRS. As discussed below, certain of the Debtors' tax attributes are expected to be significantly reduced or eliminated entirely upon implementation of the Plan as a result of the recognition of COD Income. The Debtors may also incur other income in connection with the implementation of the Plan, as discussed below. Furthermore, the Reorganized Debtors' use of remaining tax attributes following emergence (as described below) is expected to be subject to limitation under sections 382 and 383 of the Tax Code.

### 2.  Cancellation of Indebtedness Income

In general, absent an exception, a debtor will realize and recognize COD Income upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness. The amount of COD Income incurred is, generally, the amount by which the indebtedness discharged exceeds the value of any consideration given in exchange therefor (or, if the consideration is in the form of new debt of the issuer, the issue price of such new debt).

Under section 108 of the Tax Code, a debtor is not required to include COD Income in gross income if the debtor is under the jurisdiction of a court in a case under the Bankruptcy Code and the discharge of debt occurs pursuant to that proceeding. Instead, as a consequence of such exclusion, a debtor must reduce its tax attributes by the amount of COD Income that it excluded from gross income pursuant to section 108(a) of the Tax Code. In general, tax attributes will be reduced in the following order: (a) NOLs and NOL carryforwards; (b) general business credit carryforwards; (c) minimum tax credit carryforwards; (d) capital loss carryforwards; (e) tax basis in assets (but not below the amount of liabilities to which the debtor remains subject); (f) passive activity loss and credit carryforwards; and (g) foreign tax credit carryforwards. Alternatively, a debtor with COD Income may elect first to reduce the basis of its depreciable assets pursuant to section 108(b)(5) of the Tax Code. Any excess COD Income over the amount of available tax attributes is generally not subject to U.S. federal income tax and has no other U.S. federal income tax impact.

In connection with the Restructuring Transactions, the Debtors expect to realize significant COD Income. The amount of the tax attributes required to be reduced will depend on whether the transactions undertaken pursuant to the Plan are structured as a Taxable Transaction. The exact amount of any COD Income that will be realized by the Debtors will not be determinable until the consummation of the Plan. Regardless of the transactions undertaken pursuant to the Plan, the Debtors expect that the amount of such COD Income will be excluded from gross income and will significantly reduce or eliminate their NOLs. In addition, depending on the structure of the transactions undertaken pursuant to the Plan, some of the Debtors' tax basis in their assets may be reduced by COD Income that is not absorbed by the NOLs, tax credits or other tax attributes of the Debtors.

Any reduction in tax attributes attributable to the COD Income incurred does not occur until the end of the taxable year in which the Plan goes effective.

### 3. Other Income

The Debtors may incur other income for U.S. federal income tax purposes in connection with the Restructuring Transactions that, unlike COD Income, generally will not be excluded from the Debtors' U.S. federal taxable income. For example, if transactions undertaken pursuant to the Plan are structured as a Taxable Transaction, the Debtors would expect to realize taxable gain or loss in connection with such transfer. In addition, the U.S. federal income tax considerations relating to the Plan are complex and subject to uncertainties. No assurance can be given that the IRS will agree with the Debtors' interpretations of the tax rules applicable to, or tax positions taken with respect to, the transactions undertaken to effect the Plan. If the IRS were to successfully challenge any such interpretation or position, the Debtors may recognize additional taxable income for U.S. federal income tax purposes. The Debtors may not have sufficient deductions, losses or other attributes for U.S. federal income tax purposes to fully offset any such gain or income.

### 4. Limitation on Use of Tax Attributes After the Effective Date

Under the Tax Code, any NOL carryforwards and certain other tax attributes, including carryforwards of disallowed interest expense and certain "built-in" losses, of a corporation remaining after attribute reduction (collectively, "Pre-Change Losses") may be subject to an annual limitation (the "Section 382 Limitation") if the corporation undergoes an "ownership change" within the meaning of section 382 of the Tax Code. Section 383 of the Tax Code applies a similar limitation to capital loss carryforwards and tax credits. These limitations apply in addition to, and not in lieu of, the attribute reduction that may result from the COD Income arising in connection with the implementation of the Plan.

In general, under section 382 of the Tax Code, if a corporation undergoes an "ownership change," and does not qualify for (or elects out of) the special bankruptcy exception in section 382(l)(5) of the Tax Code described below, the amount of its Pre-Change Losses that may be utilized to offset future taxable income is subject to an annual Section 382 Limitation. The amount of the annual Section 382 Limitation to which a corporation that undergoes an ownership change would be subject is generally equal to the product of (a) the fair market value of the stock of the loss corporation immediately before the ownership change (with certain adjustments) multiplied

by (b) the "long-term tax-exempt rate" in effect for the month in which the ownership change occurs (currently, 3.44% for an ownership change occurring in March 2024).

The annual Section 382 Limitation represents the amount of pre-change NOLs, as well as certain built-in losses recognized within the five-year period following the ownership change and, subject to modifications and pursuant to section 383 of the Tax Code, the amount of capital loss carryforwards and tax credits that may be used each year to offset income. The Section 382 Limitation may be increased, up to the amount of the net unrealized built-in gain (if any) at the time of the ownership change, to the extent that the corporation recognizes certain built-in gains in its assets during the five-year period following the ownership change or is treated as recognizing built-in gains pursuant to the safe harbors provided in IRS Notice 2003-65.

The Debtors anticipate that the Hornblower Group and the American Queen Group will each experience an "ownership change" (within the meaning of section 382 of the Tax Code) on the Effective Date and, as a result, such groups' ability to use Pre-Change Losses (and capital loss carryforwards and tax credits) is expected to be limited. Any unused limitation may be carried forward, thereby increasing the annual Section 382 Limitation in the subsequent taxable year.

An exception to the Section 382 Limitation generally applies in bankruptcy if the corporation's pre-bankruptcy shareholders and certain holders of debt receive, in respect of their claims, at least 50% of the stock of the reorganized corporation (or of a controlling corporation, if such corporation also is in bankruptcy) pursuant to a confirmed plan of reorganization (the "Section 382(l)(5) Exception"). If a corporation qualifies for the Section 382(l)(5) Exception, the corporation will not be treated as having undergone an ownership change, and, therefore, the annual Section 382 Limitation will not apply to the corporation's Pre-Change Losses. Instead, the corporation's Pre-Change Losses are required to be reduced by the amount of any interest deductions claimed during the three taxable years preceding the effective date of any ownership change, and the portion of the current taxable year ending on the date of the ownership change, in respect of all debt converted into stock pursuant to the bankruptcy reorganization. Additionally, if the Section 382(l)(5) Exception applies and the reorganized corporation undergoes another ownership change within two years after consummation of the plan of reorganization, then the reorganized corporation would be presumed to have an annual Section 382 Limitation of zero beginning with any taxable year ending after the subsequent ownership change. A corporation may elect not to apply the Section 382(l)(5) Exception. The Debtors do not expect to be eligible for the Section 382(l)(5) Exception.

If the Company does not qualify for, or elects not to apply, the Section 382(l)(5) Exception described above, the provisions of section 382(l)(6) of the Tax Code applicable to corporations under the jurisdiction of a bankruptcy court would apply in calculating the annual Section 382 Limitation (the "Section 382(l)(6) Rule"). Under the Section 382(l)(6) Rule, a corporation in bankruptcy that undergoes an ownership change pursuant to a plan of reorganization values its stock to be used in computing the Section 382 Limitation after taking into account any increase in value resulting from the discharge of creditors' claims in the reorganization (rather than the value without taking into account such increases, as is the case under the general rule for non-bankruptcy ownership changes).

**C.      Certain U.S. Federal Income Tax Consequences to Certain U.S. Holders of Certain Allowed Claims**

**1.      Consequences to U.S. Holders of First Lien Claims**

Pursuant to the Plan, in full and final satisfaction, settlement, release, and discharge of such Claims, each Holder of an Allowed First Lien Claim will receive New HB Common Equity, Subscription Rights, and cash from the Crestview Cash Contribution and a portion of the AQV Net Cash Proceeds, if any.

The U.S. federal income tax consequences of the Plan to U.S. Holders of Allowed First Lien Claims will depend, in part, on whether the transactions undertaken pursuant to the Plan constitute a Taxable Transaction. If the transactions undertaken pursuant to the Plan do not constitute a Taxable Transaction with respect to Debtor Hornblower Group Holdco, LLC (such transaction, a "Reorganization"), the U.S. federal income tax consequences to such U.S. Holders of Allowed First Lien Claims will further depend on whether the Claims surrendered constitute "securities" for U.S. federal income tax purposes.

**a.      Consequences with Respect to Debt of Debtor Hornblower Group Holdco, LLC**

**i.      Taxable Transaction**

To the extent that the transactions undertaken pursuant to the Plan constitute a Taxable Transaction and not a Reorganization with respect to Debtor Hornblower Group Holdco, LLC, a U.S. Holder of an Allowed First Lien Claim should be treated as exchanging the portion of such Claim that is treated as debt of Debtor Hornblower Group Holdco, LLC (as determined for U.S. federal income tax purposes) for the New HB Common Equity, Subscription Rights and cash in a fully taxable exchange under section 1001 of the Tax Code.

A U.S. Holder of an Allowed First Lien Claim who is subject to this treatment should recognize gain or loss equal to the difference between (a) the total fair market value of the New HB Common Equity, Subscription Rights and cash received in exchange for such portion of its Claim (subject to the discussion of "Accrued Interest" below) and (b) the U.S. Holder's adjusted tax basis in such portion of its Claim. The character of such gain or loss as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the U.S. Holder, whether the Claim was purchased at a discount, and whether and to what extent the U.S. Holder previously has claimed a bad debt deduction with respect to its Claim. If recognized gain is capital gain, it generally would be long-term capital gain if the U.S. Holder held its Claim for more than one year at the time of the exchange. The deductibility of capital losses is subject to certain limitations, as discussed below. To the extent that a portion of the consideration received in exchange for its Claim is allocable to accrued but untaxed interest, the U.S. Holder may recognize ordinary income. See the discussions of "Accrued Interest," "Market Discount" and "Limitations on Use of Capital Losses" below. A U.S. Holder's tax basis in New HB Common Equity and Subscription Rights should be equal to their fair market value. A U.S. Holder's holding period for each item of consideration received on the Effective Date should begin on the day following the Effective Date.

106

ii.    Treatment of a Debt Instrument as a "Security"

Whether a debt instrument constitutes a "security" for U.S. federal income tax purposes is determined based on all the relevant facts and circumstances, but most authorities have held that the length of the term of a debt instrument at initial issuance is an important factor in determining whether such instrument is a security for U.S. federal income tax purposes. These authorities have indicated that a term of less than five (5) years is evidence that the instrument is not a security, whereas a term of ten (10) years or more is evidence that it is a security. The First Lien Term Facility had a term to maturity of approximately seven (7) years when issued. There are numerous other factors that could be taken into account in determining whether a debt instrument is a security, including the security for payment, the creditworthiness of the obligor, the subordination or lack thereof with respect to other creditors, the right to vote or otherwise participate in the management of the obligor, convertibility of the instrument into an equity interest of the obligor, whether payments of interest are fixed, variable, or contingent, whether such instrument is deemed to be in exchange for another debt instrument and whether such payments are made on a current basis or accrued. The Debtors intend to take the position that loans under the Revolver Term-Out Facility do not constitute "securities" for U.S. federal income tax purposes. Holders of First Liens Claims are urged to consult their tax advisors as to the classification of Allowed First Lien Claims as "securities" for U.S. federal income tax purposes.

iii.    Reorganization

If the transactions undertaken pursuant to the Plan constitute a Reorganization with respect to the Debtor Hornblower Group Holdco, LLC and the portion of an Allowed First Lien Claim that is treated as debt of Debtor Hornblower Group Holdco, LLC (as determined for U.S. federal income tax purposes) qualifies as a "security" for U.S. federal income tax purposes, a U.S. Holder of such a Claim should recognize gain (but not loss), to the extent of the lesser of (a) the amount of gain realized from the exchange (generally equal to the fair market value of all of the consideration received in exchange for the portion of the Claim that is treated as debt of Debtor Hornblower Group Holdco, LLC (as determined for U.S. federal income tax purposes) minus the Holder's adjusted basis, if any, in such portion of the Claim) or (b) the fair market value of "other property" (as described under section 356 of the Tax Code), received in the distribution.  For this purposes, if the portion of an Allowed First Lien Claim that is treated as debt of Debtor Hornblower Group Holdco, LLC is treated as a "security" and the issuer of the New HB Common Equity and Subscription Rights is Hornblower Group Holdco, LLC, the New HB Common Equity and Subscription Rights should be considered "stock or a security" of a party to the Reorganization and not "other property."  With respect to non-cash consideration that is treated as a "stock or security" of a party to the Reorganization, such U.S. Holder should obtain a tax basis in such property, other than any such amounts treated as received in satisfaction of accrued but untaxed interest, equal to (a) the tax basis of the portion of the Claim surrendered, less (b) the fair market value of "other property" received in exchange for such portion of its Claim, plus (c) gain recognized (if any). A U.S. Holder's tax basis in such non-cash consideration, as determined under the previous sentence, should be allocated among such property based on the fair market value of such property, and the holding period for such non-cash consideration should include the holding period for the surrendered Claims. With respect to non-cash consideration that is treated as "other property," U.S. Holders should obtain a tax basis in such property, other than any amounts treated as received in satisfaction of accrued but untaxed interest, equal to the property's fair market value

as of the date such property is distributed to the U.S. Holder. The holding period for any such property should begin on the day following the receipt of such property.

The tax basis of any non-cash consideration treated as received in satisfaction of accrued but untaxed interest should equal the amount of such accrued but untaxed interest, but in no event should such basis exceed the fair market value of the consideration received in satisfaction of accrued but untaxed interest. The holding period for the non-cash consideration treated as received in satisfaction of accrued but untaxed interest should not include the holding period of the debt instrument constituting the surrendered Claim and should begin on the day following the receipt of such property.

If the transactions undertaken pursuant to the Plan constitute a Reorganization with respect to Debtor Hornblower Group Holdco, LLC but an Allowed First Lien Claim does not qualify as a "security" for U.S. federal income tax purposes, a U.S. Holder of such Claim will be treated as exchanging the portion of the Claim that is treated as debt of Debtor Hornblower Group Holdco, LLC (as determined for U.S. federal income tax purposes) for the New HB Common Equity and Subscription Rights in a fully taxable exchange under section 1001 of the Tax Code. The U.S. federal income tax consequences to such U.S. Holder will be substantially similar to the consequences that such U.S. Holder would have experienced in a Taxable Transaction, as described above in the discussion under "Taxable Transaction."

The treatment of the Crestview Cash Contribution in a Reorganization is subject to uncertainty, including with respect to its treatment as a separate cash payment on the Allowed First Lien Claims or as "other property" received in a Reorganization and whether it should be allocated in accordance with the Debt Allocation. Holders of Allowed First Lien Claims are urged to consult their own tax advisors as to the tax consequences of such payment.

        b.     <u>Consequences with Respect to Debt of Debtor American Queen Holdco, LLC</u>

A U.S. Holder of an Allowed First Lien Claim should be treated as exchanging the portion of such Claim treated as debt of Debtor American Queen Holdco, LLC (as determined for U.S. federal income tax purposes) for cash in a fully taxable exchange under section 1001 of the Tax Code and should recognize gain or loss equal to the difference between (a) the cash, if any, received in exchange for such portion of its Claim (subject to the discussion of "Accrued Interest" below) and (b) the U.S. Holder's adjusted tax basis in such portion of its Claim. The U.S. federal income tax consequences to such U.S. Holder will be substantially similar to the consequences, described above, that such U.S. Holder would have experienced in a Taxable Transaction.

It is possible that U.S. Holders of Allowed First Lien Claims will receive some amounts of AQV Net Cash Proceeds after the Effective Date. The possibility that a U.S. Holder of an Allowed First Lien Claims will receive additional value following the Effective Date may result in the U.S. Holder being required to defer all or a portion of any tax loss on the portion of such Claim that is treated as debt of Debtor American Queen Holdco, LLC (as determined for U.S. federal income tax purposes) until it is clear that the U.S. Holder will not receive any further distributions with respect to such portion of its Claim or the U.S. Holder disposes of such portion of its Claim. A U.S. Holder of Allowed First Lien Claims should consult their own tax advisor regarding the

timing of any gain or loss relating to their Claims, including the potential application of the installment method.

## 2.       Consequences to U.S. Holders of Revolver Claims

Pursuant to the Plan, in full and final satisfaction, settlement, release, and discharge of such Claims, each Holder of an Allowed Revolver Claim will receive New HB Common Equity, Subscription Rights and cash from the AQV Net Cash Proceeds, if any. The U.S. federal income tax consequences of the transactions undertaken pursuant to the Plan to U.S. Holders of Allowed Revolver Claims will depend, in part, on whether such transactions constitute a Taxable Transaction or a Reorganization with respect to Debtor Hornblower Group Holdco, LLC and whether the Claims surrendered constitute "securities" for U.S. federal income tax purposes. See the discussions under "Consequences to U.S. Holders of First Lien Claims" and "Treatment of a Debt Instrument as a 'Security'" above.

The Debtors intend to take the position that the Revolver Loans are treated as debt of Debtor Hornblower Group Holdco, LLC (as determined for U.S. federal income tax purposes) which do not constitute "securities" for U.S. federal income tax purposes. Therefore, the exchange of an Allowed Revolver Claim for New HB Common Equity, Subscription Rights and cash from the AQV Net Cash Proceeds, if any, will be treated as a taxable exchange under section 1001 of the Tax Code. A U.S. Holder of an Allowed Revolver Claim should recognize gain or loss equal to the difference between (a) the sum of any cash received and the total fair market value of the New HB Common Equity and Subscription Rights received in the exchange (subject to the discussion of "Accrued Interest" below) and (b) the U.S. Holder's adjusted tax basis in its Claim. The character of such gain or loss as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the U.S. Holder, whether the Claim was purchased at a discount, and whether and to what extent the U.S. Holder previously has claimed a bad debt deduction with respect to its Claim. If recognized gain is capital gain, it generally would be long-term capital gain if the U.S. Holder held its Claim for more than one year at the time of the exchange. The deductibility of capital losses is subject to certain limitations, as discussed below. To the extent that a portion of the consideration received in exchange for its Claim is allocable to accrued but untaxed interest, the U.S. Holder may recognize ordinary income. See the discussions of "Accrued Interest," "Market Discount" and "Limitations on Use of Capital Losses" below. A U.S. Holder's tax basis in New HB Common Equity and Subscription Rights should be equal to their fair market value. A U.S. Holder's holding period for each item of consideration received on the Effective Date should begin on the day following the Effective Date.

It is possible that U.S. Holders of Allowed Revolver Claims will receive some amounts after the Effective Date. The possibility that a U.S. Holder of a Claim will receive additional value following the Effective Date may result in the U.S. Holder being required to defer all or a portion of any tax loss on their Claim until it is clear that the U.S. Holder will not receive any further distributions with respect to the Claim or the U.S. Holder disposes of its Claim. A U.S. Holder of Allowed Revolver Claims should consult their own tax advisor regarding the timing of any gain or loss relating to their Claims, including the potential application of the installment method.

**3.      Consequences to U.S. Holders of General Unsecured Claims and Unsecured Go-Forward Trade Claims**

The treatment of U.S. Holders of General Unsecured Claims and Unsecured Go-Forward Trade Claims is currently reserved under the Plan. The final tax consequences to U.S. Holders of General Unsecured Claims and Unsecured Go-Forward Trade Claims will depend on the consideration distributed to such Holders under the Plan.

**4.      Accrued Interest**

A portion of the consideration received by U.S. Holders of Allowed Claims may be attributable to accrued but untaxed interest (or original issue discount ("OID")) on such Claims. If any amount is attributable to such accrued interest (or OID), then such amount should be taxable to that U.S. Holder as interest income if such accrued interest has not been previously included in the U.S. Holder's gross income for U.S. federal income tax purposes. Conversely, U.S. Holders of Allowed Claims should be able to recognize a deductible loss to the extent any accrued interest on the Claims was previously included in the U.S. Holder's gross income for U.S. federal income tax purposes but was not paid in full by the Debtors.

If the fair value of the consideration is not sufficient to fully satisfy all principal and interest on an Allowed Claim, the extent to which such consideration will be attributable to accrued but untaxed interest is unclear. Under the Plan, the aggregate consideration to be distributed to U.S. Holders of Allowed Claims in each Class will be allocated first to the principal amount of such Allowed Claims (as determined for United States federal income tax purposes), with any excess allocated to the remaining portion of such Claims, if any. There is no assurance that the IRS will respect such allocation.

U.S. Holders are urged to consult their own tax advisors regarding the allocation of consideration received in satisfaction of their Claims and the U.S. federal income tax treatment of accrued but unpaid interest, as well as the character of any loss claimed with respect to accrued but unpaid interest previously included in gross income for U.S. federal income tax purposes.

**5.      Market Discount**

Under the "market discount" provisions of the Tax Code, some or all of any gain realized by a U.S. Holder of an Allowed Claim constituting a debt instrument who exchanges such Claim for a recovery pursuant to the Plan may be treated as ordinary income (instead of capital gain) to the extent of the amount of accrued "market discount" on the debt instrument constituting the exchanged Claim. In general, a debt instrument is considered to have been acquired with "market discount" if it is acquired other than on original issue and if the holder's adjusted tax basis in the debt instrument is less than (i) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or (ii) in the case of a debt instrument issued with OID, its adjusted issue price, by at least a de minimis amount (equal to 0.25% of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

Any gain recognized by a U.S. Holder on the taxable disposition of a Claim that had been acquired with market discount should be treated as ordinary income to the extent of the market

discount that accrued thereon while the Claim was considered to be held by the U.S. Holder (unless the U.S. Holder elected to include market discount in income as it accrued). To the extent that Allowed Claims that were acquired with market discount are exchanged in a tax-free transaction for other property, any market discount that accrued on the Allowed Claims (up to the time of the exchange) but was not recognized by the U.S. Holder is carried over to the property received therefor and any gain recognized on the subsequent sale, exchange, redemption, or other disposition of the property is treated as ordinary income to the extent of the accrued, but not recognized, market discount with respect to the exchanged debt instrument.

U.S. Holders of Allowed Claims who acquired the debt instrument underlying their Claims with market discount are urged to consult with their own tax advisors as to the appropriate treatment of any such market discount and the timing of the recognition thereof.

### 6. Limitation on Use of Capital Losses

A U.S. Holder of an Allowed Claim who recognizes capital losses as a result of the distributions under the Plan will be subject to limits on the use of such capital losses. For a non-corporate U.S. Holder, capital losses may be used to offset any capital gains (without regard to holding periods), and also ordinary income to the extent of the lesser of (a) $3,000 ($1,500 for married individuals filing separate returns) or (b) the excess of the capital losses over the capital gains. A non-corporate U.S. Holder may carry over unused capital losses and apply them against future capital gains and a portion of their ordinary income for an unlimited number of years. For corporate U.S. Holders, capital losses may only be used to offset capital gains. A corporate U.S. Holder that has more capital losses than may be used in a tax year may carry back unused capital losses to the three years preceding the capital loss year or may carry over unused capital losses for the five years following the capital loss year.

### D. U.S. Federal Income Tax Consequences of Ownership and Disposition of New HB Common Equity and Subscription Rights

### 1. Dividends on New HB Common Equity

Any distributions made on account of New HB Common Equity will constitute dividends for U.S. federal income tax purposes to the extent of the current or accumulated earnings and profits of Reorganized Hornblower as determined under U.S. federal income tax principles. To the extent that a U.S. Holder receives distributions that would otherwise constitute dividends for U.S. federal income tax purposes but that exceed such current and accumulated earnings and profits, such distributions will be treated first as a non-taxable return of capital reducing the U.S. Holder's basis in its shares. Any such distributions in excess of the U.S. Holder's basis in its shares (determined on a share-by-share basis) generally will be treated as capital gain.

Dividends paid to U.S. Holders that are corporations generally will be eligible for the dividends received deduction so long as there are sufficient earnings and profits. However, the dividends received deduction is only available if certain holding period requirements are satisfied. The length of time that a shareholder has held its stock is reduced for any period during which the shareholder's risk of loss with respect to the stock is diminished by reason of the existence of certain options, contracts to sell, short sales, or similar transactions. In addition, to the extent that

a corporation incurs indebtedness that is directly attributable to an investment in the stock on which the dividend is paid, all or a portion of the dividends received deduction may be disallowed. Dividends received by non-corporate Holders may be eligible for reduced rates of taxation.

### 2.     Sale, Redemption, or Repurchase of New HB Common Equity

Unless a non-recognition provision applies or a redemption is treated as a dividend under section 302 of the Tax Code, U.S. Holders generally will recognize gain or loss upon the sale, redemption, or other taxable disposition of New HB Common Equity. In general, this gain or loss will be a capital gain or loss, subject to special rules that may apply in the case of redemptions. Such capital gain generally would be long-term capital gain if at the time of the sale, exchange, retirement, or other taxable disposition, the U.S. Holder held the New HB Common Equity for more than one year. Long-term capital gains of an individual taxpayer generally are taxed at preferential rates. The deductibility of capital losses is subject to certain limitations as described above. Under the recapture rules of section 108(e)(7) of the Tax Code, a U.S. Holder may be required to treat gain recognized on the taxable disposition of the New HB Common Equity as ordinary income if such U.S. Holder took a bad debt deduction with respect to its Allowed Claim or recognized an ordinary loss on the exchange of its Allowed Claim for New HB Common Equity.

### 3.     Subscription Rights

A U.S. Holder that elects to exercise its Subscription Rights should be treated as purchasing, in exchange for its Subscription Rights and the amount of cash paid by the U.S. Holder to exercise such Subscription Rights, New HB Common Equity issued in connection with such exercise. Such a purchase should generally be treated as the exercise of an option under general tax principles, and such U.S. Holder should not recognize income, gain, or loss for U.S. federal income tax purposes when it receives the New HB Common Equity upon the exercise of the Subscription Rights. A U.S. Holder's aggregate tax basis in the New HB Common Equity should equal the sum of (i) the amount of cash paid by the U.S. Holder to exercise the Subscription Rights plus (ii) such U.S. Holder's tax basis in the Subscription Rights immediately before the Subscription Rights are exercised. A U.S. Holder's holding period for the New HB Common Equity received pursuant to such exercise should begin on the day following the date the U.S. Holder receives the New HB Common Equity upon the exercise of such U.S. Holder's Subscription Rights.

A U.S. Holder that elects not to exercise the Subscription Rights may be entitled to claim a loss equal to the amount of tax basis allocated to such Subscription Rights, subject to any limitation on such U.S. Holder's ability to utilize capital losses. U.S. Holders electing not to exercise their Subscription Rights are urged to consult with their own tax advisors as to the tax consequences of such decision.

### E.     Certain U.S. Federal Income Tax Consequences to Certain Non-U.S. Holders of Allowed Claims

The following discussion includes only certain U.S. federal income tax consequences of the Restructuring Transactions to non-U.S. Holders. The discussion does not include any non-U.S. tax considerations. The rules governing the U.S. federal income tax consequences to non-U.S.

Holders are complex. Each non-U.S. Holder is urged to consult its own tax advisor regarding the U.S. federal, state, and local and the non-U.S. tax consequences of the consummation of the Plan and the ownership and disposition of the New HB Common Equity and Subscription Rights to such non-U.S. Holders.

### 1.      Gain Recognition

To the extent that the Restructuring Transactions are treated as a Taxable Transaction or otherwise result in the recognition of taxable gain for U.S. federal income tax purposes, any gain realized by a non-U.S. Holder on the exchange of its Claim under the Plan generally will not be subject to U.S. federal income taxation unless (a) the non-U.S. Holder is an individual who was present in the United States for 183 days or more during the taxable year in which the Restructuring Transactions occur and certain other conditions are met or (b) such gain is effectively connected with the conduct by such non-U.S. Holder of a trade or business in the United States (and if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such non-U.S. Holder in the United States).

If the first exception applies, to the extent that any gain is taxable, the non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30% (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of the exchange. If the second exception applies, the non-U.S. Holder generally will be subject to U.S. federal income tax with respect to any gain realized on the exchange in the same manner as a U.S. Holder. In addition, if such a non-U.S. Holder is a corporation, it may be subject to a branch profits tax equal to 30% (or such lower rate provided by an applicable treaty) of its effectively connected earnings and profits for the taxable year, subject to certain adjustments.

### 2.      Payments in respect of Accrued Interest

Subject to the discussion of FATCA and backup withholding below, payments to a non-U.S. Holder that are attributable to amounts received pursuant to the Plan in respect of accrued but untaxed interest generally will not be subject to U.S. federal income tax or withholding, provided that the withholding agent has received or receives, prior to payment, appropriate documentation (generally, IRS Form W-8BEN or W-8BEN-E) establishing that the non-U.S. Holder is not a U.S. person, unless:

- the non-U.S. Holder actually or constructively owns, directly or indirectly through entities that are treated as partnership for U.S. federal income tax purposes, 10% or more of the equity of Debtor Hornblower Holdings LP (in the case of interest payments received pursuant to the Plan);

- the non-U.S. Holder is a "controlled foreign corporation" that is a "related person" (each, within the meaning of the Tax Code) with respect to Debtor American Queen Holdco, LLC or Debtor Hornblower Group Holdco, LLC (in the case of interest payments received pursuant to the Plan);

- the non-U.S. Holder is a bank receiving interest described in section 881(c)(3)(A) of the Tax Code; or

- such interest is effectively connected with the conduct by the non-U.S. Holder of a trade or business within the United States.

A non-U.S. Holder described in the first three bullets above generally will be subject to withholding of U.S. federal income tax at a 30% rate (or at a reduced rate or exemption from tax under an applicable income tax treaty) on amounts received pursuant to the Plan in respect of accrued but untaxed interest.

A non-U.S. Holder described in the fourth bullet above generally will not be subject to withholding tax if it provides a properly executed IRS Form W-8ECI (or successor form) to the withholding agent, but will be subject to U.S. federal income tax in the same manner as a U.S. Holder (unless an applicable income tax treaty provides otherwise), and a non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such non-U.S. Holder's effectively connected earnings and profits that are attributable to the interest at a rate of 30% (or at a reduced rate or exemption from tax under an applicable income tax treaty).

For purposes of providing a properly executed IRS Form W-8BEN or W-8BEN-E, special procedures are provided under applicable Treasury Regulations for payments through qualified foreign intermediaries or certain financial institutions that hold customers' securities in the ordinary course of their trade or business. As described above in more detail under the heading "Certain U.S. Federal Income Tax Consequences to Certain U.S. Holders of Allowed Claims—Accrued Interest," the aggregate consideration to be distributed to Holders of Allowed Claims in each Class will be allocated first to the principal amount of such Allowed Claims, with any excess allocated to unpaid interest that accrued on these Claims, if any.

### 3.    Ownership of New HB Common Equity

Any distributions made (or deemed to be made) with respect to New HB Common Equity will constitute dividends for U.S. federal income tax purposes to the extent of Reorganized Hornblower's current or accumulated earnings and profits as determined under U.S. federal income tax principles. To the extent that a non-U.S. Holder receives distributions that would otherwise constitute dividends for U.S. federal income tax purposes but that exceed such current and accumulated earnings and profits, such distributions will be treated first as a non-taxable return of capital reducing the non-U.S. Holder's basis in its New HB Common Equity. Any such distributions in excess of a non-U.S. Holder's basis in its New HB Common Equity (determined on a share-by-share basis) generally will be treated as capital gain from a sale or exchange. Except as described below, dividends paid with respect to New HB Common Equity held by a non-U.S. Holder that are not effectively connected with a non-U.S. Holder's conduct of a U.S. trade or business (or if an income tax treaty applies, are not attributable to a permanent establishment maintained by such non-U.S. Holder in the United States) will be subject to U.S. federal withholding tax at a rate of 30% (or lower treaty rate, if applicable). A non-U.S. Holder generally will be required to satisfy certain IRS certification requirements in order to claim a reduction of or exemption from withholding under a tax treaty by providing an IRS Form W-8BEN or W-8BEN-

E (or a successor form) to Reorganized Hornblower upon which the non-U.S. Holder certifies, under penalties of perjury, its status as a non-U.S. person and its entitlement to the lower treaty rate or exemption from tax with respect to such payments. Dividends paid with respect to New HB Common Equity held by a non-U.S. Holder that are effectively connected with a non-U.S. Holder's conduct of a U.S. trade or business (and if an income tax treaty applies, are attributable to a permanent establishment maintained by such non-U.S. Holder in the United States) generally will be subject to U.S. federal income tax in the same manner as a U.S. Holder, and a non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such non-U.S. Holder's effectively connected earnings and profits that are attributable to the dividends at a rate of 30% (or at a reduced rate under an applicable income tax treaty).

### 4.      Sale, Redemption, or Repurchase of New HB Common Equity

A non-U.S. Holder generally will not be subject to U.S. federal income tax with respect to any gain realized on the sale or other taxable disposition (including a cash redemption, unless such redemption is treated as a dividend for U.S. federal income tax purposes) of New HB Common Equity unless:

(A)      such non-U.S. Holder is an individual who is present in the United States for 183 days or more in the taxable year of disposition and satisfies certain other conditions or who is subject to special rules applicable to former citizens and residents of the United States; or

(B)      such gain is effectively connected with such non-U.S. Holder's conduct of a U.S. trade or business (and if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such non-U.S. Holder in the United States); or

(C)      Reorganized Hornblower is or has been during a specified testing period a "U.S. real property holding corporation" for U.S. federal income tax purposes.

If the first exception applies, the non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30% (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of disposition of New HB Common Equity. If the second exception applies, the non-U.S. Holder generally will be subject to U.S. federal income tax with respect to such gain in the same manner as a U.S. Holder, and a non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to earnings and profits effectively connected with a U.S. trade or business that are attributable to such gains at a rate of 30% (or at a reduced rate or exemption from tax under an applicable income tax treaty). The Debtors consider it unlikely, based on their current business plans and operations, that Reorganized Hornblower will become a "U.S. real property holding corporation" in the future.

### 5.      Ownership, Exercise, and Lapse of the Subscription Rights

The U.S. federal income tax treatment of the ownership, exercise and lapse of Subscription Rights to a Non-U.S. Holder is generally expected to be the same as that described above for U.S. Holders of Subscription Rights in Section D.3, "U.S. Federal Income Tax Consequences of

115

Ownership and Disposition of New HB Common Equity and Subscription Rights—Subscription Rights."

### 6.     FATCA

Under the Foreign Account Tax Compliance Act ("<u>FATCA</u>"), foreign financial institutions and certain other foreign entities must generally report certain information with respect to their U.S. account holders and investors or be subject to withholding at a rate of 30% on the receipt of "withholdable payments." For this purpose, "withholdable payments" are generally U.S.-source payments of fixed or determinable, annual or periodical income (including dividends, if any, on New HB Common Equity). Pursuant to proposed Treasury Regulations on which taxpayers are permitted to rely pending their finalization, this withholding obligation would not apply to gross proceeds from the sale or disposition of property such as the New HB Common Equity. FATCA withholding will apply even if the applicable payment would not otherwise be subject to U.S. federal nonresident withholding.

**EACH NON-U.S. HOLDER IS URGED TO CONSULT ITS OWN TAX ADVISOR REGARDING THE POSSIBLE IMPACT OF THESE RULES ON SUCH NON-U.S. HOLDER'S OWNERSHIP OF NEW HB COMMON EQUITY.**

### G.     <u>Information Reporting and Back-Up Withholding</u>

All distributions to Holders of Claims under the Plan are subject to any applicable tax withholding, including (as applicable) employment tax withholding. Under U.S. federal income tax law, interest, dividends, and other reportable payments may, under certain circumstances, be subject to "backup withholding" at the then applicable withholding rate (currently 24%). Backup withholding generally applies if the holder fails to furnish its social security number or other taxpayer identification number (a "<u>TIN</u>"), furnishes an incorrect TIN, fails properly to report interest or dividends, or under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the TIN provided is its correct number and that it is a United States person that is not subject to backup withholding. Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax and the appropriate information is timely supplied to the IRS. Certain persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions.

In addition, from an information reporting perspective, the Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the Holders' tax returns.

**THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX**

SITUATION. ALL HOLDERS OF CLAIMS AND INTERESTS ARE URGED TO CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL, OR FOREIGN TAX LAWS, AND OF TAX LEGISLATION AND ANY OTHER CHANGE IN APPLICABLE TAX LAWS.

## ARTICLE X.
## CERTAIN RISK FACTORS TO BE CONSIDERED

> **BEFORE VOTING TO ACCEPT OR REJECT THE PLAN, ALL HOLDERS OF CLAIMS THAT ARE IMPAIRED AND ENTITLED TO VOTE SHOULD READ AND CONSIDER CAREFULLY THE RISK FACTORS SET FORTH HEREIN, AS WELL AS ALL OTHER INFORMATION SET FORTH OR OTHERWISE REFERENCED IN THIS DISCLOSURE STATEMENT.**
>
> **THESE FACTORS SHOULD NOT BE REGARDED AS CONSTITUTING THE ONLY RISKS PRESENT IN CONNECTION WITH THE DEBTORS' BUSINESS OR THE PLAN AND ITS IMPLEMENTATION.**
>
> **ALL HOLDERS OF CLAIMS THAT ARE IMPAIRED AND ENTITLED TO VOTE SHOULD CAREFULLY READ AND REVIEW ANY SUCH DOCUMENTS FILED BEFORE THE VOTING DEADLINE.  NEW FACTORS, RISKS, AND UNCERTAINTIES EMERGE FROM TIME TO TIME AND IT IS NOT POSSIBLE TO PREDICT ALL SUCH FACTORS, RISKS AND UNCERTAINTIES.**

A.    **Certain Bankruptcy Law Considerations**

1.    **Risk of Non-Confirmation of Plan under the Bankruptcy Code**

Although the Debtors believe that the Plan will satisfy all requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion or that modifications to the Plan will not be required for confirmation, or that such modifications would not necessitate re-solicitation of votes to accept the Plan. Moreover, the Debtors can make no assurances that they will receive the requisite votes for acceptance to confirm the Plan.  Holders of Claims in Classes 3, 4, 5, and 6 are permitted to vote on the Plan.  Voting is decided on a class-wide basis; under the Bankruptcy Code, a class is deemed to vote in favor of a plan if the plan is favored by (i) at least 50% of the claims in the class (in number) actually voting in the Class and (ii) claims constituting at least two-thirds of the total claims (in value) in the class actually voting in the Class.

Even if Classes 3, 4, 5, and 6 vote in favor of the Plan in accordance with the Bankruptcy Code and the requirements for "cramdown" (as described below) are met with respect to any impaired class that rejected or was deemed to reject the Plan, the Bankruptcy Court may decline to confirm the Plan if it finds that any of the requirements for confirmation are not met.  If the Plan is not confirmed, it is unclear what distributions Holders of Claims or Interests ultimately would receive with respect to their Claims or Interests under a subsequent plan of reorganization.

2.      **Non-Consensual Confirmation**

In the event that any impaired class of Claims or Interests does not accept or is deemed not to accept the Plan, the Bankruptcy Court may nevertheless confirm the Plan at the Debtors' request if at least one impaired class has voted to accept the Plan (with such acceptance being determined without including the vote of any "insider" in such class), and as to each impaired class that has not accepted the Plan, the Bankruptcy Court determines that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired classes (such outcome being referred to as a "cramdown"). In the event that any class or classes entitled to vote on the Plan vote to reject it, the Debtors believe that the Plan satisfies the requirements for non-consensual confirmation so long as one of Classes 3, 4, 5, and 6 votes to accept it.

3.      **Risk of Non-Occurrence of the Effective Date**

There can be no assurance as to the timing of the Effective Date. If the conditions precedent to the Effective Date set forth in the Plan have not occurred or have not been waived as set forth in Article IX of the Plan, then the Confirmation Order may be vacated, in which event no distributions would be made under the Plan, the Debtors and all Holders of Claims or Interests would be restored to the status quo as of the day immediately preceding the Confirmation Date, and the Debtors' obligations with respect to Allowed Claims and Interests would remain unchanged.

4.      **Risk of Termination of Restructuring Support Agreement, Backstop Commitment Agreement, or DIP Credit Agreements**

The Restructuring Support Agreement contains provisions that give the Consenting Stakeholders the ability to either terminate their obligations to support the restructuring thereunder upon the occurrence or non-occurrence of certain events or if certain conditions are not satisfied, including the failure to achieve the Milestones (as defined in the Restructuring Support Agreement). Similarly, the Backstop Commitment Agreement contains provisions that give the Commitment Parties the ability to terminate their obligations to fully backstop the Rights Offering upon the occurrence of certain events or if certain conditions are not satisfied, including the failure to achieve the Milestones. Likewise, the DIP Credit Agreements provide for certain events of default, which include the termination of the Restructuring Support Agreement, the occurrence of which will permit the Required DIP Lenders (as defined therein) to terminate their financing commitments thereunder. Termination of the Restructuring Support Agreement and/or the DIP Credit Agreements could result in the loss of support for the Plan by important creditor constituencies. Termination of the Restructuring Support Agreement could also result in the termination of the Rights Offering, the DIP Facilities provided under DIP Credit Agreements, and the Backstop Commitment Agreement. In addition, the Rights Offering and Backstop Commitment Agreement are subject to approval by the Bankruptcy Court, and there is no guarantee that the Bankruptcy Court will grant its approval. Any such loss of support could adversely affect the Debtors' ability to confirm and consummate the Plan, which could significantly and detrimentally impact the Debtors' business and relationships with, among others, vendors, suppliers, employees, and customers, or, as described below, result in the conversion of these Chapter 11 Cases into cases under chapter 7 of the Bankruptcy Code.

5.      **Conversion into Chapter 7 Cases**

If no chapter 11 plan can be confirmed, or if the Bankruptcy Court otherwise finds that it would be in the best interests of Holders of Claims or Interests, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be appointed or elected to liquidate the Debtors' assets for distribution in accordance with the priorities established by the Bankruptcy Code. For a discussion of the effects that a chapter 7 liquidation would have on the recoveries to Holders of Claims or Interests, see Article XIII.C hereof, as well as the Liquidation Analysis attached hereto as **Exhibit E**.

6.      **Parties in Interest May Object to the Debtors' Classification of Claims and Interests**

Parties in interest may object to the Debtors' classification of Claims and Interests. Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class. The Debtors believe that the classification of Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests, each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims or Interests in each such Class. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

7.      **Impact of these Chapter 11 Cases on the Debtors**

These Chapter 11 Cases may affect the Debtors' relationships with, and their ability to negotiate favorable terms with, creditors, customers, vendors, suppliers, employees, Non-Debtor Affiliates, and other personnel and counterparties. While the Debtors expect to continue, and have thus far continued normal operations during the pendency of these Chapter 11 Cases, public perception of their continued viability may affect, among other things, the desire of new and existing customers to enter into or continue their agreements or arrangements with the Debtors. The failure to maintain any of these important relationships could adversely affect the Debtors' business, financial condition, and results of operations.

Because of the public disclosure of these Chapter 11 Cases and concerns vendors may have about the Debtors' liquidity and/or the Debtors' ability to obtain or maintain normal credit terms with vendors may be impaired. Also, the Debtors' transactions that are outside of the ordinary course of business are generally subject to the approval of the Bankruptcy Court during the pendency of the Chapter 11 Cases, which may limit the Debtors' ability to respond on a timely basis to certain events or take advantage of certain opportunities. As a result, the effect that the Chapter 11 Cases will have on the Debtors' business, financial conditions, and results of operations cannot be accurately predicted or quantified at this time.

8.      **The Debtors' Corporate Structure Could Change**

As part of these efforts to reorganize and restructure throughout the pendency of their Chapter 11 Cases, the Debtors are currently engaged in discussions regarding, among other things, (a) the potential sale or disposition, pursuant to section 363 of the Bankruptcy Code or otherwise, of the assets or equity interests of American Queen HoldCo, LLC and/or its direct and indirect subsidiaries. as well as certain Non-Debtor Affiliates; (b) implementation of the Rights Offering and the issuance of New HB Common Equity thereto, and (c) the terms of the RSA Settlement which will require restructuring of certain Debtors and Non-Debtor Affiliates. These discussions

119

may result in changes to the Company's corporate structure and or operations. Furthermore, given that certain Non-Debtor Affiliates maintain business operations and capital structures which are independent from those of the Debtors, developments with respect to these independent operations and capital structures could have material impacts on the Debtors' corporate organizational structure, including, for example, any acceleration of debt issued by any such Non-Debtor Affiliates and related consequences.

9.      **Releases, Injunctions, and Exculpations Provisions May Not Be Approved**

Article VIII of the Plan provides for certain releases, injunctions, and exculpations, including a release of liens and third-party releases that may otherwise be asserted against the Debtors, Reorganized Debtors, or Released Parties, as applicable. The releases, injunctions, and exculpations provided in the Plan may not be approved. If the releases, injunctions, and exculpations are not approved, certain Released Parties may withdraw their support for the Plan. The releases provided to the Released Parties and the exculpation provided to the Exculpated Parties are necessary to the success of the Debtors' reorganization because the Released Parties and Exculpated Parties have made significant contributions to the Debtors' reorganization efforts and have agreed to make further contributions, including by agreeing to convert certain of their Claims against the Debtors' Estates into equity in the Reorganized Company, but only if they receive the full benefit of the Plan's release and exculpation provisions. The Plan's release and exculpation provisions are an inextricable component of the Restructuring Support Agreement and the significant deleveraging and financial benefits embodied in the Plan.

10.     **The Debtors' Businesses May Be Negatively Affected if the Debtor Is Unable to Assume its Executory Contracts**

An executory contract is a contract as to which performance remains due to some extent by both contract parties. The Plan provides for the assumption of all Executory Contracts and Unexpired Leases of the Hornblower Debtors as of the Effective Date, subject to certain exceptions, as set forth in Article V of the Plan. The Hornblower Debtors intend to preserve as much of the benefit of their existing Executory Contracts and Unexpired Leases as possible. However, if the Hornblower Debtors are unable for any reason to assume their Executory Contracts and Unexpired Leases as of the Plan Effective Date, then they would be required to either forego the benefits offered by such contracts or to find alternative arrangements to replace them. This concern is particularly acute with respect to the assumption of the Hornblower Debtors key concession and ferry contracts with certain governmental units. The Debtors believe that they will be able to satisfy the requisite Bankruptcy Code requirements for assuming such agreements but, if the Bankruptcy Court disagrees, it could significantly reduce the Debtors' or the Reorganized Debtors' revenue as such agreements are critical to the Debtors' businesses.

11.     **The Plan Is Based upon Assumptions the Debtors Developed That May Prove Incorrect and Could Render the Plan Unsuccessful**

The Restructuring affects both the Debtors' capital structure and the ownership structure and operation of their business, and reflects assumptions and analyses based on the Debtors' experience and perception of historical trends, current conditions, and expected future developments, as well as other factors that the Debtors consider appropriate under the circumstances.

Whether actual future results and developments will be consistent with the Debtors' expectations and assumptions depends on a variety of factors, including, but not limited to: (a) the ability to implement changes to the Debtors' capital structure; (b) the ability to obtain adequate liquidity and financing sources; (c) the ability to maintain customers' confidence in the Debtors' viability as continuing entities and to attract and retain sufficient business from them; (d) the ability to retain key employees; and (e) the overall strength and stability of general economic conditions of the Debtors' industry generally. The failure of any of these factors could materially adversely affect the successful reorganization of the Debtors' business.

In addition, the feasibility of the Plan for confirmation purposes under the Bankruptcy Code relies on financial projections, including with respect to revenues, EBITDA, debt service, and cash flow. Financial forecasts are necessarily speculative, and it is likely that one or more of the assumptions and estimates that are the basis of these financial forecasts will not be accurate.

The Debtors expect that their actual financial condition and results of operations may differ, perhaps materially, from what was anticipated. Consequently, there can be no assurance that the results or developments contemplated by any plan of reorganization the Debtors may implement will occur, or, even if they do occur, that they will have the anticipated effects on the Debtors and their respective subsidiaries or their business and operations. The failure of any such results or developments to materialize as anticipated could materially adversely affect the successful execution of the Plan.

## 12. Projections and Other Forward-Looking Statements Are Not Assured, and Actual Results May Vary

Certain of the information contained in this Disclosure Statement is, by nature, forward-looking, and contains estimates and assumptions that might ultimately prove to be incorrect and projections that may be materially different from actual future experiences. Many of the assumptions underlying the projections are subject to significant uncertainties that are beyond the control of the Debtors or Reorganized Debtors, including the timing, confirmation, and consummation of the Plan, inflation, and other unanticipated market and economic conditions. There are uncertainties associated with any projections and estimates, and they should not be considered assurances or guarantees of the amount of funds or the amount of Claims in the various Classes that might be allowed. Some assumptions may not materialize, and unanticipated events and circumstances may affect the actual results. Projections are inherently subject to substantial and numerous uncertainties and to a wide variety of significant business, economic, and competitive risks, and the assumptions underlying the projections may be inaccurate in material respects. In addition, unanticipated events and circumstances occurring after the approval of this Disclosure Statement by the Bankruptcy Court, including any natural disasters, geopolitical events, or health epidemics may affect the actual financial results achieved by the Debtors. Such results may vary significantly from the forecasts and such variations may be material.

## 13. Claims Could Be More than Projected

There can be no assurance that the estimated Allowed amount of Claims in certain Classes will not be significantly more than projected, which in turn, could cause the value of distributions to be reduced substantially. Some assumptions may not materialize, and unanticipated events and circumstances may affect the ultimate outcomes. Therefore, the actual amount of Allowed Claims may vary from estimates included in the Financial Projections set forth in **Exhibit F** and the Liquidation Analysis attached hereto as **Exhibit E**, and the variation may be material.

14. **Impact of Interest Rates**

Changes in interest rates may affect the fair market value of the Reorganized Debtors' assets or the distributions to Holders of Claims or Interests under the Plan.

15. **The Debtors May Fail to Obtain the Proceeds of the Rights Offering, the Exit Term Loans, or the Exit Revolver**

There can be no assurance that the Debtors will receive any or all of the proceeds of the Rights Offering, the Exit Term Loans, or the Exit Revolver.  Because the Exit Credit Documents have not been finalized or approved by the Bankruptcy Court, there can be no assurance that the Debtors will receive any or all of the proceeds of the Exit Term Loans or the Exit Revolver. Notwithstanding the Backstop Commitment Agreement applicable to the Rights Offering, because the Rights Offering has not yet been completed and because the Debtors have not yet entered into or obtained Bankruptcy Court approval of the Backstop Commitment Agreement, there can be no assurance that the Debtors will receive any or all of the proceeds of the Rights Offering.  If the Debtors do not receive the proceeds of the Rights Offering, the Exit Term Loans, or the Exit Revolver, the Debtors will not be able to consummate the Plan in its current form.

16. **Contingencies May Affect Distributions to Holders of Allowed Claims or Interests**

The distributions available to Holders of Allowed Claims and Interests under the Plan can be affected by a variety of contingencies, including whether the Bankruptcy Court orders certain Allowed Claims to be subordinated and turned over to other Allowed Claims.  The occurrence of any and all such contingences could affect distributions under the Plan.

17. **The Debtors May Seek to Amend, Waive, Modify, or Withdraw the Plan at Any Time Before Confirmation**

Subject to and in accordance with the terms of the DIP Credit Agreements, Restructuring Support Agreement, and Backstop Commitment Agreement, the Debtors reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify the Plan before the entry of the Confirmation Order or waive any conditions thereto if and to the extent such amendments or waivers are necessary or desirable to consummate the Plan.  The potential impact of any such amendment or waiver on the Holders of Claims and Interests cannot presently be foreseen but may include a change in the economic impact of the Plan on some or all of the proposed Classes or a change in the relative rights of such Classes.  All Holders of Claims and Interests will receive notice of such amendments or waivers required by applicable Law and the Bankruptcy Court.  If the Debtors seek to modify the Plan after receiving sufficient acceptances but before the Bankruptcy Court's entry of an order confirming the Plan, the previously solicited acceptances will be valid only if (a) all Classes of adversely affected Holders accept the modification in writing, or (b) the Bankruptcy Court determines, after notice to designated parties, that such modification was *de minimis* or purely technical or otherwise did not adversely change the treatment of Holders of accepting Claims or Interests, or is otherwise permitted by the Bankruptcy Code.

**18.     Other Parties in Interest Might Be Permitted to Propose Alternative Plans of Reorganization That May Be Less Favorable to Certain of the Debtors' Constituencies Than the Plan**

Other parties in interest could seek authority from the Bankruptcy Court to propose an alternative plan of reorganization to the Plan.  Under the Bankruptcy Code, a debtor in possession initially has the exclusive right to propose and solicit acceptances of a plan of reorganization for a period of 120 days from the petition date, which may be extended with Bankruptcy Court approval for a period not to exceed 18 months.  However, such exclusivity period can also be reduced or terminated upon order of the Bankruptcy Court.  If such an order were to be entered, other parties in interest would then have the opportunity to propose alternative plans of reorganization in these Chapter 11 Cases.

If another party in interest were to propose an alternative plan of reorganization following expiration or termination of the Debtors' exclusivity period, such a plan may be less favorable to existing Holders of Claims and Interests than the Debtors' Plan.  The Debtors consider maintaining relationships with their lenders, shareholders, employees, vendors, and customers as critical to maintaining the value of the Debtors' business following the Effective Date and have sought to treat those constituencies accordingly.  However, proponents of alternative plans of reorganization may not share the Debtors' assessments and may seek to impair the Claims or Interests of such constituencies to a greater degree than proposed under the Plan.  If there were competing plans of reorganization, the Chapter 11 Cases likely would become longer, more complicated, and much more expensive.  If this were to occur, or if the Debtors' employees, vendors, or other constituencies important to the Debtors' business were to react adversely to an alternative plan of reorganization, the adverse consequences discussed below in Article X.A.19 also could occur.

**19.     The Debtors Cannot Predict the Amount of Time Spent in Bankruptcy for the Purpose of Implementing the Plan, and a Lengthy Bankruptcy Proceeding Could Disrupt the Debtors' Business, as Well as Impair the Prospect for Reorganization on the Terms Contained in the Plan**

Pursuant to the Restructuring Support Agreement, the Debtors anticipate that the process of obtaining Confirmation of the Plan will be completed within approximately [●] weeks of the filing of this Disclosure Statement, but it could last considerably longer if, for example, Confirmation is contested or the conditions to Confirmation are not satisfied or waived.  It is impossible to predict with certainty the amount of additional time that the Debtors may spend in bankruptcy, and the Debtors cannot be certain that the Plan will be confirmed.  Even if confirmed on a timely basis, the bankruptcy proceeding could itself have an adverse effect on the Debtors' business.  There is a risk, due to uncertainty about the Debtors' futures that, among other things:

- consumers could move to the Debtors' competitors;

- employees could be distracted from performance of their duties or more easily attracted to other career opportunities; and

- business partners and vendors could terminate their relationships with the Debtors or demand financial assurances or enhanced performance, any of which could impair the Debtors' prospects.

A prolonged bankruptcy proceeding also would involve additional expenses and further divert the attention of the Debtors' management team from the operation of the Debtors' business,

as well as create concerns for employees, vendors, and other parties with whom the Debtors interact.

### 20.     Foreign Proceedings

Certain of the Debtors are subject to Canadian Recognition Proceedings in in Canada. However, the Debtors are not subject to such proceedings in all foreign jurisdictions where they operate. There can be no assurance that these Chapter 11 Cases will be recognized in other foreign jurisdictions. In addition, there can also be no assurance that the Confirmation and consummation of the Plan will be fully recognized in other foreign jurisdictions, or that creditors in such jurisdictions will not seek to enforce any of their rights and remedies in such jurisdictions. In the event a creditor seeks to enforce rights and remedies in another foreign jurisdiction, there can be no assurance that the courts and other authorities in such foreign jurisdictions will make factual findings or legal determinations or otherwise take positions that are consistent with the Plan or that do not have a material adverse effect on the Debtors or the Plan.

## B.     Risks Relating to the Company's Business and Industry

### 1.     Post-Effective Date Indebtedness

On the Effective Date, the Reorganized Debtors will seek to enter into the Exit Term Loans and the Exit Revolver. The Reorganized Debtors' ability to service their debt obligations will depend on, among other things, their future operating performance, which depends partly on economic, financial, competitive, and other factors beyond the Reorganized Debtors' control. The Reorganized Debtors may not be able to generate sufficient cash from operations to meet their debt service obligations as well as fund necessary capital expenditures and investments in sales and marketing. In addition, if the Reorganized Debtors need to refinance their debt, obtain additional financing, or sell assets or equity, they may not be able to do so on commercially reasonable terms, if at all.

### 2.     The Company's Business Relies on Discretionary Spending and is Sensitive to General Economic Conditions

The Company's services represent discretionary spending by consumers, businesses and institutions. Many factors, such as general business conditions, interest rates, the availability of credit, unemployment levels, taxation, and public heath crises affect discretionary spending. The Company's customers' purchases of tourism, transportation, experience, and hospitality services, often decline in periods when disposable income falls or during actual or perceived unfavorable economic conditions. During these periods of reduced consumer, business, and institutional spending, it is also more difficult for the Company to accurately forecast future demand trends. This could result in the Company's increasing carrying costs or leading to an inability to satisfy demand. Accordingly, the Company's revenues and profitability are sensitive to economic downturns, the frequency and severity of such are not always predictable. Thus, depending on these and other factors which affect consumer, business, and institutional spending habits, there is a risk that the Company's actual business performance could differ from projections of performance.

### 3. Lingering Impacts of COVID-19 in the Form of Supply Chain Inflation, Changes in Labor Costs and Increased Transportation Costs Could Adversely Affect the Company's Operations and Profitability

As noted, Hornblower's business depends on discretionary spending by consumers, and is thus susceptible to risks associated with events that impact such spending, such as the COVID-19 pandemic. Worldwide efforts to contain the COVID-19 pandemic have continued to materially and adversely impacted the global economy and thus consumer spending, as well as disrupted global supply chains, and may continue to have similar effects on a going-forward basis. These containment efforts also impacted the global supply chains, resulting in increased transportation and distribution costs, which in turn had a direct impact on the Company's profitability. Future economic downturns or supply chain disruptions resulting from the impact of COVID-19, including any future variants or resurgences of the virus, could also affect, among other things, the accuracy of the Company's forecasts of future demand and vendor costs. Further, as discussed further below in Section B.7, the Company is affected by labor shortages, increased labor costs, and union activity, each of which may materially affect the Company's profitability.

This uncertainty could cause the Company's cost of operations to fluctuate, meaning that the Company's profitability could vary from initial projections.

### 4. Disruptions to Third-Party Vendors May Affect the Company's Operations

Hornblower depends upon third-party vendor services in many areas of its operations. Interruptions to these third-party services, which operate both domestically and internationally, are outside the Company's control, and may occasionally result from damage or destruction to third-party distribution centers, weather-related events or natural disasters, pandemics (including COVID-19), trade policy changes or restrictions, tariffs or import-related taxes, third-party labor disruptions, shipping capacity restraints, third-party contract disputes, military conflicts, acts of terrorism, political instability, or other factors. Any interruption or delay in service by third parties, or could cause temporary disruptions in its operations which could in turn result in loss of profits, consumer dissatisfaction and loss of market share, or other adverse effects on its business.

### 5. The Company's Business Performance is Affected by the Actions of Third-Party Vendors

The Company's business operations are comprised of many relationships with third-party vendors and suppliers, including for fuel, some of which operate outside of the United States. Though the Company requires each of its vendors to comply with accepted labor practices, manufacturing safety, and other laws, and also independently tests its merchandise for product safety standards, the Company must rely upon its vendors' representations regarding product quality, safety, and compliance with applicable laws and standards to some extent, as it does not supervise or control its vendors' operations. The Company's brand reputation and financial performance may be adversely affected if such representations turn out to be false, as well as if vendors violate applicable laws or regulations or otherwise implement practices that the Company's customers regard as unethical, unsafe, or harmful to the environment.

Further, for several of the Company's vendors, the Company has no contractual assurances of continued supply, pricing, or access to new products, and vendors could change the terms upon which they sell goods or provide services to the Company, or discontinue business with the Company, at any time. Accordingly, the Company's projected operational costs may increase if

its vendors were to unexpectedly reduce or discontinue such dealings, and the Company's ability to identify qualified new or replacement vendors able to supply products in a timely and sufficient manner may be constrained. These risks are exacerbated with respect to vendors located outside of the United States, as our business with foreign vendors might be impacted by fluctuations in the value of the U.S. dollar relative to other foreign currencies, changes in global and domestic fuel prices, changes to labor, manufacturing, or trade regulations in non-U.S. jurisdictions, and international geopolitical or environmental events which impact the ability of our foreign vendors to provide goods and services.

6.      **The Company's Use of Consumer Information Presents Regulatory and Other Risks Beyond the Company's Control**

Efficient and uninterrupted operation of the Company's booking and customer management operations are critical to the successful operation of its online business and marketing programs, as well as the Company's ability to provide a positive customer experience at its ports. In furtherance of these operations and to improve the booking and hospitality experience, the Company collects, maintains, and uses data provided to it through online activities and customer interactions. The Company's ability to store and use this data is subject to certain contractual restrictions in third-party contracts as well as evolving international, federal, and state privacy, data protection, and data security laws and enforcement trends. The Company is also subject to the Payment Card Industry Data Security Standards ("PCI-DSS"), as mandated by credit card brands used by its customers. Failure to meet the PCI-DSS requirements could result in the Company's inability to accept credit cards as a method of payment, which may adversely affect the Company's reputation and/or brand value and its ability to sell products to consumers.

While Hornblower strives to be in constant compliance with applicable law, it is not able to predict all changes in these laws and enforcement practices. Maintaining such compliance could at any time become costly or time consuming for Company management, which in turn could adversely affect business performance. Further, any inadvertent failure to comply with applicable law could result proceedings by governmental entities or others, subsequent fines or defense costs, and reputational harm, all which may negatively impact the Company's business operations.

The Company's storage and use of customer information also presents risk in the form of potential losses associated with the failure to adequately protect or maintain that information. Malicious actors may attempt to penetrate the Company's computer systems, payment card terminals, or other payment systems and, if successful, misappropriate personal information, payment card, or check information or confidential Company business information. The techniques used by criminals to obtain unauthorized access to sensitive data change frequently and often are not recognized until launched against a target; accordingly, the Company may be unable to anticipate these techniques or implement adequate preventative measures. In addition, an employee, contractor, or other third party with whom the Company does business may attempt to circumvent its security measures to obtain such information. Any failure to maintain the security of the Company's customers' confidential information, or data belonging to it or its vendors, could put the Company at a competitive disadvantage, result in reputational harm, or subject it to potential litigation or fines. There can be no assurance that the Company will not suffer a criminal attack in the future or that unauthorized parties will not gain access to personal information, which could negatively impact the Company's business operations.

### 7. Failure to Obtain and Retain Highly Skilled Personnel Could Hurt the Company's Operations

The Company requires highly skilled personnel to operate and provide technical services and support for the Company's business, including highly skilled and licensed vessel personnel. A well-trained, motivated, and adequately-staffed work force has a positive impact on the Company's ability to attract and retain business. As a result, Hornblower's future success depends on its continuing ability to identify, hire, develop, motivate, and retain skilled personnel for all areas of the Company's organization. The Company's continued ability to compete effectively depends on the Company's ability to attract new employees and to retain and motivate the Company's existing employees. Heightened competition for skilled personnel could materially and adversely limit the Company's operations and further increase the Company's labor-related costs. Furthermore, the cost of retaining the labor force necessary to carry out the Company's operation is susceptible to increase as the result of various factors outside of the Company's control, such as legislative changes to minimum wage laws, increased costs in the labor market generally, and changes to other labor and healthcare related regulations. These increased costs could have a material adverse effect on the Company's business, operations, and competitive position.

Specifically, experienced vessel operators, including captains, are not quickly replaceable and the loss of high-level vessel employees, including captains, over a short period of time could impair the Company's ability to operate all of the Company's vessels. Therefore, any loss or reduction in the number of such key personnel could have a material adverse effect on the Company's business, operations, and competitive position.

### 8. Unanticipated Impacts During Key Seasonal Periods Could Adversely Impact the Company's Operating Results

As noted, the Company's business realizes a significant portion of its revenues, net income, and cash flows from tourism seasons. Accordingly, operational cost and consumer demand forecasting is especially important to the Company's financial condition. Hornblower incurs certain significant incremental expenses prior to and during peak seasons in anticipation of increased business activity, which include costs associated with hiring a substantial number of temporary employees to supplement the Company's existing workforce. Any unanticipated decrease in demand for the Company's products during these periods of higher operational costs, due to COVID-19 resurgence or otherwise, could have a material adverse effect on the Company's business and profitability.

### 9. The Company's Business Could Be Adversely Impacted by Extreme Weather Events and the Effects of Climate Change

The Company's business could face increased costs due to extreme weather conditions such as hurricanes, flooding, wildfires, or significant snow events. These unanticipated conditions impact consumer demand, and tourism demand may be negatively impacted for periods extending beyond the individualized weather events themselves. The occurrence of extreme weather or natural disasters, as well as geopolitical events, could result in increases in energy costs, the temporary or permanent closure of ports and services, a temporary lack of an appropriate workforce in a particular market, or a temporary or long-term disruption in supply of products and services from local and overseas vendors.

Adverse weather conditions such as high or low water, fog, ice, tropical storms and hurricanes can adversely affect the operating conditions on the waterways upon which the Debtors' vessels operate. When the Debtors are forced to operate in such conditions, their repair and other operating costs typically increase. Accordingly, extended periods of adverse weather conditions can result in higher operating costs and reduced revenue generating capacity for the Debtors.

Changes to the climate more broadly could also lead to more significant changes in weather patterns where the Company does business and increase the frequency and severity of such extreme weather conditions. For example, rising sea levels may impact the premises and docks from which the Company operates, and potentially require costly repairs or improvements. Further, public expectations for reductions in greenhouse gas emissions could result in increased energy, transportation, and raw materials costs, as well as require the Company to make additional investments in facilities, vessels, and equipment. As a result, the effects of climate change and extreme weather could negatively impact the Company's liquidity and operations.

**10.    Significant risks are inherent in the day-to-day operations in Debtors' business**

The day-to-day activities of certain of the Debtors businesses involve the operation of maritime vessels, machinery and other operating equipment. Due to the nature of these Debtors' operations, personal injury or loss of life or severe damage to and destruction of property and equipment may occur, which may interrupt the Debtors business. Hornblower could be named as a defendant in a lawsuit asserting substantial claims upon the occurrence of any of these events. Although Hornblower maintains insurance protection in amounts Hornblower considers to be adequate, this insurance could be insufficient in coverage and may not be effective under all circumstances to which Hornblower may be subject. If Hornblower is not fully insured against a successful claim, any such claim could have a material adverse effect on Hornblower's financial condition and results of operations.

The Company operates a tourism, hospitality, and entertainment business, and alcohol is served aboard their vessels. As such, there is an increased risk of injury to passengers and staff, as well as property damage aboard the Company's vessels, which may negatively impact the Company's operations.

Further, accidents, particularly those involving hazardous materials, spills, or vessel sinkings, can effectively close sections of the waterways to marine traffic and negatively impact the Company's operations.

**11.    The Company May Fail to Achieve, or Realize Results From, its Environmental, Sustainability, and Corporate Governance ("ESG") Goals**

In response to evolving consumer and investor sentiment around ESG, the Company may establish goals which address ESG matters and establish new and more robust disclosures associated therewith. In furtherance of such goals, the Company may determine that material investments in machinery or technology are necessary or make commitments to waste reductions which temporarily increase costs. Such efforts may not be received positively by consumers, and the Company's ability to achieve any goal or objective, including with respect to environmental and diversity initiatives, is subject to numerous risks, many of which are outside of its control. As a result, the Company may not be able to achieve its ESG goals within the timelines it establishes to do so, or at all.

Failure to implement ESG practices successfully, achieve related goals, or to focus on goals that are not perceived to be valuable to consumers, regulators, or investors, could damage the Company's reputation. The Company could also incur additional significant costs and require additional resources to implement ESG practices in furtherance of its ESG goals which could negatively impact its business operations.

**12.     The Company's Intellectual Property Rights, Including Licenses Obtained from Third Parties, May be Inadequate to Protect its Business**

The Company holds a variety of United States trademarks, service marks, patents, copyrights, and registrations and applications therefor, as well as several foreign counterparts thereto and/or independent foreign intellectual property asset registrations.  In some cases, the Company relies solely on unregistered common law trademark rights and unregistered copyrights under applicable United States law to distinguish and/or protect its products, services, and branding from the products, services, and branding of its competitors.  If the Company's intellectual property rights are successfully challenged, it could be forced to re-brand, re-design, or discontinue the sale of certain of our products or services, resulting in harm to the Company's reputation and other associated costs.  The Company also permits its franchisees to use certain of its trademarks, and any failure to properly control such franchisees' use of these trademarks could adversely affect the Company's ability to enforce them against third parties.  A loss of any of the Company's material intellectual property rights could have a material adverse effect on its business, financial condition, and results of operations.

The Company also licenses, and does not own, the intellectual property rights necessary to sell certain products and provide certain services. While none of these licenses is individually material to the Company's aggregate business, a large portion of such business depends on the continued ability to license these intellectual property rights.  Any disruption to the Company's ability to obtain these licenses from third parties, including as the result of changes to the Debtors' corporate organizational structure or intercompany agreements which impair or eliminate its ability to utilize license rights currently held by Non-Debtor Affiliates, could have a material adverse impact on its business.

The use of licensed imagery also presents the risk that the Company may be subject to claims that it has infringed third parties' intellectual property rights, which could be expensive and time consuming to defend, cause the Company to cease using certain intellectual property rights, result in the payment of significant damages, or force the Company to enter into costly licensing or royalty agreements, to the extent such agreements are available at all.  Any of the foregoing consequences could have an adverse material effect on the Company's sales, operations, or financial condition.

**C.     Regulatory Risks**

**1.     Governmental Regulations Affecting the Maritime Industry, or Changes in These Regulations, Could Result in Increased Expenses or May Have a Negative Impact on the Maritime Industry**

The maritime industry is subject to various laws and regulations, including international, national, state and local laws and regulations, all of which are subject to amendment or changes in interpretation.  In addition, various governmental and quasi-governmental agencies require vessel operators to obtain and maintain permits, licenses and certificates and require routine inspections,

monitoring, recordkeeping and reporting of their vessels and operations. The majority of the Debtors' vessels are subject to inspection or certification by the U.S. Coast Guard and the crews the Debtors' employ aboard vessels are licensed or certified by the U.S. Coast Guard. Any significant changes in laws or regulations affecting the Debtors' industry, or in the interpretation thereof, could cause the Debtors to incur significant expenses.

The maritime industry presents increased regulatory and litigation risks and costs for the Company. For example, employment claims are at an increased risk due to employees necessarily remaining aboard a vessel for an extended period of time during their shifts, and unable to take unrestricted breaks or accessing onshore facilities. Maritime employers are obligated to pay "maintenance and cure" expenses, such as living expenses and medical treatment, for seamen who become sick or injured during the course of their employment. Further, the use of non-seamen personnel such as tours guides, entertainers, and independent contractors, in addition to regulated seaman crews, increases employee misclassification-related risk of litigation. Although the Debtors work diligently to minimize these risks and comply with maritime and employment laws and regulations, these risks are present and may have a negative impact on the Debtors' profitability and business operations.

Certain of the Debtors' businesses rely on vessels that are powered by diesel fuel. Regulations imposed on emission levels produced by the engines required to power the Debtors' vessels have become increasingly restrictive. As a result, new technologies have been introduced to meet these more restrictive requirements which are more costly than those previously used, increasing the construction cost of new vessels or requiring costly engine upgrades to existing vessels. In addition, these new technologies are more expensive to operate and may not produce the same overall operating performance when compared to engines previously used aboard vessels, which can increase the Debtors' cost to operate. Further, there can be no assurance that, should these limitations on emissions continue to become more restrictive, the producers of these engines will be successful in developing new technologies that will comply with these more stringent restrictions or that such technologies will be available without significant increased costs.

In addition, changes in environmental laws impacting the maritime industry, including the passage of climate change legislation or other regulatory initiatives that restrict emissions of greenhouse gases, may require costly vessel modifications, the use of higher-priced fuel and changes in operating practices that the Debtors may not be able to recover through increased pricing to customers For example, regulations in California which require some vessels to use shore power or pollution-reducing equipment while berthed in California ports. Further, ballast water regulations have caused vessel owners and operators to incur significant costs in recent years.

Although the Debtors work actively with regulators at all levels to avoid inordinate impairment of its operations, regulations and their interpretations may ultimately have a negative impact on the Debtors' industry.

**2.     The U.S. Coastwise Trade Laws restrict foreign ownership of the Debtors' equity interests, and the failure to comply with U.S. Coastwise Trade Laws could have a material adverse effect on the Debtors' business or the repeal, suspension or substantial**

**amendment of any of the U.S. Coastwise Trade Laws could increase competition and have a material adverse effect on the Debtors' business**

The U.S. Coastwise Trade Laws require that, to be eligible to operate a vessel transporting non-proprietary cargo on the inland waterways of the United States and engage in coastwise trade, the company that owns the vessel must be at least 75% owned and controlled by U.S. citizens under applicable U.S. maritime laws at each tier of its ownership; the Passenger Vessel Services Act provides that the same rules are applicable to vessels carrying passengers between U.S. ports. U.S. regulations therefore restrict, directly or indirectly, foreign ownership interests in the entities that directly or indirectly own the vessels which the Debtors operate.  The Debtors will be responsible for monitoring the direct and indirect ownership of Non-U.S. citizens of its capital stock and the ownership interests in its affiliates that own vessels operating upon the waters of the United States to ensure compliance with the citizenship requirements of the U.S. Coastwise Trade Laws.  After the Plan Effective Date, if the Reorganized Debtors or their affiliates owning vessels operating upon the waters of the United States at any point cease to be 75% owned and controlled by U.S. citizens, they may become subject to severe penalties and fines, including, under certain circumstances, being deemed to have made an unapproved foreign transfer of their vessels resulting in the permanent loss of such vessels' U.S. coastwise trading privileges and the forfeiture of the Reorganized Debtor's operations upon the waters of the United States.

In order to ensure compliance with the U.S. Coastwise Trade Laws' citizenship requirements that at least 75% of the New HB Common Equity in Reorganized Debtor will be owned and controlled by U.S. citizens, at least 76% of the shares of New HB Common Equity issued on the Effective Date will be issued to U.S. citizens.  The remaining 24% of the shares of New HB Common Equity issued on the Effective Date may be issued to Non-U.S. citizens, to the extent necessary.  Non-U.S. citizens who would have otherwise received additional shares of New HB Common Equity will receive New Warrants.  New Warrants may only be exercised by (i) U.S. citizens, and (ii) Non-U.S. citizens to the extent permitted under the New Organizational Documents.  The forms of the New Warrants will not grant the holder of a New Warrant any voting or control rights, dividend rights, or contain any negative covenants restricting the operation of the Reorganized Debtors' business.  The New Organizational Documents will restrict ownership of the shares of New HB Common Equity by Non-U.S. citizens in the aggregate to not more than 24% and will contain certain other provisions to enable the Reorganized Debtors to comply with the citizenship requirements of the U.S. Coastwise Trade Laws, including, without limitation, provisions that provide for the automatic redemption of shares through the issuance of warrants in the event that the applicable permitted percentage of ownership by Non-U.S. citizens is exceeded. Such warrants will have the same risks and restrictions as the New Warrants, which risks and restrictions are discussed herein.

The U.S. Coastwise Trade Laws continue to be in effect, but has from time to time come under scrutiny.  If the U.S. Coastwise Trade Laws were to be repealed, suspended, or substantially amended and, as a consequence, competitors with lower operating costs were to enter the U.S. marine tourism and hospitality market, the Debtors' advantages as U.S. citizen operators of U.S. Coastwise Trade Law-compliant vessels could be eroded over time.

### 3.      The Debtors Are Subject to Risks Associated with Possible Climate Change Legislation, Regulation, and International Accords

Greenhouse gas emissions have increasingly become the subject of a large amount of international, national, regional, state, and local attention.  The U.S. Congress has considered in the past legislation that would create an economy-wide "cap-and-trade" system that would establish a limit (or cap) on overall greenhouse gas emissions and create a market for the purchase and sale of emissions permits or "allowances."  Any proposed cap-and-trade legislation would likely affect the marine industry due to anticipated increases in energy costs as fuel providers pass on the cost of the emissions allowances, which they would be required to obtain under cap-and-trade to cover the emissions from fuel production and the eventual use of fuel by the Debtors' or its energy suppliers.  In addition, cap-and-trade proposals would likely increase the cost of energy, including purchases of diesel fuel, steam and electricity, and certain raw materials used by the Debtors.  Proposed domestic and international cap-and-trade systems could materially increase the Debtors' raw material and operating costs.  Future environmental regulatory developments related to climate change in the United States that restrict emissions of greenhouse gases could result in financial impacts on the Debtors' operations that cannot be predicted with certainty at this time.

### 4.      Failure to Comply with Environmental, Health, Inspection, and Safety Regulations Could Result in Substantial Penalties and Changes to the Debtors' Operations

The Debtors' operations, facilities, properties, and vessels are subject to extensive and evolving laws and regulations.  These laws pertain to air emissions; water discharges; the handling and disposal of solid and hazardous materials and oil and oil-related products, hazardous substances and wastes; the investigation and remediation of contamination; vessel inspection; and health, safety; and the protection of the environment and natural resources. Failure to comply with these laws and regulations may trigger a variety of administrative, civil, and criminal enforcement measures, including the assessment of civil and criminal penalties, the imposition of remedial obligations, assessment of monetary penalties and the issuance of injunctions limiting or preventing some or all of the Debtors' operations. As a result, the Debtors are involved from time to time in administrative and legal proceedings related to environmental, health and safety matters and have in the past and will continue to incur costs and other expenditures relating to such matters. In addition to environmental laws that regulate the Debtors' ongoing operations, the Debtors are also subject to environmental remediation liability.  Under federal and state laws, the Debtors may be liable as a result of the release or threatened release of hazardous substances or wastes or other pollutants into the environment at or by the Debtors' facilities, properties or vessels, or as a result of the Debtors' current or past operations. These laws, such as the federal Clean Water Act, the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, or "CERCLA," the Resource Conservation and Recovery Act and the Oil Pollution Act of 1990, or "OPA 90," typically impose liability and cleanup responsibility without regard to whether the owner or operator knew of or caused the release or threatened release.  Even if more  than one person may be liable for the release or threatened release, each person covered by the environmental laws may, under certain circumstances, be held wholly responsible for all of the cleanup costs and damages. In addition, third-parties may sue the owner or operator of a site or vessel for damage based on personal injury, property damage, or other costs and cleanup costs, resulting from environmental contamination.  Under OPA 90, owners, operators, and bareboat charterers are jointly and severally strictly liable for the discharge of oil within the internal and territorial waters of the United States, and the 200-mile exclusive economic zone around the United

States.  Additionally, an oil spill could result in significant liability, including fines, penalties, criminal liability and costs for natural resource damages.  Most states bordering on a navigable waterway have enacted legislation providing for potentially unlimited liability for the discharge of pollutants within their waters.  The discovery of environmental issues at the Debtors' sites, the modification of existing laws or regulations or the promulgation of new laws or regulations, more vigorous enforcement by regulators, the imposition of joint and several liability under CERCLA or analogous state laws or OPA 90, and other unanticipated events could result in a material adverse effect on the Debtors' financial condition and results of operations.

**D.    Factors Relating to Securities to Be Issued Under the Plan Generally**

**1.    There is No Public Market for New HB Common Equity**

There is no public market for the New HB Common Equity and there can be no assurance as to the development or liquidity of any market for the New HB Common Equity, or that the New HB Common Equity (or New Warrants) will be listed upon any national securities exchange or any over-the-counter market after the Effective Date. If a trading market does not develop, is not maintained, or remains inactive, holders of the New HB Common Equity (or New Warrants) may experience difficulty in reselling such securities or may be unable to sell them at all.  Even if such a market were to exist, such securities could trade at prices higher or lower than the estimated value set forth in this Disclosure Statement depending upon many factors, including, without limitation, prevailing interest rates, markets for similar securities, industry conditions, and the performance of, and investor expectations for, the Reorganized Debtors.

**2.    The Shares of New HB Common Equity Issued Pursuant to the Plan, the Rights Offering, and the Backstop Commitment Agreement Have Not Been Registered and May Be Subject to Resale Restrictions**

See Article VIII of this Disclosure Statement for a further discussion of the transfer restrictions applicable to the Securities.

**3.    Dilution**

The ownership percentage represented by the New HB Common Equity (or New Warrants) distributed on the Effective Date under the Plan to holders of Allowed HB First Lien Claims will be subject to dilution from the equity issued in connection with the (a) Rights Offering (including the Backstop Commitment Premium), (b) the MIP, (c) other post-emergence issuances, and (d) the conversion of any options, warrants, convertible securities, exercisable securities, or other securities that may be issued post-emergence.

**4.    The Estimated Valuation of the Reorganized Debtors and the New HB Common Equity (or New Warrants) and the Estimated Recoveries to Holders of Allowed Claims and Interests Are Not Necessarily Representative of the Private or Public Sale Values of the New HB Common Equity (or New Warrants)**

The Debtors' estimated recoveries to Holders of Allowed Claims are not intended to represent the private or public sale values of the Reorganized Company's securities.  The estimated recoveries are based on numerous assumptions (the realization of many of which are beyond the control of the Reorganized Debtors), including, among other things: (a) the successful reorganization of the Debtors; (b) an assumed date for the occurrence of the Effective Date; (c) the Debtors' ability to achieve the operating and financial results included in the Financial Projections; and (d) the Debtors' ability to maintain adequate liquidity to fund operations.

**5.      Small Number of Holders or Voting Blocks May Control the Reorganized Debtors**

Consummation of the Plan may result in a small number of holders each owning a significant percentage of the New HB Common Equity (or New Warrants).  These holders may be in a position to control the outcome of all actions requiring stockholder approval, including the election of directors, without the approval of other stockholders. This concentration of ownership could also facilitate or hinder a negotiated change of control of the Reorganized Debtors and, consequently, have an impact upon the value of the New HB Common Equity (or New Warrants).

**6.      Equity Interests Subordinated to the Reorganized Debtors' Indebtedness**

In any subsequent liquidation, dissolution, or winding up of the Reorganized Debtors, the New HB Common Equity (or New Warrants) would rank below all debt claims against the Reorganized Debtors.  As a result, holders of the New HB Common Equity (or New Warrants) will not be entitled to receive any payment or other distribution of assets upon the liquidation, dissolution, or winding up of the Reorganized Debtors until after all the Reorganized Debtors' debt obligations have been satisfied.

**7.      No Intention to Pay Dividends**

The Reorganized Debtors do not anticipate paying any dividends on the New HB Common Equity (or New Warrants) as it expects to retain any future cash flows for debt reduction and to support its operations. In addition, covenants in the documents governing the Reorganized Debtors' indebtedness may restrict their ability to pay cash dividends and may prohibit the payment of dividends and certain other payments. As a result, the success of an investment in the New HB Common Equity (or New Warrants) will depend entirely upon any future appreciation in the value of the New HB Common Equity (or New Warrants). There is, however, no guarantee that the New HB Common Equity (or New Warrants) will appreciate in value or even maintain its initial value.

**E.      Risks Relating to the Reorganized Debtors' Indebtedness**

**1.      Insufficient Cash Flow to Meet Debt Obligations**

The Reorganized Debtors' earnings and cash flow may vary significantly from year to year. Additionally, the Reorganized Debtors' future cash flow may be insufficient to meet their debt obligations and commitments, including the Exit Term Loans, increasing the risk that they may default on such debt obligations.  Any insufficiency could negatively impact the Reorganized Debtors' business.  A range of economic, competitive, business, and industry factors will affect the Reorganized Debtors' future financial performance and, as a result, their ability to generate cash flow from operations and to pay their debt. Many of these factors are beyond the Reorganized Debtors' control.

If the Reorganized Debtors do not generate enough cash flow from operations to satisfy their debt obligations, they may have to undertake alternative financing plans, such as refinancing or restructuring debt, selling assets, reducing or delaying capital investments, or seeking to raise additional capital.

It cannot be assured, however, that undertaking alternative financing plans, if necessary, would allow the Reorganized Debtors to meet their debt obligations.  An inability to generate sufficient cash flow to satisfy their debt obligations or to obtain alternative financing could

materially and adversely affect the Reorganized Debtors' ability to make payments on the Exit Term Loans, as well as the Reorganized Debtors' business, financial condition, results of operations, and prospects.

## F. Additional Factors

### 1. Debtors Could Withdraw Plan

Subject to the terms of the Restructuring Support Agreement, the Debtors can revoke or withdraw the Plan before the Confirmation Date.

### 2. Debtors Have No Duty to Update

The statements contained in this Disclosure Statement are made by the Debtors as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has been no change in the information set forth herein since that date. The Debtors have no duty to update this Disclosure Statement unless otherwise ordered to do so by the Bankruptcy Court.

### 3. No Representations Outside This Disclosure Statement Are Authorized

No representations concerning or related to the Debtors, the Chapter 11 Cases, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement. Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than those contained in, or included with, this Disclosure Statement should not be relied upon in making the decision to accept or reject the Plan.

### 4. No Legal or Tax Advice Is Provided by This Disclosure Statement

The contents of this Disclosure Statement should not be construed as legal, business, or tax advice. Each Holder should consult its own legal counsel and accountant as to legal, tax, and other matters concerning its Claim and/or Interest. This Disclosure Statement is not legal advice to you. This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to confirmation of the Plan.

### 5. No Representation Made

Nothing contained herein or in the Plan shall constitute a representation of the tax or other legal effects of the Plan on the Debtors or Holders of Claims or Interests.

### 6. Certain Tax Consequences

The tax consequences of the Restructuring Transactions to Reorganized Hornblower may materially differ depending on how the Restructuring Transactions are structured, which has not yet been determined. For a discussion of certain tax considerations to the Debtors and certain Holders of Claims in connection with the implementation of the Plan as well as certain tax implications of owning and disposing of the consideration to be received pursuant to the Plan, see Article IX hereof.

## ARTICLE XI.
## VOTING PROCEDURES AND REQUIREMENTS

Before voting to accept or reject the Plan, each Holder of Claims in the Voting Classes, in each case, as of April 22, 2024 (the "Voting Record Date", and each such Holder as of the Voting Record Date, a "Record Holder") should carefully review the Plan attached hereto as **Exhibit A**.

All descriptions of the Plan set forth in this Disclosure Statement are subject to the terms and conditions of the Plan set forth in their entirety therein.

*The proposed Disclosure Statement Order is incorporated herein by reference and should be read in conjunction with this Disclosure Statement and in formulating a decision to vote to accept or reject the Plan.*

**THE DISCUSSION OF THE SOLICITATION AND VOTING PROCESS SET FORTH IN THIS DISCLOSURE STATEMENT IS ONLY A SUMMARY**. PLEASE REFER TO THE PROPOSED DISCLOSURE STATEMENT ORDER ATTACHED HERETO FOR A MORE COMPREHENSIVE DESCRIPTION OF THE SOLICITATION AND VOTING PROCESS.

### A.  Voting Instructions and Voting Deadline

All Record Holders will be sent a ballot (each, a "Ballot") together with this Disclosure Statement.  Such Record Holders should read the Ballot carefully and follow the instructions contained therein.  Please use only the Ballot that accompanies this Disclosure Statement to cast your vote.

The Debtors have engaged Omni Agent Solutions, Inc. as their solicitation agent (the "Notice and Claims Agent") to assist in the transmission of voting materials and in the tabulation of votes with respect to the Plan.  **FOR YOUR VOTE TO BE COUNTED, YOUR VOTE MUST BE RECEIVED BY THE NOTICE AND CLAIMS AGENT AT THE ADDRESS SET FORTH BELOW, OR ELECTRONICALLY SOLELY AS DESCRIBED BELOW, ON OR BEFORE THE VOTING DEADLINE OF 4:00 P.M. (PREVAILING CENTRAL TIME) ON MAY 24, 2024, UNLESS EXTENDED BY THE DEBTORS.**

IF YOUR BALLOT IS DAMAGED OR LOST, YOU MAY CONTACT THE NOTICE AND CLAIMS AGENT AT THE NUMBER SET FORTH BELOW TO RECEIVE A REPLACEMENT BALLOT.  ANY BALLOT THAT IS EXECUTED AND RETURNED BUT WHICH DOES NOT INDICATE A VOTE FOR ACCEPTANCE OR REJECTION OF THE PLAN WILL NOT BE COUNTED.

IF YOU HAVE ANY QUESTIONS CONCERNING VOTING PROCEDURES, YOU MAY CONTACT THE NOTICE AND CLAIMS AGENT AT:

**Hornblower Holdings LLC Claims Processing**
**c/o Omni Agent Solutions, Inc.**
**5955 De Soto Ave., Suite 100**
**Woodland Hills, CA 91367**

**Tel:  (888) 504-8055 (Domestic, toll free); +1 (747) 263-0163 (International, toll)**

Questions (but not documents) may be directed to the following email: HornblowerInquiries@OmniAgnt.com (with "Hornblower Questions" in the subject line).

Additional copies of this Disclosure Statement are available upon request made to the Notice and Claims Agent at the telephone numbers or email address set forth immediately above. The Disclosure Statement and related solicitation materials, as well as all documents filed on the Court's docket in the Debtors' Chapter 11 cases, are also available for review and download, free of charge, on the Debtors' restructuring website at https://omniagentsolutions.com/Hornblower.

## B.     **Voting Procedures**

The Debtors are providing copies of this Disclosure Statement (with all exhibits thereto, including the Plan), a Ballot, and related materials (collectively, a "Solicitation Package") to Record Holders of Claims. Any Record Holder who has not received an applicable Ballot should contact the Notice and Claims Agent.

Holders of Claims eligible to vote should provide all of the information requested by the Ballot and ***promptly*** return all Ballots received in the self-addressed, postage-paid envelope provided with each such Ballot, or by regular mail, overnight courier, or hand delivery, to the Notice and Claims Agent by the Voting Deadline.

Alternatively, Holders may submit their Ballots electronically through the Notice and Claims Agent's online portal, which can be accessed at https://omniagentsolutions.com/Hornblower. Holders should click on the "Submit E-Ballot" section of the website and follow the instructions to submit their Ballot electronically. Each Holder will receive a unique e-ballot identification number with which to access and submit the customized, electronic version of their Ballot on the Notice and Claims Agent's online portal.

The Notice and Claims Agent's online portal is the sole manner in which Ballots will be accepted via electronic or online transmission. **Such Ballots submitted by facsimile, email or other means of electronic transmission will not be counted**. Holders of Claims who cast a Ballot using the Notice and Claims Agent's online portal should NOT also submit a paper Ballot.

**ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE OR THAT IS OTHERWISE NOT IN COMPLIANCE WITH THE SOLICITATION AND VOTING PROCEDURES PROVIDED IN THIS ARTICLE XI OF THE DISCLOSURE STATEMENT AND AS ATTACHED AS EXHIBIT 2 TO THE DISCLOSURE STATEMENT ORDER WILL NOT BE COUNTED.**

## C.     **Holders of Claims Entitled to Vote**

Pursuant to the provisions of the Bankruptcy Code, only holders of allowed claims or equity interests in classes of claims or equity interests that are impaired and that are not deemed to have rejected a proposed plan are entitled to vote to accept or reject such proposed plan. Classes of claims or equity interests in which the holders of claims or equity interests are unimpaired under a chapter 11 plan are deemed to have accepted such plan and are not entitled to vote to accept or reject the plan. For a detailed description of the treatment of Claims and Interests under the Plan, see Article VI of this Disclosure Statement.

The Debtors will request confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code as necessary. Section 1129(b) of the Bankruptcy Code permits the confirmation

of a chapter 11 plan notwithstanding the rejection of such plan by one or more impaired classes of claims or equity interests.   Under section 1129(b) of the Bankruptcy Code, a plan may be confirmed by a bankruptcy court if it does not "discriminate unfairly" and is "fair and equitable" with respect to each rejecting class.   For a more detailed description of the requirements for confirmation of a nonconsensual plan, see Article X.A.2 of this Disclosure Statement.

The Claims in the Voting Classes are impaired under the Plan and may, in certain circumstances, receive a distribution under the Plan.   Accordingly, Holders of Claims in the following Classes are entitled to vote to accept or reject the Plan:   Class 3 (First Lien Claims), Class 4 (Revolving Claims), Class 5 (General Unsecured Claims), and Class 6 (Unsecured Go-Forward Trade Claims).

**D.**     **Fiduciaries and Other Representatives**

If a Ballot is signed by a trustee, executor, administrator, guardian, attorney-in-fact, officer of a corporation, or another, acting in a fiduciary or representative capacity, including a nominee on behalf of beneficial holders of Claims, such person should indicate such capacity when signing and, if requested, must submit proper evidence satisfactory to the Debtors of authority to so act.

UNLESS A BALLOT IS SUBMITTED TO THE NOTICE AND CLAIMS AGENT ON OR BEFORE THE VOTING DEADLINE, SUCH BALLOT WILL BE REJECTED AS INVALID AND WILL NOT BE COUNTED AS AN ACCEPTANCE OR REJECTION OF THE PLAN; PROVIDED, HOWEVER, THE DEBTORS RESERVE THE RIGHT, IN THEIR SOLE DISCRETION, TO REQUEST THE BANKRUPTCY COURT TO ALLOW ANY SUCH BALLOTS TO BE COUNTED.

**E.**     **Agreements Upon Furnishing Ballots**

The delivery of an accepting Ballot pursuant to one of the procedures set forth above will constitute the agreement of the Holder with respect to such Ballot to accept (i) all of the terms of, and conditions to, this Solicitation; and (ii) the terms of the Plan including the injunction, releases, and exculpations set forth in Article VIII therein.   All parties in interest retain their right to object to confirmation of the Plan, subject to any applicable terms of the Restructuring Support Agreement.

**F.**     **Change of Vote**

Except as provided in the Restructuring Support Agreement, any party who has previously submitted to the Notice and Claims Agent before the Voting Deadline a properly completed Ballot may revoke such Ballot and change its vote by submitting to the Notice and Claims Agent before the Voting Deadline a subsequent, properly completed, valid Ballot for acceptance or rejection of the Plan.

**G.**     **Waivers of Defects, Irregularities, Etc.**

Unless otherwise directed by the Bankruptcy Court, all questions as to the validity, form, eligibility (including time of receipt), acceptance, and revocation or withdrawals of Ballots will be determined by the Notice and Claims Agent or the Debtors, as applicable, in their sole discretion,

which determination will be final and binding.  The Debtors reserve the right to reject any and all Ballots submitted by any of the respective Holders not in proper form, the acceptance of which would, in the opinion of the Debtors or their counsel, as applicable, be unlawful.  The Debtors further reserve their respective rights to waive any defects or irregularities or conditions of delivery as to any particular Ballot by any of the Holders.  The interpretation (including the Ballot and the respective instructions thereto) by the applicable Debtor, unless otherwise directed by the Bankruptcy Court, will be final and binding on all parties.  Unless waived, any defects or irregularities in connection with deliveries of Ballots must be cured within such time as the Debtors (or the Bankruptcy Court) determines.  Neither the Debtors nor any other person will be under any duty to provide notification of defects or irregularities with respect to deliveries of Ballots, nor will any of them incur any liabilities for failure to provide such notification.  Unless otherwise directed by the Bankruptcy Court, delivery of such Ballots will not be deemed to have been made until such irregularities have been cured or waived.  Ballots previously furnished (and as to which any irregularities have not theretofore been cured or waived) will be invalidated.

## H.    Miscellaneous

All Ballots must be signed by the Record Holder of the Allowed First Lien Claims, Revolver Claims, General Unsecured Claims, or Unsecured Go-Forward Trade Claims, as applicable, or any person who has obtained a properly completed Ballot proxy from the Record Holder of Allowed First Lien Claims, Revolver Claims, General Unsecured Claims, or Unsecured Go-Forward Trade Claims, as applicable, on such date.  For purposes of voting to accept or reject the Plan, the Record Holders of the First Lien Claims, Revolver Claims, General Unsecured Claims, or Unsecured Go-Forward Trade Claims will be deemed to be the "Holders" of such Claims or Interests.  Unless otherwise ordered by the Bankruptcy Court, Ballots that are signed, dated, and timely received, but on which a vote to accept or reject the Plan has not been indicated, will not be counted.  The Debtors, in their sole discretion, may request that the Notice and Claims Agent attempt to contact such Holders to cure any such defects in the Ballots.  Any Ballot marked to both accept and reject the Plan will not be counted.  If a Holder returns more than one Ballot voting First Lien Claims, Revolver Claims, General Unsecured Claims, or Unsecured Go-Forward Trade Claims, the Ballots are not voted in the same manner, and the Holder does not correct this before the Voting Deadline, the last Ballot submitted will be the Ballot counted.  An otherwise properly executed Ballot that attempts to partially accept and partially reject the Plan will likewise not be counted.

The Ballots provided to Holders will reflect the principal amount of such Holder's Claim or Interest; however, when tabulating votes, the Notice and Claims Agent may adjust the amount of such Holder's Claim or Interest by multiplying the principal amount by a factor that reflects all amounts accrued between the Voting Record Date and the Petition Date including, without limitation, interest.

Under the Bankruptcy Code, for purposes of determining whether the requisite acceptances have been received, only First Lien Claims, Revolver Claims, General Unsecured Claims, or Unsecured Go-Forward Trade Claims, as applicable, who actually vote to accept or reject the Plan will be counted.  The failure of a Holder to deliver a duly executed Ballot to the Notice and Claims Agent will be deemed to constitute an abstention by such Holder with respect to voting on the Plan and such abstentions will not be counted as votes for or against the Plan.

Except as provided below, unless a Ballot is timely submitted to the Notice and Claims Agent before the Voting Deadline together with any other documents required by such Ballot, the Debtors may, in their sole discretion, reject such Ballot as invalid, and therefore decline to count it in connection with seeking confirmation of the Plan.

## ARTICLE XII.
## CONFIRMATION OF THE PLAN

### A.    Confirmation Hearing

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a hearing to confirm a plan of reorganization upon appropriate notice to all required parties.  Notice of the Confirmation Hearing will be provided to all known creditors or their representatives.  The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of the continuation date made at the Confirmation Hearing, at any subsequent continued Confirmation Hearing, or pursuant to a notice filed on the docket for these Chapter 11 Cases.

### B.    Objections to Confirmation

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to the confirmation of a plan.  Any objection to confirmation of the Plan must be in writing, must conform to the Bankruptcy Rules and the Local Rules for the United States Bankruptcy Court for the Southern District of Texas, must set forth the name of the objector, the nature and amount of Claims or Interests held or asserted by the objector against the Debtors' Estates or properties, the basis for the objection and the specific grounds therefor, and must be filed with the Bankruptcy Court, together with proof of service thereof.

> **UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY SERVED AND FILED, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.**

### C.    Requirements for Confirmation of the Plan

#### 1.    Requirements of Section 1129(a) of the Bankruptcy Code

1.  General Requirements

At the Confirmation Hearing, the Bankruptcy Court will determine whether the confirmation requirements specified in section 1129(a) of the Bankruptcy Code have been satisfied including, without limitation, whether:

   i.   the Plan complies with the applicable provisions of the Bankruptcy Code;

   ii.  the Debtors have complied with the applicable provisions of the Bankruptcy Code;

iii. the Plan has been proposed in good faith and not by any means forbidden by law;

iv. any payment made or promised by the Debtors or by a person issuing securities or acquiring property under the Plan, for services or for costs and expenses in or in connection with these Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, has been disclosed to the Bankruptcy Court, and any such payment made before confirmation of the Plan is reasonable, or if such payment is to be fixed after confirmation of the Plan, such payment is subject to the approval of the Bankruptcy Court as reasonable;

v. the Debtors have disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as a director or officer of the Reorganized Debtors, an affiliate of the Debtors participating in a Plan with the Debtors, or a successor to the Debtors under the Plan, and the appointment to, or continuance in, such office of such individual is consistent with the interests of Holders of Claims or Interests and with public policy, and the Debtors have disclosed the identity of any insider who will be employed or retained by the Reorganized Debtors, and the nature of any compensation for such insider;

vi. with respect to each Class of Claims or Interests, each Holder of an impaired Claim or Interest has either accepted the Plan or will receive or retain under the Plan, on account of such Holder's Claim or Interest, property of a value, as of the Effective Date of the Plan, that is not less than the amount such Holder would receive or retain if the Debtors were liquidated on the Effective Date of the Plan under chapter 7 of the Bankruptcy Code;

vii. except to the extent the Plan meets the requirements of section 1129(b) of the Bankruptcy Code (as discussed further below), each Class of Claims or Interests either accepted the Plan or is not impaired under the Plan;

viii. except to the extent that the Holder of a particular Claim has agreed to a different treatment of such Claim, the Plan provides that administrative expenses and priority Claims, other than priority tax Claims, will be paid in full on the Effective Date, and that priority tax Claims will receive either payment in full on the Effective Date or deferred cash payments over a period not exceeding five years after the Petition Date, of a value, as of the Effective Date of the Plan, equal to the allowed amount of such Claims;

ix. at least one Class of impaired Claims or Interests has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim or Interest in such Class;

x.  confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors or any successor to the Debtors under the Plan; and

xi.  all fees payable under section 1930 of title 28, as determined by the Bankruptcy Court at the Confirmation Hearing, have been paid or the Plan provides for the payment of all such fees on the Effective Date of the Plan.

## 2.    Best Interests Test

As noted above, with respect to each impaired class of claims and equity interests, confirmation of a plan requires that each such holder either (i) accept the plan or (ii) receive or retain under the plan property of a value, as of the effective date of the plan, that is not less than the value such holder would receive or retain if the debtors were liquidated under chapter 7 of the Bankruptcy Code ("Chapter 7").  This requirement is referred to as the "best interests test."

This test requires the Bankruptcy Court to determine what the holders of allowed claims and allowed equity interests in each impaired class would receive from a liquidation of the debtor's assets and properties in the context of a liquidation under Chapter 7.  To determine if a plan is in the best interests of each impaired class, the value of the distributions from the proceeds of the liquidation of the debtor's assets and properties (after subtracting the amounts attributable to the aforesaid claims) is then compared with the value offered to such classes of claims and equity interests under the plan.

A liquidation analysis (the "Liquidation Analysis") has been prepared solely for purposes of estimating proceeds available in a liquidation under Chapter 7 of the Debtor's Estates and is attached as **Exhibit E** to this Disclosure Statement.  The Liquidation Analysis is based on estimates and assumptions that are inherently subject to significant economic, competitive, and operational uncertainties and contingencies that are beyond the control of the Debtors or a trustee under Chapter 7.  Furthermore, the actual amounts of Claims against and Interests in the Debtors' Estates could vary materially from the estimates set forth in the Liquidation Analysis, depending on, among other things, the claims asserted during Chapter 7.  Accordingly, while the information contained in the Liquidation Analysis is necessarily presented with numerical specificity, the Debtors cannot assure you that the values assumed would be realized or the claims estimates assumed would not change if the Debtors were in fact liquidated, nor can assurances be made that the Bankruptcy Court would accept this analysis or concur with these assumptions in making its determination under section 1129(a) of the Bankruptcy Code.

As set forth in detail on the Liquidation Analysis, the Debtors believe that the Plan will produce a greater recovery for the Holders of Claims and Interests than would be achieved in a Chapter 7 liquidation.  Consequently, the Debtors believe that the Plan, which provides for the continuation of the Debtors' business, will provide a substantially greater ultimate return to the Holders of Claims or Interests than would a Chapter 7 liquidation.

### 3.    Feasibility

Pursuant to section 1129(a)(11) of the Bankruptcy Code, among other things, the Bankruptcy Court must determine that confirmation of the Plan is not likely to be followed by the liquidation or need for further financial reorganization of the Debtors or any successors to the Debtors under the Plan.  This condition is often referred to as the "feasibility" of the Plan.  The Debtors believe that the Plan satisfies this requirement.

For purposes of determining whether the Plan meets this requirement, the Debtors' management prepared a projected financial outlook.  These financial outlooks, and the assumptions on which they are based, are annexed hereto as **Exhibit F** (the "Financial Projections") and reflect, among other things, the Company's substantially deleveraged balance sheet.  Based upon the Financial Projections, the Debtors believe that the Reorganized Debtors will be able to make all payments required pursuant to the Plan, and therefore, that confirmation of the Plan is not likely to be followed by liquidation or the need for further reorganization.  The Debtors also believe that they will be able to repay or refinance on commercially reasonable terms any and all of the indebtedness under the Plan at or before the maturity of such indebtedness.

The Financial Projections should be read in conjunction with the assumptions, qualifications, and explanations set forth in this Disclosure Statement and in the Plan in their entirety.  The Debtors prepared the Financial Projections based upon, among other things, the anticipated future financial condition and results of operations of the Reorganized Debtors.  The Debtors do not, as a matter of course, publish their business plans, strategies, projections, or their anticipated results of operations or financial condition.  Accordingly, the Company does not intend to update or otherwise revise the Financial Projections, or to include such information in documents required to be filed with the SEC or otherwise make such information public to reflect events or circumstances existing or arising after the date of this Disclosure Statement or to reflect the occurrence of unanticipated events, even in the event that any or all of the underlying assumptions are shown to be in error.

THE FINANCIAL PROJECTIONS WERE NOT PREPARED TO COMPLY WITH THE GUIDELINES FOR PROSPECTIVE FINANCIAL STATEMENTS PUBLISHED BY THE FINANCIAL ACCOUNTING STANDARDS BOARD.  THE DEBTORS' INDEPENDENT ACCOUNTANTS HAVE NEITHER EXAMINED NOR COMPILED THE ACCOMPANYING FINANCIAL PROJECTIONS AND ACCORDINGLY DO NOT EXPRESS AN OPINION OR ANY OTHER FORM OF ASSURANCE WITH RESPECT TO THE FINANCIAL PROJECTIONS, ASSUME NO RESPONSIBILITY FOR THE FINANCIAL PROJECTIONS, AND DISCLAIM ANY ASSOCIATION WITH THE FINANCIAL PROJECTIONS.  EXCEPT AS MAY OTHERWISE BE PROVIDED IN THE PLAN OR THIS DISCLOSURE STATEMENT, THE DEBTORS DO NOT INTEND TO UPDATE OR OTHERWISE REVISE THESE FINANCIAL PROJECTIONS TO REFLECT EVENTS OR CIRCUMSTANCES EXISTING OR ARISING AFTER THE DATE OF THIS DISCLOSURE STATEMENT OR TO REFLECT THE OCCURRENCE OF UNANTICIPATED EVENTS.

THE FINANCIAL PROJECTIONS, WHILE PRESENTED WITH NUMERICAL SPECIFICITY, ARE NECESSARILY BASED ON A VARIETY OF ESTIMATES AND ASSUMPTIONS THAT, THOUGH CONSIDERED REASONABLE BY THE DEBTORS,

MAY NOT BE REALIZED, AND ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC, COMPETITIVE, INDUSTRY, REGULATORY, MARKET, AND FINANCIAL UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH WILL BE BEYOND THE COMPANY'S AND THE REORGANIZED DEBTORS' CONTROL. THE DEBTORS CAUTION THAT NO REPRESENTATIONS CAN BE OR ARE MADE AS TO THE ACCURACY OF THE FINANCIAL PROJECTIONS OR TO THE REORGANIZED DEBTORS' ABILITY TO ACHIEVE THE PROJECTED RESULTS. SOME ASSUMPTIONS MAY ULTIMATELY BE INCORRECT. MOREOVER, EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THE PROJECTIONS WERE PREPARED MAY BE DIFFERENT FROM THOSE ASSUMED, OR, ALTERNATIVELY, MAY HAVE BEEN UNANTICIPATED, AND THUS MAY AFFECT FINANCIAL RESULTS IN A MATERIAL AND POSSIBLY ADVERSE MANNER. THE FINANCIAL PROJECTIONS, THEREFORE, MAY NOT BE RELIED UPON AS A GUARANTEE OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR. SEE <u>ARTICLE X</u> OF THIS DISCLOSURE STATEMENT (CERTAIN RISK FACTORS TO BE CONSIDERED).

IN DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN, HOLDERS OF CLAIMS OR INTERESTS ENTITLED TO VOTE ON THE PLAN MUST MAKE THEIR OWN DETERMINATIONS AS TO THE REASONABLENESS OF SUCH ASSUMPTIONS AND THE RELIABILITY OF THE FINANCIAL PROJECTIONS AND SHOULD CONSULT WITH THEIR OWN ADVISORS.

### 4. Equitable Distribution of Voting Power

Pursuant to section 1123(a)(6) of the Bankruptcy Code, to the extent applicable to these Chapter 11 Cases, the New Organizational Documents of the Reorganized Debtors will prohibit the issuance of non-voting equity securities.

### 5. Additional Requirements for Non-Consensual Confirmation

As mentioned above, in the event that any impaired Class of Claims or Interests does not accept or is deemed to reject the Plan, the Bankruptcy Court may still confirm the Plan at the request of the Debtors if, as to each impaired Class of Claims or Interests that has not accepted the Plan, the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to such Class of Claims or Interests, pursuant to section 1129(b) of the Bankruptcy Code. Both of these requirements are in addition to other requirements established by case law interpreting the statutory requirements.

#### 1. Unfair Discrimination Test

The "no unfair discrimination" test applies to Classes of Claims or Interests that are of equal priority and are receiving different treatment under the Plan. A chapter 11 plan does not discriminate unfairly, within the meaning of the Bankruptcy Code, if the legal rights of a dissenting Class are treated in a manner consistent with the treatment of other Classes whose legal rights are substantially similar to those of the dissenting Class and if no Class of Claims or Interests receives more than it legally is entitled to receive for its Claims or Interests. This test does not require that the treatment be the same or equivalent, but that such treatment be "fair."

The Debtors believe that the Plan satisfies the "unfair discrimination" test.

2.   Fair and Equitable Test

The "fair and equitable" test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100% of the allowed amount of the claims in such class.  As to dissenting classes, the test sets different standards depending on the type of claims in such class.

The Debtors believe that the Plan satisfies the "fair and equitable" test.  The Debtors submit that if the Debtors "cramdown" the Plan pursuant to section 1129(b) of the Bankruptcy Code, the Plan is structured so that it does not "discriminate unfairly" and satisfies the "fair and equitable" requirement.  With respect to the unfair discrimination requirement, all Classes under the Plan are provided treatment that is substantially equivalent to the treatment that is provided to other Classes that have equal rank in priority.  With respect to the fair and equitable requirement, no Class under the Plan will receive more than 100% of the amount of Allowed Claims or Interests in that Class. The Debtors believe that the Plan and the treatment of all Classes of Claims or Interests under the Plan satisfy the foregoing requirements for nonconsensual Confirmation of the Plan.

**ARTICLE XIII.**
**ALTERNATIVES TO CONFIRMATION**
**AND CONSUMMATION OF THE PLAN**

The Debtors have evaluated several alternatives to the Plan.  After studying these alternatives, the Debtors have concluded that the Plan is the best alternative and will maximize recoveries to parties in interest, assuming confirmation and consummation of the Plan.  If the Plan is not confirmed and consummated, the alternatives to the Plan are (a) the preparation and presentation of an alternative plan of reorganization, (b) a sale of some or all of the Debtors' assets pursuant to section 363 of the Bankruptcy Code, or (c) a liquidation under chapter 7 of the Bankruptcy Code.

**A.**   **Alternative Plan of Reorganization**

Subject to the terms of the Restructuring Support Agreement, the DIP Credit Agreements and the Backstop Commitment Agreement, if the Plan is not confirmed, the Debtors (or if the Debtors' exclusive period in which to file a plan of reorganization has expired, any other party in interest) could attempt to formulate a different plan.  Such a plan might involve either a reorganization and continuation of the Debtors' business or an orderly liquidation of its assets. The Debtors, however, submit that the Plan, as described herein, enables their creditors to realize the most value under the circumstances.

**B.**   **Sale Under Section 363 of the Bankruptcy Code**

If the Plan is not confirmed, the Hornblower Debtors could seek from the Bankruptcy Court, after notice and a hearing, authorization to sell their assets under section 363 of the Bankruptcy Code.  Upon analysis and consideration of this alternative, the Hornblower Debtors do not believe a sale of their assets under section 363 of the Bankruptcy Code would yield a higher recovery for Holders of Claims or Interests in the Hornblower Debtors than the Plan.

C.    <u>**Liquidation Under Chapter 7 or Applicable Non-Bankruptcy Law**</u>

If no plan can be confirmed, the Chapter 11 Cases may be converted to cases under Chapter 7 in which a trustee would be elected or appointed to liquidate the assets of the Debtors for distribution to their creditors in accordance with the priorities established by the Bankruptcy Code.  The Liquidation Analysis sets forth the effect a Chapter 7 liquidation would have on the recovery of Holders of Allowed Claims and Interests.

As noted in the Liquidation Analysis, the Debtors believe that liquidation under Chapter 7 would result in lower distributions to creditors than those provided for under the Plan.  Among other things, the value that the Debtors would expect to obtain from their assets in a Chapter 7 liquidation, instead of continuing as a going concern as provided in the Plan, would be materially less.  A Chapter 7 liquidation would also generate more unsecured claims against the Debtors' Estates from, among other things, damages related to rejected contracts.  In addition, a Chapter 7 liquidation would result in a delay from the conversion of the Chapter 11 Cases and the additional administrative expenses associated with the appointment of a trustee and the trustee's retention of professionals, who would take time and incur expenses to become familiar with the many legal and factual issues in these Chapter 11 Cases.

**ARTICLE XIV.**
**<u>CONCLUSION AND RECOMMENDATION</u>**

For all of the reasons set forth in this Disclosure Statement, the Debtors believe the Plan is in the best interests of all stakeholders and urge the Holders of the Voting Classes to vote in favor thereof.  Any alternative other than confirmation of the Plan could result in extensive delays and increased administrative expenses, ultimately resulting in smaller distributions to the Holders of Allowed Claims and Interests than those set forth in the Plan.

*[Remainder of page intentionally left blank]*

Dated:   March 18, 2024

HORNBLOWER HOLDINGS LLC (for itself and on behalf of each of the other Debtors and Debtors-in-Possession)

*/s/ Jonathan Hickman*
Name:  Jonathan Hickman
Title:   Chief Restructuring Officer