**EXHIBIT B**

**RESTRUCTURING SUPPORT AGREEMENT**

*Execution Version*

HORNBLOWER HOLDINGS LP, ET AL.

RESTRUCTURING SUPPORT AGREEMENT

**February 21, 2024**

**THIS RESTRUCTURING SUPPORT AGREEMENT AND THE DOCUMENTS ATTACHED TO THIS RESTRUCTURING SUPPORT AGREEMENT COLLECTIVELY DESCRIBE A PROPOSED RESTRUCTURING OF HORNBLOWER HOLDINGS LP, A DELAWARE LIMITED PARTNERSHIP, AND ITS AFFILIATES AND SUBSIDIARIES PARTY HERETO ON THE TERMS AND CONDITIONS SET FORTH ON EXHIBIT A ATTACHED TO THIS RESTRUCTURING SUPPORT AGREEMENT.**

**THIS RESTRUCTURING SUPPORT AGREEMENT IS NOT AN OFFER OR A SOLICITATION WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OR SECTION 1126 OF THE BANKRUPTCY CODE.  ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE.**

**THIS RESTRUCTURING SUPPORT AGREEMENT IS A SETTLEMENT PROPOSAL TO CERTAIN HOLDERS OF COMPANY CLAIMS/INTERESTS IN FURTHERANCE OF SETTLEMENT DISCUSSIONS.   ACCORDINGLY, THIS RESTRUCTURING SUPPORT AGREEMENT IS PROTECTED BY RULE 408 OF THE FEDERAL RULES OF EVIDENCE AND ANY OTHER APPLICABLE STATUTES OR DOCTRINES PROTECTING THE USE OR DISCLOSURE OF CONFIDENTIAL SETTLEMENT DISCUSSIONS. NOTHING CONTAINED IN THIS RESTRUCTURING SUPPORT AGREEMENT SHALL CONSTITUTE OR BE CONSTRUED TO BE AN ADMISSION OF FACT OR LIABILITY.**

**THIS RESTRUCTURING SUPPORT AGREEMENT DOES NOT PURPORT TO SUMMARIZE ALL OF THE TERMS, CONDITIONS, REPRESENTATIONS, WARRANTIES, AND OTHER PROVISIONS WITH RESPECT TO THE TRANSACTIONS DESCRIBED IN THIS RESTRUCTURING SUPPORT AGREEMENT, WHICH TRANSACTIONS WILL BE SUBJECT TO THE COMPLETION OF DEFINITIVE DOCUMENTS INCORPORATING THE TERMS AND CONDITIONS SET FORTH IN THIS RESTRUCTURING SUPPORT AGREEMENT AND THE CLOSING OF ANY TRANSACTION SHALL BE SUBJECT TO THE TERMS AND CONDITIONS SET FORTH IN SUCH DEFINITIVE DOCUMENTS.**

This RESTRUCTURING SUPPORT AGREEMENT (including all exhibits, annexes, and schedules to this Agreement in accordance with Section 15.02 of this Agreement, this "Agreement") is made and entered into as of February 21, 2024 (the "Execution Date"), by and among the following parties, each in the capacity set forth on its signature page to this

Agreement (each of the following described in sub-clauses (i) through (vi) of this preamble, a "<u>Party</u>" and, collectively, the "<u>Parties</u>"):[1]

    i.    Hornblower Holdings LP, a limited partnership organized under the Laws of the State of Delaware ("<u>Hornblower</u>"), Hornblower Holdings, LLC, and each of their respective direct and indirect subsidiaries that has executed and delivered, or, in the future, executes and delivers, counterpart signature pages to this Agreement (each a "<u>Company Party</u>" and, collectively with Hornblower, the "<u>Company Parties</u>");

    ii.    the undersigned holders of, or nominees, investment managers, investment advisors, or subadvisors to funds and/or accounts that hold, or trustees of trusts that hold, certain of the outstanding First Lien Claims that have executed and delivered counterpart signature pages to this Agreement, or signature pages to a Joinder or Transfer Agreement (as applicable), to the Company Parties and Initial Consenting Stakeholders (collectively, the "<u>Consenting First Lien Lenders</u>");

    iii.    the undersigned holders of, or nominees, investment managers, investment advisors, or subadvisors to funds and/or accounts that hold, or trustees of trusts that hold, certain of the outstanding Incremental Superpriority Claims (the "<u>Incremental Superpriority Lenders</u>") that have executed and delivered counterpart signature pages to this Agreement, or signature pages to a Joinder or Transfer Agreement (as applicable), to counsel to the Company Parties and Initial Consenting Stakeholders (collectively, the "<u>Consenting Incremental Superpriority Lenders</u>" and, together with the Consenting First Lien Lenders, the "<u>Consenting Term Lenders</u>");

    iv.    the undersigned holders of, or nominees, investment managers, investment advisors, or subadvisors to funds and/or accounts that hold, or trustees of trusts that hold, certain of the outstanding Revolver Claims that have executed and delivered counterpart signature pages to this Agreement, or signature pages to a Joinder or Transfer Agreement (as applicable), to counsel to the Company Parties and Initial Consenting Stakeholders (collectively, the "<u>Consenting Revolver Lenders</u>" and, together with the Consenting First Lien Lenders, the "<u>Consenting HB First Lien Lenders</u>");

    v.    the undersigned holders of, or nominees, investment managers, investment advisors, or subadvisors to funds and/or accounts that hold, or trustees of trusts that hold, certain of the outstanding JBIH Claims that have executed and delivered counterpart signature pages to this Agreement, or signature pages to a Joinder or Transfer Agreement (as applicable), to counsel to the Company Parties and Initial Consenting Stakeholders (collectively, the "<u>Consenting JBIH Lenders</u>" and, collectively with the Consenting HB First Lien Lenders and the Consenting Incremental Superpriority Lenders, the "<u>Consenting Lenders</u>"); and

---

[1] Capitalized terms used but not defined in the preamble and recitals to this Agreement have the meanings ascribed to them in Section 1, or the Restructuring Term Sheet, as applicable.

     vi.    the undersigned holders or beneficial holders of, or nominees, investment managers, investment advisors, or subadvisors to funds and/or accounts that hold or beneficially hold, or trustees of trusts that hold or beneficially hold Interests in Hornblower that have executed and delivered counterpart signature pages to this Agreement, a Joinder, or a Transfer Agreement to counsel to the Company Parties and Initial Consenting Stakeholders (each, a "<u>Consenting Equityholder</u>" and, collectively, the "<u>Consenting Equityholders</u>" and, together with the Consenting Lenders, the "<u>Consenting Stakeholders</u>").

### *RECITALS*

**WHEREAS**, the Parties have in good faith and at arm's length negotiated certain restructuring transactions with respect to the Company Parties' capital structure and operations on the terms set forth in this Agreement and in the term sheet attached as **<u>Exhibit A</u>** to this Agreement (the "<u>Restructuring Transactions</u>", and such term sheet, together with the exhibits and appendices annexed to such term sheet, the "<u>Restructuring Term Sheet</u>");

**WHEREAS**, the Company Parties intend to implement the Restructuring Transactions through commencing voluntary prearranged cases under chapter 11 of the Bankruptcy Code in the Bankruptcy Court and effectuating the Restructuring Transactions by means of the Plan (the cases commenced by the Company Parties in the Bankruptcy Court, the "<u>Chapter 11 Cases</u>");

**WHEREAS**, recognition of the Chapter 11 Cases (the "<u>CCAA Proceeding</u>") will be sought in the Ontario Superior Court of Justice (Commercial List) (the "<u>CCAA Court</u>") pursuant to Part IV of the Companies' Creditors Arrangement Act (the "<u>CCAA</u>");

**WHEREAS**, on the date hereof: (i) the Company Parties and (ii) the Consenting Stakeholders have agreed to the Restructuring Term Sheet, which sets forth the principal terms of the Restructuring Transactions;

**WHEREAS**, the Parties have agreed to support the Restructuring Transactions subject to and in accordance with the terms of this Agreement (including the Restructuring Term Sheet) and desire to work together to complete the negotiation of the terms of the documents and the completion of each of the actions necessary or desirable to effect the Restructuring Transactions; and

**WHEREAS**, the Parties have agreed to take certain actions in support of the Restructuring Transactions on the terms and conditions set forth in this Agreement, including the Restructuring Term Sheet.

**NOW, THEREFORE**, in consideration of the covenants and agreements contained in this Agreement, and for other valuable consideration, the receipt and sufficiency of which are acknowledged, each Party, intending to be legally bound, agrees as follows:

### *AGREEMENT*

**Section 1.**     ***Definitions and Interpretation.***

1.01.   <u>Definitions</u>.  The following terms shall have the following definitions:

"<u>Ad Hoc Group</u>" means the unaffiliated group of Consenting Term Lenders represented by the Ad Hoc Group Advisors.

"<u>Ad Hoc Group Advisors</u>" means, collectively, Milbank LLP, as counsel, Perella Weinberg Partners, LP, as investment banker, FTI Consulting, Inc., as financial advisor, Haynes & Boones, LLP, as local Texas counsel, Seward & Kissel LLP, as Jones Act counsel, one counsel in Australia, one counsel in Canada, one counsel in the United Kingdom, one counsel in the Bahamas, one concession agreement counsel, one legal counsel to address any conflicts issues, and foreign legal counsel selected by the Ad Hoc Group in each foreign jurisdiction that the Ad Hoc group determines is necessary subject to the prior written consent of the Company Parties (not to be unreasonably withheld, conditioned, or delayed).

"<u>Ad Hoc Group Fees and Expenses</u>" means all reasonable and documented fees and expenses incurred by the Ad Hoc Group Advisors in connection with the representation of the Ad Hoc Group, regardless of whether such fees and expenses are incurred before, on, or after the Execution Date, incurred through and including the Plan Effective Date, in each case in connection with the negotiation and/or implementation of this Agreement and/or the Restructuring Transactions and in each case in accordance with the terms of any applicable fee letter agreement between such firms and one or more of the Company Parties.

"<u>Affiliate</u>" means, with respect to any specified Entity, any other Entity directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Entity.  For purposes of this definition, "control" (including, with correlative meanings, the terms "controlling," "controlled by," and "under common control with") as used with respect to any Entity, shall mean the possession, directly or indirectly, of the right or power to direct or cause the direction of the management or policies of such Entity, whether through the ownership of voting securities, by agreement, or otherwise.

"<u>Agents</u>" means, collectively, each of the First Lien Agent, the Incremental Superpriority Agent, the Revolver Agent and the JBIH Agent, in each case including any successors thereto.

"<u>Agreement</u>" has the meaning set forth in the preamble to this Agreement and, for the avoidance of doubt, includes all exhibits, annexes, and schedules to this Agreement in accordance with <u>Section 15.02</u> of this Agreement (including the Restructuring Term Sheet).

"<u>Agreement Effective Period</u>" means, with respect to a Party, the period from the RSA Effective Date (or the date after the RSA Effective Date that such Party becomes a Party to this Agreement by executing a Joinder or Transfer Agreement) to the Termination Date applicable to that Party.

"<u>Alternative Transaction Proposal</u>" means any written or oral inquiry, proposal, offer, bid, term sheet, discussion, or agreement with respect to a sale, disposition, new-money investment,

restructuring, reorganization, merger, amalgamation, acquisition, consolidation, dissolution, debt investment, equity investment, financing (including any debtor-in-possession financing or exit financing), use of cash collateral, joint venture, partnership, liquidation, tender offer, recapitalization, plan of reorganization or liquidation, share exchange, business combination, or similar transaction involving any one or more Company Parties or a Claim against or Interest or other interests in any one or more Company Parties that is an alternative to one or more of the Restructuring Transactions.

"AQV Bidding Procedures Order" means an order of the Bankruptcy Court establishing bidding procedures for the sale of AQV Debtors or their assets, setting dates for the submission of bids and the auction (if any) in accordance with the bidding procedures, and granting related relief.

"AQV Debtors" means, collectively, American Queen Holdco, LLC and its direct and indirect subsidiaries.

"AQV Sale Motion" means the motion filed by the Company Parties with the Bankruptcy Court seeking approval of the AQV Bidding Procedures and authorization to sell the assets of the AQV Debtors pursuant to section 363 of the Bankruptcy Code, together with any other pleadings or documents to be filed with the Bankruptcy Court in support of such motion.

"AQV Sale Order" means the order or orders of the Bankruptcy Court authorizing the AQV Debtors to implement and close the AQV Sale Transaction.

"AQV Sale Transaction" means in connection with the AQV wind down, a sale or multiple sales of the assets of the AQV Debtors to a purchaser or purchasers to be consummated pursuant to the AQV Sale Order pursuant to section 363 of the Bankruptcy Code.

"AQV Wind Down" means, a wind down of the AQV Debtors.

"Backstop Documents" means the Backstop Motion, the Backstop Order and the Backstop Purchase Agreement.

"Backstop Motion" means the motion filed by the Company Parties seeking authority from the Bankruptcy Court to enter into the Backstop Purchase Agreement and to satisfy their obligations to the Backstop Parties thereunder (including granting such obligations administrative expense priority status under section 503(b)(1) and 507(a)(2) of the Bankruptcy Code), together with any other pleadings or documents to be filed with the Bankruptcy Court in support of such motion.

"Backstop Order" means the order entered by the Bankruptcy Court approving the relief requested in the Backstop Motion, including the authorization for the Debtors to enter into the Backstop Purchase Agreement.

"Backstop Parties" means each of the Consenting HB First Lien Lenders that are party to this Agreement as of the RSA Effective Date or their designees or transferees that shall provide the Company Parties with a commitment to backstop the Rights Offering on terms and conditions set forth in the Backstop Purchase Agreement and this Agreement.

"Backstop Purchase Agreement" means that agreement (as may be amended, modified or otherwise supplemented from time to time) setting forth (i) the identities of the Backstop Parties for the Rights Offering, and (ii) the terms and conditions of the Backstop Commitments (as defined in the Restructuring Term Sheet), and the payment of consideration to the Backstop Parties in exchange for such commitments, together with any related agreements, documents or instrument, and which shall be acceptable in form and substance to the Backstop Parties.

"Bankruptcy Code" means Title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as amended.

"Bankruptcy Court" means the United States Bankruptcy Court for the Southern District of Texas.

"Business Day" means any day other than a Saturday, Sunday, or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, the state of New York.

"Cash Collateral" has the meaning set forth in section 363(a) of the Bankruptcy Code.

"Causes of Action" means any action, Claim, cause of action, controversy, demand, right, action, lien, indemnity, interest, guaranty, suit, obligation, liability, damage, judgment, account, defense, offset, power, privilege, and license of any kind or character whatsoever, whether known or unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Plan Effective Date, in contract or in tort, in law (whether local, state, or federal U.S. or non-U.S. law) or in equity, or pursuant to any other theory of local, state, or federal U.S. or non-U.S. law.  For the avoidance of doubt, "Cause of Action" includes:  (a) any right of setoff, counterclaim, or recoupment and any Claim for breach of contract or for breach of duties imposed by law or in equity; (b) any Claim based on or relating to, or in any manner arising from, in whole or in part, tort, breach of contract, breach of fiduciary duty, fraudulent transfer or fraudulent conveyance or voidable transaction law, violation of local, state, or federal or non-U.S. law or breach of any duty imposed by law or in equity, including securities laws, negligence, and gross negligence; (c) any Claim pursuant to section 362 or chapter 5 of the Bankruptcy Code or similar local, state, or federal U.S. or non-U.S. law; (d) any Claim or defense including fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; (e) any state or foreign law pertaining to actual or constructive fraudulent transfer, fraudulent conveyance, or similar Claim; (f) any "lender liability" or equitable subordination Claims or defenses; and (g) the right to object to or otherwise contest any Claims or Interests.

"CCAA" has the meaning set forth in the recitals to this Agreement.

"CCAA Proceeding" has the meaning set forth in the recitals to this Agreement.

"CCAA Court" has the meaning set forth in the recitals to this Agreement.

"Chapter 11 Cases" has the meaning set forth in the recitals to this Agreement.

"Claim" has the meaning ascribed to it in section 101(5) of the Bankruptcy Code and section 2(1) of the CCAA.

"Company Claims/Interests" means, collectively, any Claim against or Interest in a Company Party.

"Company Advisors" means the Company Parties' retained advisors, including: (i) Paul, Weiss, Rifkind, Wharton & Garrison LLP, as counsel, (ii) Porter Hedges LLP, as co-counsel, (iii) Hill Dickinson LLP, as United Kingdom counsel, (iv) Borden Ladner Gervais LLP, as Canadian counsel, (v) Montgomery McCracken Walker & Rhoads LLP, as maritime counsel, (vi) Guggenheim Securities, LLC, as investment banker, (vii) Alvarez & Marsal North America, LLC, as financial and restructuring advisors, and (viii) any other advisors the Company retains in connection with the implementation of the Restructuring Transaction.

"Company Parties" has the meaning set forth in the preamble to this Agreement.

"Confidentiality Agreement" means an executed confidentiality agreement with a Company Party, including with respect to the issuance of a "cleansing letter" or other agreement regarding the public disclosure of material non-public information, in connection with any proposed Restructuring Transaction.

"Confirmation Order" means the order of the Bankruptcy Court confirming the Plan under section 1129 of the Bankruptcy Code, which Confirmation Order shall be in accordance with this Agreement and the Definitive Documents.

"Confirmation Recognition Order" means an order of the CCAA Court recognizing the Confirmation Order, which order shall be consistent in all material respects with this Agreement.

"Consenting Equityholders" has the meaning set forth in the preamble to this Agreement.

"Consenting First Lien Lenders" has the meaning set forth in the preamble to this Agreement.

"Consenting Incremental Superpriority Lenders" has the meaning set forth in the preamble to this Agreement; provided, that the Incremental Superpriority Loans shall be refinanced by DIP Loans upon entry of the DIP Order(s) effectuating the Refinancing (as defined in the Restructuring Term Sheet).

"Consenting JBIH Lenders" has the meaning set forth in the preamble to this Agreement.

"Consenting Stakeholders" has the meaning set forth in the preamble to this Agreement.

"Consenting Stakeholders Fees and Expenses" means, collectively, the Ad Hoc Group Fees and Expenses, the Crestview Fees and Expenses and the Prepetition Agent Fees and Expenses.

"Consenting Term Lenders" has the meaning set forth in the preamble to this Agreement.

"Consenting Revolver Lenders" has the meaning set forth in the preamble to this Agreement.

"Crestview" means each of Crestview HB Holdings, L.P. Crestview IV HB Holdings, L.P. and, in each case, each Related Fund thereof.

"Crestview Advisors" means (a) Davis Polk & Wardwell LLP, as counsel, (b) any special counsel, (c) one local counsel selected by Crestview in each applicable jurisdiction, (d) PJT Partners, Inc. and (e) all other advisors that Crestview determines is necessary subject to the prior written consent of the Company Parties.

"Crestview Consent Right" means the right of Crestview, as Consenting First Lien Lenders, Consenting JBIH Lenders, Consenting Revolving Lenders and/or Consenting Equityholders, to consent to or approve any of the Definitive Documents (or any amendment, modifications, or supplements thereto), in each case solely to the extent that such Definitive Document: (i) adversely affects, directly or indirectly, the rights of, or the consents or waivers proposed to be granted to, or received by, Crestview or its Affiliates (in any capacity) pursuant to this Agreement or any Definitive Document; (ii) implements, modifies or affects the releases or exculpation proposed to be granted to or received by Crestview or its Affiliates (in any capacity), the governance rights or the terms of the New HB Organizational Documents described in the Restructuring Term Sheet or the treatment of indemnification rights, directors' and officers' liability insurance or Crestview's Company Claims/Interests pursuant to this Agreement or any Definitive Document; (iii) affects, directly or indirectly, the obligations that Crestview or its Affiliates (in any capacity) may have pursuant to this Agreement (including the Restructuring Term Sheet) or any Definitive Document, as applicable; (iv) affects, directly or indirectly, the Journey Beyond Entities, their assets or liabilities or any Restructuring Transaction to which the Journey Beyond Entities are party; or (v) provides for disparate and adverse treatment of, or has a disparate and adverse impact on, Crestview or its Affiliates (in any capacity), or their respective Company Claims/Interests, as compared to any other Consenting Stakeholder under this Agreement or any other Definitive Document; in each case, which consent shall not be unreasonably withheld, conditioned, or delayed.

"Crestview Fees and Expenses" means all reasonable and documented fees and expenses incurred by the Crestview Advisors, regardless of whether such fees and expenses are incurred before, on, or after the Execution Date, incurred through and including the Plan Effective Date, in each case in connection with the negotiation and/or implementation of this Agreement and/or the Restructuring Transactions; *provided* that (i) legal fees and expenses accruing prior to the Petition Date and fees and expenses of PJT Partners, Inc. shall be subject to an aggregate reimbursement cap of $2,750,000, (ii) legal fees and expenses accruing after the Petition Date shall be reasonably estimated for inclusion in any budget in connection with the DIP Facility in accordance with the DIP Documents (which estimates shall not restrict or limit the amount of fees and expenses payable hereunder) and (iii) Crestview Fees and Expenses shall not include any fees and expenses incurred by the Crestview Advisors solely in connection with litigation brought against Crestview in its capacity as shareholder or against its board members (it being understood that in the event litigation is brought against Crestview in multiple capacities, Davis Polk & Wardwell LLP shall estimate in good faith the portion of such fees and expenses attributable to litigation brought against Crestview in its capacity as shareholder or against its board members, and such portion

shall be excluded from the definition of Crestview Fees and Expenses), *provided* that this clause (iii) shall not nullify or void any indemnification or other rights against the Company Parties or any other Person, or under any applicable insurance policies. All invoices for Crestview Fees and Expenses delivered to the Company Parties shall be contemporaneously delivered to the Ad Hoc Group.

"Debtors" means the Company Parties that commence Chapter 11 Cases.

"Definitive Documents" means all of the definitive documents implementing the Restructuring Transactions, including those set forth in Section 3.01 of this Agreement, and, in each case, any amendments, modifications, and supplements thereto and any related notes, certificates, agreements, documents, and instruments (as applicable).

"DIP Claims" means any Claim on account of DIP Loans.

"DIP Credit Agreements" means the Senior DIP Credit Agreement and the Junior DIP Credit Agreement, each as defined in the Restructuring Term Sheet.

"DIP Documents" means the DIP Motion, the DIP Orders, the DIP Credit Agreements and any amendments, modifications, supplements thereto, and together with any related notes, certificates, agreements, security agreements, documents and instruments (including any amendments, restatements, supplements or modifications of any of the foregoing) related to or executed in connection therewith.

"DIP Loans" means the loans outstanding under the DIP Credit Agreements.

"DIP Motion" means the motion seeking approval of the Company Parties' incurrence of the DIP Loans and the Bankruptcy Court's entry of the DIP Orders, together with any other pleadings or documents to be filed with the Bankruptcy Court in support of such motion.

"DIP Orders" means the Interim DIP Order, the Final DIP Order, the Interim DIP Recognition Order and the Final DIP Recognition Order.

"Disclosure Statement" means the disclosure statement with respect to the Plan in accordance with, among other things, sections 1125, 1126(b), and 1145 of the Bankruptcy Code, Rule 3018 of the Federal Rules of Bankruptcy Procedure, and other applicable Law, including all exhibits, annexes, schedules, and supplements thereto, each as may be amended, supplemented, or modified from time to time.

"Disclosure Statement Motion" means the motion filed with the Bankruptcy Court seeking entry of the Disclosure Statement Order, together with any other pleadings or documents to be filed with the Bankruptcy Court in support of such motion.

"Disclosure Statement Order" means the order (and all exhibits thereto) entered by the Bankruptcy Court approving the adequacy of information in the Disclosure Statement and approving the Solicitation Materials and the solicitation of votes on the Plan and the Rights Offering Documents.

"Entity" means any person, individual, corporation, limited liability company, partnership, joint venture, association, joint stock company, trust, unincorporated organization, Governmental Body, any agency or political subdivision of any Governmental Body, or any other entity, whether acting in an individual, fiduciary, or other capacity.

"Execution Date" has the meaning set forth in the preamble to this Agreement.

"Exit Credit Agreement" means the credit agreement pursuant to which the Reorganized Hornblower Debtors incur the Exit Term Loans on the Plan Effective Date, and that governs the terms of the Exit Term Loans.

"Exit Credit Documents" means the Exit Credit Agreement, including any amendments, modifications, supplements thereto, and together with any related notes, certificates, agreements, security agreements, documents and instruments (including any amendments, restatements, supplements or modifications of any of the foregoing) related to or executed in connection therewith.

"Exit Term Loans" means the first lien secured term loans incurred on the Plan Effective Date pursuant to the Exit Credit Documents.

"Final DIP Order" means the order entered by the Bankruptcy Court authorizing and approving the DIP Loans and the DIP Documents on a final basis and setting forth the terms and conditions for the use of the proceeds of the DIP Loans and use Cash Collateral.

"Final DIP Recognition Order" means an order of the CCAA Court recognizing the Final DIP Order, which order shall be consistent in all material respects with this Agreement and the DIP Credit Agreements.

"Final Order" means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter that has not been reversed, stayed, modified, or amended, and as to which the time to appeal or seek certiorari has expired and no appeal or petition for certiorari has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be filed has been resolved by the highest court to which the order or judgment could be appealed or from which certiorari could be sought or a new trial, reargument or rehearing shall have been denied, resulted in no modification of such order, or has otherwise been dismissed with prejudice.

"First Day Pleadings" means any first-day and second-day pleadings that the Company Parties determine, in consultation with the Consenting Stakeholders, are necessary or desirable to file with the Bankruptcy Court.

"First Lien Agent" means GLAS Trust Company LLC, as successor to UBS AG, Stamford Branch, in its capacity as administrative agent and collateral agent under the First Lien Credit Agreement and any predecessor, replacement or successor agent thereto.

"First Lien Claim" means any Claim on account of First Lien Loans.

"First Lien Credit Agreement" means that certain First Lien Credit Agreement, dated as of April 27, 2018 (as amended, restated, modified, supplemented, or replaced from time to time in accordance with its terms), by and among Hornblower Sub, LLC and American Queen Sub, LLC, as borrowers, certain of the Company Parties, as subsidiary loan parties, UBS AG, Stamford Branch, as administrative agent and collateral agent, and the other parties thereto from time to time.

"First Lien Loans" means the loans outstanding under the First Lien Credit Agreement, including, for the avoidance of doubt, Term Loans and the Revolving Facility Loans (each as defined in the First Lien Credit Agreement).

"Governmental Body" means any U.S. or non-U.S. federal, state, municipal, or other government, or other department, commission, board, bureau, agency, public authority, or instrumentality thereof, or any other U.S. or non-U.S. court or arbitrator (other than the Bankruptcy Court).

"HB First Lien Claims" means, collectively, the First Lien Claims and the Revolver Claims.

"Hornblower" has the meaning set forth in the preamble to this Agreement.

"HSR Act" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976 (as amended).

"Incremental Superpriority Agent" means Alter Domus (US) LLC, in its capacity as administrative agent, collateral agent, and incremental term loan representative under the Incremental Superpriority Credit Agreement and any predecessor, replacement or successor agent thereto.

"Incremental Superpriority Claim" means any Claim on account of Incremental Superpriority Loans; *provided*, that the Incremental Superpriority Loans shall be refinanced by DIP Loans upon entry of the DIP Order(s) effectuating the Incremental Superpriority Refinancing (as defined in the Restructuring Term Sheet).

"Incremental Superpriority Credit Agreement" means that certain Incremental Superpriority Credit Agreement, dated as of November 17, 2023 (as amended pursuant to that certain *Incremental Assumption and Amendment Agreement No. 1*, dated as of December 28, 2023 and as further amended, restated, modified, supplemented, or replaced from time to time in accordance with its terms), by and among Hornblower Sub, LLC and American Queen Sub, LLC, as borrowers, certain of the Company Parties, as subsidiary loan parties, Alter Domus (US) LLC, as administrative agent, collateral agent, and incremental term loan representative and the other parties thereto from time to time.

"Incremental Superpriority Loans" means the loans outstanding under the Incremental Superpriority Credit Agreement; *provided*, that the Incremental Superpriority Loans shall be refinanced by DIP Loans upon entry of the DIP Order(s) effectuating the Incremental Superpriority Refinancing (as defined in the Restructuring Term Sheet).

"Initial Consenting Stakeholder" means each Consenting Stakeholder party hereto as of the date of execution of this Agreement.

"Interests" means, collectively, the shares (or any class thereof), common stock, preferred stock, limited partnership units, limited liability company interests, membership interests, and any other equity, ownership, or profits interests of any Company Party, and options, warrants, rights, stock appreciation rights, phantom units, incentives, commitments, calls, redemption rights, repurchase rights, or other securities or arrangements to acquire or subscribe for, or which are convertible into, or exercisable or exchangeable for, the shares (or any class thereof) of, common stock, preferred stock, limited partnership units, limited liability company interests, membership interests, or any other equity, ownership, or profits interests of any Company Party (in each case whether or not arising under or in connection with any employment agreement).

"Interim DIP Order" means the interim order entered by the Bankruptcy Court authorizing and approving the DIP Loans and the DIP Documents on an interim basis and setting forth the terms and conditions for the use of the proceeds of the DIP Loans and use Cash Collateral.

"Interim DIP Recognition Order" means an order of the CCAA Court recognizing the Interim DIP Order, which order shall be consistent in all material respects with this Agreement and the DIP Credit Agreements.

"JBIH Agent" means UBS AG, Stamford Branch, in its capacity as administrative agent under the JBIH Credit Agreement and any predecessor, replacement or successor agent thereto.

"JBIH Claim" means any Claim on account of JBIH Loans.

"JBIH Credit Agreement" means that certain Credit Agreement, dated as of November 18, 2022 (as amended, supplemented or otherwise modified from time to time), by and among Journey Beyond Intermediate Holdings, LLC, as borrower, Journey Beyond Holdings, Ltd., as parent, Hornblower Group, LLC and Hornblower Group Holdco, LLC, as obligors, the lenders from time to time party thereto, the JBIH Agent, as administrative agent and collateral agent.

"JBIH Loans" means the loans outstanding under the JBIH Credit Agreement.

"Joinder" means a joinder to this Agreement substantially in the form attached to this Agreement as **Exhibit B** providing, among other things, that such Person signatory thereto is bound by the terms of this Agreement.  For the avoidance of doubt, any party that executes a Joinder shall be a "Party" under this Agreement as provided therein, subject (solely in the case of any such party that is not a Related Fund of an existing Consenting Stakeholder) to the consent of the Company Parties and the Required Consenting HB First Lien Lenders.

"Jones Act" means the Shipping Act of 1916 and the Merchant Marine Act of 1920 (as amended).

"Journey Beyond Entities" has the meaning ascribed to such term in the Restructuring Term Sheet.

"Law" means any federal, state, local, or non-U.S. law (including, in each case, any common law), statute, code, ordinance, rule, regulation, decree, injunction, order, ruling, assessment, writ or other legal requirement, or judgment, in each case, that is validly adopted, promulgated, issued, or entered by a Governmental Body of competent jurisdiction (including the Bankruptcy Court and the CCAA Court).

"Loan Claims" means, collectively, the First Lien Claims, the Superpriority Claims, the Incremental Superpriority Claims, the Revolver Claims, and the JBIH Claims.

"Milestones" has the meaning set forth in **Schedule 1** attached to this Agreement.

"New HB Common Equity" has the meaning ascribed to such term in the Restructuring Term Sheet.

"New HB Organizational Documents" means the new Organizational Documents of Reorganized Hornblower and its direct and indirect subsidiaries (as applicable), including any shareholders agreement, registration agreement, or similar document.

"New JB Common Equity" has the meaning ascribed to such term in the Restructuring Term Sheet.

"New JB Organizational Documents" means the new Organizational Documents of the Journey Beyond Entities, including any shareholders agreement, registration agreement, or similar document, as well as any Definitive Document effectuating the treatment of the JBIH Claims set forth in the Restructuring Term Sheet.

"Organizational Documents" means, with respect to any Company Party, the documents by which such Company Party was organized or formed (such as a certificate of incorporation, certificate of formation, certificate of limited partnership, or articles of organization, and including, without limitation, any certificates of designation for preferred stock or other forms of preferred equity) or which relate to the internal governance of such Person (such as by-laws, a partnership agreement, or an operating, limited liability company, shareholders, or members agreement).

"Parties" has the meaning set forth in the preamble to this Agreement.

"Permits" means any license, permit, registration, authorization, approval, certificate of authority, accreditation, qualification, or similar document or authority that has been issued or granted by any Governmental Body.

"Permitted Transferee" means each transferee of any Company Claims/Interests that meets the requirements of Section 9 of this Agreement.

"Person" means an individual, a partnership, a joint venture, a limited liability company, a corporation, a trust, an unincorporated organization, a group, a Governmental Body, or any legal entity or association.

"Petition Date" means the first date any of the Debtors commence the Chapter 11 Cases.

13

"Plan" means the joint plan of reorganization filed by the Debtors under chapter 11 of the Bankruptcy Code that embodies the Restructuring Transactions, including all exhibits, annexes, schedules, and supplements thereto, each as may be amended, supplemented, or modified from time to time, including the Plan Supplement.

"Plan Effective Date" means the first Business Day on which all conditions to consummation of the Plan have been satisfied in full or waived, in accordance with the terms of the Plan, and the Plan becomes effective.

"Plan Supplement" means the compilation of documents and forms of documents, schedules, and exhibits to the Plan that will be filed by the Debtors with the Bankruptcy Court.

"Prepetition Agent Fees and Expenses" means all fees and expenses of the Agents required to be paid in accordance with the Prepetition Credit Agreements.

"Prepetition Credit Agreements" means the First Lien Credit Agreement, the Incremental Superpriority Credit Agreement, the Superpriority Credit Agreement, the Revolver Credit Agreement, and the JBIH Credit Agreement.

"Public Disclosure" has the meaning set forth in Section 15.20 of this Agreement.

"Qualified Marketmaker" means an entity that (i) holds itself out to the public or the applicable private markets as standing ready in the ordinary course of business to purchase from customers and sell to customers Company Claims/Interests (or enter with customers into long and short positions in Company Claims/Interests), in its capacity as a dealer or market maker in Company Claims/Interests and (ii) is, in fact, regularly in the business of making a market in Claims against, or Interests in, issuers or borrowers (including debt securities or other debt).

"Related Fund" means, with respect to a Consenting Stakeholder, any Affiliates (including at the institutional level) of such Consenting Stakeholder or any fund, account (including any separately managed accounts) or investment vehicle that is controlled, managed, advised or sub-advised by such Consenting Stakeholder, an Affiliate of such Consenting Stakeholder or by the same investment manager, advisor or subadvisor as such Consenting Stakeholder or an Affiliate of such Consenting Stakeholder.

"Reorganized Hornblower" has the meaning ascribed to such term in the Restructuring Term Sheet.

"Reorganized Hornblower Debtors" has the meaning ascribed to such term in the Restructuring Term Sheet.

"Required Consenting HB First Lien Lenders" means, as of the relevant date, Consenting HB First Lien Lenders holding[2] at least a majority of the HB First Lien Claims that are held by

---

[2]   For purposes of this Agreement, including in connection with determining requisite consent thresholds, termination thresholds, the occurrence of the RSA Effective Date, covenants, and representations and warranties with respect to holdings of Loan Claims, holdings of Loan Claims shall include any executed but unsettled trades and any Loan Claims beneficially held by the applicable party. Any covenants or representations and warranties with respect to voting shall be satisfied with respect to

14

Consenting HB First Lien Lenders at the relevant time; *provided* that, with respect to any matter subject to the Crestview Consent Right, "Required Consenting HB First Lien Lenders" shall also require Crestview.

"<u>Required Consenting Stakeholders</u>" means, as of the relevant date, the Required Consenting HB First Lien Lenders and the Consenting JBIH Lenders.

"<u>Restructuring Term Sheet</u>" has the meaning set forth in the recitals to this Agreement.

"<u>Restructuring Transactions</u>" has the meaning set forth in the recitals to this Agreement, which Restructuring Transactions will be implemented by means of the Plan and the other Definitive Documents.

"<u>Revolver Agent</u>" means UBS AG, Stamford Branch, in its capacity as administrative agent and collateral agent under the Revolver Credit Agreement and any predecessor, replacement or successor agent thereto.

"<u>Revolver Claim</u>" means any Claim on account of the Revolver Loans.

"<u>Revolver Credit Agreement</u>" means that certain Credit Agreement, dated as of May 13, 2020 (as amended, restated, modified, supplemented, or replaced from time to time in accordance with its terms), by and among Hornblower Sub, LLC and American Queen Sub, LLC, as borrowers, certain of the Company Parties, as subsidiary loan parties, UBS AG, Stamford Branch, as administrative agent and collateral agent, and the other parties thereto from time to time.

"<u>Revolver Loan</u>" means the loans outstanding under the Revolver Credit Agreement.

"<u>Rights Offering</u>" has the meaning ascribed to such term in the Restructuring Term Sheet.

"<u>Rights Offering Documents</u>" means the documentation setting forth the terms, conditions, and procedures for the method to conduct the Rights Offering, any documentation necessary to effectuate the Rights Offering, and any amendments, modifications, or supplements thereto.

"<u>RSA Effective Date</u>" means the date on which the conditions set forth in <u>Section 2</u> of this Agreement have been satisfied or waived by the required Party or Parties in accordance with this Agreement.

"<u>Rules</u>" means Rule 501(a)(1), (2), (3), and (7) of the Securities Act.

"<u>Securities Act</u>" means the Securities Act of 1933, as amended.

"<u>Solicitation Materials</u>" means any documents, forms, ballots, notices, and other materials provided in connection with the solicitation of votes on the Plan pursuant to sections 1125 and 1126 of the Bankruptcy Code.

---

any unsettled trades by using commercially reasonable efforts to exercise all rights such Consenting Stakeholder has to cause and direct the applicable holder of such Loan Claims to vote.

"Superpriority Agent" means Alter Domus (US) LLC, in its capacity as administrative agent and collateral agent under the Superpriority Credit Agreement and any replacement or successor agent thereto.

"Superpriority Claim" means any Claim on account of Superpriority Loans.

"Superpriority Credit Agreement" means that certain Superpriority Credit Agreement, dated as of November 10, 2020 (as amended, restated, modified, supplemented, or replaced from time to time in accordance with its terms), by and among Hornblower Sub, LLC and American Queen Sub, LLC, as borrowers, certain of the Company Parties, as subsidiary loan parties, Alter Domus (US) LLC, as administrative agent and collateral agent, and the other parties thereto from time to time.

"Superpriority Loans" means the loans outstanding under the Superpriority Credit Agreement.

"Termination Date" means the date on which a termination of this Agreement is effective as to a Party in accordance with Sections 13.01, 13.02, 13.03, or 13.04.

"Transfer" means to sell, resell, reallocate, use, pledge, assign, transfer, hypothecate, participate, donate, or otherwise encumber or dispose of, directly or indirectly (including through derivatives, options, swaps, pledges, forward sales, or other transactions).

"Transfer Agreement" means an executed form of the transfer agreement substantially in the form attached to this Agreement as **Exhibit C** providing, among other things, that a transferee is bound by the terms of this Agreement.  For the avoidance of doubt, any transferee that executes a Transfer Agreement shall be a "Party" under this Agreement as provided therein.

1.02.   Interpretation.  For purposes of this Agreement:

(a)   in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender;

(b)   capitalized terms defined only in the plural or singular form shall nonetheless have their defined meanings when used in the opposite form;

(c)   unless otherwise specified, any reference in this Agreement to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions;

(d)   unless otherwise specified, any reference in this Agreement to an existing document, schedule, or exhibit shall mean such document, schedule, or exhibit, as it may have been or may be amended, restated, amended and restated, supplemented, or otherwise modified or replaced from time to time; notwithstanding the foregoing, any capitalized terms in this Agreement which are defined with reference to another agreement (other than the Restructuring Term Sheet), are defined with reference to such other agreement as of the date of this Agreement, without giving

effect to any termination of such other agreement or amendments to such capitalized terms in any such other agreement following the Execution Date;

(e)      unless otherwise specified, all references to "Sections" are references to Sections of this Agreement;

(f)      the words "herein," "hereof," and "hereto" refer to this Agreement in its entirety rather than to any particular portion of this Agreement;

(g)      captions and headings to Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Agreement;

(h)      references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable limited liability company Laws;

(i)      the use of "include" or "including" is without limitation, whether stated or not;

(j)      unless otherwise specified, references to "days" shall mean calendar days; and

(k)      references to "counsel to the Consenting Stakeholders" shall mean each counsel specified in <u>Section 15.10</u> other than counsel to the Company Parties.

1.03.    <u>Conflicts</u>.  To the extent there is a conflict between the body of this Agreement (without reference to the exhibits, annexes, and schedules hereto), on the one hand, and the Restructuring Term Sheet or any other exhibits, annexes, and schedules to this Agreement, on the other hand, the terms and provisions of the Restructuring Term Sheet or any other exhibits, annexes, and schedules to this Agreement shall govern.  To the extent there is a conflict between this Agreement (including the Restructuring Term Sheet and any other exhibits, annexes, and schedules hereto) on the one hand, and the Definitive Documents, on the other hand, the terms and provisions of the Definitive Documents shall govern.

**Section 2.**      *Effectiveness of this Agreement.*

2.01.    This Agreement shall become effective and binding upon each of the Parties on the RSA Effective Date, which is the date on which all of the following conditions have been satisfied or waived in accordance with this Agreement:

(a)      each of the Company Parties shall have executed and delivered counterpart signature pages of this Agreement to counsel to each of the Parties;

(b)      each of the Consenting Equityholders shall have executed and delivered counterpart signature pages of this Agreement to counsel to each of the Parties;

(c)      the following shall have executed and delivered counterpart signature pages of this Agreement to counsel to the Company Parties:

(i)       holders of at least two-thirds (66.7%) of the aggregate outstanding First Lien Claims;

(ii)      holders of at least two-thirds (66.7%) of the aggregate outstanding Incremental Superpriority Claims;

(iii)     holders of at least two-thirds (66.7%) of the aggregate outstanding Revolver Claims; and

(iv)     holders of at least two-thirds (66.7%) of the aggregate outstanding JBIH Claims;

(d)      the Company Parties shall have paid all Consenting Stakeholders Fees and Expenses, in each case, for which an invoice has been received by the Company Parties on or before the RSA Effective Date; and

(e)      counsel to the Company Parties shall have given notice to counsel to the Consenting Stakeholders in the manner set forth in Section 15.10 hereof (by email or otherwise) that the other conditions to the RSA Effective Date set forth in this Section 2 have occurred.

2.02.   This Agreement shall be effective from the RSA Effective Date until validly terminated pursuant to the terms of this Agreement.  To the extent that a Consenting Stakeholder holds, as of the date hereof or thereafter, multiple Company Claims/Interests, such Consenting Stakeholder shall be deemed to have executed this Agreement in respect of all of its Company Claims/Interests.

**Section 3.**       *Definitive Documents.*

3.01.   The Definitive Documents governing the Restructuring Transactions shall include all material customary documents necessary to implement the Restructuring Transactions, including, but not limited to:  (a) the Plan; (b) the Confirmation Order; (c) the Confirmation Recognition Order; (d) the Disclosure Statement; (e) the Disclosure Statement Order; (f) the Disclosure Statement Motion; (g) the Solicitation Materials; (h) the Backstop Documents; (i) the Rights Offering Documents; (j) the DIP Documents; (k) the First Day Pleadings, any other material pleadings, and all orders sought and entered pursuant to the foregoing; (l) the Exit Credit Documents; (m) the AQV Sale Motion; (n) the AQV Bidding Procedures Order; (o) the AQV Sale Order; (p) the New HB Organizational Documents; (q) the New JB Organizational Documents; (r) the Plan Supplement; and (s) all other customary documents delivered in connection with transactions of this type (including, without limitation, any and all material documents necessary to implement the Restructuring Transactions).

3.02.   The Definitive Documents not executed or in a form attached to this Agreement as of the Execution Date remain subject to negotiation and completion.  Upon completion, the Definitive Documents and every other document, deed, agreement, filing, notification, letter, or instrument related to the Restructuring Transactions shall be consistent in all material respects with the terms of this Agreement (including the Restructuring Term Sheet), as they may be modified, amended, or supplemented in accordance with Section 14 of this Agreement.  Further, the Definitive Documents not executed or in a form attached to this Agreement as of the Execution

Date shall otherwise be in form and substance reasonably acceptable to (a) the Company Parties, (b) other than with respect to the New JB Organizational Documents, the Required Consenting HB First Lien Lenders, and (c) solely to the extent of the Crestview Consent Right, Crestview. The New JB Organizational Documents and any provisions of any Definitive Documents related to the emergence of the Journey Beyond Entities as separate entities from the other Company Parties (including related to tax treatment) shall be in form and substance reasonably acceptable to the Consenting JBIH Lenders.

**Section 4.**    *Milestones.*    The Restructuring Transactions shall be implemented in accordance with the Milestones set forth in Schedule 1 attached to this Agreement, which may only be extended with the express prior written consent (email being sufficient) of the Required Consenting HB First Lien Lenders.

**Section 5.**    *Commitments of the Consenting Stakeholders.*

5.01.    Affirmative Commitments.    During the Agreement Effective Period, each Consenting Stakeholder agrees, in respect of all of its Company Claims/Interests, severally, and not jointly, to:

(a)    use commercially reasonable efforts and timely take all reasonable actions necessary to support, implement, and consummate the Restructuring Transactions, including (as applicable) in connection with:  (1) supporting the debtor and third-party releases, injunctions, discharges, indemnities, and exculpation provisions incorporated into the Plan, *provided* that such provisions shall be consistent with the terms set forth in this Agreement (including the Restructuring Term Sheet); and (2) voting (as applicable and to the extent solicited) all Company Claims/Interests owned or held by such Consenting Stakeholder and exercising any powers or rights available to it (including in any board, shareholders', or creditors' meeting or in any process requiring voting or approval to which they are legally entitled to participate), in each case in favor of any matter requiring approval to the extent necessary to implement the Restructuring Transactions or measures reasonably requested by the Company Parties to implement the Restructuring Transactions; *provided* that no Consenting Stakeholder shall be obligated to waive (to the extent waivable by such Consenting Stakeholder) any condition to the consummation of any part of the Restructuring Transactions set forth in any Definitive Document;

(b)    use commercially reasonable efforts to cooperate with and assist the Company Parties in obtaining additional support for the Restructuring Transactions from the Company Parties' other stakeholders;

(c)    use commercially reasonable efforts to give any notice, order, instruction, or direction to any applicable Agent reasonably necessary to give effect to the Restructuring Transactions;

(d)    negotiate in good faith and use commercially reasonable efforts to execute and implement the Definitive Documents that are consistent with this Agreement to which it is required to be a party;

(e)    to the extent any legal, financial, or structural impediment arises that would prevent, hinder, impede, or delay the consummation of the Restructuring Transactions, negotiate in good

faith regarding appropriate additional or alternative provisions to eliminate such impediment (without affecting the economic outcome for the Consenting Stakeholders or other material terms contemplated by this Agreement);

(f)      cooperate in good faith to structure the Restructuring Transactions in a manner that is tax-efficient for each of the Initial Consenting Stakeholders and the Company Parties; *provided that*, for the avoidance of doubt, the failure to structure the Restructuring Transactions in a manner that is tax-efficient for each of the Initial Consenting Stakeholders notwithstanding such good faith efforts shall not be a breach of this Agreement;

(g)      forbear from the exercise of its rights (including any right of set-off) or remedies it may have under any of the Prepetition Credit Agreements, and any agreement contemplated thereby or executed in connection therewith, as applicable, and under applicable U.S. or non-U.S. law or otherwise, in each case, with respect to any breaches, defaults, events of defaults, or potential defaults (expressly including, for the avoidance of doubt, any such breaches, defaults, events of defaults, or potential defaults occurring during the Agreement Effective Period) by the Company Parties.   Each Consenting Stakeholder specifically agrees that this Agreement constitutes a direction to each of the Agents to refrain from exercising any remedy available or power conferred to any of the Agents against the Company Parties or any of their assets except as necessary to effectuate the Restructuring Transactions.  For the avoidance of doubt, nothing in this Section 5.01(f) shall restrict or limit the Consenting Stakeholders from taking any action permitted or required to be taken hereunder for the purposes of consummating the Restructuring Transactions, including pursuant to any Definitive Document or the filing of a proof of claim or interest; and

(h)      use commercially reasonable efforts to obtain any and all required governmental, regulatory, and/or third-party approvals required to be obtained by such Consenting Stakeholder for the Restructuring Transactions.

5.02.   Negative Commitments.  During the Agreement Effective Period, each Consenting Stakeholder agrees, in respect of each of its Company Claims/Interests, that it shall not:

(a)      object to, delay, impede, or take any other action to interfere with the acceptance, implementation, or consummation of the Restructuring Transactions, including through instructions to the applicable Agent;

(b)      directly or indirectly solicit, initiate, encourage, endorse, propose, file, support, approve, or vote for any Alternative Transaction Proposal;

(c)      file any motion, pleading, or other document with any court (including any modifications or amendments to any motion, pleading, or other document with any court) that, in whole or in part, is not materially consistent with this Agreement;

(d)      exercise, or direct any other person to exercise, any right or remedy for the enforcement, collection, or recovery of any Claims against or Interests in the Company Parties including rights or remedies arising from or asserting or bringing any Claims under or with respect to the Prepetition Credit Agreements that are inconsistent with this Agreement or the Definitive Documents;

(e)      initiate, or have initiated on its behalf, any litigation or proceeding of any kind with respect to the Chapter 11 Cases, the CCAA Proceeding, this Agreement, the Restructuring Term Sheet or the other Restructuring Transactions contemplated in this Agreement against the Company Parties or the other Parties other than to enforce this Agreement or any Definitive Document or as otherwise permitted under this Agreement;

(f)      object to, delay, impede, or take any other action to interfere with the Company Parties' ownership and possession of their assets, wherever located, or interfere with the automatic stay arising under section 362 of the Bankruptcy Code or the stay imposed by the CCAA Court in the CCAA Proceeding; or

(g)      file or otherwise support, encourage, seek, solicit, pursue, initiate, assist, join or participate in any challenge to the validity, enforceability, perfection or priority of, or any action seeking avoidance, claw-back, recharacterization or subordination of, any portion of the (i) Company Claims/Interests (or the liens or collateral in respect thereof) of the Consenting Stakeholders or (ii) that certain Fourth Amended and Restated Subordinated Intercompany Note issued by HB TopCo Pty Ltd to Journey Beyond Intermediate Holdings, LLC.

5.03.   <u>Commitments with Respect to Chapter 11 Cases and CCAA Proceeding</u>.   In addition to the affirmative and negative commitments set forth in <u>Sections 5.01</u>, and <u>5.02</u>, during the Agreement Effective Period, each Consenting Stakeholder agrees in respect of all of its Company Claims/Interests, severally, and not jointly, that it shall:

(a)      (i) to the extent such Consenting Stakeholder is entitled to vote to accept or reject the Plan, (A) vote each of its Company Claims/Interests to accept the Plan by delivering its duly executed and completed ballot accepting the Plan on a timely basis following the commencement of the solicitation of the Plan and its actual receipt of the Solicitation Materials, and (B) not change, withdraw, amend, or revoke (or cause or direct to be changed, withdrawn, amended, or revoked) any such vote described in the foregoing <u>Section 5.03(a)(i)</u>, and (ii) regardless of whether such Consenting Stakeholder is entitled to vote to accept or reject the Plan, agree to provide or opt into, and to not opt out of or object to, releases set forth in the Plan consistent with the terms set forth in this Agreement (including the Restructuring Term Sheet), and not change, withdraw, amend, or revoke (or cause or direct to be changed, withdrawn, amended, or revoked) any such release;

(b)      not directly or indirectly, through any person, seek, solicit, propose, support, assist, engage in negotiations in connection with, or participate in the formulation, preparation, filing, or prosecution of any Alternative Transaction Proposal or object to or take any other action that would reasonably be expected to prevent, interfere with, delay, or impede the solicitation of votes on the Plan, approval of the Disclosure Statement, the confirmation and consummation of the Plan and the Restructuring Transactions, or the entry of orders regarding the Definitive Documents; *provided*, that such Disclosure Statement and Plan shall be consistent with the terms set forth in this Agreement (including the Restructuring Term Sheet);

(c)      use commercially reasonable efforts to support and take all actions reasonably requested by the Company Parties to facilitate the solicitation, approval of the Disclosure Statement, and confirmation and consummation of the Plan within the timeframes contemplated

by this Agreement; *provided*, that such Disclosure Statement and Plan shall be consistent with the terms set forth in this Agreement, including the Restructuring Term Sheet;

(d)      use commercially reasonable efforts to support, and not directly or indirectly object to, delay, impede, or take any other action to interfere with any motion or other pleading or document filed by a Company Party in the Bankruptcy Court or the CCAA Proceeding that is consistent with this Agreement; and

(e)      not object to, join in any objection to, impede, or take any other action to interfere with any motion or other pleading or document filed by the Company Parties or any other Party in the Bankruptcy Court that is consistent with this Agreement.

5.04.   Additional Commitments of the Consenting Equityholders.  During the Agreement Effective Period, each Consenting Equityholder agrees, severally, and not jointly, that it shall:

(a)      not pledge, encumber, assign, sell, or otherwise transfer, offer, or contract to pledge, encumber, assign, sell, or otherwise transfer, including by the declaration of a worthless stock deduction for any tax year ending prior to the Plan Effective Date, in whole or in part, any portion of its right, title, or interests in any Interests in the Company Parties, whether held directly or indirectly;

(b)      not take (i) any action that would result in the application of Section 108(e)(4) of the Code, or (ii) any tax position that can reasonably be expected to adversely impact any tax attributes of any Company Party; and

(c)      not purchase or otherwise acquire, or contract to purchase or otherwise acquire, in whole or in part, any right, title or interests in any Claims, whether directly or indirectly, to the extent that such purchase or acquisition is described in Section 108(e)(4) of the U.S. Internal Revenue Code of 1986, as amended; *provided* that nothing in Section 5.04(b) or this Section 5.04(c) shall apply to any Claims held or beneficially owned (including any executed but unsettled trades) by any Consenting Equityholder as of the RSA Effective Date.

**Section 6.      *Additional Provisions Regarding the Consenting Stakeholders' Commitments.*** Nothing in this Agreement shall:  (a) affect the ability of any Consenting Stakeholder to consult with any other Consenting Stakeholder, the Company Parties, or any other party in interest, including any official committee and/or the United States Trustee (solely to the extent such consultation is consistent with this Agreement and does not delay, interfere with, or impede the Restructuring Transactions); (b) impair or waive the rights of any Consenting Stakeholder to assert or raise any objection not prohibited under this Agreement or any Definitive Document in connection with the Restructuring Transactions; (c) prevent any Consenting Stakeholder from (i) enforcing this Agreement or any Definitive Documents, (ii) contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement or any Definitive Documents, or (iii) exercising any rights or remedies under this Agreement or any Definitive Documents; (d) limit the rights of a Consenting Stakeholder under the Chapter 11 Cases and/or the CCAA Proceeding, including appearing as a party in interest in any matter to be adjudicated in order to be heard concerning any matter arising in the Chapter 11 Cases and/or the CCAA Proceeding, in each case, so long as the exercise of any such right is not inconsistent with such Consenting Stakeholder's

obligations hereunder; (e) limit the ability of a Consenting Stakeholder to purchase, sell or enter into any transactions regarding the Company Claims/Interests, subject to the terms hereof, and any applicable agreements governing such Company Claims/Interests; (f) constitute a waiver or amendment of any term or provision of the Prepetition Credit Agreements; (g) require any Consenting Stakeholder to incur, assume, or become liable for any financial or other liability or obligation other than as expressly described in this Agreement; (h) prevent any Consenting Stakeholder from taking any customary perfection step or other action as is necessary to preserve or defend the validity, existence, and priority of its Company Claims/Interests or any lien securing any such Claims/Interests (including the filing of proofs of claim); or (i) require any Consenting Stakeholder to (x) take, or refrain from taking, any action where to do so would breach any law, regulation, order or direction of a Governmental Body, the Bankruptcy Court, or the CCAA Court applicable to such Consenting Stakeholder, or (y) fail to comply with any antitrust or regulatory obligations applicable to such Consenting Stakeholder, in each case under clauses (x) and (y), as reasonably determined by such Consenting Stakeholder in good faith based on advice of counsel (which may include internal counsel); *provided*, with respect to the foregoing clause (x), solely to the extent such breach cannot be avoided or removed by taking reasonable steps which would not otherwise cause any material disadvantage to such Consenting Stakeholder.

**Section 7.**   *Commitments of the Company Parties.*

7.01.   <u>Affirmative Commitments</u>.   During the Agreement Effective Period, subject to <u>Section 8.01</u> of this Agreement, each of the Company Parties (or their successors in interest, as applicable) agrees to:

(a)      use commercially reasonable efforts to (i) pursue, consummate, and implement the Restructuring Transactions on the terms and in accordance with the Milestones set forth in this Agreement (including the Restructuring Term Sheet), including by negotiating the Definitive Documents in good faith, and (ii) cooperate, if necessary, with the Consenting Stakeholders to obtain necessary Bankruptcy Court and CCAA Court approval of the Definitive Documents to consummate the Transactions;

(b)      support and take all commercially reasonable actions necessary or reasonably requested by the other Parties to facilitate the solicitation, confirmation, approval, and consummation of the Restructuring Transactions, as applicable, to the extent consistent with the terms and conditions in this Agreement;

(c)      to the extent any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the Restructuring Transactions contemplated in this Agreement, take all steps reasonably necessary or desirable to eliminate any such impediment, including negotiating in good faith appropriate additional or alternative provisions to address any such impediment, in consultation with the Consenting Stakeholders.

(d)      incorporate into the Plan debtor and third-party releases, injunctions, discharge, indemnity, and exculpation provisions consistent with the terms set forth in this Agreement (including the Restructuring Term Sheet) and use commercially reasonable efforts to obtain Bankruptcy Court approval of such provisions;

(e)     use commercially reasonable efforts to obtain any and all required Permits and regulatory and/or third-party approvals for the Restructuring Transactions, including regulatory approvals under Australian law as may be applicable, the Jones Act and the HSR Act or similar anti-trust regulatory approvals;

(f)     negotiate in good faith, execute, deliver, and perform its obligations under the Definitive Documents in accordance with the terms of this Agreement and any other required agreements to effectuate and consummate the Restructuring Transactions and the transactions contemplated by the Definitive Documents;

(g)     use commercially reasonable efforts to obtain additional support for the Restructuring Transactions from their other material stakeholders;

(h)     to the extent applicable, use commercially reasonable efforts to provide counsel to the Consenting Stakeholders a review period of (i) at least two (2) calendar days prior to the date when the Company Parties intend to file any Definitive Document with the Bankruptcy Court and/or the CCAA Court, with the filing of such Definitive Document subject to the consent rights set forth in this Agreement, and (ii) at least two (2) calendar days prior to the date when the Company intends to file any other material pleading with the Bankruptcy Court and/or the CCAA Court (but excluding monthly or quarterly operating reports, retention applications, fee applications, fee statements, and any declarations in support thereof or related thereto) and consult in good faith with counsel to the Consenting Stakeholders regarding the form and substance of any such proposed filing and, if reasonably requested by counsel to the Consenting Stakeholders prior to any applicable hearing, any arguments in respect thereof;

(i)     timely object to any motion filed with the Bankruptcy Court or the CCAA Court by any person (i) seeking the entry of an order terminating the Company Parties' exclusive right to file and/or solicit acceptances of a chapter 11 plan or (ii) seeking the entry of an order terminating, annulling, or modifying the automatic stay (as set forth in section 362 of the Bankruptcy Code) or the stay imposed by the CCAA Court in the CCAA Proceeding, in each case, with regard to any material asset that, to the extent such relief was granted, would have a material adverse effect on or delay the consummation of the Restructuring Transactions;

(j)     timely object to, and not file, any pleading before the Bankruptcy Court or the CCAA Court seeking entry of an order (i) directing the appointment of an examiner or a trustee, (ii) converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, (iii) dismissing the Chapter 11 Cases or the CCAA Proceeding, or (iv) for relief that (x) is inconsistent with this Agreement in any material respect and (y) would reasonably be expected to frustrate the purposes of this Agreement, including by preventing or delaying the consummation of the Restructuring Transactions;

(k)     timely object to any pleading filed with the Bankruptcy Court or any other court of competent jurisdiction seeking to challenge the validity, enforceability, perfection or priority of, or any action seeking avoidance, claw-back, recharacterization or subordination of, any portion of the Loan Claims or any liens or collateral securing such Loan Claims;

(l)    maintain their good standing under the laws of the state or other jurisdiction in which they are incorporated or organized, except to the extent that any failure to maintain such Company Party's good standing arises solely from the filing of the Chapter 11 Cases or the CCAA Proceeding;

(m)    promptly notify the Consenting Stakeholders and counsel to the Consenting Stakeholders in writing (email being sufficient) of the issuance by any governmental authority, including the Bankruptcy Court, any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling or order that would reasonably be expected to prevent the consummation of a material portion of the Restructuring Transactions;

(n)    if the Company Parties know of a breach by any Party (including a Company Party) of such Party's obligations, undertakings, representations, warranties, or covenants set forth in this Agreement or any other Definitive Document, furnish prompt written notice to the Consenting Stakeholders and counsel to the Consenting Stakeholders;

(o)    inform the Consenting Stakeholders and counsel to the Consenting Stakeholders reasonably promptly after becoming aware of: (i) any matter or circumstance which it knows, or believes is likely, to be a material impediment to the implementation or consummation of the Restructuring Transactions; (ii) any notice of any commencement of any involuntary insolvency proceedings, legal suit for payment of material debt, or securement of material security from or by any person in respect of any Company Party; or (iii) the occurrence of any termination event under this Agreement of which any Company Party is reasonably aware;

(p)    except as otherwise expressly set forth in, or otherwise contemplated by, this Agreement, use commercially reasonable efforts to, (i) conduct its businesses and operations only in the ordinary course in a manner that is materially consistent with past practices and in compliance with Law, (ii) maintain its physical assets, properties, and facilities in their working order condition and repair as of the Execution Date, in the ordinary course, in a manner that is consistent with past practices, and in compliance with Law (ordinary wear and tear and casualty and condemnation excepted), (iii) maintain its books and records in the ordinary course, in a manner that is materially consistent with past practices, and in compliance with Law, (iv) maintain all insurance policies, or suitable replacements therefor, in full force and effect, in the ordinary course, in a manner that is materially consistent with past practices, and in compliance with Law, (v) maintain its good standing under the Laws of the state or other jurisdiction in which it is incorporated, organized or formed; and (vi) preserve intact its business organizations and relationships with third parties (including creditors, lessors, licensors, suppliers, distributors, and customers) and employees in the ordinary course, in a manner that is consistent in all material respects with past practices, and in compliance with Law;

(q)    pay and reimburse in full in cash in immediately available funds (i) after the Petition Date, subject to any applicable orders of the Bankruptcy Court but without the need to file fee or retention applications, all Consenting Stakeholders Fees and Expenses incurred prior to (to the extent not previously paid) on and after the Petition Date, but in any event within five (5) Business Days of delivery to the Company Parties of any applicable invoice or receipt, and (ii) on the Plan Effective Date, all Consenting Stakeholders Fees and Expenses incurred and outstanding in

connection with the Restructuring Transactions (including any estimated fees and expenses estimated to be incurred through the Plan Effective Date);

(r)      cooperate in good faith to structure the Restructuring Transactions in a manner that is tax-efficient for each of the Initial Consenting Stakeholders and the Company Parties; *provided that*, for the avoidance of doubt, the failure to structure the Restructuring Transactions in a manner that is tax-efficient for each of the Initial Consenting Stakeholders notwithstanding such good faith efforts shall not be a breach of this Agreement; and

(s)      seek Bankruptcy Court approval of the Superpriority Refinancing and Incremental Superpriority Refinancing in connection with the Bankruptcy Court's entry of the Interim DIP Order; *provided however*, the Bankruptcy Court's failure to approve the Superpriority Refinancing or Incremental Superpriority Refinancing pursuant to the Interim DIP Order shall not give rise to a breach or default under this Agreement so long as such transactions are approved pursuant to the Final DIP Order.

7.02.   <u>Negative Commitments of the Company Parties</u>.  During the Agreement Effective Period, subject to <u>Section 8.01</u> of this Agreement, each of the Company Parties shall not directly or indirectly:

(a)      take, or encourage any other person or entity to take, any action, directly or indirectly, that would reasonably be expected to breach or be inconsistent with this Agreement, or take any other action, directly or indirectly, that would reasonably be expected to interfere with the acceptance, implementation, or consummation of the Restructuring Transactions, this Agreement, the Confirmation Order, or the Plan;

(b)      take any action that is inconsistent with, or is intended to frustrate or impede approval, implementation, and consummation of, this Agreement, the Restructuring Transactions described in this Agreement, the Restructuring Term Sheet, the Definitive Documents, or the Plan;

(c)      amend, supplement, waive, modify, or file a pleading seeking authority to amend, supplement, waive, or modify the Plan or any other Definitive Document, in whole or in part, in a manner that is not consistent with this Agreement;

(d)      execute, agree to execute, file, or agree to file any motion, pleading, or Definitive Documents with the Bankruptcy Court or any other court (including any modifications or amendments thereof) that, in whole or in part, is inconsistent with this Agreement, the Definitive Documents, or the Plan;

(e)      sell, or file any motion or application seeking to sell, any assets other than in the ordinary course of business without the prior written consent of Required Consenting HB First Lien Lenders;

(f)      (A) redeem or make or declare any dividends, distributions, or other payments on account of its Interests in Hornblower, or (B) make any transfers (whether by dividend, distribution, or otherwise) on account of its Interests in Hornblower to any direct or indirect parent entity or shareholder of the Company, including on account of any management, advisory, or similar fees;

*provided* that, for the avoidance of doubt, the foregoing shall not constitute a waiver of any such amounts;

(g)      authorize, create, or issue any additional Interests in any of the Company Parties other than to the extent necessary to implement the Restructuring Transactions and solely in connection with such implementation;

(h)      amend any of their Organizational Documents in a manner that is inconsistent with this Agreement or the Plan;

(i)      sell, or file any motion or application seeking to sell, any assets (or the equity of) or any right used in the business of Journey Beyond Holdings, Ltd. or its direct or indirect subsidiaries other than in the ordinary course of business without the prior written consent of Crestview;

(j)      directly or indirectly solicit, initiate, encourage, endorse, propose, file, support, approve, or otherwise promote or advance any Alternative Transaction Proposal;

(k)      file or otherwise support, encourage, seek, solicit, pursue, initiate, assist, join or participate in any challenge to the validity, enforceability, perfection or priority of, or any action seeking avoidance, claw-back, recharacterization or subordination of, any portion of the Loan Claims or any liens or collateral securing such Loan Claims; or

(l)      pledge, encumber, assign, sell, or otherwise transfer, offer, or contract to pledge, encumber, assign, sell, or otherwise transfer, in whole or in part, any portion of its right, title, or interests in any Interests in the Company Parties, whether held directly or indirectly, to the extent such pledge, encumbrance, assignment, sale, or other transfer is inconsistent with the Restructuring Transactions and will impair any of the Company Parties' tax attributes.

**Section 8.      *Additional Provisions Regarding Company Parties' Commitments.***

8.01.      Notwithstanding anything to the contrary in this Agreement, each Company Party and its directors, officers, employees, investment bankers, attorneys, accountants, consultants, and other advisors or representatives shall have the right to: (a) consider, respond to, and facilitate access to information in response to unsolicited Alternative Transaction Proposals; (b) provide access to non-public information concerning any Company Party to any Entity that (i) provides an unsolicited Alternative Transaction Proposal, (ii) executes and delivers a Confidentiality Agreement (which Confidentiality Agreement shall permit the Company to share any Alternative Transaction Proposals, the status of any discussions, and the identity of any counterparty with the Consenting Stakeholders), and (iii) requests such information; (c) cooperate with any inquiries or any proposals regarding unsolicited Alternative Transaction Proposal; and (d) enter into discussions or negotiations with holders of any Company Claim/Interest (including any Consenting Stakeholder), any other party in interest, or any other Entity regarding the Restructuring Transactions or unsolicited Alternative Transaction Proposals; provided, that the Company Parties shall (w) if any Company Party receives an Alternative Transaction Proposal, provide copies of any such written Alternative Transaction Proposal or a summary of any such oral Alternative Transaction Proposal received by the Company Parties to the Consenting Stakeholders' Advisors no later than one (1) calendar day following receipt thereof by any of the

Company Parties, (x) provide prompt updates on the status of discussions regarding any Alternative Transaction Proposal, and (y) promptly provide such information as reasonably requested by the advisors to the Consenting Stakeholders in connection with any Alternative Transaction Proposal, including any information provided to any party considering proposing an Alternative Transaction Proposal. The Company Parties (whether directly or, indirectly, through their and/or the Company Parties' advisors) will make themselves reasonably available for separate weekly status update calls with the Consenting Stakeholders with respect to the foregoing (it being understood that the foregoing requirements of this <u>Section 8.01</u> cannot be construed to create any obligations on any of the Company Parties' advisors to take or refrain from taking any action, absent an express contractual requirement to do so under their respective engagement agreements with the Company Parties, nor can any of the foregoing be construed to override any existing confidentiality or other obligations owed by any Company Party or its advisors to any Person).

8.02.   Nothing in this Agreement shall:  (a) impair or waive the rights of any Company Party to assert or raise any objection not prohibited under this Agreement or any Definitive Document in connection with the Restructuring Transactions; or (b) prevent any Company Party from (i) enforcing this Agreement or any Definitive Documents, (ii) contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement or any Definitive Documents, or (iii) exercising any rights or remedies under this Agreement or any Definitive Documents.

**Section 9.**     *Transfer of Interests and Securities.*

9.01.   During the Agreement Effective Period, no Consenting Stakeholders shall Transfer any ownership (including any beneficial ownership as defined in the Rule 13d-3 under the Securities Exchange Act of 1934, as amended) in any Loan Claims to any affiliated or unaffiliated party, including any party in which it may hold a direct or indirect beneficial interest, unless either: (a) the Initial Consenting Stakeholders consent to such Transfer (such consent to not be unreasonably withheld, conditioned, or delayed and such consent not to be required in the case of a Transfer to a Related Fund of an existing Consenting Stakeholder) and the transferee executes and delivers to counsel to the Company Parties and counsel to the Consenting Stakeholders, at or before the time of the proposed Transfer, a Transfer Agreement; or (b) the transferee is a Consenting Stakeholder and the transferee provides notice of such Transfer (including the amount and type of Loan Claims transferred) to counsel to the Company Parties and counsel to the Consenting Stakeholders at or before the time of the proposed Transfer.

9.02.   During the Agreement Effective Period, the Consenting Equityholders shall not Transfer any Interests in Hornblower and any such Transfer shall be void *ab initio*.

9.03.   Upon compliance with the requirements of <u>Section 9.01</u>, the transferor shall be deemed to relinquish its rights (and be released from its obligations) under this Agreement only to the extent of the rights and obligations in respect of such transferred Loan Claims, and the transferee shall be deemed a "Consenting Stakeholder" (as a "Consenting First Lien Lender"; a "Consenting Incremental Superpriority Lender"; a "Consenting Revolver Lender" or a "Consenting JBIH Lender", as applicable) and a "Party" under this Agreement.  Any Transfer in violation of <u>Section 9.01</u> shall be void *ab initio*.

9.04.   This Agreement shall in no way be construed to preclude the Consenting Stakeholders from acquiring additional Loan Claims.  Notwithstanding the foregoing, (a) such additional Loan Claims shall automatically and immediately upon acquisition by a Consenting Stakeholder be deemed subject to the terms of this Agreement (regardless of when or whether notice of such acquisition is given to counsel to the Company Parties or counsel to the Consenting Stakeholders) and (b) such Consenting Stakeholder must provide notice of such acquisition (including the amount and type of Loan Claims acquired) to counsel to the Company Parties within five (5) Business Days of such acquisition.

9.05.   This Section 9 shall not impose any obligation on any Company Party to issue any "cleansing letter" or otherwise publicly disclose information for the purpose of enabling a Consenting Stakeholder to Transfer any of its Loan Claims.  Notwithstanding anything to the contrary in this Agreement, to the extent a Company Party and another Party have entered into a Confidentiality Agreement, the terms of such Confidentiality Agreement shall continue to apply and remain in full force and effect according to its terms, and this Agreement does not supersede any rights or obligations otherwise arising under such Confidentiality Agreements.

9.06.   Notwithstanding the restrictions in this Section 9, a Consenting Stakeholder may Transfer Loan Claims to a Qualified Marketmaker without the requirement that such Qualified Marketmaker execute and deliver a Transfer Agreement in respect of such Loan Claims, so long as such Qualified Marketmaker subsequently transfers such Loan Claims (by purchase, sale assignment, participation, or otherwise) within five (5) Business Days of its acquisition to a transferee that executes a Transfer Agreement (unless such transferee is already a Consenting Stakeholder). To the extent that a Consenting Stakeholder is acting in its capacity as a Qualified Marketmaker, it may Transfer (by purchase, sale, assignment, participation, or otherwise) any right, title or interests in Loan Claims that the Qualified Marketmaker acquires from a holder of the Loan Claims who is not a Consenting Stakeholder without the requirement that the transferee be a Permitted Transferee.

9.07.   Notwithstanding anything to the contrary in this Section 9, the restrictions on Transfer set forth in this Section 9 shall not apply to the grant of any liens or encumbrances on any Claims in favor of a bank or broker-dealer holding custody of such Claims and Interests in the ordinary course of business and which lien or encumbrance is released upon the Transfer of such Claims.

**Section 10.** *Representations and Warranties of Consenting Stakeholders.*   Each of the Consenting Stakeholders represents, warrants, and covenants to and for the benefit of each other Party (and their respective financial and other professional advisors), severally, and not jointly, that, as of the Execution Date, except as provided in, or as otherwise may be limited by, the Prepetition Credit Agreements:

(a)      (i) it is the sole beneficial or record owner of the face amount of the Company Claims/Interests or is the nominee, investment manager, advisor, or subadvisor for beneficial holders of the Company Claims/Interests reflected in such Consenting Stakeholder's signature page to this Agreement or a Transfer Agreement, as applicable (as may be updated as a result of any Transfers pursuant to Section 9 of this Agreement), and (ii) it has not Transferred, or agreed to Transfer (other than in accordance with Section 9 of this Agreement), in whole or in part, any

Claim or Cause of Action with respect to its Company Claims/Interests that is subject to the releases contemplated by the Restructuring Transactions, and (iii) having made reasonable inquiry, it is not the beneficial or record owner of any Loan Claims or Interests in Hornblower other than those reflected in such Consenting Stakeholder's signature page to this Agreement or a Transfer Agreement, as applicable (as may be updated as a result of any Transfers pursuant to Section 9 of this Agreement);

(b)        it has the full power and authority to act on behalf of, vote, and consent to matters concerning, such Company Claims/Interests; such Company Claims/Interests are free and clear of any pledge, lien, security interest, charge, claim, equity, option, proxy, voting restriction, right of first refusal, or other limitation on disposition, transfer, or encumbrances of any kind, that would adversely affect in any way such Consenting Stakeholder's ability to perform any of its obligations under this Agreement at the time such obligations are required to be performed;

(c)        it has the full power to vote, approve changes to, and transfer all of its Company Claims/Interests referable to it as contemplated by this Agreement subject to applicable Law;

(d)        it is either (A) a qualified institutional buyer as defined in Rule 144A of the Securities Act, (B) not a U.S. person (as defined in Regulation S of the Securities Act), or (C) an institutional accredited investor (as defined in the Rules); and

(e)        it acknowledges the Company Parties' representation and warranty that the issuance and sale of the New HB Common Equity and any other securities issued pursuant to the Plan and the Restructuring Transactions is intended to be exempt from registration under the Securities Act pursuant to Section 4(a)(2) of the Securities Act and Regulation D thereunder or pursuant to section 1145 of the Bankruptcy Code, as applicable.

**Section 11.    *Representations and Warranties of Company Parties*.**  Each of the Company Parties represents, warrants, and covenants to each other Party that, as of the Execution Date:

(a)        the execution and delivery by it of this Agreement does not result in a breach of, or constitute (with due notice or lapse of time or both) a default (other than, for the avoidance of doubt, a breach or default that would be triggered as a result of the Chapter 11 Cases of any Company Parties undertaking to implement the Restructuring Transactions through the Chapter 11 Cases) under any material contractual obligation to which it or any of its affiliates is a party; and

(b)        the issuance and sale of the New HB Common Equity and any other securities pursuant to the Plan and the Restructuring Transactions is intended to be exempt from registration under the Securities Act pursuant to Section 4(a)(2) of the Securities Act and Regulation D thereunder or pursuant to section 1145 of the Bankruptcy Code.

**Section 12.    *Mutual Representations, Warranties, and Covenants*.**  Each of the Parties represents, warrants, and covenants to each other Party, severally, and not jointly, that, as of the Execution Date and as of the Plan Effective Date:

(a)        it is validly existing and in good standing under the Laws of the state of its organization, and this Agreement is a legal, valid, and binding obligation of such Party,

enforceable against it in accordance with its terms, except as enforcement may be limited by applicable Laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability;

(b)     except as expressly provided in this Agreement, the Bankruptcy Code, and the CCAA, no consent or approval is required by any person or Entity in order for it to effectuate the Restructuring Transactions contemplated by, and perform its respective obligations under, this Agreement;

(c)     the entry into and performance by it of, and the transactions contemplated by, this Agreement do not, and will not, conflict with any Law or regulation applicable to it or with any of its certificates of incorporation, bylaws, limited liability company agreements, or other Organizational Documents;

(d)     except as expressly provided in this Agreement, it has (or will have, at the relevant time) all requisite corporate or other power and authority to enter into, execute, and deliver this Agreement and to effectuate the Restructuring Transactions contemplated by, and perform its respective obligations under, this Agreement;

(e)     it has sufficient knowledge and experience to evaluate properly the terms and conditions of this Agreement, and has been afforded the opportunity to consult with its legal and financial advisors with respect to its decision to execute this Agreement, and it has made its own analysis and decision to enter into this Agreement and otherwise investigated this matter to its full satisfaction;

(f)     the execution and delivery of this Agreement and the performance of its obligations hereunder have been duly authorized by all necessary corporate or other organizational action on its part; and

(g)     except as expressly provided by this Agreement, it is not party with the other Parties to this Agreement to any restructuring or similar agreements or arrangements regarding the indebtedness of any of the Company Parties that have not been disclosed to all Parties to this Agreement.

**Section 13.**     *Termination Events.*

13.01.  <u>Consenting Stakeholders Termination Events</u>.  This Agreement may be terminated (a) with respect to the Consenting HB First Lien Lenders and the Consenting Incremental Superpriority Lenders, by the Required Consenting HB First Lien Lenders and (b) with respect to Crestview only, by Crestview, in each case, by the delivery to the Company Parties and the Consenting Stakeholders of a written notice in accordance with <u>Section 15.10</u> hereof upon the occurrence of any of the following events:

(a)     the breach in any material respect by any Company Party or any other Consenting Stakeholder of any of the representations, warranties, or covenants of such Company Party or such Consenting Stakeholder, as applicable, set forth in this Agreement that materially and adversely affects such terminating Consenting Stakeholder(s) that has not been cured (if susceptible to cure) before the earlier of (i) five (5) Business Days after such terminating Consenting Stakeholder(s)

transmit a written notice in accordance with Section 15.10 hereof detailing any such breach and (ii) one (1) calendar day prior to any proposed Plan Effective Date; *provided*, that this termination right may not be exercised by any Party that is in material breach of this Agreement;

(b) the Company Parties' entry into, implementation, modification, amendment, or filing of, or making publicly available, any of the Definitive Documents without obtaining the written consent of the applicable terminating Consenting Stakeholders (or requisite portion of such terminating Consenting Stakeholders) to the extent required in accordance with this Agreement or any Definitive Document or in a form that does not comply with this Agreement, including Sections 3.01 and 3.02, which has not been cured within one (1) Business Day;

(c) the termination of the Backstop Purchase Agreement (including, with respect to a termination of this Agreement by Crestview, a termination of the Backstop Purchase Agreement solely as to Crestview);

(d) any Company Party's (i) withdrawal of the Plan, (ii) public announcement of its intention not to support the Plan and/or the Restructuring Transactions, (iii) filing, public announcement, or execution of a definitive written agreement with respect to an Alternative Transaction Proposal, (iv) provision of notice pursuant to Section 8.01(y) hereof, or (v) agreement or indication of a material commitment to pursue (including, for the avoidance of doubt, as may be evidenced by a term sheet, letter of intent, or similar document from or to a Company Party), or public announcement of its intent to pursue, an Alternative Transaction Proposal;

(e) any Company Party files any motion, pleading, or related document with the Bankruptcy Court that is materially inconsistent with this Agreement, the Restructuring Term Sheet, or the Definitive Documents, and such motion, pleading, or related document has not been withdrawn ten (10) Business Days of the Company receiving written notice in accordance with Section 15.10 hereof that such motion, pleading, or related document is materially inconsistent with this Agreement;

(f) the issuance by any governmental authority, including the Bankruptcy Court and any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling or order that (i)(a) enjoins the consummation of or rendering illegal the Restructuring Transactions or any material portion thereof, or (b) would have a Material Adverse Effect (as defined in the Backstop Agreement) on the Company Parties' businesses, and (ii) has been issued at the request of or with the acquiescence of any Company Party or remains in effect for thirty (30) calendar days after such terminating Consenting Stakeholders transmit a written notice in accordance with Section 15.10 hereof detailing any such issuance; *provided, however,* that this termination right may not be exercised by any Party that sought or requested such ruling or order in contravention of any obligation set out in this Agreement;

(g) any of the Definitive Documents, after completion, (i) contain terms, conditions, representations, warranties or covenants that are materially inconsistent with this Agreement (including the Restructuring Term Sheet), (ii) shall have been materially and adversely amended or modified, or (iii) shall have been withdrawn, in each case, without the consent of the applicable Consenting Stakeholder(s) as required pursuant to Section 3 hereof that has not been cured (if susceptible to cure) within five (5) Business Days after such terminating Consenting

Stakeholder(s) transmit a written notice in accordance with Section 15.10 hereof detailing any of the foregoing;

(h)     if the Confirmation Order, Disclosure Statement Order, Backstop Order, or any of the DIP Orders shall have been materially and adversely reversed, vacated or modified, without the prior written consent of the applicable Consenting Stakeholder(s) as required pursuant to Section 3 hereof;

(i)     any Company Party or Initial Consenting Stakeholder terminates this Agreement;

(j)     solely with respect to the Required Consenting HB First Lien Lenders, the failure to meet a Milestone, which has not been waived or extended in a manner consistent with this Agreement, unless such failure is the result of any act, omission, or delay on the part of the terminating Consenting HB First Lien Lenders in violation of its obligations under this Agreement;

(k)     if any Company Party (i) voluntarily commences any case or files any petition seeking bankruptcy, winding up, dissolution, liquidation, administration, moratorium, reorganization, or other relief under any federal, state, or foreign bankruptcy, insolvency, administrative receivership, or similar law now or hereafter in effect, except as contemplated or permitted by this Agreement, (ii) consents to the institution of, or fails to contest in a timely and appropriate manner, any involuntary proceeding or petition described in the immediately preceding clause (i), (iii) applies for or consents to the appointment of a receiver, administrator, administrative receiver, trustee, custodian, sequestrator, conservator, or similar official with respect to any Company Party or for a substantial part of such Company Party's assets, (iv) makes a general assignment or arrangement for the benefit of creditors, or (v) takes any corporate action for the purpose of authorizing any of the foregoing;

(l)     an order is entered by the Bankruptcy Court or the CCAA Court granting relief from the automatic stay imposed by section 362 of the Bankruptcy Code or the stay imposed by the CCAA Court in the CCAA Proceeding, in each case, authorizing any party to proceed against any material asset of the Company Parties and such order materially and adversely affects any Company Party's ability to operate its business in the ordinary course or consummate the Restructuring Transactions;

(m)     with respect to a Consenting Stakeholder, a Company Party or other Consenting Stakeholder files or directly or indirectly supports another party in filing any motion, application, or adversary proceeding challenging the validity, enforceability, perfection, or priority of, or seeking avoidance, recharacterization, or subordination of, any portion of the Loan Claims held by such Consenting Stakeholder or asserts any other Cause of Action against such Consenting Stakeholder, or with respect or relating to such Loan Claims, the Prepetition Credit Agreements or any Loan Document (as such term is defined in each of the foregoing Prepetition Credit Agreements), or the prepetition liens securing the Loan Claims or challenging the validity, enforceability, perfection, or priority of, or seeking avoidance, recharacterization, or subordination of, any portion of such Consenting Stakeholders' Loan Claims or asserting any other Cause of Action against such Consenting Stakeholder, or with respect or relating to such Loan Claims or the prepetition liens securing such Loan Claims;

(n)      (i) the occurrence of a termination event under or the maturity date of the DIP Documents, (ii) the termination or modification of any of the DIP Orders in a manner that is inconsistent with the Restructuring Term Sheet or the DIP Credit Agreements; or (iii) the termination or modification of any order or agreement permitting the use of cash collateral in the Chapter 11 Cases or the CCAA Proceeding, in each case, without the consent of the applicable terminating Consenting Stakeholders;

(o)      any Company Party loses the exclusive right to file a chapter 11 plan or to solicit acceptances thereof pursuant to section 1121 of the Bankruptcy Code;

(p)      solely with respect to Crestview, either (i) the Bankruptcy Court enters an order denying confirmation of the Plan or disallowing any material provision thereof subject to the Crestview Consent Right (without the consent of Crestview) and such order remains in effect for seven (7) calendar days after entry of such order or (ii) the Plan Effective Date has not occurred on or before the date that is nine (9) months after the Petition Date, which may be extended by the Company Parties up to thirty (30) calendar days if the purpose of such extension is solely to obtain regulatory approvals; or

(q)      the entry of an order by the Bankruptcy Court or the CCAA, or the filing of a motion or application by any Company Party seeking an order (without the prior written consent of the applicable terminating Consenting Stakeholders, not to be unreasonably withheld), (i) converting one or more of the Chapter 11 Cases of a Company Party to a case under chapter 7 of the Bankruptcy Code, (ii) appointing an examiner with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code or a trustee in one or more of the Chapter 11 Cases or the CCAA Proceedings of a Company Party, (iii) rejecting this Agreement; or (iv) dismissing one or more of the Chapter 11 Cases or the CCAA Proceedings.

13.02.  <u>Company Party Termination Events.</u>  Any Company Party may terminate this Agreement as to all Parties upon prior written notice to all Parties in accordance with <u>Section 15.10</u> hereof upon the occurrence of any of the following events:

(a)      the breach in any material respect by one or more of the Consenting HB First Lien Lenders that remains uncured for a period of five (5) Business Days after the terminating Party transmits a written notice in accordance with <u>Section 15.10</u> of this Agreement detailing any such breach that has not been cured (if susceptible to cure) before the earlier of (x) five (5) Business Days after the terminating Party transmits a written notice in accordance with <u>Section 15.10</u> of this Agreement detailing any such breach and (y) one (1) calendar day prior to any proposed Plan Effective Date;

(b)      the breach in any material respect by one or more of the Consenting Incremental Superpriority Lenders of any provision set forth in this Agreement that has not been cured (if susceptible to cure) before the earlier of (x) five (5) Business Days after the terminating Party transmits a written notice in accordance with <u>Section 15.10</u> of this Agreement detailing any such breach and (y) one (1) calendar day prior to any proposed Plan Effective Date;

(c)      the breach in any material respect by one or more of the Consenting Equityholders or Consenting JBIH Lenders of any provision set forth in this Agreement that has not been cured

(if susceptible to cure) before the earlier of (i) five (5) Business Days after the terminating Party transmits a written notice in accordance with <u>Section 15.10</u> of this Agreement detailing any such breach and (ii) one (1) calendar day prior to any proposed Plan Effective Date;

(d)      the board of directors, board of managers, or such similar governing body of any Company Party determines in good faith, based on the advice of outside counsel, and notifies counsel to the Consenting Stakeholders, that proceeding with any of the Restructuring Transactions would be inconsistent with the exercise of its fiduciary duties or applicable Law; or

(e)      the issuance by any governmental authority, including the Bankruptcy Court, any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling or order that (i) enjoins the consummation of or rendering illegal the Restructuring Transactions or any material portion thereof and (ii) remains in effect for thirty (30) Business Days after the terminating Company Party transmits a written notice in accordance with <u>Section 15.10</u> of this Agreement detailing any such issuance; *provided*, *however*, this termination right shall not apply to or be exercised by any Company Party that sought or requested such ruling or order in contravention of any obligation or restriction set out in this Agreement.

13.03.   <u>Mutual Termination</u>. This Agreement, and the obligations of all Parties hereunder, may be terminated by mutual written agreement among all of the following:  (a) the Required Consenting Stakeholders; and (b) each Company Party.

13.04.   <u>Automatic Termination</u>. This Agreement shall terminate automatically as to all Parties without any further required action or notice immediately upon the occurrence of the Plan Effective Date.

13.05.   <u>Effect of Termination</u>.  Except as set forth in <u>Section 15.18</u> hereof, upon the occurrence of a Termination Date as to a Party, in any capacity, and other than as set forth in <u>Section 13.04</u> hereof upon an automatic termination of this Agreement, this Agreement shall be of no further force and effect as to such Party and its Affiliates, in every capacity, and each Party and its Affiliates subject to such termination shall be released from its commitments, undertakings, and agreements under or related to this Agreement, in all capacities and shall have the rights and remedies that it would have had, had it not entered into this Agreement, and shall be entitled to take all actions, whether with respect to the Restructuring Transactions or otherwise, that it would have been entitled to take had it not entered into this Agreement, including with respect to any and all Claims or Causes of Action, and any releases with respect to such Party will be null and void and without further force or effect; *provided*, *however*, that each of the following shall survive any such termination:  (a) any claim for breach of or non-performance of its obligations under this Agreement that occurs prior to such Termination Date, and all rights and remedies with respect to such claims shall remain in full force and effect and not be prejudiced in any way by such termination; and (b) any obligations under this Agreement that expressly survive any such termination under this Agreement, including <u>Section 15.18</u> hereof.  Upon the occurrence of a Termination Date prior to the Plan Effective Date, any and all consents, directions, or ballots provided or tendered by the Parties subject to such termination with respect to the Restructuring Transactions, in each case before the Termination Date, shall be deemed, for all purposes, to be null and void from the first instance and shall not be considered or otherwise used in any manner by the Parties in connection with the Restructuring Transactions, this Agreement, or otherwise

(without the need to seek an order of a court of competent jurisdiction or consent from the Company Parties or any other applicable Party allowing such change); *provided*, *however*, any Consenting Stakeholder withdrawing or changing its vote with respect to the Plan pursuant to this Section 13.05 on or after the Petition Date shall promptly provide written notice of such withdrawal or change to each other Party to this Agreement and the Disclosure Statement Order shall provide for such withdrawal or change without Bankruptcy Court approval notwithstanding any requirement in the Bankruptcy Rules requiring permission of the Bankruptcy Court for a Consenting Stakeholder to change or withdraw (or cause to change or withdraw) its vote to accept the Plan, the Company Parties and the other Parties shall consent to any attempt by such Consenting Stakeholder to change or withdraw (or cause to change or withdraw) such vote at such time.  Nothing in this Agreement shall be construed as prohibiting a Company Party or any of the Consenting Stakeholders from contesting whether any such termination is in accordance with its terms or to seek enforcement of any rights under this Agreement that arose or existed before a Termination Date.  Except as expressly provided in this Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict (a) any right of any Company Party or the ability of any Company Party to protect and preserve its rights (including rights under this Agreement), remedies, and interests, including its claims against any Consenting Stakeholder, and (b) any right of any Consenting Stakeholder or the ability of any Consenting Stakeholder, to protect and preserve its rights (including rights under this Agreement), remedies, and interests, including its claims against any Company Party or other Consenting Stakeholder.  Other than with respect to a termination pursuant to Section 13.02(d), no purported termination of this Agreement shall be effective under this Section 13.05 or otherwise if the Party seeking to terminate this Agreement is in material breach of this Agreement.  Nothing in this Section 13.05 shall restrict any Company Party's right to terminate this Agreement in accordance with Section 13.02(d) hereof or any Consenting Stakeholder's right to terminate this Agreement in accordance with Section 13.01(d).

13.06.  The Company Parties acknowledge that after the Petition Date, the giving of notice of termination and the exercise of any rights under this Agreement by any Party shall not be considered a violation of the automatic stay of section 362 of the Bankruptcy Code or the stay imposed by the CCAA Court in the CCAA Proceeding; *provided*, that nothing herein shall prejudice any Party's right to argue that the giving of notice of termination or the exercise of any remedies was not proper under the terms of this Agreement.  The Company Parties, to the extent enforceable, waive any right to assert that the exercise of termination rights under this Agreement is subject to the automatic stay provisions of the Bankruptcy Code and expressly stipulate and consent hereunder to the prospective modification of the automatic stay provisions of the Bankruptcy Code for purposes of exercising termination rights under this Agreement, to the extent the Bankruptcy Court determines that such relief is required.

**Section 14.**    *Amendments and Waivers*.

(a)    This Agreement may not be modified, amended, or supplemented, and no condition or requirement of this Agreement may be waived, in any manner except in accordance with this Section 14.

(b)    This Agreement may be modified, amended, or supplemented, or a condition or requirement of this Agreement may be waived, in a writing signed by:  (a) each Company Party

and (b) the following Parties: (i) the Required Consenting HB First Lien Lenders; and (ii) Crestview (solely with respect to any modification, amendment, waiver, or supplement that affects Crestview or implicates the Crestview Consent Right); *provided*, *however*, that if the proposed modification, amendment, waiver, or supplement has a material, disproportionate, and adverse effect on any of the Company Claims/Interests held by a Consenting Stakeholder, then the consent of each such affected Consenting Stakeholder shall also be required to effectuate such modification, amendment, waiver, or supplement; *provided*, *further*, that Section 13.01(p) may be waived in a writing signed by each Company Party and Crestview.

(c)      Any proposed modification, amendment, waiver, or supplement that does not comply with this Section 14 shall be ineffective and void *ab initio*.

(d)      Notwithstanding anything in this Agreement to the contrary, following the Plan Effective Date and the effective date of any other Definitive Document, any amendments, supplements, or modifications to such Definitive Document shall be in accordance with the terms of such Definitive Document and no longer be subject to the consent or approval rights set forth herein.

(e)      The waiver by any Party of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach. No failure on the part of any Party to exercise, and no delay in exercising, any right, power or remedy under this Agreement shall operate as a waiver of any such right, power or remedy or any provision of this Agreement, nor shall any single or partial exercise of such right, power or remedy by such Party preclude any other or further exercise of such right, power or remedy or the exercise of any other right, power or remedy. All remedies under this Agreement are cumulative and are not exclusive of any other remedies provided by Law.

**Section 15.      *Miscellaneous.***

15.01.  Acknowledgement.

(a)      Each Party irrevocably acknowledges and agrees that this Agreement is not and shall not be deemed to be a solicitation for acceptances of the Plan.

(b)      Notwithstanding any other provision in this Agreement, this Agreement is not and shall not be deemed to be an offer with respect to any securities. Any such offer will be made only in compliance with all applicable securities Laws, and/or other applicable Law.

15.02.  Exhibits Incorporated by Reference; Conflicts.   Each of the exhibits, annexes, signatures pages, and schedules attached hereto is expressly incorporated in, and made a part of, this Agreement, and all references to this Agreement shall include such exhibits, annexes, signature pages, and schedules.

15.03.  Further Assurances.  Subject to the other terms of this Agreement, the Parties agree to execute and deliver such other instruments and perform such acts, in addition to the matters specified in this Agreement, as may be reasonably appropriate or necessary, or as may be required by order of the Bankruptcy Court, from time to time, to effectuate the Restructuring Transactions, as applicable.

15.04.  <u>Complete Agreement</u>.  Except as otherwise explicitly provided in this Agreement, this Agreement constitutes the entire agreement among the Parties with respect to the subject matter hereof and supersedes all prior agreements, oral or written, among the Parties with respect to the subject matter of this Agreement, other than any Confidentiality Agreement.

15.05.  <u>GOVERNING LAW; SUBMISSION TO JURISDICTION; SELECTION OF FORUM</u>.  THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED IN SUCH STATE, WITHOUT GIVING EFFECT TO THE CONFLICT OF LAWS PRINCIPLES OF ANY SUCH CONTRACTS.  Each Party to this Agreement agrees that it shall bring any action or proceeding in respect of any claim arising out of or related to this Agreement, to the extent possible, in the Federal District Court for the Southern District of New York in New York City, New York or the state courts located therein, and solely in connection with claims arising under this Agreement:  (a) irrevocably submits to the exclusive jurisdiction of such court; (b) waives any objection to laying venue in any such action or proceeding in such court; and (c) waives any objection that such court is an inconvenient forum or does not have jurisdiction over any Party to this Agreement.  Notwithstanding the foregoing consent to New York jurisdiction, if the Chapter 11 Cases are commenced, each Party agrees that the Bankruptcy Court shall have exclusive jurisdiction of all matters arising out of or in connection with this Agreement.  By executing and delivering this Agreement, and upon commencement of the Chapter 11 Cases, each of the Parties irrevocably and unconditionally submits to the personal jurisdiction of the Bankruptcy Court, solely for purposes of any action, suit, proceeding, or other contested matter arising out of or relating to this Agreement, or for recognition or enforcement of any judgment rendered or order entered in any such action, suit, proceeding, or other contested matter.

15.06.  <u>TRIAL BY JURY WAIVER</u>.   EACH OF THE PARTIES IRREVOCABLY WAIVES ANY RIGHT TO HAVE A JURY PARTICIPATE IN RESOLVING ANY DISPUTE, WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE, BETWEEN ANY OF THE PARTIES ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.  INSTEAD, ANY DISPUTES RESOLVED IN COURT SHALL BE RESOLVED IN A BENCH TRIAL WITHOUT A JURY.

15.07.  <u>Execution of Agreement</u>.  This Agreement may be executed and delivered in any number of counterparts and by way of electronic signature and delivery, each such counterpart, when executed and delivered, shall be deemed an original, and all of which together shall constitute the same agreement.  Except as expressly provided in this Agreement, each individual executing this Agreement on behalf of a Party has been duly authorized and empowered to execute and deliver this Agreement on behalf of said Party.

15.08.  <u>Rules of Construction</u>.  This Agreement is the product of negotiations among the Company Parties and the Consenting Stakeholders, and in the enforcement or interpretation of this Agreement, is to be interpreted in a neutral manner, and any presumption with regard to interpretation for or against any Party by reason of that Party having drafted or caused to be drafted this Agreement, or any portion of this Agreement, shall not be effective in regard to the interpretation of this Agreement.  The Company Parties and the Consenting Stakeholders were

each represented by counsel during the negotiations and drafting of this Agreement and continue to be represented by counsel.

15.09. <u>Successors and Assigns; Third Parties</u>.  Subject to <u>Section 9</u> hereof, neither this Agreement nor any of the rights or obligations hereunder may be assigned by any Party hereto without the prior written consent of the other Parties hereto, and then only to a Person who has agreed to be bound by the provisions of this Agreement.  This Agreement is intended to (and does) bind and inure to the benefit of the Parties and their respective successors and permitted assigns, as applicable.  Unless as otherwise expressly stated or referred to herein, there are no third party beneficiaries under this Agreement.  The rights or obligations of any Party under this Agreement may not be assigned, delegated, or transferred to any other Entity except as expressly permitted in this Agreement.

15.10. <u>Notices</u>.  All notices hereunder shall be deemed given if in writing and delivered, by electronic mail, courier, or registered or certified mail (return receipt requested), to the following addresses (or at such other addresses as shall be specified by like notice):

(a)      if to a Company Party, to:

Hornblower Holdings LLC
Hornblower Holdings LP
Pier 3 on the Embarcadero
San Francisco, CA 94105
Attn: Adam Peakes
E-mail address: adam.peakes@hornblower.com

with copies to:

Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, NY 10019
Attn:  Paul M. Basta, Jacob A. Adlerstein, Kyle J. Kimpler
E-mail address:  pbasta@paulweiss.com; jadlerstein@paulweiss.com; kkimpler@paulweiss.com

(b)      if to Crestview, to the notice address provided on Crestview's signature page

with copies to:

Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, NY 10017
Attn: Brian M. Resnick, Adam L. Shpeen, Joseph W. Brown, David Kratzer
E-mail address: brian.resnick@davispolk.com; adam.shpeen@davispolk.com; joseph.w.brown@davispolk.com; david.kratzer@davispolk.com

(c)      if to the Consenting Term Lenders, to the notice address provided on such Consenting Term Lender's signature page

        with copies to:

        Milbank LLP
        55 Hudson Yards
        New York, NY 10001
        Attn:  Evan Fleck; Matt Brod; Justin Cunningham
        E-mail address: efleck@milbank.com; mbrod@milbank.com;
        jcunnin1@milbank.com

Any notice given by delivery, mail, or courier shall be effective when received.

    15.11. <u>Independent Due Diligence and Decision Making</u>.  Each Consenting Stakeholder hereby acknowledges for the benefit of the other Parties and their respective advisors that it has the requisite knowledge and experience in financial and business matters so that it is capable of evaluating the merits and risks of the securities that may be acquired by it pursuant to the transactions contemplated hereby and has had an opportunity to receive information from the Company Parties and that it has been represented by counsel in connection with this Agreement and the transactions contemplated hereby. Each Consenting Stakeholder hereby further confirms for the benefit of the other Parties and their respective advisors that its decision to execute this Agreement has been based upon its independent investigation of the operations, businesses, financial and other conditions, and prospects of the Company Parties and/or the Restructuring Transactions, and without reliance on any statement of any other Party (or such other Party's financial, legal or other professional advisors), other than such express representations and warranties of the Company Parties set forth in this Agreement.

    15.12. <u>Waiver</u>.  If the Restructuring Transactions are not consummated, or if this Agreement is terminated for any reason, nothing herein shall be construed as a waiver by any Party of any or all of such Party's rights, remedies, claims, and defenses and the Parties fully reserve any and all of their rights, remedies, claims, and defenses.  Pursuant to Federal Rule of Evidence 408 and any other applicable rules of evidence, this Agreement and all negotiations relating hereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms or the payment of damages to which a Party may be entitled under this Agreement.

    15.13. <u>Specific Performance</u>.  It is understood and agreed by the Parties that money damages would be an insufficient remedy for any breach of this Agreement by any Party, and each non-breaching Party shall be entitled to seek specific performance and injunctive or other equitable relief (without the posting of any bond and without proof of actual damages) as a remedy of any such breach, including an order of any court of competent jurisdiction requiring any Party to comply promptly with any of its obligations hereunder.

    15.14. <u>Claims</u>.  Except where otherwise specified, the agreements, representations, warranties, and obligations of (a) the Company Parties under this Agreement are, in all respects,

joint and several, and (b) the Consenting Stakeholders under this Agreement are, in all respects, several and not joint.

15.15.  <u>Severability and Construction</u>.  If any provision of this Agreement shall be held by a court of competent jurisdiction to be illegal, invalid, or unenforceable, the remaining provisions shall remain in full force and effect if essential terms and conditions of this Agreement for each Party remain valid, binding, and enforceable.

15.16.  <u>Remedies Cumulative</u>.  All rights, powers, and remedies provided under this Agreement or otherwise available in respect of this Agreement at Law or in equity shall be cumulative and not alternative.  The exercise of any right, power, or remedy by any Party shall not preclude the simultaneous or later exercise of any other such right, power, or remedy by such Party. The failure of any Party hereto to exercise any right, power, or remedy provided under this Agreement or otherwise available in respect hereof at law or in equity, or to insist upon strict compliance by any other Party hereto with its obligations hereunder, and any custom or practice of the Parties at variance with the terms hereof, shall not constitute a waiver by such Party of its right to exercise any such or other right, power, or remedy or to demand such strict compliance.

15.17.  <u>Capacities of Consenting Stakeholders</u>.  Each Consenting Stakeholder has entered into this Agreement on account of all Company Claims/Interests that it holds or beneficially owns (directly or through discretionary accounts that it manages, advises, or subsidiary-advises) and, except where otherwise specified in this Agreement, shall take or refrain from taking all actions that it is obligated to take or refrain from taking under this Agreement with respect to all such Company Claims/Interests.

15.18.  <u>Survival</u>.  For the avoidance of doubt, the Parties acknowledge and agree that if this Agreement is terminated, <u>Section 13.05</u> and <u>Section 15</u>, and any defined terms used in such Sections shall survive such termination and shall continue in full force and effect in accordance with the terms hereof.

15.19.  <u>Email Consents</u>.  Where a written consent, acceptance, approval, or waiver is required pursuant to or contemplated by this Agreement, including a written approval by the Company Parties or any applicable Consenting Stakeholder, such written consent, acceptance, approval, or waiver shall be deemed to have occurred if, by agreement between counsel to the Parties submitting and receiving such consent, acceptance, approval, or waiver, it is conveyed in writing (including electronic mail) between each such counsel without representations or warranties of any kind on behalf of such counsel.

15.20.  <u>Public Disclosure</u>.  The Company Parties shall deliver drafts to counsel to the Consenting Stakeholders of any press releases and public documents that constitute disclosure of the existence or terms of this Agreement or any amendment to the terms of this Agreement to the general public (each a "<u>Public Disclosure</u>") at least two (2) calendar days before making any such disclosure, and counsel to the Consenting Stakeholders shall be authorized to share such Public Disclosure with their respective clients.  Any Public Disclosure shall be reasonably acceptable to the Required Consenting Stakeholders.  Under no circumstances may any Party make any public disclosure of any kind that would disclose either: (i) the holdings of any Consenting Stakeholder (including on the signature pages of the Consenting Stakeholders, which shall not be publicly

disclosed or filed) or (ii) the identity of any Consenting Stakeholder without the prior written consent of such Consenting Stakeholder or the order of a Bankruptcy Court or other court with competent jurisdiction; *provided*, *however*, notwithstanding the foregoing, the Company Parties shall not be required to keep confidential the aggregate Claims holdings of all Consenting First Lien Lenders, Consenting Incremental Superpriority Lenders (if applicable), or the Consenting Equityholders, and each Consenting Stakeholder hereby consents to the disclosure of the execution of this Agreement by the Company Parties, and the terms hereof, in the Plan, the Disclosure Statement filed therewith, and any filings by the Company Parties with the Bankruptcy Court and the CCAA Court, or as otherwise required by applicable law or regulation, or the rules of any applicable stock exchange or regulatory body.

15.21.  <u>Relationship Among Parties</u>.

(a)     None of the Consenting Stakeholders shall have any fiduciary duty, any duty of trust or confidence in any form, or other duties or responsibilities to each other, the Company Parties or their affiliates, or any of the Company Parties' or their affiliates' creditors or other stakeholders and, other than as expressly set forth in this Agreement, there are no commitments among or between the Consenting Stakeholders.  It is understood and agreed that any Consenting Stakeholder may trade in any debt or equity securities of the Company Parties without the consent of the Company Parties or any other Consenting Stakeholder, subject to applicable Laws, applicable provisions of the Prepetition Credit Agreements, and <u>Section 9</u> of this Agreement.  No prior history, pattern, or practice of sharing confidences among or between any of the Consenting Stakeholders or the Company Parties shall in any way affect or negate this understanding and agreement.

(b)     The obligations of each Consenting Stakeholder are several and not joint with the obligations of any other Consenting Stakeholder.  Nothing contained herein and no action taken by any Consenting Stakeholder shall be deemed to constitute the Consenting Stakeholders as a partnership, an association, a joint venture, or any other kind of group or entity, or create a presumption that the Consenting Stakeholders are in any way acting in concert.  The decision of each Consenting Stakeholder to enter into this Agreement has been made by each such Consenting Stakeholder independently of any other Consenting Stakeholder.

(c)     The Parties have no agreement, arrangement or understanding with respect to acting together for the purpose of acquiring, voting or disposing of any securities of any of the Company Parties.  The Consenting Stakeholders are not part of a "group" (within the meaning of Section 13(d)(3) or Section 14(d)(2) of the Securities Exchange Act of 1934, as amended or any successor provision), including any group acting for the purpose of acquiring, holding, or disposing of securities (within the meaning of Rule 13d-5(b)(1) under the Securities Exchange Act of 1934, as amended), with any other Party.  For the avoidance of doubt, neither the existence of this Agreement, nor any action that may be taken by a Consenting Stakeholder pursuant to this Agreement, shall be deemed to constitute or to create a presumption by any of the Parties that the Consenting Stakeholders are in any way acting in concert or as such a "group" within the meaning of Rule 13d-5(b)(1).  All rights under this Agreement are separately granted to each Consenting Stakeholder by the Company and vice versa, and the use of a single document is for the convenience of the Company.  The decision to commit to enter into the transactions contemplated by this Agreement has been made independently.

IN WITNESS WHEREOF, the Parties have executed this Agreement on the day and year first above written.

[*Signatures Follow*]

## <u>SCHEDULE 1</u>

### Milestones

The Restructuring Transactions shall be implemented in accordance with the following milestones (the "<u>Milestones</u>"), each of which shall be extended with the express prior written consent (email being sufficient) of the Required Consenting HB First Lien Lenders.  The Debtors agree that they shall:

1. commence their Chapter 11 Cases on or before February 21, 2024 (the "<u>Petition Date</u>");

2. no later than one (1) day after the Petition Date, file the DIP Motion and AQV Sale Motion;

3. obtain entry by the Bankruptcy Court of the Interim DIP Order no later than three (3) Business Days after the Petition Date;

4. obtain entry of the Interim DIP Recognition Order by the CCAA Court no later than ten (10) calendar days after the entry of the Interim DIP Order;

5. obtain entry by the Bankruptcy Court of the AQV Bidding Procedures Order as soon as reasonably practicable but in no event later than fifteen (15) calendar days after the Petition Date;

6. no later than twenty-one (21) calendar days after the Petition Date, file the Plan, Disclosure Statement, Disclosure Statement Motion and Backstop Motion;

7. obtain entry by the Bankruptcy Court of the Final DIP Order and the AQV Sale Order as soon as reasonably practicable but in no event later than forty-five (45) calendar days after the Petition Date;

8. obtain entry of the Final DIP Recognition Order by the CCAA Court as soon as reasonably practicable but in no event later than ten (10) calendar days after the entry of the Final DIP Order;

9. obtain entry by the Bankruptcy Court of the Disclosure Statement Order and the Backstop Order no later than sixty (60) calendar days after the Petition Date;

10. obtain entry by the Bankruptcy Court of the Confirmation Order no later than one-hundred-twenty (120) calendar days after the Petition Date;

11. obtain entry of the Confirmation Recognition Order by the CCAA Court no later than ten (10) calendar days after the entry of the Confirmation Order; and

12. cause the Plan Effective Date to occur no later than one-hundred-forty (140) days after the Petition Date; *provided* that this Milestone may be extended by the Debtors up to thirty (30) days if the purpose of such extension is solely to obtain regulatory approvals.

# EXHIBIT A

## Restructuring Term Sheet

HORNBLOWER HOLDINGS LP, ET AL.

RESTRUCTURING TERM SHEET

**February 21, 2024**

This term sheet (the "Term Sheet") sets forth the principal terms of the Restructuring Transactions of the Company Parties. The Restructuring Transactions will be consummated through the commencement by the Company Parties of the Chapter 11 Cases and the CCAA Proceeding, in accordance with the terms of the RSA (as defined below) to be executed by the Company Parties and the Consenting Stakeholders and to which this Term Sheet is appended. Capitalized terms used but not otherwise defined herein have the meaning given to such terms in the RSA (defined below).

THIS RESTRUCTURING TERM SHEET IS NOT AN OFFER OR A SOLICITATION WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OR SECTION 1126 OF THE BANKRUPTCY CODE. ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE.

THIS TERM SHEET IS A SETTLEMENT PROPOSAL TO CERTAIN HOLDERS OF COMPANY CLAIMS/INTERESTS IN FURTHERANCE OF SETTLEMENT DISCUSSIONS. ACCORDINGLY, THIS TERM SHEET IS PROTECTED BY RULE 408 OF THE FEDERAL RULES OF EVIDENCE AND ANY OTHER APPLICABLE STATUTES OR DOCTRINES PROTECTING THE USE OR DISCLOSURE OF CONFIDENTIAL SETTLEMENT DISCUSSIONS. NOTHING CONTAINED IN THIS TERM SHEET SHALL CONSTITUTE OR BE CONSTRUED TO BE AN ADMISSION OF FACT OR LIABILITY.

THIS TERM SHEET DOES NOT PURPORT TO SUMMARIZE ALL OF THE TERMS, CONDITIONS, REPRESENTATIONS, WARRANTIES, AND OTHER PROVISIONS WITH RESPECT TO THE TRANSACTIONS DESCRIBED IN THIS TERM SHEET, WHICH TRANSACTIONS WILL BE SUBJECT TO THE COMPLETION OF DEFINITIVE DOCUMENTS INCORPORATING THE TERMS AND CONDITIONS SET FORTH IN THIS TERM SHEET AND THE RSA AND THE CLOSING OF ANY TRANSACTION SHALL BE SUBJECT TO THE TERMS AND CONDITIONS SET FORTH IN SUCH DEFINITIVE DOCUMENTS.

| Material Terms of the Restructuring | |
|---|---|
| **Term** | **Description** |
| *Overview of the Restructuring* | This Term Sheet contemplates the restructuring of the Company Parties. The Restructuring Transactions will be consummated pursuant to the Plan to be confirmed by the Bankruptcy Court and recognized by the CCAA Court. To effectuate the Restructuring Transactions, certain parties, including (a) the Company Parties and (b) the Consenting Stakeholders will enter into a Restructuring Support Agreement (as amended, restated, supplemented or |

otherwise modified in accordance with the terms hereof and thereof, the "<u>RSA</u>") consistent in all respects with the terms set forth herein.

The Chapter 11 Cases and CCAA Proceeding will be financed by (i) a $300 million debtor-in-possession superpriority senior secured term loan financing facility that is senior to the Junior DIP Claims, (the "<u>Senior DIP Facility</u>" and the loans incurred thereunder, the "<u>Senior DIP Loans</u>") consisting of $300 million of DIP Loans incurred pursuant to the credit agreement attached hereto as **Exhibit 2** (the "<u>Senior DIP Credit Agreement</u>" and the lenders thereunder from time to time, the "<u>Senior DIP Lenders</u>") which will be available for the purpose of refinancing all of the Prepetition Superpriority Loans and other obligations in respect thereof (the "<u>Superpriority Refinancing</u>"); and (ii) a $285 million debtor-in-possession superpriority secured delayed-draw term loan financing facility that is junior to the Senior DIP Loans and Superpriority Claims but senior to the HB First Lien Claims and Revolver Claims (the "<u>Junior DIP Facility</u>" and the loans incurred thereunder, the "<u>Junior DIP Loans</u>") consisting of $285 million[1] of DIP Loans incurred pursuant to the credit agreement attached hereto as **Exhibit 3** (the "<u>Junior DIP Credit Agreement</u>" and the lenders thereunder from time to time, the "<u>Junior DIP Lenders</u>"),  consisting of $121 million of new money commitments  (the "<u>Junior New Money Commitments</u>") and $164 million of refinancing commitments (the "<u>Junior Refinancing Commitments</u>") which will be available exclusively for the purpose of refinancing all of the Prepetition Incremental Superpriority Loans and other obligations in respect thereof (the "<u>Incremental Superpriority Refinancing</u>"). Junior New Money Commitments and Junior Refinancing Commitments shall be allocated to each Consenting HB First Lien Lender that is an Initial Consenting Stakeholder (or its Related Funds) according to its Pro Rata Allocation (as defined herein). The Junior DIP Loans shall be funded in accordance with the Junior DIP Credit Agreement. The Superpriority Refinancing and Incremental Superpriority Refinancing shall occur pursuant to the Interim DIP Order; *provided* however that there shall not be any default under the RSA or the DIP Facility unless the Bankruptcy Court denies the Superpriority Refinancing or Incremental Superpriority Refinancing in connection with the Final DIP Order.

On the Plan Effective Date: (a) subject to satisfaction of certain conditions set forth the Definitive Documents, the Restructuring Transactions shall be effectuated, including the incurrence of the Exit Term Loan and Exit Revolver by the Reorganized Hornblower Debtors[2]; (b) the Hornblower Debtors shall consummate a rights offering (the "<u>Rights Offering</u>") pursuant to which the Rights Offering Participants and the Backstop Parties (each as defined below), as applicable, shall fund an aggregate amount of up to $345 million to acquire the new common equity (or warrants to purchase new common equity in lieu

---

[1]   Excludes accrued financing costs which are payable-in-kind at emergence.

[2]   "<u>Reorganized Hornblower Debtors</u>" means Hornblower Group HoldCo, LLC and its direct and indirect Debtor subsidiaries (collectively, the "<u>Hornblower Debtors</u>"), in each case as reorganized pursuant to and under the Restructuring Transactions, and, to the extent not included in the foregoing, Reorganized Hornblower (as defined herein).

thereof to the extent necessary to ensure compliance with the Jones Act) to be issued by Hornblower Group Holdco, LLC or such other parent or subsidiary thereof or new entity as mutually determined by the Debtors and the Required Consenting HB First Lien Lenders ("Reorganized Hornblower" and such new common equity and/or warrants to purchase new common equity, the "New HB Common Equity"), and the proceeds of the Rights Offering shall be used to, among other things, satisfy the Company Parties' obligations under the Junior DIP Facility, including any accrued and unpaid fees, interest and premiums (the "DIP Obligations") and fund the operations of the Reorganized Hornblower Debtors, provided that, any participant in such Rights Offering (or any of its Related Funds) that is a Junior DIP Lender may elect to direct that the aggregate amount of Junior DIP Loans (together with any fees, interest or premium thereon (including exit premium)) held by such participant (or Related Fund) be netted against the subscription price payable in respect of such Rights Offering, with any shortfall amount to be paid in cash; and (c) holders of Claims and Interests shall receive treatment consistent with this Term Sheet.

For the avoidance of doubt, all debt and equity investments (including debtor-in-possession financing and any backstop or other commitments in respect of any of the foregoing) in connection with the restructuring (other than with respect to the Journey Beyond Entities[3]) that are provided by any Initial Consenting Stakeholder (including any Related Fund) (in any capacity) shall be offered to each other Initial Consenting Stakeholder on a pro rata basis according to the HB First Lien Claims held or beneficially owned by each Initial Consenting Stakeholder as reflected on such Initial Consenting Stakeholder's signature page to the RSA as of the RSA Effective Date (the "Pro Rata Allocation"). The Pro Rata Allocation for any such debt and equity investments for Crestview equals 27.79% and the Pro Rata Allocation for Strategic Value Partners LLC and its affiliates ("SVP") equals 72.21%.

| | |
|---|---|
| ***AQV Wind Down*** | As soon as reasonably practicable and in accordance with the applicable Milestones, the Company Parties shall cease operations of American Queen Holdco, LLC and its direct and indirect subsidiaries (collectively, the "AQV Debtors") and implement the going concern sale and/or wind down of the AQV Debtors (the "AQV Wind Down"). In furtherance of the AQV Wind Down, the Company Parties shall: (a) with the consent of the Required Consenting HB First Lien Lenders, take steps to reject, pursuant to section 365 of the Bankruptcy Code, as soon as reasonably practicable, but in no event later than the Plan Effective Date, all executory contracts and unexpired leases related to the operations of the AQV Debtors, unless otherwise assumed by a buyer; and (b) file the AQV Sale Motion with the Bankruptcy Court seeking entry of the AQV |

---

[3]   "Journey Beyond Entities" means Journey Beyond Intermediate Holdings, LLC (or any direct or indirect subsidiary thereof designated by the Consenting JBIH Lenders) and each of its direct and indirect subsidiaries, together with any newly formed entity determined by the applicable Debtors and the Consenting JBIH Lenders to hold or receive the equity or assets of any of the foregoing.

3

| | |
|---|---|
| | Bidding Procedures Order and the AQV Sale Order, pursuant to which the AQV Debtors shall consummate the AQV Sale Transaction.<br><br>If the AQV Debtors continue to maintain any assets after the closing of the AQV Sale Transaction, the AQV Debtors or any administrator of the AQV Debtors or their remaining assets (as applicable) shall take the necessary steps to liquidate and monetize any such remaining assets, and seek any related relief from the Bankruptcy Court.  The net proceeds of the AQV Sale Transaction and the net proceeds from the monetization of the assets of the AQV Debtors not sold pursuant to the AQV Sale Transaction (collectively, the "AQV Cash Proceeds") shall be distributed to the creditors of the AQV Debtors. |
| *Rights Offering* | During the Chapter 11 Cases and in conjunction with and pursuant to the Plan, the Hornblower Debtors shall effectuate the Rights Offering to each record holder as of a specified record date[4] of Allowed[5] HB First Lien Claims that is (a) a qualified institutional buyer as defined in Rule 144A of the Securities Act, (b) not a U.S. person (as defined in Regulation S of the Securities Act), or (c) an institutional accredited investor (as defined in the Rules) (each such holder, a "Rights Offering Participant" and, collectively, the "Rights Offering Participants").  Each Rights Offering Participant shall be offered the subscription right (collectively, the "Rights"), attached to its respective Allowed HB First Lien Claim, to purchase its *pro rata* share (based on such Rights Offering Participant's relative share of the total amount of all Allowed HB First Lien Claims) of New HB Common Equity for an aggregate purchase price in cash (or DIP Claims, if applicable) of $345 million (the "Rights Offering Amount"), which shall be subject to reduction as described below.  Rights Offering Participants shall be issued Rights at no charge.  The Rights shall be attached to each Allowed HB First Lien Claim and shall be transferable with such Allowed Claims as shall be set forth in the Rights Offering Documents.  The Rights Offering Participants shall be entitled to designate recipients of the New HB Common Equity purchased pursuant to the exercise of their Rights as shall be set forth in the Rights Offering Documents. |

---

[4]   Record date to be mutually agreeable to SVP and Crestview.

[5]   "Allowed" means, with respect to any Claim or Interest, as applicable, except to the extent that the Plan provides otherwise, any portion thereof: (a) that is allowed under the Plan, by Final Order, or pursuant to a settlement; (b) that is evidenced by a Proof of Claim timely Filed by the applicable Claims Bar Date or a request for payment of an Administrative Claim Filed by the Administrative Claims Bar Date, as applicable (or that is not required to be evidenced by a Filed Proof of Claim under the Plan, the Bankruptcy Code, or a Final Order); or (c) that is scheduled by the Debtors as not disputed, contingent, or unliquidated, and for which no Proof of Claim has been timely Filed; provided that, with respect to a Claim or Interest described in clauses (b) and (c) above, (x) such Claim or Interest shall be considered Allowed only if and to the extent that such Claim or Interest is not Disallowed and no objection to the allowance of such Claim or Interest is interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or such an objection is so interposed and the Claim or Interest has been Allowed by a Final Order and (y) no Claim of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such Entity pays in full the amount that it owes such Debtor or Reorganized Debtor, as applicable.  "Allow," "Allowing," and "Allowance" shall have correlative meanings.

All New HB Common Equity issued pursuant to the Rights Offering shall be issued at a discount of 30% to the implied post-money Plan equity value of $448 million[6]. The proceeds from the Rights Offering, the Exit Term Loan, and the Exit Revolver shall be used to meet a Projected Minimum Liquidity amount of $25 million on the Plan Effective Date (the "Minimum Liquidity Amount"). "Projected Minimum Liquidity" shall mean (i) the total of the Hornblower Debtors projected cash and customary cash equivalents (including from the proceeds of the Rights Offering, the Exit Term Loan, and the Exit Revolver and availability under the Exit Revolver), plus (ii) any permanent positive change in the projected cash flows of the Hornblower Debtors and their subsidiaries through March 31, 2026. To the extent Projected Minimum Liquidity would exceed the Minimum Liquidity Amount, the Rights Offering Amount shall be reduced by the amount of such excess, and the Rights issued to each holder of Allowed HB First Lien Claims shall be reduced on a pro rata basis. The Debtors shall forecast Projected Minimum Liquidity on the expected Plan Effective Date on a date that the Debtors reasonably believe to be no more than 25 days prior to the Plan Effective Date and no less than 20 days prior to the Plan Effective Date. The Debtors shall consult with the Backstop Parties and their advisors in preparing such Projected Minimum Liquidity forecast and shall give the Backstop Parties and their advisors at least two full business days to review and comment on such forecast along with the relevant supporting material. The final determination of the Projected Minimum Liquidity shall be determined by the Debtors with the reasonable consent of the Required Consenting HB First Lien Lenders in consultation with Crestview. Notwithstanding anything herein to the contrary, the Rights Offering Amount shall be in an amount no greater than $345 million regardless of the Projected Minimum Liquidity.

Any New HB Common Equity that is not subscribed for and purchased in the Rights Offering, and taking into account any reduction as described above, by a Rights Offering Participant shall be put to and purchased by the Backstop Parties in accordance with the terms and conditions of the Backstop Purchase Agreement; *provided*, *however*, that no Backstop Party shall be required to purchase New HB Common Equity pursuant to such Backstop Party's Backstop Commitment (as defined in the Backstop Purchase Agreement) in an aggregate amount that exceeds the Backstop Amount (as defined in the Backstop Purchase Agreement) for such Backstop Party. There will be no over-subscription privilege in the Rights Offering, such that any New HB Common Equity that is not subscribed for and purchased in the Rights Offering by a Rights Offering Participant will not be offered to other Rights Offering Participants, but rather will be purchased by the Backstop Parties (subject to their respective Backstop Amounts) in accordance with the terms and conditions of the Backstop Purchase Agreement.

The Rights Offering shall be conducted by the Hornblower Debtors and consummated on terms, subject to conditions and in accordance with the Rights Offering Documents.

---

[6]  To reflect a Plan total enterprise value of $725 million.

| | |
|---|---|
| | The Rights Offering will result in the Rights Offering Participants' and/or Backstop Parties' aggregate ownership of 84% (subject to commensurate reduction on account of the potential downsize of the Rights Offering Amount as described above) of the New HB Common Equity as of the Plan Effective Date on account of the Rights, subject to the dilution by issuances of MIP Equity (as defined below).

To the extent the Debtors and the Required Consenting HB First Lien Lenders mutually determine that it is required to satisfy Jones Act requirements, warrants to purchase New HB Common Equity will be issued in the Rights Offering and pursuant to the Backstop Purchase Agreement in lieu of New HB Common Equity in a manner acceptable to the Debtors and the Required Consenting HB First Lien Lenders. |
| ***Backstop Commitments*** | In conjunction with the Restructuring Transactions, the Initial Consenting Stakeholders (or Related Funds thereof) (in such capacity, the "Backstop Parties") shall provide the Hornblower Debtors with a commitment to backstop the Rights Offering according to their respective Pro Rata Allocations and on terms and conditions set forth in the Backstop Purchase Agreement attached hereto as **Exhibit 4**.

In consideration for the Hornblower Debtors' right to cause the Backstop Parties to purchase (directly or through an affiliate) their respective Backstop Commitment Percentages (as defined in the Backstop Purchase Agreement) of the Unsubscribed Equity Interests (as defined in the Backstop Purchase Agreement), the Reorganized Hornblower Debtors shall be required to pay a non-refundable aggregate premium (the "Backstop Commitment Premium") to the Backstop Parties equal to 10% of the Rights Offering Amount, which Backstop Commitment Premium shall be paid in the form of New HB Common Equity on the Plan Effective Date.[7]

Subject to the terms of the Backstop Purchase Agreement, the Hornblower Debtors will reimburse or pay, as the case may be, all reasonable and documented fees, costs, expenses, disbursements and charges of the Backstop Parties incurred in connection with or relating to the diligence, negotiation, preparation, execution, delivery, implementation and/or consummation of the Plan, the Rights Offering, the Backstop Commitments, the Backstop Purchase Agreement, the Backstop Motion, the Backstop Order, and the transactions contemplated by any of the foregoing, or any of the other Definitive Documents (collectively, the "Backstop Expenses"). |
| ***Exit Term Loan*** | On the Plan Effective Date, the Reorganized Hornblower Debtors shall enter into the Exit Credit Agreement and other Exit Credit Documents providing for the Exit Term Loan.  The Exit Term Loan shall be on terms reasonably acceptable to the Debtors and the Required Consenting HB First Lien Lenders, consistent with the requirements of sections 3.01 and 3.02 of the RSA, and consistent with the materials terms set forth in the term sheet attached hereto as **Exhibit 5** (the "Exit Credit Term Sheet"). |

---

[7]   For the avoidance of doubt, the Backstop Commitment Premium shall be based upon the Rights Offering Amount prior to any reduction as set forth herein.

| | |
|---|---|
| ***Exit Revolver*** | On the Plan Effective Date, the Reorganized Hornblower Debtors shall enter into an exit revolving credit facility (the "Exit Revolver") providing for revolving loans in an amount up to $50 million, which shall be on terms reasonably acceptable to the Debtors and the Required Consenting HB First Lien Lenders. |
| ***JBIH Claims*** | Each holder of JBIH Claims shall receive its pro rata share of 100% of the equity in the Journey Beyond Entities or such other treatment acceptable to the Debtors and the Consenting JBIH Lenders and reasonably acceptable to the Required Consenting HB First Lien Lenders. Such treatment shall be effectuated as determined by the Consenting JBIH Lenders with the consent of the Debtors (not to be unreasonably withheld, conditioned or delayed), either under the Plan in the Chapter 11 Cases or otherwise |
| ***Journey Beyond Term Loans*** | Journey Beyond Term Loans[8] to either be rolled with balance and terms unchanged or refinanced, in each case on terms acceptable to the applicable Debtors and the Consenting JBIH Lenders. Journey Beyond Term Loans to be treated outside of Plan and Chapter 11 Cases. |

| Treatment of Claims and Interests Under the Restructuring and the Plan | |
|---|---|
| **Claim** | **Proposed Treatment** |
| **Unclassified Claims** | |
| ***DIP Claims*** | **Treatment.** On the Plan Effective Date, each holder of an Allowed claim under the DIP Credit Agreements (collectively, the "DIP Claims") shall receive payment in full in cash from the proceeds of the Rights Offering or, with respect to the Senior DIP Loans, such Senior DIP Loans shall convert into Exit Term Loans in accordance with the terms of the Senior DIP Credit Agreement and the RSA.<br><br>**Voting.** Not classified; non-voting. |
| ***Administrative Claims*** | **Treatment.** Except to the extent that such holder of an Allowed administrative claim (collectively, the "Administrative Claims"), the Debtors and the Required Consenting HB First Lien Lenders agree in writing to less favorable treatment for such Administrative Claim, such holder shall receive payment in full, in cash, of the unpaid portion of its Allowed Administrative Claim on the Plan Effective Date or as soon thereafter as reasonably practicable (or, if payment is not then due, on the due date of such Allowed Administrative Claim).<br><br>Administrative Claims shall include, among other things: (a) claims against the Debtors arising under section 503(b) of the Bankruptcy Code; (b) Allowed claims for reasonable fees and expenses of professionals retained in the Chapter 11 Cases and CCAA Proceeding with the approval of the Bankruptcy Court and the CCAA Court; and (c) the Backstop Expenses in accordance with the terms and conditions of the Backstop Purchase Agreement and the Backstop Order. |

---

[8]   "Journey Beyond Term Loans" means the loans incurred pursuant to that certain Syndicated Facility Agreement, dated as of February 15, 2022, by and among HB Holdco Pty LTD, as holdings, HB Acquisition PTY Ltd, as borrower, the lenders party thereto, Global Loan Agency Services Australia Pty LTD, as administrative agent, and Global Loan Agency Services Australia Nominees Pty Limited, as collateral agent.

| | |
|---|---|
| | **Voting.** Not classified; non-voting. |
| *Priority Tax Claims* | **Treatment.** All Allowed claims against the Debtors under section 507(a)(8) of the Bankruptcy Code (collectively, the "<u>Priority Tax Claims</u>") shall be treated in accordance with section 1129(a)(9)(C) of the Bankruptcy Code. |
| | **Voting.** Not classified; non-voting. |
| **Classified Claims and Interests** | |
| *Other Secured Claims* | **Treatment.** Except to the extent that a holder of an Allowed secured claim, other than a DIP Claim, JBIH Claim, Term Loan Claim, or Revolver Claim (collectively, the "<u>Other Secured Claims</u>"), the Debtors, and the Required Consenting HB First Lien Lenders, agree in writing to less favorable treatment for such Other Secured Claim, such holder shall receive either (a) payment in full in cash of the unpaid portion of their Allowed Other Secured Claims, including any interest thereon required to be paid under section 506(b) of the Bankruptcy Code (or if payment is not then due, on the due date of such Allowed Other Secured Claims), (b) reinstatement pursuant to section 1124 of the Bankruptcy Code, (c) the return or abandonment of the collateral securing such claim to such holder, or (d) such other treatment necessary to satisfy section 1129 of the Bankruptcy Code. |
| | **Voting.** Unimpaired. Each holder of an Allowed Other Secured Claim will be conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, each holder of an Allowed Other Secured Claim will not be entitled to vote to accept or reject the Plan. |
| *Other Priority Claims* | **Treatment.** Except to the extent that a holder of an Allowed claim described in section 507(a) of the Bankruptcy Code, other than a Priority Tax Claim (collectively, the "<u>Other Priority Claims</u>") the Debtors, and the Required Consenting HB First Lien Lenders, agree in writing to less favorable treatment for such Other Priority Claim, such holder shall receive payment in full, in cash, of the unpaid portion of its Allowed Other Priority Claim on the Plan Effective Date or as soon thereafter as reasonably practicable (or, if payment is not then due, on the due date of such Other Priority Claim). |
| | **Voting.** Unimpaired. Each holder of an Other Priority Claim will be conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, each holder of an Allowed Other Priority Claim will not be entitled to vote to accept or reject the Plan. |
| *First Lien Claims* | **Treatment.** |
| | On the Plan Effective Date or as soon thereafter as reasonably practicable, each holder of an Allowed First Lien Claim, except to the extent that such holder of Allowed First Lien Claim agrees to less favorable treatment of its Allowed First Lien Claim, shall receive its *pro rata* share of: |
| | (a) 96% of the Rights; |
| | (b) 96% of the New HB Common Equity (subject to dilution on account of the New HB Common Equity issued in connection with (i) the Rights |

8

| | |
|---|---|
| | Offering, (ii) the Backstop Commitment Premium and (iii) the MIP Equity; and |
| | (c) $50 million in cash funded to the Hornblower Debtors by Crestview or an affiliate thereof (the "Crestview Cash Distribution");[9] *provided* that such holder may elect to use its pro rata share of the Crestview Cash Distribution as a credit towards the exercise of its Rights, in which case such portion of the Crestview Cash Distribution shall be retained by the Hornblower Debtors. |
| | **Voting.**  Impaired.  Each holder of an Allowed First Lien Claim will be entitled to vote to accept or reject the Plan. |
| | **Allowance.**  The First Lien Claims shall be deemed Allowed on the Plan Effective Date in the aggregate principal amount of $696 million plus accrued and unpaid interest, fees, and other amounts arising and payable under and in accordance with the First Lien Credit Agreement, accrued as of the Petition Date. |
| *Revolver Claims* | **Treatment.**  On the Plan Effective Date or as soon thereafter as reasonably practicable, each holder of an Allowed Revolver Claim, except to the extent that such holder of an Allowed Revolver Claim agrees to less favorable treatment of its Allowed Revolver Claim with the consent of the Required Consenting Stakeholders, shall receive its *pro rata* share of: |
| | (a) 4% of the Rights; and |
| | (b) 4% of the New HB Common Equity (subject to dilution on account of the New HB Common Equity issued in connection with (i) the Rights Offering, (ii) the Backstop Commitment Premium and (iii) the MIP Equity. |
| | **Voting.**  Impaired.  Each holder of an Allowed Revolver Claim will be entitled to vote to accept or reject the Plan. |
| | **Allowance.** The Revolver Claims shall be deemed Allowed on the Plan Effective Date in the aggregate principal amount of $26 million plus accrued and unpaid interest, fees, and other amounts arising and payable under and in accordance with the Revolver Credit Agreement, accrued as of the Petition Date. |
| *General Unsecured Claims* | **Treatment.**  On the Plan Effective Date or as soon thereafter as reasonably practicable, each holder of an Allowed unsecured Claim against the Debtors that is not (a) an Administrative Claim, (b) a Priority Tax Claim, (c) an Other Priority Claim, (d) an Intercompany Claim (as defined below) or (e) a Section 510(b) Claim, shall receive treatment acceptable to the Debtors and the Required Consenting HB First Lien Lenders. |
| | **Voting.** Impaired. Each holder of an Allowed Unsecured Claim will be entitled to vote to accept or reject the Plan. |
| *Intercompany Claims* | **Treatment.**  All Claims against a Debtor held by another Debtor (the "Intercompany Claims"), if applicable, will be adjusted, reinstated, or discharged |

---

[9]    Crestview may elect to fund such $50 million payment net of any amounts due to it under the Plan (including on account of First Lien Claims or DIP Claims).

| | |
|---|---|
| | as determined by the Company Parties, subject to the reasonable consent of the Required Consenting HB First Lien Lenders. |
| | **Voting.**  Unimpaired, each holder of an Allowed Intercompany Claim will be deemed to have accepted the Plan; or Impaired, each holder of an Allowed Intercompany Claim will be deemed to have rejected the Plan. |
| *Interests in Company Party Subsidiaries* | **Treatment.**  Excluding the AQV Debtors, all existing Interests in Company Parties other than Hornblower (the "<u>Intercompany Interests</u>") shall be reinstated or cancelled in the Company Parties' discretion, subject to the reasonable consent of, with respect to the Reorganized Hornblower Debtors, the Required Consenting HB First Lien Lenders and, with respect to the Journey Beyond Entities, the Consenting JBIH Lenders.  Interests in American Queen HoldCo, LLC will be cancelled as of the Plan Effective Date. |
| | **Treatment.**  Unimpaired. Each holder of an Allowed Intercompany Interest will be deemed to have accepted the Plan; or Impaired.  Each holder of an Allowed Intercompany Interest will be deemed to have rejected the Plan. |
| *Section 510(b) Claims* | **Treatment.** Holders of any claim subject to subordination under section 510(b) of the Bankruptcy Code (collectively, the "<u>Section 510(b) Claims</u>"), shall receive no recovery. |
| | **Voting.** Impaired. Each holder of a Section 510(b) Claim will be deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, each holder of a Section 510(b) Claim will not be entitled to vote to accept or reject the Plan. |
| *Interests in Hornblower* | **Treatment.**   On the Plan Effective Date, all Interests in Hornblower and Hornblower Holdings, LLC will be cancelled and the holders of such Interests shall not receive or retain any distribution, property, or other value on account of their Interests in Hornblower or Hornblower Holdings, LLC. |
| | **Voting.** Impaired.  Holders of Interests in Hornblower or Hornblower Holdings, LLC are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and, therefore, are not entitled to vote to accept or reject the Plan. |
| **General Provisions** | |
| *Capital Structure* | On the Plan Effective Date, the debt and equity capital structure of the Reorganized Hornblower Debtors will be consistent in all material respects with the capital structure of the Reorganized Debtors as set forth in this Term Sheet, unless otherwise agreed to by the Debtors and the Required Consenting Stakeholders. The debt and equity capital structure of the Journey Beyond Entities on the Plan Effective Date shall be determined by the applicable Debtors and the Consenting JBIH Lenders. |
| | Neither the New HB Common Equity nor any other Interests in of any of the Reorganized Debtors will be listed for trading on a securities exchange, and none of the Reorganized Debtors will be required to file reports with the United States Securities and Exchange Commission unless it is required to do so pursuant to the Exchange Act. |

| | |
|---|---|
| ***Executory Contracts and Unexpired Leases*** | Executory contracts and unexpired leases (other than those subject to the AQV Wind Down) shall be assumed or rejected (as the case may be), as determined by the Debtors, and with the reasonable consent of the Required Consenting HB First Lien Lenders.  On or prior to the Plan Effective Date, all executory contracts and unexpired leases of the AQV Debtors shall be rejected, unless otherwise assumed by a buyer. |
| ***Employee Compensation, Severance, and Benefits Programs*** | Except with respect to the AQV Debtors, all employment agreements and severance policies, including all employment, compensation and benefit plans, policies, and programs of the Debtors applicable to any of their employees and retirees, including without limitation, all workers' compensation programs, savings plans, retirement plans, healthcare plans, disability plans, incentive plans, life and accidental death and dismemberment insurance plans, but excluding all equity or equity-based incentive plans (collectively, the "<u>Specified Employee Plans</u>"), shall be assumed by the Debtors (and assigned to the Reorganized Debtors, if necessary) pursuant to section 365(a) of the Bankruptcy Code, either by separate motion filed with the Bankruptcy Court or pursuant to the terms of the Plan and the order confirming the Plan; *provided*, in each case, with respect to any provision of a Specified Employee Plan that relates to a "change in control", "change of control" or words of similar import, that the Debtors, and, if applicable, the individual participants in the applicable Specified Employee Plan, agree that the Restructuring Transactions and related transactions do not constitute such an event for purposes of such Specified Employee Plan.  Any employment agreements or offer letters relating to each of the current Chief Executive Officer, President, Chief People Officer, Chief Financial Officer, and General Counsel (the "<u>Key Executives</u>") shall be assumed. |
| ***D&O Liability Insurance Policies, Tail Policies, and Indemnification*** | Notwithstanding anything to the contrary contained in the RSA, the Debtors shall maintain and continue in full force and effect all insurance policies (and purchase any related tail policies providing for coverage for at least a six-year period after the Plan Effective Date) for directors', managers' and officers' liability (the "<u>D&O Liability Insurance Policies</u>").  The Debtors shall assume (and assign to the Reorganized Hornblower Debtors, if necessary), pursuant to section 365(a) of the Bankruptcy Code, either by a separate motion filed with the Bankruptcy Court or pursuant to the terms of the Plan and the order confirming the Plan, all of the D&O Liability Insurance Policies and all indemnification provisions in existence as of the date of the RSA for current and former directors, managers, employees and officers of the Company Parties (whether in by-laws, certificate of formation or incorporation, board resolutions, employment contracts, or otherwise, such indemnification provisions, "<u>Indemnification Provisions</u>"), and all such obligations will continue as obligations of the Reorganized Hornblower Debtors; *provided, that,* the Reorganized Debtors shall not indemnify directors of the Debtors for any claims or causes of action arising out of or relating to any act or omission resulting from gross negligence or willful misconduct.  All claims arising from the D&O Liability Insurance Policies and such Indemnification Provisions shall be unimpaired by the Plan.<br><br>The D&O Liability Insurance and Indemnification Provisions assumed by the Reorganized Hornblower Debtors shall (i) remain in full force and effect, (ii) not be modified, reduced, discharged, impaired, or otherwise affected by the occurrence of the Plan Effective Date, and (iii) survive the Debtors' emergence |

|  | from the Chapter 11 Cases unimpaired and unaffected irrespective of whether such obligation is owed for an act or event occurring before, on, or after the Plan Effective Date. |
|--|--|
|  | In addition, after the Plan Effective Date, the Reorganized Debtors shall not terminate or otherwise reduce the coverage under any directors' and officers' insurance policies (including any "tail policy") in effect or purchased as of the Petition Date, and all members, managers, directors, and officers of the Company who served in such capacity at any time prior to the Plan Effective Date or any other individuals covered by such insurance policies, will be entitled to the full benefits of any such policy for the full term of such policy regardless of whether such members, managers, directors, officers, or other individuals remain in such positions after the Plan Effective Date. |
| *Cancellation of Instruments, Certificates and Other Documents* | On the Plan Effective Date, except to the extent otherwise provided above or in the Plan, all instruments, certificates and other documents evidencing indebtedness or debt securities of, or Interests in, any of the Debtors shall be cancelled, and the obligations of the Debtors thereunder, or in any way related thereto, shall be discharged. |
| *Consenting Stakeholders Fees and Expenses* | On the Plan Effective Date, in addition to the Backstop Expenses, without the need to file a fee or retention application in the Chapter 11 Cases, the Company Parties shall pay the Consenting Stakeholders Fees and Expenses then incurred and outstanding in connection with the Restructuring Transactions in accordance with the RSA. |
| *Exemption from SEC Registration* | The issuance of all securities under the Plan will be exempt from registration under (a) section 1145 of the Bankruptcy Code to the extent permitted pursuant to section 1145 of the Bankruptcy Code, or (b) such other applicable securities law exemption that is reasonably acceptable to the Debtors and the Required Consenting HB First Lien Lenders and in consultation with the Consenting Equityholders. |
| *Tax Issues* | The Restructuring Transactions shall, to the extent practicable, be structured in a tax-efficient manner as reasonably determined by the Debtors and the Required Consenting HB First Lien Lenders and in consultation with the Consenting Equityholders in accordance with Sections 5.01(f) and 7.01(r) of the RSA. |
| *Jones Act* | The Restructuring Transactions contemplated by this Term Sheet, including with respect to limitations on ownership and control of New HB Common Equity, will be structured so as to satisfy the ownership and control requirements of the Jones Act and any other applicable statutory or regulatory requirements, as determined by the Debtors and the Required Consenting HB First Lien Lenders. |
|  | The New HB Common Equity ownership of Crestview and SVP and the members of the New Board shall qualify as US citizens for Jones Act purposes. |
| *Unsolicited Proposals* | Notwithstanding anything to the contrary herein, the terms of this Term Sheet shall be subject to the "unsolicited proposals" provision set forth in Section 8.01 of the RSA. |
| **Company Governance/Organizational Documents/Release** | |
| *New Board* | As of the Plan Effective Date, the terms of the current members of the board of managers shall expire. The composition of Reorganized Hornblower's initial |

| | |
|---|---|
| | board of directors (the "New Board"), to the extent known, shall be disclosed in the Plan Supplement and appointed in accordance with the New Organizational Documents. The New Board shall consist of five (5) members, four of which shall be designated by SVP and one of which shall be designated by Crestview or its Related Funds (the "Crestview Designee"). The Crestview Designee may be removed by Crestview at any time, in which case Crestview may appoint a new member of the New Board so long as Crestview and its Related Funds retain at least 50% of the New HB Common Equity owned by Crestview and its Related Funds as of the Plan Effective Date.<br><br>Directors of the New Board shall be appointed by a majority vote of shareholders, except that Crestview shall have the right to appoint one (1) member of the New Board, so long as (i) Crestview and its Related Funds retain at least 50% of the equity owned by Crestview as of the Plan Effective Date, and (ii) as of the Plan Effective Date, Crestview holds or beneficially owns at least 20% of the aggregate HB First Lien Claims. New Board appointment rights shall not be transferable except in connection with a sale of at least 75% of the New HB Common Equity owned by Crestview (and its Related Funds) or SVP, as applicable, as of the Plan Effective Date. The number, independence, and other characteristics of the directors on the New Board shall satisfy any Jones Act requirements. |
| ***Management Incentive Plan*** | On or following the Plan Effective Date, the New Board shall adopt a management equity incentive plan (the "MIP") pursuant to which New HB Common Equity (or restricted stock, restricted stock units, options, "profits interests" or some combination of the foregoing) representing 8% of the New HB Common Equity issued as of the Plan Effective Date on a fully diluted basis (the "MIP Equity") shall be reserved for grants to be made from time to time to the directors, officers, consultants and other management and employees of Reorganized Hornblower, subject to the terms and conditions set forth in the MIP. The details and allocation of the MIP and the underlying awards will be determined by the New Board. The New Board will determine the allocation of the MIP Equity to the Key Executives within 60 days following the Plan Effective Date (the "Negotiation Period"). If, at the end of the Negotiation Period, any Key Executive is not satisfied with their allocation under the MIP, such new Executive may terminate employment within 30 days following the end of the Negotiation Period and will be entitled to receive the severance benefits they would be eligible for under their employment agreement or offer letter upon a termination without "cause." |
| ***New Organizational Documents*** | The New Organizational Documents shall have the terms set forth below and otherwise be subject to the consent rights set forth in the RSA.<br><br>All governance matters shall be voted on by a simple majority of the New Board, including selection of the Chief Executive Officer and appointment of a Chairman. The transfer of New HB Common Equity by minority shareholders (including Crestview (or its Related Funds)) shall be subject to a right of first offer for SVP (subject to customary exceptions, including transfers to Related Funds, including continuation vehicles), and shall benefit from to-be-negotiated tag-rights.<br><br>Any sale of the Reorganized Hornblower Debtors or all or substantially all of their assets shall be governed by a majority New Board vote and majority |

13

<table>
<tr><td></td><td>

shareholder vote. In addition, shareholder drag-along rights may be triggered upon a sale of greater than 50% of the New HB Common Equity in a bona fide third-party sale.

The New Organization Documents shall include preemptive rights for all shareholders owning over 5% of the New HB Common Equity with respect to (i) all equity or equity-like issuances, subject to customary carveouts and (ii) incurrences of debt in the event all or part of such debt incurrence is provided by insiders or affiliates (for debt incurrences, preemptive rights shall be allocated pro rata for amount funded by insiders and affiliates).

Both Crestview (and its Related Funds) and SVP shall have specified protections and approval rights over:

- (i) changing any minority shareholder protections and (ii) other amendments that have a materially adverse and disproportionate effect on Crestview (or its Related Funds) or SVP, respectively;

- affiliate transactions

- issuing any equity or equity-like instruments that will not be subject to the preemptive rights, other than to (i) a third-party seller as consideration in a New Board-approved M&A transaction or (ii) management or employees of Hornblower (who are not associated or affiliated with SVP or Crestview) pursuant to a New Board-approved management incentive plan;

- changes in tax or regulatory status, if such change results in a materially adverse effect;

- liquidation, dissolution or winding up, or commencement of bankruptcy or similar proceedings, unless (i) approved by an independent special committee of the New Board and (ii) to the extent either Crestview or SVP (or their Related Funds) are participating, the other party shall receive preemptive rights and pro rata participation rights in connection with issuance of any debt, equity or similar instruments, including DIP or exit financing, backstop commitments or other fees, in connection with such proceeding; and

- any management incentive plan awards to persons associated or affiliated with SVP or Crestview (or its Affiliates) including but not limited to members of the New Board.

SVP and Crestview (and its Related Funds) shall have customary information and access rights and customary post-IPO registration rights, including demand and piggyback registration rights.

</td></tr>
<tr><td>

***Releases and Exculpation***

</td><td>

The Plan and the Confirmation Order will contain the exculpation provisions, the Debtor releases, and the "third-party" releases set forth in **Exhibit 1** to this Term Sheet.[10]

</td></tr>
</table>

---

[10]   Defined terms used but not otherwise defined in **Exhibit 1** to this Term Sheet shall have the meaning ascribed to such terms in the RSA.

14

| | |
|---|---|
| ***Discharge*** | Customary discharge provisions. |
| ***Injunction*** | Customary injunction provisions. |

\*       \*       \*       \*

**Exhibit 1**

**Releases and Exculpation Language**

## Exhibit 1

### Proposed Plan Releases and Exculpation Provisions

| Definitions | The following terms shall have the following definitions for purposes of this <u>Exhibit 1</u>: |
|---|---|
| | • "<u>Exculpated Parties</u>" means, collectively, and in each case in its capacity as such: (a) each of the Debtors; (b) each of the Reorganized Debtors; and (c) the Debtors' Chief Restructuring Officer. |
| | • "<u>Released Parties</u>" means, collectively, and in each case in its capacity as such: (a) each Debtor; (b) each Reorganized Debtor; (c) each Consenting Stakeholder; (d) each Agent; (e) each DIP Agent, each DIP Lender, and each Backstop Party; (f) with respect to each of the Entities in the foregoing clauses (a) through (e), each such Entity's current and former Affiliates (regardless of whether such interests are held directly or indirectly); (g) with respect to each of the Entities in the foregoing clauses (a) through (f), each such Entity's current and former predecessors, successors, subsidiaries, direct and indirect equityholders, funds, portfolio companies, and management companies; and (h) with respect to each of the Entities in the foregoing clauses (a) through (g), each such Entity's current and former directors, officers, managers, members, principals, partners, employees, independent contractors, agents, representatives, managed accounts or funds, management companies, fund advisors, investment advisors, advisory board members, financial advisors, partners (including both general and limited partners), consultants, financial advisors, attorneys, accountants, investment bankers, and other professionals; *provided* that, in each case, an Entity shall not be a Released Party if it elects to opt out of the releases contained in the Plan, if permitted to opt out; *provided further* that an Entity shall not be a Released Party if it files with the Bankruptcy Court an objection to the Plan (including the releases) that is not consensually resolved before Confirmation or supports any such objection or objector. |
| | • "<u>Releasing Parties</u>" means, collectively, and in each case in its capacity as such: (a) each Debtor; (b) each Reorganized Debtor; (c) each Consenting Stakeholder; (d) each Agent; (e) each DIP Agent, each DIP Lender, and each Backstop Party; (f) all Holders of Claims that vote to accept the Plan; (g) all Holders of Claims that are deemed to accept the Plan who do not affirmatively opt out of the releases provided by the Plan by checking the box on the applicable notice of non-voting status indicating that they opt not to grant the releases provided in the Plan; (h) all Holders of Claims that abstain from voting on the Plan and who do not affirmatively opt out of the releases provided by the Plan by checking the box on the applicable ballot indicating that they opt not to grant the releases provided in the Plan; (i) all Holders of Claims or Interests that vote to reject the Plan or are deemed to reject the Plan and who do not affirmatively opt out of the releases provided by the Plan by checking the box on the applicable ballot or notice of non-voting status indicating that they opt |

on the applicable ballot or notice of non-voting status indicating that they opt not to grant the releases provided in the Plan; (j) with respect to each of the Entities in the foregoing clauses (a) through (i), each such Entity's current and former Affiliates (regardless of whether such interests are held directly or indirectly); (k) with respect to each of the Entities in the foregoing clauses (a) through (j), each such Entity's current and former predecessors, successors, subsidiaries, direct and indirect equityholders, funds, portfolio companies, and management companies; and (l) with respect to each of the Entities in the foregoing clauses (a) through (k), each such Entity's current and former directors, officers, managers, members, principals, partners, employees, independent contractors, agents, representatives, managed accounts or funds, management companies, fund advisors, investment advisors, advisory board members, financial advisors, partners (including both general and limited partners), consultants, financial advisors, attorneys, accountants, investment bankers, and other professionals; *provided* that, in each case, an Entity shall not be a Releasing Party if it elects to opt out of the releases contained in the Plan, if permitted to opt out; *provided further* that no Holder that votes to accept the Plan shall be entitled to opt out of, and each such Holder shall be deemed to opt into, the releases; *provided further* that an Entity shall not be a Releasing Party if it files with the Bankruptcy Court an objection to the Plan (including the releases) that is not consensually resolved before Confirmation or supports any such objection or objector.

## C.   *Debtor Release*

**Notwithstanding anything else contained herein to the contrary, to the fullest extent permitted by applicable law, pursuant to section 1123(b) of the Bankruptcy Code and Bankruptcy Rule 9019 and in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, on and after the Plan Effective Date, each Released Party is deemed to be, and hereby is conclusively, absolutely, unconditionally, irrevocably, finally, and forever released and discharged by each and all of the Debtors, the Reorganized Debtors, and their Estates, including any successors to the Debtors or any Estate's representative appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Claim or Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all Claims and Causes of Action, including any derivative Claims asserted or assertable on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, asserted or unasserted, matured or unmatured, liquidated or unliquidated, fixed or contingent, accrued or unaccrued, existing or hereafter arising, in law, equity, contract, tort, or otherwise, that the Debtors, the Reorganized Debtors, or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Cause of Action against, or Interest in, a Debtor or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Reorganized Debtors, or their Estates (including the Debtors' capital structure, management, ownership, assets, or operation thereof), the**

purchase, sale, or rescission of any Security of the Debtors or the Reorganized Debtors, the assertion or enforcement of rights and remedies against the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim, Causes of Action, or Interest that is treated in this Plan, the business or contractual arrangements between any Debtor and any Released Party, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions between or among a Debtor or an Affiliate of a Debtor and another Debtor or an Affiliate of a Debtor, the Chapter 11 Cases, the DIP Facility, the First Lien Credit Agreement, the Incremental Superpriority Credit Agreement, the JBIH Credit Agreement, the Revolver Credit Agreement, the Superpriority Credit Agreement, the formulation, preparation, dissemination, negotiation, or Filing of the RSA, the Disclosure Statement, the Disclosure Statement Order, the Solicitation Materials, the Confirmation Order, the Confirmation Recognition Order, the Backstop Documents, the Rights Offering Documents, the DIP Documents, the Exit Credit Agreement, the documents related to the Exit Revolver, the New Organizational Documents, the AQV Bidding Procedures Order, the AQV Sale Order, the Plan, the Plan Supplement, or any aspect of the Restructuring Transactions, including the AQV Sale Transaction and any contract, instrument, release, or other agreement or document created or entered into in connection with the RSA, the DIP Facility, the Disclosure Statement, the Backstop Purchase Agreement, the Rights Offering, the Exit Revolver, the Exit Credit Agreement, the Plan, the Plan Supplement, the Confirmation Order, the Confirmation Recognition Order, the Chapter 11 Cases, the Filing of the Chapter 11 Cases, the AQV Sale Transaction, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of this Plan, any action or actions taken in furtherance of or consistent with the administration of this Plan, including the issuance or distribution of Securities pursuant to this Plan, or the distribution of property under this Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Plan Effective Date related or relating to any of the foregoing.

Notwithstanding anything contained herein to the contrary, the foregoing release does not release any post-Plan Effective Date obligations of any party or Entity under the Plan, any act occurring after the Plan Effective Date with respect to the Restructuring Transactions, the obligations arising under any Definitive Document to the extent imposing obligations arising after the Plan Effective Date (including those set forth in the Plan Supplement), or other document, instrument, or agreement executed to implement the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the terms by which matters are subject to a compromise and settlement, including the Debtor Releases in [Article IX.0], which includes by reference each of the related provisions and definitions contained in this Plan, and, further, shall constitute the Bankruptcy Court's finding that the Debtor Releases in [Article IX.0] are: (1) essential to Confirmation of this Plan; (2) an exercise of the Debtors' business judgment; (3) in exchange for the good and valuable consideration provided by the Released Parties, including the Released Parties' contributions to facilitating the Restructuring Transactions and implementing this Plan; (4) a good-faith settlement and compromise of the Claims and Causes of Action released by the Debtor Releases in [Article IX.0]; (5) in the best interests of the Debtors, their Estates, and all Holders of Claims and

3

Interests; (6) fair, equitable, and reasonably given and made after due notice and opportunity for a hearing; and (7) a bar to any of the Debtors, the Reorganized Debtors, or the Debtors' Estates asserting any Claim or Cause of Action released pursuant to the Debtor Releases in [**Article IX.0**].

D.     *Third-Party Release*

Except as otherwise expressly set forth in this Plan, on and after the Plan Effective Date, pursuant to section 1123(b) of the Bankruptcy Code and Bankruptcy Rule 9019 and to the fullest extent permitted by applicable law, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is deemed to be, and hereby is conclusively, absolutely, unconditionally, irrevocably, finally, and forever released and discharged by each Releasing Party (in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Claim or Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities) from any and all Claims and Causes of Action, including any derivative Claims asserted or assertable on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, asserted or unasserted, matured or unmatured, liquidated or unliquidated, fixed or contingent, accrued or unaccrued, existing or hereafter arising, in law, equity, contract, tort, or otherwise that such Entity would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Cause of Action against, or Interest in, a Debtor based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the Debtors' capital structure, management, ownership, assets, or operation thereof), the purchase, sale, or rescission of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim, Causes of Action, or Interest that is treated in this Plan, the business or contractual arrangements between any Debtor and any Released Party, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions between or among a Debtor or an Affiliate of a Debtor and another Debtor or an Affiliate of a Debtor, the Chapter 11 Cases, the DIP Facility, the First Lien Credit Agreement, the Incremental Superpriority Credit Agreement, the JBIH Credit Agreement, the Revolver Credit Agreement, the Superpriority Credit Agreement, the formulation, preparation, dissemination, negotiation, or Filing of the RSA, the Disclosure Statement, the Disclosure Statement Order, the Solicitation Materials, the Confirmation Order, the Confirmation Recognition Order, the Backstop Documents, the Rights Offering Documents, the DIP Documents, the Exit Credit Agreement, documents related to the Exit Revolver, the New Organizational Documents, the AQV Bidding Procedures Order, the AQV Sale Order, the Plan, the Plan Supplement, or any aspect of the Restructuring Transactions, including the AQV Sale Transaction and any contract, instrument, release, or other agreement or document created or entered into in connection with the RSA, the DIP Facility, the Disclosure Statement, the Backstop Purchase Agreement, the Rights Offering, the Exit Credit Agreement, the Exit Revolver, the Plan, the Plan Supplement, the Confirmation Order, the Confirmation Recognition Order, the Chapter 11 Cases, the Filing of the Chapter 11 Cases, the AQV Sale Transaction, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of this Plan, any action or actions taken in furtherance of or consistent with the administration of this Plan, including the

4

issuance or distribution of Securities pursuant to this Plan, or the distribution of property under this Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Plan Effective Date related or relating to any of the foregoing.

Notwithstanding anything contained herein to the contrary, the foregoing release does not release (1) any post-Plan Effective Date obligations of any party or Entity under the Plan, any act occurring after the Plan Effective Date with respect to the Restructuring Transaction, the obligations arising under any Definitive Document to the extent imposing obligations arising after the Plan Effective Date (including those set forth in the Plan Supplement), or other document, instrument, or agreement executed to implement the Plan, (2) the rights of Holders of Allowed Claims to receive distributions under this Plan, (3) the rights of any current employee of the Debtors under any employment agreement or plan, or (4) the rights of the Debtors with respect to any confidentiality provisions or covenants restricting competition in favor of the Debtors under any employment agreement with a current or former employee of the Debtors.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the terms by which matters are subject to a compromise and settlement, including the Debtor Releases in [Article IX.0], which includes by reference each of the related provisions and definitions contained in this Plan, and, further, shall constitute the Bankruptcy Court's finding that the Third-Party Releases in this [Article IX.D] are:  (1) essential to Confirmation of this Plan; (2) in exchange for the good and valuable consideration provided by the Released Parties, including the Released Parties' contributions to facilitating the Restructuring Transactions and implementing this Plan; (3) a good-faith settlement and compromise of the Claims and Causes of Action released by the Third-Party Releases in this [Article IX.D]; (4) in the best interests of the Debtors and their Estates and all Holders of Claims and Interests; (5) fair, equitable, and reasonably given and made after due notice and opportunity for a hearing; and (6) a bar to any of the Releasing Parties asserting any Claim or Causes of Action released pursuant to the Third-Party Releases in this [Article IX.D].

E.    *Exculpation*

Except as otherwise specifically provided in this Plan, no Exculpated Party shall have or incur liability for, and each Exculpated Party is hereby released and exculpated from, any Causes of Action or Claim whether direct or derivative related to any act or omission in connection with, relating to, or arising out of the Chapter 11 Cases from the Petition Date to the Plan Effective Date, the formulation, preparation, dissemination, negotiation, or Filing of the RSA, the Disclosure Statement, the Disclosure Statement Order, the Solicitation Materials, the Confirmation Order, the Confirmation Recognition Order, the Backstop Documents, the Rights Offering Documents, the DIP Documents, the Exit Credit Agreement, the documents related to the Exit Revolver, the New Organizational Documents, the AQV Bidding Procedures Order, the AQV Sale Order, the Plan, the Plan Supplement, or any transaction related to the Restructuring Transactions, including the AQV Sale Transaction and any contract, instrument, release, or other agreement or document created or entered into before or during the Chapter 11 Cases in

connection with the Restructuring Transactions, any preference, fraudulent transfer, or other avoidance Claim arising pursuant to chapter 5 of the Bankruptcy Code or other applicable law, the Filing of the Chapter 11 Cases, the AQV Sale Transaction, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of this Plan, including the issuance of Securities pursuant to this Plan, or the distribution of property under this Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Plan Effective Date related or relating to any of the foregoing, except for Claims arising from any act or omission that is determined in a Final Order to have constituted willful misconduct, gross negligence, or actual fraud, but in all respects such Exculpated Parties shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to this Plan and the Confirmation Order.

The Exculpated Parties set forth above have, and upon Confirmation of this Plan shall be deemed to have, participated in good faith and in compliance with applicable law with respect to the solicitation of votes and distribution of consideration pursuant to this Plan and, therefore, are not and shall not be liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of this Plan or such distributions made pursuant to this Plan.

# **Exhibit 2**

**Senior DIP Credit Agreement**

EXECUTION VERSION

THE FOLLOWING INFORMATION IS SUPPLIED SOLELY FOR U.S. FEDERAL INCOME TAX PURPOSES. THE TERM LOAN WAS ISSUED WITH "ORIGINAL ISSUE DISCOUNT" ("OID") WITHIN THE MEANING OF SECTION 1273 OF THE INTERNAL REVENUE CODE OF 1986, AS AMENDED. A HOLDER OR BENEFICIAL OWNER MAY OBTAIN THE ISSUE PRICE, AMOUNT OF ORIGINAL ISSUE DISCOUNT, ISSUE DATE, AND YIELD TO MATURITY FOR THIS LOAN BY SUBMITTING A WRITTEN REQUEST FOR SUCH INFORMATION TO THE BORROWERS AT PIER 3, THE EMBARCADERO, SAN FRANCISCO, CA 94111, ATTN: ADAM PEAKES.

**SENIOR SECURED SUPERPRIORITY DEBTOR-IN-POSSESSION CREDIT AGREEMENT**

Dated as of February 21, 2024

among

HORNBLOWER HOLDCO, LLC and
AMERICAN QUEEN HOLDCO, LLC,
as Parents,

HORNBLOWER SUB, LLC and
AMERICAN QUEEN SUB, LLC,
as Borrowers,

THE LENDERS PARTY HERETO,

and

GLAS TRUST COMPANY LLC,
as Administrative Agent and Collateral Agent

_____

DEUTSCHE BANK AG NEW YORK BRANCH,
as Sole Lead Arranger and Sole Bookrunner

SENIOR SECURED SUPER-PRIORITY DEBTOR-IN-POSSESSION FACILITY

# TABLE OF CONTENTS

Page

## ARTICLE I
## DEFINITIONS

| | | |
|---|---|---|
| Section 1.01 | Defined Terms | 1 |
| Section 1.02 | Classification of Loans and Borrowings | 45 |
| Section 1.03 | Terms Generally | 45 |
| Section 1.04 | Accounting Terms; GAAP | 46 |
| Section 1.05 | Effectuation of Transactions | 46 |
| Section 1.06 | Exchange Rates; Currency Equivalents | 46 |
| Section 1.07 | [Reserved] | 46 |
| Section 1.08 | [Reserved] | 46 |
| Section 1.09 | Timing of Payment or Performance | 46 |
| Section 1.10 | Times of Day | 46 |
| Section 1.11 | Divisions | 46 |

## ARTICLE II
## THE CREDITS

| | | |
|---|---|---|
| Section 2.01 | Term Loan Commitments | 47 |
| Section 2.02 | Loans and Borrowings | 47 |
| Section 2.03 | Requests for Borrowings | 47 |
| Section 2.04 | [Reserved] | 48 |
| Section 2.05 | [Reserved] | 48 |
| Section 2.06 | Funding of Borrowings | 48 |
| Section 2.07 | Interest Elections | 49 |
| Section 2.08 | Termination of Term Loan Commitments | 50 |
| Section 2.09 | Repayment of Term Loans; Evidence of Debt | 50 |
| Section 2.10 | Repayment of Term Loans | 50 |
| Section 2.11 | Prepayment of Term Loans | 51 |
| Section 2.12 | Fees | 52 |
| Section 2.13 | Interest | 53 |
| Section 2.14 | Alternate Rate of Interest | 54 |
| Section 2.15 | Increased Costs | 55 |
| Section 2.16 | Break Funding Payments | 56 |
| Section 2.17 | Taxes | 56 |
| Section 2.18 | Payments Generally; Pro Rata Treatment; Sharing of Setoffs | 59 |
| Section 2.19 | Mitigation Obligations; Replacement of Lenders | 60 |
| Section 2.20 | [Reserved] | 61 |
| Section 2.21 | [Reserved] | 61 |
| Section 2.22 | Illegality | 61 |
| Section 2.23 | Benchmark Replacement Setting | 61 |
| Section 2.24 | Joint and Several Liability of Borrowers | 62 |

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES

| | | |
|---|---|---|
| Section 3.01 | Organization; Powers | 63 |
| Section 3.02 | Authorization; Enforceability | 63 |
| Section 3.03 | Governmental Approvals; No Conflicts | 63 |
| Section 3.04 | Financial Condition; No Material Adverse Effect | 64 |
| Section 3.05 | Properties | 64 |
| Section 3.06 | Litigation and Environmental Matters | 65 |

Section 3.07    Compliance with Laws and Agreements..................................................................65
Section 3.08    Investment Company Status...............................................................................65
Section 3.09    Taxes..............................................................................................................65
Section 3.10    ERISA.............................................................................................................66
Section 3.11    Disclosure.......................................................................................................66
Section 3.12    Subsidiaries.....................................................................................................66
Section 3.13    Intellectual Property; Licenses, Etc....................................................................66
Section 3.14    [Reserved].......................................................................................................66
Section 3.15    [Reserved].......................................................................................................66
Section 3.16    Federal Reserve Regulations.............................................................................67
Section 3.17    Purpose of Term Loans....................................................................................67
Section 3.18    USA PATRIOT Act; Anti-Money Laundering Laws; Conflict with Sanctions Laws ..................67
Section 3.19    No Unlawful Contributions or Other Payments ...................................................68
Section 3.20    Labor Matters..................................................................................................68
Section 3.21    Insurance........................................................................................................68
Section 3.22    Security..........................................................................................................68
Section 3.23    Budget and Financial Plan.................................................................................68
Section 3.24    Lien Priority....................................................................................................68

## ARTICLE IV
## CONDITIONS

Section 4.01    Closing Date....................................................................................................69

## ARTICLE V
## AFFIRMATIVE COVENANTS

Section 5.01    Financial Statements, Reports, etc. ....................................................................72
Section 5.02    Notice of Material Events..................................................................................74
Section 5.03    Citizenship......................................................................................................75
Section 5.04    Existence; Conduct of Business .........................................................................76
Section 5.05    Payment of Taxes.............................................................................................76
Section 5.06    Insurance........................................................................................................76
Section 5.07    Maintaining Records; Access to Properties and Inspections.................................76
Section 5.08    Use of Proceeds...............................................................................................77
Section 5.09    Compliance with Laws......................................................................................77
Section 5.10    Compliance with Environmental Laws ...............................................................77
Section 5.11    Further Assurances...........................................................................................77
Section 5.12    [Reserved .......................................................................................................77
Section 5.13    [Reserved].......................................................................................................77
Section 5.14    Maintenance of Properties.................................................................................77
Section 5.15    Certain Post-Closing Obligations.......................................................................78
Section 5.16    Lender Meetings...............................................................................................78
Section 5.17    Bankruptcy Matters..........................................................................................78
Section 5.18    Milestones.......................................................................................................79
Section 5.19    Canadian Pension Plans....................................................................................79

## ARTICLE VI
## NEGATIVE COVENANTS

Section 6.01    Indebtedness....................................................................................................80
Section 6.02    Liens..............................................................................................................83
Section 6.03    Sale and Lease-Back Transactions......................................................................86
Section 6.04    Investments, Loans and Advances......................................................................86
Section 6.05    Mergers, Amalgamations Consolidations, Sales of Assets and Acquisitions .............88
Section 6.06    Dividends and Distributions...............................................................................89

| Section 6.07 | Transactions with Affiliates | 90 |
|---|---|---|
| Section 6.08 | Business of the Borrowers and the Subsidiaries | 91 |
| Section 6.09 | Limitation on Payments and Modifications of Indebtedness; Modifications of Certificate of Incorporation, By-Laws and Certain Other Agreements; etc. | 92 |
| Section 6.10 | Fiscal Year | 93 |
| Section 6.11 | Financial Covenant | 93 |
| Section 6.12 | Passive Holding Companies | 93 |
| Section 6.13 | [Reserved] | 94 |
| Section 6.14 | No Unrestricted Subsidiaries | 94 |
| Section 6.15 | Amendments to the Prepetition Revolving Loan Documents, Prepetition First Lien Loan Documents or Junior DIP Loan Documents | 94 |
| Section 6.16 | Permitted Activities of Journey Beyond and its Subsidiaries | 94 |
| Section 6.17 | Disbursements | 95 |
| Section 6.18 | Amendments of Certain Contracts | 96 |

## ARTICLE VII
## EVENTS OF DEFAULT

| Section 7.01 | Events of Default | 96 |
|---|---|---|
| Section 7.02 | [Reserved] | 100 |
| Section 7.03 | Application of Payments | 100 |

## ARTICLE VIII
## AGENTS

| Section 8.01 | Appointment and Authorization of Agents | 100 |
|---|---|---|
| Section 8.02 | Rights as a Lender | 101 |
| Section 8.03 | Exculpatory Provisions | 101 |
| Section 8.04 | Reliance by the Agents | 102 |
| Section 8.05 | Delegation of Duties | 102 |
| Section 8.06 | Indemnification | 103 |
| Section 8.07 | Resignation of Administrative Agent | 103 |
| Section 8.08 | Non-Reliance on Agents and Other Lenders | 103 |
| Section 8.09 | Administrative Agent May File Proofs of Claim; Irrevocable Authorization | 104 |
| Section 8.10 | Withholding Taxes | 105 |
| Section 8.11 | Binding Effect | 105 |
| Section 8.12 | Security Documents and Collateral Agent | 105 |
| Section 8.13 | [Reserved] | 106 |
| Section 8.14 | Ship Mortgage Trust | 106 |
| Section 8.15 | Control by the Majority | 106 |
| Section 8.16 | Sole Lead Arranger and Sole Bookrunner | 106 |
| Section 8.17 | Erroneous Payments | 106 |

## ARTICLE IX
## MISCELLANEOUS

| Section 9.01 | Notices | 107 |
|---|---|---|
| Section 9.02 | Waivers; Amendments | 109 |
| Section 9.03 | Expenses; Indemnity; Damage Waiver | 111 |
| Section 9.04 | Successors and Assigns | 112 |
| Section 9.05 | Survival | 115 |
| Section 9.06 | Counterparts; Integration; Effectiveness | 115 |
| Section 9.07 | Severability | 115 |
| Section 9.08 | Right of Setoff | 116 |
| Section 9.09 | Governing Law; Jurisdiction; Consent to Service of Process | 116 |
| Section 9.10 | WAIVER OF JURY TRIAL | 117 |

Section 9.11    Headings ............................................................................................................... 117
Section 9.12    Confidentiality ..................................................................................................... 117
Section 9.13    USA PATRIOT Act .............................................................................................. 118
Section 9.14    Judgment Currency .............................................................................................. 118
Section 9.15    Release of Liens and Guarantees ........................................................................ 119
Section 9.16    No Advisory or Fiduciary Responsibility ........................................................... 119
Section 9.17    Interest Rate Limitation ....................................................................................... 120
Section 9.18    Acknowledgment and Consent to Bail-In of Affected Financial Institutions .............. 120
Section 9.19    [Reserved] ............................................................................................................ 120
Section 9.20    Acknowledgement Regarding Any Supported QFCs .......................................... 120

**ARTICLE X**
**GUARANTY**

Section 10.01    Guaranty of the Obligations ............................................................................... 121
Section 10.02    Contribution by Guarantors ............................................................................... 121
Section 10.03    Payment by Guarantors ...................................................................................... 121
Section 10.04    Liability of Guarantors Absolute ....................................................................... 122
Section 10.05    Waivers by Guarantors ....................................................................................... 123
Section 10.06    Guarantors' Rights of Subrogation, Contribution, Etc. ..................................... 123
Section 10.07    Subordination of Other Obligations ................................................................... 124
Section 10.08    Continuing Guaranty .......................................................................................... 124
Section 10.09    Authority of Guarantors or the Borrower ........................................................... 124
Section 10.10    Financial Condition of the Borrower .................................................................. 124
Section 10.11    Bankruptcy, Etc. ................................................................................................. 124
Section 10.12    Discharge of Guaranty Upon Sale of Guarantor ................................................ 125
Section 10.13    Keepwell ............................................................................................................. 125
Section 10.14    Definitions ........................................................................................................... 125
Section 10.15    Guarantee Limitation ......................................................................................... 126

**ARTICLE XI**
**SECURITY AND PRIORITY**

Section 11.01    Collateral; Grant of Lien and Security Interest ................................................. 126
Section 11.02    [Reserved] ........................................................................................................... 126
Section 11.03    Grants, Rights and Remedies .............................................................................. 126
Section 11.04    No Filings Required ............................................................................................ 126
Section 11.05    Survival ............................................................................................................... 126

SCHEDULES:

| Schedule 1.01(B) | — | Mortgaged Properties |
|---|---|---|
| Schedule 1.01(C) | — | Approved Classification Society |
| Schedule 1.01(D) | — | [Reserved] |
| Schedule 1.01(F) | — | Mortgaged Vessels |
| Schedule 2.01 | — | Term Loan Commitments |
| Schedule 3.04 | — | Financial Statements |
| Schedule 3.06(a) | — | Litigation |
| Schedule 3.12 | — | Subsidiaries |
| Schedule 3.12 | — | Subsidiaries |
| Schedule 3.21 | — | Insurance |
| Schedule 5.15 | — | Certain Post-Closing Obligations |
| Schedule 6.01 | — | Existing Indebtedness |
| Schedule 6.02(a) | — | Existing Liens |
| Schedule 6.04 | — | Existing Investments |
| Schedule 6.07 | — | Transactions with Affiliates |
| Schedule 9.01 | — | Applicable Account; Notices |

EXHIBITS:

| Exhibit A | — | Form of Assignment and Assumption |
|---|---|---|
| Exhibit B | — | Form of Perfection Certificate |
| Exhibit C | — | [Reserved] |
| Exhibit D | — | [Reserved] |
| Exhibit E | — | [Reserved] |
| Exhibit F | — | [Reserved] |
| Exhibit G | — | Certain Subordination Terms |
| Exhibit H-1 | — | Form of U.S. Tax Compliance Certificate |
| Exhibit H-2 | — | Form of U.S. Tax Compliance Certificate |
| Exhibit H-3 | — | Form of U.S. Tax Compliance Certificate |
| Exhibit H-4 | — | Form of U.S. Tax Compliance Certificate |
| Exhibit I | — | Form of Borrowing Request |
| Exhibit J | — | Form of Interest Election Request |
| Exhibit K | — | Form of Promissory Note |
| Exhibit L | — | [Reserved] |
| Exhibit M | — | [Reserved] |
| Exhibit N-1 | — | [Reserved] |
| Exhibit N-2 | — | [Reserved] |
| Exhibit N-3 | — | [Reserved] |
| Exhibit O | — | [Reserved] |
| Exhibit P | — | Form of Budget |

SENIOR SECURED SUPERPRIORITY DEBTOR-IN-POSSESSION CREDIT AGREEMENT dated as of February 21, 2024 (this "<u>Agreement</u>"), among HORNBLOWER HOLDCO, LLC, a Delaware limited liability company, as debtor and debtor-in-possession ("<u>Hornblower Parent</u>"), AMERICAN QUEEN HOLDCO, LLC, a Delaware limited liability company, as debtor and debtor-in-possession ("<u>AQ Parent</u>" and, together with Hornblower Parent, each a "<u>Parent</u>" and, collectively, the "<u>Parents</u>"), HORNBLOWER SUB, LLC, a Delaware limited liability company, as debtor and debtor-in-possession ("<u>Hornblower Borrower</u>"), AMERICAN QUEEN SUB, LLC, a Delaware limited liability company, as debtor and debtor-in-possession ("<u>AQ Borrower</u>" and, together with Hornblower Borrower, each a "<u>Borrower</u>" and, collectively, the "<u>Borrowers</u>"), JOURNEY BEYOND HOLDINGS, LLC, a Delaware limited liability company, as debtor and debtor-in-possession ("<u>JB TopCo</u>"), and the other Debtors (as defined below) party hereto, the LENDERS party hereto from time to time (the "<u>Lenders</u>"), and GLAS TRUST COMPANY LLC ("GLAS"), as Administrative Agent for the Lenders and Collateral Agent for the Secured Parties.

The parties hereto agree as follows:

PRELIMINARY STATEMENTS

WHEREAS, the Loan Parties (as defined herein) have commenced voluntary cases (the "<u>Chapter 11 Cases</u>") under Chapter 11 of the Bankruptcy Code (as defined herein) in the United States Bankruptcy Court for the Southern District of Texas (the "<u>Bankruptcy Court</u>"), and continue to operate their businesses and manage their properties as debtors-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code;

WHEREAS, the Foreign Representative (as defined herein) will also commence proceedings before the Ontario Superior Court of Justice (Commercial List) (the "<u>Canadian Court</u>") under Part IV of the Companies' Creditors Arrangement Act, R.S.C., 1985, c. C-36, as amended (the "<u>CCAA</u>") recognizing the Chapter 11 Cases as "foreign main proceedings" (the "<u>Canadian Recognition Proceedings</u>");

WHEREAS, the Borrowers have requested that the Lenders make post-petition loans and advances to the Borrowers as set forth herein. The Lenders are willing to extend such credit to the Borrowers subject to the terms and conditions hereinafter set forth;

WHEREAS, to provide security for the repayment of the Term Loans (as defined herein), and the payment of the other Obligations (as defined herein) of the Loan Parties hereunder and under the Loan Documents (as defined herein), the Loan Parties will provide and grant to the Collateral Agent, for its benefit and the benefit of the Secured Parties, certain security interests, liens, and other rights and protections pursuant to the terms hereof, and security interests and liens pursuant to Sections 364(c)(2), 364(c)(3) and 364(d) of the Bankruptcy Code, super-priority administrative expense claims pursuant to Section 364(c)(1) of the Bankruptcy Code and a Canadian DIP Charge (as defined herein) pursuant to the CCAA, and other rights and protections, as more fully described herein.

In consideration of the mutual covenants and agreements herein contained, the parties hereto covenant and agree as follows:

**ARTICLE I**
**DEFINITIONS**

Section 1.01      <u>Defined Terms</u>.  As used in this Agreement, the following terms shall have the meanings specified below:

"<u>ABR</u>" when used in reference to any ABR Loan or ABR Borrowing, refers to whether such ABR Loan, or the ABR Loans comprising such ABR Borrowing, are bearing interest at a rate determined by reference to the Alternate Base Rate.

"<u>ABR Borrowing</u>" means a Borrowing comprised of ABR Loans.

"<u>ABR Loan</u>" means any Term Loan bearing interest at a rate determined by reference to the ABR in accordance with the provisions of Article II.

"ABR Term SOFR Determination Day" has the meaning given to such term in the definition of "Term SOFR".

"Acceptable Plan" means a Plan of Reorganization in form and substance reasonably satisfactory to the Required Lenders (as the same may be amended, supplemented, or modified from time to time after entry thereof in a manner satisfactory to the Required Lenders) that, among other things, is consistent with the terms and conditions set forth in the Restructuring Support Agreement.

"Actual Net Operating Cash Flow Amount" means, with respect to any period of determination, the sum of (i) the amount of actual net operating cash flows of the Loan Parties (without deduction for Professional Fees) during the relevant period of determination minus (ii) Capex during the relevant period of determination which corresponds to each of the Budgeted Net Operating Cash Flow Amounts described in the line item contained in the Budget across from the heading "Net Operating Cash Flow Less Capex."

"Additional Collateral Vessel" means any Vessel set forth on Schedule 1.01(F) under the heading "Additional Collateral Vessels" that is owned by any Loan Party.

"Additional PIK Margin" has the meaning assigned to such term in the definition of the term "Applicable Margin".

"Adjusted Term SOFR" means, for purposes of any calculation, the rate per annum equal to (a) Term SOFR for such calculation plus (b) the Term SOFR Adjustment; provided that if Adjusted Term SOFR shall ever be less than 1.00%, then Adjusted Term SOFR shall be deemed to be 1.00%.

"Administrative Agent" means GLAS, in its capacity as administrative agent hereunder and under the other Loan Documents, and its successors in such capacity as provided in Article VIII.

"Administrative Questionnaire" means an administrative questionnaire in a form supplied by the Administrative Agent.

"Affected Financial Institution" means (a) any EEA Financial Institution or (b) any UK Financial Institution.

"Affiliate" means, with respect to a specified Person, another Person that directly or indirectly Controls or is Controlled by or is under common Control with the Person specified. None of the Administrative Agent, any Lender or any of their respective Affiliates shall be considered an Affiliate of any Parent or any subsidiary thereof.

"Agent Fee Letter" means that certain Fee Letter, on or about the date hereof by and among the Borrowers and the Administrative Agent, as it may be amended, amended and restated, supplemented or otherwise modified from time to time.

"Agent Parties" has the meaning assigned to such term in Section 9.01(c).

"Agents" means the Administrative Agent and the Collateral Agent.

"Aggregate Payments" has the meaning assigned to such term in Section 10.02.

"Agreement" has the meaning given to such term in the preliminary statements hereto.

"Agreement Currency" has the meaning given to such term in Section 9.14(b).

"Alternate Base Rate" means, for any day, a rate per annum equal to the greatest of (a) the Prime Rate in effect on such day, (b) the Federal Funds Effective Rate in effect on such day plus 1/2 of 1.00% and (c) Adjusted Term SOFR for a one-month tenor on such day plus 1.00%. Any change in the Alternate Base Rate due to a change in the Prime Rate, the Federal Funds Effective Rate or Adjusted Term SOFR shall be effective from and including the

effective date of such change in the Prime Rate, the Federal Funds Effective Rate or Adjusted Term SOFR, respectively.

"Anti-Corruption Laws" has the meaning given to such term in Section 3.19.

"Anti-Money Laundering Laws" means any laws relating to terrorism or money laundering applicable to the relevant party or any of its Affiliates, including the USA PATRIOT Act, the laws comprising or implementing the Bank Secrecy Act and the *Proceeds of Crime (Money Laundering) and Terrorist Financing Act* (Canada) and the regulations thereunder (as any of the foregoing laws may from time to time be amended, renewed, extended, or replaced).

"Applicable Account" means the Administrative Agent's address or addresses and account or accounts as set forth on Schedule 9.01, or such other address or account of a third party or sub-agent, as appropriate, as the Administrative Agent may from time to time notify the Borrowers and the Lenders.

"Applicable Creditor" has the meaning given to such term in Section 9.14(b).

"Applicable Margin" means for any day, with respect to any Term Loans, (1) 6.50% per annum, in the case of any Term SOFR Loan, and (2) 5.50% per annum, in the case of any ABR Loan; provided, that if a PIK Election has been made with respect to any Term Loan, then each of the percentages per annum set forth in clauses (1) and (2) above shall be increased by 0.50% for the applicable PIK Interest Period, solely with respect to the portion of such Term Loan for which the PIK Election was made (such additional interest rate margin, the "Additional PIK Margin").

"Approved Bank" has the meaning assigned to such term in the definition of the term "Permitted Investments."

"Approved Fund" means any Person (other than a natural person) that is (or will be) engaged in making, purchasing, holding or investing in commercial loans and similar extensions of credit in the ordinary course of its activities and that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers or manages a Lender.

"AQ Borrower" has the meaning assigned to such term in the preamble.

"AQ Parent" has the meaning assigned to such term in the preamble.

"AQV Wind-down Plan" means the plan that contemplates the full wind-down, decommission, closure and otherwise shuttering all of the "Overnight" business and each division thereof, which was delivered to the Required Lenders prior to the Petition Date.

"Arranger" means DBNY in its capacity as sole lead arranger and sole bookrunner for the Term Loans.

"Asset Sale" means any loss, total loss (whether actual, constructive, agreed, arranged or compromised) damage, destruction or condemnation of, or any Disposition (including any sale and leaseback of assets and any mortgage or lease of Real Property or a Vessel) to any person of, any asset or assets of any Borrower or any Subsidiary.

"Assignment and Assumption" means an assignment and assumption entered into by a Lender and a permitted assignee pursuant to Section 9.04 (with the consent of any Person whose consent is required by Section 9.04), substantially in the form of Exhibit A or any other form reasonably approved by the Administrative Agent.

"Assignment of Freights and Hires" means an assignment of freights and hires in respect of a Mortgaged Vessel, in a form reasonably acceptable to the Administrative Agent (acting at the direction of the Required Lenders) and the Borrowers and substantially in the form delivered under the Prepetition Super Senior Credit Agreement.

"<u>Assignment of Insurances</u>" means an assignment of insurances in respect of a Mortgaged Vessel, in a form reasonably acceptable to the Administrative Agent (acting at the direction of the Required Lenders) and the Borrowers and substantially in the form delivered under the Prepetition Super Senior Credit Agreement.

"<u>Australian Specific Security Deed</u>" means the specific security deed (share) in respect of the equity interests in HB TopCo Pty, Ltd, an Australian proprietary limited company, in such form reasonably acceptable to the Required Lenders, the Collateral Agent and JB TopCo, as such document may be amended, restated, supplemented or otherwise modified from time to time.

"<u>Available Tenor</u>" means, as of any date of determination and with respect to the then-current Benchmark, as applicable, if such Benchmark is a term rate, any tenor for such Benchmark (or component thereof) that is or may be used for determining the length of an Interest Period pursuant to this Agreement as of such date and not including, for the avoidance of doubt, any tenor for such Benchmark that is then-removed from the definition of "Interest Period" pursuant to Section 2.23(d).

"<u>Bail-In Action</u>" means the exercise of any Write-Down and Conversion Powers by the applicable Resolution Authority in respect of any liability of an Affected Financial Institution.

"<u>Bail-In Legislation</u>" means (a) with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law, regulation rule or requirement for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule and (b) with respect to the United Kingdom, Part I of the United Kingdom Banking Act 2009 (as amended from time to time) and any other law, regulation or rule applicable in the United Kingdom relating to the resolution of unsound or failing banks, investment firms or other financial institutions or their affiliates (other than through liquidation, administration or other insolvency proceedings).

"<u>Bankruptcy Code</u>" means Title 11 of the United State Code, as amended, or any similar federal or state law for the relief of debtors.

"<u>Bankruptcy Court DIP Order</u>" means the Interim DIP Order or the Final DIP Order, as applicable.

"<u>Benchmark</u>" means, initially, the Term SOFR Reference Rate; <u>provided</u> that if a Benchmark Transition Event has occurred with respect to the Term SOFR Reference Rate or the then-current Benchmark, then "Benchmark" means the applicable Benchmark Replacement to the extent that such Benchmark Replacement has replaced such prior benchmark rate pursuant to Section 2.23(a).

"<u>Benchmark Replacement</u>" means, with respect to any Benchmark Transition Event, the first alternative set forth in the order below that can be determined by the Administrative Agent for the applicable Benchmark Replacement Date:

(a)        Daily Simple SOFR or

(b)        the sum of: (i) the alternate benchmark rate that has been selected by the Required Lenders (in consultation with the Administrative Agent) and the Borrowers giving due consideration to (A) any selection or recommendation of a replacement benchmark rate or the mechanism for determining such a rate by the relevant Governmental Authority or (B) any evolving or then-prevailing market convention for determining a benchmark rate as a replacement to the then-current Benchmark for U.S. dollar-denominated credit facilities of this nature and (ii) the related Benchmark Replacement Adjustment.

If the Benchmark Replacement as determined pursuant to clause (a) or (b) above would be less than 1.00%, the Benchmark Replacement will be deemed to be 1.00% for the purposes of this Agreement and the other Loan Documents.

"<u>Benchmark Replacement Adjustment</u>" means, with respect to any replacement of the then-current Benchmark with an Unadjusted Benchmark Replacement, the spread adjustment, or method for calculating or

determining such spread adjustment, (which may be a positive or negative value or zero) that has been selected by the Required Lenders (in consultation with the Administrative Agent) and the Borrowers giving due consideration to (a) any selection or recommendation of a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement by the relevant Governmental Authority or (b) any evolving or then-prevailing market convention for determining a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement for Dollar-denominated credit facilities of this nature at such time.

"Benchmark Replacement Date" means the earliest to occur of the following events with respect to the then-current Benchmark:

(a)   in the case of clause (a) or (b) of the definition of "Benchmark Transition Event," the later of (i) the date of the public statement or publication of information referenced therein and (ii) the date on which the administrator of such Benchmark (or the published component used in the calculation thereof) permanently or indefinitely ceases to provide such Benchmark (or such component thereof) or, if such Benchmark is a term rate, all Available Tenors of such Benchmark (or such component thereof); or

(b)   in the case of clause (c) of the definition of "Benchmark Transition Event," the first date on which all Available Tenors of such Benchmark (or the published component used in the calculation thereof) has been or, if such Benchmark is a term rate, all Available Tenors or such Benchmark (or such component thereof) have been determined and announced by the regulatory supervisor for the administrator of such Benchmark (or such component thereof) to be non-representative; provided that such non-representativeness will be determined by reference to the most recent statement or publication referenced in such clause (c) and even if such Benchmark (or such component thereof) or, if such Benchmark is a term rate, any Available Tenor of such Benchmark (or such component thereof) continues to be provided on such date.

For the avoidance of doubt, if such Benchmark is a term rate, the "Benchmark Replacement Date" will be deemed to have occurred in the case of clause (a) or (b) with respect to any Benchmark upon the occurrence of the applicable event or events set forth therein with respect to all then-current Available Tenors of such Benchmark (or the published component used in the calculation thereof).

"Benchmark Transition Event" means the occurrence of one or more of the following events with respect to the then-current Benchmark:

(a)   a public statement or publication of information by or on behalf of the administrator of such Benchmark (or the published component used in the calculation thereof) announcing that such administrator has ceased or will cease to provide such Benchmark (or such component thereof) or, if such Benchmark is a term rate, all Available Tenors of such Benchmark (or such component thereof), permanently or indefinitely, provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide such Benchmark (or such component thereof) or, if such Benchmark is a term rate, any Available Tenor of such Benchmark (or such component thereof);

(b)   a public statement or publication of information by the regulatory supervisor for the administrator of such Benchmark (or the published component used in the calculation thereof), the Federal Reserve Board, the Federal Reserve Bank of New York, an insolvency official with jurisdiction over the administrator for such Benchmark (or such component), a resolution authority with jurisdiction over the administrator for such Benchmark (or such component) or a court or an entity with similar insolvency or resolution authority over the administrator for such Benchmark (or such component), which states that the administrator of such Benchmark (or such component) has ceased or will cease to provide such Benchmark (or such component thereof) or, if such Benchmark is a term rate, all Available Tenors of such Benchmark (or such component thereof) permanently or indefinitely, provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide such Benchmark (or such component thereof) or, if such Benchmark is a term rate, any Available Tenor of such Benchmark (or such component thereof); or

5

(c)    a public statement or publication of information by the regulatory supervisor for the administrator of such Benchmark (or the published component used in the calculation thereof) announcing that all Available Tenors of such Benchmark (or such component thereof) are not, or as of a specified future date will not be, representative.

For the avoidance of doubt, if such Benchmark is a term rate, a "Benchmark Transition Event" will be deemed to have occurred with respect to any Benchmark if a public statement or publication of information set forth above has occurred with respect to each then-current Available Tenor of such Benchmark (or the published component used in the calculation thereof).

"Benchmark Unavailability Period" means the period (if any) (a) beginning at the time that a Benchmark Replacement Date has occurred if, at such time, no Benchmark Replacement has replaced the then-current Benchmark for all purposes hereunder and under any Loan Document in accordance with Section 2.23 and (b) ending at the time that a Benchmark Replacement has replaced the then-current Benchmark for all purposes hereunder and under any Loan Document in accordance with Section 2.23.

"Beneficial Ownership Certification" means a certification regarding beneficial ownership required by the Beneficial Ownership Regulation.

"Beneficial Ownership Regulation" means 31 C.F.R. § 1010.230.

"BHC Act Affiliate" of a party means an "affiliate" (as such term is defined under, and interpreted in accordance with, 12 U.S.C. § 1841(k)) of such party.

"Board of Directors" means, with respect to any Person, (a) in the case of any corporation, the board of directors of such Person or any committee thereof duly authorized to act on behalf of such board, (b) in the case of any limited liability company, the board of managers of such Person, (c) in the case of any partnership, the board of directors or board of managers of the general partner of such Person and (d) in any other case, the functional equivalent of the foregoing.

"Board of Governors" means the Board of Governors of the Federal Reserve System of the United States of America.

"Borrower Materials" means materials and/or information provided by or on behalf of the Borrowers hereunder.

"Borrowers" has the meaning assigned to such term in the preamble.

"Borrowing" means Term Loans of the same Type made, converted or continued on the same date and, in the case of Term SOFR Loans, as to which a single Interest Period is in effect.

"Borrowing Request" means a written request by the Borrowers for a Borrowing substantially in the form of Exhibit I delivered in accordance with Section 2.03 or another form approved by the Administrative Agent (including any form on an electronic platform or electronic transmission system as approved by the Administrative Agent).

"Budget" means a budget in the form attached hereto as Exhibit P, as the same may be amended, supplemented, extended and/or otherwise modified at any time and from time to time in accordance with Section 5.01(n).

"Budget Event" shall mean any of the following:

(i)    the aggregate amount of actual receipts during any Budget Testing Period shall be less than the aggregate budgeted receipts in the Budget for such Budget Testing Period by an amount greater than the Permitted Variance (the "Budgeted Receipts Test");

6

(ii)     the actual amount of aggregate operating disbursements (excluding Professional Fees) shall exceed the projected aggregate operating disbursements (excluding Professional Fees) in the Budget for such Budget Testing Period by more than the Permitted Variance (the "Cumulative Budgeted Disbursements Test");

(iii)    [reserved]; or

(iv)     the Actual Net Operating Cash Flow Amount for any Budget Testing Period shall be less than the Budgeted Net Operating Cash Flow Amount for such Budget Testing Period by more than the Permitted Variance (the "Net Operating Cash Flow Test");

provided that, notwithstanding anything to the contrary set forth in this Agreement or any Loan Document, the Required Lenders' Advisors may waive compliance (which may be (i) over email and/or (ii) retroactive and given effect as of the applicable Budget Testing Date) with any Budget Event.

"Budget Testing Date" means the first Sunday following the Petition Date and on Sunday of each week thereafter.

"Budget Testing Period" shall mean the four-week period ending on the most recent Budget Testing Date (or, if shorter, the period beginning on Sunday of the week of the Closing Date through such Budget Testing Date).

"Budgeted Net Operating Cash Flow Amount" means the amount described in the line item contained in the Budget across from the heading "Net Operating Cash Flow Less Capex", during the relevant period of determination.

"Business Day" means any day that is not a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by law to remain closed; provided that, when used in connection with any Term SOFR Loans, the term "Business Day" means any U.S. Government Securities Business Day.

"Canadian Administration Charge" means a superpriority charge granted by the Canadian Court over the Canadian Collateral to secure payment of the professional fees and disbursements of the Debtors' Canadian counsel, the Information Officer and counsel to the Information Officer (in a maximum amount not to exceed the amount in the Canadian Supplemental Order).

"Canadian Collateral" means all the Collateral of the Canadian Debtors, wherever located, and the Collateral of any other Debtor located in Canada.

"Canadian Collateral Agreement" means the Canadian DIP Collateral Agreement, dated on or about the date hereof among each Loan Party thereto and the Collateral Agent, as amended, restated, supplemented or otherwise modified from time to time in accordance with the Loan Documents.

"Canadian Confirmation Recognition Order" means an Order of the Canadian Court in the Canadian Recognition Proceedings, among other things, recognizing the Confirmation Order in Canada, which Order shall be in form and substance satisfactory to the Required Lenders, and as the same may be amended, supplemented, or modified from time to time after entry thereof with the consent of the Collateral Agent (acting at the direction of the Required Lenders).

"Canadian Court" has the meaning specified in the recitals hereto.

"Canadian D&O Charge" means a charge granted by the Canadian Court on the Canadian Collateral (in a maximum amount not to exceed the amount in the Canadian Supplemental Order), securing an indemnity by the Canadian Debtors in favor of their directors and officers against certain obligations or liabilities that they may incur as directors and officers of the Canadian Debtors on or after the commencement of the Canadian Recognition Proceedings, as provided for in the Canadian Supplemental Order.

"Canadian Debtors" means the Debtors that are Canadian Loan Parties.

7

"Canadian Defined Benefit Pension Plan" means any Canadian Pension Plan which contains a "defined benefit provision," as defined in subsection 147.1(1) of the *Income Tax Act* (Canada), as amended from time to time.

"Canadian DIP Charge" means the superpriority charge granted by the Canadian Court pursuant to the Canadian DIP Recognition Order in favor of the Collateral Agent (for its benefit and the benefit of the Secured Parties) on the Canadian Collateral.

"Canadian DIP Recognition Order" means the Canadian Interim DIP Recognition Order, unless the Canadian Final DIP Recognition Order has been issued by the Canadian Court, in which case it shall mean the Canadian Final DIP Recognition Order.

"Canadian Dollar" and "CDN$" means lawful money of Canada.

"Canadian Final DIP Recognition Order" means an order of the Canadian Court in the Canadian Recognition Proceedings, which order shall, among other things, recognize the Final DIP Order and shall be in form and substance satisfactory to the Collateral Agent (at the direction of the Required Lenders), and as the same may be amended, supplemented, or modified from time to time after entry thereof with the consent of the Collateral Agent (acting at the direction of the Required Lenders).

"Canadian Initial Recognition Order" shall mean the Initial Recognition Order issued by the Canadian Court after the commencement of the Chapter 11 Cases in the Canadian Recognition Proceedings, recognizing the Chapter 11 Cases as "foreign main proceedings" under Part IV of the CCAA, and granting a stay of proceedings in respect of the Debtors in Canada, which Order shall be in form and substance satisfactory to the Required Lenders, and as same may be amended, supplemented, or modified from time to time after entry thereof with the consent of the Collateral Agent (acting at the direction of the Required Lenders).

"Canadian Interim DIP Recognition Order" shall mean the provisions of the Canadian Supplemental Order which, recognize the Interim DIP Order and grant the Canadian DIP Charge, which Order shall be in form and substance satisfactory to the Required Lenders, as same may be amended, supplemented, or modified from time to time after entry thereof with the consent of the Collateral Agent (acting at the direction of the Required Lenders).

"Canadian Interim Stay Order" shall mean the order by the Canadian Court pursuant to Section 106 of the *Courts of Justice Act* R.S.O. 1990, c. C.43 providing for an interim stay of proceedings, pending the commencement of the Canadian Recognition Proceedings, which Order shall be in form and substance satisfactory to the Required Lenders, and as same may be amended, supplemented, or modified from time to time after entry thereof with the consent of the Collateral Agent (acting at the direction of the Required Lenders).

"Canadian Junior DIP Charge" means the charge granted by the Canadian Court in favor of the Collateral Agent and Lenders under (and as defined in) the Junior DIP Credit Agreement on the Canadian Collateral pursuant to the Canadian DIP Recognition Order, which charge shall rank subordinate to the Canadian DIP Charge.

"Canadian Loan Parties" means each Subsidiary Loan Party organized under the laws of Canada or any province or territory thereof.

"Canadian Orders" means, as applicable and as the context may require, the Canadian Initial Recognition Order, the Canadian Supplemental Order and/or the Canadian DIP Recognition Order, or such other Orders as may be granted by the Canadian Court in the Canadian Recognition Proceedings which Orders shall be in form and substance, satisfactory to the Required Lenders, and as any of the same may be amended, supplemented, or modified from time to time after entry thereof with the consent of the Collateral Agent (acting at the direction of the Required Lenders).

"Canadian Pension Event" means, solely with respect to a Canadian Defined Benefit Pension Plan, (a) the termination by any Loan Party of such a Canadian Defined Benefit Pension Plan; or (b) the filing of a notice of intention to terminate in whole or in part such a Canadian Defined Benefit Pension Plan; or (c) the issuance of an order or notice of intended decision by any governmental authority to terminate or have an administrator or like body

appointed to administer such a Canadian Defined Benefit Pension Plan; or (d) any other event or condition, which might constitute grounds for the termination of, winding-up or partial termination or winding-up or the appointment of an administrator to administer, any such Canadian Defined Benefit Pension Plan.

"Canadian Pension Plan" means any "registered pension plan" as such term is defined under the *Income Tax Act* (Canada) and/or any plan that is required to be registered under any applicable federal or provincial pension standards legislation, in each case that is maintained or contributed to by any Loan Party for its employees or former employees in Canada.

"Canadian Recognition Proceedings" has the meaning specified in the recitals hereto.

"Canadian Supplemental Order" shall mean the Supplemental Order issued by the Canadian Court after the commencement of the Chapter 11 Cases in the Canadian Recognition Proceedings which, among other things, grants the CCAA Charges and recognizes the Interim DIP Order, which Order shall be in form and substance satisfactory to the Required Lenders, and as same may be amended, supplemented, or modified from time to time after entry thereof with the consent of the Required Lenders.

"Capital Expenditures" means, for any person in respect of any period, the aggregate of all expenditures incurred by such person during such period that, in accordance with GAAP, are or should be included in "additions to property, plant or equipment" or similar items reflected in the statement of cash flows of such person; provided, however, that Capital Expenditures for the Borrowers and their Subsidiaries shall not include:

      (a)      expenditures to the extent they are made with proceeds of the issuance of Equity Interests of, or a cash capital contribution to, any Borrower or any Subsidiary after the Closing Date,

      (b)      expenditures with proceeds of insurance settlements, condemnation awards and other settlements in respect of lost, destroyed, damaged or condemned assets, equipment or other property to the extent such Capital Expenditures are made to replace or repair such lost, destroyed, damaged or condemned assets, equipment or other property or otherwise to acquire, maintain, develop, construct, improve, upgrade or repair assets or properties useful in the business of the Borrowers and their Subsidiaries within 15 months of receipt of such proceeds (or, if not made within such period of 15 months, are committed to be made during such period),

      (c)      interest capitalized during such period,

      (d)      expenditures that are accounted for as capital expenditures of such person and that actually are paid for by a third party (excluding any Parent, any Borrower or any Subsidiary) and for which no Parent, nor any Borrower nor any Subsidiary has provided or is required to provide or incur, directly or indirectly, any consideration or obligation to such third party or any other person (whether before, during or after such period),

      (e)      the book value of any asset owned by such person prior to or during such period to the extent that such book value is included as a capital expenditure during such period as a result of such person reusing or beginning to reuse such asset during such period without a corresponding expenditure actually having been made in such period; provided that (i) any expenditure necessary in order to permit such asset to be reused shall be included as a Capital Expenditure during the period that such expenditure actually is made and (ii) such book value shall have been included in Capital Expenditures when such asset was originally acquired,

      (f)      the purchase price of equipment purchased during such period to the extent the consideration therefor consists of any combination of (i) used or surplus equipment traded in at the time of such purchase and (ii) the proceeds of a concurrent sale of used or surplus equipment, in each case, in the ordinary course of business consistent with past or industry practice,

      (g)      [reserved], or

(h)     the purchase of property, plant or equipment made within 15 months of the sale of any asset to the extent purchased with the proceeds of such sale (or, if not made within such period of 15 months, to the extent committed to be made during such period).

Notwithstanding anything to the contrary set forth herein, for purposes of the defined term "Capital Expenditures", neither JB TopCo nor HB TopCo shall be deemed to be a Subsidiary.

"Capitalized Software Expenditures" means, for any period, the aggregate of all expenditures (whether paid in cash or accrued as liabilities) by a person during such period in respect of licensed or purchased software or internally developed software and software enhancements that, in accordance with GAAP, are or are required to be reflected as capitalized costs on the consolidated balance sheet of such person and its subsidiaries.

"Carve Out" has the meaning specified in the Bankruptcy Court DIP Order, which shall include an amount up to the amount set forth in the Canadian Recognition Proceeding for the benefit of the beneficiaries of the Canadian Administration Charge (without duplication).

"Cash Interest Expense" means, with respect to the Borrowers and the Subsidiaries on a consolidated basis for any period, Interest Expense for such period, less the sum of, without duplication, (a) pay-in-kind Interest Expense or other non-cash Interest Expense (including as a result of the effects of acquisition method accounting), (b) to the extent included in Interest Expense, the amortization of any financing fees paid by, or on behalf of, any Borrower or any Subsidiary, including such fees paid in connection with the Transactions, and (c) the amortization of debt discounts, if any, or fees in respect of Hedging Agreements; provided that Cash Interest Expense shall exclude any one time financing fees, including those paid in connection with the Transactions, or upon entering into any amendment of this Agreement.

Notwithstanding anything to the contrary set forth herein, for purposes of the defined term "Cash Interest Expense", neither JB TopCo nor HB TopCo shall be deemed to be a Subsidiary.

"Cash Management Agreement" means any agreement to provide to any Parent, any Borrower or any Subsidiary cash management services for collections, treasury management services (including controlled disbursement, overdraft, automated clearing house fund transfer services, return items and interstate depository network services), any demand deposit, payroll, trust or operating account relationships, commercial credit cards, merchant card, purchase or debit cards, non-card e-payables services, and other cash management services, including electronic funds transfer services, lockbox services, stop payment services and wire transfer services.

"Cash Management Bank" means any person that, at the time it enters into a Cash Management Agreement (or on the Closing Date), is a Lender or an Affiliate of any such person, in each case, in its capacity as a party to such Cash Management Agreement.

"CCAA" has the meaning specified in the recitals hereto.

"CCAA Charges" means the Canadian Administration Charge, the Canadian D&O Charge, the Canadian DIP Charge and the Canadian Junior DIP Charge, as granted by the Canadian Court in the Canadian Recognition Proceedings.

"Change in Control" means (a) (i) the failure of Hornblower Parent, to own, directly or indirectly through wholly owned subsidiaries, beneficially and of record, all of the Equity Interest of the Hornblower Borrower or (ii) the failure of AQ Parent, to own, directly or indirectly through wholly owned subsidiaries, beneficially and of record, all of the Equity Interest of the AQ Borrower, (b) the failure by the Permitted Holders to own, directly or indirectly through one or more holding company parents of Hornblower Parent, AQ Parent and JB TopCo, beneficially and of record, Equity Interests in Hornblower Parent, AQ Parent or JB TopCo representing at least a majority of the aggregate ordinary voting power for the election of directors (or equivalent officers) of Hornblower Parent, AQ Parent or JB TopCo represented by the issued and outstanding Equity Interests in Hornblower Parent, AQ Parent or JB TopCo, respectively, unless the Permitted Holders otherwise have the right (pursuant to contract, proxy or otherwise), directly or indirectly, to designate or appoint (and do so designate or appoint) a majority of the Board of Directors of

Hornblower Parent, AQ Parent or JB TopCo, (c) [reserved] or (d) the occupation of a majority of the seats (other than vacant seats) on the Board of Directors of Hornblower Parent, AQ Parent or JB TopCo by Persons who were neither nominated, designated or approved by the Board of Directors of Hornblower Parent, AQ Parent or JB TopCo, respectively, or the Permitted Holders nor appointed by directors (or equivalent officers) so nominated, designated or approved; provided that none of the events set forth in clauses (a) through (d) above shall constitute a Change in Control if they occur as a result of any transaction consummated pursuant to the AQV Wind-down Plan.

"Change in Law" means:  (a) the adoption of any rule, regulation, treaty or other law after the Closing Date, (b) any change in any rule, regulation, treaty or other law or in the administration, interpretation or application thereof by any Governmental Authority after the Closing Date or (c) the making or issuance of any request, guideline or directive (whether or not having the force of law) of any Governmental Authority made or issued after the Closing Date; provided that notwithstanding anything herein to the contrary, (i) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all rules, regulations, guidelines or directives thereunder or issued in connection therewith and (ii) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case, pursuant to Basel III, shall in each case be deemed to be a "Change in Law," regardless of the date enacted, adopted or issued.

"Chapter 11 Cases" has the meaning assigned to such term in the recitals hereto.

"Chief Restructuring Officer" means Jonathan Hickman of Alvarez & Marsal or such other individual, reasonably acceptable to the Required Lenders, engaged by the Loan Parties on terms, including, without limitation, the scope of the services and fees, acceptable to the Required Lenders.

"Citizen of the United States" means a "citizen of the United States" within the meaning of 46 U.S.C. § 50501(a), (b) and (d) qualified to own and operate vessels for operation in the coastwise trade of the United States.

"Closing Date" means the date on which all conditions precedent set forth in Section 4.01 shall have been satisfied or waived by each Lender in writing in its sole discretion.

"Closing Date Refinancing" has the meaning given to such term in Section 4.01(h).

"Closing Payment" has the meaning given to such term in Section 2.12(a).

"Co-Investors" means each of (a) the Sponsors and (b) the Management Group.

"Code" means the Internal Revenue Code of 1986, as amended.

"Collateral" means the "DIP Collateral" as defined in any Bankruptcy Court DIP Order and words of similar intent, and all the "Collateral" as defined in any Security Document and shall also include the Mortgaged Properties, Mortgaged Vessels and all other property that is subject to any Lien in favor of the Administrative Agent, the Collateral Agent or any subagent for the benefit of the Secured Parties pursuant to any Security Document or the Bankruptcy Court DIP Order.

"Collateral Agent" means GLAS acting as collateral agent and mortgage trustee for the Secured Parties and its successors in such capacity as provided in Article VIII.

"Collateral Agreement" means the DIP Collateral Agreement, dated on or about the Closing Date among the Borrowers, each other Loan Party party thereto, and the Collateral Agent, as amended, restated, supplemented or otherwise modified from time to time in accordance with the Loan Documents.

"Collateral and Guarantee Requirement" means, at any time, the requirement that, subject to Section 5.15:

(a)        all Obligations shall have been unconditionally guaranteed by each Guarantor;

(b)        the Obligations and the Loan Guarantee shall have been secured by a first-priority security interest (subject to the Carve-Out in all respects and Liens permitted by Section 6.02) through the provisions of the Interim DIP Order,  the Final DIP Order and the Canadian DIP Recognition Order, as applicable, in all the Equity Interests of the Borrowers, each Subsidiary Loan Party;

(c)        on or prior to the Closing Date, the Collateral Agent shall have received (i) from each Loan Party a counterpart of the Collateral Agreement, (ii) from Hornblower Cruises and Events, Inc., Hornblower Canadian Holdings, Inc. and each Canadian Loan Party, a counterpart to the Canadian Collateral Agreement, (iii) from Hornblower Group, Inc. and each UK Loan Party, a counterpart to the UK Collateral Documents and (iv) from JB TopCo, a counterpart of the Australian Specific Security Deed;

(d)        in the case of any person that becomes a Subsidiary Loan Party after the Closing Date, the Collateral Agent shall have received (i) a supplement to the Collateral Agreement and/or the Canadian Collateral Agreement, as applicable, (ii) a supplement to this Agreement, (iii) a Perfection Certificate, (iv) supplements to the other Security Documents, (v) joinders to any Intercreditor Agreement (if applicable) and (vi) Security Documents governed by the law of the applicable jurisdiction with respect to assets that are customarily pledged for the benefit of lenders in secured financings (including share pledges), if applicable, in the case of clauses (i) through (v) in the form specified therefor or otherwise reasonably acceptable to the Administrative Agent (acting at the direction of the Required Lenders), and in each case, duly executed and delivered on behalf of such Subsidiary Loan Party;

(e)        after the Closing Date, (x) all outstanding Equity Interests of any person that comes a Subsidiary Loan Party after the Closing Date and (y) all Equity Interests directly acquired by a Loan Party after the Closing Date, shall have been pledged pursuant to the applicable Security Document, together with undated stock powers or other instruments of transfer with respect thereto indorsed in blank;

(f)        no later than twenty (20) Business Days after the Closing Date with respect to the Material Vessels and the Additional Collateral Vessels set forth on Schedule 1.01(F) (or on such later date as the Required Lenders may agree in their sole discretion), the Collateral Agent shall have received (i) such customary documentation as the Collateral Agent (acting at the direction of the Required Lenders) may reasonably deem necessary or desirable in order to create a valid perfected and enforceable security interest, in each case, as and to the extent provided therein, after giving effect to any Intercreditor Agreements first preferred or first priority ship mortgage (and, where applicable, a deed of covenants collateral thereto) on each Material Vessel and Additional Collateral Vessel (including evidence that a Mortgage on each Material Vessel and Additional Collateral Vessel set forth on Schedule 1.01(F) has been duly filed for recording (but, for the avoidance of doubt, the evidence of recordation thereof shall not be required to be completed within such applicable period) with the National Vessel Documentation Center  or with respect to any Material Vessel or Additional Collateral Vessel not documented under the laws of the United States of America, the appropriate office or offices for recording of ship mortgages under the laws of the nation under whose laws the particular Material Vessel or Additional Collateral Vessel has been documented with the consent, not to be unreasonably withheld or delayed, of the Administrative Agent (acting at the direction of the Required Lenders), it being agreed the laws of The Bahamas, the United Kingdom and Canada are consented to by the Administrative Agent (such jurisdictions, together with the United States of America, collectively, the "Permitted Flag Jurisdictions"); provided that the Administrative Agent (acting at the direction of the Required Lenders) may object to any such jurisdiction on the basis of a Change in Law since the Closing Date that would materially and adversely affect the Collateral Agent's ability to obtain a Mortgage in such jurisdiction) subject to no other Liens of record except Permitted Vessel Liens, at the time of recordation thereof, and an Assignment of Freights and Hires and an Assignment of Insurances in relation to each such Material Vessel and Additional Collateral Vessel, (ii) with respect to each such Mortgage in respect of a Material Vessel and Additional Collateral Vessel, opinions of counsel, to the extent and as requested by the Collateral Agent (acting at the direction of the Required Lenders) in its reasonable discretion, regarding the enforceability, due authorization, execution and delivery and the validity and perfection of Liens in respect of such Vessel upon completion of the recording process (notwithstanding anything to the contrary in this Agreement, which such opinion regarding the validity and perfection of Liens may be delivered upon such completion of the recording process and such other matters customarily covered in maritime counsel opinions as the Collateral Agent (acting at the direction of the Required Lenders) may reasonably request, in form and

12

substance reasonably acceptable to the Collateral Agent (acting at the direction of the Required Lenders), (iii) with respect to each such Mortgage in respect of a Canadian Material Vessel or Canadian Additional Collateral Vessel, receipt of certified vessel transcripts of registry issued by Transport Canada), an Assignment of Freights and Hires and an Assignment of Insurances and (iv) such other documents (and other actions) as the Collateral Agent (acting at the direction of the Required Lenders) may reasonably request with respect to any such Mortgage or Mortgaged Vessel, Assignment of Insurances, including delivery of notices of assignment in connection with the Assignment of Freights and Hires and/or Assignment of Insurances; *provided* that, to the extent relevant ship registry identifies any deficiency with any such filed Mortgage, any Loan Party shall be deemed to satisfy this clause (d) to the extent such Loan Party has delivered executed Mortgages to the Collateral Agent and has used, or continues to use, commercially reasonable efforts to remedy such deficiency promptly to the satisfaction of such ship registry such that the filed Mortgage is recorded by the ship registry without any deficiency;

(g)     no later than five (5) Business Days prior to the date on which each Assignment of Insurances and each Vessel Mortgage is executed and delivered with respect to a Vessel, the Collateral Agent shall have received copies of all policies of marine insurances and certificates of entry for protection and indemnity cover with respect to such Vessels in compliance with Section 5.06 hereof;

(h)     the Obligations shall at all times be secured by a valid, binding, continuing, enforceable perfected first priority Lien on the DIP Funding Account and the proceeds thereof and, on the Closing Date (or such later date as the Required Lenders may agree in their sole discretion), the Borrowers must obtain a Control Agreement for the DIP Funding Account; and

(i)     except to the extent otherwise provided hereunder, including subject to Liens permitted by Section 6.02, or under any Security Document, the Bankruptcy Court DIP Order or the Canadian DIP Recognition Order, the Obligations and the Guarantee shall have been secured by a perfected first-priority (subject in all respects to the Carve Out, the Bankruptcy Court DIP Order and the Canadian DIP Recognition Order (including with respect to Lien priorities set forth therein) and Liens permitted by Section 6.02) security interest (to the extent such security interest may be perfected by virtue of the Bankruptcy Court DIP Order, the Canadian DIP Recognition Order, or by filing financing statements under the Uniform Commercial Code or PPSA or making any necessary filings for perfection with the United States Patent and Trademark Office, United States Copyright Office or Canadian Intellectual Property Office or any similar filings, instruments and registrations in any applicable jurisdiction (including, without limitation, Australia and the Bahamas), and all other actions required by the applicable Requirement of Law or reasonably requested by the Collateral Agent (acting at the direction of the Required Lenders) to be delivered, filed, registered or recorded to create the Liens intended to the created by the Security Documents) in substantially all tangible and intangible personal property of the Borrower and each Guarantor (including accounts, inventory, equipment, investment property, contract rights, applications and registrations of intellectual property filed in the United States and Canada, other general intangibles, and proceeds of the foregoing), in each case, with the priority required by the Security Documents, the Bankruptcy Court DIP Order and the Canadian DIP Recognition Order, in each case subject to exceptions and limitations otherwise set forth in this Agreement, the Security Documents, the Bankruptcy Court DIP Order and the Canadian DIP Recognition Order.

"Commodity Exchange Act" means the Commodity Exchange Act (7 U.S.C. §1 et seq.), as amended from time to time, and any successor statute.

"Company" has the meaning assigned to such term in the Preliminary Statements.

"Confirmation Order" means an order of the Court entered in the Chapter 11 Cases pursuant to section 1129 of the Bankruptcy Code, which order shall confirm an Acceptable Plan, be a final Order and otherwise be in form and substance satisfactory to the Required Lenders, together with all extensions, modifications, and amendments thereto, also in form and substance satisfactory to the Required Lenders.

"Conforming Changes" means, with respect to either the use or administration of Term SOFR or the use, administration, adoption or implementation of any Benchmark Replacement, any technical, administrative or operational changes (including changes to the definition of "Alternate Base Rate," the definition of "Business Day,"

13

the definition of "U.S. Government Securities Business Day," the definition of "Interest Period" or any similar or analogous definition (or the addition of a concept of "interest period"), timing and frequency of determining rates and making payments of interest, timing of borrowing requests or prepayment, conversion or continuation notices, the applicability and length of lookback periods, the applicability of Section 2.16 and other technical, administrative or operational matters) that the Required Lenders (in consultation with the Administrative Agent) decide may be appropriate to reflect the adoption and implementation of any such rate or to permit the use and administration thereof by the Administrative Agent in a manner substantially consistent with market practice (or, if the Required Lenders (in consultation with the Administrative Agent) decide that adoption of any portion of such market practice is not administratively feasible or if the Required Lenders (in consultation with the Administrative Agent) determine that no market practice for the administration of any such rate exists, in such other manner of administration as the Required Lenders (in consultation with the Administrative Agent) decide is reasonably necessary in connection with the administration of this Agreement and the other Loan Documents).

"Consolidated Debt" at any date means the sum of (without duplication) all Indebtedness (other than letters of credit or bank guarantees, to the extent undrawn) consisting of Indebtedness for borrowed money and Financing Lease Obligations of the Borrowers and their Subsidiaries determined on a consolidated basis on such date in accordance with GAAP.

"Consolidated Net Income" means, with respect to any person for any period, the aggregate of the Net Income of such person and its subsidiaries for such period, on a consolidated basis (but excluding JB TopCo and any Person owned by JB TopCo); provided, however, that, without duplication,

(i)       any net after-tax extraordinary, nonrecurring or unusual gains or losses or income or expense or charge (less all fees and expenses relating thereto), including any (1) severance, relocation or other restructuring expenses (to the extent set forth in a certificate of a Financial Officer of the Borrowers), any expenses related to any New Project or any reconstruction, decommissioning, recommissioning or reconfiguration of fixed assets for alternative uses, (2) fees, expenses or charges relating to facilities closing costs, curtailments or modifications to pension and post-retirement employee benefit plans, excess pension charges, acquisition integration costs, new product lines, plant shutdown costs, facilities opening and integration costs, (3) signing, retention or completion bonuses, (4) expenses or charges related to any offering of Equity Interests or debt securities of the Borrowers, or any Parent, any Investment, acquisition, Disposition, recapitalization or incurrence, issuance, repayment, repurchase, refinancing, amendment or modification of Indebtedness (in each case, whether or not successful), and (5) any fees, expenses, charges or change in control payments related to the Transactions (including any costs relating to auditing prior periods, any transition-related expenses, and Transaction Expenses incurred before, on or after the Closing Date), in each case, shall be excluded,

(ii)       any net after-tax income or loss from Disposed of, abandoned, closed or discontinued operations or fixed assets and any net after-tax gain or loss on the Dispositions of Disposed of, abandoned, closed or discontinued operations or fixed assets shall be excluded,

(iii)       any net after-tax gain or loss (less all fees and expenses or charges relating thereto) attributable to business Dispositions or asset Dispositions other than in the ordinary course of business consistent with past or industry practice (as determined in good faith by the management of the Borrowers) shall be excluded,

(iv)       any net after-tax income or loss (less all fees and expenses or charges relating thereto) attributable to the early extinguishment or buy-back of indebtedness, Hedging Agreements or other derivative instruments shall be excluded,

(v)       the Net Income for such period of any person that is not a subsidiary of such person or that is accounted for by the equity method of accounting, shall be included only to the extent of the amount of dividends or distributions or other payments paid in cash (or to the extent converted into cash) to the referent person or a subsidiary thereof in respect of such period,

14

(vi)        the cumulative effect of a change in accounting principles during such period shall be excluded,

(vii)       effects of acquisition method accounting adjustments (including the effects of such adjustments pushed down to such person and its subsidiaries) in component amounts required or permitted by GAAP, resulting from the application of acquisition method accounting or the amortization or write-off of any amounts thereof, net of taxes, shall be excluded,

(viii)      any non-cash impairment charges or asset write-offs, in each case pursuant to GAAP, and the amortization of intangibles and other non-cash fair value adjustments arising pursuant to GAAP, shall be excluded,

(ix)        any non-cash compensation charge or expenses realized or resulting from stock option plans, employee benefit plans or post-employment benefit plans, or grants or sales of stock, stock appreciation or similar rights, stock options, restricted stock, preferred stock or other rights shall be excluded,

(x)         accruals and reserves that are established or adjusted within twelve months after the Closing Date and that are so required to be established or adjusted in accordance with GAAP or as a result of adoption or modification of accounting policies shall be excluded,

(xi)        non-cash gains, losses, income and expenses resulting from fair value accounting required by the applicable standard under GAAP and related interpretation shall be excluded,

(xii)       any non-cash charges for deferred tax asset valuation allowances shall be excluded,

(xiii)      any unrealized currency translation gains and losses related to currency remeasurements of Indebtedness, and any non-cash net loss or gain resulting from Hedging Agreements for currency exchange risk, shall be excluded,

(xiv)      the Net Income of any Person and its Subsidiaries shall be calculated without deducting the income attributable to, or adding the losses attributable to, the minority equity interests of third parties in any non-Wholly Owned Subsidiary except to the extent of dividends declared or paid in respect of such period or any prior period on the shares of Equity Interests of such Subsidiary held by such third parties and (b) any ordinary course dividend, distribution or other payment paid in cash and received from any Person in excess of amounts included in clause (v) above shall be included,

(xv)       the non-cash gains or losses from the effects of the "straight-line" of rent expense shall be excluded,

(xvi)      to the extent covered by insurance and actually reimbursed, or, so long as such person has made a determination that there exists reasonable evidence that such amount will in fact be reimbursed by the insurer and only to the extent that such amount is (x) not denied by the applicable carrier in writing within 180 days and (y) in fact reimbursed within 365 days following the date of such evidence (with a deduction for any amount so added back to the extent not so reimbursed within such 365 days), (A) expenses with respect to liability or casualty events or business interruption shall be excluded; and (B) amounts estimated in good faith to be received from insurance in respect of lost revenues or earnings in respect of liability or casualty events or business interruption shall be included (with a deduction for amounts actually received up to such estimated amount to the extent included in Net Income in a future period), and

(xvii)     an amount equal to the amount of distributions actually made to any parent or equity holder of such person in respect of such period in accordance with Section 6.06(b)(v) shall be included as an expense as though such amounts had been paid as income taxes directly by such person for such period.]

"Contributing Guarantors" has the meaning assigned to such term in Section 10.02.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies, or the dismissal or appointment of the management, of a Person, whether through the ability to exercise voting power, by contract or otherwise. "Controlling" and "Controlled" have meanings correlative thereto.

"Conversion Date" means the date of an Exit Conversion.

"Covered Entity" means any of the following: (i) a "covered entity" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 252.82(b), (ii) a "covered bank" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 47.3(b) or (iii) a "covered FSI" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 382.2(b).

"Covered Party" has the meaning assigned to such term in Section 9.20.

"Current Assets" means, with respect to the Borrowers and their Subsidiaries on a consolidated basis (but excluding JB TopCo and any Person owned by JB TopCo) at any date of determination, the sum of all assets (other than cash and Permitted Investments or other cash equivalents) that would, in accordance with GAAP, be classified on a consolidated balance sheet of the Borrowers and their Subsidiaries as current assets at such date of determination, other than amounts related to current or deferred Taxes based on income or profits.

"Current Liabilities" means, with respect to the Borrowers and their Subsidiaries on a consolidated basis (but excluding JB TopCo and any Person owned by JB TopCo) at any date of determination, all liabilities that would, in accordance with GAAP, be classified on a consolidated balance sheet of the Borrowers and their Subsidiaries as current liabilities at such date of determination, other than (a) the current portion of any Indebtedness, (b) accruals of Interest Expense (excluding Interest Expense that is due and unpaid), (c) accruals for current or deferred Taxes based on income or profits, (d) accruals, if any, of transaction costs resulting from the Transactions, (e) accruals of any costs or expenses related to (i) severance or termination of employees prior to the Closing Date or (ii) bonuses, pension and other post-retirement benefit obligations, and (f) accruals for add-backs to EBITDA included in clauses  (a)(iv), (a)(v), and (a)(vii) of the definition of such term.

"Daily Simple SOFR" means, for any day, SOFR, with the conventions for this rate (which will include a lookback) being established by the Administrative Agent in accordance with the conventions for this rate recommended by the relevant Governmental Authority for determining "Daily Simple SOFR" for business loans of this nature; provided that if the Administrative Agent decides that any such convention is not administratively feasible for the Administrative Agent, then the Administrative Agent may establish another convention in its reasonable discretion.

"Debtors" has the meaning assigned to such term in the Bankruptcy Court DIP Order.

"Debtor Relief Laws" means the Bankruptcy Code, the Bankruptcy and Insolvency Act (Canada), R.S.C. 1985, c. B-3, as amended,  the CCAA, the Winding-Up and Restructuring Act (Canada) and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors (or any class of creditors), moratorium, arrangement, rearrangement, receivership, insolvency, reorganization, or similar debtor relief laws of the United States, Canada or any province or territory thereof, or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally (including any applicable corporations legislation to the extent the relief sought thereunder relates to or involves the compromise, settlement, adjustment or arrangement of debt).

"Debt Service" means, with respect to the Borrowers and their Subsidiaries on a consolidated basis for any period, Cash Interest Expense for such period plus scheduled principal amortization of Consolidated Debt for such period.

"Declined Proceeds" has the meaning assigned to such term in Section 2.11(d).

"Default" means any event or condition that upon notice, lapse of time or both would, unless cured or waived, become an Event of Default.

"Default Right" has the meaning assigned to such term in, and shall be interpreted in accordance with, 12 C.F.R. §§ 252.81, 47.2 or 382.1, as applicable.

"Delaware Divided LLC" means any limited liability company which has been formed upon the consummation of a Delaware LLC Division.

"Delaware LLC Division" means the statutory division of any limited liability company into two or more limited liability companies pursuant to Section 18-217 of the Delaware Limited Liability Company Act or a comparable provision of any other Requirement of Law.

"DIP Funding Account" means the account in the name of any Borrower, in which the proceeds of the Term Loans shall be deposited and held.

"DIP Priming Liens" has the meaning specified in the Bankruptcy Court DIP Order.

"DIP Superpriority Claim" means the allowed superpriority expense claims pursuant to Bankruptcy Code Sections 364(c)(1), 503 and 507 granted to the Collateral Agent for the benefit of the Secured Parties by the Bankruptcy Court DIP Order.

"Disinterested Director" means, with respect to any person and transaction, a member of the Board of Directors of such person who does not have any material direct or indirect financial interest in or with respect to such transaction.

"Dispose" means to convey, sell, lease, sell and leaseback, assign, farm-out, transfer or otherwise dispose of any property, business or asset (including to dispose of any property, business or asset to a Delaware Divided LLC pursuant to a Delaware LLC Division).  The term "Disposition" shall have a correlative meaning to the foregoing.

"Disqualified Stock" means, with respect to any person, any Equity Interests of such person that, by its terms (or by the terms of any security or other Equity Interests into which it is convertible or for which it is exchangeable), or upon the happening of any event or condition (a) matures or is mandatorily redeemable (other than solely for Qualified Equity Interests), pursuant to a sinking fund obligation or otherwise (except as a result of a change of control or asset sale so long as any rights of the holders thereof upon the occurrence of a change of control or asset sale event shall be subject to the prior repayment in full of the Term Loans and all other Obligations that are accrued and payable and the termination of the Term Loan Commitments), (b) is redeemable at the option of the holder thereof (other than solely for Qualified Equity Interests), in whole or in part, (c) provides for the scheduled payments of dividends in cash, or (d) is or becomes convertible into or exchangeable for Indebtedness or any other Equity Interests that would constitute Disqualified Stock, in each case, prior to the date that is ninety-one (91) days after the Latest Maturity Date in effect at the time of issuance thereof (provided that only the portion of the Equity Interests that so mature or are mandatorily redeemable, are so convertible or exchangeable or are so redeemable at the option of the holder thereof prior to such date shall be deemed to be Disqualified Stock).  Notwithstanding the foregoing: (i) any Equity Interests issued to any employee or to any plan for the benefit of employees of the Borrowers or the Subsidiaries or by any such plan to such employees shall not constitute Disqualified Stock solely because they may be required to be repurchased by a Borrower in order to satisfy applicable statutory or regulatory obligations or as a result of such employee's termination, death or disability and (ii) any class of Equity Interests of such person that by its terms provides that obligations thereunder will (or upon commercially reasonable terms may) be satisfied by delivery of Equity Interests that are not Disqualified Stock shall not be deemed to be Disqualified Stock.

"Dollar Equivalent" means, at any time, (a) with respect to any amount denominated in Dollars, such amount, and (b) with respect to any amount denominated in any currency other than Dollars, the equivalent amount thereof in Dollars as determined by the Administrative Agent at such time on the basis of the spot rate as of the date of determination for the purchase of Dollars with such currency.

"Dollars" or "dollars" or "$" refers to lawful money of the United States of America.

"<u>Domestic Lender</u>" means any Lender that is a United States Person as defined in Section 7701(a)(30) of the Code.

"<u>Domestic Subsidiary</u>" means any Subsidiary that is organized under the laws of the United States, any state thereof or the District of Columbia.

"<u>EBITDA</u>" means, with respect to the Borrowers and their Subsidiaries on a consolidated basis for any period (but excluding JB TopCo and any Person owned by JB TopCo), the Consolidated Net Income of the Borrowers and such Subsidiaries for such period plus (a) the sum of (in each case without duplication and to the extent the respective amounts described in subclauses (i) through (xiii) of this clause (a) reduced such Consolidated Net Income (and were not excluded therefrom) for the respective period for which EBITDA is being determined):

(i)        provision for Taxes based on income, profits or capital of the Borrowers and their Subsidiaries for such period, including state, franchise and similar taxes and foreign withholding taxes (including penalties and interest related to taxes or arising from tax examinations),

(ii)        Interest Expense (and to the extent not included in Interest Expense, (x) all cash dividend payments (excluding items eliminated in consolidation) on any series of preferred stock or Disqualified Stock and (y) costs of surety bonds in connection with financing activities) of the Borrowers and their Subsidiaries for such period, (net of interest income of the Borrowers and their Subsidiaries for such period),

(iii)        depreciation and amortization expenses of the Borrowers and their Subsidiaries for such period including the amortization of intangible assets, deferred financing fees, original issue discount and Capitalized Software Expenditures and amortization of unrecognized prior service costs and actuarial gains and losses related to pensions and other post-employment benefits,

(iv)        business optimization expenses and other restructuring charges or reserves to the extent set forth in a certificate of a Financial Officer of the Borrowers (which, for the avoidance of doubt, shall include the effect of inventory optimization programs, facility closure, facility consolidations, retention, severance, systems establishment costs, contract termination costs, future lease commitments and excess pension charges),

(v)        any other non-cash charges; <u>provided</u> that for purposes of this subclause (v) of this clause (a), any non-cash charges or losses shall be treated as cash charges or losses in any subsequent period during which cash disbursements attributable thereto are made (but excluding, for the avoidance of doubt, amortization of a prepaid cash item that was paid in a prior period),

(vi)        the amount of management, consulting, monitoring, transaction and advisory fees and related expenses paid to the Fund or any Fund Affiliate (or any accruals related to such fees and related expenses) during such period not in contravention of this Agreement (it being understood and agreed, for the avoidance of doubt, that no such fees and expenses are permitted to be paid to the Fund or any Fund Affiliate prior to the Termination Date),

(vii)        any expenses or charges (other than depreciation or amortization expense as described in the preceding clause (iii)) related to any issuance of Equity Interests, Investment, acquisition, New Project, recapitalization or the incurrence, modification or repayment of Indebtedness permitted to be incurred by this Agreement (including a refinancing thereof) (whether or not successful), including (x) such fees, expenses or charges related to this Agreement, the Junior DIP Credit Agreement, the Prepetition First Lien Credit Agreement and/or the Prepetition Revolving Credit Agreement and (y) any amendment or other modification of the Obligations or other Indebtedness and (z) [reserved],

(viii)        [reserved],

(ix)        any costs or expense incurred pursuant to any management equity plan or stock option plan or any other management or employee benefit plan or agreement or any stock subscription or shareholder

agreement, to the extent that such costs or expenses are funded with cash proceeds contributed to the capital of a Borrower or a Subsidiary Loan Party (other than contributions received from a Borrower or another Subsidiary Loan Party) or net cash proceeds of an issuance of Equity Interests of a Borrower (other than Disqualified Stock),

      (x)      non-operating expenses,

      (xi)      the amount of any loss attributable to a New Project, until the date that is 12 months after the date of completing the construction, acquisition, assembling or creation of such New Project, as the case may be; provided that (A) such losses are reasonably identifiable and factually supportable and certified by a Responsible Officer of the Borrowers and (B) losses attributable to such New Project after 12 months from the date of completing such construction, acquisition, assembling or creation, as the case may be, shall not be included in this subclause (xi), and

      (xii)      with respect to any joint venture that is not a Subsidiary, and solely to the extent relating to any net income referred to in clause (v) of the definition of "Consolidated Net Income," an amount equal to the proportion of those items described in clauses (i) and (ii) above relating to such joint venture corresponding to the Borrowers' and their Subsidiaries' proportionate share of such joint venture's Consolidated Net Income (determined as if such joint venture were a Subsidiary);

minus (b) the sum of (without duplication and to the extent the amounts described in this clause (b) increased such Consolidated Net Income for the respective period for which EBITDA is being determined) non-cash items increasing Consolidated Net Income of the Borrowers and their Subsidiaries for such period (but excluding any such items (A) in respect of which cash was received in a prior period or will be received in a future period or (B) which represent the reversal of any accrual of, or cash reserve for, anticipated cash charges that reduced EBITDA in any prior period).

Further, notwithstanding anything to the contrary contained herein, (A) under no circumstance may any amounts related to loss of estimated or expected revenue or any actual revenue (including any loss of estimated or expected revenue resulting from cancellations of cruises) directly or indirectly resulting from COVID-19 be added back for purposes of determining Consolidated Net Income or EBITDA under this Agreement, and (B) under no circumstance shall any amounts added to the Consolidated Net Income of the Borrowers and their respective Subsidiaries for purposes of determining EBITDA under this Agreement pursuant to subclauses (iv), (vi), (x) and (xi) of clause (a) above, plus any amounts added to EBITDA pursuant to clause (i) of the first paragraph of the definition of "Pro Forma Basis" and/or clause (1) of the second paragraph of the definition of "Pro Forma Basis", plus any amounts included in EBITDA by virtue of clause (i) of the definition of Consolidated Net Income in the aggregate, for any period, exceed 25% of EBITDA (calculated after giving effect to such capped and other uncapped adjustments) for such period.

"ECF Percentage" means, 100% of Excess Cash Flow for such Excess Cash Flow Period.

"EEA Financial Institution" means (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"EEA Member Country" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"EEA Resolution Authority" means any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"Environment" means ambient and indoor air, surface water and groundwater (including potable water, navigable water and wetlands), the land surface or subsurface strata, natural resources such as flora and fauna, the workplace or as otherwise defined in any Environmental Law.

"Environmental Laws" means all applicable laws (including common law), rules, regulations, codes, ordinances, orders, binding agreements, decrees or judgments, promulgated or entered into by or with any Governmental Authority, relating in any way to the Environment, preservation or reclamation of natural resources, the generation, management, Release or threatened Release of any Hazardous Material or to human health and safety (to the extent relating to exposure to Hazardous Materials).

"Environmental Liability" means any liability, obligation, loss, claim, action, order or cost, contingent or otherwise (including any liability for damages, costs of medical monitoring, costs of environmental investigation, remediation or restoration, administrative oversight costs, consultants' fees, fines, penalties and/or indemnities), of any Parent, any Borrower or any Subsidiary resulting from or based upon (a) any actual or alleged violation of any Environmental Law or permit, license or approval issued thereunder, (b) the generation, use, handling, transportation, storage or treatment of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the Release or threatened Release of any Hazardous Materials or (e) any contract, agreement or other consensual arrangement pursuant (and the extent) to which liability is assumed or imposed with respect to any of the foregoing.

"Equity Interests" of any Person means any and all shares, interests, rights to purchase or otherwise acquire, warrants, options, participations or other equivalents of or interests in (however designated) equity or ownership of such Person, including any preferred stock, any limited or general partnership interest and any limited liability company membership interest, and any securities or other rights or interests convertible into or exchangeable for any of the foregoing.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and any final regulations promulgated and rulings issued thereunder.

"ERISA Affiliate" means any trade or business (whether or not incorporated) that, together with a Parent, a Borrower or a Subsidiary is treated as a single employer or under common control under Section 414(b), 414(c), 414(m) or 414(o) of the Code.

"ERISA Event" means (a) any Reportable Event or the requirements of Section 4043(b) of ERISA apply with respect to a Plan; (b) with respect to any Plan, the failure to satisfy the minimum funding standard under Section 412 of the Code or Section 302 of ERISA, whether or not waived; (c) a determination that any Plan is, or is expected to be, in "at-risk" status (as defined in Section 303(i)(4) of ERISA or Section 430(i)(4) of the Code); (d) the filing pursuant to Section 412(c) of the Code or Section 302(c) of ERISA of an application for a waiver of the minimum funding standard with respect to any Plan, the failure to make by its due date a required installment under Section 430(j) of the Code with respect to any Plan or the failure to make any required contribution to a Multiemployer Plan; (e) the incurrence by a Parent, a Borrower, a Subsidiary or any ERISA Affiliate of any liability under Title IV of ERISA with respect to the termination of any Plan or Multiemployer Plan; (f) the receipt by a Parent, a Borrower, a Subsidiary or any ERISA Affiliate from the PBGC or a plan administrator of any notice relating to an intention to terminate any Plan or to appoint a trustee to administer any Plan under Section 4042 of ERISA; (g) the incurrence by a Parent, a Borrower, a Subsidiary or any ERISA Affiliate of any liability with respect to the withdrawal or partial withdrawal from any Plan or Multiemployer Plan; (h) the receipt by a Parent, a Borrower, a Subsidiary or any ERISA Affiliate of any notice, or the receipt by any Multiemployer Plan from a Parent, a Borrower, a Subsidiary or any ERISA Affiliate of any notice, concerning the impending imposition of Withdrawal Liability or a determination that a Multiemployer Plan is, or is expected to be, insolvent or in reorganization, within the meaning of Title IV of ERISA; (i) the conditions for imposition of a lien under Section 303(k) of ERISA shall have been met with respect to any Plan; or (j) the withdrawal of any of a Parent, a Borrower, a Subsidiary or any ERISA Affiliate from a Plan subject to Section 4063 of ERISA during a plan year in which such entity was a "substantial employer" as defined in Section 4001(a)(2) of ERISA or a cessation of operations that is treated as such a withdrawal under Section 4062(e) of ERISA.

"EU Bail-In Legislation Schedule" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

"Event of Default" has the meaning assigned to such term in Section 7.01.

"Excess Cash Flow" means, with respect to the Borrowers and their Subsidiaries on a consolidated basis for any Excess Cash Flow Period, EBITDA of the Borrowers and their Subsidiaries on a consolidated basis for such Excess Cash Flow Period, minus, (A) without duplication,

(a)　　　Debt Service for such Excess Cash Flow Period,

(b)　　　the amount of any voluntary prepayment permitted hereunder of term Indebtedness during such Excess Cash Flow Period (other than any voluntary prepayment of the Term Loans, which shall be the subject of Section 2.11(c)(ii) hereof) and the amount of any voluntary payments of revolving Indebtedness to the extent accompanied by permanent reductions of any revolving facility commitments during such Excess Cash Flow Period, so long as the amount of such prepayment is not already reflected in Debt Service,

(c)　　　(i) Capital Expenditures by the Borrowers and their Subsidiaries on a consolidated basis during such Excess Cash Flow Period that are paid in cash during such period and (ii) the aggregate consideration paid in cash during the Excess Cash Flow Period in respect of New Project expenditures and other Investments permitted hereunder (other than Permitted Investments and Investments in any Loan Party or any Subsidiary thereof) and payments in respect of restructuring activities, less any amounts received in respect thereof as a return of capital,

(d)　　　Capital Expenditures, New Project expenditures or other permitted Investments (other than Permitted Investments and Investments in any Loan Party or any Subsidiary thereof) or payments in respect of planned restructuring activities, that any Borrower or any Subsidiary shall, during such Excess Cash Flow Period, become obligated to make payments with respect thereto but that are not made during such Excess Cash Flow Period; provided that (i) the Borrowers shall deliver a certificate to the Administrative Agent not later than 90 days after the end of such Excess Cash Flow Period, signed by a Responsible Officer of each Borrower and certifying such payments in respect of such Capital Expenditures, New Project expenditures or other permitted Investments or planned restructuring activities that are reasonably expected to be made in the following Excess Cash Flow Period, and (ii) any amount so deducted shall not be deducted again in a subsequent Excess Cash Flow Period,

(e)　　　Taxes paid in cash by any Parent and its Subsidiaries on a consolidated basis during such Excess Cash Flow Period or that will be paid within six months after the close of such Excess Cash Flow Period; provided that with respect to any such amounts to be paid after the close of such Excess Cash Flow Period, (i) any amount so deducted shall not be deducted again in a subsequent Excess Cash Flow Period, and (ii) appropriate reserves shall have been established in accordance with GAAP,

(f)　　　an amount equal to any increase in Working Capital of the Borrowers and its Subsidiaries for such Excess Cash Flow Period,

(g)　　　cash expenditures made in respect of Hedging Agreements during such Excess Cash Flow Period, to the extent not reflected in the computation of EBITDA or Interest Expense,

(h)　　　permitted Restricted Payments paid in cash by any Borrower during such Excess Cash Flow Period and permitted Restricted Payments paid by any Subsidiary to any person other than any Parent, any Borrower or any of the Subsidiaries during such Excess Cash Flow Period, in each case in accordance with Section 6.06,

(i)　　　amounts paid in cash during such Excess Cash Flow Period on account of (A) items that were accounted for as non-cash reductions of Net Income in determining Consolidated Net Income or as non-cash reductions of Consolidated Net Income in determining EBITDA of the Borrowers and their Subsidiaries in a prior Excess Cash Flow Period and (B) reserves or accruals established in acquisition method accounting,

(j)       to the extent not deducted in the computation of Net Proceeds in respect of any asset disposition or condemnation giving rise thereto (and to the extent such Net Proceeds increased Consolidated Net Income), the amount of any mandatory prepayment of principal of Indebtedness (excluding Indebtedness created hereunder or under any other Loan Document), together with any interest, premium or penalties required to be paid (and actually paid) in connection therewith, but with respect to Junior Financing, to the extent such payments are expressly permitted under Section 6.09(b), and

(k)       the amount related to items that were added to or not deducted from Net Income in calculating Consolidated Net Income or were added to or not deducted from Consolidated Net Income in calculating EBITDA to the extent such items represented a cash payment (which had not reduced Excess Cash Flow upon the accrual thereof in a prior Excess Cash Flow Period), or an accrual for a cash payment, by any Borrower and their respective Subsidiaries or did not represent cash received by any Borrower and their respective Subsidiaries, in each case on a consolidated basis during such Excess Cash Flow Period,

plus, (B) without duplication,

(a)       an amount equal to any decrease in Working Capital of the Borrowers and their Subsidiaries for such Excess Cash Flow Period,

(b)       all amounts referred to in clauses (A)(b), (A)(c) and (A)(d) above to the extent funded with the proceeds of (i) the issuance or the incurrence of Indebtedness (including Financing Lease Obligations and purchase money Indebtedness, but excluding, solely as relating to Capital Expenditures, proceeds from extensions of credit under any revolving credit facility and which extensions of credit are repaid within thirty (30) days of the incurrence of such Capital Expenditures), (ii) the sale or issuance of any Equity Interests (including any capital contributions) and (iii) proceeds arising from any loss, damage, destruction or condemnation of, or any sale, transfer or other disposition (including any sale and leaseback of assets and any mortgage or lease of Real Property) to any person of any asset or assets, in each case to the extent there is a corresponding deduction from Excess Cash Flow above,

(c)       to the extent any permitted Capital Expenditures, New Project expenditures or permitted Investments or payments in respect of planned restructuring activities referred to in clause (A)(d) above do not occur in the following Excess Cash Flow Period of the Borrowers specified in the certificate of the Borrowers provided pursuant to clause (A)(d) above, the amount of such Capital Expenditures, New Project expenditures or permitted Investments or payments in respect of planned restructuring activities that were not so made in such following Excess Cash Flow Period,

(d)       cash payments received in respect of Hedging Agreements during such Excess Cash Flow Period to the extent (i) not included in the computation of EBITDA or (ii) such payments do not reduce Cash Interest Expense,

(e)       any extraordinary or nonrecurring gain realized in cash during such Excess Cash Flow Period (except to the extent such gain consists of Net Proceeds subject to Section 2.11(c)), and

(f)       the amount related to items that were deducted from or not added to Net Income in connection with calculating Consolidated Net Income or were deducted from or not added to Consolidated Net Income in calculating EBITDA to the extent either (i) such items represented cash received by any Borrower or any Subsidiary or (ii) such items do not represent cash paid by any Borrower or any Subsidiary, in each case on a consolidated basis during such Excess Cash Flow Period.

Notwithstanding anything to the contrary set forth herein, for purposes of the defined term "Excess Cash Flow", neither JB TopCo nor HB TopCo shall be deemed to be a Subsidiary.

"Excess Cash Flow Period" means each fiscal year of the Borrowers, commencing with the fiscal year of the Borrowers ending in December of 2023.

"Exchange Act" means the United States Securities Exchange Act of 1934, as amended from time to time.

"Excluded Hedging Obligation" means, with respect to any Guarantor, any Hedging Obligation if, and to the extent that, all or a portion of the Guarantee of such Guarantor of, or the grant by such Guarantor of a security interest to secure, such Hedging Obligation (or any Guarantee thereof) is or becomes illegal under the Commodity Exchange Act or any rule, regulation or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof) by virtue of such Guarantor's failure for any reason to constitute an "eligible contract participant" as defined in the Commodity Exchange Act and the regulations thereunder at the time the Guarantee of such Guarantor or the grant of such security interest becomes effective with respect to such Hedging Obligation unless otherwise agreed between the Administrative Agent and the Borrowers.  If a Hedging Obligation arises under a master agreement governing more than one swap, such exclusion shall apply only to the portion of such Hedging Obligation that is attributable to swaps for which such Guarantee or security interest is or becomes illegal.

"Excluded Indebtedness" means all Indebtedness other than Indebtedness expressly permitted to be incurred pursuant to Section 6.01.

"Excluded Subsidiary" means any of the following:

(a)      [reserved],

(b)      each Subsidiary that is not a Wholly Owned Subsidiary (for so long as such Subsidiary remains a non-Wholly Owned Subsidiary), it being understood that a Subsidiary Loan Party that ceases to be a Wholly-Owned Subsidiary shall not become an Excluded Subsidiary for purposes of the Loan Documents, unless the requirements for release under Section 9.15(b) have been satisfied; provided that no Subsidiary shall constitute an Excluded Subsidiary pursuant to this clause (b) unless (A) a guarantee thereby of the Obligations is prohibited by any applicable organizational documents, joint venture agreement or shareholder agreement existing on the Closing Date, (B) any organizational documents, joint venture agreement or shareholder agreement prohibits such a guaranty without the consent of any other party; provided that this clause (B) shall not apply if (1) such other party is a Loan Party or a Wholly Owned Subsidiary or (2) consent has been obtained to consummate such guaranty (it being understood that the foregoing shall not be deemed to obligate any Loan Party or its subsidiary to obtain any such consent) and for so long as such organizational documents, joint venture agreement or shareholder agreement or replacement or renewal thereof is in effect, or (C) a guaranty thereby of the Obligations would give any other party (other than a Loan Party or a Subsidiary) to any organizational documents, joint venture agreement or shareholder agreement governing such Person the right to terminate its obligations thereunder);

(c)      each Subsidiary that is prohibited from guaranteeing or granting Liens to secure the Obligations by any Requirement of Law or that would require consent, approval, license or authorization of a Governmental Authority to guarantee or grant Liens to secure the Obligations (unless such consent, approval, license or authorization has been received),

(d)      each Subsidiary that is prohibited by any applicable third-party (that is not a Loan Party or a Wholly Owned Subsidiary) contractual requirement (with respect to any such contractual requirement, only to the extent existing on the Closing Date) from guaranteeing or granting Liens to secure the Obligations (and for so long as such restriction or any replacement or renewal thereof is in effect),

(e)      [reserved],

(f)      [reserved],

(g)      [reserved],

(h)      any other Subsidiary with respect to which the Required Lenders and the Borrowers reasonably agree that the cost (including any material adverse tax consequences to a Borrower or any of its

23

Subsidiaries) of providing a Guarantee of or granting Liens to secure the Obligations are likely to be excessive in relation to the value to be afforded thereby,

(i)        HB TopCo, and

(j)        with respect to any Hedging Obligation, any Subsidiary that is not an "eligible contract participant" as defined in the Commodity Exchange Act and the regulations thereunder.

For the avoidance of doubt, (x) no Borrower shall constitute an Excluded Subsidiary, (y) JB TopCo shall not constitute an Excluded Subsidiary and (z) no Subsidiary that was or is a borrower or a guarantor under or in respect of the Prepetition Credit Agreements or the Junior DIP Credit Agreement shall constitute an Excluded Subsidiary.

"Excluded Taxes" means, with respect to the Administrative Agent, any Lender, or any other recipient of any payment to be made by or on account of any obligation of any Loan Party hereunder or under any other Loan Document, (a) Taxes imposed on (or measured by) such recipient's net income (however denominated) and franchise Taxes imposed on it, in each case, by a jurisdiction as a result of (i) such recipient being organized or having its principal office located in or, in the case of any Lender, having its applicable lending office located in, such jurisdiction, or (ii) any other present or former connection between such recipient and such jurisdiction (other than any connection arising from such recipient having executed, delivered, become a party to, performed its obligations or received payments under, received or perfected a security interest under, sold or assigned of an interest in, engaged in any other transaction pursuant to, and/or enforced, any Loan Documents), (b) any branch profits tax imposed under Section 884(a) of the Code, or any similar Tax, imposed by any jurisdiction described in clause (a) above, (c) any U.S. federal withholding Tax imposed pursuant to FATCA, (d) any withholding Tax that is attributable to such recipient's failure to comply with Section 2.17(e), and (e) in the case of a Foreign Lender (other than any Foreign Lender becoming a party hereto pursuant to a request by any Loan Party under Section 2.19), any U.S. federal withholding Taxes imposed on amounts payable to such Foreign Lender pursuant to a Requirement of Law in effect at the time such Foreign Lender becomes a party hereto (or designates a new lending office), except to the extent that such Foreign Lender (or its assignor, if any) was entitled, immediately prior to the designation of a new lending office (or assignment), to receive additional amounts with respect to such withholding Tax under Section 2.17(a).

"Exit Conversion" has the meaning given to such term in Section 2.11(a).

"Exit Conversion Conditions" means:

(a)        the execution, delivery and initial effectiveness of the Exit Facilities Documentation on terms and subject to conditions consistent with or no less favorable to the Lenders than the terms set forth in the Exit Facilities Commitment Letter;

(b)        the satisfaction of all conditions precedent to funding under the Exit Facilities Commitment Letter;

(c)        [reserved];

(d)        [reserved];

(e)        (i) an Acceptable Plan and the Confirmation Order shall be in full force and effect and no stay thereof shall be in effect, and shall not have been reversed, modified, amended, or vacated, or any provision contained therein waived, in each case in any manner that is adverse in any material respect to the Lenders without the consent of the Required Lenders and (ii) all conditions precedent to the effectiveness of an Acceptable Plan shall have been (or will be substantially concurrently) satisfied or waived (to the extent such waiver is not adverse to the Lenders) and the effective date under such Acceptable Plan shall have occurred or will occur substantially concurrently with the Conversion Date;

(f)        [reserved]; and

24

(g)      the Administrative Agent shall have received a certificate of a Financial Officer of the Borrowers, which shall include a certification as to solvency of the Parents and their respective Subsidiaries on the Conversion Date after giving effect to the Exit Conversion and other transactions on or prior to the Conversion Date, and a certification as to the satisfaction of the conditions set forth in clauses (a) through (f) above.

"Exit Facilities Commitment Letter" means that certain commitment letter (including all exhibits, schedules and annexes thereto), dated the date hereof, by and among Deutsche Bank AG New York Branch and the Borrowers, as amended, restated, supplemented, waived or otherwise modified from time to time.

"Exit Facilities Documentation" has the meaning given to such term in the Exit Facilities Commitment Letter.

"Exit Term Loans" has the meaning given to such term in the Exit Facilities Commitment Letter.

"Exit Premium" has the meaning given to such term in Section 2.12(d).

"Extension Date" has the meaning given to such term in Section 2.12(d).

"Extension Fee" has the meaning given to such term in Section 2.12(d).

"Fair Share" has the meaning assigned to such term in Section 10.02.

"Fair Share Contribution Amount" has the meaning assigned to such term in Section 10.02.

"FATCA" means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), or any current or future regulations promulgated thereunder or official administrative interpretations thereof and any agreements entered into pursuant to current Section 1471(b)(1) of the Code (or any amended or successor version described above) and any intergovernmental agreement, treaty or convention among Governmental Authorities (and any related legislation, regulations or official administrative guidance) implementing the foregoing.

"Federal Funds Effective Rate" means, for any day, the greater of (a) the rate calculated by the Federal Reserve Bank of New York based on such days' Federal funds transactions by depository institutions (as determined in such manner as the Federal Reserve Bank of New York shall set forth on its public website from time to time) and published on the next succeeding Business Day by the Federal Reserve Bank of New York as the Federal Funds Effective Rate and (b) 0%.  If no such rate is available for such date, the Federal Funds Effective Rate shall be the average of the quotations (rounded upward, if necessary, to a whole multiple of 1/100 of 1%) for the day of such transactions received by the Administrative Agent from three major banks reasonably satisfactory to the Administrative Agent.

"Fee Letters" means the Agent Fee Letter and the Lender Fee Letter.

"Final DIP Order" has the meaning specified in the Interim DIP Order or otherwise as may be amended, modified or supplemented from time to time with the express written consent of the Required Lenders and the Agents.

"Final DIP Order Entry Date" means the date on which the Final DIP Order is entered on the docket of the Bankruptcy Court.

"Financial Covenant" means the covenant of the Borrowers set forth in Section 6.11.

"Financial Officer" means, with respect to any person, the director of financial reporting, the chief financial officer, principal accounting officer, treasurer, assistant treasurer or controller of such Person.

"Financing Lease Obligation" means, at the time any determination thereof is to be made, the amount of the liability in respect of a financing lease that would at such time be required to be capitalized and reflected as a liability

on a balance sheet (excluding the footnotes thereto) in accordance with GAAP; <u>provided</u> that obligations of the Borrowers or their Subsidiaries, or of a special purpose or other entity not consolidated with the Borrowers and their Subsidiaries, either existing on the Closing Date or created thereafter that (a) (x) as of the Closing Date, were not included on the consolidated balance sheet of the Borrowers as financing lease obligations and were subsequently recharacterized as financing lease obligations or (y) in the case of such a special purpose or other entity becoming consolidated with the Borrowers and their Subsidiaries, were required to be characterized as financing lease obligations upon such consolidation, in each case, due to a change in GAAP or (b) did not exist on the Closing Date and were required to be characterized as financing lease obligations when created after such date, but would not have been required to be treated as financing lease obligations under GAAP on the Closing Date had they existed at that time, shall for all purposes under this Agreement, not be treated as Financing Lease Obligations; <u>provided</u> further that for all purposes hereunder the amount of Financing Lease Obligations shall be the amount thereof accounted for as a liability in accordance with Accounting Standards Codification 840 (regardless of whether or not then in effect) and without giving effect to Accounting Standards Codification 842 requiring operating leases to be recharacterized or required to be capitalized and reflected as a liability on a balance sheet (excluding the footnotes thereto).

"<u>Flood Insurance Laws</u>" means, collectively, (i) the National Flood Insurance Act of 1968 as now or hereafter in effect or any successor statute thereto, (ii) the Flood Disaster Protection Act of 1973 as now or hereafter in effect or any successor statute thereto, (iii) the National Flood Insurance Reform Act of 1994 as now or hereafter in effect or any successor statute thereto, (iv) the Flood Insurance Reform Act of 2004 as now or hereafter in effect or any successor statute thereto and (v) the Biggert-Waters Flood Insurance Reform Act of 2012 as now or hereafter in effect or any successor statute thereto.

"<u>Foreign Lender</u>" means any Lender that is not a United States Person as defined in Section 7701(a)(30) of the Code.

"<u>Foreign Loan Party</u>" means any Loan Party that is not organized under the laws of the United States, any state thereof or the District of Columbia.

"<u>Foreign Representative</u>" means Hornblower Group, Inc., in its capacity as foreign representative as duly appointed as such under Section 1505 of the Bankruptcy Code.

"<u>Foreign Subsidiary</u>" means any Subsidiary other than a Domestic Subsidiary.

"<u>Fund</u>" means collectively, investment funds advised, managed or controlled by Affiliates of Crestview Advisors, L.L.C.

"<u>Fund Affiliate</u>" means (i) each Affiliate of the Fund that is neither a "portfolio company" (which means a company actively engaged in providing goods or services to unaffiliated customers), whether or not controlled, nor a company controlled by a "portfolio company" and (ii) any individual who is a partner or employee of Crestview Advisors, L.L.C.

"<u>Funding Guarantors</u>" has the meaning assigned to such term in Section 10.02.

"<u>GAAP</u>" means generally accepted accounting principles in effect from time to time in the United States of America, applied on a consistent basis, subject to the provisions of Section 1.04; <u>provided</u> that any reference to the application of GAAP in Sections 3.09, 3.20, 5.05, 5.07 and 6.02(e) to a Foreign Subsidiary (and not as a consolidated Subsidiary of the Borrowers) shall mean generally accepted accounting principles or equivalent in effect from time to time in the jurisdiction of organization of such Foreign Subsidiary.

"<u>Governmental Authority</u>" means any federal, state, provincial, territorial, local or foreign court or governmental agency, authority, instrumentality or regulatory or legislative body.

"<u>Guarantee</u>" of or by any person (the "<u>guarantor</u>") means (a) any obligation, contingent or otherwise, of the guarantor guaranteeing or having the economic effect of guaranteeing any Indebtedness or other monetary obligation payable or performable by another person (the "<u>primary obligor</u>") in any manner, whether directly or indirectly, and

including any obligation of the guarantor, direct or indirect, (i) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation, (ii) to purchase or lease property, securities or services for the purpose of assuring the owner of such Indebtedness or other obligation of the payment thereof, (iii) to maintain working capital, equity capital or any other financial statement condition or liquidity of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation or (iv) entered into for the purpose of assuring in any other manner the holders of such Indebtedness or other obligation of the payment thereof or to protect such holders against loss in respect thereof (in whole or in part), or (b) any Lien on any assets of the guarantor securing any Indebtedness or other obligation (or any existing right, contingent or otherwise, of the holder of Indebtedness or other obligation to be secured by such a Lien) of any other person, whether or not such Indebtedness or other obligation is assumed by the guarantor; provided, however, that the term "Guarantee" shall not include endorsements of instruments for deposit or collection in the ordinary course of business or customary and reasonable indemnity obligations in effect on the Closing Date or entered into in connection with any acquisition or Disposition of assets permitted by this Agreement (other than such obligations with respect to Indebtedness).  The amount of any Guarantee shall be deemed to be an amount equal to the stated or determinable amount of the Indebtedness in respect of which such Guarantee is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined by such person in good faith.

"Guaranteed Obligations" has the meaning assigned to such term in Section 10.01.

"guarantor" has the meaning assigned to such term in the definition of the term "Guarantee."

"Guarantors" means the Loan Parties other than the Borrowers.

"Hazardous Materials" means all pollutants, contaminants, wastes, chemicals, materials, substances and constituents, including explosive or radioactive substances or petroleum byproducts or petroleum distillates, asbestos or asbestos-containing materials, polychlorinated biphenyls, radon gas, pesticides or fungicides, of any nature subject to regulation or which can give rise to liability under any Environmental Law.

"HB TopCo" means HB TopCo Pty Ltd (ACN 656 565 249), an entity organized under the laws of Australia.

"Hedging Agreement" means any agreement with respect to any swap, forward, future or derivative transaction, or option or similar agreement involving, or settled by reference to, one or more rates, currencies, commodities, equity or debt instruments or securities, or economic, financial or pricing indices or measures of economic, financial or pricing risk or value, or credit spread transaction, repurchase transaction, reserve repurchase transaction, securities lending transaction, weather index transaction, spot contracts, fixed price physical delivery contracts, or any similar transaction or any combination of these transactions, in each case of the foregoing, whether or not exchange traded; provided that no phantom stock or similar plan providing for payments only on account of services provided by current or former directors, officers, employees or consultants of any Parent, any Borrower or any of the Subsidiaries shall be a Hedging Agreement.

"Hedging Obligation" means, with respect to any Guarantor, any obligation to pay or perform under any agreement, contract or transaction that constitutes a "swap" within the meaning of Section 1a(47) of the Commodity Exchange Act.

"Hornblower Borrower" has the meaning assigned to such term in the preamble.

"Hornblower Parent" has the meaning assigned to such term in the preamble.

"Increased Amount" of any Indebtedness means any increase in the amount of such Indebtedness in connection with any accrual of interest, the accretion of accreted value, the amortization of original issue discount, fees or premiums or deferred financing fees, the payment of interest or dividends in the form of additional Indebtedness or in the form of Equity Interests, as applicable, the accretion of original issue discount, interest, fees or premiums deferred financing fees or liquidation preference and increases in the amount of Indebtedness outstanding solely as a result of fluctuations in the exchange rate of currencies.

"Incremental Superpriority 507(b) Claims" has the meaning assigned to such term in the Bankruptcy Court DIP Order.

"Incremental Superpriority Adequate Protection Liens" has the meaning assigned to such term in the Bankruptcy Court DIP Order.

"Indebtedness" of any person means, if and to the extent (other than with respect to clause (i)) the same would constitute indebtedness or a liability on a balance sheet prepared in accordance with GAAP, without duplication, (a) all obligations of such person for borrowed money, (b) all obligations of such person evidenced by bonds, debentures, notes or similar instruments, (c) all obligations of such person under conditional sale or other title retention agreements relating to property or assets purchased by such person, (d) all obligations of such person issued or assumed as the deferred purchase price of property or services (other than such obligations accrued in the ordinary course), to the extent that the same would be required to be shown as a long term liability on a balance sheet prepared in accordance with GAAP, (e) all Financing Lease Obligations of such person, (f) all net payments that such person would have to make in the event of an early termination, on the date Indebtedness of such person is being determined, in respect of outstanding Hedging Agreements, (g) the principal component of all obligations, contingent or otherwise, of such person as an account party in respect of letters of credit, (h) the principal component of all obligations of such person in respect of bankers' acceptances, (i) all Guarantees by such person of Indebtedness described in clauses (a) to (h) above and (j) the amount of all obligations of such person with respect to the redemption, repayment or other repurchase of any Disqualified Stock (excluding accrued dividends that have not increased the liquidation preference of such Disqualified Stock); provided, that Indebtedness shall not include (A) trade and other ordinary-course payables, accrued expenses and intercompany liabilities arising in the ordinary course of business and (in the case of any such liabilities incurred after the Closing Date, on an arm's length basis), (B) prepaid or deferred revenue, (C) purchase price holdbacks arising in the ordinary course of business in respect of a portion of the purchase prices of an asset to satisfy unperformed obligations of the seller of such asset, (D) [reserved], (E) earn-out obligations until such obligations become a liability on the balance sheet of such person in accordance with GAAP, (F) obligations in respect of Third Party Funds, (G) in the case of the Borrowers and the Subsidiaries (I) all intercompany Indebtedness having a term not exceeding 364 days (inclusive of any roll-over or extensions of terms) and made in the ordinary course of business and (in the case of any such Indebtedness incurred after the Closing Date, on an arm's length basis) and (II) intercompany liabilities in connection with the ordinary course cash management, tax and accounting operations of the Borrowers and the Subsidiaries.  The Indebtedness of any person shall include the Indebtedness of any partnership in which such person is a general partner, other than to the extent that the instrument or agreement evidencing such Indebtedness limits the liability of such person in respect thereof.

"Indemnified Liabilities" means any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses, fees or disbursements of any kind whatsoever that may at any time (whether before or after the payment of the Term Loans) be imposed on, incurred by or asserted against an Agent Party in any way relating to or arising out of the Term Loan Commitments, the use of proceeds hereunder, this Agreement, any of the other Loan Documents or any documents contemplated by or referred to herein or therein, the Transaction or the other transactions contemplated hereby or thereby or any action taken or omitted by such Agent Party under or in connection with any of the foregoing.

"Indemnified Taxes" means (a) any Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of any Loan Party hereunder or under any other Loan Document and (b) to the extent not otherwise described in clause (a), Other Taxes.

"Indemnitee" has the meaning assigned to such term in Section 9.03(b).

"Ineligible Institution" means the persons identified in writing to the Administrative Agent by the Borrowers on or prior to the Closing Date, and (solely in the case of competitors of the Borrowers and their respective Subsidiaries) as may be identified in writing to the Administrative Agent by the Borrowers from time to time with the consent of the Administrative Agent (acting at the direction of the Required Lenders), by delivery of a notice thereof to the Administrative Agent setting forth such person or persons (or the person or persons previously identified to the Administrative Agent that are to be no longer considered "Ineligible Institutions") which designation shall become effective two (2) Business Days after it is delivered to the Administrative Agent, but which shall not apply retroactively to disqualify any Person that has previously acquired any assignment or participation in the Loan solely with respect

28

to such previously acquired Loan or participation; provided that, promptly upon receipt by the Administrative Agent of any such notice, the Administrative Agent shall post such notice to the Lenders.  Notwithstanding anything to the contrary contained in this Agreement, (a) the Administrative Agent shall not be responsible or have any liability for, or have any duty to ascertain, inquire into, monitor or enforce, compliance with the provisions hereof relating to Ineligible Institutions and (b) the Borrowers (on behalf of itself and the other Loan Parties) and the Lenders acknowledge and agree that the Administrative Agent shall have no responsibility or obligation to determine whether any Lender or potential Lender is an Ineligible Institution and that the Administrative Agent shall have no liability with respect to any assignment or participation made to an Ineligible Institution.

"Information" has the meaning assigned to such term in Section 9.12(a).

"Information Officer" means the information officer appointed by the Canadian Court in the Canadian Recognition Proceedings.

"Intellectual Property" means all rights, priorities and privileges relating to intellectual property, whether arising under United States, multinational or foreign laws or otherwise, including all copyrights and any registrations and applications for registration thereof, copyright licenses, patents and patent applications, patent licenses, trademarks and any registrations and applications for registration thereof, trademark licenses, trade names, trade dress, domain names, trade secrets, knowhow and processes, software and all rights to sue at law or in equity for any infringement, violation or other impairment thereof, including the right to receive all proceeds and damages therefrom.

"Intercompany Services Agreement" means the Services Agreement, dated as of February 15, 2022 and as in effect on the date hereof, by and among Hornblower Group, Inc., HB TopCo, Journey Beyond, the Journey Beyond Borrower and Experience Australia Topco Pty Ltd (ACN 614 712 631) (as further amended, restated, supplemented or otherwise modified or replaced from time to time after the date hereof in accordance with the terms thereof and hereof).

"Intercreditor Agreement" means (i) the provisions of the Bankruptcy Court DIP Orders addressing priority of payments and Liens, turnover, exercise of remedies and other matters pertaining to the relationship between the Agents and the Lenders, on the one hand, and (A) the Agents and Lenders under (and as defined in) the Junior DIP Credit Agreement, on the other hand and (B) the Agents and Lenders under (and as defined in) the Prepetition Credit Agreements and (ii) any intercreditor agreement or subordination agreement entered into from time to time in form and substance reasonably satisfactory to the Required Lenders.

"Interest Election Request" means a request by the Borrowers to convert or continue a Borrowing in accordance with Section 2.07, substantially in the form of Exhibit J or another form approved by the Administrative Agent.

"Interest Expense" means, with respect to any person for any period, the sum of (a) gross interest expense (net of interest income) of such person for such period on a consolidated basis, including (i) the amortization of debt discounts, (ii) the amortization of all fees (including fees with respect to Hedging Agreements) payable in connection with the incurrence of Indebtedness to the extent included in interest expense and (iii) the portion of any payments or accruals with respect to Financing Lease Obligations allocable to interest expense, and (b) capitalized interest of such person.  For purposes of the foregoing, gross interest expense shall be determined after giving effect to any net payments made or received and costs incurred by the Borrowers and the Subsidiaries with respect to Hedging Agreements, and interest on a Financing Lease Obligation shall be deemed to accrue at an interest rate reasonably determined by the Borrowers to be the rate of interest implicit in such Financing Lease Obligation in accordance with GAAP.

"Interest Payment Date" means (a) with respect to any ABR Loan, the last Business Day of each March, June, September and December and (b) with respect to any Term SOFR Loan, the last day of the Interest Period applicable to the Borrowing of which such Loan is a part and, in the case of a Term SOFR Borrowing with an Interest Period of more than three months' duration, each day that would have been an Interest Payment Date had successive Interest Periods of three months' duration been applicable to such Borrowing.

  
"Interest Period" means, with respect to any Term SOFR Borrowing, the period commencing on the date such Borrowing is disbursed or converted to or continued as a Term SOFR Borrowing and ending on the date that is one, three or six months thereafter as selected by the Borrowers in their Borrowing Request (in each case, subject to the available for the Benchmark applicable to the relevant Loan); provided that (a) if any Interest Period would end on a day other than a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless such next succeeding Business Day would fall in the next calendar month, in which case such Interest Period shall end on the next preceding Business Day, (b) any Interest Period that commences on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the last calendar month of such Interest Period) shall end on the last Business Day of the last calendar month at the end of such Interest Period, (c) no Interest Period shall extend beyond the Maturity Date and (d) no tenor that has been removed from this definition pursuant to Section 2.23(d) shall be available.  For purposes hereof, the date of a Borrowing initially shall be the date on which such Borrowing is made and thereafter shall be the effective date of the most recent conversion or continuation of such Borrowing.

"Interim DIP Order" means the order of the Bankruptcy Court, approving the Term Loans on an interim basis, in form and substance reasonably satisfactory to the Administrative Agent (acting at the direction of the Required Lenders); it being understood and agreed that order delivered to the Administrative Agent on the Petition Date are satisfactory to the Lenders, in each case, together with any amendment, supplement or other modification thereto that are not adverse to the Lenders.

"Interim DIP Order Entry Date" means the date on which the Interim DIP Order is entered on the docket of the Bankruptcy Court.

"Investment" has the meaning assigned to such term in Section 6.04.

"JB Business" has the meaning assigned to such term in the definition of "JB Disposition".

"JB Disposition" means any offer for sale, lease or other disposition of all or substantially all of the business of Journey Beyond and its subsidiaries, taken as a whole (the "JB Business"), or any material portion thereof (whether by virtue of an asset sale transaction, a lease transaction, affiliation transaction, or a change of control, change of membership, merger, amalgamation, consolidation or other combination transaction with respect to the JB Business (or any of its subsidiaries)) or entering into any agreement (written or otherwise) with any Person with respect to the disposition of all or substantially all of the JB Business, or any material portion thereof.

"JB Holding Entities" means each of Journey Beyond Holdings, Ltd. and Journey Beyond Intermediate Holdings, LLC.

"JB TopCo" has the meaning assigned to such term in the preamble.

"JB TopCo Parent" means any direct or indirect parent of JB TopCo.

"JB TopCo Restricted Party" means JB TopCo and HB TopCo.

"JBIH Credit Agreement" means that certain Credit Agreement, dated as of November 18, 2022, by and among Journey Beyond Holdings, Ltd., as parent, Journey Beyond Intermediate Holdings, LLC, as borrower, Hornblower Group, LLC, as HB TopCo (as defined therein), the lenders party thereto from time to time, the Administrative Agent (as defined therein) and the Collateral Agent (as defined therein), as amended, restated, supplemented or otherwise modified from time to time.

"Journey Beyond" means HB HoldCo Pty Ltd (ACN 655 636 776), an Australian proprietary limited company.

"Journey Beyond Borrower" means HB AcquisitionCo Pty Ltd. (CAN 655 643 280), an Australian proprietary limited company.

"<u>Journey Beyond Credit Agreement</u>" means that certain Syndicated Facility Agreement, dated as of February 15, 2022, by and among Journey Beyond, the Journey Beyond Borrower, as borrower, GLOBAL LOAN AGENCY SERVICES AUSTRALIA PTY LTD (ABN 68 608 829 303), as administrative agent, GLOBAL LOAN AGENCY SERVICES AUSTRALIA NOMINEES PTY LIMITED (ABN 39 608 945 008), as collateral agent, and each of the lenders from time to time party thereto, as amended, restated, supplemented, waived or otherwise modified from time to time prior to the Closing Date.

"<u>Journey Beyond Subsidiary</u>" means, unless the context otherwise requires, a subsidiary of Journey Beyond.

"<u>Junior DIP Advisors</u>" means the "Required Lenders' Advisors" as defined in the Junior DIP Credit Agreement.

"<u>Junior DIP Credit Agreement</u>" means that certain Junior Secured Superpriority Debtor-in-Possession Credit Agreement dated as of February 21, 2024, among the Parents, the Borrowers, GLAS Trust Company LLC and the lenders party thereto from time to time as amended, restated, supplemented or otherwise modified from time to time in accordance with this Agreement.

"<u>Junior DIP Loan Documents</u>" shall mean the Junior DIP Credit Agreement and the other "Loan Documents" under and as defined in the Junior DIP Credit Agreement (as in effect on the Closing Date), as each such document may be amended, restated, supplemented or otherwise modified from time to time.

"<u>Judgment Currency</u>" has the meaning assigned to such term in Section 9.14.

"<u>Latest Maturity Date</u>" means, at any date of determination, the latest maturity or expiration date applicable to any Term Loans at such time, in each case as extended in accordance with this Agreement from time to time.

"<u>Lender Fee Letter</u>" means that certain Fee Letter, on or about the date hereof, by and among the Borrowers and the Lenders, as it may be amended, amended and restated, supplemented or otherwise modified from time to time.

"<u>Lenders</u>" means the Persons listed on <u>Schedule 2.01</u>, and any other Person that becomes a "Lender" hereunder pursuant to <u>Section 9.04</u>, in each case, other than any such Person that ceases to be a party hereto pursuant to an Assignment and Assumption.

"<u>Lien</u>" means, with respect to any asset, (a) any mortgage, deed of trust, lien, hypothecation, pledge, charge, security interest, hypothec or similar monetary encumbrance in or on such asset and (b) the interest of a vendor or a lessor under any conditional sale agreement, financing lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such asset; <u>provided</u> that in no event shall an operating lease or an agreement to sell be deemed to constitute a Lien.

"<u>Liquidity Certificate</u>" has the meaning assigned to such term in Section 6.11.

"<u>Liquidity Testing Date</u>" has the meaning assigned to such term in Section 6.11.

"<u>Loan Documents</u>" means (i) this Agreement, (ii) the Security Documents, (iii) the Intercreditor Agreement, (iv) any Note issued under Section 2.09(e) and (v) the Fee Letters.

"<u>Loan Guarantee</u>" means the Guarantees of the Obligations under Article X and/or any other Guarantee of the Obligations.

"<u>Loan Parties</u>" means the Parents, the Borrowers, the Subsidiary Loan Parties and the Parent Entity Debtors.

"<u>Local Time</u>" means New York City time (daylight or standard, as applicable).

"<u>Management Group</u>" means the group consisting of the directors, executive officers and other management personnel of the Borrowers, the Parents or any Parent Entity, as the case may be, on the Closing Date together with

(a) any successor or assign of such Person that is an Affiliate of such Person, a familial relative of such Person or an Affiliate of a familial relative of such Person, (b) any new directors whose election by such boards of directors or whose nomination for election by the shareholders of any Borrower, any Parent or any Parent Entity, as the case may be, was approved by a vote of a majority of the directors of such Borrower, such Parent or any Parent Entity, as the case may be, then still in office who were either directors on the Closing Date or whose election or nomination was previously so approved and (c) executive officers and other management personnel of any Borrower, any Parent or any Parent Entity, as the case may be, hired at a time when the directors on the Closing Date together with the directors so approved constituted a majority of the directors of such Borrower or such Parent, as the case may be.

"Margin Stock" means "margin stock" as such term is defined in Regulation U of the Federal Reserve Board.

"Material Adverse Effect" means a material adverse effect on (a) the business, property, operations or financial condition of either JB TopCo and its Subsidiaries (other than Journey Beyond and its subsidiaries), (b) the Borrowers and their Subsidiaries, taken as a whole, in each case under clauses (a) and (b), excluding (i) any matters publicly disclosed in writing or disclosed to the Lenders in writing prior to the date hereof, (ii) any matters disclosed in any first day pleadings or declarations filed in the Chapter 11 Cases and (iii) the filing of the Chapter 11 Cases or the commencement of the Canadian Recognition Proceedings or (c) the validity or enforceability of any of the Loan Documents or the rights and remedies of the Agents and the Lenders thereunder.

"Material Contract" means (i) that certain Contract, dated as of March 1, 2021, by and between the United States of America, acting by the Director of the National Park Service, through the National Park Service Regional Director Interior Region 1 (the "Director"), and Statue Cruises, LLC, a Delaware limited liability company ("Statue Cruises"), (ii) that certain Contract, dated as of March 1, 2024, by and between the Director and Statue Cruises, (iii) that certain Contract, dated as of May 9, 2019, by and between the United States of America, acting by the Director of the National Park Service, through the National Park Service Regional Director of the Pacific West Region, and Alcatraz Cruises, LLC, a Delaware limited liability company (as amended by that  (iv) that certain Contract dated as of January 1, 2014, by and between the Niagara Parks Commission, Hornblower Canada Co., a Nova Scotia unlimited liability company, and Hornblower Inc., a California corporation, (v) that certain Contract, dated as of October 27, 2020, by and between Puerto Rico and the Island Municipalities instrumentality of the Commonwealth of Puerto Rico, HMS – Ferries Puerto Rico, LLC, a Commonwealth of Puerto Rico limited liability company, and HMS Ferries, Inc., a Delaware Corporation and (vi) the New York Ferry Agreement.

"Material Indebtedness" means Indebtedness (other than Term Loans) of any one or more of any Borrower or any Subsidiary in an aggregate principal amount exceeding $1,000,000.

"Material Real Property" means (i) any parcel or parcels of Real Property located in the United States or Canada now or hereafter owned in fee by any Borrower or any Subsidiary Loan Party and having a fair market value (on a per-property basis) of (x) at least $100,000 as at the Closing Date for Real Property now owned or (y) at least $100,000 as of the date of acquisition for Real Property acquired after the Closing Date, in each case as determined by the Borrowers in good faith and (ii) any other parcel or parcels of Real Property located in the United States or Canada that is subject to a Lien securing obligations under any Prepetition Credit Agreement or the Junior DIP Credit Agreement.

"Material Vessel" means (i) any Vessel (other than an Additional Collateral Vessel) now or hereafter owned by any Borrower or any Subsidiary Loan Party and having a fair market value (on a per-Vessel basis) of (x) at least $100,000 as at the Closing Date for Vessels now owned or (y) at least $100,000 as of the date of acquisition for Vessels acquired after the Closing Date, in each case as determined by the Borrowers in good faith and (ii) any other Vessel (other than an Additional Collateral Vessel) that is subject to a Lien securing obligations under any Prepetition Credit Agreement or the Junior DIP Credit Agreement. As of the Closing Date, the Material Vessels are set forth on Schedule 1.01(F) under the heading "Material Vessels".

"Maturity Date" means, the earliest to occur of (i) the date that is nine months after the Petition Date; (ii) if the Final DIP Order has not been entered by the Bankruptcy Court on or before the applicable Milestone (as defined below), the date of the applicable Milestone; (iii) the date the Bankruptcy Court orders a conversion of the Chapter 11 Cases to a chapter 7 liquidation or the dismissal of the Chapter 11 Case of any Debtor; (iv) the consummation of a sale or other disposition of all or substantially all of the assets of the Debtors under section 363 of the Bankruptcy

Code; (v) the date that is 30 calendar days after the Interim DIP Order Date if the Final DIP Order Entry Date shall not have occurred by such date; and (vi) the substantial consummation (as defined in 11 U.S.C. § 1101(2)) of a Plan of Reorganization, which has been confirmed by an order entered by the Bankruptcy Court.

"Maximum Rate" has the meaning assigned to such term in Section 9.17.

"Moody's" means Moody's Investors Service, Inc. and any successor to its rating agency business.

"Mortgage" means a first priority ship mortgage, first preferred ship mortgage, mortgage, charge, deed of trust, assignment of leases and rents or other security document (including any deed of covenants collateral to a Mortgage) granting a Lien on any Mortgaged Property, Material Vessel or Additional Collateral Vessel to secure the Obligations. Each Mortgage of a Mortgaged Property shall be reasonably satisfactory to the Collateral Agent (acting at the direction of the Required Lenders) and the Borrowers and each Mortgage of a Material Vessel or Additional Collateral Vessel shall be in substantially in a form as is reasonably satisfactory to the Collateral Agent (acting at the direction of the Required Lenders) and the Borrowers (it being agreed that Exhibit N-1 of the Prepetition Super Senior Credit Agreement is reasonably acceptable to the Collateral Agent (acting at the direction of the Required Lenders) and the Borrowers), together with any amendments or modifications thereto as from time to time agreed to by the Collateral Agent and the Borrowers.

"Mortgaged Properties" means the Material Real Properties owned in fee by the Borrowers and the Subsidiary Loan Parties, including those that are set forth on Schedule 1.01(B) and each additional Material Real Property encumbered by a Mortgage pursuant to Section 5.11.

"Mortgaged Vessels" means the Material Vessels and Additional Collateral Vessels owned by any of the Borrowers or the Subsidiary Loan Parties, including those that are set forth on Schedule 1.01(F) and each additional Material Vessel encumbered by a Mortgage pursuant to Section 5.11.

"Multiemployer Plan" means a multiemployer plan as defined in Section 4001(a)(3) of ERISA to which any Borrower or any Subsidiary or any ERISA Affiliate is making or accruing an obligation to make contributions, or has within any of the preceding six plan years made or accrued an obligation to make contributions.

"National Vessel Documentation Center" means the National Vessel Documentation Center of the United States Coast Guard, Department of Homeland Security, and any successor board, agency or other Governmental Authority.

"Net Income" means, with respect to any person, the net income (loss) of such person, determined in accordance with GAAP and before any reduction in respect of preferred stock dividends.

"Net Proceeds" means,

(a)     100% of the cash proceeds actually received by any Borrower or any Subsidiary (including any cash payments received by way of deferred payment of principal pursuant to a note or installment receivable or purchase price adjustment receivable or otherwise and including casualty insurance settlements and condemnation awards, but only as and when received) from any Asset Sale (other than any Asset Sales pursuant to Section 6.05(a), (b), (c), (e) or (g)) net of any bona fide direct costs incurrent in connection with such Asset Sale, including (i) customary attorneys' fees, accountants' fees, investment banking fees, survey costs, title insurance premiums, and related search and recording charges, transfer taxes, deed or mortgage recording taxes, required debt payments and required payments of other obligations relating to the applicable asset to the extent such debt or obligations are secured by a Lien permitted hereunder (other than pursuant to the Loan Documents) on such asset (and only to the extent such required debt payments or other required payments of obligations are in respect of Indebtedness that is secured by a Lien that ranks senior to the Liens securing the Obligations), other customary expenses and brokerage, consultant and other customary fees actually incurred in connection therewith, (ii) Taxes paid or payable as a result thereof, (iii) the amount of any reasonable reserve established in accordance with GAAP against any adjustment to the sale price or any liabilities (other than any taxes deducted pursuant to clause (i) or (ii) above) (x) related to any of the

applicable assets and (y) retained by any Borrower or any of the Subsidiaries including pension and other post-employment benefit liabilities and liabilities related to environmental matters or against any indemnification obligations (however, the amount of any subsequent reduction of such reserve (other than in connection with a payment in respect of any such liability) shall be deemed to be Net Proceeds of such Asset Sale occurring on the date of such reduction), (iv) payments made on a ratable basis (or less than ratable basis) to holders of non-controlling interests in non-Wholly Owned Subsidiaries as a result of such Asset Sale by such non-Wholly Owned Subsidiary or (v) amounts prohibited from being so applied by the terms of the Niagara Contract as in effect on the Closing Date (but only for so long as such prohibitions are in effect); and

(b)      100% of the cash proceeds from the incurrence, issuance or sale by any Borrower or any Subsidiary of any Indebtedness (other than Excluded Indebtedness), net of all taxes and fees (including investment banking fees), commissions, costs and other expenses, in each case incurred in connection with such issuance or sale.

"New Project" means (x) each new vessel chartered-in or Vessel owned by the Borrowers or the Subsidiaries which in fact commences operations and (y) each creation (in one or a series of related transactions) of a business unit (including establishing concession services) to the extent such business unit commences operations or each expansion (in one or a series of related transactions) of business into a new market.

"New York Ferry Agreement" means that certain Agreement dated February 12, 2016 by and between the NYCEDC and HNY Ferry, LLC, as amended, restated, supplemented or otherwise modified from time to time in accordance therewith.

"Niagara Contract" means the Boat Tours Lease and Operating Agreement 2012, among Hornblower Canada Co., as tenant, The Niagara Parks Commission, as landlord and Hornblower Group, Inc. (f/k/a Hornblower, Inc.), as indemnifier (as amended, restated, supplemented or otherwise modified from time to time after the Closing Date in accordance with the terms thereof and hereof).

"Niagara Security Agreement" means (i) the Security Agreement, dated January 1, 2014, among Hornblower Canada Co. and The Niagara Parks Commission, (ii) the Collateral Deed of Covenant, dated March 7, 2014, by and between Hornblower Canada Co. and The Niagara Parks Commission for the vessel *Hornblower Guardian*, Official Number 837802, (iii) the Collateral Deed of Covenant, dated March 7, 2014, by and between Hornblower Canada Co. and The Niagara Parks Commission for the vessel *Niagara Wonder*, Official Number 837992, (iv) the Collateral Deed of Covenant dated March 7, 2014, by and between Hornblower Canada Co. and the Niagara Parks Commission for the vessel *Niagara Thunder*, Official Number 837993 and (v) any other mortgage or security agreement required by the Niagara Contract, in each case, as amended, restated, supplemented or otherwise modified from time to time after the Closing Date in accordance with the terms thereof and hereof.

"Non-Filing Party" means any of Journey Beyond Holdings LTD., a Cayman Islands exempted company, Journey Beyond Intermediate Holdings LLC, a Delaware limited liability company, HB TopCo, Journey Beyond and any Journey Beyond Subsidiary.

"Note" has the meaning assigned to such term in Section 2.09(e).

"Obligations" means (a) the due and punctual payment by the Borrowers of (i) the unpaid principal (including, for the avoidance of doubt, the amount of any accrued interest that is capitalized pursuant to a PIK Election), premium (including the Exit Premium and any Extension Fee) and interest (including interest accruing during the pendency of any bankruptcy, insolvency, arrangement, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding) any Obligations, when and as due, whether at maturity, by acceleration, upon one or more dates set for prepayment or otherwise, (ii) [reserved] and (iii) all other monetary obligations of the Borrowers owed under or pursuant to this Agreement and each other Loan Document, including obligations to pay fees, expense reimbursement obligations and indemnification obligations, whether primary, secondary, direct, contingent, fixed or otherwise (including monetary obligations incurred during the pendency of any bankruptcy, insolvency, arrangement, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding), and (b) the due and punctual payment of all obligations of each other Loan Party and

34

JB TopCo under or pursuant to each of the Loan Documents; <u>provided</u> that in no event will Obligations include any Excluded Hedging Obligations.

"<u>Obligee Guarantor</u>" has the meaning assigned to such term in Section 10.07.

"<u>Organizational Documents</u>" means, with respect to any Person, the charter, articles and/or certificate of organization, incorporation, amalgamation or association and bylaws or other organizational or governing documents of such Person.

"<u>Other Taxes</u>" means any and all present or future stamp, court or documentary Taxes or any other excise, transfer, sales, property, intangible, recording, filing or similar Taxes arising from any payment made hereunder or under any other Loan Document or from the execution, registration, delivery or enforcement of, consummation or administration of, from the receipt of perfection of security interest under, or otherwise with respect to, the Loan Documents.

"<u>Parent Entity</u>" means any direct or indirect parent of a Parent.

"<u>Parent Entity Debtor</u>" means each Parent Entity that is a Debtor

"<u>Parent Entity Debtor Documents</u>" means, collectively, (i) the JBIH Credit Agreement, (ii) each of the Loan Documents (as defined therein) that each Parent Entity Debtor is party to (other than the Engagement Letter (as defined therein) and the SBLC Guarantee (as defined therein)) as of the date hereof and (iii) that certain Parent Guarantee and Contribution Agreement, dated as of February 15, 2022, by and among Hornblower Holdings, LP, HB TopCo, HB Holdco Pty Ltd, HB Acquisitionco Pty Ltd and Global Loan Agency Services Australia Nominees Pty Limited (ABN 39 608 945 008), in each case, as in effect on the date hereof.

"<u>Parent Holdings L.P.</u>" means Hornblower & America Queen Group, L.P., a Delaware limited partnership.

"<u>Parents</u>" has the meaning assigned to such term in the introductory paragraph of this Agreement.

"<u>Participant</u>" has the meaning assigned to such term in Section 9.04(d)(i).

"<u>Participant Register</u>" has the meaning assigned to such term in Section 9.04(d)(ii).

"<u>PBGC</u>" means the Pension Benefit Guaranty Corporation referred to and defined in ERISA.

"<u>Perfection Certificate</u>" means a certificate substantially in the form of <u>Exhibit B</u>.

"<u>Periodic Term SOFR Determination Day</u>" has the meaning assigned to such term in the definition of "Term SOFR".

"<u>Permitted Flag Jurisdiction</u>" has the meaning assigned to such term in clause (f) of the definition of "Collateral and Guarantee Requirement".

"<u>Permitted Holder Group</u>" has the meaning assigned to such term in the definition of the term "Permitted Holders."

"<u>Permitted Holders</u>" means (i) the Co-Investors, (ii) any person that has no material assets other than the capital stock of any Borrower and that, directly or indirectly, holds or has acquired beneficial ownership of 100% on a fully diluted basis of the voting Equity Interests of any Borrower, and of which no other person or "group" (within the meaning of Rules 13d-3 and 13d-5 or Section 14(d)(2) under the Exchange Act as in effect on the Closing Date or any successor provision), other than any of the other Permitted Holders specified in clause (i), beneficially owns more than 50% on a fully diluted basis of the voting Equity Interests thereof and (iii) any "group" (within the meaning of Rules 13d-3 and 13d-5 or Section 14(d)(2) under the Exchange Act as in effect on the Closing Date or any successor provision) the members of which include any of the other Permitted Holders specified in clause (i) and that, directly

or indirectly, hold or acquire beneficial ownership of the voting Equity Interests of any Borrower (a "Permitted Holder Group"), so long as (1) each member of the Permitted Holder Group has voting rights proportional to the percentage of ownership interests held or acquired by such member and (2) no person or other "group" (other than the other Permitted Holders specified in clause (i)) beneficially owns more than 50% on a fully diluted basis of the voting Equity Interests held by the Permitted Holder Group.

"Permitted Investments" means any of the following, to the extent owned by any Borrower or any Subsidiary, or otherwise received as consideration pursuant to Section 6.05:

(a)      dollars, euro or such other currencies mutually agreed to by the Administrative Agent (acting at the direction of the Required Lenders) and the Borrowers and held by such Borrower or such Subsidiary from time to time in the ordinary course of business;

(b)      readily marketable obligations issued or directly and fully guaranteed or insured by the government or any agency or instrumentality of the United States, having average maturities of not more than 12 months from the date of acquisition thereof; provided that the full faith and credit of the United States is pledged in support thereof;

(c)      time deposits with, or insured certificates of deposit or bankers' acceptances of, any commercial bank that (i) is a Lender or (ii) has combined capital and surplus of at least $500,000,000 (any such bank in the foregoing clauses (i) or (ii) being an "Approved Bank"), in each case with average maturities of not more than 12 months from the date of acquisition thereof;

(d)      commercial paper and variable or fixed rate notes issued by an Approved Bank (or by the parent company thereof) or any variable or fixed rate note issued by, or guaranteed by, a corporation rated A-2 (or the equivalent thereof) or better by S&P or P-2 (or the equivalent thereof) or better by Moody's, in each case with average maturities of not more than 12 months from the date of acquisition thereof;

(e)      repurchase agreements entered into by any Person with an Approved Bank, a bank or trust company (including any of the Lenders) or recognized securities dealer, in each case, having capital and surplus in excess of $500,000,000 for direct obligations issued by or fully guaranteed or insured by the government or any agency or instrumentality of the United States, in which such Person shall have a perfected first priority security interest (subject to no other Liens) and having, on the date of purchase thereof, a fair market value of at least 100% of the amount of the repurchase obligations;

(f)      marketable short-term money market and similar highly liquid funds either (i) having assets in excess of $500,000,000 or (ii) having a rating of at least A-2 or P-2 from either S&P or Moody's (or, if at any time neither S&P nor Moody's shall be rating such obligations, an equivalent rating from another nationally recognized rating service);

(g)      securities with average maturities of 12 months or less from the date of acquisition issued or fully guaranteed by any state, commonwealth or territory of the United States, by any political subdivision or taxing authority of any such state, commonwealth or territory having an investment grade rating from either S&P or Moody's (or the equivalent thereof);

(h)      investments with average maturities of 12 months or less from the date of acquisition in mutual funds rated AAA- (or the equivalent thereof) or better by S&P or Aaa3 (or the equivalent thereof) or better by Moody's;

(i)      instruments equivalent to those referred to in clauses (a) through (h) above denominated in euros or any other foreign currency comparable in credit quality and tenor to those referred to above and customarily used by corporations for cash management purposes in any jurisdiction outside the United States to the extent reasonably required in connection with any business conducted by any Subsidiary organized in such jurisdiction; and

(j)        investments, classified in accordance with GAAP as current assets of any Borrower or any Subsidiary, in money market investment programs that are registered under the Investment Company Act of 1940 or that are administered by financial institutions having capital of at least $500,000,000, and, in either case, the portfolios of which are limited such that substantially all of such investments are of the character, quality and maturity described in clauses (a) through (i) of this definition.

"Permitted Liens" has the meaning assigned to such term in Section 6.02.

"Permitted Variance" means, for purposes of testing whether a Budget Event has occurred, during any Budget Testing Period, a variance of, (a) with respect to the Budgeted Receipts Test, 6.25%, (b) with respect to the Cumulative Budgeted Disbursements Test, 5.0% and (c) with respect to the Net Operating Cash Flow Test, 7.5%; provided that (x) for the first Budget Testing Period after the Closing Date for purposes of testing whether a Budget Event has occurred, the percentage in each of the foregoing (1) clause (a) shall be increased by 11.25% and (2) clauses (b) and (c) shall be increased by 10.0%, (y) for the second Budget Testing Period after the Closing Date for purposes of testing whether a Budget Event has occurred, the percentage in each of the foregoing (1) clause (a) shall be increased by 8.75% and (2) clauses (b) and (c) shall be increased by 7.5% and (z) for the third and fourth Budget Testing Period after the Closing Date for purposes of testing whether a Budget Event has occurred, the percentage in each of the foregoing (1) clause (a) shall be increased by 6.25% and (2) clauses (b) and (c) shall be increased by 5.0%.

"Permitted Vessel Liens" means the Liens permitted pursuant to clauses (d), (k), (l)(ii), (r) and (oo) of Section 6.02 and the Liens on the Material Vessels and Additional Collateral Vessels securing obligations under the Junior DIP Loan Documents, Prepetition First Lien Loan Documents and the Prepetition Revolving Loan Documents.

"Person" means any natural person, corporation, limited liability company, unlimited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"Petition Date" means February 21, 2024

"PIK Election" has the meaning assigned to such term in Section 2.07(e).

"PIK Interest Period" means:

(a)        in the case of a Term SOFR Loan, the period commencing on the first date of the Interest Period for such Term SOFR Loan and ending on the last day of the Interest Period for such Term SOFR Loan; and

(b)        in the case of an ABR Loan, the period commencing on the date that is the first day after each Interest Payment Date and ending on the earlier of the first Interest Payment Date for such ABR Loan to occur thereafter.

"Plan" means any employee pension benefit plan (other than a Multiemployer Plan) that (i) is subject to the provisions of Title IV of ERISA or Section 412 of the Code or Section 302 of ERISA and (ii) is, or in the last six years has been, sponsored or maintained or contributed to (or to which there is, or was, an obligation to contribute) by any Borrower or any ERISA Affiliate.

"Plan of Reorganization" means a plan of reorganization with respect to the Loan Parties and their Subsidiaries pursuant to the Chapter 11 Cases or a plan of arrangement pursuant to any other Debtor Relief Laws.

"Platform" means Syndtrak® or another similar electronic system to which the Administrative Agent will post Borrower Materials to be made available to the Lenders.

"PPSA" means the *Personal Property Security Act (Ontario)*, including the regulations thereto, as in effect from time to time and any statute substituted therefor and any amendments thereto, provided that, if perfection or the effect of perfection or non-perfection or the priority of any Lien created hereunder or under any other Loan Document in respect of the Collateral is governed by the personal property security legislation or other applicable legislation

with respect to personal property security in effect in a province or other jurisdiction other than Ontario, "PPSA" means the Personal Property Security Act or such other applicable legislation in effect from time to time in such other jurisdiction for purposes of the provisions hereof relating to such perfection, effect of perfection or non-perfection or priority.

"Prepayment Notice" means a written notice delivered by the Borrowers for a repayment or prepayment in a form reasonably acceptable to the Administrative Agent and the Borrowers (it being agreed that Exhibit O of the Prepetition Super Senior Credit Agreement is reasonably acceptable to the Administrative Agent and the Borrowers) delivered in accordance with Section 2.10(d) or Section 2.11(i).

"Prepetition Credit Agreements" means the Prepetition First Lien Credit Agreement, the Prepetition Super Senior Credit Agreement, the Prepetition Incremental Super Senior Credit Agreement and the Prepetition Revolving Credit Agreement.

"Prepetition First Lien Agent" means GLAS Trust Company LLC (as successor to UBS AG, Stamford Branch), in its capacity as administrative agent and collateral agent under the Prepetition First Lien Credit Agreement.

"Prepetition First Lien Credit Agreement" means that certain Credit Agreement dated as of April 27, 2018, among the Parents, the Borrowers, the Prepetition First Lien Agent and the lenders and issuing banks party thereto from time to time as amended, restated, supplemented or otherwise modified from time to time in accordance with the requirements of Section 6.15.

"Prepetition First Lien Loan Documents" means the Prepetition First Lien Credit Agreement and the other "Loan Documents" under and as defined in the Prepetition First Lien Credit Agreement (as in effect on the Closing Date), as each such document may be amended, restated, supplemented or otherwise modified from time to time in accordance with the requirements of Section 6.15.

"Prepetition Permitted Senior Liens" has the meaning assigned to such term in the Bankruptcy Court DIP Order.

"Prepetition Revolving Agent" means UBS AG, Stamford Branch, in its capacity as administrative agent and collateral agent under the Prepetition Revolving Credit Agreement.

"Prepetition Revolving Credit Agreement" means that certain Credit Agreement dated as of May 13, 2020, among the Parents, the Borrowers, the Prepetition Revolving Agent and the lenders and issuing banks party thereto from time to time as amended, restated, supplemented or otherwise modified from time to time in accordance with the requirements of Section 6.15.

"Prepetition Revolving Loan Documents" means the Prepetition Revolving Credit Agreement and the other "Loan Documents" under and as defined in the Prepetition Revolving Credit Agreement (as in effect on the Closing Date), as each such document may be amended, restated, supplemented or otherwise modified from time to time in accordance with the requirements of Section 6.15.

"Prepetition Superpriority Permitted Liens" has the meaning assigned to such term in the Bankruptcy Court DIP Order.

"Prepetition Super Senior Agent" means Alter Domus (US) LLC, in its capacity as administrative agent and collateral agent under the Prepetition Super Senior Credit Agreement.

"Prepetition Super Senior Credit Agreement" means that certain Superpriority Credit Agreement dated as of November 10, 2020, among the Parents, the Borrowers, the Prepetition Super Senior Agent and the lenders and issuing banks party thereto from time to time as amended, restated, supplemented or otherwise modified from time to time prior to the Petition Date.

"Prime Rate" means the rate of interest last quoted by *The Wall Street Journal* as the "Prime Rate" in the U.S. or, if *The Wall Street Journal* ceases to quote such rate, the highest per annum interest rate published by the Board in Federal Reserve Statistical Release H.15 (519) (Selected Interest Rates) as the "bank prime loan" rate or, if such rate is no longer quoted therein, any similar rate quoted therein (as determined by the Administrative Agent) or any similar release by the Board (as determined by the Administrative Agent).  The Prime Rate is a reference rate and does not necessarily represent the lowest or best rate actually charged to any customer.  The Administrative Agent or any Lender may make commercial loans or other loans at rates of interest at, above or below the Prime Rate.  Any change in the Prime Rate shall take effect at the opening of business on the day specified in the public announcement of such change.

"Pro Forma Basis" means, as to any person, for any events as described below that occur subsequent to the commencement of a period for which the financial effect of such events is being calculated, and giving effect to the events for which such calculation is being made, such calculation as will give pro forma effect to such events as if such events occurred on the first day of the four consecutive fiscal quarter period ended on or before the occurrence of such event (the "Reference Period"):  (i) pro forma effect shall be given to any Disposition, any acquisition, Investment, capital expenditure, construction, repair, replacement, improvement, development, disposition, merger, amalgamation, consolidation (including the Transactions) (or any similar transaction or transactions not otherwise permitted under Section 6.04 or 6.05 that require a waiver or consent of the Required Lenders and such waiver or consent has been obtained), any dividend, distribution or other similar payment, New Project and any restructurings of the business of any Borrower or any of their respective Subsidiaries that such Borrower or any of its Subsidiaries has determined to make and/or made and are expected to have a continuing impact and are factually supportable, which would include cost savings resulting from head count reduction, closure of facilities and similar operational and other cost savings, which adjustments the Borrowers determine in good faith are reasonably identifiable and factually supportable and which the Borrowers reasonably expect to realize within 12 months of the date of taking such action as set forth in a certificate of a Financial Officer of the Borrowers (the foregoing, together with any transactions related thereto or in connection therewith, the "relevant transactions"), in each case that occurred during the Reference Period (or, in the case of determinations made pursuant to Article II or Article VI (other than Section 6.11), occurring during the Reference Period or thereafter and through and including the date upon which the relevant transaction is consummated); *provided* that in no event shall the aggregate amount added back to EBITDA pursuant to this clause (i), plus any amounts included in calculating EBITDA pursuant to subclauses (iv), (vi) and (x) of clause (a) of the definition thereof *plus* any amounts included in EBITDA by virtue of clause (i) of the definition of Consolidated Net Income, plus any amounts included in EBITDA by virtue of clause (1) of the second paragraph of the definition of "Pro Forma Basis", in any applicable period exceed 25% of EBITDA in such period (calculated after giving effect to such capped and other uncapped adjustments)  and (ii) in making any determination on a Pro Forma Basis, (x) all Indebtedness (including Indebtedness issued, incurred or assumed as a result of, or to finance, any relevant transactions and for which the financial effect is being calculated, whether incurred under this Agreement or otherwise, but excluding normal fluctuations in revolving Indebtedness incurred for working capital purposes and not to finance any acquisition) issued, incurred, assumed or permanently repaid during the Reference Period (or, in the case of determinations made pursuant to Article II or Article VI (other than Section 6.11), occurring during the Reference Period or thereafter and through and including the date upon which the relevant transaction is consummated) shall be deemed to have been issued, incurred, assumed or permanently repaid at the beginning of such period, (y) Interest Expense of such person attributable to interest on any Indebtedness, for which pro forma effect is being given as provided in the preceding clause (x), bearing floating interest rates shall be computed on a pro forma basis as if the rates that would have been in effect during the period for which pro forma effect is being given had been actually in effect during such periods and (z) in giving effect to clause (i) above with respect to each New Project which commences operations and records not less than one full fiscal quarter's operations during the Reference Period, the operating results of such New Project shall be annualized on a straight line basis during such period, taking into account any seasonality adjustments determined by the Borrowers in good faith.

Pro forma calculations made pursuant to the definition of the term "Pro Forma Basis" shall be determined in good faith by a Responsible Officer of each Borrower and may include adjustments to reflect (1) operating expense reductions and other operating improvements, synergies or cost savings reasonably expected to result from any relevant pro forma event (including, to the extent applicable, the Transactions), which adjustments the Borrowers determine in good faith are reasonably identifiable and factually supportable and which the Borrowers reasonably expect to realize within 12 months of the date of the taking of any applicable action as set forth in a certificate of a Financial Officer of the Borrowers and (2) [reserved]; *provided* that (x) the adjustments referred to in clause (1) above

shall be calculated net of the amount of actual benefits realized during the applicable period and (y) in no event shall the aggregate amount added back to EBITDA pursuant to clause (1) above, plus any amounts included in calculating EBITDA pursuant to subclauses (iv), (vi) and (x) of clause (a) of the definition thereof plus any amounts included in EBITDA by virtue of clause (i) of the definition of Consolidated Net Income plus any amounts included in EBITDA by virtue of clause (i) of the first paragraph of the definition of "Pro Forma Basis", in any applicable period exceed 25% of EBITDA in such period (calculated after giving effect to such capped and other uncapped adjustments).

For purposes of this definition, any amount in a currency other than Dollars will be converted to Dollars based on the average exchange rate for such currency for the most recent twelve-month period immediately prior to the date of determination in a manner consistent with that used in calculating EBITDA for the applicable period.

"Process Agent" has the meaning assigned to such term in Section 9.09(d).

"Professional Fees" shall mean all unpaid fees and expenses incurred by Professional Persons.

"Professional Persons" shall mean (i) any persons or firms retained by the Loan Parties in connection with this Agreement, the Chapter 11 Cases, the Canadian Recognition Proceedings and the transactions contemplated hereby, (ii) the Information Officer and its counsel and (iii) any persons or firms retained by the Required Lenders and Agents in connection with entry into this Agreement, the Chapter 11 Cases, the Canadian Recognition Proceedings and the transactions contemplated hereby.

"Public Lender" means any Lender that does not wish to receive material non-public information (or, in the case of a company that is not a public-reporting company, material information of a type that would not be reasonably expected to be publicly available if such company were a public-reporting company) with respect to the Parents, the Borrowers or their Subsidiaries or any of their respective securities.

"QFC" has the meaning assigned to such term "qualified financial contract" in, and shall be interpreted in accordance with, 12 U.S.C. § 5390(c)(8)(D).

"QFC Credit Support" has the meaning assigned to such term in Section 9.20.

"Qualified Equity Interests" means Equity Interests other than Disqualified Stock.

"Real Property" means, collectively, all right, title and interest (including any leasehold estate) in and to any and all parcels of or interests in real property owned in fee or leased by any Loan Party, whether by lease, license, or other means, together with, in each case, all easements, hereditaments and appurtenances relating thereto, all improvements and appurtenant fixtures and equipment, incidental to the ownership, lease or operation thereof.

"Register" has the meaning assigned to such term in Section 9.04(b)(iv).

"Related Parties" means, with respect to any specified Person, such Person's Controlled or Controlling Affiliates and the respective partners, directors, officers, employees, trustees, agents, advisors and members of such Person and of such Person's Controlled or Controlling Affiliates and permitted successors and assigns.

"Release" means any spilling, leaking, seepage, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, disposing, depositing, emanating or migrating in, into, onto or through the Environment.

"Reportable Event" means any reportable event as defined in Section 4043(c) of ERISA or the regulations issued thereunder, other than those events as to which the 30-day notice period referred to in Section 4043(c) of ERISA has been waived, with respect to a Plan.

"Required Lenders" means, at any time, Lenders having Term Loans outstanding that, taken together, represent more than 66⅔% of the sum of all Term Loans outstanding at such time.

"<u>Required Lenders' Advisors</u>" means the advisors to the Required Lenders consisting of White & Case LLP.

"<u>Requirements of Law</u>" means, with respect to any Person, any statutes, laws, treaties, rules, regulations, orders, decrees, writs, injunctions, official administrative guidance or determinations of any arbitrator or court or other Governmental Authority, in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"<u>Resolution Authority</u>" means an EEA Resolution Authority or, with respect to any UK Financial Institution, a UK Resolution Authority.

"<u>Responsible Officer</u>" means the chief executive officer, president, vice president, chief financial officer, treasurer or assistant treasurer, or other similar officer, manager or a director of a Loan Party and with respect to certain limited liability companies or partnerships that do not have officers, any manager, sole member, managing member or general partner thereof, and as to any document delivered on or prior to the Closing Date or thereafter pursuant to paragraph (c)(i) of the definition of the term "Collateral and Guarantee Requirement," any secretary or assistant secretary of a Loan Party. Any document delivered hereunder that is signed by a Responsible Officer of a Loan Party shall be conclusively presumed to have been authorized by all necessary corporate, partnership and/or other action on the part of such Loan Party and such Responsible Officer shall be conclusively presumed to have acted on behalf of such Loan Party.

"<u>Restricted Payment</u>" has the meaning assigned to such term in Section 6.06. The amount of any Restricted Payment made other than in the form of cash or cash equivalents shall be the fair market value thereof (as reasonably determined by the Borrowers in good faith).

"<u>Restructuring Support Agreement</u>" means that certain Restructuring Support Agreement, dated as of February 21, 2024 (as amended and supplemented from time to time), between the Loan Parties and the other parties party thereto.

"<u>Revolving Adequate Protection Liens</u>" has the meaning assigned to such term in the Bankruptcy Court DIP Order.

"<u>S&P</u>" means Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc., and any successor to its rating agency business.

"<u>SEC</u>" means the Securities and Exchange Commission or any Governmental Authority succeeding to any of its principal functions.

"<u>Secured Parties</u>" means, collectively, the Administrative Agent, the Collateral Agent, each Lender, and each sub-agent appointed pursuant to Section 8.05 by the Administrative Agent or the Collateral Agent and, as the context may require, each other holder of, or obligee in respect of, any Secured Obligations (as defined in the Collateral Agreement).

"<u>Securities Act</u>" means the Securities Act of 1933, as amended.

"<u>Security Documents</u>" means the Bankruptcy Court DIP Orders, the Canadian DIP Recognition Order, the Mortgages and the Canadian Mortgages (as defined in the Canadian Collateral Agreement) (and, where applicable, any deed of covenants collateral thereto), the Collateral Agreement, the Australian Specific Security Deed, the IP Security Agreements (as defined in the Collateral Agreement), the Canadian Collateral Agreement, each Account Control Agreement, the Assignments of Freights and Hires, the Assignments of Insurances, the UK Collateral Documents and each of the security agreements, pledge agreements and other instruments and documents executed and delivered in connection with this Agreement.

"<u>SOFR</u>" means a rate equal to the secured overnight financing rate as administered by the SOFR Administrator.

"SOFR Administrator" means the Federal Reserve Bank of New York (or a successor administrator of the secured overnight financing rate).

"Special Flood Hazard Area" has the meaning assigned to such term in Section 5.06(b).

"Sponsor(s)" means Crestview Advisors, L.L.C., one or more investment funds controlled by Crestview Advisors, L.L.C. and any of their respective Affiliates, including (other than solely where the term "Sponsor" is used in the definition of "Co-Investor") any Controlled portfolio companies.

"subsidiary" means, with respect to any Person (the "parent") at any date, any corporation, limited liability company, partnership, association or other entity the accounts of which would be consolidated with those of the parent in the parent's consolidated financial statements if such financial statements were prepared in accordance with GAAP, as well as any other corporation, limited liability company, partnership, association or other entity (a) of which securities or other ownership interests representing more than 50% of the equity or more than 50% of the ordinary voting power or, in the case of a partnership, more than 50% of the general partnership interests are, as of such date, owned, controlled or held, or (b) that is, as of such date, otherwise Controlled, by the parent or one or more subsidiaries of the parent or by the parent and one or more subsidiaries of the parent.

"Subsidiary" means, unless the context otherwise requires, (i) a subsidiary of any Borrower or the Borrowers and (ii) each of JB TopCo and HB Topco, it being agreed and acknowledged that a reference to the "Borrowers and their Subsidiaries" shall not include a reference to JB TopCo and its Subsidiaries.

"Subsidiary Loan Party" means (i) each Subsidiary of any Borrower that is not an Excluded Subsidiary and (ii) JB Topco.

"Supported QFC" has the meaning assigned to such term in Section 9.20.

"Tax and Trust Funds" means any cash or cash equivalents maintained in or credited to any deposit account or securities account that are comprised solely of, (a) funds specifically and exclusively used or to be used for payroll and payroll taxes and other employee benefit payments to or for the benefit of any employees of Parents and any of their Subsidiaries, (b) funds specifically and exclusively used or to be used to pay all Taxes required to be collected, remitted or withheld (including withholding Taxes (including the employer's share thereof)) and (c) any other funds which any Loan Party is permitted or otherwise not prohibited by the terms of this Agreement to hold as an escrow or fiduciary for the benefit of another person (that is not a Loan Party), including, for the avoidance of doubt, any customer deposits.

"Taxes" means any and all present or future taxes, duties, levies, imposts, assessments, deductions, withholdings (including backup withholding), fees or other similar charges imposed by any Governmental Authority, and any interest, fines, penalties or additions to tax with respect to the foregoing.

"Term Facility" means the Term Loan Commitments and the Term Loans hereunder.

"Term Lender" means each party to this Agreement with a Term Loan Commitment on the date hereof.

"Term Loan Commitment" means, with respect to each Lender, the commitment, if any, of such Lender to make a Term Loan hereunder on the Closing Date. The amount of each Lender's Term Loan Commitment as of the Closing Date is set forth on Schedule 2.01. The aggregate amount of the Lenders' Term Loan Commitments as of the Closing Date is $300,000,000.

"Term Loans" means the term loans made by the Lenders to the Borrowers pursuant to Section 2.01 on the Closing Date (including, for the avoidance of doubt, the amount of interest that has been added to the outstanding principal balance of the amount of the Term Loans pursuant to any PIK Election). The aggregate amount of the Term Loans outstanding on the Closing Date without giving effect to the payment of the closing payment set forth in Section 2.12(a) is $300,000,000.

"Term SOFR" means:

(a)      for any calculation with respect to a Term SOFR Loan, the Term SOFR Reference Rate for a tenor comparable to the applicable Interest Period on the day (such day, the "Periodic Term SOFR Determination Day") that is two (2) U.S. Government Securities Business Days prior to the first day of such Interest Period, as such rate is published by the Term SOFR Administrator; provided, however, that if as of 5:00 p.m. (New York City time) on any Periodic Term SOFR Determination Day the Term SOFR Reference Rate for the applicable tenor has not been published by the Term SOFR Administrator and a Benchmark Replacement Date with respect to the Term SOFR Reference Rate has not occurred, then Term SOFR will be the Term SOFR Reference Rate for such tenor as published by the Term SOFR Administrator on the first preceding U.S. Government Securities Business Day for which such Term SOFR Reference Rate for such tenor was published by the Term SOFR Administrator so long as such first preceding U.S. Government Securities Business Day is not more than three (3) U.S. Government Securities Business Days prior to such Periodic Term SOFR Determination Day, and

(b)      for any calculation with respect to an ABR Loan on any day, the Term SOFR Reference Rate for a tenor of one month on the day (such day, the "ABR Term SOFR Determination Day") that is two (2) U.S. Government Securities Business Days prior to such day, as such rate is published by the Term SOFR Administrator; provided, however, that if as of 5:00 p.m. (New York City time) on any ABR Term SOFR Determination Day the Term SOFR Reference Rate for the applicable tenor has not been published by the Term SOFR Administrator and a Benchmark Replacement Date with respect to the Term SOFR Reference Rate has not occurred, then Term SOFR will be the Term SOFR Reference Rate for such tenor as published by the Term SOFR Administrator on the first preceding U.S. Government Securities Business Day for which such Term SOFR Reference Rate for such tenor was published by the Term SOFR Administrator so long as such first preceding U.S. Government Securities Business Day is not more than three (3) U.S. Government Securities Business Days prior to such ABR Term SOFR Determination Day.

"Term SOFR Adjustment" means, for any calculation with respect to an ABR Loan or a Term SOFR Loan, a percentage per annum as set forth below for the applicable Type of such Loan and (if applicable) Interest Period therefor:

ABR Loans:

| 0.11448% |
| --- |

Term SOFR Loans:

| Interest Period | Percentage |
| --- | --- |
| One month | 0.11448% |
| Three months | 0.26161% |
| Six months | 0.42826% |

"Term SOFR Administrator" means CME Group Benchmark Administration Limited (CBA) (or a successor administrator of the Term SOFR Reference Rate selected by the Administrative Agent in its reasonable discretion).

"Term SOFR Borrowing" means a Borrowing comprised of Term SOFR Loans.

"Term SOFR Loan" means any Term SOFR Term Loan.

"Term SOFR Reference Rate" means the forward-looking term rate based on SOFR.

"Term SOFR Term Loan" means any Term Loan bearing interest at a rate determined by reference to Adjusted Term SOFR in accordance with the provisions of Article II other than pursuant to clause (c) of the definition of "Alternate Base Rate".

"Termination Date" has the meaning assigned to such term in the first paragraph of Article V.

"<u>Third Party Funds</u>" means any segregated accounts or funds, or any portion thereof, received by any Loan Party or any of its Subsidiaries as agent on behalf of third parties (other than a Loan Party) in accordance with a written agreement that imposes a duty upon such Loan Party or one or more of its Subsidiaries to collect and remit those funds to such third parties.

"<u>Transaction Documents</u>" means this Agreement and the other Loan Documents.

"<u>Transaction Expenses</u>" means any fees or expenses incurred or paid by any Borrower or any of its Subsidiaries or any of their Affiliates in connection with the Transactions, this Agreement and the other Loan Documents and the transactions contemplated hereby and thereby.

"<u>Transactions</u>" means, collectively, the transactions to occur pursuant to the Transaction Documents, including (a) the Chapter 11 Cases; (b) the execution, delivery and performance of the Transaction Documents, the creation of the Liens pursuant to the Security Documents, and the borrowings hereunder, (c) the consummation of the Closing Date Refinancing and (d) the payment of the Transaction Expenses.

"<u>Trust Property</u>" means (a) the security, powers, rights, titles, benefits and interests (both present and future) constituted by and conferred on the Collateral Agent under or pursuant to the Mortgages on the Material Vessels and the Additional Collateral Vessels (including the benefits of all covenants, undertakings, representations, warranties and obligations given, made or undertaken to the Collateral Agent in such Mortgages (and, where applicable, any deed of covenants collateral thereto)), (b) all moneys, property and other assets paid or transferred to or vested in the Collateral Agent, or any agent of the Collateral Agent whether from any Loan Party or any other Person, and (c) all money, investments, property and other assets at any time representing or deriving from any of the foregoing, including all interest, income and other sums at any time received or receivable by the Collateral Agent or any agent of the Collateral Agent in respect of the same (or any part thereof) and all proceeds of the foregoing.

"<u>Type</u>" when used in reference to any Term Loan or Borrowing, refers to whether the rate of interest on such Term Loan, or on the Term Loans comprising such Borrowing, is determined by reference to the Term SOFR or the Alternate Base Rate.

"<u>UK Collateral Documents</u>" means any Security Document entered into governed by the law of England & Wales.

"<u>UK Financial Institution</u>" means any BRRD Undertaking (as such term is defined under the PRA Rulebook (as amended from time to time) promulgated by the United Kingdom Prudential Regulation Authority) or any person subject to IFPRU 11.6 of the FCA Handbook (as amended from time to time) promulgated by the United Kingdom Financial Conduct Authority, which includes certain credit institutions and investment firms, and certain affiliates of such credit institutions or investment firms.

"<u>UK Loan Parties</u>" means each Subsidiary Loan Party organized under the laws of England and Wales.

"<u>UK Resolution Authority</u>" means the Bank of England or any other public administrative authority having responsibility for the resolution of any UK Financial Institution.

"<u>Unadjusted Benchmark Replacement</u>" means the applicable Benchmark Replacement excluding the related Benchmark Replacement Adjustment.

"<u>Unencumbered Property</u>" has the meaning assigned to such term in the Bankruptcy Court DIP Order.

"<u>United States Tax Compliance Certificate</u>" has the meaning assigned to such term in Section 2.17(e).

"<u>Unrestricted Cash</u>" means cash or cash equivalents of any Borrower or any of their respective Subsidiaries that would not appear as "restricted" on a consolidated balance sheet of any Borrower or any of their respective Subsidiaries.

"U.S. Government Securities Business Day" means any day except for (a) a Saturday, (b) a Sunday or (c) a day on which the Securities Industry and Financial Markets Association recommends that the fixed income departments of its members be closed for the entire day for purposes of trading in United States government securities.

"U.S. Special Resolution Regime" has the meaning assigned to such term in Section 9.20.

"USA PATRIOT Act" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, as amended from time to time.

"Variance Report" has the meaning assigned to such term in Section 5.01(k).

"Vessels" means, collectively, the vessels owned by any Loan Party, together with, in each case, all owned improvements and appurtenant fixtures and equipment, incidental to the ownership or operation thereof.

"Wholly Owned Subsidiary" means, with respect to any Person at any date, a subsidiary of such Person, all of the Equity Interests of which (other than directors' qualifying shares or nominee or other similar shares required pursuant to applicable law) are owned by such Person or another Wholly Owned Subsidiary of such person.  Unless the context otherwise requires, "Wholly Owned Subsidiary" means a Subsidiary of any Borrower that is a Wholly Owned Subsidiary of such Borrower.

"Withdrawal Liability" means liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in Part I of Subtitle E of Title IV of ERISA.

"Working Capital" means, with respect to the Borrowers and their Subsidiaries on a consolidated basis at any date of determination, Current Assets at such date of determination minus Current Liabilities at such date of determination; provided that, for purposes of calculating Excess Cash Flow, increases or decreases in Working Capital shall be calculated without regard to any changes in Current Assets or Current Liabilities as a result of (a) any reclassification in accordance with GAAP of assets or liabilities, as applicable, between current and noncurrent or (b) the effects of acquisition method accounting.

"Write-Down and Conversion Powers" means, (a) with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule., and (b) with respect to the United Kingdom, any powers of the applicable Resolution Authority under the Bail-In Legislation to cancel, reduce, modify or change the form of a liability of any UK Financial Institution or any contract or instrument under which that liability arises, to convert all or part of that liability into shares, securities or obligations of that person or any other person, to provide that any such contract or instrument is to have effect as if a right had been exercised under it or to suspend any obligation in respect of that liability or any of the powers under that Bail-In Legislation that are related to or ancillary to any of those powers.

Section 1.02    Classification of Loans and Borrowings.  For purposes of this Agreement, Term Loans may be classified and referred to by Type (e.g., a "Term SOFR Loan").

Section 1.03    Terms Generally.  The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation."  The word "will" shall be construed to have the same meaning and effect as the word "shall."   Unless the context requires otherwise, (a) any definition of or reference to any agreement (including this Agreement and the other Loan Documents), instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, amended and restated, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein), (b) any reference herein to any Person shall be construed to include such Person's successors and assigns (subject to any restrictions on assignment set forth herein) and, in the case of any Governmental Authority, any other Governmental Authority that shall have succeeded to any or all functions thereof, (c) any reference herein to a Loan Party shall mean such Person as debtor and debtor-in-possession, (d) the words "herein," "hereof" and

45

"hereunder," and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (e) all references herein to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, this Agreement and (f) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.  Unless otherwise expressly provided herein, any reference herein to any person shall be construed to include such person's successors and permitted assigns.

Section 1.04    Accounting Terms; GAAP.  Except as otherwise expressly provided herein, all terms of an accounting or financial nature shall be construed in accordance with GAAP, as in effect from time to time; provided, however, that if the Borrowers notify the Administrative Agent that the Borrowers request an amendment to any provision (including any definitions) hereof to eliminate the effect of any change occurring after the Closing Date in GAAP or in the application thereof on the operation of such provision (or if the Administrative Agent notifies the Borrowers that the Required Lenders request an amendment to any provision hereof for such purpose), regardless of whether any such notice is given before or after such change in GAAP or in the application thereof, then such provision shall be interpreted on the basis of GAAP as in effect and applied immediately before such change shall have become effective until such notice shall have been withdrawn or such provision amended in accordance herewith. Notwithstanding any other provision contained herein, all terms of an accounting or financial nature used herein shall be construed, and all computations of amounts and ratios referred to herein shall be made, without giving effect to any election under Financial Accounting Standards Accounting Standards Codification No. 825—Financial Instruments, or any successor thereto (including pursuant to the Accounting Standards Codification), to value any Indebtedness of any Parent, any Borrower or any Subsidiary at "fair value" as defined therein.

Section 1.05    Effectuation of Transactions.  All references herein to any Parent, any Borrower and the other Subsidiaries shall be deemed to be references to such Persons, and all the representations and warranties of the Parents, the Borrowers and the other Loan Parties contained in this Agreement and the other Loan Documents shall be deemed made, in each case, after giving effect to the Transactions to occur on the Closing Date, unless the context otherwise requires.

Section 1.06    Exchange Rates; Currency Equivalents.  Except for purposes of financial statements delivered hereunder or except as otherwise provided herein, the applicable amount of any currency (other than Dollars) for purposes of the Loan Documents shall be such Dollar Equivalent amount as determined by the Administrative Agent in accordance with this Agreement.  No Default or Event of Default shall arise as a result of any limitation or threshold set forth in Dollars in Article VI or clause (f), (g) or (j) of Section 7.01 being exceeded solely as a result of changes in currency exchange rates from those rates applicable on the first day of the fiscal quarter in which such determination occurs or in respect of which such determination is being made.

Section 1.07    [Reserved].

Section 1.08    [Reserved].

Section 1.09    Timing of Payment or Performance.  Except as otherwise expressly provided herein, when the payment of any obligation or the performance of any covenant, duty or obligation is stated to be due or performance required on a day which is not a Business Day, the date of such payment or performance shall extend to the immediately succeeding Business Day.

Section 1.10    Times of Day.  Unless otherwise specified herein, all references herein to times of day shall be references to New York City time (daylight or standard, as applicable).

Section 1.11    Divisions.  For all purposes under the Loan Documents, in connection with any division or plan of division under Delaware law (or any comparable event under a different jurisdiction's laws): (a) if any asset, right, obligation or liability of any Person becomes the asset, right, obligation or liability of a different Person, then it shall be deemed to have been transferred from the original Person to the subsequent Person, and (b) if any new Person comes into existence, such new Person shall be deemed to have been organized on the first date of its existence by the holders of its Equity Interests at such time.

46

## ARTICLE II
## THE CREDITS

Section 2.01    Term Loan Commitments.  Subject to the terms and conditions set forth herein and in the Bankruptcy Court DIP Orders, each Lender severally agrees to make new term loans to the Borrowers denominated in Dollars on the applicable borrowing date in an amount equal to such Lender's Term Loan Commitment.  The Term Loan Commitments shall be funded by each Lender upon the Bankruptcy Court's entry of the Interim DIP Order in an aggregate principal amount equal to such Lender's Term Loan Commitment.  The Term Loan Commitments in respect of the Term Loans shall terminate automatically immediately after the making of the Term Loans.  Amounts borrowed under this Section 2.01 and repaid or prepaid may not be reborrowed.  Proceeds of the Term Loans shall be deposited in the DIP Funding Account (other than a portion of which may be directly funded to one or more operating accounts of the Borrowers with the consent of the Required Lenders) and used solely as expressly permitted herein.  All Term Loans and all other Obligations owing hereunder with respect to the Term Loans shall be paid in full not later than the Maturity Date.

Section 2.02    Loans and Borrowings.

(a)    Each Loan shall be made as part of a Borrowing consisting of Term Loans of the same Type and in the same currency made by the Lenders ratably in accordance with their respective Term Loan Commitments.  The failure of any Lender to make any Term Loan required to be made by it shall not relieve any other Lender of its obligations hereunder, provided that the Term Loan Commitments of the Lenders are several and no Lender shall be responsible for any other Lender's failure to make Term Loans as required hereby.

(b)    Subject to Section 2.14, each Borrowing shall be comprised entirely of ABR Loans or Term SOFR Loans as the Borrowers may request in accordance herewith.  Each Lender at its option may make any ABR Loan or Term SOFR Loan by causing any domestic or foreign branch or Affiliate of such Lender to make such Loan; provided that any exercise of such option shall not affect the obligation of the Borrowers to repay such Loan in accordance with the terms of this Agreement and such Lender shall not be entitled to any amounts payable under Section 2.15 or 2.17 solely in respect of increased costs resulting from such exercise and existing at the time of such exercise.

(c)    Borrowings of more than one Type may be outstanding at the same time; provided that there shall not at any time be more than a total of seven (7) Term SOFR Borrowings outstanding hereunder.

(d)    Notwithstanding any other provision of this Agreement, the Borrowers shall not be entitled to request, or to elect to convert or continue, any Borrowing if the Interest Period requested with respect thereto would end after the Term Facility Maturity Date.

Section 2.03    Requests for Borrowings.  The Borrowing shall be made upon the Borrowers' irrevocable notice to the Administrative Agent in the form of a written Borrowing Request, not later than (a) in the case of a Term SOFR Borrowing of Term Loans, 11:00 a.m., Local Time three (3) Business Days before the date of the proposed Borrowing or (b) in the case of an ABR Borrowing of Term Loans, not later than 10:00 a.m. Local Time one (1) Business Day prior to the date of the proposed Borrowing (unless in the case of a Borrowing to be made on the Closing Date, the Administrative Agent agrees to a shorter notice period).  Each such Borrowing Request shall be irrevocable. Each Borrowing Request shall specify the following information:

(i)    the aggregate amount of such Borrowing;

(ii)    the date of such Borrowing, which shall be a Business Day;

(iii)    whether such Borrowing is to be an ABR Borrowing or a Term SOFR Borrowing;

(iv)    in the case of a Term SOFR Borrowing, the initial Interest Period to be applicable thereto, which shall be a period contemplated by the definition of the term "Interest Period";

(v)      the location and number of the Borrowers' (or Borrower's) account to which funds are to be disbursed, which accounts shall be the DIP Funding Account (other than a portion of which may be directly funded to one or more operating accounts of the Borrowers with the consent of the Required Lenders); and

(vi)     that as of the date of such Borrowing, the conditions set forth in Section 4.01 are satisfied.

If no election as to the Type of Borrowing is specified as to any Borrowing, then the requested Borrowing shall be an ABR Borrowing.

If no Interest Period is specified with respect to any requested Term SOFR Borrowing, then the Interest Period shall be deemed to be a period of one month. Promptly following receipt of a Borrowing Request in accordance with this Section 2.03, the Administrative Agent shall advise each Lender of the details thereof and of the amount of such Lender's Loan to be made as part of the requested Borrowing.

Section 2.04      [Reserved].

Section 2.05      [Reserved].

Section 2.06      Funding of Borrowings.

(a)      Each Lender shall make each Term Loan to be made by it hereunder on the proposed date thereof by wire transfer of immediately available funds by 1:00 p.m. Local Time, to the Applicable Account of the Administrative Agent most recently designated by it for such purpose by notice to the Lenders.  Upon receipt of all requested funds, the Administrative Agent will make such Term Loans available to the Borrowers by promptly wire transferring the amounts so received, in like funds to an account of the Borrowers (or Borrower) designated by the Borrowers in the applicable Borrowing Request.

(b)      Unless the Administrative Agent shall have received notice from a Lender prior to the proposed date of any Borrowing that such Lender will not make available to the Administrative Agent such Lender's share of such Borrowing, the Administrative Agent may assume that such Lender has made such share available on such date in accordance with paragraph (a) of this Section and may, in reliance on such assumption and in its sole discretion, make available to the Borrowers (or Borrower) a corresponding amount.  In such event, if a Lender has not in fact made its share of the applicable Borrowing available to the Administrative Agent, then the applicable Lender agrees to pay to the Administrative Agent an amount equal to such share on demand of the Administrative Agent.  If such Lender does not pay such corresponding amount forthwith upon demand of the Administrative Agent therefor, the Administrative Agent shall promptly notify the Borrowers, and the Borrowers agree to pay such corresponding amount to the Administrative Agent forthwith on demand.  The Administrative Agent shall also be entitled to recover from such Lender or the Borrowers interest on such corresponding amount, for each day from and including the date such amount is made available to the Borrowers to but excluding the date of payment to the Administrative Agent, at (i) in the case of such Lender, the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation, or (ii) in the case of the Borrowers, the interest rate applicable to such Borrowing in accordance with Section 2.13.  If such Lender pays such amount to the Administrative Agent, then such amount shall constitute such Lender's Term Loan included in such Borrowing.

(c)      The obligations of the applicable Lenders hereunder to make the Term Loans and to make payments pursuant to Section 8.06 are several and not joint.  The failure of any Lender to make any Term Loan or to make any payment under Section 8.06 on any date required hereunder shall not relieve any other Lender of its corresponding obligation to do so on such date, and no Lender shall be responsible for the failure of any other Lender to so make its Term Loan or to make its payment under Section 8.06.

Section 2.07      Interest Elections.

(a)      Each Borrowing initially shall be of the Type specified in the applicable Borrowing Request or designated by Section 2.03 and, in the case of a Term SOFR Borrowing, shall have an initial Interest Period as specified in such Borrowing Request or designated by Section 2.03.  Thereafter, the Borrowers may elect to convert

such Borrowing to a different Type or to continue such Borrowing and, in the case of a Term SOFR Borrowing, may elect Interest Periods therefor, all as provided in this Section.  The Borrowers may elect different options with respect to different portions of the affected Borrowing, in which case each such portion shall be allocated ratably among the Lenders holding the Term Loans comprising such Borrowing, and the Term Loans comprising each such portion shall be considered a separate Borrowing.

(b)    To make an election pursuant to this Section, the Borrowers shall notify the Administrative Agent of such election in writing by the time that a Borrowing Request would be required under Section 2.03 if the Borrowers were requesting a Borrowing of the Type resulting from such election to be made on the effective date of such election. Each such written Interest Election Request shall be irrevocable and shall be confirmed promptly by hand delivery or electronic means to the Administrative Agent of a written Interest Election Request in the form of Exhibit J and signed by the Borrowers.

(c)    Each Interest Election Request shall be in writing and shall specify the following information in compliance with Section 2.03:

(i)    the Borrowing to which such Interest Election Request applies and, if different options are being elected with respect to different portions thereof, the portions thereof to be allocated to each resulting Borrowing (in which case the information to be specified pursuant to clauses (iii) and (iv) below shall be specified for each resulting Borrowing);

(ii)    the effective date of the election made pursuant to such Interest Election Request, which shall be a Business Day;

(iii)    whether the resulting Borrowing is to be an ABR Borrowing or a Term SOFR Borrowing; and

(iv)    if the resulting Borrowing is to be a Term SOFR Borrowing, the Interest Period to be applicable thereto after giving effect to such election, which shall be a period contemplated by the definition of the term "Interest Period."

If any such Interest Election Request requests a Term SOFR Borrowing but does not specify an Interest Period, then the Borrowers shall be deemed to have selected an Interest Period of one month's duration.

(d)    If the Borrowers fail to deliver a timely Interest Election Request with respect to a Term SOFR Borrowing prior to the end of the Interest Period applicable thereto, then, unless such Borrowing is repaid as provided herein, at the end of such Interest Period such Borrowing shall be converted to an ABR Borrowing.  Notwithstanding any contrary provision hereof, if an Event of Default has occurred and is continuing then, unless the Administrative Agent, at the request of the Required Lenders, notifies the Borrowers that it agrees to waive this sentence, then, so long as an Event of Default is continuing (i) no outstanding Borrowing denominated in Dollars may be converted to or continued as a Term SOFR Borrowing and (ii) unless repaid, each Term SOFR Borrowing shall be converted to an ABR Borrowing at the end of the applicable Interest Period.

(e)    Notwithstanding anything to the contrary herein, but subject to any adjustment in interest rate contemplated by the definition of "Applicable Margin", Interest shall be payable in cash; *provided* that an amount equal to the sum of (1) the then current Applicable Margin *minus* (2)(x) for any Term SOFR Loan, 3.50% and (y) for any ABR Loan, 3.00% (the "Maximum PIK Amount") shall be payable in kind on such Interest Payment Date by capitalizing the amount thereof and adding such amount to the outstanding principal amount of such Term Loan on and as of such date (which amount shall automatically constitute a part of the outstanding amount of such Term Loan for all purposes hereof (including the accrual of interest thereon at the rates applicable to such Term Loan generally), unless, at the option of the Borrowers in their sole discretion and by written notice delivered to the Administrative Agent at least five (5) Business Days prior to such Interest Payment Date, the Borrowers elect to pay all or a portion of such applicable Maximum PIK Amount in cash, in which case, such interest or such portion thereof (as so elected by the Borrowers) shall be paid in cash (the payment by the Borrowers of any portion of the Maximum PIK Amount in kind, instead of in cash, in accordance with this Section 2.13(e), a "PIK Election").

Section 2.08     Termination of Term Loan Commitments.  On the Closing Date (after giving effect to the funding of the Term Loans to be made on such date), the Term Loan Commitments of each Lender as of the Closing Date shall automatically and irrevocably terminate.  For the avoidance of doubt, the Borrowers shall not have a right to terminate the Term Loan Commitments prior to the Closing Date.

Section 2.09     Repayment of Term Loans; Evidence of Debt.

(a)     The Borrowers hereby unconditionally promise to pay to the Administrative Agent for the account of each Lender the then unpaid principal amount of each Term Loan of such Lender as provided in Section 2.10.

(b)     Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing the indebtedness of the Borrowers to such Lender resulting from each Loan made by such Lender, including the amounts of principal (including, for the avoidance of doubt, the amount of interest that has been added to the outstanding principal of the Term Loans pursuant to any PIK Election) and interest payable and paid to such Lender from time to time hereunder.

(c)     The Administrative Agent shall maintain accounts in which it shall record (i) the amount of each Loan made hereunder and Type thereof and the Interest Period applicable thereto, (ii) the amount of any principal (including, for the avoidance of doubt, the amount of interest that has been added to the outstanding principal of the Term Loans pursuant to any PIK Election) or interest due and payable or to become due and payable from the Borrowers to each Lender hereunder and (iii) the amount of any sum received by the Administrative Agent hereunder for the account of the Lenders and each Lender's share thereof.

(d)     The entries made in the accounts maintained pursuant to paragraph (b) or (c) of this Section shall be conclusive absent manifest error, provided that the failure of any Lender or the Administrative Agent to maintain such accounts or any error therein shall not in any manner affect the obligation of the Borrowers to pay any amounts due hereunder in accordance with the terms of this Agreement.  In the event of any inconsistency between the entries made pursuant to paragraphs (b) and (c) of this Section, the accounts maintained by the Administrative Agent pursuant to paragraph (c) of this Section shall control.

(e)     The Term Loans made by each Lender shall, at the request of such Lender, be evidenced by a single promissory note (a "Note") of the Borrowers in substantially the form of Exhibit K, dated as of (i) the Closing Date or (ii) the effective date of an assignment pursuant to Section 9.04(b), payable to the order of such Lender and otherwise duly completed.  The date, amount, Type, interest rate and Interest Period of each Loan made by each Lender, and all payments made on account of the principal thereof, shall be recorded by such Lender on its books for its Notes, and, prior to any transfer may be endorsed by such Lender on the schedule attached to such Notes or any continuation thereof or on any separate record maintained by such Lender.  Failure to make any such notation or to attach a schedule shall not affect any Lender's or the Borrowers' rights or obligations in respect of such Term Loans or affect the validity of such transfer by any Lender of its Note.

Section 2.10     Repayment of Term Loans.

(a)     To the extent not previously paid, all Term Loans shall be due and payable on the Maturity Date.

(b)     Prior to any optional repayment of any Borrowings, the Borrowers shall notify the Administrative Agent in writing by delivering a Prepayment Notice of such election not later than 2:00 p.m., New York City time (a) in the case of a Term SOFR Borrowing, three (3) Business Days before the scheduled date of such repayment and (b) in the case of an ABR Borrowing, one (1) Business Day before the scheduled date of such repayment (or, in each case, such shorter period acceptable to the Administrative Agent); provided that a notice of prepayment may state that such notice is conditioned upon the effectiveness of other credit facilities, indentures or similar agreements or other transactions, in which case such notice may be revoked by the Borrowers (by notice to the Administrative Agent on or prior to the specified effective date) if such condition is not satisfied.  In the absence of a designation by the Borrowers as described in the preceding sentence, the Administrative Agent shall make such designation in its reasonable discretion with a view, but no obligation, to minimize breakage costs owing under Section 2.16.  Each

repayment of a Borrowing shall be applied ratably to the Term Loans included in the repaid Borrowing. Repayments of Borrowings shall be accompanied by accrued interest on the amount repaid.

Section 2.11    Prepayment of Term Loans.

(a)    The Borrowers shall have the right at any time and from time to time (i) to prepay any Borrowing in whole or in part, without premium (but subject to the Exit Premium and any Extension Fee) or penalty (but subject to Section 2.16), in an aggregate principal amount that is an integral multiple of $500,000 and not less than $1,000,000 or, if less, the amount outstanding, in accordance with clauses (d), (e) and (f) of this Section 2.11 and (ii) upon the satisfaction (or waiver by all Lenders) of each of the Exit Conversion Conditions, to elect to convert all Term Loans outstanding under this Agreement into Exit Term Loans in accordance with clause (g) of this Section 2.11 (any such conversion, an "Exit Conversion").

(b)    Subject to the related priorities set forth in the Bankruptcy Court DIP Order and the Canadian DIP Recognition Order, the Borrowers shall apply all Net Proceeds promptly upon receipt thereof to prepay Term Loans (together with the Exit Premium and any Extension Fee payable thereon) in accordance with clauses (d), (e) and (f) of this Section 2.11.

(c)    Following the end of each fiscal year of the Borrowers, commencing with the fiscal year ending in December of 2023, subject to the related priorities set forth in the Bankruptcy Court DIP Order and the Canadian DIP Recognition Order,  the Borrowers shall, within 10 Business Days after financial statements have been delivered, or were required to be delivered, pursuant to 5.01(a) for the relevant fiscal year, prepay Term Borrowings (together with the Exit Premium and any Extension Fee) in an aggregate amount equal to (i) the ECF Percentage of such Excess Cash Flow for such fiscal year, minus (ii) to the extent not financed using the proceeds of the incurrence of long-term Indebtedness the amount of any voluntary payments during such Excess Cash Flow Period of Term Loans.

(d)    Prior to any prepayment of Term Loans, the Borrowers shall select the Borrowing or Borrowings to be prepaid and shall specify such selection in the Prepayment Notice pursuant to paragraph (e) of this Section.  Any Lender, by notice to the Administrative Agent in writing at least three (3) Business Days prior to the prepayment date, may decide to decline all or any portion of any prepayment of its Term Loans pursuant to this Section (other than an optional prepayment pursuant to paragraph (a) of this Section, which may not be declined), in which case the aggregate amount of the prepayment that would have been applied to prepay Term Loans but was so declined shall be retained by the Borrowers ("Declined Proceeds").  In connection with any mandatory prepayments by the Borrowers of the Term Loans pursuant to Section 2.11(b) or Section 2.11(c) such prepayments shall be applied on a pro rata basis to the then outstanding Term Loans being prepaid in direct order of maturity irrespective of whether such outstanding Term Loans are ABR Loans or Term SOFR Loans.

(e)    The Borrowers shall notify the Administrative Agent in writing by delivering a Prepayment Notice of any prepayment hereunder not later than 11:00 a.m., Local Time, five (5) Business Days before the date of prepayment.  Each such notice shall be irrevocable and shall specify the prepayment date and the principal amount of each Borrowing or portion thereof to be prepaid and, in the case of a mandatory prepayment, a reasonably detailed calculation of the amount of such prepayment; provided that a notice of optional prepayment may state that such notice is conditional upon the effectiveness of other credit facilities or the receipt of the proceeds from the issuance of other Indebtedness or the occurrence of some other identifiable event or condition, in which case such notice of prepayment may be revoked by the Borrowers (by written notice to the Administrative Agent on or prior to the specified date of prepayment) if such condition is not satisfied.  Promptly following receipt of any such written notice, the Administrative Agent shall advise the Lenders of the contents thereof.  Each partial prepayment of any Borrowing shall be in an amount that would be permitted in the case of an advance of a Borrowing of the same Type as provided in Section 2.02, except as necessary to apply fully the required amount of a mandatory prepayment.  Each prepayment of a Borrowing shall be applied ratably to the Term Loans included in the prepaid Borrowing.

(f)    All prepayments hereunder shall be accompanied by (1) accrued interest to the extent required by Section 2.13, (2) any amounts payable as provided in Section 2.16 and (3) any premium payable under Section 2.12(e).

(g)    The Borrowers shall notify the Administrative Agent in writing not later than 11:00 a.m., Local Time, five (5) Business Days before the Conversion Date (or such later date as may be agreed by the Administrative

Agent and the Required Lenders). Each such notice shall be irrevocable and shall specify the proposed Conversion Date. Immediately upon the conversion of the Term Loans into Exit Facilities Term Loans on the Conversion Date, all Term Loans shall be deemed to be repaid in full (but subject to the payment in full in cash of all accrued interest and fees payable hereunder, the Exit Premium and any Extension Fee) and all other Obligations shall have been deemed satisfied in full, except for indemnities and other obligations which by the express terms of the relevant Loan Documents survive the repayment of the Term Loans.

Section 2.12      Fees.

(a)      The Borrowers hereby agree to pay to the Administrative Agent and the Collateral Agent, for its own account, fees payable in the amounts and at the times separately agreed upon between the Borrowers and the Administrative Agent and the Collateral Agent in the Agent Fee Letter.

(b)      The Borrowers hereby jointly and severally agree to pay to the Lenders, for their own account, fees payable in the amounts and at the times separately agreed upon between the Borrowers and the Lenders in the Lender Fee Letter.

(c)      [Reserved].

(d)      [Reserved].

(e)      As consideration for the Lenders providing the Term Loans, the Borrowers hereby agree (I) to pay to the Administrative Agent, for the ratable account of each Lender, an extension fee (the "Extension Fee") in cash in an amount equal to 1.00% the aggregate principal amount of the Term Loans outstanding on the date that is eight (8) months after the Closing Date (the "Extension Date"), which Extension Fee shall be earned on the Extension Date and due and payable upon the earliest of (x) termination, acceleration, conversion and/or repayment or prepayment (whether pursuant to voluntary or mandatory prepayments provisions hereunder) of the Term Loans, including on the Maturity Date and (y) upon a proceeding under any Debtor Relief Laws with respect to any Loan Party (other than the Chapter 11 Cases), in each case, to the extent such event occurs on or after the Extension Date, and (II) to pay to the Administrative Agent, for the ratable account of each Lender, an exit premium in cash in an amount equal to 1.50% of the sum of the principal amount of Term Loans repaid or refinanced (including, for the avoidance of doubt, by way of (i) receipt of stock, other securities, other property or assets (including cash or any combination thereof) or (ii) conversion pursuant to Section 2.11(a)) on such date (the "Exit Premium") upon the earliest of (x) termination, acceleration, conversion and/or repayment or prepayment (whether pursuant to voluntary or mandatory prepayments provisions hereunder) of the Term Loans, including on the Maturity Date and (y) upon a proceeding under any Debtor Relief Laws with respect to any Loan Party (other than the Chapter 11 Cases). The Exit Premium shall be fully earned on the Closing Date. If the Term Loans are accelerated or otherwise become due prior to their maturity, in each case, as a result of an Event of Default (including the acceleration of claims by operation of law), the amount of principal of and premium on the Term Loans that becomes due and payable shall equal 100% of the principal amount of the Term Loans plus the Exit Premium and (if applicable) the Extension Fee, as if such acceleration or other occurrence were a voluntary prepayment of the Term Loans accelerated or otherwise becoming due. Without limiting the generality of the foregoing, it is understood and agreed that if the Term Loans are accelerated or otherwise become due prior to their maturity, in each case, in respect of any Event of Default (including the acceleration of claims by operation of law), the Exit Premium and (if applicable) the Extension Fee applicable with respect to a voluntary prepayment of the Term Loans will also be due and payable on the date of such acceleration or such other prior due date as though the Term Loans were voluntarily prepaid as of such date and shall constitute part of the Obligations, in view of the impracticability and extreme difficulty of ascertaining actual damages and by mutual agreement of the parties as to a reasonable calculation of each Lender's loss as a result thereof. Any premium payable above shall be presumed to be the liquidated damages sustained by each Lender and the Borrowers agree that it is reasonable under the circumstances currently existing. THE BORROWERS EXPRESSLY WAIVE (TO THE FULLEST EXTENT THEY MAY LAWFULLY DO SO) THE PROVISIONS OF ANY PRESENT OR FUTURE STATUTE OR LAW THAT PROHIBITS OR MAY PROHIBIT THE COLLECTION OF THE EXIT PREMIUM OR THE EXTENSION FEE IN CONNECTION WITH ANY SUCH ACCELERATION. The Borrowers expressly agree (to the fullest extent they may lawfully do so) that: (A) the Exit Premium and the Extension Fee are reasonable and is the product of an arm's length transaction between sophisticated business people, ably represented by counsel; (B) the Exit Premium and the Extension Fee shall be payable notwithstanding the then prevailing market rates at the time payment is made;

(C) there has been a course of conduct between the Lenders and the Borrowers giving specific consideration in this transaction for such agreement to pay the Exit Premium and the Extension Fee; and (D) the Borrowers shall be estopped hereafter from claiming differently than as agreed to in this paragraph.

(f)     All fees shall be paid on the dates due, in immediately available funds, to the Administrative Agent for distribution, if and as appropriate, among the Lenders.  Once paid, such fees shall not be refundable under any circumstances.

Section 2.13     Interest.

(a)     The Term Loans comprising each ABR Borrowing shall bear interest at the Alternate Base Rate plus the Applicable Margin.

(b)     The Term Loans comprising each Term SOFR Borrowing shall bear interest at Adjusted Term SOFR for the Interest Period in effect for such Borrowing plus the Applicable Margin.

(c)     Upon the occurrence and during the continuance of an Event of Default, the principal amount of all Term Loans outstanding and, to the extent permitted by applicable law, any interest payments on the Term Loans or any fees or other amounts owed hereunder, shall thereafter, after as well as before judgment, bear interest (including post-petition interest in any proceeding under Debtor Relief Laws) payable in cash on demand at a rate that is 2.0% *per annum* in excess of the interest rate otherwise payable hereunder with respect to the applicable Loans (or, in the case of any such fees and other amounts, at a rate which is 2.00% *per annum* in excess of the interest rate otherwise payable hereunder for ABR Loans); provided that in the case of Term SOFR Loans, upon the expiration of the Interest Period in effect at the time any such increase in interest rate is effective such Term SOFR Loans shall thereupon become ABR Loans and shall thereafter bear interest payable upon demand at a rate which is 2.0% *per annum* in excess of the interest rate otherwise payable hereunder for ABR Loans.  Payment or acceptance of the increased rates of interest provided for in this Section 2.13(c) is not a permitted alternative to timely payment and shall not constitute a waiver of any Event of Default or otherwise prejudice or limit any rights or remedies of the Administrative Agent or any Lender.

(d)     Accrued interest on each Loan shall be payable in arrears (i) on each Interest Payment Date for such Loan and (ii) on the Maturity Date; provided that (A) interest accrued pursuant to paragraph (c) of this Section shall be payable on demand, (B) in the event of any repayment or prepayment of any Loan, accrued interest on the principal amount repaid or prepaid shall be payable on the date of such repayment or prepayment and (C) in the event of any conversion of any Term SOFR Loan prior to the end of the current Interest Period therefor, accrued interest on such Loan shall be payable on the effective date of such conversion.

(e)     All interest hereunder shall be computed on the basis of a year of 360 days, except that interest computed by reference to clause (a) of the definition of "Alternate Base Rate" shall be computed on the basis of a year of 365 days (or 366 days in a leap year), and in each case shall be payable for the actual number of days elapsed (including the first day but excluding the last day).

(f)     [Reserved].

(g)     For the purposes of the *Interest Act* (Canada) and disclosure thereunder, whenever any interest or any fee to be paid hereunder or in connection herewith is to be calculated on the basis of a 360-day or 365-day year, the yearly rate of interest to which the rate used in such calculation is equivalent is the rate so used multiplied by the actual number of days in the calendar year in which the same is to be ascertained and divided by 360 or 365, as applicable.  The rates of interest under this Agreement are nominal rates, and not effective rates or yields.  The principle of deemed reinvestment of interest does not apply to any interest calculation under this Agreement.

(h)     Each Canadian Loan Party acknowledges and confirms that:

(i)     clause (g) above satisfies the requirements of Section 4 of the *Interest Act* (Canada) to the extent it applies to the expression or statement of any interest payable under any Loan Document; and

(ii)    such Canadian Loan Party is able to calculate the yearly rate or percentage of interest payable under any Loan Document based upon the methodology set out in clause (g) above.

(i)    Any provision of this Agreement that would oblige a Canadian Loan Party to pay any fine, penalty or rate of interest on any arrears of principal or interest secured by a mortgage on real property or hypothec on immovables that has the effect of increasing the charge on arrears beyond the rate of interest payable on principal money not in arrears shall not apply to such Canadian Loan Party, which shall be required to pay interest on money in arrears at the same rate of interest payable on principal money not in arrears.

(j)    If any provision of this Agreement would oblige a Canadian Loan Party to make any payment of interest or other amount payable to any Secured Party in an amount or calculated at a rate which would be prohibited by law or would result in a receipt by that Secured Party of "interest" at a "criminal rate" (as such terms are construed under the *Criminal Code* (Canada)), then, notwithstanding such provision, such amount or rate shall be deemed to have been adjusted with retroactive effect to the maximum amount or rate of interest, as the case may be, as would not be so prohibited by applicable law or so result in a receipt by that Secured Party of "interest" at a "criminal rate", such adjustment to be effected, to the extent necessary (but only to the extent necessary), as follows:

(i)    first, by reducing the amount or rate of interest; and

(ii)    thereafter, by reducing any fees, commissions, costs, expenses, premiums and other amounts required to be paid which would constitute interest for the purposes of Section 347 of the *Criminal Code* (Canada).

Section 2.14    Alternate Rate of Interest.  Subject to Section 2.23, if at least two Business Days prior to the commencement of any Interest Period for a Term SOFR Borrowing:

(a)    the Administrative Agent determines (which determination shall be conclusive absent manifest error) that adequate and reasonable means do not exist for ascertaining Adjusted Term SOFR for such Interest Period; or

(b)    the Administrative Agent is advised by the Required Lenders that Adjusted Term SOFR for such Interest Period will not adequately and fairly reflect the cost to such Lenders of making or maintaining their Term Loans included in such Borrowing for such Interest Period,

the Administrative Agent shall give notice thereof to the Borrowers and the Lenders in writing as promptly as practicable thereafter and, until the Administrative Agent notifies the Borrowers and the Lenders that the circumstances giving rise to such notice no longer exist, (i) any Interest Election Request that requests the conversion of any Borrowing to, or continuation of any Borrowing as, a Term SOFR Borrowing denominated in Dollars shall be ineffective and such Borrowing shall be converted to or continued as on the last day of the Interest Period applicable thereto an ABR Borrowing (determined without reference to the Adjusted Term SOFR component of the Alternate Base Rate), and (ii) if any Borrowing Request requests a Term SOFR Borrowing, then such Borrowing shall be made as an ABR Borrowing (determined without reference to the Adjusted Term SOFR component of the Alternate Base Rate); provided, however, that, in each case, the Borrowers may revoke any Borrowing Request that is pending when such notice is received.

Section 2.15    Increased Costs.

(a)    If any Change in Law shall:

(i)    impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended by, any Lender (except any such reserve requirements reflected in Adjusted Term SOFR);

(ii)    subject any Lender to any Tax of any kind whatsoever (except for Indemnified Taxes indemnifiable under Section 2.17 or Excluded Taxes); or

(iii)     impose on any Lender or the interbank market any other condition, cost or expense affecting this Agreement or Term SOFR Loans or ABR Loans made by such Lender;

and the result of any of the foregoing shall be to increase the cost to such Lender of making or maintaining any Term SOFR Loan or ABR Loan (or of maintaining its obligation to make any such Loan) or to increase the cost to such Lender or to reduce the amount of any sum received or receivable by such Lender hereunder (whether of principal, interest or otherwise), then, from time to time upon request of such Lender, the Borrowers will pay to such Lender such additional amount or amounts as will compensate such Lender for such increased costs actually incurred or reduction actually suffered.

(b)     If any Lender determines that any Change in Law regarding capital requirements or liquidity has or would have the effect of reducing the rate of return on such Lender's capital or on the capital of such Lender's holding company, if any, as a consequence of this Agreement or the Term Loans made by such Lender to a level below that which such Lender or such Lender's holding company could have achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of such Lender's holding company with respect to capital adequacy and liquidity), then, from time to time upon request of such Lender, the Borrowers will pay to such Lender such additional amount or amounts as will compensate such Lender or such Lender's holding company for any such reduction actually suffered.

(c)     Promptly after any Lender has determined that it will make a request for increased compensation pursuant to this Section 2.15, such Lender shall notify the Borrowers thereof. A certificate of a Lender setting forth the amount or amounts necessary to compensate such Lender or its holding company, as applicable, in reasonable detail, as the case may be, as specified in paragraph (a) or (b) of this Section delivered to the Borrowers shall be conclusive absent manifest error; provided that any such certificate claiming amounts described in clause (a), (b) or (c) of the definition of "Change in Law" shall, in addition, state the basis upon which such amount has been calculated and certify that such Lender's demand for payment of such costs hereunder, and such method of allocation, is not inconsistent with its treatment of other borrowers which, as a credit matter, are similarly situated to the Borrowers (or any Borrower) and which are subject to similar provisions.  The Borrowers shall pay such Lender the amount shown as due on any such certificate within 15 days after receipt thereof.

(d)     Failure or delay on the part of any Lender to demand compensation pursuant to this Section shall not constitute a waiver of such Lender's right to demand such compensation, provided that the Borrowers shall not be required to compensate a Lender pursuant to this Section 2.15 for any increased costs incurred or reductions suffered more than 180 days prior to the date that such Lender notifies the Borrowers of the Change in Law giving rise to such increased costs or reductions and of such Lender's intention to claim compensation therefor; provided further that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the 180-day period referred to above shall be extended to include the period of retroactive effect thereof.

(e)     Notwithstanding any other provision of this Section, no Lender shall demand compensation for any increased cost or reduction pursuant to this Section if it shall not at the time be the general policy or practice of such Lender to demand such compensation in similar circumstances under comparable provisions of other credit agreements.

Section 2.16     Break Funding Payments.  In the event of (a) the payment of any principal of any Term SOFR Loan other than on the last day of an Interest Period applicable thereto (including as a result of an Event of Default), (b) the conversion of any Term SOFR Loan other than on the last day of the Interest Period applicable thereto, (c) the failure to borrow, convert, continue or prepay any Term SOFR Loan on the date specified in any notice delivered pursuant hereto (regardless of whether such notice may be revoked under Section 2.11(i) and is revoked in accordance therewith) or (d) the assignment of any Term SOFR Loan other than on the last day of the Interest Period applicable thereto as a result of a request by the Borrowers pursuant to Section 2.19 or Section 9.02(c), then, in any such event, the Borrowers shall, after receipt of a written request by any Lender affected by any such event (which request shall set forth in reasonable detail the basis for requesting such amount), compensate each Lender for the loss, cost and expense attributable to such event.  For purposes of calculating amounts payable by the Borrowers to the Lenders under this Section 2.16, each Lender shall be deemed to have funded each Term SOFR Loan made by it at Adjusted Term SOFR for such Loan by a matching deposit or other borrowing for a comparable amount and for a comparable period, whether or not such Term SOFR Loan was in fact so funded.  A certificate of any Lender setting

forth any amount or amounts that such Lender is entitled to receive pursuant to this Section delivered to the Borrowers shall be conclusive absent manifest error.  The Borrowers shall pay such Lender the amount shown as due on any such certificate within 15 days after receipt of such demand.  Notwithstanding the foregoing, this Section 2.16 will not apply to losses, costs or expenses resulting from Taxes, as to which Section 2.17 shall govern.

Section 2.17    Taxes.

(a)    Any and all payments by or on account of any obligation of any Loan Party hereunder or under any other Loan Document shall be made free and clear of and without deduction or withholding on account of any Taxes, provided that if any Loan Party, the Administrative Agent or any other applicable withholding agent shall be required by applicable Requirements of Law (as determined in the good faith discretion of the applicable withholding agent) to deduct or withhold Taxes from such payments, then (i) if the Tax in question is an Indemnified Tax, the amount payable by the applicable Loan Party shall be increased as necessary so that after all required deductions or withholding for such Taxes have been made (including such deductions or withholding applicable to additional amounts payable under this Section 2.17) each Lender (or in a case where the Administrative Agent receives a payment for its own account, the Administrative Agent) receives an amount equal to the sum it would have received had no such deductions or withholding been made, (ii) the applicable Loan Party, the Administrative Agent or other applicable withholding agent shall make such deductions or withholding and (iii) the applicable withholding agent shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable Requirements of Law.

(b)    Without limiting the provisions of paragraph (a) above, the Borrowers shall timely pay any Other Taxes to the relevant Governmental Authority in accordance with Requirements of Law, or at the option of the Administrative Agent timely reimburse it for the payment of, any Other Taxes.

(c)    The Loan Parties shall, jointly and severally, indemnify the Administrative Agent and each Lender, within 10 days after demand therefor, for any Indemnified Taxes payable by the Administrative Agent or such Lender, as the case may be (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section 2.17) and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to the Borrowers by a Lender, or by the Administrative Agent on its own behalf or on behalf of a Lender, shall be conclusive absent manifest error.

(d)    As soon as practicable after any payment of Indemnified Taxes by a Loan Party to a Governmental Authority, but no later than 30 days thereafter, the Borrowers shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(e)    Any Lender that is entitled to an exemption from or reduction of withholding Tax with respect to any payments made under any Loan Document shall deliver to the Borrowers and the Administrative Agent, at the time or times reasonably requested by the Borrowers or the Administrative Agent, such properly completed and executed documentation reasonably requested by the Borrowers or the Administrative Agent as will permit such payments to be made without withholding or at a reduced rate of withholding.  In addition, any Lender, if reasonably requested by the Borrowers or the Administrative Agent, shall deliver such other documentation prescribed by Requirements of Law or reasonably requested by the Borrowers or the Administrative Agent as will enable the Borrowers or the Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements.  Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in paragraphs (e)(i), (ii), (ii)(1), (ii)(2), (ii)(3), (ii)(4), and (iii) of this Section) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

Without limiting the generality of the foregoing:

(i)    Each Domestic Lender shall deliver to the Borrowers and the Administrative Agent on or before the date on which it becomes a party to this Agreement (and from time to time thereafter upon the

reasonable request of the Borrowers or the Administrative Agent) two properly completed and duly signed copies of Internal Revenue Service Form W-9 (or any successor form) certifying that such Lender is exempt from U.S. federal backup withholding.

(ii)     Each Lender that is a Foreign Lender shall deliver to the Borrowers and the Administrative Agent on or before the date on which it becomes a party to this Agreement (and from time to time thereafter upon the reasonable request of any Borrower or the Administrative Agent) whichever of the following is applicable:

(1)     two properly completed and duly signed copies of Internal Revenue Service Form W-8BEN-E or W-8BEN (or any successor forms) claiming eligibility for benefits of an income tax treaty to which the United States of America is a party and such other documentation as required under the Code,

(2)     two properly completed and duly signed copies of Internal Revenue Service Form W-8ECI (or any successor forms),

(3)     in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 871(h) or Section 881(c) of the Code, (x) two properly completed and duly signed certificates, substantially in the form of Exhibit H (any such certificate a "United States Tax Compliance Certificate"), and (y) two properly completed and duly signed copies of Internal Revenue Service Form W-8BEN-E or W-8BEN (or any successor forms),

(4)     to the extent a Foreign Lender is not the beneficial owner (for example, where the Lender is a partnership or a participating Lender), two properly completed and duly signed copies of Internal Revenue Service Forms W-8IMY (or any successor forms) of the Foreign Lender, each accompanied by a withholding statement and a properly completed and duly signed Form W-8ECI, W-8BEN-E or W-8BEN, United States Tax Compliance Certificate, Form W-9, Form W-8IMY (or other successor forms) or any other required information from each beneficial owner that would be required under this Section 2.17 if such beneficial owner were a Lender, as applicable (provided that, if the Lender is a partnership (and not a participating Lender) and one or more direct or indirect partners are claiming the portfolio interest exemption, the United States Tax Compliance Certificate may be provided by such Lender on behalf of such direct or indirect partner(s)), or

(5)     any other form prescribed by applicable Requirements of Law as a basis for claiming an exemption from or a reduction in U.S. federal withholding tax duly completed together with such supplementary documentation as may be prescribed by applicable Requirements of Law to permit the Borrowers and the Administrative Agent to determine the withholding or deduction required to be made.

(iii)     If a payment made to any Lender or the Administrative Agent under any Loan Document would be subject to U.S. federal withholding tax imposed by FATCA if such Lender or the Administrative Agent were to fail to comply with the applicable reporting requirements of those Sections (including those contained in Section 1471(b) or 1472(b), as applicable) of the Code, such Lender or the Administrative Agent shall deliver to the Borrowers and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by any Borrower or the Administrative Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by any Borrower or the Administrative Agent as may be necessary for the Borrowers and the Administrative Agent to comply with their obligations under FATCA, to determine whether such Lender or the Administrative Agent has or has not complied with such Lender's or the Administrative Agent's FATCA obligations and, if necessary, to determine the amount to deduct and withhold from such payment.  Solely for purposes of this Section 2.17(e)(iii), "FATCA" shall include any amendments made to FATCA after the Closing Date.

Each Lender agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify the Borrowers and the Administrative Agent in writing of its legal inability to do so.

In addition, the Administrative Agent shall deliver to the Borrowers, (x)(i) prior to the date on which the first payment by the Borrowers is due hereunder or (ii) prior to the first date on or after the date on which the Administrative Agent becomes a successor Administrative Agent pursuant to Section 8.07 on which payment by the Borrowers is due hereunder, properly completed and executed documentation prescribed by applicable law certifying its entitlement to an available exemption from or reduction in applicable U.S. federal withholding Tax in respect of any payments to be made to the Administrative Agent (in its capacity as the Administrative Agent and for its own account) by any Loan Party pursuant to any Loan Document, and (y) on or before the date on which any such previously delivered documentation expires or becomes obsolete or invalid, after the occurrence of any event requiring a change in the most recent documentation previously delivered by it to the Borrowers, and from time to time if reasonably requested by any Borrower, further copies of such documentation.  Notwithstanding any other provision of this Section 2.17(e), the Administrative Agent shall not be required to deliver any documentation pursuant to this Section 2.17(e) that it is not legally eligible to deliver or any such documentation that, in the Administrative Agent's reasonable judgment, would subject the Administrative Agent to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of the Administrative Agent.  Each Lender hereby authorizes the Administrative Agent to deliver to the Loan Parties and to any successor Administrative Agent any documentation provided by such Lender to the Administrative Agent pursuant to Section 2.17(e).

(f)        If any party determines, in its sole discretion exercised in good faith, that it has received a refund of any Taxes as to which it has been indemnified pursuant to this Section 2.17 (including by the payment of additional amounts pursuant to this Section), it shall pay to the indemnifying party an amount equal to such refund (but only to the extent of indemnity payments made under this Section 2.17 with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of such indemnified party and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund).  Such indemnifying party, upon the request of such indemnified party, shall repay to such indemnified party the amount paid over pursuant to this Section 2.17(f) (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) in the event that such indemnified party is required to repay such refund to such Governmental Authority.  Notwithstanding anything to the contrary in this Section 2.17(f), in no event will the indemnified party be required to pay any amount to an indemnifying party pursuant to this Section 2.17(f) the payment of which would place the indemnified party in a less favorable net after-Tax position than the indemnified party would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid.  This Section 2.17(f) shall not be construed to require any indemnified party to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to the indemnifying party or any other Person.

(g)        Each Lender shall severally indemnify the Administrative Agent, within 10 days after demand therefor, for (i) any Indemnified Taxes on or with respect to any payment under any Loan Document that is attributable to such Lender (but only to the extent that no Loan Party has already indemnified the Administrative Agent for such Indemnified Taxes and without limiting the obligation of the Loan Parties to do so), (ii) any Taxes attributable to such Lender's failure to comply with the provisions of Section 9.04(d)(ii) relating to the maintenance of a Participant Register and (iii) any Excluded Taxes attributable to such Lender that are payable or paid by the Administrative Agent in connection with any Loan Document and any reasonable expenses and, in each case, arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error.  Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under any Loan Document or otherwise payable by the Administrative Agent to such Lender under any Loan Document or otherwise payable by the Administrative Agent to any Lender from any other source against any amount due to the Administrative Agent under this Section 2.17(g).

For purposes of this Section 2.17, (x) the terms "applicable law" and "applicable Requirement of Law" include FATCA and (y) the term "Loan Party" includes JB TopCo.

Section 2.18        Payments Generally; Pro Rata Treatment; Sharing of Setoffs.

(a)        The Borrowers shall make each payment required to be made by it under any Loan Document (whether of principal, interest or fees, or of amounts payable under Section 2.15, 2.16 or 2.17, or otherwise) prior to the time expressly required hereunder or under such other Loan Document for such payment (or, if no such time is

expressly required, prior to 1:00 p.m., Local Time), on the date when due, in immediately available funds, without condition or deduction for any counterclaim, recoupment or setoff.  Any amounts received after such time on any date may, in the discretion of the Administrative Agent, be deemed to have been received on the next succeeding Business Day for purposes of calculating interest thereon.  All such payments shall be made to the Applicable Account as may be specified by the Administrative Agent, except that payments pursuant to Sections 2.15, 2.16 or 2.17 and 9.03 shall be made directly to the Persons entitled thereto and payments pursuant to other Loan Documents shall be made to the Persons specified therein.  The Administrative Agent shall distribute any such payments received by it for the account of any other Person to the appropriate recipient promptly following receipt thereof.  Except as otherwise provided herein, if any payment under any Loan Document shall be due on a day that is not a Business Day, the date for payment shall be extended to the next succeeding Business Day.  If any payment on a Term SOFR Loan becomes due and payable on a day other than a Business Day, the maturity thereof shall be extended to the next succeeding Business Day unless the result of such extension would be to extend such payment into another calendar month, in which event such payment shall be made on the immediately preceding Business Day.  In the case of any payment of principal pursuant to the preceding two sentences, interest thereon shall be payable at the then applicable rate for the period of such extension.  All payments or prepayments of any Loan shall be made in Dollars, all payments of accrued interest payable on a Term Loan shall be made in Dollars, and all other payments under each Loan Document shall be made in Dollars.

(b)	If at any time insufficient funds are received by and available to the Administrative Agent or the Collateral Agent from any Loan Party (or proceeds from any Collateral) (x) following an acceleration of the Obligations under this Agreement, (y) any Event of Default under Section 7.01(h) or (i) or (z) otherwise, to pay fully all amounts of principal, interest and fees and other Obligations then due from the Borrowers hereunder, such funds shall be applied: (i) first, ratably, to pay any fees, indemnities or expense reimbursements then due to the Administrative Agent, the Collateral Agent from the Borrowers, (ii) second, towards payment of interest, fees and premium then due from the Borrowers in respect of any Term Loans hereunder and any interest accrued thereon, ratably among the parties entitled thereto in accordance with such amounts then due to such parties, (iii) third, to payment in full of Term Loans then due from the Borrowers hereunder, ratably among the parties entitled thereto in accordance with the amounts of principal then due to such parties, (iv) fourth, towards payment of other Obligations then due from the Borrowers, ratably among the parties entitled thereto in accordance with the amounts of such Obligations then due to such parties and (v) last, the balance, if any, after all of the Obligations have been paid in full, to the Borrowers or as otherwise required by Requirements of Law.

(c)	If any Lender shall, by exercising any right of setoff or counterclaim or otherwise, obtain payment in respect of any principal of or interest on any of its Term Loans resulting in such Lender receiving payment of a greater proportion of the aggregate amount of its Term Loans and accrued interest thereon than the proportion received by any other Lender entitled to receive the same proportion of such payment, then the Lender receiving such greater proportion shall purchase (for cash at face value) participations in the Term Loans of such other Lenders to the extent necessary so that the benefit of all such payments shall be shared by the Lenders ratably in accordance with principal amount of each such Lender's respective Term Loans and accrued interest thereon vis-à-vis the aggregate principal amount of all such Lenders' Term Loans and the aggregate accrued interest thereon; provided that (i) if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest and (ii) the provisions of this paragraph shall not be construed to apply to (A) any payment made by the Borrowers pursuant to and in accordance with the express terms of this Agreement as in effect on the Closing Date, (B) any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Term Loans to any assignee or participant or (C) any disproportionate payment obtained by a Lender as a result of the extension by Lenders of the maturity date or expiration date of some but not all Term Loans or any increase in the Applicable Margin in respect of Term Loans of Lenders that have consented to any such extension.  The Borrowers consent to the foregoing and agrees, to the extent they may effectively do so under applicable law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against the Borrowers (or any Borrower) rights of setoff and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of the Borrowers (or any Borrower) in the amount of such participation.

(d)	Unless the Administrative Agent shall have received written notice from the Borrowers prior to the date on which any payment is due to the Administrative Agent for the account of the Lenders hereunder that the Borrowers will not make such payment, the Administrative Agent may assume that the Borrowers have made such

payment on such date in accordance herewith and may, in reliance upon such assumption and in its sole discretion, distribute to the Lenders the amount due. In such event, if the Borrowers have not in fact made such payment, then each of the Lenders severally agrees to repay to the Administrative Agent forthwith on demand the amount so distributed to such Lender with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Administrative Agent, at the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation.

(e)     If any Lender shall fail to make any payment required to be made by it pursuant to Section 2.05(d) or (e), 2.06 or 2.17(d), then the Administrative Agent may, in its discretion (notwithstanding any contrary provision hereof), apply any amounts thereafter received by the Administrative Agent for the account of such Lender to satisfy such Lender's obligations under such Sections until all such unsatisfied obligations are fully paid.

Section 2.19     Mitigation Obligations; Replacement of Lenders.

(a)     If any Lender requests compensation under Section 2.15, or if the Borrowers are required to pay any amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 2.17 or any event gives rise to the operation of Section 2.22, then such Lender shall use reasonable efforts to designate a different lending office for funding or booking its Term Loans hereunder affected by such event, or to assign and delegate its rights and obligations hereunder to another of its offices, branches or Affiliates, if, in the judgment of such Lender, such designation or assignment and delegation (i) would eliminate or reduce amounts payable pursuant to Section 2.15 or 2.17 or mitigate the applicability of Section 2.22, as the case may be, and (ii) would not subject such Lender to any unreimbursed cost or expense reasonably deemed by such Lender to be material and would not be inconsistent with the internal policies of, or otherwise be disadvantageous in any material economic, legal or regulatory respect to, such Lender.

(b)     If (i) any Lender requests compensation under Section 2.15 or gives notice under Section 2.22 or (ii) the Borrowers are required to pay any amount to any Lender or to any Governmental Authority for the account of any Lender pursuant to Section 2.17, then the Borrowers may, at their sole expense and effort, upon notice to such Lender and the Administrative Agent, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in Section 9.04), all its interests, rights and obligations under this Agreement and the other Loan Documents to an assignee that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment and delegation); provided that (A) the Borrowers shall have received the prior written consent of the Administrative Agent to the extent such consent would be required under Section 9.04(b) for an assignment of Term Loans or Term Loan Commitments, as applicable, which consents, in each case, shall not unreasonably be withheld or delayed, (B) such Lender shall have received payment of an amount equal to the outstanding principal of its Term Loans, accrued but unpaid interest thereon, accrued but unpaid fees and all other amounts payable to it hereunder from the assignee (to the extent of such outstanding principal and accrued interest and fees, including pursuant to Section 2.12(d)) or the Borrowers (in the case of all other amounts), (C) the Borrowers or such assignee shall have paid (unless waived) to the Administrative Agent the processing and recordation fee specified in Section 9.04(b)(ii) and (D) in the case of any such assignment resulting from a claim for compensation under Section 2.15, or payments required to be made pursuant to Section 2.17 or a notice given under Section 2.22, such assignment will result in a material reduction in such compensation or payments. A Lender shall not be required to make any such assignment and delegation if, prior thereto, as a result of a waiver by such Lender or otherwise (including as a result of any action taken by such Lender under paragraph (a) above), the circumstances entitling the Borrowers to require such assignment and delegation cease to apply. Each party hereto agrees that an assignment required pursuant to this paragraph may be effected pursuant to an Assignment and Assumption executed by the Borrowers, the Administrative Agent and the assignee and that the Lender required to make such assignment need not be a party thereto.

Section 2.20     [Reserved].

Section 2.21     [Reserved].

Section 2.22     Illegality. If any Lender determines that any law has made it unlawful, or that any Governmental Authority has asserted that it is unlawful, for any Lender to make, maintain or fund Term Loans whose

interest is determined by reference to Adjusted Term SOFR, or to determine or charge interest rates based upon Adjusted Term SOFR, then, on notice thereof by such Lender to the Borrowers through the Administrative Agent, any obligation of such Lender to make or continue Term SOFR Loans or to convert ABR Loans denominated in dollars to Term SOFR Loans shall be suspended until such Lender notifies the Administrative Agent and the Borrowers that the circumstances giving rise to such determination no longer exist.  Upon receipt of such notice, (x) the Borrowers shall, upon three Business Days' notice from such Lender (with a copy to the Administrative Agent), prepay or, if applicable, convert all Term SOFR Loans of such Lender to ABR Loans either on the last day of the Interest Period therefor, if such Lender may lawfully continue to maintain such Term SOFR Loans to such day, or immediately, if such Lender may not lawfully continue to maintain such Term SOFR Loans, and (y) if such notice asserts the illegality of such Lender determining or charging interest rates based upon Adjusted Term SOFR, the Administrative Agent shall during the period of such suspension compute the Alternate Base Rate applicable to such Lender without reference to Adjusted Term SOFR component thereof until the Administrative Agent is advised in writing by such Lender that it is no longer illegal for such Lender to determine or charge interest rates based upon Adjusted Term SOFR.  Each Lender agrees to notify the Administrative Agent and the Borrowers in writing promptly upon becoming aware that it is no longer illegal for such Lender to determine or charge interest rates based upon Adjusted Term SOFR.  Upon any such prepayment or conversion, the Borrowers shall also pay accrued interest on the amount so prepaid or converted.

Section 2.23    Benchmark Replacement Setting.

(a)    Benchmark Replacement.  Notwithstanding anything to the contrary herein or in any other Loan Document, if a Benchmark Transition Event and its related Benchmark Replacement Date have occurred prior to any setting of the then-current Benchmark, then (x) if a Benchmark Replacement is determined in accordance with clause (a) of the definition of "Benchmark Replacement" for such Benchmark Replacement Date, such Benchmark Replacement will replace such Benchmark for all purposes hereunder and under any Loan Document in respect of such Benchmark setting and subsequent Benchmark settings without any amendment to, or further action or consent of any other party to, this Agreement or any other Loan Document and (y) if a Benchmark Replacement is determined in accordance with clause (b) of the definition of "Benchmark Replacement" for such Benchmark Replacement Date, such Benchmark Replacement will replace such Benchmark for all purposes hereunder and under any Loan Document in respect of any Benchmark setting on the date agreed by the Administrative Agent and the Required Lenders.  If the Benchmark Replacement is Daily Simple SOFR, all interest payments will be payable on a monthly basis.

(b)    Benchmark Replacement Conforming Changes.  In connection with either the use or administration of Term SOFR or the use, administration, adoption or implementation of any Benchmark Replacement, the Administrative Agent will have the right to make Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Loan Document, any amendments implementing such Conforming Changes will become effective without any further action or consent of any other party to this Agreement or any other Loan Document.

(c)    Notices; Standards for Decisions and Determinations.  The Administrative Agent will promptly notify the Borrowers and the Lenders of (i) the implementation of any Benchmark Replacement and (ii) the effectiveness of any Conforming Changes in connection with the use, administration, adoption or implementation of a Benchmark Replacement.  The Administrative Agent will notify the Borrowers of (x) the removal or reinstatement of any tenor of a Benchmark pursuant to Section 2.23(d) and (y) the commencement of any Benchmark Unavailability Period.  Any determination, decision or election that may be made by the Administrative Agent or, if applicable, any Lender (or group of Lenders) pursuant to this Section 2.23, including any determination with respect to a tenor, rate or adjustment or of the occurrence or non-occurrence of an event, circumstance or date and any decision to take or refrain from taking any action or any selection, will be conclusive and binding absent manifest error and may be made in its or their sole discretion and without consent from any other party to this Agreement or any other Loan Document, except, in each case, as expressly required pursuant to this Section 2.23.

(d)    Unavailability of Tenor of Benchmark.  Notwithstanding anything to the contrary herein or in any other Loan Document, at any time (including in connection with the implementation of a Benchmark Replacement), (i) if the then-current Benchmark is a term rate (including Term SOFR Reference Rate) and either (A) any tenor for such Benchmark is not displayed on a screen or other information service that publishes such rate from time to time as selected by the Administrative Agent in its reasonable discretion or (B) the regulatory supervisor for the

administrator of such Benchmark has provided a public statement or publication of information announcing that any tenor for such Benchmark is not or will not be representative, then the Administrative Agent may modify the definition of "Interest Period" (or any similar or analogous definition) for any Benchmark settings at or after such time to remove such unavailable or non-representative tenor and (ii) if a tenor that was removed pursuant to clause (i) above either (A) is subsequently displayed on a screen or information service for a Benchmark (including a Benchmark Replacement) or (B) is not, or is no longer, subject to an announcement that it is not or will not be representative for a Benchmark (including a Benchmark Replacement), then the Administrative Agent may modify the definition of "Interest Period" (or any similar or analogous definition) for all Benchmark settings at or after such time to reinstate such previously removed tenor.

(e)      Benchmark Unavailability Period.  Upon the Borrowers' receipt of notice of the commencement of a Benchmark Unavailability Period, (i) the Borrowers may revoke any pending request for a Term SOFR Borrowing of, conversion to or continuation of Term SOFR Loans to be made, converted or continued during any Benchmark Unavailability Period and, failing that, the Borrowers will be deemed to have converted any such request into a request for a Borrowing of or conversion to ABR Loans and (ii) any outstanding affected Term SOFR Loans will be deemed to have been converted to ABR Loans at the end of the applicable Interest Period.  During a Benchmark Unavailability Period or at any time that a tenor for the then-current Benchmark is not an Available Tenor, the component of the Alternate Base Rate based upon the then-current Benchmark or such tenor for such Benchmark, as applicable, will not be used in any determination of the Alternate Base Rate.

Section 2.24      Joint and Several Liability of Borrowers.  Each Borrower is jointly and severally liable under this Agreement for all of the Obligations, regardless of the manner or amount in which proceeds of any Loans are used, allocated, shared or disbursed by or among the Borrowers themselves, or the manner in which the Administrative Agent and/or any other Secured Party accounts for such Term Loans or such other Obligations on its books and records. Each Borrower shall be liable for all amounts due to any Agent and/or any Lender from any Borrower under this Agreement, regardless of which Borrower actually receives Term Loans hereunder or the amount of such Term Loans received or the manner in which the Administrative Agent and/or such Lender accounts for such Term Loans on its books and records. Each Borrower's Obligations with respect to Term Loans made to it hereunder, and such Borrower's Obligations arising as a result of the joint and several liability of such Borrower hereunder with respect to Term Loans made to the other Borrowers hereunder shall be separate and distinct obligations, but all such Obligations shall be primary obligations of such Borrower. The Borrowers acknowledge and expressly agree with each Agent and each Lender that the joint and several liability of each Borrower is required solely as a condition to, and is given solely as inducement for and in consideration of, credit or accommodations extended or to be extended under the Loan Documents to any or all of the other Borrowers and is not required or given as a condition of credit extensions to such Borrower. Each Borrower's Obligations under this Agreement shall, to the fullest extent permitted by law, be unconditional irrespective of (i) the release of any other Borrower pursuant to the terms of this Agreement or the validity or enforceability, avoidance, or subordination of the Obligations of any other Borrower under this Agreement or of any promissory note or other document evidencing all or any part of the Obligations of any other Borrower under this Agreement, (ii) the absence of any attempt to collect the Obligations under this Agreement from any other Borrower, or any other security therefor, or the absence of any other action to enforce the same, (iii) the waiver, consent, extension, forbearance, or granting of any indulgence by the Administrative Agent, the Collateral Agent and/or any Lender with respect to any provision of any instrument evidencing the Obligations of any other Borrower under this Agreement, or any part thereof, or any other agreement now or hereafter executed by any other Borrower and delivered to the Administrative Agent, the Collateral Agent and/or any Lender, (iv) the failure by the Administrative Agent, the Collateral Agent and/or any Lender to take any steps to perfect and maintain its security interest in, or to preserve its rights to, any security or collateral for the Obligations of any other Borrower under this Agreement or (v) any other circumstances which might constitute a legal or equitable discharge or defense of a guarantor or of any other Borrower. With respect to any Borrower's Obligations arising as a result of the joint and several liability of the Borrowers hereunder with respect to Term Loans made to any of the other Borrowers hereunder, such Borrower waives, until such Obligations shall have been indefeasibly paid in full in cash and this Agreement shall have been terminated, any right to enforce any right of subrogation or any remedy which the Administrative Agent, the Collateral Agent and/or any Lender now has or may hereafter have against any other Borrower, any endorser or any guarantor of all or any part of such Obligations, and any benefit of, and any right to participate in, any security or collateral given to the Administrative Agent, the Collateral Agent and/or any Lender to secure payment of such Obligations or any other liability of any Borrower to the Administrative Agent, the Collateral Agent and/or any Lender. Upon an Event of Default which has occurred and is continuing, the Administrative Agent and/or the

Collateral Agent may proceed directly and at once, without notice, against any Borrower to collect and recover the full amount, or any portion of such Obligations, without first proceeding against any other Borrower or any other Person, or against any security or collateral for such Obligations. Each Borrower consents and agrees that neither the Administrative Agent nor the Collateral Agent shall be under any obligation to marshal any assets in favor of any Borrower or against or in payment of any or all of such Obligations.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES

Each Loan Party represents and warrants to the Lenders and the Agents that:

Section 3.01    Organization; Powers.  Each of the Loan Parties and its Subsidiaries (a) is duly organized, validly existing and in good standing (to the extent such concept exists in the relevant jurisdictions) under the laws of the jurisdiction of its organization, incorporation, amalgamation or continuance (b) subject to the entry and terms of the Bankruptcy Court DIP Order and the Canadian DIP Recognition Order and other orders of the Bankruptcy Court and Canadian Court, as applicable, has the corporate or other organizational power and authority to carry on its business as now conducted and as proposed to be conducted and to execute, deliver and perform its obligations under each Loan Document to which it is a party and to effect the Transactions and (c) except where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect, is qualified to do business in, and is in good standing in, every jurisdiction where such qualification is required, including jurisdictions where its ownership, lease or operation of properties requires such qualification.

Section 3.02    Authorization; Enforceability.  Subject to the entry of and terms of the Bankruptcy Court DIP Order and the Canadian DIP Recognition Order and the other orders of the Bankruptcy Court and the Canadian Court, as applicable, the Transactions to be entered into by each Loan Party have been duly authorized by all necessary corporate or other action and, if required, action by the holders of such Loan Party's Equity Interests.  Subject to the entry of and terms of the Bankruptcy Court DIP Order and the Canadian DIP Recognition Order and the other orders of the Bankruptcy Court and the Canadian Court, as applicable, this Agreement has been duly executed and delivered by each of the Parents and the Borrowers and constitutes, and each other Loan Document to which any Loan Party is to be a party, when executed and delivered by such Loan Party, will constitute, a legal, valid and binding obligation of such Loan Party, as the case may be, enforceable against it in accordance with its terms, subject to (i) the effects of applicable bankruptcy, insolvency, arrangement, reorganization, fraudulent conveyance, moratorium or other similar laws affecting creditors' rights generally, (ii) and subject to general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law), (iii) implied covenants of good faith and fair dealing, (iv) any foreign laws, rules and regulations as they relate to pledges of Equity Interests in Foreign Subsidiaries that are not Loan Parties.

Section 3.03    Governmental Approvals; No Conflicts.  Other than the Bankruptcy Court DIP Order and the Canadian DIP Recognition Order, the Transactions (a) do not require any consent or approval of, registration or filing with, or any other action by, any Governmental Authority, except such as have been obtained or made and are in full force and effect and except filings necessary to perfect Liens created under the Loan Documents, (b) will not violate (i) the Organizational Documents of, or (ii) any Requirements of Law applicable to, any of the Loan Parties or any of its Subsidiaries, unless stayed by the Chapter 11 Cases or the Canadian Recognition Proceedings, as applicable, (c) will not violate (other than violations arising as a result of the commencement of the Chapter 11 Cases or the Canadian Recognition Proceedings and except as otherwise excused by the Bankruptcy Court or the Canadian Court, as applicable) or result in a default under any indenture or other agreement or instrument in respect of Material Indebtedness binding upon any of the Loan Parties or any of its Subsidiary or their respective assets, or give rise to a right thereunder to require any payment, repurchase or redemption to be made by any of the Loan Parties or any of its Subsidiaries, or give rise to a right of (other than rights arising as a result of the commencement of the Chapter 11 Cases or the Canadian Recognition Proceedings and except as otherwise excused by the Bankruptcy Court or Canadian Court, as applicable), or result in, termination, cancellation or acceleration of any obligation thereunder and (d) will not result in the creation or imposition of any Lien on any asset of any of the Loan Parties or any of its Subsidiaries, except Liens created under the Loan Documents, except (in the case of each of clauses (a), (b)(ii) and (c) above) to the extent that the failure to obtain or make such consent, approval, registration, filing or action, or such violation, as the case may be, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

Section 3.04         Financial Condition; No Material Adverse Effect.

(a)        The unaudited balance sheets and related statements of income, stockholders' equity and cash flows as of and for the fiscal quarter ended September 30, 2023 for each of the Parents and their subsidiaries and (b) (i) the audited consolidated balance sheets for the fiscal years ended December 31, 2021 and December 31, 2022 and (ii) statements of income, stockholders' equity, and cash flow as of and for the fiscal years ended December 31, 2021 and December 31, 2022 for each of the Parents and their subsidiaries, including in each case the notes thereto, if applicable, present fairly in all material respects the consolidated financial condition of each of the Parents and their subsidiaries as of the dates and for the periods referred to therein and the results of operations and, if applicable, cash flows for the periods then ended, and, except as set forth on Schedule 3.04, were prepared in accordance with GAAP applied on a consistent basis throughout the periods covered thereby, except, in the case of interim period financial statements, for the absence of notes and for normal year-end adjustments and except as otherwise noted therein.

(b)        Since the Petition Date, there has been no event or circumstance, either individually or in the aggregate, that has had or would reasonably be expected to have a Material Adverse Effect.

Section 3.05         Properties.

(a)        Subject to the entry of the Bankruptcy Court DIP Orders, each of the Borrowers and the Subsidiary Loan Parties has good title to all the Mortgaged Properties, (i) free and clear of all Liens except for Permitted Liens or Liens arising by operation of Law and (ii) except for defects in title that do not materially interfere with its ability to conduct its business as currently conducted or as proposed to be conducted or to utilize such properties for their intended purposes.

(b)        No Mortgage encumbers Mortgaged Property that has improvements located in a Special Flood Hazard Area unless flood insurance available under the National Flood Insurance Act of 1968 (as now or hereafter in effect or any successor statute thereto) has been obtained in accordance with Section 5.06.

(c)        The name, official number, jurisdiction of registration and flag, and record owner (whether or not such record owner is a Loan Party) of each Material Vessel and Additional Collateral Vessel as of the date hereof is set forth on Schedule 1.01(F), and each such Material Vessel and Additional Collateral Vessel is owned by the record owner set forth on Schedule 1.01(F) free and clear of all Liens except for Permitted Vessel Liens.

(d)        Each Vessel is operated in material compliance with all applicable Requirements of Law

(e)        As of the date hereof, there is no pending or threatened condemnation, confiscation, requisition, purchase, seizure or forfeiture of, or any taking of title to any Vessel.

(f)        The record owner of each Material Vessel and Additional Collateral Vessel set forth on Schedule 1.01(F) that is operated in the coastwise trade of the United States is a Citizen of the United States is subject to a valid certificate of documentation in full force and effect and endorsed for coastwide trade of the United States and any operator thereof is such a Citizen to the extent required by law.

(g)        Each Material Vessel and Additional Collateral Vessel set forth on Schedule 1.01(F) operated in a trade other than the coastwise trade of the United States is duly documented as required by the laws of the jurisdiction of registration and flag in which it is documented and is in material compliance with the Requirements of Law for the trade in which such Material Vessel and Additional Collateral Vessel, as applicable, is in fact operated and each owner and/or operator of such Material Vessel and Additional Collateral Vessel, as applicable, complies in all respects with the requirements of such laws in respect of its nationality or citizenship.

(h)        No Material Vessel or Additional Collateral Vessel is subject to any charter except to a Loan Party. No Material Vessel or Additional Collateral Vessel is subject to any management agreement except with a Loan Party.

Section 3.06        Litigation and Environmental Matters.

(a)        Except the Chapter 11 Cases, the Canadian Recognition Proceedings and as set forth in Schedule 3.06(a), as of the date hereof, there are no actions, suits or proceedings by or before any arbitrator or Governmental Authority pending against or, to the knowledge of any Parent or any Borrower, threatened against or affecting any of the Loan Parties or any of their Subsidiaries that could reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect.

(b)        Except with respect to any matters that, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect, none of the Loan Parties or any of their respective Subsidiaries and, none of their respective operations or properties, including each Mortgaged Property and each Vessel (i) has failed to comply with any Environmental Law or to obtain, maintain or comply with any permit, license or other approval required under any Environmental Law, (ii) has, to the knowledge of any Parent or any Borrower, become subject to any Environmental Liability, (iii) has received written notice of any claim with respect to any Environmental Liability, (iv) has, to the knowledge of any Borrower, any basis to reasonably expect that any of the Loan Parties or any of their respective Subsidiaries will become subject to any Environmental Liability or (v) currently owns, leases or operates, or to the knowledge of any Borrower or any Subsidiary, has formerly owned or operated any properties, including any Vessel, which contain or where there has been a Release or threat of Release of any Hazardous Materials in amounts or concentrations which constitute a violation of any Environmental Law, could reasonably be expected to result in any of the Loan Parties or any of its Subsidiaries incurring Environmental Liability, or require investigation, response or other corrective action by any Borrower or any Subsidiary under, applicable Environmental Laws.  To the knowledge of any Parent and any Borrower, all Hazardous Materials transported from any property currently or formerly owned or operated by any of the Loan Parties or any of its Subsidiaries, including any Vessel, for off-site disposal have been disposed of in a manner which would not reasonably be expected to result, individually or in the aggregate, in a Material Adverse Effect. There has been no material written environmental assessment or audit conducted by or on behalf of and in the possession, custody or control of any of the Loan Parties or any of its Subsidiaries relating to of any property, currently or, to Parents' or any Borrower's knowledge, formerly owned or leased by any of the Loan Parties or any of its Subsidiaries, including any Vessel, that has not been provided to the Administrative Agent prior to the date hereof.

Section 3.07        Compliance with Laws and Agreements.  Each of the Loan Parties and its Subsidiaries is in material compliance with (a) its Organizational Documents, (b) all Requirements of Law applicable to it or its property, unless stayed by the Chapter 11 Cases or the Canadian Recognition Proceedings, (c) all indentures and other agreements and instruments in respect of Material Indebtedness binding upon it or its property and (d) all Material Contracts, except, in the case of clauses (b) and (c) of this Section, where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

Section 3.08        Investment Company Status.  None of the Loan Parties or any of its Subsidiary is required to register as an "investment company" as defined in, or subject to regulation under, the Investment Company Act of 1940, as amended from time to time.

Section 3.09        Taxes.

Except for failures that could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect and subject to the Bankruptcy Code, the CCAA, the terms of the applicable Bankruptcy Court DIP Order and the Canadian DIP Recognition Order, and any required approvals by the Bankruptcy Court and Canadian Court, the Loan Parties and each of their Subsidiaries (a) have timely filed (taking into account any extensions), caused to be filed or have had filed on their behalf all Tax returns and reports required to have been filed with the appropriate Governmental Authorities in all jurisdictions in which such Tax returns are required to be filed and all such Tax returns are true and correct in all material respects, and (b) have timely paid or caused to be timely paid all Taxes levied or imposed on it or its properties, income or assets (whether or not shown on a Tax return) including in their capacity as tax withholding agents, except any Taxes that are being contested in good faith by appropriate proceedings, provided that such Loan Party or such Subsidiary, as the case may be, has set aside on its books adequate reserves therefore in accordance with GAAP or the payment of which is stayed by the Chapter 11 Cases or the Canadian Recognition Proceedings.

There is no current, pending or proposed Tax assessment, deficiency or other claim against any of the Loan Parties or any of its Subsidiaries except (i) those being actively contested by such Loan Party or such Subsidiary in good faith and by appropriate proceedings diligently conducted that stay the enforcement of the Tax in question and for which adequate reserves have been provided in accordance with GAAP or (ii) those that would not reasonably be expected to, individually or in the aggregate, have a Material Adverse Effect.  None of the Loan Parties or any of its Subsidiaries has participated in a "listed transaction" within the meaning of Treasury Regulation Section 1.6011-4(b)(2).

Section 3.10    ERISA; Canadian Defined Benefit Pension Plans.  Except as would not reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect: (i) no Reportable Event has occurred during the past five years as to which any of the Loan Parties or any of their Subsidiaries or any ERISA Affiliate was required to file a report with the PBGC; (ii) no ERISA Event has occurred or is reasonably expected to occur; and (iii) none of the Loan Parties or any of their Subsidiaries or any of their ERISA Affiliates has received any written notification that any Multiemployer Plan is in reorganization or has been terminated within the meaning of Title IV of ERISA. No Loan Party has established, contributed to, maintained, participated in, or otherwise assumed any liability in respect of any Canadian Defined Benefit Pension Plan.

Section 3.11    Disclosure.  None of the reports, financial statements, certificates or other written information furnished by or on behalf of any Loan Party to the Administrative Agent or any Lender in connection with the negotiation of any Loan Document or delivered thereunder (as modified or supplemented by other information so furnished) when taken as a whole contains any material misstatement of fact or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not materially misleading; provided that, with respect to projected financial information, the Parents and the Borrowers represent only that such information was prepared in good faith based upon assumptions believed by them to be reasonable at the time delivered and, if such projected financial information was delivered prior to the date hereof, as of the date hereof, it being understood that any such projected financial information may vary from actual results and such variations could be material.

Section 3.12    Subsidiaries.  As of the date hereof, Schedule 3.12 sets forth the name of, and the ownership interest of each Parent and each Subsidiary in, each Subsidiary.

Section 3.13    Intellectual Property; Licenses, Etc.  The Borrowers and their Subsidiaries own, license or possess the right to use, all Intellectual Property that is reasonably necessary for the operation of their businesses as currently conducted, free and clear of all Liens except Permitted Liens, except as, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.  No Intellectual Property used by any Borrower or any Subsidiary and the operation of their respective business as currently conducted infringes upon or violates any rights held by any Person except for such infringements or violations, individually or in the aggregate, which could not reasonably be expected to have a Material Adverse Effect.  No claim or litigation regarding any Intellectual Property is pending or, to the knowledge of the Borrowers, threatened against any Borrower or any of its Subsidiary, which, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

Section 3.14    [Reserved].

Section 3.15    [Reserved].

Section 3.16    Federal Reserve Regulations.  No Borrower or Subsidiary is engaged or will engage, principally or as one of its important activities, in the business of purchasing or carrying margin stock (within the meaning of Regulation U of the Board of Governors), or extending credit for the purpose of purchasing or carrying margin stock.  No part of the proceeds of the Term Loans will be used, directly or indirectly, to purchase or carry any margin stock or to refinance any Indebtedness originally incurred for such purpose, or for any other purpose that entails a violation (including on the part of any Lender) of the provisions of Regulations U or X of the Board of Governors.

Section 3.17    Purpose of Term Loans.  The proceeds of the Term Loans will be used in accordance in all material respects with the terms of the Bankruptcy Court DIP Order, the Canadian DIP Recognition Order and the Loan Documents, including, without limitation: (i) to pay amounts due to Lenders and the Agents hereunder and

professional fees and expenses (including legal, financial advisor, appraisal and valuation-related fees and expenses) incurred by Lenders and the Agents, including those incurred in connection with the preparation, negotiation, documentation and court approval of the transactions contemplated hereby, (ii) to consummate the Closing Date Refinancing and (iii) to the extent any proceeds remain after application in accordance with preceding clauses (i) and (ii), to provide working capital, finance operating expenses  and for other general corporate purposes of the Loan Parties, and to pay administration costs of the Chapter 11 Cases and the Canadian Recognition Proceedings and Professional Fees and all other obligations benefiting from the Carve Out and the Canadian Administration Charge and claims or amounts approved by the Bankruptcy Court and the Canadian Court (if applicable).

Section 3.18      USA PATRIOT Act; Anti-Money Laundering Laws; Conflict with Sanctions Laws.

(a)      On the date hereof, each Loan Party is in compliance with the provisions of the USA PATRIOT Act, and the Borrowers have provided to the Administrative Agent and each Lender all information related to the Loan Parties (including names, addresses, a duly executed Internal Revenue Service Form W-9 or other tax identification numbers (if applicable)) requested in writing by the Administrative Agent or any Lender not less than five (5) Business Days prior to the date hereof under "know your customer" and anti-money laundering rules and regulations, including the USA PATRIOT Act, to be obtained by the Administrative Agent or any Lender.

(b)      On the date hereof, each Loan Party is not in violation of any Anti-Money Laundering Law and does not engage in or conspire to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in any Anti-Money Laundering Law.

(c)      None of any Borrower or any of their respective Subsidiaries, any director or officer or any Material Vessel or Additional Collateral Vessel or, to the knowledge of any Parent or any Borrower, any agent or employee of any of the Loan Parties or any of its Subsidiaries is a person, government, country or entity ("person") that is, or is owned 50 percent or more, or controlled, by one or more persons that are: (a) the target of sanctions administered by the United States (including without limitation, by the U.S. Department of the Treasury's Office of Foreign Assets Control, the U.S. Department of Commerce, and the U.S. Department of State), as well as the Government of Canada, the United Nations Security Council, the European Union, or the United Kingdom (including without limitation, His Majesty's Treasury), or any other relevant sanctions authority with jurisdiction over such person (collectively "Sanctions"), or (b) located, organized, resident in, doing business or conducting transactions with the government of, or persons within, a country or territory that is the target of comprehensive Sanctions (currently including, without limitation, Cuba, Iran, North Korea, Syria, Crimea, the so-called Donetsk People's Republic and the so-called Luhansk People's Republic regions of Ukraine); and the Borrowers will not directly or indirectly use the proceeds from the Term Loans, or lend, contribute or otherwise make available such proceeds to any Subsidiary, joint venture partner or other person (i) to fund any activities of or business with any person that, at the time of such funding, is the target of Sanctions or any country or territory that, at the time of such funding, is the target of comprehensive Sanctions,  (ii) in any other manner that will result in a violation by any person (including any person participating in the Transaction, whether as Lender, Agent or otherwise) of Sanctions, or (iii) in any other manner that could reasonably be expected to result in any person (including any person participating in the Transaction, whether as Lender, Agent or otherwise) becoming a person that is the target of Sanctions. Each Borrower and their respective Subsidiaries and, to the knowledge of any Borrower, any other agent acting on behalf of any of the Loan Parties or any of its Subsidiaries have at all times complied with, and are in compliance with, all applicable Sanctions in all material respects and have implemented and maintain in effect policies and procedures reasonably designed to promote compliance with Sanctions.

Section 3.19      No Unlawful Contributions or Other Payments.  The Loan Parties and their Subsidiaries are in compliance in all material respects with the Foreign Corrupt Practices Act, as amended, and rules and regulations thereunder ("FCPA"), the UK Bribery Act, the Corruption of Foreign Public Officials Act (Canada) and any other applicable anti-corruption laws ("Anti-Corruption Laws").  No part of the proceeds of the Loans will be used directly or to the knowledge of any Borrower, indirectly, for any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of Anti-Corruption Laws.

Section 3.20      Labor Matters.  Except as, individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect:  (a) there are no strikes or other labor disputes pending or threatened

against any Parent, any Borrower or any of the Subsidiaries; (b) the hours worked and payments made to employees of the Parents, the Borrowers and the Subsidiaries have not been in violation of the Fair Labor Standards Act or any other applicable law dealing with such matters; and (c) all payments due from any Parent, any Borrower or any of the Subsidiaries or for which any claim may be made against any Parent, any Borrower or any of the Subsidiaries, on account of wages and employee health and welfare insurance and other benefits have been paid or accrued as a liability on the books of such Parent, such Borrower or such Subsidiary to the extent required by GAAP.

Section 3.21     Insurance.  Schedule 3.21 sets forth a true, complete and correct description, in all material respects, of all material insurance (excluding any title insurance) maintained by or on behalf of any Borrower or the Subsidiaries as of the date hereof.  As of such date, such insurance is in full force and effect.

Section 3.22     Security.

(a)     Upon execution and delivery thereof by the parties thereto and upon the entry by the Bankruptcy Court of the Bankruptcy Court DIP Order and by the Canadian Court of the Canadian DIP Recognition Order, as applicable, the Security Documents are effective to create in favor of the Collateral Agent (for the benefit of the Secured Parties) or, if so contemplated by the respective Security Document, the Collateral Agent and the other Secured Parties, in each case, a legal, valid and enforceable security interest in the Collateral (and in the case of the Canadian DIP Recognition Order, the Canadian Collateral) described therein and proceeds thereof (subject to the exceptions set forth in Section 3.03).  Upon the entry by the Bankruptcy Court of the Bankruptcy Court DIP Order and by the  Canadian Court of the Canadian DIP Recognition Order, as applicable, and in accordance therewith, the security interests and liens granted to the Collateral Agent to secure the Secured Obligations (as defined in the Collateral Agreement) pursuant to the Bankruptcy Court DIP Order and the Canadian DIP Recognition Order, as applicable, and the Security Documents shall automatically, and without further action, constitute a fully perfected Lien on, and security interest in, all right, title and interest of the Loan Parties in such Collateral  (and in the case of the Canadian DIP Recognition Order, the Canadian Collateral) (subject to Liens permitted by Section 6.02 and the Carve-Out), subject to filings or actions required to perfect any Liens in foreign jurisdictions.

Section 3.23     Budget and Financial Plan.

The Budget was prepared in good faith based on assumptions believed by the Loan Parties to be reasonable at the time prepared and upon information believed by the management of the Borrowers to have been reasonable based upon the information available to the management of the Borrowers at the time such Budget was prepared; it being understood and agreed that the information and/or projections included in the Budget are not to be viewed as facts and are subject to significant contingencies, many of which are not within the control of the Borrowers and/or any Subsidiary, and that projected or estimated information may differ from actual results, and such differences may be material.  Upon the delivery of any Variance Report in accordance with this Agreement, such Variance Report shall fairly represent, in all material respects, the information covered thereby.

Section 3.24     Lien Priority.   On the Closing Date, with respect to the Loans and the Obligations hereunder shall be secured and have the priority set forth in the Interim DIP Order.

**ARTICLE IV**
**CONDITIONS**

Section 4.01     Closing Date.  The obligations of the Lenders to make Loans on the Closing Date is subject to each of the following conditions, each of which shall be satisfied on or prior to the Closing Date (or waived by each Lender in its sole discretion):

(a)     The Administrative Agent (or its counsel) shall have received from each party hereto either (i) a counterpart of this Agreement signed on behalf of such party or (ii) written evidence satisfactory to the Administrative Agent (which may include facsimile or other electronic transmission of a signed counterpart of this Agreement) that such party has signed a counterpart of this Agreement.

(b)     [reserved]

(c)        The Administrative Agent shall have received a written opinion (addressed to the Agents and the Lenders and dated on or prior to the Closing Date) of (1) Paul, Weiss, Rifkind, Wharton & Garrison LLP, New York, Delaware and California counsel for the Loan Parties, (2) [reserved], (3) Borden Ladner Gervais LLP, Ontario counsel for the Loan Parties, (4) Stewart McKelvey, Nova Scotia counsel to Loan Parties, (5) White & Case LLP, English counsel to the Lenders and (6) Jones Day, Australian counsel for the Loan Parties , in each case, in form and substance reasonably satisfactory to the Administrative Agent and the Lenders, covering such matters relating to the Loan Documents as the Administrative Agent and the Lenders shall reasonably request. Each of the Parents and the Borrowers hereby requests such counsel to deliver such opinion.

(d)        The Administrative Agent shall have received a certificate of the Parents and Borrowers, dated on or about the date hereof, to the effect set forth in Sections 4.01(m) and 4.01(p) hereof.

(e)        The Administrative Agent shall have received a certificate of each Loan Party, dated on or about the date hereof attaching a copy of (i) each Organizational Document of each Loan Party certified, to the extent applicable, as of a recent date by the applicable Governmental Authority, (ii) signature and incumbency certificates of the Responsible Officers of each Loan Party executing the Loan Documents to which it is a party, (iii) resolutions of the Board of Directors of each Loan Party approving and authorizing the execution, delivery and performance of Loan Documents to which it is a party, certified as of a date on or prior to the date hereof by its secretary, an assistant secretary or a Responsible Officer as being in full force and effect without modification or amendment, (iv) resolutions of the holders of the issued shares in each UK Loan Party approving the terms of and the transactions contemplated by the Loan Documents to which it is a party, certified as of a date hereof by a Responsible Officer that is it correct, complete and in full force and effect and has not been amended or superseded, (v) a good standing certificate, certificate of compliance or other similar certificate from the applicable Governmental Authority of each Loan Party's jurisdiction of incorporation, organization, continuance, amalgamation or formation, (vi) the PSC register of each UK Loan Party, certified as of the date hereof by a Responsible Officer of the holders of the issued shares of such UK Loan Party that it is correct, complete and not amended or superseded and (vii) an officer's certificate of each UK Loan Party and Hornblower Group, Inc certifying that: (A) borrowing, securing or guaranteeing the Obligations would not cause any such limit binding on it to be exceeded; (B) each copy document provided under this clause (e) is correct, complete and in full force and effect and has not been amended or superseded as at the date no earlier than the date hereof and (C) that it has complied within the relevant timeframe with any notice it has received pursuant to Part 21A of the Companies Act 2006 from a charged company and no warning notice or restrictions notice (in each case as defined in Schedule 1B of the Companies Act 2006) has been issued in respect of the shares the subject of security.

(f)        The Agents and the Lenders shall have received all fees payable thereto, including those set forth in the Agent Fee Letter, or to any Lender, including those set forth in the Lender Fee Letter, in each case, on or prior to the Closing Date and, to the extent invoiced at least three Business Days prior to the Closing Date, reimbursement or payment of all reasonable and documented out-of-pocket expenses (including reasonable fees, charges and disbursements of Seward & Kissel LLP, lead counsel to the Agents, Perella Weinberg Partners, financial advisor to the Loan Parties, White & Case LLP, New York, English and Australian counsel to the Lenders, Osler, Hoskin & Harcourt LLP, Canadian counsel to the Lenders, Cox & Palmer LLP, Canadian maritime counsel to the Lenders, McKinney, Bancroft & Hughes, Bahamian maritime counsel to the Lenders and Jones Walker LLP, maritime counsel to the Lenders) required to be reimbursed or paid by any Loan Party hereunder or under any Loan Document.

(g)        The Collateral and Guarantee Requirement  (other than to the extent contemplated by Section 5.15 (which, for the avoidance of doubt, shall override the applicable clauses of the definition of "Collateral and Guarantee Requirement" for the purposes of this Section 4.01), and subject to the grace periods and post-closing set forth in such definition) shall have been satisfied (or waived) and the Administrative Agent shall have received a completed Perfection Certificate dated as of the Closing Date and signed by a Responsible Officer of each Borrower, together with all attachments contemplated thereby, and none of such Collateral shall be subject to any other pledges, security interests or mortgages except Liens permitted by Section 6.02.

(h)        The Administrative Agent and each Lender shall have received fully executed copies of each Parent Entity Debtor Document;

(i)        All obligations under the Prepetition Super Senior Credit Agreement, shall have been, or substantially concurrently with the funding of the Term Loans on the Closing Date shall be, refinanced, repaid,

redeemed and/or terminated in its entirety and all commitments to lend and guarantees and security granted in connection therewith shall have been terminated and/or released or customary arrangements shall have been made for such termination and/or release (collectively, the "Closing Date Refinancing");

(j)     The Junior DIP Credit Agreement and each other Junior DIP Loan Document shall be been duly executed and delivered by the parties thereto, in each case in form and substance satisfactory to the Lenders, and the Borrowers shall have incurred Initial Term Loans and Bridge Refinancing Loans under (and in each case as defined in the Junior DIP Credit Agreement) having an aggregate principal amount of at least $223,000,000; it being understood and agreed that the Junior DIP Credit Agreement and each other Junior DIP Loan Document delivered to the Administrative Agent on the Petition Date are satisfactory to the Lenders, in each case, together with any amendment, supplement or other modification thereto that are not adverse to the Lenders.

(k)     Other than as a result of the Chapter 11 Cases and the Canadian Recognition Proceedings, since the Petition Date, there shall not have occurred a Material Adverse Effect.

(l)     The Restructuring Support Agreement shall have been duly executed and delivered by the parties thereto in form and substance reasonably satisfactory to the Lenders.

(m)     The Administrative Agent and the Lenders shall have received the financial statements referred to in Section 3.04.

(n)     The representations and warranties of each Loan Party set forth in the Loan Documents shall be true and correct in all material respects on the Closing Date; provided that, to the extent that such representations and warranties specifically refer to an earlier date, they shall be true and correct in all material respects as of such earlier date; provided, further, that any representation and warranty that is qualified as to "materiality," "Material Adverse Effect" or similar language shall be true and correct in all respects on the Closing Date, or on such earlier date, as the case may be.

(o)     The Administrative Agent shall have received, in the case of a Borrowing, a Borrowing Request as required by Section 2.03.

(p)     The DIP Funding Account shall have been established.

(q)     No Default or Event of Default shall have occurred and be continuing or would result from the making of any Term Loans or the consummation of any other Transactions on such date.

(r)     The Lenders and the Administrative Agent shall have received the Budget in form and substance reasonably acceptable to the Required Lenders and the Required Lenders' Advisors.

(s)     (i) The Administrative Agent and Lenders shall have received, at least three Business Days prior to the Closing Date, a duly executed Internal Revenue Service Form W-9 (or other applicable tax form) and all documentation and other information required under applicable "know your customer" and anti-money laundering rules and regulations, including, without limitation, the USA PATRIOT Act and (ii) to the extent any Borrower qualifies as a "legal entity customer" under the Beneficial Ownership Regulation, at least five days prior to the Closing Date, any Lender or Administrative Agent that has requested, a Beneficial Ownership Certification in relation to any Borrower shall have received such Beneficial Ownership Certification, and each Lender shall be satisfied with all such items delivered under this clause (r).

(t)     The Administrative Agent shall have received certified copies of Uniform Commercial Code, PPSA, United States Patent and Trademark Office, United States Copyright Office and Canadian Intellectual Property Office, tax and judgment lien searches, bankruptcy and pending lawsuit searches or equivalent reports or searches, each of a recent date listing all effective financing statements, lien notices or comparable documents that name any Loan Party as debtor and that are filed in the United States Patent and Trademark Office, the United States Copyright Office, the Canadian Intellectual Property Office, those state, provincial, territorial and county jurisdictions in which any Loan Party is organized or maintains its principal place of business, as applicable, and such other searches that are required

by the Perfection Certificate or that the Administrative Agent deems necessary or appropriate, none of which encumber the Collateral covered or intended to be covered by the Security Documents (other than Permitted Liens).

(u)       The Chapter 11 Cases shall have been commenced and all of the pleadings related to the "first day orders" shall be in form and substance reasonably satisfactory to the Required Lenders; it being understood and agreed that the forms of such orders delivered to counsel to the Required Lenders on the Petition Date are satisfactory to the Required Lenders, in each case, together with any amendment, supplements or other modifications thereto that are not adverse to the Lenders.

(v)       The Interim DIP Order shall have been entered by the Bankruptcy Court within four (4) Business Days after the Petition Date and the Administrative Agent shall have received a true and complete copy of such order, and such order shall be in full force and effect and shall not have been reversed, modified, amended, stayed or vacated absent prior written consent of the Required Lenders and the Agents.

(w)      The Canadian Recognition Proceedings shall have been commenced and all applications, motions, pleadings, affidavits or other documents filed with the Canadian Court and related to the Canadian Interim Stay Order, the Canadian Initial Recognition Order and the Canadian Supplemental Order shall be in form and substance reasonably satisfactory to the Required Lenders; it being understood and agreed that the forms of such orders delivered to Canadian counsel to the Required Lenders on the Petition Date are satisfactory to the Required Lenders.

(x)       All orders entered by the Bankruptcy Court or the Canadian Court pertaining to the Loan Parties' cash management ("Cash Management Orders") and all motions and other documents filed, and submitted to, the Bankruptcy Court or the Canadian Court in connection therewith shall be in form and substance reasonably satisfactory to the Required Lenders; it being understood and agreed that the forms of such orders, motions and documents delivered to counsel to the Required Lenders on the Petition Date are satisfactory to the Required Lenders.

(y)       No trustee, receiver, interim receiver or examiner with expanded powers shall have been appointed in respect of the Debtors or their business, properties or assets and no motion seeking such relief shall be pending.

(z)       All orders entered by the Bankruptcy Court or the Canadian Court pertaining to any payment of the Loan Parties' vendors or other trade counterparties and all motions and other documents filed, and submitted to, the Bankruptcy Court or the Canadian Court in connection therewith shall be in form and substance reasonably satisfactory to the Required Lenders.

## ARTICLE V
## AFFIRMATIVE COVENANTS

Each Parent and Parent Entity Debtor (with respect to Section 5.01, Section 5.02, Section 5.04, Section 5.05 and Section 5.09), JB TopCo and each Borrower covenants and agrees with each Lender that, until the Term Loan Commitments shall have expired or been terminated, the principal of and interest on each Loan and all fees, expenses and all other Obligations shall have been paid in full (other than in respect of contingent indemnification and expense reimbursement claims not then due) (the "Termination Date"), unless the Required Lenders shall otherwise consent in writing, each of the Borrowers and JB TopCo will, and will cause each of their respective Subsidiaries (other than Journey Beyond and any of its Subsidiaries) to:

Section 5.01       Financial Statements, Reports, etc.  Furnish to (x) the Administrative Agent (which will promptly furnish such information to the Lenders) or (y) with respect to Section 5.01(i) through 5.01(q), the Required Lenders' Advisors:

(a)       within 120 days after the end of each fiscal year (or, if delivered in a shorter period to any holder of other Indebtedness in its capacity as such, such shorter period), an audited consolidated balance sheet and related statements of operations, cash flows and owners' equity showing the financial position of the Borrowers and their Subsidiaries as of the close of such fiscal year and the consolidated results of their operations during such year and setting forth in comparative form the corresponding figures for the prior fiscal year, which consolidated balance sheet and related statements of operations, cash flows and owners' equity shall be accompanied by customary management

discussion and analysis and audited by independent public accountants of recognized national standing and accompanied by an opinion of such accountants (which opinion shall not be qualified as to scope of audit or as to the status of any Borrower or any Subsidiary as a going concern) to the effect that such consolidated financial statements fairly present, in all material respects, the financial position and results of operations of the Borrowers and their Subsidiaries on a consolidated basis in accordance with GAAP (it being understood that the delivery of annual reports on Form 10-K of the Borrowers and their consolidated Subsidiaries or a registration statement on Form S-1 or Form S-4 shall satisfy the requirements of this Section 5.01(a) to the extent such annual reports or registration statement include the information specified herein);

(b)        within 45 days after the end of each of the first three fiscal quarters of each fiscal year (or, if delivered in a shorter period to any holder of other Indebtedness in its capacity as such, such shorter period), a consolidated balance sheet and related statements of operations and cash flows showing the financial position of the Borrowers and their Subsidiaries as of the close of such fiscal quarter and the consolidated results of their operations during such fiscal quarter and the then-elapsed portion of the fiscal year and setting forth in comparative form the corresponding figures for the corresponding periods of the prior fiscal year, all of which shall be in reasonable detail and which consolidated balance sheet and related statements of operations and cash flows shall be accompanied by customary management discussion and analysis and certified by a Financial Officer of the Borrowers as fairly presenting, in all material respects, the financial position and results of operations of the Borrowers and their Subsidiaries on a consolidated basis in accordance with GAAP (subject to normal year-end audit adjustments and the absence of footnotes) (it being understood that the delivery of quarterly reports on Form 10-Q of the Borrowers and their consolidated Subsidiaries or a registration statement on Form S-1 or Form S-4 shall satisfy the requirements of this Section 5.01(b) to the extent such quarterly reports or registration statement include the information specified herein);

(c)        (x) concurrently with any delivery of financial statements under clause (a) or (b) above, a certificate of a Financial Officer of the Borrowers (i) certifying that no Event of Default or Default has occurred or, if such an Event of Default or Default has occurred, specifying the nature and extent thereof and any corrective action taken or proposed to be taken with respect thereto, (ii) [reserved], (iii) [reserved], (iv) in the case of financial statements under clause (a) above, setting forth the reasonably detailed calculation of Excess Cash Flow for the fiscal year then ended (to the extent not previously delivered) and (v) [reserved] and (y) concurrently with any delivery of financial statements under clause (a) above, if the accounting firm is not restricted from providing such a certificate by its policies office, a certificate of the accounting firm opining on or certifying such statements stating whether they obtained knowledge during the course of their examination of such statements of any Default or Event of Default (which certificate may be limited to accounting matters and disclaim responsibility for legal interpretations);

(d)        promptly after the same become publicly available, copies of all periodic and other publicly available reports, proxy statements and other materials filed by any Parent, any Parent Entity Debtor, any Borrower or any of the Subsidiaries with the SEC, or after an initial public offering, distributed to its stockholders generally, as applicable; provided, however, that such reports, proxy statements, filings and other materials required to be delivered pursuant to this clause (d) shall be deemed delivered for purposes of this Agreement when posted to the website of any Borrower or the website of the SEC and written notice of such posting has been delivered to the Administrative Agent;

(e)        [reserved]

(f)        upon the reasonable request of the Administrative Agent (acting at the direction of the Required Lenders) not more frequently than once per Fiscal Quarter, an updated Perfection Certificate (or, to the extent such request relates to specified information contained in the Perfection Certificate, such information) reflecting all changes since the date of the information most recently received pursuant to this clause (f) or Section 5.11;

(g)        promptly, from time to time, such other information regarding the operations, business affairs and financial condition of any Parent, any Parent Entity Debtor, any Borrower or any of the Subsidiaries, or compliance with the terms of any Loan Document as in each case the Administrative Agent may reasonably request (for itself or on behalf of any Lender);

(h)      in the event that any Parent or any Parent Entity, as the case may be, is not engaged in any business or activity, and does not own any assets or have other liabilities, other than those incidental to its ownership directly or indirectly of the Equity Interests of any Borrower and the incurrence of Indebtedness for borrowed money (and, without limitation on the foregoing, does not have any subsidiaries other than a Borrower and the Subsidiaries and any direct or indirect parent companies of a Borrower that are not engaged in any other business or activity and do not hold any other assets or have any liabilities except as indicated above) such consolidated reporting at such Parent Entity's level in a manner consistent with that described in clauses (a) and (b) of this Section 5.01 for the Borrowers will satisfy the requirements of such paragraphs;

(i)      as soon as available and in any event within thirty (30) days after the end of each month, commencing with the period ending January 31, 2024, unaudited consolidated statements of operations and cash flows of the Borrowers and their Subsidiaries as of the end of such month, accompanied by any material management discussion and analysis which shall include internally-prepared monthly reporting packages;

(j)      substantially concurrent with delivery to the administrative agent and/or lenders pursuant to the Journey Beyond Credit Agreement, copies of all financial statements provided to the administrative agent and/or lenders under the Journey Beyond Credit Agreement;

(k)      on Thursday of each week, commencing with February 29, 2024, the Borrowers shall deliver to the Administrative Agent and the Required Lenders' Advisors a budget variance report that sets forth up to and including the last Budget Testing Date (A) actual results against anticipated results under the applicable Budget for the Budget Testing Period in regard which such accompanying cash flow forecast is being delivered, reported on a cumulative and a week-by-week basis (in each case, highlighting key line items) as of the end of such period, (B) the variance in dollar amounts and percentages, on a line item basis, (C) a written explanation for all line item variances for any given Budget Testing Period and (D) such other information as the Required Lenders' Advisors may reasonably request with reasonable advance notice to the Borrowers (each, a "Variance Report");

(l)      [reserved];

(m)      promptly, and in any event within two (2) Business Days after the same becomes internally available, the Borrowers shall provide information regarding the AQV Wind-Down Plan or any material developments related thereto (including, for the avoidance of doubt, access to any dataroom, outreach lists, process letters, copies of any proposal letters and any internally prepared materials (including substantially final drafts) prepared for management or potential buyers or bidders, in each case relating to all or any part of the "Overnight" business);

(n)      no later than March 21, 2024, and no later than the Thursday of each fourth week thereafter (or more frequently as the Borrowers may elect), the Loan Parties shall provide the Administrative Agent and the Required Lenders' Advisors with an updated 13-week statement for the subsequent 13-week period (a "Revised Budget"), which Revised Budget shall modify and supersede any prior Budget upon the approval of the Required Lenders' Advisors (with an e-mail from the Required Lenders' Advisors being sufficient) in their sole discretion;

(o)      promptly upon delivery (and in any event within one Business Day thereof) to management copies of all internally prepared KPI and financial reporting packages that are currently prepared in the ordinary course;

(p)      at least two (2) calendar days in advance of such filing or as promptly as practicable, (i) drafts of all pleadings, motions, applications, judicial information, financial information, notices, reports, orders and other documents intended to be filed by or on behalf of any Debtor with the Bankruptcy Court in the Chapter 11 Cases, or distributed by or on behalf of any of the Debtors or any other Loan Party to any official committee appointed in the Chapter 11 Cases and (ii) drafts of all filings, motions, pleadings, other papers or material notices intended to be filed by or on behalf of any Debtor or the Foreign Representative of any such Debtor, or any other Loan Party with the Canadian Court in the Canadian Recognition Proceedings, including all motions for all Canadian Orders; and

(q)      the proposed service list in connection with any Order or relief sought by any Debtor from the Canadian Court.

The Borrowers hereby acknowledge and agrees that all financial statements and certificates furnished pursuant to paragraphs (a), (b) and (d) above are hereby deemed to be Borrower Materials suitable for distribution, and to be made available, to Public Lenders as contemplated by the next paragraph and may be treated by the Administrative Agent and the Lenders as if the same had been marked "PUBLIC" in accordance with such paragraph (unless the Borrowers otherwise notify the Administrative Agent on or prior to the delivery thereof).

The Borrowers hereby agree that they will use commercially reasonable efforts to identify that portion of the Borrower Materials that may be distributed to the Public Lenders and that (i) all such Borrower Materials shall be clearly and conspicuously marked "PUBLIC" which, at a minimum, shall mean that the word "PUBLIC" shall appear prominently on the first page thereof, (ii) by marking Borrower Materials "PUBLIC," the Borrowers shall be deemed to have authorized the Administrative Agent and the Lenders to treat such Borrower Materials as solely containing information that is either (A) publicly available, (B) of a type that would reasonably be expected to be publicly available if any Parent or any Borrower were a public reporting company or (C) not material (although it may be sensitive and proprietary) with respect to any Parent, any Borrower or its Subsidiaries or any of their respective securities for purposes of United States Federal and state securities laws (provided, however, that such Borrower Materials shall be treated as set forth in Section 9.12, to the extent such Borrower Materials constitute information subject to the terms thereof), (iii) all Borrower Materials marked "PUBLIC" are permitted to be made available through a portion of the Platform designated "Public Investor"; and (iv) the Administrative Agent shall be entitled to treat any Borrower Materials that are not marked "PUBLIC" as being suitable only for posting on a portion of the Platform not designated "Public Investor"; provided that the Administrative Agent may deem the Loan Documents and the documents required to be delivered pursuant to Sections 5.01(a), (b) and (d) to be marked "PUBLIC."

Notwithstanding anything to the contrary set forth herein, for purposes of this Section 5.01, neither JB TopCo nor HB TopCo shall be deemed to be a Subsidiary.

Section 5.02    Notice of Material Events.  Promptly after any Responsible Officer of any Parent Entity Debtor, any Parent or any Borrower obtains actual knowledge thereof, will furnish to the Administrative Agent (for distribution to each Lender through the Administrative Agent) written notice of the following:

(a)    the occurrence of any Default or Event of Default;

(b)    to the extent permissible by law, the filing or commencement of any action, suit or proceeding by or before any arbitrator or Governmental Authority against or, to the knowledge of a Financial Officer or another executive officer of any Parent, any Borrower or any Subsidiary, affecting any Parent, any Borrower or any Subsidiary or the receipt of a notice of an Environmental Liability that could reasonably be expected to result in a Material Adverse Effect;

(c)    any other development specific to any Parent Entity Debtor, any Parent, any Borrower or any of the Subsidiaries that has had, or would reasonably be expected to have, a Material Adverse Effect,

(d)    the occurrence of any ERISA Event that, together with all other ERISA Events that have occurred, could reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect;

(e)    any casualty event with respect to a Material Vessel or Additional Collateral Vessel that results in damage in excess of $1,000,000 and any arrest or detention of a Material Vessel or Additional Collateral Vessel for longer than one (1) day;

(f)    (i) the occurrence of any Default under and as defined in the Journey Beyond Credit Agreement (no later than five (5) Business Days after the occurrence thereof, unless otherwise cured), (ii) the occurrence of any Event of Default under and as defined in the Journey Beyond Credit Agreement (no later than one (1) Business Day after the occurrence thereof), and (iii) receipt by any Loan Party, JB TopCo, Journey Beyond or any Journey Beyond Subsidiary of any event of default and/or acceleration of the obligations of Journey Beyond or any Journey Beyond Subsidiaries under the Journey Beyond Credit Agreement (no later than one (1) Business Day of receipt of such notice); and

(g)     any amendment, waiver or other modification of the Restructuring Support Agreement (together with copies of all documentation with respect thereto) or any actual or purported termination thereof.

Each notice delivered under this Section shall be accompanied by a written statement of a Responsible Officer of each Parent Entity Debtor, each Parent or each Borrower setting forth the details of the event or development requiring such notice and any action taken or proposed to be taken with respect thereto.

Section 5.03     Citizenship.

(a)     Cause each Loan Party which owns a Material Vessel or an Additional Collateral Vessel, as applicable, operated in the coastwise trade of the United States and each Person that operates a Material Vessel or an Additional Collateral Vessel, as applicable, used in the United States coastwise trade:

(i)     to remain a Citizen of the United States qualified in all material respects to own and/or operate such Material Vessel or Additional Collateral Vessel, as applicable, under the laws of the United States; and

(ii)    to comply with and satisfy all applicable Requirements of Law in order that such Material Vessel or Additional Collateral Vessel, as applicable, is and remains documented pursuant to the laws of the United States with endorsements which qualify such Material Vessel or Additional Collateral Vessel, as applicable, to engage in the coastwise trade of the United States of America.

(b)     Cause each Loan Party which owns a Material Vessel or an Additional Collateral Vessel, as applicable, operated in the coastwise trade of the United States of America and each Person that operates a Material Vessel or an Additional Collateral Vessel, as applicable, operated in trades other than the coastwise trade of the United States of America:

(i)     to remain such a citizen as is necessary to qualify in all material respects with the requirements to own and/or operate such Material Vessel or Additional Collateral Vessel, as applicable, under the laws of the jurisdiction of registration and flag of such Material Vessel; and

(ii)    to comply with and satisfy all applicable Requirements of Law of the jurisdiction of registration and flag of such Material Vessel or Additional Collateral Vessel, as applicable, with endorsements or documents which qualify such Material Vessel or Additional Collateral Vessel, as applicable, to engage in such trades as such Material Vessel is engaged in from time to time.

Section 5.04     Existence; Conduct of Business.  Do or cause to be done all things necessary to obtain, preserve, renew and keep in full force and effect its legal existence and the rights, licenses, permits, privileges, franchises, and Intellectual Property, except to the extent (other than with respect to the preservation of the existence of the Parents and the Borrowers) that the failure to do so could not reasonably be expected to have a Material Adverse Effect; provided that the foregoing shall not prohibit (a) any merger, amalgamation, consolidation, liquidation, dissolution or any Disposition permitted by Section 6.05 or (b) the abandonment of Intellectual Property permitted by Section 6.05(k).

Section 5.05     Payment of Taxes.  Subject to the Bankruptcy Court DIP Orders and any required approval by the Bankruptcy Court, pay its obligations and liabilities in respect of Taxes (including in its capacity as a withholding agent) levied or imposed upon it or its properties, income or assets, before the same shall become delinquent or in default, except to the extent (i) any such Taxes are being contested in good faith and by appropriate proceedings  and for which adequate reserves have been provided in accordance with GAAP or (ii) the failure to make payment could not reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect.

Section 5.06     Insurance.

(a)     Maintain, with insurance companies that the Parents believe (in the good faith judgment of the management of the Parents) are financially sound and responsible at the time the relevant coverage is placed or

renewed, insurance in at least such amounts (after giving effect to any self-insurance which the Parents believe (in the good faith judgment of management of the Parents) is reasonable and prudent in light of the size and nature of its business) and against at least such risks (and with such risk retentions) as the Parents believe (in the good faith judgment or the management of the Parents) are reasonable and prudent in light of the size and nature of its business or, in the case of the insurances with respect to the Mortgaged Vessels, comply with the insurance requirements of each Mortgage, and at any time, will furnish to the Lenders, upon written request from the Administrative Agent, information presented in reasonable detail as to the insurance so carried.  Each such policy of insurance shall (i) name the Collateral Agent, on behalf of the Secured Parties, as an additional insured thereunder as its interests may appear and (ii) in the case of each casualty and property insurance policy, contain a loss payable clause or lender's loss payee/mortgagee endorsement that names the Collateral Agent, on behalf of the Secured Parties as the lender's loss payee or mortgagee thereunder (which shall be accomplished pursuant to the Bankruptcy Court DIP Order without any further action required by any Loan Party); provided that no such endorsement shall be required with respect to any insurance policy of Hornblower Canada Co. currently endorsed in connection with the Niagara Security Agreements.

(b)      If any improvements located on any Mortgaged Property is at any time located in an area identified by the Federal Emergency Management Agency (or any successor agency) as a special flood hazard area (each, a "Special Flood Hazard Area") with respect to which flood insurance has been made available under the National Flood Insurance Act of 1968 (as now or hereafter in effect or any successor act thereto), (i) maintain, or cause to be maintained, with a financially sound and reputable insurer, as determined in the Borrowers' reasonable discretion, flood insurance in an amount reasonably satisfactory to the Administrative Agent (acting at the direction of the Required Lenders) and otherwise sufficient to comply with all applicable rules and regulations promulgated pursuant to the Flood Insurance Laws and (ii) deliver to the Administrative Agent evidence of such compliance in form and substance reasonably acceptable to the Administrative Agent.

Section 5.07      Maintaining Records; Access to Properties and Inspections.  Maintain all financial records in accordance with GAAP and permit any persons designated by the Administrative Agent (acting at the direction of the Required Lenders) or, upon the occurrence and during the continuance of an Event of Default, any Lender to visit and inspect the financial records and the properties (which, with respect to the Material Real Properties, shall include permission to conduct non-invasive environmental site assessments where a reasonable basis for such assessments exists) of any Parent, any Borrower or any of the Subsidiaries at reasonable times, upon reasonable prior notice to the Parents or the Borrowers, and as often as reasonably requested and to make extracts from and copies of such financial records, and permit any persons designated by the Administrative Agent or, upon the occurrence and during the continuance of an Event of Default, any Lender upon reasonable prior notice to the Parents or the Borrowers to discuss the affairs, finances and condition of any Parent, any Borrower or any of the Subsidiaries with the officers thereof and independent accountants therefor (so long as the Borrowers have the opportunity to participate in any such discussions with such accountants), in each case, subject to reasonable requirements of confidentiality, including requirements imposed by law or by contract.

Section 5.08      Use of Proceeds.  Use the proceeds of the Term Loans made on the Closing Date only as contemplated by Section 3.17.

Section 5.09      Compliance with Laws.  Comply with all laws, rules, regulations and orders of any Governmental Authority applicable to it or its property, except where the failure to do so, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect; provided that this Section 5.09 shall not apply to Environmental Laws, which are the subject of Section 5.10, or to laws related to Taxes, which are the subject of Section 5.05.  The Borrowers and their Subsidiaries will maintain in effect and enforce policies and procedures reasonably designed to ensure compliance by the Borrowers, their Subsidiaries and their respective directors, officers, employees and agents with Anti-Money Laundering Laws, Anti-Corruption Laws and applicable Sanctions, and the Borrowers shall not engage in or conspire to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in any Anti-Money Laundering Law.  Loan Parties that own Material Vessels or Additional Collateral Vessels not operated in the United States coastwise trade (which for the avoidance of doubt shall include Material Vessels and Additional Collateral Vessels registered under the laws of the United States for the foreign trade) shall ensure that such Vessels shall be in material compliance with all applicable Requirements of Law of the countries under whose laws they are registered

at all times and that the operators of such Vessels shall similarly comply with all such applicable Requirements of Law relating to such Vessels while such Vessels shall be operated by them.

Section 5.10    Compliance with Environmental Laws.  Comply, and make reasonable efforts to cause all lessees and other persons occupying its properties, including all Vessels, to comply, with all Environmental Laws applicable to its operations and properties; and obtain and renew all material authorizations and permits required pursuant to Environmental Law for its operations and properties, in each case in accordance with Environmental Laws, except, in each case with respect to this Section 5.10, to the extent the failure to do so would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 5.11    Further Assurances.

(a)    Comply with the Collateral and Guarantee Requirement.

(b)    Subject to the provisions of the Collateral and Guarantee Requirement and any applicable limitations in any Security Document and in each case at the expense of the Loan Parties, promptly upon reasonable request by the Administrative Agent or the Collateral Agent, in each case acting at the direction of the Required Lenders, or as may be required by applicable law, (i) correct any material defect or error that may be discovered in the execution, acknowledgment, filing or recordation of any Security Document or other document or instrument relating to any Collateral, and (ii) do, execute, acknowledge, deliver, record, re-record, file, re-file, register and re-register any and all such further acts, deeds, certificates, documents, financing statements, agreements, assurances and other instruments as are necessary or as the Administrative Agent or Collateral Agent may request from time to time in order to carry out more effectively the purposes of the Security Documents.

Section 5.12    [Reserved].

Section 5.13    [Reserved].

Section 5.14    Maintenance of Properties.  Keep and maintain all property material to the conduct of its business in good working order and condition (subject to casualty, condemnation and ordinary wear and tear), except where the failure to do so could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 5.15    Certain Post-Closing Obligations.  As promptly as practicable, and in any event within the time periods after the Closing Date specified in Schedule 5.15 or such later date as the Administrative Agent (acting at the direction of the Required Lenders) agrees to in writing in its reasonable discretion, deliver the documents or take the actions specified on Schedule 5.15, in each case except to the extent otherwise agreed by the Administrative Agent (acting at the direction of the Required Lenders) pursuant to its authority as set forth in the definition of the term "Collateral and Guarantee Requirement."  For the avoidance of doubt, with respect to each Mortgaged Property set forth on Schedule 1.01(B) and each Additional Collateral Vessel and Mortgaged Vessel set forth on Schedule 1.01(F), the Collateral and Guarantee Requirement shall be required to be satisfied in the manner set forth therein and in the time periods set forth therein.

Section 5.16    Lender Meetings. (i) On a weekly basis, at a time mutually agreed with the Required Lenders' Advisors that is after the delivery of the information required pursuant to Section 5.01(k), upon the written request of the Required Lenders or the Required Lenders' Advisors, participate in one conference call with the Lenders and the Required Lenders' Advisors to discuss the financial condition and results of operations of the Borrowers and their Subsidiaries and Journey Beyond and its Subsidiaries, the Budget and Variance Report, any "vessel sale" consummated during the preceding one-week period and any material changes or updates to any concession agreement, (ii) on a weekly basis, at a time mutually agreed with the Required Lenders' Advisors, cause its applicable advisors to participate in one 'advisors only' conference call with the Required Lenders' Advisors to discuss the sales process (if any) involving the JB Business, subject to the limitations set forth in Section 7.01(u) and (iii) the Borrowers will participate in a meeting of the Lenders once during each fiscal quarter following the delivery of financial statements required pursuant to Section 5.01(a) or (b), to be held via teleconference at a time mutually and reasonably agreed among the Required Lenders and the Borrowers to discuss the previous fiscal quarter's financial results.

Section 5.17    Bankruptcy Matters.

(a)    Cause all proposed (i) "first day" and "second day" (if applicable) orders on a final basis, (ii) orders (other than the Bankruptcy Court DIP Order) related to or affecting the Term Loans and other Obligations and the Loan Documents, any other financing or use of cash collateral, any sale or other disposition of Collateral outside the ordinary course, cash management, adequate protection, any Plan of Reorganization and/or any disclosure statement related thereto, (iii) orders concerning the financial condition of the Borrowers or any of their respective Subsidiaries or other Indebtedness of the Loan Parties or seeking relief under section 363, 365, 1113 or 1114 of the Bankruptcy Code or section 9019 of the Federal Rules of Bankruptcy Procedure or any similar provision of the CCAA, and (iv) orders establishing material procedures for administration of the Chapter 11 Cases or the Canadian Recognition Proceedings or approving significant transactions submitted to the Bankruptcy Court or the Canadian Court, in each case, proposed by the Loan Parties to be in accordance with and permitted by the terms of this Agreement and reasonably acceptable to the Required Lenders in their reasonable discretion in all respects, it being understood and agreed that the forms of orders approved by the Required Lenders (and with respect to any provision that affects the rights, obligations, liabilities or duties of the Administrative Agent or the Collateral Agent, the Administrative Agent or the Collateral Agent, respectively) prior to the Petition Date are in accordance with and permitted by the terms of this Agreement and are reasonably acceptable in all respects;

(b)    comply in a timely manner with their obligations and responsibilities as debtors in possession under the Bankruptcy Court DIP Order and the Canadian Orders; and

(c)    except as otherwise permitted by an Acceptable Plan or this Agreement, provide prior written notice as soon as reasonably practicable to the Required Lenders prior to any assumption or rejection of any Loan Party's or any Subsidiary's material contracts or material nonresidential real property leases pursuant to Section 365 of the Bankruptcy Code.

(d)    Deliver to the Administrative Agent (for distribution to the Required Lenders) all documents required to be delivered to creditors under the Restructuring Support Agreement, any applicable restructuring support agreement or any case stipulation; *provided* that the Borrowers shall not be required to deliver any such documents provided by any party in interest to the extent that any such document is filed under seal; *provided,* further, that such documents that are filed under seal, to the extent permitted by applicable law, shall be provided to the Required Lenders' Advisors on a professional eyes' only basis.

Section 5.18    Milestones.

(i)    commence the Chapter 11 Cases on or before the Petition Date;

(ii)    no later than one (1) day after the Petition Date, file the DIP Motion and AQV Sale Motion;

(iii)    obtain entry by the Bankruptcy Court of the Interim DIP Order no later than three (3) Business Days after the Petition Date;

(iv)    obtain entry of the Canadian Interim DIP Recognition Order by the Canadian Court no later than ten (10) calendar days after the entry of the Interim DIP Order;

(v)    obtain entry by the Bankruptcy Court of the AQV Bidding Procedures Order as soon as reasonably practicable but in no event later than fifteen (15) calendar days after the Petition Date;

(vi)    no later than twenty-one (21) calendar days after the Petition Date, file the Plan, Disclosure Statement, Disclosure Statement Motion and Backstop Motion;

(vii)    obtain entry by the Bankruptcy Court of the Final DIP Order and the AQV Sale Order as soon as reasonably practicable but in no event later than forty-five (45) calendar days after the Petition Date;

(viii)    obtain entry of the Canadian Final DIP Recognition Order by the Canadian Court as soon as reasonably practicable but in no event no later than ten (10) calendar days after the entry of the Final DIP Order;

(ix)    obtain entry by the Bankruptcy Court of the Disclosure Statement Order and the Backstop Order no later than sixty (60) calendar days after the Petition Date;

(x)    obtain entry by the Bankruptcy Court of the Confirmation Order no later than one-hundred-twenty (120) calendar days after the Petition Date;

(xi)    obtain entry of the Canadian Confirmation Recognition Order by the Canadian Court no later than ten (10) calendar days after the entry of the Confirmation Order; and

(xii)    cause the Plan Effective Date to occur no later than one-hundred-forty (140) days after the Petition Date; provided that this Milestone may be extended by the Debtors up to thirty (30) days if the purpose of such extension is solely to obtain regulatory approvals.

(b)    For purposes of this Section 5.18, capitalized terms not otherwise defined in this Agreement shall have the respective meanings specified in the Restructuring Support Agreement.  Notwithstanding anything to the contrary set forth in this Agreement or any other Loan Document, in the extent any amendment, waiver, supplement or other modification is made to Schedule 1 of the Restructuring Support Agreement (except to the extent that such modification relates to any of clauses (a)(iii), (a)(iv), (a)(vii), (a)(viii), (a)(x) or (a)(xii) above), such amendment, waiver, supplement or other modification shall be deemed to be made to this Section 5.18 without any further action required by any party to this Agreement.

Section 5.19    Canadian Pension Plans.

(a)    Except as individually or in the aggregate would not reasonably be expected to result in a Material Adverse Effect, for each existing, or hereafter adopted, Canadian Pension Plan, comply with and perform in all respects all of its obligations under and in respect of such Canadian Pension Plan, including under any funding agreements and all applicable laws (including any fiduciary, funding, investment and administration obligations)

(b)    Deliver to the Administrative Agent (for distribution by the Administrative Agent to the Lenders) (A) if requested by the Administrative Agent (acting at the direction of the Required Lenders), copies of each actuarial report or valuation with respect to each Canadian Pension Plan as filed with any applicable Governmental Authority; and (B) prior notification of the establishment of any new Canadian Defined Benefit Plan to which any Loan Party has assumed an obligation to contribute or has any liability under, or the assumption of any liability under or commencement of contributions to any Canadian Defined Benefit Plan by the applicable Loan Party.

(c)    Promptly upon any Loan Party becoming aware of the occurrence of any Canadian Pension Event, provide a written notice to the Administrative Agent (for distribution by the Administrative Agent to the Lenders) specifying the nature thereof.


# ARTICLE VI
# NEGATIVE COVENANTS

Each Borrower (and in the case of Section 6.12, each Parent and Parent Entity Debtor) and JB TopCo covenants and agrees with each Lender that, until the Termination Date, unless the Required Lenders shall otherwise consent in writing, the Borrowers will not, and will not permit any of their Subsidiaries (or in the case of JB TopCo will not, and will not permit any of its Subsidiaries (other than, except as set forth in Section 6.16, Journey Beyond and its subsidiaries)) to:

Section 6.01    Indebtedness.  Incur, create, assume or permit to exist any Indebtedness, except:

(a)     Indebtedness of the Loan Parties or any JB TopCo Restricted Party existing or committed on the Petition Date (<u>provided</u> that any such Indebtedness that is in excess of $2,000,000 (other than Indebtedness owed by JP TopCo and HB TopCo) shall be set forth on <u>Schedule 6.01</u>);

(b)     Indebtedness created hereunder and under the other Loan Documents;

(c)     [reserved];

(d)     Indebtedness owed to (including obligations in respect of letters of credit or bank guarantees or similar instruments for the benefit of) any person providing workers' compensation, health, disability or other employee benefits or property, casualty or liability insurance to any Borrower or any Subsidiary, pursuant to reimbursement or indemnification obligations to such person, in each case in the ordinary course of business or consistent with past practice or industry practices;

(e)     Unsecured Indebtedness of any Borrower to any other Borrower, any Parent or any Subsidiary or of any Subsidiary to any Parent, any Borrower or any other Subsidiary; <u>provided</u> that (i) Indebtedness of any Subsidiary that is not a Subsidiary Loan Party owing to the Loan Parties shall be subject to Section 6.04(b), (ii) Indebtedness of any Subsidiary that is not a Subsidiary Loan Party owing to JB TopCo shall not be permitted, and (iii) Indebtedness owed by any Loan Party to any Parent or any Subsidiary that is not a Loan Party shall be unsecured and subordinated to the Obligations under this Agreement on subordination terms substantially in the form of <u>Exhibit G</u> hereto or on other subordination terms reasonably satisfactory to the Administrative Agent (acting at the direction of the Required Lenders);

(f)     Indebtedness in respect of performance bonds, bid bonds, appeal bonds, surety bonds and completion guarantees and similar obligations, in each case provided in the ordinary course of business or consistent with past practice or industry practices, including those incurred to secure health, safety and environmental obligations in the ordinary course of business or consistent with past practice or industry practice, in an aggregate amount not to exceed $1,000,000;

(g)     Indebtedness arising from the honoring by a bank or other financial institution of a check, draft or similar instrument drawn against insufficient funds in the ordinary course of business or other cash management services, in each case incurred the ordinary course of business;

(h)     Indebtedness permitted by the Budget;

(i)     Financing Lease Obligations, mortgage financings and other Indebtedness incurred by any Borrower or any Subsidiary prior to or within 270 days after the acquisition, lease, construction, repair, replacement or improvement of the respective property (real or personal, and whether through the direct purchase of property or the Equity Interest of any person owning such property) permitted under this Agreement in order to finance such acquisition, lease, construction, repair, replacement or improvement, in an aggregate principal amount that at the time of, and after giving effect to, the incurrence thereof, together with the aggregate amount of any other Indebtedness outstanding pursuant to this Section 6.01(i), would not exceed $1,000,000;

(j)     Financing Lease Obligations or other obligations or deferrals attributable to capital spending;

(k)     Unsecured other Indebtedness in an aggregate principal amount that at the time of, and after giving effect to, the incurrence thereof, together with the aggregate amount of any other Indebtedness outstanding pursuant to this Section 6.01(k), would not exceed $1,000,000; <u>provided</u> that the aggregate principal amount of any such Indebtedness incurred by any Subsidiary that is not a Guarantor shall not exceed at the time of, and after giving effect to, the incurrence thereof, $500,000;

(l)     [reserved];

(m)     Guarantees (i) by any Loan Party of any Indebtedness of any Borrower or any other Loan Party permitted to be incurred under this Agreement, (ii) by any Borrower or any Subsidiary Loan Party of Indebtedness

otherwise permitted hereunder of any Subsidiary that is not a Subsidiary Loan Party to the extent such Guarantees are permitted by Section 6.04 (other than Section 6.04(v)), (iii) by any Subsidiary that is not a Subsidiary Loan Party of Indebtedness of another Subsidiary that is not a Subsidiary Loan Party, and (iv) to the extent outstanding on the Closing Date, by any Borrower of Indebtedness of Subsidiaries that are not Subsidiary Loan Parties incurred for working capital purposes in the ordinary course of business on ordinary business terms so long as such Indebtedness is permitted to be incurred under Section 6.01(t) to the extent such Guarantees are permitted by Section 6.04 (other than Section 6.04(v)); provided that (x) Guarantees by any Borrower or any Subsidiary Loan Party under this Section 6.01(m) of any other Indebtedness of a person that is subordinated to other Indebtedness of such person shall be expressly subordinated to the Obligations under this Agreement to at least the same extent as such underlying Indebtedness is subordinated and (y) no Guarantee by any Subsidiary of any obligations under the Junior DIP Credit Agreement, the Prepetition First Lien Credit Agreement, the Prepetition Revolving Credit Agreement or any other Junior Financing shall be permitted unless such Subsidiary has also provided a Guarantee of the Obligations pursuant to this Agreement;

(n)     Indebtedness arising from agreements entered into prior to the Closing Date of any Borrower or any Subsidiary providing for indemnification, adjustment of purchase or acquisition price or similar obligations (including earn-outs), in each case, incurred or assumed in connection with Investments or the disposition of any business, assets or a Subsidiary not prohibited by this Agreement;

(o)     Indebtedness in respect of letters of credit, bank guarantees, warehouse receipts or similar instruments issued to support performance obligations and trade letters of credit (other than obligations in respect of other Indebtedness) in the ordinary course of business or consistent with past practice or industry practices, in an aggregate amount not to exceed $1,000,000;

(p)     [reserved];

(q)     Indebtedness consisting of (i) the financing of insurance premiums or (ii) take-or-pay obligations contained in supply arrangements, in each case, in the ordinary course of business consistent with past or industry practice;

(r)     [reserved];

(s)     [reserved];

(t)     [reserved];

(u)     Indebtedness incurred in the ordinary course of business in respect of obligations of any Borrower or any Subsidiary to pay the deferred purchase price of goods or services or progress payments in connection with such goods and services; provided that such obligations are incurred in connection with open accounts extended by suppliers on customary trade terms in the ordinary course of business consistent with past or industry practice and not in connection with the borrowing of money or any Hedging Agreements;

(v)     Indebtedness representing deferred compensation to employees, consultants or independent contractors of any Borrower (or, to the extent such work is done for any Borrower or their respective Subsidiaries, any direct or indirect parent thereof) or any Subsidiary incurred in the ordinary course of business consistent with past or industry practice;

(w)     [reserved];

(x)     Indebtedness of any Borrower or any other Loan Party under (x) the Junior DIP Loan Documents, in an aggregate principal amount outstanding that would not exceed an amount equal to $284,677,918.10, (y) the Prepetition First Lien Loan Documents, in an aggregate principal amount outstanding that would not exceed an amount equal to $695,543,945.45 and (z) the Prepetition Revolving Loan Documents, in an aggregate principal amount outstanding that would not exceed an amount equal to $26,407,961.78;

      (y)       obligations in respect of Cash Management Agreements in the ordinary course of business;

      (z)       [reserved];

      (aa)     [reserved];

      (bb)     [reserved];

      (cc)     [reserved];

      (dd)    Indebtedness issued by any Borrower or any of its Subsidiary to current or former officers, directors and employees, their respective estates, spouses or former spouses to finance the purchase or redemption of Equity Interests of any Parent or any Parent Entity permitted by Section 6.06;

      (ee)     [reserved];

      (ff)      [reserved]; and

      (gg)    all premium (if any, including tender premiums) expenses, defeasance costs, interest (including post-petition interest), fees, expenses, charges and additional or contingent interest on obligations described in clauses (a) through (ff) above or refinancings thereof.

      Notwithstanding anything to the contrary herein, (i) in no event shall Indebtedness (other than Indebtedness incurred pursuant to Section 6.01(h) that is expressly permitted to be incurred by the Budget) incurred by the Subsidiaries of the Borrowers which are not Loan Parties, in the aggregate, exceed $500,000 and (ii) in no event shall JB TopCo or HB TopCo incur any Indebtedness after the Closing Date.

      For purposes of determining compliance with this Section 6.01, the amount of any Indebtedness denominated in any currency other than Dollars shall be calculated based on customary currency exchange rates in effect, in the case of such Indebtedness incurred (in respect of term Indebtedness) or committed (in respect of revolving Indebtedness) on or prior to the Closing Date, on the Closing Date and, in the case of such Indebtedness incurred (in respect of term Indebtedness) or committed (in respect of revolving Indebtedness) after the Closing Date, on the date on which such Indebtedness was incurred (in respect of term Indebtedness) or committed (in respect of revolving Indebtedness). In addition, with respect to any Indebtedness that was permitted to be incurred hereunder on the date of such incurrence, any Increased Amount of such Indebtedness shall also be permitted hereunder after the date of such incurrence.

      Section 6.02     <u>Liens</u>.  Create, incur, assume or permit to exist any Lien on any property or assets (including stock or other securities of any person) of any Borrower or any Subsidiary at the time owned by it or on any income or revenues or rights in respect of any thereof, except the following (collectively, "<u>Permitted Liens</u>"):

      (a)      Liens on property or assets of the Borrowers and the Subsidiaries existing on the Petition Date (<u>provided</u> that any such liens that secure obligations (contingent or otherwise) in excess of $500,000 shall be set forth on <u>Schedule 6.02(a)</u>); <u>provided</u>, <u>further</u>, that such Liens shall secure only those obligations that they secure on the Petition Date and shall not subsequently apply to any other property or assets of the Borrowers or any Subsidiary other than (A) after-acquired property that is affixed or incorporated into the property covered by such Liens, and (B) proceeds and products thereof;

      (b)      any Lien created under the Loan Documents or permitted in respect of any Mortgaged Property or Mortgaged Vessel by the terms of the applicable Mortgage;

      (c)      (i) Liens securing obligations permitted to be incurred under Section 6.01(x), (ii) the Carve Out and (iii) Liens granted as adequate protection pursuant to an order of the Bankruptcy Court; provided that, in each case such Liens shall be subject to the priorities set forth in the Bankruptcy Court DIP Order, the Canadian DIP Recognition Order and the Intercreditor Agreements;

(d)        Liens for Taxes, assessments or other governmental charges or levies not yet delinquent by more than 30 days or that are being contested in compliance with Section 5.05;

(e)        Liens imposed by law, such as landlords', carriers', warehousemen's, mechanics', materialmen's, repairmen's, suppliers', construction or other like Liens, securing obligations that are not overdue by more than 30 days or that are being contested in good faith by appropriate proceedings and in respect of which, if applicable, any Borrower or any Subsidiary shall have set aside on its books reserves in accordance with GAAP;

(f)        Subject to the Bankruptcy Court DIP Order and the Canadian DIP Recognition Order, (i) pledges and deposits and other Liens made in the ordinary course of business in compliance with the Federal Employers Liability Act or any other workers' compensation, unemployment insurance and other social security laws or regulations and deposits securing liability to insurance carriers under insurance or self-insurance arrangements in respect of such obligations and (ii) pledges and deposits and other Liens securing liability for reimbursement or indemnification obligations of (including obligations in respect of letters of credit or bank guarantees for the benefit of) insurance carriers providing property, casualty or liability insurance to any Borrower or any Subsidiary;

(g)        deposits and other Liens to secure the performance of bids, trade contracts (other than for Indebtedness), leases (other than Financing Lease Obligations), statutory obligations, surety and appeal bonds, performance and return of money bonds, bids, leases, government contracts, trade contracts, agreements with utilities, and other obligations of a like nature (including letters of credit in lieu of any such bonds or to support the issuance thereof) incurred in the ordinary course of business, including those incurred to secure health, safety and environmental obligations in the ordinary course of business or consistent with past practice or industry practice or otherwise constituting Investments permitted by Section 6.04;

(h)        (i) zoning restrictions, easements, survey exceptions, trackage rights, leases (other than Financing Lease Obligations), licenses, special assessments, rights-of-way, covenants, conditions, restrictions and declarations on or with respect to the use of Real Property or Vessels, servicing agreements, development agreements, site plan agreements and other similar encumbrances incurred in the ordinary course of business and (ii) title defects or irregularities that are of a minor nature and that, individually or in the aggregate, do not interfere in any material respect with the ordinary conduct of the business of any Borrower or any Subsidiary;

(i)        Liens securing Indebtedness permitted by Section 6.01(i) or (j); provided that such Liens do not apply to any property or assets of any Borrower or any Subsidiary other than the property or assets acquired, leased, constructed, replaced, repaired or improved with such Indebtedness (or the Indebtedness refinanced thereby), and accessions and additions thereto, proceeds and products thereof and customary security deposits and (ii) individual financings provided by one lender may be cross-collateralized to other financings of the same type provided by such lender (and its Affiliates);

(j)        [Reserved];

(k)        Liens securing judgments that do not constitute an Event of Default under Section 7.01(j);

(l)        Liens disclosed (i) by the title insurance policies or surveys reasonably acceptable to the Administrative Agent, delivered with respect to the Mortgaged Properties set forth on Schedule 1.01(B) as of the Closing Date or subsequent to the Closing Date pursuant to Section 5.11 or Schedule 5.15 and any replacement, extension or renewal of any such Lien; provided that such replacement, extension or renewal Lien shall not cover any property other than the property that was subject to such Lien prior to such replacement, extension or renewal; provided, further, that the Indebtedness and other obligations secured by such replacement, extension or renewal Lien are permitted by this Agreement, and (ii) by abstracts of title issued by the National Vessel Documentation Center delivered with respect to the Material Vessels and Additional Collateral Vessels set forth on Schedule 1.01(F) as of the Closing Date; provided that the Borrowers will cause any Liens so disclosed to be discharged promptly after the Closing Date with proceeds of Term Loans;

(m)        any interest or title of a lessor or sublessor under any leases or subleases entered into by any Borrower or any Subsidiary in the ordinary course of business;

(n)        Liens that are contractual rights of setoff (i) relating to the establishment of depository relations with banks and other financial institutions not given in connection with the issuance of Indebtedness, (ii) relating to pooled deposits, sweep accounts, reserve accounts or similar accounts of any Borrower or any Subsidiary to permit satisfaction of overdraft or similar obligations incurred in the ordinary course of business of any Borrower or any Subsidiary, including with respect to credit card charge-backs and similar obligations, or (iii) relating to purchase orders and other agreements entered into with customers, suppliers or service providers of any Borrower or any Subsidiary in the ordinary course of business;

(o)        Liens (i) arising solely by virtue of any statutory or common law provision relating to banker's liens, rights of setoff or similar rights, (ii) attaching to commodity trading accounts or other commodity brokerage accounts incurred in the ordinary course of business, (iii) encumbering reasonable customary initial deposits and margin deposits and similar Liens attaching to brokerage accounts incurred in the ordinary course of business and not for speculative purposes or (iv) in respect of Third Party Funds;

(p)        Liens securing obligations in respect of trade-related letters of credit, bankers' acceptances or similar obligations permitted under Section 6.01(f), (h) or (o) and covering the property (or the documents of title in respect of such property) financed by, or cash collateralizing, such letters of credit, bankers' acceptances or similar obligations and the proceeds and products thereof;

(q)        leases or subleases, licenses or sublicenses (including with respect to Intellectual Property), in each case granted to others in the ordinary course of business on a non-exclusive basis not interfering in any material respect with the business of the Borrowers and their Subsidiaries, taken as a whole;

(r)        Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods;

(s)        [reserved];

(t)        with respect to Real Property Located in Canada, the reservations in any original grants from the Crown of any Real Property or interest therein and statutory exceptions to title;

(u)        Liens on any amounts held by a trustee under any indenture or other debt agreement issued in escrow pursuant to customary escrow arrangements pending the release thereof, or under any indenture or other debt agreement pursuant to customary discharge, redemption or defeasance provisions;

(v)        the prior rights of consignees and their lenders under consignment arrangements entered into in the ordinary course of business consistent with past practice or industry practice;

(w)        agreements to subordinate any interest of any Borrower or any Subsidiary in any accounts receivable or other proceeds arising from inventory consigned by any Borrower or any of its Subsidiaries pursuant to an agreement entered into in the ordinary course of business;

(x)        Liens arising from precautionary Uniform Commercial Code financing statements;

(y)        Liens existing on the Petition Date on Equity Interests in joint ventures (i) securing obligations of such joint venture or (ii) pursuant to the relevant joint venture agreement or arrangement;

(z)        Liens on securities that are the subject of repurchase agreements constituting Permitted Investments under clause (e) of the definition thereof;

(aa)        Liens on the Collateral securing obligations under the Junior DIP Credit Agreement; provided that such Liens shall be subordinated to the Liens created under the Loan Documents pursuant to any Intercreditor Agreement;

(bb)        [reserved];

(cc)     Liens securing insurance premiums financing arrangements; <u>provided</u> that such Liens are limited to the applicable unearned insurance premiums;

(dd)     in the case of Real Property that constitutes a leasehold interest, any Lien to which the fee simple interest (or any superior leasehold interest) is subject;

(ee)     Liens securing Indebtedness or other obligation (i) of any Borrower or a Subsidiary in favor of any Borrower or any Subsidiary Loan Party and (ii) of any Subsidiary that is not a Loan Party in favor of any Subsidiary that is not a Loan Party;

(ff)     Liens on not more than $5,000,000 of deposits securing Hedging Agreements entered into for non-speculative purposes;

(gg)     Liens on goods or inventory the purchase, shipment or storage price of which is financed by a documentary letter of credit, bank guarantee or bankers' acceptance issued or created for the account of any Borrower or any Subsidiary in the ordinary course of business; <u>provided</u> that such Lien secures only the obligations of such Borrower or such Subsidiaries in respect of such letter of credit, bank guarantee or banker's acceptance to the extent permitted under Section 6.01;

(hh)     [reserved];

(ii)     [reserved];

(jj)     [reserved];

(kk)     [reserved];

(ll)     [reserved];

(mm)     other Liens with respect to property or assets of any Borrower or any Subsidiary securing obligations (other than obligations in respect of indebtedness for borrowed money) in an aggregate principal amount that at the time of, and after giving effect to, the incurrence of such Liens, would not exceed $500,000; <u>provided</u> that any such Liens on Collateral shall be junior in right of security to the Liens securing the Obligations;

(nn)     (i) Liens of the National Park Service and (ii) Liens on assets of Hornblower Canada Co. granted in favor of The Niagara Parks Commission pursuant to the Niagara Contract, any Niagara Security Agreement or any other agreement required thereunder;

(oo)     Liens in the ordinary course of business for dry-docking, maintenance, repairs and improvements to Vessels, crews' wages, salvage (including contract salvage) and other maritime liens (other than in respect of Indebtedness); and

(pp)     the CCAA Charges.

In addition, with respect to any Lien securing Indebtedness that was permitted to secure such Indebtedness at the time of the incurrence of such Indebtedness, such Lien shall also be permitted to secure any Increased Amount of such Indebtedness.

Section 6.03     <u>Sale and Lease-Back Transactions</u>.  Enter into any arrangement, directly or indirectly, with any person whereby it shall sell or transfer any property, real or personal, used or useful in its business, whether now owned or hereafter acquired, and thereafter, as part of such transaction, rent or lease such property or other property that it intends to use for substantially the same purpose or purposes as the property being sold or transferred.

Section 6.04     <u>Investments, Loans and Advances</u>.  (i) Purchase or acquire (including pursuant to any merger or amalgamation with a person that is not a Wholly Owned Subsidiary immediately prior to such merger or

amalgamation) any Equity Interests, evidences of Indebtedness or other securities of any other person, (ii) make any loans or advances to or Guarantees of the Indebtedness of any other person (other than in respect of intercompany liabilities incurred in connection with the cash management, tax and accounting operations of the Borrowers and the Subsidiaries), or (iii) purchase or otherwise acquire, in one transaction or a series of related transactions, (x) all or substantially all of the property and assets or business of another person or (y) assets constituting a business unit, line of business or division of such person or (iv) make a capital contribution to any other Person (each of the foregoing, an "Investment"), except:

(a)       Investments made pursuant to, or in connection with, the AQV Wind-down Plan;

(b)       (i) Investments by any Borrower or any Subsidiary in the Equity Interests of any Borrower or any Subsidiary which is set forth on Schedule 6.04; (ii) intercompany loans by any Borrower, any Subsidiary Loan Party to any Borrower or any other Subsidiary existing on the Petition Date which is set forth on Schedule 6.04; and (iii) Guarantees by any Borrower or any Subsidiary of Indebtedness otherwise permitted hereunder of any Borrower or any Subsidiary; provided that no such Investments by Loan Parties shall be made in Subsidiaries that are not Subsidiary Loan Parties;

(c)       Permitted Investments and Investments that were Permitted Investments when made;

(d)       [reserved];

(e)       loans and advances to officers, directors, employees or consultants of any Borrower or any Subsidiary (i) in the ordinary course of business (calculated without regard to write-downs or write-offs thereof), (ii) in respect of payroll payments and expenses in the ordinary course of business and (iii) in connection with such person's purchase of Equity Interests of any Parent (or any Parent Entity) solely to the extent that the amount of such loans and advances shall be contributed to such Borrower in cash as common equity;

(f)       accounts receivable, security deposits and prepayments arising and trade credit granted in the ordinary course of business and any assets or securities received in satisfaction or partial satisfaction thereof from financially troubled account debtors to the extent reasonably necessary in order to prevent or limit loss and any prepayments and other credits to suppliers made in the ordinary course of business;

(g)       Hedging Agreements entered into for non-speculative purposes;

(h)       Investments existing on, or contractually committed as of, the Petition Date and set forth on Schedule 6.04 and any extensions, renewals or reinvestments thereof, so long as the aggregate amount of all Investments pursuant to this clause (h) is not increased at any time above the amount of such Investment existing or committed on the Petition Date (other than pursuant to an increase as required by the terms of any such Investment as in existence on the Petition Date);

(i)       Investments resulting from pledges and deposits under Sections 6.02(f), (g), (o), (r), (s), (ee) and (ll);

(j)       Investments permitted by the Budget;

(k)       [reserved];

(l)       intercompany loans between Subsidiaries that are not Loan Parties and Guarantees by Subsidiaries that are not Loan Parties permitted by Section 6.01(m);

(m)       Investments received in connection with the bankruptcy or reorganization of, or settlement of delinquent accounts and disputes with or judgments against, customers and suppliers, in each case in the ordinary course of business or Investments acquired by a Borrower or a Subsidiary as a result of a foreclosure or realization by any Borrower or any of the Subsidiaries with respect to any secured Investments or other transfer of title with respect to any secured Investment in default;

(n)      [reserved];

(o)      [reserved];

(p)      Guarantees by any Borrower or any Subsidiary of operating leases (other than Financing Lease Obligations) or of other obligations that do not constitute Indebtedness, in each case entered into by any Borrower or any Subsidiary in the ordinary course of business;

(q)      [reserved];

(r)      [reserved];

(s)      Investments consisting of the non-exclusive licensing of Intellectual Property pursuant to joint marketing arrangements with unaffiliated third parties in the ordinary course of business;

(t)      Investments in the ordinary course of business consisting of Uniform Commercial Code Article 3 endorsements for collection or deposit and Uniform Commercial Code Article 4 customary trade arrangements with customers consistent with past practice and industry practice;

(u)      [reserved];

(v)      Guarantees permitted under Section 6.01(m) (except to the extent such Guarantee is expressly subject to this Section 6.04);

(w)      advances in the form of a prepayment of expenses, so long as such expenses are being paid in accordance with customary trade terms of such Borrower or such Subsidiary;

(x)      [reserved];

(y)      Investments by JB TopCo or HB TopCo made for the purpose of funding capital contributions to Journey Beyond; provided that (i) such Investment shall be made substantially concurrently with (and in any event within three (3) Business Days) of the receipt of cash proceeds from any cash capital contributions to Hornblower Holdings LP in exchange for the issuance of common Qualified Equity Interests and (ii) such contributions shall be made in the form specified in clause (i) to each intermediate entity between HB TopCo and Journey Beyond within such three Business Day period;

(z)      Investments consisting of the licensing or contribution of Intellectual Property pursuant to joint marketing arrangements with other persons in the ordinary course of business; and

(aa)      To the extent constituting Investments, purchases and acquisitions of inventory, supplies, materials and equipment or purchases of contract rights or non-exclusive licenses or leases of Intellectual Property in each case in the ordinary course of business.

Notwithstanding anything to the contrary, (i) any Investment made by Loan Parties pursuant to this Section 6.04 (other than Investments made pursuant to Sections 6.04(j) or 6.04(y)) in a Person that is not a Subsidiary Loan Party shall not be permitted and (ii) no Investments after the Petition Date made in, or made by, JB TopCo or HB TopCo shall be permitted other than Investments permitted to be made pursuant to Section 6.04(y).

Section 6.05      Mergers, Amalgamations Consolidations, Sales of Assets and Acquisitions.  Merge into, amalgamate or consolidate with any other person, or permit any other person to merge into, amalgamate or consolidate with it, or Dispose of (in one transaction or in a series of related transactions) all or any part of its assets (whether now

owned or hereafter acquired), effect any Delaware LLC Division or Dispose of any Equity Interests of any Borrower or any Subsidiary, or purchase, lease or otherwise acquire (in one transaction or a series of transactions) all of the assets of any other person or division or line of business of a person, or create, form or organize any subsidiary or legal entity after the Petition Date, except that this Section 6.05 shall not prohibit:

(a)        (i) the purchase and Disposition of inventory owned by any Foreign Subsidiary, in each case in the ordinary course of business by any Borrower or any Subsidiary, (ii) the acquisition or lease (pursuant to an operating lease) of any other asset in the ordinary course of business by any Borrower or any Subsidiary or, with respect to operating leases, otherwise for fair market value on market terms (as determined in good faith by the Borrowers in consultation with the Required Lenders) or (iii) the Disposition of Permitted Investments in the ordinary course of business;

(b)        Dispositions made pursuant to, or in connection with, the AQV Wind-down Plan;

(c)        Dispositions (excluding to JB TopCo or any Person owned by JB TopCo) to any Borrower or a Subsidiary Loan Party (upon voluntary liquidation or otherwise; provided that, with respect to any Dispositions by a Loan Party to a Subsidiary that is not a Subsidiary Loan Party in reliance on this clause (c), 100% of such consideration shall be received in cash and any such Disposition by a Loan Party to a Subsidiary that is not a Subsidiary Loan Party shall be made in the ordinary course of business for fair market value and the aggregate amount of Dispositions pursuant to the clause (c) shall not exceed $1,000,000;

(d)        Dispositions by HB TopCo in connection with any JB Disposition to an unaffiliated third party; provided that for the avoidance of doubt, such JB Disposition shall not involve the Disposition of Collateral (including equity interests issued by HB TopCo) or any other property owned by a Subsidiary Loan Party;

(e)        Investments permitted by Section 6.04, Permitted Liens, and Restricted Payments permitted by Section 6.06;

(f)        Dispositions of defaulted receivables in the ordinary course of business and not as part of an accounts receivable financing transaction; provided that the Net Proceeds thereof, if any, are applied in accordance with Section 2.11(b);

(g)        the sale or issuance (other than to a Subsidiary of any Borrower or to any Subsidiary management equity plan or stock option plan or any other management or employee benefit plan or agreement) of common Qualified Equity Interests of Hornblower Holdings LP substantially concurrently with (and in any event within three (3) Business Day), and for the purpose of financing, Investments permitted pursuant to Section 6.04(y);

(h)        [reserved];

(i)        leases, licenses or subleases or sublicenses any real or personal property (other than Intellectual Property) in the ordinary course of business;

(j)        [reserved];

(k)        Dispositions of inventory or Dispositions or abandonment of Intellectual Property of any Borrower and their respective Subsidiaries determined in good faith by the management of the Borrowers to be no longer useful or necessary in the operation of the business of the Borrowers or any of their Subsidiaries; provided that the Net Proceeds thereof are applied in accordance with Section 2.11(b);

(l)        [reserved];

(m)        [reserved];

(n)       Dispositions permitted by the Budget;

(o)       Dispositions not otherwise permitted by this Section 6.05; provided that the aggregate gross proceeds thereof shall not exceed, in any fiscal year of the Borrowers, $1,000,000; and

(p)       Dispositions, including of any Vessels, to the New York City Economic Development Corporation or any affiliate or successor Person in accordance with the terms of the New York Ferry Agreement.

Notwithstanding anything to the contrary, no Disposition shall be made pursuant to this Section 6.05 (or otherwise under this Agreement) to the Sponsor or a Person that is not a Borrower or any Subsidiary thereof or JB TopCo, and no Disposition shall be made to HB TopCo, JB TopCo or any Person owned (directly or indirectly) by JB TopCo and (y) no Disposition of any Vessel shall be permitted absent the prior written consent of the Required Lenders unless made in reliance on Section 6.05(n) or (o) or the Net Proceeds of such Disposition are applied to the indefeasible payment in full in cash of the Obligations.

Section 6.06      Dividends and Distributions.   Declare or pay (i) any dividend or make any other distribution (by reduction of capital or otherwise), whether in cash, property, securities or a combination thereof, with respect to any of its (or any other Person's) Equity Interests (other than dividends and distributions on Equity Interests payable solely by the issuance of additional Equity Interests (other than Disqualified Stock) of the person paying such dividends or distributions) or directly or indirectly redeem, purchase, retire or otherwise acquire for value (or permit any Subsidiary to purchase or acquire) any of its or any Person's Equity Interests or set aside any amount for any such purpose (other than through the issuance of additional Equity Interests (other than Disqualified Stock) of the person redeeming, purchasing, retiring or acquiring such shares), (ii) any payment made to retire, or to obtain the surrender of, any outstanding warrants, options or other rights to acquire shares of any class of stock of the Parents, the Borrowers or any of their respective Subsidiaries (or any direct or indirect parent of the Borrowers or Parents or JB TopCo) now or hereafter outstanding (iii) any management, reimbursement or similar fees payable to the Sponsor or any of its Affiliates (all of the foregoing, "Restricted Payments"); provided, however, that:

(a)       Restricted Payments may be made to any Borrower or any Wholly Owned Subsidiary of any Borrower (other than JB TopCo) (or, in the case of non-Wholly Owned Subsidiaries, to the Borrowers or any Subsidiary that is a direct or indirect parent of such Subsidiary and to each other owner of Equity Interests of such Subsidiary on a pro rata basis (or more favorable basis from the perspective of the Borrowers or such Subsidiary) based on their relative ownership interests);

(b)       To the extent provided for in the Budget, Restricted Payments may be made in respect of (i) overhead, legal, accounting and other Professional Fees and expenses of any Parent, JB TopCo Parent or any Parent Entity, (ii) [reserved], (iii) franchise and similar taxes and other fees and expenses in connection with the maintenance of its existence and its ownership of any Borrower or JB TopCo, (iv) payments permitted by Section 6.07(b) (other than Section 6.07(b)(vii)), (v) in respect of any taxable period ending after the Petition Date for which JB TopCo, any Borrower and/or any of its Subsidiaries are, for U.S. federal and/or applicable state and local and non-U.S. income tax purposes, (A) disregarded entities directly or indirectly owned by any Parent, JB TopCo Parent or Parent Entity that is a corporation (the "Corporate Parent") or (B) members of a consolidated, combined, affiliated, unitary or similar tax group of which a direct or indirect Parent, JB TopCo Parent or Parent Entity is the common parent (the "Common Parent"), distributions to the Corporate Parent or the Common Parent, as applicable, the proceeds of which will be used to pay its U.S. federal and applicable state and local and non-U.S. income taxes attributable to the operations of any JB TopCo Restricted Party, Borrower or its applicable Subsidiaries, in an amount not to exceed the amount of such U.S. federal, state or local or non-U.S. income taxes that such JB TopCo Restricted Party, Borrower and/or such Subsidiaries, as applicable, would have paid for such taxable period had such JB TopCo Restricted Party, Borrower and/or its applicable Subsidiaries, as applicable, been a stand-alone corporate taxpayer or a stand-alone corporate group, (vi) [reserved] and (vii) customary salary, bonus and other benefits payable to, and indemnities provided on behalf of, officers, directors and employees of any Parent or JB TopCo Parent in order to permit any Parent or JB TopCo Parent to make such payments; provided that in the case of subclauses (i), (ii) and (iii), the amount of such Restricted Payments shall not exceed the portion of any amounts referred to in such subclauses (i), (ii) and (iii) that are allocable to any Borrower and its Subsidiaries (which shall be 100% for so long as, as the case may be, (x) each Parent or JB TopCo Parent owns no material assets other than the Equity Interests in such Borrower or JB TopCo, as applicable, and assets incidental to such equity ownership, or (y) any Parent Entity owns directly or indirectly no

material assets other than Equity Interests in such Parent or JB TopCo Parent, as applicable, and assets incidental to such equity ownership); and

(c)     other Restricted Payments made in accordance with the Budget made by any JB TopCo Restricted Party, provided that 100% of the proceeds thereof (net of all taxes (including tax distributions) and fees (including investment banking fees), commissions, costs and other expenses, in each case incurred in connection with such distribution) are promptly distributed to the Loan Parties.

Notwithstanding anything to the contrary in this Agreement, none of JB TopCo or HB TopCo shall make any Restricted Payments other than to the extent expressly permitted by Section 6.06(b) and (c) and dividends by JB TopCo and HB TopCo to their respective direct parents for the purpose of funding the foregoing.

Section 6.07     Transactions with Affiliates.

(a)     Sell or transfer any property or assets to, or purchase or acquire any property or assets from, or otherwise engage in any other transaction with, any of its Affiliates (other than the Loan Parties), unless such transaction (or series of related transactions) is upon terms that are substantially no less favorable to such Borrower or such Subsidiary Loan Party, as applicable, than would be obtained in a comparable arm's-length transaction with a person that is not an Affiliate.

(b)     The foregoing clause (a) shall not prohibit, to the extent otherwise permitted under this Agreement,

(i)     [reserved],

(ii)     Loans or advances to employees or consultants of any Parent, JB TopCo Parent  (or any Parent Entity), any Borrower or any of the Subsidiaries in accordance with Section 6.04(e),

(iii)     transactions among any Borrower or any Subsidiary or any entity that becomes a Subsidiary as a result of such transaction (including via merger, consolidation or amalgamation in which a Subsidiary is the surviving or continuing entity),

(iv)     [reserved],

(v)     agreements and arrangements in existence on the Petition Date set forth on Schedule 6.07, without giving effect to any amendments or modifications thereto,

(vi)     to the extent entered into prior to the Petition Date, (A) any employment agreements entered into by any Borrower or any of the Subsidiaries in the ordinary course of business, (B) any subscription agreement or similar agreement pertaining to the repurchase of Equity Interests pursuant to put/call rights or similar rights with employees, officers or directors, and (C) any employee compensation, benefit plan or arrangement, any health, disability or similar insurance plan which covers employees, and any reasonable employment contract and transactions pursuant thereto,

(vii)     Restricted Payments permitted under Section 6.06, including payments to any Parent (and any Parent Entity), Dispositions permitted pursuant to Section 6.05(b) and Investments permitted under Section 6.04,

(viii)     any purchase by any Parent of the Equity Interests of any Borrower; provided that any Equity Interests of any Borrower held by any Parent shall be pledged to the Collateral Agent (and such Parent shall deliver the relevant certificates or other instruments (if any) representing such Equity Interests to the Collateral Agent) on behalf of the Secured Parties pursuant to the Collateral Agreement,

(ix)     [reserved],

(x)     [reserved],

(xi)        [reserved],

(xii)       [reserved],

(xiii)      [reserved],

(xiv)      [reserved],

(xv)       [reserved],

(xvi)      [reserved],

(xvii)     payments by any Parent (and any Parent Entity), the Borrowers and the Subsidiaries pursuant to a tax sharing agreement or arrangement (whether written or as a matter of practice) that complies with clause (v) of Section 6.06(b),

(xviii)    [reserved], and;

(xix)      Payments, loans (or cancellation of loans) or advances to employees or consultants that are (i) approved by a majority of the Disinterested Directors of each Parent, JB TopCo Parent or each Borrower in good faith, (ii) made in compliance with applicable law and (iii) otherwise permitted under this Agreement.

Section 6.08    Business of the Borrowers and the Subsidiaries.  Notwithstanding any other provisions hereof, engage at any time in any material respect in any business or business activity substantially different from any business or business activity conducted by any of them on the Closing Date.

Section 6.09    Limitation on Payments and Modifications of Indebtedness; Modifications of Certificate of Incorporation, By-Laws and Certain Other Agreements; etc.

(a)        Amend or modify, or grant any waiver or release under or terminate in any manner, the articles or certificate of incorporation, amalgamation, or continuance, notice of articles, by-laws, limited liability company operating agreement, partnership agreement or other organizational documents of any Borrower or any of the Subsidiary.

(b)        Make, directly or indirectly, any payment or other distribution (whether in cash, securities or other property) of, or in respect of, principal of or interest on any subordinated Indebtedness, junior lien Indebtedness or unsecured Indebtedness for borrowed money (including, for the avoidance of doubt, Indebtedness outstanding under the Junior DIP Credit Agreement, the Prepetition First Lien Credit Agreement or the Prepetition Revolving Credit Agreement), other than (i) [reserved], (ii) payments made in compliance with the Budget or (iii) unless an Event of Default has occurred and is continuing, payment of regularly scheduled interest and principal payments as, in the form of payment and when due in respect of any Indebtedness, other than payments in respect of any subordinated Indebtedness; *provided* that the foregoing exceptions shall not apply to any payments in respect of Indebtedness owed to JB TopCo.

(c)        Permit any Subsidiary to enter into any agreement or instrument that by its terms restricts (i) the payment of dividends or distributions or the making of cash advances to any Borrower or any Subsidiary that is a direct or indirect parent of such Subsidiary or (ii) the granting of Liens by such Borrower or such Subsidiary that is a Loan Party pursuant to the Security Documents, in each case other than those arising under any Loan Document, except, in each case, restrictions existing by reason of:

(A)        restrictions imposed by applicable law;

(B)        contractual encumbrances or restrictions in effect on the Closing Date under Indebtedness existing on the Closing Date and set forth on Schedule 6.01;

(C)        the Prepetition Credit Facility Documents and the Junior DIP Loan Documents;

(D)        customary provisions in joint venture agreements and other similar agreements applicable to joint ventures entered into in the ordinary course of business;

(E)        any restrictions imposed by any agreement relating to secured Indebtedness permitted by this Agreement to the extent that such restrictions apply only to the property or assets securing such Indebtedness;

(F)        [reserved];

(G)        customary provisions contained in leases or licenses of Intellectual Property and other similar agreements entered into in the ordinary course of business;

(H)        customary provisions restricting subletting or assignment of any lease governing a leasehold interest;

(I)        customary provisions restricting assignment of any agreement entered into in the ordinary course of business;

(J)        customary restrictions and conditions contained in any agreement relating to the sale, transfer, lease or other disposition of any asset permitted under Section 6.05 pending the consummation of such sale, transfer, lease or other disposition;

(K)        customary restrictions and conditions contained in the document relating to any Lien, so long as (1) such Lien is a Permitted Lien and such restrictions or conditions relate only to the specific asset subject to such Lien, and (2) such restrictions and conditions are not created for the purpose of avoiding the restrictions imposed by this Section 6.09;

(L)        customary net worth provisions contained in Real Property leases entered into by Subsidiaries, so long as the Borrowers have determined in good faith that such net worth provisions would not reasonably be expected to impair the ability of the Borrowers and their Subsidiaries to meet their ongoing obligations;

(M)        [reserved];

(N)        [reserved];

(O)        customary restrictions contained in leases, subleases, licenses or Equity Interests or asset sale agreements otherwise permitted hereby as long as such restrictions relate to the Equity Interests and assets subject thereto;

(P)        restrictions on cash or other deposits imposed by customers under contracts entered into in the ordinary course of business;

(Q)        [reserved]; or

(R)        restrictions imposed by the Niagara Contract or any Niagara Security Agreement.

Notwithstanding anything to the contrary in this Agreement, no payments (whether in respect of principal, interest, fees, premium or otherwise) shall be permitted (and no Loan Party shall directly or indirectly support any such payment) to be made in respect of any Indebtedness owed to or by JB TopCo or HB TopCo.

Section 6.10    Fiscal Year.  In the case of each Borrower, permit its fiscal year to change without prior written notice to the Administrative Agent (acting at the direction of the Required Lenders), in which case, the

Borrowers and the Administrative Agent will, and are hereby authorized by the Lenders to, make any adjustments to this Agreement that are necessary to reflect such change in fiscal year.

Section 6.11    Financial Covenant.  Permit Unrestricted Cash to be less than $10,000,000, as tested on each Monday (or, with respect to any Monday that is not a Business Day, the following Business Day) (such date, a "Liquidity Testing Date"); provided further that on Friday of each week (or, with respect to any Friday that is not a Business Day, the following Business Day), commencing on first Friday after the Closing Date, the Borrowers shall deliver to the Administrative Agent a certificate of a Financial Officer of the Borrowers (a "Liquidity Certificate") (i) certifying that, as of the immediately preceding Liquidity Testing Date, no Event of Default or Default has occurred or, if such an Event of Default or Default has occurred, specifying the nature and extent thereof and any corrective action taken or proposed to be taken with respect thereto and (ii) setting forth computations in reasonable detail demonstrating compliance with this Section 6.11 as of the immediately preceding Liquidity Testing Date and certifying that the Borrowers were in compliance with this Section 6.11 as of the immediately preceding Liquidity Testing Date.

Section 6.12    Passive Holding Companies.

(a)    Each Parent Entity Debtor, each Parent, each JB Holding Entity and each of JB TopCo and HB TopCo will not conduct, transact or otherwise engage in any business or operations other than (i) the ownership of the Equity Interests of any of their respective subsidiaries owned as of the Closing Date, (ii) the maintenance of its legal existence (other than in connection with a merger, amalgamation or consolidation of any Parent or any Parent Entity Debtor with or into any other Parent or any other Parent Entity Debtor), including the ability to incur fees, costs and expenses relating to such maintenance, (iii) participating in tax, accounting and other administrative matters as a member of the consolidated group of the Parent Entity Debtors, the Parents, the JB Holding Entities and the Borrowers, in each case to the same extent as such Person participated prior to the Petition Date, (iv) the performance of its obligations under and in connection with its Organizational Documents, the Loan Documents, the Junior DIP Loan Documents, the Prepetition First Lien Loan Documents, the Prepetition Revolving Loan Documents and (solely with respect to the JB Holding Entities, the JBIH Credit Agreement (in each case, other than any payment, indemnity or reimbursement obligations that are not expressly permitted to be made in accordance with the Budget), (v) [reserved], (vi) incurring customary fees, costs and expenses relating to overhead and general operating including professional fees for legal, tax and accounting issues and paying taxes, in each case, to the extent permitted under the Budget, (vii) providing usual and customary indemnification to officers and directors, (viii) [reserved], (ix) in the case of JB TopCo and HB TopCo, activities expressly permitted pursuant to Article VI of this Agreement and (x) activities incidental to the businesses or activities described in clauses (i) to (ix) of this paragraph to the extent such incidental activities are substantially the same as such activities entered into prior to the Petition Date.

(b)    Each Parent, each Parent Entity Debtor, each JB Holding Entities and each of JB TopCo and HB TopCo will not own or acquire any material assets (other than Equity Interests as referred to in Section 6.12(a)(i) above, or intercompany Investments their respective Subsidiaries on the Closing Date) or incur any liabilities (other than liabilities imposed by law, including tax liabilities, and other liabilities incidental to its existence and business and activities permitted by this Agreement) or issue any Disqualified Stock, or create or suffer to exist any Lien upon any property or assets now owned or hereafter acquired, leased or licensed by it other than the Liens created under the Loan Documents, the Parent Entity Debtor Documents, the Junior DIP Loan Documents, the Prepetition First Lien Loan Documents, the Prepetition Revolving Loan Documents and, solely with respect to the JB Holding Entities, the JBIH Credit Agreement or other Liens expressly permitted under Section 6.02.

(c)    Each Parent, each JB Holding Entities and each Parent Entity Debtor will not guarantee any Indebtedness other than Indebtedness of the Borrowers or any Subsidiaries permitted to be incurred hereunder, Indebtedness under the Parent Entity Debtor Documents that is outstanding on the date hereof, solely with respect to the JB Holding Entities, the JBIH Credit Agreement and each of JB Topco and HB Topco will not guarantee any Indebtedness other than the Obligations under the Loan Documents and under the Junior DIP Loan Documents, the Prepetition First Lien Loan Documents and the Prepetition Revolving Loan Documents.  Notwithstanding the foregoing, nothing in this Section 6.12 shall restrict the JB Holding Entities from any activities permitted under the JBIH Credit Agreement as in effect on the date hereof.

Section 6.13      [Reserved].

Section 6.14      No Unrestricted Subsidiaries.  For the avoidance of doubt, the Loan Parties shall not at any time have the ability to designate any Subsidiary as an "Unrestricted Subsidiary" or any such similar term.

Section 6.15      Amendments to the Prepetition Revolving Loan Documents, Prepetition First Lien Loan Documents or Junior DIP Loan Documents.  The Loan Parties shall not amend or permit any amendment or modification of any Junior DIP Loan Document, Prepetition First Lien Loan Document and/or Prepetition Revolving Loan Document without the prior written consent of the Required Lenders to the extent such amendment, modification or waiver is adverse to the Lenders or their rights hereunder.

Section 6.16      Permitted Activities of Journey Beyond and its Subsidiaries.

Notwithstanding anything to the contrary set forth in this Agreement, JB TopCo shall cause Journey Beyond to not, and shall cause JB TopCo to not permit any of the Journey Beyond Subsidiaries to:

(i)      Incur any (x) Indebtedness for borrowed money or (y) Indebtedness incurred outside of the ordinary course of business and consistent with past practices, in each case, other than:

(A)      (i) the incurrence of Indebtedness under the Journey Beyond Credit Agreement (as in effect on the Closing Date) and (ii) any refinancing thereof, provided that the principal amount (or accreted value, if applicable) of such refinancing Indebtedness does not exceed the principal amount (or accreted value, if applicable) of the then outstanding amounts under the Journey Beyond Credit Agreement (plus unpaid accrued interest and premium (including tender premiums) thereon and underwriting discounts, defeasance costs, fees, commissions, expenses, plus an amount equal to any existing commitment unutilized thereunder and letters of credit undrawn thereunder);

(B)      [reserved];

(C)      [reserved];

(D)      [reserved]; and

(E)      all premiums (if any), interest (including post-petition interest and paid-in-kind interest), fees, expenses, charges and additional or contingent interest on obligations described in clauses (A) through (D) above or refinancings thereof.

(ii)      issue additional Equity Interests or Disqualified Stock to Sponsor or its Affiliates, other than JB TopCo and its subsidiaries;

(iii)      convey, sell or otherwise transfer any assets to the Sponsor or its Affiliates.

Section 6.17      Disbursements.

(i)      The Loan Parties and/or their financial advisors shall meet (which may be done telephonically) with the Required Lenders' Advisors one time per week to (a) discuss proposed disbursements pursuant to clauses (i) and (ii) above and (b) provide general liquidity updates and such additional information reasonably requested by the Required Lenders' Advisors related to the Loan Parties' operations. The Lenders shall be entitled to receive copies of all materials circulated for discussion at any such meeting concurrently with all other participants, and upon request shall be provided with a report as to disbursements approved at any such meeting.

(ii)      At all times after the Closing Date, the Loan Parties shall not make any single disbursement in respect of any obligations arising under the Parent Entity Debtor Documents that are not expressly permitted to be made in accordance with the Budget.

Section 6.18     <u>Amendments of Certain Contracts</u>.  The Loan Parties shall not amend or permit any amendment or modification of the Intercompany Services Agreement, the Restructuring Support Agreement or any Material Contract existing on the Closing Date or any provisions thereunder in any manner that is materially adverse to the Loan Parties.

Section 6.19     <u>Chapter 11 or Canadian Recognition Proceedings Modifications</u>.  Except as permitted pursuant to the terms of this Agreement, the Bankruptcy Court DIP Order and the Canadian DIP Recognition Order or otherwise consented to by the Required Lenders and the Agents:

(a)     Make or permit to be made any change, amendment or modification, or any application or motion for any change, amendment, amendment and restatement or modification, to the Bankruptcy Court DIP Order or the Canadian DIP Recognition Order.

(b)     Incur, create, assume or suffer to exist or permit any other superpriority claim which is pari passu with or senior to the DIP Superpriority Claims of the Administrative Agent, the Collateral Agent and the Lenders hereunder, or the Canadian DIP Charge, except for the Carve Out and the Canadian Administration Charge (as against the Canadian Collateral).

Section 6.20     <u>Canadian Defined Benefit Pension Plans</u>.  Establish, contribute to, maintain, participate in, or otherwise assume any liability in respect of any Canadian Defined Benefit Pension Plans.

**ARTICLE VII**
**EVENTS OF DEFAULT**

Section 7.01     <u>Events of Default</u>.  If any of the following events (any such event, an "<u>Event of Default</u>") shall occur:

(a)     default shall be made in the payment of any principal of any Loan when and as the same shall become due and payable, whether at the due date thereof or at a date fixed for prepayment thereof or by acceleration thereof or otherwise;

(b)     default shall be made in the payment of any interest on any Loan or in the payment of any fee, premium (including Exit Premium and any Extension Fee) or any other amount (other than an amount referred to in paragraph (a) of this Section) payable under any Loan Document, when and as the same shall become due and payable, and such failure shall continue unremedied for a period of three Business Days;

(c)     any representation or warranty made or deemed made by or on behalf of any Parent Entity Debtor, any Parent, any Borrower, any of their Subsidiaries or JB TopCo in or in connection with any Loan Document or any amendment or modification thereof or waiver thereunder, or in any report, certificate, financial statement or other document furnished pursuant to or in connection with any Loan Document or any amendment or modification thereof or waiver thereunder, shall prove to have been incorrect in any material respect when made or deemed made;

(d)     any Parent Entity Debtor, any Parent, any Borrower, any of their Subsidiaries or JB TopCo shall fail to observe or perform any covenant, condition or agreement contained in Section 5.04 (with respect to the existence of such Parent Entity Debtor, such Parent, such Borrower or such Subsidiaries), 5.01(k), 5.01(l), 5.01(m), 5.01(n), 5.01(o), 5.01(p), 5.02(a), 5.02(e), 5.08, 5.15, 5.17, 5.18 or in Article VI;

(e)     any Parent Entity Debtor, any Parent, any Borrower, any of their Subsidiaries or JB TopCo shall fail to observe or perform any covenant, condition or agreement contained in any Loan Document (other than those specified in paragraph (a), (b) or (d) of this Section), and such failure shall continue unremedied for a period of 30 days after notice thereof from the Administrative Agent to the Borrowers;

(f)     any Loan Party or any of its Subsidiaries shall fail to make any payment (whether of principal or interest and regardless of amount) in respect of any Material Indebtedness, when and as the same shall become due and payable (after giving effect to any applicable grace period);

95

(g)     any event or condition occurs that results in any Material Indebtedness (including the Junior DIP Credit Agreement, but excluding Indebtedness under Prepetition First Lien Credit Agreement and the Prepetition Revolving Credit Agreement if and for so long as the remedies under such agreements are subject to the automatic stay applicable under section 362 of the Bankruptcy Code) becoming due prior to its scheduled maturity or that enables or permits (with all applicable grace periods having expired) the holder or holders of such Material Indebtedness or any trustee or agent on its or their behalf to cause such Material Indebtedness to become due, or to require the prepayment, repurchase, redemption or defeasance thereof, prior to its scheduled maturity; provided that this paragraph (g) shall not apply to (i) secured Indebtedness that becomes due as a result of the sale, transfer or other disposition (including as a result of a casualty or condemnation event) of the property or assets securing such Indebtedness (to the extent such sale, transfer or other disposition is not prohibited under this Agreement) or (ii) termination events or similar events (other than defaults or events of default) occurring under any Hedging Agreement that constitutes Material Indebtedness (it being understood that paragraph (f) of this Section will apply to any failure to make any payment required as a result of any such termination or similar event);

(h)     other than in connection with the Restructuring Transactions (as defined in the Restructuring Support Agreement), an involuntary proceeding shall be commenced or an involuntary petition shall be filed seeking (i) liquidation, court protection, reorganization, arrangement or other relief in respect of any Non-Filing Party or its debts, or of a material part of its assets, under any Federal, state, provincial, territorial or foreign bankruptcy, insolvency, receivership, arrangement or similar law now or hereafter in effect or (ii) the appointment of a receiver, interim receiver, receiver and manager, monitor, trustee, custodian, examiner, sequestrator, conservator or similar official for any Non-Filing Party or for a material part of its assets, and, in any such case, such proceeding or petition shall continue undismissed or unstayed for 60 days or an order or decree approving or ordering any of the foregoing shall be entered;

(i)     other than in connection with the Restructuring Transactions (as defined in the Restructuring Support Agreement), any Non-Filing Party shall (i) voluntarily commence any proceeding or file any petition seeking liquidation, court protection, reorganization, arrangement or other relief under any Federal, state or foreign bankruptcy, insolvency, arrangement, receivership or similar law now or hereafter in effect, (ii) consent to the institution of, or fail to contest in a timely and appropriate manner, any proceeding or petition described in paragraph (h) of this Section, (iii) apply for or consent to the appointment of a receiver, interim receiver, receiver and manager, monitor, trustee, examiner, custodian, sequestrator, conservator or similar official for any Non-Filing Party or for a material part of its assets, (iv) file an answer admitting the material allegations of a petition filed against it in any such proceeding or (v) make a general assignment for the benefit of creditors (or any class of creditors);

(j)     Except for any order fixing the amount of any claim in the Chapter 11 Cases, one or more enforceable judgments for the payment of money in an aggregate amount in excess of $2,500,000 (to the extent not covered by insurance as to which the insurer has been notified of such judgment or order and has not denied coverage) shall be rendered against any Loan Party and any of its Subsidiaries or any combination thereof (which arose following the Petition Date) and the same shall remain undischarged for a period of 60 consecutive days during which execution shall not be effectively stayed, or any judgment creditor shall legally attach or levy upon assets of any Borrower or any of its Subsidiaries to enforce any such judgment;

(k)     (i) an ERISA Event occurs that has resulted or would reasonably be expected to result in liability of any Borrower or any of its Subsidiaries in an aggregate amount that would reasonably be expected to result in a Material Adverse Effect, or (ii) any Borrower or any of its Subsidiaries or any ERISA Affiliate fails to pay when due, after the expiration of any applicable grace period, any installment payment with respect to its Withdrawal Liability that has resulted or would reasonably be expected to result in liability of any Borrower or any of its Subsidiaries in an aggregate amount that could reasonably be expected to result in a Material Adverse Effect;

(l)     any Lien purported to be created under any Security Document, the Bankruptcy Court DIP Order or the Canadian DIP Recognition Order shall cease to be, or shall be asserted by any Loan Party or JB TopCo not to be, a valid and perfected Lien on any material portion of the Collateral, with the priority required by the applicable Security Document, except (i) as a result of the sale or other disposition of the applicable Collateral in a transaction permitted under the Loan Documents, (ii) as a result of the Collateral Agent's failure to maintain possession of any stock certificates, promissory notes, certificates of title or other instruments delivered to it under the Security

Documents or (iii) as to Collateral consisting of real property to the extent that such losses are covered by a lender's title insurance policy and such insurer has not denied coverage;

(m)     any material provision of any Loan Document or any Guarantee of a material portion of the Obligations shall for any reason be asserted by any Loan Party or JB TopCo not to be a legal, valid and binding obligation of any Loan Party thereto other than as expressly permitted hereunder or thereunder;

(n)     any Guarantees of the Obligations by any Loan Party pursuant to this Agreement, or the Security Documents shall cease to be in full force and effect (in each case, other than in accordance with the terms of the Loan Documents);

(o)     a Change in Control shall occur;

(p)     (x) an Event of Default under the Journey Beyond Credit Agreement (as in effect on the date hereof) shall have occurred and be continuing or (y) the Administrative Agent (as defined in the Journey Beyond Credit Agreement) or any Lender (as defined in the Journey Beyond Credit Agreement) accelerates or otherwise causes all or any portion of the Obligations (as defined in the Journey Beyond Credit Agreement) to become due or to be repurchased, prepaid, defeased or redeemed (automatically or otherwise), prior to its stated maturity, or any Guarantee (as defined in the Journey Beyond Credit Agreement) thereof to become payable or cash collateral in respect thereof to be demanded; provided, however, that if the secured parties under the Journey Beyond Credit Agreement irrevocably waive such Events of Default or rescind such acceleration, the Event of Default with respect to this clause (p) shall automatically cease from and after such date;

(q)     [reserved];

(r)     there occurs any Budget Event;

(s)     the Indebtedness under the JBIH Credit Agreement becoming due prior to its scheduled maturity or that enables or permits (with all applicable grace periods having expired) the holder or holders of such Indebtedness or any trustee or agent on its or their behalf to cause such Indebtedness to become due, or to require the prepayment, repurchase, redemption or defeasance thereof, prior to its scheduled maturity;

(t)     any Loan Party shall support or otherwise facilitate a JB Disposition (it being understood and agreed that any subsidiary of JB TopCo shall be permitted to support or otherwise facilitate a JB Disposition);

(u)     any failure to notify the Required Lenders' Advisors (on a "professional eyes-only" basis unless otherwise consented to by the Borrowers) promptly and in any event within two Business Days of receipt of any offers, bids, solicitations, letters of intent, indications of interest, or similar with respect to the acquisition of the JB Business or any transaction for the sale or other disposition (including by merger, amalgamation or other combination) involving the JB Business, which notice shall include (to the extent permitted to be disclosed by applicable confidentiality terms after using commercially reasonable efforts to permit disclosure in a manner consistent with this Section 7.01(u)) the material terms and conditions of the proposed transaction and the identity of the prospective counterparty (it being understood, for the avoidance of doubt, that in no event may the identity of the prospective counterparty or any other identifying information of the prospective counterparty be disclosed by the Required Lenders' Advisors to any of the Lenders), together with copies of any related documentation or written materials, or any failure to provide notice to the Required Lenders' Advisors (on a "professional eyes-only" basis unless otherwise consented to by the Borrowers) (i) prior to any solicitation, furnishing of information or materials or otherwise taking any action to initiate or progress the sales process or (ii) (to the extent permitted to be disclosed by applicable confidentiality terms after using commercially reasonable efforts to permit disclosure in a manner consistent with this Section 7.01(u)) of the negotiation or entering into of any transaction, in each case involving the JB Business, directly, or indirectly through any agent, broker, advisor, investment banker or similar; or

(v)     (i) any breach by any Loan Party of its obligations under the Restructuring Support Agreement or (ii) the Restructuring Support Agreement is terminated for any reason;

(w)        any Loan Party shall fail to deliver timely report or information or otherwise meet timely any other deadline under the Interim DIP Order or Final DIP Order or any other Security Document and such failure shall continue for a period of 3 days after notice thereof from the Administrative Agent (acting at the direction of the Required Lenders) to the Borrowers;

(x)        the resignation or removal of the Chief Restructuring Officer unless a replacement Chief Restructuring Officer shall have been appointed within thirty (30) days of such resignation or removal;

(y)        without the approval of the Required Lenders, an order by the Bankruptcy Court or Canadian Court is entered granting any superpriority claim that is pari passu with or senior to those of the Secured Parties or any Lien that is senior to the Liens securing the Obligations, other than as explicitly permitted under the Bankruptcy Court DIP Order or the Canadian DIP Recognition Order, as applicable;

(z)        without the approval of the Required Lenders, (i) an order with respect to any of the Chapter 11 Cases shall be entered by the Bankruptcy Court (1) appointing a trustee under Section 1104 of the Bankruptcy Code, (2) appointing an examiner with decision making authority relating to the operation of the business or (3) converting any Chapter 11 Case to a case under Chapter 7 of the Bankruptcy Code (other than with respect to the "Overnight" business and each division thereof) or (ii) an order of the Canadian Court shall have been entered (1) appointing a receiver, interim receiver, trustee or any similar official over any of the Debtors or the Canadian Collateral or (2) converting the Canadian Recognition Proceedings to any other proceeding under Canadian Debtor Relief Law;

(aa)        without the approval of the Required Lenders, an order shall be entered by the Bankruptcy Court dismissing any of the Chapter 11 Cases or by the Canadian Court dismissing the Canadian Recognition Proceedings, which does not contain a provision for payment in full in cash of all Obligations upon entry thereof;

(bb)        any Loan Party shall seek to, or shall support (in any such case by way of any motion or other pleading filed with the Bankruptcy Court, Canadian Court or any other writing to another party-in-interest executed by or on behalf of such Loan Party) any other Person's motion to, avoid or disallow in whole or in part the Lenders' claims or Liens in respect of the Obligations or contest any provision of any Loan Document;

(cc)        any Loan Party shall attempt to vacate or modify the Interim DIP Order, Final DIP Order or Canadian DIP Recognition Order without the consent of the Required Lenders;

(dd)        an application for any of the orders described in clauses (y), (z) or (aa) above shall be made by a Loan Party or any such application shall be made by a Person other than the Loan Parties and such application is not contested by the Loan Parties in good faith or the relief requested is not withdrawn, dismissed or denied within forty-five (45) days after the filing;

(ee)        the filing by any of the Loan Parties of a Plan of Reorganization other than an Acceptable Plan; and

(ff)        (x) a Canadian Pension Plan has failed to comply with, or be funded in accordance with, applicable law, (y) a Loan Party has incurred any obligation in connection with the termination or withdrawal from a Canadian Pension Plan, or (z) the occurrence of a Canadian Pension Event,  in each case of clauses (x) through (z) which individually or in the aggregate results in liability of the applicable Loan Party in an aggregate amount which would reasonably be expected to result in a Material Adverse Effect.

then, and in every such event (other than an event with respect to any Parent Entity Debtor, any Parent or any Borrower described in paragraph (h) or (i) of this Section), and at any time thereafter during the continuance of such event, subject to the terms of the Bankruptcy Court DIP Order, the Canadian DIP Recognition Order and any Intercreditor Agreement, the Administrative Agent may, and at the request of the Required Lenders shall, by notice to the Borrowers, take any of the following actions, at the same or different times:  (i) terminate the Term Loan Commitments, and thereupon the Term Loan Commitments shall terminate immediately, (ii) declare the Term Loans then outstanding to be due and payable in whole (or in part, in which case any principal not so declared to be due and payable may thereafter be declared to be due and payable), (iii) [reserved], and (iv) exercise all rights and remedies granted to it under any Loan Document and all its rights under any other applicable law or in equity, including under the UCC and the PPSA, and thereupon the principal of the Term Loans so declared to be due and payable, together

with accrued interest thereon and all fees and other obligations of the Borrowers accrued hereunder, shall become due and payable immediately, without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Borrowers; and in case of any event with respect to any Parent Entity Debtor, any Parent or any Borrower described in paragraph (h) or (i) of this Section, the Term Loan Commitments shall automatically terminate and the principal of the Term Loans then outstanding, together with accrued interest thereon and all fees and other obligations of the Borrowers accrued hereunder, shall automatically become due and payable.

Notwithstanding anything herein to the contrary, the Exit Premium shall become immediately due and payable in the event the Term Loans are accelerated upon or following an Event of Default (including any automatic acceleration resulting from the commencement of an arrangement, a bankruptcy or other insolvency proceeding in accordance with Sections 7.01(h) and (i)), as if the outstanding Term Loans had been optionally prepaid on the date of such acceleration. Any Exit Premium payable shall constitute liquidated damages sustained by the Lenders as a result of the early repayment and the Loan Parties hereby agree that it is reasonable under the circumstances currently existing in view of the impracticability and extreme difficulty of ascertaining actual damages and by mutual agreement of the parties to a reasonable calculation of the Lender's lost profits as a result thereof. The Loan Parties and the Lenders acknowledge and agree that the Exit Premium constitutes liquidated damages for loss of investment opportunity and damages suffered by the Lenders shall in no way constitute interest or "unmatured interest" (as such term is used in Section 502(b) of the Bankruptcy Code). THE LOAN PARTIES EXPRESSLY WAIVE THE PROVISIONS OF ANY PRESENT OR FUTURE STATUTE OR LAW THAT PROHIBITS OR MAY PROHIBIT THE COLLECTION OF THE EXIT PREMIUM IN CONNECTION WITH ANY SUCH ACCELERATION. The parties hereto further acknowledge and agree that the Exit Premium is not intended to act as a penalty or to punish the Loan Parties for any repayment or prepayment of the Term Loans but rather represent compensation for the cost of the Lenders' investment opportunities.

Notwithstanding anything to the contrary herein, the enforcement of Liens or remedies with respect to the Collateral and the exercise of all other remedies provided for in this Agreement and the other Loan Documents, shall be subject to the provisions of the Bankruptcy Court DIP Order.

Section 7.02      [Reserved].

Section 7.03      Application of Payments. Subject to the Bankruptcy Court DIP Order, the Canadian DIP Recognition Order and the Security Documents, any amount received by the Administrative Agent or the Collateral Agent from any Loan Party (or from proceeds of any Collateral) following any acceleration of the Obligations under this Agreement or any Event of Default with respect to any Borrower under Section 7.01(h) or (i), in each case that is continuing, shall be applied in accordance with Section 2.18(b).

## ARTICLE VIII
## AGENTS

Section 8.01      Appointment and Authorization of Agents. Each Lender hereby irrevocably appoints GLAS to act on its behalf as the Administrative Agent hereunder and under the other Loan Documents and as Collateral Agent hereunder and under the Loan Documents and authorizes the Administrative Agent and Collateral Agent, in each applicable capacity, to take such actions on its behalf and to exercise such powers as are delegated to each such Agent by the terms hereof or thereof, together with such actions and powers as are reasonably incidental thereto including, with respect to the Collateral Agent for purposes of acquiring, holding and enforcing any and all Liens on Collateral granted by any of the Loan Parties or JB TopCo to secure any of the Obligations, together with such powers and discretion as reasonably incidental thereto. The provisions of this Article are solely for the benefit of the Agents, the Lenders and the Company Advisors (to the extent provided in Section 8.08), and no Loan Party shall have rights as a third-party beneficiary of any of such provisions. It is understood and agreed that the use of the term "agent" herein or in any other Loan Documents (or any other similar term) with reference to each Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable Requirement of Law. Instead such term is used as a matter of market custom, and is intended to create or reflect only an administrative relationship between independent contracting parties.

Each Lender hereby irrevocably appoints the Collateral Agent as mortgage trustee in respect of the Mortgages, Mortgaged Vessels and Trust Property. The Collateral Agent agrees and declares, and each of the other

Secured Parties acknowledges, that, subject to the terms and conditions of this Section 8.01, the Collateral Agent holds the Trust Property in trust for the Secured Parties absolutely.

Each of the other Secured Parties agrees that the obligations, rights and benefits vested in each Agent shall be performed and exercised in accordance with this Section 8.01.  For the avoidance of doubt, each Agent shall have the benefit of all of the provisions of this Agreement (including exculpatory and indemnification provisions) benefiting it in their capacity as Agents for the Secured Parties in each Loan Document to which it is a party.  In addition, the Collateral Agent and any attorney, agent or delegate of the Collateral Agent may indemnify itself or himself out of the Trust Property against all liabilities, costs, fees, damages, charges, losses and expenses sustained or incurred by it or him in relation to the taking or holding of any of the Trust Property or in connection with the exercise or purported exercise of the rights, trusts, powers and discretions vested in the Collateral Agent or any other such Person by or pursuant to the Mortgages (and, where applicable, any deed of covenants collateral thereto), on Material Vessels and Additional Collateral Vessels or in respect of anything else done or omitted to be done in any way relating to such Mortgages.

Section 8.02      Rights as a Lender.  Any Agent shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not any such Agent hereunder, and the term "Lender" or "Lenders" shall, unless otherwise expressly indicated or unless the context otherwise requires, include the Person serving as any such Agent hereunder in its individual capacity.  Such Person and its Affiliates may accept deposits from, lend money to, own securities of, act as the financial advisor or in any other advisory capacity for, and generally engage in any kind of business with, any Borrower or any Subsidiary or other Affiliate thereof as if such Person were not such Agent hereunder and without any duty to account therefor to the Lenders.

Section 8.03      Exculpatory Provisions.

(a)      The Agents shall not have any duties or obligations except those expressly set forth herein and in the other Loan Documents, and their duties hereunder shall be administrative in nature.  Without limiting the generality of the foregoing, no Agent shall (i) be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing; (ii) have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Loan Documents that such Agent is required to exercise as directed in writing by the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents); provided that no Agent shall be required to take any action that, in its opinion or the opinion of its counsel, may expose such Agent to liability or that is contrary to any Loan Document or applicable Law, including for the avoidance of doubt any action that may be in violation of the automatic stay under any Debtor Relief Law; and (iii) except as expressly set forth herein and in the other Loan Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to any Borrower or any of its Affiliates that is communicated to or obtained by such Agent or any of its Affiliates in any capacity.

(b)      No Agent shall be liable for any action taken or not taken by it (i) with the consent or at the request or direction of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as such Agent shall believe in good faith shall be necessary, under the circumstances as provided in Article VII and Section 9.02) or (ii) in the absence of its own gross negligence or willful misconduct as determined by a court of competent jurisdiction by final and nonappealable judgment; provided that any action or inaction taken at the direction of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as such Agent shall believe in good faith shall be necessary) shall not be deemed gross negligence or willful misconduct.  No Agent shall be deemed to have knowledge or notice of the occurrence of any Default or Event of Default unless and until the Agent shall have received written notice from a Lender or the Borrowers referring to this Agreement, clearly describing such Default or Event of Default and stating that such notice is a "notice of default."

(c)      No Agent Party shall be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement or any other Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any Default or Event of Default, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Loan Document or any other agreement, instrument or

100

document or the creation, perfection or priority of any Lien purported to be created by the Security Documents, (v) the value or the sufficiency of any Collateral or (vi) the satisfaction of any condition set forth in Article IV or elsewhere herein, other than (in the case of the Administrative Agent) to confirm receipt of items expressly required to be delivered to it.  No Agent Party shall be under any obligation to inspect the properties, books or records of any Loan Party.  No provision of this Agreement or any other Loan Document or any agreement or instrument contemplated hereby or thereby, the transactions contemplated hereby or thereby shall require any Agent to: (i) expend or risk its own funds or provide indemnities in the performance of any of its duties hereunder or the exercise of any of its rights or power or (ii) otherwise incur any financial liability in the performance of its duties or the exercise of any of its rights or powers.  The Administrative Agent does not warrant, nor accept responsibility, nor shall the Administrative Agent have any liability with respect to the administration, submission or any other matter related to rates in the definitions of Alternate Base Rate, the Term SOFR Reference Rate, Adjusted Term SOFR or Term SOFR, or any component definition thereof or rates referred in the definition thereof or with respect to any comparable or successor rate thereto.

(d)     Neither Agent shall be liable for any action omitted to be taken by it by reason of the lack of direction or instruction for such action (including, without limitation, for refusing to exercise discretion or for withholding its consent in the absence of receipt of, or resulting from a failure, delay or refusal on the part of any Lender to provide, written instructions to exercise such direction or grant such consent from any such Lender, as applicable).  Neither Agent shall have any liability for any failure, inability, unwillingness on the part of any Lender or Loan Party to provide accurate and complete information on a timely basis to such Agent, or otherwise on the part of any such party to comply with the terms of this Agreement, and shall not have any liability for any inaccuracy or error in the performance or observance on such Agent's part of any of its duties hereunder that is caused by or results from any such inaccurate, incomplete or untimely information received by it, or other failure on the part of any such other party to comply with the terms hereof.

(e)     Neither Agent shall be liable for interest on any money received by it and no Lender shall be entitled to receive any interest on any money held by any Agent nor shall any Lender be entitled to any accounting with respect thereto. Money held by the Agent hereunder need not be segregated from other funds except to the extent required by law.

(f)     For purposes of clarity, and without limiting any rights, protections, immunities or indemnities afforded to either Agent hereunder (including without limitation this ARTICLE VIII), phrases such as "satisfactory to the [Administrative][Collateral] Agent," "approved by the [Administrative][Collateral] Agent," "acceptable to the [Administrative][Collateral] Agent," "as determined by the [Administrative][Collateral] Agent," "in the [Administrative][Collateral] Agent' discretion," "selected by the [Administrative][Collateral] Agent," "elected by the [Administrative][Collateral] Agent," "requested by the [Administrative][Collateral] Agent," and phrases of similar import that authorize and permit an Agent to approve, disapprove, determine, act or decline to act in its discretion shall be subject to such Agent receiving written direction from the Required Lenders (or such other number or percentage of the Lenders as expressly required hereunder or under the other Loan Documents) to take such action or to exercise such rights.

Section 8.04     Reliance by the Agents.  The Agents shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including any electronic message, Internet or intranet website posting or other distribution) believed by the Agents to be genuine and to have been signed, sent or otherwise authenticated by the proper Person.  The Agents also may rely upon any statement made to it orally or by telephone and believed by the Agents to have been made by the proper Person, and shall not incur any liability for relying thereon.  The Agents may consult with legal counsel (who may be counsel for the Borrowers), independent accountants and other experts selected by the Agents, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.  The Agents may deem and treat the Lender specified in the register with respect to any amount owing hereunder as the owner thereof for all purposes unless a written notice of assignment, negotiation or transfer thereof shall have been filed with the Administrative Agent.

Section 8.05     Delegation of Duties.  Each Agent may perform any and all of its duties and exercise its rights and powers hereunder or under any other Loan Document by or through any one or more sub-agents appointed by the each such Agent.  Each Agent and any such sub-agent may perform any and all of its duties and exercise its

rights and powers by or through their respective Related Parties.  The exculpatory provisions of this Article shall apply to any such sub-agent and to the Related Parties of each such Agent and any such sub-agent, and shall apply to their respective activities as each such Agent.  No Agent shall be responsible for the negligence or misconduct of any sub-agents except to the extent that a court of competent jurisdiction determines in a final and nonappealable judgment that such Agent acted with gross negligence or willful misconduct in the selection of such sub-agents.

Section 8.06    Indemnification.  Whether or not the transactions contemplated hereby are consummated, each Lender shall severally, and not jointly, indemnify upon demand each Agent Party (to the extent not reimbursed by or on behalf of the Borrowers and without limiting the obligations of any Loan Party or JB TopCo to do so) on a pro rata basis (based on its aggregate outstanding Term Loans on the date on which indemnification is sought under this section, or if indemnification is sought after the date upon which the Term Loan Commitments shall have terminated and the Term Loans shall have been paid in full, ratably according to each Lender's aggregate exposure percentage immediately prior to such date) and hold harmless each Agent Party from and against any and all Indemnified Liabilities incurred by it; provided that no Lender shall be liable for payment to any Agent Party, of any portion of such Indemnified Liabilities to the extent determined in a final, nonappealable judgment of a court of competent jurisdiction to have resulted from such Agent Party's own gross negligence or willful misconduct (and no action taken in accordance with the directions of the Required Lender shall be deemed to constitute gross negligence or willful misconduct for purposes of this Section).  In the case of any investigation, litigation or proceeding giving rise to any Indemnified Liabilities, this Section applies whether any such investigation, litigation or proceeding is brought by any Lender or any other Person.  Without limitation of the foregoing, each Lender shall severally, and not jointly, reimburse each Agent upon demand for its ratable share of any costs or out-of-pocket expenses (including the fees, disbursements and other charges of counsel) incurred by such Agent in connection with preparation, execution, delivery, administration, modification, amendment or enforcement (whether through negotiations, legal proceedings or otherwise) of, or legal advice in respect of rights and responsibilities under, this Agreement, any other Loan Document, or any document contemplated by or referred to herein, to the extent that such Agent is not reimbursed for such costs or expenses by or on behalf of the Borrowers.  The agreements in this Section shall survive the termination of this Agreement and the payment of the Term Loans and all other amounts payable hereunder and the replacement or resignation of each Agent.

Section 8.07    Resignation of Administrative Agent.  Any Agent may resign as such Agent upon 30 days' notice to the Lenders and the Borrowers.  Upon receipt of any such notice of resignation, the Required Lenders shall appoint a successor Agent (which may be an Affiliate of a Lender), with the consent of the Borrowers at all times other than during the existence of an Event of Default under Section 7.01(a), (b), (h) or (i) (which consent shall not be unreasonably withheld or delayed).  Whether or not a successor has been appointed, such resignation shall become effective in accordance with such notice on such effective date, where (i) the retiring Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents (except that in the case of any collateral security held by such Agent on behalf of the Lenders under any of the Loan Documents, the retiring Agent shall continue to hold such collateral security until such time as a successor Agent is appointed) and (ii) all payments, communications and determinations provided to be made by, to or through such Agent shall instead be made by or to each Lender directly, until such time, if any, as the Required Lenders appoint a successor Agent as provided for above.  Upon the acceptance of a successor's appointment as Agent hereunder, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring Agent, and the retiring Agent shall be discharged from all of its duties and obligations hereunder or under the other Loan Documents.  The fees payable by the Borrowers to a successor Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrowers and such successor.  After the retiring Agent's resignation hereunder and under the other Loan Documents, the provisions of this Article VIII and Section 9.03 shall continue in effect for the benefit of such retiring Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while the retiring Agent was acting as Administrative Agent or Collateral Agent, as applicable.

Section 8.08    Non-Reliance on Agents and Other Lenders.  Each Lender expressly acknowledges that neither the Agents, any financial advisor or investment banker of the Loan Parties ("Company Advisors") nor any of their respective officers, directors, employees, agents, attorneys-in-fact or affiliates have made any representations or warranties to it and that no act by any Agent hereafter taken, including any review of the affairs of a Loan Party or any affiliate of a Loan Party, shall be deemed to constitute any representation or warranty by any Agent to any Lender.  Each Lender acknowledges that it has, independently and without reliance upon any Agent Party, Company Advisor or any other Lender or any of their Related Parties and based on such documents and information as it has deemed

appropriate, made its own credit analysis and decision to enter into this Agreement. Each Lender also acknowledges that it will, independently and without reliance upon any Agent Party, Company Advisor or any other Lender or any of their Related Parties and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Loan Document or any related agreement or any document furnished hereunder or thereunder.

Section 8.09    Administrative Agent May File Proofs of Claim; Irrevocable Authorization.  In case of the pendency of any proceeding under any Debtor Relief Law, Bail-In Action or any other judicial proceeding relative to any Borrower, the Administrative Agent (irrespective of whether the principal of any Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Administrative Agent shall have made any demand on the Borrowers) shall be entitled and empowered (but not obligated) by intervention in such proceeding or otherwise:

(a)    to file and prove a claim for the whole amount of the principal, premium (including the Exit Premium and any Extension Fee) and interest owing and unpaid in respect of the Term Loans and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders and the Agents (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders and the Agents and their respective agents and counsel and all other amounts due to the Lenders and the Agents under Sections 2.12 and 9.03) allowed in such judicial proceeding; and

(b)    to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, interim receiver, receiver and manager, monitor, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender and each Agent to make such payments to the Administrative Agent and, in the event that the Administrative Agent and the Collateral Agent shall consent to the making of such payments directly to the Lenders, to pay to the Administrative Agent and the Collateral Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Administrative Agent and its agents and counsel, and any other amounts due the Administrative Agent and the Collateral Agent under Sections 2.12 and 9.03.

In addition, each of the Lenders hereby irrevocably authorizes the Administrative Agent, on behalf of all Secured Parties to take any of the following actions upon the instruction of the Required Lenders:

(a)    consent to the Disposition of all or any portion of the Collateral free and clear of the Liens securing the Obligations in connection with any Disposition pursuant to the applicable provisions of any Debtor Relief Law, including Section 363 of the Bankruptcy Code or any applicable provision of the CCAA;

(b)    credit bid all or any portion of the Obligations, or purchase all or any portion of the Collateral (in each case, either directly or through one or more acquisition vehicles), in connection with any Disposition of all or any portion of the Collateral pursuant to the applicable provisions of the Bankruptcy Code, including under Section 363 thereof or any foreign bankruptcy, insolvency, receivership or similar law now or hereafter in effect including the CCAA;

(c)    credit bid all or any portion of the Obligations, or purchase all or any portion of the Collateral (in each case, either directly or through one or more acquisition vehicles), in connection with any Disposition of all or any portion of the Collateral pursuant to the applicable provisions of the UCC including pursuant to Sections 9-610 or 9-620 of the UCC or the PPSA;

(d)    credit bid all or any portion of the Obligations, or purchase all or any portion of the Collateral (in each case, either directly or through one or more acquisition vehicles), in connection with any foreclosure, realization, other Disposition or enforcement against the Collateral conducted in accordance with applicable law following the occurrence of an Event of Default, including by power of sale, judicial action or otherwise; and/or

(e)        estimate the amount of any contingent or unliquidated Obligations of such Lender or other Secured Party;

it being understood that no Lender shall be required to fund any amounts in connection with any purchase of all or any portion of the Collateral by the Collateral Agent pursuant to the foregoing clause (b), (c) or (d) without its prior written consent.

Each Lender and each other Secured Party agrees that the Collateral Agent is under no obligation to credit bid any part of the Obligations or to purchase or retain or acquire any portion of the Collateral; <u>provided</u> that, in connection with any credit bid or purchase under clause (b), (c) or (d) of the preceding paragraph, the Obligations owed to all of the Secured Parties (other than with respect to contingent or unliquidated liabilities as set forth in the next succeeding paragraph) shall be entitled to be, and shall be, credit bid by the Collateral Agent on a ratable basis.

With respect to each contingent or unliquidated claim that is an Obligation, the Collateral Agent is hereby authorized, but is not required, to estimate the amount thereof for purposes of any credit bid or purchase described in the second preceding paragraph so long as the fixing of the amount or liquidation of such claim would not unduly delay the ability of the Collateral Agent to credit bid the Obligations or purchase the Collateral in the relevant Disposition.  In the event that the Collateral Agent, as directed by the Required Lenders in their sole and absolute discretion, elects not to estimate any such contingent or unliquidated claim or any such claim cannot be estimated without unduly delaying the ability of the Collateral Agent to consummate any credit bid or purchase in accordance with the second preceding paragraph, then any contingent or unliquidated claims not so estimated shall be disregarded, shall not be credit bid, and shall not be entitled to any interest in the portion or the entirety of the Collateral purchased by means of such credit bid.

Each Secured Party whose Obligations are credit bid under clause (b), (c) or (d) of the third preceding paragraph shall be entitled to receive interests in the Collateral or other asset or assets acquired in connection with such credit bid (or in the capital stock of the acquisition vehicle or vehicles that are used to consummate such acquisition) on a ratable basis in accordance with the percentage obtained by dividing (x) the amount of the Obligations of such Secured Party that were credit bid in such credit bid or other Disposition, by (y) the aggregate amount of all Obligations that were credit bid in such credit bid or other Disposition.

Section 8.10      <u>Withholding Taxes</u>.  To the extent required by any applicable laws, the Administrative Agent may withhold from any payment to any Lender an amount equivalent to any applicable withholding Tax.

Section 8.11      <u>Binding Effect</u>.  Each Secured Party by accepting the benefits of the Loan Documents agrees that (i) any action taken by any Agent or the Required Lenders (or, if expressly required hereby, a greater proportion of the Lenders) in accordance with the provisions of the Loan Documents, (ii) any action taken by any Agent in reliance upon the instructions of Required Lenders (or, where so required by the terms of this Agreement, a greater proportion of the Lenders or other parties hereto as required herein) and (iii) the exercise by any Agent or the Required Lenders (or, where so required by the terms of this Agreement, a greater proportion of the Lenders or other parties hereto as required herein) of the powers set forth herein or therein, together with such other powers as are reasonably incidental thereto, shall be authorized and binding upon all of the Secured Parties.

Section 8.12      <u>Security Documents and Collateral Agent</u>.  The Lenders and the other Secured Parties authorize the Collateral Agent to release any Collateral or Guarantors in accordance with Section 9.15.

Upon the request of the Collateral Agent at any time, the Required Lenders (or, where so required by the terms of this Agreement, a greater proportion of the Lenders or other parties hereto as required herein) will confirm in writing the Collateral Agent's authority to release or subordinate its interest in particular types or items of property, or to release any Loan Party or JB TopCo from the Loan Guarantee pursuant to Section 9.15.  In each case as specified in Section 9.15, the Collateral Agent will (and each Lender and Secured Party hereby authorizes the Collateral Agent to), at the Borrowers' expense, execute and deliver to the applicable Loan Party or JB TopCo such documents as such Loan Party or JB TopCo may reasonably request to evidence the release of such item of Collateral from the assignment and security interest granted under the Security Documents or to subordinate its interest therein, or to release such Loan Party or JB TopCo from the Loan Guarantee, in each case in accordance with the terms of the Loan Documents and Section 9.15.

Neither Agent shall be responsible for (i) perfecting, maintaining, monitoring, preserving or protecting the security interest or Lien granted under this Agreement, any other Loan Document or any agreement or instrument contemplated hereby or thereby, (ii) the filing, re-filing, recording, re-recording or continuing or any document, financing statement, mortgage, assignment, notice, instrument of further assurance or other instrument in any public office at any time or times or (iii) providing, maintaining, monitoring or preserving insurance on (including any flood insurance policies or for determining whether any flood insurance policies are or should be obtained in respect of the Collateral, which each Lender shall be solely responsible for), or the payment of taxes with respect to, any of the Collateral.  Neither Agent shall be required to qualify in any jurisdiction in which it is not presently qualified to perform its obligations as such Agent.

Section 8.13    [Reserved].

Section 8.14    Ship Mortgage Trust.  The Collateral Agent agrees and declares, and each of the other Secured Parties acknowledges, that, subject to the terms and conditions of this Section 8.14, the Collateral Agent holds the Trust Property in trust for the Secured Parties absolutely.  Each of the other Secured Parties agrees that the obligations, rights and benefits vested in the Collateral Agent shall be performed and exercised in accordance with this Section 8.14. For the avoidance of doubt, the Collateral Agent shall have the benefit of all of the provisions of this Agreement (including exculpatory and indemnification provisions) benefiting it in its capacity as Collateral Agent and as mortgage trustee for the Secured Parties.  In addition, the Collateral Agent and any attorney, agent or delegate of the Collateral Agent may indemnify itself or himself out of the Trust Property against all liabilities, costs, fees, damages, charges, losses and expenses sustained or incurred by it or him in relation to the taking or holding of any of the Trust Property or in connection with the exercise or purported exercise of the rights, trusts, powers and discretions vested in the Collateral Agent or any other such Person by or pursuant to the Mortgages (and, where applicable, any deed of covenants collateral thereto), on Material Vessels and Additional Collateral Vessels or in respect of anything else done or omitted to be done in any way relating to such Mortgages.

Section 8.15    Control by the Majority.  Subject to any Intercreditor Agreement, the Bankruptcy Court DIP Order and the Canadian DIP Recognition Order, the Required Lenders shall direct the time, method and place of conducting any proceeding for any remedy available to the Collateral Agent or of exercising any trust or power conferred on the Collateral Agent.

Section 8.16    Sole Lead Arranger and Sole Bookrunner.  Notwithstanding any provision to the contrary contained elsewhere in this Agreement or in any other Loan Document, the Arranger will not have any duties or responsibilities, nor will the Arranger have or be deemed to have any fiduciary relationship with any Lender, and no implied covenants, functions, responsibilities, duties, obligations or liabilities will be read into this Agreement or any other Loan Document or otherwise exist against the Arranger.

Section 8.17    Section 8.17 Erroneous Payments.

(a)    Each Lender hereby agrees that (i) if the Administrative Agent notifies such Lender that the Administrative Agent has determined in its sole discretion that any funds received by such Lender from the Administrative Agent or any of its Affiliates were erroneously or mistakenly transmitted to, or otherwise erroneously or mistakenly received by, such Lender (whether or not known to such Lender) (whether as a payment, prepayment or repayment of principal, interest, fees or otherwise; individually and collectively, an "Erroneous Payment") and demands the return of such Erroneous Payment (or a portion thereof), such Lender shall promptly, but in no event later than five (5) Business Days thereafter, return to the Administrative Agent the amount of any such Erroneous Payment (or portion thereof) as to which such a demand was made, in same day funds (in the currency so received); provided that the Administrative Agent may not make any such demand under this clause (i) with respect to an Erroneous Payment unless such demand is made within 30 days of the date of receipt of such Erroneous Payment by the applicable Lender and (ii) to the extent permitted by applicable law, such Lender shall not assert any right or claim to the Erroneous Payment, and hereby waives any claim, counterclaim, defense or right of set-off or recoupment with respect to any demand, claim or counterclaim by the Administrative Agent for the return of any Erroneous Payments received, including, without limitation, waiver of any defense based on "discharge for value" or any similar theory or doctrine. A notice of the Administrative Agent to any Lender under this clause (a) shall be conclusive, absent manifest error.

(b)        Without limiting the immediately preceding clause (a), each Lender hereby further agrees that if it receives a payment from the Administrative  Agent (or any of its Affiliates) (x) that is in a different amount than, or on a different date from, that specified in a notice of payment sent by the Administrative Agent, (y) that was not preceded or accompanied by notice of payment, or (z) that such Lender otherwise becomes aware was transmitted, or received, in error or by mistake (in whole or in part), then in each case, if an error has been made each such Lender is deemed to have knowledge of such error at the time of receipt of such Erroneous Payment, and to the extent permitted by applicable law, such Lender shall not assert any right or claim to the Erroneous Payment and hereby waives any claim, counterclaim, defense or right of set-off or recoupment with respect to any demand, claim or counterclaim by the Administrative Agent for the return of any Erroneous Payments received, including without limitation waiver of any defense based on "discharge for value" or any similar theory or doctrine. Each Lender agrees that, in each such case, it shall promptly (and, in all events, within five (5) Business Days of its knowledge (or deemed knowledge) of such error) notify the Administrative Agent of such occurrence and, upon demand from the Administrative Agent, it shall promptly, but in all events no later than five (5) Business Days thereafter, return to the Administrative Agent the amount of any such Erroneous Payment (or portion thereof) as to which such a demand was made in same day funds (in the currency so received).

(c)        The Borrower and each other Loan Party hereby agrees that (x) in the event of an Erroneous Payment (or portion thereof) is not recovered from any Lender that has received such Erroneous Payment (or portion thereof) for any reason (and without limiting the Administrative Agent's rights and remedies under this Article VIII), the Administrative Agent shall be subrogated to all the rights of such Lender with respect to such amount and (y) an Erroneous Payment shall not pay, prepay, repay, discharge or otherwise satisfy any Obligations owed by the Borrower or any other Loan Party.

(d)        In addition to any rights and remedies of the Administrative Agent provided by law, the Administrative Agent shall have the right, without prior notice to any Lender, any such notice being expressly waived by such Lender to the extent permitted by applicable law, with respect to any Erroneous Payment for which demand has been made in accordance with this Section 8.17 and which has not been returned to the Administrative Agent, to set off and appropriate and apply against such amounts any and all deposits (general or special, time or demand, provisional or final but excluding trust accounts) in any currency, and any other credits, indebtedness or claims, in any currency, in each case whether direct or indirect, absolute or contingent, matured or unmatured, at any time held or owing by the Administrative Agent or any of its Affiliates to or for the credit or the account of such Lender. The Administrative Agent agrees to promptly notify the Lender after any such setoff and application made by the Administrative Agent; provided, that, the failure to give such notice shall not affect the validity of such setoff and application.

(e)        Each party's obligations under this Section 8.17 shall survive the resignation or removal of the Administrative Agent, the termination of the Commitments and the repayment, satisfaction or discharge of all Obligations (or any portion thereof) under any Loan Document.

# ARTICLE IX
# MISCELLANEOUS

Section 9.01        Notices.

(a)        All notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by fax or other electronic transmission, as follows:

(i)        if to the Parents, the Borrowers or any Agent, to the address, fax number, e-mail address or telephone number specified for such Person on Schedule 9.01; and

(ii)        if to any Lender, to it at its address (or fax number, telephone number or email address) set forth in its Administrative Questionnaire (including, as appropriate, notices delivered solely to the Person

designated by a Lender on its Administrative Questionnaire then in effect for the delivery of notices that may contain material non-public information relating to the Borrowers).

Notices and other communications sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received; notices and other communications sent by facsimile shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next business day for the recipient). Notices and other communications delivered through electronic communications to the extent provided in subsection (b) below shall be effective as provided in such subsection (b).

(b)     Electronic Communications.  Notices and other communications to the Lenders hereunder may be delivered or furnished by electronic communication (including e-mail and Internet or intranet websites) pursuant to procedures reasonably approved by the Administrative Agent; provided that the foregoing shall not apply to notices to any Lender pursuant to Article II if such Lender has notified the Administrative Agent that it is incapable of receiving notices under such Article by electronic communication.

Unless the Administrative Agent otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement); provided that if such notice or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next Business Day for the recipient, and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing clause (i) of notification that such notice or communication is available and identifying the website address therefor.

(c)     The Platform.  THE PLATFORM IS PROVIDED "AS IS" AND "AS AVAILABLE."  THE AGENT PARTIES (AS DEFINED BELOW) DO NOT WARRANT THE ACCURACY OR COMPLETENESS OF THE BORROWER MATERIALS OR THE ADEQUACY OF THE PLATFORM, AND EXPRESSLY DISCLAIM LIABILITY FOR ERRORS IN OR OMISSIONS FROM THE BORROWER MATERIALS.  NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS, IS MADE BY ANY AGENT PARTY IN CONNECTION WITH THE BORROWER MATERIALS OR THE PLATFORM.  In no event shall any Agent or any of its respective Related Parties (collectively, the "Agent Parties") have any liability to any Parent, any Borrower, any Lender or any other Person for losses, claims, damages, liabilities or expenses of any kind (whether in tort, contract or otherwise) arising out of any Borrower's or the Administrative Agent's transmission of Borrower Materials through the Internet, except to the extent that such losses, claims, damages, liabilities or expenses are determined by a court of competent jurisdiction by a final and non-appealable judgment to have resulted from the gross negligence or willful misconduct of such Agent Party; provided, however, that in no event shall any Agent Party have any liability to any Parent, any Borrower, any Lender or any other Person for indirect, special, incidental, consequential or punitive damages (as opposed to direct or actual damages).

(d)     Change of Address, Etc.  Each of any Parent, any Borrower and the Administrative Agent may change its address, electronic mail address, fax or telephone number for notices and other communications or website hereunder by notice to the other parties hereto.  Each other Lender may change its address, fax or telephone number for notices and other communications hereunder by notice to the Borrowers and the Administrative Agent.  In addition, each Lender agrees to notify the Administrative Agent from time to time to ensure that the Administrative Agent has on record (i) an effective address, contact name, telephone number, fax number and electronic mail address to which notices and other communications may be sent and (ii) accurate wire instructions for such Lender.

(e)     Reliance by Agents and Lenders.  Each Agent and the Lenders shall be entitled to rely and act upon any notices purportedly given by or on behalf of the Borrowers even if (i) such notices were not made in a manner specified herein, were incomplete or were not preceded or followed by any other form of notice specified herein, or (ii) the terms thereof, as understood by the recipient, varied from any confirmation thereof.  The Borrowers shall indemnify each Agent, each Lender and the Related Parties from all losses, costs, expenses and liabilities resulting from the reliance by such Person on each notice purportedly given by or on behalf of the Borrowers in the absence of

gross negligence or willful misconduct as determined in a final and non-appealable judgment by a court of competent jurisdiction. All telephonic communications with any Agent may be recorded by such Agent, and each of the parties hereto hereby consents to such recording. Delivery of any reports, information and documents to any Agent (except for written notices or letters of direction delivered to such Agent under Section 9.01 of this Agreement or any other Loan Document) is for informational purposes only and such Agent's receipt of such shall not constitute constructive notice of any information contained therein or determinable from information contained therein, including the Borrower's compliance with any of its covenants hereunder.

Section 9.02    Waivers; Amendments.

(a)    No failure or delay by any Agent or any Lender in exercising any right or power under this Agreement or any Loan Document shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power. The rights and remedies of each Agent and the Lenders hereunder and under the other Loan Documents are cumulative and are not exclusive of any rights or remedies that they would otherwise have. No waiver of any provision of this Agreement or any Loan Document or consent to any departure by any Loan Party therefrom shall in any event be effective unless the same shall be permitted by paragraph (b) of this Section, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given. Without limiting the generality of the foregoing, the making of a Term Loan shall not be construed as a waiver of any Default or Event of Default, regardless of whether any Agent or any Lender may have had notice or knowledge of such Default or Event of Default at the time. No notice or demand on the Borrowers or the Parents in any case shall entitle the Borrowers or Parents to any other or further notice or demand in similar or other circumstances.

(b)    Neither this Agreement, any Loan Document nor any provision hereof or thereof may be waived, amended or modified except, in the case of this Agreement, pursuant to an agreement or agreements in writing entered into by the Parents, the Borrowers, the Administrative Agent and the Required Lenders (other than the Fee Letters, which may be amended and modified in accordance with the terms thereof), in the case of any other Loan Document, pursuant to an agreement or agreements in writing entered into by the Administrative Agent and the Loan Party or Loan Parties that are parties thereto, in each case with the consent of the Required Lenders; provided that no such agreement shall:

(i)    increase the Term Loan Commitment of any Lender without the prior written consent of such Lender (it being understood that a waiver of any condition precedent set forth in Section 4.01 or the waiver of any Default or Event of Default, mandatory prepayment or mandatory reduction of the Term Loan Commitments shall not constitute an extension or increase of any Commitment of any Lender),

(ii)    reduce the principal amount of any Term Loan or reduce the rate of interest thereon, or reduce any fees or premium payable hereunder, without the written consent of each Lender directly and adversely affected thereby; provided that only the consent of the Required Lenders shall be necessary to waive any obligation of the Borrowers to pay default interest pursuant to Section 2.13(c) or to amend Section 2.13(c),

(iii)    postpone the maturity of any Loan, or the date of any scheduled payment of the principal amount of any Term Loan, or any date for the payment of any interest or fees payable hereunder, or reduce the amount of, waive or excuse any such payment, or postpone the scheduled date of expiration of any Commitment, without the written consent of each Lender directly and adversely affected thereby,

(iv)    change Section 2.18(b) or (c) or any other provision in this Agreement or any other Loan Document in a manner that would alter the priority or pro rata sharing of payments required thereby, without the written consent of each Lender directly and adversely affected thereby,

(v)    change any of the provisions of this Section without the written consent of each Lender directly and adversely affected thereby,

(vi)     amend the definition of "Required Lenders" or any other provision of any Loan Document specifying the number or percentage of Lenders required to waive, amend or modify any rights thereunder or make any determination or grant any consent thereunder, without the written consent of each Lender,

(vii)     (vii)     release all or substantially all the value of the Loan Guarantee (except as expressly provided in this Agreement the Collateral Agreement) without the written consent of each Lender,

(viii)     release all or substantially all the Collateral from the Liens of the Security Documents (except as expressly provided in this Agreement or the Security Documents), without the written consent of each Lender,

(ix)     subordinate the Obligations (or any portion thereof), or the Liens on the Collateral securing the Obligations (or any portion thereof) to any other Indebtedness, without the written consent of each Lender;

(x)     [reserved];

(xi)     [reserved]; and

(xii)     change any of the provisions of Section 9.04 without the consent of each Lender.

provided, further, that no such agreement shall amend, modify or otherwise affect the rights or duties of any Agent without the prior written consent of such Agent.  Notwithstanding the foregoing, (a) this Agreement may be amended (or amended and restated) with the written consent of the Required Lenders, the Administrative Agent, the Parents and the Borrowers (i) to add one or more additional credit facilities to this Agreement and to permit the extensions of credit from time to time outstanding thereunder and the accrued interest and fees in respect thereof to share ratably in the benefits of this Agreement and the other Loan Documents and (ii) to include appropriately the Lenders holding such credit facilities in any determination of the Required Lenders on substantially the same basis as the Lenders prior to such inclusion and (b) guarantees, collateral security documents and related documents executed by Foreign Subsidiaries in connection with this Agreement may be in a form reasonably determined by the Administrative Agent (acting at the direction of the Required Lenders) and may be, together with this Agreement, amended and waived with the consent of the Administrative Agent (acting at the direction of the Required Lenders) at the request of the Borrowers without the need to obtain the consent of any other Lender if such amendment or waiver is delivered in order (i) to comply with local law or advice of local counsel, (ii) to cure ambiguities or defects or (iii) to cause such guarantee, collateral security document or other document to be consistent with this Agreement and the other Loan Documents.

(c)     In connection with any proposed amendment, modification, waiver or termination (a "Proposed Change") requiring the consent of all Lenders or all affected Lenders, if the consent of the Required Lenders to such Proposed Change is obtained, but the consent to such Proposed Change of other Lenders whose consent is required is not obtained (any such Lender whose consent is not obtained as described in paragraph (b) of this Section being referred to as a "Non-Consenting Lender"), then the Borrowers may, at their sole expense and effort, upon notice to such Non-Consenting Lender and the Administrative Agent, require such Non-Consenting Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in Section 9.04), all its interests, rights and obligations under this Agreement to a permitted assignee that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment); provided that (i) the Borrowers shall have received the prior written consent of the Administrative Agent (acting at the direction of the Required Lenders) to the extent such consent would be required under Section 9.04(b) for an assignment of Loans or Commitments, as applicable, which consent shall not unreasonably be withheld or delayed, (ii) such Non-Consenting Lender shall have received payment of an amount equal to the outstanding principal amount of its Loans, accrued but unpaid interest thereon, accrued but unpaid fees and all other amounts payable to it hereunder (including pursuant to Section 2.12(e)) from the permitted assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrowers (in the case of all other amounts) and (iii) unless waived, the Borrowers or such permitted assignee shall have paid to the Administrative Agent the processing and recordation fee specified in Section 9.04(b)(ii).  A Lender shall not be required to make any such assignment and delegation if, prior thereto, as a result of a waiver by such Lender or otherwise (including as a result of any action taken by such Lender under paragraph (a) above), the circumstances

entitling the Borrowers to require such assignment and delegation cease to apply.  Each party hereto agrees that an assignment required pursuant to this paragraph may be effected pursuant to an Assignment and Assumption executed by the Borrowers and the assignee and that the Lender required to make such assignment need not be a party thereto.

Section 9.03    Expenses; Indemnity; Damage Waiver.

(a)    The Borrowers shall pay (i) all reasonable and documented or invoiced out-of-pocket costs and expenses incurred by each Agent, the Arranger and their respective Affiliates (without duplication), including any and all recording and filing fees, cost and expenses incurred in connection with the Platform, the reasonable fees, charges and disbursements of Seward & Kissel LLP, lead counsel to the Agents, White & Case LLP, New York, English and Australian counsel to the Lenders, Osler, Hoskin & Harcourt LLP, Canadian counsel to the Lenders, Cox & Palmer LLP, Canadian maritime counsel to the Lenders, McKinney, Bancroft & Hughes, Bahamian maritime counsel to the Lenders and Jones Walker LLP, United States maritime counsel to the Lenders and, if necessary, one firm of maritime counsel and a local firm of counsel in each applicable jurisdiction and, in the case of an actual or perceived conflict of interest, where such person affected by such conflict informs the Borrowers of such conflict and thereafter retains its own counsel with the Borrowers' prior written consent (not to be unreasonably withheld), one additional counsel (and maritime and local counsel, if applicable) per affected party, in each case, as counsel, for, as applicable, the Agents or the applicable Lenders, in connection with the arrangement of the credit facilities provided for herein, and the preparation, execution, delivery and administration of the Loan Documents or any amendments, modifications or waivers of the provisions thereof (whether or not such amendment, waiver or modification is approved by the Lenders), (ii) [Reserved] and (iii) all reasonable and documented or invoiced out-of-pocket expenses incurred by each Agent or any Lender, including the fees, charges and disbursements of counsel for each Agent and the Lenders, in connection with the enforcement or protection of any rights or remedies (A) in connection with the Loan Documents (including all such costs and expenses incurred during any legal proceeding, including any proceeding under any Debtor Relief Laws), including its rights under this Section or (B) in connection with the Loans made hereunder, including all such out-of-pocket costs and expenses incurred during any workout, restructuring or negotiations in respect of such Loans; provided that such counsel shall be limited to (w) one lead counsel of the Agents and their Related Parties, taken as a whole, (x) one lead counsel of the Lenders and their Related Parties, taken as a whole, (y) one firm of maritime counsel and (z) a local firm of counsel in each applicable jurisdiction as, in each case, may reasonably be deemed necessary by the Administrative Agent in each relevant jurisdiction and, in the case of an actual or perceived conflict of interest, where such person affected by such conflict informs the Borrowers of such conflict and thereafter retains its own counsel with the Borrowers' prior written consent (not to be unreasonably withheld), one additional counsel (and maritime and local counsel, if applicable) per affected party.

(b)    The Borrowers shall indemnify each Agent, each Lender, the Arranger and each Related Party of any of the foregoing Persons (each such Person being called an "Indemnitee") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities, including any and all liabilities with respect to, or resulting from any delay in paying, stamp, excise and similar other taxes, if any, and reasonable and documented or invoiced out-of-pocket fees and expenses for any Indemnitee (excluding the allocated costs of in house counsel and limited to not more than (x) one counsel for the Agents and their Related Parties, taken as a whole and (y) one counsel for the Lenders and their Related Parties, taken as a whole, and, if necessary, (x) a single local counsel in each appropriate jurisdiction for the Agents and their Related Parties, taken as a whole, and (y) a single local counsel in each appropriate jurisdiction for the Lenders and their Related Parties, taken as a whole, and, if necessary, (x) a single special counsel in each appropriate specialty for the Agents and their Related Parties, taken as a whole and (y) a single special counsel in each appropriate specialty for the Lenders and their Related Parties, taken as a whole (and, in each case, in the case of an actual or perceived conflict of interest where such Indemnitee affected by such conflict informs the Borrowers of such conflict and thereafter retains its own counsel, of another firm of such for such affected Indemnitee)), incurred by or asserted against any Indemnitee by any third party or by any Borrower, any Parent Entity Debtor, any Parent or any Subsidiary arising out of, in connection with, or as a result of (i) the execution or delivery of this Agreement, any Loan Document or any other agreement or instrument contemplated hereby or thereby, the performance by the parties to the Loan Documents of their respective obligations thereunder or the consummation of the Transactions or any other transactions contemplated thereby, (ii) any Term Loan or the use of proceeds therefrom, (iii) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, regardless of whether brought by a third party or by any Borrower, any Parent Entity Debtor, any Parent or any Subsidiary and regardless of whether any Indemnitee is a party thereto, (iv) any actual or alleged presence of or Release or threat of Release of Hazardous Materials on, at, to or from any Material

110

Real Property or any other property, including any Mortgaged Property or Vessel, currently or formerly owned, leased or operated by any Loan Party or any of their respective Subsidiaries or any of their predecessors, or any other Environmental Liability related in any way to any Loan Party or any of their respective Subsidiaries or any of their predecessors and/or (v) any claim, inquiry, litigation, investigation or other proceeding relating to any of the foregoing, whether or not any Indemnitee is a party thereto and regardless of whether such matter is initiated by a third party or by any Parent Entity Debtor, any Parent, any Borrower or any of their respective subsidiaries or Affiliates; provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities, costs or related expenses (x) resulted from the gross negligence or willful misconduct of such Indemnitee or any of its Related Parties (as determined by a court of competent jurisdiction in a final and non-appealable judgment), (y) (other than with respect to the Agents and their Related Parties) resulted from a material breach of the Loan Documents by such Indemnitee or any of its Related Parties (as determined by a court of competent jurisdiction in a final and non-appealable judgment) or (z) arise from any claim, actions, suits, inquiries, litigation, investigation or proceeding between or among Indemnitees that do not involve an act or omission by any Borrower or any of their respective Affiliates (other than any claim, actions, suits, inquiries, litigation, investigation or proceeding by or against an Indemnitee in its capacity or in fulfilling its role as an Agent under this Agreement).

(c)       [Reserved].

(d)       Neither any Loan Party nor JB TopCo shall assert, and each hereby waives on behalf of itself and each other Loan Party, any claim against any Indemnitee (i) for any direct or actual damages arising from the use by unintended recipients of information or other materials distributed to such unintended recipients by such Indemnitee through telecommunications, electronic or other information transmission systems (including the Internet) in connection with this Agreement or the other Loan Documents or the transactions contemplated hereby or thereby; provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such direct or actual damages are determined by a court of competent jurisdiction by final, non-appealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnitee or (ii) on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Loan Document or any agreement or instrument contemplated hereby or thereby, the Transactions or any Term Loan or the use of the proceeds thereof.

(e)       All amounts due under this Section shall be payable not later than ten (10) Business Days after written demand therefor; provided, however, that any Indemnitee shall promptly refund an indemnification payment received hereunder to the extent that there is a final judicial determination that such Indemnitee was not entitled to indemnification with respect to such payment pursuant to this Section.

Section 9.04       Successors and Assigns.

(a)       The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that (i) the Borrowers may not assign or otherwise transfer any of their rights or obligations hereunder other than as expressly provided in Section 6.05 without the prior written consent of each Lender (and any attempted assignment or transfer by the Borrowers without such consent shall be null and void) and (ii) no Lender may assign or otherwise transfer its rights or obligations hereunder except in accordance with this Section.  Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants (to the extent provided in paragraph (d) of this Section), the Company Advisors (to the extent provided in Section 8.08) and, to the extent expressly contemplated hereby, the Related Parties of each of the Administrative Agent and the Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement or the other Loan Documents.

(b)       (i) Subject to the conditions set forth in paragraph (b)(ii) below, any Lender may assign to one or more assignees (each, an "Assignee") all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans at the time owing to it) with the prior written consent (such consent (except with respect to assignments to an Ineligible Institution) not to be unreasonably withheld or delayed) of (A) the Borrowers; provided that no consent of the Borrowers shall be required for an assignment of (x) a Term Loan by a Term Lender to any Term Lender or an Affiliate of any Term Lender or an Approved Fund of a Term Lender, or (y), in each case, if an Event of Default has occurred and is continuing (other than to an Ineligible Institution) (provided that such consent of the Borrowers shall be deemed to have been given if the Borrower have not responded to a request

111

for consent within 10 Business Days) and (B) the Administrative Agent; provided that no consent of the Administrative Agent shall be required for an assignment of a Term Loan to a Term Lender, an Affiliate of a Term Lender or an Approved Fund of a Term Lender.

(ii) Assignments shall be subject to the following additional conditions:  (A) except in the case of an assignment to a Lender, an Affiliate of a Lender or an Approved Fund (in each case, other than an Ineligible Institution) or an assignment of the entire remaining amount of the assigning Lender's Commitment or Loans, the amount of the Commitment or Loans of the assigning Lender subject to each such assignment (determined as of the trade date specified in the Assignment and Assumption with respect to such assignment or, if no trade date is so specified, as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent) shall, not be less than $1,000,000 and integral multiples of $1,000,000 in excess thereof unless the Borrowers and the Administrative Agent otherwise consent (in each case, such consent not to be unreasonably withheld or delayed); provided that no such consent of the Borrowers shall be required if an Event of Default under Section 7.01(a), (b), (d) (solely to the extent related to a failure to observe any covenant, condition or agreement contained in Sections 5.18 or 6.11), (e) (solely with respect to the failure to observe any covenant, condition or agreement contained in Sections 5.01(a), (b) or (c)), (h), (i), (v) or (z) has occurred and is continuing; provided, further, that simultaneous assignments by or to two or more Approved Funds shall be combined for purposes of determining whether the minimum assignment requirement is met, (B) each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement, (C) the parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption via an electronic settlement system acceptable to the Administrative Agent or, if previously agreed with the Administrative Agent, manually execute and deliver to the Administrative Agent an Assignment and Assumption, and, in each case, together (unless waived or reduced by the Administrative Agent) with a processing and recordation fee of $3,500; provided that the Administrative Agent, in its sole discretion, may elect to waive or reduce such processing and recordation fee; provided, further, that assignments made pursuant to Section 2.19(b) or Section 9.02(c) shall not require the signature of the assigning Lender to become effective and (D) the assignee, if it shall not be a Lender, shall deliver to the Administrative Agent all "know your customer" documents requested by the Administrative Agent pursuant to anti-money laundering rules and regulations, any tax forms required by Section 2.17(e) and an Administrative Questionnaire in which the assignee designates one or more credit contacts to whom all syndicate-level information (which may contain material non-public information about the Borrowers, the Loan Parties and their Related Parties or their respective securities) will be made available and who may receive such information in accordance with the assignee's compliance procedures and applicable laws, including Federal and state securities laws.

(iii) Subject to acceptance and recording thereof pursuant to paragraph (b)(v) of this Section, from and after the effective date specified in each Assignment and Assumption, the assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of (and subject to the obligations and limitations of) Sections 2.15, 2.16, 2.17 and 9.03 and to any fees payable hereunder that have accrued for such Lender's account but have not yet been paid).  Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this Section 9.04 shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with paragraph (d)(i) of this Section.

(iv) The Administrative Agent, acting for this purpose as a non-fiduciary agent of the Borrowers, shall maintain at one of its offices a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Term Loan Commitment of, and principal and interest amounts (including details of all PIK Elections) of the Term Loans owing to, each Lender pursuant to the terms hereof from time to time (the "Register").  The entries in the Register shall be conclusive absent manifest error, and the Parents, the Borrowers, the Administrative Agent and the other Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary.  The Register shall be available for inspection at any reasonable time and from time to time upon reasonable prior written notice by (i) the Borrowers, (ii) to the extent of its own Term Loan and Term Loan Commitments, any Lender, and (iii) the Agents and their Affiliates.  The parties hereto acknowledge that the Term Loan Commitments and Term Loans are intended to be in "registered form" within the meaning of Treasury

regulations Sections 1.871-14(c) and 5f.103-1(c), Sections 163(f), 871(h) and 881(c) of the Code and Section 1.163-5(b) of the United States Proposed Treasury Regulations (or, in each case, any amended or successor version), and this Section 9.04(b)(iv) shall be interpreted and applied in a manner consistent therewith.

(v)    Upon its receipt of a duly completed Assignment and Assumption executed by an assigning Lender and an assignee, the assignee's completed Administrative Questionnaire and a properly completed and duly executed copy of IRS Form W-9 (or other applicable tax form required by Section 2.17(e)) and all other documentation and other information required under applicable "know your customer" and anti-money laundering rules and regulations including the USA PATRIOT Act (unless the assignee shall already be a Lender hereunder), the processing and recordation fee referred to in paragraph (b) of this Section and any written consent to such assignment required by paragraph (b) of this Section, the Administrative Agent shall accept such Assignment and Assumption and record the information contained therein in the Register.  No assignment shall be effective for purposes of this Agreement unless it has been recorded in the Register as provided in this paragraph.

(vi) The words "execution," "signed," "signature" and words of like import in any Assignment and Assumption shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act or any other similar state laws based on the Uniform Electronic Transactions Act.

(c)    [Reserved]

(d)    (i)    Any Lender may, without the consent of, or notice to, the Borrowers or the Administrative Agent, sell participations to one or more banks or other Persons other than a natural person other than any Ineligible Institution (to the extent that the list of Ineligible Institutions has been made available to all Lenders; provided that regardless of whether the list of Ineligible Institutions has been made available to all Lenders, no Lender may sell participations in Term Loans or Term Loan Commitments to an Ineligible Institution without the consent of the Borrowers if the list of Ineligible Institutions has been made available to such Lender), any Parent, any Borrower or any of any Borrower's Subsidiaries (a "Participant") in all or a portion of such Lender's rights and obligations under this Agreement (including all or a portion of its Term Loan Commitments and the Term Loans owing to it); provided that (A) such Lender's obligations under this Agreement shall remain unchanged, (B) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (C) each Parent, each Borrower, each Agent and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement.  Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and any other Loan Documents and to approve any amendment, modification or waiver of any provision of this Agreement and any other Loan Documents; provided that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver described in the clause (i), (ii), (iii), (vii) or (viii) of the first proviso to Section 9.02(b) that directly and adversely affects such Participant (but, for the avoidance of doubt, not any waiver of any Default or Event of Default).  Subject to paragraph (d)(iii) of this Section, the Borrowers agree that each Participant shall be entitled to the benefits of Sections 2.15, 2.16 and 2.17 (subject to the obligations and limitations of such Sections, including Section 2.17(e) (provided that any required documentation under Section 2.17(e) shall be provided solely to the participating Lender) and Section 2.19) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to paragraph (b) of this Section.  To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 9.08 as though it were a Lender; provided that such Participant shall be subject to Section 2.18(c) as though it were a Lender.  Notwithstanding the foregoing, each Loan Party and the Lenders acknowledge and agree that the Administrative Agent shall not have any responsibility or obligation to determine whether any Participant or potential Participant is an Ineligible Institution and the Administrative Agent shall have no liability with respect to any participation made to an Ineligible Institution.

(ii)    Each Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of the Borrowers, maintain a register on which it enters the name and address of each Participant and

the principal and interest amounts of each participant's interest in the Term Loans or other obligations under this Agreement (the "Participant Register"). The entries in the Participant Register shall be conclusive, absent manifest error, and the Borrowers and such Lender shall treat each person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary; provided that no Lender shall have the obligation to disclose all or a portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any loans or other obligations under any Loan Document) to any Person except to the extent that such disclosure is necessary in connection with a Tax audit or other proceeding to establish that any loans are in registered form for U.S. federal income tax purposes. The parties hereto acknowledge that the Term Loan Commitments and Term Loans are intended to be in "registered form" within the meaning of Treasury regulations Sections 1.871-14(c) and 5f.103-1(c), Sections 163(f), 871(h) and 881(c) of the Code and Section 1.163-5(b) of the United States Proposed Treasury Regulations (or, in each case, any amended or successor version), and this Section 9.04(d)(ii) shall be interpreted and applied in a manner consistent therewith.

(iii)    A Participant shall not be entitled to receive any greater payment under Section 2.15 or Section 2.17 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, except to the extent that a Participant's right to a greater payment results from a Change in Law that occurs after the Participant acquired the applicable participation.

Any Lender may, without the consent of the Borrowers or the Administrative Agent, at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank or other "central" bank, and this Section shall not apply to any such pledge or assignment of a security interest, provided that no such pledge or assignment of a security interest shall release a Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

Section 9.05    Survival. All covenants, agreements, representations and warranties made by the Loan Parties and JB TopCo in the Loan Documents and in the certificates or other instruments delivered in connection with or pursuant to any Loan Document shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of the Loan Documents and the making of any Term Loans, regardless of any investigation made by any such other party or on its behalf and notwithstanding that any Agent or any Lender may have had notice or knowledge of any Default or incorrect representation or warranty at the time any credit is extended hereunder, and shall continue in full force and effect as long as the principal of or any accrued interest on any Term Loan or any fee or any other amount payable under this Agreement is outstanding and unpaid. The provisions of Sections 2.15, 2.16, 2.17 and 9.03 and Article VIII shall survive and remain in full force and effect regardless of the consummation of the transactions contemplated hereby, an assignment or rights by or replacement of any Lender, the repayment of all Term Loans and all other amounts payable hereunder or the termination of this Agreement or any provision hereof or the resignation or removal of any Agent.

Section 9.06    Counterparts; Integration; Effectiveness. This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. This Agreement, the other Loan Documents and any separate letter agreements with respect to fees payable to any Agent or any Lender constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof. This Agreement shall become effective when it shall have been executed by each Agent and when the Administrative Agent shall have received counterparts hereof that, when taken together, bear the signatures of each of the other parties hereto, and thereafter shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns. Any signature to this Agreement may be delivered by facsimile, electronic mail (including pdf) or any electronic signature complying with the U.S. federal ESIGN Act of 2000 or the New York Electronic Signature and Records Act or other transmission method and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes to the fullest extent permitted by applicable law. For the avoidance of doubt, the foregoing also applies to any amendment, supplement, extension or renewal of this Agreement.

Section 9.07    Severability. Any provision of this Agreement held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or

unenforceability without affecting the validity, legality and enforceability of the remaining provisions hereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

Section 9.08    Right of Setoff.  If an Event of Default shall have occurred and be continuing, each Lender and each of their respective Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by law, to set off and apply any and all deposits (general or special, time or demand, provisional or final, in whatever currency) at any time held and other obligations (in whatever currency) at any time owing by such Lender or any such Affiliate to or for the credit or the account of the Borrowers against any of and all the obligations of the Borrowers then due and owing under this Agreement held by such Lender, irrespective of whether or not such Lender shall have made any demand under this Agreement and although (i) such obligations may be contingent or unmatured and (ii) such obligations are owed to a branch or office of such Lender different from the branch or office holding such deposit or obligated on such Indebtedness.  The applicable Lender shall notify the Borrowers and the Administrative Agent of such setoff and application; provided that any failure to give or any delay in giving such notice shall not affect the validity of any such setoff and application under this Section.  The rights of each Lender and their respective Affiliates under this Section are in addition to other rights and remedies (including other rights of setoff) that such Lender and their respective Affiliates may have.

Section 9.09    Governing Law; Jurisdiction; Consent to Service of Process.

(a)    **THIS AGREEMENT AND ANY CLAIMS, CONTROVERSY, DISPUTE OR CAUSES OF ACTION (WHETHER IN CONTRACT OR TORT OR OTHERWISE) BASED UPON, ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT (OTHER THAN AS EXPRESSLY SET FORTH IN OTHER LOAN DOCUMENTS) SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF NEW YORK.**

(b)    Each party hereto hereby irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of the Bankruptcy Court and any appellate court from any thereof, in any action or proceeding (whether in contract, tort or otherwise) arising out of or relating to any Loan Document, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such court.  Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.  Nothing in any Loan Document shall affect any right that any Agent or any Lender may otherwise have to bring any action or proceeding relating to any Loan Document against any Parent or any Borrower or their respective properties in the courts of any jurisdiction.

(c)    Each party hereto hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection that it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to any Loan Document in any court referred to in paragraph (b) of this Section.  Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(d)    Each party to this Agreement irrevocably consents to service of process in the manner provided for notices in Section 9.01. Nothing in any Loan Document will affect the right of any party to this Agreement to serve process in any other manner permitted by law. Each Foreign Loan Party hereby irrevocably and unconditionally appoints Hornblower Borrower, with an office on the date hereof at Pier 3, The Embarcadero, San Francisco, CA 94111, and its successors hereunder (the "Process Agent"), as its agent to receive on behalf of such Foreign Loan Party and its property all writs, claims, process and summonses in any action or proceeding brought against it in the State of New York.  Such service may be made by mailing or delivering a copy of such process to the Borrowers (as applicable) in care of the Process Agent at the address specified above for the Process Agent, and each Foreign Loan Party irrevocably authorizes and directs the Process Agent to accept such service on its behalf.  Failure by the Process Agent to give notice to any Foreign Loan Party or failure of any Foreign Loan Party to receive notice of such service of process shall not impair or affect the validity of such service on the Process Agent or such Foreign Loan Party, or of any judgment based thereon. Each Foreign Loan Party covenants and agrees that it shall take any and all reasonable action, including the execution and filing of any and all documents, that may be necessary to continue the delegation of the Process Agent above in full force and effect, and to cause the Process Agent to act as such.  Nothing herein

shall in any way be deemed to limit the ability to serve any such writs, process or summonses in any other manner permitted by applicable law.

(e)     Notwithstanding anything to the contrary herein, the Canadian Recognition Proceedings and the orders of the Canadian Court granted therein shall be subject to the exclusive jurisdiction of the Canadian Court.

Section 9.10     WAIVER OF JURY TRIAL.  EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LEGAL ACTION OR PROCEEDING (WHETHER IN CONTRACT, TORT OR OTHERWISE AND IN LAW OR EQUITY)  DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS.  EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS, AS APPLICABLE, BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

Section 9.11     Headings.  Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and shall not affect the construction of, or be taken into consideration in interpreting, this Agreement.

Section 9.12     Confidentiality.

(a)     Each Agent and the Lenders agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (i) to its Affiliates, and to its and its Affiliates' directors, officers, employees, trustees and agents, including accountants, legal counsel and other agents and advisors (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential and any failure of such Persons acting on behalf of such Agent or the relevant Lender to comply with this Section shall constitute a breach of this Section by the such Agent or the relevant Lender, as applicable), (ii) to the extent requested by any governmental or regulatory authority or self-regulatory authority, required by applicable law or by any subpoena or similar legal process; provided that solely to the extent permitted by law and other than in connection with routine audits and reviews by regulatory and self-regulatory authorities, each Lender and each Agent shall notify the Borrowers as promptly as practicable of any such requested or required disclosure in connection with any legal or regulatory proceeding; provided further that in no event shall any Lender or any Agent be obligated or required to return any materials furnished by any Parent, any Parent Entity Debtor, any Borrower or any Subsidiary of any Parent Entity Debtor, (iii) to any other party to this Agreement, (iv) in connection with the exercise of any remedies hereunder or any suit, action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder, (v) subject to an agreement containing confidentiality undertakings substantially similar to those of this Section, to (A) any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights or obligations under this Agreement, (B) any actual or prospective counterparty (or its advisors) to any Hedging Agreement or derivative transaction relating to any Loan Party or its Subsidiaries and its obligations under the Loan Documents or other transaction under which payments are to be made by reference to any Borrower and its obligations, this Agreement or payments hereunder or any credit insurance provider relating to such Borrower or (C) any pledgee referred to in Section 9.04(d), (vi) if required by any rating agency; provided that prior to any such disclosure, such rating agency shall have agreed in writing to maintain the confidentiality of such Information, (vii) to the extent such Information (x) becomes publicly available other than as a result of a breach of this Section or (y) becomes available to any Agent, any Lender or any of their respective Affiliates on a nonconfidential basis from a source other than any Parent, any Parent Entity Debtor or any Borrower, (viii) to the extent that such information is independently developed by any Agent, any Lender or any of their respective Affiliates without the use of any confidential information, (ix) for purposes of establishing a "due diligence" defense or in connection with any suit, action, or proceeding relating to this Agreement or any other Loan Document, (x) to the extent any Borrower consents in writing to any specific disclosure or (xi) to the extent necessary or customary for inclusion in league table measurement.  For the purposes hereof, "Information" means all information received from any Parent or any Borrower relating to any Parent, any Parent Entity Debtor, any Borrower, any other Subsidiary or their business, other than any such information that is available to any Agent or any Lender

on a nonconfidential basis prior to disclosure by any Parent, any Parent Entity Debtor, any Borrower or any Subsidiary; provided that, in the case of information received from any Parent, any Parent Entity Debtor, any Borrower or any Subsidiary after the Closing Date, such information is clearly identified at the time of delivery as confidential. Any Person required to maintain the confidentiality of Information as provided in this Section shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information. For the avoidance of doubt, nothing in this Section 9.12 shall prohibit any Person from voluntarily disclosing or providing any Confidential Information within the scope of this confidentiality provision to any governmental, regulatory or self-regulatory organization (any such entity, a "Regulatory Authority") to the extent that any such prohibition on disclosure set forth in this Section 9.12 shall be prohibited by the laws or regulations applicable to such Regulatory Authority.

(b)    EACH LENDER ACKNOWLEDGES THAT INFORMATION AS DEFINED IN SECTION 9.12(a) FURNISHED TO IT PURSUANT TO THIS AGREEMENT MAY INCLUDE MATERIAL NON-PUBLIC INFORMATION CONCERNING THE PARENTS, THE PARENT ENTITY DEBTORS, THE BORROWERS, THE LOAN PARTIES AND THEIR RELATED PARTIES OR THEIR RESPECTIVE SECURITIES AND CONFIRMS THAT IT HAS DEVELOPED COMPLIANCE PROCEDURES REGARDING THE USE OF MATERIAL NON-PUBLIC INFORMATION AND THAT IT WILL HANDLE SUCH MATERIAL NON-PUBLIC INFORMATION IN ACCORDANCE WITH THOSE PROCEDURES AND APPLICABLE LAW, INCLUDING FEDERAL AND STATE SECURITIES LAWS.

(c)    ALL INFORMATION, INCLUDING REQUESTS FOR WAIVERS AND AMENDMENTS FURNISHED BY ANY BORROWER OR ANY AGENT PURSUANT TO, OR IN THE COURSE OF ADMINISTERING, THIS AGREEMENT, WILL BE SYNDICATE-LEVEL INFORMATION, WHICH MAY CONTAIN MATERIAL NON-PUBLIC INFORMATION ABOUT THE PARENTS, THE PARENT ENTITY DEBTORS, THE BORROWERS, THE LOAN PARTIES AND THEIR RELATED PARTIES OR THEIR RESPECTIVE SECURITIES. ACCORDINGLY, EACH LENDER REPRESENTS TO THE BORROWERS AND THE ADMINISTRATIVE AGENT THAT IT HAS IDENTIFIED IN ITS ADMINISTRATIVE QUESTIONNAIRE A CREDIT CONTACT WHO MAY RECEIVE INFORMATION THAT MAY CONTAIN MATERIAL NON-PUBLIC INFORMATION IN ACCORDANCE WITH ITS COMPLIANCE PROCEDURES AND APPLICABLE LAW, INCLUDING FEDERAL AND STATE SECURITIES LAWS.

Section 9.13    USA PATRIOT Act.  Each Lender that is subject to the USA PATRIOT Act and the Administrative Agent (for itself and not on behalf of any Lender) hereby notifies the Borrowers that pursuant to the requirements of the USA PATRIOT Act, it is required to obtain, verify and record information that identifies each Loan Party and JB TopCo, which information includes the name, address and tax identification number of each Loan Party and JB TopCo and other information that will allow such Lender or the Administrative Agent, as applicable, to identify each Loan Party and JB TopCo in accordance with the USA PATRIOT Act.

Section 9.14    Judgment Currency.

(a)    If, for the purpose of obtaining judgment in any court, it is necessary to convert a sum owing hereunder in one currency into another currency, each party hereto agrees, to the fullest extent that it may effectively do so, that the rate of exchange used shall be that at which in accordance with normal banking procedures in the relevant jurisdiction the first currency could be purchased with such other currency on the Business Day immediately preceding the day on which final judgment is given.

(b)    The obligations of the Borrowers in respect of any sum due to any party hereto or any holder of any obligation owing hereunder (the "Applicable Creditor") shall, notwithstanding any judgment in a currency (the "Judgment Currency") other than the currency in which such sum is stated to be due hereunder (the "Agreement Currency"), be discharged only to the extent that, on the Business Day following receipt by the Applicable Creditor of any sum adjudged to be so due in the Judgment Currency, the Applicable Creditor may in accordance with normal banking procedures in the relevant jurisdiction purchase the Agreement Currency with the Judgment Currency; if the amount of the Agreement Currency so purchased is less than the sum originally due to the Applicable Creditor in the Agreement Currency, the Borrowers agree, as a separate obligation and notwithstanding any such judgment, to

indemnify the Applicable Creditor against such loss.  The obligations of the Borrowers under this Section shall survive the termination of this Agreement and the payment of all other amounts owing hereunder.

Section 9.15     Release of Liens and Guarantees.

(a)      [Reserved].

(b)      The Lenders and the other Secured Parties hereby irrevocably agree that a Subsidiary Loan Party shall be automatically released from its obligations under the Loan Documents, and all security interests created by the Security Documents in Collateral owned by such Subsidiary Loan Party shall be automatically released, upon consummation of any transaction not prohibited by this Agreement resulting in such Subsidiary Loan Party ceasing to be a Subsidiary of any Borrower or otherwise becoming an Excluded Subsidiary.

(c)      Each Agent will, at the Borrowers' expense, execute and deliver to the applicable Loan Party such documents (without recourse, representation or warranty) as such Loan Party may prepare and reasonably request to subordinate the Collateral Agent's Lien on any property granted to or held by the Collateral Agent under any Loan Document to the holder of any Lien on such property that is permitted by Section 6.02(i).

(d)      Each of the Lenders irrevocably authorizes each Agent to provide any release or evidence of release, termination or subordination contemplated by this Section 9.15.  Upon request by either Agent at any time, the Required Lenders will confirm in writing such Agent's authority to release or subordinate its interest in particular types or items of property, or to release any Loan Party from its obligations under any Loan Document, in each case in accordance with the terms of the Loan Document and this Section.  Notwithstanding anything contained in this Agreement or any other Loan Document to the contrary, in no event shall any Agent be required to authorize or execute and deliver any instrument or document evidencing any release or subordination unless the Borrowers or applicable Loan Party or JB TopCo shall have provided such Agent with a certificate of a Responsible Officer that the authorization, execution and delivery of such release or subordination, as applicable, are authorized or permitted by the terms of this Agreement and the other Loan Documents. Each Agent may conclusively rely, without independent investigation, on such certificate and shall incur no liability for acting in reliance thereon.

(e)      Any such release of Obligations shall be deemed subject to the provision that such Obligations shall be reinstated if after such release any portion of any payment in respect of the Obligations guaranteed thereby shall be rescinded or must otherwise be restored or returned upon or in connection with the insolvency, bankruptcy, dissolution, liquidation, arrangement or reorganization of the Hornblower Borrower or any other Loan Party or JB TopCo, or upon or in connection with or as a result of the appointment of a receiver, intervenor or conservator of, or trustee or similar officer for, any Borrower or any other Loan Party or JB TopCo or any substantial part of its property, or otherwise, all as though such payment had not been made.

Section 9.16     No Advisory or Fiduciary Responsibility.  In connection with all aspects of each transaction contemplated hereby (including in connection with any amendment, waiver or other modification hereof or of any other Loan Document), each Borrower and each Parent acknowledges and agrees that (i) (A) the arranging and other services regarding this Agreement provided by the Agents, the Arranger and the Lenders are arm's-length commercial transactions between the Borrowers, the Parents and their respective Affiliates, on the one hand, and the Agents, the Arranger and the Lenders, on the other hand, (B) each Borrower and each Parent has consulted its own legal, accounting, regulatory and tax advisors to the extent it has deemed appropriate, and (C) each Borrower and each Parent is capable of evaluating, and understands and accepts, the terms, risks and conditions of the transactions contemplated hereby and by the other Loan Documents; (ii) (A) each of the Agents, the Arranger and the Lenders is and has been acting solely as a principal and, except as expressly agreed in writing by the relevant parties, has not been, is not and will not be acting as an advisor, agent or fiduciary for any Borrower, any Parent, any of their respective Affiliates or any other Person and (B) none of the Agents, the Arranger or the Lenders has any obligation to any Borrower, any Parent or any of their respective Affiliates with respect to the transactions contemplated hereby except

118

those obligations expressly set forth herein and in the other Loan Documents; and (iii) the Agents, the Arranger and the Lenders and their respective Affiliates may be engaged, for their accounts or the accounts of customers, in a broad range of transactions that involve interests that differ from those of the Borrowers, the Parents and their respective Affiliates, and none of the Agents, the Arranger and the Lenders has any obligation to disclose any of such interests to the Borrowers, the Parents or any of their respective Affiliates.  To the fullest extent permitted by law, each of each Borrower and each Parent hereby agrees it will not claim that the Agents, the Arranger or the Lenders have rendered advisory services of any nature or owes a fiduciary or similar duty to it in connection with the Transactions and waives and releases any claims that it may have against the Agents, the Arranger and the Lenders with respect to any breach or alleged breach of agency or fiduciary duty in connection with any aspect of any transaction contemplated hereby.

Section 9.17    Interest Rate Limitation.  Notwithstanding anything to the contrary contained in any Loan Document, the interest paid or agreed to be paid under the Loan Documents shall not exceed the maximum rate of non-usurious interest permitted by applicable law (the "Maximum Rate").  If the Administrative Agent or any Lender or shall receive interest in an amount that exceeds the Maximum Rate, the excess interest shall be applied to the principal of the Term Loans, or, if it exceeds such unpaid principal, refunded to the Borrowers.  In determining whether the interest contracted for, charged or received by the Administrative Agent or a Lender exceeds the Maximum Rate, such Person may, to the extent permitted by applicable law, (a) characterize any payment that is not principal as an expense, fee or premium rather than interest, (b) exclude voluntary prepayments and the effects thereof, and (c) amortize, prorate, allocate and spread in equal or unequal parts the total amount of interest throughout the contemplated term of the obligations hereunder.

Section 9.18    Acknowledgment and Consent to Bail-In of Affected Financial Institutions.  Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any Lender that is the Affected Financial Institution arising under any Loan Document, to the extent such liability is unsecured, may be subject to the write-down and conversion powers of the applicable Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)    the application of any Write-Down and Conversion Powers by the applicable Resolution Authority to any such liabilities arising hereunder which may be payable to it by any Lender that is an Affected Financial Institution; and

(b)    the effects of any Bail-In Action on any such liability, including, if applicable:

(i)    a reduction in full or in part or cancellation of any such liability;

(ii)    a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such Affected Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

(iii)    the variation of the terms of such liability in connection with the exercise of the write-down and conversion powers of the applicable Resolution Authority.

Section 9.19    [Reserved].

Section 9.20    Acknowledgement Regarding Any Supported QFCs.  To the extent that the Loan Documents provide support, through a guarantee or otherwise, for Hedging Agreements or any other agreement or instrument that is a QFC (such support "QFC Credit Support" and each such QFC a "Supported QFC"), the parties acknowledge and agree as follows with respect to the resolution power of the Federal Deposit Insurance Corporation under the Federal Deposit Insurance Act and Title II of the Dodd-Frank Wall Street Reform and Consumer Protection Act (together with the regulations promulgated thereunder, the "U.S. Special Resolution Regimes") in respect of such Supported QFC and QFC Credit Support (with the provisions below applicable notwithstanding that the Loan

119

Documents and any Supported QFC may in fact be stated to be governed by the laws of the State of New York and/or of the United States or any other state of the United States):

(a)       In the event a Covered Entity that is party to a Supported QFC (each, a "Covered Party") becomes subject to a proceeding under a U.S. Special Resolution Regime, the transfer of such Supported QFC and the benefit of such QFC Credit Support (and any interest and obligation in or under such Supported QFC and such QFC Credit Support, and any rights in property securing such Supported QFC or such QFC Credit Support) from such Covered Party will be effective to the same extent as the transfer would be effective under the U.S. Special Resolution Regime if the Supported QFC and such QFC Credit Support (and any such interest, obligation and rights in property) were governed by the laws of the United States or a state of the United States.

(b)       In the event a Covered Party or a BHC Act Affiliate of a Covered Party becomes subject to a proceeding under a U.S. Special Resolution Regime, Default Rights under the Loan Documents that might otherwise apply to such Supported QFC or any QFC Credit Support that may be exercised against such Covered Party are permitted to be exercised to no greater extent than such Default Rights could be exercised under the U.S. Special Resolution Regime if the Supported QFC and the Loan Documents were governed by the laws of the United States or a state of the United States.]

**ARTICLE X**
**GUARANTY**

Section 10.01      Guaranty of the Obligations.  Subject to the provisions of Section 10.02, the Guarantors jointly and severally hereby irrevocably and unconditionally guaranty to the Administrative Agent, for the ratable benefit of the Beneficiaries, the due and punctual payment in full in cash of all Obligations when the same shall become due, whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise (including amounts that would become due but for the operation of the automatic stay under Section 362(a) of the Bankruptcy Code, 11 U.S.C. § 362(a), any stay granted in or in connection with the Canadian Recognition Proceedings, or any other applicable provision of the Debtor Relief Laws) (collectively, the "Guaranteed Obligations").

Section 10.02      Contribution by Guarantors.  All Guarantors desire to allocate among themselves (collectively, the "Contributing Guarantors"), in a fair and equitable manner, their obligations arising under this Guaranty.  Accordingly, in the event any payment or distribution is made on any date by a Guarantor (a "Funding Guarantor") under this Guaranty such that its Aggregate Payments exceeds its Fair Share as of such date, such Funding Guarantor shall be entitled to a contribution from each of the other Contributing Guarantors in an amount sufficient to cause each Contributing Guarantor's Aggregate Payments to equal its Fair Share as of such date.  "Fair Share" means, with respect to a Contributing Guarantor as of any date of determination, an amount equal to (a) the ratio of (i) the Fair Share Contribution Amount with respect to such Contributing Guarantor to (ii) the aggregate of the Fair Share Contribution Amounts with respect to all Contributing Guarantors multiplied by (b) the aggregate amount paid or distributed on or before such date by all Funding Guarantors under this Guaranty in respect of the Guaranteed Obligations.  "Fair Share Contribution Amount" means, with respect to a Contributing Guarantor as of any date of determination, the maximum aggregate amount of the obligations of such Contributing Guarantor under this Guaranty that would not render its obligations hereunder or thereunder subject to avoidance as a fraudulent transfer or conveyance under Section 548 of Title 11 of the United States Code or any comparable applicable provisions of state law; provided that solely for purposes of calculating the "Fair Share Contribution Amount" with respect to any Contributing Guarantor for purposes of this Section 10.02, any assets or liabilities of such Contributing Guarantor arising by virtue of any rights to subrogation, reimbursement or indemnification or any rights to or obligations of contribution hereunder shall not be considered as assets or liabilities of such Contributing Guarantor.  "Aggregate Payments" means, with respect to a Contributing Guarantor as of any date of determination, an amount equal to (1) the aggregate amount of all payments and distributions made on or before such date by such Contributing Guarantor in respect of this Guaranty (including in respect of this Section 10.02), minus (2) the aggregate amount of all payments received on or before such date by such Contributing Guarantor from the other Contributing Guarantors as contributions under this Section 10.02.  The amounts payable as contributions hereunder shall be determined as of the date on which the related payment or distribution is made by the applicable Funding Guarantor.  The allocation among Contributing Guarantors of their obligations as set forth in this Section 10.02 shall not be construed in any way to

limit the liability of any Contributing Guarantor hereunder.  Each Guarantor is a third party beneficiary to the contribution agreement set forth in this Section 10.02.

Section 10.03    Payment by Guarantors.  Subject to Section 10.02, Guarantors hereby jointly and severally agree, in furtherance of the foregoing and not in limitation of any other right which any Beneficiary may have at law or in equity against any Guarantor by virtue hereof, that upon the failure of the Borrowers to pay any of the Guaranteed Obligations when and as the same shall become due, whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise (including amounts that would become due but for the operation of the automatic stay under Section 362(a) of the Bankruptcy Code, 11 U.S.C. § 362(a), any stay granted in or in connection with the Canadian Recognition Proceedings, or any other applicable provision of the Debtor Relief Laws), Guarantors will upon demand pay, or cause to be paid, in cash, to the Administrative Agent for the ratable benefit of Beneficiaries, an amount equal to the sum of the unpaid principal amount of all Guaranteed Obligations then due as aforesaid, accrued and unpaid interest on such Guaranteed Obligations (including interest which, but for the Borrowers' becoming the subject of a case under the Bankruptcy Code or any proceeding under the CCAA, would have accrued on such Guaranteed Obligations, whether or not a claim is allowed against the Borrowers for such interest in the related bankruptcy or insolvency case) and all other Guaranteed Obligations then owed to Beneficiaries as aforesaid.

Section 10.04    Liability of Guarantors Absolute.  Each Guarantor agrees that its obligations hereunder are irrevocable, absolute, independent and unconditional and shall not be affected by any circumstance which constitutes a legal or equitable discharge of a guarantor or surety other than payment in full in cash of the Guaranteed Obligations.  In furtherance of the foregoing and without limiting the generality thereof, each Guarantor agrees as follows:

(a)     this Guaranty is a guaranty of payment when due and not of collectability.  This Guaranty is a primary obligation of each Guarantor and not merely a contract of surety;

(b)     the Administrative Agent may enforce this Guaranty upon the occurrence of an Event of Default notwithstanding the existence of any dispute between the Borrowers and any Beneficiary with respect to the existence of such Event of Default;

(c)     the obligations of each Guarantor hereunder are independent of the obligations of the Borrowers and the obligations of any other guarantor (including any other Guarantor) of the obligations of the Borrower, and a separate action or actions may be brought and prosecuted against such Guarantor whether or not any action is brought against the Borrowers or any of such other guarantors and whether or not the Borrowers is joined in any such action or actions;

(d)     payment by any Guarantor of a portion, but not all, of the Guaranteed Obligations shall in no way limit, affect, modify or abridge any Guarantor's liability for any portion of the Guaranteed Obligations which has not been paid.  Without limiting the generality of the foregoing, if the Administrative Agent is awarded a judgment in any suit brought to enforce any Guarantor's covenant to pay a portion of the Guaranteed Obligations, such judgment shall not be deemed to release such Guarantor from its covenant to pay the portion of the Guaranteed Obligations that is not the subject of such suit, and such judgment shall not, except to the extent satisfied by such Guarantor, limit, affect, modify or abridge any other Guarantor's liability hereunder in respect of the Guaranteed Obligations;

(e)     any Beneficiary, upon such terms as it deems appropriate, without notice or demand and without affecting the validity or enforceability hereof or giving rise to any reduction, limitation, impairment, discharge or termination of any Guarantor's liability hereunder, from time to time may (i) renew, extend, accelerate, increase the rate of interest on, or otherwise change the time, place, manner or terms of payment of the Guaranteed Obligations; (ii) settle, compromise, release or discharge, or accept or refuse any offer of performance with respect to, or substitutions for, the Guaranteed Obligations or any agreement relating thereto and/or subordinate the payment of the same to the payment of any other obligations; (iii) request and accept other guaranties of the Guaranteed Obligations and take and hold security for the payment hereof or the Guaranteed Obligations; (iv) release, surrender, exchange, substitute, compromise, settle, rescind, waive, alter, subordinate or modify, with or without consideration, any security for payment of the Guaranteed Obligations, any other guaranties of the Guaranteed Obligations, or any other obligation of any Person (including any other Guarantor) with respect to the Guaranteed Obligations; (v) enforce and apply any

121

security now or hereafter held by or for the benefit of such Beneficiary in respect hereof or the Guaranteed Obligations and direct the order or manner of sale thereof, or exercise any other right or remedy that such Beneficiary may have against any such security, in each case as such Beneficiary in its discretion may determine consistent herewith and any applicable security agreement, including foreclosure on any such security pursuant to one or more judicial or nonjudicial sales, whether or not every aspect of any such sale is commercially reasonable, and even though such action operates to impair or extinguish any right of reimbursement or subrogation or other right or remedy of any Guarantor against any other Loan Party or any security for the Guaranteed Obligations; and (vi) exercise any other rights available to it under the Loan Documents; and

(f)        this Guaranty and the obligations of Guarantors hereunder shall be valid and enforceable and shall not be subject to any reduction, limitation, impairment, discharge or termination for any reason (other than payment in full in cash of the Guaranteed Obligations), including the occurrence of any of the following, whether or not any Guarantor shall have had notice or knowledge of any of them:  (i) any failure or omission to assert or enforce or agreement or election not to assert or enforce, or the stay or enjoining, by order of court, by operation of law or otherwise, of the exercise or enforcement of, any claim or demand or any right, power or remedy (whether arising under the Loan Documents, at law, in equity or otherwise) with respect to the Guaranteed Obligations or any agreement relating thereto, or with respect to any other guaranty of or security for the payment of the Guaranteed Obligations; (ii) any rescission, waiver, amendment or modification of, or any consent to departure from, any of the terms or provisions (including provisions relating to events of default) hereof, any of the other Loan Documents or any agreement or instrument executed pursuant thereto, or of any other guaranty or security for the Guaranteed Obligations, in each case whether or not in accordance with the terms hereof or such Loan Document or any agreement relating to such other guaranty or security; (iii) the Guaranteed Obligations, or any agreement relating thereto, at any time being found to be illegal, invalid or unenforceable in any respect; (iv) the application of payments received from any source (other than payments received pursuant to the other Loan Documents or from the proceeds of any security for the Guaranteed Obligations, except to the extent such security also serves as collateral for indebtedness other than the Guaranteed Obligations) to the payment of indebtedness other than the Guaranteed Obligations, even though any Beneficiary might have elected to apply such payment to any part or all of the Guaranteed Obligations; (v) any Beneficiary's consent to the change, reorganization or termination of the corporate structure or existence of Parents or any of their respective Subsidiaries and to any corresponding restructuring of the Guaranteed Obligations; (vi) any failure to perfect or continue perfection of a security interest in any collateral which secures any of the Guaranteed Obligations; (vii) any defenses, set-offs or counterclaims which any of the Borrowers may allege or assert against any Beneficiary in respect of the Guaranteed Obligations, including failure of consideration, breach of warranty, payment, statute of frauds, statute of limitations, accord and satisfaction and usury; and (viii) any other act or thing or omission, or delay to do any other act or thing, which may or might in any manner or to any extent vary the risk of any Guarantor as an obligor in respect of the Guaranteed Obligations.

Section 10.05        Waivers by Guarantors.  Each Guarantor hereby waives, for the benefit of Beneficiaries: (a) any right to require any Beneficiary, as a condition of payment or performance by such Guarantor, to (i) proceed against any Borrower, any other guarantor (including any other Guarantor) of the Guaranteed Obligations or any other Person, (ii) proceed against or exhaust any security held from any Borrower, any such other guarantor or any other Person, (iii) proceed against or have resort to any balance of any deposit account or credit on the books of any Beneficiary in favor of any Loan Party or any other Person, or (iv) pursue any other remedy in the power of any Beneficiary whatsoever; (b) any defense arising by reason of the incapacity, lack of authority or any disability or other defense of the Borrowers or any other Guarantor including any defense based on or arising out of the lack of validity or the unenforceability of the Guaranteed Obligations or any agreement or instrument relating thereto or by reason of the cessation of the liability of the Borrowers or any other Guarantor from any cause other than payment in full in cash of the Guaranteed Obligations; (c) any defense based upon any statute or rule of law which provides that the obligation of a surety must be neither larger in amount nor in other respects more burdensome than that of the principal; (d) any defense based upon any Beneficiary's errors or omissions in the administration of the Guaranteed Obligations, except behavior which amounts to bad faith; (e) (i) any principles or provisions of law, statutory or otherwise, which are or might be in conflict with the terms hereof and any legal or equitable discharge of such Guarantor's obligations hereunder, (ii) the benefit of any statute of limitations affecting such Guarantor's liability hereunder or the enforcement hereof, (iii) any rights to set-offs, recoupments and counterclaims, and (iv) promptness, diligence and any requirement

122

that any Beneficiary protect, secure, perfect or insure any security interest or lien or any property subject thereto; (f) notices, demands, presentments, protests, notices of protest, notices of dishonor and notices of any action or inaction, including acceptance hereof, notices of default hereunder or any agreement or instrument related thereto, notices of any renewal, extension or modification of the Guaranteed Obligations or any agreement related thereto, notices of any extension of credit to the Borrowers and notices of any of the matters referred to in Section 10.04 and any right to consent to any thereof; and (g) any defenses or benefits that may be derived from or afforded by law which limit the liability of or exonerate guarantors or sureties, or which may conflict with the terms hereof.

Section 10.06    Guarantors' Rights of Subrogation, Contribution, Etc.    Until the Guaranteed Obligations shall have been indefeasibly paid in full in cash, each Guarantor hereby waives any claim, right or remedy, direct or indirect, that such Guarantor now has or may hereafter have against the Borrowers or any other Guarantor or any of its assets in connection with this Guaranty or the performance by such Guarantor of its obligations hereunder, in each case whether such claim, right or remedy arises in equity, under contract, by statute, under common law or otherwise and including (a) any right of subrogation, reimbursement or indemnification that such Guarantor now has or may hereafter have against the Borrowers with respect to the Guaranteed Obligations, (b) any right to enforce, or to participate in, any claim, right or remedy that any Beneficiary now has or may hereafter have against the Borrower, and (c) any benefit of, and any right to participate in, any collateral or security now or hereafter held by any Beneficiary.  In addition, until the Guaranteed Obligations shall have been paid in full in cash, each Guarantor shall withhold exercise of any right of contribution such Guarantor may have against any other guarantor (including any other Guarantor) of the Guaranteed Obligations, including any such right of contribution as contemplated by Section 10.02.  Each Guarantor further agrees that, to the extent the waiver or agreement to withhold the exercise of its rights of subrogation, reimbursement, indemnification and contribution as set forth herein is found by a court of competent jurisdiction to be void or voidable for any reason, any rights of subrogation, reimbursement or indemnification such Guarantor may have against the Borrowers or against any collateral or security, and any rights of contribution such Guarantor may have against any such other guarantor, shall be junior and subordinate to any rights any Beneficiary may have against the Borrowers, to all right, title and interest any Beneficiary may have in any such collateral or security, and to any right any Beneficiary may have against such other guarantor.  If any amount shall be paid to any Guarantor on account of any such subrogation, reimbursement, indemnification or contribution rights at any time when all Guaranteed Obligations shall not have been finally and paid in full in cash, such amount shall be held in trust for the Administrative Agent on behalf of Beneficiaries and shall forthwith be paid over to the Administrative Agent for the benefit of Beneficiaries to be credited and applied against the Guaranteed Obligations, whether matured or unmatured, in accordance with the terms hereof.

Section 10.07    Subordination of Other Obligations.  Any Indebtedness of the Borrowers or any Guarantor now or hereafter held by any Guarantor (the "Obligee Guarantor") is hereby subordinated in right of payment to the Guaranteed Obligations, and any such Indebtedness collected or received by the Obligee Guarantor after an Event of Default has occurred and is continuing shall be held in trust for the Administrative Agent on behalf of Beneficiaries and shall forthwith be paid over to the Administrative Agent for the benefit of Beneficiaries to be credited and applied against the Guaranteed Obligations but without affecting, impairing or limiting in any manner the liability of the Obligee Guarantor under any other provision hereof.

Section 10.08    Continuing Guaranty.  This Guaranty is a continuing guaranty and shall remain in effect until all of the Guaranteed Obligations shall have been paid in full in cash.  Each Guarantor hereby irrevocably waives any right to revoke this Guaranty as to future transactions giving rise to any Guaranteed Obligations.

Section 10.09    Authority of Guarantors or the Borrower.  It is not necessary for any Beneficiary to inquire into the capacity or powers of any Guarantor or the Borrowers or the officers, directors or any agents acting or purporting to act on behalf of any of them.

Section 10.10    Financial Condition of the Borrower.  Any Term Loan may be made or continued from time to time, may be entered into from time to time, in each case without notice to or authorization from any Guarantor regardless of the financial or other condition of the Borrowers at the time of any such grant or continuation, as the case may be.  No Beneficiary shall have any obligation to disclose or discuss with any Guarantor its assessment, or any Guarantor's assessment, of the financial condition of any Borrower.  Each Guarantor has adequate means to obtain information from the Borrowers on a continuing basis concerning the financial condition of the Borrowers and their ability to perform their respective obligations under the Loan Documents, and each Guarantor assumes the

responsibility for being and keeping informed of the financial condition of the Borrowers and of all circumstances bearing upon the risk of nonpayment of the Guaranteed Obligations. Each Guarantor hereby waives and relinquishes any duty on the part of any Beneficiary to disclose any matter, fact or thing relating to the business, operations or conditions of the Borrowers now known or hereafter known by any Beneficiary.

Section 10.11    Bankruptcy, Etc.

(a)    So long as any Guaranteed Obligations remain outstanding, no Guarantor shall, without the prior consent of the Administrative Agent acting pursuant to the instructions of Required Lenders, commence or join with any other Person in commencing any bankruptcy, arrangement, reorganization, restructuring, liquidation, conservatorship, moratorium, rearrangement, receivership or insolvency case or proceeding of or against the Borrowers or any other Guarantor (other than the Chapter 11 Cases and the Canadian Recognition Proceedings). The obligations of Guarantors hereunder shall not be reduced, limited, impaired, discharged, deferred, suspended or terminated by any case or proceeding, voluntary or involuntary, involving the bankruptcy, insolvency, receivership, reorganization, liquidation, restructuring, conservatorship, moratorium, rearrangement or arrangement of the Borrowers or any other Guarantor or by any defense which the Borrowers or any other Guarantor may have by reason of the order, decree or decision of any court or administrative body resulting from any such proceeding.

(b)    Each Guarantor acknowledges and agrees that any interest on any portion of the Guaranteed Obligations which accrues after the commencement of any case or proceeding referred to in clause (a) above, including without limitation, the Chapter 11 Cases and the Canadian Recognition Proceedings (or, if interest on any portion of the Guaranteed Obligations ceases to accrue by operation of law by reason of the commencement of such case or proceeding, such interest as would have accrued on such portion of the Guaranteed Obligations if such case or proceeding had not been commenced), shall be included in the Guaranteed Obligations because it is the intention of Guarantors and Beneficiaries that the Guaranteed Obligations which are guaranteed by Guarantors pursuant hereto should be determined without regard to any rule of law or order which may relieve the Borrowers or any of its Subsidiaries of any portion of such Guaranteed Obligations. Guarantors will permit any trustee in bankruptcy, proposal trustee receiver, or interim receiver, debtor in possession, assignee for the benefit of creditors (or any class of creditors) or similar Person to pay the Administrative Agent, or allow the claim of the Administrative Agent in respect of, any such interest accruing after the date on which such case or proceeding is commenced.

(c)    In the event that all or any portion of the Guaranteed Obligations are paid by the Borrowers or any of its Subsidiaries, the obligations of Guarantors hereunder shall continue and remain in full force and effect or be reinstated, as the case may be, in the event that all or any part of such payment(s) are rescinded or recovered directly or indirectly from any Beneficiary as a preference, fraudulent transfer or otherwise, and any such payments which are so rescinded or recovered shall constitute Guaranteed Obligations for all purposes hereunder.

Section 10.12    Discharge of Guaranty Upon Sale of Guarantor. If all of the Equity Interests of any Guarantor or any of its successors in interest hereunder shall be Disposed of (including by merger or consolidation) in accordance with the terms and conditions hereof, the Guaranty of such Guarantor or such successor in interest, as the case may be, hereunder shall automatically be discharged and released without any further action by any Beneficiary or any other Person effective as of the time of such Disposition.

Section 10.13    Keepwell. Each Qualified ECP Guarantor hereby jointly and severally absolutely, unconditionally and irrevocably undertakes to provide such funds or other support as may be needed from time to time by any other Loan Party hereunder to honor all of such Loan Party's obligations under this Guaranty in respect of Swap Obligations (provided that each Qualified ECP Guarantor shall only be liable under this Section 10.13 for the maximum amount of such liability that can be hereby incurred without rendering its obligations under this Section 10.13, or otherwise under this Guaranty, as it relates to such Loan Party, voidable under applicable law relating to fraudulent conveyance or fraudulent transfer, and not for any greater amount). The obligations of each Qualified ECP Guarantor under this Section 10.13 shall remain in full force and effect until the Guaranteed Obligations shall have been paid in full. Each Qualified ECP Guarantor intends that this Section 10.13 constitute, and this Section 10.13 shall be deemed to constitute, a "keepwell, support, or other agreement" for the benefit of each other Loan Party for all purposes of Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

Section 10.14    Definitions. As used in this Article X, the following terms shall be defined as follows:

"Beneficiary" means each Agent and each Lender and Lender Counterparty, and "Beneficiaries" means, collectively, the Agents, the Lenders and the Lender Counterparties.

"Lender Counterparty" means each Lender, each Agent and each of their respective Affiliates counterparty to a Hedging Agreement with any Loan Party (including any Person who is an Agent or a Lender (and any Affiliate thereof) as of the Closing Date but subsequently, whether before or after entering into a Hedging Agreement, ceases to be an Agent or a Lender, as the case may be).

"Qualified ECP Guarantor" means, in respect of any Swap Obligation, each Loan Party that has total assets exceeding $10,000,000 at the time such Swap Obligation is incurred.

Section 10.15    Guarantee Limitation. Any guarantee granted by a UK Loan Party under this Agreement or any of the other Loan Documents shall not apply to any liability to the extent that it would result in this guarantee constituting unlawful financial assistance within the meaning of sections 678 or 679 of the Companies Act 2006.

## ARTICLE XI
## SECURITY AND PRIORITY

Section 11.01    Collateral; Grant of Lien and Security Interest.

(a)    Pursuant to, and otherwise subject to the terms of, the Bankruptcy Court DIP Order and the Canadian DIP Recognition Order and in accordance with the terms thereof, subject to the Carve Out and the Canadian Administration Charge (as against the Canadian Collateral), as security for the full and timely payment and performance of all of the Obligations and subject to the limitations, reservations, restrictions, and qualifications contained in any Security Document, the Loan Parties hereby, pledge and grant to Collateral Agent for the benefit of the Secured Parties, a security interest in and to a Lien on all of the Collateral (including the Canadian Collateral) without duplication.

(b)    Notwithstanding anything herein to the contrary all proceeds received by the Agents and the Lenders from the Collateral subject to the Liens granted in this Section 11.01 and in each other Loan Document and by the Bankruptcy Court DIP Order and the Canadian DIP Recognition Order shall be subject in all respects to the Carve Out and the Canadian Administration Charge (as against the Canadian Collateral).

Section 11.02    [Reserved].

Section 11.03    Grants, Rights and Remedies. The Liens and security interests granted pursuant to Section 11.01(a) hereof and the administrative priority and lien priority granted pursuant to the Bankruptcy Court DIP Order may be independently granted by the Loan Documents and by other Loan Documents hereafter entered into. This Agreement, the Bankruptcy Court DIP Order, the Canadian DIP Recognition Order and such other Loan Documents supplement each other, and the grants, priorities, rights and remedies of the Agents and the Lenders hereunder and thereunder are cumulative; provided that to the extent of conflict the Bankruptcy Court DIP Order controls.

Section 11.04    No Filings Required. The Liens and security interests referred to herein shall be deemed valid and perfected by entry of the Interim DIP Order or the Final DIP Order and the Canadian DIP Recognition Order, as the case may be. No Agent shall be required to file any financing statements, mortgages, notices of Lien or similar instruments in any jurisdiction or filing office, take possession or control of any Collateral, or take any other action in order to validate or perfect the Lien and security interest granted by or pursuant to this Agreement, the Interim DIP Order, the Final DIP Order or the Canadian DIP Recognition Order, as the case may be, or any other Loan Document.

Section 11.05    Survival. The Liens, lien priority, administrative priorities and other rights and remedies granted to the Agents and the Lenders pursuant to this Agreement, the Bankruptcy Court DIP Orders, the Canadian DIP Recognition Order and the other Loan Documents (specifically including, but not limited to, the existence, perfection and priority of the Liens and security interests provided herein and therein, the administrative priority and the Canadian DIP Charge provided herein and therein) shall not be modified, altered or impaired in any manner by any other financing or extension of credit or incurrence of Indebtedness by the Borrowers (pursuant to Section 364 of

the Bankruptcy Code or otherwise), or by any dismissal or conversion of any of the Chapter 11 Cases or the Canadian Recognition Proceedings, or by any other act or omission whatsoever.  Without limitation, notwithstanding any such order, financing, extension, incurrence, dismissal, conversion, act or omission, except with respect to the Carve Out and the Canadian Administration Charge, no costs or expenses of administration which have been or may be incurred in the Chapter 11 Cases, the Canadian Recognition Proceedings or any conversion of the same or in any other proceedings related thereto, and no priority claims, are or will be prior to or on parity with any claim of the Agents and the Lenders against the Borrowers in respect of any Obligation.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

HORNBLOWER SUB, LLC,
as Hornblower Borrower

By: _____
        Name:
        Title:

AMERICAN QUEEN SUB, LLC,
as AQ Borrower

By: _____
        Name:
        Title:

HORNBLOWER HOLDCO, LLC,
as Hornblower Parent

By: _____
        Name:
        Title:

AMERICAN QUEEN HOLDCO, LLC,
as AQ Parent

By: _____
        Name:
        Title:

**Exhibit 3**

**Junior DIP Credit Agreement**

**Execution Version**

---

**JUNIOR SECURED SUPERPRIORITY DEBTOR-IN-POSSESSION CREDIT AGREEMENT**

Dated as of February 21, 2024

among

HORNBLOWER HOLDCO, LLC and
AMERICAN QUEEN HOLDCO, LLC,
as Parents,

HORNBLOWER SUB, LLC and
AMERICAN QUEEN SUB, LLC,
as Borrowers,

THE LENDERS PARTY HERETO,

and

GLAS TRUST COMPANY LLC,
as Administrative Agent and Collateral Agent

JUNIOR SECURED SUPER-PRIORITY DEBTOR-IN-POSSESSION FACILITY

---

**TABLE OF CONTENTS**

**Page**

**ARTICLE I**
**DEFINITIONS**

Section 1.01 Defined Terms ........................................................................................................1
Section 1.02 Classification of Loans and Borrowings ..............................................................46
Section 1.03 Terms Generally ...................................................................................................46
Section 1.04 Accounting Terms; GAAP ....................................................................................46
Section 1.05 Effectuation of Transactions ................................................................................46
Section 1.06 Exchange Rates; Currency Equivalents ...............................................................47
Section 1.07 [Reserved] .............................................................................................................47
Section 1.08 [Reserved] .............................................................................................................47
Section 1.09 Timing of Payment or Performance .....................................................................47
Section 1.10 Times of Day .........................................................................................................47

**ARTICLE II**
**THE CREDITS**

Section 2.01 Loans Commitments ..............................................................................................47
Section 2.02 Loans and Borrowings ..........................................................................................48
Section 2.03 Requests for Borrowings .......................................................................................48
Section 2.04 [Reserved] .............................................................................................................49
Section 2.05 [Reserved] .............................................................................................................49
Section 2.06 Funding of Borrowings .........................................................................................49
Section 2.07 Interest Elections ..................................................................................................49
Section 2.08 Termination of Commitments. ..............................................................................50
Section 2.09 Repayment of Loans; Evidence of Debt ...............................................................51
Section 2.10 Repayment of Term Loans ....................................................................................51
Section 2.11 Prepayment of Loans ............................................................................................52
Section 2.12 Fees .......................................................................................................................53
Section 2.13 Interest ..................................................................................................................54
Section 2.14 Alternate Rate of Interest .....................................................................................55
Section 2.15 Increased Costs .....................................................................................................56
Section 2.16 Break Funding Payments ......................................................................................57
Section 2.17 Taxes ......................................................................................................................57
Section 2.18 Payments Generally; Pro Rata Treatment; Sharing of Setoffs ...........................60
Section 2.19 Mitigation Obligations; Replacement of Lenders ................................................61
Section 2.20 [Reserved]. ............................................................................................................62
Section 2.21 Defaulting Lenders ...............................................................................................62
Section 2.22 Illegality ................................................................................................................63
Section 2.23 Benchmark Replacement Setting ..........................................................................63
Section 2.24 Joint and Several Liability of Borrowers .............................................................64

**ARTICLE III**
**REPRESENTATIONS AND WARRANTIES**

Section 3.01 Organization; Powers ...........................................................................................65
Section 3.02 Authorization; Enforceability ...............................................................................65
Section 3.03 Governmental Approvals; No Conflicts ...............................................................66
Section 3.04 Financial Condition; No Material Adverse Effect ................................................66
Section 3.05 Properties ..............................................................................................................66
Section 3.06 Litigation and Environmental Matters .................................................................67
Section 3.07 Compliance with Laws and Agreements ...............................................................68

Section 3.08    Investment Company Status...........................................................................68
Section 3.09    Taxes...........................................................................................................68
Section 3.10    ERISA.........................................................................................................68
Section 3.11    Disclosure...................................................................................................68
Section 3.12    Subsidiaries.................................................................................................68
Section 3.13    Intellectual Property; Licenses, Etc.............................................................69
Section 3.14    [Reserved]...................................................................................................69
Section 3.15    [Reserved]...................................................................................................69
Section 3.16    Federal Reserve Regulations.......................................................................69
Section 3.17    Purpose of Loans.........................................................................................69
Section 3.18    USA PATRIOT Act; Conflict with Sanctions Laws....................................69
Section 3.19    No Unlawful Contributions or Other Payments............................................70
Section 3.20    Labor Matters..............................................................................................70
Section 3.21    Insurance.....................................................................................................70
Section 3.22    Security Documents......................................................................................70
Section 3.23    Budget and Financial Plan. ..........................................................................70
Section 3.24    Lien Priority. ...............................................................................................70

**ARTICLE IV**
**CONDITIONS**

Section 4.01    Closing Date.................................................................................................71
Section 4.02    Credit Extensions after the Closing Date .....................................................73

**ARTICLE V**
**AFFIRMATIVE COVENANTS**

Section 5.01    Financial Statements, Reports, etc. ..............................................................75
Section 5.02    Notice of Material Events............................................................................77
Section 5.03    Citizenship..................................................................................................78
Section 5.04    Existence; Conduct of Business....................................................................78
Section 5.05    Payment of Taxes........................................................................................78
Section 5.06    Insurance.....................................................................................................79
Section 5.07    Maintaining Records; Access to Properties and Inspections..........................79
Section 5.08    Use of Proceeds..........................................................................................79
Section 5.09    Compliance with Laws.................................................................................79
Section 5.10    Compliance with Environmental Laws.........................................................80
Section 5.11    Further Assurances.......................................................................................80
Section 5.12    Credit Rating...............................................................................................80
Section 5.13    [Reserved]...................................................................................................80
Section 5.14    Maintenance of Properties............................................................................80
Section 5.15    Certain Post-Closing Obligations.................................................................80
Section 5.16    Lender Meetings..........................................................................................81
Section 5.17    Bankruptcy Matters......................................................................................81
Section 5.18    Milestones...................................................................................................81

**ARTICLE VI**
**NEGATIVE COVENANTS**

Section 6.01    Indebtedness................................................................................................82
Section 6.02    Liens...........................................................................................................85
Section 6.03    Sale and Lease-Back Transactions...............................................................89
Section 6.04    Investments, Loans and Advances ...............................................................89
Section 6.05    Mergers, Amalgamations, Consolidations, Sales of Assets and Acquisitions .............91
Section 6.06    Dividends and Distributions.........................................................................92
Section 6.07    Transactions with Affiliates.........................................................................93

Section 6.08   Business of the Borrowers and the Subsidiaries ........................................................94
Section 6.09   Limitation on Payments and Modifications of Indebtedness; Modifications of
              Certificate of Incorporation, By-Laws and Certain Other Agreements; etc. ...............94
Section 6.10   Fiscal Year .............................................................................................................96
Section 6.11   Financial Covenant .................................................................................................96
Section 6.12   Passive Holding Companies.....................................................................................96
Section 6.13   [Reserved] ...............................................................................................................97
Section 6.14   No Unrestricted Subsidiaries....................................................................................97
Section 6.15   Amendments to the Prepetition Revolving Credit Agreement and Parent Entity Debtor
              Documents...............................................................................................................97
Section 6.16   Permitted Activities of Journey Beyond and its Subsidiaries .....................................97
Section 6.17   [Reserved] ...............................................................................................................98
Section 6.18   Amendments of Certain Contracts ............................................................................98
Section 6.19   Disbursements ..........................................................................................................98

# ARTICLE VII
# EVENTS OF DEFAULT

Section 7.01   Events of Default ......................................................................................................99
Section 7.02   [Reserved] .............................................................................................................102
Section 7.03   Application of Payments .........................................................................................102

# ARTICLE VIII
# AGENTS

Section 8.01   Appointment and Authorization of Agents ...............................................................103
Section 8.02   Rights as a Lender..................................................................................................103
Section 8.03   Exculpatory Provisions ..........................................................................................103
Section 8.04   Reliance by the Agents ...........................................................................................105
Section 8.05   Delegation of Duties ..............................................................................................105
Section 8.06   Indemnification ......................................................................................................105
Section 8.07   Resignation of Administrative Agent ......................................................................106
Section 8.08   Non-Reliance on Agents and Other Lenders.............................................................106
Section 8.09   Administrative Agent May File Proofs of Claim; Irrevocable Authorization ..............106
Section 8.10   Withholding Taxes .................................................................................................108
Section 8.11   Binding Effect........................................................................................................108
Section 8.12   Security Documents and Collateral Agent ...............................................................108
Section 8.13   Erroneous Payments...............................................................................................108
Section 8.14   Ship Mortgage Trust ..............................................................................................110
Section 8.15   Control by the Majority...........................................................................................111

# ARTICLE IX
# MISCELLANEOUS

Section 9.01   Notices ..................................................................................................................111
Section 9.02   Waivers; Amendments.............................................................................................112
Section 9.03   Expenses; Indemnity; Damage Waiver .....................................................................114
Section 9.04   Successors and Assigns...........................................................................................116
Section 9.05   Survival .................................................................................................................119
Section 9.06   Counterparts; Integration; Effectiveness...................................................................119
Section 9.07   Severability ...........................................................................................................120
Section 9.08   Right of Setoff........................................................................................................120
Section 9.09   Governing Law; Jurisdiction; Consent to Service of Process .....................................120
Section 9.10   WAIVER OF JURY TRIAL .....................................................................................121
Section 9.11   Headings ...............................................................................................................121
Section 9.12   Confidentiality .......................................................................................................121

Section 9.13    USA PATRIOT Act .................................................................................... 122
Section 9.14    Judgment Currency ................................................................................... 122
Section 9.15    Release of Liens and Guarantees .............................................................. 123
Section 9.16    No Advisory or Fiduciary Responsibility ................................................ 123
Section 9.17    Interest Rate Limitation ........................................................................... 123
Section 9.18    Acknowledgment and Consent to Bail-In of Affected Financial Institutions ............................... 124
Section 9.19    [Reserved] ................................................................................................ 124
Section 9.20    Acknowledgement Regarding Any Supported QFCs ............................... 124

**ARTICLE X**
**GUARANTY**

Section 10.01    Guaranty of the Obligations ..................................................................... 125
Section 10.02    Contribution by Guarantors ...................................................................... 125
Section 10.03    Payment by Guarantors ............................................................................ 125
Section 10.04    Liability of Guarantors Absolute .............................................................. 126
Section 10.05    Waivers by Guarantors ............................................................................. 127
Section 10.06    Guarantors' Rights of Subrogation, Contribution, Etc. ............................ 128
Section 10.07    Subordination of Other Obligations ......................................................... 128
Section 10.08    Continuing Guaranty ................................................................................ 128
Section 10.09    Authority of Guarantors or the Borrower .................................................. 128
Section 10.10    Financial Condition of the Borrower ......................................................... 128
Section 10.11    Bankruptcy, Etc. ....................................................................................... 129
Section 10.12    Discharge of Guaranty Upon Sale of Guarantor ...................................... 129

**ARTICLE XI**
**SECURITY AND PRIORITY**

Section 11.01    Collateral; Grant of Lien and Security Interest ........................................ 129
Section 11.02    [Reserved] ................................................................................................ 130
Section 11.03    Grants, Rights and Remedies .................................................................... 130
Section 11.04    No Filings Required ................................................................................... 130
Section 11.05    Survival ..................................................................................................... 130

SCHEDULES:

| Schedule 1.01(A) | — | [Reserved] |
|---|---|---|
| Schedule 1.01(B) | — | Mortgaged Properties |
| Schedule 1.01(E) | — | [Reserved] |
| Schedule 1.01(F) | — | Mortgaged Vessels |
| Schedule 2.01 | — | Commitments |
| Schedule 3.04 | — | Financial Statements |
| Schedule 3.06(a) | — | Litigation |
| Schedule 3.12 | — | Subsidiaries |
| Schedule 3.21 | — | Insurance |
| Schedule 5.15 | — | Certain Post-Closing Obligations |
| Schedule 6.01 | — | Existing Indebtedness |
| Schedule 6.02(a) | — | Existing Liens |
| Schedule 6.04 | — | Existing Investments |
| Schedule 6.07 | — | Transactions with Affiliates |
| Schedule 9.01 | — | Applicable Account; Notices |

EXHIBITS:

| Exhibit A | — | Form of Assignment and Assumption |
|---|---|---|
| Exhibit B | — | Form of Perfection Certificate |
| Exhibit C | — | [Reserved] |
| Exhibit D | — | [Reserved] |
| Exhibit E | — | [Reserved] |
| Exhibit F | — | [Reserved] |
| Exhibit G | — | Certain Subordination Terms |
| Exhibit H-1 | — | Form of U.S. Tax Compliance Certificate |
| Exhibit H-2 | — | Form of U.S. Tax Compliance Certificate |
| Exhibit H-3 | — | Form of U.S. Tax Compliance Certificate |
| Exhibit H-4 | — | Form of U.S. Tax Compliance Certificate |
| Exhibit I | — | Form of Borrowing Request |
| Exhibit J | — | Form of Interest Election Request |
| Exhibit K | — | Form of Promissory Note |
| Exhibit L | — | [Reserved] |
| Exhibit M | — | [Reserved] |
| Exhibit N-1 | — | [Reserved] |
| Exhibit N-2 | — | [Reserved] |
| Exhibit N-3 | — | [Reserved] |
| Exhibit O | — | [Reserved] |
| Exhibit P | — | Form of Budget |

JUNIOR SECURED SUPERPRIORITY DEBTOR-IN-POSSESSION CREDIT AGREEMENT dated as of February 21, 2024 (this "Agreement"), among HORNBLOWER HOLDCO, LLC, a Delaware limited liability company, as debtor and debtor-in-possession ("Hornblower Parent"), AMERICAN QUEEN HOLDCO, LLC, a Delaware limited liability company, as debtor and debtor-in-possession ("AQ Parent" and, together with Hornblower Parent, each a "Parent" and, collectively, the "Parents"), HORNBLOWER SUB, LLC, a Delaware limited liability company, as debtor and debtor-in-possession ("Hornblower Borrower"), AMERICAN QUEEN SUB, LLC, a Delaware limited liability company, as debtor and debtor-in-possession ("AQ Borrower" and, together with Hornblower Borrower and AQ Borrower, each a "Borrower" and, collectively, the "Borrowers"), JOURNEY BEYOND HOLDINGS, LLC, a Delaware limited liability company, as debtor and debtor-in-possession ("JB TopCo"), and the other Debtors (as defined below) party hereto, the LENDERS party hereto from time to time, and GLAS TRUST COMPANY LLC ("GLAS"), as administrative agent for the Lenders (in such capacity, the "Administrative Agent") and as the Collateral Agent for the Secured Parties.

The parties hereto agree as follows:

PRELIMINARY STATEMENTS

WHEREAS, the Loan Parties (as defined herein) have commenced voluntary cases (the "Chapter 11 Cases") under Chapter 11 of the Bankruptcy Code (as defined herein) in the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court"), and the Loan Parties continue to operate their businesses and manage their properties as debtors-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code;

WHEREAS, the Foreign Representative (as defined herein) has also commenced proceedings before the Ontario Superior Court of Justice (Commercial List) (the "Canadian Court") under Part IV of the Companies' Creditors Arrangement Act, R.S.C., 1985, c. C-36, as amended (the "CCAA") recognizing the Chapter 11 Cases as "foreign main proceedings" (the "Canadian Recognition Proceedings");

WHEREAS, the Borrowers have requested that the Lenders make post-petition loans and advances to the Borrowers as set forth herein.  The Lenders are willing to extend such credit to the Borrowers subject to the terms and conditions hereinafter set forth;

WHEREAS, to provide security for the repayment of the Loans (as defined herein), and the payment of the other Obligations (as defined herein) of the Loan Parties hereunder and under the Loan Documents (as defined herein), the Loan Parties will provide and grant to the Collateral Agent, for its benefit and the benefit of the Secured Parties, certain security interests, liens, and other rights and protections pursuant to the terms hereof, and security interests and liens pursuant to Sections 364(c)(2), 364(c)(3) and 364(d) of the Bankruptcy Code, super-priority administrative expense claims pursuant to Section 364(c)(1) of the Bankruptcy Code and a Canadian DIP Charge (as defined herein) pursuant to the CCAA, and other rights and protections, as more fully described herein.

In consideration of the mutual covenants and agreements herein contained, the parties hereto covenant and agree as follows:

ARTICLE I
DEFINITIONS

Section 1.01    Defined Terms.  As used in this Agreement, the following terms shall have the meanings specified below:

"ABR" when used in reference to any ABR Loan or ABR Borrowing, refers to whether such ABR Loan, or the ABR Loans comprising such ABR Borrowing, are bearing interest at a rate determined by reference to the Alternate Base Rate.

"ABR Borrowing" means a Borrowing comprised of ABR Loans.

"<u>ABR Loan</u>" means any Term Loan bearing interest at a rate determined by reference to the ABR in accordance with the provisions of Article II.

"<u>ABR Term SOFR Determination Day</u>" has the meaning given to such term in the definition of "Term SOFR".

"<u>Acceptable Plan</u>" means a Plan of Reorganization in form and substance reasonably satisfactory to the Required Lenders (as the same may be amended, supplemented, or modified from time to time after entry thereof in accordance with the terms thereof) that, among other things, is consistent with the terms and conditions set forth in the Restructuring Support Agreement.

"<u>Actual Net Operating Cash Flow Amount</u>" means, with respect to any period of determination, the sum of (i) the amount of actual net operating cash flows of the Loan Parties (without deduction for Professional Fees) during the relevant period of determination minus (ii) Capex during the relevant period of determination which corresponds to each of the Budgeted Net Operating Cash Flow Amounts described in the line item contained in the Budget across from the heading "Net Operating Cash Flow Less Capex."

"<u>Additional Collateral Vessel</u>" means any Vessel set forth on <u>Schedule 1.01(F)</u> under the heading "Additional Collateral Vessels" that is owned by any Loan Party.

"<u>Adjusted Term SOFR</u>" means, for purposes of any calculation, the rate per annum equal to (a) Term SOFR for such calculation <u>plus</u> (b) the Term SOFR Adjustment; <u>provided</u> that if Adjusted Term SOFR shall ever be less than 1.00%, then Adjusted Term SOFR shall be deemed to be 1.00%.

"<u>Administrative Agent</u>" means GLAS, in its capacity as administrative agent hereunder and under the other Loan Documents, and its successors in such capacity as provided in Article VIII.

"<u>Administrative Questionnaire</u>" means an administrative questionnaire in a form supplied by the Administrative Agent.

"<u>Affected Financial Institution</u>" means (a) any EEA Financial Institution or (b) any UK Financial Institution.

"<u>Affiliate</u>" means, with respect to a specified Person, another Person that directly or indirectly Controls or is Controlled by or is under common Control with the Person specified. None of the Administrative Agent, any Lender or any of their respective Affiliates shall be considered an Affiliate of any Parent or any subsidiary thereof.

"<u>Agent Fee Letter</u>" means that certain Fee Letter, on or about the date hereof by and among the Borrowers and the Administrative Agent, as it may be amended, amended and restated, supplemented or otherwise modified from time to time.

"<u>Agent Parties</u>" has the meaning given to such term in Section 9.01(c).

"<u>Agents</u>" means the Administrative Agent and the Collateral Agent.

"<u>Aggregate Payments</u>" as defined in Section 10.02.

"<u>Agreement</u>" has the meaning given to such term in the preliminary statements hereto.

"<u>Agreement Currency</u>" has the meaning given to such term in Section 9.14(b).

"<u>Alter Domus</u>" means Alter Domus (US) LLC.

"<u>Alternate Base Rate</u>" means, for any day, a rate per annum equal to the greatest of (a) the Prime Rate in effect on such day, (b) the Federal Funds Effective Rate in effect on such day <u>plus</u> 1/2 of 1.00% and (c) Adjusted

2

Term SOFR for a one-month tenor on such day plus 1.00%. Any change in the Alternate Base Rate due to a change in the Prime Rate, the Federal Funds Effective Rate or Adjusted Term SOFR shall be effective from and including the effective date of such change in the Prime Rate, the Federal Funds Effective Rate or Adjusted Term SOFR, respectively.

"Anti-Corruption Laws" has the meaning given to such term in Section 3.19.

"Applicable Account" means the Administrative Agent's address or addresses and account or accounts as set forth on Schedule 9.01, or such other address or account of a third party or sub-agent, as appropriate, as the Administrative Agent may from time to time notify the Borrowers and the Lenders.

"Applicable Creditor" has the meaning given to such term in Section 9.14(b).

"Applicable Margin" means for any day, with respect to any Term Loans or Delayed Draw Term Loan, (1) 9.00% per annum, in the case of any Term SOFR, and (2) 8.00% per annum, in the case of any ABR Loan.

"Approved Bank" has the meaning assigned to such term in the definition of the term "Permitted Investments."

"Approved Fund" means any Person (other than a natural person) that is (or will be) engaged in making, purchasing, holding or investing in commercial loans and similar extensions of credit in the ordinary course of its activities and that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers or manages a Lender.

"AQ Borrower" has the meaning assigned to such term in the preamble.

"AQ Parent" has the meaning assigned to such term in the preamble.

"AQV Wind-down Plan" means the plan that contemplates the full wind-down, decommission, closure and otherwise shuttering all of the "Overnight" business and each division thereof, which was delivered by the Borrowers to the Required Lenders on January 11, 2024.

"Asset Sale" means any loss, damage, destruction or condemnation of, or any Disposition (including any sale and leaseback of assets and any mortgage or lease of Real Property or a Vessel) to any person of, any asset or assets of any Borrower or any Subsidiary.

"Assignment and Assumption" means an assignment and assumption entered into by a Lender and a permitted assignee pursuant to Section 9.04 (with the consent of any Person whose consent is required by Section 9.04), substantially in the form of Exhibit A or any other form reasonably approved by the Administrative Agent.

"Assignment of Freights and Hires" means an assignment of freights and hires in respect of a Mortgaged Vessel, in a form reasonably acceptable to the Administrative Agent and the Borrowers and substantially in the form delivered under the Prepetition Super Senior Credit Agreement.

"Assignment of Insurances" means an assignment of insurances in respect of a Mortgaged Vessel, in a form reasonably acceptable to the Administrative Agent and the Borrowers and substantially in the form delivered under the Prepetition Super Senior Credit Agreement.

"Australian Specific Security Deed" means the specific security deed (share) in respect of the equity interests in HB TopCo Pty, Ltd, an Australian proprietary limited company, in such form reasonably acceptable to the Required Lenders, the Collateral Agent and JB TopCo, as such document may be amended, restated, supplemented or otherwise modified from time to time.

"Available Tenor" means, as of any date of determination and with respect to the then-current Benchmark, as applicable, if such Benchmark is a term rate, any tenor for such Benchmark (or component thereof) that is or may

be used for determining the length of an Interest Period pursuant to this Agreement as of such date and not including, for the avoidance of doubt, any tenor for such Benchmark that is then-removed from the definition of "Interest Period" pursuant to Section 2.23(d).

"Bail-In Action" means the exercise of any Write-Down and Conversion Powers by the applicable Resolution Authority in respect of any liability of an Affected Financial Institution.

"Bail-In Legislation" means (a) with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law, regulation rule or requirement for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule and (b) with respect to the United Kingdom, Part I of the United Kingdom Banking Act 2009 (as amended from time to time) and any other law, regulation or rule applicable in the United Kingdom relating to the resolution of unsound or failing banks, investment firms or other financial institutions or their affiliates (other than through liquidation, administration or other insolvency proceedings).

"Bankruptcy Code" means Title 11 of the United State Code, as amended, or any similar federal or state law for the relief of debtors.

"Bankruptcy Court DIP Order" means the Interim DIP Order or the Final DIP Order, as applicable.

"Benchmark" means, initially, the Term SOFR Reference Rate; provided that if a Benchmark Transition Event has occurred with respect to the Term SOFR Reference Rate or the then-current Benchmark, then "Benchmark" means the applicable Benchmark Replacement to the extent that such Benchmark Replacement has replaced such prior benchmark rate pursuant to Section 2.23(a).

"Benchmark Replacement" means, with respect to any Benchmark Transition Event, the first alternative set forth in the order below that can be determined by the Administrative Agent for the applicable Benchmark Replacement Date:

(a)      Daily Simple SOFR, or

(b)      the sum of: (i) the alternate benchmark rate that has been selected by the Required Lenders (in consultation with the Administrative Agent) and the Borrowers giving due consideration to (A) any selection or recommendation of a replacement benchmark rate or the mechanism for determining such a rate by the relevant Governmental Authority or (B) any evolving or then-prevailing market convention for determining a benchmark rate as a replacement to the then-current Benchmark for U.S. dollar-denominated syndicated credit facilities and (ii) the related Benchmark Replacement Adjustment.

If the Benchmark Replacement as determined pursuant to clause (a) or (b) above would be less than 1.00%, the Benchmark Replacement will be deemed to be 1.00% for the purposes of this Agreement and the other Loan Documents.

"Benchmark Replacement Adjustment" means, with respect to any replacement of the then-current Benchmark with an Unadjusted Benchmark Replacement, the spread adjustment, or method for calculating or determining such spread adjustment, (which may be a positive or negative value or zero) that has been selected by the Required Lenders (in consultation with the Administrative Agent) and the Borrowers giving due consideration to (a) any selection or recommendation of a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement by the relevant Governmental Authority or (b) any evolving or then-prevailing market convention for determining a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement for Dollar-denominated syndicated credit facilities at such time.

"Benchmark Replacement Date" means the earliest to occur of the following events with respect to the then-current Benchmark:

4

(a)   in the case of clause (a) or (b) of the definition of "Benchmark Transition Event," the later of (i) the date of the public statement or publication of information referenced therein and (ii) the date on which the administrator of such Benchmark (or the published component used in the calculation thereof) permanently or indefinitely ceases to provide such Benchmark (or such component thereof) or, if such Benchmark is a term rate, all Available Tenors of such Benchmark (or such component thereof); or

(b)   in the case of clause (c) of the definition of "Benchmark Transition Event," the first date on which all Available Tenors of such Benchmark (or the published component used in the calculation thereof) has been or, if such Benchmark is a term rate, all Available Tenors or such Benchmark (or such component thereof) have been determined and announced by the regulatory supervisor for the administrator of such Benchmark (or such component thereof) to be non-representative; provided that such non-representativeness will be determined by reference to the most recent statement or publication referenced in such clause (c) and even if such Benchmark (or such component thereof) or, if such Benchmark is a term rate, any Available Tenor of such Benchmark (or such component thereof) continues to be provided on such date.

For the avoidance of doubt, if such Benchmark is a term rate, the "Benchmark Replacement Date" will be deemed to have occurred in the case of clause (a) or (b) with respect to any Benchmark upon the occurrence of the applicable event or events set forth therein with respect to all then-current Available Tenors of such Benchmark (or the published component used in the calculation thereof).

"Benchmark Transition Event" means the occurrence of one or more of the following events with respect to the then-current Benchmark:

(a)   a public statement or publication of information by or on behalf of the administrator of such Benchmark (or the published component used in the calculation thereof) announcing that such administrator has ceased or will cease to provide such Benchmark (or such component thereof) or, if such Benchmark is a term rate, all Available Tenors of such Benchmark (or such component thereof), permanently or indefinitely, provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide such Benchmark (or such component thereof) or, if such Benchmark is a term rate, any Available Tenor of such Benchmark (or such component thereof);

(b)   a public statement or publication of information by the regulatory supervisor for the administrator of such Benchmark (or the published component used in the calculation thereof), the Federal Reserve Board, the Federal Reserve Bank of New York, an insolvency official with jurisdiction over the administrator for such Benchmark (or such component), a resolution authority with jurisdiction over the administrator for such Benchmark (or such component) or a court or an entity with similar insolvency or resolution authority over the administrator for such Benchmark (or such component), which states that the administrator of such Benchmark (or such component) has ceased or will cease to provide such Benchmark (or such component thereof) or, if such Benchmark is a term rate, all Available Tenors of such Benchmark (or such component thereof) permanently or indefinitely, provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide such Benchmark (or such component thereof) or, if such Benchmark is a term rate, any Available Tenor of such Benchmark (or such component thereof); or

(c)   a public statement or publication of information by the regulatory supervisor for the administrator of such Benchmark (or the published component used in the calculation thereof) announcing that all Available Tenors of such Benchmark (or such component thereof) are not, or as of a specified future date will not be, representative.

For the avoidance of doubt, if such Benchmark is a term rate, a "Benchmark Transition Event" will be deemed to have occurred with respect to any Benchmark if a public statement or publication of information set forth above has occurred with respect to each then-current Available Tenor of such Benchmark (or the published component used in the calculation thereof).

"Benchmark Unavailability Period" means the period (if any) (a) beginning at the time that a Benchmark Replacement Date has occurred if, at such time, no Benchmark Replacement has replaced the then-current Benchmark for all purposes hereunder and under any Loan Document in accordance with Section 2.23 and (b) ending at the time that a Benchmark Replacement has replaced the then-current Benchmark for all purposes hereunder and under any Loan Document in accordance with Section 2.23.

"Beneficial Ownership Certification" means a certification regarding beneficial ownership required by the Beneficial Ownership Regulation.

"Beneficial Ownership Regulation" means 31 C.F.R. § 1010.230.

"BHC Act Affiliate" of a party means an "affiliate" (as such term is defined under, and interpreted in accordance with, 12 U.S.C. § 1841(k)) of such party.

"Board of Directors" means, with respect to any Person, (a) in the case of any corporation, the board of directors of such Person or any committee thereof duly authorized to act on behalf of such board, (b) in the case of any limited liability company, the board of managers of such Person, (c) in the case of any partnership, the board of directors or board of managers of the general partner of such Person and (d) in any other case, the functional equivalent of the foregoing.

"Board of Governors" means the Board of Governors of the Federal Reserve System of the United States of America.

"Borrower Materials" means materials and/or information provided by or on behalf of the Borrowers hereunder.

"Borrowers" has the meaning assigned to such term in the preamble.

"Borrowing" means Loans of the same Class and Type made, converted or continued on the same date and, in the case of Term SOFR Loans, as to which a single Interest Period is in effect.

"Borrowing Request" means a written request by the Borrowers for a Borrowing substantially in the form of Exhibit I delivered in accordance with Section 2.03 or another form approved by the Administrative Agent (including any form on an electronic platform or electronic transmission system as shall be approved by the Administrative Agent).

"Bridge Refinancing Commitment" means, as to each Lender, a Loan deemed made to the Borrowers pursuant to Section 2.01(c) in an aggregate principal amount not to exceed the amount set forth opposite such Lender's name in Schedule 2.01 under the caption "Bridge Refinancing Commitment". The aggregate of Bridge Refinancing Commitments of the Lenders shall be $163,677,918.10.

"Bridge Refinancing Lender" means a Lender with a Bridge Refinancing Commitment or a Bridge Refinancing Loan.

"Bridge Refinancing Loans" means the Term Loans made or deemed made on the Closing Date for the purpose of refinancing the Prepetition Incremental Super Senior Loans (including accrued but unpaid interest, fee and premium (including the Exit Premium (as defined in the Prepetition Incremental Super Senior Credit Agreement))) outstanding upon the Initial Term Loans being funded. The aggregate amount of the Bridge Refinancing Loans of the Lenders shall be $163,677,918.10.

"Budget" means a budget in the form attached hereto as Exhibit P, as the same may be amended, supplemented, extended, and/or otherwise modified at any time and from time to time in accordance with Section 5.01(m).

"Budget Event" shall mean any of the following:

(i)      the aggregate amount of actual receipts during any Budget Testing Period shall be less than the aggregate budgeted receipts in the Budget for such Budget Testing Period by an amount greater than the Permitted Variance (the "Budgeted Receipts Test");

(ii)      the actual amount of aggregate operating disbursements (excluding Professional Fees) shall exceed the projected aggregate operating disbursements (excluding Professional Fees) in the Budget for such Budget Testing Period by more than the Permitted Variance (the "Cumulative Budgeted Disbursements Test");

(iii)      [reserved]; or

(iv)      the Actual Net Operating Cash Flow Amount for any Budget Testing Period shall be less than the Budgeted Net Operating Cash Flow Amount for such Budget Testing Period by more than the Permitted Variance (the "Net Operating Cash Flow Test");

provided that, notwithstanding anything to the contrary set forth in this Agreement or any Loan Document, the Required Lenders' Advisors may waive compliance (which may be (i) over email and/ or (ii) retroactive and given effect as of the applicable Budget Testing Date) with any Budget Event.

"Budget Testing Date" means the first Sunday following the Petition Date and on Sunday of each week thereafter.

"Budget Testing Period" shall mean the four-week period ending on the most recent Budget Testing Date (or, if shorter, the period beginning on Sunday of the week of the Closing Date through such Budget Testing Date).

"Budgeted Net Operating Cash Flow Amount" means the amount described in the line item contained in the Budget across from the heading "Net Operating Cash Flow Less Capex", during the relevant period of determination.

"Business Day" means any day that is not a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by law to remain closed; provided that when used in connection with any Term SOFR Loans, the term "Business Day" means any U.S. Government Securities Business Day.

"Canadian Administration Charge" means a superpriority charge granted by the Canadian Court over the Canadian Collateral to secure payment of the professional fees and disbursements of the Debtors' Canadian counsel, the Information Officer and counsel to the Information Officer (in a maximum amount not to exceed the amount in the Canadian Recognition Order).

"Canadian Collateral" means all the Collateral of the Debtors that are Canadian Loan Parties, wherever located, and the Collateral of any other Debtor located in Canada.

"Canadian Collateral Agreement" means, the Debtor-in-Possession Canadian Collateral Agreement (Junior Secured Superpriority), dated on or about the date hereof among each Loan Party party thereto and the Collateral Agent, as amended, restated, supplemented or otherwise modified from time to time in accordance with the Loan Documents.

"Canadian Court" has the meaning specified in the recitals hereto.

"Canadian D&O Charge" means a charge granted by the Canadian Court on the Canadian Collateral (in a maximum amount not to exceed the amount in the Canadian Recognition Order), securing an indemnity by the Debtors that are Canadian Loan Parties in favor of their directors and officers against certain obligations or liabilities that they may incur as directors and officers of the Debtors that are Canadian Loan Parties on or after the commencement of the Canadian Recognition Proceedings, as provided for in the Canadian Supplemental Order.

"Canadian DIP Charge" means the superpriority charge granted by the Canadian Court pursuant to the Canadian DIP Recognition Order in favor of the Collateral Agent (for its benefit and the benefit of the Secured Parties) on the Canadian Collateral.

"Canadian DIP Recognition Order" means the Canadian Interim DIP Recognition Order, unless the Canadian Final DIP Recognition Order has been issued by the Canadian Court, in which case it shall mean the Canadian Final DIP Recognition Order.

"Canadian Dollar" and "CDN$" means lawful money of Canada.

"Canadian Final DIP Recognition Order" means an order of the Canadian Court in the Canadian Recognition Proceedings, which order shall, among other things, recognize the Final DIP Order and shall be in form and substance satisfactory to the Collateral Agent, and as the same may be amended, supplemented, or modified from time to time after entry thereof with the consent of the Collateral Agent.

"Canadian Initial Recognition Order" shall mean the Initial Recognition Order issued by the Canadian Court after the commencement of the Chapter 11 Cases in the Canadian Recognition Proceedings, recognizing the Chapter 11 Cases as "foreign main proceedings" under Part IV of the CCAA, and granting a stay of proceedings in respect of the Debtors in Canada, and as the same may be amended, supplemented, or modified from time to time after entry thereof with the consent of the Collateral Agent.

"Canadian Interim DIP Recognition Order" shall mean the provisions of the Canadian Supplemental Order which, recognize the Interim DIP Order and grant the Canadian DIP Charge, as the same may be amended, supplemented, or modified from time to time after entry thereof with the consent of the Collateral Agent.

"Canadian Interim Stay Order" shall mean the order by the Canadian Court pursuant to Section 106 of the *Courts of Justice Act* R.S.O. 1990, c. C.43 providing for an interim stay of proceedings, pending the commencement of the Canadian Recognition Proceedings.

"Canadian Loan Parties" means each Subsidiary Loan Party organized under the laws of Canada or any province or territory thereof.

"Canadian Orders" means, as applicable and as the context may require, the Canadian Initial Recognition Order, the Canadian Supplemental Order and/or the Canadian DIP Recognition Order, or such other Orders as may be granted by the Canadian Court in the Canadian Recognition Proceedings which are, in form and substance, satisfactory to the Collateral Agent.

"Canadian Recognition Proceedings" has the meaning specified in the recitals hereto.

"Canadian Supplemental Order" shall mean the Supplemental Order issued by the Canadian Court after the commencement of the Chapter 11 Cases in the Canadian Recognition Proceedings which, among other things, grants the CCAA Charges and recognizes the Interim DIP Order.

"Capital Expenditures" means, for any person in respect of any period, the aggregate of all expenditures incurred by such person during such period that, in accordance with GAAP, are or should be included in "additions to property, plant or equipment" or similar items reflected in the statement of cash flows of such person; provided, however, that Capital Expenditures for the Borrowers and their Subsidiaries shall not include:

        (a)        expenditures to the extent they are made with proceeds of the issuance of Equity Interests of, or a cash capital contribution to, any Borrower or any Subsidiary after the Closing Date,

        (b)        Capital Expenditures with proceeds of insurance settlements, condemnation awards and other settlements in respect of lost, destroyed, damaged or condemned assets, equipment or other property to the extent such Capital Expenditures are made to replace or repair such lost, destroyed, damaged or condemned assets, equipment or other property or otherwise to acquire, maintain, develop, construct,

improve, upgrade or repair assets or properties useful in the business of the Borrowers and their Subsidiaries within 15 months of receipt of such proceeds (or, if not made within such period of 15 months, are committed to be made during such period),

      (c)      interest capitalized during such period,

      (d)      expenditures that are accounted for as capital expenditures of such person and that actually are paid for by a third party (excluding any Parent, any Borrower or any Subsidiary) and for which no Parent, nor any Borrower nor any Subsidiary has provided or is required to provide or incur, directly or indirectly, any consideration or obligation to such third party or any other person (whether before, during or after such period),

      (e)      the book value of any asset owned by such person prior to or during such period to the extent that such book value is included as a capital expenditure during such period as a result of such person reusing or beginning to reuse such asset during such period without a corresponding expenditure actually having been made in such period; provided, that (i) any expenditure necessary in order to permit such asset to be reused shall be included as a Capital Expenditure during the period that such expenditure actually is made and (ii) such book value shall have been included in Capital Expenditures when such asset was originally acquired,

      (f)      the purchase price of equipment purchased during such period to the extent the consideration therefor consists of any combination of (i) used or surplus equipment traded in at the time of such purchase and (ii) the proceeds of a concurrent sale of used or surplus equipment, in each case, in the ordinary course of business consistent with past or industry practice,

      (g)      [reserved], or

      (h)      the purchase of property, plant or equipment made within 15 months of the sale of any asset to the extent purchased with the proceeds of such sale (or, if not made within such period of 15 months, to the extent committed to be made during such period).

Notwithstanding anything to the contrary set forth herein, for purposes of the defined term "Capital Expenditures", neither JB TopCo nor HB TopCo shall be deemed to be a Subsidiary.

"Capitalized Software Expenditures" means, for any period, the aggregate of all expenditures (whether paid in cash or accrued as liabilities) by a person during such period in respect of licensed or purchased software or internally developed software and software enhancements that, in accordance with GAAP, are or are required to be reflected as capitalized costs on the consolidated balance sheet of such person and its subsidiaries.

"Carve Out" has the meaning specified in the Bankruptcy Court DIP Order, which shall include an amount up to the amount set forth in the Canadian Recognition Proceeding for the benefit of the beneficiaries of the Canadian Administration Charge (without duplication).

"Cash Interest Expense" means, with respect to the Borrowers and the Subsidiaries on a consolidated basis for any period, Interest Expense for such period, less the sum of, without duplication, (a) pay-in-kind Interest Expense or other non-cash Interest Expense (including as a result of the effects of acquisition method accounting), (b) to the extent included in Interest Expense, the amortization of any financing fees paid by, or on behalf of, any Borrower or any Subsidiary, including such fees paid in connection with the Transactions, and (c) the amortization of debt discounts, if any, or fees in respect of Hedging Agreements; provided, that Cash Interest Expense shall exclude any one time financing fees, including those paid in connection with the Transactions, or upon entering into any amendment of this Agreement.

Notwithstanding anything to the contrary set forth herein, for purposes of the defined term "Cash Interest Expense", neither JB TopCo nor HB TopCo shall be deemed to be a Subsidiary.

9

"Cash Management Agreement" means any agreement to provide to any Parent, any Borrower or any Subsidiary cash management services for collections, treasury management services (including controlled disbursement, overdraft, automated clearing house fund transfer services, return items and interstate depository network services), any demand deposit, payroll, trust or operating account relationships, commercial credit cards, merchant card, purchase or debit cards, non-card e-payables services, and other cash management services, including electronic funds transfer services, lockbox services, stop payment services and wire transfer services.

"Cash Management Bank" means any person that, at the time it enters into a Cash Management Agreement (or on the Closing Date), is a Lender or an Affiliate of any such person, in each case, in its capacity as a party to such Cash Management Agreement.

"CCAA" has the meaning specified in the recitals hereto.

"CCAA Charges" means the Canadian Administration Charge, the Canadian D&O Charge and the Canadian DIP Charge, as granted by the Canadian Court in the Canadian Recognition Proceedings.

"Change in Control" means (a) (i) the failure of Hornblower Parent, to own, directly or indirectly through wholly owned subsidiaries, beneficially and of record, all of the Equity Interest of the Hornblower Borrower or (ii) the failure of AQ Parent, to own, directly or indirectly through wholly owned subsidiaries, beneficially and of record, all of the Equity Interest of the AQ Borrower, (b) the failure by the Permitted Holders to own, directly or indirectly through one or more holding company parents of Hornblower Parent, AQ Parent and JB TopCo, beneficially and of record, Equity Interests in Hornblower Parent, AQ Parent or JB TopCo representing at least a majority of the aggregate ordinary voting power for the election of directors of Hornblower Parent, AQ Parent or JB TopCo represented by the issued and outstanding Equity Interests in Hornblower Parent, AQ Parent or JB TopCo, respectively, unless the Permitted Holders otherwise have the right (pursuant to contract, proxy or otherwise), directly or indirectly, to designate or appoint (and do so designate or appoint) a majority of the Board of Directors of Hornblower Parent, AQ Parent or JB TopCo, (c) [reserved] or (d) the occupation of a majority of the seats (other than vacant seats) on the Board of Directors of Hornblower Parent, AQ Parent or JB TopCo by Persons who were neither nominated, designated or approved by the Board of Directors of Hornblower Parent, AQ Parent or JB TopCo, respectively, or the Permitted Holders nor appointed by directors so nominated, designated or approved; provided that none of the events set forth in clauses (a) through (d) above shall constitute a Change in Control if they occur as a result of any transaction consummated pursuant to the AQV Wind-down Plan.

"Change in Law" means:  (a) the adoption of any rule, regulation, treaty or other law after the Closing Date, (b) any change in any rule, regulation, treaty or other law or in the administration, interpretation or application thereof by any Governmental Authority after the Closing Date or (c) the making or issuance of any request, guideline or directive (whether or not having the force of law) of any Governmental Authority made or issued after the Closing Date; provided that notwithstanding anything herein to the contrary, (i) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all rules, regulations, guidelines or directives thereunder or issued in connection therewith and (ii) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case, pursuant to Basel III, shall in each case be deemed to be a "Change in Law," regardless of the date enacted, adopted or issued.

"Chapter 11 Cases" has the meaning specified in the recitals hereto.

"Chief Restructuring Officer" means Jonathan Hickman of Alvarez & Marsal or such other individual, reasonably acceptable to the Required Lenders, engaged by the Loan Parties on terms, including, without limitation, the scope of the services and fees, acceptable to the Required Lenders.

"Citizen of the United States" means a "citizen of the United States" within the meaning of 46 U.S.C. § 50501(a), (b) and (d) qualified to own and operate vessels for operation in the coastwise trade of the United States.

"Class" means, (a) when used in respect of any Loan or Borrowing, whether such Loan or the Loans comprising such Borrowing are Initial Term Loans or Delayed Draw Term Loans and (b) when used in respect of

any Commitment, whether such Commitment is in respect of a commitment to make Initial Term Loans or Delayed Draw Term Loans.

"Closing Date" means the date on which all conditions precedent set forth in Section 4.01 shall have been satisfied or waived by each Lender in writing in its sole discretion.

"Closing Date Commitments" means the Initial Term Loan Commitments, the Delayed Draw Term Loan Commitments and the Bridge Refinancing Commitments.

"Closing Date Loans" means the Initial Term Loans, the Delayed Draw Term Loans and the Bridge Refinancing Loans.

"Closing Date Purchase Commitment" means, as to each Lender, the commitment of such Lender to purchase a Bridge Refinancing Loan on the Closing Date pursuant to Section 2.01(c) in an aggregate principal amount not to exceed the amount set forth opposite such Lender's name in Schedule 2.01 under the caption "Closing Date Purchase Commitment". The aggregate amount of the Closing Date Purchase Commitments of the Lenders shall be $45,482,947.54.

"Closing Payment" has the meaning given to such term in Section 2.12(a).

"Co-Investors" means each of (a) the Sponsors and (b) the Management Group.

"Code" means the Internal Revenue Code of 1986, as amended.

"Collateral" means the "DIP Collateral" as defined in any Bankruptcy Court DIP Order and words of similar intent, and all the "Collateral" as defined in any Security Document and shall also include the Mortgaged Properties, Mortgaged Vessels and all other property that is subject to any Lien in favor of the Administrative Agent, the Collateral Agent or any subagent for the benefit of the Secured Parties pursuant to any Security Document or the Bankruptcy Court DIP Order.

"Collateral Agent" means GLAS acting as collateral agent and mortgage trustee for the Secured Parties and its successors in such capacity as provided in Article VIII.

"Collateral Agreement" means the DIP Collateral Agreement, dated on or about the Closing Date among the Borrowers, each other Loan Party party thereto, and the Collateral Agent, as amended, restated, supplemented or otherwise modified from time to time in accordance with the Loan Documents.

"Collateral and Guarantee Requirement" means, at any time, the requirement that, subject to Section 5.15:

(a)    all Obligations shall have been unconditionally guaranteed by each Guarantor;

(b)    the Obligations and the Guarantee shall have been secured by a first-priority security interest (subject to the Carve Out in all respects and Liens permitted by Section 6.02) through the provisions of the Interim DIP Order, the Final DIP Order and the Canadian DIP Recognition Order, as applicable, in all the Equity Interests of the Borrowers and each Subsidiary Loan Party;

(c)    on or prior to the Closing Date, the Collateral Agent shall have received (i) from each Loan Party a counterpart of the Collateral Agreement, (ii) from Hornblower Cruises and Events, Inc., Hornblower Canadian Holdings, Inc. and each Canadian Loan Party, a counterpart to the Canadian Collateral Agreement, (iii) from Hornblower Group, Inc. and each UK Loan Party, a counterpart to the UK Collateral Documents and (iv) from JB TopCo, a counterpart of the Australian Specific Security Deed;

(d)    no later than twenty (20) Business Days after the Closing Date with respect to the Material Vessels and the Additional Collateral Vessels set forth on Schedule 1.01(F) (or on such later date as the Required Lenders may agree in their sole discretion), the Collateral Agent shall have received (i)

11

such customary documentation as the Required Lenders may reasonably deem necessary or desirable in order to create a valid perfected and enforceable security interest, in each case, as and to the extent provided therein, after giving effect to the Senior ICA Provisions and the Intercreditor Agreements first preferred or first priority ship mortgage (and, where applicable, a deed of covenants collateral thereto) on each such Material Vessel and Additional Collateral Vessel (including evidence that a Mortgage on each Material Vessel and Additional Collateral Vessel set forth on Schedule 1.01(F) has been duly filed for recording (but, for the avoidance of doubt, the recordation thereof shall not be required to be completed within such applicable period) with the National Vessel Documentation Center or with respect to any Material Vessel or Additional Collateral Vessel not documented under the laws of the United States of America, the appropriate office or offices for recording of ship mortgages under the laws of the nation under whose laws the particular Material Vessel or Additional Collateral Vessel has been documented with the consent, not to be unreasonably withheld or delayed, of the Administrative Agent, it being agreed the laws of The Bahamas, the United Kingdom and Canada are consented to by the Administrative Agent (such jurisdictions, together with the United States of America, collectively, the "Permitted Flag Jurisdictions"); provided that the Administrative Agent may object to any such jurisdiction on the basis of a Change in Law since the Closing Date that would materially and adversely affect the Administrative Agent's ability to obtain a Mortgage in such jurisdiction) subject to no other Liens of record except Permitted Vessel Liens, at the time of recordation thereof, and an Assignment of Freights and Hires and an Assignment of Insurances in relation to each such Material Vessel and Additional Collateral Vessel, (ii) with respect to each such Mortgage in respect of a Material Vessel and Additional Collateral Vessel, opinions of counsel, to the extent and as requested by the Collateral Agent (acting at the direction of the Required Lenders) in its reasonable discretion, regarding the enforceability, due authorization, execution and delivery and the validity and perfection of Liens in respect of such Vessel upon completion of the recording process (notwithstanding anything to the contrary in this Agreement, which such opinion regarding the validity and perfection of Liens may be delivered upon such completion of the recording process and, with respect to each such Mortgage in respect of a Canadian Material Vessel or Canadian Additional Collateral Vessel, receipt of certified vessel transcripts of registry issued by Transport Canada), an Assignment of Freights and Hires and an Assignment of Insurances and such other matters customarily covered in maritime counsel opinions as the Collateral Agent may reasonably request, in form and substance reasonably acceptable to the Collateral Agent (acting at the direction of the Required Lenders), and (iii) such other documents (and other actions) as the Collateral Agent (acting at the direction of the Required Lenders) may reasonably request with respect to any such Mortgage or Mortgaged Vessel or Additional Collateral Vessel; *provided* that, to the extent relevant ship registry identifies any deficiency with any such filed Mortgage, any Loan Party shall be deemed to satisfy this clause (d) to the extent such Loan Party has delivered executed Mortgages to the Collateral Agent and has used, or continues to use, commercially reasonable efforts to remedy such deficiency promptly to the satisfaction of such ship registry such that the filed Mortgage is recorded by the ship registry without any deficiency;

(e)     the Obligations shall at all times be secured by a valid, binding, continuing, enforceable perfected first priority Lien on the DIP Funding Account and the proceeds thereof and, on the Closing Date (or such later date as the Required Lenders may agree in their sole discretion), the Borrowers must obtain a Control Agreement for the DIP Funding Account; and

(f)     except to the extent otherwise provided hereunder, including subject to Liens permitted by Section 6.02, or under any Security Document, the Bankruptcy Court DIP Order or the Canadian DIP Recognition Order, the Obligations and the Guarantee shall have been secured by a perfected first-priority (subject in all respects to the Carve Out, the Bankruptcy Court DIP Order and the Canadian DIP Recognition Order (including with respect to Lien priorities set forth therein) and Liens permitted by Section 6.02) security interest (to the extent such security interest may be perfected by virtue of the Bankruptcy Court DIP Order, the Canadian DIP Recognition Order, or by filing financing statements under the Uniform Commercial Code or PPSA or making any necessary filings for perfection with the United States Patent and Trademark Office, United States Copyright Office or Canadian Intellectual Property Office) in substantially all tangible and intangible personal property of the Borrower and each Guarantor (including accounts, inventory, equipment, investment property, contract rights, applications and registrations of intellectual property filed in the United States and Canada, other general intangibles, and proceeds of the foregoing), in each case, with the priority required by the Security Documents, the

12

Bankruptcy Court DIP Order and the Canadian DIP Recognition Order, in each case subject to exceptions and limitations otherwise set forth in this Agreement, the Security Documents, the Bankruptcy Court DIP Order and the Canadian DIP Recognition Order.

"Commitments" means, with respect to any Lender, such Lender's Term Loan Commitment and such Lender's Bridge Refinancing Commitment.

"Commodity Exchange Act" means the Commodity Exchange Act (7 U.S.C. §1 et seq.), as amended from time to time, and any successor statute.

"Company" has the meaning set forth in the Preliminary Statements.

"Company Advisors" has the meaning given to such term in Section 8.08.

"Confirmation Order" means an order of the Court entered in the Chapter 11 Cases pursuant to section 1129 of the Bankruptcy Code, which order shall confirm an Acceptable Plan, be a final Order and otherwise be in form and substance satisfactory to the Required Lenders, together with all extensions, modifications, and amendments thereto, also in form and substance satisfactory to the Required Lenders.

"Conforming Changes" means, with respect to either the use or administration of Term SOFR or the use, administration, adoption or implementation of any Benchmark Replacement, any technical, administrative or operational changes (including changes to the definition of "Alternate Base Rate," the definition of "Business Day," the definition of "U.S. Government Securities Business Day," the definition of "Interest Period" or any similar or analogous definition (or the addition of a concept of "interest period"), timing and frequency of determining rates and making payments of interest, timing of borrowing requests or prepayment, conversion or continuation notices, the applicability and length of lookback periods, the applicability of Section 2.16 and other technical, administrative or operational matters) that the Required Lenders (in consultation with the Administrative Agent) decide may be appropriate to reflect the adoption and implementation of any such rate or to permit the use and administration thereof by the Administrative Agent in a manner substantially consistent with market practice (or, if the Required Lenders (in consultation with the Administrative Agent) decide that adoption of any portion of such market practice is not administratively feasible or if the Required Lenders (in consultation with the Administrative Agent) determine that no market practice for the administration of any such rate exists, in such other manner of administration as the Required Lenders (in consultation with the Administrative Agent) decide is reasonably necessary in connection with the administration of this Agreement and the other Loan Documents).

"Consolidated Debt" at any date means the sum of (without duplication) all Indebtedness (other than letters of credit or bank guarantees, to the extent undrawn) consisting of Indebtedness for borrowed money and Financing Lease Obligations of the Borrowers and their Subsidiaries determined on a consolidated basis on such date in accordance with GAAP.

"Consolidated Net Income" means, with respect to any person for any period, the aggregate of the Net Income of such person and its subsidiaries for such period, on a consolidated basis (but excluding JB TopCo and any Person owned by JB TopCo); provided, however, that, without duplication,

(i)       any net after-tax extraordinary, nonrecurring or unusual gains or losses or income or expense or charge (less all fees and expenses relating thereto), including any (1) severance, relocation or other restructuring expenses (to the extent set forth in a certificate of a Financial Officer of the Borrowers), any expenses related to any New Project or any reconstruction, decommissioning, recommissioning or reconfiguration of fixed assets for alternative uses, (2) fees, expenses or charges relating to facilities closing costs, curtailments or modifications to pension and post-retirement employee benefit plans, excess pension charges, acquisition integration costs, new product lines, plant shutdown costs, facilities opening and integration costs, (3) signing, retention or completion bonuses, (4) expenses or charges related to any offering of Equity Interests or debt securities of the Borrowers or any Parent, any Investment, acquisition, Disposition, recapitalization or incurrence, issuance, repayment, repurchase, refinancing, amendment or modification of Indebtedness (in each case, whether or not successful), and (5) any fees, expenses, charges

13

or change in control payments related to the Transactions (including any costs relating to auditing prior periods, any transition-related expenses, and Transaction Expenses incurred before, on or after the Closing Date), in each case, shall be excluded,

(ii)        any net after-tax income or loss from Disposed of, abandoned, closed or discontinued operations or fixed assets and any net after-tax gain or loss on the Dispositions of Disposed of, abandoned, closed or discontinued operations or fixed assets shall be excluded,

(iii)        any net after-tax gain or loss (less all fees and expenses or charges relating thereto) attributable to business Dispositions or asset Dispositions other than in the ordinary course of business consistent with past or industry practice (as determined in good faith by the management of the Borrowers) shall be excluded,

(iv)        any net after-tax income or loss (less all fees and expenses or charges relating thereto) attributable to the early extinguishment or buy-back of indebtedness, Hedging Agreements or other derivative instruments shall be excluded,

(v)        the Net Income for such period of any person that is not a subsidiary of such person or that is accounted for by the equity method of accounting, shall be included only to the extent of the amount of dividends or distributions or other payments paid in cash (or to the extent converted into cash) to the referent person or a subsidiary thereof in respect of such period,

(vi)        the cumulative effect of a change in accounting principles during such period shall be excluded,

(vii)        effects of acquisition method accounting adjustments (including the effects of such adjustments pushed down to such person and its subsidiaries) in component amounts required or permitted by GAAP, resulting from the application of acquisition method accounting or the amortization or write-off of any amounts thereof, net of taxes, shall be excluded,

(viii)        any non-cash impairment charges or asset write-offs, in each case pursuant to GAAP, and the amortization of intangibles and other non-cash fair value adjustments arising pursuant to GAAP, shall be excluded,

(ix)        any non-cash compensation charge or expenses realized or resulting from stock option plans, employee benefit plans or post-employment benefit plans, or grants or sales of stock, stock appreciation or similar rights, stock options, restricted stock, preferred stock or other rights shall be excluded,

(x)        accruals and reserves that are established or adjusted within twelve months after the Closing Date and that are so required to be established or adjusted in accordance with GAAP or as a result of adoption or modification of accounting policies shall be excluded,

(xi)        non-cash gains, losses, income and expenses resulting from fair value accounting required by the applicable standard under GAAP and related interpretation shall be excluded,

(xii)        any non-cash charges for deferred tax asset valuation allowances shall be excluded,

(xiii)        any unrealized currency translation gains and losses related to currency remeasurements of Indebtedness, and any non-cash net loss or gain resulting from Hedging Agreements for currency exchange risk, shall be excluded,

(xiv)        the Net Income of any Person and its Subsidiaries shall be calculated without deducting the income attributable to, or adding the losses attributable to, the minority equity interests of third parties in any non-Wholly Owned Subsidiary except to the extent of dividends declared or paid in respect of such

14

period or any prior period on the shares of Equity Interests of such Subsidiary held by such third parties and (b) any ordinary course dividend, distribution or other payment paid in cash and received from any Person in excess of amounts included in clause (v) above shall be included,

(xv)     the non-cash gains or losses from the effects of the "straight-line" of rent expense shall be excluded,

(xvi)     to the extent covered by insurance and actually reimbursed, or, so long as such person has made a determination that there exists reasonable evidence that such amount will in fact be reimbursed by the insurer and only to the extent that such amount is (x) not denied by the applicable carrier in writing within 180 days and (y) in fact reimbursed within 365 days following the date of such evidence (with a deduction for any amount so added back to the extent not so reimbursed within such 365 days), (A) expenses with respect to liability or casualty events or business interruption shall be excluded; and (B) amounts estimated in good faith to be received from insurance in respect of lost revenues or earnings in respect of liability or casualty events or business interruption shall be included (with a deduction for amounts actually received up to such estimated amount to the extent included in Net Income in a future period), and

(xvii)     an amount equal to the amount of distributions actually made to any parent or equity holder of such person in respect of such period in accordance with Section 6.06(b)(v) shall be included as an expense as though such amounts had been paid as income taxes directly by such person for such period.

"Contributing Guarantors" shall have the meaning assigned to it in Section 10.02.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies, or the dismissal or appointment of the management, of a Person, whether through the ability to exercise voting power, by contract or otherwise.  "Controlling" and "Controlled" have meanings correlative thereto.

"Covered Entity" means any of the following:

(i) a "covered entity" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 252.82(b);

(ii) a "covered bank" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 47.3(b); or

(iii) a "covered FSI" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 382.2(b).

"Covered Party" shall have the meaning assigned to it in Section 9.20.

"Current Assets" means, with respect to the Borrowers and their Subsidiaries on a consolidated basis (but excluding JB TopCo and any Person owned by JB TopCo) at any date of determination, the sum of all assets (other than cash and Permitted Investments or other cash equivalents) that would, in accordance with GAAP, be classified on a consolidated balance sheet of the Borrowers and their Subsidiaries as current assets at such date of determination, other than amounts related to current or deferred Taxes based on income or profits.

"Current Liabilities" means, with respect to the Borrowers and their Subsidiaries on a consolidated basis (but excluding JB TopCo and any Person owned by JB TopCo) at any date of determination, all liabilities that would, in accordance with GAAP, be classified on a consolidated balance sheet of the Borrowers and their Subsidiaries as current liabilities at such date of determination, other than (a) the current portion of any Indebtedness, (b) accruals of Interest Expense (excluding Interest Expense that is due and unpaid), (c) accruals for current or deferred Taxes based on income or profits, (d) accruals, if any, of transaction costs resulting from the Transactions, (e) accruals of any costs or expenses related to (i) severance or termination of employees prior to the

15

Closing Date or (ii) bonuses, pension and other post-retirement benefit obligations, and (f) accruals for add-backs to EBITDA included in clauses (a)(iv), (a)(v), and (a)(vii) of the definition of such term.

"Daily Simple SOFR" means, for any day, SOFR, with the conventions for this rate (which will include a lookback) being established by the Administrative Agent (acting at the direction of the Required Lenders) in accordance with the conventions for this rate recommended by the relevant Governmental Authority for determining "Daily Simple SOFR" for syndicated business loans; provided, that if the Administrative Agent decides that any such convention is not administratively feasible for the Administrative Agent, then the Administrative Agent may establish another convention in its reasonable discretion.

"Debtors" has the meaning specified in the Bankruptcy Court DIP Order.

"Debtor Relief Laws" means the Bankruptcy Code, the Bankruptcy and Insolvency Act (Canada), R.S.C. 1985, c. B-3, as amended,  the CCAA, the Winding-Up and Restructuring Act (Canada) and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors (or any class of creditors), moratorium, arrangement, rearrangement, receivership, insolvency, reorganization, or similar debtor relief laws of the United States, Canada or any province or territory thereof, or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally (including any applicable corporations legislation to the extent the relief sought thereunder relates to or involves the compromise, settlement, adjustment or arrangement of debt).

"Debt Service" means, with respect to the Borrowers and their Subsidiaries on a consolidated basis for any period, Cash Interest Expense for such period plus scheduled principal amortization of Consolidated Debt for such period.

"Declined Proceeds" shall have the meaning set forth in Section 2.11(d).

"DDTL Commitment Fee" has the meaning given to such term in Section 2.12(d).

"Default" means any event or condition that upon notice, lapse of time or both would, unless cured or waived, become an Event of Default.

"Default Right" has the meaning assigned to that term in, and shall be interpreted in accordance with, 12 C.F.R. §§ 252.81, 47.2 or 382.1, as applicable.

"Defaulting Lender" means, subject to Section 2.21(b), any Lender that (a) has failed to (i) fund all or any portion of its Loans within two Business Days of the date such Loans were required to be funded hereunder, or (ii) pay to the Administrative Agent or any other Lender any other amount required to be paid by it hereunder within two Business Days of the date when due, (b) has notified the Borrowers and the Administrative Agent in writing that it does not intend to comply with its funding obligations hereunder or generally under other agreements in which it commits to extend credit, or has made a public statement to that effect or generally, (c) has failed, within three Business Days after written request by the Administrative Agent or the Borrowers, to confirm in writing to the Administrative Agent and the Borrowers that it will comply with its prospective funding obligations hereunder (provided that such Lender shall cease to be a Defaulting Lender pursuant to this clause (c) upon receipt of such written confirmation by the Administrative Agent and the Borrowers) or (d) has, or has a direct or indirect parent company that has, (i) become the subject of a proceeding under any Debtor Relief Law, (ii) had appointed for it a receiver, custodian, conservator, trustee, administrator, assignee for the benefit of creditors (or any class of creditors) or similar Person charged with reorganization or liquidation of its business or assets, including the Federal Deposit Insurance Corporation or any other state or federal regulatory authority acting in such a capacity or (iii) become the subject of a Bail-In Action; provided that a Lender shall not be a Defaulting Lender solely by virtue of the ownership or acquisition of any equity interest in that Lender or any direct or indirect parent company thereof by a Governmental Authority so long as such ownership interest does not result in or provide such Lender with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permit such Lender (or such Governmental Authority) to reject, repudiate, disavow or disaffirm any contracts or agreements made with such Lender.  Any determination by the Administrative Agent that a Lender is a Defaulting Lender under any one or more of clauses (a) through (d) above shall be conclusive and

16

binding absent manifest error, and such Lender shall be deemed to be a Defaulting Lender (subject to Section 2.21(b)) upon delivery of written notice of such determination to the Borrowers and each Lender.

"Delaware Divided LLC" means any limited liability company which has been formed upon the consummation of a Delaware LLC Division.

"Delaware LLC Division" means the statutory division of any limited liability company into two or more limited liability companies pursuant to Section 18-217 of the Delaware Limited Liability Company Act or a comparable provision of any other Requirement of Law.

"Delayed Draw Term Loans" has the meaning specified in Section 2.01(b).

"Delayed Draw Term Loan Availability Period" shall mean the period commencing on the Final DIP Order Entry Date and ending on (but excluding) the Delayed Draw Term Loan Commitment Termination Date.

"Delayed Draw Term Loan Commitment" shall mean, for each Lender, the amount set forth opposite such Lender's name in Schedule 2.01 directly below the column entitled "Delayed Draw Term Loan Commitment" or, if such Lender has entered into one or more Assignment and Assumptions, set forth for such Lender in the Register maintained by the Administrative Agent as such Lender's "Delayed Draw Term Loan Commitment".  The aggregate amount of the Lenders' Delayed Draw Term Loan Commitments as of the Closing Date is $61,000,000.

"Delayed Draw Term Loan Commitment Termination Date" means the earliest of (a) the day on which all of the Delayed Draw Term Loan Commitment has been borrowed in full pursuant to Sections 2.01, (b) the date of termination of the Commitments pursuant to Section 7.01 or (c) the Maturity Date.

"DIP Funding Account" means a deposit account designated in writing (which may be by e-mail) by the Borrowers to the Required Lenders, in which the proceeds of the Initial Term Loans and Delayed Draw Term Loans shall be deposited and held.

"DIP Priming Liens" has the meaning specified in the Bankruptcy Court DIP Order.

"DIP Superpriority Claim" means the allowed superpriority expense claims pursuant to Bankruptcy Code Sections 364(c)(1), 503 and 507 granted to the Administrative Agent and the Collateral Agent, for the benefit of the Secured Parties, by the Bankruptcy Court DIP Order.

"Discharge of Senior DIP Obligations" means (i) payment in full in cash of all Senior DIP Credit Agreement Obligations (other than (x) any indemnification obligations for which no claim has been asserted and (y) obligations and liabilities under Secured Cash Management Agreements (under and as defined in the Senior DIP Credit Agreement) and Secured Hedge Agreements (under and as defined in the Senior DIP Credit Agreement), in each case, not then due) and (ii) termination or expiration of all commitments, if any, to extend credit that would constitute Senior DIP Credit Agreement Obligations.

"Disinterested Director" means, with respect to any person and transaction, a member of the Board of Directors of such person who does not have any material direct or indirect financial interest in or with respect to such transaction.

"Dispose" means to convey, sell, lease, sell and leaseback, assign, farm-out, transfer or otherwise dispose of any property, business or asset (including to dispose of any property, business or asset to a Delaware Divided LLC pursuant to a Delaware LLC Division).  The term "Disposition" shall have a correlative meaning to the foregoing.

"Disqualified Stock" means, with respect to any person, any Equity Interests of such person that, by its terms (or by the terms of any security or other Equity Interests into which it is convertible or for which it is exchangeable), or upon the happening of any event or condition (a) matures or is mandatorily redeemable (other than solely for Qualified Equity Interests), pursuant to a sinking fund obligation or otherwise (except as a result of a

change of control or asset sale so long as any rights of the holders thereof upon the occurrence of a change of control or asset sale event shall be subject to the prior repayment in full of the Loans and all other Obligations that are accrued and payable and the termination of the Commitments), (b) is redeemable at the option of the holder thereof (other than solely for Qualified Equity Interests), in whole or in part, (c) provides for the scheduled payments of dividends in cash, or (d) is or becomes convertible into or exchangeable for Indebtedness or any other Equity Interests that would constitute Disqualified Stock, in each case, prior to the date that is ninety-one (91) days after the Latest Maturity Date in effect at the time of issuance thereof (provided, that only the portion of the Equity Interests that so mature or are mandatorily redeemable, are so convertible or exchangeable or are so redeemable at the option of the holder thereof prior to such date shall be deemed to be Disqualified Stock).  Notwithstanding the foregoing: (i) any Equity Interests issued to any employee or to any plan for the benefit of employees of the Borrowers or the Subsidiaries or by any such plan to such employees shall not constitute Disqualified Stock solely because they may be required to be repurchased by a Borrower in order to satisfy applicable statutory or regulatory obligations or as a result of such employee's termination, death or disability and (ii) any class of Equity Interests of such person that by its terms provides that obligations thereunder will (or upon commercially reasonable terms may) be satisfied by delivery of Equity Interests that are not Disqualified Stock shall not be deemed to be Disqualified Stock.

"Dollar Equivalent" means, at any time, (a) with respect to any amount denominated in Dollars, such amount, and (b) with respect to any amount denominated in any currency other than Dollars, the equivalent amount thereof in Dollars as determined by the Administrative Agent (acting at the direction of the Required Lenders) at such time on the basis of the spot rate as of the date of determination for the purchase of Dollars with such currency.

"Dollars" or "dollars" or "$" refers to lawful money of the United States of America.

"Domestic Lender" means any Lender that is a United States Person as defined in Section 7701(a)(30) of the Code.

"Domestic Subsidiary" means any Subsidiary that is organized under the laws of the United States, any state thereof or the District of Columbia.

"EBITDA" means, with respect to the Borrowers and their Subsidiaries on a consolidated basis for any period (but excluding JB TopCo and any Person owned by JB TopCo), the Consolidated Net Income of the Borrowers and such Subsidiaries for such period plus (a) the sum of (in each case without duplication and to the extent the respective amounts described in subclauses (i) through (xiii) of this clause (a) reduced such Consolidated Net Income (and were not excluded therefrom) for the respective period for which EBITDA is being determined):

> (i)     provision for Taxes based on income, profits or capital of the Borrowers and their Subsidiaries for such period, including state, franchise and similar taxes and foreign withholding taxes (including penalties and interest related to taxes or arising from tax examinations),

> (ii)    Interest Expense (and to the extent not included in Interest Expense, (x) all cash dividend payments (excluding items eliminated in consolidation) on any series of preferred stock or Disqualified Stock and (y) costs of surety bonds in connection with financing activities) of the Borrowers and their Subsidiaries for such period, (net of interest income of the Borrowers and their Subsidiaries for such period),

> (iii)   depreciation and amortization expenses of the Borrowers and their Subsidiaries for such period including the amortization of intangible assets, deferred financing fees, original issue discount and Capitalized Software Expenditures and amortization of unrecognized prior service costs and actuarial gains and losses related to pensions and other post-employment benefits,

> (iv)    business optimization expenses and other restructuring charges or reserves to the extent set forth in a certificate of a Financial Officer of the Borrowers (which, for the avoidance of doubt, shall include the effect of inventory optimization programs, facility closure, facility consolidations, retention, severance, systems establishment costs, contract termination costs, future lease commitments and excess pension charges),

(v)      any other non-cash charges; <u>provided</u>, that for purposes of this subclause (v) of this clause (a), any non-cash charges or losses shall be treated as cash charges or losses in any subsequent period during which cash disbursements attributable thereto are made (but excluding, for the avoidance of doubt, amortization of a prepaid cash item that was paid in a prior period),

(vi)      the amount of management, consulting, monitoring, transaction and advisory fees and related expenses paid to the Fund or any Fund Affiliate (or any accruals related to such fees and related expenses) during such period not in contravention of this Agreement,

(vii)      any expenses or charges (other than depreciation or amortization expense as described in the preceding clause (iii)) related to any issuance of Equity Interests, Investment, acquisition, New Project, recapitalization or the incurrence, modification or repayment of Indebtedness permitted to be incurred by this Agreement (including a refinancing thereof) (whether or not successful), including (x) such fees, expenses or charges related to this Agreement and the Prepetition Credit Agreements and (y) any amendment or other modification of the Obligations or other Indebtedness and (z) [reserved],

(viii)      [reserved],

(ix)      any costs or expense incurred pursuant to any management equity plan or stock option plan or any other management or employee benefit plan or agreement or any stock subscription or shareholder agreement, to the extent that such costs or expenses are funded with cash proceeds contributed to the capital of a Borrower or a Subsidiary Loan Party (other than contributions received from a Borrower or another Subsidiary Loan Party) or net cash proceeds of an issuance of Equity Interests of a Borrower (other than Disqualified Stock),

(x)      non-operating expenses,

(xi)      the amount of any loss attributable to a New Project, until the date that is 12 months after the date of completing the construction, acquisition, assembling or creation of such New Project, as the case may be; <u>provided</u>, that (A) such losses are reasonably identifiable and factually supportable and certified by a Responsible Officer of the Borrowers and (B) losses attributable to such New Project after 12 months from the date of completing such construction, acquisition, assembling or creation, as the case may be, shall not be included in this subclause (xi),

(xii)      with respect to any joint venture that is not a Subsidiary, and solely to the extent relating to any net income referred to in clause (v) of the definition of "Consolidated Net Income," an amount equal to the proportion of those items described in clauses (i) and (ii) above relating to such joint venture corresponding to the Borrowers' and their Subsidiaries' proportionate share of such joint venture's Consolidated Net Income (determined as if such joint venture were a Subsidiary), and

(xiii)      [reserved];

<u>minus</u> (b) the sum of (without duplication and to the extent the amounts described in this clause (b) increased such Consolidated Net Income for the respective period for which EBITDA is being determined) non-cash items increasing Consolidated Net Income of the Borrowers and their Subsidiaries for such period (but excluding any such items (A) in respect of which cash was received in a prior period or will be received in a future period or (B) which represent the reversal of any accrual of, or cash reserve for, anticipated cash charges that reduced EBITDA in any prior period).

Further, notwithstanding anything to the contrary contained herein, (A) under no circumstance may any amounts related to loss of estimated or expected revenue or any actual revenue (including any loss of estimated or expected revenue resulting from cancellations of cruises) directly or indirectly resulting from COVID-19 be added back for purposes of determining Consolidated Net Income or EBITDA under this Agreement, and (B) under no circumstance shall any amounts added to the Consolidated Net Income of the Borrowers and their respective Subsidiaries for purposes of determining EBITDA under this Agreement pursuant to subclauses (iv), (vi), (x) and (xi)

19

of clause (a) above, <u>plus</u> any amounts added to EBITDA pursuant to clause (i) of the first paragraph of the definition of "Pro Forma Basis" and/or clause (1) of the second paragraph of the definition of "Pro Forma Basis", <u>plus</u> any amounts included in EBITDA by virtue of clause (i) of the definition of Consolidated Net Income in the aggregate, for any period, exceed 25% of EBITDA (calculated after giving effect to such capped and other uncapped adjustments) for such period.

"<u>ECF Percentage</u>" means, 100% of Excess Cash Flow for such Excess Cash Flow Period.

"<u>EEA Financial Institution</u>" means (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"<u>EEA Member Country</u>" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"<u>EEA Resolution Authority</u>" means any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"<u>Environment</u>" means ambient and indoor air, surface water and groundwater (including potable water, navigable water and wetlands), the land surface or subsurface strata, natural resources such as flora and fauna, the workplace or as otherwise defined in any Environmental Law.

"<u>Environmental Laws</u>" means all applicable laws (including common law), rules, regulations, codes, ordinances, orders, binding agreements, decrees or judgments, promulgated or entered into by or with any Governmental Authority, relating in any way to the Environment, preservation or reclamation of natural resources, the generation, management, Release or threatened Release of any Hazardous Material or to human health and safety (to the extent relating to exposure to Hazardous Materials).

"<u>Environmental Liability</u>" means any liability, obligation, loss, claim, action, order or cost, contingent or otherwise (including any liability for damages, costs of medical monitoring, costs of environmental investigation, remediation or restoration, administrative oversight costs, consultants' fees, fines, penalties and indemnities), of any Parent, any Borrower or any Subsidiary resulting from or based upon (a) any actual or alleged violation of any Environmental Law or permit, license or approval issued thereunder, (b) the generation, use, handling, transportation, storage or treatment of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the Release or threatened Release of any Hazardous Materials or (e) any contract, agreement or other consensual arrangement pursuant (and the extent) to which liability is assumed or imposed with respect to any of the foregoing.

"<u>Equity Interests</u>" of any Person means any and all shares, interests, rights to purchase or otherwise acquire, warrants, options, participations or other equivalents of or interests in (however designated) equity or ownership of such Person, including any preferred stock, any limited or general partnership interest and any limited liability company membership interest, and any securities or other rights or interests convertible into or exchangeable for any of the foregoing.

"<u>ERISA</u>" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and any final regulations promulgated and rulings issued thereunder.

"<u>ERISA Affiliate</u>" means any trade or business (whether or not incorporated) that, together with a Parent, a Borrower or a Subsidiary is treated as a single employer or under common control under Section 414(b), 414(c), 414(m) or 414(o) of the Code.

"<u>ERISA Event</u>" means (a) any Reportable Event or the requirements of Section 4043(b) of ERISA apply with respect to a Plan; (b) with respect to any Plan, the failure to satisfy the minimum funding standard under

Section 412 of the Code or Section 302 of ERISA, whether or not waived; (c) a determination that any Plan is, or is expected to be, in "at-risk" status (as defined in Section 303(i)(4) of ERISA or Section 430(i)(4) of the Code); (d) the filing pursuant to Section 412(c) of the Code or Section 302(c) of ERISA of an application for a waiver of the minimum funding standard with respect to any Plan, the failure to make by its due date a required installment under Section 430(j) of the Code with respect to any Plan or the failure to make any required contribution to a Multiemployer Plan; (e) the incurrence by a Parent, a Borrower, a Subsidiary or any ERISA Affiliate of any liability under Title IV of ERISA with respect to the termination of any Plan or Multiemployer Plan; (f) the receipt by a Parent, a Borrower, a Subsidiary or any ERISA Affiliate from the PBGC or a plan administrator of any notice relating to an intention to terminate any Plan or to appoint a trustee to administer any Plan under Section 4042 of ERISA; (g) the incurrence by a Parent, a Borrower, a Subsidiary or any ERISA Affiliate of any liability with respect to the withdrawal or partial withdrawal from any Plan or Multiemployer Plan; (h) the receipt by a Parent, a Borrower, a Subsidiary or any ERISA Affiliate of any notice, or the receipt by any Multiemployer Plan from a Parent, a Borrower, a Subsidiary or any ERISA Affiliate of any notice, concerning the impending imposition of Withdrawal Liability or a determination that a Multiemployer Plan is, or is expected to be, insolvent or in reorganization, within the meaning of Title IV of ERISA; (i) the conditions for imposition of a lien under Section 303(k) of ERISA shall have been met with respect to any Plan; or (j) the withdrawal of any of a Parent, a Borrower, a Subsidiary or any ERISA Affiliate from a Plan subject to Section 4063 of ERISA during a plan year in which such entity was a "substantial employer" as defined in Section 4001(a)(2) of ERISA or a cessation of operations that is treated as such a withdrawal under Section 4062(e) of ERISA.

"Erroneous Payment" shall have the meaning provided in Section 8.12(a).

"Erroneous Payment Deficiency Assignment" shall have the meaning provided in Section 8.12(d).

"Erroneous Payment Impacted Class" shall have the meaning provided in Section 8.12(d).

"Erroneous Payment Return Deficiency" shall have the meaning provided in Section 8.12(d).

"Erroneous Payment Subrogation Rights" shall have the meaning provided in Section 8.12(d).

"EU Bail-In Legislation Schedule" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

"Event of Default" has the meaning assigned to such term in Section 7.01.

"Excess Cash Flow" means, with respect to the Borrowers and their Subsidiaries on a consolidated basis for any Excess Cash Flow Period, EBITDA of the Borrowers and their Subsidiaries on a consolidated basis for such Excess Cash Flow Period, minus, (A) without duplication,

(a)     Debt Service for such Excess Cash Flow Period,

(b)     the amount of any voluntary prepayment permitted hereunder of term Indebtedness during such Excess Cash Flow Period (other than any voluntary prepayment of the Term Loans, which shall be the subject of Section 2.11(c)(ii) hereof) and the amount of any voluntary payments of revolving Indebtedness to the extent accompanied by permanent reductions of any revolving facility commitments during such Excess Cash Flow Period, so long as the amount of such prepayment is not already reflected in Debt Service,

(c)     (i) Capital Expenditures by the Borrowers and their Subsidiaries on a consolidated basis during such Excess Cash Flow Period that are paid in cash during such period and (ii) the aggregate consideration paid in cash during the Excess Cash Flow Period in respect of New Project expenditures and other Investments permitted hereunder (other than Permitted Investments and Investments in any Loan Party or any Subsidiary thereof) and payments in respect of restructuring activities, less any amounts received in respect thereof as a return of capital,

(d)     Capital Expenditures, New Project expenditures or other permitted Investments (other than Permitted Investments and Investments in any Loan Party or any Subsidiary thereof) or payments in respect of planned restructuring activities, that any Borrower or any Subsidiary shall, during such Excess Cash Flow Period, become obligated to make payments with respect thereto but that are not made during such Excess Cash Flow Period; provided that (i) the Borrowers shall deliver a certificate to the Administrative Agent not later than 90 days after the end of such Excess Cash Flow Period, signed by a Responsible Officer of each Borrower and certifying such payments in respect of such Capital Expenditures, New Project expenditures or other permitted Investments or planned restructuring activities that are reasonably expected to be made in the following Excess Cash Flow Period, and (ii) any amount so deducted shall not be deducted again in a subsequent Excess Cash Flow Period,

(e)     Taxes paid in cash by any Parent and its Subsidiaries on a consolidated basis during such Excess Cash Flow Period or that will be paid within six months after the close of such Excess Cash Flow Period; provided, that with respect to any such amounts to be paid after the close of such Excess Cash Flow Period, (i) any amount so deducted shall not be deducted again in a subsequent Excess Cash Flow Period, and (ii) appropriate reserves shall have been established in accordance with GAAP,

(f)     an amount equal to any increase in Working Capital of the Borrowers and its Subsidiaries for such Excess Cash Flow Period,

(g)     cash expenditures made in respect of Hedging Agreements during such Excess Cash Flow Period, to the extent not reflected in the computation of EBITDA or Interest Expense,

(h)     permitted Restricted Payments paid in cash by any Borrower during such Excess Cash Flow Period and permitted Restricted Payments paid by any Subsidiary to any person other than any Parent, any Borrower or any of the Subsidiaries during such Excess Cash Flow Period, in each case in accordance with Section 6.06,

(i)     amounts paid in cash during such Excess Cash Flow Period on account of (A) items that were accounted for as non-cash reductions of Net Income in determining Consolidated Net Income or as non-cash reductions of Consolidated Net Income in determining EBITDA of the Borrowers and their Subsidiaries in a prior Excess Cash Flow Period and (B) reserves or accruals established in acquisition method accounting,

(j)     to the extent not deducted in the computation of Net Proceeds in respect of any asset disposition or condemnation giving rise thereto (and to the extent such Net Proceeds increased Consolidated Net Income), the amount of any mandatory prepayment of principal of Indebtedness (excluding Indebtedness created hereunder or under any other Loan Document), together with any interest, premium or penalties required to be paid (and actually paid) in connection therewith, but with respect to Junior Financing, to the extent such payments are expressly permitted under Section 6.09(b), and

(k)     the amount related to items that were added to or not deducted from Net Income in calculating Consolidated Net Income or were added to or not deducted from Consolidated Net Income in calculating EBITDA to the extent such items represented a cash payment (which had not reduced Excess Cash Flow upon the accrual thereof in a prior Excess Cash Flow Period), or an accrual for a cash payment, by any Borrower and their respective Subsidiaries or did not represent cash received by any Borrower and their respective Subsidiaries, in each case on a consolidated basis during such Excess Cash Flow Period,

plus, (B) without duplication,

(a)     an amount equal to any decrease in Working Capital of the Borrowers and their Subsidiaries for such Excess Cash Flow Period,

(b)     all amounts referred to in clauses (A)(b), (A)(c) and (A)(d) above to the extent funded with the proceeds of (i) the issuance or the incurrence of Indebtedness (including Financing Lease

Obligations and purchase money Indebtedness, but excluding, solely as relating to Capital Expenditures, proceeds from extensions of credit under any revolving credit facility and which extensions of credit are repaid within thirty (30) days of the incurrence of such Capital Expenditures), (ii) the sale or issuance of any Equity Interests (including any capital contributions) and (iii) proceeds arising from any loss, damage, destruction or condemnation of, or any sale, transfer or other disposition (including any sale and leaseback of assets and any mortgage or lease of Real Property) to any person of any asset or assets, in each case to the extent there is a corresponding deduction from Excess Cash Flow above,

(c)        to the extent any permitted Capital Expenditures, New Project expenditures or permitted Investments or payments in respect of planned restructuring activities referred to in clause (A)(d) above do not occur in the following Excess Cash Flow Period of the Borrowers specified in the certificate of the Borrowers provided pursuant to clause (A)(d) above, the amount of such Capital Expenditures, New Project expenditures or permitted Investments or payments in respect of planned restructuring activities that were not so made in such following Excess Cash Flow Period,

(d)        cash payments received in respect of Hedging Agreements during such Excess Cash Flow Period to the extent (i) not included in the computation of EBITDA or (ii) such payments do not reduce Cash Interest Expense,

(e)        any extraordinary or nonrecurring gain realized in cash during such Excess Cash Flow Period (except to the extent such gain consists of Net Proceeds subject to Section 2.11(c)), and

(f)        the amount related to items that were deducted from or not added to Net Income in connection with calculating Consolidated Net Income or were deducted from or not added to Consolidated Net Income in calculating EBITDA to the extent either (i) such items represented cash received by any Borrower or any Subsidiary or (ii) such items do not represent cash paid by any Borrower or any Subsidiary, in each case on a consolidated basis during such Excess Cash Flow Period.

Notwithstanding anything to the contrary set forth herein, for purposes of the defined term "Excess Cash Flow", neither JB TopCo nor HB TopCo shall be deemed to be a Subsidiary.

"Excess Cash Flow Period" means each fiscal year of the Borrowers, commencing with the fiscal year of the Borrowers ending in December of 2023.

"Exchange Act" means the United States Securities Exchange Act of 1934, as amended from time to time.

"Excluded Hedging Obligation" means, with respect to any Guarantor, any Hedging Obligation if, and to the extent that, all or a portion of the Guarantee of such Guarantor of, or the grant by such Guarantor of a security interest to secure, such Hedging Obligation (or any Guarantee thereof) is or becomes illegal under the Commodity Exchange Act or any rule, regulation or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof) by virtue of such Guarantor's failure for any reason to constitute an "eligible contract participant" as defined in the Commodity Exchange Act and the regulations thereunder at the time the Guarantee of such Guarantor or the grant of such security interest becomes effective with respect to such Hedging Obligation unless otherwise agreed between the Administrative Agent (acting at the direction of the Required Lenders) and the Borrowers.  If a Hedging Obligation arises under a master agreement governing more than one swap, such exclusion shall apply only to the portion of such Hedging Obligation that is attributable to swaps for which such Guarantee or security interest is or becomes illegal.

"Excluded Indebtedness" means all Indebtedness other than Indebtedness expressly permitted to be incurred pursuant to Section 6.01.

"Excluded Subsidiary" means any of the following:

(a)        [reserved],

(b)      each Subsidiary that is not a Wholly Owned Subsidiary (for so long as such Subsidiary remains a non-Wholly Owned Subsidiary), it being understood that a Subsidiary Loan Party that ceases to be a Wholly Owned Subsidiary shall not become an Excluded Subsidiary for purposes of the Loan Documents unless the requirements for release under Section 9.15(b) have been satisfied; provided that no Subsidiary shall constitute an Excluded Subsidiary pursuant to this clause (b) unless (A) a guarantee thereby of the Obligations is prohibited by any applicable organizational documents, joint venture agreement or shareholder agreement existing on the Closing Date, (B) any organizational documents, joint venture agreement or shareholder agreement prohibits such a guaranty without the consent of any other party; provided, that this clause (B) shall not apply if (1) such other party is a Loan Party or a Wholly Owned Subsidiary or (2) consent has been obtained to consummate such guaranty (it being understood that the foregoing shall not be deemed to obligate any Loan Party or its subsidiary to obtain any such consent) and for so long as such organizational documents, joint venture agreement or shareholder agreement or replacement or renewal thereof is in effect, or (C) a guaranty thereby of the Obligations would give any other party (other than a Loan Party or a Subsidiary) to any organizational documents, joint venture agreement or shareholder agreement governing such Person the right to terminate its obligations thereunder);

(c)      each Subsidiary that is prohibited from guaranteeing or granting Liens to secure the Obligations by any Requirement of Law or that would require consent, approval, license or authorization of a Governmental Authority to guarantee or grant Liens to secure the Obligations (unless such consent, approval, license or authorization has been received),

(d)      each Subsidiary that is prohibited by any applicable third-party (that is not a Loan Party or a Wholly Owned Subsidiary) contractual requirement (with respect to any such contractual requirement, only to the extent existing on the Closing Date) from guaranteeing or granting Liens to secure the Obligations (and for so long as such restriction or any replacement or renewal thereof is in effect),

(e)      [reserved],

(f)      [reserved],

(g)      [reserved],

(h)      any other Subsidiary with respect to which the Required Lenders and the Borrowers reasonably agree that the cost (including any material adverse tax consequences to a Borrower or any of its Subsidiaries) of providing a Guarantee of or granting Liens to secure the Obligations are likely to be excessive in relation to the value to be afforded thereby,

(i)      HB TopCo, and

(j)      with respect to any Hedging Obligation, any Subsidiary that is not an "eligible contract participant" as defined in the Commodity Exchange Act and the regulations thereunder.

For the avoidance of doubt, (x) no Borrower shall constitute an Excluded Subsidiary, (y) JB TopCo shall not constitute an Excluded Subsidiary and (z) no Subsidiary that was or is a borrower or a guarantor under or in respect of the Prepetition Credit Agreements shall constitute an Excluded Subsidiary.

"Excluded Taxes" means, with respect to the Administrative Agent, any Lender, or any other recipient of any payment to be made by or on account of any obligation of any Loan Party hereunder or under any other Loan Document, (a) Taxes imposed on (or measured by) such recipient's net income (however denominated) and franchise Taxes imposed on it, in each case, by a jurisdiction as a result of (i) such recipient being organized or having its principal office located in or, in the case of any Lender, having its applicable lending office located in, such jurisdiction, or (ii) any other present or former connection between such recipient and such jurisdiction (other than any connection arising from such recipient having executed, delivered, become a party to, performed its obligations or received payments under, received or perfected a security interest under, sold or assigned of an

interest in, engaged in any other transaction pursuant to, and/or enforced, any Loan Documents), (b) any branch profits tax imposed under Section 884(a) of the Code, or any similar Tax, imposed by any jurisdiction described in clause (a) above, (c) any U.S. federal withholding Tax imposed pursuant to FATCA, (d) any withholding Tax that is attributable to such recipient's failure to comply with Section 2.17(e), and (e) in the case of a Foreign Lender (other than any Foreign Lender becoming a party hereto pursuant to a request by any Loan Party under Section 2.19), any U.S. federal withholding Taxes imposed on amounts payable to such Foreign Lender pursuant to a Requirement of Law in effect at the time such Foreign Lender becomes a party hereto (or designates a new lending office), except to the extent that such Foreign Lender (or its assignor, if any) was entitled, immediately prior to the designation of a new lending office (or assignment), to receive additional amounts with respect to such withholding Tax under Section 2.17(a).

"<u>Facility</u>" means collectively, (i) the Initial Term Loan Commitments and the Initial Term Loans hereunder, (ii) the Delayed Draw Term Loan Commitments and the Delayed Draw Term Loans hereunder and (iii) the Bridge Refinancing Commitments and the Bridge Refinancing Loans hereunder.

"<u>Fair Share</u>" as defined in Section 10.02.

"<u>Fair Share Contribution Amount</u>" as defined in Section 10.02.

"<u>FATCA</u>" means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), or any current or future regulations promulgated thereunder or official administrative interpretations thereof and any agreements entered into pursuant to current Section 1471(b)(1) of the Code (or any amended or successor version described above) and any intergovernmental agreement, treaty or convention among Governmental Authorities (and any related legislation, regulations or official administrative guidance) implementing the foregoing.

"<u>Federal Funds Effective Rate</u>" means, for any day, the greater of (a) the rate calculated by the Federal Reserve Bank of New York based on such days' Federal funds transactions by depositary institutions (as determined in such manner as the Federal Reserve Bank of New York shall set forth on its public website from time to time) and published on the next succeeding Business Day by the Federal Reserve Bank of New York as the Federal Funds Effective Rate and (b) 0%.  If no such rate is available for such date, the Federal Funds Effective Rate shall be the average of the quotations (rounded upward, if necessary, to a whole multiple of 1/100 of 1%) for the day of such transactions received by the Administrative Agent from three major banks reasonably satisfactory to the Administrative Agent (acting at the direction of the Required Lenders).

"<u>Fee Letter</u>" means the Agent Fee Letter.

"<u>Final DIP Order</u>" has the meaning specified in the Interim DIP Order or otherwise as may be amended, modified or supplemented from time to time with the express written consent of the Required Lenders and the Agents.

"<u>Final DIP Order Entry Date</u>" means the date on which the Final DIP Order is entered on the docket of the Bankruptcy Court.

"<u>Financial Officer</u>" means, with respect to any person, the director of financial reporting, the chief financial officer, principal accounting officer, treasurer, assistant treasurer or controller of such Person.

"<u>Financing Lease Obligation</u>" means, at the time any determination thereof is to be made, the amount of the liability in respect of a financing lease that would at such time be required to be capitalized and reflected as a liability on a balance sheet (excluding the footnotes thereto) in accordance with GAAP; <u>provided</u> that obligations of the Borrowers or their Subsidiaries, or of a special purpose or other entity not consolidated with the Borrowers and their Subsidiaries, either existing on the Closing Date or created thereafter that (a) (x) as of the Closing Date, were not included on the consolidated balance sheet of the Borrowers as financing lease obligations and were subsequently recharacterized as financing lease obligations or (y) in the case of such a special purpose or other entity becoming consolidated with the Borrowers and their Subsidiaries, were required to be characterized as

25

financing lease obligations upon such consolidation, in each case, due to a change in GAAP or (b) did not exist on the Closing Date and were required to be characterized as financing lease obligations when created after such date, but would not have been required to be treated as financing lease obligations under GAAP on the Closing Date had they existed at that time, shall for all purposes under this Agreement, not be treated as Financing Lease Obligations; provided further that for all purposes hereunder the amount of Financing Lease Obligations shall be the amount thereof accounted for as a liability in accordance with Accounting Standards Codification 840 (regardless of whether or not then in effect) and without giving effect to Accounting Standards Codification 842 requiring operating leases to be recharacterized or required to be capitalized and reflected as a liability on a balance sheet (excluding the footnotes thereto).

"First Lien Adequate Protection Liens" has the meaning specified in the Bankruptcy Court DIP Order.

"First Lien/First Lien Intercreditor Agreement" means the Amended and Restated First Lien/First Lien Intercreditor Agreement, dated as of November 12, 2020, by and among UBS AG, Stamford Branch, as Applicable Authorized Representative (each as defined therein), UBS AG, Stamford Branch, as Authorized Representative under the Credit Agreement (each as defined therein), UBS AG, Stamford Branch, as Initial Other Authorized Representative (as defined therein), the Administrative Agent, as Authorized Representative under this Agreement, Alter Domus as Authorized Representative under the Superpriority Credit Agreement (as defined therein) and the other parties party thereto.

"Flood Insurance Laws" means, collectively, (i) the National Flood Insurance Act of 1968 as now or hereafter in effect or any successor statute thereto, (ii) the Flood Disaster Protection Act of 1973 as now or hereafter in effect or any successor statue thereto, (iii) the National Flood Insurance Reform Act of 1994 as now or hereafter in effect or any successor statute thereto, (iv) the Flood Insurance Reform Act of 2004 as now or hereafter in effect or any successor statute thereto and (v) the Biggert-Waters Flood Insurance Reform Act of 2012 as now or hereafter in effect or any successor statute thereto.

"Foreign Lender" means any Lender that is not a United States Person as defined in Section 7701(a)(30) of the Code.

"Foreign Representative" means Hornblower Group, Inc., in its capacity as foreign representative as duly appointed as such under Section 1505 of the Bankruptcy Code.

"Foreign Subsidiary" means any Subsidiary other than a Domestic Subsidiary.

"Fund" means collectively, investment funds advised, managed or controlled by Affiliates of Crestview Advisors, L.L.C.

"Fund Affiliate" means (i) each Affiliate of the Fund that is neither a "portfolio company" (which means a company actively engaged in providing goods or services to unaffiliated customers), whether or not controlled, nor a company controlled by a "portfolio company" and (ii) any individual who is a partner or employee of Crestview Advisors, L.L.C.

"Funding Guarantors" as defined in Section 10.02.

"GAAP" means generally accepted accounting principles in effect from time to time in the United States of America, applied on a consistent basis, subject to the provisions of Section 1.04; provided, that any reference to the application of GAAP in Sections 3.09, 3.20, 5.05, 5.07 and 6.02(e) to a Foreign Subsidiary (and not as a consolidated Subsidiary of the Borrowers) shall mean generally accepted accounting principles or equivalent in effect from time to time in the jurisdiction of organization of such Foreign Subsidiary.

"GLAS" has the meaning given to such term in the preliminary statements hereto.

"Governmental Authority" means any federal, state, provincial, territorial, local or foreign court or governmental agency, authority, instrumentality or regulatory or legislative body.

26

"<u>Guarantee</u>" of or by any person (the "<u>guarantor</u>") means (a) any obligation, contingent or otherwise, of the guarantor guaranteeing or having the economic effect of guaranteeing any Indebtedness or other monetary obligation payable or performable by another person (the "<u>primary obligor</u>") in any manner, whether directly or indirectly, and including any obligation of the guarantor, direct or indirect, (i) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation, (ii) to purchase or lease property, securities or services for the purpose of assuring the owner of such Indebtedness or other obligation of the payment thereof, (iii) to maintain working capital, equity capital or any other financial statement condition or liquidity of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation or (iv) entered into for the purpose of assuring in any other manner the holders of such Indebtedness or other obligation of the payment thereof or to protect such holders against loss in respect thereof (in whole or in part), or (b) any Lien on any assets of the guarantor securing any Indebtedness or other obligation (or any existing right, contingent or otherwise, of the holder of Indebtedness or other obligation to be secured by such a Lien) of any other person, whether or not such Indebtedness or other obligation is assumed by the guarantor; <u>provided</u>, <u>however</u>, that the term "Guarantee" shall not include endorsements of instruments for deposit or collection in the ordinary course of business or customary and reasonable indemnity obligations in effect on the Closing Date or entered into in connection with any acquisition or Disposition of assets permitted by this Agreement (other than such obligations with respect to Indebtedness).  The amount of any Guarantee shall be deemed to be an amount equal to the stated or determinable amount of the Indebtedness in respect of which such Guarantee is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined by such person in good faith.

"<u>Guaranteed Obligations</u>" as defined in Section 10.01.

"<u>guarantor</u>" has the meaning assigned to such term in the definition of the term "Guarantee."

"<u>Guarantors</u>" means the Loan Parties other than the Borrowers.

"<u>Hazardous Materials</u>" means all pollutants, contaminants, wastes, chemicals, materials, substances and constituents, including explosive or radioactive substances or petroleum by products or petroleum distillates, asbestos or asbestos-containing materials, polychlorinated biphenyls, radon gas, pesticides or fungicides, of any nature subject to regulation or which can give rise to liability under any Environmental Law.

"<u>HB TopCo</u>" means HB TopCo Pty Ltd (ACN 656 565 249), an entity organized under the laws of Australia.

"<u>Hedge Bank</u>" means any person that, at the time it enters into a Hedging Agreement (or on the Closing Date), is a Lender or an Affiliate of any such person, in each case of the foregoing, in its capacity as a party to such Hedging Agreement.

"<u>Hedging Agreement</u>" means any agreement with respect to any swap, forward, future or derivative transaction, or option or similar agreement involving, or settled by reference to, one or more rates, currencies, commodities, equity or debt instruments or securities, or economic, financial or pricing indices or measures of economic, financial or pricing risk or value, or credit spread transaction, repurchase transaction, reserve repurchase transaction, securities lending transaction, weather index transaction, spot contracts, fixed price physical delivery contracts, or any similar transaction or any combination of these transactions, in each case of the foregoing, whether or not exchange traded; <u>provided</u>, that no phantom stock or similar plan providing for payments only on account of services provided by current or former directors, officers, employees or consultants of any Parent, any Borrower or any of the Subsidiaries shall be a Hedging Agreement.

"<u>Hedging Obligation</u>" means, with respect to any Guarantor, any obligation to pay or perform under any agreement, contract or transaction that constitutes a "swap" within the meaning of Section 1a(47) of the Commodity Exchange Act.

"<u>Hornblower Borrower</u>" has the meaning assigned to such term in the preamble.

"Hornblower Parent" has the meaning assigned to such term in the preamble.

"Increased Amount" of any Indebtedness means any increase in the amount of such Indebtedness in connection with any accrual of interest, the accretion of accreted value, the amortization of original issue discount, fees or premiums or deferred financing fees, the payment of interest or dividends in the form of additional Indebtedness or in the form of Equity Interests, as applicable, the accretion of original issue discount, interest, fees or premiums deferred financing fees or liquidation preference and increases in the amount of Indebtedness outstanding solely as a result of fluctuations in the exchange rate of currencies.

"Incremental Superpriority 507(b) Claims" has the meaning specified in the Bankruptcy Court DIP Order.

"Incremental Superpriority Adequate Protection Liens" has the meaning specified in the Bankruptcy Court DIP Order.

"Indebtedness" of any person means, if and to the extent (other than with respect to clause (i)) the same would constitute indebtedness or a liability on a balance sheet prepared in accordance with GAAP, without duplication, (a) all obligations of such person for borrowed money, (b) all obligations of such person evidenced by bonds, debentures, notes or similar instruments, (c) all obligations of such person under conditional sale or other title retention agreements relating to property or assets purchased by such person, (d) all obligations of such person issued or assumed as the deferred purchase price of property or services (other than such obligations accrued in the ordinary course), to the extent that the same would be required to be shown as a long term liability on a balance sheet prepared in accordance with GAAP, (e) all Financing Lease Obligations of such person, (f) all net payments that such person would have to make in the event of an early termination, on the date Indebtedness of such person is being determined, in respect of outstanding Hedging Agreements, (g) the principal component of all obligations, contingent or otherwise, of such person as an account party in respect of letters of credit, (h) the principal component of all obligations of such person in respect of bankers' acceptances, (i) all Guarantees by such person of Indebtedness described in clauses (a) to (h) above and (j) the amount of all obligations of such person with respect to the redemption, repayment or other repurchase of any Disqualified Stock (excluding accrued dividends that have not increased the liquidation preference of such Disqualified Stock); provided, that Indebtedness shall not include (A) trade and other ordinary-course payables, accrued expenses and intercompany liabilities arising in the ordinary course of business, (B) prepaid or deferred revenue, (C) purchase price holdbacks arising in the ordinary course of business in respect of a portion of the purchase prices of an asset to satisfy unperformed obligations of the seller of such asset, (D) [reserved], (E) earn-out obligations until such obligations become a liability on the balance sheet of such person in accordance with GAAP, (F) obligations in respect of Third Party Funds, (G) in the case of the Borrowers and the Subsidiaries and (I) all intercompany Indebtedness having a term not exceeding 364 days (inclusive of any roll-over or extensions of terms) and made in the ordinary course of business and (II) intercompany liabilities in connection with the cash management, tax and accounting operations of the Borrowers and the Subsidiaries. The Indebtedness of any person shall include the Indebtedness of any partnership in which such person is a general partner, other than to the extent that the instrument or agreement evidencing such Indebtedness limits the liability of such person in respect thereof.

"Indemnified Liabilities" means any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses, fees or disbursements of any kind whatsoever that may at any time (whether before or after the payment of the Loans) be imposed on, incurred by or asserted against an Agent Party in any way relating to or arising out of the Commitments, the use of proceeds hereunder, this Agreement, any of the other Loan Documents or any documents contemplated by or referred to herein or therein, the Transaction or the other transactions contemplated hereby or thereby or any action taken or omitted by such Agent Party under or in connection with any of the foregoing.

"Indemnified Taxes" means (a) any Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of any Loan Party hereunder or under any other Loan Document and (b) to the extent not otherwise described in clause (a), Other Taxes.

"Indemnitee" has the meaning assigned to such term in Section 9.03(b).

"Ineligible Institution" means the persons identified in writing to the Administrative Agent by the Borrowers on or prior to the Closing Date, and as may be identified in writing to the Administrative Agent by the Borrowers from time to time with the consent of the Administrative Agent (not to be unreasonably withheld or delayed) to include competitors of the Borrowers, by delivery of a notice thereof to the Administrative Agent setting forth such person or persons (or the person or persons previously identified to the Administrative Agent that are to be no longer considered "Ineligible Institutions") which designation shall become effective two (2) Business Days after it is delivered to the Administrative Agent, but which shall not apply retroactively to disqualify any Person that has previously acquired any assignment or participation in the Loan solely with respect to such previously acquired Loan or participation.  Notwithstanding anything to the contrary contained in this Agreement, (a) the Administrative Agent shall not be responsible or have any liability for, or have any duty to ascertain, inquire into, monitor or enforce, compliance with the provisions hereof relating to Ineligible Institutions and (b) the Borrowers (on behalf of itself and the other Loan Parties) and the Lenders acknowledge and agree that the Administrative Agent shall have no responsibility or obligation to determine whether any Lender or potential Lender is an Ineligible Institution and that the Administrative Agent shall have no liability with respect to any assignment or participation made to an Ineligible Institution.

"Information" has the meaning assigned to such term in Section 9.12(a).

"Information Officer" means the information officer appointed by the Canadian Court in the Canadian Recognition Proceedings.

"Initial Term Loans" means the term loans made by the Lenders to the Borrowers pursuant Section 2.01(a) on the Closing Date.  The aggregate amount of the Initial Term Loans outstanding on the Closing Date without giving effect to the payment of the closing payment set forth in Section 2.12(a) is $60,000,000.

"Initial Term Loan Commitment" means, with respect to each Lender, the commitment, if any, of such Lender to make an Initial Term Loan hereunder on the Closing Date.  The amount of each Lender's Initial Term Loan Commitment as of the Closing Date is set forth on Schedule 2.01.  The aggregate amount of the Lenders' Initial Term Loan Commitments as of the Closing Date is $60,000,000.

"Intellectual Property" means all rights, priorities and privileges relating to intellectual property, whether arising under United States, Canadian, multinational or foreign laws or otherwise, including all copyrights and any registrations and applications for registration thereof, copyright licenses, patents and patent applications, patent licenses, trademarks and any registrations and applications for registration thereof, trademark licenses, industrial designs and any registrations and applications for registration thereof, industrial design licenses, trade names, trade dress, domain names, trade secrets, knowhow and processes, and all rights to sue at law or in equity for any infringement, violation or other impairment thereof, including the right to receive all proceeds and damages therefrom.

"Intercompany Services Agreement" means the Services Agreement, dated as of February 15, 2022 and as in effect on the date hereof, by and among Hornblower Group, Inc., HB TopCo Pty Ltd. (ACN 656 565 249), HB HoldCo Pty Ltd. (ACN 655 636 776), the Journey Beyond Borrower and Experience Australia Topco Pty Ltd (ACN 614 712 631) (as further amended, restated, supplemented or otherwise modified or replaced from time to time after the date hereof in accordance with the terms thereof and hereof).

"Intercreditor Agreement" shall mean (i) the First Lien/First Lien Intercreditor Agreement, (ii) the Superpriority Intercreditor Agreement and (iii) any other intercreditor agreement or subordination agreement entered into from time to time in form and substance reasonably satisfactory to the Required Lenders.

"Interest Election Request" means a request by the Borrowers to convert or continue a Borrowing in accordance with Section 2.07, substantially in the form of Exhibit J or another form approved by the Administrative Agent.

"Interest Expense" means, with respect to any person for any period, the sum of (a) gross interest expense (net of interest income) of such person for such period on a consolidated basis, including (i) the amortization of debt discounts, (ii) the amortization of all fees (including fees with respect to Hedging Agreements) payable in

29

connection with the incurrence of Indebtedness to the extent included in interest expense and (iii) the portion of any payments or accruals with respect to Financing Lease Obligations allocable to interest expense, and (b) capitalized interest of such person.  For purposes of the foregoing, gross interest expense shall be determined after giving effect to any net payments made or received and costs incurred by the Borrowers and the Subsidiaries with respect to Hedging Agreements, and interest on a Financing Lease Obligation shall be deemed to accrue at an interest rate reasonably determined by the Borrowers to be the rate of interest implicit in such Financing Lease Obligation in accordance with GAAP.

"Interest Payment Date" means (a) with respect to any ABR Loan, the last Business Day of each March, June, September and December and (b) with respect to any Term SOFR Loan, the last day of the Interest Period applicable to the Borrowing of which such Loan is a part and, in the case of a Term SOFR Borrowing with an Interest Period of more than three months' duration, each day that would have been an Interest Payment Date had successive Interest Periods of three months' duration been applicable to such Borrowing.

"Interest Period" means, with respect to any Term SOFR Borrowing, the period commencing on the date such Borrowing is disbursed or converted to or continued as a Term SOFR Borrowing and ending on the date that is one, three or six months thereafter as selected by the Borrowers in their Borrowing Request (in each case, subject to the available for the Benchmark applicable to the relevant Loan); provided that (a) if any Interest Period would end on a day other than a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless such next succeeding Business Day would fall in the next calendar month, in which case such Interest Period shall end on the next preceding Business Day, (b) any Interest Period that commences on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the last calendar month of such Interest Period) shall end on the last Business Day of the last calendar month at the end of such Interest Period, (c) no Interest Period shall extend beyond the Maturity Date and (d) no tenor that has been removed from this definition pursuant to Section 2.23(d) shall be available.  For purposes hereof, the date of a Borrowing initially shall be the date on which such Borrowing is made and thereafter shall be the effective date of the most recent conversion or continuation of such Borrowing.

"Interim DIP Order" means the order of the Bankruptcy Court, approving the Facility on an interim basis.

"Interim DIP Order Entry Date" means the date on which the Interim DIP Order is entered on the docket of the Bankruptcy Court.

"Investment" has the meaning assigned to such term in Section 6.04.

"JB Disposition" means any offer for sale, lease or other disposition of all or substantially all of the business of Journey Beyond and its subsidiaries, taken as a whole (the "JB Business"), or any material portion thereof (whether by virtue of an asset sale transaction, a lease transaction, affiliation transaction, or a change of control, change of membership, merger, amalgamation, consolidation or other combination transaction with respect to the JB Business (or any of its subsidiaries)) or entering into any agreement (written or otherwise) with any Person with respect to the disposition of all or substantially all of the JB Business, or any material portion thereof.

"JB TopCo" has the meaning assigned to such term in the preamble.

"JB TopCo Parent" means any direct or indirect parent of JB TopCo.

"JB TopCo Restricted Party" means JB TopCo and HB TopCo.

"Journey Beyond" means HB HoldCo Pty Ltd (ACN 655 636 776), an Australian proprietary limited company.

"Journey Beyond Borrower" means HB AcquisitionCo Pty Ltd. (CAN 655 643 280), an Australian proprietary limited company.

"<u>Journey Beyond Credit Agreement</u>" means that certain Syndicated Facility Agreement, dated as of February 15, 2022, by and among Journey Beyond, the Journey Beyond Borrower, as borrower, GLOBAL LOAN AGENCY SERVICES AUSTRALIA PTY LTD (ABN 68 608 829 303), as administrative agent, GLOBAL LOAN AGENCY SERVICES AUSTRALIA NOMINEES PTY LIMITED (ABN 39 608 945 008), as collateral agent, and each of the lenders from time to time party thereto, as amended, restated, supplemented, waived or otherwise modified from time to time prior to the Closing Date.

"<u>Journey Beyond SSA</u>" means that certain Share Sale Agreement, dated as of December 24, 2021, by and among Experience Australia Topco Pty Ltd (ACN 614 712 631), the Journey Beyond Borrower and Hornblower Holdings, LP, a Delaware limited partnership.

"<u>Journey Beyond Subsidiary</u>" means, unless the context otherwise requires, a subsidiary of Journey Beyond.

"<u>Judgment Currency</u>" has the meaning assigned to such term in Section 9.14.

"<u>Latest Maturity Date</u>" means, at any date of determination, the latest maturity or expiration date applicable to any Term Loans at such time, in each case as extended in accordance with this Agreement from time to time.

"<u>Lenders</u>" means the Persons listed on <u>Schedule 2.01</u>, and any other Person that becomes a "Lender" hereunder pursuant to <u>Section 9.04</u>, in each case, other than any such Person that ceases to be a party hereto pursuant to an Assignment and Assumption.

"<u>Lien</u>" means, with respect to any asset, (a) any mortgage, deed of trust, lien, hypothecation, pledge, charge, security interest, hypothec or similar monetary encumbrance in or on such asset and (b) the interest of a vendor or a lessor under any conditional sale agreement, financing lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such asset; <u>provided</u> that in no event shall an operating lease or an agreement to sell be deemed to constitute a Lien.

"<u>Liquidity Certificate</u>" has the meaning assigned to such term in Section 6.11.

"<u>Liquidity Testing Date</u>" has the meaning assigned to such term in Section 6.11.

"<u>Loan Documents</u>" means (i) this Agreement, (ii) the Security Documents, (iii) the Intercreditor Agreements, (iv) any Note issued under Section 2.09(e) and (v) the Fee Letter.

"<u>Loan Parties</u>" means the Parents, the Borrowers, the Subsidiary Loan Parties and the Parent Entity Debtors.

"<u>Loans</u>" means the Term Loans made by the respective Lenders to the Borrowers pursuant to this Agreement.

"<u>Local Time</u>" means New York City time (daylight or standard, as applicable).

"<u>Management Group</u>" means the group consisting of the directors, executive officers and other management personnel of the Borrowers, the Parents or any Parent Entity, as the case may be, on the Closing Date together with (a) any successor or assign of such Person that is an Affiliate of such Person, a familial relative of such Person or an Affiliate of a familial relative of such Person, (b) any new directors whose election by such boards of directors or whose nomination for election by the shareholders of any Borrower, any Parent or any Parent Entity, as the case may be, was approved by a vote of a majority of the directors of such Borrower, such Parent or any Parent Entity, as the case may be, then still in office who were either directors on the Closing Date or whose election or nomination was previously so approved and (c) executive officers and other management personnel of any Borrower, any Parent or any Parent Entity, as the case may be, hired at a time when the directors on the Closing Date together with the directors so approved constituted a majority of the directors of such Borrower or such Parent, as the case may be.

31

"<u>Margin Stock</u>" means "margin stock" as such term is defined in Regulation U of the Federal Reserve Board.

"<u>Material Adverse Effect</u>" means a material adverse effect on (a) the business, property, operations or financial condition of either JB TopCo and its Subsidiaries (other than Journey Beyond and its subsidiaries), (b) the Borrowers and their Subsidiaries, taken as a whole, in each case under clauses (a) and (b), excluding (i) any matters publicly disclosed in writing or disclosed to the Lenders in writing prior to the date hereof, (ii) any matters disclosed in any first day pleadings or declarations filed in the Chapter 11 Cases and (iii) the filing of the Chapter 11 Cases or the commencement of the Canadian Recognition Proceedings or (c) the validity or enforceability of any of the Loan Documents or the rights and remedies of the Agents and the Lenders thereunder.

"<u>Material Indebtedness</u>" means Indebtedness (other than Loans) of any one or more of any Borrower or any Subsidiary in an aggregate principal amount exceeding $1,000,000.

"<u>Material Real Property</u>" means (i) any parcel or parcels of Real Property located in the United States or Canada now or hereafter owned in fee by any Borrower or any Subsidiary Loan Party and having a fair market value (on a per-property basis) of (x) at least $100,000 as at the Closing Date for Real Property now owned or (y) at least $100,000 as of the date of acquisition for Real Property acquired after the Closing Date, in each case as determined by the Borrowers in good faith and (ii) any other parcel or parcels of Real Property located in the United States or Canada that is subject to a Lien securing obligations under any Prepetition Credit Agreement or the Senior DIP Credit Agreement.

"<u>Material Vessel</u>" means (i) any Vessel (other than an Additional Collateral Vessel) now or hereafter owned by any Borrower or any Subsidiary Loan Party and having a fair market value (on a per-Vessel basis) of (x) at least $100,000 as at the Closing Date for Vessels now owned or (y) at least $100,000 as of the date of acquisition for Vessels acquired after the Closing Date, in each case as determined by the Borrowers in good faith and (ii) any other Vessel (other than an Additional Collateral Vessel) that is subject to a Lien securing obligations under any Prepetition Credit Agreement or the Junior DIP Credit Agreement. As of the Closing Date, the Material Vessels are set forth on Schedule 1.01(F) under the heading "Material Vessels".

"<u>Maturity Date</u>" means, the earliest to occur of (i) the date that is nine months after the Petition Date; (ii) if the Final DIP Order has not been entered by the Bankruptcy Court on or before the applicable Milestone (as defined below), the date of the applicable Milestone; (iii) the date the Bankruptcy Court orders a conversion of the Chapter 11 Cases to a chapter 7 liquidation or the dismissal of the chapter 11 case of any Debtor; (iv) the consummation of a sale or other disposition of all or substantially all of the assets of the Debtors under section 363 of the Bankruptcy Code; (v) the date that is 30 calendar days after the Interim DIP Order Date if the Final DIP Order Entry Date shall not have occurred by such date; and (vi) the substantial consummation (as defined in 11 U.S.C. § 1101(2)) of a Plan of Reorganization, which has been confirmed by an order entered by the Bankruptcy Court.

"<u>Maximum Rate</u>" has the meaning assigned to such term in Section 9.17.

"<u>Moody's</u>" means Moody's Investors Service, Inc. and any successor to its rating agency business.

"<u>Mortgage</u>" means a mortgage, charge, hypothec, deed of trust, assignment of leases and rents or other security document granting a Lien on any Mortgaged Property, Material Vessel or Additional Collateral Vessel to secure the Obligations. Each Mortgage of a Mortgaged Property shall be reasonably satisfactory to the Collateral Agent (acting at the direction of the Required Lenders) and the Borrowers and each Mortgage of a Material Vessel or Additional Collateral Vessel shall be in substantially in a form as is reasonably satisfactory to the Collateral Agent (acting at the direction of the Required Lenders) and the Borrowers (it being agreed that Exhibit N-1 of the Prepetition Super Senior Credit Agreement is reasonably acceptable to the Collateral Agent (acting at the direction of the Required Lenders) and the Borrowers), together with any amendments or modifications thereto as from time to time agreed to by the Collateral Agent (acting at the direction of the Required Lenders) and the Borrowers.

"<u>Mortgaged Properties</u>" means the Material Real Properties owned in fee by the Borrowers and the Subsidiary Loan Parties, including those that are set forth on <u>Schedule 1.01(B)</u> and each additional Material Real Property encumbered by a Mortgage pursuant to Section 5.11.

"<u>Mortgaged Vessels</u>" means the Material Vessels and Additional Collateral Vessels owned by any of the Borrowers or the Subsidiary Loan Parties, including those that are set forth on <u>Schedule 1.01(F)</u> and each additional Material Vessel encumbered by a Mortgage pursuant to Section 5.11.

"<u>Multiemployer Plan</u>" means a multiemployer plan as defined in Section 4001(a)(3) of ERISA to which any Borrower or any Subsidiary or any ERISA Affiliate is making or accruing an obligation to make contributions, or has within any of the preceding six plan years made or accrued an obligation to make contributions.

"<u>National Vessel Documentation Center</u>" means the National Vessel Documentation Center of the United States Coast Guard, Department of Homeland Security, and any successor board, agency or other Governmental Authority.

"<u>Net Income</u>" means, with respect to any person, the net income (loss) of such person, determined in accordance with GAAP and before any reduction in respect of preferred stock dividends.

"<u>Net Proceeds</u>" means,

(a)     100% of the cash proceeds actually received by any Borrower or any Subsidiary (including any cash payments received by way of deferred payment of principal pursuant to a note or installment receivable or purchase price adjustment receivable or otherwise and including casualty insurance settlements and condemnation awards, but only as and when received) from any Asset Sale (other than any Asset Sales pursuant to Section 6.05(a), (b), (c), (e) or (i)) net of any bona fide direct costs incurrent in connection with such Asset Sale, including (i) customary attorneys' fees, accountants' fees, investment banking fees, survey costs, title insurance premiums, and related search and recording charges, transfer taxes, deed or mortgage recording taxes, required debt payments and required payments of other obligations relating to the applicable asset to the extent such debt or obligations are secured by a Lien permitted hereunder (other than pursuant to the Loan Documents) on such asset (and only to the extent such required debt payments or other required payments of obligations are in respect of Indebtedness that is secured by a Lien that ranks senior to the Liens securing the Obligations), other customary expenses and brokerage, consultant and other customary fees actually incurred in connection therewith, (ii) Taxes paid or payable as a result thereof, (iii) the amount of any reasonable reserve established in accordance with GAAP against any adjustment to the sale price or any liabilities (other than any taxes deducted pursuant to clause (i) or (ii) above) (x) related to any of the applicable assets and (y) retained by any Borrower or any of the Subsidiaries including pension and other post-employment benefit liabilities and liabilities related to environmental matters or against any indemnification obligations (however, the amount of any subsequent reduction of such reserve (other than in connection with a payment in respect of any such liability) shall be deemed to be Net Proceeds of such Asset Sale occurring on the date of such reduction), (iv) payments made on a ratable basis (or less than ratable basis) to holders of non-controlling interests in non-Wholly Owned Subsidiaries as a result of such Asset Sale or (v) amounts prohibited from being so applied by the terms of the Niagara Contract as in effect on the Closing Date (but only for so long as such prohibitions are in effect); and

(b)     100% of the cash proceeds from the incurrence, issuance or sale by any Borrower or any Subsidiary of any Indebtedness (other than Excluded Indebtedness), net of all taxes and fees (including investment banking fees), commissions, costs and other expenses, in each case incurred in connection with such issuance or sale;

"<u>New Project</u>" means (x) each new vessel chartered-in or Vessel owned by the Borrowers or the Subsidiaries which in fact commences operations and (y) each creation (in one or a series of related transactions) of a business unit (including establishing concession services) to the extent such business unit commences operations or each expansion (in one or a series of related transactions) of business into a new market.

"New York Ferry Agreement" means that certain Agreement dated February 12, 2016 by and between the NYCEDC and HNY Ferry, LLC, as amended, restated, supplemented or otherwise modified from time to time in accordance therewith.

"Niagara Contract" means the Boat Tours Lease and Operating Agreement 2012, among Hornblower Canada Co., as tenant, The Niagara Parks Commission, as landlord and Hornblower Group, Inc. (f/k/a Hornblower, Inc.), as indemnifier (as amended, restated, supplemented or otherwise modified from time to time after the Closing Date in accordance with the terms thereof and hereof).

"Niagara Security Agreement" means (i) the Security Agreement, dated January 1, 2014, among Hornblower Canada Co. and The Niagara Parks Commission, (ii) the Collateral Deed of Covenant, dated March 7, 2014, by and between Hornblower Canada Co. and The Niagara Parks Commission for the vessel *Hornblower Guardian*, Official Number 837802, (iii) the Collateral Deed of Covenant, dated March 7, 2014, by and between Hornblower Canada Co. and The Niagara Parks Commission for the vessel *Niagara Wonder*, Official Number 837992, (iv) the Collateral Deed of Covenant dated March 7, 2014, by and between Hornblower Canada Co. and the Niagara Parks Commission for the vessel *Niagara Thunder*, Official Number 837993 and (v) any other mortgage or security agreement required by the Niagara Contract, in each case, as amended, restated, supplemented or otherwise modified from time to time after the Closing Date in accordance with the terms thereof and hereof.

"Non-Consenting Lender" has the meaning assigned to such term in Section 9.02(c).

"Non-Filing Party" means any of Journey Beyond Holdings LTD., a Cayman Islands exempted company, Journey Beyond Intermediate Holdings LLC, a Delaware limited liability company, HB TopCo, Journey Beyond and any Journey Beyond Subsidiary.

"Note" has the meaning assigned to such term in Section 2.09(e).

"Obligations" means (a) the due and punctual payment by the Borrowers of (i) the unpaid principal, premium (including the Exit Premium) and interest (including interest accruing during the pendency of any bankruptcy, insolvency, arrangement, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding) any Obligations, when and as due, whether at maturity, by acceleration, upon one or more dates set for prepayment or otherwise, (ii) [reserved] and (iii) all other monetary obligations of the Borrowers owed under or pursuant to this Agreement and each other Loan Document, including obligations to pay fees, expense reimbursement obligations and indemnification obligations, whether primary, secondary, direct, contingent, fixed or otherwise (including monetary obligations incurred during the pendency of any bankruptcy, insolvency, arrangement, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding), and (b) the due and punctual payment of all obligations of each other Loan Party and JB TopCo under or pursuant to each of the Loan Documents; provided that in no event will Loan Obligations include any Excluded Hedging Obligations.

"Obligee Guarantor" as defined in Section 10.07.

"Organizational Documents" means, with respect to any Person, the charter, articles or certificate of organization, incorporation or amalgamation, notice of articles, bylaws, partnership agreement or other organizational or governing documents of such Person.

"Other Taxes" means any and all present or future stamp, court or documentary Taxes or any other excise, transfer, sales, property, intangible, recording, filing or similar Taxes arising from any payment made hereunder or under any other Loan Document or from the execution, registration, delivery or enforcement of, consummation or administration of, from the receipt of perfection of security interest under, or otherwise with respect to, the Loan Documents.

"Parent Entity" means any direct or indirect parent of a Parent.

"Parent Entity Debtor" means each Parent Entity that is a Debtor.

"Parent Entity Debtor Documents" means, collectively, (i) that certain Credit Agreement, dated as of November 18, 2022, by and among Journey Beyond Holdings, Ltd., as parent, Journey Beyond Intermediate Holdings, LLC, as borrower, Hornblower Group, LLC, as HB TopCo (as defined therein), the lenders party thereto from time to time, the Administrative Agent (as defined therein) and the Collateral Agent (as defined therein), (ii) each of the Loan Documents (as defined therein) that each Parent Entity Debtor is party to (other than the Engagement Letter (as defined therein) and the SBLC Guarantee (as defined therein)) as of the date hereof and (iii) that certain Parent Guarantee and Contribution Agreement, dated as of February 15, 2022, by and among Hornblower Holdings, LP, HB TopCo, HB Holdco Pty Ltd, HB Acquisitionco Pty Ltd and Global Loan Agency Services Australia Nominees Pty Limited (ABN 39 608 945 008), in each case, as in effect on the date hereof.

"Parent Holdings L.P." means Hornblower & America Queen Group, L.P., a Delaware limited partnership.

"Parents" has the meaning assigned to such term in the introductory paragraph of this Agreement.

"Participant" has the meaning assigned to such term in Section 9.04(d)(i).

"Participant Register" has the meaning assigned to such term in Section 9.04(d)(ii).

"Payment Recipient" shall have the meaning provided in Section 8.12(a).

"PBGC" means the Pension Benefit Guaranty Corporation referred to and defined in ERISA.

"Perfection Certificate" means a certificate substantially in the form of Exhibit B.

"Periodic Term SOFR Determination Day" has the meaning specified in the definition of "Term SOFR".

"Permitted Flag Jurisdiction" shall have the meaning assigned to such term in clause (d) of the definition of "Collateral and Guarantee Requirement".

"Permitted Holder Group" has the meaning assigned to such term in the definition of the term "Permitted Holders."

"Permitted Holders" means (i) the Co-Investors, (ii) any person that has no material assets other than the capital stock of any Borrower and that, directly or indirectly, holds or has acquired beneficial ownership of 100% on a fully diluted basis of the voting Equity Interests of any Borrower, and of which no other person or "group" (within the meaning of Rules 13d-3 and 13d-5 or Section 14(d)(2) under the Exchange Act as in effect on the Closing Date or any successor provision), other than any of the other Permitted Holders specified in clause (i), beneficially owns more than 50% on a fully diluted basis of the voting Equity Interests thereof and (iii) any "group" (within the meaning of Rules 13d-3 and 13d-5 or Section 14(d)(2) under the Exchange Act as in effect on the Closing Date or any successor provision) the members of which include any of the other Permitted Holders specified in clause (i) and that, directly or indirectly, hold or acquire beneficial ownership of the voting Equity Interests of any Borrower (a "Permitted Holder Group"), so long as (1) each member of the Permitted Holder Group has voting rights proportional to the percentage of ownership interests held or acquired by such member and (2) no person or other "group" (other than the other Permitted Holders specified in clause (i)) beneficially owns more than 50% on a fully diluted basis of the voting Equity Interests held by the Permitted Holder Group.

"Permitted Investments" means any of the following, to the extent owned by any Borrower or any Subsidiary, or otherwise received as consideration pursuant to Section 6.05:

    (a)    dollars, euro or such other currencies mutually agreed to by the Administrative Agent (acting at the direction of the Required Lenders) and the Borrowers and held by such Borrower or such Subsidiary from time to time in the ordinary course of business;

    (b)    readily marketable obligations issued or directly and fully guaranteed or insured by the government or any agency or instrumentality of the United States, having average maturities of not more

than 12 months from the date of acquisition thereof; provided that the full faith and credit of the United States is pledged in support thereof;

(c)     time deposits with, or insured certificates of deposit or bankers' acceptances of, any commercial bank that (i) is a Lender or (ii) has combined capital and surplus of at least $500,000,000 (any such bank in the foregoing clauses (i) or (ii) being an "Approved Bank"), in each case with average maturities of not more than 12 months from the date of acquisition thereof;

(d)     commercial paper and variable or fixed rate notes issued by an Approved Bank (or by the parent company thereof) or any variable or fixed rate note issued by, or guaranteed by, a corporation rated A-2 (or the equivalent thereof) or better by S&P or P-2 (or the equivalent thereof) or better by Moody's, in each case with average maturities of not more than 12 months from the date of acquisition thereof;

(e)     repurchase agreements entered into by any Person with an Approved Bank, a bank or trust company (including any of the Lenders) or recognized securities dealer, in each case, having capital and surplus in excess of $500,000,000 for direct obligations issued by or fully guaranteed or insured by the government or any agency or instrumentality of the United States, in which such Person shall have a perfected first priority security interest (subject to no other Liens) and having, on the date of purchase thereof, a fair market value of at least 100% of the amount of the repurchase obligations;

(f)     marketable short-term money market and similar highly liquid funds either (i) having assets in excess of $500,000,000 or (ii) having a rating of at least A-2 or P-2 from either S&P or Moody's (or, if at any time neither S&P nor Moody's shall be rating such obligations, an equivalent rating from another nationally recognized rating service);

(g)     securities with average maturities of 12 months or less from the date of acquisition issued or fully guaranteed by any state, commonwealth or territory of the United States, by any political subdivision or taxing authority of any such state, commonwealth or territory having an investment grade rating from either S&P or Moody's (or the equivalent thereof);

(h)     investments with average maturities of 12 months or less from the date of acquisition in mutual funds rated AAA- (or the equivalent thereof) or better by S&P or Aaa3 (or the equivalent thereof) or better by Moody's;

(i)     instruments equivalent to those referred to in clauses (a) through (h) above denominated in euros or any other foreign currency comparable in credit quality and tenor to those referred to above and customarily used by corporations for cash management purposes in any jurisdiction outside the United States to the extent reasonably required in connection with any business conducted by any Subsidiary organized in such jurisdiction; and

(j)     investments, classified in accordance with GAAP as current assets of any Borrower or any Subsidiary, in money market investment programs that are registered under the Investment Company Act of 1940 or that are administered by financial institutions having capital of at least $500,000,000, and, in either case, the portfolios of which are limited such that substantially all of such investments are of the character, quality and maturity described in clauses (a) through (i) of this definition.

"Permitted Liens" has the meaning assigned to such term in Section 6.02.

"Permitted Variance" means, for purposes of testing whether a Budget Event has occurred, during any Budget Testing Period, a variance of (a) with respect to the Budgeted Receipts Test, 6.25%, (b) with respect to the Cumulative Budgeted Disbursements Test, 5.0% and (c) with respect to the Net Operating Cash Flow Test, 7.5%; provided that (x) for the first Budget Testing Period after the Closing Date for purposes of testing whether a Budget Event has occurred, the percentage in each of the foregoing (1) clause (a) shall be increased by 11.25% and (2) clauses (b) and (c) shall be increased by 10.0%, (y) for the second Budget Testing Period after the Closing Date for purposes of testing whether a Budget Event has occurred, the percentage in each of the foregoing (1) clause (a) shall

36

be increased by 8.75% and (2) clauses (b) and (c) shall be increased by 7.5% and (z) for the third and fourth Budget Testing Period after the Closing Date for purposes of testing whether a Budget Event has occurred, the percentage in each of the foregoing (1) clause (a) shall be increased by 6.25% and (2) clauses (b) and (c) shall be increased by 5.0%.

"<u>Permitted Vessel Liens</u>" means the Liens permitted pursuant to clauses (b), (d), (k), (l), (r) and (oo) of Section 6.02 and the Liens on the Material Vessels and Additional Collateral Vessels securing obligations under the Prepetition Credit Facilities.

"<u>Person</u>" means any natural person, corporation, limited liability company, unlimited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"<u>Petition Date</u>" means February 21, 2024

"<u>Plan</u>" means any employee pension benefit plan (other than a Multiemployer Plan) that (i) is subject to the provisions of Title IV of ERISA or Section 412 of the Code or Section 302 of ERISA and (ii) is, or in the last six years has been, sponsored or maintained or contributed to (or to which there is, or was, an obligation to contribute) by any Borrower or any ERISA Affiliate.

"<u>Plan of Reorganization</u>" means a plan of reorganization with respect to the Loan Parties and their Subsidiaries pursuant to the Chapter 11 Cases or a plan of arrangement pursuant to any other Debtor Relief Laws.

"<u>Platform</u>" means Syndtrak® or another similar electronic system to which the Administrative Agent will post Borrower Materials to be made available to the Lenders.

"<u>PPSA</u>" means the *Personal Property Security Act (Ontario)*, including the regulations thereto, as in effect from time to time and any statute substituted therefor and any amendments thereto, provided that, if perfection or the effect of perfection or non-perfection or the priority of any Lien created hereunder or under any other Loan Document in respect of the Collateral is governed by the personal property security legislation or other applicable legislation with respect to personal property security in effect in a province or other jurisdiction other than Ontario, "PPSA" means the Personal Property Security Act or such other applicable legislation in effect from time to time in such other jurisdiction for purposes of the provisions hereof relating to such perfection, effect of perfection or non-perfection or priority.

"<u>Prepayment Notice</u>" means a written notice delivered by the Borrowers for a repayment or prepayment in a form reasonably acceptable to the Administrative Agent and the Borrowers (it being agreed that Exhibit O of the Prepetition Super Senior Credit Agreement is reasonably acceptable to the Administrative Agent and the Borrowers) delivered in accordance with Section 2.10(d) or Section 2.11(i).

"<u>Prepetition Collateral</u>" has the meaning specified in the Bankruptcy Court DIP Order.

"<u>Prepetition Credit Agreements</u>" means the Prepetition First Lien Credit Agreement, the Prepetition Super Senior Credit Agreement, the Prepetition Incremental Super Senior Credit Agreement and the Prepetition Revolving Credit Agreement.

"<u>Prepetition Credit Facilities</u>" means the loans and other obligations outstanding under the Prepetition Credit Agreements.

"<u>Prepetition Credit Facility Loan Documents</u>" shall mean (i) the Prepetition First Lien Credit Agreement and the other "Loan Documents" under and as defined in the Prepetition First Lien Credit Agreement (as in effect on the Closing Date), as each such document may be amended, restated, supplemented or otherwise modified from time to time, (ii) the Prepetition Super Senior Credit Agreement and the other "Loan Documents" under and as defined in the Prepetition Super Senior Credit Agreement (as in effect on the Closing Date), as each such document may be amended, restated, supplemented or otherwise modified from time to time, (iii) the Prepetition Incremental Super Senior Credit Agreement and the other "Loan Documents" under and as defined in the Prepetition Incremental

Super Senior Credit Agreement (as in effect on the Closing Date), as each such document may be amended, restated, supplemented or otherwise modified from time to time and (iv) the Prepetition Revolving Credit Agreement and the other "Loan Documents" under and as defined in the Prepetition Revolving Credit Agreement (as in effect on the Closing Date), as each such document may be amended, restated, supplemented or otherwise modified from time to time.

"Prepetition First Liens" has the meaning specified in the Bankruptcy Court DIP Order.

"Prepetition First Lien Agent" means GLAS (as successor to UBS AG, Stamford Branch), in its capacity as administrative agent and collateral agent under the Prepetition First Lien Credit Agreement.

"Prepetition First Lien Credit Agreement" means that certain Credit Agreement dated as of April 27, 2018, among the Parents, the Borrowers, the Prepetition First Lien Agent and the lenders and issuing banks party thereto from time to time as amended, restated, supplemented or otherwise modified from time to time.

"Prepetition Incremental Superpriority Collateral" has the meaning specified in the Bankruptcy Court DIP Order.

"Prepetition Incremental Superpriority Liens" has the meaning specified in the Bankruptcy Court DIP Order.

"Prepetition Incremental Superpriority Obligations" has the meaning specified in the Bankruptcy Court DIP Order.

"Prepetition Incremental Super Senior Agent" means Alter Domus, in its capacity as administrative agent, incremental term loan representative and collateral agent under the Prepetition Incremental Super Senior Credit Agreement.

"Prepetition Incremental Super Senior Credit Agreement" means that certain Incremental Superpriority Credit Agreement dated as of November 17, 2023, among the Parents, the Borrowers, the Prepetition Incremental Super Senior Agent and the lenders and issuing banks party thereto from time to time as amended, restated, supplemented or otherwise modified from time to time.

"Prepetition Incremental Super Senior Loans" means the Loans made under the Prepetition Incremental Super Senior Credit Agreement.

"Prepetition Obligations" means the "Obligations" under the Prepetition Credit Facilities.

"Prepetition Permitted Senior Liens" has the meaning specified in the Bankruptcy Court DIP Order.

"Prepetition Revolving Agent" means UBS AG, Stamford Branch, in its capacity as administrative agent and collateral agent under the Prepetition Revolving Credit Agreement.

"Prepetition Revolving Credit Agreement" means that certain Credit Agreement dated as of May 13, 2020, among the Parents, the Borrowers, the Prepetition Revolving Agent and the lenders and issuing banks party thereto from time to time as amended, restated, supplemented or otherwise modified from time to time.

"Prepetition Revolving Obligations" has the meaning specified in the Bankruptcy Court DIP Order.

"Prepetition Revolving Loan Documents" shall mean the Prepetition Revolving Credit Agreement and the other "Loan Documents" under and as defined in the Prepetition Revolving Credit Agreement (as in effect on the Closing Date), as each such document may be amended, restated, supplemented or otherwise modified from time to time.

"Prepetition Superpriority Collateral" has the meaning specified in the Bankruptcy Court DIP Order.

38

"Prepetition Superpriority Liens" has the meaning specified in the Bankruptcy Court DIP Order.

"Prepetition Superpriority Obligations" has the meaning specified in the Bankruptcy Court DIP Order.

"Prepetition Super Senior Agent" means Alter Domus, in its capacity as administrative agent and collateral agent under the Prepetition Super Senior Credit Agreement.

"Prepetition Super Senior Credit Agreement" means that certain Superpriority Credit Agreement dated as of November 10, 2020, among the Parents, the Borrowers, the Prepetition Super Senior Agent and the lenders and issuing banks party thereto from time to time as amended, restated, supplemented or otherwise modified from time to time prior to the Petition Date.

"Prime Rate" means the rate of interest last quoted by *The Wall Street Journal* as the "Prime Rate" in the U.S. or, if *The Wall Street Journal* ceases to quote such rate, the highest per annum interest rate published by the Board in Federal Reserve Statistical Release H.15 (519) (Selected Interest Rates) as the "bank prime loan" rate or, if such rate is no longer quoted therein, any similar rate quoted therein (as determined by the Administrative Agent (acting at the direction of the Required Lenders)) or any similar release by the Board (as determined by the Administrative Agent (acting at the direction of the Required Lenders)).  The Prime Rate is a reference rate and does not necessarily represent the lowest or best rate actually charged to any customer.  The Administrative Agent or any Lender may make commercial loans or other loans at rates of interest at, above or below the Prime Rate.  Any change in the Prime Rate shall take effect at the opening of business on the day specified in the public announcement of such change.

"Pro Forma Basis" means, as to any person, for any events as described below that occur subsequent to the commencement of a period for which the financial effect of such events is being calculated, and giving effect to the events for which such calculation is being made, such calculation as will give pro forma effect to such events as if such events occurred on the first day of the four consecutive fiscal quarter period ended on or before the occurrence of such event (the "Reference Period"):  (i) pro forma effect shall be given to any Disposition, any acquisition, Investment, capital expenditure, construction, repair, replacement, improvement, development, disposition, merger, amalgamation, consolidation (including the Transactions) (or any similar transaction or transactions not otherwise permitted under Section 6.04 or 6.05 that require a waiver or consent of the Required Lenders and such waiver or consent has been obtained), any dividend, distribution or other similar payment, New Project and any restructurings of the business of any Borrower or any of its Subsidiaries that such Borrower or any of its Subsidiaries has determined to make and/or made and are expected to have a continuing impact and are factually supportable, which would include cost savings resulting from head count reduction, closure of facilities and similar operational and other cost savings, which adjustments the Borrowers determine in good faith are reasonably identifiable and factually supportable and which the Borrowers reasonably expect to realize within 12 months of the date of taking such action as set forth in a certificate of a Financial Officer of the Borrowers (the foregoing, together with any transactions related thereto or in connection therewith, the "relevant transactions"), in each case that occurred during the Reference Period (or, in the case of determinations made pursuant to Article II or Article VI (other than Section 6.11), occurring during the Reference Period or thereafter and through and including the date upon which the relevant transaction is consummated) and (ii) in making any determination on a Pro Forma Basis, (x) all Indebtedness (including Indebtedness issued, incurred or assumed as a result of, or to finance, any relevant transactions and for which the financial effect is being calculated, whether incurred under this Agreement or otherwise, but excluding normal fluctuations in revolving Indebtedness incurred for working capital purposes and not to finance any acquisition) issued, incurred, assumed or permanently repaid during the Reference Period (or, in the case of determinations made pursuant to Article II or Article VI (other than Section 6.11), occurring during the Reference Period or thereafter and through and including the date upon which the relevant transaction is consummated) shall be deemed to have been issued, incurred, assumed or permanently repaid at the beginning of such period, (y) Interest Expense of such person attributable to interest on any Indebtedness, for which pro forma effect is being given as provided in the preceding clause (x), bearing floating interest rates shall be computed on a pro forma basis as if the rates that would have been in effect during the period for which pro forma effect is being given had been actually in effect during such periods and (z) in giving effect to clause (i) above with respect to each New Project which commences operations and records not less than one full fiscal quarter's operations during the Reference Period, the operating results of such New Project shall be annualized on a straight line basis during such period, taking into account any seasonality adjustments determined by the Borrowers in good faith.

Pro forma calculations made pursuant to the definition of the term "Pro Forma Basis" shall be determined in good faith by a Responsible Officer of each Borrower and may include adjustments to reflect (1) operating expense reductions and other operating improvements, synergies or cost savings reasonably expected to result from any relevant pro forma event (including, to the extent applicable, the Transactions), which adjustments the Borrowers determine in good faith are reasonably identifiable and factually supportable and which the Borrowers reasonably expect to realize within 12 months of the date of the taking of any applicable action as set forth in a certificate of a Financial Officer of the Borrowers and (2) [reserved]; provided that (x) the adjustments referred to in clause (1) above shall be calculated net of the amount of actual benefits realized during the applicable period and (y) in no event shall the aggregate amount added back to EBITDA pursuant to clause (1) above, plus any amounts included in calculating EBITDA pursuant to subclauses (iv), (vi), (x) and (xiii) of clause (a) of the definition thereof plus any amounts included in EBITDA by virtue of clause (i) of the definition of Consolidated Net Income, in any applicable period exceed 25% of EBITDA in such period (calculated after giving effect to such capped and other uncapped adjustments).

For purposes of this definition, any amount in a currency other than Dollars will be converted to Dollars based on the average exchange rate for such currency for the most recent twelve-month period immediately prior to the date of determination in a manner consistent with that used in calculating EBITDA for the applicable period.

"Professional Fees" shall mean all unpaid fees and expenses incurred by Professional Persons.

"Professional Persons" shall mean (i) any persons or firms retained by the Loan Parties in connection with this Agreement, the Chapter 11 Cases and the transactions contemplated hereby, (ii) the Information Officer and its counsel and (iii) any persons or firms retained by the Required Lenders and Agents in connection with entry into this Agreement, the Chapter 11 Cases and the transactions contemplated hereby.

"Proposed Change" has the meaning assigned to such term in Section 9.02(c).

"Public Lender" means any Lender that does not wish to receive material non-public information (or, in the case of a company that is not a public-reporting company, material information of a type that would not be reasonably expected to be publicly available if such company were a public-reporting company) with respect to the Parents, the Borrowers or their Subsidiaries or any of their respective securities.

"QFC" shall have the meaning assigned to the term "qualified financial contract" in, and shall be interpreted in accordance with, 12 U.S.C. 5390(c)(8)(D).

"QFC Credit Support" shall have the meaning assigned to it in Section 9.20.

"Qualified Equity Interests" means Equity Interests other than Disqualified Stock.

"Real Property" means, collectively, all right, title and interest (including any leasehold estate) in and to any and all parcels of or interests in real property owned in fee or leased by any Loan Party, whether by lease, license, or other means, together with, in each case, all easements, hereditaments and appurtenances relating thereto, all improvements and appurtenant fixtures and equipment, incidental to the ownership, lease or operation thereof.

"Register" has the meaning assigned to such term in Section 9.04(b)(iv).

"Related Fund" means, with respect to any Lender, any Affiliates or designees of such Lender, or any of its or their managed or advised funds or accounts.

"Related Parties" means, with respect to any specified Person, such Person's Controlled or Controlling Affiliates and the respective partners, directors, officers, employees, trustees, agents, advisors and members of such Person and of such Person's Controlled or Controlling Affiliates and permitted successors and assigns.

"<u>Release</u>" means any spilling, leaking, seepage, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, disposing, depositing, emanating or migrating in, into, onto or through the Environment.

"<u>Reportable Event</u>" means any reportable event as defined in Section 4043(c) of ERISA or the regulations issued thereunder, other than those events as to which the 30-day notice period referred to in Section 4043(c) of ERISA has been waived, with respect to a Plan.

"<u>Required Lenders</u>" means, at any time, Lenders having Loans outstanding that, taken together, represent more than 50% of the sum of all Loans outstanding at such time; <u>provided</u>, that the Loans of any Defaulting Lender shall be disregarded in determining Required Lenders at any time.

"<u>Required Lenders' Advisors</u>" means the advisors to the Required Lenders consisting of Perella Weinberg Partners, FTI Consulting, Inc., and Milbank LLP.

"<u>Requirements of Law</u>" means, with respect to any Person, any statutes, laws, treaties, rules, regulations, orders, decrees, writs, injunctions, official administrative guidance or determinations of any arbitrator or court or other Governmental Authority, in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"<u>Resolution Authority</u>" means an EEA Resolution Authority or, with respect to any UK Financial Institution, a UK Resolution Authority.

"<u>Responsible Officer</u>" means the chief executive officer, president, vice president, chief financial officer, treasurer or assistant treasurer, or other similar officer, manager or a director of a Loan Party and with respect to certain limited liability companies or partnerships that do not have officers, any manager, sole member, managing member or general partner thereof, and as to any document delivered on or prior to the Closing Date or thereafter pursuant to paragraph (a)(i) of the definition of the term "Collateral and Guarantee Requirement," any secretary or assistant secretary of a Loan Party.  Any document delivered hereunder that is signed by a Responsible Officer of a Loan Party shall be conclusively presumed to have been authorized by all necessary corporate, partnership and/or other action on the part of such Loan Party and such Responsible Officer shall be conclusively presumed to have acted on behalf of such Loan Party.

"<u>Restricted Payment</u>" has the meaning assigned to such term in Section 6.06.  The amount of any Restricted Payment made other than in the form of cash or cash equivalents shall be the fair market value thereof (as reasonably determined by the Borrowers in good faith).

"<u>Restructuring Support Agreement</u>" means that certain Restructuring Support Agreement, dated as of the Petition Date (as amended and supplemented from time to time), between the Loan Parties and the other parties party thereto.

"<u>Revolving Adequate Protection Liens</u>" has the meaning specified in the Bankruptcy Court DIP Order.

"<u>S&P</u>" means Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc., and any successor to its rating agency business.

"<u>SEC</u>" means the Securities and Exchange Commission or any Governmental Authority succeeding to any of its principal functions.

"<u>Secured Parties</u>" means, collectively, the Administrative Agent, the Collateral Agent, each Lender and each sub-agent appointed pursuant to Section 8.05 by the Administrative Agent or the Collateral Agent and, as the context may require, each other holder of, or obligee in respect of, any Secured Obligations (as defined in the Collateral Agreement).

"<u>Securities Act</u>" means the Securities Act of 1933, as amended.

41

"Security Documents" means the Bankruptcy Court DIP Orders, the Mortgages and the Canadian Mortgages (as defined in the Canadian Collateral Agreement) (and, where applicable, any deed of covenants collateral thereto), the Collateral Agreement, the Australian Specific Security Deed, the IP Security Agreements (as defined in the Collateral Agreement), the Canadian Collateral Agreement, each Account Control Agreement, the Assignments of Freights and Hires, the Assignments of Insurances, the UK Collateral Documents  and each of the security agreements, pledge agreements and other instruments and documents executed and delivered in connection with this Agreement.

"Senior DIP Credit Agreement" means that certain Senior Secured Superpriority Debtor-in-Possession Credit Agreement dated as of February 21, 2024, among the Parents, the Borrowers, GLAS and the lenders party thereto from time to time as amended, restated, supplemented or otherwise modified from time to time in accordance with this Agreement.

"Senior DIP Loan Documents" shall mean the Senior DIP Credit Agreement and the other "Loan Documents" under and as defined in the Senior DIP Credit Agreement (as in effect on the Closing Date), as each such document may be amended, restated, supplemented or otherwise modified from time to time.

"Senior DIP Credit Agreement Obligations" means the "Obligations" under and as defined in the Senior DIP Credit Agreement.

"Senior ICA Provisions" means paragraphs 7(a)-(j) of the Interim DIP Order and the corresponding provisions in the Final DIP Order.

"SOFR" means a rate equal to the secured overnight financing rate as administered by the SOFR Administrator.

"SOFR Administrator" means the Federal Reserve Bank of New York (or a successor administrator of the secured overnight financing rate).

"Special Flood Hazard Area" has the meaning assigned to such term in Section 5.06(b).

"Sponsor(s)" means Crestview Advisors, L.L.C., one or more investment funds controlled by Crestview Advisors, L.L.C. and any of their respective Affiliates, including (other than solely where the term "Sponsor" is used in the definition of "Co-Investor") any Controlled portfolio companies.

"subsidiary" means, with respect to any Person (the "parent") at any date, any corporation, limited liability company, partnership, association or other entity the accounts of which would be consolidated with those of the parent in the parent's consolidated financial statements if such financial statements were prepared in accordance with GAAP, as well as any other corporation, limited liability company, partnership, association or other entity (a) of which securities or other ownership interests representing more than 50% of the equity or more than 50% of the ordinary voting power or, in the case of a partnership, more than 50% of the general partnership interests are, as of such date, owned, controlled or held, or (b) that is, as of such date, otherwise Controlled by the parent or one or more subsidiaries of the parent or by the parent and one or more subsidiaries of the parent.

"Subsidiary" means, unless the context otherwise requires, (i) a subsidiary of any Borrower or the Borrowers and (ii) each of JB TopCo and HB Topco, it being agreed and acknowledged that a reference to the "Borrowers and their Subsidiaries" shall not include a reference to JB TopCo and its Subsidiaries.

"Subsidiary Loan Party" means (i) each Subsidiary of any Borrower that is not an Excluded Subsidiary and (ii) JB Topco.

"Supported QFC" shall have the meaning assigned to such term in Section 9.20.

"Superpriority 507(b) Claim" has the meaning specified in the Bankruptcy Court DIP Order.

"Superpriority Adequate Protection Liens" has the meaning specified in the Bankruptcy Court DIP Order.

"Superpriority Intercreditor Agreement" means the Amended and Restated Superpriority Intercreditor Agreement, dated on or about November 17, 2023, among the Prepetition Incremental Super Senior Agent, Prepetition Super Senior Agent, the Prepetition First Lien Agent, the Prepetition Revolving Agent and the Loan Parties from time to time party thereto.

"Tax and Trust Funds" means any cash or cash equivalents maintained in or credited to any deposit account or securities account that are comprised solely of, (a) funds specifically and exclusively used or to be used for payroll and payroll taxes and other employee benefit payments to or for the benefit of any employees of Parents and any of their Subsidiaries, (b) funds specifically and exclusively used or to be used to pay all Taxes required to be collected, remitted or withheld (including withholding Taxes (including the employer's share thereof)) and (c) any other funds which any Loan Party is permitted or otherwise not prohibited by the terms of this Agreement to hold as an escrow or fiduciary for the benefit of another person (that is not a Loan Party), including, for the avoidance of doubt, any customer deposits.

"Taxes" means any and all present or future taxes, duties, levies, imposts, assessments, deductions, withholdings (including backup withholding), fees or other similar charges imposed by any Governmental Authority, and any interest, fines, penalties or additions to tax with respect to the foregoing.

"Term Lender" means, each party to this Agreement with a Term Loan Commitment on the date hereof.

"Term Loan Commitments" means the commitment of a Lender to make Term Loans, including Initial Term Loans and/or Delayed Draw Term Loans.

"Term Loans" means (a) the Initial Term Loans, (b) Delayed Draw Term Loans and (c) the Bridge Refinancing Loans.

"Term SOFR" means:

(a)     for any calculation with respect to a Term SOFR Loan, the Term SOFR Reference Rate for a tenor comparable to the applicable Interest Period on the day (such day, the "Periodic Term SOFR Determination Day") that is two (2) U.S. Government Securities Business Days prior to the first day of such Interest Period, as such rate is published by the Term SOFR Administrator; provided, however, that if as of 5:00 p.m. (New York City time) on any Periodic Term SOFR Determination Day the Term SOFR Reference Rate for the applicable tenor has not been published by the Term SOFR Administrator and a Benchmark Replacement Date with respect to the Term SOFR Reference Rate has not occurred, then Term SOFR will be the Term SOFR Reference Rate for such tenor as published by the Term SOFR Administrator on the first preceding U.S. Government Securities Business Day for which such Term SOFR Reference Rate for such tenor was published by the Term SOFR Administrator so long as such first preceding U.S. Government Securities Business Day is not more than three (3) U.S. Government Securities Business Days prior to such Periodic Term SOFR Determination Day, and

(b)     for any calculation with respect to an ABR Loan on any day, the Term SOFR Reference Rate for a tenor of one month on the day (such day, the "ABR Term SOFR Determination Day") that is two (2) U.S. Government Securities Business Days prior to such day, as such rate is published by the Term SOFR Administrator; provided, however, that if as of 5:00 p.m. (New York City time) on any ABR Term SOFR Determination Day the Term SOFR Reference Rate for the applicable tenor has not been published by the Term SOFR Administrator and a Benchmark Replacement Date with respect to the Term SOFR Reference Rate has not occurred, then Term SOFR will be the Term SOFR Reference Rate for such tenor as published by the Term SOFR Administrator on the first preceding U.S. Government Securities Business Day for which such Term SOFR Reference Rate for such tenor was published by the Term SOFR Administrator so long as such first preceding U.S. Government Securities Business Day is not more than three (3) U.S. Government Securities Business Days prior to such ABR Term SOFR Determination Day.

"Term SOFR Adjustment" means, for any calculation with respect to an ABR Loan or a Term SOFR Loan, a percentage per annum as set forth below for the applicable Type of such Loan and (if applicable) Interest Period therefor:

ABR Loans:

| 0.11448% |
|---|

SOFR Loans:

| Interest Period | Percentage |
|---|---|
| One month | 0.11448 % |
| Three months | 0.26161% |
| Six months | 0.42826% |

"Term SOFR Administrator" means CME Group Benchmark Administration Limited (CBA) (or a successor administrator of the Term SOFR Reference Rate selected by the Administrative Agent (acting at the direction of the Required Lenders) in its reasonable discretion).

"Term SOFR Borrowing" means a Borrowing comprised of Term SOFR Loans.

"Term SOFR Loan" means any Term SOFR Term Loan.

"Term SOFR Reference Rate" means the forward-looking term rate based on SOFR.

"Term SOFR Term Loan" means any Term Loan bearing interest at a rate determined by reference to Adjusted Term SOFR in accordance with the provisions of Article II other than pursuant to clause (c) of the definition of "Alternate Base Rate".

"Termination Date" has the meaning assigned to such term in the first paragraph of Article V.

"Third Party Funds" means any segregated accounts or funds, or any portion thereof, received by any Loan Party or any of its Subsidiaries as agent on behalf of third parties (other than a Loan Party) in accordance with a written agreement that imposes a duty upon such Loan Party or one or more of its Subsidiaries to collect and remit those funds to such third parties.

"Transaction Documents" means this Agreement and the other Loan Documents.

"Transaction Expenses" means any fees or expenses incurred or paid by any Borrower or any of its Subsidiaries or any of their Affiliates in connection with the Transactions, this Agreement and the other Loan Documents and the transactions contemplated hereby and thereby.

"Transactions" means, collectively, the transactions to occur pursuant to the Transaction Documents, including (a) the Chapter 11 Cases; (b) the execution, delivery and performance of the Transaction Documents, the creation of the Liens pursuant to the Security Documents, and the borrowings hereunder; and (c) the payment of the Transaction Expenses.

"Trust Property" means (a) the security, powers, rights, titles, benefits and interests (both present and future) constituted by and conferred on the Collateral Agent under or pursuant to the Mortgages on the Material Vessels and the Additional Collateral Vessels (including the benefits of all covenants, undertakings, representations, warranties and obligations given, made or undertaken to the Collateral Agent in such Mortgages (and, where applicable, any deed of covenants collateral thereto)), (b) all moneys, property and other assets paid or transferred to or vested in the Collateral Agent, or any agent of the Collateral Agent whether from any Loan Party or any other Person, and (c) all money, investments, property and other assets at any time representing or deriving from any of the foregoing, including all interest, income and other sums at any time received or receivable by the Collateral Agent or any agent of the Collateral Agent in respect of the same (or any part thereof) and all proceeds of the foregoing.

44

"<u>Type</u>" when used in reference to any Loan or Borrowing, refers to whether the rate of interest on such Loan, or on the Loans comprising such Borrowing, is determined by reference to the Term SOFR or the Alternate Base Rate.

"<u>UK Collateral Documents</u>" means any Security Document entered into governed by the law of England & Wales.

"<u>UK Financial Institution</u>" means any BRRD Undertaking (as such term is defined under the PRA Rulebook (as amended from time to time) promulgated by the United Kingdom Prudential Regulation Authority) or any person subject to IFPRU 11.6 of the FCA Handbook (as amended from time to time) promulgated by the United Kingdom Financial Conduct Authority, which includes certain credit institutions and investment firms, and certain affiliates of such credit institutions or investment firms.

"<u>UK Loan Parties</u>" means each Subsidiary Loan Party organized under the laws of England and Wales.

"<u>UK Resolution Authority</u>" means the Bank of England or any other public administrative authority having responsibility for the resolution of any UK Financial Institution.

"<u>Unadjusted Benchmark Replacement</u>" means the applicable Benchmark Replacement excluding the related Benchmark Replacement Adjustment.

"<u>Unencumbered Property</u>" has the meaning specified in the Bankruptcy Court DIP Order.

"<u>United States Tax Compliance Certificate</u>" has the meaning specified in Section 2.17(e).

"<u>Unrestricted Cash</u>" means cash or cash equivalents of any Borrower or any of its Subsidiaries that would not appear as "restricted" on a consolidated balance sheet of any Borrower or any of its Subsidiaries.

"<u>U.S. Government Securities Business Day</u>" means any day except for (a) a Saturday, (b) a Sunday or (c) a day on which the Securities Industry and Financial Markets Association recommends that the fixed income departments of its members be closed for the entire day for purposes of trading in United States government securities.

"<u>U.S. Special Resolution Regime</u>" shall have the meaning assigned to it in Section 9.20.

"<u>USA PATRIOT Act</u>" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, as amended from time to time.

"<u>Variance Report</u>" has the meaning specified in Section 5.01(k).

"<u>Vessels</u>" means, collectively, the vessels owned by any Loan Party, together with, in each case, all owned improvements and appurtenant fixtures and equipment, incidental to the ownership or operation thereof.

"<u>Wholly Owned Subsidiary</u>" means, with respect to any Person at any date, a subsidiary of such Person, all of the Equity Interests of which (other than directors' qualifying shares or nominee or other similar shares required pursuant to applicable law) are owned by such Person or another Wholly Owned Subsidiary of such person. Unless the context otherwise requires, "Wholly Owned Subsidiary" means a Subsidiary of any Borrower that is a Wholly Owned Subsidiary of such Borrower.

"<u>Withdrawal Liability</u>" means liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in Part I of Subtitle E of Title IV of ERISA.

"<u>Working Capital</u>" means, with respect to the Borrowers and their Subsidiaries on a consolidated basis at any date of determination, Current Assets at such date of determination <u>minus</u> Current Liabilities at such date of determination; <u>provided</u>, that, for purposes of calculating Excess Cash Flow, increases or decreases in Working

Capital shall be calculated without regard to any changes in Current Assets or Current Liabilities as a result of (a) any reclassification in accordance with GAAP of assets or liabilities, as applicable, between current and noncurrent or (b) the effects of acquisition method accounting.

"Write-Down and Conversion Powers" means, (a) with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule., and (b) with respect to the United Kingdom, any powers of the applicable Resolution Authority under the Bail-In Legislation to cancel, reduce, modify or change the form of a liability of any UK Financial Institution or any contract or instrument under which that liability arises, to convert all or part of that liability into shares, securities or obligations of that person or any other person, to provide that any such contract or instrument is to have effect as if a right had been exercised under it or to suspend any obligation in respect of that liability or any of the powers under that Bail-In Legislation that are related to or ancillary to any of those powers.

Section 1.02     Classification of Loans and Borrowings.  For purposes of this Agreement, Loans may be classified and referred to by Type (e.g., a "Term SOFR Loan") or as either Initial Term Loans, Delayed Draw Term Loans, or Bridge Refinancing Loans.  Borrowings also may be classified and referred to by Class (e.g., a "Initial Term Loans Borrowing" or "Delayed Draw Term Loan Borrowing").

Section 1.03     Terms Generally.  The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation."  The word "will" shall be construed to have the same meaning and effect as the word "shall."  Unless the context requires otherwise, (a) any definition of or reference to any agreement (including this Agreement and the other Loan Documents), instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, amended and restated, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein), (b) any reference herein to any Person shall be construed to include such Person's successors and assigns (subject to any restrictions on assignment set forth herein) and, in the case of any Governmental Authority, any other Governmental Authority that shall have succeeded to any or all functions thereof, (c) the words "herein," "hereof" and "hereunder," and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (d) all references herein to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, this Agreement and (e) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.  Unless otherwise expressly provided herein, any reference to any person shall be construed to include such person's successors and permitted assigns.

Section 1.04     Accounting Terms; GAAP.  Except as otherwise expressly provided herein, all terms of an accounting or financial nature shall be construed in accordance with GAAP, as in effect from time to time; provided, however, that if the Borrowers notify the Administrative Agent that the Borrowers request an amendment to any provision (including any definitions) hereof to eliminate the effect of any change occurring after the Closing Date in GAAP or in the application thereof on the operation of such provision (or if the Administrative Agent notifies the Borrowers that the Required Lenders request an amendment to any provision hereof for such purpose), regardless of whether any such notice is given before or after such change in GAAP or in the application thereof, then such provision shall be interpreted on the basis of GAAP as in effect and applied immediately before such change shall have become effective until such notice shall have been withdrawn or such provision amended in accordance herewith.  Notwithstanding any other provision contained herein, all terms of an accounting or financial nature used herein shall be construed, and all computations of amounts and ratios referred to herein shall be made, without giving effect to any election under Financial Accounting Standards Accounting Standards Codification No. 825—Financial Instruments, or any successor thereto (including pursuant to the Accounting Standards Codification), to value any Indebtedness of any Parent, any Borrower or any Subsidiary at "fair value" as defined therein.

Section 1.05     Effectuation of Transactions.  All references herein to any Parent, any Borrower and the other Subsidiaries shall be deemed to be references to such Persons, and all the representations and warranties of the

Parents, the Borrowers and the other Loan Parties contained in this Agreement and the other Loan Documents shall be deemed made, in each case, after giving effect to the Transactions to occur on the Closing Date, unless the context otherwise requires.

Section 1.06    Exchange Rates; Currency Equivalents.  Except for purposes of financial statements delivered hereunder or except as otherwise provided herein, the applicable amount of any currency (other than Dollars) for purposes of the Loan Documents shall be such Dollar Equivalent amount as determined by the Administrative Agent (acting at the direction of the Required Lenders) in accordance with this Agreement.  No Default or Event of Default shall arise as a result of any limitation or threshold set forth in Dollars in Article VI or clause (f), (g) or (j) of Section 7.01 being exceeded solely as a result of changes in currency exchange rates from those rates applicable on the first day of the fiscal quarter in which such determination occurs or in respect of which such determination is being made.

Section 1.07    [Reserved].

Section 1.08    [Reserved].

Section 1.09    Timing of Payment or Performance.  Except as otherwise expressly provided herein, when the payment of any obligation or the performance of any covenant, duty or obligation is stated to be due or performance required on a day which is not a Business Day, the date of such payment or performance shall extend to the immediately succeeding Business Day.

Section 1.10    Times of Day.  Unless otherwise specified herein, all references herein to times of day shall be references to New York City time (daylight or standard, as applicable).

## ARTICLE II
## THE CREDITS

Section 2.01    Loans Commitments.  Subject to the terms and conditions set forth herein, in the Bankruptcy Court DIP Orders and the Canadian DIP Recognition Order:

(a)    Each Lender severally agrees to make new term loans to the Borrowers denominated in Dollars on the applicable borrowing date in an amount equal to such Lender's Initial Term Loan Commitment.  The Initial Term Loan Commitments shall be funded upon the Bankruptcy Court's entry of the Interim DIP Order in an aggregate principal amount equal to such Lenders Initial Term Loan Commitment.  The Initial Term Loan Commitments in respect of the Initial Term Loans shall terminate automatically immediately after the making of the Initial Term Loans.  Amounts borrowed under this Section 2.01(a) and repaid or prepaid may not be reborrowed.  Proceeds of the Initial Term Loans shall be deposited in the DIP Funding Account (other than a portion of which may be directly funded to one or more operating accounts of the Borrowers with the consent of the Required Lenders) and used solely as permitted herein.

(b)    Each Lender agrees to advance the Delayed Draw Term Loan Commitment in Dollars to the Borrowers (each a "Delayed Draw Term Loans") during the Delayed Draw Term Loan Availability Period.  Amounts of Delayed Draw Term Loans borrowed under this Section 2.01 that are repaid or prepaid may not be reborrowed.  Proceeds of the Delayed Draw Term Loans shall be deposited in the DIP Funding Account (other than a portion of which may be directly funded to one or more operating accounts of the Borrowers with the consent of the Required Lenders) and used solely as permitted herein.

(c)    Upon entry of the Interim DIP Order,

(i)    each Lender that holds a Bridge Refinancing Commitment shall be deemed to make Bridge Refinancing Loans in an aggregate amount equal to such Lender's Bridge Refinancing Commitment and such Prepetition Incremental Superpriority Obligations held by such Bridge Refinancing Lender (and its Related Funds) under the Prepetition Incremental Super Senior Credit Agreement shall be substituted and exchanged for (and prepaid by) such Bridge Refinancing Loans, and

47

(ii)       each Lender that holds a Closing Date Purchase Commitment shall, simultaneously with the deemed funding of Bridge Refinancing Loans, fund an amount equal to such Lender's Closing Date Purchase Commitment, which shall be applied as a purchase (at a purchase price equal to the percentage equal to 1 divided by 1.04) , by such Lender of a ratable portion of the Bridge Refinancing Loans held by each Bridge Refinancing Lender after making the Bridge Refinancing Loans pursuant to the forgoing clause (i) and, at the election of any Bridge Refinancing Lender, the purchase price payable thereto shall be netted against the funding obligations (if any) of such Bridge Refinancing Lender (or its Related Funds) on such date under this Agreement (with any excess proceeds thereof being distributed to the applicable Bridge Refinancing Lender).

(d)       To effect the borrowings and payments pursuant the foregoing clause (a) and (c), the related transfers of funds shall, at the election of any Bridge Refinancing Lender or its Related Funds, be netted to the extent necessary to minimize the actual flows of funds between the relevant parties.

(e)       All Loans and all other Obligations owing hereunder with respect to the Loans shall be paid in full not later than the Maturity Date.

Section 2.02       <u>Loans and Borrowings</u>.

(a)       Each Loan shall be made as part of a Borrowing consisting of Loans of the same Type and in the same currency made by the Lenders ratably in accordance with their respective Commitments.  The failure of any Lender to make any Loan required to be made by it shall not relieve any other Lender of its obligations hereunder, <u>provided</u> that the Commitments of the Lenders are several and other than as expressly provided herein with respect to a Defaulting Lender, no Lender shall be responsible for any other Lender's failure to make Loans as required hereby.

(b)       Subject to Section 2.14, each Borrowing shall be comprised entirely of ABR Loans or Term SOFR Loans as the Borrowers may request in accordance herewith; <u>provided</u> that (i) all Borrowings denominated in a currency other than Dollars shall be comprised of Term SOFR Loans and (ii) ABR Loans shall be denominated in Dollars.  Each Lender at its option may make any ABR Loan or Term SOFR Loan by causing any domestic or foreign branch or Affiliate of such Lender to make such Loan; <u>provided</u>, that any exercise of such option shall not affect the obligation of the Borrowers to repay such Loan in accordance with the terms of this Agreement and such Lender shall not be entitled to any amounts payable under Section 2.15 or 2.17 solely in respect of increased costs resulting from such exercise.

Section 2.03       <u>Requests for Borrowings</u>.  The Borrowing shall be made upon the Borrowers' irrevocable notice to the Administrative Agent in the form of a written Borrowing Request, not later than 11:00 a.m., Local Time three (3) Business Days before the date of the proposed Borrowing (unless in the case of a Borrowing to be made on the Closing Date, the Administrative Agent (acting at the direction of the Required Lenders) agrees to a shorter notice period).  Each such Borrowing Request shall be irrevocable.  Each Borrowing Request shall specify the following information:

(i)       whether the requested Borrowing is to be a Borrowing of Initial Term Loans or Delayed Draw Term Loans, as applicable;

(ii)       the aggregate amount of such Borrowing, which in the case of a Borrowing of Delayed Draw Term Loans, shall be in an aggregate principal amount of not less than $5,000,000 (or if less, the remaining undrawn amount of Delayed Draw Term Loan Commitments);

(iii)       the date of such Borrowing, which shall be a Business Day;

(iv)       whether such Borrowing is to be an ABR Borrowing or a Term SOFR Borrowing;

(v)       in the case of a Term SOFR Borrowing, the initial Interest Period to be applicable thereto, which shall be a period contemplated by the definition of the term "Interest Period"; and

48

(vi)      that as of the date of such Borrowing, the conditions set forth in Sections 4.01 or 4.02 (if applicable) are satisfied;

provided that, the Borrowers shall only be permitted to submit one Borrowing Request in respect of the Delayed Draw Term Loans every two weeks.

If no election as to the Type of Borrowing is specified as to any Borrowing, then the requested Borrowing shall be an ABR Borrowing.  If no Interest Period is specified with respect to any requested Term SOFR Borrowing, then the Interest Period shall be determined in accordance with clause (a) of the proviso to the definition of Interest Period. Promptly following receipt of a Borrowing Request in accordance with this Section 2.03, the Administrative Agent shall advise each Lender of the applicable Class of the details thereof and of the amount of such Lender's Loan to be made as part of the requested Borrowing.

Section 2.04      [Reserved].

Section 2.05      [Reserved].

Section 2.06      Funding of Borrowings.

(a)      Each Lender shall make each Term Loan to be made by it hereunder on the proposed date thereof by wire transfer of immediately available funds by 1:00 p.m. Local Time, to the Applicable Account of the Administrative Agent most recently designated by it for such purpose by notice to the Lenders.  Upon receipt of all requested funds, the Administrative Agent will make such Term Loans available to the Borrowers by promptly wire transferring the amounts so received, in like funds to an account of the Borrowers (or Borrower) designated by the Borrowers in the applicable Borrowing Request.

(b)      Unless the Administrative Agent shall have received notice from a Lender prior to the proposed date of any Borrowing that such Lender will not make available to the Administrative Agent such Lender's share of such Borrowing, the Administrative Agent may assume that such Lender has made such share available on such date in accordance with paragraph (a) of this Section and may, in reliance on such assumption and in its sole discretion, make available to the Borrowers (or Borrower) a corresponding amount.  In such event, if a Lender has not in fact made its share of the applicable Borrowing available to the Administrative Agent, then the applicable Lender agrees to pay to the Administrative Agent an amount equal to such share on demand of the Administrative Agent.  If such Lender does not pay such corresponding amount forthwith upon demand of the Administrative Agent therefor, the Administrative Agent shall promptly notify the Borrowers, and the Borrowers agree to pay such corresponding amount to the Administrative Agent forthwith on demand.  The Administrative Agent shall also be entitled to recover from such Lender or the Borrowers interest on such corresponding amount, for each day from and including the date such amount is made available to the Borrowers to but excluding the date of payment to the Administrative Agent, at (i) in the case of such Lender, the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation, or (ii) in the case of the Borrowers, the interest rate applicable to such Borrowing in accordance with Section 2.13.  If such Lender pays such amount to the Administrative Agent, then such amount shall constitute such Lender's Term Loan included in such Borrowing.

(c)      The obligations of the applicable Lenders hereunder to make the Term Loans and to make payments pursuant to Section 8.06 are several and not joint.  The failure of any Lender to make any Term Loan or to make any payment under Section 8.06 on any date required hereunder shall not relieve any other Lender of its corresponding obligation to do so on such date, and no Lender shall be responsible for the failure of any other Lender to so make its Term Loan or to make its payment under Section 8.06.

Section 2.07      Interest Elections.

(a)      Each Borrowing initially shall be of the Type specified in the applicable Borrowing Request or designated by Section 2.03 and, in the case of a Term SOFR Borrowing, shall have an initial Interest Period as specified in such Borrowing Request or designated by Section 2.03.  Thereafter, the Borrowers may elect to convert

such Borrowing to a different Type or to continue such Borrowing and, in the case of a Term SOFR Borrowing, may elect Interest Periods therefor, all as provided in this Section.  The Borrowers may elect different options with respect to different portions of the affected Borrowing, in which case each such portion shall be allocated ratably among the Lenders holding the Loans comprising such Borrowing, and the Loans comprising each such portion shall be considered a separate Borrowing.

(b)        To make an election pursuant to this Section, the Borrowers shall notify the Administrative Agent of such election in writing by the time that a Borrowing Request would be required under Section 2.03 if the Borrowers were requesting a Borrowing of the Type resulting from such election to be made on the effective date of such election.  Each such written Interest Election Request shall be irrevocable and shall be confirmed promptly by hand delivery or electronic means to the Administrative Agent of a written Interest Election Request in the form of Exhibit J and signed by the Borrowers.

(c)        Each Interest Election Request shall be in writing and shall specify the following information in compliance with Section 2.03:

(i)        the Borrowing to which such Interest Election Request applies and, if different options are being elected with respect to different portions thereof, the portions thereof to be allocated to each resulting Borrowing (in which case the information to be specified pursuant to clauses (iii) and (iv) below shall be specified for each resulting Borrowing);

(ii)        the effective date of the election made pursuant to such Interest Election Request, which shall be a Business Day;

(iii)        whether the resulting Borrowing is to be an ABR Borrowing or a Term SOFR Borrowing; and

(iv)        if the resulting Borrowing is to be a Term SOFR Borrowing, the Interest Period to be applicable thereto after giving effect to such election, which shall be a period contemplated by the definition of the term "Interest Period."

If any such Interest Election Request requests a Term SOFR Borrowing but does not specify an Interest Period, then the Borrowers shall be deemed to have selected an Interest Period of one month's duration.

(d)        If the Borrowers fail to deliver a timely Interest Election Request with respect to a Term SOFR Borrowing prior to the end of the Interest Period applicable thereto, then, unless such Borrowing is repaid as provided herein, at the end of such Interest Period such Borrowing shall be converted to an ABR Borrowing. Notwithstanding any contrary provision hereof, if an Event of Default has occurred and is continuing and the Administrative Agent, at the request of the Required Lenders, so notifies the Borrowers, then, so long as an Event of Default is continuing (i) no outstanding Borrowing denominated in Dollars may be converted to or continued as a Term SOFR Borrowing and (ii) unless repaid, each Term SOFR Borrowing shall be converted to an ABR Borrowing at the end of the applicable Interest Period.

Section 2.08        Termination of Commitments.

(a)        On the Closing Date (after giving effect to the funding of the Term Loans to be made on such date), the Initial Term Loan Commitments of each Lender as of the Closing Date shall automatically and irrevocably terminate.  For the avoidance of doubt, the Borrowers shall not have a right to terminate the Initial Term Loan Commitments prior to the Closing Date.

(b)        Each Lender's Delayed Draw Term Loan Commitment shall terminate in its entirety on the Delayed Draw Term Loan Commitment Termination Date. For the avoidance of doubt, the Borrowers shall not have a right to terminate the Delayed Draw Term Loan Commitments prior to the Delayed Draw Term Loan Commitment Termination Date.

Section 2.09        Repayment of Loans; Evidence of Debt.

(a)        Subject to the Senior ICA Provisions and the priorities set forth in the Bankruptcy Court DIP Order and the Canadian DIP Recognition Order, the Borrowers hereby unconditionally promise to pay to the Administrative Agent for the account of each Lender the then unpaid principal amount of each Term Loan of such Lender as provided in Section 2.10.

(b)        Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing the indebtedness of the Borrowers to such Lender resulting from each Loan made by such Lender, including the amounts of principal and interest payable and paid to such Lender from time to time hereunder.

(c)        The Administrative Agent shall maintain accounts in which it shall record (i) the amount of each Loan made hereunder and Type thereof and the Interest Period applicable thereto, (ii) the amount of any principal or interest due and payable or to become due and payable from the Borrowers to each Lender hereunder and (iii) the amount of any sum received by the Administrative Agent hereunder for the account of the Lenders and each Lender's share thereof.

(d)        The entries made in the accounts maintained pursuant to paragraph (b) or (c) of this Section shall be conclusive absent manifest error, provided that the failure of any Lender or the Administrative Agent to maintain such accounts or any error therein shall not in any manner affect the obligation of the Borrowers to pay any amounts due hereunder in accordance with the terms of this Agreement.  In the event of any inconsistency between the entries made pursuant to paragraphs (b) and (c) of this Section, the accounts maintained by the Administrative Agent pursuant to paragraph (c) of this Section shall control.

(e)        The Loans made by each Lender shall, at the request of such Lender, be evidenced by a single promissory note (a "Note") of the Borrowers in substantially the form of Exhibit K, dated as of (i) the Closing Date or (ii) the effective date of an assignment pursuant to Section 9.04(b), payable to the order of such Lender and otherwise duly completed.  The date, amount, Type, interest rate and Interest Period of each Loan made by each Lender, and all payments made on account of the principal thereof, shall be recorded by such Lender on its books for its Notes, and, prior to any transfer may be endorsed by such Lender on the schedule attached to such Notes or any continuation thereof or on any separate record maintained by such Lender.  Failure to make any such notation or to attach a schedule shall not affect any Lender's or the Borrowers' rights or obligations in respect of such Loans or affect the validity of such transfer by any Lender of its Note.

Section 2.10        Repayment of Term Loans.

(a)        To the extent not previously paid, all Term Loans shall be due and payable on the Maturity Date.

(b)        Prior to any optional repayment of any Borrowings, the Borrowers shall notify the Administrative Agent in writing by delivering a Prepayment Notice of such election not later than 2:00 p.m., New York City time (a) in the case of a Term SOFR Borrowing, three (3) Business Days before the scheduled date of such repayment and (b) in the case of an ABR Borrowing, one (1) Business Day before the scheduled date of such repayment (or, in each case, such shorter period acceptable to the Administrative Agent (acting at the direction of the Required Lenders)); provided, that a notice of prepayment may state that such notice is conditioned upon the effectiveness of other credit facilities, indentures or similar agreements or other transactions, in which case such notice may be revoked by the Borrowers (by notice to the Administrative Agent on or prior to the specified effective date) if such condition is not satisfied.  In the absence of a designation by the Borrowers as described in the preceding sentence, the Administrative Agent (acting at the direction of the Required Lenders) shall make such designation in its reasonable discretion with a view, but no obligation, to minimize breakage costs owing under Section 2.16.  Each repayment of a Borrowing shall be applied ratably to the Loans included in the repaid Borrowing.  Repayments of Borrowings shall be accompanied by accrued interest on the amount repaid.

Section 2.11     Prepayment of Loans.

(a)     The Borrowers shall have the right at any time and from time to time to prepay any Borrowing in whole or in part, without premium (but subject to the Exit Premium ) or penalty (but subject to Section 2.16), in an aggregate principal amount that is an integral multiple of $500,000 and not less than $1,000,000 or, if less, the amount outstanding, subject to prior notice in accordance with Section 2.11(d) and (e).

(b)     Subject to the Senior ICA Provisions and the related priorities set forth in the Bankruptcy Court DIP Order and the Canadian DIP Recognition Order, the Borrowers shall apply all Net Proceeds promptly upon receipt thereof to prepay Term Loans (together with the Exit Premium payable thereon) in accordance with clause (h) of this Section 2.11; provided that, until the Discharge of Senior DIP Obligations has occurred, no mandatory prepayments of Term Loans shall be required under this Section 2.11(b) except to the extent the amount of mandatory prepayments pursuant to Section 2.11(b) of the Senior DIP Credit Agreement is declined by the lenders thereunder.

(c)     Following the end of each fiscal year of the Borrowers, commencing with the fiscal year ending in December of 2023, subject to the Senior ICA Provisions and the related priorities set forth in the Bankruptcy Court DIP Order and the Canadian DIP Recognition Order, the Borrowers shall, within 10 Business Days after financial statements have been delivered, or were required to be delivered, pursuant to 5.01(a) for the relevant fiscal year, prepay Term Loan Borrowings (together with the Exit Premium) in an aggregate amount equal to (i) the ECF Percentage of such Excess Cash Flow for such fiscal year, minus (ii) to the extent not financed using the proceeds of the incurrence of long-term Indebtedness the amount of any voluntary payments during such Excess Cash Flow Period of Term Loans; provided that, until the Discharge of Senior DIP Obligations has occurred, no mandatory prepayments of Term Loans shall be required under this Section 2.11(c) except to the extent the amount of mandatory prepayments pursuant to Section 2.11(c) of the Senior DIP Credit Agreement is declined by the lenders thereunder.

(d)     Prior to any prepayment of Term Loans, the Borrowers shall select the Borrowing or Borrowings to be prepaid and shall specify such selection in the Prepayment Notice pursuant to paragraph (i) of this Section.  In the event of any mandatory prepayment of Term Loan Borrowings made at a time when Term Loan Borrowings of more than one Class remain outstanding, the Borrowers shall select Term Loan Borrowings to be prepaid so that the aggregate amount of such prepayment is allocated between Term Loan Borrowings pro rata based on the aggregate principal amount of outstanding Borrowings of each such Class; provided that the Required Lenders (on behalf of all the Lenders), by notice to the Administrative Agent in writing at least three (3) Business Days prior to the prepayment date, may decide to decline all or any portion of any prepayment of its Term Loans pursuant to this Section (other than an optional prepayment pursuant to paragraph (a) of this Section, which may not be declined), in which case the aggregate amount of the prepayment that would have been applied to prepay Term Loans but was so declined shall be retained by the Borrowers ("Declined Proceeds").  Optional prepayments of Term Loan Borrowings shall be allocated among the Classes of Term Loan Borrowings as directed by the Borrowers.  In the absence of a designation by the Borrowers as described in the preceding provisions of this paragraph of the Type of Borrowing of any Class, the Required Lenders shall select the Borrowing or Borrowings to be prepaid and direct the Administrative Agent to effect such payment accordingly; provided that, in connection with any mandatory prepayments by the Borrowers of the Term Loans pursuant to Section 2.11(b) or Section 2.11(c) such prepayments shall be applied on a pro rata basis to the then outstanding Term Loans being prepaid in direct order of maturity irrespective of whether such outstanding Term Loans are ABR Loans or Term SOFR Loans

(e)     The Borrowers shall notify the Administrative Agent in writing by delivering a Prepayment Notice of any prepayment hereunder not later than 11:00 a.m., Local Time, five (5) Business Days before the date of prepayment.  Each such notice shall be irrevocable and shall specify the prepayment date and the principal amount of each Borrowing or portion thereof to be prepaid and, in the case of a mandatory prepayment, a reasonably detailed calculation of the amount of such prepayment; provided that a notice of optional prepayment may state that such notice is conditional upon the effectiveness of other credit facilities or the receipt of the proceeds from the issuance of other Indebtedness or the occurrence of some other identifiable event or condition, in which case such notice of prepayment may be revoked by the Borrowers (by written notice to the Administrative Agent on or prior to the specified date of prepayment) if such condition is not satisfied.  Promptly following receipt of any such written notice, the Administrative Agent shall advise the Lenders of the contents thereof.  Each partial prepayment of any

Borrowing shall be in an amount that would be permitted in the case of an advance of a Borrowing of the same Type as provided in Section 2.02, except as necessary to apply fully the required amount of a mandatory prepayment. Each prepayment of a Borrowing shall be applied ratably to the Loans included in the prepaid Borrowing.

(f)     All prepayments hereunder shall be accompanied by (1) accrued interest to the extent required by Section 2.13, (2) any amounts payable as provided in Section 2.16 and (3) any premium payable under Section 2.12(e).

Section 2.12     Fees.

(a)     As consideration for the Lenders providing the Closing Date Loans, the Borrower hereby agrees to pay to the Administrative Agent (for distribution to the Lenders holding Initial Term Loan Commitments, the Delayed Draw Term Loan Commitments and the Bridge Refinancing Commitments) a payment (the "Closing Payment") in an aggregate amount equal to 4.00% of the aggregate principal amount of Initial Term Loan Commitments, the Delayed Draw Term Loan Commitments and the Bridge Refinancing Commitments held by each Lender as of the Closing Date. The Closing Payment will be fully earned and payable on the Closing Date and paid-in-kind in the form of an increased amount of Initial Term Loans (in respect of Initial Term Loan Commitments and the Delayed Draw Term Loan Commitments) and Bridge Refinancing Loans (in respect of the Bridge Refinancing Commitments), in each case of such Lender (but such increased Initial Term Loans and Bridge Refinancing Term Loans shall not reduce the Initial Term Loan Commitments or Bridge Refinancing Commitments, as applicable). On the Closing Date, the Closing Payment shall be capitalized and added to the aggregate principal amount of Initial Term Loans held by such Lender and the Administrative Agent shall update the Register to reflect such capitalization.

(b)     The Borrowers agree to pay to the Administrative Agent and the Collateral Agent, for its own account, fees payable in the amounts and at the times separately agreed upon between the Borrowers and the Administrative Agent and the Collateral Agent in the Agent Fee Letter.

(c)     Notwithstanding the foregoing, and subject to Section 2.21, the Borrowers shall not be obligated to pay any amounts to any Defaulting Lender pursuant to this Section.

(d)     The Borrowers shall pay to the Administrative Agent for the account of each Lender having a Delayed Draw Term Loan Commitment a commitment fee (the "DDTL Commitment Fee"), which shall accrue at a rate equal to 1.00% per annum on the average daily amount by which the aggregate Delayed Draw Term Loan Commitments exceeds the sum of the Delayed Draw Term Loans during the period from and including the Closing Date to the date on which such Lenders' Delayed Draw Term Loan Commitment terminates.  The DDTL Commitment Fee shall accrue at all times from the Closing Date until the Delayed Draw Term Loan Commitment Termination Date, including at any time during which one or more of the conditions in Article IV is not met.  The DDTL Commitment Fee shall be payable in kind on the last Business Day of each March, June, September and December, commencing with the first such date to occur after the Closing Date, and on the Delayed Draw Term Loan Commitment Termination Date by capitalizing the amount thereof and adding such amount to the outstanding principal amount of such Lenders' Delayed Draw Term Loans on and as of such date (which amount shall automatically constitute a part of the outstanding amount of such Delayed Draw Term Loans for all purposes hereof (including the accrual of interest thereon at the rates applicable to such Delayed Draw Term Loan generally)).

(e)     The Borrowers agree to pay to the Administrative Agent, for the ratable account of each Lender, an exit premium in cash in an amount equal to 4.00% of the sum of the principal amount of Loans repaid or refinanced (including, for the avoidance of doubt, by way of receipt of stock, other securities, other property or assets (including cash or any combination thereof)) on such date (the "Exit Premium") upon the earliest of (x) termination, acceleration, conversion and/or repayment or prepayment (whether pursuant to voluntary or mandatory prepayments provisions hereunder) of the Loans, including on the Maturity Date and (y) upon a proceeding under any Debtor Relief Laws with respect to any Loan Party. The Exit Premium shall be fully earned on the Closing Date. If the Loans are accelerated or otherwise become due prior to their maturity, in each case, as a result of an Event of Default (including upon the occurrence of a bankruptcy or insolvency event (including the acceleration of claims by operation of law)), the amount of principal of and premium on the Loans that becomes due and payable shall equal 100% of the principal amount of the Loans plus the Exit Premium, as if such acceleration or other

53

occurrence were a voluntary prepayment of the Loans accelerated or otherwise becoming due. Without limiting the generality of the foregoing, it is understood and agreed that if the Loans are accelerated or otherwise become due prior to their maturity, in each case, in respect of any Event of Default (including upon the occurrence of a bankruptcy or insolvency event (including the acceleration of claims by operation of law)), the Exit Premium applicable with respect to a voluntary prepayment of the Loans will also be due and payable on the date of such acceleration or such other prior due date as though the Loans were voluntarily prepaid as of such date and shall constitute part of the Obligations, in view of the impracticability and extreme difficulty of ascertaining actual damages and by mutual agreement of the parties as to a reasonable calculation of each Lender's loss as a result thereof. Any premium payable above shall be presumed to be the liquidated damages sustained by each Lender and the Borrowers agree that it is reasonable under the circumstances currently existing. THE BORROWERS EXPRESSLY WAIVE (TO THE FULLEST EXTENT THEY MAY LAWFULLY DO SO) THE PROVISIONS OF ANY PRESENT OR FUTURE STATUTE OR LAW THAT PROHIBITS OR MAY PROHIBIT THE COLLECTION OF THE EXIT PREMIUM IN CONNECTION WITH ANY SUCH ACCELERATION. The Borrowers expressly agree (to the fullest extent they may lawfully do so) that: (A) the Exit Premium is reasonable and is the product of an arm's length transaction between sophisticated business people, ably represented by counsel; (B) the Exit Premium shall be payable notwithstanding the then prevailing market rates at the time payment is made; (C) there has been a course of conduct between the Lenders and the Borrowers giving specific consideration in this transaction for such agreement to pay the Exit Premium; and (D) the Borrowers shall be estopped hereafter from claiming differently than as agreed to in this paragraph.

(f)      All fees shall be paid on the dates due, in immediately available funds, to the Administrative Agent for distribution, if and as appropriate, among the Lenders. Once paid, such fees shall not be refundable under any circumstances.

Section 2.13      Interest.

(a)      The Loans comprising each ABR Borrowing shall bear interest at the Alternate Base Rate plus the Applicable Margin.

(b)      The Loans comprising each Term SOFR Borrowing shall bear interest at Adjusted Term SOFR for the Interest Period in effect for such Borrowing plus the Applicable Margin.

(c)      Upon the occurrence and during the continuance of an Event of Default, the principal amount of all Loans outstanding and, to the extent permitted by applicable law, any interest payments on the Loans or any fees or other amounts owed hereunder, shall thereafter, after as well as before judgment, bear interest (including post-petition interest in any proceeding under Debtor Relief Laws) payable in cash on demand at a rate that is 2.0% per annum in excess of the interest rate otherwise payable hereunder with respect to the applicable Loans (or, in the case of any such fees and other amounts, at a rate which is 2.00% per annum in excess of the interest rate otherwise payable hereunder for ABR Loans); provided that in the case of Term SOFR Loans, upon the expiration of the Interest Period in effect at the time any such increase in interest rate is effective such Term SOFR Loans shall thereupon become ABR Loans and shall thereafter bear interest payable upon demand at a rate which is 2.0% per annum in excess of the interest rate otherwise payable hereunder for ABR Loans. Payment or acceptance of the increased rates of interest provided for in this Section 2.13(c) is not a permitted alternative to timely payment and shall not constitute a waiver of any Event of Default or otherwise prejudice or limit any rights or remedies of the Administrative Agent or any Lender.

(d)      Accrued interest on each Loan shall be payable in arrears (i) on each Interest Payment Date for such Loan and (ii) on the Maturity Date; provided that (A) interest accrued pursuant to paragraph (c) of this Section shall be payable on demand, (B) in the event any repayment or prepayment of any Loan, accrued interest on the principal amount repaid or prepaid shall be payable on the date of such repayment or prepayment and (C) in the event of any conversion of any Term SOFR Loan prior to the end of the current Interest Period therefor, accrued interest on such Loan shall be payable on the effective date of such conversion.

(e)      All interest hereunder shall be computed on the basis of a year of 360 days, except that interest computed by reference to clause (a) of the definition of "Alternate Base Rate" shall be computed on the basis of a

year of 365 days (or 366 days in a leap year), and in each case shall be payable for the actual number of days elapsed (including the first day but excluding the last day).

(f)      Notwithstanding anything to the contrary in this Section 2.13, interest due and payable on each Interest Payment Date and on the Maturity Date shall be payable in kind on such date by capitalizing the amount thereof and adding such amount to the outstanding principal amount of such Loan on and as of such date (which amount shall automatically constitute a part of the outstanding amount of such Loan for all purposes hereof (including the accrual of interest thereon at the rates applicable to such Loan generally)).

(g)      For the purposes of the *Interest Act* (Canada) and disclosure thereunder, whenever any interest or any fee to be paid hereunder or in connection herewith is to be calculated on the basis of a 360-day or 365-day year, the yearly rate of interest to which the rate used in such calculation is equivalent is the rate so used multiplied by the actual number of days in the calendar year in which the same is to be ascertained and divided by 360 or 365, as applicable.  The rates of interest under this Agreement are nominal rates, and not effective rates or yields.  The principle of deemed reinvestment of interest does not apply to any interest calculation under this Agreement.

(h)      Each Canadian Loan Party acknowledges and confirms that:

(i)      clause (g) above satisfies the requirements of Section 4 of the *Interest Act* (Canada) to the extent it applies to the expression or statement of any interest payable under any Loan Document; and

(ii)      such Canadian Loan Party is able to calculate the yearly rate or percentage of interest payable under any Loan Document based upon the methodology set out in clause (g) above.

(i)      Any provision of this Agreement that would oblige a Canadian Loan Party to pay any fine, penalty or rate of interest on any arrears of principal or interest secured by a mortgage on real property or hypothec on immovables that has the effect of increasing the charge on arrears beyond the rate of interest payable on principal money not in arrears shall not apply to such Canadian Loan Party, which shall be required to pay interest on money in arrears at the same rate of interest payable on principal money not in arrears.

(j)      If any provision of this Agreement would oblige a Canadian Loan Party to make any payment of interest or other amount payable to any Secured Party in an amount or calculated at a rate which would be prohibited by law or would result in a receipt by that Secured Party of "interest" at a "criminal rate" (as such terms are construed under the *Criminal Code* (Canada)), then, notwithstanding such provision, such amount or rate shall be deemed to have been adjusted with retroactive effect to the maximum amount or rate of interest, as the case may be, as would not be so prohibited by applicable law or so result in a receipt by that Secured Party of "interest" at a "criminal rate", such adjustment to be effected, to the extent necessary (but only to the extent necessary), as follows:

(i)      first, by reducing the amount or rate of interest; and

(ii)      thereafter, by reducing any fees, commissions, costs, expenses, premiums and other amounts required to be paid which would constitute interest for the purposes of Section 347 of the *Criminal Code* (Canada).

(k)      In connection with the use or administration of Adjusted Term SOFR, the Administrative Agent will have the right to make Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Loan Document, any amendments implementing such Conforming Changes will become effective without any further action or consent of any other party to this Agreement or any other Loan Document. The Administrative Agent will promptly notify the Borrower and the Lenders of the effectiveness of any Conforming Changes in connection with the use or administration of Adjusted Term SOFR.

Section 2.14      Alternate Rate of Interest.  Subject to Section 2.23, if at least two Business Days prior to the commencement of any Interest Period for a Term SOFR Borrowing:

(a)        the Administrative Agent (acting at the direction of the Required Lenders) determines (which determination shall be conclusive absent manifest error) that adequate and reasonable means do not exist for ascertaining Adjusted Term SOFR for such Interest Period; or

(b)        the Administrative Agent is advised by the Required Lenders that Adjusted Term SOFR for such Interest Period will not adequately and fairly reflect the cost to such Lenders of making or maintaining their Loans included in such Borrowing for such Interest Period,

the Administrative Agent shall give notice thereof to the Borrowers and the Lenders in writing as promptly as practicable thereafter and, until the Administrative Agent notifies the Borrowers and the Lenders that the circumstances giving rise to such notice no longer exist, (i) any Interest Election Request that requests the conversion of any Borrowing to, or continuation of any Borrowing as, a Term SOFR Borrowing denominated in Dollars shall be ineffective and such Borrowing shall be converted to or continued as on the last day of the Interest Period applicable thereto an ABR Borrowing, and (ii) if any Borrowing Request requests a Term SOFR Borrowing, then such Borrowing shall be made as an ABR Borrowing; provided, however, that, in each case, the Borrowers may revoke any Borrowing Request that is pending when such notice is received.

Section 2.15        Increased Costs.

(a)        If any Change in Law shall:

(i)        impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended by, any Lender (except any such reserve requirements reflected in Adjusted Term SOFR);

(ii)        subject any Lender to any Tax of any kind whatsoever (except for Indemnified Taxes indemnifiable under Section 2.17 or Excluded Taxes); or

(iii)        impose on any Lender or the London interbank market any other condition, cost or expense affecting this Agreement or Term SOFR Loans or ABR Loans made by such Lender;

and the result of any of the foregoing shall be to increase the cost to such Lender of making or maintaining any Term SOFR Loan or ABR Loan (or of maintaining its obligation to make any such Loan) or to increase the cost to such Lender or to reduce the amount of any sum received or receivable by such Lender hereunder (whether of principal, interest or otherwise), then, from time to time upon request of such Lender, the Borrowers will pay to such Lender such additional amount or amounts as will compensate such Lender for such increased costs actually incurred or reduction actually suffered.

(b)        If any Lender determines that any Change in Law regarding capital requirements or liquidity has or would have the effect of reducing the rate of return on such Lender's capital or on the capital of such Lender's holding company, if any, as a consequence of this Agreement or the Loans made by such Lender to a level below that which such Lender or such Lender's holding company could have achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of such Lender's holding company with respect to capital adequacy and liquidity), then, from time to time upon request of such Lender, the Borrowers will pay to such Lender such additional amount or amounts as will compensate such Lender or such Lender's holding company for any such reduction actually suffered.

(c)        Promptly after any Lender has determined that it will make a request for increased compensation pursuant to this Section 2.15, such Lender shall notify the Borrowers thereof.  A certificate of a Lender setting forth the amount or amounts necessary to compensate such Lender or its holding company, as applicable, in reasonable detail, as the case may be, as specified in paragraph (a) or (b) of this Section delivered to the Borrowers shall be conclusive absent manifest error; provided, that any such certificate claiming amounts described in clause (a), (b) or (c) of the definition of "Change in Law" shall, in addition, state the basis upon which such amount has been calculated and certify that such Lender's demand for payment of such costs hereunder, and such method of allocation, is not inconsistent with its treatment of other borrowers which, as a credit matter, are similarly situated to

56

the Borrowers (or any Borrower) and which are subject to similar provisions.  The Borrowers shall pay such Lender the amount shown as due on any such certificate within 15 days after receipt thereof.

(d)      Failure or delay on the part of any Lender to demand compensation pursuant to this Section shall not constitute a waiver of such Lender's right to demand such compensation, provided that the Borrowers shall not be required to compensate a Lender pursuant to this Section 2.15 for any increased costs incurred or reductions suffered more than 180 days prior to the date that such Lender notifies the Borrowers of the Change in Law giving rise to such increased costs or reductions and of such Lender's intention to claim compensation therefor; provided further that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the 180-day period referred to above shall be extended to include the period of retroactive effect thereof.

(e)      Notwithstanding any other provision of this Section, no Lender shall demand compensation for any increased cost or reduction pursuant to this Section if it shall not at the time be the general policy or practice of such Lender to demand such compensation in similar circumstances under comparable provisions of other credit agreements.

Section 2.16      Break Funding Payments.  In the event of (a) the payment of any principal of any Term SOFR Loan other than on the last day of an Interest Period applicable thereto (including as a result of an Event of Default), (b) the conversion of any Term SOFR Loan other than on the last day of the Interest Period applicable thereto, (c) the failure to borrow, convert, continue or prepay any Term SOFR Loan on the date specified in any notice delivered pursuant hereto (regardless of whether such notice may be revoked under Section 2.11(i) and is revoked in accordance therewith) or (d) the assignment of any Term SOFR Loan other than on the last day of the Interest Period applicable thereto as a result of a request by the Borrowers pursuant to Section 2.19 or Section 9.02(c), then, in any such event, the Borrowers shall, after receipt of a written request by any Lender affected by any such event (which request shall set forth in reasonable detail the basis for requesting such amount), compensate each Lender for the loss, cost and expense attributable to such event.  For purposes of calculating amounts payable by the Borrowers to the Lenders under this Section 2.16, each Lender shall be deemed to have funded each Term SOFR Loan made by it at Adjusted Term SOFR for such Loan by a matching deposit or other borrowing for a comparable amount and for a comparable period, whether or not such Term SOFR Loan was in fact so funded.  A certificate of any Lender setting forth any amount or amounts that such Lender is entitled to receive pursuant to this Section delivered to the Borrowers shall be conclusive absent manifest error.  The Borrowers shall pay such Lender the amount shown as due on any such certificate within 15 days after receipt of such demand.  Notwithstanding the foregoing, this Section 2.16 will not apply to losses, costs or expenses resulting from Taxes, as to which Section 2.17 shall govern.

Section 2.17      Taxes.

(a)      Any and all payments by or on account of any obligation of any Loan Party hereunder or under any other Loan Document shall be made free and clear of and without deduction or withholding on account of any Taxes, provided that if any Loan Party, the Administrative Agent or any other applicable withholding agent shall be required by applicable Requirements of Law (as determined in the good faith discretion of the applicable withholding agent) to deduct or withhold Taxes from such payments, then (i) if the Tax in question is an Indemnified Tax, the amount payable by the applicable Loan Party shall be increased as necessary so that after all required deductions or withholding for such Taxes have been made (including such deductions or withholding applicable to additional amounts payable under this Section 2.17) each Lender (or in a case where the Administrative Agent receives a payment for its own account, the Administrative Agent) receives an amount equal to the sum it would have received had no such deductions or withholding been made, (ii) the applicable Loan Party, the Administrative Agent or other applicable withholding agent shall make such deductions or withholding and (iii) the applicable withholding agent shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable Requirements of Law.

(b)      Without limiting the provisions of paragraph (a) above, the Borrowers shall timely pay any Other Taxes to the relevant Governmental Authority in accordance with Requirements of Law, or at the option of the Administrative Agent timely reimburse it for the payment of, any Other Taxes.

(c)　　　The Loan Parties shall, jointly and severally, indemnify the Administrative Agent and each Lender, within 10 days after demand therefor, for any Indemnified Taxes payable by the Administrative Agent or such Lender, as the case may be (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section 2.17) and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to the Borrowers by a Lender, or by the Administrative Agent on its own behalf or on behalf of a Lender, shall be conclusive absent manifest error.

(d)　　　As soon as practicable after any payment of Indemnified Taxes by a Loan Party to a Governmental Authority, but no later than 30 days thereafter, the Borrowers shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent (acting at the direction of the Required Lenders).

(e)　　　Any Lender that is entitled to an exemption from or reduction of withholding Tax with respect to any payments made under any Loan Document shall deliver to the Borrowers and the Administrative Agent, at the time or times reasonably requested by the Borrowers or the Administrative Agent, such properly completed and executed documentation reasonably requested by the Borrowers or the Administrative Agent as will permit such payments to be made without withholding or at a reduced rate of withholding.  In addition, any Lender, if reasonably requested by the Borrowers or the Administrative Agent, shall deliver such other documentation prescribed by Requirements of Law or reasonably requested by the Borrowers or the Administrative Agent as will enable the Borrowers or the Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements.  Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in paragraphs (e)(i), (ii), (ii)(1), (ii)(2), (ii)(3), (ii)(4), and (iii) of this Section) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

Without limiting the generality of the foregoing:

(i)　　　Each Domestic Lender shall deliver to the Borrowers and the Administrative Agent on or before the date on which it becomes a party to this Agreement (and from time to time thereafter upon the reasonable request of the Borrowers or the Administrative Agent) two properly completed and duly signed copies of Internal Revenue Service Form W-9 (or any successor form) certifying that such Lender is exempt from U.S. federal backup withholding.

(ii)　　　Each Lender that is a Foreign Lender shall deliver to the Borrowers and the Administrative Agent on or before the date on which it becomes a party to this Agreement (and from time to time thereafter upon the reasonable request of any Borrower or the Administrative Agent) whichever of the following is applicable:

(1)　　　two properly completed and duly signed copies of Internal Revenue Service Form W-8BEN-E or W-8BEN (or any successor forms) claiming eligibility for benefits of an income tax treaty to which the United States of America is a party and such other documentation as required under the Code,

(2)　　　two properly completed and duly signed copies of Internal Revenue Service Form W-8ECI (or any successor forms),

(3)　　　in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 871(h) or Section 881(c) of the Code, (x) two properly completed and duly signed certificates, substantially in the form of Exhibit H (any such certificate a "United States Tax Compliance Certificate"), and (y) two properly completed and duly signed copies of Internal Revenue Service Form W-8BEN-E or W-8BEN (or any successor forms),

(4)　　　to the extent a Foreign Lender is not the beneficial owner (for example, where the Lender is a partnership or a participating Lender), two properly completed and duly signed copies of Internal Revenue

Service Forms W-8IMY (or any successor forms) of the Foreign Lender, each accompanied by a withholding statement and a properly completed and duly signed Form W-8ECI, W-8BEN-E or W-8BEN, United States Tax Compliance Certificate, Form W-9, Form W-8IMY (or other successor forms) or any other required information from each beneficial owner that would be required under this Section 2.17 if such beneficial owner were a Lender, as applicable (provided that, if the Lender is a partnership (and not a participating Lender) and one or more direct or indirect partners are claiming the portfolio interest exemption, the United States Tax Compliance Certificate may be provided by such Lender on behalf of such direct or indirect partner(s)), or

(5)        any other form prescribed by applicable Requirements of Law as a basis for claiming an exemption from or a reduction in U.S. federal withholding tax duly completed together with such supplementary documentation as may be prescribed by applicable Requirements of Law to permit the Borrowers and the Administrative Agent to determine the withholding or deduction required to be made.

(iii)        If a payment made to any Lender or the Administrative Agent under any Loan Document would be subject to U.S. federal withholding tax imposed by FATCA if such Lender or the Administrative Agent were to fail to comply with the applicable reporting requirements of those Sections (including those contained in Section 1471(b) or 1472(b), as applicable) of the Code, such Lender or the Administrative Agent shall deliver to the Borrowers and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by any Borrower or the Administrative Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by any Borrower or the Administrative Agent as may be necessary for the Borrowers and the Administrative Agent to comply with their obligations under FATCA, to determine whether such Lender or the Administrative Agent has or has not complied with such Lender's or the Administrative Agent's FATCA obligations and, if necessary, to determine the amount to deduct and withhold from such payment.  Solely for purposes of this Section 2.17(e)(iii), "FATCA" shall include any amendments made to FATCA after the Closing Date.

Each Lender agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify the Borrowers and the Administrative Agent in writing of its legal inability to do so.

In addition, the Administrative Agent shall deliver to the Borrowers, (x)(i) prior to the date on which the first payment by the Borrowers is due hereunder or (ii) prior to the first date on or after the date on which the Administrative Agent becomes a successor Administrative Agent pursuant to Section 8.07 on which payment by the Borrowers is due hereunder, properly completed and executed documentation prescribed by applicable law certifying its entitlement to an available exemption from or reduction in applicable U.S. federal withholding Tax in respect of any payments to be made to the Administrative Agent (in its capacity as the Administrative Agent and for its own account) by any Loan Party pursuant to any Loan Document, and (y) on or before the date on which any such previously delivered documentation expires or becomes obsolete or invalid, after the occurrence of any event requiring a change in the most recent documentation previously delivered by it to the Borrowers, and from time to time if reasonably requested by any Borrower, further copies of such documentation.  Notwithstanding any other provision of this Section 2.17(e), the Administrative Agent shall not be required to deliver any documentation pursuant to this Section 2.17(e) that it is not legally eligible to deliver or any such documentation that, in the Administrative Agent's reasonable judgment, would subject the Administrative Agent to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of the Administrative Agent.  Each Lender hereby authorizes the Administrative Agent to deliver to the Loan Parties and to any successor Administrative Agent any documentation provided by such Lender to the Administrative Agent pursuant to Section 2.17(e).

(f)        If any party determines, in its sole discretion exercised in good faith, that it has received a refund of any Taxes as to which it has been indemnified pursuant to this Section 2.17 (including by the payment of additional amounts pursuant to this Section), it shall pay to the indemnifying party an amount equal to such refund (but only to the extent of indemnity payments made under this Section 2.17 with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of such indemnified party and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund).  Such

indemnifying party, upon the request of such indemnified party, shall repay to such indemnified party the amount paid over pursuant to this Section 2.17(f) (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) in the event that such indemnified party is required to repay such refund to such Governmental Authority.  Notwithstanding anything to the contrary in this Section 2.17(f), in no event will the indemnified party be required to pay any amount to an indemnifying party pursuant to this Section 2.17(f) the payment of which would place the indemnified party in a less favorable net after-Tax position than the indemnified party would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid.  This Section 2.17(f) shall not be construed to require any indemnified party to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to the indemnifying party or any other Person.

(g)     Each Lender shall severally indemnify the Administrative Agent, within 10 days after demand therefor, for (i) any Indemnified Taxes on or with respect to any payment under any Loan Document that is attributable to such Lender (but only to the extent that no Loan Party has already indemnified the Administrative Agent for such Indemnified Taxes and without limiting the obligation of the Loan Parties to do so), (ii) any Taxes attributable to such Lender's failure to comply with the provisions of Section 9.04(d)(ii) relating to the maintenance of a Participant Register and (iii) any Excluded Taxes attributable to such Lender that are payable or paid by the Administrative Agent in connection with any Loan Document and any reasonable expenses and, in each case, arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error.  Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under any Loan Document or otherwise payable by the Administrative Agent to any Lender under any Loan Document or otherwise payable by the Administrative Agent to any Lender from any other source against any amount due to the Administrative Agent under this Section 2.17(g).

For purposes of this Section 2.17, (x) the terms "applicable law" and "applicable Requirement of Law" include FATCA and (y) the term "Loan Party" includes JB TopCo.

Section 2.18     Payments Generally; Pro Rata Treatment; Sharing of Setoffs.

(a)     The Borrowers shall make each payment required to be made by it under any Loan Document (whether of principal, interest or fees, or of amounts payable under Section 2.15, 2.16 or 2.17, or otherwise) prior to the time expressly required hereunder or under such other Loan Document for such payment (or, if no such time is expressly required, prior to 1:00 p.m., Local Time), on the date when due, in immediately available funds, without condition or deduction for any counterclaim, recoupment or setoff.  Any amounts received after such time on any date may, in the discretion of the Administrative Agent, be deemed to have been received on the next succeeding Business Day for purposes of calculating interest thereon.  All such payments shall be made to the Applicable Account as may be specified by the Administrative Agent, except that payments pursuant to Sections 2.15, 2.16 or 2.17 and 9.03 shall be made directly to the Persons entitled thereto and payments pursuant to other Loan Documents shall be made to the Persons specified therein.  Subject to the Senior ICA Provisions, the Administrative Agent shall distribute any such payments received by it for the account of any other Person to the appropriate recipient promptly following receipt thereof.  Except as otherwise provided herein, if any payment under any Loan Document shall be due on a day that is not a Business Day, the date for payment shall be extended to the next succeeding Business Day. If any payment on a Term SOFR Loan becomes due and payable on a day other than a Business Day, the maturity thereof shall be extended to the next succeeding Business Day unless the result of such extension would be to extend such payment into another calendar month, in which event such payment shall be made on the immediately preceding Business Day.  In the case of any payment of principal pursuant to the preceding two sentences, interest thereon shall be payable at the then applicable rate for the period of such extension.  All payments or prepayments of any Loan shall be made in Dollars, all payments of accrued interest payable on a Loan shall be made in Dollars, and all other payments under each Loan Document shall be made in Dollars.

(b)     If at any time insufficient funds are received by and available to the Administrative Agent or the Collateral Agent from any Loan Party (or proceeds from any Collateral) (x) following an acceleration of the Obligations under this Agreement, (y) any Event of Default under Section 7.01(h) or (i) or (z) otherwise, to pay fully

all amounts of principal, interest and fees and other Obligations then due from the Borrowers hereunder, such funds shall be applied:  (i) <u>first</u>, ratably, to pay any fees, indemnities or expense reimbursements then due to the Administrative Agent and the Collateral Agent from the Borrowers, (ii) <u>second</u>, towards payment of interest, fees and premium then due from the Borrowers in respect of any Loans hereunder and any interest accrued thereon, ratably among the parties entitled thereto in accordance with such amounts then due to such parties, (iii) <u>third</u>, to payment in full of Loans then due from the Borrowers hereunder, ratably among the parties entitled thereto in accordance with the amounts of principal then due to such parties, (iv) <u>fourth</u>, towards payment of other Obligations then due from the Borrowers, ratably among the parties entitled thereto in accordance with the amounts of such Obligations then due to such parties and (v) <u>last</u>, the balance, if any, after all of the Obligations have been paid in full, to the Borrowers or as otherwise required by Requirements of Law.

(c)     If any Lender shall, by exercising any right of setoff or counterclaim or otherwise, obtain payment in respect of any principal of or interest on any of its Term Loans resulting in such Lender receiving payment of a greater proportion of the aggregate amount of its Term Loans and accrued interest thereon than the proportion received by any other Lender entitled to receive the same proportion of such payment, then the Lender receiving such greater proportion shall purchase (for cash at face value) participations in the Term Loans of such other Lenders to the extent necessary so that the benefit of all such payments shall be shared by the Lenders ratably in accordance with the aggregate principal amount of each such Lender's respective Term Loans and accrued interest thereon vis-à-vis the aggregate principal amount of all such Lenders' Term Loans and the aggregate accrued interest thereon; provided that (i) if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest and (ii) the provisions of this paragraph shall not be construed to apply to (A) any payment made by the Borrowers pursuant to and in accordance with the express terms of this Agreement as in effect on the Closing Date (including the application of funds arising from the existence of a Defaulting Lender), (B) any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans to any assignee or participant or (C) any disproportionate payment obtained by a Lender as a result of the extension by Lenders of the maturity date or expiration date of some but not all Loans or any increase in the Applicable Margin in respect of Loans of Lenders that have consented to any such extension.  The Borrowers consent to the foregoing and agrees, to the extent they may effectively do so under applicable law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against the Borrowers (or any Borrower) rights of setoff and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of the Borrowers (or any Borrower) in the amount of such participation.

(d)     Unless the Administrative Agent shall have received written notice from the Borrowers prior to the date on which any payment is due to the Administrative Agent for the account of the Lenders hereunder that the Borrowers will not make such payment, the Administrative Agent may assume that the Borrowers have made such payment on such date in accordance herewith and may, in reliance upon such assumption and in its sole discretion, distribute to the Lenders the amount due.  In such event, if the Borrowers have not in fact made such payment, then each of the Lenders severally agrees to repay to the Administrative Agent forthwith on demand the amount so distributed to such Lender with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Administrative Agent, at the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent (acting at the direction of the Required Lenders) in accordance with banking industry rules on interbank compensation.

(e)     If any Lender shall fail to make any payment required to be made by it pursuant to Section 2.05(d) or (e), 2.06 or 2.17(d), then the Administrative Agent may, in its discretion (notwithstanding any contrary provision hereof), apply any amounts thereafter received by the Administrative Agent for the account of such Lender to satisfy such Lender's obligations under such Sections until all such unsatisfied obligations are fully paid.

Section 2.19     <u>Mitigation Obligations; Replacement of Lenders</u>.

(a)     If any Lender requests compensation under Section 2.15, or if the Borrowers are required to pay any amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 2.17 or any event gives rise to the operation of Section 2.22, then such Lender shall use reasonable efforts to designate a different lending office for funding or booking its Loans hereunder affected by such event, or to assign and delegate its rights and obligations hereunder to another of its offices, branches or Affiliates, if, in the judgment of such

Lender, such designation or assignment and delegation (i) would eliminate or reduce amounts payable pursuant to Section 2.15 or 2.17 or mitigate the applicability of Section 2.22, as the case may be, and (ii) would not subject such Lender to any unreimbursed cost or expense reasonably deemed by such Lender to be material and would not be inconsistent with the internal policies of, or otherwise be disadvantageous in any material economic, legal or regulatory respect to, such Lender.

(b)        If (i) any Lender requests compensation under Section 2.15 or gives notice under Section 2.22, (ii) the Borrowers are required to pay any amount to any Lender or to any Governmental Authority for the account of any Lender pursuant to Section 2.17 or (iii) any Lender is a Defaulting Lender, then (1) the Borrowers may, at their sole expense and effort, upon notice to such Lender and the Administrative Agent, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in Section 9.04), all its interests, rights and obligations under this Agreement and the other Loan Documents to an assignee that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment and delegation) or (2) solely in respect of a Defaulting Lender of the type described in clause (a)(i) of the definition thereof with respect to a failure to fund a specific funding request (the, "Specified Funding Failure" and the Commitments subject to such Specified Funding Failure, the "Specified Commitments" and the amount of the Specified Commitments not funded in respect thereof, the "Specified Commitment Amount"), any other Lender (other than a Defaulting Lender) may, it its sole expense and effort, upon notice to such Defaulting Lender and the Administrative Agent, require such Defaulting Lender to assign and delegate, without recourse (in accordance with an subject to the restrictions contained in Section 9.04), all of such Defaulting Lenders interest, rights and obligations in respect of the Specified Commitments which were not funded pursuant to the terms hereof (for the avoidance of doubt this clause (2) shall not require a Defaulting Lender to assign an amount of Commitments in excess of the Specified Commitment Amount); provided that (A) the Borrowers shall have received the prior written consent of the Administrative Agent (acting at the direction of the Required Lenders) to the extent such consent would be required under Section 9.04(b) for an assignment of Loans or Commitments, as applicable, which consents, in each case, shall not unreasonably be withheld or delayed, (B) such Lender shall have received payment of an amount equal to the outstanding principal of its Loans, accrued but unpaid interest thereon, accrued but unpaid fees and all other amounts payable to it hereunder from the assignee (to the extent of such outstanding principal and accrued interest and fees, including pursuant to Section 2.12(e)) or the Borrowers (in the case of all other amounts), (C) the Borrowers or such assignee shall have paid (unless waived) to the Administrative Agent the processing and recordation fee specified in Section 9.04(b)(ii) and (D) in the case of any such assignment resulting from a claim for compensation under Section 2.15, or payments required to be made pursuant to Section 2.17 or a notice given under Section 2.22, such assignment will result in a material reduction in such compensation or payments.  A Lender shall not be required to make any such assignment and delegation if, prior thereto, as a result of a waiver by such Lender or otherwise (including as a result of any action taken by such Lender under paragraph (a) above), the circumstances entitling the Borrowers to require such assignment and delegation cease to apply.  Each party hereto agrees that an assignment required pursuant to this paragraph may be effected pursuant to an Assignment and Assumption executed by the Borrowers, the Administrative Agent and the assignee and that the Lender required to make such assignment need not be a party thereto.

Section 2.20        [Reserved].

Section 2.21        Defaulting Lenders.

(a)        Adjustments.  Notwithstanding anything to the contrary contained in this Agreement, if any Lender becomes a Defaulting Lender, then, until such time as that Lender is no longer a Defaulting Lender, to the extent permitted by applicable law:

(i)        Waivers and Amendments.  Such Defaulting Lender's right to approve or disapprove any amendment, waiver or consent with respect to this Agreement shall be restricted as set forth in the definition of "Required Lenders".

(ii)        Reallocation of Payments.  Any payment of principal, interest, fees or other amounts received by the Administrative Agent for the account of that Defaulting Lender (whether voluntary or mandatory, at maturity, pursuant to Article VII or otherwise, and including any amounts made available to the Administrative Agent by that Defaulting Lender pursuant to Section 9.08), shall be applied at such time

or times as may be determined by the Administrative Agent (acting at the direction of the Required Lenders) as follows:  first, to the payment of any amounts owing by that Defaulting Lender to the Administrative Agent hereunder; second, as the Borrowers may request (so long as no Default or Event of Default exists), to the funding of any Loan in respect of which that Defaulting Lender has failed to fund its portion thereof as required by this Agreement, as determined by the Administrative Agent (acting at the direction of the Required Lenders); third, if so determined by the Administrative Agent (acting at the direction of the Required Lenders) and the Borrowers, to be held in a deposit account and released pro rata in order to satisfy such Defaulting Lender's potential future funding obligations with respect to Loans under this Agreement; fourth, to the payment of any amounts owing to the Lenders as a result of any judgment of a court of competent jurisdiction obtained by any Lender against that Defaulting Lender as a result of that Defaulting Lender's breach of its obligations under this Agreement; fifth, so long as no Default or Event of Default exists, to the payment of any amounts owing to the Borrowers as a result of any judgment of a court of competent jurisdiction obtained by the Borrowers (or any Borrower) against that Defaulting Lender as a result of that Defaulting Lender's breach of its obligations under this Agreement; and sixth, to that Defaulting Lender or as otherwise directed by a court of competent jurisdiction; provided that if such payment is a payment of the principal amount of any Loans and such Lender is a Defaulting Lender under clause (a) of the definition thereof, such payment shall be applied solely to pay the relevant Loans of the relevant non-Defaulting Lenders on a pro rata basis.  Any payments, prepayments or other amounts paid or payable to a Defaulting Lender that are applied (or held) to pay amounts owed by a Defaulting Lender pursuant to this Section 2.21 shall be deemed paid to and redirected by that Defaulting Lender, and each Lender irrevocably consents hereto.

Section 2.22     Illegality.  If any Lender determines that any law has made it unlawful, or that any Governmental Authority has asserted that it is unlawful, for any Lender to make, maintain or fund Loans whose interest is determined by reference to Adjusted Term SOFR, or to determine or charge interest rates based upon Adjusted Term SOFR, then, on notice thereof by such Lender to the Borrowers through the Administrative Agent, any obligation of such Lender to make or continue Term SOFR Loans or to convert ABR Loans denominated in dollars to Term SOFR Loans shall be suspended until such Lender notifies the Administrative Agent and the Borrowers that the circumstances giving rise to such determination no longer exist.  Upon receipt of such notice, (x) the Borrowers shall, upon three Business Days' notice from such Lender (with a copy to the Administrative Agent), prepay or, if applicable, convert all Term SOFR Loans of such Lender to ABR Loans either on the last day of the Interest Period therefor, if such Lender may lawfully continue to maintain such Term SOFR Loans to such day, or immediately, if such Lender may not lawfully continue to maintain such Term SOFR Loans, and (y) if such notice asserts the illegality of such Lender determining or charging interest rates based upon Adjusted Term SOFR, the Administrative Agent shall during the period of such suspension compute the Alternate Base Rate applicable to such Lender without reference to Adjusted Term SOFR component thereof until the Administrative Agent is advised in writing by such Lender that it is no longer illegal for such Lender to determine or charge interest rates based upon Adjusted Term SOFR.  Each Lender agrees to notify the Administrative Agent and the Borrowers in writing promptly upon becoming aware that it is no longer illegal for such Lender to determine or charge interest rates based upon Adjusted Term SOFR.  Upon any such prepayment or conversion, the Borrowers shall also pay accrued interest on the amount so prepaid or converted.

Section 2.23     Benchmark Replacement Setting.

(a)     Benchmark Replacement.  Notwithstanding anything to the contrary herein or in any other Loan Document, if a Benchmark Transition Event and its related Benchmark Replacement Date have occurred prior to any setting of the then-current Benchmark, then (x) if a Benchmark Replacement is determined in accordance with clause (a) of the definition of "Benchmark Replacement" for such Benchmark Replacement Date, such Benchmark Replacement will replace such Benchmark for all purposes hereunder and under any Loan Document in respect of such Benchmark setting and subsequent Benchmark settings without any amendment to, or further action or consent of any other party to, this Agreement or any other Loan Document and (y) if a Benchmark Replacement is determined in accordance with clause (b) of the definition of "Benchmark Replacement" for such Benchmark Replacement Date, such Benchmark Replacement will replace such Benchmark for all purposes hereunder and under any Loan Document in respect of any Benchmark setting at or after 5:00 p.m. (New York City time) on the fifth (5th) Business Day after the date notice of such Benchmark Replacement is provided to the Lenders without any amendment to, or further action or consent of any other party to, this Agreement or any other Loan Document so

long as the Administrative Agent has not received, by such time, written notice of objection to such Benchmark Replacement from Lenders comprising the Required Lenders.  If the Benchmark Replacement is Daily Simple SOFR, all interest payments will be payable on a monthly basis.

(b)    <u>Benchmark Replacement Conforming Changes</u>.  In connection with the use, administration, adoption or implementation of a Benchmark Replacement, the Administrative Agent will have the right to make Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Loan Document, any amendments implementing such Conforming Changes will become effective without any further action or consent of any other party to this Agreement or any other Loan Document.

(c)    <u>Notices; Standards for Decisions and Determinations</u>.  The Administrative Agent will promptly notify the Borrowers and the Lenders of (i) the implementation of any Benchmark Replacement and (ii) the effectiveness of any Conforming Changes in connection with the use, administration, adoption or implementation of a Benchmark Replacement.  The Administrative Agent will notify the Borrowers of (x) the removal or reinstatement of any tenor of a Benchmark pursuant to Section 2.23(d) and (y) the commencement of any Benchmark Unavailability Period.  Any determination, decision or election that may be made by the Administrative Agent (acting at the direction of the Required Lenders) or, if applicable, any Lender (or group of Lenders) pursuant to this Section 2.23, including any determination with respect to a tenor, rate or adjustment or of the occurrence or non-occurrence of an event, circumstance or date and any decision to take or refrain from taking any action or any selection, will be conclusive and binding absent manifest error and may be made in its or their sole discretion and without consent from any other party to this Agreement or any other Loan Document, except, in each case, as expressly required pursuant to this Section 2.23.

(d)    <u>Unavailability of Tenor of Benchmark</u>.  Notwithstanding anything to the contrary herein or in any other Loan Document, at any time (including in connection with the implementation of a Benchmark Replacement), (i) if the then-current Benchmark is a term rate (including Term SOFR Reference Rate) and either (A) any tenor for such Benchmark is not displayed on a screen or other information service that publishes such rate from time to time as selected by the Administrative Agent in its reasonable discretion or (B) the regulatory supervisor for the administrator of such Benchmark has provided a public statement or publication of information announcing that any tenor for such Benchmark is not or will not be representative, then the Administrative Agent may modify the definition of "Interest Period" (or any similar or analogous definition) for any Benchmark settings at or after such time to remove such unavailable or non-representative tenor and (ii) if a tenor that was removed pursuant to clause (i) above either (A) is subsequently displayed on a screen or information service for a Benchmark (including a Benchmark Replacement) or (B) is not, or is no longer, subject to an announcement that it is not or will not be representative for a Benchmark (including a Benchmark Replacement), then the Administrative Agent may modify the definition of "Interest Period" (or any similar or analogous definition) for all Benchmark settings at or after such time to reinstate such previously removed tenor.

(e)    <u>Benchmark Unavailability Period</u>.  Upon the Borrowers' receipt of notice of the commencement of a Benchmark Unavailability Period, (i) the Borrowers may revoke any pending request for a Term SOFR Borrowing of, conversion to or continuation of Term SOFR Loans to be made, converted or continued during any Benchmark Unavailability Period and, failing that, the Borrowers will be deemed to have converted any such request into a request for a Borrowing of or conversion to ABR Loans and (ii) any outstanding affected Term SOFR Loans will be deemed to have been converted to ABR Loans at the end of the applicable Interest Period.  During a Benchmark Unavailability Period or at any time that a tenor for the then-current Benchmark is not an Available Tenor, the component of the Alternate Base Rate based upon the then-current Benchmark or such tenor for such Benchmark, as applicable, will not be used in any determination of the Alternate Base Rate.

Section 2.24    <u>Joint and Several Liability of Borrowers</u>.  Each Borrower is jointly and severally liable under this Agreement for all of the Obligations, regardless of the manner or amount in which proceeds of any Loans are used, allocated, shared or disbursed by or among the Borrowers themselves, or the manner in which the Administrative Agent and/or any other Secured Party accounts for such Term Loans or such other Obligations on its books and records. Each Borrower shall be liable for all amounts due to the Administrative Agent and/or any Lender from any Borrower under this Agreement, regardless of which Borrower actually receives Term Loans hereunder or the amount of such Term Loans received or the manner in which the Administrative Agent and/or such Lender accounts for such Term Loans on its books and records. Each Borrower's Obligations with respect to Term Loans

made to it hereunder, and such Borrower's Obligations arising as a result of the joint and several liability of such Borrower hereunder with respect to Term Loans made to the other Borrowers hereunder shall be separate and distinct obligations, but all such Obligations shall be primary obligations of such Borrower. The Borrowers acknowledge and expressly agree with the Administrative Agent and each Lender that the joint and several liability of each Borrower is required solely as a condition to, and is given solely as inducement for and in consideration of, credit or accommodations extended or to be extended under the Loan Documents to any or all of the other Borrowers and is not required or given as a condition of credit extensions to such Borrower. Each Borrower's Obligations under this Agreement shall, to the fullest extent permitted by law, be unconditional irrespective of (i) the release of any other Borrower pursuant to the terms of this Agreement or the validity or enforceability, avoidance, or subordination of the Obligations of any other Borrower under this Agreement or of any promissory note or other document evidencing all or any part of the Obligations of any other Borrower under this Agreement, (ii) the absence of any attempt to collect the Obligations under this Agreement from any other Borrower, or any other security therefor, or the absence of any other action to enforce the same, (iii) the waiver, consent, extension, forbearance, or granting of any indulgence by the Administrative Agent, the Collateral Agent and/or any Lender with respect to any provision of any instrument evidencing the Obligations of any other Borrower under this Agreement, or any part thereof, or any other agreement now or hereafter executed by any other Borrower and delivered to the Administrative Agent, the Collateral Agent and/or any Lender, (iv) the failure by the Administrative Agent, the Collateral Agent and/or any Lender to take any steps to perfect and maintain its security interest in, or to preserve its rights to, any security or collateral for the Obligations of any other Borrower under this Agreement or (v) any other circumstances which might constitute a legal or equitable discharge or defense of a guarantor or of any other Borrower. With respect to any Borrower's Obligations arising as a result of the joint and several liability of the Borrowers hereunder with respect to Term Loans made to any of the other Borrowers hereunder, such Borrower waives, until such Obligations shall have been indefeasibly paid in full in cash and this Agreement shall have been terminated, any right to enforce any right of subrogation or any remedy which the Administrative Agent, the Collateral Agent and/or any Lender now has or may hereafter have against any other Borrower, any endorser or any guarantor of all or any part of such Obligations, and any benefit of, and any right to participate in, any security or collateral given to the Administrative Agent, the Collateral Agent and/or any Lender to secure payment of such Obligations or any other liability of any Borrower to the Administrative Agent, the Collateral Agent and/or any Lender. Upon an Event of Default which has occurred and is continuing, the Administrative Agent and/or the Collateral Agent may proceed directly and at once, without notice, against any Borrower to collect and recover the full amount, or any portion of such Obligations, without first proceeding against any other Borrower or any other Person, or against any security or collateral for such Obligations. Each Borrower consents and agrees that neither the Administrative Agent nor the Collateral Agent shall be under any obligation to marshal any assets in favor of any Borrower or against or in payment of any or all of such Obligations.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES

Each Loan Party represents and warrants to the Lenders and Agents that:

Section 3.01      Organization; Powers.  Each of the Loan Parties and its Subsidiaries (a) is duly organized, validly existing and in good standing (to the extent such concept exists in the relevant jurisdictions) under the laws of the jurisdiction of its organization, incorporation, amalgamation or continuance, (b) subject to the entry and terms of the Bankruptcy Court DIP Order and the Canadian DIP Recognition Order and other orders of the Bankruptcy Court and Canadian Court, as applicable, has the corporate or other organizational power and authority to carry on its business as now conducted and as proposed to be conducted and to execute, deliver and perform its obligations under each Loan Document to which it is a party and to effect the Transactions and (c) except where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect, is qualified to do business in, and is in good standing in, every jurisdiction where such qualification is required, including jurisdictions where its ownership, lease or operation of properties requires such qualification.

Section 3.02      Authorization; Enforceability.  Subject to the entry of and terms of the Bankruptcy Court DIP Order and the Canadian DIP Recognition Order and the other orders of the Bankruptcy Court and the Canadian Court, as applicable, the Transactions are entered into by each Loan Party have been duly authorized by all necessary corporate or other action and, if required, action by the holders of such Loan Party's Equity Interests. Subject to the entry of and terms of the Bankruptcy Court DIP Order and the Canadian DIP Recognition Order and

the other orders of the Bankruptcy Court and the Canadian Court, as applicable, this Agreement has been duly executed and delivered by each of the Parents and the Borrowers and constitutes, and each other Loan Document to which any Loan Party is to be a party, when executed and delivered by such Loan Party, will constitute, a legal, valid and binding obligation of such Loan Party, as the case may be, enforceable against it in accordance with its terms, subject to (i) the effects of applicable bankruptcy, insolvency, arrangement, reorganization, fraudulent conveyance, moratorium or other similar laws affecting creditors' rights generally, (ii) and subject to general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law), (iii) implied covenants of good faith and fair dealing, (iv) any foreign laws, rules and regulations as they relate to pledges of Equity Interests in Foreign Subsidiaries that are not Loan Parties.

Section 3.03    Governmental Approvals; No Conflicts.  Other than the Bankruptcy Court DIP Order and the Canadian DIP Recognition Order, the Transactions (a) do not require any consent or approval of, registration or filing with, or any other action by, any Governmental Authority, except such as have been obtained or made and are in full force and effect and except filings necessary to perfect Liens created under the Loan Documents, (b) will not violate (i) the Organizational Documents of, or (ii) any Requirements of Law applicable to, any of the Loan Parties or any of its Subsidiaries, unless stayed by the Chapter 11 Cases or the Canadian Recognition Proceedings, as applicable, (c) will not violate (other than violations arising as a result of the commencement of the Chapter 11 Cases or the Canadian Recognition Proceedings and except as otherwise excused by the Bankruptcy Court or the Canadian Court, as applicable) or result in a default under any indenture or other agreement or instrument in respect of Material Indebtedness binding upon any of the Loan Parties or any of its Subsidiary or their respective assets, or give rise to a right thereunder to require any payment, repurchase or redemption to be made by any of the Loan Parties or any of its Subsidiaries, or give rise to a right of (other than rights arising as a result of the commencement of the Chapter 11 Cases or the Canadian Recognition Proceedings and except as otherwise excused by the Bankruptcy Court or Canadian Court, as applicable), or result in, termination, cancellation or acceleration of any obligation thereunder and (d) will not result in the creation or imposition of any Lien on any asset of any of the Loan Parties or any of its Subsidiaries, except Liens created under the Loan Documents, except (in the case of each of clauses (a), (b)(ii) and (c) above) to the extent that the failure to obtain or make such consent, approval, registration, filing or action, or such violation, as the case may be, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

Section 3.04    Financial Condition; No Material Adverse Effect.

(a)     The unaudited balance sheets and related statements of income, stockholders' equity and cash flows as of and for the fiscal quarter ended September 30, 2023 for each of the Parents and their subsidiaries and (b) (i) the audited consolidated balance sheets for the fiscal years ended December 31, 2021 and December 31, 2022 and (ii) statements of income, stockholders' equity, and cash flow as of and for the fiscal years ended December 31, 2021 and December 31, 2022 for each of the Parents and their subsidiaries, including in each case the notes thereto, if applicable, present fairly in all material respects the consolidated financial condition of each of the Parents and their subsidiaries as of the dates and for the periods referred to therein and the results of operations and, if applicable, cash flows for the periods then ended, and, except as set forth on Schedule 3.04, were prepared in accordance with GAAP applied on a consistent basis throughout the periods covered thereby, except, in the case of interim period financial statements, for the absence of notes and for normal year-end adjustments and except as otherwise noted therein.

(b)     Since the Petition Date, there has been no event or circumstance, either individually or in the aggregate, that has had or would reasonably be expected to have a Material Adverse Effect.

Section 3.05    Properties.

(a)     Subject to the entry of the Bankruptcy Court DIP Orders, each of the Borrowers and the Subsidiary Loan Parties has good title to all the Mortgaged Properties, (i) free and clear of all Liens except for Permitted Liens or Liens arising by operation of law and (ii) except for defects in title that do not materially interfere with its ability to conduct its business as currently conducted or as proposed to be conducted or to utilize such properties for their intended purposes.

(b)        No Mortgage encumbers Mortgaged Property that has improvements located in a Special Flood Hazard Area unless flood insurance available under the National Flood Insurance Act of 1968 (as now or hereafter in effect or any successor statute thereto) has been obtained in accordance with Section 5.06.

(c)        The name, official number, jurisdiction of registration and flag, and record owner (whether or not such record owner is a Loan Party) of each Material Vessel and Additional Collateral Vessel as of the date hereof is set forth on Schedule 1.01(F), and each such Material Vessel and Additional Collateral Vessel is owned by the record owner set forth on Schedule 1.01(F) free and clear of all Liens except for Permitted Vessel Liens.

(d)        Each Vessel is operated in material compliance with all applicable Requirements of Law.

(e)        As of the date hereof, there is no pending or threatened condemnation, confiscation, requisition, purchase, seizure or forfeiture of, or any taking of title to any Vessel.

(f)        The record owner of each Material Vessel and Additional Collateral Vessel set forth on Schedule 1.01(F) that is operated in the coastwise trade of the United States is a Citizen of the United States and any operator thereof is such a Citizen to the extent required by law.

(g)        Each Material Vessel and Additional Collateral Vessel set forth on Schedule 1.01(F) operated in a trade other than the coastwise trade of the United States is duly documented as required by the laws of the jurisdiction of registration and flag in which it is documented and is in material compliance with the Requirements of Law for the trade in which such Material Vessel and Additional Collateral Vessel, as applicable, is in fact operated and each owner and/or operator of such Material Vessel and Additional Collateral Vessel, as applicable, complies in all respects with the requirements of such laws in respect of its nationality or citizenship.

(h)        No Material Vessel or Additional Collateral Vessel is subject to any charter except to a Loan Party.  No Material Vessel or Additional Collateral Vessel is subject to any management agreement except with a Loan Party.

Section 3.06        Litigation and Environmental Matters.

(a)        Except the Chapter 11 Cases, the Canadian Recognition Proceedings and as set forth in Schedule 3.06(a), as of the date hereof, there are no actions, suits or proceedings by or before any arbitrator or Governmental Authority pending against or, to the knowledge of any Parent or any Borrower, threatened against or affecting any of the Loan Parties or any of their Subsidiaries that could reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect.

(b)        Except with respect to any other matters that, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect, none of any Borrower or any Subsidiary (i) has failed to comply with any Environmental Law or to obtain, maintain or comply with any permit, license or other approval required under any Environmental Law, (ii) has, to the knowledge of any Parent or any Borrower, become subject to any Environmental Liability, (iii) has received written notice of any claim with respect to any Environmental Liability, (iv) has, to the knowledge of any Borrower, any basis to reasonably expect that any of the Loan Parties or any of its Subsidiaries will become subject to any Environmental Liability or (v) currently owns, leases or operates, or to the knowledge of any Borrower or any Subsidiary, has formerly owned, leased or operated any properties which contain or where there has been a Release or threat of Release of any Hazardous Materials in amounts or concentrations which constitute a violation of, could reasonably be expected to result in any of the Loan Parties or any of its Subsidiaries incurring Environmental Liability, or require investigation, response or other corrective action by any Borrower or any Subsidiary under, applicable Environmental Laws.  To the knowledge of any Parent and any Borrower, all Hazardous Materials transported from any property currently or formerly owned or operated by any of the Loan Parties or any of its Subsidiaries for off-site disposal have been disposed of in a manner which would not reasonably be expected to result, individually or in the aggregate, in a Material Adverse Effect.  There has been no material written environmental assessment or audit conducted by or on behalf of and in the possession, custody or control of any of the Loan Parties or any of its Subsidiaries of any property, currently or, to Parents' or

any Borrower's knowledge, formerly owned or leased by any of the Loan Parties or any of its Subsidiaries that has not been provided to the Administrative Agent prior to the date hereof.

Section 3.07    Compliance with Laws and Agreements.  Each of the Loan Parties and its Subsidiaries is in material compliance with (a) its Organizational Documents, (b) all Requirements of Law applicable to it or its property, unless stayed by the Chapter 11 Cases or the Canadian Recognition Proceedings, and (c) all indentures and other agreements and instruments in respect of Material Indebtedness binding upon it or its property, except, in the case of clauses (b) and (c) of this Section, where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

Section 3.08    Investment Company Status.  None of the Loan Parties or any of its Subsidiary is required to register as an "investment company" as defined in, or subject to regulation under, the Investment Company Act of 1940, as amended from time to time.

Section 3.09    Taxes.  Except for failures that could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect and subject to the Bankruptcy Code, the CCAA, the terms of the applicable Bankruptcy Court DIP Order and the Canadian DIP Recognition Order, and any required approvals by the Bankruptcy Court and Canadian Court, the Loan Parties and each of their Subsidiaries (a) have timely filed (taking into account any extensions), caused to be filed or have had filed on their behalf all Tax returns and reports required to have been filed with the appropriate Governmental Authorities in all jurisdictions in which such Tax returns are required to be filed and all such Tax returns are true and correct in all material respects, and (b) have timely paid or caused to be timely paid all Taxes levied or imposed on it or its properties, income or assets (whether or not shown on a Tax return) including in their capacity as tax withholding agents, except any Taxes that are being contested in good faith by appropriate proceedings, provided that such Loan Party or such Subsidiary, as the case may be, has set aside on its books adequate reserves therefore in accordance with GAAP or the payment of which is stayed by the Chapter 11 Cases or the Canadian Recognition Proceedings.

There is no current, pending or proposed Tax assessment, deficiency or other claim against any of the Loan Parties or any of its Subsidiaries except (i) those being actively contested by such Loan Party or such Subsidiary in good faith and by appropriate proceedings diligently conducted that stay the enforcement of the Tax in question and for which adequate reserves have been provided in accordance with GAAP or (ii) those that would not reasonably be expected to, individually or in the aggregate, have a Material Adverse Effect.  None of the Loan Parties or any of its Subsidiaries has participated in a "listed transaction" within the meaning of Treasury Regulation Section 1.6011-4(b)(2).

Section 3.10    ERISA.  Except as would not reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect:  (i) no Reportable Event has occurred during the past five years as to which any of the Loan Parties or any of their Subsidiaries or any ERISA Affiliate was required to file a report with the PBGC; (ii) no ERISA Event has occurred or is reasonably expected to occur; and (iii) none of the Loan Parties or any of their Subsidiaries or any of their ERISA Affiliates has received any written notification that any Multiemployer Plan is in reorganization or has been terminated within the meaning of Title IV of ERISA.

Section 3.11    Disclosure.  None of the reports, financial statements, certificates or other written information furnished by or on behalf of any Loan Party to the Administrative Agent or any Lender in connection with the negotiation of any Loan Document or delivered thereunder (as modified or supplemented by other information so furnished) when taken as a whole contains any material misstatement of fact or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not materially misleading; provided that, with respect to projected financial information, the Parents and the Borrowers represent only that such information was prepared in good faith based upon assumptions believed by them to be reasonable at the time delivered and, if such projected financial information was delivered prior to the date hereof, as of the date hereof, it being understood that any such projected financial information may vary from actual results and such variations could be material.

Section 3.12    Subsidiaries.  As of the date hereof, Schedule 3.12 sets forth the name of, and the ownership interest of each Parent and each Subsidiary in, each Subsidiary.

Section 3.13    Intellectual Property; Licenses, Etc.  The Borrowers and their Subsidiaries own, license or possess the right to use, all Intellectual Property that is reasonably necessary for the operation of their businesses as currently conducted, free and clear of all Liens except Permitted Liens, except as, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.  No Intellectual Property used by any Borrower or any Subsidiary and the operation of their respective business as currently conducted infringes upon or violates any rights held by any Person except for such infringements or violations, individually or in the aggregate, which could not reasonably be expected to have a Material Adverse Effect.  No claim or litigation regarding any Intellectual Property is pending or, to the knowledge of the Borrowers, threatened against any Borrower or any of its Subsidiary, which, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

Section 3.14    [Reserved].

Section 3.15    [Reserved].

Section 3.16    Federal Reserve Regulations.  No Borrower or Subsidiary is engaged or will engage, principally or as one of its important activities, in the business of purchasing or carrying margin stock (within the meaning of Regulation U of the Board of Governors), or extending credit for the purpose of purchasing or carrying margin stock.  No part of the proceeds of the Loans will be used, directly or indirectly, to purchase or carry any margin stock or to refinance any Indebtedness originally incurred for such purpose, or for any other purpose that entails a violation (including on the part of any Lender) of the provisions of Regulations U or X of the Board of Governors.

Section 3.17    Purpose of Loans.  The proceeds of the Initial Term Loans and the Delayed Draw Term Loans will be used in accordance in all material respects with the terms of the Bankruptcy Court DIP Order, the Canadian DIP Recognition Order and the Loan Documents, including, without limitation: (i) to pay amounts due to Lenders and the Agents hereunder and professional fees and expenses (including legal, financial advisor, appraisal and valuation-related fees and expenses) incurred by Lenders and the Agents, including those incurred in connection with the preparation, negotiation, documentation and court approval of the transactions contemplated hereby and (ii) to provide working capital, and for other general corporate purposes of the Loan Parties, and to pay administration costs of the Chapter 11 Cases and the Canadian Recognition Proceedings and Professional Fees and all other obligations benefiting from the Carve Out and the Canadian Administration Charge (without regard to whether such obligations are provided for in a Budget) and claims or amounts approved by the Bankruptcy Court and the Canadian Court (if applicable) and for any other purpose not prohibited by the terms hereof.  The Bridge Refinancing Loans will be used, or deemed to be used, to repay all outstanding obligations outstanding under the Prepetition Incremental Super Senior Credit Agreement.

Section 3.18    USA PATRIOT Act; Conflict with Sanctions Laws.

(a)    On the date hereof, each Loan Party is in compliance in all material respects with the material provisions of the USA PATRIOT Act, and the Borrowers have provided to the Administrative Agent all information related to the Loan Parties (including names, addresses, a duly executed Internal Revenue Service Form W-9 or other tax identification numbers (if applicable)) reasonably requested in writing by the Administrative Agent not less than ten (10) Business Days prior to the date hereof and mutually agreed to be required under "know your customer" and anti-money laundering rules and regulations, including the USA PATRIOT Act, to be obtained by the Administrative Agent or any Lender.

(b)    None of any Borrower or any of its Subsidiaries or, to the knowledge of any Parent or any Borrower, any director, officer, agent or employee of any of the Loan Parties or any of its Subsidiaries is a person, government, country or entity with whom transactions or dealings would be prohibited for Persons to engage in under any of the sanctions administered by the U.S. Department of the Treasury's Office of Foreign Assets Control, the U.S. Department of Commerce, and the U.S. Department of State, as well as the Government of Canada, the European Union, Her Majesty's Treasury or other relevant sanctions authority with jurisdiction over such person (collectively "Sanctions"), nor is any Borrower or any of its Subsidiaries located, organized, resident, doing business or conducting transactions with the government of, or persons within, a country or territory that is the subject of Sanctions; and the Borrowers will not directly, or knowingly, indirectly use the proceeds from the Loans, or lend, contribute or otherwise make available such proceeds to any Subsidiary, joint venture partner or other Person (i) to

69

fund any activities of or business with any Person that, at the time of such funding, is the subject of Sanctions, or is in any country or territory that, at the time of such funding or facilitation, is the subject of Sanctions, or (ii) in any other manner that will result in a violation by any Person (including any Person participating in the transaction, whether as Lender, Agent or otherwise) of Sanctions.

Section 3.19    No Unlawful Contributions or Other Payments.  The Loan Parties and their Subsidiaries are in compliance in all material respects with the Foreign Corrupt Practices Act, as amended, and rules and regulations thereunder ("FCPA"), the UK Bribery Act, the Corruption of Foreign Public Officials Act (Canada) and any other applicable anti-corruption laws ("Anti-Corruption Laws").  No part of the proceeds of the Loans will be used directly or to the knowledge of any Borrower, indirectly, for any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of Anti-Corruption Laws.

Section 3.20    Labor Matters.  Except as, individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect:  (a) there are no strikes or other labor disputes pending or threatened against any Parent, any Borrower or any of the Subsidiaries; (b) the hours worked and payments made to employees of the Parents, the Borrowers and the Subsidiaries have not been in violation of the Fair Labor Standards Act or any other applicable law dealing with such matters; and (c) all payments due from any Parent, any Borrower or any of the Subsidiaries or for which any claim may be made against any Parent, any Borrower or any of the Subsidiaries, on account of wages and employee health and welfare insurance and other benefits have been paid or accrued as a liability on the books of such Parent, such Borrower or such Subsidiary to the extent required by GAAP.

Section 3.21    Insurance.  Schedule 3.21 sets forth a true, complete and correct description, in all material respects, of all material insurance (excluding any title insurance) maintained by or on behalf of any Borrower or the Subsidiaries as of the date hereof.  As of such date, such insurance is in full force and effect.

Section 3.22    Security Documents.  Upon execution and delivery thereof by the parties thereto and upon the entry by the Bankruptcy Court of the Bankruptcy Court DIP Order and by the Canadian Court of the Canadian DIP Recognition Order, as applicable, the Security Documents are effective to create in favor of the Collateral Agent (for the benefit of the Secured Parties) or, if so contemplated by the respective Security Document, the Collateral Agent and the other Secured Parties, in each case, a legal, valid and enforceable security interest in the Collateral (and in the case of the Canadian DIP Recognition Order, the Canadian Collateral) described therein and proceeds thereof (subject to the exceptions set forth in Section 3.03).  Upon the entry by the Bankruptcy Court of the Bankruptcy Court DIP Order and by the Canadian Court of the Canadian DIP Recognition Order, as applicable, and in accordance therewith, the security interests and liens granted to the Collateral Agent to secure the Secured Obligations pursuant to the Bankruptcy Court DIP Order and the Canadian DIP Recognition Order, as applicable, and the Security Documents shall automatically, and without further action, constitute a fully perfected Lien on, and security interest in, all right, title and interest of the Loan Parties in such Collateral (and in the case of the Canadian DIP Recognition Order, the Canadian Collateral) (subject to Liens permitted by Section 6.02 and the Carve-Out), subject to filings or actions required to perfect any Liens in foreign jurisdictions.

Section 3.23    Budget and Financial Plan.

The Budget was prepared in good faith based on assumptions believed by the Loan Parties to be reasonable at the time prepared and upon information believed by the management of the Borrowers to have been reasonable based upon the information available to the management of the Borrowers at the time such Budget was prepared; it being understood and agreed that the information and/or projections included in the Budget are not to be viewed as facts and are subject to significant contingencies, many of which are not within the control of the Borrowers and/or any Subsidiary, and that projected or estimated information may differ from actual results, and such differences may be material.  Upon the delivery of any Variance Report in accordance with this Agreement, such Variance Report shall fairly represent, in all material respects, the information covered thereby.

Section 3.24    Lien Priority.  On the Closing Date, the Loans and the Obligations hereunder shall be secured and have the priority set forth in the Interim DIP Order.

### ARTICLE IV
### CONDITIONS

Section 4.01    Closing Date.  The obligations of the Lenders to make Loans on the Closing Date is subject to each of the following conditions, each of which shall be satisfied on or prior to the Closing Date (or waived by each Lender in its sole discretion):

(a)      The Administrative Agent (or its counsel) shall have received from each party hereto either (i) a counterpart of this Agreement signed on behalf of such party or (ii) written evidence satisfactory to the Administrative Agent (acting at the direction of the Required Lenders) (which may include facsimile or other electronic transmission of a signed counterpart of this Agreement) that such party has signed a counterpart of this Agreement.

(b)      [reserved].

(c)      The Administrative Agent shall have received a written opinion (addressed to the Administrative Agent, the Collateral Agent and the Lenders and dated on or prior to the Closing Date) of (w) Paul, Weiss, Rifkind, Wharton & Garrison LLP, New York, Delaware and California counsel for the Loan Parties, (x) [reserved], (y) Borden Ladner Gervais LLP, Ontario counsel for the Loan Parties, and (z) Stewart McKelvey, Nova Scotia counsel to Loan Parties, in each case, in form and substance reasonably satisfactory to the Administrative Agent (acting at the direction of the Required Lenders), covering such matters relating to the Loan Documents as the Administrative Agent (acting at the direction of the Required Lenders) shall reasonably request.  Each of the Parents and the Borrowers hereby requests such counsel to deliver such opinion.

(d)      The Administrative Agent shall have received a certificate of the Parents and Borrowers, dated on or about the date hereof, to the effect set forth in Sections 4.01(m) and 4.01(p) hereof.

(e)      The Administrative Agent shall have received a certificate of each Loan Party, dated on or about the date hereof attaching a copy of (i) each Organizational Document of each Loan Party certified, to the extent applicable, as of a recent date by the applicable Governmental Authority, (ii) signature and incumbency certificates of the Responsible Officers of each Loan Party executing the Loan Documents to which it is a party, (iii) resolutions of the board of directors and/or similar governing bodies of each Loan Party approving and authorizing the execution, delivery and performance of Loan Documents to which it is a party, certified as of a date on or prior to the date hereof by its secretary, an assistant secretary or a Responsible Officer as being in full force and effect without modification or amendment, and (iv) a good standing certificate, certificate of compliance or other similar certificate from the applicable Governmental Authority of each Loan Party's jurisdiction of incorporation, organization, continuance, amalgamation or formation.

(f)      The Administrative Agent, the Collateral Agent and the Lenders, as applicable, shall have received all fees payable thereto, including those set forth in the Agent Fee Letter, or to any Lender on or prior to the Closing Date and, to the extent invoiced at least one (1) Business Day prior to the Closing Date, reimbursement or payment of all reasonable and documented out-of-pocket expenses (including reasonable fees, charges and disbursements of ArentFox Schiff LLP, lead counsel to the Administrative Agent and the Collateral Agent, Perella Weinberg Partners, financial advisor to the Lenders, FTI Consulting, Inc., financial advisor to the Lenders, Milbank LLP, New York counsel to the Lenders, local counsel in each applicable jurisdiction (including Canada and Australia) and maritime counsel) required to be reimbursed or paid by any Loan Party hereunder or under any Loan Document.

(g)      The Collateral and Guarantee Requirement  (other than to the extent contemplated by Section 5.15 (which, for the avoidance of doubt, shall override the applicable clauses of the definition of "Collateral and Guarantee Requirement" for the purposes of this Section 4.01), and subject to the grace periods and post-closing set forth in such definition) shall have been satisfied (or waived) and the Administrative Agent shall have received a completed Perfection Certificate dated as of the Closing Date and signed by a Responsible Officer of each Borrower, together with all attachments contemplated thereby, and none of such Collateral shall be subject to any other pledges, security interests or mortgages except Liens permitted by Section 6.02.

(h)     The Administrative Agent and each Lender shall have received fully executed copies of each Parent Entity Debtor Document.

(i)     [Reserved].

(j)     Since the Petition Date, there shall not have occurred a Material Adverse Effect.

(k)     [Reserved].

(l)     The Restructuring Support Agreement shall have been duly executed and delivered by the parties thereto in form and substance reasonably satisfactory to the Lenders.

(m)     The representations and warranties of each Loan Party set forth in the Loan Documents shall be true and correct in all material respects on the Closing Date; provided that, to the extent that such representations and warranties specifically refer to an earlier date, they shall be true and correct in all material respects as of such earlier date; provided, further, that any representation and warranty that is qualified as to "materiality," "Material Adverse Effect" or similar language shall be true and correct in all respects on the Closing Date, or on such earlier date, as the case may be.

(n)     The Administrative Agent shall have received, in the case of a Borrowing, a Borrowing Request as required by Section 2.03.

(o)     The DIP Funding Account shall have been established.

(p)     No Default or Event of Default shall have occurred and be continuing or would result from the making of any Loans or the consummation of any other Transactions on such date.

(q)     The Lenders and the Administrative Agent shall have received the Budget in form and substance reasonably acceptable to the Required Lenders and the Required Lenders' Advisors.

(r)     (i) The Administrative Agent and Lenders shall have received, at least three Business Days prior to the Closing Date, a duly executed Internal Revenue Service Form W-9 (or other applicable tax form) and all documentation and other information required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including the USA PATRIOT Act and (ii) to the extent any Borrower qualifies as a "legal entity customer" under the Beneficial Ownership Regulation, at least five days prior to the Closing Date, any Lender or Administrative Agent that has requested, in a written notice to the Borrowers at least 10 Business Days prior to the Closing Date, a Beneficial Ownership Certification in relation to any Borrower shall have received such Beneficial Ownership Certification (provided that, upon the execution and delivery by such Lender of its signature page to this Agreement, the condition set forth in this clause (ii) shall be deemed to be satisfied).

(s)     The Administrative Agent shall have received certified copies of Uniform Commercial Code, PPSA, United States Patent and Trademark Office, United States Copyright Office and Canadian Intellectual Property Office, tax and judgment lien searches, bankruptcy and pending lawsuit searches or equivalent reports or searches, each of a recent date listing all effective financing statements, lien notices or comparable documents that name any Loan Party as debtor and that are filed in the United States Patent and Trademark Office, the United States Copyright Office, the Canadian Intellectual Property Office, those state, provincial, territorial and county jurisdictions in which any Loan Party is organized or maintains its principal place of business, as applicable, and such other searches that are required by the Perfection Certificate or that the Administrative Agent deems necessary or appropriate, none of which encumber the Collateral covered or intended to be covered by the Security Documents (other than Permitted Liens).

(t)     The Chapter 11 Cases shall have been commenced and all of the pleadings related to the "first day orders" shall be in form and substance reasonably satisfactory to the Required Lenders; it being understood and agreed that the forms of such orders delivered to counsel to the Required Lenders on the Petition Date are satisfactory to the Required Lenders.

(u)       The Interim DIP Order shall have been entered by the Bankruptcy Court within four (4) Business Days after the Petition Date and the Administrative Agent shall have received a true and complete copy of such order, and such order shall be in full force and effect and shall not have been reversed, modified, amended, stayed or vacated absent prior written consent of the Required Lenders and the Agents.

(v)       The Canadian Recognition Proceedings shall have been commenced and all applications, motions, pleadings, affidavits or other documents filed with the Canadian Court and related to the Canadian Interim Stay Order, the Canadian Initial Recognition Order and the Canadian Supplemental Order shall be in form and substance reasonably satisfactory to the Required Lenders; it being understood and agreed that the forms of such orders delivered to Canadian counsel to the Required Lenders on the Petition Date are satisfactory to the Required Lenders.

(w)       All orders entered by the Bankruptcy Court or the Canadian Court pertaining to the Loan Parties' cash management ("Cash Management Orders") and all motions and other documents filed, and submitted to, the Bankruptcy Court or the Canadian Court in connection therewith shall be in form and substance reasonably satisfactory to the Required Lenders; it being understood and agreed that the forms of such orders, motions and documents delivered to counsel to the Required Lenders on the Petition Date are satisfactory to the Required Lenders.

(x)       No trustee, receiver, interim receiver or examiner with expanded powers shall have been appointed in respect of the Debtors or their business, properties or assets and no motion seeking such relief shall be pending.

(y)       All orders entered by the Bankruptcy Court or the Canadian Court pertaining to any payment of the Loan Parties' vendors or other trade counterparties and all motions and other documents filed, and submitted to, the Bankruptcy Court or the Canadian Court in connection therewith shall be in form and substance reasonably satisfactory to the Required Lenders.

For purposes of determining whether the conditions specified in this Section 4.01 have been satisfied on the Closing Date, by making the Loans hereunder, each Lender that has executed this Agreement shall be deemed to have consented to, approved or accepted, or to be satisfied with, each document or other matter required hereunder to be consented to or approved by or acceptable or satisfactory to such Lender.

Section 4.02       Credit Extensions after the Closing Date.  The obligations of the Lenders to make Credit Extensions after the Closing Date is subject to each of the following conditions, each of which shall be satisfied (or waived by the Required Lenders in their sole discretion) of each of the following conditions precedent:

(a)       The Administrative Agent shall have received, in the case of a Borrowing, a Borrowing Request as required by Section 2.03.

(b)       Since the Closing Date, there shall not have occurred a Material Adverse Effect.

(c)       The representations and warranties of each Loan Party set forth in the Loan Documents shall be true and correct in all material respects as of the date of such Borrowing; provided that, to the extent that such representations and warranties specifically refer to an earlier date, they shall be true and correct in all material respects as of such earlier date; provided, further, that any representation and warranty that is qualified as to "materiality," "Material Adverse Effect" or similar language shall be true and correct in all respects on the Closing Date, or on such earlier date, as the case may be.

(d)       No Default or Event of Default shall have occurred and be continuing or would result from such Borrowing.

(e)       Before giving effect to the applicable Borrowing, the aggregate Delayed Draw Term Loan Commitment on the date of such Borrowing equals or exceeds the requested amount of such Borrowing.

(f)        Before and after giving effect to the applicable Borrowing the Loan Parties shall (i) be in compliance with the Budget and the Milestones as of such date and (ii) after giving effect to the applicable Borrowing the Loan Parties' budgeted ending cash balance at the end of the second week immediately following the date of such Borrowing as set forth on the most recent Budget shall not exceed $22,500,000.

(g)        The Lenders and the Required Lenders' Advisors shall have received a certificate from a Financial Officer of the Borrowers certifying to the effect of clauses 4.02(b) through 4.02(g).

(h)        The Interim Order shall be in full force and effect and shall not have been vacated or reserved, shall not be subject to a stay and shall not have been modified or amended in any respect without the prior written consent of the Required Lenders and (solely with respect to its own rights, obligations, liabilities, duties and treatment) the Administrative Agent.

(i)        The Final DIP Order Entry Date shall have occurred and the Final DIP Order shall be in full force and effect and shall not have been vacated or reversed, shall not be subject to any stay, and shall not have been modified or amended in any respect without the consent of the Administrative Agent (solely with respect to its own rights, obligations, liabilities, duties and treatment) and the Required Lenders, and the Loan Parties and their Subsidiaries shall be in compliance with the Final DIP Order.

(j)        (x) all other material "second day orders" and all related pleadings intended to be entered on or prior to the date of entry of the Final DIP Order and any order establishing material procedures for the administration of the Chapter 11 Cases, shall have been entered by the Bankruptcy Court and (y) all pleadings relating to procedures for approval of significant transactions, including, without limitation, asset sale procedures, regardless of when filed or entered, shall be reasonably satisfactory in form and substance to the Administrative Agent (solely with respect to its own rights, obligations, liabilities, duties and treatment) and the Required Lenders, or this condition is waived by the Administrative Agent (solely with respect to its own rights, obligations, liabilities, duties and treatment) and the Required Lenders.

(k)        the Restructuring Support Agreement shall be in full force and effect, and no breach by the Debtors that would reasonably be expected to give rise to a termination event under Section 13.01 thereof shall have occurred and be continuing thereunder.

(l)        the Collateral Agent, for the benefit of the Secured Parties, shall have valid, binding, enforceable, non-avoidable, and automatically and fully and perfected Liens on, and security interests, in the Collateral, in each case, having the priorities set forth in the Bankruptcy Court DIP Orders and subject only to the payment in full in cash of any amounts due under the Carve Out.

(m)        the Chapter 11 Cases of any of the Debtors shall not have been dismissed or converted to cases under Chapter 7 of the Bankruptcy Code.

(n)        no trustee under Chapter 7 or Chapter 11 of the Bankruptcy Code or examiner with expanded powers shall have been appointed in any of the Chapter 11 Cases.

## ARTICLE V
## AFFIRMATIVE COVENANTS

Each Parent and Parent Entity Debtor (with respect to Section 5.01, Section 5.02, Section 5.04, Section 5.05 and Section 5.09), JB TopCo and each Borrower covenants and agrees with each Lender that, until the Commitments shall have expired or been terminated, the principal of and interest on each Loan and all fees, expenses and all other Obligations shall have been paid in full (other than in respect of contingent indemnification and expense reimbursement claims not then due) (the "Termination Date"), unless the Required Lenders shall otherwise consent in writing, each of the Borrowers and JB TopCo will, and will cause each of their respective Subsidiaries (other than Journey Beyond and any of its Subsidiaries) to:

Section 5.01      Financial Statements, Reports, etc.   Furnish to (x) the Administrative Agent (which will promptly furnish such information to the Lenders) or (y) with respect to Section 5.01(i) through 5.01(p), the Required Lenders' Advisors:

(a)      within 120 days after the end of each fiscal year (or, if delivered in a shorter period to any holder of other Indebtedness in its capacity as such, such shorter period), an audited consolidated balance sheet and related statements of operations, cash flows and owners' equity showing the financial position of the Borrowers and their Subsidiaries as of the close of such fiscal year and the consolidated results of their operations during such year and setting forth in comparative form the corresponding figures for the prior fiscal year, which consolidated balance sheet and related statements of operations, cash flows and owners' equity shall be accompanied by customary management discussion and analysis and audited by independent public accountants of recognized national standing and accompanied by an opinion of such accountants (which opinion shall not be qualified as to scope of audit or as to the status of any Borrower or any Subsidiary as a going concern) to the effect that such consolidated financial statements fairly present, in all material respects, the financial position and results of operations of the Borrowers and their Subsidiaries on a consolidated basis in accordance with GAAP (it being understood that the delivery of annual reports on Form 10-K of the Borrowers and their consolidated Subsidiaries or a registration statement on Form S-1 or Form S-4 shall satisfy the requirements of this Section 5.01(a) to the extent such annual reports or registration statement include the information specified herein);

(b)      within 45 days after the end of each of the first three fiscal quarters of each fiscal year (or, if delivered in a shorter period to any holder of other Indebtedness in its capacity as such, such shorter period), a consolidated balance sheet and related statements of operations and cash flows showing the financial position of the Borrowers and their Subsidiaries as of the close of such fiscal quarter and the consolidated results of their operations during such fiscal quarter and the then-elapsed portion of the fiscal year and setting forth in comparative form the corresponding figures for the corresponding periods of the prior fiscal year, all of which shall be in reasonable detail and which consolidated balance sheet and related statements of operations and cash flows shall be accompanied by customary management discussion and analysis and certified by a Financial Officer of the Borrowers as fairly presenting, in all material respects, the financial position and results of operations of the Borrowers and their Subsidiaries on a consolidated basis in accordance with GAAP (subject to normal year-end audit adjustments and the absence of footnotes) (it being understood that the delivery of quarterly reports on Form 10-Q of the Borrowers and their consolidated Subsidiaries or a registration statement on Form S-1 or Form S-4 shall satisfy the requirements of this Section 5.01(b) to the extent such quarterly reports or registration statement include the information specified herein);

(c)      (x) concurrently with any delivery of financial statements under clause (a) or (b) above, a certificate of a Financial Officer of the Borrowers (i) certifying that no Event of Default or Default has occurred or, if such an Event of Default or Default has occurred, specifying the nature and extent thereof and any corrective action taken or proposed to be taken with respect thereto, (ii) [reserved], (iii) [reserved], (iv) in the case of financial statements under clause (a) above, setting forth the reasonably detailed calculation of Excess Cash Flow for the fiscal year then ended (to the extent not previously delivered) and (v) [reserved] and (y) concurrently with any delivery of financial statements under clause (a) above, if the accounting firm is not restricted from providing such a certificate by its policies office, a certificate of the accounting firm opining on or certifying such statements stating whether they obtained knowledge during the course of their examination of such statements of any Default or Event of Default (which certificate may be limited to accounting matters and disclaim responsibility for legal interpretations);

(d)      promptly after the same become publicly available, copies of all periodic and other publicly available reports, proxy statements and other materials filed by any Parent, any Parent Entity Debtor, any Borrower or any of the Subsidiaries with the SEC, or after an initial public offering, distributed to its stockholders generally, as applicable; provided, however, that such reports, proxy statements, filings and other materials required to be delivered pursuant to this clause (d) shall be deemed delivered for purposes of this Agreement when posted to the website of any Borrower or the website of the SEC and written notice of such posting has been delivered to the Administrative Agent;

(e)      [reserved]

(f)        upon the reasonable request of the Administrative Agent (acting at the direction of the Required Lenders) not more frequently than once per Fiscal Quarter, an updated Perfection Certificate (or, to the extent such request relates to specified information contained in the Perfection Certificate, such information) reflecting all changes since the date of the information most recently received pursuant to this clause (f) or Section 5.11(f);

(g)        promptly, from time to time, such other information regarding the operations, business affairs and financial condition of any Parent, any Parent Entity Debtor, any Borrower or any of the Subsidiaries, or compliance with the terms of any Loan Document as in each case the Administrative Agent (acting at the direction of the Required Lenders) may reasonably request (for itself or on behalf of any Lender);

(h)        in the event that any Parent or any Parent Entity, as the case may be, is not engaged in any business or activity, and does not own any assets or have other liabilities, other than those incidental to its ownership directly or indirectly of the Equity Interests of any Borrower and the incurrence of Indebtedness for borrowed money (and, without limitation on the foregoing, does not have any subsidiaries other than a Borrower and the Subsidiaries and any direct or indirect parent companies of a Borrower that are not engaged in any other business or activity and do not hold any other assets or have any liabilities except as indicated above) such consolidated reporting at such Parent Entity's level in a manner consistent with that described in clauses (a) and (b) of this Section 5.01 for the Borrowers will satisfy the requirements of such paragraphs;

(i)        as soon as available and in any event within thirty (30) days after the end of each month, commencing with the period ending January 31, 2024, unaudited consolidated statements of operations and cash flows of the Borrowers and their Subsidiaries as of the end of such month, accompanied by any material management discussion and analysis which shall include internally-prepared monthly reporting packages;

(j)        substantially concurrent with delivery to the administrative agent and/or lenders pursuant to the Journey Beyond Credit Agreement, copies of all financial statements provided to the administrative agent and/or lenders under the Journey Beyond Credit Agreement;

(k)        on Thursday of each week, commencing with February 29, 2024, the Borrowers shall deliver to the Administrative Agent and the Required Lenders' Advisors a budget variance report that sets forth up to and including the last Budget Testing Date (A) actual results against anticipated results under the applicable Budget for the Budget Testing Period in regard which such accompanying cash flow forecast is being delivered, reported on a cumulative and a week-by-week basis (in each case, highlighting key line items) as of the end of such period, (B) the variance in dollar amounts and percentages, on a line item basis, (C) a written explanation for all line item variances for any given Budget Testing Period and (D) such other information as the Required Lenders' Advisors may reasonably request with reasonable advance notice to the Borrowers (each, a "Variance Report");

(l)        promptly, and in any event within two (2) Business Days after the same becomes internally available, the Borrowers shall provide information regarding the AQV Wind-Down Plan or any material developments related thereto (including, for the avoidance of doubt, access to any dataroom, outreach lists, process letters, copies of any proposal letters and any internally prepared materials (including substantially final drafts) prepared for management or potential buyers or bidders, in each case relating to all or any part of the "Overnight" business);

(m)        no later than March 21, 2024, and no later than the Thursday of each fourth week thereafter (or more frequently as the Borrowers may elect), the Loan Parties shall provide the Administrative Agent and the Required Lenders' Advisors with an updated 13-week statement for the subsequent 13-week period (a "Revised Budget"), which Revised Budget, if requested by the Borrowers (and if no Revised Budget has been requested to supersede the Budget prior to the 12-week anniversary of the Closing Date, the Borrowers shall be deemed to have so requested with respect to the Revised Budget delivered on or about each 12-week anniversary of the Closing Date), may modify and supersede any prior Budget upon the approval of the Required Lenders' Advisors (with an e-mail from the Required Lenders' Advisors being sufficient) in their sole discretion;

(n)        promptly upon delivery (and in any event within one Business Day thereof) to management copies of all internally prepared KPI and financial reporting packages that are currently prepared in the ordinary course;

(o)　　　at least two (2) calendar days in advance of such filing or as promptly as practicable, (i) drafts of all pleadings, motions, applications, judicial information, financial information, notices, reports, orders and other documents intended to be filed by or on behalf of any Debtor with the Bankruptcy Court in the Chapter 11 Cases, or distributed by or on behalf of any of the Debtors or any other Loan Party to any official committee appointed in the Chapter 11 Cases and (ii) drafts of all filings, motions, pleadings, other papers or material notices intended to be filed by or on behalf of any Debtor or the Foreign Representative of any such Debtor, or any other Loan Party with the Canadian Court in the Canadian Recognition Proceedings, including all motions for all Canadian Orders; and

(p)　　　the proposed service list in connection with any Order or relief sought by any Debtor from the Canadian Court.

The Borrowers hereby acknowledge and agrees that all financial statements and certificates furnished pursuant to paragraphs (a), (b) and (d) above are hereby deemed to be Borrower Materials suitable for distribution, and to be made available, to Public Lenders as contemplated by the next paragraph and may be treated by the Administrative Agent and the Lenders as if the same had been marked "PUBLIC" in accordance with such paragraph (unless the Borrowers otherwise notify the Administrative Agent on or prior to the delivery thereof).

The Borrowers hereby agree that they will use commercially reasonable efforts to identify that portion of the Borrower Materials that may be distributed to the Public Lenders and that (i) all such Borrower Materials shall be clearly and conspicuously marked "PUBLIC" which, at a minimum, shall mean that the word "PUBLIC" shall appear prominently on the first page thereof, (ii) by marking Borrower Materials "PUBLIC," the Borrowers shall be deemed to have authorized the Administrative Agent and the Lenders to treat such Borrower Materials as solely containing information that is either (A) publicly available, (B) of a type that would reasonably be expected to be publicly available if any Parent or any Borrower were a public reporting company or (C) not material (although it may be sensitive and proprietary) with respect to any Parent, any Borrower or its Subsidiaries or any of their respective securities for purposes of United States Federal and state securities laws (provided, however, that such Borrower Materials shall be treated as set forth in Section 9.12, to the extent such Borrower Materials constitute information subject to the terms thereof), (iii) all Borrower Materials marked "PUBLIC" are permitted to be made available through a portion of the Platform designated "Public Investor"; and (iv) the Administrative Agent shall be entitled to treat any Borrower Materials that are not marked "PUBLIC" as being suitable only for posting on a portion of the Platform not designated "Public Investor"; provided, that the Administrative Agent may deem the Loan Documents and the documents required to be delivered pursuant to Sections 5.01(a), (b) and (d) to be marked "PUBLIC."

Notwithstanding anything to the contrary set forth herein, for purposes of this Section 5.01, neither JB TopCo nor HB TopCo shall be deemed to be a Subsidiary.

Section 5.02　　　Notice of Material Events.  Promptly after any Responsible Officer of any Parent Entity Debtor, any Parent or any Borrower obtains actual knowledge thereof, will furnish to the Administrative Agent (for distribution to each Lender through the Administrative Agent) written notice of the following:

(a)　　　the occurrence of any Default or Event of Default;

(b)　　　to the extent permissible by law, the filing or commencement of any action, suit or proceeding by or before any arbitrator or Governmental Authority against or, to the knowledge of a Financial Officer or another executive officer of any Parent, any Borrower or any Subsidiary, affecting any Parent, any Borrower or any Subsidiary or the receipt of a notice of an Environmental Liability that could reasonably be expected to result in a Material Adverse Effect;

(c)　　　any other development specific to any Parent Entity Debtor, any Parent, any Borrower or any of the Subsidiaries that has had, or would reasonably be expected to have, a Material Adverse Effect,

(d)　　　the occurrence of any ERISA Event that, together with all other ERISA Events that have occurred, could reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect;

(e)        any casualty event with respect to a Material Vessel or Additional Collateral Vessel that result in damage in excess of $1,000,000 and any arrest or detention of a Material Vessel or Additional Collateral Vessel for longer than one (1) day; and

(f)        (i) the occurrence of any Default under and as defined in the Journey Beyond Credit Agreement (no later than five (5) Business Days after the occurrence thereof, unless otherwise cured), (ii) the occurrence of any Event of Default under and as defined in the Journey Beyond Credit Agreement (no later than one (1) Business Day after the occurrence thereof), and (iii) receipt by any Loan Party, JB TopCo, Journey Beyond or any Journey Beyond Subsidiary of any notice of acceleration of the obligations of Journey Beyond or any Journey Beyond Subsidiaries under the Journey Beyond Credit Agreement (no later than one (1) Business Day of receipt of such notice).

Each notice delivered under this Section shall be accompanied by a written statement of a Responsible Officer of each Parent Entity Debtor, each Parent or each Borrower setting forth the details of the event or development requiring such notice and any action taken or proposed to be taken with respect thereto.

Section 5.03        Citizenship.

(a)        Cause each Loan Party which owns a Material Vessel or an Additional Collateral Vessel, as applicable, operated in the coastwise trade of the United States and each Person that operates a Material Vessel or an Additional Collateral Vessel, as applicable, used in the United States coastwise trade:

(i)        to remain a Citizen of the United States qualified in all material respects to own and/or operate such Material Vessel or Additional Collateral Vessel, as applicable, under the laws of the United States; and

(ii)        to comply with and satisfy all applicable Requirements of Law in order that such Material Vessel or Additional Collateral Vessel, as applicable, is and remains documented pursuant to the laws of the United States with endorsements which qualify such Material Vessel or Additional Collateral Vessel, as applicable, to engage in the coastwise trade of the United States of America.

(b)        Cause each Loan Party which owns a Material Vessel or an Additional Collateral Vessel, as applicable, operated in the coastwise trade of the United States of America and each Person that operates a Material Vessel or an Additional Collateral Vessel, as applicable, operated in trades other than the coastwise trade of the United States of America:

(i)        to remain such a citizen as is necessary to qualify in all material respects with the requirements to own and/or operate such Material Vessel or Additional Collateral Vessel, as applicable, under the laws of the jurisdiction of registration and flag of such Material Vessel; and

(ii)        to comply with and satisfy all applicable Requirements of Law of the jurisdiction of registration and flag of such Material Vessel or Additional Collateral Vessel, as applicable, with endorsements or documents which qualify such Material Vessel or Additional Collateral Vessel, as applicable, to engage in such trades as such Material Vessel is engaged in from time to time.

Section 5.04        Existence; Conduct of Business.  Do or cause to be done all things necessary to obtain, preserve, renew and keep in full force and effect its legal existence and the rights, licenses, permits, privileges, franchises, and Intellectual Property, in each case that are material to the conduct of its business, except to the extent (other than with respect to the preservation of the existence of the Parents and the Borrowers) that the failure to do so could not reasonably be expected to have a Material Adverse Effect; provided that the foregoing shall not prohibit (a) any merger, amalgamation, consolidation, liquidation, dissolution or any Disposition permitted by Section 6.05 or (b) the abandonment of Intellectual Property permitted by Section 6.05(k).

Section 5.05        Payment of Taxes.  Subject to the Bankruptcy Court DIP Orders and any required approval by the Bankruptcy Court, pay its obligations and liabilities in respect of Taxes (including in its capacity as a withholding agent) levied or imposed upon it or its properties, income or assets, before the same shall become

78

delinquent or in default, except to the extent (i) any such Taxes are being contested in good faith and by appropriate proceedings and for which adequate reserves have been provided in accordance with GAAP or (ii) the failure to make payment could not reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect.

Section 5.06    Insurance.

(a)    Maintain, with insurance companies that the Parents believe (in the good faith judgment of the management of the Parents) are financially sound and responsible at the time the relevant coverage is placed or renewed, insurance in at least such amounts (after giving effect to any self-insurance which the Parents believe (in the good faith judgment of management of the Parents) is reasonable and prudent in light of the size and nature of its business) and against at least such risks (and with such risk retentions) as the Parents believe (in the good faith judgment or the management of the Parents) are reasonable and prudent in light of the size and nature of its business, and at any time, will furnish to the Lenders, upon written request from the Administrative Agent, information presented in reasonable detail as to the insurance so carried.  Each such policy of insurance shall (i) name the Collateral Agent, on behalf of the Secured Parties, as an additional insured thereunder as its interests may appear and (ii) in the case of each casualty and property insurance policy, contain a loss payable clause or lender's loss payee/mortgagee endorsement that names the Collateral Agent, on behalf of the Secured Parties as the lender's loss payee or mortgagee thereunder (which shall be accomplished pursuant to the Bankruptcy Court DIP Order without any further action required by any Loan Party); provided, that no such endorsement shall be required with respect to any insurance policy of Hornblower Canada Co. currently endorsed in connection with the Niagara Security Agreements.

(b)    If any improvements located on any Mortgaged Property is at any time located in an area identified by the Federal Emergency Management Agency (or any successor agency) as a special flood hazard area (each, a "Special Flood Hazard Area") with respect to which flood insurance has been made available under the National Flood Insurance Act of 1968 (as now or hereafter in effect or any successor act thereto), (i) maintain, or cause to be maintained, with a financially sound and reputable insurer, as determined in the Borrowers' reasonable discretion, flood insurance in an amount reasonably satisfactory to the Administrative Agent (acting at the direction of the Required Lenders) and otherwise sufficient to comply with all applicable rules and regulations promulgated pursuant to the Flood Insurance Laws and (ii) deliver to the Administrative Agent evidence of such compliance in form and substance reasonably acceptable to the Administrative Agent (acting at the direction of the Required Lenders).

Section 5.07    Maintaining Records; Access to Properties and Inspections.  Maintain all financial records in accordance with GAAP and permit any persons designated by the Administrative Agent or, upon the occurrence and during the continuance of an Event of Default, any Lender to visit and inspect the financial records and the properties (which, with respect to the Material Real Properties, shall include permission to conduct non-invasive environmental site assessments where a reasonable basis for such assessments exists) of any Parent, any Borrower or any of the Subsidiaries at reasonable times, upon reasonable prior notice to the Parents or the Borrowers, and as often as reasonably requested and to make extracts from and copies of such financial records, and permit any persons designated by the Administrative Agent or, upon the occurrence and during the continuance of an Event of Default, any Lender upon reasonable prior notice to the Parents or the Borrowers to discuss the affairs, finances and condition of any Parent, any Borrower or any of the Subsidiaries with the officers thereof and independent accountants therefor (so long as the Borrowers have the opportunity to participate in any such discussions with such accountants), in each case, subject to reasonable requirements of confidentiality, including requirements imposed by law or by contract.

Section 5.08    Use of Proceeds.  Use the proceeds of the Loans made on the Closing Date only as contemplated by Section 3.17.

Section 5.09    Compliance with Laws.  Comply with all laws, rules, regulations and orders of any Governmental Authority applicable to it or its property, except where the failure to do so, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect; provided, that this Section 5.09 shall not apply to Environmental Laws, which are the subject of Section 5.10, or to laws related to Taxes, which are the subject of Section 5.05.  The Borrowers and their Subsidiaries will maintain in effect and enforce policies and

procedures reasonably designed to ensure compliance in all material respects by the Borrowers, their Subsidiaries and their respective directors, officers, employees and agents with Anti-Corruption Laws and applicable Sanctions. Loan Parties that own Material Vessels or Additional Collateral Vessels not operated in the United States coastwise trade (which for the avoidance of doubt shall include Material Vessels and Additional Collateral Vessels registered under the laws of the United States for the foreign trade) shall ensure that such Vessels shall be in material compliance with all applicable Requirements of Law of the countries under whose laws they are registered at all times and that the operators of such Vessels shall similarly comply with all such applicable Requirements of Law relating to such Vessels while such Vessels shall be operated by them.

Section 5.10    Compliance with Environmental Laws.  Comply, and make reasonable efforts to cause all lessees and other persons occupying its properties to comply, with all Environmental Laws applicable to its operations and properties; and obtain and renew all material authorizations and permits required pursuant to Environmental Law for its operations and properties, in each case in accordance with Environmental Laws, except, in each case with respect to this Section 5.10, to the extent the failure to do so would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 5.11    Further Assurances.

(a)    Comply with the Collateral and Guarantee Requirement.

(b)    Subject to the provisions of the Collateral and Guarantee Requirement and any applicable limitations in any Security Document and in each case at the expense of the Loan Parties, promptly upon reasonable request by the Administrative Agent or the Collateral Agent, in each case acting at the direction of the Required Lenders, or as may be required by applicable law, (i) correct any material defect or error that may be discovered in the execution, acknowledgment, filing or recordation of any Security Document or other document or instrument relating to any Collateral, and (ii) do, execute, acknowledge, deliver, record, re-record, file, re-file, register and re-register any and all such further acts, deeds, certificates, documents, financing statements, agreement, assurances and other instruments as are necessary or as the Administrative Agent or Collateral Agent, in each case acting at the direction of the Required Lenders, may reasonably request from time to time in order to carry out more effectively the purposes of the Security Documents.  Notwithstanding the foregoing, if any Subsidiary or other Parent Entity, which is not required to be a Loan Party hereunder, guarantees the obligations or becomes an obligor under or with respect to the Senior DIP Credit Agreement, concurrently therewith notify the Administrative Agent in writing, and promptly cause such entity to also become a Guarantor pursuant to documents and arrangements reasonably satisfactory to the Administrative Agent (acting at the direction of the Required Lenders).

Section 5.12    Credit Rating.  The Loan Parties shall use commercially reasonable efforts to obtain a public corporate credit rating (but not a specific rating) from either Standard & Poor's, a division of S&P Global, Inc., or Moody's Investors Service, Inc. in respect of the Facility.

Section 5.13    [Reserved].

Section 5.14    Maintenance of Properties.  Keep and maintain all property material to the conduct of its business in good working order and condition (subject to casualty, condemnation and ordinary wear and tear), except where the failure to do so could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 5.15    Certain Post-Closing Obligations.  As promptly as practicable, and in any event within the time periods after the Closing Date specified in Schedule 5.15 or such later date as the Administrative Agent agrees to in writing in its reasonable discretion, deliver the documents or take the actions specified on Schedule 5.15, in each case except to the extent otherwise agreed by the Administrative Agent (acting at the direction of the Required Lenders) pursuant to its authority as set forth in the definition of the term "Collateral and Guarantee Requirement."  For the avoidance of doubt, with respect to each Mortgaged Property set forth on Schedule 1.01(B) and each Additional Collateral Vessel and Mortgaged Vessel set forth on Schedule 1.01(F), the Collateral and Guarantee Requirement shall be required to be satisfied in the manner set forth therein and in the time periods set forth therein.

Section 5.16    Lender Meetings. (i) On a weekly basis, at a time mutually agreed with the Required Lenders' Advisors that is after the delivery of the information required pursuant to Section 5.1(k), upon the written request of the Required Lenders or the Required Lenders' Advisors, participate in one conference call with the Lenders and the Required Lenders' Advisors to discuss the financial condition and results of operations of the Borrowers and their Subsidiaries and Journey Beyond and its Subsidiaries, the Budget and Variance Report, any "vessel sale" consummated during the preceding one-week period and any material changes or updates to any concession agreement, (ii) on a weekly basis, at a time mutually agreed with the Required Lenders' Advisors, cause its applicable advisors to participate in one 'advisors only' conference call with the Required Lenders' Advisors to discuss the sales process (if any) involving the JB Business, subject to the limitations set forth in Section 7.01(u) and (iii) the Borrowers will participate in a meeting of the Lenders once during each fiscal quarter following the delivery of financial statements required pursuant to Section 5.01(a) or (b), to be held via teleconference at a time mutually and reasonably agreed among the Required Lenders and the Borrowers to discuss the previous fiscal quarter's financial results.

Section 5.17    Bankruptcy Matters.

(a)    cause all proposed (i) "first day" and "second day" (if applicable) orders on a final basis, (ii) orders (other than the Bankruptcy Court DIP Order) related to or affecting the Loans and other Obligations and the Loan Documents, any other financing or use of cash collateral, any sale or other disposition of Collateral outside the ordinary course, cash management, adequate protection, any Plan of Reorganization and/or any disclosure statement related thereto, (iii) orders concerning the financial condition of the Borrowers or any of their respective Subsidiaries or other Indebtedness of the Loan Parties or seeking relief under section 363, 365, 1113 or 1114 of the Bankruptcy Code or section 9019 of the Federal Rules of Bankruptcy Procedure or any similar provision of the CCAA, and (iv) orders establishing material procedures for administration of the Chapter 11 Cases or the Canadian Recognition Proceedings or approving significant transactions submitted to the Bankruptcy Court or the Canadian Court, in each case, proposed by the Loan Parties to be in accordance with and permitted by the terms of this Agreement and reasonably acceptable to the Required Lenders in their reasonable discretion in all respects, it being understood and agreed that the forms of orders approved by the Required Lenders (and with respect to any provision that affects the rights, obligations, liabilities or duties of the Administrative Agent or the Collateral Agent, respectively) prior to the Petition Date are in accordance with and permitted by the terms of this Agreement and are reasonably acceptable in all respects;

(b)    comply in a timely manner with their obligations and responsibilities as debtors in possession under the Bankruptcy Court DIP Order and the Canadian DIP Recognition Order; and

(c)    except as otherwise permitted by an Acceptable Plan or this Agreement, provide prior written notice as soon as reasonably practicable to the Required Lenders prior to any assumption or rejection of any Loan Party's or any Subsidiary's material contracts or material non residential real property leases pursuant to Section 365 of the Bankruptcy Code.

(d)    deliver to the Administrative Agent all documents required to be delivered to creditors under the Restructuring Support Agreement, any applicable restructuring support agreement or any case stipulation; *provided* that the Borrower shall not be required to deliver any such documents provided by any party in interest to the extent that any such document is filed under seal; *provided*, further, that such documents that are filed under seal, to the extent permitted by applicable law, shall be provided to the advisors to the Administrative Agent on a professional eyes' only basis.

Section 5.18    Milestones.

(a)    Comply with the following covenants and milestones in accordance with the dates indicated below, or any later date approved by the Required Lenders in their sole discretion, which approval may be confirmed by e-mail correspondence from the Required Lenders' Advisors (collectively, the "Milestones" and each a "Milestone"):

(i)    commence the Chapter 11 Cases on or before the Petition Date;

(ii)      no later than one (1) day after the Petition Date, file the DIP Motion and AQV Sale Motion;

(iii)      obtain entry by the Bankruptcy Court of the Interim DIP Order no later than three (3) Business Days after the Petition Date;

(iv)      obtain entry of the Interim DIP Recognition Order by the CCAA Court no later than ten (10) calendar days after the entry of the Interim DIP Order;

(v)      obtain entry by the Bankruptcy Court of the AQV Bidding Procedures Order as soon as reasonably practicable but in no event later than fifteen (15) calendar days after the Petition Date;

(vi)      no later than twenty-one (21) calendar days after the Petition Date, file the Plan, Disclosure Statement, Disclosure Statement Motion and Backstop Motion;

(vii)      obtain entry by the Bankruptcy Court of the Final DIP Order and the AQV Sale Order as soon as reasonably practicable but in no event later than forty-five (45) calendar days after the Petition Date;

(viii)      obtain entry of the Final DIP Recognition Order by the CCAA Court as soon as reasonably practicable but in no event later than ten (10) calendar days after the entry of the Final DIP Order;

(ix)      obtain entry by the Bankruptcy Court of the Disclosure Statement Order and the Backstop Order no later than sixty (60) calendar days after the Petition Date;

(x)      obtain entry by the Bankruptcy Court of the Confirmation Order no later than one-hundred-twenty (120) calendar days after the Petition Date;

(xi)      obtain entry of the Confirmation Recognition Order by the CCAA Court no later than ten (10) calendar days after the entry of the Confirmation Order; and

(xii)      cause the Plan Effective Date to occur no later than one-hundred-forty (140) days after the Petition Date; *provided* that this Milestone may be extended by the Debtors up to thirty (30) days if the purpose of such extension is solely to obtain regulatory approvals.

(b)      For purposes of this Section 5.18, capitalized terms not otherwise defined in this Agreement shall have the respective meanings specified in the Restructuring Support Agreement.  Notwithstanding anything to the contrary set forth in this Agreement or any other Loan Document, in the extent any amendment, waiver, supplement or other modification is made to Schedule 1 of the Restructuring Support Agreement, such amendment, waiver, supplement or other modification shall be deemed to be made to this Section 5.18 without any further action required by any party to this Agreement.

## ARTICLE VI
## NEGATIVE COVENANTS

Each Borrower (and in the case of Section 6.12, each Parent and Parent Entity Debtor) and JB TopCo covenants and agrees with each Lender that, until the Termination Date, unless the Required Lenders shall otherwise consent in writing (or with respect to Section 6.16 and Section 6.19, the Required Lenders), the Borrowers will not, and will not permit any of their Subsidiaries (or in the case of JB TopCo will not, and will not permit any of its Subsidiaries (other than Journey Beyond and its subsidiaries)) to:

Section 6.01      Indebtedness.  Incur, create, assume or permit to exist any Indebtedness, except:

(a)      Indebtedness of the Loan Parties or any JB TopCo Restricted Party existing or committed on the Petition Date (<u>provided</u>, that any such Indebtedness that is in excess of $2,000,000 (other than Indebtedness owed by JB TopCo and HB TopCo) shall be set forth on <u>Schedule 6.01</u>);

(b)      Indebtedness created hereunder and under the other Loan Documents;

(c)      [reserved];

(d)      Indebtedness owed to (including obligations in respect of letters of credit or bank guarantees or similar instruments for the benefit of) any person providing workers' compensation, health, disability or other employee benefits or property, casualty or liability insurance to any Borrower or any Subsidiary, pursuant to reimbursement or indemnification obligations to such person, in each case in the ordinary course of business or consistent with past practice or industry practices;

(e)      Unsecured Indebtedness of any Borrower to any other Borrower, any Parent or any Subsidiary or of any Subsidiary to any Parent, any Borrower or any other Subsidiary; <u>provided</u>, that (i) Indebtedness of any Subsidiary that is not a Subsidiary Loan Party owing to the Loan Parties shall be subject to Section 6.04(b), (ii) Indebtedness of any Subsidiary that is not a Subsidiary Loan Party owing to JB TopCo shall not be permitted, and (iii) Indebtedness owed by any Loan Party to any Parent or any Subsidiary that is not a Loan Party shall be unsecured and subordinated to the Obligations under this Agreement on subordination terms substantially in the form of <u>Exhibit G</u> hereto or on other subordination terms reasonably satisfactory to the Administrative Agent (acting at the direction of the Required Lenders);

(f)      Indebtedness in respect of performance bonds, bid bonds, appeal bonds, surety bonds and completion guarantees and similar obligations, in each case provided in the ordinary course of business or consistent with past practice or industry practices, including those incurred to secure health, safety and environmental obligations in the ordinary course of business or consistent with past practice or industry practice, in an aggregate amount not to exceed $1,000,000;

(g)      Indebtedness arising from the honoring by a bank or other financial institution of a check, draft or similar instrument drawn against insufficient funds in the ordinary course of business or other cash management services, in each case incurred the ordinary course of business;

(h)      Indebtedness permitted by the Budget;

(i)       Financing Lease Obligations, mortgage financings and other Indebtedness incurred by any Borrower or any Subsidiary prior to or within 270 days after the acquisition, lease, construction, repair, replacement or improvement of the respective property (real or personal, and whether through the direct purchase of property or the Equity Interest of any person owning such property) permitted under this Agreement in order to finance such acquisition, lease, construction, repair, replacement or improvement, in an aggregate principal amount that at the time of, and after giving effect to, the incurrence thereof, together with the aggregate amount of any other Indebtedness outstanding pursuant to this Section 6.01(i), would not exceed $1,000,000;

(j)      Financing Lease Obligations or other obligations or deferrals attributable to capital spending;

(k)      Unsecured other Indebtedness in an aggregate principal amount that at the time of, and after giving effect to, the incurrence thereof, together with the aggregate amount of any other Indebtedness outstanding pursuant to this Section 6.01(k), would not exceed $1,000,000; <u>provided</u>, that the aggregate principal amount of any such Indebtedness incurred by any Subsidiary that is not a Guarantor shall not exceed at the time of, and after giving effect to, the incurrence thereof, $500,000;

(l)      [reserved];

(m)      Guarantees (i) by any Loan Party of any Indebtedness of any Borrower or any other Loan Party permitted to be incurred under this Agreement, (ii) by any Borrower or any Subsidiary Loan Party of Indebtedness

otherwise permitted hereunder of any Subsidiary that is not a Subsidiary Loan Party to the extent such Guarantees are permitted by Section 6.04 (other than Section 6.04(v)), (iii) by any Subsidiary that is not a Subsidiary Loan Party of Indebtedness of another Subsidiary that is not a Subsidiary Loan Party, and (iv) to the extent outstanding on the Closing Date, by any Borrower of Indebtedness of Subsidiaries that are not Subsidiary Loan Parties incurred for working capital purposes in the ordinary course of business on ordinary business terms so long as such Indebtedness is permitted to be incurred under Section 6.01(t) to the extent such Guarantees are permitted by Section 6.04 (other than Section 6.04(v)); provided that (x) Guarantees by any Borrower or any Subsidiary Loan Party under this Section 6.01(m) of any other Indebtedness of a person that is subordinated to other Indebtedness of such person shall be expressly subordinated to the Obligations under this Agreement to at least the same extent as such underlying Indebtedness is subordinated and (y) no Guarantee by any Subsidiary of any obligations under the Senior DIP Credit Agreement, the Prepetition First Lien Credit Agreement, the Prepetition Revolving Credit Agreement or any other Junior Financing shall be permitted unless such Subsidiary has also provided a Guarantee of the Obligations pursuant to this Agreement;

(n)     Indebtedness arising from agreements entered into prior to the Closing Date of any Borrower or any Subsidiary providing for indemnification, adjustment of purchase or acquisition price or similar obligations (including earn-outs), in each case, incurred or assumed in connection with Investments or the disposition of any business, assets or a Subsidiary not prohibited by this Agreement;

(o)     Indebtedness in respect of letters of credit, bank guarantees, warehouse receipts or similar instruments issued to support performance obligations and trade letters of credit (other than obligations in respect of other Indebtedness) in the ordinary course of business or consistent with past practice or industry practices, in an aggregate amount not to exceed $1,000,000;

(p)     [reserved];

(q)     Indebtedness consisting of (i) the financing of insurance premiums or (ii) take-or-pay obligations contained in supply arrangements, in each case, in the ordinary course of business consistent with past or industry practice;

(r)     [reserved];

(s)     [reserved];

(t)     [reserved];

(u)     Indebtedness incurred in the ordinary course of business in respect of obligations of any Borrower or any Subsidiary to pay the deferred purchase price of goods or services or progress payments in connection with such goods and services; provided, that such obligations are incurred in connection with open accounts extended by suppliers on customary trade terms in the ordinary course of business consistent with past or industry practice and not in connection with the borrowing of money or any Hedging Agreements;

(v)     Indebtedness representing deferred compensation to employees, consultants or independent contractors of any Borrower (or, to the extent such work is done for any Borrower or their respective Subsidiaries, any direct or indirect parent thereof) or any Subsidiary incurred in the ordinary course of business consistent with past or industry practice;

(w)     (i) prior to entry into the Senior DIP Credit Agreement, Indebtedness of the Borrowers or any Subsidiary under the Prepetition Super Senior Credit Agreement, in an aggregate principal amount outstanding that would not exceed an amount equal to $282,876,288.66 and (ii) Indebtedness of the Borrowers or any Subsidiary under the Senior DIP Credit Agreement, in an aggregate principal amount outstanding that would not exceed an amount equal to $300,000,000.00;

(x)     (i) Indebtedness of the Borrowers or any Subsidiary under the Prepetition First Lien Credit Agreement, in an aggregate principal amount outstanding that would not exceed an amount equal to

$695,543,945.45 and (ii) Indebtedness of the Borrowers and any Subsidiary under the Prepetition Revolving Credit Agreement, in an aggregate principal amount outstanding that, would not exceed an amount equal to $26,407,961.78; provided that (A) the incurrence of any Indebtedness pursuant to this clause (x) shall be subject to the last paragraph of this Section 6.01, (B) any amounts incurred under any Prepetition Credit Agreement (including amounts outstanding or committed on the date of this Agreement) shall at all times be deemed to be incurred under this Section 6.01(x) and (C) the foregoing amounts shall, in each case be reduced by an amount equal to any mandatory or voluntary prepayment or repayment made or deemed made in respect of such Indebtedness;

(y)      obligations in respect of Cash Management Agreements in the ordinary course of business;

(z)      [reserved];

(aa)     [reserved];

(bb)     [reserved];

(cc)     [reserved];

(dd)     Indebtedness issued by any Borrower or any of its Subsidiary to current or former officers, directors and employees, their respective estates, spouses or former spouses to finance the purchase or redemption of Equity Interests of any Parent or any Parent Entity permitted by Section 6.06;

(ee)     [reserved];

(ff)     [reserved]; and

(gg)     all premium (if any, including tender premiums) expenses, defeasance costs, interest (including post-petition interest), fees, expenses, charges and additional or contingent interest on obligations described in clauses (a) through (ff) above or refinancings thereof.

Notwithstanding anything to the contrary herein, (i) in no event shall Indebtedness (other than Indebtedness incurred pursuant to Section 6.01(h) that is expressly permitted to be incurred by the Budget) incurred by the Subsidiaries of the Borrowers which are not Loan Parties, in the aggregate, exceed $500,000 and (ii) in no event shall JB TopCo or HB TopCo incur any Indebtedness after the Closing Date.

For purposes of determining compliance with this Section 6.01, the amount of any Indebtedness denominated in any currency other than Dollars shall be calculated based on customary currency exchange rates in effect, in the case of such Indebtedness incurred (in respect of term Indebtedness) or committed (in respect of revolving Indebtedness) on or prior to the Closing Date, on the Closing Date and, in the case of such Indebtedness incurred (in respect of term Indebtedness) or committed (in respect of revolving Indebtedness) after the Closing Date, on the date on which such Indebtedness was incurred (in respect of term Indebtedness) or committed (in respect of revolving Indebtedness). In addition, with respect to any Indebtedness that was permitted to be incurred hereunder on the date of such incurrence, any Increased Amount of such Indebtedness shall also be permitted hereunder after the date of such incurrence.

Section 6.02      Liens.  Create, incur, assume or permit to exist any Lien on any property or assets (including stock or other securities of any person) of any Borrower or any Subsidiary at the time owned by it or on any income or revenues or rights in respect of any thereof, except the following (collectively, "Permitted Liens"):

(a)      Liens on property or assets of the Borrowers and the Subsidiaries existing on the Petition Date (provided, that any such liens that secure obligations (contingent or otherwise) in excess of $500,000 shall be set forth on Schedule 6.02(a)); provided, further, that such Liens shall secure only those obligations that they secure on the Petition Date and shall not subsequently apply to any other property or assets of the Borrowers or any Subsidiary other than (A) after-acquired property that is affixed or incorporated into the property covered by such Liens, and (B) proceeds and products thereof;

(b)        any Lien created under the Loan Documents or permitted in respect of any Mortgaged Property or Mortgaged Vessel by the terms of the applicable Mortgage;

(c)        (i) Liens securing obligations permitted to be incurred under Section 6.01(w) and 6.01(x), (ii) the Carve Out and (iii) Liens granted as adequate protection pursuant to an order of the Bankruptcy Court or an order of the Canadian Court; provided that, in each case such Liens shall be subject to the priorities set forth in the Bankruptcy Court DIP Order and the Intercreditor Agreements;

(d)        Liens for Taxes, assessments or other governmental charges or levies not yet delinquent by more than 30 days or that are being contested in compliance with Section 5.05;

(e)        Liens imposed by law, such as landlords', carriers', warehousemen's, mechanics', materialmen's, repairmen's, suppliers', construction or other like Liens, securing obligations that are not overdue by more than 30 days or that are being contested in good faith by appropriate proceedings and in respect of which, if applicable, any Borrower or any Subsidiary shall have set aside on its books reserves in accordance with GAAP;

(f)        Subject to the Bankruptcy Court DIP Order and the Canadian DIP Recognition Order, (i) pledges and deposits and other Liens made in the ordinary course of business in compliance with the Federal Employers Liability Act or any other workers' compensation, unemployment insurance and other social security laws or regulations and deposits securing liability to insurance carriers under insurance or self-insurance arrangements in respect of such obligations and (ii) pledges and deposits and other Liens securing liability for reimbursement or indemnification obligations of (including obligations in respect of letters of credit or bank guarantees for the benefit of) insurance carriers providing property, casualty or liability insurance to any Borrower or any Subsidiary;

(g)        deposits and other Liens to secure the performance of bids, trade contracts (other than for Indebtedness), leases (other than Financing Lease Obligations), statutory obligations, surety and appeal bonds, performance and return of money bonds, bids, leases, government contracts, trade contracts, agreements with utilities, and other obligations of a like nature (including letters of credit in lieu of any such bonds or to support the issuance thereof) incurred in the ordinary course of business, including those incurred to secure health, safety and environmental obligations in the ordinary course of business or consistent with past practice or industry practice or otherwise constituting Investments permitted by Section 6.04;

(h)        (i) zoning restrictions, easements, survey exceptions, trackage rights, leases (other than Financing Lease Obligations), licenses, special assessments, rights-of-way, covenants, conditions, restrictions and declarations on or with respect to the use of Real Property or Vessels, servicing agreements, development agreements, site plan agreements and other similar encumbrances incurred in the ordinary course of business and (ii) title defects or irregularities that are of a minor nature and that, individually or in the aggregate, do not interfere in any material respect with the ordinary conduct of the business of any Borrower or any Subsidiary;

(i)        Liens securing Indebtedness permitted by Section 6.01(i) or (j); provided, that such Liens do not apply to any property or assets of any Borrower or any Subsidiary other than the property or assets acquired, leased, constructed, replaced, repaired or improved with such Indebtedness (or the Indebtedness refinanced thereby), and accessions and additions thereto, proceeds and products thereof and customary security deposits and (ii) individual financings provided by one lender may be cross-collateralized to other financings of the same type provided by such lender (and its Affiliates);

(j)        Liens existing on November 3, 2023 securing the obligation to pay the "Deferred Consideration Amount" (as defined in the Journey Beyond SSA (as in effect on November 3, 2023));

(k)        Liens securing judgments that do not constitute an Event of Default under Section 7.01(j);

(l)        Liens disclosed (i) by the title insurance policies or surveys reasonably acceptable to the Administrative Agent (acting at the direction of the Required Lenders), delivered with respect to the Mortgaged Properties set forth on Schedule 1.01(B) as of the Closing Date or subsequent to the Closing Date pursuant to Section 5.11 or Schedule 5.15 and any replacement, extension or renewal of any such Lien; provided, that such

replacement, extension or renewal Lien shall not cover any property other than the property that was subject to such Lien prior to such replacement, extension or renewal; underlined provided, underlined further, that the Indebtedness and other obligations secured by such replacement, extension or renewal Lien are permitted by this Agreement, and (ii) by abstracts of title issued by the National Vessel Documentation Center delivered with respect to the Material Vessels and Additional Collateral Vessels set forth on Schedule 1.01(F) as of the Closing Date; underlined provided, that the Borrowers will cause any Liens so disclosed to be discharged promptly after the Closing Date with proceeds of Loans;

(m)     any interest or title of a lessor or sublessor under any leases or subleases entered into by any Borrower or any Subsidiary in the ordinary course of business;

(n)     Liens that are contractual rights of setoff (i) relating to the establishment of depository relations with banks and other financial institutions not given in connection with the issuance of Indebtedness, (ii) relating to pooled deposits, sweep accounts, reserve accounts or similar accounts of any Borrower or any Subsidiary to permit satisfaction of overdraft or similar obligations incurred in the ordinary course of business of any Borrower or any Subsidiary, including with respect to credit card charge-backs and similar obligations, or (iii) relating to purchase orders and other agreements entered into with customers, suppliers or service providers of any Borrower or any Subsidiary in the ordinary course of business;

(o)     Liens (i) arising solely by virtue of any statutory or common law provision relating to banker's liens, rights of setoff or similar rights, (ii) attaching to commodity trading accounts or other commodity brokerage accounts incurred in the ordinary course of business, (iii) encumbering reasonable customary initial deposits and margin deposits and similar Liens attaching to brokerage accounts incurred in the ordinary course of business and not for speculative purposes or (iv) in respect of Third Party Funds;

(p)     Liens securing obligations in respect of trade-related letters of credit, bankers' acceptances or similar obligations permitted under Section 6.01(f), (h) or (o) and covering the property (or the documents of title in respect of such property) financed by, or cash collateralizing, such letters of credit, bankers' acceptances or similar obligations and the proceeds and products thereof;

(q)     leases or subleases, licenses or sublicenses (including with respect to Intellectual Property), in each case granted to others in the ordinary course of business on a non-exclusive basis not interfering in any material respect with the business of the Borrowers and their Subsidiaries, taken as a whole;

(r)     Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods;

(s)     [reserved];

(t)     [reserved];

(u)     Liens on any amounts held by a trustee under any indenture or other debt agreement issued in escrow pursuant to customary escrow arrangements pending the release thereof, or under any indenture or other debt agreement pursuant to customary discharge, redemption or defeasance provisions;

(v)     the prior rights of consignees and their lenders under consignment arrangements entered into in the ordinary course of business consistent with past practice or industry practice;

(w)     agreements to subordinate any interest of any Borrower or any Subsidiary in any accounts receivable or other proceeds arising from inventory consigned by any Borrower or any of its Subsidiaries pursuant to an agreement entered into in the ordinary course of business;

(x)     Liens arising from precautionary Uniform Commercial Code financing statements;

(y)     Liens existing on the Petition Date on Equity Interests in joint ventures (i) securing obligations of such joint venture or (ii) pursuant to the relevant joint venture agreement or arrangement;

87

(z)      Liens on securities that are the subject of repurchase agreements constituting Permitted Investments under clause (c) of the definition thereof;

(aa)      in the case of Real Property located in Canada, the reservations in any original grants from the Crown of any Real Property or interest therein and statutory exceptions to title;

(bb)      [reserved];

(cc)      Liens securing insurance premiums financing arrangements; provided, that such Liens are limited to the applicable unearned insurance premiums;

(dd)      in the case of Real Property that constitutes a leasehold interest, any Lien to which the fee simple interest (or any superior leasehold interest) is subject;

(ee)      Liens securing Indebtedness or other obligation (i) of any Borrower or a Subsidiary in favor of any Borrower or any Subsidiary Loan Party and (ii) of any Subsidiary that is not a Loan Party in favor of any Subsidiary that is not a Loan Party;

(ff)      Liens on not more than $5,000,000 of deposits securing Hedging Agreements entered into for non-speculative purposes;

(gg)      Liens on goods or inventory the purchase, shipment or storage price of which is financed by a documentary letter of credit, bank guarantee or bankers' acceptance issued or created for the account of any Borrower or any Subsidiary in the ordinary course of business; provided, that such Lien secures only the obligations of such Borrower or such Subsidiaries in respect of such letter of credit, bank guarantee or banker's acceptance to the extent permitted under Section 6.01;

(hh)      [reserved];

(ii)      [reserved];

(jj)      [reserved];

(kk)      [reserved];

(ll)      [reserved];

(mm)      other Liens with respect to property or assets of any Borrower or any Subsidiary securing obligations (other than obligations in respect of indebtedness for borrowed money) in an aggregate principal amount that at the time of, and after giving effect to, the incurrence of such Liens, would not exceed $500,000; provided, that any such Liens on Collateral shall be junior in right of security to the Liens securing the Obligations;

(nn)      (i) Liens of the National Park Service and (ii) Liens on assets of Hornblower Canada Co. granted in favor of The Niagara Parks Commission pursuant to the Niagara Contract, any Niagara Security Agreement or any other agreement required thereunder;

(oo)      Liens in the ordinary course of business for dry-docking, maintenance, repairs and improvements to Vessels, crews' wages, salvage (including contract salvage) and other maritime liens (other than in respect of Indebtedness); and

(pp)      The CCAA Charges.

Notwithstanding anything to the contrary contained herein, any Lien permitted to be junior to the Liens securing the Obligations shall be either pari passu with, or junior to, the Liens securing the Indebtedness under the Prepetition Credit Agreements. In addition, with respect to any Lien securing Indebtedness that was permitted to

secure such Indebtedness at the time of the incurrence of such Indebtedness, such Lien shall also be permitted to secure any Increased Amount of such Indebtedness.

Section 6.03      Sale and Lease-Back Transactions.  Enter into any arrangement, directly or indirectly, with any person whereby it shall sell or transfer any property, real or personal, used or useful in its business, whether now owned or hereafter acquired, and thereafter, as part of such transaction, rent or lease such property or other property that it intends to use for substantially the same purpose or purposes as the property being sold or transferred.

Section 6.04      Investments, Loans and Advances.  (i) Purchase or acquire (including pursuant to any merger or amalgamation with a person that is not a Wholly Owned Subsidiary immediately prior to such merger or amalgamation) any Equity Interests, evidences of Indebtedness or other securities of any other person, (ii) make any loans or advances to or Guarantees of the Indebtedness of any other person (other than in respect of intercompany liabilities incurred in connection with the cash management, tax and accounting operations of the Borrowers and the Subsidiaries), or (iii) purchase or otherwise acquire, in one transaction or a series of related transactions, (x) all or substantially all of the property and assets or business of another person or (y) assets constituting a business unit, line of business or division of such person or (iv) make a capital contribution to any other Person (each of the foregoing, an "Investment"), except:

(a)      Investments made pursuant to, or in connection with, the AQV Wind-down Plan;

(b)      (i) Investments by any Borrower or any Subsidiary in the Equity Interests of any Borrower or any Subsidiary which is set forth on Schedule 6.04; (ii) intercompany loans by any Borrower, any Subsidiary Loan Party to any Borrower or any other Subsidiary existing on the Petition Date which is set forth on Schedule 6.04; and (iii) Guarantees by any Borrower or any Subsidiary of Indebtedness otherwise permitted hereunder of any Borrower or any Subsidiary; provided, that no such Investments by Loan Parties shall be made in Subsidiaries that are not Subsidiary Loan Parties;

(c)      Permitted Investments and Investments that were Permitted Investments when made;

(d)      [reserved];

(e)      loans and advances to officers, directors, employees or consultants of any Borrower or any Subsidiary (i) in the ordinary course of business (calculated without regard to write-downs or write-offs thereof), (ii) in respect of payroll payments and expenses in the ordinary course of business and (iii) in connection with such person's purchase of Equity Interests of any Parent (or any Parent Entity) solely to the extent that the amount of such loans and advances shall be contributed to such Borrower in cash as common equity;

(f)      accounts receivable, security deposits and prepayments arising and trade credit granted in the ordinary course of business and any assets or securities received in satisfaction or partial satisfaction thereof from financially troubled account debtors to the extent reasonably necessary in order to prevent or limit loss and any prepayments and other credits to suppliers made in the ordinary course of business;

(g)      Hedging Agreements entered into for non-speculative purposes;

(h)      Investments existing on, or contractually committed as of, the Petition Date and set forth on Schedule 6.04 and any extensions, renewals or reinvestments thereof, so long as the aggregate amount of all Investments pursuant to this clause (h) is not increased at any time above the amount of such Investment existing or committed on the Petition Date (other than pursuant to an increase as required by the terms of any such Investment as in existence on the Petition Date);

(i)      Investments resulting from pledges and deposits under Sections 6.02(f), (g), (o), (r), (s), (ee) and (ll);

(j)      Investments permitted by the Budget;

89

(k)        [reserved];

(l)        intercompany loans between Subsidiaries that are not Loan Parties and Guarantees by Subsidiaries that are not Loan Parties permitted by Section 6.01(m);

(m)        Investments received in connection with the bankruptcy or reorganization of, or settlement of delinquent accounts and disputes with or judgments against, customers and suppliers, in each case in the ordinary course of business or Investments acquired by a Borrower or a Subsidiary as a result of a foreclosure or realization by any Borrower or any of the Subsidiaries with respect to any secured Investments or other transfer of title with respect to any secured Investment in default;

(n)        [reserved];

(o)        [reserved];

(p)        Guarantees by any Borrower or any Subsidiary of operating leases (other than Financing Lease Obligations) or of other obligations that do not constitute Indebtedness, in each case entered into by any Borrower or any Subsidiary in the ordinary course of business;

(q)        [reserved];

(r)        [reserved];

(s)        Investments consisting of the non-exclusive licensing of Intellectual Property pursuant to joint marketing arrangements with unaffiliated third parties in the ordinary course of business;

(t)        Investments in the ordinary course of business consisting of Uniform Commercial Code Article 3 endorsements for collection or deposit and Uniform Commercial Code Article 4 customary trade arrangements with customers consistent with past practice and industry practice;

(u)        [reserved];

(v)        Guarantees permitted under Section 6.01(m) (except to the extent such Guarantee is expressly subject to this Section 6.04);

(w)        advances in the form of a prepayment of expenses, so long as such expenses are being paid in accordance with customary trade terms of such Borrower or such Subsidiary;

(x)        [reserved];

(y)        Investments by JB TopCo or HB TopCo made for the purpose of funding capital contributions to Journey Beyond; provided that (i) such Investment shall be made substantially concurrently with (and in any event within three (3) Business Days) of the receipt of cash proceeds from any cash capital contributions to HB TopCo in exchange for the issuance of common Qualified Equity Interests and (ii) such contributions shall be made in the form specified in clause (i) to each intermediate entity between HB TopCo and Journey Beyond within such three Business Day period;

(z)        Investments consisting of the licensing or contribution of Intellectual Property pursuant to joint marketing arrangements with other persons in the ordinary course of business;

(aa)       To the extent constituting Investments, purchases and acquisitions of inventory, supplies, materials and equipment or purchases of contract rights or non-exclusive licenses or leases of Intellectual Property in each case in the ordinary course of business;

Notwithstanding anything to the contrary, (i) any Investment made by Loan Parties pursuant to this Section 6.04 (other than Investments made pursuant to Sections 6.04(j) or 6.04(y)) in a Person that is not a Subsidiary Loan Party shall not be permitted and (ii) no Investments after the Petition Date made in, or made by, JB TopCo or HB TopCo shall be permitted other than Investments permitted to be made pursuant to Section 6.04(y).

Section 6.05    Mergers, Amalgamations, Consolidations, Sales of Assets and Acquisitions.  Merge into, amalgamate or consolidate with any other person, or permit any other person to merge into, amalgamate or consolidate with it, or Dispose of (in one transaction or in a series of related transactions) all or any part of its assets (whether now owned or hereafter acquired), effect any Delaware LLC Division or Dispose of any Equity Interests of any Borrower or any Subsidiary, or purchase, lease or otherwise acquire (in one transaction or a series of transactions) all of the assets of any other person or division or line of business of a person, or create, form or organize any subsidiary or legal entity after the Petition Date, except that this Section 6.05 shall not prohibit:

(a)    (i) the purchase and Disposition of inventory owned by any Foreign Subsidiary, in each case in the ordinary course of business by any Borrower or any Subsidiary, (ii) the acquisition or lease (pursuant to an operating lease) of any other asset in the ordinary course of business by any Borrower or any Subsidiary or, with respect to operating leases, otherwise for fair market value on market terms (as determined in good faith by the Borrowers in consultation with the Required Lenders) or (iii) the Disposition of Permitted Investments in the ordinary course of business;

(b)    Dispositions made pursuant to, or in connection with, the AQV Wind-down Plan;

(c)    Dispositions (excluding to JB TopCo or any Person owned by JB TopCo) to any Borrower or a Subsidiary Loan Party (upon voluntary liquidation or otherwise); provided, that, with respect to any Dispositions by a Loan Party to a Subsidiary that is not a Subsidiary Loan Party in reliance on this clause (c), 100% of such consideration shall be received in cash and any such Disposition by a Loan Party to a Subsidiary that is not a Subsidiary Loan Party shall be made in the ordinary course of business for fair market value and the aggregate amount of Dispositions pursuant to the clause (c) shall not exceed $1,000,000;

(d)    Dispositions by HB TopCo in connection with any JB Disposition to an unaffiliated third party; provided that for the avoidance of doubt, such JB Disposition shall not involve the Disposition of Collateral (including equity interests issued by HB TopCo) or any other property owned by a Subsidiary Loan Party;

(e)    Investments permitted by Section 6.04, Permitted Liens, and Restricted Payments permitted by Section 6.06;

(f)    Dispositions of defaulted receivables in the ordinary course of business and not as part of an accounts receivable financing transaction; provided, that the Net Proceeds thereof, if any, are applied in accordance with Section 2.11(c);

(g)    [reserved]

(h)    the sale or issuance (other than to a Subsidiary of any Borrower or to any Subsidiary management equity plan or stock option plan or any other management or employee benefit plan or agreement) of common Qualified Equity Interests of JB TopCo to its direct parent substantially concurrently with (and in any event within three (3) Business Day), and for the purpose of financing, Investments permitted pursuant to Section 6.04(y);

(i)    leases, licenses or subleases or sublicenses any real or personal property (other than Intellectual Property) in the ordinary course of business;

(j)    [reserved];

(k)    Dispositions of inventory or Dispositions or abandonment of Intellectual Property of any Borrower and its Subsidiaries determined in good faith by the management of the Borrowers to be no longer useful

91

or necessary in the operation of the business of the Borrowers or any of their Subsidiaries; provided, that the Net Proceeds thereof are applied in accordance with Section 2.11(c);

(l)        [reserved];

(m)       [reserved];

(n)        Dispositions permitted by the Budget;

(o)        Dispositions not otherwise permitted by this Section 6.05; provided, that the aggregate gross proceeds thereof shall not exceed, in any fiscal year of the Borrowers, $1,000,000; and

(p)        Dispositions, including of any Vessels, to the New York City Economic Development Corporation or any affiliate or successor Person in accordance with the terms of the New York Ferry Agreement.

Notwithstanding anything to the contrary, no Disposition shall be made pursuant to this Section 6.05 (or otherwise under this Agreement) to the Sponsor that is not a Borrower or any Subsidiary thereof or JB TopCo, and no Disposition shall be made to HB TopCo, JB TopCo or any Person owned (directly or indirectly) by JB TopCo and (y) no Disposition of any Vessel shall be permitted absent the prior written consent of the Required Lenders unless made in reliance on Section 6.05(m) or (o).

Section 6.06        Dividends and Distributions.  Declare or pay (i) any dividend or make any other distribution (by reduction of capital or otherwise), whether in cash, property, securities or a combination thereof, with respect to any of its (or any other Person's) Equity Interests (other than dividends and distributions on Equity Interests payable solely by the issuance of additional Equity Interests (other than Disqualified Stock) of the person paying such dividends or distributions) or directly or indirectly redeem, purchase, retire or otherwise acquire for value (or permit any Subsidiary to purchase or acquire) any of its or any Person's Equity Interests or set aside any amount for any such purpose (other than through the issuance of additional Equity Interests (other than Disqualified Stock) of the person redeeming, purchasing, retiring or acquiring such shares), (ii) any payment made to retire, or to obtain the surrender of, any outstanding warrants, options or other rights to acquire shares of any class of stock of the Parents, the Borrowers or any of their respective Subsidiaries (or any direct or indirect parent of the Borrowers or Parents or JB TopCo) now or hereafter outstanding (iii) any management, reimbursement or similar fees payable to the Sponsor or any of its Affiliates (all of the foregoing, "Restricted Payments"); provided, however, that:

(a)        Restricted Payments may be made to any Borrower or any Wholly Owned Subsidiary of any Borrower (other than JB TopCo) (or, in the case of non-Wholly Owned Subsidiaries, to the Borrowers or any Subsidiary that is a direct or indirect parent of such Subsidiary and to each other owner of Equity Interests of such Subsidiary on a pro rata basis (or more favorable basis from the perspective of the Borrowers or such Subsidiary) based on their relative ownership interests);

(b)        To the extent provided for in the Budget, Restricted Payments may be made in respect of (i) overhead, legal, accounting and other Professional Fees and expenses of any Parent, JB TopCo Parent or any Parent Entity, (ii) [reserved], (iii) franchise and similar taxes and other fees and expenses in connection with the maintenance of its existence and its ownership of any Borrower or JB TopCo, (iv) payments permitted by Section 6.07(b) (other than Section 6.07(b)(vii)), (v) in respect of any taxable period ending after the Petition Date for which JB TopCo, any Borrower and/or any of its Subsidiaries are, for U.S. federal and/or applicable state and local and non-U.S. income tax purposes, (A) disregarded entities directly or indirectly owned by any Parent, JB TopCo Parent or Parent Entity that is a corporation (the "Corporate Parent") or (B) members of a consolidated, combined, affiliated, unitary or similar tax group of which a direct or indirect Parent, JB TopCo Parent or Parent Entity is the common parent (the "Common Parent"), distributions to the Corporate Parent or the Common Parent, as applicable, the proceeds of which will be used to pay its U.S. federal and applicable state and local and non-U.S. income taxes attributable to the operations of any JB TopCo Restricted Party, Borrower or its applicable Subsidiaries, in an amount not to exceed the amount of such U.S. federal, state or local or non-U.S. income taxes that such JB TopCo Restricted Party, Borrower and/or such Subsidiaries, as applicable, would have paid for such taxable period had such JB TopCo Restricted Party, Borrower and/or its applicable Subsidiaries, as applicable, been a stand-alone corporate

taxpayer or a stand-alone corporate group, (vi) [reserved] and (vii) customary salary, bonus and other benefits payable to, and indemnities provided on behalf of, officers, directors and employees of any Parent or JB TopCo Parent in order to permit any Parent or JB TopCo Parent to make such payments; provided, that in the case of subclauses (i), (ii) and (iii), the amount of such Restricted Payments shall not exceed the portion of any amounts referred to in such subclauses (i), (ii) and (iii) that are allocable to any Borrower and its Subsidiaries (which shall be 100% for so long as, as the case may be, (x) each Parent or JB TopCo Parent owns no material assets other than the Equity Interests in such Borrower or JB TopCo, as applicable, and assets incidental to such equity ownership, or (y) any Parent Entity owns directly or indirectly no material assets other than Equity Interests in such Parent or JB TopCo Parent, as applicable, and assets incidental to such equity ownership); and

(c)       other Restricted Payments made in accordance with the Budget made by any JB TopCo Restricted Party, provided that 100% of the proceeds thereof (net of all taxes (including tax distributions) and fees (including investment banking fees), commissions, costs and other expenses, in each case incurred in connection with such distribution) are promptly distributed to the Loan Parties.

Notwithstanding anything to the contrary in this Agreement, none of JB TopCo or HB TopCo shall make any Restricted Payments other than to the extent expressly permitted by Section 6.06(b) and (c) and dividends by JB TopCo and HB TopCo to their respective direct parents for the purpose of funding the foregoing.

Section 6.07       Transactions with Affiliates.

(a)       Sell or transfer any property or assets to, or purchase or acquire any property or assets from, or otherwise engage in any other transaction with, any of its Affiliates (other than the Loan Parties), unless such transaction (or series of related transactions) is upon terms that are substantially no less favorable to such Borrower or such Subsidiary Loan Party, as applicable, than would be obtained in a comparable arm's-length transaction with a person that is not an Affiliate.

(b)       The foregoing clause (a) shall not prohibit, to the extent otherwise permitted under this Agreement,

(i)       [reserved],

(ii)       Loans or advances to employees or consultants of any Parent, JB TopCo Parent  (or any Parent Entity), any Borrower or any of the Subsidiaries in accordance with Section 6.04(e),

(iii)       transactions among any Borrower or any Subsidiary or any entity that becomes a Subsidiary as a result of such transaction (including via merger, consolidation or amalgamation in which a Subsidiary is the surviving entity),

(iv)       [reserved],

(v)       agreements and arrangements in existence on the Petition Date set forth on Schedule 6.07, without giving effect to any amendments or modifications thereto,

(vi)       to the extent entered into prior to the Petition Date, (A) any employment agreements entered into by any Borrower or any of the Subsidiaries in the ordinary course of business, (B) any subscription agreement or similar agreement pertaining to the repurchase of Equity Interests pursuant to put/call rights or similar rights with employees, officers or directors, and (C) any employee compensation, benefit plan or arrangement, any health, disability or similar insurance plan which covers employees, and any reasonable employment contract and transactions pursuant thereto,

(vii)       Restricted Payments permitted under Section 6.06, including payments to any Parent (and any Parent Entity), Dispositions permitted pursuant to Section 6.05(b) and Investments permitted under Section 6.04,

93

(viii)   any purchase by any Parent of the Equity Interests of any Borrower; provided, that any Equity Interests of any Borrower held by any Parent shall be pledged to the Collateral Agent (and such Parent shall deliver the relevant certificates or other instruments (if any) representing such Equity Interests to the Collateral Agent) on behalf of the Secured Parties pursuant to the Collateral Agreement,

(ix)   [reserved],

(x)   [reserved],

(xi)   [reserved],

(xii)   [reserved],

(xiii)   [reserved],

(xiv)   [reserved],

(xv)   [reserved],

(xvi)   [reserved],

(xvii)   payments by any Parent (and any Parent Entity), the Borrowers and the Subsidiaries pursuant to a tax sharing agreement or arrangement (whether written or as a matter of practice) that complies with clause (v) of Section 6.06(b),

(xviii)   [reserved], and;

(xix)   Payments, loans (or cancellation of loans) or advances to employees or consultants that are (i) approved by a majority of the Disinterested Directors of each Parent, JB TopCo Parent or each Borrower in good faith, (ii) made in compliance with applicable law and (iii) otherwise permitted under this Agreement.

Section 6.08   Business of the Borrowers and the Subsidiaries.  Notwithstanding any other provisions hereof, engage at any time in any material respect in any business or business activity substantially different from any business or business activity conducted by any of them on the Closing Date.

Section 6.09   Limitation on Payments and Modifications of Indebtedness; Modifications of Certificate of Incorporation, By-Laws and Certain Other Agreements; etc.

(a)   Amend or modify, or grant any waiver or release under or terminate in any manner, the articles or certificate of incorporation, amalgamation, or continuance, notice of articles, by-laws, limited liability company operating agreement, partnership agreement or other organizational documents of any Borrower or any of the Subsidiary, except (unless such amendment or modification is adverse to the Lenders (including their ability to exercise remedies hereunder)) to the extent any amendment or modification is necessary in anticipation of a filing under any Debtor Relief Laws.

(b)   Make, directly or indirectly, any payment or other distribution (whether in cash, securities or other property) of, or in respect of, principal of or interest on any subordinated Indebtedness, junior lien Indebtedness or unsecured Indebtedness for borrowed money, other than (i) [reserved], (ii) payments made in compliance with the Budget or (iii) unless an Event of Default has occurred and is continuing, payment of regularly scheduled interest and principal payments as, in the form of payment and when due in respect of any Indebtedness, other than payments in respect of any subordinated Indebtedness; provided that the foregoing exceptions shall not apply to any payments in respect of Indebtedness owed to JB TopCo.

(c)        Permit any Subsidiary to enter into any agreement or instrument that by its terms restricts (i) the payment of dividends or distributions or the making of cash advances to any Borrower or any Subsidiary that is a direct or indirect parent of such Subsidiary or (ii) the granting of Liens by such Borrower or such Subsidiary that is a Loan Party pursuant to the Security Documents, in each case other than those arising under any Loan Document, except, in each case, restrictions existing by reason of:

(A)        restrictions imposed by applicable law;

(B)        contractual encumbrances or restrictions in effect on the Closing Date under Indebtedness existing on the Closing Date and set forth on <u>Schedule 6.01</u>;

(C)        the Prepetition Credit Facility Documents and the Senior DIP Credit Agreement;

(D)        customary provisions in joint venture agreements and other similar agreements applicable to joint ventures entered into in the ordinary course of business;

(E)        any restrictions imposed by any agreement relating to secured Indebtedness permitted by this Agreement to the extent that such restrictions apply only to the property or assets securing such Indebtedness;

(F)        [reserved];

(G)        customary provisions contained in leases or licenses of Intellectual Property and other similar agreements entered into in the ordinary course of business;

(H)        customary provisions restricting subletting or assignment of any lease governing a leasehold interest;

(I)        customary provisions restricting assignment of any agreement entered into in the ordinary course of business;

(J)        customary restrictions and conditions contained in any agreement relating to the sale, transfer, lease or other disposition of any asset permitted under Section 6.05 pending the consummation of such sale, transfer, lease or other disposition;

(K)        customary restrictions and conditions contained in the document relating to any Lien, so long as (1) such Lien is a Permitted Lien and such restrictions or conditions relate only to the specific asset subject to such Lien, and (2) such restrictions and conditions are not created for the purpose of avoiding the restrictions imposed by this Section 6.09;

(L)        customary net worth provisions contained in Real Property leases entered into by Subsidiaries, so long as the Borrowers have determined in good faith that such net worth provisions would not reasonably be expected to impair the ability of the Borrowers and their Subsidiaries to meet their ongoing obligations;

(M)        [reserved];

(N)        [reserved];

(O)        customary restrictions contained in leases, subleases, licenses or Equity Interests or asset sale agreements otherwise permitted hereby as long as such restrictions relate to the Equity Interests and assets subject thereto;

(P)        restrictions on cash or other deposits imposed by customers under contracts entered into in the ordinary course of business;

(Q)     [reserved]; or

(R)     restrictions imposed by the Niagara Contract or any Niagara Security Agreement.

Notwithstanding anything to the contrary in this Agreement, no payments (whether in respect of principal, interest, fees, premium or otherwise) shall be permitted (and no Loan Party shall directly or indirectly support) to be made in respect of any Indebtedness owed to or by JB TopCo or HB TopCo.

Section 6.10     Fiscal Year.  In the case of each Borrower, permit its fiscal year to change without prior written notice to the Administrative Agent, in which case, the Borrowers and the Administrative Agent will, and are hereby authorized by the Lenders to, make any adjustments to this Agreement that are necessary to reflect such change in fiscal year.

Section 6.11     Financial Covenant.

Permit Unrestricted Cash to be less than $10,000,000, as tested on each Monday (or, with respect to any Monday that is not a Business Day, the following Business Day) (such date, a "Liquidity Testing Date"); provided further that on Friday of each week (or, with respect to any Friday that is not a Business Day, the following Business Day), commencing on first Friday after the Closing Date, the Borrowers shall deliver to the Administrative Agent a certificate of a Financial Officer of the Borrowers (a "Liquidity Certificate") (i) certifying that, as of the immediately preceding Liquidity Testing Date, no Event of Default or Default has occurred or, if such an Event of Default or Default has occurred, specifying the nature and extent thereof and any corrective action taken or proposed to be taken with respect thereto and (ii) setting forth computations in reasonable detail demonstrating compliance with this Section 6.11 as of the immediately preceding Liquidity Testing Date and certifying that the Borrowers were in compliance with this Section 6.11 as of the immediately preceding Liquidity Testing Date.

Section 6.12     Passive Holding Companies.

(a)     Each Parent Entity Debtor, each Parent, and each of JB TopCo and HB TopCo will not conduct, transact or otherwise engage in any business or operations other than (i) the ownership of the Equity Interests of any of their respective Subsidiaries owned as of the Closing Date, (ii) the maintenance of its legal existence (other than in connection with a merger, amalgamation or consolidation of any Parent with or into any other Parent or any Parent Entity Debtor with or into any other Parent Entity Debtor), including the ability to incur fees, costs and expenses relating to such maintenance, (iii) participating in tax, accounting and other administrative matters as a member of the consolidated group of the Parent Entity Debtors, the Parents and the Borrowers, in each case to the same extent as such Person participated prior to the Petition Date, (iv) the performance of its obligations under and in connection with its Organizational Documents, the Loan Documents, the Prepetition Credit Agreements and the Parent Entity Debtor Documents (in each case, other than any payment, indemnity or reimbursement obligations that are not expressly permitted to be made in accordance with the Budget), (v) [reserved], (vi) incurring customary fees, costs and expenses relating to overhead and general operating including professional fees for legal, tax and accounting issues and paying taxes, in each case, to the extent permitted under the Budget, (vii) providing usual and customary indemnification to officers and directors, (viii) [reserved], (ix) in the case of JB TopCo and HB TopCo, activities expressly permitted pursuant to Article VI of this Agreement and (x) activities incidental to the businesses or activities described in clauses (i) to (ix) of this paragraph to the extent such incidental activities are substantially the same as such activities entered into prior to the Petition Date.

(b)     Each Parent, each Parent Entity Debtor and each of JB TopCo and HB TopCo will not own or acquire any material assets (other than Equity Interests as referred to in Section 6.12(a)(i) above, or intercompany Investments in their respective Subsidiaries on the Closing Date) or incur any liabilities (other than liabilities imposed by law, including tax liabilities, and other liabilities incidental to its existence and business and activities permitted by this Agreement) or issue any Disqualified Stock, or create or suffer to exist any Lien upon any property or assets now owned or hereafter acquired, leased or licensed by it other than the Liens created under the Loan Documents, the Prepetition Credit Agreements, the Parent Entity Debtor Documents (provided that, with respect to the Parent Entity Debtor Documents, such liability and or Lien was in existence on the Petition Date, without giving effect to any increases or extensions thereof) or liens expressly permitted under Section 6.02.

96

(c)      Each Parent and each Parent Entity Debtor will not guarantee any Indebtedness other than Indebtedness of the Borrowers or any Subsidiaries permitted to be incurred hereunder, Indebtedness under the Parent Entity Debtor Documents that is outstanding on the date hereof and each of JB Topco and HB Topco will not guarantee any Indebtedness other than the Obligations under the Loan Documents and under the Prepetition Credit Agreements (other than the Prepetition Revolving Credit Agreement).

Section 6.13      [Reserved].

Section 6.14      No Unrestricted Subsidiaries.  For the avoidance of doubt, the Loan Parties shall not at any time have the ability to designate any Subsidiary as an "Unrestricted Subsidiary" or any such similar term.

Section 6.15      Amendments to the Prepetition Revolving Credit Agreement and Parent Entity Debtor Documents.  The Loan Parties shall not amend or permit any amendment, modification or waiver of the Prepetition Revolving Credit Agreement, any Prepetition Revolving Loan Document or any Parent Entity Debtor Document without the prior written consent of the Required Lenders to the extent such amendment, modification or waiver is adverse to the Required Lenders or their rights hereunder.  For the avoidance of doubt, any amendment, modification or waiver that requires the payment of any fee to any lender shall be deemed to be adverse to the Required Lenders and their rights hereunder.

Section 6.16      Permitted Activities of Journey Beyond and its Subsidiaries.

Notwithstanding anything to the contrary set forth in this Agreement, JB TopCo shall cause Journey Beyond to not, and shall cause JB TopCo to not permit any of the Journey Beyond Subsidiaries to:

(i)      Incur any (x) Indebtedness for borrowed money or (y) Indebtedness incurred outside of the ordinary course of business and consistent with past practices, in each case, other than:

(A)      (i) the incurrence of Indebtedness under the Journey Beyond Credit Agreement (as in effect on the Closing Date) and (ii) any refinancing thereof, provided, that the principal amount (or accreted value, if applicable) of such refinancing Indebtedness does not exceed the principal amount (or accreted value, if applicable) of the then outstanding amounts under the Journey Beyond Credit Agreement (plus unpaid accrued interest and premium (including tender premiums) thereon and underwriting discounts, defeasance costs, fees, commissions, expenses, plus an amount equal to any existing commitment unutilized thereunder and letters of credit undrawn thereunder);

(B)      [reserved];

(C)      [reserved];

(D)      [reserved]; and

(E)      all premiums (if any), interest (including post-petition interest and paid-in-kind interest), fees, expenses, charges and additional or contingent interest on obligations described in clauses (A) through (D) above or refinancings thereof.

(ii)      issue additional Equity Interests or Disqualified Stock to Sponsor or its Affiliates, other than JB TopCo and its subsidiaries;

(iii)      convey, sell or otherwise transfer any assets to the Sponsor or its Affiliates.

Section 6.17      [Reserved].

Section 6.18      Amendments of Certain Contracts.  The Loan Parties shall not amend or permit any amendment or modification of the Intercompany Services Agreement or any similar agreement existing on the Closing Date or any provisions thereunder in any manner that is materially adverse to the Loan Parties.

Section 6.19      Disbursements.

(i)      At all times from and after the Petition Date through Plan Effective Date (as defined in the Restructuring Term Sheet), financial advisors to the Loan Parties and Required Lenders (and the Required Lenders' Advisors) will meet at least once per week to collaboratively discuss and implement ways to minimize costs related to the "Overnight" business or any division thereof  including decisions regarding vessel layup and transportation to scrap; provided that from and after the Petition Date, the Loan Parties shall not make (or permit any Subsidiary to make) disbursements, investments and/or other extensions of credit support to or in connection with the "Overnight" business and/or any division thereof (including any WARN payments related thereto) in an aggregate amount in excess of $9,000,000.

(ii)      At all times from and after the Petition Date through Plan Effective Date (as defined in the Restructuring Term Sheet), the Loan Parties shall not make disbursement in an aggregate amount in excess of $500,000 in respect of any obligations arising prior to the Petition Date (other than (x) non-discretionary payroll disbursements, concession payments and other payments, which based on the advice of external legal counsel, if not made would reasonably give rise to director and officer liability, in each case of this clause (x) made in accordance with the Budget (subject to Permitted Variances) and (y) payments that have been granted administrative priority by the Bankruptcy Court) without the prior written consent of the Required Lenders' Advisors (which may be over email); provided that (x) the Required Lenders' Advisors shall be deemed to have consented to such disbursement unless the Required Lenders' Advisors shall object thereto by written notice to the Borrowers within one Business Day after having received notice thereof and (y) this clause (ii) shall not apply to any payments or disbursements on account of the "Overnight" business, which such payments and disbursements shall be governed by clause (i) above.

(iii)      The Loan Parties and/or their financial advisors shall meet (which may be done telephonically) with the Required Lenders' Advisors one time per week to (a) discuss proposed disbursements pursuant to clauses (i) and (ii) above and (b) provide general liquidity updates and such additional information reasonably requested by the Required Lenders' Advisors related to the Loan Parties' operations.

(iv)      At all times after the Closing Date, the Loan Parties shall not make any single disbursement in respect of any obligations arising under the Parent Entity Debtor Documents that are not expressly permitted to be made in accordance with the Budget.

SECTION 6.20.   Chapter 11 or Canadian Recognition Proceedings Modifications.  Except as permitted pursuant to the terms of this Agreement, the Bankruptcy Court DIP Order and the Canadian DIP Recognition Order or otherwise consented to by the Required Lenders and the Agents:

(a)      Make or permit to be made any change, amendment or modification, or any application or motion for any change, amendment, amendment and restatement or modification, to the Bankruptcy Court DIP Order or the Canadian DIP Recognition Order.

(b)      Incur, create, assume or suffer to exist or permit any other superpriority claim which is pari passu with or senior to the DIP Superpriority Claims of the Administrative Agent, the Collateral Agent and the Lenders hereunder, except for the Carve Out and the Canadian Administration Charge (as against the Canadian Collateral).

**ARTICLE VII**

**EVENTS OF DEFAULT**

Section 7.01     Events of Default.  If any of the following events (any such event, an "Event of Default") shall occur:

(a)     default shall be made in the payment of any principal of any Loan when and as the same shall become due and payable, whether at the due date thereof or at a date fixed for prepayment thereof or by acceleration thereof or otherwise;

(b)     default shall be made in the payment of any interest on any Loan or in the payment of any fee, premium (including Exit Premium) or any other amount (other than an amount referred to in paragraph (a) of this Section) payable under any Loan Document, when and as the same shall become due and payable, and such failure shall continue unremedied for a period of three Business Days;

(c)     any representation or warranty made or deemed made by or on behalf of any Parent Entity Debtor, any Parent, any Borrower, any of their Subsidiaries or JB TopCo in or in connection with any Loan Document or any amendment or modification thereof or waiver thereunder, or in any report, certificate, financial statement or other document furnished pursuant to or in connection with any Loan Document or any amendment or modification thereof or waiver thereunder, shall prove to have been incorrect in any material respect when made or deemed made;

(d)     any Parent Entity Debtor, any Parent, any Borrower, any of their Subsidiaries or JB TopCo shall fail to observe or perform any covenant, condition or agreement contained in Section 5.04 (with respect to the existence of such Parent Entity Debtor, such Parent, such Borrower or such Subsidiaries), 5.01(k), 5.01(l), 5.01(m), 5.01(n), 5.01(o), 5.01(p), 5.02(a), 5.02(e), 5.08, 5.15, 5.17, 5.18 or in Article VI;

(e)     any Parent Entity Debtor, any Parent, any Borrower, any of their Subsidiaries or JB TopCo shall fail to observe or perform any covenant, condition or agreement contained in any Loan Document (other than those specified in paragraph (a), (b) or (d) of this Section), and such failure shall continue unremedied for a period of 30 days after notice thereof from the Administrative Agent to the Borrowers;

(f)     any Loan Party or any of its Subsidiaries shall fail to make any payment (whether of principal or interest and regardless of amount) in respect of any Material Indebtedness, when and as the same shall become due and payable (after giving effect to any applicable grace period);

(g)     any event or condition occurs that results in any Material Indebtedness (other than Indebtedness referred to in clauses (a) or (b) above or under any Prepetition Credit Facility Loan Documents so long as the remedies under such Prepetition Credit Agreements are subject to the automatic stay applicable under section 362 of the Bankruptcy Code) becoming due prior to its scheduled maturity or that enables or permits (with all applicable grace periods having expired) the holder or holders of any Material Indebtedness or any trustee or agent on its or their behalf to cause any Material Indebtedness to become due, or to require the prepayment, repurchase, redemption or defeasance thereof, prior to its scheduled maturity; provided that this paragraph (g) shall not apply to (i) secured Indebtedness that becomes due as a result of the sale, transfer or other disposition (including as a result of a casualty or condemnation event) of the property or assets securing such Indebtedness (to the extent such sale, transfer or other disposition is not prohibited under this Agreement) or (ii) termination events or similar events (other than defaults or events of default) occurring under any Hedging Agreement that constitutes Material Indebtedness (it being understood that paragraph (f) of this Section will apply to any failure to make any payment required as a result of any such termination or similar event);

(h)     other than in connection with the Restructuring Transactions (as defined in the Restructuring Support Agreement), an involuntary proceeding shall be commenced or an involuntary petition shall be filed seeking (i) liquidation, court protection, reorganization, arrangement or other relief in respect of any Non-Filing Party or its debts, or of a material part of its assets, under any Federal, state, provincial, territorial or foreign bankruptcy, insolvency, receivership, arrangement or similar law now or hereafter in effect or (ii) the appointment of a receiver, interim receiver, receiver and manager, monitor, trustee, custodian, examiner, sequestrator, conservator or similar official for any Non-Filing Party or for a material part of its assets, and, in any such case, such proceeding or

petition shall continue undismissed or unstayed for 60 days or an order or decree approving or ordering any of the foregoing shall be entered;

(i)       other than in connection with the Restructuring Transactions (as defined in the Restructuring Support Agreement), any Non-Filing Party shall (i) voluntarily commence any proceeding or file any petition seeking liquidation, court protection, reorganization, arrangement or other relief under any Federal, state or foreign bankruptcy, insolvency, arrangement, receivership or similar law now or hereafter in effect, (ii) consent to the institution of, or fail to contest in a timely and appropriate manner, any proceeding or petition described in paragraph (h) of this Section, (iii) apply for or consent to the appointment of a receiver, interim receiver, receiver and manager, monitor, trustee, examiner, custodian, sequestrator, conservator or similar official for any Non-Filing Party  or for a material part of its assets, (iv) file an answer admitting the material allegations of a petition filed against it in any such proceeding or (v) make a general assignment for the benefit of creditors (or any class of creditors);

(j)       Except for any order fixing the amount of any claim in the Chapter 11 Cases, one or more enforceable judgments for the payment of money in an aggregate amount in excess of $2,500,000 (to the extent not covered by insurance as to which the insurer has been notified of such judgment or order and has not denied coverage) shall be rendered against any Loan Party and any of its Subsidiaries or any combination thereof (which arose following the Petition Date) and the same shall remain undischarged for a period of 60 consecutive days during which execution shall not be effectively stayed, or any judgment creditor shall legally attach or levy upon assets of any Borrower or any of its Subsidiaries to enforce any such judgment;

(k)       (i) an ERISA Event occurs that has resulted or would reasonably be expected to result in liability of any Borrower or any of its Subsidiaries in an aggregate amount that would reasonably be expected to result in a Material Adverse Effect, or (ii) any Borrower or any of its Subsidiaries or any ERISA Affiliate fails to pay when due, after the expiration of any applicable grace period, any installment payment with respect to its Withdrawal Liability that has resulted or would reasonably be expected to result in liability of any Borrower or any of its Subsidiaries in an aggregate amount that could reasonably be expected to result in a Material Adverse Effect;

(l)       any Lien purported to be created under any Security Document or the Bankruptcy Court DIP Order shall cease to be, or shall be asserted by any Loan Party or JB TopCo not to be, a valid and perfected Lien on any material portion of the Collateral, with the priority required by the applicable Security Document, except (i) as a result of the sale or other disposition of the applicable Collateral in a transaction permitted under the Loan Documents, (ii) as a result of the Collateral Agent's failure to maintain possession of any stock certificates, promissory notes, certificates of title or other instruments delivered to it under the Security Documents or (iii) as to Collateral consisting of real property to the extent that such losses are covered by a lender's title insurance policy and such insurer has not denied coverage;

(m)       any material provision of any Loan Document or any Guarantee of a material portion of the Obligations shall for any reason be asserted by any Loan Party or JB TopCo not to be a legal, valid and binding obligation of any Loan Party thereto other than as expressly permitted hereunder or thereunder;

(n)       any Guarantees of the Obligations by any Loan Party pursuant to this Agreement, or the Security Documents shall cease to be in full force and effect (in each case, other than in accordance with the terms of the Loan Documents);

(o)       a Change in Control shall occur;

(p)       (x) an Event of Default under the Journey Beyond Credit Agreement (as in effect on the date hereof) shall have occurred and be continuing or (y) the Administrative Agent (as defined in the Journey Beyond Credit Agreement) or any Lender (as defined in the Journey Beyond Credit Agreement) accelerates or otherwise causes all or any portion of the Obligations (as defined in the Journey Beyond Credit Agreement) to become due or to be repurchased, prepaid, defeased or redeemed (automatically or otherwise), prior to its stated maturity, or any Guarantee (as defined in the Journey Beyond Credit Agreement) thereof to become payable or cash collateral in respect thereof to be demanded; provided, however, that if the secured parties under the Journey Beyond Credit

100

Agreement irrevocably waive such Events of Default or rescind such acceleration, the Event of Default with respect to this clause (p) shall automatically cease from and after such date;

(q)     Journey Beyond shall fail to pay all or any portion of the Deferred Consideration Amount (as defined in the Journey Beyond SSA) as such obligations become due and payable;

(r)     there occurs any Budget Event;

(s)     [reserved];

(t)     any Loan Party shall support or otherwise facilitate a JB Disposition (it being understood and agreed that any subsidiary of JB TopCo shall be permitted to support or otherwise facilitate a JB Disposition);

(u)     any failure to notify the Required Lenders' Advisors (on a "professional eyes-only" basis unless otherwise consented to by the Borrowers) promptly and in any event within two Business Days of receipt of any offers, bids, solicitations, letters of intent, indications of interest, or similar with respect to the acquisition of the JB Business or any transaction for the sale or other disposition (including by merger, amalgamation or other combination) involving the JB Business, which notice shall include (to the extent permitted to be disclosed by applicable confidentiality terms after using commercially reasonable efforts to permit disclosure in a manner consistent with this Section 7.01(u)) the material terms and conditions of the proposed transaction and the identity of the prospective counterparty (it being understood, for the avoidance of doubt, that in no event may the identity of the prospective counterparty or any other identifying information of the prospective counterparty be disclosed by the Required Lenders' Advisors to any of the Lenders), together with copies of any related documentation or written materials, or any failure to provide notice to the Required Lenders' Advisors (on a "professional eyes-only" basis unless otherwise consented to by the Borrowers) (i) prior to any solicitation, furnishing of information or materials or otherwise taking any action to initiate or progress the sales process or (ii) (to the extent permitted to be disclosed by applicable confidentiality terms after using commercially reasonable efforts to permit disclosure in a manner consistent with this Section 7.01(u)) of the negotiation or entering into of any transaction, in each case involving the JB Business, directly, or indirectly through any agent, broker, advisor, investment banker or similar;

(v)     (i) any breach by any Loan Party of its obligations under the Restructuring Support Agreement or (ii) the Restructuring Support Agreement is terminated for any reason;

(w)     any Loan Party shall fail to deliver timely report or information or otherwise meet timely any other deadline under the Interim DIP Order or Final DIP Order and such failure shall continue for a period of 3 days after notice thereof from the Administrative Agent to the Borrowers;

(x)     the resignation or removal of the Chief Restructuring Officer unless a replacement Chief Restructuring Officer shall have been appointed within thirty (30) days of such resignation or removal;

(y)     without the approval of the Required Lenders, an order by the Bankruptcy Court is entered granting any superpriority claim that is pari passu with or senior to those of the Secured Parties or any Lien that is senior to the Liens securing the Obligations, other than as explicitly permitted under the Bankruptcy Court DIP Order;

(z)     without the approval of the Required Lenders, an order with respect to any of the Chapter 11 Cases shall be entered by the Bankruptcy Court (i) appointing a trustee under Section 1104 of the Bankruptcy Code, (ii) appointing an examiner with decision making authority relating to the operation of the business or (iii) converting any Chapter 11 Case to a case under Chapter 7 of the Bankruptcy Code (other than with respect to the "Overnight" business and each division thereof);

(aa)     without the approval of the Required Lenders, an order shall be entered by the Bankruptcy Court dismissing any of the Chapter 11 Cases which does not contain a provision for payment in full in cash of all Obligations upon entry thereof;

(bb)     any Loan Party shall seek to, or shall support (in any such case by way of any motion or other pleading filed with the Bankruptcy Court or any other writing to another party-in-interest executed by or on behalf of

101

such Loan Party) any other Person's motion to, avoid or disallow in whole or in part the Lenders' claims or Liens in respect of the Obligations or contest any provision of any Loan Document;

(cc)      any Loan Party shall attempt to vacate or modify the Interim DIP Order or Final DIP Order over the objection of the Required Lenders;

(dd)      an application for any of the orders described in clauses (y), (z) or (aa) above shall be made by a Loan Party or any such application shall be made by a Person other than the Loan Parties and such application is not contested by the Loan Parties in good faith or the relief requested is not withdrawn, dismissed or denied within forty-five (45) days after the filing; and

(ee)      the filing by any of the Loan Parties of a Plan of Reorganization other than an Acceptable Plan;

then, and in every such event (other than an event with respect to any Parent Entity Debtor, any Parent or any Borrower described in paragraph (h) or (i) of this Section), and at any time thereafter during the continuance of such event, subject to the terms of the Bankruptcy Court DIP Order, the Canadian DIP Recognition Order and the Senior ICA Provisions, the Administrative Agent may, and at the request of the Required Lenders shall, by notice to the Borrowers take any of the following actions, at the same or different times:  (i) terminate the Commitments, and thereupon the Commitments shall terminate immediately, (ii) declare the Loans then outstanding to be due and payable in whole (or in part, in which case any principal not so declared to be due and payable may thereafter be declared to be due and payable), (iii) [reserved], and (iv) exercise all rights and remedies granted to it under any Loan Document and all its rights under any other applicable law or in equity, including under the UCC and the PPSA, and thereupon the principal of the Loans so declared to be due and payable, together with accrued interest thereon and all fees and other obligations of the Borrowers accrued hereunder, shall become due and payable immediately, without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Borrowers; and in case of any event with respect to any Parent Entity Debtor, any Parent or any Borrower described in paragraph (h) or (i) of this Section, the Commitments shall automatically terminate and the principal of the Loans then outstanding, together with accrued interest thereon and all fees and other obligations of the Borrowers accrued hereunder, shall automatically become due and payable.

Notwithstanding anything herein to the contrary, the Exit Premium shall become immediately due and payable in the event the Loans are accelerated upon or following an Event of Default (including any automatic acceleration resulting from the commencement of an arrangement, a bankruptcy or other insolvency proceeding in accordance with Sections 7.01(h) and i)), as if the outstanding Loans had been optionally prepaid on the date of such acceleration.  Any Exit Premium payable shall constitute liquidated damages sustained by the Lenders as a result of the early redemption and the Loan Parties hereby agree that it is reasonable under the circumstances currently existing in view of the impracticability and extreme difficulty of ascertaining actual damages and by mutual agreement of the parties to a reasonable calculation of the Lender's lost profits as a result thereof.  The Loan Parties and the Lenders acknowledge and agree that the Exit Premium constitutes liquidated damages for loss of investment opportunity and damages suffered by the Lenders shall in no way constitute interest or "unmatured interest" (as such term is used in Section 502(b) of the Bankruptcy Code).  THE LOAN PARTIES EXPRESSLY WAIVE THE PROVISIONS OF ANY PRESENT OR FUTURE STATUTE OR LAW THAT PROHIBITS OR MAY PROHIBIT THE COLLECTION OF THE EXIT PREMIUM IN CONNECTION WITH ANY SUCH ACCELERATION.  The parties hereto further acknowledge and agree that the Exit Premium is not intended to act as a penalty or to punish the Loan Parties for any repayment or prepayment of the Loans but rather represent compensation for the cost of the Lenders' investment opportunities.

Notwithstanding anything to the contrary herein, the enforcement of Liens or remedies with respect to the Collateral and the exercise of all other remedies provided for in this Agreement and the other Loan Documents, shall be subject to the provisions of the Bankruptcy Court DIP Order.

Section 7.02      [Reserved].

Section 7.03      Application of Payments.  Subject to the Senior ICA Provisions, the Bankruptcy Court DIP Order, the Canadian DIP Recognition Order and the Security Documents, any amount received by the Administrative Agent or the Collateral Agent from any Loan Party (or from proceeds of any Collateral) following

any acceleration of the Obligations under this Agreement or any Event of Default with respect to any Borrower under Section 7.01(h) or (i), in each case that is continuing, shall be applied in accordance with Section 2.18(b).

# ARTICLE VIII
## AGENTS

Section 8.01    Appointment and Authorization of Agents.  Each Lender hereby irrevocably appoints GLAS to act on its behalf as the Administrative Agent hereunder and under the other Loan Documents and as Collateral Agent hereunder and under the Loan Documents and authorizes the Administrative Agent and Collateral Agent, in each applicable capacity, to take such actions on its behalf and to exercise such powers as are delegated to each such Agent by the terms hereof or thereof, together with such actions and powers as are reasonably incidental thereto including, with respect to the Collateral Agent for purposes of acquiring, holding and enforcing any and all Liens on Collateral granted by any of the Loan Parties or JB TopCo to secure any of the Obligations, together with such powers and discretion as reasonably incidental thereto.  The provisions of this Article are solely for the benefit of the Agents and the Lenders and the Company Advisors (to the extent provided in Section 8.08), and no Loan Party shall have rights as a third-party beneficiary of any of such provisions.  It is understood and agreed that the use of the term "agent" herein or in any other Loan Documents (or any other similar term) with reference to each Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable Requirement of Law.  Instead such term is used as a matter of market custom, and is intended to create or reflect only an administrative relationship between independent contracting parties.

Each Lender hereby irrevocably appoints the Collateral Agent as mortgage trustee in respect of the Mortgages, Mortgaged Vessels and Trust Property.  The Collateral Agent agrees and declares, and each of the other Secured Parties acknowledges that, subject to the terms and conditions of this Section 8.01, the Collateral Agent holds the Trust Property in trust for the Secured Parties absolutely.

Each of the other Secured Parties agrees that the obligations, rights and benefits vested in each Agent shall be performed and exercised in accordance with this Section 8.01.  For the avoidance of doubt, each Agent shall have the benefit of all of the provisions of this Agreement (including exculpatory and indemnification provisions) benefiting it in their capacity as Agents for the Secured Parties hereunder and in each Loan Document to which it is a party.  In addition, the Collateral Agent and any attorney, agent or delegate of the Collateral Agent may indemnify itself or himself out of the Trust Property against all liabilities, costs, fees, damages, charges, losses and expenses sustained or incurred by it or him in relation to the taking or holding of any of the Trust Property or in connection with the exercise or purported exercise of the rights, trusts, powers and discretions vested in the Collateral Agent or any other such Person by or pursuant to the Mortgages (and, where applicable, any deed of covenants collateral thereto), on Material Vessels and Additional Collateral Vessels or in respect of anything else done or omitted to be done in any way relating to such Mortgages.

Section 8.02    Rights as a Lender.  Any Agent shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not any such Agent hereunder, and the term "Lender" or "Lenders" shall, unless otherwise expressly indicated or unless the context otherwise requires, include the Person serving as any such Agent hereunder in its individual capacity.  Such Person and its Affiliates may accept deposits from, lend money to, own securities of, act as the financial advisor or in any other advisory capacity for, and generally engage in any kind of business with, any Borrower or any Subsidiary or other Affiliate thereof as if such Person were not such Agent hereunder and without any duty to account therefor to the Lenders.

Section 8.03    Exculpatory Provisions.

(a)    The Agents shall not have any duties or obligations except those expressly set forth herein and in the other Loan Documents, and their duties hereunder shall be administrative in nature.  Without limiting the generality of the foregoing, no Agent shall (i) be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing; (ii) have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Loan Documents that such Agent is required to exercise as directed in writing by the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents); provided that no Agent shall be required to take any action that, in its opinion or the opinion of its counsel, may

103

expose such Agent to liability or that is contrary to any Loan Document or applicable Law, including for the avoidance of doubt any action that may be in violation of the automatic stay under any Debtor Relief Law or that may effect a forfeiture, modification or termination of property of a Defaulting Lender in violation of any Debtor Relief Law; and (iii) except as expressly set forth herein and in the other Loan Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to any Borrower or any of its Affiliates that is communicated to or obtained by such Agent or any of its Affiliates in any capacity.

(b)        No Agent shall be liable for any action taken or not taken by it (i) with the consent or at the request or direction of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as such Agent shall believe in good faith to be necessary, under the circumstances as provided in Article VII and Section 9.02) or (ii) in the absence of its own gross negligence or willful misconduct as determined by a court of competent jurisdiction by final and nonappealable judgment; provided, that, any action or inaction taken at the direction of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as such Agent shall believe in good faith to be necessary, under the circumstances as provided in Article VII and Section 9.02) shall not be deemed gross negligence or willful misconduct. No Agent shall be deemed to have knowledge or notice of the occurrence of any Default or Event of Default unless and until the Agent shall have received written notice from a Lender or the Borrowers referring to this Agreement, clearly describing such Default or Event of Default and stating that such notice is a "notice of default."

(c)        No Agent Party shall be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement or any other Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or in any other Loan Document or the occurrence of any Default or Event of Default, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Loan Document or any other agreement, instrument or document or the creation, perfection or priority of any Lien purported to be created by the Security Documents, (v) the value or the sufficiency of any Collateral or (vi) the satisfaction of any condition set forth in Article IV or elsewhere herein, other than (in the case of the Administrative Agent) to confirm receipt of items expressly required to be delivered to it. No Agent Party shall be under any obligation to inspect the properties, books or records of any Loan Party. No provision of this Agreement or any other Loan Document or any agreement or instrument contemplated hereby or thereby, the transactions contemplated hereby or thereby shall require any Agent to: (i) expend or risk its own funds or provide indemnities in the performance of any of its duties hereunder or the exercise of any of its rights or power or (ii) otherwise incur any financial liability in the performance of its duties or the exercise of any of its rights or powers. The Administrative Agent does not warrant, nor accept responsibility, nor shall the Administrative Agent have any liability with respect to the administration, submission or any other matter related to rates in the definitions of Alternate Base Rate, the Term SOFR Reference Rate, Adjusted Term SOFR or Term SOFR, or any component definition thereof or rates referred in the definition thereof or with respect to any comparable or successor rate thereto.

(d)        Neither Agent shall be liable for any action omitted to be taken by it by reason of the lack of direction or instruction for such action (including, without limitation, for refusing to exercise discretion or for withholding its consent in the absence of receipt of, or resulting from a failure, delay or refusal on the part of any Lender to provide, written instructions to exercise such discretion or grant such consent from any such Lender, as applicable). Neither Agent shall have any liability for any failure, inability, unwillingness on the part of any Lender or Loan Party to provide accurate and complete information on a timely basis to such Agent, or otherwise on the part of any such party to comply with the terms of this Agreement, and shall not have any liability for any inaccuracy or error in the performance or observance on such Agent's part of any of its duties hereunder that is caused by or results from any such inaccurate, incomplete or untimely information received by it, or other failure on the part of any such other party to comply with the terms hereof.

(e)        Neither Agent shall be liable for interest on any money received by it. Money held by the Agent hereunder need not be segregated from other funds except to the extent required by law. No Agent shall have any liability for interest on any money received by it hereunder except as otherwise agreed in writing.

(f)        For purposes of clarity, and without limiting any rights, protections, immunities or indemnities afforded to either Agent hereunder (including without limitation this ARTICLE VIII), phrases such as "satisfactory

to the [Administrative] [Collateral] Agent," "approved by the [Administrative] [Collateral] Agent," "acceptable to the [Administrative] [Collateral] Agent," "as determined by the [Administrative] [Collateral] Agent," "in the [Administrative] [Collateral] Agent' discretion," "selected by the [Administrative] [Collateral] Agent," "elected by the [Administrative] [Collateral] Agent," "requested by the [Administrative] [Collateral] Agent," and phrases of similar import that authorize and permit an Agent to approve, disapprove, determine, act or decline to act in its discretion shall be subject to such Agent receiving written direction from the Required Lenders (or such other number or percentage of the Lenders as expressly required hereunder or under the other Loan Documents) to take such action or to exercise such rights.

Section 8.04    Reliance by the Agents.  The Agents shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including any electronic message, Internet or intranet website posting or other distribution) believed by the Agents to be genuine and to have been signed, sent or otherwise authenticated by the proper Person.  The Agents also may rely upon any statement made to it orally or by telephone and believed by the Agents to have been made by the proper Person, and shall not incur any liability for relying thereon.  The Agents may consult with legal counsel (who may be counsel for the Borrowers), independent accountants and other experts selected by the Agents, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.  The Agents may deem and treat the Lender specified in the register with respect to any amount owing hereunder as the owner thereof for all purposes unless a written notice of assignment, negotiation or transfer thereof shall have been filed with the Administrative Agent.

Section 8.05    Delegation of Duties.  Each Agent may perform any and all of its duties and exercise its rights and powers hereunder or under any other Loan Document by or through any one or more sub-agents appointed by the each such Agent.  Each Agent and any such sub-agent may perform any and all of its duties and exercise its rights and powers by or through their respective Related Parties.  The exculpatory provisions of this Article shall apply to any such sub-agent and to the Related Parties of each such Agent and any such sub-agent (including Cantor Fitzgerald Securities as Lender for the purposes of the syndication of the Facility), and shall apply to their respective activities in connection with the syndication of the Loans as well as activities as each such Agent.  No Agent shall be responsible for the negligence or misconduct of any sub-agents except to the extent that a court of competent jurisdiction determines in a final and nonappealable judgment that such Agent acted with gross negligence or willful misconduct in the selection of such sub-agents.

Section 8.06    Indemnification.  Whether or not the transactions contemplated hereby are consummated, each Lender shall indemnify upon demand each Agent Party (to the extent not reimbursed by or on behalf of the Borrowers and without limiting the obligations of any Loan Party or JB TopCo to do so) on a pro rata basis (based on its aggregate outstanding Term Loans on the date on which indemnification is sought under this section, or if indemnification is sought after the date upon which the Commitments shall have terminated and the Loans shall have been paid in full, ratably according to each Lender's aggregate exposure percentage immediately prior to such date) and hold harmless each Agent Party from and against any and all Indemnified Liabilities incurred by it; provided that no Lender shall be liable for payment to any Agent Party, of any portion of such Indemnified Liabilities to the extent determined in a final, nonappealable judgment of a court of competent jurisdiction to have resulted from such Agent Party's own gross negligence or willful misconduct (and no action taken in accordance with the directions of the Required Lender shall be deemed to constitute gross negligence or willful misconduct for purposes of this Section).  In the case of any investigation, litigation or proceeding giving rise to any Indemnified Liabilities, this Section applies whether any such investigation, litigation or proceeding is brought by any Lender or any other Person.  Without limitation of the foregoing, each Lender shall reimburse each Agent upon demand for its ratable share of any costs or out-of-pocket expenses (including the fees, disbursements and other charges of counsel) incurred by such Agent in connection with preparation, execution, delivery, administration, modification, amendment or enforcement (whether through negotiations, legal proceedings or otherwise) of, or legal advice in respect of rights and responsibilities under, this Agreement, any other Loan Document, or any document contemplated by or referred to herein, to the extent that such Agent is not reimbursed for such costs or expenses by or on behalf of the Borrowers.  The agreements in this Section 8 shall survive the resignation or replacement of the Administrative Agent, any transfer of rights or obligations by, or the replacement of, a Lender, the termination of the Loans and/or the repayment, satisfaction or discharge of all Obligations (or any portion thereof) under any Loan Document.

Section 8.07    Resignation of Administrative Agent.  Any Agent may resign as such Agent upon 30 days' notice to the Lenders and the Borrowers.  Upon receipt of any such notice of resignation, the Required Lenders shall appoint from among the Lenders a successor agent (which may be an Affiliate of a Lender), with the consent of the Borrowers at all times, but such consent of the Borrowers will not be required during the existence of an Event of Default under Section 7.01(a), (b), (h) or (i) (which consent shall not be unreasonably withheld or delayed).  If no such successor shall have been so appointed by the Required Lenders and shall have accepted such appointment prior to the effective date of the resignation of such Agent, then such Agent may (but shall not be obligated to), on behalf of the Lenders, appoint a successor Agent.  Whether or not a successor has been appointed, such resignation shall become effective in accordance with such notice on such effective date, where (i) the retiring Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents (except that in the case of any collateral security held by the Agent on behalf of the Lenders under any of the Loan Documents, the retiring Agent may (but shall not be obligated to) continue to hold such collateral security until such time as a successor Agent is appointed) and (ii) all payments, communications and determinations provided to be made by, to or through such Agent shall instead be made by or to each Lender directly, until such time, if any, as the Required Lenders appoint a successor Agent as provided for above.  Upon the acceptance of a successor's appointment as Agent hereunder, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring Agent, and the retiring Agent shall be discharged from all of its duties and obligations hereunder or under the other Loan Documents.  The fees payable by the Borrowers to a successor Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrowers and such successor.  After the retiring Agent's resignation hereunder and under the other Loan Documents, the provisions of this Article VIII and Section 9.03 shall continue in effect for the benefit of such retiring Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while the retiring Agent was acting as Administrative Agent or Collateral Agent, as applicable.

Section 8.08    Non-Reliance on Agents and Other Lenders.  Each Lender expressly acknowledges that neither the Agents, any financial advisor or investment banker of the Loan Parties ("Company Advisors") nor any of their respective officers, directors, employees, agents, attorneys-in-fact or affiliates have made any representations or warranties to it and that no act by any Agent hereafter taken, including any review of the affairs of a Loan Party or any affiliate of a Loan Party, shall be deemed to constitute any representation or warranty by any Agent to any Lender.  Each Lender acknowledges that it has, independently and without reliance upon any Agent Party, Company Advisor or any other Lender or any of their Related Parties and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement.  Each Lender also acknowledges that it will, independently and without reliance upon any Agent Party, Company Advisor or any other Lender or any of their Related Parties and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Loan Document or any related agreement or any document furnished hereunder or thereunder.

Section 8.09    Administrative Agent May File Proofs of Claim; Irrevocable Authorization.  In case of the pendency of any proceeding under any Debtor Relief Law, Bail-In Action or any other judicial proceeding relative to any Borrower, the Collateral Agent (irrespective of whether the principal of any Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Administrative Agent shall have made any demand on the Borrowers) shall be entitled and empowered (but not obligated) by intervention in such proceeding or otherwise:

(a)    to file and prove a claim for the whole amount of the principal, premium (including the Exit Premium) and interest owing and unpaid in respect of the Loans and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders and the Agents (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders and the Agents and their respective agents and counsel and all other amounts due to the Lenders and the Agents under Sections 2.12 and 9.03) allowed in such judicial proceeding; and

(b)    to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, interim receiver, receiver and manager, monitor, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender and Agent

106

to make such payments to the Administrative Agent and, in the event that the Administrative Agent shall consent to the making of such payments directly to the Lenders, to pay to the Administrative Agent and the Collateral Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Administrative Agent, the Collateral Agent and their respective agents and counsel, and any other amounts due the Administrative Agent and the Collateral Agent under Sections 2.12 and 9.03.

In addition, each of the Lenders hereby irrevocably authorizes the Collateral Agent, on behalf of all Secured Parties to take any of the following actions upon the instruction of the Required Lenders:

(a)      consent to the Disposition of all or any portion of the Collateral free and clear of the Liens securing the Obligations in connection with any Disposition pursuant to the applicable provisions of any Debtor Relief Law, including Section 363 of the Bankruptcy Code or any applicable provision of the CCAA;

(b)      credit bid all or any portion of the Obligations, or purchase all or any portion of the Collateral (in each case, either directly or through one or more acquisition vehicles), in connection with any Disposition of all or any portion of the Collateral pursuant to the applicable provisions of the Bankruptcy Code, including under Section 363 thereof or any foreign bankruptcy, insolvency, receivership or similar law now or hereafter in effect, including the CCAA;

(c)      credit bid all or any portion of the Obligations, or purchase all or any portion of the Collateral (in each case, either directly or through one or more acquisition vehicles), in connection with any Disposition of all or any portion of the Collateral pursuant to the applicable provisions of the UCC including pursuant to Sections 9-610 or 9-620 of the UCC or the PPSA;

(d)      credit bid all or any portion of the Obligations, or purchase all or any portion of the Collateral (in each case, either directly or through one or more acquisition vehicles), in connection with any foreclosure, realization, other Disposition or enforcement against the Collateral conducted in accordance with applicable law following the occurrence of an Event of Default, including by power of sale, judicial action or otherwise; and/or

(e)      estimate the amount of any contingent or unliquidated Obligations of such Lender or other Secured Party;

it being understood that no Lender shall be required to fund any amounts in connection with any purchase of all or any portion of the Collateral by the Administrative Agent pursuant to the foregoing clause (b), (c) or (d) without its prior written consent.

Each Lender and each other Secured Party agrees that the Collateral Agent is under no obligation to credit bid any part of the Obligations or to purchase or retain or acquire any portion of the Collateral; provided that, in connection with any credit bid or purchase under clause (b), (c) or (d) of the preceding paragraph, the Obligations owed to all of the Secured Parties (other than with respect to contingent or unliquidated liabilities as set forth in the next succeeding paragraph) shall be entitled to be, and shall be, credit bid by the Collateral Agent on a ratable basis.

With respect to each contingent or unliquidated claim that is an Obligation, the Collateral Agent is hereby authorized, but is not required, to estimate the amount thereof for purposes of any credit bid or purchase described in the second preceding paragraph so long as the fixing of the amount or liquidation of such claim would not unduly delay the ability of the Collateral Agent to credit bid the Obligations or purchase the Collateral in the relevant Disposition.  In the event that the Collateral Agent, in the sole and absolute discretion of the Required Lenders, elects not to estimate any such contingent or unliquidated claim or any such claim cannot be estimated without unduly delaying the ability of the Collateral Agent to consummate any credit bid or purchase in accordance with the second preceding paragraph, then any contingent or unliquidated claims not so estimated shall be disregarded, shall not be credit bid, and shall not be entitled to any interest in the portion or the entirety of the Collateral purchased by means of such credit bid.

Each Secured Party whose Obligations are credit bid under clause (b), (c) or (d) of the third preceding paragraph shall be entitled to receive interests in the Collateral or other asset or assets acquired in connection with such credit bid (or in the capital stock of the acquisition vehicle or vehicles that are used to consummate such acquisition) on a ratable basis in accordance with the percentage obtained by dividing (x) the amount of the Obligations of such Secured Party that were credit bid in such credit bid or other Disposition, by (y) the aggregate amount of all Obligations that were credit bid in such credit bid or other Disposition.

Section 8.10    Withholding Taxes.  To the extent required by any applicable laws, the Administrative Agent may withhold from any payment to any Lender an amount equivalent to any applicable withholding Tax.

Section 8.11    Binding Effect.  Each Secured Party by accepting the benefits of the Loan Documents agrees that (i) any action taken by any Agent or the Required Lenders (or, if expressly required hereby, a greater proportion of the Lenders) in accordance with the provisions of the Loan Documents, (ii) any action taken by any Agent in reliance upon the instructions of Required Lenders (or, where so required by the terms of this Agreement, a greater proportion of the Lenders or other parties hereto as required herein) and (iii) the exercise by any Agent or the Required Lenders (or, where so required by the terms of this Agreement, a greater proportion of the Lenders or other parties hereto as required herein) of the powers set forth herein or therein, together with such other powers as are reasonably incidental thereto, shall be authorized and binding upon all of the Secured Parties.

Section 8.12    Security Documents and Collateral Agent.  The Lenders and the other Secured Parties authorize the Collateral Agent to release any Collateral or Guarantors or subordinate its Liens on the Collateral in accordance with Section 9.15.

Upon the request of the Collateral Agent at any time, the Required Lenders (or, where so required by the terms of this Agreement, a greater proportion of the Lenders or other parties hereto as required herein) will confirm in writing the Collateral Agent's authority to release or subordinate its interest in particular types or items of property, or to release any Loan Party or JB TopCo from its obligations under this Agreement pursuant to Section 9.15.  In each case as specified in Section 9.15, the Collateral Agent will (and each Lender and Secured Party hereby authorizes the Collateral Agent to), at the Borrowers' expense, execute and deliver to the applicable Loan Party or JB TopCo such documents as such Loan Party or JB TopCo may reasonably request to evidence the release of such item of Collateral from the assignment and security interest granted under the Security Documents or to subordinate its interest therein, or to release such Loan Party or JB TopCo from its obligations under this Agreement, in each case in accordance with the terms of the Loan Documents and Section 9.15 and so long as the Borrowers or applicable Loan Party or JB TopCo shall have provided the Collateral Agent such certifications or documents as the Collateral Agent (acting at the direction of the Required Lenders) shall reasonably request in order to demonstrate compliance with this Agreement and the other Loan Documents.  The Administrative Agent and Collateral Agent may rely, without independent investigation, on such certificates and other documents.

Neither Agent shall not be responsible for (i) perfecting, maintaining, monitoring, preserving or protecting the security interest or Lien granted under this Agreement, any other Loan Document or any agreement or instrument contemplated hereby or thereby, (ii) the filing, re-filing, recording, re-recording or continuing or any document, financing statement, mortgage, assignment, notice, instrument of further assurance or other instrument in any public office at any time or times or (iii) providing, maintaining, monitoring or preserving insurance on (including any flood insurance policies or for determining whether any flood insurance policies are or should be obtained in respect of the Collateral, which each Lender shall be solely responsible for), or the payment of taxes with respect to, any of the Collateral.  Neither Agent shall be required to qualify in any jurisdiction in which it is not presently qualified to perform its obligations as such Agent.

Section 8.13    Erroneous Payments.

(a)    If the Administrative Agent notifies a Lender, or any Person who has received funds on behalf of a Lender (any such Lender or other recipient, a "Payment Recipient") that the Administrative Agent has determined in its sole discretion (whether or not after receipt of any notice under immediately succeeding clause (b)) that any funds received by such Payment Recipient from the Administrative Agent or any of its Affiliates were erroneously transmitted to, or otherwise erroneously or mistakenly received by, such Payment Recipient (whether or not known to such Lender or other Payment Recipient on its behalf) (any such funds, whether received as a payment,

prepayment or repayment of principal, interest, fees, distribution or otherwise, individually and collectively, an "Erroneous Payment") and demands the return of such Erroneous Payment (or a portion thereof) (*provided*, that, without limited any other rights or remedies (whether at law or in equity), the Administrative Agent may not make any such demand under this clause (a) with respect to an Erroneous Payment unless such demand is made within 15 Business Days of the date of receipt of such Erroneous Payment by the applicable payment receipt), such Erroneous Payment shall at all times remain the property of the Administrative Agent and shall be segregated by the Payment Recipient and held in trust for the benefit of the Administrative Agent, and such Lender shall (or, with respect to any Payment Recipient who received such funds on its behalf, shall cause such Payment Recipient to) promptly, but in no event later than two Business Days thereafter, return to the Administrative Agent the amount of any such Erroneous Payment (or portion thereof) as to which such a demand was made, in same day funds (in the currency so received). A notice of the Administrative Agent to any Payment Recipient under this clause (a) shall be conclusive, absent manifest error.

(b)        Without limiting immediately preceding clause (a), each Lender, or any Person who has received funds on behalf of such Lender, hereby further agrees that if it receives a payment, prepayment or repayment (whether received as a payment, prepayment or repayment of principal, interest, fees, distribution or otherwise) from the Administrative Agent (or any of its Affiliates) (x) that is in a different amount than, or on a different date from, that specified in a notice of payment, prepayment or repayment sent by the Administrative Agent (or any of its Affiliates) with respect to such payment, prepayment or repayment, (y) that was not preceded or accompanied by a notice of payment, prepayment or repayment sent by the Administrative Agent (or any of its Affiliates), or (z) that such Lender, or other such recipient, otherwise becomes aware was transmitted, or received, in error or by mistake (in whole or in part) in each case:

(i)        (A) in the case of immediately preceding clauses (x) or (y), an error shall be presumed to have been made (absent written confirmation from the Administrative Agent to the contrary) or (B) an error has been made (in the case of immediately preceding clause (z)), in each case, with respect to such payment, prepayment or repayment;

(ii)        such Lender shall (and shall cause any other recipient that receives funds on its respective behalf to) promptly (and, in all events, within one Business Day of its knowledge of such error) notify the Administrative Agent of its receipt of such payment, prepayment or repayment, the details thereof (in reasonable detail) and that it is so notifying the Administrative Agent pursuant to this Section 8.12(b); and

(iii)        upon demand from the Administrative Agent, it shall promptly, but in no event later than two Business Day thereafter, return to the Administrative Agent the amount of any such Erroneous Payment (or portion thereof) as to which such a demand was made in same day funds, together with interest thereon in respect of each day from and including the date such Erroneous Payment (or portion thereof) was received by such Lender to the date such amount is repaid to the Administrative Agent at the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation from time to time in effect.

(c)        Each Lender hereby authorizes the Administrative Agent to set off, net and apply any and all amounts at any time owing to such Lender under any Loan Document, or otherwise payable or distributable by the Administrative Agent to such Lender from any source, against any amount due to the Administrative Agent under immediately preceding clause (a) or under the indemnification provisions of this Agreement.

(d)        In the event that an Erroneous Payment (or portion thereof) is not recovered by the Administrative Agent for any reason, after demand therefor by the Administrative Agent in accordance with immediately preceding clause (a), from any Lender that has received such Erroneous Payment (or portion thereof) (and/or from any Payment Recipient who received such Erroneous Payment (or portion thereof) on its respective behalf) (such unrecovered amount, an "Erroneous Payment Return Deficiency"), upon the Administrative Agent's notice to such Lender at any time, (i) such Lender shall be deemed to have assigned its Loans (but not its Commitments) with respect to which such Erroneous Payment was made (the "Erroneous Payment Impacted Class") in an amount equal to the Erroneous Payment Return Deficiency (or such lesser amount as the Administrative Agent may specify) (such assignment of the Loans (but not Commitments) of the Erroneous Payment Impacted Class, the "Erroneous Payment Deficiency Assignment") at par plus any accrued and unpaid interest (with the assignment fee to be waived by the

109

Administrative Agent in such instance), and is hereby (together with the Borrower) deemed to execute and deliver an Assignment and Assumption (or, to the extent applicable, an agreement incorporating an Assignment and Assumption by reference pursuant to a Platform as to which the Administrative Agent and such parties are participants) with respect to such Erroneous Payment Deficiency Assignment, and such Lender shall deliver any Term Notes evidencing such Loans to the Borrower or the Administrative Agent, (ii) the Administrative Agent as the assignee Lender shall be deemed to acquire the Erroneous Payment Deficiency Assignment, (iii) upon such deemed acquisition, the Administrative Agent as the assignee Lender shall become a Lender hereunder with respect to such Erroneous Payment Deficiency Assignment and the assigning Lender shall cease to be a Lender hereunder with respect to such Erroneous Payment Deficiency Assignment, excluding, for the avoidance of doubt, its obligations under the indemnification provisions of this Agreement and its applicable Commitments which shall survive as to such assigning Lender and (iv) the Administrative Agent may reflect in the Register its ownership interest in the Loans subject to the Erroneous Payment Deficiency Assignment. The Administrative Agent may, in its discretion, sell any Loans acquired pursuant to an Erroneous Payment Deficiency Assignment in accordance with Section 9.04 and upon receipt of the proceeds of such sale, the Erroneous Payment Return Deficiency owing by the applicable Lender shall be reduced by the net proceeds of the sale of such Loan (or portion thereof), and the Administrative Agent shall retain all other rights, remedies and claims against such Lender (and/or against any recipient that receives funds on its respective behalf). For the avoidance of doubt, no Erroneous Payment Deficiency Assignment will reduce the Commitments of any Lender and such Commitments shall remain available in accordance with the terms of this Agreement.  In addition, each party hereto agrees that, except to the extent that the Administrative Agent has sold a Loan (or portion thereof) acquired pursuant to an Erroneous Payment Deficiency Assignment, and irrespective of whether the Administrative Agent may be equitably subrogated, the Administrative Agent shall be contractually subrogated to all the rights and interests of the applicable Lender under the Loan Documents with respect to each Erroneous Payment Return Deficiency (the "<u>Erroneous Payment Subrogation Rights</u>").

(e)      The Borrower and each other Loan Party hereby agrees that (x) in the event of an Erroneous Payment (or portion thereof) is not recovered from any Lender that has received such Erroneous Payment (or portion thereof) for any reason (and without limiting the Administrative Agent's rights and remedies under this Article VIII), the Administrative Agent shall be subrogated to all the rights of such Lender with respect to such amount and (y) an Erroneous Payment shall not pay, prepay, repay, discharge or otherwise satisfy any Obligations owned by the Borrower or any other Loan Party.

(f)      To the extent permitted by applicable law, no Payment Recipient shall assert any right or claim to an Erroneous Payment, and hereby waives, and is deemed to waive, any claim, counterclaim, defense or right of set-off or recoupment with respect to any demand, claim or counterclaim by the Administrative Agent for the return of any Erroneous Payment received, including without limitation waiver of any defense based on "discharge for value" or any similar doctrine.

(g)      Each party's obligations, agreements and waivers under this Section 8.12 shall survive the resignation or replacement of the Administrative Agent, any transfer of rights or obligations by, or the replacement of, a Lender, and the termination of the Commitments.

Section 8.14      <u>Ship Mortgage Trust</u>.  The Collateral Agent agrees and declares, and each of the other Secured Parties acknowledges, that, subject to the terms and conditions of this Section 8.14, the Collateral Agent holds the Trust Property in trust for the Secured Parties absolutely.  Each of the other Secured Parties agrees that the obligations, rights and benefits vested in the Collateral Agent shall be performed and exercised in accordance with this Section 8.14. For the avoidance of doubt, the Collateral Agent shall have the benefit of all of the provisions of this Agreement (including exculpatory and indemnification provisions) benefiting it in its capacity as Collateral Agent and as mortgage trustee for the Secured Parties.  In addition, the Collateral Agent and any attorney, agent or delegate of the Collateral Agent may indemnify itself or himself out of the Trust Property against all liabilities, costs, fees, damages, charges, losses and expenses sustained or incurred by it or him in relation to the taking or holding of any of the Trust Property or in connection with the exercise or purported exercise of the rights, trusts, powers and discretions vested in the Collateral Agent or any other such Person by or pursuant to the Mortgages (and, where applicable, any deed of covenants collateral thereto), on Material Vessels and Additional Collateral Vessels or in respect of anything else done or omitted to be done in any way relating to such Mortgages.

Section 8.15    Control by the Majority. Subject to the Senior ICA Provisions, the Bankruptcy Court DIP Order and the Canadian DIP Recognition Order, the Secured Parties holding a majority in principal amount of the outstanding Secured Obligations may direct the time, method and place of conducting any proceeding for any remedy available to the Collateral Agent or of exercising any trust or power conferred on the Collateral Agent.

# ARTICLE IX
# MISCELLANEOUS

Section 9.01    Notices.

(a)    All notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by fax or other electronic transmission, as follows:

(i)    if to the Parents, the Borrowers or any Agent, to the address, fax number, e-mail address or telephone number specified for such Person on Schedule 9.01; and

(ii)    if to any Lender, to it at its address (or fax number, telephone number or email address) set forth in its Administrative Questionnaire (including, as appropriate, notices delivered solely to the Person designated by a Lender on its Administrative Questionnaire then in effect for the delivery of notices that may contain material non-public information relating to the Borrowers).

Notices and other communications sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received; notices and other communications sent by facsimile shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next business day for the recipient).  Notices and other communications delivered through electronic communications to the extent provided in subsection (b) below shall be effective as provided in such subsection (b).

(b)    Electronic Communications.  Notices and other communications to the Lenders hereunder may be delivered or furnished by electronic communication (including e-mail and Internet or intranet websites) pursuant to procedures reasonably approved by the Administrative Agent; provided that the foregoing shall not apply to notices to any Lender pursuant to Article II if such Lender has notified the Administrative Agent that it is incapable of receiving notices under such Article by electronic communication.

Unless the Administrative Agent otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement); provided that if such notice or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next Business Day for the recipient, and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing clause (i) of notification that such notice or communication is available and identifying the website address therefor.

(c)    The Platform.  THE PLATFORM IS PROVIDED "AS IS" AND "AS AVAILABLE."  THE AGENT PARTIES (AS DEFINED BELOW) DO NOT WARRANT THE ACCURACY OR COMPLETENESS OF THE BORROWER MATERIALS OR THE ADEQUACY OF THE PLATFORM, AND EXPRESSLY DISCLAIM LIABILITY FOR ERRORS IN OR OMISSIONS FROM THE BORROWER MATERIALS.  NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS, IS MADE BY ANY AGENT PARTY IN CONNECTION WITH THE BORROWER MATERIALS OR THE PLATFORM.  In no event shall any Agent or any of its respective Related Parties (collectively, the "Agent Parties") have any liability to any Parent, any Borrower, any Lender or any other Person for losses, claims, damages, liabilities or expenses of any kind (whether in tort, contract or otherwise) arising out of any Borrower's or the Administrative Agent's transmission of Borrower

Materials through the Internet, except to the extent that such losses, claims, damages, liabilities or expenses are determined by a court of competent jurisdiction by a final and non-appealable judgment to have resulted from the gross negligence or willful misconduct of such Agent Party; provided, however, that in no event shall any Agent Party have any liability to any Parent, any Borrower, any Lender or any other Person for indirect, special, incidental, consequential or punitive damages (as opposed to direct or actual damages).

(d)       Change of Address, Etc.  Each of any Parent, any Borrower and the Administrative Agent may change its address, electronic mail address, fax or telephone number for notices and other communications or website hereunder by notice to the other parties hereto.  Each other Lender may change its address, fax or telephone number for notices and other communications hereunder by notice to the Borrowers and the Administrative Agent. In addition, each Lender agrees to notify the Administrative Agent from time to time to ensure that the Administrative Agent has on record (i) an effective address, contact name, telephone number, fax number and electronic mail address to which notices and other communications may be sent and (ii) accurate wire instructions for such Lender.

(e)       Reliance by Agents and Lenders.  Each Agent and the Lenders shall be entitled to rely and act upon any notices purportedly given by or on behalf of the Borrowers even if (i) such notices were not made in a manner specified herein, were incomplete or were not preceded or followed by any other form of notice specified herein, or (ii) the terms thereof, as understood by the recipient, varied from any confirmation thereof.  The Borrowers shall indemnify each Agent, each Lender and the Related Parties from all losses, costs, expenses and liabilities resulting from the reliance by such Person on each notice purportedly given by or on behalf of the Borrowers in the absence of gross negligence or willful misconduct as determined in a final and non-appealable judgment by a court of competent jurisdiction.  All telephonic communications with any Agent may be recorded by such Agent, and each of the parties hereto hereby consents to such recording.  Delivery of any reports, information and documents to any Agent (except for written notices or letters of direction delivered to such Agent under Section 9.01 of this Agreement or any other Loan Document) is for informational purposes only and such Agent's receipt of such shall not constitute constructive notice of any information contained therein or determinable from information contained therein, including the Borrower's compliance with any of its covenants hereunder.

Section 9.02       Waivers; Amendments.

(a)       No failure or delay by any Agent or any Lender in exercising any right or power under this Agreement or any Loan Document shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power.  The rights and remedies of each Agent and the Lenders hereunder and under the other Loan Documents are cumulative and are not exclusive of any rights or remedies that they would otherwise have.  No waiver of any provision of this Agreement or any Loan Document or consent to any departure by any Loan Party therefrom shall in any event be effective unless the same shall be permitted by paragraph (b) of this Section, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given.  Without limiting the generality of the foregoing, the making of a Loan shall not be construed as a waiver of any Default, regardless of whether any Agent or any Lender may have had notice or knowledge of such Default at the time.  No notice or demand on the Borrowers or the Parents in any case shall entitle the Borrowers or Parents to any other or further notice or demand in similar or other circumstances.

(b)       Neither this Agreement, any Loan Document nor any provision hereof or thereof may be waived, amended or modified except, in the case of this Agreement, pursuant to an agreement or agreements in writing entered into by the Parents, the Borrowers, the Administrative Agent and the Required Lenders (other than the Fee Letter, which may be amended and modified in accordance with the terms thereof and with respect to clause (x) below which shall not require the consent of the Required Lenders), in the case of any other Loan Document, pursuant to an agreement or agreements in writing entered into by the Administrative Agent and the Loan Party or Loan Parties that are parties thereto, in each case with the consent of the Required Lenders; provided that no such agreement shall:

(i)       increase the Commitment of any Lender without the prior written consent of such Lender (which, notwithstanding the foregoing, such consent of such Lender shall be the only consent required hereunder to make such modification) (it being understood that a waiver of any condition precedent set

112

forth in Section 4.01 or the waiver of any Default, mandatory prepayment or mandatory reduction of the Commitments shall not constitute an extension or increase of any Commitment of any Lender),

(ii)     reduce the principal amount of any Loan or reduce the rate of interest thereon, or reduce any fees payable hereunder, without the written consent of each Lender directly and adversely affected thereby; provided that only the consent of the Required Lenders shall be necessary to waive any obligation of the Borrowers to pay default interest pursuant to Section 2.13(c) or to amend Section 2.13(c),

(iii)     postpone the maturity of any Loan, or the date of any scheduled payment of the principal amount of any Term Loan, or any date for the payment of any interest or fees payable hereunder, or reduce the amount of, waive or excuse any such payment, or postpone the scheduled date of expiration of any Commitment, without the written consent of each Lender directly and adversely affected thereby,

(iv)     change Section 2.18(b) or (c) or any other provision of this Agreement in a manner that would alter the pro rata sharing of payments required thereby, without the written consent each Lender adversely affected thereby,

(v)     change any of the provisions of this Section without the written consent of each Lender directly and adversely affected thereby,

(vi)     change the percentage set forth in the definition of "Required Lenders" or any other provision of any Loan Document specifying the number or percentage of Lenders required to waive, amend or modify any rights thereunder or make any determination or grant any consent thereunder, without the written consent of each Lender,

(vii)     release all or substantially all the value of the Guarantees under this Agreement or the Collateral Agreement (except as expressly provided in this Agreement the Collateral Agreement) without the written consent of each Lender (other than a Defaulting Lender),

(viii)     release all or substantially all the Collateral from the Liens of the Security Documents (except as expressly provided in this Agreement or the Security Documents), without the written consent of each Lender (other than a Defaulting Lender),

(ix)     other than in connection with a Senior DIP Credit Agreement (or any refinancing of the Senior DIP Credit Agreement, subordinate the payment priority of the Obligations to any other Indebtedness or subordinate all or substantially all the Liens granted to the Collateral Agent (for the benefit of the Secured Parties) in the Collateral to Liens securing other Indebtedness, in each case, without the written consent of each Lender adversely affected thereby;

(x)     disproportionately and adversely affect any Lender that is an Affiliate of any Borrower as compared to all other Lenders, without the written consent of each such Lender that is an Affiliate of a Borrower; and

(xi)     increase the aggregate principal amount of Commitments available to be drawn under this Agreement or enter into a new debtor-in-possession financing that is provided by the Lenders (or their Related Funds) party hereto after the Closing Date without the written consent of each Lender that is an Affiliate of the Borrower; except in the case of this clause (xi) to the extent each Lender that is an Affiliate of the Borrower is offered to participate on a pro rata basis in any such Indebtedness on substantially the same terms as all other Lenders, which offer shall remain open to such Lender for a period of not less than five Business Days, *provided*, *however*, that if any such Lender does not accept an offer to provide its pro rata share (but not greater than its pro rata share) of such Indebtedness within the time specified for acceptance of such offer being made, such Lender shall be deemed to have declined such offer;

provided, further, that no such agreement shall amend, modify or otherwise affect the rights or duties of any Agent without the prior written consent of such Agent.  Notwithstanding the foregoing, (a) this Agreement may be

amended (or amended and restated) with the written consent of the Required Lenders, the Administrative Agent, the Parents and the Borrowers (i) to add one or more additional credit facilities to this Agreement and to permit the extensions of credit from time to time outstanding thereunder and the accrued interest and fees in respect thereof to share ratably in the benefits of this Agreement and the other Loan Documents and (ii) to include appropriately the Lenders holding such credit facilities in any determination of the Required Lenders on substantially the same basis as the Lenders prior to such inclusion and (b) guarantees, collateral security documents and related documents executed by Foreign Subsidiaries in connection with this Agreement may be in a form reasonably determined by the Administrative Agent (acting at the direction of the Required Lenders) and may be, together with this Agreement, amended and waived with the consent of the Administrative Agent (acting at the direction of the Required Lenders) at the request of the Borrowers without the need to obtain the consent of any other Lender if such amendment or waiver is delivered in order (i) to comply with local law or advice of local counsel, (ii) to cure ambiguities or defects or (iii) to cause such guarantee, collateral security document or other document to be consistent with this Agreement and the other Loan Documents.

(c)     In connection with any proposed amendment, modification, waiver or termination (a "Proposed Change") requiring the consent of all Lenders or all affected Lenders, if the consent of the Required Lenders, to such Proposed Change is obtained, but the consent to such Proposed Change of other Lenders whose consent is required is not obtained (any such Lender whose consent is not obtained as described in paragraph (b) of this Section being referred to as a "Non-Consenting Lender"), then, so long as the Lender that is acting as Administrative Agent is not a Non-Consenting Lender, the Borrowers may, at their sole expense and effort, upon notice to such Non-Consenting Lender and the Administrative Agent, require such Non-Consenting Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in Section 9.04), all its interests, rights and obligations under this Agreement to a permitted assignee that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment); provided that (i) the Borrowers shall have received the prior written consent of the Administrative Agent (acting at the direction of the Required Lenders) to the extent such consent would be required under Section 9.04(b) for an assignment of Loans or Commitments, as applicable, which consent shall not unreasonably be withheld or delayed, (ii) such Non-Consenting Lender shall have received payment of an amount equal to the outstanding principal amount of its Loans, accrued but unpaid interest thereon, accrued but unpaid fees and all other amounts payable to it hereunder (including pursuant to Section 2.12(e)) from the permitted assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrowers (in the case of all other amounts) and (iii) unless waived, the Borrowers or such permitted assignee shall have paid to the Administrative Agent the processing and recordation fee specified in Section 9.04(b)(ii).  A Lender shall not be required to make any such assignment and delegation if, prior thereto, as a result of a waiver by such Lender or otherwise (including as a result of any action taken by such Lender under paragraph (a) above), the circumstances entitling the Borrowers to require such assignment and delegation cease to apply.  Each party hereto agrees that an assignment required pursuant to this paragraph may be effected pursuant to an Assignment and Assumption executed by the Borrowers, the Administrative Agent and the assignee and that the Lender required to make such assignment need not be a party thereto.

(d)     Notwithstanding anything in this Agreement or the other Loan Documents to the contrary, the Loans of any Lender that is at the time a Defaulting Lender shall not have any voting or approval rights under the Loan Documents and shall be excluded in determining whether all Lenders or the Required Lenders have taken or may take any action hereunder (including any consent to any amendment or waiver pursuant to this Section); provided that (x) the Commitment of any Defaulting Lender may not be increased or extended without the consent of such Lender and (y) any waiver, amendment or modification requiring the consent of all Lenders or each affected Lender that affects any Defaulting Lender more adversely than other affected Lenders shall require the consent of such Defaulting Lender.

Section 9.03     Expenses; Indemnity; Damage Waiver.

(a)     The Borrowers shall pay (i) all reasonable and documented or invoiced out-of-pocket costs and expenses incurred by each Agent and its respective Affiliates (without duplication), including any and all recording and filing fees, cost and expenses incurred in connection with the Platform, the reasonable fees, charges and disbursements of ArentFox Schiff LLP, as lead counsel to the Agents, Milbank LLP, as lead counsel to the Lenders, Blake, Cassels & Graydon LLP, as Ontario counsel to the Lenders, Watson Farley & Williams LLP, maritime counsel to the Lenders, and, if necessary, one firm of maritime counsel and a local firm of counsel in each applicable

jurisdiction (including the Bahamas and Canada) and, in the case of an actual or perceived conflict of interest, where such person affected by such conflict informs the Borrowers of such conflict and thereafter retains its own counsel with the Borrowers' prior written consent (not to be unreasonably withheld), one additional counsel (and maritime and local counsel, if applicable) per affected party, in each case, as counsel, for the Agents, in connection with the syndication of the credit facilities provided for herein, and the preparation, execution, delivery and administration of the Loan Documents or any amendments, modifications or waivers of the provisions thereof (whether or not such amendment, waiver or modification is approved by the Lenders), (ii) [Reserved] and (iii) all reasonable and documented or invoiced out-of-pocket expenses incurred by each Agent or any Lender, including the fees, charges and disbursements of counsel for each Agent and the Lenders, in connection with the enforcement or protection of any rights or remedies (A) in connection with the Loan Documents (including all such costs and expenses incurred during any legal proceeding, including any proceeding under any Debtor Relief Laws), including its rights under this Section or (B) in connection with the Loans made hereunder, including all such out-of-pocket costs and expenses incurred during any workout, restructuring or negotiations in respect of such Loans; provided that such counsel shall be limited to (w) one lead counsel of the Agents and their Related Parties, taken as a whole, (x) one lead counsel of the Lenders and their Related Parties, taken as a whole, (y) one firm of maritime counsel and (z) a local firm of counsel in each applicable jurisdiction as, in each case, may reasonably be deemed necessary by the Administrative Agent in each relevant jurisdiction and, in the case of an actual or perceived conflict of interest, where such person affected by such conflict informs the Borrowers of such conflict and thereafter retains its own counsel with the Borrowers' prior written consent (not to be unreasonably withheld), one additional counsel (and maritime and local counsel, if applicable) per affected party.

(b)       The Borrowers shall indemnify each Agent, each Lender and each Related Party of any of the foregoing Persons (each such Person being called an "Indemnitee") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities, including any and all liabilities with respect to, or resulting from any delay in paying, stamp, excise and similar other taxes, if any, and reasonable and documented or invoiced out-of-pocket fees and expenses for any Indemnitee (excluding the allocated costs of in house counsel and limited to not more than (x) one counsel for the Agents and their Related Parties, taken as a whole and (y) one counsel for the Lenders and their Related Parties, taken as a whole, and, if necessary, (x) a single local counsel in each appropriate jurisdiction for the Agents and their Related Parties, taken as a whole, and (y) a single local counsel in each appropriate jurisdiction for the Lenders and their Related Parties, taken as a whole, and, if necessary, (x) a single special counsel in each appropriate specialty for the Agents and their Related Parties, taken as a whole and (y) a single special counsel in each appropriate specialty for the Lenders and their Related Parties, taken as a whole (and, in each case, in the case of an actual or perceived conflict of interest where such Indemnitee affected by such conflict informs the Borrowers of such conflict and thereafter retains its own counsel, of another firm of such for such affected Indemnitee)), incurred by or asserted against any Indemnitee by any third party or by any Borrower, any Parent, any Parent Entity Debtor or any Subsidiary arising out of, in connection with, or as a result of (i) the execution or delivery of this Agreement, any Loan Document or any other agreement or instrument contemplated hereby or thereby, the performance by the parties to the Loan Documents of their respective obligations thereunder or the consummation of the Transactions or any other transactions contemplated thereby, (ii) any Loan or the use of proceeds therefrom, (iii) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, regardless of whether brought by a third party or by any Borrower, any Parent, any Parent Entity Debtor or any Subsidiary and regardless of whether any Indemnitee is a party thereto, (iv) any or alleged presence of Release or threat of Release of Hazardous Materials on, at, to or from any Material Real Property or any other property currently or formerly owned or operated by any Parent, any Parent Entity Debtor, any Borrower or any Subsidiary, or any other Environmental Liability related in any way to any Parent, any Parent Entity Debtor, any Borrower or any Subsidiary and or (v) any claim, inquiry, litigation, investigation or other proceeding relating to any of the foregoing, whether or not any Indemnitee is a party thereto and regardless of whether such matter is initiated by a third party or by any Parent, any Parent Entity Debtor, any Borrower or any of their subsidiaries or Affiliates; provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities, costs or related expenses (x) resulted from the gross negligence or willful misconduct of such Indemnitee or any of its Related Parties (as determined by a court of competent jurisdiction in a final and non-appealable judgment), (y) resulted from a material breach of the Loan Documents by such Indemnitee or any of its Related Parties (as determined by a court of competent jurisdiction in a final and non-appealable judgment) or (z) arise from any claim, actions, suits, inquiries, litigation, investigation or proceeding between or among Indemnitees that do not involve an act or omission by any Borrower or any of its

Affiliates (other than any claim, actions, suits, inquiries, litigation, investigation or proceeding by or against an Indemnitee in its capacity or in fulfilling its role as an Administrative Agent under this Agreement).

(c)      [Reserved].

(d)      Neither any Loan Party nor JB TopCo shall assert, and each hereby waives on behalf of itself and each other Loan Party, any claim against any Indemnitee (i) for any direct or actual damages arising from the use by unintended recipients of information or other materials distributed to such unintended recipients by such Indemnitee through telecommunications, electronic or other information transmission systems (including the Internet) in connection with this Agreement or the other Loan Documents or the transactions contemplated hereby or thereby; provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such direct or actual damages are determined by a court of competent jurisdiction by final, non-appealable judgment to have resulted from the gross negligence or willful misconduct (as determined by a court of competent jurisdiction in a final and non-appealable judgment) of such Indemnitee or (ii) on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Loan Document or any agreement or instrument contemplated hereby or thereby, the Transactions or any Loan or the use of the proceeds thereof.

(e)      All amounts due under this Section shall be payable not later than ten (10) Business Days after written demand therefor; provided, however, that any Indemnitee shall promptly refund an indemnification payment received hereunder to the extent that there is a final judicial determination that such Indemnitee was not entitled to indemnification with respect to such payment pursuant to this Section.

Section 9.04      Successors and Assigns.

(a)      The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that (i) the Borrowers may not assign or otherwise transfer any of their rights or obligations hereunder other than as expressly provided in Section 6.05 without the prior written consent of each Lender (and any attempted assignment or transfer by the Borrowers without such consent shall be null and void) and (ii) no Lender may assign or otherwise transfer its rights or obligations hereunder except in accordance with this Section.  Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants (to the extent provided in paragraph (d) of this Section), the Company Advisors (to the extent provided in Section 8.08) and, to the extent expressly contemplated hereby, the Related Parties of each of the Administrative Agent and the Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement or the other Loan Documents.

(b)      (i) Subject to the conditions set forth in paragraphs (b)(ii) and (f) below, any Lender may assign to one or more assignees (each, an "Assignee") all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans at the time owing to it) with the prior written consent (such consent (except with respect to assignments to an Ineligible Institution) not to be unreasonably withheld or delayed) of (A) the Borrowers; provided that no consent of the Borrowers shall be required for an assignment of (x) a Term Loan by a Term Lender to any Term Lender or an Affiliate of any Term Lender or an Approved Fund of a Term Lender, or (y), in each case, if an Event of Default has occurred and is continuing (other than to an Ineligible Institution) and (B) the Administrative Agent; provided that (A) any Assignee must become or be party to the Restructuring Support Agreement and (B) no consent of the Administrative Agent shall be required for an assignment of a Term Loan to a Term Lender, an Affiliate of a Term Lender or an Approved Fund of a Term Lender.  In case of any assignments executed and delivered in connection with the initial syndication of the Facility following the Closing Date by Cantor Fitzgerald Securities and notwithstanding anything to the contrary in this Agreement, no consent of the Borrowers or the Administrative Agent shall be required for such assignment.

(ii) Assignments shall be subject to the following additional conditions:  (A) except in the case of an assignment to a Lender, an Affiliate of a Lender or an Approved Fund (in each case, other than an Ineligible Institution) or an assignment of the entire remaining amount of the assigning Lender's Commitment or Loans, the amount of the Commitment or Loans of the assigning Lender subject to each such assignment (determined as of the trade date specified in the Assignment and Assumption with respect to such assignment or, if no trade date is so

116

specified, as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent) shall, not be less than $1,000,000 and integral multiples of $1,000,000 in excess thereof unless the Borrowers and the Administrative Agent otherwise consent (in each case, such consent not to be unreasonably withheld or delayed); provided that no such consent of the Borrowers shall be required if an Event of Default under Section 7.01(a), (b), (h) or (i) has occurred and is continuing; provided, further, that simultaneous assignments by or to two or more Approved Funds shall be combined for purposes of determining whether the minimum assignment requirement is met, (B) each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement, (C) the parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption via an electronic settlement system acceptable to the Administrative Agent or, if previously agreed with the Administrative Agent, manually execute and deliver to the Administrative Agent an Assignment and Assumption, and, in each case, together (unless waived or reduced by the Administrative Agent) with a processing and recordation fee of $3,500; provided that the Administrative Agent, in its sole discretion, may elect to waive or reduce such processing and recordation fee; provided, further, that assignments made pursuant to Section 2.19(b) or Section 9.02(c) shall not require the signature of the assigning Lender to become effective and (D) the assignee, if it shall not be a Lender, shall deliver to the Administrative Agent all "know your customer" documents requested by the Administrative Agent pursuant to anti-money laundering rules and regulations, any tax forms required by Section 2.17(e) and an Administrative Questionnaire in which the assignee designates one or more credit contacts to whom all syndicate-level information (which may contain material non-public information about the Borrowers, the Loan Parties and their Related Parties or their respective securities) will be made available and who may receive such information in accordance with the assignee's compliance procedures and applicable laws, including Federal and state securities laws.

(iii) Subject to acceptance and recording thereof pursuant to paragraph (b)(v) of this Section, from and after the effective date specified in each Assignment and Assumption, the assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of (and subject to the obligations and limitations of) Sections 2.15, 2.16, 2.17 and 9.03 and to any fees payable hereunder that have accrued for such Lender's account but have not yet been paid). Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this Section 9.04 shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with paragraph (d)(i) of this Section.

(iv) The Administrative Agent, acting for this purpose as a non-fiduciary agent of the Borrowers, shall maintain at one of its offices a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitment of, and principal and interest amounts of the Loans owing to, each Lender pursuant to the terms hereof from time to time (the "Register"). The entries in the Register shall be conclusive absent manifest error, and the Parents, the Borrowers, the Administrative Agent and the other Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary. In addition, the Administrative Agent shall maintain on the Register information regarding the designation, and revocation of designation, of any Lender as a Defaulting Lender. The Register shall be available for inspection at any reasonable time and from time to time upon reasonable prior written notice by (i) the Borrowers, (ii) to the extent of its own Loan and Commitments, any Lender, and (iii) the Collateral Agent and its Affiliates. The parties hereto acknowledge that the Commitments and Loans are intended to be in "registered form" within the meaning of Treasury regulations Sections 1.871-14(c) and 5f.103-1(c) and Sections 163(f), 871(h) and 881(c) of the Code, and this Section 9.04(b)(iv) shall be interpreted and applied in a manner consistent therewith.

(v) Upon its receipt of a duly completed Assignment and Assumption executed by an assigning Lender and an assignee, the assignee's completed Administrative Questionnaire and a properly completed and duly executed copy of IRS Form W-9 (or other applicable tax form required by Section 2.17(e)) and all other documentation and other information required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations including the USA PATRIOT Act (unless the assignee shall already be

117

a Lender hereunder), the processing and recordation fee referred to in paragraph (b) of this Section and any written consent to such assignment required by paragraph (b) of this Section, the Administrative Agent shall accept such Assignment and Assumption and record the information contained therein in the Register.  No assignment shall be effective for purposes of this Agreement unless it has been recorded in the Register as provided in this paragraph.

(vi) The words "execution," "signed," "signature" and words of like import in any Assignment and Assumption shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act or any other similar state laws based on the Uniform Electronic Transactions Act.

(c)      [Reserved]

(d)      (i)      Any Lender may, without the consent of, or notice to, the Borrowers or the Administrative Agent, sell participations to one or more banks or other Persons other than a natural person other than any Ineligible Institution (to the extent that the list of Ineligible Institutions has been made available to all Lenders; provided, that regardless of whether the list of Ineligible Institutions has been made available to all Lenders, no Lender may sell participations in Loans or Commitments to an Ineligible Institution without the consent of the Borrowers if the list of Ineligible Institutions has been made available to such Lender), a Defaulting Lender, any Parent, any Borrower or any of any Borrower's Subsidiaries (a "Participant") in all or a portion of such Lender's rights and obligations under this Agreement (including all or a portion of its Commitments and the Loans owing to it); provided that (A) such Lender's obligations under this Agreement shall remain unchanged, (B) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (C) each Parent, each Borrower, each Agent and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement.  Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and any other Loan Documents and to approve any amendment, modification or waiver of any provision of this Agreement and any other Loan Documents; provided that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver described in the clause (i), (ii), (iii), (vii) or (viii) of the first proviso to Section 9.02(b) that directly and adversely affects such Participant (but, for the avoidance of doubt, not any waiver of any Default or Event of Default).  Subject to paragraph (d)(iii) of this Section, the Borrowers agree that each Participant shall be entitled to the benefits of Sections 2.15, 2.16 and 2.17 (subject to the obligations and limitations of such Sections, including Section 2.17(e) (provided that any required documentation under Section 2.17(e) shall be provided solely to the participating Lender) and Section 2.19) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to paragraph (b) of this Section.  To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 9.08 as though it were a Lender; provided that such Participant shall be subject to Section 2.18(c) as though it were a Lender.  Notwithstanding the foregoing, each Loan Party and the Lenders acknowledge and agree that the Administrative Agent shall not have any responsibility or obligation to determine whether any Participant or potential Participant is an Ineligible Institution and the Administrative Agent shall have no liability with respect to any participation made to an Ineligible Institution.

(ii)      Each Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of the Borrowers, maintain a register on which it enters the name and address of each Participant and the principal and interest amounts of each participant's interest in the Loans or other obligations under this Agreement (the "Participant Register").  The entries in the Participant Register shall be conclusive, absent manifest error, and the Borrowers and such Lender shall treat each person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary; provided that no Lender shall have the obligation to disclose all or a portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any loans or other obligations under any Loan Document) to any Person except to the extent that such disclosure is necessary in connection with a Tax audit or other proceeding to establish that any loans are in registered form for U.S. federal income tax purposes.  The

118

parties hereto acknowledge that the Commitments and Loans are intended to be in "registered form" within the meaning of Treasury regulations Sections 1.871-14(c) and 5f.103-1(c) and Sections 163(f), 871(h) and 881(c) of the Code, and this Section 9.04(d)(ii) shall be interpreted and applied in a manner consistent therewith.

> (iii)      A Participant shall not be entitled to receive any greater payment under Section 2.15 or Section 2.17 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, except to the extent that a Participant's right to a greater payment results from a Change in Law that occurs after the Participant acquired the applicable participation.

Any Lender may, without the consent of the Borrowers or the Administrative Agent, at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank or other "central" bank, and this Section shall not apply to any such pledge or assignment of a security interest, provided that no such pledge or assignment of a security interest shall release a Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(e)      In connection with any assignment of rights and obligations of any Defaulting Lender hereunder, no such assignment shall be effective unless and until, in addition to the other conditions thereto set forth herein, the parties to the assignment shall make such additional payments to the Administrative Agent in an aggregate amount sufficient, upon distribution thereof as appropriate (which may be outright payment, purchases by the assignee of participations or sub-participations, or other compensating actions, including funding, with the consent of the Borrowers and the Administrative Agent, the applicable pro rata share of Loans previously requested but not funded by the Defaulting Lender, to each of which the applicable assignee and assignor hereby irrevocably consent), to pay and satisfy in full all payment liabilities then owed by such Defaulting Lender to the Administrative Agent or any other Lender hereunder (and interest accrued thereon).  Notwithstanding the foregoing, in the event that any assignment of rights and obligations of any Defaulting Lender hereunder shall become effective under applicable law without compliance with the provisions of this paragraph, then the assignee of such interest shall be deemed to be a Defaulting Lender for all purposes of this Agreement until such compliance occurs.

(f)      [reserved]:

(g)      [reserved].

(h)      [reserved].

(i)      [reserved].

(j)      [reserved].

Section 9.05      Survival.  All covenants, agreements, representations and warranties made by the Loan Parties and JB TopCo in the Loan Documents and in the certificates or other instruments delivered in connection with or pursuant to any Loan Document shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of the Loan Documents and the making of any Loans, regardless of any investigation made by any such other party or on its behalf and notwithstanding that any Agent or any Lender may have had notice or knowledge of any Default or incorrect representation or warranty at the time any credit is extended hereunder, and shall continue in full force and effect as long as the principal of or any accrued interest on any Loan or any fee or any other amount payable under this Agreement is outstanding and unpaid.  The provisions of Sections 2.15, 2.16, 2.17 and 9.03 and Article VIII shall survive and remain in full force and effect regardless of the consummation of the transactions contemplated hereby, an assignment or rights by or replacement of any Lender, the repayment of all Loans and all other amounts payable hereunder or the termination of this Agreement or any provision hereof or the resignation or removal of any Agent.

Section 9.06      Counterparts; Integration; Effectiveness.  This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but

all of which when taken together shall constitute a single contract.  This Agreement, the other Loan Documents and any separate letter agreements with respect to fees payable to any Agent or the syndication of the Loans and Commitments constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof.  This Agreement shall become effective when it shall have been executed by each Agent and when the Administrative Agent shall have received counterparts hereof that, when taken together, bear the signatures of each of the other parties hereto, and thereafter shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.  Any signature to this Agreement may be delivered by facsimile, electronic mail (including pdf) or any electronic signature complying with the U.S. federal ESIGN Act of 2000 or the New York Electronic Signature and Records Act or other transmission method and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes to the fullest extent permitted by applicable law.  For the avoidance of doubt, the foregoing also applies to any amendment, supplement, extension or renewal of this Agreement.

Section 9.07    Severability.  Any provision of this Agreement held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions hereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.  Without limiting the foregoing provisions of this Section 9.07, if and to the extent that the enforceability of any provisions in this Agreement relating to Defaulting Lenders shall be limited by Debtor Relief Laws, as determined in good faith by the Administrative Agent (acting at the direction of the Required Lenders), then such provisions shall be deemed to be in effect only to the extent not so limited.

Section 9.08    Right of Setoff.  If an Event of Default shall have occurred and be continuing, each Lender and each of their respective Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by law, to set off and apply any and all deposits (general or special, time or demand, provisional or final, in whatever currency) at any time held and other obligations (in whatever currency) at any time owing by such Lender or any such Affiliate to or for the credit or the account of the Borrowers against any of and all the obligations of the Borrowers then due and owing under this Agreement held by such Lender, irrespective of whether or not such Lender shall have made any demand under this Agreement and although (i) such obligations may be contingent or unmatured and (ii) such obligations are owed to a branch or office of such Lender different from the branch or office holding such deposit or obligated on such Indebtedness; provided that in the event that any Defaulting Lender shall exercise any such right of setoff, (x) all amounts so set off shall be paid over immediately to the Administrative Agent for further application in accordance with the provisions of Section 2.21 and, pending such payment, shall be segregated by such Defaulting Lender from its other funds and deemed held in trust for the benefit of the Administrative Agent and the Lenders and (y) the Defaulting Lender shall provide promptly to the Administrative Agent a statement describing in reasonable detail the Obligations owing to such Defaulting Lender as to which it exercised such right of setoff.  The applicable Lender shall notify the Borrowers and the Administrative Agent of such setoff and application; provided that any failure to give or any delay in giving such notice shall not affect the validity of any such setoff and application under this Section.  The rights of each Lender and their respective Affiliates under this Section are in addition to other rights and remedies (including other rights of setoff) that such Lender and their respective Affiliates may have.

Section 9.09    Governing Law; Jurisdiction; Consent to Service of Process.

**THIS AGREEMENT SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO ANY PRINCIPLE OF CONFLICTS OF LAW THAT COULD REQUIRE THE APPLICATION OF ANY OTHER LAW.**

(b)    Each party hereto hereby irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of the Supreme Court of the State of New York sitting in New York County and of the United States District Court of the Southern District of New York, and any appellate court from any thereof, in any action or proceeding arising out of or relating to any Loan Document, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such New York State or, to the extent permitted by law, in such Federal court.  Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be

120

conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.  Nothing in any Loan Document shall affect any right that any Agent or any Lender may otherwise have to bring any action or proceeding relating to any Loan Document against any Parent or any Borrower or their respective properties in the courts of any jurisdiction.

(c)  Each party hereto hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection that it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to any Loan Document in any court referred to in paragraph (b) of this Section.  Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(d)  Each party to this Agreement irrevocably consents to service of process in the manner provided for notices in Section 9.01.  Nothing in any Loan Document will affect the right of any party to this Agreement to serve process in any other manner permitted by law.

Section 9.10    WAIVER OF JURY TRIAL.  EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO ANY LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).  EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

Section 9.11    Headings.  Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and shall not affect the construction of, or be taken into consideration in interpreting, this Agreement.

Section 9.12    Confidentiality.

(a)  Each Agent and the Lenders agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (i) to its Affiliates, and to its and its Affiliates' directors, officers, employees, trustees and agents, including accountants, legal counsel and other agents and advisors (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential and any failure of such Persons acting on behalf of such Agent or the relevant Lender to comply with this Section shall constitute a breach of this Section by the such Agent or the relevant Lender, as applicable), (ii) to the extent requested by any governmental or regulatory authority or self-regulatory authority, required by applicable law or by any subpoena or similar legal process; provided that solely to the extent permitted by law and other than in connection with routine audits and reviews by regulatory and self-regulatory authorities, each Lender and each Agent shall notify the Borrowers as promptly as practicable of any such requested or required disclosure in connection with any legal or regulatory proceeding; provided further that in no event shall any Lender or any Agent be obligated or required to return any materials furnished by any Parent, any Parent Entity Debtor, any Borrower or any Subsidiary of any Parent Entity Debtor, (iii) to any other party to this Agreement, (iv) in connection with the exercise of any remedies hereunder or any suit, action or proceeding relating to this Agreement or the enforcement of rights hereunder, (v) subject to an agreement containing confidentiality undertakings substantially similar to those of this Section, to (A) any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights or obligations under this Agreement, (B) any actual or prospective counterparty (or its advisors) to any Hedging Agreement or derivative transaction relating to any Loan Party or its Subsidiaries and its obligations under the Loan Documents or (C) any pledgee referred to in Section 9.04(d), (vi) if required by any rating agency; provided that prior to any such disclosure, such rating agency shall have agreed in writing to maintain the confidentiality of such Information, (vii) to the extent such Information (x) becomes publicly available other than as a result of a breach of this Section or (y) becomes available to any Agent, any Lender or any of their respective Affiliates on a nonconfidential basis from a source other than any Parent, any

121

Parent Entity Debtor or any Borrower or (viii) to the extent necessary or customary for inclusion in league table measurement. For the purposes hereof, "Information" means all information received from any Parent or any Borrower relating to any Parent, any Parent Entity Debtor, any Borrower, any other Subsidiary or their business, other than any such information that is available to any Agent or any Lender on a nonconfidential basis prior to disclosure by any Parent, any Parent Entity Debtor, any Borrower or any Subsidiary; provided that, in the case of information received from any Parent, any Parent Entity Debtor, any Borrower or any Subsidiary after the Closing Date, such information is clearly identified at the time of delivery as confidential. Any Person required to maintain the confidentiality of Information as provided in this Section shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

(b)       EACH LENDER ACKNOWLEDGES THAT INFORMATION AS DEFINED IN SECTION 9.12(a) FURNISHED TO IT PURSUANT TO THIS AGREEMENT MAY INCLUDE MATERIAL NON-PUBLIC INFORMATION CONCERNING THE PARENTS, THE PARENT ENTITY DEBTORS, THE BORROWERS, THE LOAN PARTIES AND THEIR RELATED PARTIES OR THEIR RESPECTIVE SECURITIES AND CONFIRMS THAT IT HAS DEVELOPED COMPLIANCE PROCEDURES REGARDING THE USE OF MATERIAL NON-PUBLIC INFORMATION AND THAT IT WILL HANDLE SUCH MATERIAL NON-PUBLIC INFORMATION IN ACCORDANCE WITH THOSE PROCEDURES AND APPLICABLE LAW, INCLUDING FEDERAL AND STATE SECURITIES LAWS.

(c)       ALL INFORMATION, INCLUDING REQUESTS FOR WAIVERS AND AMENDMENTS FURNISHED BY ANY BORROWER OR ANY AGENT PURSUANT TO, OR IN THE COURSE OF ADMINISTERING, THIS AGREEMENT, WILL BE SYNDICATE-LEVEL INFORMATION, WHICH MAY CONTAIN MATERIAL NON-PUBLIC INFORMATION ABOUT THE PARENTS, THE PARENT ENTITY DEBTORS, THE BORROWERS, THE LOAN PARTIES AND THEIR RELATED PARTIES OR THEIR RESPECTIVE SECURITIES. ACCORDINGLY, EACH LENDER REPRESENTS TO THE BORROWERS AND THE ADMINISTRATIVE AGENT THAT IT HAS IDENTIFIED IN ITS ADMINISTRATIVE QUESTIONNAIRE A CREDIT CONTACT WHO MAY RECEIVE INFORMATION THAT MAY CONTAIN MATERIAL NON-PUBLIC INFORMATION IN ACCORDANCE WITH ITS COMPLIANCE PROCEDURES AND APPLICABLE LAW, INCLUDING FEDERAL AND STATE SECURITIES LAWS.

Section 9.13       USA PATRIOT Act. Each Lender that is subject to the USA PATRIOT Act and the Administrative Agent (for itself and not on behalf of any Lender) hereby notifies the Borrowers that pursuant to the requirements of the USA PATRIOT Act, it is required to obtain, verify and record information that identifies each Loan Party and JB TopCo, which information includes the name and address of each Loan Party and JB TopCo and other information that will allow such Lender or the Administrative Agent, as applicable, to identify each Loan Party and JB TopCo in accordance with the USA PATRIOT Act.

Section 9.14       Judgment Currency.

(a)       If, for the purpose of obtaining judgment in any court, it is necessary to convert a sum owing hereunder, in one currency into another currency, each party hereto agrees, to the fullest extent that it may effectively do so, that the rate of exchange used shall be that at which in accordance with normal banking procedures in the relevant jurisdiction the first currency could be purchased with such other currency on the Business Day immediately preceding the day on which final judgment is given.

(b)       The obligations of the Borrowers in respect of any sum due to any party hereto or any holder of any obligation owing hereunder (the "Applicable Creditor") shall, notwithstanding any judgment in a currency (the "Judgment Currency") other than the currency in which such sum is stated to be due hereunder (the "Agreement Currency"), be discharged only to the extent that, on the Business Day following receipt by the Applicable Creditor of any sum adjudged to be so due in the Judgment Currency, the Applicable Creditor may in accordance with normal banking procedures in the relevant jurisdiction purchase the Agreement Currency with the Judgment Currency; if the amount of the Agreement Currency so purchased is less than the sum originally due to the Applicable Creditor in the Agreement Currency, the Borrowers agree, as a separate obligation and notwithstanding any such judgment, to indemnify the Applicable Creditor against such loss. The obligations of the Borrowers under this Section shall survive the termination of this Agreement and the payment of all other amounts owing hereunder.

122

Section 9.15    Release of Liens and Guarantees.

(a)    [Reserved].

(b)    The Lenders and the other Secured Parties hereby irrevocably agree that a Subsidiary Loan Party shall be automatically released from its obligations under the Loan Documents, and all security interests created by the Security Documents in Collateral owned by such Subsidiary Loan Party shall be automatically released, upon consummation of any transaction not prohibited by this Agreement resulting in such Subsidiary Loan Party ceasing to be a Subsidiary of any Borrower or otherwise becoming an Excluded Subsidiary.

(c)    Each Agent will, at the Borrowers' expense, execute and deliver to the applicable Loan Party such documents (without recourse, representation or warranty) as such Loan Party may prepare and reasonably request to subordinate the Collateral Agent's Lien on any property granted to or held by the Collateral Agent under any Loan Document to the holder of any Lien on such property that is permitted by Section 6.02(i).

(d)    Each of the Lenders irrevocably authorizes each Agent to provide any release or evidence of release, termination or subordination contemplated by this Section 9.15.  Upon request by either Agent at any time, the Required Lenders will confirm in writing such Agent's authority to release or subordinate its interest in particular types or items of property, or to release any Loan Party from its obligations under any Loan Document, in each case in accordance with the terms of the Loan Document and this Section.

(e)    Any such release of Obligations shall be deemed subject to the provision that such Obligations shall be reinstated if after such release any portion of any payment in respect of the Obligations guaranteed thereby shall be rescinded or must otherwise be restored or returned upon or in connection with the insolvency, bankruptcy, dissolution, liquidation, arrangement or reorganization of the Hornblower Borrower or any other Loan Party or JB TopCo, or upon or in connection with or as a result of the appointment of a receiver, intervenor or conservator of, or trustee or similar officer for, the Hornblower Borrower or any other Loan Party or JB TopCo or any substantial part of its property, or otherwise, all as though such payment had not been made.

Section 9.16    No Advisory or Fiduciary Responsibility.  In connection with all aspects of each transaction contemplated hereby (including in connection with any amendment, waiver or other modification hereof or of any other Loan Document), each Borrower and each Parent acknowledges and agrees that (i) (A) the arranging and other services regarding this Agreement provided by the Agents and the Lenders are arm's-length commercial transactions between the Borrowers, the Parents and their respective Affiliates, on the one hand, and the Agents and the Lenders, on the other hand, (B) each Borrower and each Parent has consulted its own legal, accounting, regulatory and tax advisors to the extent it has deemed appropriate, and (C) each Borrower and each Parent is capable of evaluating, and understands and accepts, the terms, risks and conditions of the transactions contemplated hereby and by the other Loan Documents; (ii) (A) each of the Agents and the Lenders is and has been acting solely as a principal and, except as expressly agreed in writing by the relevant parties, has not been, is not and will not be acting as an advisor, agent or fiduciary for any Borrower, any Parent, any of their respective Affiliates or any other Person and (B) none of the Agents or the Lenders has any obligation to any Borrower, any Parent or any of their respective Affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth herein and in the other Loan Documents; and (iii) the Agents and the Lenders and their respective Affiliates may be engaged, for their accounts or the accounts of customers, in a broad range of transactions that involve interests that differ from those of the Borrowers, the Parents and their respective Affiliates, and none of the Agents and the Lenders has any obligation to disclose any of such interests to the Borrowers, the Parents or any of their respective Affiliates.  To the fullest extent permitted by law, each of each Borrower and each Parent hereby agrees it will not claim that the Agents or the Lenders have rendered advisory services of any nature or owes a fiduciary or similar duty to it in connection with the Transactions and waives and releases any claims that it may have against the Agents and the Lenders with respect to any breach or alleged breach of agency or fiduciary duty in connection with any aspect of any transaction contemplated hereby.

Section 9.17    Interest Rate Limitation.  Notwithstanding anything to the contrary contained in any Loan Document, the interest paid or agreed to be paid under the Loan Documents shall not exceed the maximum rate of non-usurious interest permitted by applicable law (the "Maximum Rate").  If the Administrative Agent or any Lender or shall receive interest in an amount that exceeds the Maximum Rate, the excess interest shall be applied to

123

the principal of the Loans, or, if it exceeds such unpaid principal, refunded to the Borrowers.  In determining whether the interest contracted for, charged or received by the Administrative Agent or a Lender exceeds the Maximum Rate, such Person may, to the extent permitted by applicable law, (a) characterize any payment that is not principal as an expense, fee or premium rather than interest, (b) exclude voluntary prepayments and the effects thereof, and (c) amortize, prorate, allocate and spread in equal or unequal parts the total amount of interest throughout the contemplated term of the obligations hereunder.

Section 9.18    Acknowledgment and Consent to Bail-In of Affected Financial Institutions.  Solely to the extent any Lender that is an Affected Financial Institution is a party to this Agreement and notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any Lender that is the Affected Financial Institution arising under any Loan Document, to the extent such liability is unsecured, may be subject to the write-down and conversion powers of the applicable Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)    the application of any Write-Down and Conversion Powers by the applicable Resolution Authority to any such liabilities arising hereunder which may be payable to it by any Lender that is an Affected Financial Institution; and

(b)    the effects of any Bail-In Action on any such liability, including, if applicable:

(i)    a reduction in full or in part or cancellation of any such liability;

(ii)    a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such Affected Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

(iii)    the variation of the terms of such liability in connection with the exercise of the write-down and conversion powers of the applicable Resolution Authority.

Section 9.19    [Reserved].

Section 9.20    Acknowledgement Regarding Any Supported QFCs.  To the extent that the Loan Documents provide support, through a guarantee or otherwise, for Hedging Agreements or any other agreement or instrument that is a QFC (such support "QFC Credit Support" and each such QFC a "Supported QFC"), the parties acknowledge and agree as follows with respect to the resolution power of the Federal Deposit Insurance Corporation under the Federal Deposit Insurance Act and Title II of the Dodd-Frank Wall Street Reform and Consumer Protection Act (together with the regulations promulgated thereunder, the "U.S. Special Resolution Regimes") in respect of such Supported QFC and QFC Credit Support (with the provisions below applicable notwithstanding that the Loan Documents and any Supported QFC may in fact be stated to be governed by the laws of the State of New York and/or of the United States or any other state of the United States):

(a)    In the event a Covered Entity that is party to a Supported QFC (each, a "Covered Party") becomes subject to a proceeding under a U.S. Special Resolution Regime, the transfer of such Supported QFC and the benefit of such QFC Credit Support (and any interest and obligation in or under such Supported QFC and such QFC Credit Support, and any rights in property securing such Supported QFC or such QFC Credit Support) from such Covered Party will be effective to the same extent as the transfer would be effective under the U.S. Special Resolution Regime if the Supported QFC and such QFC Credit Support (and any such interest, obligation and rights in property) were governed by the laws of the United States or a state of the United States.

(b)    In the event a Covered Party or a BHC Act Affiliate of a Covered Party becomes subject to a proceeding under a U.S. Special Resolution Regime, Default Rights under the Loan Documents that

might otherwise apply to such Supported QFC or any QFC Credit Support that may be exercised against such Covered Party are permitted to be exercised to no greater extent than such Default Rights could be exercised under the U.S. Special Resolution Regime if the Supported QFC and the Loan Documents were governed by the laws of the United States or a state of the United States.

(c)     Without limitation of the foregoing, it is understood and agreed that rights and remedies of the parties with respect to a Defaulting Lender shall in no event affect the rights of any Covered Party with respect to a Supported QFC or any QFC Credit Support.

## ARTICLE X
## GUARANTY

Section 10.01                           Guaranty of the Obligations.  Subject to the provisions of Section 10.02, the Guarantors jointly and severally hereby irrevocably and unconditionally guaranty to the Administrative Agent, for the ratable benefit of the Secured Parties, the due and punctual payment in full in cash of all Obligations when the same shall become due, whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise (including amounts that would become due but for the operation of the automatic stay under Section 362(a) of the Bankruptcy Code, 11 U.S.C. § 362(a), any stay granted in or in connection with the Canadian Recognition Proceedings, or any other applicable provision of the Debtor Relief Laws) (collectively, the "Guaranteed Obligations").

Section 10.02                           Contribution by Guarantors.  All Guarantors desire to allocate among themselves (collectively, the "Contributing Guarantors"), in a fair and equitable manner, their obligations arising under this Guaranty.  Accordingly, in the event any payment or distribution is made on any date by a Guarantor (a "Funding Guarantor") under this Guaranty such that its Aggregate Payments exceeds its Fair Share as of such date, such Funding Guarantor shall be entitled to a contribution from each of the other Contributing Guarantors in an amount sufficient to cause each Contributing Guarantor's Aggregate Payments to equal its Fair Share as of such date.  "Fair Share" means, with respect to a Contributing Guarantor as of any date of determination, an amount equal to (a) the ratio of (i) the Fair Share Contribution Amount with respect to such Contributing Guarantor to (ii) the aggregate of the Fair Share Contribution Amounts with respect to all Contributing Guarantors multiplied by (b) the aggregate amount paid or distributed on or before such date by all Funding Guarantors under this Guaranty in respect of the Guaranteed Obligations.  "Fair Share Contribution Amount" means, with respect to a Contributing Guarantor as of any date of determination, the maximum aggregate amount of the obligations of such Contributing Guarantor under this Guaranty that would not render its obligations hereunder or thereunder subject to avoidance as a fraudulent transfer or conveyance under Section 548 of Title 11 of the United States Code or any comparable applicable provisions of state law; provided that solely for purposes of calculating the "Fair Share Contribution Amount" with respect to any Contributing Guarantor for purposes of this Section 10.02, any assets or liabilities of such Contributing Guarantor arising by virtue of any rights to subrogation, reimbursement or indemnification or any rights to or obligations of contribution hereunder shall not be considered as assets or liabilities of such Contributing Guarantor.  "Aggregate Payments" means, with respect to a Contributing Guarantor as of any date of determination, an amount equal to (1) the aggregate amount of all payments and distributions made on or before such date by such Contributing Guarantor in respect of this Guaranty (including in respect of this Section 10.02), minus (2) the aggregate amount of all payments received on or before such date by such Contributing Guarantor from the other Contributing Guarantors as contributions under this Section 10.02.  The amounts payable as contributions hereunder shall be determined as of the date on which the related payment or distribution is made by the applicable Funding Guarantor.  The allocation among Contributing Guarantors of their obligations as set forth in this Section 10.02 shall not be construed in any way to limit the liability of any Contributing Guarantor hereunder.  Each Guarantor is a third party beneficiary to the contribution agreement set forth in this Section 10.02.

Section 10.03                           Payment by Guarantors.  Subject to Section 10.02, Guarantors hereby jointly and severally agree, in furtherance of the foregoing and not in limitation of any other right which any Secured Party may have at law or in equity against any Guarantor by virtue hereof, that upon the failure of the Borrowers to pay any of the Guaranteed Obligations when and as the same shall become due, whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise (including amounts that would become due but for the operation of the automatic stay under Section 362(a) of the Bankruptcy Code,

11 U.S.C. § 362(a), any stay granted in or in connection with the Canadian Recognition Proceedings or any other applicable provision of the Debtor Relief Laws), Guarantors will upon demand pay, or cause to be paid, in Cash, to the Administrative Agent for the ratable benefit of the Secured Parties, an amount equal to the sum of the unpaid principal amount of all Guaranteed Obligations then due as aforesaid, accrued and unpaid interest on such Guaranteed Obligations (including interest which, but for the Borrowers' becoming the subject of a case under the Bankruptcy Code or any proceeding under the CCAA, would have accrued on such Guaranteed Obligations, whether or not a claim is allowed against the Borrowers for such interest in the related bankruptcy or insolvency case) and all other Guaranteed Obligations then owed to the Secured Parties as aforesaid.

Section 10.04                  Liability of Guarantors Absolute.  Each Guarantor agrees that its obligations hereunder are irrevocable, absolute, independent and unconditional and shall not be affected by any circumstance which constitutes a legal or equitable discharge of a guarantor or surety other than payment in full in cash of the Guaranteed Obligations.  In furtherance of the foregoing and without limiting the generality thereof, each Guarantor agrees as follows:

(a)        this Guaranty is a guaranty of payment when due and not of collectability.  This Guaranty is a primary obligation of each Guarantor and not merely a contract of surety;

(b)        the Administrative Agent may enforce this Guaranty upon the occurrence of an Event of Default notwithstanding the existence of any dispute between the Borrowers and any Secured Party with respect to the existence of such Event of Default;

(c)        the obligations of each Guarantor hereunder are independent of the obligations of the Borrowers and the obligations of any other guarantor (including any other Guarantor) of the obligations of the Borrower, and a separate action or actions may be brought and prosecuted against such Guarantor whether or not any action is brought against the Borrowers or any of such other guarantors and whether or not the Borrowers is joined in any such action or actions;

(d)        payment by any Guarantor of a portion, but not all, of the Guaranteed Obligations shall in no way limit, affect, modify or abridge any Guarantor's liability for any portion of the Guaranteed Obligations which has not been paid.  Without limiting the generality of the foregoing, if the Administrative Agent is awarded a judgment in any suit brought to enforce any Guarantor's covenant to pay a portion of the Guaranteed Obligations, such judgment shall not be deemed to release such Guarantor from its covenant to pay the portion of the Guaranteed Obligations that is not the subject of such suit, and such judgment shall not, except to the extent satisfied by such Guarantor, limit, affect, modify or abridge any other Guarantor's liability hereunder in respect of the Guaranteed Obligations;

(e)        any Secured Party, upon such terms as it deems appropriate, without notice or demand and without affecting the validity or enforceability hereof or giving rise to any reduction, limitation, impairment, discharge or termination of any Guarantor's liability hereunder, from time to time may (i) renew, extend, accelerate, increase the rate of interest on, or otherwise change the time, place, manner or terms of payment of the Guaranteed Obligations; (ii) settle, compromise, release or discharge, or accept or refuse any offer of performance with respect to, or substitutions for, the Guaranteed Obligations or any agreement relating thereto and/or subordinate the payment of the same to the payment of any other obligations; (iii) request and accept other guaranties of the Guaranteed Obligations and take and hold security for the payment hereof or the Guaranteed Obligations; (iv) release, surrender, exchange, substitute, compromise, settle, rescind, waive, alter, subordinate or modify, with or without consideration, any security for payment of the Guaranteed Obligations, any other guaranties of the Guaranteed Obligations, or any other obligation of any Person (including any other Guarantor) with respect to the Guaranteed Obligations; (v) enforce and apply any security now or hereafter held by or for the benefit of such Secured Party in respect hereof or the Guaranteed Obligations and direct the order or manner of sale thereof, or exercise any other right or remedy that such Secured Party may have against any such security, in each case as such Secured Party in its discretion may determine consistent herewith and any applicable security agreement, including foreclosure or realization on any such security pursuant to one or more judicial or nonjudicial sales, whether or not every aspect of any such sale is commercially reasonable, and even though such action operates to impair or extinguish any right of reimbursement or subrogation or other right or remedy of any Guarantor against any other Loan Party or

any security for the Guaranteed Obligations; and (vi) exercise any other rights available to it under the Credit Documents; and

(f)        this Guaranty and the obligations of Guarantors hereunder shall be valid and enforceable and shall not be subject to any reduction, limitation, impairment, discharge or termination for any reason (other than payment in full in cash of the Guaranteed Obligations), including the occurrence of any of the following, whether or not any Guarantor shall have had notice or knowledge of any of them:  (i) any failure or omission to assert or enforce or agreement or election not to assert or enforce, or the stay or enjoining, by order of court, by operation of law or otherwise, of the exercise or enforcement of, any claim or demand or any right, power or remedy (whether arising under the Credit Documents, at law, in equity or otherwise) with respect to the Guaranteed Obligations or any agreement relating thereto, or with respect to any other guaranty of or security for the payment of the Guaranteed Obligations; (ii) any rescission, waiver, amendment or modification of, or any consent to departure from, any of the terms or provisions (including provisions relating to events of default) hereof, any of the other Credit Documents or any agreement or instrument executed pursuant thereto, or of any other guaranty or security for the Guaranteed Obligations, in each case whether or not in accordance with the terms hereof or such Loan Document or any agreement relating to such other guaranty or security; (iii) the Guaranteed Obligations, or any agreement relating thereto, at any time being found to be illegal, invalid or unenforceable in any respect; (iv) the application of payments received from any source (other than payments received pursuant to the other Credit Documents or from the proceeds of any security for the Guaranteed Obligations, except to the extent such security also serves as collateral for indebtedness other than the Guaranteed Obligations) to the payment of indebtedness other than the Guaranteed Obligations, even though any Secured Party might have elected to apply such payment to any part or all of the Guaranteed Obligations; (v) any Secured Party's consent to the change, reorganization or termination of the corporate structure or existence of Parents or any of its Subsidiaries and to any corresponding restructuring of the Guaranteed Obligations; (vi) any failure to perfect or continue perfection of a security interest in any collateral which secures any of the Guaranteed Obligations; (vii) any defenses, set-offs or counterclaims which the Borrowers may allege or assert against any Secured Party in respect of the Guaranteed Obligations, including failure of consideration, breach of warranty, payment, statute of frauds, statute of limitations, accord and satisfaction and usury; and (viii) any other act or thing or omission, or delay to do any other act or thing, which may or might in any manner or to any extent vary the risk of any Guarantor as an obligor in respect of the Guaranteed Obligations.

Section 10.05                                  Waivers by Guarantors.  Each Guarantor hereby waives, for the benefit of the Secured Parties:  (a) any right to require any Secured Party, as a condition of payment or performance by such Guarantor, to (i) proceed against the Borrower, any other guarantor (including any other Guarantor) of the Guaranteed Obligations or any other Person, (ii) proceed against or exhaust any security held from the Borrower, any such other guarantor or any other Person, (iii) proceed against or have resort to any balance of any deposit account or credit on the books of any Secured Party in favor of any Loan Party or any other Person, or (iv) pursue any other remedy in the power of any Secured Party whatsoever; (b) any defense arising by reason of the incapacity, lack of authority or any disability or other defense of the Borrowers or any other Guarantor including any defense based on or arising out of the lack of validity or the unenforceability of the Guaranteed Obligations or any agreement or instrument relating thereto or by reason of the cessation of the liability of the Borrowers or any other Guarantor from any cause other than payment in full in cash of the Guaranteed Obligations; (c) any defense based upon any statute or rule of law which provides that the obligation of a surety must be neither larger in amount nor in other respects more burdensome than that of the principal; (d) any defense based upon any Secured Party's errors or omissions in the administration of the Guaranteed Obligations, except behavior which amounts to bad faith; (e) (i) any principles or provisions of law, statutory or otherwise, which are or might be in conflict with the terms hereof and any legal or equitable discharge of such Guarantor's obligations hereunder, (ii) the benefit of any statute of limitations affecting such Guarantor's liability hereunder or the enforcement hereof, (iii) any rights to set-offs, recoupments and counterclaims, and (iv) promptness, diligence and any requirement that any Secured Party protect, secure, perfect or insure any security interest or lien or any property subject thereto; (f) notices, demands, presentments, protests, notices of protest, notices of dishonor and notices of any action or inaction, including acceptance hereof, notices of default hereunder, or any agreement or instrument related thereto, notices of any renewal, extension or modification of the Guaranteed Obligations or any agreement related thereto, notices of any extension of credit to the Borrowers and notices of any of the matters referred to in Section 10.04 and any right to

127

consent to any thereof; and (g) any defenses or benefits that may be derived from or afforded by law which limit the liability of or exonerate guarantors or sureties, or which may conflict with the terms hereof.

Section 10.06                                    Guarantors' Rights of Subrogation, Contribution, Etc.  Until the Guaranteed Obligations shall have been indefeasibly paid in full in cash, each Guarantor hereby waives any claim, right or remedy, direct or indirect, that such Guarantor now has or may hereafter have against the Borrowers or any other Guarantor or any of its assets in connection with this Guaranty or the performance by such Guarantor of its obligations hereunder, in each case whether such claim, right or remedy arises in equity, under contract, by statute, under common law or otherwise and including (a) any right of subrogation, reimbursement or indemnification that such Guarantor now has or may hereafter have against the Borrowers with respect to the Guaranteed Obligations, (b) any right to enforce, or to participate in, any claim, right or remedy that any Secured Party now has or may hereafter have against the Borrower, and (c) any benefit of, and any right to participate in, any collateral or security now or hereafter held by any Secured Party.  In addition, until the Guaranteed Obligations shall have been paid in full, each Guarantor shall withhold exercise of any right of contribution such Guarantor may have against any other guarantor (including any other Guarantor) of the Guaranteed Obligations, including any such right of contribution as contemplated by Section 10.02. Each Guarantor further agrees that, to the extent the waiver or agreement to withhold the exercise of its rights of subrogation, reimbursement, indemnification and contribution as set forth herein is found by a court of competent jurisdiction to be void or voidable for any reason, any rights of subrogation, reimbursement or indemnification such Guarantor may have against the Borrowers or against any collateral or security, and any rights of contribution such Guarantor may have against any such other guarantor, shall be junior and subordinate to any rights any Secured Party may have against the Borrower, to all right, title and interest any Secured Party may have in any such collateral or security, and to any right any Secured Party may have against such other guarantor.  If any amount shall be paid to any Guarantor on account of any such subrogation, reimbursement, indemnification or contribution rights at any time when all Guaranteed Obligations shall not have been finally and paid in full, such amount shall be held in trust for the Administrative Agent on behalf of the Secured Parties and shall forthwith be paid over to the Administrative Agent for the benefit of the Secured Parties to be credited and applied against the Guaranteed Obligations, whether matured or unmatured, in accordance with the terms hereof.

Section 10.07                                    Subordination of Other Obligations.  Any Indebtedness of the Borrowers or any Guarantor now or hereafter held by any Guarantor (the "Obligee Guarantor") is hereby subordinated in right of payment to the Guaranteed Obligations, and any such Indebtedness collected or received by the Obligee Guarantor after an Event of Default has occurred and is continuing shall be held in trust for the Administrative Agent on behalf of the Secured Parties and shall forthwith be paid over to the Administrative Agent for the benefit of the Secured Parties to be credited and applied against the Guaranteed Obligations but without affecting, impairing or limiting in any manner the liability of the Obligee Guarantor under any other provision hereof.

Section 10.08                                    Continuing Guaranty.  This Guaranty is a continuing guaranty and shall remain in effect until all of the Guaranteed Obligations shall have been paid in full.  Each Guarantor hereby irrevocably waives any right to revoke this Guaranty as to future transactions giving rise to any Guaranteed Obligations.

Section 10.09                                    Authority of Guarantors or the Borrower.  It is not necessary for any Secured Party to inquire into the capacity or powers of any Guarantor or the Borrowers or the officers, directors or any agents acting or purporting to act on behalf of any of them.

Section 10.10                                    Financial Condition of the Borrower.  Any Loan may be continued from time to time without notice to or authorization from any Guarantor regardless of the financial or other condition of the Borrowers at the time of any such grant or continuation, as the case may be.  No Secured Party shall have any obligation to disclose or discuss with any Guarantor its assessment, or any Guarantor's assessment, of the financial condition of the Borrower.  Each Guarantor has adequate means to obtain information from the Borrowers on a continuing basis concerning the financial condition of the Borrowers and its ability to perform its obligations under the Credit Documents, and each Guarantor assumes the responsibility for being and keeping informed of the financial condition of the Borrowers and of all circumstances bearing upon the risk of nonpayment of the Guaranteed Obligations.  Each Guarantor hereby waives and relinquishes any duty on the part of

any Secured Party to disclose any matter, fact or thing relating to the business, operations or conditions of the Borrowers now known or hereafter known by any Secured Party.

Section 10.11                    Bankruptcy, Etc.

(a)        So long as any Guaranteed Obligations remain outstanding, no Guarantor shall, without the prior consent of the Administrative Agent acting pursuant to the instructions of the Required Lenders, commence or join with any other Person in commencing any bankruptcy, arrangement, reorganization, restructuring, liquidation, conservatorship, moratorium, rearrangement, receivership or insolvency case or proceeding of or against the Borrowers or any other Guarantor.  The obligations of Guarantors hereunder shall not be reduced, limited, impaired, discharged, deferred, suspended or terminated by any case or proceeding, voluntary or involuntary, involving the bankruptcy, insolvency, receivership, reorganization, liquidation, restructuring, conservatorship, moratorium, rearrangement or arrangement of the Borrowers or any other Guarantor or by any defense which the Borrowers or any other Guarantor may have by reason of the order, decree or decision of any court or administrative body resulting from any such proceeding.

(b)        Each Guarantor acknowledges and agrees that any interest on any portion of the Guaranteed Obligations which accrues after the commencement of any case or proceeding referred to in clause (a) above (or, if interest on any portion of the Guaranteed Obligations ceases to accrue by operation of law by reason of the commencement of such case or proceeding, such interest as would have accrued on such portion of the Guaranteed Obligations if such case or proceeding had not been commenced) shall be included in the Guaranteed Obligations because it is the intention of Guarantors and the Secured Parties that the Guaranteed Obligations which are guaranteed by Guarantors pursuant hereto should be determined without regard to any rule of law or order which may relieve the Borrowers or any of its Subsidiaries of any portion of such Guaranteed Obligations.  Guarantors will permit any trustee in bankruptcy, proposal trustee receiver, interim receiver, debtor in possession, assignee for the benefit of creditors (or any class of creditors) or similar Person to pay the Administrative Agent, or allow the claim of the Administrative Agent in respect of, any such interest accruing after the date on which such case or proceeding is commenced.

(c)        In the event that all or any portion of the Guaranteed Obligations are paid by the Borrowers or any of its Subsidiaries, the obligations of Guarantors hereunder shall continue and remain in full force and effect or be reinstated, as the case may be, in the event that all or any part of such payment(s) are rescinded or recovered directly or indirectly from any Secured Party as a preference, fraudulent transfer or otherwise, and any such payments which are so rescinded or recovered shall constitute Guaranteed Obligations for all purposes hereunder.

Section 10.12                    Discharge of Guaranty Upon Sale of Guarantor.  If all of the Equity Interests of any Guarantor or any of its successors in interest hereunder shall be Disposed of (including by merger, amalgamation or consolidation) in accordance with the terms and conditions hereof, the Guaranty of such Guarantor or such successor in interest, as the case may be, hereunder shall automatically be discharged and released without any further action by any Secured Party or any other Person effective as of the time of such Disposition.

**ARTICLE XI**
**SECURITY AND PRIORITY**

Section 11.01        Collateral; Grant of Lien and Security Interest.

(a)        Pursuant to, and otherwise subject to the terms of, the Bankruptcy Court DIP Order and the Canadian DIP Recognition Order and in accordance with the terms thereof, subject to the Carve Out and the Canadian Administration Charge (as against the Canadian Collateral), as security for the full and timely payment and performance of all of the Obligations and subject to the limitations, reservations, restrictions, and qualifications contained in any Security Document, the Loan Parties hereby, pledge and grant to Collateral Agent for the benefit of the Secured Parties, a security interest in and to a Lien on all of the Collateral (including the Canadian Collateral) without duplication.

(b)        Notwithstanding anything herein to the contrary all proceeds received by the Agents and the Lenders from the Collateral subject to the Liens granted in this Section 11.01 and in each other Loan Document and

by the Bankruptcy Court DIP Order and the Canadian DIP Recognition Order shall be subject in all respects to the Carve Out and the Canadian Administration Charge (as against the Canadian Collateral).

Section 11.02    [Reserved].

Section 11.03    Grants, Rights and Remedies.  The Liens and security interests granted pursuant to Section 11.01(a) hereof and the administrative priority and lien priority granted pursuant to the Bankruptcy Court DIP Order may be independently granted by the Loan Documents and by other Loan Documents hereafter entered into.  This Agreement, the Bankruptcy Court DIP Order, the Canadian DIP Recognition Order and such other Loan Documents supplement each other, and the grants, priorities, rights and remedies of the Agents and the Lenders hereunder and thereunder are cumulative; provided that to the extent of conflict the Bankruptcy Court DIP Order controls.

Section 11.04    No Filings Required.  The Liens and security interests referred to herein shall be deemed valid and perfected by entry of the Interim DIP Order or the Final DIP Order and the Canadian DIP Recognition Order, as the case may be.  No Agent shall be required to file any financing statements, mortgages, notices of Lien or similar instruments in any jurisdiction or filing office, take possession or control of any Collateral, or take any other action in order to validate or perfect the Lien and security interest granted by or pursuant to this Agreement, the Interim DIP Order, the Final DIP Order or the Canadian DIP Recognition Order, as the case may be, or any other Loan Document.

Section 11.05    Survival.  The Liens, lien priority, administrative priorities and other rights and remedies granted to the Agents and the Lenders pursuant to this Agreement, the Bankruptcy Court DIP Orders, the Canadian DIP Recognition Order and the other Loan Documents (specifically including, but not limited to, the existence, perfection and priority of the Liens and security interests provided herein and therein, the administrative priority and the Canadian DIP Charge provided herein and therein) shall not be modified, altered or impaired in any manner by any other financing or extension of credit or incurrence of Indebtedness by the Borrower (pursuant to Section 364 of the Bankruptcy Code or otherwise), or by any dismissal or conversion of any of the Chapter 11 Cases or the Canadian Recognition Proceedings, or by any other act or omission whatsoever.  Without limitation, notwithstanding any such order, financing, extension, incurrence, dismissal, conversion, act or omission, except with respect to the Carve Out and the Canadian Administration Charge, no costs or expenses of administration which have been or may be incurred in the Chapter 11 Cases, the Canadian Recognition Proceedings or any conversion of the same or in any other proceedings related thereto, and no priority claims, are or will be prior to or on parity with any claim of the Agents and the Lenders against the Borrower in respect of any Obligation.

      IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

HORNBLOWER SUB, LLC,
as Hornblower Borrower

By: _____
      Name:
      Title:

AMERICAN QUEEN SUB, LLC,
as AQ Borrower

By: _____
      Name:
      Title:

HORNBLOWER HOLDCO, LLC,
as Hornblower Parent

By: _____
      Name:
      Title:

AMERICAN QUEEN HOLDCO, LLC,
as AQ Parent

By: _____
      Name:
      Title:

**Exhibit 4**

**Backstop Purchase Agreement**

*EXECUTION VERSION*

BACKSTOP COMMITMENT AGREEMENT

AMONG

HORNBLOWER HOLDINGS LP

EACH OF THE OTHER DEBTORS LISTED ON SCHEDULE 1 HERETO

AND

THE COMMITMENT PARTIES PARTY HERETO

Dated as of February 21, 2024

# TABLE OF CONTENTS

Page

**ARTICLE I DEFINITIONS** ............................................................................... **2**

SECTION 1.1    DEFINITIONS .......................................................................... 2
SECTION 1.2    CONSTRUCTION ................................................................... 17

**ARTICLE II BACKSTOP COMMITMENT** ..................................................... **18**

SECTION 2.1    THE RIGHTS OFFERING ...................................................... 18
SECTION 2.2    THE SUBSCRIPTION COMMITMENT; THE BACKSTOP COMMITMENT ............... 18
SECTION 2.3    COMMITMENT PARTY DEFAULT ........................................ 18
SECTION 2.4    SUBSCRIPTION ACCOUNT FUNDING ................................ 19
SECTION 2.5    CLOSING ................................................................................ 20
SECTION 2.6    TRANSFER OF BACKSTOP COMMITMENTS ..................... 21
SECTION 2.7    DESIGNATION RIGHTS ........................................................ 22
SECTION 2.8    NOTIFICATION OF AGGREGATE NUMBER OF EXERCISED SUBSCRIPTION RIGHTS ............... 22
SECTION 2.9    JONES ACT RESTRICTIONS ON TRANSFERS OF BACKSTOP COMMITMENT....... 22

**ARTICLE III BACKSTOP COMMITMENT PREMIUM AND EXPENSE REIMBURSEMENT** ........................................................ **23**

SECTION 3.1    PREMIUM PAYABLE BY THE DEBTORS ............................ 23
SECTION 3.2    PAYMENT OF PREMIUM ..................................................... 23
SECTION 3.3    EXPENSE REIMBURSEMENT ............................................... 24
SECTION 3.4    TAX TREATMENT .................................................................. 25
SECTION 3.5    INTEGRATION; ADMINISTRATIVE EXPENSE ................... 25

**ARTICLE IV REPRESENTATIONS AND WARRANTIES OF THE DEBTORS** ............ **25**

SECTION 4.1    ORGANIZATION AND QUALIFICATION ............................ 25
SECTION 4.2    CORPORATE POWER AND AUTHORITY ........................... 25
SECTION 4.3    EXECUTION AND DELIVERY; ENFORCEABILITY ............ 26
SECTION 4.4    AUTHORIZED AND ISSUED CAPITAL; ISSUANCE ........... 26
SECTION 4.5    NO CONFLICT ........................................................................ 27
SECTION 4.6    CONSENTS AND APPROVALS .............................................. 27
SECTION 4.7    ARM'S-LENGTH ..................................................................... 28
SECTION 4.8    FINANCIAL STATEMENTS ................................................... 28
SECTION 4.9    ABSENCE OF CERTAIN CHANGES ..................................... 28
SECTION 4.10   NO VIOLATION; COMPLIANCE WITH LAWS ................... 28
SECTION 4.11   LEGAL PROCEEDINGS ......................................................... 29
SECTION 4.12   LABOR RELATIONS .............................................................. 29
SECTION 4.13   INTELLECTUAL PROPERTY ................................................ 29
SECTION 4.14   TITLE TO REAL AND PERSONAL PROPERTY ................. 29
SECTION 4.15   NO UNDISCLOSED RELATIONSHIPS ................................ 30
SECTION 4.16   LICENSES AND PERMITS ..................................................... 30
SECTION 4.17   ENVIRONMENTAL ................................................................ 30
SECTION 4.18   TAX MATTERS ...................................................................... 31

SECTION 4.19   EMPLOYEE BENEFIT PLANS ............................................................. 32
SECTION 4.20   NO UNLAWFUL PAYMENTS ............................................................ 32
SECTION 4.21   COMPLIANCE WITH ANTI-MONEY LAUNDERING LAWS ............... 32
SECTION 4.22   COMPLIANCE WITH SANCTIONS LAWS .................................... 33
SECTION 4.23   NO BROKER'S FEES .......................................................... 33
SECTION 4.24   TAKEOVER STATUTES ........................................................ 34
SECTION 4.25   INVESTMENT COMPANY ACT .................................................. 34
SECTION 4.26   INSURANCE .................................................................. 34
SECTION 4.27   EXEMPTION FROM REGISTRATION............................................. 34
SECTION 4.28   MATERIAL CONTRACTS ....................................................... 34
SECTION 4.29   ALTERNATIVE TRANSACTION PROPOSAL ...................................... 34
SECTION 4.30   U.S. COASTWISE TRADE .................................................... 35
SECTION 4.31   COMMON EQUITY OWNED BY NON-U.S. CITIZENS ........................... 35
SECTION 4.32   TRANSACTIONS WITH EXCLUDED SUBSIDIARIES ............................. 35

ARTICLE V REPRESENTATIONS AND WARRANTIES OF THE
            COMMITMENT PARTIES ......................................................... 35

SECTION 5.1    INCORPORATION ............................................................. 35
SECTION 5.2    CORPORATE POWER AND AUTHORITY .......................................... 35
SECTION 5.3    EXECUTION AND DELIVERY .................................................. 35
SECTION 5.4    NO REGISTRATION ........................................................... 35
SECTION 5.5    PURCHASING INTENT ......................................................... 36
SECTION 5.6    SOPHISTICATION; EVALUATION .............................................. 36
SECTION 5.7    NO CONFLICT ............................................................... 36
SECTION 5.8    CONSENTS AND APPROVALS .................................................. 37
SECTION 5.9    LEGAL PROCEEDINGS ......................................................... 37
SECTION 5.10   NO BROKER'S FEES .......................................................... 37
SECTION 5.11   SUFFICIENCY OF FUNDS ..................................................... 37
SECTION 5.12   THIRD-PARTY RELIANCE ..................................................... 37
SECTION 5.13   HB FIRST LIEN CLAIMS. .................................................... 37

ARTICLE VI ADDITIONAL COVENANTS ....................................................... 38

SECTION 6.1    APPROVAL ORDERS ........................................................... 38
SECTION 6.2    CONDUCT OF BUSINESS ...................................................... 38
SECTION 6.3    COMMITMENTS OF THE DEBTORS AND THE COMMITMENT PARTIES ............ 39
SECTION 6.4    ADDITIONAL COMMITMENTS OF THE DEBTORS AND THE COMMITMENT
               PARTIES ................................................................... 40
SECTION 6.5    NO INTEGRATION; NO GENERAL SOLICITATION .............................. 41
SECTION 6.6    USE OF PROCEEDS ........................................................... 41
SECTION 6.7    LEGENDS ................................................................... 41
SECTION 6.8    ANTITRUST APPROVAL ....................................................... 42
SECTION 6.9    RIGHTS OFFERING ........................................................... 44
SECTION 6.10   ACCESS TO INFORMATION; CONFIDENTIALITY; CLEANSING MATERIALS ....... 44
SECTION 6.11   U.S. COASTWISE TRADE .................................................... 45
SECTION 6.12   VESSEL OPERATION AND REGISTRATION ..................................... 45
SECTION 6.13   MILESTONES ................................................................ 46

**ARTICLE VII ADDITIONAL PROVISIONS REGARDING FIDUCIARY OBLIGATIONS .................................................................................. 47**

SECTION 7.1    FIDUCIARY OUT ............................................................ 47
SECTION 7.2    ALTERNATIVE TRANSACTIONS ...................................... 48

**ARTICLE VIII CONDITIONS TO THE OBLIGATIONS OF THE PARTIES ................. 48**

SECTION 8.1    CONDITIONS TO THE OBLIGATIONS OF THE COMMITMENT PARTIES ............. 48
SECTION 8.2    WAIVER OF CONDITIONS TO OBLIGATIONS OF COMMITMENT PARTIES ......... 51
SECTION 8.3    CONDITIONS TO THE OBLIGATIONS OF THE DEBTORS .................... 51
SECTION 8.4    BRING-DOWN CONFIRMATION OF COMMON EQUITY OWNED BY NON-U.S. CITIZENS ......................... 52

**ARTICLE IX INDEMNIFICATION AND CONTRIBUTION ........................................ 53**

SECTION 9.1    INDEMNIFICATION OBLIGATIONS ................................... 53
SECTION 9.2    INDEMNIFICATION PROCEDURE ..................................... 53
SECTION 9.3    SETTLEMENT OF INDEMNIFIED CLAIMS ........................... 54
SECTION 9.4    CONTRIBUTION ............................................................. 55
SECTION 9.5    TREATMENT OF INDEMNIFICATION PAYMENTS ................ 55
SECTION 9.6    NO SURVIVAL ............................................................... 55

**ARTICLE X TERMINATION ................................................................................. 56**

SECTION 10.1    CONSENSUAL TERMINATION ....................................... 56
SECTION 10.2    TERMINATION BY THE DEBTORS .................................. 56
SECTION 10.3    TERMINATION BY THE REQUIRED COMMITMENT PARTIES ............ 57
SECTION 10.4    EFFECT OF TERMINATION .......................................... 58

**ARTICLE XI GENERAL PROVISIONS ................................................................. 59**

SECTION 11.1    SETTLEMENT DISCUSSIONS ......................................... 59
SECTION 11.2    NOTICES ...................................................................... 59
SECTION 11.3    ASSIGNMENT; THIRD-PARTY BENEFICIARIES ................ 60
SECTION 11.4    PRIOR NEGOTIATIONS; ENTIRE AGREEMENT ................ 60
SECTION 11.5    GOVERNING LAW; VENUE ........................................... 61
SECTION 11.6    WAIVER OF JURY TRIAL .............................................. 62
SECTION 11.7    COUNTERPARTS ........................................................... 62
SECTION 11.8    WAIVERS AND AMENDMENTS; RIGHTS CUMULATIVE; CONSENT ............ 62
SECTION 11.9    HEADINGS .................................................................... 63
SECTION 11.10    SPECIFIC PERFORMANCE ........................................... 63
SECTION 11.11    DAMAGES .................................................................. 63
SECTION 11.12    NO RELIANCE ............................................................ 63
SECTION 11.13    NO RECOURSE ........................................................... 64
SECTION 11.14    SEVERABILITY ........................................................... 64
SECTION 11.15    ENFORCEABILITY OF AGREEMENT ............................. 64
SECTION 11.16    PUBLICITY ................................................................. 64

SCHEDULES

Schedule 1      Debtors
Schedule 2      Backstop Commitment Percentages
Schedule 3      Material Contracts
Schedule 4      Material Vessels

EXHIBITS

Exhibit A        Form of Joinder Agreement for Related Purchaser
Exhibit B-1      Form of Joinder Agreement for Existing Commitment Party Purchaser
Exhibit B-2      Form of Amendment for Existing Commitment Party Purchaser
Exhibit C        Form of Joinder Agreement for New Purchaser

## BACKSTOP COMMITMENT AGREEMENT

THIS BACKSTOP COMMITMENT AGREEMENT (including any Exhibits and Schedules hereto, this "**Agreement**"), dated as of February 21, 2024, is made by and among (i) Hornblower Holdings LP (including as debtor in possession and as reorganized pursuant to the Plan, as applicable, "**Hornblower**"), and each of its direct and indirect debtor subsidiaries listed on Schedule 1 hereto (Hornblower and each such subsidiary, a "**Debtor**" and, collectively, the "**Debtors**"), on the one hand, and (ii) each of the Commitment Parties, on the other hand. Each Debtor and each Commitment Party is referred to herein, individually, as a "**Party**" and, collectively, as the "**Parties**."

## RECITALS

WHEREAS, each of the Parties has entered into the Restructuring Support Agreement, dated as of February 21, 2024, by and among (i) the Debtors and (ii) the Consenting Stakeholders (each of the foregoing, as defined in the RSA) (such agreement, along with all exhibits thereto, as may be amended, restated, supplemented or otherwise modified from time to time in according therewith, the "**RSA**"), which provides for the restructuring of the Debtors' capital structure and financial obligations pursuant a joint plan of reorganization to be filed in voluntary bankruptcy cases to be commenced under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended from time to time, the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Court**" and such cases, the "**Chapter 11 Cases**"), implementing the terms and conditions of the restructuring term sheet attached as Exhibit A thereto (the "**Term Sheet**") in accordance with the RSA;

WHEREAS, pursuant to the RSA and the Plan, the Debtors will conduct a rights offering in accordance with the Rights Offering Procedures, whereby it shall distribute Subscription Rights to purchase the Subscription Equity Interests for a maximum aggregate purchase price of $345.0 million (subject to any reductions thereto pursuant to the RSA, the "**Aggregate Rights Offering Amount**"), at a purchase price per Subscription Equity Interest calculated at a 30.0% discount to the Plan Equity Value, (the "**Purchase Price**", and the foregoing collectively, the "**Rights Offering**");

WHEREAS, subject to the terms and conditions contained in this Agreement, each Commitment Party has agreed (on a several and not joint basis) to fully exercise all Subscription Rights issued to it;

WHEREAS, subject to the terms and conditions contained in this Agreement, the Debtors have agreed to sell to each Commitment Party, and each Commitment Party has agreed to purchase (on a several and not joint basis), its Backstop Commitment Percentage of the Unsubscribed Equity Interests, if any; and

WHEREAS, as consideration for their respective Funding Commitments, the Debtors have agreed, subject to the terms, conditions and limitations set forth herein and in accordance with the Backstop Order, to pay the Commitment Parties the Backstop Commitment

Premium and the Expense Reimbursement, and provide the indemnification on the terms set forth herein;

NOW, THEREFORE, in consideration of the mutual promises, agreements, representations, warranties and covenants contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each of the Parties hereby agrees as follows:

# ARTICLE I

## DEFINITIONS

Section 1.1    <u>Definitions</u>. Except as otherwise expressly provided in this Agreement, whenever used in this Agreement (including any Exhibits and Schedules hereto), the following terms shall have the respective meanings specified therefor below:

"**<u>Ad Hoc Term Lender Group</u>**" has the meaning set forth in the RSA.

"**<u>Affiliate</u>**" means, with respect to any Person, any other Person directly or indirectly controlling, controlled by, or under common control with, such Person as of the date on which, or at any time during the period for which, the determination of affiliation is being made (including any Related Funds of such Person); *provided* that for purposes of this Agreement, no Commitment Party shall be deemed an Affiliate of the Debtors or any of their Subsidiaries; *provided further* that for purposes of this Agreement, the Crestview Commitment Parties and their Related Funds shall be deemed to not constitute Affiliates of the Debtors or any of their Subsidiaries. For purposes of this definition, the term "control" (including the correlative meanings of the terms "controlled by" and "under common control with"), as used with respect to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management policies of such Person, whether through the ownership of voting securities, by Contract or otherwise.

"**<u>Aggregate Rights Offering Amount</u>**" has the meaning set forth in the Recitals.

"**<u>Agreement</u>**" has the meaning set forth in the Preamble.

"**<u>Alternative Transaction Proposal</u>**" has the meaning set forth in the RSA.

"**<u>Anti-Corruption Laws</u>**" means all laws, rules, and regulations of any jurisdiction from time to time concerning or relating to the prevention or prohibition of bribery or corruption applicable to the Debtors or their Subsidiaries by virtue of such Person being organized or operating in such jurisdiction (including the United States Foreign Corrupt Practices Act of 1977, as amended).

"**<u>Anti-Money Laundering Laws</u>**" has the meaning set forth in <u>Section 4.21</u>.

"**<u>Antitrust Approvals</u>**" means any notification, authorization, approval, consent, filing, application, nonobjection, expiration or termination of applicable waiting period (including any extension thereof), exemption, determination of lack of jurisdiction, waiver,

2

variance, filing, permission, qualification, registration or notification required or, if agreed between the Debtors and the Required Commitment Parties (acting reasonably), advisable under any Antitrust Laws.

"**Antitrust Authorities**" means the United States Federal Trade Commission, the Antitrust Division of the United States Department of Justice, the attorneys general of the several states of the United States and any other Governmental Authority having jurisdiction pursuant to the Antitrust Laws, and "**Antitrust Authority**" means any one of them.

"**Antitrust Laws**" mean the Sherman Act, the Clayton Act, the HSR Act, the Federal Trade Commission Act, each, as amended, and any other Law governing agreements in restraint of trade, monopolization, pre-merger notification, the lessening of competition through merger or acquisition or anti-competitive conduct, and any foreign investment Laws.

"**Applicable Consent**" has the meaning set forth in Section 4.6.

"**AQV Bidding Procedures Order**" has the meaning set forth in the RSA.

"**AQV Sale Motion**" has the meaning set forth in the RSA.

"**AQV Sale Order**" has the meaning set forth in the RSA.

"**Available Equity Interests**" means, collectively, the Unsubscribed Equity Interests that any Commitment Party fails to purchase in accordance with the terms of this Agreement.

"**Backstop Amount**" has the meaning set forth in Section 2.4(a)(iv).

"**Backstop Commitment**" has the meaning set forth in Section 2.2(b).

"**Backstop Commitment Percentage**" means, with respect to any Commitment Party, such Commitment Party's percentage of the Backstop Commitment as set forth opposite such Commitment Party's name under the column titled "**Backstop Commitment Percentage**" on Schedule 2 (as it may be amended, supplemented or otherwise modified from time to time in accordance with this Agreement). Any reference to "Backstop Commitment Percentage" in this Agreement means the Backstop Commitment Percentage in effect at the time of the relevant determination.

"**Backstop Commitment Premium**" has the meaning set forth in Section 3.1.

"**Backstop Motion**" has the meaning set forth in the RSA.

"**Backstop Order**" means the order entered by the Bankruptcy Court approving and authorizing the Debtors' entry into this Agreement and the other Rights Offering Documents, including the Debtors' obligation to pay the Backstop Commitment Premium which shall be in form and substance reasonably acceptable to the Debtors and the Required Commitment Parties.

"**Bankruptcy Code**" has the meaning set forth in the Recitals.

3

"**Bankruptcy Court**" has the meaning set forth in the Recitals.

"**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, 28 U.S.C. § 2075, as applicable to the Chapter 11 Cases and the general, local, and chambers rules of the Bankruptcy Court.

"**Business Day**" has the meaning set forth in the RSA.

"**CCAA Court**" has the meaning set forth in the RSA.

"**Chapter 11 Cases**" has the meaning set forth in the Recitals.

"**Claim**" has the meaning set forth in set forth in section 101(5) of the Bankruptcy Code.

"**Classification Society**" with respect to a Vessel means (a) DNV-GL or the classification society under which such Vessel is classed on the date hereof, or (b) one of the members of the International Association of Classification Societies, as may be approved by the Required Commitment Parties, such approval not to be unreasonably withheld, conditioned or delayed.

"**Closing**" has the meaning set forth in Section 2.5(a).

"**Closing Date**" has the meaning set forth in Section 2.5(a).

"**Commitment Party**" means each Person that holds a Funding Commitment pursuant to this Agreement, including, without limitation, any holder of a Funding Commitment that is a Related Purchaser, Existing Commitment Party Purchaser or a New Purchaser that has joined this Agreement pursuant to a joinder or amendment entered into pursuant to Section 2.6(b), Section 2.6(c), or Section 2.6(d), respectively.

"**Commitment Party Default**" means a breach of this Agreement arising if any Commitment Party fails to (i) fully exercise its Subscription Rights pursuant to and in accordance with Section 2.2(a) and Section 2.4 of this Agreement and to pay the applicable aggregate Purchase Price and/or (ii) deliver and pay the applicable aggregate Purchase Price for such Commitment Party's Backstop Commitment Percentage of any Unsubscribed Equity Interests, by the Subscription Funding Date in accordance with Section 2.4.

"**Commitment Party Replacement**" has the meaning set forth in Section 2.3(a).

"**Commitment Party Replacement Period**" has the meaning set forth in Section 2.3(a).

"**Company Disclosure Schedules**" means the disclosure schedules delivered by the Debtors to the Commitment Parties on the date of this Agreement.

4

"**Complete Business Day**" means on any Business Day, the time from 12:00 a.m. to 11:59 p.m. (inclusive) on such Business Day.

"**Confirmation Order**" has the meaning set forth in the RSA, and which order shall be in form and substance reasonably acceptable to the Required Commitment Parties and the Debtors.

"**Confirmation Recognition Order**" has the meaning set forth in the RSA.

"**Consenting Lenders**" has the meaning set forth in the RSA.

"**Consenting Stakeholders**" has the meaning set forth in the RSA.

"**Contract**" means any legally binding agreement, contract or instrument, including any loan, note, bond, mortgage, indenture, guarantee, deed of trust, license, franchise, commitment, lease, franchise agreement, letter of intent, memorandum of understanding or other obligation, and any amendments thereto, whether written or oral, but excluding the Plan.

"**Crestview Commitment Parties**" means Crestview HB Holdings, L.P., Crestview IV HB Holdings, L.P, and each Commitment Party that is a Related Fund thereof.

"**Crestview Consent Right**" has the meaning set forth in the RSA.

"**Debtor**" has the meaning set forth in the Preamble.

"**Defaulting Commitment Party**" means in respect of a Commitment Party Default that is continuing, the applicable defaulting Commitment Party.

"**Definitive Documents**" has the meaning set forth in the RSA.

"**DIP Credit Agreement**" has the meaning set forth in the RSA.

"**DIP Motion**" has the meaning set forth in the RSA.

"**Disclosure Statement**" has the meaning set forth in the RSA, which shall be in form and substance reasonably acceptable to the Required Commitment Parties and the Debtors.

"**Disclosure Statement Motion**" has the meaning set forth in the RSA.

"**Disclosure Statement Order**" means the order entered by the Bankruptcy Court approving the Disclosure Statement as containing, among other things, "adequate information" as required by section 1125 of the Bankruptcy Code and solicitation procedures related thereto, which shall be in form and substance reasonably acceptable to the Required Commitment Parties and the Debtors.

"**Effective Date**" means the date on which all conditions to consummation of the Plan have been satisfied in full or waived, in accordance with the terms of the Plan, and the Plan becomes effective.

"**Employee Benefit Plan**" means any "employee benefit plan" as defined in Section 3(3) of ERISA which is or was sponsored, maintained or contributed to by, or required to be contributed by, the Debtors, any of their Subsidiaries or any of their respective ERISA Affiliates.

"**Environmental Laws**" means any and all applicable foreign or domestic, federal or state (or any subdivision of either of them) Laws, statutes, ordinances, orders, rules, regulations, judgments, Governmental Authorizations, or any other requirements of Governmental Authorities and the common law relating to (i) environmental matters, including those relating to any Hazardous Materials; (ii) the generation, use, storage, transportation, Release, treatment, presence or disposal of, or exposure to, Hazardous Materials; or (iii) health and safety matters or industrial hygiene, land use or the protection of human, plant or animal health or welfare, as any of them relate to Hazardous Materials.

"**Environmental Liability**" means any liability, obligation, loss, claim, action, order or cost, contingent or otherwise (including any liability for damages, costs of medical monitoring, costs of environmental remediation and restoration, administrative oversight costs, consultants' fees, fines, penalties or indemnities) resulting from or based upon (i) any actual or alleged violation of any Environmental Law, (ii) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (iii) exposure to any Hazardous Materials, (iv) the Release or threatened Release of any Hazardous Materials or (v) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and any successor thereto.

"**ERISA Affiliate**" means, as applied to any Person, (i) any corporation which is a member of a controlled group of corporations within the meaning of Section 414(b) of the IRC of which that Person is a member; (ii) any trade or business (whether or not incorporated) which is a member of a group of trades or businesses under common control within the meaning of Section 414(c) of the IRC of which that Person is a member and (iii) any entity that is under common control under Sections 414(m) and (o) of the of the Code for purposes of provisions relating to Section 412 of the Code or Section 302 of ERISA.

"**ERISA Event**" means (i) a "reportable event" within the meaning of Section 4043 of ERISA and the regulations issued thereunder with respect to any Pension Plan (excluding those for which the 30-day notice period has been waived); (ii) the failure to meet the minimum funding standard of Section 412 of the IRC, (iii) the provision by the administrator of any Pension Plan pursuant to Section 4041(a)(2) or Section 302 of ERISA of a notice of intent to terminate such plan in a distress termination described in Section 4041(c) of ERISA; (iv) the withdrawal by the Debtors, any of their Subsidiaries or any of their respective ERISA Affiliates from any Pension Plan with two or more contributing sponsors or the termination of any such Pension Plan resulting in liability to the Debtors, any of their Subsidiaries or any of their respective Affiliates pursuant to Section 4063 or 4064 of ERISA; (v) the institution by the PBGC of proceedings to terminate any Pension Plan, or the occurrence of any event or condition which could reasonably be expected to constitute grounds under ERISA for the termination of, or the

appointment of a trustee to administer, any Pension Plan; (vi) the imposition of liability on the Debtors, any of their Subsidiaries or any of their respective ERISA Affiliates pursuant to Section 4062(e) or 4069 of ERISA or by reason of the application of Section 4212(c) of ERISA; (vii) the withdrawal of the Debtors, any of their Subsidiaries or any of their respective ERISA Affiliates in a complete or partial withdrawal (within the meaning of Sections 4203 and 4205 of ERISA) from any Multiemployer Plan, or the receipt by the Debtors, any of their Subsidiaries or any of their respective ERISA Affiliates of notice from any Multiemployer Plan that it is in endangered or critical status under Section 432 of the IRC or Section 305 of ERISA, or that it is insolvent pursuant to Section 4245 of ERISA, or that it intends to terminate or has terminated under Section 4041A or 4042 of ERISA; (viii) the occurrence of an act or omission which could reasonably be expected to give rise to the imposition on the Debtors, any of their Subsidiaries or any of their respective ERISA Affiliates of fines, penalties, taxes or related charges under Chapter 43 of the IRC or under Section 409, Section 502(c), (i) or (l), or Section 4071 of ERISA in respect of any Pension Plan; (ix) the incurrence of liability or the imposition of a Lien on the Debtors or any of their Subsidiaries pursuant to Section 436 or 430(k) of the IRC or pursuant to ERISA with respect to any Pension Plan; or (x) a determination that any Pension Plan is, or is expected to be, considered an at-risk plan within the meaning of Section 430 of the IRC or Section 303 of ERISA.

"**Event**" means any event, development, occurrence, circumstance, effect, condition, result, state of facts or change.

"**Exchange Act**" means the Securities Exchange Act of 1934, as amended.

"**Existing Commitment Party Purchaser**" has the meaning set forth in Section 2.6(c).

"**Exit Credit Agreement**" has the meaning set forth in the RSA.

"**Expense Reimbursement**" has the meaning set forth in Section 3.3.

"**Fiduciaries**" has the meaning set forth in Section 7.1.

"**Fiduciary Out Notice**" has the meaning set forth in Section 7.1.

"**Filing Party**" has the meaning set forth in Section 6.8(c).

"**Final DIP Order**" has the meaning set forth in the RSA.

"**Final DIP Recognition Order**" has the meaning set forth in the RSA.

"**Final Order**" has the meaning set forth in the RSA.

"**Financial Statements**" has the meaning set forth in Section 4.8.

"**Financial Statement Date**" has the meaning set forth in Section 4.8.

"**FIRB Act**" means the Foreign Acquisitions and Takeovers Act 1975 (Cth).

"**First Lien Claims**" has the meaning set forth in the RSA.

"**Funding Amount**" has the meaning set forth in Section 2.4(a)(iv).

"**Funding Commitment**" has the meaning set forth in Section 2.2(b).

"**Funding Notice**" has the meaning set forth in Section 2.4(a).

"**GAAP**" means United States generally accepted accounting principles.

"**Governmental Authority**" means any federal, state, municipal, national, provincial, territorial, local or other government, governmental department, commission, board, bureau, court, agency or instrumentality or political subdivision thereof or any entity or officer exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to any government or any court, in each case whether associated with a state or locality of the United States, the United States, or a foreign government.

"**Governmental Authorization**" means any permit, license, authorization, plan, directive, consent order or consent decree of or from any Governmental Authority.

"**Governmental Unit**" means any U.S. or non-U.S. federal, state, municipal, or other government, or other department, commission, board, bureau, agency, public authority, or instrumentality thereof, or any other U.S. or non-U.S. court or arbitrator.

"**Hazardous Materials**" means any chemical, material, substance, contaminant, pollutant or waste, or any constituent thereof, regulated by any Environmental Law or any Governmental Authority or which may or could pose a hazard to health and safety or to the indoor or outdoor environment, including, without limitation, petroleum or petroleum by-products or distillates, asbestos or asbestos-containing materials, polychlorinated biphenyls, per- and polyfluoroalkyl substances, and radon gas.

"**HB First Lien Claims**" has the meaning set forth in the RSA.

"**Hornblower**" has the meaning set forth in the Preamble.

"**HSR Act**" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended.

"**Indemnified Claim**" has the meaning set forth in Section 9.2.

"**Indemnified Person**" has the meaning set forth in Section 9.1.

"**Indemnifying Party**" has the meaning set forth in Section 9.1.

"**Initial Commitment Parties**" means each Commitment Party that is an SVP Commitment Party or a Crestview Commitment Party.

"**Initial Commitment Parties Advisors**" means the Ad Hoc Group Advisors and the Crestview Advisors, each as defined in the RSA.

"**Interim DIP Order**" has the meaning set forth in the RSA.

"**Interim DIP Recognition Order**" has the meaning set forth in the RSA.

"**IRC**" means the Internal Revenue Code of 1986, as amended.

"**ISM Code**" means the International Safety Management Code for the Safe Operation of Ships and for Pollution Prevention adopted by the International Maritime Organization as the same may be amended or supplemented from time to time.

"**ISM Code Documentation**" includes, with respect to each Vessel subject to the ISM Code: (a) the Safety Management Certificate issued pursuant to the ISM Code in relation to such Vessel and the related Document of Compliance issued to such Vessel's "Company" (as search term is used in the ISM Code), within the periods specified by the ISM Code; and (b) any documents which are required to establish and maintain the compliance of such Vessel or the compliance of the Debtors or any of their Subsidiaries with the ISM Code.

"**ISPS Code**" means the International Ship and Port Facility Security Code as adopted by the International Maritime Organization, as the same may be amended or supplemented from time to time.

"**ISPS Code Documentation**" includes with respect to each Vessel subject to the ISPS Code, (a) the ISSC Certificate issued under the ISPS Code, and (b) any other documents any documents which are required to establish and maintain the compliance of such Vessel or the compliance of the Debtors or any of their Subsidiaries with the ISPS Code.

"**ISSC Certificate**" means, with respect to each Vessel, subject to the ISPS Code, a valid and unexpired International Ship Security Certificate issued under the ISPS Code with respect to such Vessel.

"**Jones Act**" means, collectively, the U.S. citizenship and cabotage laws principally contained in 46 U.S.C. § 50501(a), (b) and (d) and 46 U.S.C. Chapters 121 and 551 and any successor statutes thereto, together with the rules and regulations promulgated thereunder by the U.S. Coast Guard and the U.S. Maritime Administration and their practices enforcing, administering, and interpreting such laws, statutes, rules, and regulations, in each case as amended or supplemented from time to time, relating to the ownership and operation of U.S.-flag vessels in the U.S. Coastwise Trade.

"**Joint Filing Party**" has the meaning set forth in Section 6.8(d).

"**Junior DIP Credit Agreement**" has the meaning as defined in the RSA.

"**Knowledge**" means the actual knowledge, after reasonable inquiry of their direct reports, of any of the chief executive officer, chief financial officer, chief operating officer or general counsel of such Person, as applicable. As used herein, "actual knowledge" means information that is personally known by the listed individual(s).

9

"**Law**" means any federal, state, local, or foreign law (including common law), statute, code, ordinance, rule, regulation, order, ruling, or judgment, in each case, that is validly adopted, promulgated, issued, or entered by a governmental authority of competent jurisdiction (including the Bankruptcy Court).

"**Legal Proceedings**" has the meaning set forth in Section 4.11.

"**Legends**" has the meaning set forth in Section 6.8.

"**Lien**" means any lien, adverse claim, charge, option, warrant, right of first refusal or first offer, escrow, servitude, security interest, mortgage, pledge, reservation, equitable interest, deed of trust, indenture, easement, encumbrance, restriction on transfer, conditional sale or other title retention agreement, lease, sublease, license, preemptive right, community property interest, collateral assignment, infringement, hypothecation, right of way, defect in title, lien or judicial lien as defined in sections 101(36) and (37) of the Bankruptcy Code, or other restrictions or encumbrances of any kind.

"**Losses**" has the meaning set forth in Section 9.1.

"**Management Incentive Plan**" has the meaning set forth in the RSA.

"**Material Adverse Effect**" means any Event after the date hereof, which individually, or together with all other Events, has had or would reasonably be expected to have a material and adverse effect on (i) the business, assets (including Vessels), liabilities, finances, properties, results of operations or condition (financial or otherwise) of the Debtors and their Subsidiaries, taken as a whole, or (ii) the ability of the Debtors and their Subsidiaries, taken as a whole, to perform their respective obligations under, or to consummate the transactions contemplated by, this Agreement, the RSA, or the other Definitive Documents, in each case, except to the extent such Event results from, arises out of, or is attributable to, the following (either alone or in combination): (a) any change after the date hereof in global, national or regional political conditions (including acts of war, terrorism or natural disasters) or in the general business, market, financial or economic conditions affecting the industries, regions and markets in which the Debtors or any of their Subsidiaries operate; (b) any changes after the date hereof in applicable Law or GAAP, or in the interpretation or enforcement thereof; (c) the execution, announcement or performance of this Agreement, the RSA, or the other Definitive Documents or the transactions contemplated hereby or thereby, including, without limitation, the Restructuring Transactions; (d) changes in the market price or trading volume of the claims or equity or debt securities of the Debtors or any of their Subsidiaries (but not the underlying facts giving rise to such changes unless such facts are otherwise excluded pursuant to the clauses contained in this definition); (e) the filing or pendency of the Chapter 11 Cases; (f) acts of God, including any natural (including weather-related) or man-made event or disaster, epidemic, pandemic or disease outbreak (including the COVID-19 virus or any strain, mutation or variation thereof); (g) any action taken at the express written request of the Commitment Parties or taken by the Commitment Parties, including any breach of this Agreement by the Commitment Parties or the filing of a Disclosure Statement Order that establishes a confirmation timeline acceptable to the Required Commitment Parties; (h) any failure by the Debtors or any of their Subsidiaries to meet any internal or published projection for any period (but not the underlying facts giving

rise to such failure unless such facts are otherwise excluded pursuant to other clauses contained in this definition) or (i) any objections in the Bankruptcy Court to (1) this Agreement, the other Definitive Documents or the transactions contemplated hereby or thereby or (2) the reorganization of the Debtors, the Plan or the Disclosure Statement; *provided* that the exceptions set forth in <u>clauses (a)</u>, <u>(b)</u> and <u>(f)</u> of this definition shall apply to the extent that such Event is disproportionately adverse to the Debtors and their Subsidiaries, taken as a whole, as compared to other companies comparable in size and scale to the Debtors and their Subsidiaries operating in the industries in which the Debtors and their Subsidiaries operate, but in each case, solely to the extent of such disproportionate impact; *provided, further* that the termination, loss or material and adverse amendment, modification, change or supplement to the terms of (x) both NYC Ferry and Puerto Rico Primary Concession Contracts or (y) any other Primary Concession Contract shall constitute a Material Adverse Effect pursuant to this definition.

"**Material Contracts**" means (a) all "plans of acquisition, reorganization, arrangement, liquidation or succession" and "material contracts" (as such terms are defined in Items 601(b)(2) and 601(b)(10) of Regulation S-K under the Exchange Act) to which any Debtor or any of its Subsidiaries is a party and (b) the Contracts set forth on <u>Schedule 3</u>.

"**Material Vessel**" means (i) any Vessel now owned or hereafter acquired by any Debtor and having a fair market value (on a per-Vessel basis) of (x) at least $100,000 as at the Closing Date for Vessels now owned or (y) at least $100,000 as of the date of acquisition for Vessels acquired after the Closing Date, in each case as determined by the Debtors in good faith and (ii) any other Vessel that is subject to a Lien securing obligations under any Prepetition Credit Agreement.

"**Maximum Permitted Percentage**" means direct ownership of 22.5 percent (22.5%) of the total number of issued and outstanding New HB Common Equity.

"**Multiemployer Plan**" means any Employee Benefit Plan which is a "multiemployer plan" as defined in Section 3(37) of ERISA.

"**Netting Amounts**" means the amount due to any Commitment Party or any Related Fund thereof under the Plan (including in respect of the repayment of the Junior DIP Credit Agreement or otherwise) on the Effective Date that any Commitment Party has elected to be retained by the Debtors and netted against its Funding Amount hereunder.

"**New HB Common Equity**" has the meaning set forth in the RSA.

"**New HB Organizational Documents**" has the meaning set forth in the RSA, and which, in each case, shall be in form and substance acceptable to the Required Commitment Parties and the Debtors.

"**New Purchaser**" has the meaning set forth in <u>Section 2.6(d)</u>.

"**Non-U.S. Citizen**" means any Person that is not a U.S. Citizen and any Person that fails to deliver the Requisite Documentation.

"**Non-Recourse Party**" has the meaning set forth in <u>Section 2.6</u>(b).

"**OFAC**" has the meaning set forth in Section 4.22.

"**Operating Certificates**" means, with respect to a Vessel, to the extent required by applicable Law: (i) (a) in the case of U.S. Vessels, a Certificate of Inspection issued by the U.S. Coast Guard and a Certificate of Documentation issued by the National Vessel Documentation Center, and (b) in the case of each other Vessel, a Minimum Safe Manning Certificate and Certificate of Registry (or equivalent) issued by such Vessel's flag state; (ii) a load line certificate; (iii) all ISM Code Documentation; (iv) all ISPS Code Documentation; (v) a tonnage certificate; (vi) in the case of Vessels operating in U.S. waters, a Certificate of Financial Responsibility issued under the Oil Pollution Act 1990; and (vii) all other trading certificates required for such Vessel.

"**Order**" means any judgment, order, award, injunction, writ, permit, license or decree of any Governmental Unit or arbitrator of applicable jurisdiction.

"**Organizational Documents**" means (i) with respect to any corporation, its certificate or articles of incorporation or organization, as amended, and its by-laws, (ii) with respect to any limited partnership, its certificate of limited partnership, and its partnership agreement, (iii) with respect to any general partnership, its partnership agreement, and (iv) with respect to any limited liability company, its articles of organization or certificate of formation, and its operating agreement.

"**Party**" has the meaning set forth in the Preamble.

"**Paul, Weiss**" means Paul, Weiss, Rifkind, Wharton & Garrison LLP.

"**PBGC**" means the Pension Benefit Guaranty Corporation or any successor thereto.

"**Pension Plan**" means any employee pension benefit plan, as defined in Section 3(2) of ERISA (other than a Multiemployer Plan), subject to the provisions of Title IV of ERISA or Section 412 of the IRC or Section 302 of ERISA, and in respect of which the Debtors or any of their Subsidiaries, or any of their respective ERISA Affiliates, is (or, if such plan were terminated, would under Section 4069 of ERISA be deemed to be) an "employer" as defined in Section 3(5) of ERISA.

"**Permitted Liens**" has the meaning set forth in the DIP Credit Agreement.

"**Person**" means a person as such term is defined in Section 101(41) of the Bankruptcy Code.

"**Petition Date**" has the meaning set forth in Section 6.13(a).

"**Plan**" means the Debtors' joint plan of reorganization, as amended, supplemented or otherwise revised, in form and substance acceptable to the Required Commitment Parties and the Debtors and otherwise consistent with the RSA and this Agreement.

"**Plan Equity Value**" means $448.0 million.

"**Pre-Closing Period**" has the meaning set forth in <u>Section 6.2(a)</u>.

"**Prepetition Credit Agreements**" has the meaning set forth in the RSA.

"**Primary Concession Contracts**" has the meaning set forth in <u>Schedule 4</u>.

"**Purchase Price**" has the meaning set forth in the Recitals.

"**Real Property**" means, collectively, all right, title and interest in and to any and all parcels of or interests in real property owned in fee simple or leased by the Debtors or any of their Subsidiaries, together with all easements, hereditaments and appurtenances relating thereto, and all improvements and appurtenant fixtures incidental to the ownership or lease thereof.

"**Related Fund**" means, with respect to a Commitment Party, any Affiliates (including at the institutional level) of such Commitment Party or any fund, account (including any separately managed accounts) or investment vehicle that is controlled, managed, advised or sub-advised by such Commitment Party, an Affiliate of such Commitment Party or by the same investment manager, advisor or subadvisor as such Commitment Party or an Affiliate of such Commitment Party.

"**Related Party**" means, with respect to any Person, (i) any former, current or future director, officer, agent, Representative, Affiliate, employee, general or limited partner, member, controlling persons, manager or stockholder of such Person and (ii) any former, current or future director, officer, agent, Representative, Affiliate, employee, general or limited partner, member, controlling persons, manager or stockholder of any of the foregoing, in each case solely in their respective capacity as such.

"**Related Purchaser**" has the meaning set forth in <u>Section 2.6(b)</u>.

"**Release**" means any spilling, leaking, seepage, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, disposing, depositing, emanating or migrating in, into, onto or through the environment.

"**Relevant Action**" has the meaning set forth in Section 4.6(f).

"**Reorganized Debtors**" has the meaning set forth in the RSA.

"**Replacement Commitment Parties**" has the meaning set forth in <u>Section 2.3(a)</u>.

"**Representatives**" means, with respect to any Person, such Person's directors, officers, members, partners, managers, employees, agents, investment bankers, attorneys, accountants, advisors and other representatives.

"**Required Commitment Parties**" means, as of the date of determination, a majority of the aggregate amount of Backstop Commitments of the Initial Commitment Parties (excluding any Defaulting Commitment Parties and their corresponding Backstop Commitments); provided that, with respect to any matter subject to the Crestview Consent Right, "Required Commitment Parties" shall also require the Crestview Commitment Parties.

"**Requirements of Law**" means, with respect to any Person, collectively, the common law and all federal, state, local, foreign, multinational or international laws, statutes, codes, treaties, standards, rules and regulations, guidelines, ordinances, orders, judgments, writs, injunctions, decrees (including administrative or judicial precedents or authorities) and the interpretation or administration thereof by, and other determinations, directives, requirements or requests of any Governmental Authority, in each case whether or not having the force of law and that are applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"**Restructuring Transactions**" has the meaning set forth in the RSA.

"**Revolver Claims**" has the meaning set forth in the RSA.

"**Rights Offering**" has the meaning set forth in the Recitals.

"**Rights Offering Documents**" has the meaning set forth in the RSA, and which, in each case, shall be in form and substance reasonably acceptable to the Required Commitment Parties and the Debtors.

"**Rights Offering Equity Interests**" means, collectively, the New HB Common Equity (including all Unsubscribed Equity Interests) issuable and/or issued, as applicable, pursuant to and in accordance with the Rights Offering Procedures and the RSA (and, in the case of the Unsubscribed Equity Interests, this Agreement).

"**Rights Offering Expiration Time**" means the time and the date on which the applicable rights offering subscription form must be duly delivered to the Rights Offering Subscription Agent in accordance with the Rights Offering Procedures.

"**Rights Offering Participants**" means those Persons who duly subscribe for any amount of the Subscription Equity Interests in accordance with the Rights Offering Procedures.

"**Rights Offering Procedures**" has the meaning set forth in the RSA, and which shall be in form and substance reasonably acceptable to the Required Commitment Parties and the Debtors, as may be amended or modified in a manner that is acceptable to the Debtors and the Required Commitment Parties; *provided, that,* the Crestview Commitment Parties shall have a consent right to ensure that they are able to participate in the Rights Offering on account of all HB First Lien Claims identified on their signature pages to the RSA in accordance with the terms of this Agreement and the RSA.

"**Rights Offering Subscription Agent**" means Omni Agent Solutions or another subscription agent appointed by the Debtors and reasonably satisfactory to the Required Commitment Parties.

"**RSA**" has the meaning set forth in the Recitals.

14

"**Safety Management Certificate**" means, with respect to each Vessel, subject to the ISM Code, a valid and unexpired Safety Management Certificate issued under the ISM Code with respect to such Vessel.

"**Sanctioned Jurisdiction**" has the meaning set forth in Section 4.22.

"**Sanctions**" has the meaning set forth in Section 4.22.

"**Securities Act**" has the meaning set forth in the RSA.

"**Securities Law Legend**" has the meaning set forth in Section 6.8.

"**Significant Terms**" means, collectively, (i) the definitions of "Aggregate Rights Offering Amount", "Backstop Commitment Percentage", "Initial Commitment Parties", "Purchase Price", "Required Commitment Parties", and "Significant Terms" and (ii) the terms of Section 2.6, Section 3.1, Section 10.3(c), Section 10.4 and Section 11.8.

"**Subscription Amount**" has the meaning set forth in Section 2.4(a)(ii).

"**Subscription Commitment**" has the meaning set forth in Section 2.2(a).

"**Subscription Equity Interests**" means the New HB Common Equity issuable in connection with the Subscription Rights pursuant to and in accordance with the Rights Offering Procedures.

"**Subscription Funding Date**" has the meaning set forth in Section 2.4(b).

"**Subscription Rights**" means those certain rights to purchase the Subscription Equity Interests at the Purchase Price in accordance with the Rights Offering Procedures, which will be issued to the holders of First Lien Claims and Revolver Claims on account of such claims as set forth in the Plan.

"**Subsidiary**" means, with respect to any Person, any corporation, partnership, joint venture or other legal entity as to which such Person (either alone or through or together with any other subsidiary or Affiliate), (a) owns, directly or indirectly, more than fifty percent (50%) of the stock or other equity interests, (b) has the power to elect a majority of the board of directors or similar governing body thereof or (c) has the power to direct, or otherwise control, the business and policies thereof; *provided*, that Journey Beyond Holdings, Ltd., and its direct and indirect subsidiaries shall not be considered Subsidiaries of the Debtors (together, the "*Excluded Subsidiaries*").

"**Subsidiary Interests**" has the meaning set forth in Section 4.1.

"**SVP Commitment Parties**" means Leisure Farm, LLC and each Commitment Party that is a Related Fund thereof.

"**Takeover Statute**" means any restrictions contained in any "fair price," "moratorium," "control share acquisition," "business combination" or other similar anti-takeover statute or regulation.

"**Taxes**" means all taxes, assessments, duties, levies or other similar mandatory governmental charges in the nature of a tax imposed by the United States of America or any state, local or foreign government, or any agency thereof, or other political subdivision of the United States or any such government, including all federal, state, local, foreign and other income, franchise, profits, gross receipts, capital gains, capital stock, transfer, property, sales, use, value-added, occupation, excise, severance, windfall profits, stamp, payroll, social security, withholding and other taxes, assessments, duties, levies or other similar mandatory governmental charges of any kind whatsoever (whether payable directly or by withholding and whether or not requiring the filing of a return), all estimated taxes, deficiency assessments, additions to tax, penalties and interest thereon.

"**Termination Premium**" means 10% of the Backstop Commitment.

"**Total Outstanding Equity Interests**" means the total amount of New HB Common Equity outstanding immediately following the Closing and occurrence of the Effective Date, as provided in the RSA, (including those issued in partial payment of the Backstop Commitment Premium) but excluding any New HB Common Equity reserved to be issued pursuant to the Management Incentive Plan.

"**Transfer**" means sell, transfer, assign, pledge, hypothecate, participate, donate or otherwise encumber or dispose of, directly or indirectly (including through derivatives, options, swaps, pledges, forward sales or other transactions in which any Person receives the right to own or acquire any current or future interest in) a Funding Commitment, a Subscription Right, a First Lien Claim, a Revolver Claim, New HB Common Equity or the act of any of the aforementioned actions.

"**Transfer Restrictions Legend**" has the meaning set forth in Section 6.7.

"**Unsubscribed Equity Interests**" means, collectively, the Subscription Equity Interests that have not been duly purchased by the Rights Offering Participants in accordance with the Rights Offering Procedures and the RSA.

"**U.S. Citizen**" means a Person that is a citizen of the United States within the meaning of the Jones Act.

"**U.S. Coastwise Trade**" means the carriage or transport of merchandise and/or other materials and/or passengers in the coastwise trade of the United States of America within the meaning of 46 U.S.C. Chapter 551 as now in effect and as the same may be from time to time amended.

"**U.S. Vessel**" means any vessel owned or bareboat chartered by the Debtors or any of their Subsidiaries and documented under the laws of the United States with a coastwise endorsement.

"**Vessel**" means any vessel owned by the Debtors or any of their Subsidiaries, including any U.S. Vessel.

"**willful or intentional breach**" has the meaning set forth in <u>Section 10.2(d)</u>.

Section 1.2   <u>Construction</u>. In this Agreement, unless the context otherwise requires, references to Articles, Sections, Exhibits and Schedules are references to the articles and sections or subsections of, and the exhibits and schedules attached to, this Agreement;

(b)   references in this Agreement to "writing" or comparable expressions include a reference to a written document transmitted by means of electronic mail, in portable document format (pdf), facsimile transmission or comparable means of communication;

(c)   words expressed in the singular number shall include the plural and vice versa; words expressed in the masculine shall include the feminine and neuter gender and vice versa;

(d)   the words "hereof," "herein," "hereto" and "hereunder," and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole, including all Exhibits and Schedules attached to this Agreement, and not to any provision of this Agreement;

(e)   the term this "Agreement" shall be construed as a reference to this Agreement as the same may have been, or may from time to time be, amended, modified, varied, novated or supplemented;

(f)   "include," "includes" and "including" are deemed to be followed by "without limitation" whether or not they are in fact followed by such words;

(g)   references to "day" or "days" are to calendar days;

(h)   references to "the date hereof" means the date of this Agreement;

(i)   unless otherwise specified, references to a statute mean such statute as amended from time to time and include any successor legislation thereto and any rules or regulations promulgated thereunder in effect from time to time; and

(j)   references to "dollars" or "$" refer to the currency of the United States of America, unless otherwise expressly provided.

In the event of an inconsistency between the RSA and this Agreement with respect to consents and approvals, this Agreement shall control; *provided* that the foregoing shall not limit any additional consent, approval or consultation rights granted in the RSA or the Plan. In addition, in the event of any inconsistency between this Agreement and the Backstop Order, the Backstop Order shall control.

## ARTICLE II

## BACKSTOP COMMITMENT

Section 2.1    The Rights Offering.  On and subject to the terms and conditions hereof, including entry of the Backstop Order, the Debtors shall conduct the Rights Offering pursuant to, and in accordance with, the Rights Offering Procedures, the RSA, this Agreement, and the Plan.

Section 2.2    The Subscription Commitment; The Backstop Commitment. (a) On and subject to the terms and conditions hereof, each Commitment Party agrees, severally and not jointly, to fully and timely exercise, in accordance with Section 2.4, and to cause its Related Funds that have agreed to subscribe for any Commitment Party's Subscription Rights pursuant to Section 2.6(b) hereof to fully and timely exercise, in accordance with Section 2.4, all Subscription Rights that are properly issued to such Commitment Party based on the HB First Lien Claims identified on their respective signature pages to the RSA and to duly purchase, and to cause its Related Funds that have agreed to subscribe for any Commitment Party's Subscription Rights pursuant to Section 2.6(c) hereof to duly purchase, on the Effective Date for the applicable aggregate Purchase Price thereof, all Subscription Equity Interests issuable to it in connection with such Subscription Rights (the "**Subscription Commitment**");

(b)    On and subject to the terms and conditions hereof, including entry of the Confirmation Order, each Commitment Party agrees, severally and not jointly, to purchase, and Debtors agree to sell to such Commitment Party, on the Effective Date for the applicable aggregate Purchase Price thereof, the amount of Unsubscribed Equity Interests equal to (i) such Commitment Party's Backstop Commitment Percentage multiplied by (ii) the aggregate amount of Unsubscribed Equity Interests (rounded to the nearest whole unit among the Commitment Parties solely to avoid fractional New HB Common Equity as the Commitment Parties may determine in their sole discretion) (the "**Backstop Commitment**" and, together with the Subscription Commitment, the "**Funding Commitment**").

Section 2.3    Commitment Party Default.  (a) Within five (5) Business Days after receipt of written notice from the Debtors to all Commitment Parties of a Commitment Party Default, which notice shall be given promptly to all Commitment Parties substantially concurrently following the occurrence of such Commitment Party Default (such five (5) Business Day period, which may be extended with the consent of the Required Commitment Parties and the Debtors, the "**Commitment Party Replacement Period**"), the Commitment Parties (other than any Defaulting Commitment Party) shall have the right, but not the obligation, to make arrangements for one or more of the Commitment Parties (other than any Defaulting Commitment Party) to purchase all or any portion of the Available Equity Interests (such purchase, an "**Commitment Party Replacement**") on the terms and subject to the conditions set forth in this Agreement as may be agreed upon by all of the Commitment Parties electing to purchase all or any portion of the Available Equity Interests, or, if no such agreement is reached, based upon the applicable Backstop Commitment Percentage of any such Commitment Parties and their respective Related Purchasers (other than any Defaulting Commitment Party) (such Commitment Parties, the "**Replacement Commitment Parties**"). Any such Available Equity Interests purchased by a Replacement Commitment Party shall be included, among other things,

18

in the determination of (i) the Unsubscribed Equity Interests to be purchased by such Replacement Commitment Party for all purposes hereunder, (ii) the Backstop Commitment Percentage of such Replacement Commitment Party for all purposes hereunder and (iii) the Backstop Commitment of such Replacement Commitment Party for purposes of the definition of the "Required Commitment Parties." If a Commitment Party Default occurs, each Commitment Party shall support an extension of the milestones under this Agreement and the RSA, in each case solely to the extent necessary to allow for the Commitment Party Replacement to be completed within the Commitment Party Replacement Period.

(b)     Notwithstanding anything in this Agreement to the contrary, if a Commitment Party is a Defaulting Commitment Party, (i) it shall not be entitled to any of the Backstop Commitment Premium, Termination Premium or any expense reimbursement applicable solely to such Defaulting Commitment Party (including the Expense Reimbursement) provided, or to be provided, under or in connection with this Agreement, and (ii) it and its Affiliates, equity holders, members, partners, general partners, managers and its and their respective Representatives and controlling persons shall not be entitled to any indemnification pursuant to Article IX hereof. All distributions of New HB Common Equity distributable to a Defaulting Commitment Party on account of the Backstop Commitment Premium (x) shall be re-allocated contractually and turned over as liquidated damages to those non-Defaulting Commitment Parties that have elected to subscribe for their full adjusted Backstop Commitment Percentage, or (y) if Available Equity Interests are not purchased by the non-Defaulting Commitment Parties, forfeited and retained by the Debtors, as applicable.

(c)     Nothing in this Agreement shall be deemed to require a Commitment Party to purchase more than its Backstop Commitment Percentage of the Unsubscribed Equity Interests.

(d)     For the avoidance of doubt, notwithstanding anything to the contrary set forth in Section 10.4, but subject to Section 11.11, no provision of this Agreement shall relieve any Defaulting Commitment Party from any liability hereunder, or limit the availability of the remedies set forth in Section 11.10, in connection with any such Defaulting Commitment Party's Commitment Party Default under this Article II or otherwise.

(e)     As provided in Section 10.3(c), upon any Commitment Party Default or breach of Section 6.3(a) constituting a termination event under Section 13.01 of the RSA (following reasonable written notice by the Required Commitment Parties of such breach within ten (10) days, which shall be subject to customary cure rights), in either case, by any of the Crestview Commitment Parties, the Required Commitment Parties shall have the right to terminate this Agreement with respect to such Crestview Commitment Party.

Section 2.4     Subscription Account Funding. (a) Promptly, and in any event no later than the second (2nd) Business Day following the Rights Offering Expiration Time (or sooner, as directed by the Required Commitment Parties and the Debtors to the Rights Offering Subscription Agent), the Rights Offering Subscription Agent shall deliver to each Commitment Party a written notice (the "**Funding Notice**") of:

(i)      the amount of Subscription Equity Interests elected to be purchased by the Rights Offering Participants in the Rights Offering and the aggregate Purchase Price therefor;

(ii)      the amount of Subscription Equity Interests to be issued and sold to such Commitment Party on account of the Subscription Commitment and the aggregate Purchase Price therefor (as it relates to each Commitment Party, such Commitment Party's "**Subscription Amount**");

(iii)      the aggregate amount of Unsubscribed Equity Interests and the aggregate Purchase Price required for the purchase thereof;

(iv)      the amount of Unsubscribed Equity Interests and (based upon such Commitment Party's Backstop Commitment Percentage) to be issued and sold by the Debtors to such Commitment Party and the aggregate Purchase Price therefor (as it relates to each Commitment Party, such Commitment Party's "**Backstop Amount**", as applicable, and, together with such Commitment Party's Subscription Amount, the "**Funding Amount**"); and

(v)      the account information (including wiring instructions) for the account to which such Commitment Party shall deliver and pay its Funding Amount (the "**Subscription Account**").

The Debtors shall promptly direct the Rights Offering Subscription Agent to provide any written backup, information and documentation relating to the information contained in the Funding Notice as any Commitment Party may reasonably request.

(b)      On the Effective Date (such date, the "**Subscription Funding Date**"), each Commitment Party shall deliver and pay its Funding Amount (net of any Netting Amounts) by wire transfer (for the avoidance of doubt, Commitment Parties that are Affiliates may pay such Funding Amount together by way of one or more wire transfers) in immediately available funds in U.S. dollars into the Subscription Account in satisfaction of such Commitment Party's Funding Commitment.

Section 2.5      Closing.  (a) Subject to Article VIII, unless otherwise mutually agreed in writing between the Debtors and the Required Commitment Parties (after consultation with the Crestview Commitment Parties),  the closing of the Rights Offering, including the Backstop Commitments (the "**Closing**"), shall take place electronically, at 9:00 a.m., New York City time, on the Effective Date (provided that all of the conditions set forth in Article VIII shall have been satisfied or waived in accordance with this Agreement (other than conditions that by their terms are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions)). The date on which the Closing actually occurs shall be referred to herein as the "**Closing Date**."

(b)      At the Closing, the funds held in the Subscription Account shall be released and utilized as set forth in, and in accordance with, the Plan and the Confirmation Order.

(c)     At the Closing, the issuance of the Rights Offering Equity Interests corresponding to each Commitment Party's Funding Amount will be made by the Debtors to each Commitment Party (or to its designee in accordance with Section 2.7) against payment of such Commitment Party's Funding Amount, in satisfaction of such Commitment Party's Funding Commitment.

Section 2.6    Transfer of Backstop Commitments.  (a) (i) No Commitment Party (or any permitted transferee thereof) may Transfer all or any portion of its Backstop Commitment to any Debtor or any of the Debtors' Affiliates; and (ii) notwithstanding any other provision of this Agreement, the Backstop Commitment may not be Transferred later than the date on which the Debtors have caused the Rights Offering Subscription Agent to send the Funding Notice. For the avoidance of doubt, Subscription Rights may (subject to applicable contractual limitations) be designated in accordance with the Rights Offering Procedures.

(b)     Each Commitment Party may Transfer all or any portion of its Backstop Commitment, if any, to any Related Fund of such Commitment Party (each, a "**Related Purchaser**"), *provided* that such Commitment Party shall deliver to the Debtors, counsel to the Initial Commitment Parties, and the Rights Offering Subscription Agent a joinder to this Agreement, substantially in the form attached hereto as Exhibit A, executed by such Related Fund.  A Transfer of Backstop Commitment made pursuant to this Section 2.6(b) shall relieve such transferring Commitment Party from its obligations under this Agreement with respect to such Transfer.

(c)     Each Commitment Party may Transfer all or any portion of its Backstop Commitment, if any, to any other Commitment Party or such other Commitment Party's Related Fund (each, an "**Existing Commitment Party Purchaser**"), *provided* that (i) to the extent such Existing Commitment Party Purchaser is not a Commitment Party hereunder, prior to or concurrently with such Transfer such Commitment Party shall deliver to the Debtors, counsel to the Initial Commitment Parties, and the Rights Offering Subscription Agent a joinder to this Agreement, substantially in the form attached hereto as Exhibit B-1, executed by such Existing Commitment Party Purchaser, and, if not already a party thereto,  a joinder to the RSA, in a form reasonably acceptable to the Debtors, executed by such Existing Commitment Party Purchaser, and (ii) to the extent such Existing Commitment Party Purchaser is already a Commitment Party hereunder, such Commitment Party shall deliver to the Debtors, counsel to the Initial Commitment Parties, and the Rights Offering Subscription Agent (x) an amendment to this Agreement, substantially in the form attached hereto as Exhibit B-2, executed by such Commitment Party and such Existing Commitment Party Purchaser, and (y) if it is not already a party thereto, a joinder to the RSA, in a form reasonably acceptable to the Debtors, executed by such Existing Commitment Party Purchaser. A Transfer of Backstop Commitment made pursuant to this Section 2.6(c) shall relieve such transferring Commitment Party from its obligations under this Agreement with respect to such Transfer.

(d)     Subject to Section 2.6(e), each Commitment Party shall have the right to Transfer all or any portion of its Backstop Commitment, if any, to any Person that is not an Existing Commitment Party Purchaser or a Related Fund of such Commitment Party (each of the Persons to whom such a Transfer is made, a "**New Purchaser**"), *provided* that (i) such Transfer shall be subject to the reasonable consent of the Required Commitment Parties and each Initial

Commitment Party; (ii) such Transfer shall be subject to the reasonable written consent of the Debtors; and (iii) prior to and in connection with such Transfer such Commitment Party shall deliver to the Debtors, counsel to the Initial Commitment Parties, and the Rights Offering Subscription Agent a joinder to this Agreement, substantially in the form attached hereto as Exhibit C, executed by such New Purchaser, and, if not already a party thereto, a joinder to the RSA, in a form reasonably acceptable to the Debtors, executed by the New Purchaser.

(e)     Any Transfer of Backstop Commitment made (or attempted to be made) in violation of this Agreement shall be deemed null and void *ab initio* and of no force or effect, regardless of any prior notice provided to the Parties or any Commitment Party, and shall not create (or be deemed to create) any obligation or liability of any other Commitment Party or any Debtor to the purported transferee or limit, alter or impair any agreements, covenants, or obligations of the proposed transferor under this Agreement. Any Transfer of any Backstop Commitment made pursuant to this Agreement shall be made in compliance with applicable securities laws. After the Closing Date, nothing in this Agreement shall limit or restrict in any way the ability of any Commitment Party (or any permitted transferee thereof) to Transfer any New HB Common Equity or any interest therein.

Section 2.7     Designation Rights.  Each Commitment Party shall have the right to designate by written notice to the Debtors, counsel to the Initial Commitment Parties and the Rights Offering Subscription Agent no later than five (5) Business Days prior to the Closing Date that some or all of the New HB Common Equity that it is obligated to purchase or has the right to receive hereunder be issued in the name of, and delivered to a Related Fund of such Commitment Party upon receipt by Hornblower of payment therefor in accordance with the terms hereof (it being understood that payment by either the Related Fund or the Commitment Party shall satisfy the applicable payment obligations of the Commitment Party), which notice of designation shall (a) be addressed to the Rights Offering Subscription Agent and signed by such Commitment Party and each such Related Fund, (b) specify the amount of New HB Common Equity to be delivered to or issued in the name of such Related Fund and (c) contain a confirmation by each such Related Fund of the accuracy of the representations set forth in Sections 5.4 through 5.6 as applied to such Related Fund; *provided* that no such designation pursuant to this Section 2.7 shall relieve such Commitment Party from its obligations under this Agreement.

Section 2.8     Notification of Aggregate Number of Exercised Subscription Rights.  Upon request from counsel to the Initial Commitment Parties from time to time prior to the Rights Offering Expiration Time (and any permitted extensions thereto), the Debtors shall promptly notify, or cause the Rights Offering Subscription Agent to promptly notify, the Commitment Parties of the aggregate amount of Subscription Equity Interests in respect of which Subscription Rights are known by the Debtors or the Rights Offering Subscription Agent to have been exercised pursuant to the Rights Offering as of the most recent practicable time before such request.

Section 2.9     Jones Act Restrictions on Transfers of Backstop Commitment.

(a)     Notwithstanding anything to the contrary contained herein and in addition to the remedies available to the Debtors under their certificate(s) of incorporation or otherwise, (i)

22

any purported Transfer of the Backstop Commitment or the Backstop Commitment Premium, the effect of which would be to cause one or more Non-U.S. Citizens in the aggregate to own New HB Common Equity in excess of the Maximum Permitted Percentage, shall be void *ab initio* and ineffective, (ii) to the extent that the Debtors become aware that any purported Transfer would have such effect, the Debtors shall not register such purported Transfer, and (iii) the Debtors shall not recognize or be required to recognize the purported transferee thereof as a holder of Subscription Rights, the Backstop Commitment or the Backstop Commitment Premium for any purpose whatsoever except to the extent necessary to effect any remedy available to the Debtors.

An affidavit of citizenship and any other documentation as the Debtors, in the exercise of their reasonable judgment with the advice of counsel after consultation with the Required Commitment Parties, deem advisable to fulfill the purpose or implement the provisions of their certificate(s) of incorporation in order to maintain Jones Act Compliance (the "**Requisite Documentation**"), will be required by the Debtors from all transferees of the Backstop Commitment or the Backstop Commitment Premium and, if such transferee is acting as a fiduciary, agent or nominee for an owner, with respect to such owner, and registration of any Transfer shall be denied upon refusal to furnish such Requisite Documentation; provided, however, that a failure to deliver the Requisite Documentation will result in treating such Commitment Party as a Non-U.S. Citizen, but, subject to the limitations set forth in 2.9(a), shall not prevent such Commitment Party from receiving New HB Common Equity.

## ARTICLE III

## BACKSTOP COMMITMENT PREMIUM AND EXPENSE REIMBURSEMENT

Section 3.1    Premium Payable by the Debtors.    Subject to Section 3.2, as consideration for the Funding Commitment and the other agreements of the Commitment Parties in this Agreement, the Debtors shall pay or cause to be paid a nonrefundable aggregate premium of 10% of the maximum amount of the Aggregate Rights Offering Amount (before any reduction pursuant to the RSA) (the "**Backstop Commitment Premium**"), payable in additional New HB Common Equity, to the Commitment Parties on the Effective Date. The Backstop Commitment Premium shall be payable, in accordance with Section 3.2, to the Commitment Parties (including any Replacement Commitment Party, but excluding any Defaulting Commitment Party) or their designees in proportion to their respective Backstop Commitment Percentages at the time the payment of the Backstop Commitment Premium is made.

Section 3.2    Payment of Premium.    The Backstop Commitment Premium shall be fully earned by the Commitment Parties upon execution of this Agreement, nonrefundable and non-avoidable upon entry of the Backstop Order and shall be paid by the Debtors, free and clear of any withholding or deduction for any applicable Taxes, on the Effective Date as set forth above. For the avoidance of doubt, to the extent payable in accordance with the terms of this Agreement, the Backstop Commitment Premium will be payable regardless of the amount of Unsubscribed Equity Interests (if any) actually purchased; *provided* that, subject to Section 2.3, the Backstop Commitment Premium shall not be payable in respect of the Funding Commitments of any Defaulting Commitment Party; *provided* further, that if the Closing does not occur, the Termination Premium shall be payable (in lieu of the Backstop Commitment Premium) in cash, to the extent provided in (and in accordance with) Section 10.4. The Debtors

shall satisfy their obligation to pay the Backstop Commitment Premium on the Effective Date by issuing the amount of additional New HB Common Equity (in each case rounded among the Commitment Parties solely to avoid fractional New HB Common Equity as the Required Commitment Parties may determine in their sole discretion) to each Commitment Party (or its designee pursuant to Section 2.7); on a pro rata basis based on such Commitment Party's Backstop Commitment Percentage.

Section 3.3    Expense Reimbursement.  Subject to Section 2.3(b) with respect to any Defaulting Commitment Party, (a) whether or not the transactions contemplated hereunder are consummated, the Debtors agree to pay all of the reasonable and documented out of pocket fees and expenses incurred by the Initial Commitment Parties, before, on or after the date hereof until the termination of this Agreement in accordance with its terms) that have not otherwise been paid pursuant to the RSA, the Final DIP Order or in connection with the Chapter 11 Cases, including: (i) the Initial Commitment Parties Advisors in connection with the transactions contemplated by this Agreement and the RSA; (ii) all filing fees or other costs or fees associated with the matters contemplated by Section 5.8 and Section 6.8 (including, without limitation, all filing fees, if any, required by the HSR Act or any other Antitrust Law) in connection with the transactions contemplated by this Agreement and all reasonable and documented out-of-pocket expenses of the Commitment Parties related thereto; and (iii) all reasonable and documented out-of-pocket fees and expenses incurred in connection with any required regulatory filings in connection with the transactions contemplated by this Agreement, in each case, that have been paid or are payable by the Commitment Parties (such payment obligations set forth in clauses (i), (ii) and (iii) above, collectively, the "**Expense Reimbursement**"); provided, that, Expense Reimbursement to the Crestview Commitment Parties shall be subject to the proviso set forth in the definition of "Crestview Fees and Expenses" in the RSA. The Expense Reimbursement shall, pursuant to the Backstop Order, constitute allowed administrative expenses of the Debtors' estates under Sections 503(b) and 507 of the Bankruptcy Code, which, for the avoidance of doubt, shall be *pari passu* with all other administrative expenses of the Debtors' estates, provided that nothing herein shall alter or modify the Debtor's payment obligations under the Final DIP Order. Notwithstanding anything to the contrary in this Agreement, this Section 3.3 shall survive the termination of this Agreement.

(b)    The Expense Reimbursement as described in this Section 3.3 shall be paid in cash in accordance with the terms herein.  The Expense Reimbursement accrued through the date on which the Backstop Order is entered shall be paid when due (for the avoidance of doubt, (i) in no event shall such invoices be due earlier than five (5) days after receipt thereof and (ii) the invoices that shall set forth such Expense Reimbursements shall not include time details). The Expense Reimbursement accrued thereafter shall be payable by the Debtors promptly within five (5) Business Days after receipt thereof of any applicable invoice. Unless otherwise ordered by the Bankruptcy Court, no recipient of any payment hereunder shall be required to file with respect thereto any interim or final fee application with the Bankruptcy Court with respect to such payment.

(c)    For the avoidance of doubt, nothing herein shall alter or modify the Debtors' payment obligations under the Final DIP Order or the RSA.

Section 3.4    Tax Treatment.  The Parties agree to treat, for U.S. federal income tax purposes, each of the Backstop Commitment Premium, the Expense Reimbursement, and the Termination Premium as a "put premium" paid to the Commitment Parties.  Each Party shall file all tax returns consistent with such treatment, and shall take no position inconsistent with such treatment in connection with the payment of any amounts due to the Commitment Parties pursuant to this Agreement unless required to do so pursuant to a "determination" within the meaning of Section 1313(a) of the IRC or a change in law following the date hereof.

Section 3.5    Integration; Administrative Expense.  The provisions for the payment of the Backstop Commitment Premium, the Termination Premium and Expense Reimbursement, and the indemnification provided herein, are an integral part of the transactions contemplated by this Agreement and without these provisions the Commitment Parties would not have entered into this Agreement. The Backstop Order and the Plan shall provide that the Backstop Commitment Premium, the Termination Premium, the Expense Reimbursement, and any indemnification provided herein shall, upon commencement of the Chapter 11 Cases, constitute administrative claims of the Debtors' estates under sections 503(b) and 507 of the Bankruptcy Code. In addition, and as a result thereof, the proposed Confirmation Order and the Plan filed by the Debtors shall contemplate that any New HB Common Equity issued as payment of the Backstop Commitment Premium shall be issuable under Section 1145 of the Bankruptcy Code.

# ARTICLE IV

## REPRESENTATIONS AND WARRANTIES OF THE DEBTORS

Except as set forth in the corresponding section of the Company Disclosure Schedules, each of the Debtors, jointly and severally, hereby represents and warrants to the Commitment Parties as set forth below. Except for representations, warranties and agreements that are expressly limited as to their date, each representation, warranty and agreement is made as of the date hereof.

Section 4.1    Organization and Qualification.  Each Debtor and each of its Subsidiaries (a) is duly organized, validly existing and in good standing (to the extent such concept exists in the relevant jurisdiction) under the laws of the jurisdiction of its organization, (b) has all requisite power and authority to own its property and assets and to carry on its business as now conducted and (c) is qualified to do business in, and is in good standing (to the extent such concept exists in the relevant jurisdiction) in, every jurisdiction where its ownership, lease or operation of properties or conduct of its business requires such qualification; except, in each case referred to in this Section 4.1 where the failure to do so, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect.

Section 4.2    Corporate Power and Authority.  Each Debtor has the requisite corporate or other similar power and authority (a) to enter into, execute and deliver this Agreement and any other agreements contemplated herein or in the Plan, (b) subject to entry of the Backstop Order, to perform their obligations hereunder and (c) subject to entry of the Backstop Order and the Confirmation Order, to consummate the transactions contemplated herein and in the Plan, to enter into, execute and deliver each of the Definitive Documents and to

25

perform its obligations thereunder. Subject to the receipt of the foregoing Orders, as applicable, the execution and delivery of this Agreement and each of the other Definitive Documents and the consummation of the transactions contemplated hereby and thereby have been or will be duly authorized by all requisite corporate action on behalf of the Debtors, and no other corporate proceedings on the part of the Debtors are or will be necessary to authorize this Agreement or any of the other Definitive Documents or to consummate the transactions contemplated hereby or thereby.

Section 4.3    Execution and Delivery; Enforceability.   Subject to entry of the Backstop Order, this Agreement will have been, and subject to the entry of both the Backstop Order and the Confirmation Order, each other Definitive Document will be, duly and validly executed and delivered by each of the Debtors party thereto. Upon entry of the Backstop Order and, as applicable, the Confirmation Order, and assuming due and valid execution and delivery hereof by the Commitment Parties, the Debtors' obligations hereunder will constitute the valid and legally binding obligations of the Debtors enforceable against the Debtors in accordance with their respective terms, subject to bankruptcy, insolvency, reorganization, moratorium and other similar Laws now or hereafter in effect relating to creditors' rights generally and subject to general principles of equity. Upon entry of the Confirmation Order and assuming due and valid execution and delivery of this Agreement and the other Definitive Documents by the Commitment Parties, each of the obligations hereunder and thereunder will constitute the valid and legally binding obligations of the Debtors, enforceable against the Debtors, in accordance with their respective terms, subject to bankruptcy, insolvency, reorganization, moratorium and other similar Laws now or hereafter in effect relating to creditors' rights generally and subject to general principles of equity.

Section 4.4    Authorized and Issued Capital; Issuance.   On the Closing Date, (a) the total issued capital stock of Reorganized Hornblower will be consistent with the terms of the RSA and Term Sheet, (b) no New HB Common Equity will be held by Reorganized Hornblower in its treasury, and (c) Reorganized Hornblower will have sufficient authorized and, if applicable, issued New HB Common Equity to meet its obligations to deliver the New HB Common Equity to be delivered pursuant to the Plan and consistent with the Disclosure Statement, and no warrants to purchase New HB Common Equity will be issued and outstanding.

As of the Closing Date, the Total Outstanding Equity Interests of Reorganized Hornblower will have been duly authorized and validly issued and will be fully paid and nonassessable, and free and clear of all Taxes, Liens, preemptive rights, subscription and similar rights (other than any rights or restrictions set forth in the Plan, the New HB Organizational Documents or imposed hereunder or by applicable laws).

Subject to the entry by the Bankruptcy Court of the Backstop Order, the Confirmation Order and any other applicable orders of the Bankruptcy Court, the Rights Offering Equity Interests to be issued in connection with the consummation of the Rights Offering and pursuant to the terms hereof in exchange for the applicable Purchase Price therefor, and the New HB Common Equity to be issued in connection with the Backstop Commitment Premium, will, when issued and delivered on the Closing Date, be duly authorized and validly issued and shall be fully paid and nonassessable, and free and clear of all Taxes, Liens, preemptive rights, subscription and similar rights (other than any rights or restrictions set forth in

the Plan, the New HB Organizational Documents or imposed hereunder or by applicable laws). Except as set forth in this Agreement, the Plan and the New HB Organizational Documents, and except for a sufficient amount of New HB Common Equity reserved for issuance pursuant to the Management Incentive Plan, as of the Closing Date, no shares of capital stock or other equity securities or voting interest in Reorganized Hornblower will have been issued, reserved for issuance or outstanding.

Except as described in this Agreement and except as set forth in the Company Disclosure Schedules, the Plan, the Disclosure Statement (and any supplement thereto), the DIP Credit Agreement, the Exit Credit Agreement, or the New HB Organizational Documents, upon the Closing, none of the Debtors will be party to or otherwise bound by or subject to any outstanding option, warrant, call, right, security, commitment, Contract, arrangement or undertaking (including any preemptive right) that (i) obligates any Debtor or any of its Subsidiaries to issue, deliver, sell or transfer, or repurchase, redeem or otherwise acquire, or cause to be issued, delivered, sold or transferred, or repurchased, redeemed or otherwise acquired, any shares of the capital stock of, or other equity or voting interests in any Debtor or any of its Subsidiaries or any security convertible or exercisable for or exchangeable into any capital stock of, or other equity or voting interest in any Debtor or any of its Subsidiaries, (ii) obligates any Debtor or any of its Subsidiaries to issue, grant, extend or enter into any such option, warrant, call, right, security, commitment, Contract, arrangement or undertaking, or (iii) relates to the voting of any shares of capital stock or other equity interests of any Debtor or any of its Subsidiaries except as to voting rights attendant to any such New HB Common Equity or as set forth in the New HB Organizational Documents.

Section 4.5     No Conflict.  Assuming the consents described in Section 4.6 are obtained, the execution and delivery by the Debtors of this Agreement, the Plan and the other Definitive Documents, the compliance by the Debtors and, if applicable, their Subsidiaries, with the provisions hereof and thereof and the consummation of the transactions contemplated herein and therein will not (a) conflict with, or result in a breach, modification or violation of, any of the terms or provisions of, or constitute a default under (with or without notice or the lapse of time, or both), or result, except to the extent contemplated by the Plan, in the acceleration of, or the creation of any Lien under, or cause any payment or consent to be required under any Contract to which any Debtor or any of its Subsidiaries will be bound as of the Closing Date after giving effect to the Plan or to which any of the property or assets of any Debtor or any of its Subsidiaries will be subject as of the Closing Date after giving effect to the Plan, (b) result in any violation of the provisions of any of the Organizational Documents of any Debtor or any of its Subsidiaries (other than, for the avoidance of doubt, a breach or default that would be triggered as a result of the Chapter 11 Cases or any of the Debtors' undertaking to implement the Restructuring Transactions) , or (c) result in any violation of any Law or Order applicable to any Debtor or any of its Subsidiaries or any of their properties, except in each of the cases described in clause (a) or (b) this Section 4.5, which would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 4.6     Consents and Approvals.  Other than as set forth in the Company Disclosure Schedules, no consent, approval, authorization, Order, registration or qualification of or with any Governmental Authority having jurisdiction over any Debtor or any of its Subsidiaries or any of their respective properties (each, an "**Applicable Consent**") is required for

the execution and delivery by any Debtor of this Agreement, the RSA, the Plan and the other Definitive Documents, the compliance by any Debtor and, to the extent applicable, its Subsidiaries with the provisions hereof and thereof and the consummation of the transactions contemplated herein and therein, except for (a) the entry of the Backstop Order authorizing each of Hornblower and the other Debtors to execute and deliver this Agreement and perform its obligations hereunder, (b) the entry of the Confirmation Order authorizing Hornblower and the other Debtors to perform each of their respective obligations under the Plan, (c) the entry of the Disclosure Statement Order, (d) entry by the Bankruptcy Court, or any other court of competent jurisdiction, of Orders as may be necessary in the Chapter 11 Cases from time to time, (e) filings, notifications, authorizations, approvals, consents, clearances or termination or expiration of all applicable waiting periods under any Antitrust Laws, the Jones Act, or maritime laws, in connection with the transactions contemplated by this Agreement, (f) such consents, approvals, authorizations, registrations or qualifications as may be required by foreign securities laws, federal securities laws or state securities or "Blue Sky" Laws in connection with the purchase of the Unsubscribed Equity Interests by the Commitment Parties, the issuance of the Subscription Rights, the issuance of the Subscription Equity Interests pursuant to the exercise of the Subscription Rights, the issuance of New HB Common Equity in satisfaction of First Lien Claims and Revolver Claims pursuant to the Plan, and the issuance of New HB Common Equity as payment of the Backstop Commitment Premium (each, a "**Relevant Action**"), (g) the filing of any other corporate documents in connection with the transactions contemplated by this Agreement with applicable state filing agencies, (h) any Applicable Consents required by a Governmental Authority solely in their capacity as a contract counterparty, and (i) any Applicable Consents that, if not made or obtained, would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 4.7    Arm's-Length.  The Debtors agree that each of the Commitment Parties is acting solely in the capacity of an arm's-length contractual counterparty with respect to the transactions contemplated hereby (including in connection with determining the terms of the Rights Offering) and not as a financial advisor or a fiduciary to, or an agent of any Debtor and no Commitment Party is advising any Debtor as to any legal, tax, investment, accounting or regulatory matters in any jurisdiction.

Section 4.8    Financial Statements.  The consolidated balance sheet and related consolidated statements of operations, and cash flows and stockholders' equity for the fiscal year ended December 31, 2023 (collectively, the "**Financial Statements**" and such date the "**Financial Statement Date**") present fairly, in all material respects, the financial position and results of operations and cash flows of Hornblower and its consolidated Subsidiaries as of such dates and for such periods.

Section 4.9    Absence of Certain Changes.  Other than as set forth in the Company Disclosure Schedules or in connection with the Chapter 11 Cases, since the Financial Statement Date, no Event, change or condition has occurred or exists that has had, or would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 4.10    No Violation; Compliance with Laws.  The Debtors and their Subsidiaries are not, and since the Financial Statement Date have not been, in violation of their respective certificate of incorporation, articles of association, charter, bylaws or similar

28

organizational document, except for any such violations that have not had and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect. None of the Debtors or any of their Subsidiaries is in violation of any Law or Order, except for any such violations that have not had and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 4.11    Legal Proceedings.    Other than the Chapter 11 Cases and any adversary proceedings or contested motions commenced in connection therewith, there are no material legal, governmental, administrative, judicial or regulatory investigations, audits, actions, suits, claims, arbitrations, demands, demand letters or proceedings by or before any arbitrator or Governmental Authority ("**Legal Proceedings**") pending against or, to the Knowledge of the Debtors, threatened in writing against or affecting the Debtors or any of their Subsidiaries or any property of the Debtors or any of their Subsidiaries which would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 4.12    Labor Relations.    Other than as set forth in the Company Disclosure Schedules except as, individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect: (a) there are no strikes, lockouts, slowdowns or other labor disputes against the Debtors or any of their Subsidiaries pending or, to the Knowledge of the Debtors, threatened against any of the Debtors or any of their Subsidiaries, (b) the hours worked by and payments made to employees of the Debtors or any of their Subsidiaries have not been in violation of the Fair Labor Standards Act or any other applicable Federal, state, local or foreign law dealing with such matters and (c) all payments due from the Debtors or any of their Subsidiaries on account of wages and employee health and welfare insurance and other benefits, have been paid (except to the extent such payments have been stayed by the commencement of the Chapter 11 Cases) or accrued as a liability on the books of the Debtors or any of their Subsidiaries to the extent required by GAAP. Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, the consummation of the transactions contemplated by the Definitive Documents will not give rise to a right of termination or right of renegotiation on the part of any union under any material collective bargaining agreement to which any Debtor or any of its Subsidiaries is a party or by which any Debtor or any of its Subsidiaries is bound.

Section 4.13    Intellectual Property.  Each of the Debtors and its Subsidiaries has good and marketable title to or a valid license or right to use, all patents, patent rights, trademarks, service marks, trade names, copyrights, technology, software, know-how, database rights and all licenses and rights with respect to the foregoing, and all other intellectual property rights necessary for the present conduct of its business, without, to the Knowledge of the Debtors, any infringement, misuse, misappropriation, or violation, individually or in the aggregate of the rights of others, and free from any burdensome restrictions on the present conduct of its business, except where such failure to own or license or where such infringement, misuse, misappropriation or violation or restrictions would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 4.14    Title to Real and Personal Property.  (a) Each of the Debtors and its Subsidiaries has good and valid fee simple title to or rights to purchase, or valid leasehold interests in, or easements or other limited property interests in, all its Real Property and has good

and marketable title to its personal property and assets, in each case, except for defects in title that do not materially interfere with its ability to conduct its business as currently conducted or to utilize such properties and assets for their intended purposes and except where the failure to have such valid title or leasehold interest would not reasonably be expected to have a Material Adverse Effect. All such properties and assets are free and clear of Liens, other than Permitted Liens and any Liens to be incurred in connection with the Plan. Schedule 4 lists, as of the date hereof, the name, fair market value, official number, jurisdiction of registration/flag, and record owner of each Material Vessel.

(b)     Other than as a consequence of the Chapter 11 Cases, each of the Debtors and its Subsidiaries is in material compliance with all obligations under all leases (as may be amended from time to time) to which it is a party that have not been rejected or are not anticipated to be rejected in the Chapter 11 Cases, except where the failure to comply has not had, and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, and all such leases are in full force and effect (except to the extent subject to applicable to bankruptcy, insolvency, fraudulent conveyance, fraudulent transfer, reorganization, moratorium, and similar laws affecting creditors' rights generally and to general principles of equity), except leases in respect of which the failure to be in full force and effect have not had, and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect. Each of the Debtors and its Subsidiaries enjoys peaceful and undisturbed possession under all such leases to which it is a party, other than leases in respect of which the failure to enjoy peaceful and undisturbed possession have not had, and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 4.15    No Undisclosed Relationships.    Other than Contracts or other direct or indirect relationships between or among any of the Debtors or any of their Subsidiaries, or Contracts or relationships that are immaterial in amount or significance, there are no Contracts or other direct or indirect relationships existing as of the date hereof between or among the Debtors or any of their Subsidiaries, on the one hand, and any director, officer or greater than five percent (5%) stockholder of the Debtors or any of their Subsidiaries, except for the transactions contemplated by this Agreement.

Section 4.16    Licenses and Permits.    Except as set forth in the Company Disclosure Schedules, the Debtors and their Subsidiaries possesses all Governmental Authorizations issued by, and have all declarations and filings with, the appropriate Governmental Units, in each case, that are necessary for the ownership or lease of their respective properties and the conduct of the business of the Debtors and their Subsidiaries, except where the failure to possess, make or give the same would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect. Neither the Debtors nor any of their Subsidiaries (a) has received notice of any revocation or modification of any such Governmental Authorization from the applicable Governmental Unit with authority with respect thereto or (b) has any reason to believe that any such Governmental Authorization will not be renewed in the ordinary course, except to the extent that any of the foregoing would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 4.17    Environmental.    Except as set forth in the Company Disclosure Schedules, and except for any matters that, individually or in the aggregate, would not

reasonably be expected to result in a Material Adverse Effect, no Debtor or any of its Subsidiaries, (a) has received notice of any claim with respect to any Environmental Liability or knows of any basis for any Environmental Liability, (b) is currently in non-compliance with, or to the Knowledge of the Debtors, has failed in the past to comply with, any Environmental Law or to obtain, maintain or comply with any Governmental Authorization required under any Environmental Law, except as has been fully resolved, (c) to the Knowledge of the Debtors, has failed to maintain any financial assurances necessary for its operations to comply, in all respects, with Environmental Law or (d) has become subject to any Environmental Liability. None of the Debtors or their Subsidiaries has Released, treated, stored, transported, used or disposed of Hazardous Materials at, on, under or from any currently or formerly owned or operated real estate, vessel or facility relating to its business in a manner that would reasonably be expected to require material investigation, cleanup, remedial action or remediation under Environmental Law, except in each case as to matters that would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 4.18  Tax Matters.  Except in each case as to matters that would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect:

(a)  Each of the Debtors and their Subsidiaries (i) has filed or caused to be filed all federal, state, provincial and other Tax returns that are required to be filed and (ii) has paid or caused to be paid all Taxes shown to be due and payable on said returns and all other Taxes, fees or other charges imposed on it or on any of its property by any Governmental Unit (other than (x) any returns or amounts that are not yet due or (y) amounts the validity of which are currently being contested in good faith by appropriate proceedings and with respect to which any reserves required in conformity with GAAP have been provided on the books of the applicable Debtor).

(b)  Other than in connection with (i) the Chapter 11 Cases, or (ii) Taxes being contested in good faith by appropriate proceedings for which adequate provisions have been made (to the extent required in accordance with GAAP), (x) there is no outstanding audit, assessment or written claim concerning any Tax liability of any Debtor or any of its Subsidiaries, (y) no Debtor or any of its Subsidiaries has received any written notices from any taxing authority relating to any outstanding tax issue that could affect any Debtor or any of its Subsidiaries after the Effective Date; and (z) there are no Liens with respect to Taxes upon any of the assets or properties of any Debtor or any of its Subsidiaries, other than Permitted Liens.

(c)  All Taxes that any Debtor or any of its Subsidiaries was required by law to withhold or collect in connection with amounts paid or owing to any employee, independent contractor, creditor, stockholder or other third party have been duly withheld or collected, and have been timely paid to the proper authorities to the extent due and payable.

(d)  None of the Debtors or any of their Subsidiaries are parties to any Tax sharing, allocation or indemnification agreement or arrangement that would have a continuing effect after the Effective Date (other than such agreements or arrangements that form part of a larger commercial agreement or arrangement entered into in the ordinary course of business, the primary subject matter of which is not Tax, and agreements or arrangements wholly between the Debtors and their Subsidiaries).

31

(e)      No Debtor or any of its Subsidiaries has been requested in writing, and, to the Knowledge of the Debtors, there are no claims against any Debtor, to pay any liability for Taxes of any Person (other than the Debtors or their direct or indirect Subsidiaries) that is material to any Debtor, arising from the application of Treasury Regulation Section 1.1502-6 or any analogous provision of state, local or foreign law, or as a transferee or successor.

(f)      No Debtor or any of its Subsidiaries has been either a "distributing corporation" or a "controlled corporation" in a distribution occurring during the last five years in which the parties to such distribution treated the distribution as one to which Section 355 of the IRC is applicable.

Section 4.19   Employee Benefit Plans.  No ERISA Event has occurred in the last five years and is continuing, or is reasonably expected to occur, that when taken together with all other such ERISA Events for which liability is reasonably expected to occur, would reasonably be expected to result in a Material Adverse Effect.  Except as would not reasonably be expected to have a Material Adverse Effect, the present value of all accumulated benefit obligations under all Pension Plans (based on the assumptions used for purposes of Statement of Financial Accounting Standards No. 87), taking into account only each Pension Plan the present value of the accumulated benefit obligation of which exceeded the fair market value of the assets of such Pension Plan, did not, as of the date of the most recent financial statements reflecting such amounts, exceed the fair market value of the assets of such Pension Plans, in the aggregate.

Section 4.20   No Unlawful Payments.

(a)      Each Debtor and its Subsidiaries (and all Persons acting on behalf of each Debtor and its Subsidiaries) is in compliance with applicable Anti-Corruption Laws and has implemented and maintains in effect policies and procedures reasonably designed to promote and achieve continued compliance therewith.  No funds of any Debtor or any of its Subsidiaries have been used, during the past five (5) years, or will be used in the future, by any Debtor or any of its Subsidiaries, directly or indirectly, for any payment of money or anything of value to any Person, governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of any applicable Anti-Corruption Law.

(b)      The Debtors and their Subsidiaries will not use, directly or, to the Knowledge of the Debtors, indirectly, any part of the proceeds of the Rights Offering for any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of any applicable Anti-Corruption Law.

Section 4.21   Compliance with Anti-Money Laundering Laws.  To the extent applicable and except as excused by the Bankruptcy Code, the operations of the Debtors and their Subsidiaries have been conducted, at all times during the past five (5) years, and are being conducted presently, in compliance in all material respects with applicable financial recordkeeping and reporting requirements, including, as applicable, the Trading with the Enemy Act, as amended, and any other enabling legislation or executive order relating thereto, the U.S.

Currency and Foreign Transactions Reporting Act of 1970, the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Title III of Pub. L. 107-56, signed into law October 26, 2001), the anti-money laundering statutes of all jurisdictions in which the Debtors and their Subsidiaries operate (and the rules and regulations promulgated thereunder) and any related or similar applicable Laws (collectively, the "**Anti-Money Laundering Laws**") and no Legal Proceeding by or before any Governmental Unit or any arbitrator involving alleged violations of Anti-Money Laundering Laws by the Debtors or their Subsidiaries is pending or, to the Knowledge of the Debtors, threatened. Each Debtor and its respective Subsidiaries have implemented and maintain in effect policies and procedures reasonably designed to promote and achieve compliance with the applicable Anti-Money Laundering Laws.

Section 4.22   Compliance with Sanctions Laws. Each Debtor and its respective Subsidiaries is in compliance with Sanctions in all material respects. None of the Debtors or any of their respective Subsidiaries or any of their respective directors and officers, nor, to the Knowledge of the Debtors, any agent, employee or Affiliate of the Debtors or their respective Subsidiaries, is (i) a person that is, or owned 50 percent or more by one or more persons that are, listed in any Sanctions-related list of designated persons maintained by the United States (including by the Office of Foreign Assets Control of the U.S. Department of the Treasury ("**OFAC**") or the U.S. Department of State), the United Nations Security Council, the European Union or His Majesty's Treasury of the United Kingdom, (ii) otherwise the subject or target of any sanctions administered by the United States (including by OFAC and the U.S. Department of State), the United Nations Security Council, the European Union or His Majesty's Treasury of the United Kingdom ("**Sanctions**"), or (iii) located, organized or resident in a country, region or territory that is the subject or target of Sanctions comprehensively prohibiting dealings in, with or involving such country or territory (as of the date hereof, the Crimea region of Ukraine, the so-called Donetsk People's Republic region of Ukraine, the so-called Luhansk People's Republic region of Ukraine, the non-government controlled areas of the Kherson and Zaporizhzhia regions of Ukraine, any other covered region of Ukraine identified pursuant to Executive Order 14065, Cuba, Iran, North Korea and Syria) (each, a "**Sanctioned Jurisdiction**").  The Debtors and their Subsidiaries will not directly or indirectly use any part of the proceeds of the Rights Offering or otherwise make available such proceeds to any Subsidiary, entity or person, for the purpose of funding, financing or facilitating the activities of or business with any person that is currently, or at the time of such funding, financing or facilitation, the subject or target of Sanctions; funding, financing or facilitating any activities, business or transaction with, in or involving any Sanctioned Jurisdiction, except to the extent licensed or otherwise approved by OFAC or the U.S. Department of State; or in any other manner that would constitute or give rise to a violation of any Sanctions by any person (including any person participating in the transaction, whether as advisor, investor or otherwise). Since each Debtor's inception, such Debtor and its respective Subsidiaries have not engaged, during the past five years, and are not now engaged, in any dealings or transactions with or involving any person that at the time of the dealing or transaction is or was the subject or the target of Sanctions or with any Sanctioned Jurisdiction.

Section 4.23   No Broker's Fees.  None of the Debtors or their Subsidiaries is a party to any Contract with any Person (other than this Agreement) that would give rise to a valid claim against the Commitment Parties for a brokerage commission, finder's fee or like payment in connection with the Rights Offering or the sale of the Unsubscribed Equity Interests.

Section 4.24   <u>Takeover Statutes</u>.   No Takeover Statute is applicable to this Agreement, the Backstop Commitment and the other transactions contemplated by this Agreement.

Section 4.25   <u>Investment Company Act</u>.   None of the Debtors or their Subsidiaries is an "investment company" as defined in, or subject to regulation under, the Investment Company Act of 1940, as amended.

Section 4.26   <u>Insurance</u>.   Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, (a) the Debtors and their Subsidiaries have insured their properties and assets against such risks and in such amounts as are customary for companies engaged in similar businesses; (b) all premiums due and payable in respect of insurance policies maintained by each Debtor and its respective Subsidiaries have been paid, (c) the insurance maintained by or on behalf of each Debtor and its respective Subsidiaries is adequate and (d) as of the date hereof, to the Knowledge of each of the Debtors, no Debtor or its respective Subsidiaries has received notice from any insurer or agent of such insurer with respect to any insurance policies of any Debtor or its Subsidiaries of cancellation or termination of such policies, other than such notices which are received in the ordinary course of business or for policies that have expired on their terms.

Section 4.27   <u>Exemption from Registration</u>.   Assuming the accuracy of the representations made by the Commitment Parties in <u>Article V</u>, the offer, issuance, sale and/or distribution (as applicable) of the New HB Common Equity will be made in reliance on and in compliance with exemptions from registration under the Securities Act, including, without limitation, Section 1145 of the Bankruptcy Code and Section 4(a)(2) under the Securities Act, as applicable (and in accordance with the descriptions thereof in the Plan and Disclosure Statement).

Section 4.28   <u>Material Contracts</u>.   Other than as a result of the filing of the Chapter 11 Cases or the Restructuring Transactions, and except as set forth on Section 4.28 of the Company Disclosure Schedules, the Material Contracts are valid, binding and enforceable by and against each applicable Debtor and any of their Subsidiaries party thereto and, to the Knowledge of each Debtor, each other party thereto (except where the failure to be valid, binding or enforceable would not constitute a Material Adverse Effect), and, (i) no written notice to terminate, in whole or a material portion thereof, any Material Contract has been delivered to any Debtor or any of their Subsidiaries and (ii) no amendments, modifications, changes or supplements to the terms of the Material Contracts have been made (except where such termination or modification would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect).   Other than as a result of the filing of the Chapter 11 Cases, except as set forth on Section 4.28 of the Company Disclosure Schedules, none of the Debtors or their Subsidiaries nor, to the Knowledge of any Debtor, any other party to any Material Contract, is in material default or breach under the terms thereof, in each case, except for such instances of material default or breach that would not reasonably be expected to have individually, or in the aggregate, a Material Adverse Effect.

Section 4.29   <u>Alternative Transaction Proposal</u>.   As of the date hereof, no Debtor is pursuing, or is in discussions regarding, any Alternative Transaction Proposal.

Section 4.30    U.S. Coastwise Trade.  Each of (x) the Debtors, (y) any Subsidiary which owns any U.S. Vessel or operates any other vessel engaged in the U.S. Coastwise Trade, and (z) any Subsidiary (i) having a direct or indirect ownership interest in any Subsidiary which owns or operates, or will own or operate, any such U.S. Vessel or (ii) which the Debtors rely upon to establish that it is a U.S. Citizen, is a U.S. Citizen.

Section 4.31    Common Equity Owned by Non-U.S. Citizens.  The percentage of Hornblower's common equity owned by Non-U.S. Citizens as of February 21, 2024 is no more than 24% of the total outstanding common equity.

Section 4.32    Transactions with Excluded Subsidiaries.  Other than those made in the ordinary course of business or consistent with past practice and pursuant to the Restructuring Transactions, the Debtors and their Subsidiaries will not engage in any transactions with or make any payments to any Excluded Subsidiaries.

**ARTICLE V**

**REPRESENTATIONS AND WARRANTIES OF THE COMMITMENT PARTIES**

Each Commitment Party, severally (in accordance with its Backstop Commitment Percentage) and not jointly, represents and warrants as to itself only (unless otherwise set forth herein, as of the date of this Agreement and as of the Closing Date) as set forth below.

Section 5.1    Incorporation.  Such Commitment Party is validly existing and in good standing (to the extent such concept exists in the relevant jurisdiction) under the Laws of the jurisdiction of its organization.

Section 5.2    Corporate Power and Authority.  Such Commitment Party has (or will have, at the relevant time) all requisite corporate or other power and authority to enter into, execute, and deliver this Agreement and to effectuate the Restructuring Transactions contemplated by, and perform its respective obligations under, this Agreement.

Section 5.3    Execution and Delivery.   This Agreement and each other Definitive Document to which such Commitment Party is a party (a) has been, or prior to its execution and delivery will be, duly and validly executed and delivered by such Commitment Party and (b) upon entry of the Backstop Order and, as applicable, the Confirmation Order and assuming due and valid execution and delivery hereof and thereof by Hornblower and the other Debtors (as applicable), will constitute valid and legally binding obligations of such Commitment Party, enforceable against such Commitment Party in accordance with their respective terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium and other similar Laws now or hereafter in effect relating to creditors' rights generally and subject to general principles of equity.

Section 5.4    No Registration.  Such Commitment Party understands that (a) the Rights Offering Equity Interests (including the Unsubscribed Equity Interests) and any New HB Common Equity issued to such Commitment Party in satisfaction of the Backstop Commitment Premium have not been registered under the Securities Act by reason of a specific exemption from the registration provisions of the Securities Act, the availability of which depends on,

among other things, the bona fide nature of the investment intent and the accuracy of such Commitment Party's representations as expressed herein or otherwise made pursuant hereto, and (b) the foregoing equity interests cannot be sold unless subsequently registered under the Securities Act or an exemption from registration is available.

Section 5.5     <u>Purchasing Intent</u>.  Such Commitment Party is not acquiring any Rights Offering Equity Interests (including the Unsubscribed Equity Interests) or any New HB Common Equity issuable to such Commitment Party in satisfaction of the Backstop Commitment Premium, with the view to, or for resale in connection with, any distribution thereof not in compliance with applicable securities Laws, and such Commitment Party has no present intention of selling, granting any participation in, or otherwise distributing the same, except in compliance with applicable securities Laws.

Section 5.6     <u>Sophistication; Evaluation</u>.    Such Commitment Party is an institutional "accredited investor" within the meaning of Rule 501(a) of the Securities Act or a "qualified institutional buyer" within the meaning of Rule 144A of the Securities Act. Such Commitment Party understands that the Rights Offering Equity Interests (including the Unsubscribed Equity Interests) are being offered and sold to such Commitment Party in reliance upon specific exemptions from the registration requirements of United States federal and state securities laws and that the Debtors are relying upon the truth and accuracy of, and such Commitment Party's compliance with, the representations, warranties, agreements, acknowledgments and understandings of such Commitment Party set forth herein in order to determine the availability of such exemptions and the eligibility of such Commitment Party to acquire the Rights Offering Equity Interests (including the Unsubscribed Equity Interests).  Such Commitment Party has such knowledge and experience in financial and business matters such that it is capable of evaluating the merits and risks of its investment in the Rights Offering Equity Interests (including the Unsubscribed Equity Interests).  Such Commitment Party understands and is able to bear any economic risks associated with such investment (including the potential necessity of holding such securities for an indefinite period of time).   Except for the representations and warranties of the Debtors expressly set forth in this Agreement or any other Definitive Document, such Commitment Party has independently evaluated the merits and risks of its decision to enter into this Agreement and disclaims reliance on any representations or warranties, either express or implied, by or on behalf of the Debtors (or any of their respective financial and other professional advisors).

Section 5.7     <u>No Conflict</u>.  Assuming that the consents referred to in clauses (a) and (b) of Section 5.8 are obtained, the execution and delivery by such Commitment Party of this Agreement and each other Definitive Document to which such Commitment Party is a party, the compliance by such Commitment Party with all of the provisions hereof and thereof and the consummation of the transactions contemplated herein and therein (a) will not conflict with, or result in breach, modification, termination or violation of, any of the terms or provisions of, or constitute a default under (with or without notice or lapse of time or both), or result in the acceleration of, or the creation of any Lien under, any Contract to which such Commitment Party is party or is bound or to which any of the property or assets or such Commitment Party are subject, (b) will not result in any violation of the provisions of the certificate of incorporation or bylaws (or comparable constituent documents) of such Commitment Party and (c) will not result in any material violation of any Law or Order applicable to such Commitment Party or any of its

36

properties, except in each of the cases described in clauses (a) or (c), for any conflict, breach, modification, termination, violation, default, acceleration or Lien which would not reasonably be expected, individually or in the aggregate, to prohibit or materially and adversely impact such Commitment Party's performance of its obligations under this Agreement.

Section 5.8    Consents and Approvals.   No consent, approval, authorization, Order, registration or qualification of or with any Governmental Authority having jurisdiction over such Commitment Party or any of its properties is required for the execution and delivery by such Commitment Party of this Agreement and each other Definitive Document to which such Commitment Party is a party, the compliance by such Commitment Party with the provisions hereof and thereof and the consummation of the transactions (including the purchase by such Commitment Party of its Backstop Commitment Percentage of the Unsubscribed Equity Interests or the Subscription Equity Interests it is permitted to purchase by exercising its Subscription Rights) contemplated herein and therein, except (a) Antitrust Approvals, if any, including but not limited to any filings required pursuant to the HSR Act, in each case, in connection with the transactions contemplated by this Agreement, and (b) any consent, approval, authorization, Order, registration or qualification which, if not made or obtained, would not reasonably be expected, individually or in the aggregate, to have a material adverse effect on such Commitment Party's performance of its obligations under this Agreement.

Section 5.9    Legal Proceedings.   Other than the Chapter 11 Cases and any adversary proceedings or contested motions commenced in connection therewith, there are no Legal Proceedings pending or, to the Knowledge of such Commitment Party, threatened to which the Commitment Party is a party or to which any property of the Commitment Party is the subject, that would reasonably be expected to prevent, materially delay, or materially impair the ability of such Commitment Party to consummate the transactions contemplated hereby.

Section 5.10    No Broker's Fees.   Such Commitment Party is not a party to any Contract with any Person (other than the Definitive Documents and any Contract giving rise to the Expense Reimbursement hereunder) that would give rise to a valid claim against Hornblower or any Debtor for a brokerage commission, finder's fee or like payment in connection with the Rights Offering or the sale of the Unsubscribed Equity Interests.

Section 5.11    Sufficiency of Funds.   Such Commitment Party has, or will have as of the Closing, sufficient available funds to fulfill its obligations under this Agreement.   For the avoidance of doubt, such Commitment Party acknowledges that its obligations under this Agreement and the other Definitive Documents are not conditioned in any manner upon its obtaining financing.

Section 5.12    Third-Party Reliance.   Notwithstanding anything to the contrary herein, each Commitment Party agrees that the Debtors' financial advisor may rely on the representations made in Section 5.6 hereof.

Section 5.13    HB First Lien Claims.

(a)    From the date hereof until the termination of this Agreement as to the Crestview Commitment Parties, each Crestview Commitment Party agrees that it shall not

37

purchase or otherwise acquire, in whole or in part, any right, title, interests or participations in any HB First Lien Claims, whether directly or indirectly, other than those specified on its respective signature pages to the RSA.

(b)   As of December 31, 2023, the Commitment Parties held or beneficially owned (including pursuant to unsettled trades or participations) the aggregate amounts of HB First Lien Claims as set forth on their respective signature pages to the RSA.

## ARTICLE VI

## ADDITIONAL COVENANTS

Section 6.1   <u>Approval Orders</u>.  The Debtors shall, consistent with the RSA and the Plan, use their commercially reasonable efforts to (a) obtain the entry of the Backstop Order and (b) cause the Backstop Order to become a Final Order (and request that such Order be effective immediately upon entry by the Bankruptcy Court pursuant to a waiver of Bankruptcy Rules 3020 and 6004(h), as applicable), in each case, as soon as reasonably practicable, and in a manner consistent with the RSA and this Agreement. The Debtors shall provide to each of the Commitment Parties and its counsel copies of the proposed motions seeking entry of the Backstop Order and a reasonable opportunity to review and comment on such motions and Order prior to such motions and Order being filed with the Bankruptcy Court, in accordance with Section 3 of the RSA, and such Order shall be in form and substance reasonably satisfactory to the Required Commitment Parties and the Debtors.  Any amendments, modifications, changes or supplements to any of the Backstop Order and Confirmation Order, shall be in form and substance reasonably satisfactory to the Required Commitment Parties.

Section 6.2   <u>Conduct of Business</u>.

(a)   Except as set forth in this Agreement or under the RSA or with the prior written consent of the Required Commitment Parties (requests for which, including related information, shall be directed to counsel and financial advisors to the Commitment Parties), during the period from the date of this Agreement to the earlier of the Closing Date and the date on which this Agreement is terminated in accordance with its terms (the "**Pre-Closing Period**"), (1) each Debtor shall, and shall cause each of its Subsidiaries to,  carry on its business in the ordinary course, consistent with past practice and the RSA (except when the failure to do so would not have a Material Adverse Effect), use its commercially reasonable efforts to: (i) preserve intact its business and (ii) preserve its material relationships with customers, suppliers, licensors, licensees, distributors and others having material business dealings with the Debtors or their Subsidiaries in connection with their business; and (2) the Debtors shall not, and shall not permit any of their Subsidiaries to, enter into any transaction that is material to their business other than: (A) transactions in the ordinary course of business; (B) other transactions after prior notice to the Commitment Parties and consent by the Required Commitment Parties to implement Tax planning (such consent not to be unreasonably withheld, conditioned, or delayed), and (C) transactions expressly contemplated by the RSA or the Definitive Documents.

(b)   For the avoidance of doubt, the following shall be deemed to occur outside of the ordinary course of business of the Debtors and shall require the prior written consent of

the Required Commitment Parties to the extent not contemplated by the RSA or the Definitive Documents: (1) any material amendment, material modification, termination, material waiver, material supplement, material restatement or other material change to any Material Contract (other than any Material Contracts that are otherwise addressed by <u>clause (3)</u> below); (2) entry into, or any amendment, modification, termination (other than for cause), waiver, supplement or other change to, any employment agreement of their senior officers to which any Debtor or its respective Subsidiaries is a party or any assumption of any such employment agreement in connection with the Chapter 11 Case; (3) the adoption or material amendment of any management incentive or equity plan by any Debtor; or (4) the sale of any Material Vessel listed on <u>Schedule 4</u>. Except as otherwise expressly provided in this Agreement, nothing in this Agreement shall give the Commitment Parties, directly or indirectly, any right to control or direct the operations of the Debtors. Prior to the Closing Date, the Debtors shall exercise, consistent with the terms and conditions of this Agreement and the RSA, complete control and supervision of the business of the Debtors.

(c)     Notwithstanding anything to the contrary in <u>Sections 4.16</u>, <u>6.2(a)</u> and <u>(b)</u>, <u>6.12 (a)</u>, <u>(b)</u>, and <u>(d)</u>, or <u>8.1(s)(iii)</u>, the Debtors may (i) lay up (whether or warm or cold stacked) any of its Vessels or other vessels that it operates; (ii) reactivate such Vessels or vessels consistent with ordinary business practices generally followed in the industry under current market conditions; or (iii) take any actions contemplated under the AQV Bidding Procedures Order and the AQV Sale Order.

Section 6.3     <u>Commitments of the Debtors and the Commitment Parties</u>.

During the Pre-Closing Period, each (a) of the Debtors, with respect to subsections (a) - (f) of this <u>Section 6.3</u>, agrees to, and (b) Commitment Party, severally and not jointly with respect to subsection (a) of this <u>Section 6.3</u>, agrees to:

(a)     comply with its obligations under the RSA;

(b)     timely file a formal objection to any motion, application, or pleading filed with the Bankruptcy Court seeking the entry of an order for relief that: (i) is materially inconsistent with the RSA, this Agreement, or any other Definitive Document; or (ii) would, or would be reasonably expected to, frustrate the purposes of the RSA, this Agreement, or any other Definitive Document, including by preventing the consummation of the Restructuring Transactions;

(c)     oppose any motion, application, adversary proceeding, or cause of action filed with the Bankruptcy Court by any party seeking the entry of an order (i) directing the appointment of a trustee or examiner (with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code); (ii) converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code; (iii) dismissing the Chapter 11 Cases; or (iv) modifying or terminating the Debtors' exclusive right to file and/or solicit acceptances of a plan of reorganization, as applicable;

(d)     oppose any objections filed with the Bankruptcy Court to this Agreement, the Plan, any other Definitive Document, or the Restructuring Transactions;

(e)      inform counsel to the Initial Commitment Parties in writing within two (2) Business Days after becoming aware of the occurrence, or failure to occur, of any event of which the Debtors have actual knowledge and which such occurrence or failure would likely cause (i) any representation made by any Debtor under this Agreement to be untrue or inaccurate in any material respect; (ii) any covenant of the Debtors under this Agreement not to be satisfied in any material respect; (iii) any condition precedent under this Agreement related to the obligations of the Debtors not to occur or become impossible to satisfy; or (iv) any other matter or circumstance, that they know or believe is likely, to be a material impediment to the implementation or consummation of the Restructuring Transactions; and

(f)      upon reasonable request of any Commitment Party, promptly inform counsel to such party of: (i) the status and progress of the Restructuring Transactions contemplated by this Agreement, including progress in relation to the negotiations of the Definitive Documents; and (ii) the status of obtaining any necessary authorizations (including any consents) from each Commitment Party, any competent judicial body, governmental authority, banking, taxation, supervisory, regulatory body, or any stock exchange.

Section 6.4      <u>Additional Commitments of the Debtors and the Commitment Parties</u>.  During the Pre-Closing Period, each (a) of the Debtors, with respect to subsections (a) - (j) of this <u>Section 6.4</u>, shall not directly or indirectly, and (b) Commitment Party, severally and not jointly with respect to subsections (a) - (e) of this <u>Section 6.4</u>, shall not directly or indirectly:

(a)      without the reasonable consent of the Parties, object to, delay, impede, or take any other action or inaction that is reasonably avoidable and would interfere with, delay, or impede in each case, in any material respect the acceptance, implementation, or consummation of this Agreement, the Plan or the Restructuring Transactions;

(b)      take any action or inaction that is inconsistent in any material respect with, or is intended or could reasonably be expected to frustrate or impede approval, implementation, and consummation of the Restructuring Transactions, the RSA, the Plan, or this Agreement;

(c)      file any motion or pleading, with the Bankruptcy Court or any other court (including any modifications or amendments thereof) that, in whole or in part, is inconsistent in any material respect with this Agreement, the RSA, the Plan, or the Restructuring Transactions;

(d)      execute or file any Definitive Document with the Bankruptcy Court (including any modifications or amendments thereto) that, in whole or in part, is inconsistent in any material respect with this Agreement, the RSA, the Plan, or the Restructuring Transactions;

(e)      take any other action or inaction in contravention of the RSA, this Agreement, or any other Definitive Document, or to the material detriment of the Restructuring Transactions;

(f)      without the consent of the Required Commitment Parties, transfer any material asset or right of any Debtor or any material asset or right used in the business of the Debtors to any Person outside the ordinary course of business other than pursuant to the Restructuring Transactions;

(g)      without the consent of the Required Commitment Parties, engage in any merger, consolidation, material disposition, material acquisition, material investment, dividend, incurrence of indebtedness for borrowed money, or other similar transaction outside of the ordinary course of business other than pursuant to the Restructuring Transactions; or

(h)      without the consent of the Required Commitment Parties, become a party to, establish, adopt, amend, or terminate any collective bargaining agreement or other agreement with a labor union, works council, or similar organization, except for the collective bargaining agreement to be entered into by Alcatraz Cruises, LLC.

Section 6.5      No Integration; No General Solicitation.  Neither the Debtors nor any of their affiliates (as defined in Rule 501(b) of Regulation D promulgated under the Securities Act) will, directly or through any agent, sell, offer for sale, solicit offers to buy or otherwise negotiate in respect of, any security (as defined in the Securities Act) that is or will be integrated with the sale of the New HB Common Equity in a manner that would require registration of any securities to be issued by Reorganized Hornblower on the Effective Date under the Securities Act. No Debtor or any of its affiliates or any other Person acting on its or its behalf will solicit offers for, or offer or sell, any securities by means of any form of general solicitation or general advertising within the meaning of Rule 502(c) of Regulation D promulgated under the Securities Act or in any manner involving any public offering within the meaning of Section 4(a)(2) of the Securities Act.

Section 6.6      Use of Proceeds.  The Debtors will apply the proceeds from the exercise of the Subscription Rights and the sale of the Unsubscribed Equity Interests for the purposes identified in the Plan and the Confirmation Order.

Section 6.7      Legends.

Each certificate evidencing Unsubscribed Equity Interests (and any other securities issued pursuant to Section 4(a)(2) of the Securities Act or Regulation D promulgated under the Securities Act) shall be stamped or otherwise imprinted with a legend (the "**Securities Law Legend**"), customary for similar securities issued pursuant to an exemption from registration under the Securities Act, in substantially the following form:

"THE SECURITIES REPRESENTED BY THIS CERTIFICATE WERE ORIGINALLY ISSUED ON [DATE OF ISSUANCE], HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR ANY OTHER APPLICABLE STATE SECURITIES LAWS, AND MAY NOT BE SOLD OR TRANSFERRED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR AN AVAILABLE EXEMPTION FROM REGISTRATION THEREUNDER."

In the event that any New HB Common Equity is uncertificated, such New Common  Equity shall be subject to restrictive notations substantially similar to the Securities Law Legend in the stock ledger, the books and records of the transfer agent (referred to herein as the "stock register") or other appropriate records maintained by the Debtors or their agents and the term "Securities Law Legend" shall include such restrictive notations.

The Debtors shall remove the Securities Law Legend (or restrictive notations, as applicable) set forth above from the certificates evidencing any such New HB Common Equity (or the stock ledger or other appropriate records, as applicable), at any time after the restrictions described in such Securities Law Legend ceases to be applicable, including when such equity interests may be sold under Rule 144 of the Securities Act without volume or manner of sale restrictions or current public information requirements. the Debtors may reasonably request such opinions, certificates or other evidence that such restrictions or conditions no longer apply as a condition to removing the Securities Law Legend.

Section 6.8    Antitrust Approval.

(a)    Each Party agrees to use its reasonable best efforts to (i) if applicable, file, or cause to be filed, the Notification and Report Form pursuant to the HSR Act with respect to the transactions contemplated by this Agreement with the Antitrust Division of the United States Department of Justice and the United States Federal Trade Commission and any filings (or, if required by any Antitrust Authority, any drafts thereof) under any other Antitrust Laws that are necessary to consummate and make effective the transactions contemplated by this Agreement as soon as reasonably practicable (and with respect to any filings required pursuant to the HSR Act, no later than fifteen (15) Business Days following the later of (x) the date hereof or (y) a date reasonably determined by the Required Commitment Parties (not to be later than twenty-five (25) Business Days following the date hereof)) and (ii) promptly furnish documents or information reasonably requested by any Antitrust Authority and supplying to any Governmental Authority as promptly as practicable any additional information or documents that may be requested pursuant to any Law or by such Governmental Unit and take, or cause to take, all other actions to do, or cause to be done, all other things necessary, proper or advisable to consummate and make effective the transactions contemplated by this Agreement. The Debtors agree to pay all fees of a Governmental Authority incurred by any Party in connection with the filings and other actions contemplated by this Section 6.8.

(b)    Each Commitment Party, including its Affiliates, and its Subsidiaries, agrees to use reasonable best efforts to take, or cause to be taken, any steps and to make, or cause to be made, any and all undertakings necessary to resolve such objections, if any, that a Governmental Authority or Antitrust Authority may assert under any Antitrust Law with respect to any transaction contemplated by this Agreement, the Plan or the other Definitive Documents, and to avoid or eliminate each and every impediment under any Antitrust Law that may be asserted by any Governmental Authority or Antitrust Authority with respect to any transaction contemplated by this Agreement, the Plan or the other Definitive Documents, in each case, so as to enable the Closing to occur as promptly as practicable, including, without limitation, (x) proposing, negotiating, committing to and effecting, by consent decree, hold separate order, or otherwise, the sale, divestiture or disposition of any businesses, assets, equity interests, product lines or properties of any Commitment Party (including its Affiliates, and its Subsidiaries), or any equity interest in any joint venture held any by any Commitment Party (including its Affiliates, and its Subsidiaries), (y) creating, terminating, or divesting relationships, ventures, contractual rights or obligations of any Commitment Party (including its Affiliates, and its Subsidiaries), and (z) otherwise taking or committing to take any action that would limit any Commitment Party's (including its Affiliates', and its Subsidiaries') freedom of action with respect to, or its ability to retain or hold, directly or indirectly, any businesses, assets, equity

interests, product lines or properties of any Commitment Party (including its Affiliates, and its Subsidiaries) or any equity interest in any joint venture held by any Commitment Party (including its Affiliates, and its Subsidiaries), in each case as may be required in order to obtain all approvals, consents, clearances, expirations or terminations of waiting periods, registrations, permits, authorizations and other confirmations required directly or indirectly under any Antitrust Law or to avoid the commencement of any action to prohibit any transaction contemplated by this Agreement, the Plan or the other Definitive Documents under any Antitrust Law, or, in the alternative, to avoid the entry of, or to effect the dissolution of, any injunction, temporary restraining order or other order in any action or proceeding seeking to prohibit any transaction contemplated by this Agreement, the Plan or the other Definitive Documents or delay the Closing.

(c)     The Debtors and each Commitment Party subject to an obligation pursuant to the Antitrust Laws, if applicable, to notify any transaction contemplated by this Agreement, the Plan or the other Definitive Documents that has notified the Debtors in writing of such obligation (each such Commitment Party, a "**Filing Party**") agree to reasonably cooperate with each other as to the appropriate time of filing such notification and its content. Where applicable in connection with this Agreement, the Debtors and each Filing Party shall, to the extent permitted by applicable Law: (A) promptly notify each other of, and if in writing, furnish each other with copies of (or, in the case of material oral communications, advise each other orally of) any communications from or with an Antitrust Authority; (B) not participate in any meeting with an Antitrust Authority unless it consults with each other Filing Party and the Debtors, as applicable, in advance and, to the extent permitted by the Antitrust Authority and applicable Law, give each other Filing Party and the Debtors, as applicable, a reasonable opportunity to attend and participate thereat; (C) furnish each other Filing Party and the Debtors, as applicable, with copies of all correspondence and communications between such Filing Party or the Debtors and the Antitrust Authority; (D) furnish each other Filing Party with such necessary information and reasonable assistance as may be reasonably necessary in connection with the preparation of necessary filings or submission of information to the Antitrust Authority; and (E) not withdraw its filing, if any, under the HSR Act without the prior written consent of the Required Commitment Parties and the Debtors.  Any such disclosures, rights to participate or provisions of information by one party to the other parties may be made on a counsel-only basis to the extent required under applicable Law or as appropriate to protect confidential business information, and any materials provided pursuant to this <u>Section 6.9</u> may be redacted (i) to remove references concerning valuation; (ii) to the extent necessary to comply with contractual arrangements; and (iii) to the extent necessary to address reasonable privilege and confidentiality concerns.

(d)     Should a Filing Party be subject to an obligation under the Antitrust Laws to jointly notify with one or more other Filing Parties (each, a "**Joint Filing Party**") any transaction contemplated by this Agreement, the Plan or the other Definitive Documents, such Joint Filing Party shall promptly notify each other Joint Filing Party of, and if in writing, furnish each other Joint Filing Party with copies of (or, in the case of material oral communications, advise each other Joint Filing Party orally of) any communications from or with an Antitrust Authority.

(e)     The Debtors and each Filing Party (including its Affiliates, and its Subsidiaries) shall use their reasonable best efforts to obtain all authorizations, approvals,

consents, or clearances under any applicable Antitrust Laws or to cause the termination or expiration of all applicable waiting periods under any Antitrust Laws in connection with the transactions contemplated by this Agreement at the earliest possible date after the date of filing. The communications contemplated by this <u>Section 6.8</u> may be made by the Debtors or a Filing Party on an outside counsel-only basis or subject to other agreed upon confidentiality safeguards.

Section 6.9    <u>Rights Offering</u>.  The Debtors shall effectuate the Rights Offering in accordance with the Plan and the Rights Offering Procedures in all material respects.

Section 6.10    <u>Access to Information; Confidentiality; Cleansing Materials</u>.

(a)    Subject to <u>Section 6.10(b)</u> and <u>Section 6.10(c)</u>, upon reasonable notice during the Pre-Closing Period, the Debtors shall (and shall cause their Subsidiaries to) (i) afford the SVP Commitment Parties and their Representatives, reasonably promptly upon their written request, reasonable access, during normal business hours and without unreasonable disruption or interference with the Debtors' and their Subsidiaries' business or operations, to the Debtors' and their Subsidiaries' executives, properties, books, Contracts and records and, (ii) furnish reasonably promptly to the SVP Commitment Parties and their Representatives all reasonably relevant information concerning the Debtors' and their Subsidiaries' business, properties and executives as may reasonably be requested by any such party, <u>provided</u> that the foregoing shall not require the Debtors (a) to permit any inspection, or to disclose any information, that in the reasonable judgment of the Debtors will cause the Debtors or any of their Subsidiaries to violate any of their respective obligations with respect to confidentiality to a third party if any Debtor, as applicable, shall have used commercially reasonable efforts to obtain, but failed to obtain, the consent of such third party to such inspection or disclosure; (b) to disclose any legally or otherwise privileged information of the Debtors or any of their Subsidiaries; or (c) to violate any applicable Laws or Orders.  All requests for information and access made in accordance with this <u>Section 6.10</u> shall be directed to Paul, Weiss, Rifkind, Wharton & Garrison LLP, as counsel for the Debtors, or such other Person as may be designated in writing by the Debtors' executive officers.

(b)    From and after the date hereof until the date that is one (1) year after the expiration of the Pre-Closing Period, each SVP Commitment Party shall, and shall cause its Representatives to, (i) keep confidential and not provide or disclose to any Person any documents or information received or otherwise obtained by such SVP Commitment Party or its Representatives pursuant to or in connection with this Agreement (including pursuant to Section 6.10(a) or in connection with a request for approval pursuant to Section 6.2), except that provision or disclosure of such documents or information may be made to any Representative of such SVP Commitment Party who (x) has been advised by such SVP Commitment Party of the existence of this agreement and are bound by an obligation of confidentiality with respect to the confidential information received and (y) needs to know such information for the purposes of this Agreement or the other Transaction Agreements and (z) who agrees to observe the terms of this Section 6.10(b), and (ii) not use such documents or information for any purpose other than in connection with this Agreement or the other Definitive Documents or the transactions contemplated hereby or thereby.  Notwithstanding the foregoing, the immediately preceding sentence shall not apply in respect of documents or information that (1) is now or subsequently becomes generally available to the public through no violation or breach of this Agreement by a

44

SVP Commitment Party or its Representatives; (2) becomes available to a SVP Commitment Party or its Representatives on a non-confidential basis from a source other than the Debtors or any of their Subsidiaries or any of their respective Representatives, which is not, to the actual knowledge of such SVP Commitment Party or Representative, after reasonable inquiry, subject to any legally binding obligation to keep such information confidential; (3) becomes available to a SVP Commitment Party or its Representatives through document production or discovery in connection with the Chapter 11 Cases or other judicial or administrative process, but subject to any confidentiality restrictions imposed by the Chapter 11 Cases or other such document production or discovery process; or (4) such SVP Commitment Party or any Representative thereof is required to disclose, based on the opinion of counsel, pursuant to applicable judicial, administrative or regulatory process (including, but not limited to, by court order, deposition, interrogatory, request for documents, subpoena, inspection, audit, civil investigative demand, legal, regulatory, or similar formal or informal process) or pursuant to applicable law or applicable securities exchange rules; provided, that, such SVP Commitment Party or such Representative shall provide the Debtors with prompt written notice of such legal compulsion and use reasonable best efforts to cooperate with the Debtors to obtain a protective order or similar remedy to cause such information or documents not to be disclosed, including interposing all available objections thereto, at the Debtors' sole cost and expense; provided, however, that notwithstanding the foregoing, no such notice shall be required in the case of a routine supervisory examination or routine audit by a banking, governmental, or other financial regulatory or self-regulatory authority not specifically related to the Debtors, the transaction or the information provided hereunder; provided, further, that in the event that no such protective order or other similar remedy is obtained, the disclosing party shall furnish only that portion of such information or documents that is legally required to be disclosed and shall exercise its reasonable best efforts (at the Debtors' sole cost and expense) to obtain assurance that confidential treatment will be accorded such disclosed information or documents.

(c)     For the avoidance of doubt, nothing herein shall alter or modify any Commitment Party's confidentiality obligations under any other agreement with any Debtor.

Section 6.11   <u>U.S. Coastwise Trade</u>. Each of (x) the Debtors, (y) any Subsidiary which owns or operates, or will own or operate, any U.S. Vessel engaged in the U.S. Coastwise Trade, and (z) any Subsidiary (i) having a direct or indirect ownership interest in any Subsidiary which owns or operates, or will own or operate, any such U.S. Vessel, or (ii) which the Debtors rely upon to establish that it is a U.S. Citizen, is a U.S. Citizen.

Section 6.12   <u>Vessel Operation and Registration</u>.

(a)     Subject to <u>Section 6.2(c)</u> hereof, the Debtors and their Subsidiaries will: (i) maintain the coastwise endorsement of each U.S. Vessel (A) bareboat chartered by it and (B) owned by it and documented in its name under the laws and flag of the United States with a coastwise endorsement, and not do, omit to do or allow to be done anything as a result of which such coastwise endorsement, and documentation, if owned by it, might be cancelled or imperiled; (ii) maintain each other Vessel owned by it registered under such other laws and flag under which they are registered on the date hereof, and not do, omit to do or allow to be done anything as a result of which such registration might be cancelled or imperiled; and (iii) not change the name of any Vessel owned by it.

(b)      Subject to <u>Section 6.2(c)</u> hereof, the Debtors and their Subsidiaries shall keep each Vessel owned by it in a good and safe condition and state of repair in all material respects: (i) consistent with standards generally followed in the industry (ordinary wear and tear excepted); (ii) so as to maintain its current class, if any, with the applicable Classification Society free of all outstanding conditions and recommendations affecting its class except for any such conditions or recommendations that, with approval of the applicable Classification Society, will be remedied at such Vessel's next scheduled survey, and are in fact so remedied; (iii) so as to comply with all Laws applicable to such Vessel under its current flag and registry, or to a vessel trading in any jurisdiction to which such Vessel may trade from time to time, including but not limited to the ISM Code and the ISPS Code, if applicable; and (iv) with all Operating Certificates required for the operation of such Vessel in full force and effect.

(c)      None of the Debtors nor any Subsidiary will cause or permit any Vessel (or any other vessel it owns or operates) to be operated in any manner contrary to Law or engage in any unlawful trade or violate any Law or carry any cargo that will expose any such Vessel or vessel to penalty, confiscation, forfeiture, capture or condemnation that would, in each case, result in a Material Adverse Effect.

(d)      Subject to <u>Section 6.2(c)</u> hereof, except as may be required by applicable Law or the applicable Classification Society, none of the Debtors nor any Subsidiary shall make any modification or repairs to, or replacement of, any Vessel owned by it or equipment installed on any such Vessel as of the date hereof which would materially alter the structure or type of such Vessel or materially reduce its value, or shall remove any material part of a Vessel, or any item of equipment installed on a Vessel, unless the part or item so removed is no longer useful, necessary, profitable or advantageous in the operation of such Vessel or is forthwith replaced by a suitable part or item which is in the same condition as or better condition than the part or item removed, is free from any liens (other than Permitted Liens) in favor of any Person and becomes on installation on that Vessel the property of the Vessel owner or is equipment that can be removed without any risk of damage to the Vessel.

Section 6.13   <u>Milestones</u>   The Debtors shall complete the Restructuring Transactions in accordance with the deadlines specified below, which deadlines in all cases may be extended by written agreement (with email being sufficient) of the Required Commitment Parties (collectively, the "**Milestones**"):

(a)      commence the Chapter 11 Cases on or before February 21, 2024 (the "**Petition Date**");

(b)      no later than one (1) day after the Petition Date, file the DIP Motion and AQV Sale Motion;

(c)      obtain entry by the Bankruptcy Court of the Interim DIP Order no later than three (3) Business Days after the Petition Date;

(d)      obtain entry of the Interim DIP Recognition Order by the CCAA Court no later than ten (10) calendar days after the entry of the Interim DIP Order;

46

(e)     obtain entry by the Bankruptcy Court of the AQV Bidding Procedures Order as soon as reasonably practicable but in no event later than fifteen (15) calendar days after the Petition Date;

(f)     no later than twenty-one (21) calendar days after the Petition Date, file the Plan, Disclosure Statement, Disclosure Statement Motion and Backstop Motion;

(g)     obtain entry by the Bankruptcy Court of the Final DIP Order and the AQV Sale Order as soon as reasonably practicable but in no event later than forty-five (45) calendar days after the Petition Date;

(h)     obtain entry of the Final DIP Recognition Order by the CCAA Court as soon as reasonably practicable but in no event no later than ten (10) calendar days after the entry of the Final DIP Order;

(i)     obtain entry by the Bankruptcy Court of the Disclosure Statement Order and the Backstop Order no later than sixty (60) calendar days after the Petition Date;

(j)     obtain entry by the Bankruptcy Court of the Confirmation Order no later than one-hundred-twenty (120) calendar days after the Petition Date;

(k)     obtain entry of the Confirmation Recognition Order by the CCAA Court no later than ten (10) calendar days after the entry of the Confirmation Order; and

(l)     cause the Plan Effective Date to occur no later than one-hundred-forty (140) days after the Petition Date; *provided* that this Milestone may be extended by the Debtors up to thirty (30) days if the purpose of such extension is solely to obtain regulatory approvals.

## ARTICLE VII

## ADDITIONAL PROVISIONS REGARDING FIDUCIARY OBLIGATIONS

Section 7.1     Fiduciary Out. Notwithstanding anything to the contrary in this Agreement, nothing in this Agreement shall require any Debtor or the board of directors, board of managers, or similar governing body of any Debtor (the aforementioned parties collectively as to the Debtors, "**Fiduciaries**"), in each case, acting in their capacity as such, to take any action or to refrain from taking any action to the extent such Fiduciary determines, after consulting with counsel, that taking or failing to take such action would be inconsistent with applicable Law or its fiduciary obligations under applicable Law; *provided* that counsel to the Debtors shall give notice not later than one (1) Business Day following such determination (with email being sufficient) (a "**Fiduciary Out Notice**"), to counsel to the Initial Commitment Parties following a determination made in accordance with this Section 7.1 to take or not take action, in each case in a manner that would result in a breach of this Agreement. This Section 7.1 shall not be deemed to amend, supplement or otherwise modify, or constitute a waiver of any Party's rights to terminate this Agreement pursuant to Article X or Section 7.1 of this Agreement that may arise as a result of any such action or inaction.

Section 7.2    Alternative Transactions. Notwithstanding anything to the contrary in this Agreement (but subject to Section 7.1 herein), from the date of this Agreement until the Closing Date, each Debtor and its directors, officers, employees, investment bankers, attorneys, accountants, consultants, and other advisors or representatives shall have the right to:  (a) consider, respond to, and facilitate access to information in response to unsolicited Alternative Transaction Proposals; (b) provide access to non-public information concerning any Debtor to any Entity that (i) provides an unsolicited Alternative Transaction Proposal, (ii) executes and delivers a Confidentiality Agreement (which Confidentiality Agreement shall permit the Debtors to share any Alternative Transaction Proposals, the status of any discussions, and the identity of any counterparty with the Initial Commitment Parties), and (iii) requests such information; (c) maintain or continue existing discussions with respect to, or otherwise cooperate with, any inquiries or any proposals regarding an unsolicited Alternative Transaction Proposal; and (d) enter into or continue discussions or negotiations with holders of any Debtor Claim/Interest (including any Initial Commitment Parties), any other party in interest, or any other Entity regarding the Restructuring Transactions or unsolicited Alternative Transaction Proposals; *provided*, that the Debtors shall (w) if any Debtor receives an Alternative Transaction Proposal, provide copies of any such written Alternative Transaction Proposal or a summary of any such oral Alternative Transaction Proposal received by the Debtors to the Initial Commitment Parties Advisors no later than three (3) Business Day following receipt thereof by any of the Debtors, (x) provide prompt updates on the status of discussions regarding any Alternative Transaction Proposal, and (y) promptly provide such information as reasonably requested by the Initial Commitment Parties Advisors in connection with any Alternative Transaction Proposal, including any information provided to any party considering proposing an Alternative Transaction Proposal.  The Debtors (whether directly, or as appropriate, through the Debtors' advisors) will make themselves reasonably available for separate weekly status update calls with the Initial Commitment Parties or their advisors with respect to the foregoing; *provided*, that, for the avoidance of doubt, nothing herein shall or shall be construed to create any obligation on any of the Debtors' advisors to disclose any information or otherwise take or refrain from taking any action, absent an express contractual requirement to do so under their respective engagement agreements with the Debtors.

## ARTICLE VIII

## CONDITIONS TO THE OBLIGATIONS OF THE PARTIES

Section 8.1    Conditions to the Obligations of the Commitment Parties. The obligations of each Commitment Party to consummate the transactions contemplated hereby shall be subject to (unless waived by the Required Commitment Parties) the satisfaction of the following conditions prior to or at the Closing:

(a)    Orders. The Bankruptcy Court shall have entered the Backstop Order, Disclosure Statement Order, and Confirmation Order, in each case, in form and substance reasonably acceptable to the Required Commitment Parties and consistent in all material respects with the RSA and the Definitive Documents; each such Order shall be in full force and effect, and not subject to a stay.

(b)    <u>Plan</u>. Each Debtor shall have complied, in all material respects, with the terms of the Plan that are to be performed by each Debtor on or prior to the Effective Date and the conditions to the occurrence of the Effective Date (other than any conditions relating to the occurrence of the Closing) set forth in the Plan shall have been satisfied or, with the prior consent of the Required Commitment Parties, waived in accordance with the terms of the Plan.

(c)    <u>Rights Offering</u>. The Rights Offering shall have been conducted, in all respects, in accordance with the Backstop Order, the Rights Offering Procedures and this Agreement, and the Rights Offering Expiration Time shall have occurred.

(d)    <u>Effective Date</u>. The Effective Date shall have occurred or shall be deemed to have occurred concurrently with the Closing, in accordance with the terms and conditions in the Plan and in the Confirmation Order.

(e)    <u>New HB Organizational Documents</u>. The New HB Organizational Documents, in the form and substance reasonably acceptable to the Debtors and the Required Commitment Parties, shall have been duly approved and adopted and shall be in full force and effect.

(f)    <u>Expense Reimbursement</u>. The Debtors shall have paid (or such amounts shall be paid concurrently with the Closing) all Expense Reimbursement invoiced through the Closing Date pursuant to <u>Section 3.3</u>.

(g)    <u>Consents</u>. All governmental and third-party notifications, filings, consents, waivers and approvals required for the consummation of the transactions contemplated by this Agreement and the Plan shall have been made or received.

(h)    <u>Antitrust Approvals</u>. All waiting periods imposed by any Governmental Authority or Antitrust Authority in connection with the transactions contemplated by this Agreement shall have terminated or expired and all authorizations, approvals, consents or clearances under the Antitrust Laws in connection with the transactions contemplated by this Agreement shall have been obtained.

(i)    <u>No Legal Impediment to Issuance</u>. No Law or Order shall have been enacted, adopted or issued by any Governmental Unit (including in any jurisdiction where any Vessel of the Debtors or any of their Subsidiaries is flagged that prohibits the implementation of the Plan or the transactions contemplated by this Agreement.

(j)    <u>Representations and Warranties</u>.

(i)    The representations and warranties of the Debtors contained in <u>Sections 4.1</u>, <u>4.2</u>, <u>4.3</u>, <u>4.4</u>, <u>4.6</u>, <u>4.10</u> and <u>4.25</u> shall be true and correct in all respects on and as of the Closing Date after giving effect to the Plan with the same effect as if made on and as of the Closing Date after giving effect to the Plan (except for such representations and warranties made as of a specified date, which shall be true and correct only as of the specified date).

49

(ii)      The representations and warranties of the Debtors contained in Sections 4.11, 4.16, 4.20, 4.21 and 4.22 shall be true and correct in all material respects on and as of the Closing Date, or will be true and correct in all material respects on and as of the Closing Date with the same effect as if made on and as of the Closing Date after giving effect to the Plan (except for such representations and warranties made as of a specified date, which shall be true and correct in all material respects only as of the specified date).

(iii)      The representations and warranties of the Debtors contained in this Agreement other than those referred to in clauses (i) and (ii) above shall be true and correct (disregarding all materiality or Material Adverse Effect qualifiers) on and as of the Closing Date after giving effect to the Plan with the same effect as if made on and as of the Closing Date or will be true and correct in all material respects on and as of the Closing Date (except for such representations and warranties made as of a specified date, which shall be true and correct only as of the specified date), except where the failure to be so true and correct does not constitute, individually or in the aggregate, a Material Adverse Effect.

(k)      Covenants. The Debtors shall have performed and complied, in all material respects, with all of their respective covenants and agreements contained in this Agreement that contemplate, by their terms, performance or compliance prior to the Closing Date.

(l)      Material Adverse Effect. Since the date of this Agreement, except for the Chapter 11 Cases and any adversary proceedings or contested motions in connection therewith, there shall not have occurred, and there shall not exist, any event, development, occurrence or change that constitutes, individually or in the aggregate, a Material Adverse Effect.

(m)      Officer's Certificate. The Commitment Parties shall have received on and as of the Closing Date a certificate of the chief executive officer or chief financial officer of Hornblower confirming that the conditions set forth in Sections 8.1(j), (k), and (l) have been satisfied.

(n)      RSA. The RSA shall not have been terminated in accordance with its terms and shall remain in full force and effect.

(o)      Backstop Commitment Premium. The Debtors shall have paid (or such amounts shall be paid concurrently with the Closing) to each Commitment Party the applicable Backstop Commitment Premium as set forth in Section 3.2.

(p)      Funding Notice. The Commitment Parties shall have received the Funding Notice in accordance with the terms of this Agreement.

(q)      Exit Credit Agreement. The Exit Credit Agreement shall have been entered into by the parties there to and be in effect.

(r)      Vessels. Within five (5) Business Days prior to the Closing Date, the Debtors will provide a complete and accurate list of all Vessels owned or bareboat chartered by

50

the Debtors and their Subsidiaries as of a date not more than three (3) Business Days prior to the date of delivery of such list, certifying that, in all material respects:

(i)     Each owned U.S. Vessel included on such list is duly documented in the name of one of the Debtors under the U.S. flag with a coastwise endorsement and each such other U.S. Vessel which is bareboat chartered by the Debtors and their Subsidiaries is registered under the U.S. flag with a coastwise endorsement.

(ii)    Each other Vessel included on such list is duly registered under the laws and flag of the jurisdiction indicated.

(iii)   Each Vessel included on such list is classed, if applicable, with the Classification Society indicated and is in class as set forth in <u>Section 6.12(b)</u>, subject to the proviso therein with respect to laid-up (whether warm or cold stacked) Vessels.

(s)     <u>Vessel-Related Documents</u>.

(i)     The Debtors shall have delivered to the Commitment Parties in respect of each Vessel, each dated not more than thirty (30) days prior to the Closing Date (x) an abstract of title (or its equivalent) from the flag state for such Vessel, and (y) a certificate of insurances and/or certificate of entry with respect to such Vessel.

(ii)    The Debtors shall have delivered with respect to each Vessel which is classed with a Classification Society a current class status report (or its equivalent) as maintained by such Vessel's Classification Society.

(iii)   Subject to <u>Section 6.2(c)</u> hereof, the Debtors shall have delivered to the Commitment Parties in respect of (a) each U.S. Vessel owned or operated by any of the Debtors or their Subsidiaries in the U.S. Coastwise Trade, a copy of such vessel's unexpired Certificate of Documentation with a coastwise endorsement (or if expired, a copy of the CG-1280 that has been timely submitted to the National Vessel Documentation Center to obtain a renewed Certificate of Documentation), and (b) for each other Vessel, a copy of such Vessel's most recent Certificate of Registry (or equivalent) issued by such Vessel's flag state.

Section 8.2   <u>Waiver of Conditions to Obligations of Commitment Parties</u>.  All or any of the conditions set forth in <u>Section 8.1</u> may only be waived in whole or in part with respect to all Commitment Parties by a written instrument (with email being sufficient) executed by the Required Commitment Parties in their sole discretion and if so waived, all Commitment Parties shall be bound by such waiver.

Section 8.3   <u>Conditions to the Obligations of the Debtors</u>.  The obligations of the Debtors to consummate the transactions contemplated hereby with any Commitment Party is subject to (unless waived by the Debtors by a written instrument (with email being sufficient)) the satisfaction of each of the following conditions:

(a)     <u>Orders</u>. The Bankruptcy Court shall have entered the Backstop Order, Disclosure Statement Order, and Confirmation Order, in each case, in form and substance

51

reasonably acceptable to the Debtors and consistent in all material respects with the RSA and the Definitive Documents; each such Order shall be in full force and effect, and not subject to a stay.

(b)  <u>Effective Date</u>. The Effective Date shall have occurred, or shall be deemed to have occurred concurrently with the Closing, in accordance with the terms and conditions in the Plan and in the Confirmation Order.

(c)  <u>Rights Offering</u>. The Debtors shall have received the Aggregate Rights Offering Amount in full in cash pursuant to the Rights Offering or this Agreement.

(d)  <u>Antitrust Approvals</u>. All waiting periods imposed by any Governmental Authority or Antitrust Authority in connection with the transactions contemplated by this Agreement shall have terminated or expired and all authorizations, approvals, consents or clearances under the Antitrust Laws in connection with the transactions contemplated by this Agreement shall have been obtained.

(e)  <u>No Legal Impediment to Issuance</u>. No Law or Order shall have been enacted, adopted or issued by any Governmental Unit that prohibits the implementation of the Plan or the transactions contemplated by this Agreement.

(f)  <u>Representations and Warranties</u>. The representations and warranties of the Commitment Parties contained in this Agreement shall be true and correct in all material respects on and as of the Closing Date with the same effect as if made on and as of the Closing Date (except for such representations and warranties made as of a specified date, which shall be true and correct in all material respects only as of the specified date).

(g)  <u>Consents</u>. All governmental and third-party notifications, filings, consents, waivers and approvals required for the consummation of the transactions contemplated by this Agreement and the Plan shall have been made or received (including any required approval of the Treasury of the Commonwealth of Australia under the FIRB Act).

(h)  <u>Covenants</u>. The Commitment Parties shall have performed and complied, in all material respects, with all of their respective covenants and agreements contained in this Agreement that contemplate, by their terms, performance or compliance prior to the Closing Date.

(i)  <u>RSA</u>. The RSA shall not have been terminated in accordance with its terms and shall remain in full force and effect.

Section 8.4  <u>Bring-Down Confirmation of Common Equity Owned by Non-U.S. Citizens</u>. As close as practicable to the Effective Date, the Debtors shall deliver to the Required Commitment Parties a bring-down certificate setting forth the percentage of Reorganized Hornblower's outstanding common equity owned by Non-U.S. Citizens, in the form set forth in <u>Section 4.30</u>, which may be based on the Debtors' reasonable reliance on additional reports with respect to the analysis of the approximate number of shares of common equity of Reorganized Hornblower owned by Non-U.S. Citizens.

## ARTICLE IX

## INDEMNIFICATION AND CONTRIBUTION

Section 9.1    Indemnification Obligations.  Following the entry of the Backstop Order, but effective as of the date hereof, the Debtors (the "**Indemnifying Parties**," and each, an "**Indemnifying Party**") shall, jointly and severally, indemnify and hold harmless each Commitment Party and its Affiliates, equity holders, members, partners, general partners, managers and its and their respective Representatives and controlling persons (each, an "**Indemnified Person**") from and against any and all losses, claims, damages, liabilities (including Environmental Liabilities) and costs and expenses (other than Taxes of the Commitment Parties except to the extent such Taxes represent losses arising from any non-Tax claim) (collectively, "**Losses**") that any such Indemnified Person may incur or to which any such Indemnified Person may become subject arising out of or in connection with this Agreement, the Plan, and the transactions contemplated hereby and thereby, including the Backstop Commitment, the Rights Offering, the Expense Reimbursement, the payment of the Backstop Commitment Premium or the Termination Premium or the use of the proceeds of the Rights Offering, or any claim, challenge, litigation, investigation or proceeding relating to any of the foregoing, regardless of whether any Indemnified Person is a party thereto, whether or not such proceedings are brought by the Debtors, the Reorganized Debtors, their respective equity holders, Affiliates, creditors or any other Person, and reimburse each Indemnified Person upon demand for reasonable documented out-of-pocket (with such documentation subject to redaction to preserve attorney client and work product privileges) legal or other third-party expenses incurred in connection with investigating, preparing to defend or defending, or providing evidence in or preparing to serve or serving as a witness with respect to, any lawsuit, investigation, claim or other proceeding relating to any of the foregoing (including in connection with the enforcement of the indemnification obligations set forth herein), irrespective of whether or not the transactions contemplated by this Agreement or the Plan are consummated or whether or not this Agreement is terminated; *provided* that the foregoing indemnity will not, as to any Indemnified Person, apply to Losses (a) as to a Defaulting Commitment Party or its Related Parties, or (b) to the extent they are found by a final, non-appealable judgment of a court of competent jurisdiction to arise from the willful misconduct, bad faith or gross negligence of such Indemnified Person. The Indemnified Persons are express third-party beneficiaries of this Article IX.

Section 9.2    Indemnification Procedure.    Promptly after receipt by an Indemnified Person of notice of the commencement of any claim, challenge, litigation, investigation or proceeding (an "**Indemnified Claim**"), such Indemnified Person will, if a claim is to be made hereunder against the Indemnifying Party in respect thereof, notify the Indemnifying Party in writing of the commencement thereof; *provided* that (a) the omission to so notify the Indemnifying Party will not relieve the Indemnifying Party from any liability that it may have hereunder except to the extent it has been materially prejudiced by such failure and (b) the omission to so notify the Indemnifying Party will not relieve the Indemnifying Party from any liability that it may have to such Indemnified Person otherwise than on account of this Agreement. In case any such Indemnified Claims are brought against any Indemnified Person and it notifies the Indemnifying Party of the commencement thereof, the Indemnifying Party will be entitled to participate therein, and, at its election by providing written notice to such Indemnified Person, the Indemnifying Party will be entitled to assume the defense thereof or

participation therein, with counsel reasonably acceptable to such Indemnified Person; *provided*, <u>further</u>, that if the parties (including any impleaded parties) to any such Indemnified Claims include both such Indemnified Person and the Indemnifying Party and based on advice of such Indemnified Person's counsel there are legal defenses available to such Indemnified Person that are different from or additional to those available to the Indemnifying Party, such Indemnified Person shall have the right to select separate counsel to assert such legal defenses and to otherwise participate in the defense of such Indemnified Claims. Upon receipt of notice from the Indemnifying Party to such Indemnified Person of its election to so assume the defense of such Indemnified Claims with counsel reasonably acceptable to the Indemnified Person, the Indemnifying Party shall not be liable to such Indemnified Person for expenses incurred by such Indemnified Person in connection with the defense thereof or participation therein (other than reasonable documented out-of-pocket costs of investigation) unless (i) such Indemnified Person shall have employed separate counsel (in addition to any local counsel) in connection with the assertion of legal defenses in accordance with the proviso to the immediately preceding sentence (it being understood, however, that the Indemnifying Party shall not be liable for the expenses of more than one separate counsel representing the Indemnified Persons who are parties to such Indemnified Claims (in addition to one local counsel in each jurisdiction in which local counsel is required)), (ii) the Indemnifying Party shall not have employed counsel reasonably acceptable to such Indemnified Person to represent such Indemnified Person within a reasonable time after the Indemnifying Party has received notice of commencement of the Indemnified Claims from, or delivered on behalf of, the Indemnified Person, (iii) after the Indemnifying Party assumes the defense of the Indemnified Claims, the Indemnified Person determines in good faith that the Indemnifying Party has failed or is failing to defend such claim and provides written notice of such determination, and such failure is not reasonably cured within six (6) Business Days following receipt of such notice by the Indemnifying Party, or (iv) the Indemnifying Party shall have authorized in writing the employment of counsel for such Indemnified Person.

Section 9.3    <u>Settlement of Indemnified Claims</u>.  The Indemnifying Party shall not be liable for any settlement of any Indemnified Claims effected by such Indemnified Person without the written consent of the Indemnifying Party (which consent shall not be unreasonably withheld, conditioned or delayed). If any settlement of any Indemnified Claims is consummated with the written consent of the Indemnifying Party or if there is a final judgment for the plaintiff in any such Indemnified Claims, the Indemnifying Party agrees to indemnify and hold harmless each Indemnified Person from and against any and all Losses by reason of such settlement or judgment to the extent such Losses are otherwise subject to indemnification by the Indemnifying Party hereunder in accordance with, and subject to the limitations of, this <u>Article IX</u>. Notwithstanding anything in this <u>Article IX</u> to the contrary, if at any time an Indemnified Person shall have requested the Indemnifying Party to reimburse such Indemnified Person for legal or other expenses in connection with investigating, responding to or defending any Indemnified Claims as contemplated by this <u>Article IX</u>, the Indemnifying Party shall be liable for any settlement of any Indemnified Claims effected without its written consent if (a) such settlement is entered into more than ten (10) days after receipt by the Indemnifying Party of such request for reimbursement and (b) the Indemnifying Party shall not have reimbursed such Indemnified Person in accordance with such request prior to the date of such settlement. The Indemnifying Party shall not, without the prior written consent of an Indemnified Person (which consent shall be granted or withheld, conditioned or delayed in the Indemnified Person's sole discretion), effect any settlement of any pending or threatened Indemnified Claims in respect of which

indemnity or contribution has been sought hereunder by such Indemnified Person unless (i) such settlement includes an unconditional release of such Indemnified Person in form and substance reasonably satisfactory to such Indemnified Person from all liability on the claims that are the subject matter of such Indemnified Claims and (ii) such settlement does not include any statement as to or any admission of fault, culpability or a failure to act by or on behalf of any Indemnified Person.

Section 9.4    Contribution.  If for any reason the foregoing indemnification is unavailable to any Indemnified Person or insufficient to hold it harmless from Losses that are subject to indemnification pursuant to Section 9.1, then the Indemnifying Party shall contribute to the amount paid or payable by such Indemnified Person as a result of such Loss in such proportion as is appropriate to reflect not only the relative benefits received by the Indemnifying Party, on the one hand, and such Indemnified Person, on the other hand, but also the relative fault of the Indemnifying Party, on the one hand, and such Indemnified Person, on the other hand, as well as any relevant equitable considerations. It is hereby agreed that the relative benefits to the Indemnifying Party, on the one hand, and all Indemnified Persons, on the other hand, shall be deemed to be in the same proportion as (a) the total value received or proposed to be received by the Debtors pursuant to the issuance and sale of the Rights Offering Equity Interests in the Rights Offering contemplated by this Agreement and the Plan bears to (b) the Backstop Commitment Premium paid or proposed to be paid to the Commitment Parties. Subject to Section 10.4, the Indemnifying Parties also agree that no Indemnified Person shall have any liability based on their comparative or contributory negligence or otherwise to the Indemnifying Parties, any Person asserting claims on behalf of or in right of any of the Indemnifying Parties, or any other Person in connection with an Indemnified Claim.

Section 9.5    Treatment of Indemnification Payments.  All amounts paid by an Indemnifying Party to an Indemnified Person under this Article IX shall, to the extent permitted by applicable Law, be treated for all Tax purposes as adjustments to the Backstop Commitment Premium or Termination Premium of such Indemnified Person, as the case may be, or, to the extent arising after the Closing Date, the Purchase Price for the Rights Offering Equity Interests subscribed for by such Indemnified Person in the Rights Offering, or the Unsubscribed Equity Interests purchased by such Indemnified Person, as applicable. The provisions of this Article IX are an integral part of the transactions contemplated by this Agreement and without these provisions the Commitment Parties would not have entered into this Agreement. The obligations of the Debtors under this Article IX shall constitute allowed administrative expenses of the Debtors' estate under Sections 503(b) and 507 of the Bankruptcy Code and are payable without further Order of the Bankruptcy Court, and that the Debtors may comply with the requirements of this Article IX without further Order of the Bankruptcy Court.

Section 9.6    No Survival.  All representations, warranties, covenants and agreements made in this Agreement shall not survive the Closing Date except for covenants and agreements that by their express terms are to be satisfied after the Closing Date, which covenants and agreements shall survive until satisfied in accordance with their terms. Notwithstanding the foregoing, the indemnification and other obligations of each of the Debtors pursuant to this Article IX and the other obligations set forth in Section 10.4 shall survive the Closing Date until the latest date permitted by applicable Law and, if applicable, be assumed by each of the Reorganized Debtors.

# ARTICLE X

# TERMINATION

Section 10.1    Consensual Termination. This Agreement may be terminated and the transactions contemplated hereby may be abandoned at any time prior to the Closing Date by mutual written consent of the Debtors, the Required Commitment Parties, and each of the Initial Commitment Parties.

Section 10.2    Termination by the Debtors.  This Agreement may be terminated by the Debtors upon written notice to the Commitment Parties if:

(a)    the RSA has been terminated as to the Debtors in accordance with its terms; *provided* that the foregoing shall not apply to any automatic termination event arising out of Section 13.04 of the RSA (in accordance with the terms thereof);

(b)    any Company Party Termination Event (as defined in the RSA) set forth in Section 13.02 of the RSA occurs (in accordance with the terms thereof);

(c)    the Bankruptcy Court denies entry of the Backstop Order;

(d)    subject to the right of the Commitment Parties to arrange a Commitment Party Replacement in accordance with Section 2.3(a) (which will be deemed to cure any breach by the replaced Commitment Party pursuant to this Section 10.2(d) and, for the avoidance of doubt, any such Commitment Party Replacement would not permit the Debtors to terminate this Agreement pursuant to this Section 10.2), (i) any Commitment Party shall have (x) breached any representation, warranty, covenant or other agreement made by such Commitment Party in this Agreement or any such representation or warranty shall have become inaccurate and such breach or inaccuracy would or would reasonably be expected to, individually or in the aggregate, cause a condition set forth in Section 8.3(f) or Section 8.3(h) not to be satisfied or (y) materially breached or ceased to be a party to the RSA, (ii) the Debtors shall have delivered written notice of such breach or inaccuracy to such Commitment Party, and (iii) such breach or inaccuracy is not cured by such Commitment Party by the tenth (10th) Business Day after receipt of such notice; *provided* that the Debtors shall not have the right to terminate this Agreement pursuant to this Section 10.2(d) if any of them are then in willful or intentional breach of this Agreement; *provided*, *further*, that this Agreement shall continue in full force and effect with respect to the Debtors and the non-breaching Commitment Parties.  For purposes of this Agreement, "**willful or intentional breach**" means a breach of this Agreement that is a consequence of an act undertaken by the breaching party with the knowledge that the taking of such act would, or would reasonably be expected to, cause a breach of this Agreement;

(e)    the Backstop Order or the Confirmation Order is reversed, dismissed, or vacated;

(f)    the Debtors shall not receive the Aggregate Rights Offering Amount pursuant to the Rights Offering and this Agreement (subject to the right of the Commitment Parties to arrange a Commitment Party Replacement in accordance with Section 2.3(a)); *provided* that any termination pursuant to this Section 10.2(f) shall not relieve or otherwise limit

56

the liability of any Defaulting Commitment Party hereto for any breach or violation of its obligations under this Agreement or any documents or instruments delivered in connection herewith;

(g)    any applicable Law or final and non-appealable Order shall have been enacted, adopted or issued by any Governmental Unit that prohibits the implementation of the Plan or the Rights Offering or the transactions contemplated by this Agreement or the other Definitive Documents; *provided*, that this termination right may not be exercised by any Party that sought or requested such ruling or order in contravention of any obligation set out in this Agreement;

(h)    the board of directors, board of managers, or such similar governing body of any Debtor determines in good faith, after consulting with outside counsel, and notifies counsel to the Initial Commitment Parties, that proceeding with any of the transactions under this Agreement would be inconsistent with the exercise of its fiduciary duties or applicable Law; or

(i)    the Closing Date has not occurred by 11:59 p.m. New York City time on December 20, 2024.

Section 10.3    <u>Termination by the Required Commitment Parties and each Commitment Party Group</u>.

(a)    This Agreement may be terminated upon written notice to the Debtors and the other Commitment Parties by the Required Commitment Parties if:

(i)    the RSA has been terminated as to the Debtors in accordance with its terms;

(ii)    any Consenting Lenders Termination Event occurs as set forth in Section 13.01 of the RSA (in accordance with the terms thereof);

(iii)    the Backstop Order or the Confirmation Order is reversed, dismissed, vacated or is modified or amended in any material respect after entry without the prior written consent of the Required Commitment Parties; *provided*, that this termination right may not be exercised by any Party that sought or requested such reversal, dismissal, vacation, modification or amendment;

(iv)    any applicable Law or final and non-appealable Order shall have been enacted, adopted or issued by any Governmental Unit that prohibits the implementation of the Plan or the Rights Offering or the transactions contemplated by this Agreement or the other Definitive Documents; *provided*, that this termination right may not be exercised by any Party that sought or requested such ruling or order in contravention of any obligation set out in this Agreement;

(v)    the Closing Date shall not have occurred by December 20, 2024; or

(vi)    Hornblower or any Debtor shall have breached any representation, warranty, covenant or other agreement made by Hornblower or the other Debtors in this

Agreement or any such representation or warranty shall have become inaccurate and such breach or inaccuracy would, individually or in the aggregate, cause a condition set forth in <u>Sections 8.1(j)</u>, <u>8.1(k)</u> or <u>Section 8.1(l)</u> not to be satisfied, (ii) any Commitment Party shall have delivered written notice of such breach or inaccuracy to the Debtors, and (iii) if such breach or inaccuracy is capable of being cured, such breach or inaccuracy is not cured by Hornblower or the other Debtors by the tenth (10th) Business Day after receipt of such notice; *provided*, that this Agreement may not be terminated pursuant to this <u>Section 10.3(a)(vi))</u> if the Required Commitment Parties are then in willful or intentional breach of this Agreement.

(b)     Upon a Commitment Party Default, the Required Commitment Parties may terminate this Agreement with respect to such Defaulting Commitment Party provided that such Required Commitment Parties shall at the time of such termination provide a replacement commitment (which may be by a creditworthy third party) in an amount equal to such Defaulting Commitment Party's commitment hereunder.

(c)     This Agreement may be terminated by any Commitment Party, with respect to itself only, by written notice to the Debtors and the other Commitment Parties if (i) the RSA has been terminated as to such Commitment Party (or its Related Funds) or (ii) the Closing has not occurred by the date that is nine (9) months after the Petition Date, which may be extended by the Debtors up to thirty (30) days if the purpose of such extension is solely to obtain regulatory approvals (the "**Outside Date**"); provided that the Outside Date may be waived or extended only with the prior written consent of each Commitment Party (excluding any Defaulting Commitment Party).

Section 10.4     <u>Effect of Termination</u>.

(a)     Upon termination of this Agreement pursuant to this <u>Article X</u>, this Agreement shall forthwith become void and of no force or effect and there shall be no further obligations or liabilities on the part of the Parties; *provided* that (i) subject to <u>Section 2.3(b)</u>, the obligations of the Debtors to pay the Expense Reimbursement pursuant to <u>Article III</u>, to satisfy their indemnification obligations pursuant to <u>Article IX</u> (and subject to <u>Section 9.6</u>) and to pay the Termination Premium pursuant to <u>Section 10.4(b)</u> shall survive the termination of this Agreement and shall remain in full force and effect, in each case, until such obligations have been satisfied, and (ii) this <u>Section 10.4</u> and <u>Article XI</u> shall survive the termination of this Agreement in accordance with their terms.

(b)     If this Agreement shall be terminated (i) by the Debtors pursuant to <u>Section 10.2(h)</u> and <u>10.2(i)</u> (provided that any such failure of the Closing Date to occur shall not be due to a delay or breach by a Required Commitment Party), (ii) by the Required Commitment Parties pursuant to (x) <u>Section 10.3(a)(iii)</u> (provided that such termination is a result of a modification or amendment in any material respect after entry of the Backstop Order or the Confirmation Order without the prior written consent of the Required Commitment Parties), or (y) <u>Section 10.3(a)(vi)</u>, or (iii) as a result of the termination of the RSA by (x) the Debtors pursuant to Section 13.02(d) of the RSA or (y) the Commitment Parties pursuant to Sections 13.01(a), 13.01(b), 13.01(d), 13.01(e), 13.01(g) (provided that any such amendment or modification to a Definitive Document giving rise to the termination right shall be caused by a

Debtor or any Crestview Commitment Party), 13.01(k), 13.01(m) (solely to the extent such actions are taken by the Debtors) and 13.01(q) of the RSA, then the Debtors shall, no later than two (2) Business Days following the consummation of a confirmed chapter 11 plan of reorganization for the Debtors or a sale of all or substantially all of the Debtors' assets, pay the Termination Premium entirely in cash to the Commitment Parties or their designees in accordance with Section 3.2. The parties acknowledge and agree that the payment of the Termination Premium pursuant to this Section 10.4(b) will constitute liquidated damages. To the extent that all amounts due in respect of the Termination Premium pursuant to this Section 10.4(b) have actually been paid by the Debtors to the Commitment Parties in connection with a termination of this Agreement, the Commitment Parties shall not have any additional recourse against the Debtors for any obligations or liabilities relating to or arising from this Agreement, except for Article IX. Except as expressly set forth in this Section 10.4(b), the Termination Premium shall not be payable upon the termination of this Agreement. The Termination Premium shall, pursuant to the Backstop Order, constitute allowed administrative expenses of the Debtors' estate under Sections 503(b) and 507 of the Bankruptcy Code.

(c)     The automatic stay applicable under section 362 of the Bankruptcy Code shall not prohibit a Party from taking any action or delivering any notice necessary to effectuate the termination of this Agreement pursuant to and in accordance with the terms hereof.

## ARTICLE XI

## GENERAL PROVISIONS

Section 11.1   Settlement Discussions.   This Agreement and the transactions contemplated herein are part of a proposed settlement of a dispute between the Parties. Nothing herein shall be deemed an admission of any kind. Pursuant to Federal Rule of Evidence 408 and any applicable state rules of evidence and any other applicable Law, foreign or domestic, this Agreement and all negotiations relating thereto shall not be admissible into evidence in any proceeding, except to the extent filed with, or disclosed to, the Bankruptcy Court in connection with the Chapter 11 Cases (other than a proceeding to approve or enforce the terms of this Agreement or as a defense in connection with such a proceeding).

Section 11.2   Notices.   All notices and other communications in connection with this Agreement shall be in writing and shall be deemed given if delivered personally, sent via electronic facsimile (with confirmation), mailed by registered or certified mail (return receipt requested) or delivered by an express courier (with confirmation) to the Parties at the following addresses (or at such other address for a Party as may be specified by like notice):

(a)     If to Hornblower or the other Debtors:

Hornblower Group, LLC
Hornblower Group LP
Pier 3 on The Embarcadero
San Francisco, CA 94105
Attention: Adam Peakes
Email: adam.peakes@hornblower.com

with a copy (which shall not constitute notice) to:

Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, NY 10019-6064
Facsimile: (212) 757-3990
Attention:      Paul M. Basta, Jacob A. Adlerstein, Kyle J. Kimpler
Email: pbasta@paulweiss.com, jadlerstein@paulweiss.com,
kkimpler@paulweiss.com

(b)      If to the Initial Commitment Parties (or to any of them), counsel to the Initial Commitment Parties, or any other Person to which notice is to be delivered hereunder, to the address set forth on each such Commitment Party's signature page to this Agreement,

with a copy (which shall not constitute notice) to:

Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, NY 10017
Facsimile: (212) 701-5331
Attn: Brian Resnick, Adam Shpeen, Robert (Bodie) Stewart,
Joseph W. Brown
E-mail address: brian.resnick@davispolk.com;
adam.shpeen@davispolk.com; bodie.stewart@davispolk.com;
joseph.w.brown@davispolk.com

Milbank LLP
450 Lexington Avenue
New York, NY 10017
Attn:  Evan Fleck; Matt Brod, Justin Cunningham
E-mail: efleck@milbank.com; mbrod@milbank.com;
jcunnin1@milbank.com

Section 11.3   _Assignment; Third-Party Beneficiaries_.   Neither this Agreement nor any of the rights, interests or obligations under this Agreement shall be assigned by any Party (whether by operation of Law or otherwise) without the prior written consent of the Debtors, the Required Commitment Parties and each Initial Commitment Party, other than an assignment by a Commitment Party expressly permitted by Section 2.3 or Section 2.6. Any purported assignment in violation of this Section 11.3 shall be void _ab initio_ and of no force or effect.  Except for such other Persons expressly referred to herein, or as expressly provided in (x) Article IX with respect to the Indemnified Persons, (y) Section 11.13 with respect to the Non-Recourse Parties, or (z) Section 5.6 with respect to the Debtors' financial advisor, this Agreement (including the documents and instruments referred to in this Agreement) is not intended to and does not confer upon any Person any rights or remedies under this Agreement other than the Parties.

Section 11.4   _Prior Negotiations; Entire Agreement_.   (a) This Agreement (including the exhibits, the schedules, and the other documents and instruments referred to herein

and in the RSA) constitutes the entire agreement of the Parties and supersedes all prior agreements, arrangements or understandings, whether written or oral, among the Parties with respect to the subject matter of this Agreement, except that the Parties hereto acknowledge that any confidentiality agreements heretofore executed between or among the Parties and the RSA will each continue in full force and effect.

(b)     Notwithstanding anything to the contrary in the Plan (including any amendments, supplements or modifications thereto) or the Confirmation Order (and any amendments, supplements or modifications thereto) or an affirmative vote to accept the Plan submitted by any Commitment Party, nothing contained in the Plan (including any amendments, supplements or modifications thereto) or Confirmation Order (including any amendments, supplements or modifications thereto) shall alter, amend or modify the rights of the Commitment Parties under this Agreement unless such alteration, amendment or modification has been made in accordance with Section 11.8.

Section 11.5   Governing Law; Venue. THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH (a) THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD FOR ANY CONFLICTS OF LAW PRINCIPLES THAT WOULD APPLY THE LAWS OF ANY OTHER JURISDICTION, AND (b) TO THE EXTENT APPLICABLE, THE BANKRUPTCY CODE. UPON THE COMMENCEMENT OF THE CHAPTER 11 CASES, THE PARTIES CONSENT AND AGREE (a) THAT ANY ACTION TO ENFORCE THIS AGREEMENT OR ANY DISPUTE, WHETHER SUCH DISPUTES ARISE IN LAW OR EQUITY, ARISING OUT OF OR RELATING TO THIS AGREEMENT AND THE AGREEMENTS, INSTRUMENTS AND DOCUMENTS CONTEMPLATED HEREBY SHALL BE BROUGHT EXCLUSIVELY IN THE BANKRUPTCY COURT (OR, SOLELY TO THE EXTENT THE BANKRUPTCY COURT DECLINES JURISDICTION OVER SUCH ACTION OR DISPUTE, IN ANY U.S. FEDERAL OR NEW YORK STATE COURT SITTING IN THE BOROUGH OF MANHATTAN, IN THE CITY OF NEW YORK (c) TO SUBMIT TO THE EXCLUSIVE JURISDICTION OF THE BANKRUPTCY COURT (OR, SOLELY TO THE EXTENT THE BANKRUPTCY COURT DECLINES JURISDICTION OVER SUCH ACTION OR DISPUTE, IN ANY U.S. FEDERAL OR NEW YORK STATE COURT SITTING IN THE BOROUGH OF MANHATTAN, IN THE CITY OF NEW YORK). UPON THE COMMENCEMENT OF THE CHAPTER 11 CASES, EACH OF THE PARTIES HEREBY WAIVES AND AGREES NOT TO ASSERT IN ANY SUCH DISPUTE, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY CLAIM THAT (i) SUCH PARTY IS NOT PERSONALLY SUBJECT TO THE JURISDICTION OF THE BANKRUPTCY COURT, (ii) SUCH PARTY OR SUCH PARTY'S PROPERTY IS IMMUNE FROM ANY LEGAL PROCESS ISSUED BY THE BANKRUPTCY COURT OR (iii) ANY LITIGATION OR OTHER PROCEEDING COMMENCED IN THE BANKRUPTCY COURT IS BROUGHT IN AN INCONVENIENT FORUM (OR, IN EACH CASE, SOLELY TO THE EXTENT THE BANKRUPTCY COURT DECLINES JURISDICTION OVER SUCH ACTION OR DISPUTE, ANY U.S. FEDERAL OR NEW YORK STATE COURT SITTING IN THE BOROUGH OF MANHATTAN, IN THE CITY OF NEW YORK). THE PARTIES HEREBY AGREE THAT MAILING OF PROCESS OR OTHER PAPERS IN CONNECTION WITH ANY SUCH ACTION OR PROCEEDING TO AN ADDRESS PROVIDED IN WRITING BY THE RECIPIENT OF SUCH MAILING, OR IN SUCH OTHER MANNER AS MAY BE PERMITTED BY LAW, SHALL BE VALID AND

SUFFICIENT SERVICE THEREOF AND HEREBY WAIVE ANY OBJECTIONS TO SERVICE ACCOMPLISHED IN THE MANNER HEREIN PROVIDED.

Section 11.6    Waiver of Jury Trial.    EACH PARTY HEREBY WAIVES ALL RIGHTS TO TRIAL BY JURY IN ANY JURISDICTION IN ANY ACTION, SUIT OR PROCEEDING BROUGHT TO RESOLVE ANY DISPUTE AMONG THE PARTIES UNDER THIS AGREEMENT, WHETHER IN CONTRACT, TORT OR OTHERWISE.

Section 11.7    Counterparts.    This Agreement may be executed in any number of counterparts, all of which will be considered one and the same agreement and will become effective when counterparts have been signed by each of the Parties and delivered to each other Party (including via facsimile or other electronic transmission), it being understood that each Party need not sign the same counterpart. Any facsimile or electronic signature shall be treated in all respects as having the same effect as having an original signature.

Section 11.8    Waivers and Amendments; Rights Cumulative; Consent.    This Agreement may be amended, restated, modified or changed only by a written instrument (with email being sufficient) delivered by the Debtors and the Required Commitment Parties; *provided* that any amendment that would (a) modify a Commitment Party's Backstop Commitment Percentage (which, for the avoidance of doubt, includes the Backstop Commitment) or share of the Backstop Commitment Premium, (b) increase such Commitment Party's Purchase Price in respect of any securities to be purchased in connection with the Rights Offering or hereunder, or (c) modify (directly or indirectly) a Significant Term shall require the prior written consent (with email being sufficient) of the Debtors and each affected Commitment Party.

Notwithstanding the foregoing, Schedule 2 shall be revised as necessary without requiring a written instrument to reflect conforming changes in the composition of the Commitment Parties, Backstop Commitment Percentages and as a result of Transfers of any applicable Funding Commitments permitted and consummated in compliance with the terms and conditions of this Agreement.

The terms and conditions of this Agreement (other than the conditions set forth in Section 8.1 and Section 8.3, the waiver of which shall be governed solely by Article VIII) may be waived (a) by the Debtors only by a written instrument executed by the Debtors and (b) by the Required Commitment Parties only by a written instrument executed by the Required Commitment Parties.

Notwithstanding the foregoing, any proposed amendment, modification, waiver or supplement (or similar document or action) that would disproportionally and adversely affect the Crestview Commitment Parties vis-à-vis Commitment Parties that are not Crestview Commitment Parties (including with respect to any Crestview Commitment Party Significant Term) shall require the consent of the Crestview Commitment Parties.

No delay on the part of any Party in exercising any right, power or privilege pursuant to this Agreement will operate as a waiver thereof, nor will any waiver on the part of any Party of any right, power or privilege pursuant to this Agreement, nor will any single or partial exercise of any right, power or privilege pursuant to this Agreement, preclude any other

or further exercise thereof or the exercise of any other right, power or privilege pursuant to this Agreement. The rights and remedies provided pursuant to this Agreement are cumulative and are not exclusive of any rights or remedies which any party hereto otherwise may have at law or in equity.

Section 11.9   Headings.   The headings in this Agreement are for reference purposes only and will not in any way affect the meaning or interpretation of this Agreement.

Section 11.10  Specific Performance.   The Parties agree that irreparable damage would occur if any provision of this Agreement were not performed in accordance with the terms hereof and that the Parties shall be entitled to an injunction or injunctions, including pursuant to an order of the Bankruptcy Court or other court of competent jurisdiction, without the necessity of posting a bond to prevent breaches of this Agreement or to enforce specifically the performance of the terms and provisions hereof, in addition to any other remedy to which they are entitled at law or in equity. Unless otherwise expressly stated in this Agreement, no right or remedy described or provided in this Agreement is intended to be exclusive or to preclude a Party from pursuing other rights and remedies to the extent available under this Agreement, at law or in equity.

Section 11.11  Damages.    Notwithstanding anything to the contrary in this Agreement, none of the Parties will be liable for, and none of the Parties shall claim or seek to recover, any punitive, special, indirect or consequential damages or damages for lost profits in connection with the breach or termination of this Agreement.

Section 11.12  No Reliance.   No Commitment Party or any of its Related Parties shall have any duties or obligations to the other Commitment Parties in respect of this Agreement, the Plan or the transactions contemplated hereby or thereby, except those expressly set forth herein. Without limiting the generality of the foregoing, (a) no Commitment Party or any of its Related Parties shall be subject to any fiduciary or other implied duties to the other Commitment Parties, (b) no Commitment Party or any of its Related Parties shall have any duty to take any discretionary action or exercise any discretionary powers on behalf of any other Commitment Party, (c) no Commitment Party or any of its Related Parties shall have any duty to the other Commitment Parties to obtain, through the exercise of diligence or otherwise, to investigate, confirm, or disclose to the other Commitment Parties any information relating to the Debtors or any of their Subsidiaries that may have been communicated to or obtained by such Commitment Party or any of its Affiliates in any capacity, (d) no Commitment Party may rely, and confirms that it has not relied, on any due diligence investigation that any other Commitment Party or any Person acting on behalf of such other Commitment Party may have conducted with respect to the Debtors or any of their Affiliates or any of their respective securities, and (e) each Commitment Party acknowledges that no other Commitment Party is acting as a placement agent, initial purchaser, underwriter, broker or finder with respect to its Unsubscribed Equity Interests, Backstop Commitment Percentage of its Backstop Commitment.

Each Commitment Party hereto acknowledges that this Agreement does not constitute an agreement, arrangement, or understanding with respect to acting together for the purpose of acquiring, holding, voting, or disposing of any equity securities of the Debtors and the Commitment Parties do not constitute a "group" within the meaning of Rule 13d-5 under the

Exchange Act. Nothing contained herein or any Definitive Documents and no action taken by any Commitment Party pursuant to this Agreement shall be deemed to constitute or create a presumption by any parties that the Commitment Parties are in any way acting in concert or as a "group" within the meaning of Rule 13d-5 under the Exchange Act. Each Commitment Party confirms that it has independently participated in the negotiation of the transactions contemplated under this Agreement and the Definitive Documents with the advice of its counsel and advisors.

Section 11.13  <u>No Recourse</u>.  Notwithstanding anything that may be expressed or implied in this Agreement, and notwithstanding the fact that certain of the Parties may be partnerships or limited liability companies, each Party covenants, agrees and acknowledges that no recourse under this Agreement or any documents or instruments delivered in connection with this Agreement shall be had against any Party's Affiliates or any of the respective Related Parties of such Party or of the Affiliates of such Party (each of the foregoing, in each case other than the Parties to this Agreement and each of their respective successors and permitted assignees under this Agreement, a "**<u>Non Recourse Party</u>**"), whether by the enforcement of any assessment or by any legal or equitable proceeding, or by virtue of any applicable Law, it being expressly agreed and acknowledged that no personal liability whatsoever shall attach to, be imposed on or otherwise be incurred by any of such Related Parties, as such, for any obligation or liability of any Party under this Agreement or any documents or instruments delivered in connection herewith for any claim based on, in respect of or by reason of such obligations or liabilities or their creation; *provided*, *however*, that nothing in this <u>Section 11.13</u> shall relieve or otherwise limit the liability of any Party hereto or any of their respective successors or permitted assigns for any breach or violation of its obligations under this Agreement or such other documents or instruments. For the avoidance of doubt, none of the Parties will have any recourse, be entitled to commence any proceeding or make any claim under this Agreement or in connection with the transactions contemplated hereby except against any of the Parties or their respective successors and permitted assigns, as applicable.

Section 11.14  <u>Severability</u>.  In the event that any one or more of the provisions contained in this Agreement are held invalid, illegal or unenforceable in any respect for any reason, the validity, legality and enforceability of any such provision in every other respect and of the remaining provisions contained herein will not be in any way impaired thereby, it being intended that all of the rights and privileges of the parties hereto will be enforceable to the fullest extent permitted by law.

Section 11.15  <u>Enforceability of Agreement</u>.  Each of the Parties waives any right to assert that the exercise of termination rights under this Agreement is subject to the automatic stay provisions of the Bankruptcy Code, and expressly stipulates and consents hereunder to the prospective modification of the automatic stay provisions of the Bankruptcy Code for purposes of exercising termination rights under this Agreement, to the extent the Bankruptcy Court determines that such relief is required.

Section 11.16  <u>Publicity</u>. At all times prior to the Closing Date or the earlier termination of this Agreement in accordance with its terms, the Debtors and the Commitment Parties shall consult with each other prior to issuing any press releases (and provide each other a reasonable opportunity to review and comment upon such release) or otherwise making public

announcements with respect to the transactions contemplated by this Agreement, it being understood that nothing in this <u>Section 11.16</u> shall prohibit any Party from filing any motions or other pleadings or documents with the Bankruptcy Court in connection with the Chapter 11 Cases.

[*Signature Pages Follow*]

**Exhibit 5**

**Exit Credit Term Sheet**

Project Hippo
$300.0 million Senior Secured Term Facility
$50.0 million Senior Secured Revolving Credit Facility

Summary of Principal Terms and Conditions[1]

| 1. | **Borrower:** | [Reorganized Hornblower Borrower TBD], a [Delaware] [limited liability company][corporation] (the "Borrower"). |
|---|---|---|
| 2. | **Agent:** | GLAS TRUST COMPANY LLC or another third party agent selected by the Lead Arranger will act as administrative agent and collateral agent for the Exit Facilities (in such capacities, the "Agent") for a syndicate of banks, financial institutions and other institutional lenders reasonably acceptable to the Borrower (collectively, the "Lenders"), and will perform the duties customarily associated with such roles; *provided* that a list of disqualified lenders shall be delivered to the Arranger prior to the date of this commitment letter. |
| 3. | **Sole Lead Arranger and Sole Bookrunner:** | Deutsche Bank AG New York Branch will act as sole lead arranger and bookrunner for the Exit Facilities (in such capacities, the "Arranger"), and will perform the duties customarily associated with such roles. |
| 4. | **Exit Facilities:** | (A) a senior secured term loan credit facility in an aggregate principal amount of $300.0 million (the "Exit Term Loan Facility" and the loans thereunder, the "Term Loans").<br><br>(B) a senior secured revolving credit facility in an aggregate principal amount of $50.0 million (the "Exit Revolving Credit Facility" and, together with the Exit Term Loan Facility, the "Exit Facilities"), under which the Borrower may borrow loans from time to time (the "Revolving Loans" and together with the Term Loans, the "Loans"). |
| 5. | **Incremental Term Facilities:** | The Borrower will be permitted to (a) increase the Exit Term Loan Facility (each, an "Incremental Term Loan Facility") and/or (b) increase commitments under the Exit Revolving Credit Facility (each, an "Incremental Revolving Facility"; the Incremental Term Facilities and the Incremental Revolving Facilities are collectively referred to as "Incremental Facilities"), in each case, on terms and subject to conditions to be set forth in the Exit Facilities Documentation in a manner to be mutually agreed; provided that:<br><br>(i) the aggregate principal amount of all Incremental Facilities outstanding at any time shall not exceed the sum of (x) the |

---

[1]     All capitalized terms used but not defined herein shall have the meanings assigned thereto in that certain Commitment Letter to which this Term Sheet is attached or in the other Exhibits thereto.

greater of (I) a fixed dollar amount equal to 75% of Consolidated EBITDA (to be defined in the Exit Facilities Documentation in a manner consistent with the Documentation Principles) for the most recently ended four fiscal quarter period prior to the Closing Date for which financial statements have been or were required to be delivered under the Senior DIP Credit Agreement (Consolidated EBITDA for such period, "Closing Date EBITDA") and (II) 75% of LTM Consolidated EBITDA on a pro forma basis for the most recently ended four fiscal quarter period (the amount described in this clause (x), the "Incremental Starter Prong") plus (y) additional amounts so long as, in the case of this clause (y), on the date of incurrence thereof (calculated based on customary 'stacking' provisions, and assuming a full drawing of the applicable Incremental Facility and without netting the cash proceeds thereof), (i) in the case of loans under such Incremental Facilities secured by liens on the Collateral that rank pari passu with the liens on the Collateral securing the Exit Facilities, the First Lien Net Leverage Ratio (to be defined in the Exit Facilities Documentation in a manner consistent with the Documentation Principles) on a pro forma basis will be no greater than the First Lien Net Leverage Ratio as of the Closing Date, (ii) in the case of loans under such Incremental Facilities secured by liens on the Collateral that rank junior to the liens on the Collateral securing the Exit Facilities, the Secured Net Leverage Ratio (to be defined in the Exit Facilities Documentation in a manner consistent with the Documentation Principles) on a pro forma basis will be no greater than the Secured Net Leverage Ratio as of the Closing Date and (iii) in the case of any Incremental Term Loan Facilities that are unsecured, the Total Net Leverage Ratio (to be defined in the Exit Facilities Documentation in a manner consistent with the Documentation Principles) on a pro forma basis will be no greater than the Total Net Leverage Ratio that is 0.50x greater than the Total Net Leverage Ratio as of the Closing Date (such Total Net Leverage Ratio as of the Closing Date, the "Closing Date Total Net Leverage Ratio") (the amount described in this clause (y), the "Incremental Ratio Based Amount") (it being acknowledged that, in calculating the amount that may be incurred under clause (y), the First Lien Net Leverage Ratio, Secured Net Leverage Ratio or Total Net Leverage Ratio, as applicable, may exceed the applicable specified levels as a result of the substantially concurrent incurrence of the amount permitted to be incurred at such time under clause (x));

(ii)     no existing Lender will be obligated to provide any such Incremental Term Loan Facility, but each existing Lender

|  |  | under the Exit Term Loan Facility on the date such request for an Incremental Term Loan Facility is made shall be provided with a pro rata right of first offer with respect to such Incremental Term Loan Facility; |
|---|---|---|
|  |  | (iii)   the proceeds of any Incremental Facilities shall only be used for Permitted Acquisitions (to be defined in the Exit Facilities Documentation in a manner to be mutually agreed), investments permitted by the Exit Facilities Documentation and capital expenditures (and not, for the avoidance of doubt, restricted payments); and |
|  |  | (iv)   the aggregate principal amount of all Incremental Revolving Facilities shall not exceed an amount to be mutually agreed. |
|  |  | In addition to the foregoing, the Incremental Term Loan Facilities shall be subject to (x) customary restrictions on maturity, weighted average life to maturity, ratability of prepayments, scope of guarantees/collateral and restrictiveness of covenants, representations and warranties and event of default, in each case, to be set forth in the Exit Facilities Documentation in a manner to be mutually agreed and (y) a 0.50% "most favored nation" yield provision applicable to any Incremental Term Loan Facility secured by liens on the Collateral that rank pari passu with the liens on the Collateral securing the Exit Term Loan Facility to be set forth in the Exit Facilities Documentation in a manner to be mutually agreed and which, in any event, shall not include any carve-outs or "sunset" provision. |
| 6. | **Guarantors:** | All obligations of the Borrower under the Exit Facilities will be unconditionally guaranteed (the "<u>Guarantees</u>") by (i) a parent company (or parent companies) directly or indirectly holding 100% of the equity interests of the Borrower ("<u>Holdings</u>") and (ii) each material direct and indirect subsidiary of the Borrower (the "<u>Subsidiary Guarantors</u>" and, together with Holdings, the "<u>Guarantors</u>"; the Guarantors and the Borrower, together, the "<u>Loan Parties</u>"), subject to exceptions to be set forth in the Exit Facilities Documentation in a manner consistent with the Documentation Principles. |
| 7. | **Security:** | Subject to the exceptions described below and other exceptions to be set forth in the Exit Facilities Documentation in a manner consistent with the Documentation Principles, the Exit Facilities and the Guarantees will be secured on a first-priority basis by (a) all of the equity interests of the Borrower directly held by Holdings and (b) substantially all of the material owned assets of the Borrower and each Subsidiary Guarantor, in each case, whether owned on the Closing Date or thereafter acquired (collectively, the "<u>Collateral</u>"), including but not limited to:  (1) a perfected first-priority pledge of all of the equity interests directly held by the Borrower or any Guarantor, (2) each of the Loan Parties' present and future owned material vessels |

| | | |
|---|---|---|
| | | (including all earnings and insurances with respect to each such vessel) (any such vessel, an "<u>Owned Vessel</u>"), and (3) perfected first-priority security interests in substantially all other material owned tangible and intangible assets of the Borrower and each Subsidiary Guarantor.<br><br>Notwithstanding anything to the contrary in the Documentation Precedent, the Exit Facilities Documentation shall include customary provisions to be mutually agreed providing for intellectual property filings, deposit account control agreements and real property mortgages. |
| 8. | **Use of Proceeds:** | The proceeds of the Exit Term Loan Facility on the Closing Date will be used by the Borrower to consummate the Refinancing and to pay Transaction Costs.<br><br>The proceeds of Revolving Loans will be used by the Borrower from time to time after the Closing Date for general corporate purposes (other than in connection with any restricted payments). |
| 9. | **Interest Rates:** | The interest rates under the Exit Term Loan Facility will be, at the option of the Borrower, Adjusted Term SOFR plus 5.75% or the Reference Rate plus 4.75%.<br><br>The interest rates under the Exit Revolving Credit Facility will be, at the option of the Borrower, Adjusted Term SOFR plus 5.75% or the Reference Rate plus 4.75%.<br><br>The Borrower may elect interest periods of 1, 3 or 6 months (or, if agreed to by the Administrative Agent and all Lenders, a shorter period) for Adjusted Term SOFR.<br><br>Calculation of interest shall be on the basis of the actual days elapsed in a year of 360 days (or 365 or 366 days, as the case may be, in the case of Reference Rate loans determined by reference to clause (i) of the definition of "Reference Rate") and interest shall be payable at the end of each interest period and, in any event, at least every three months.<br><br>"<u>Adjusted Term SOFR</u>" means the greater of (a) Term SOFR (to be defined in the Exit Facilities Documentation in a manner consistent with the Documentation Principles) and (b) 1.00%.<br><br>"<u>Reference Rate</u>" means the greatest of (i) the rate of interest publicly quoted by The Wall Street Journal as the "Prime Rate" in the United States (or, if The Wall Street Journal ceases quoting a prime rate of the type described, the per annum rate quoted as the base rate on such corporate loans in a different national publication as reasonably selected by the Administrative Agent), (ii) the federal funds effective rate plus 0.50% and (iii) Adjusted Term SOFR for an interest period of one-month plus 1.00%. |

| | | For the avoidance of doubt, no CSA shall apply. |
|---|---|---|
| 10. | **Default Rate** | Upon the occurrence and during the continuance of any event of default, the principal amount of all Loans outstanding and, to the extent permitted by applicable law, any interest payments on the Loans or any fees or other amounts owed in respect of the Facilities, shall thereafter bear interest (including, without limitation, post-petition interest in any proceeding under any debtor relief laws) payable on demand at a rate that is two percent (2.00%) per annum in excess of the interest rate otherwise payable with respect to the applicable Loans (or, in the case of any such fees and other amounts, at a rate that is two percent (2.00%) per annum in excess of the interest rate otherwise payable for Reference Rate loans). |
| 11. | **Final Maturity and Amortization:** | (A) Exit Term Loan Facility<br><br>The Exit Term Loan Facility will mature on the date that is five (5) years after the Closing Date, and will amortize in equal quarterly installments (commencing with the last day of the first full fiscal quarter ending after the Closing Date) in an aggregate annual amount equal to 1.0% of the original principal amount of the Exit Term Loan Facility with the balance payable on the maturity date of the Exit Term Loan Facility.<br><br>(B) Exit Revolving Credit Facility<br><br>The Exit Revolving Credit Facility will mature and the commitments thereunder will terminate on the date that is five (5) years after the Closing Date. |
| 12. | **Closing:** | The availability of the initial borrowing under the Facilities on the Closing Date shall be conditioned solely upon the conditions set forth in <u>Exhibit C</u> to the Commitment Letter. |
| 13. | **Exit Facilities Documentation:** | The Exit Facilities Documentation shall, except as set forth in this Term Sheet or as the Borrower and the Commitment Party mutually agree, (i) be usual and customary for facilities of such kind and shall be initially based on (but not limited to the terms of) that certain Superpriority Credit Agreement, dated as of November 10, 2020, by and among the Borrowers, Hornblower Holdco, LLC, American Queen Holdco, LLC, the lenders from time to time party thereto, and Alter Domus (US) LLC, as administrative agent and collateral agent, as in effect on November 10, 2020, (ii) reflect the operational and strategic requirements of the Borrower and its subsidiaries, financial modeling and business plan (including M&A), (iii) contain standards, qualifications, materiality, thresholds, exceptions, "baskets" and grace and cure periods which shall be subject to adjustment based on market custom and projected annual EBITDA, and shall include certain EBITDA-based "growers" to be agreed and (iv) include an affirmative covenant requiring each Obligor that owns an Owned Vessel to maintain customary maritime insurance which shall include, |

| | | |
|---|---|---|
| | | without limitation, hull & machinery insurance and protection and indemnity cover and customary provisions for mortgagee's interest insurance (collectively, the "<u>Documentation Principles</u>"). |
| **14.** | **Voluntary Prepayments and Reductions in Commitments:** | Voluntary reductions of the unutilized portion of the commitments under the Exit Facilities and prepayments of borrowings thereunder will be permitted at any time, in minimum principal amounts to be set forth in the Exit Facilities Documentation, without premium or penalty, except as described below, subject to reimbursement of the Lenders' redeployment costs in the case of a prepayment of Adjusted Term SOFR borrowings other than on the last day of the relevant interest period.  All voluntary prepayments will be applied as the Borrower may direct to any class of outstanding indebtedness secured by the Collateral on a *pari passu* basis with the Exit Facilities, and absent such direction (including with respect to discounted prepayments/debt repurchases), in direct order of maturity. |
| | | The Borrower shall pay a "prepayment premium" in connection with any voluntary prepayment, repricing transactions, mandatory prepayments with the net cash proceeds of issuances of debt obligations of Holdings, the Borrower and its subsidiaries after the Closing Date (other than debt permitted under the Exit Facilities Documentation) and immediately upon any acceleration of the Exit Facilities (or any mandatory assignment pursuant to the "yank a bank" provisions), in each case, of the Term Loans, in an amount equal to, (x) to the extent such repayment, acceleration or assignment occurs prior to the first anniversary of the Closing Date, 2.00% of the aggregate principal amount of the Term Loans so prepaid or assigned or subject to such acceleration and (y) to the extent such repayment, acceleration or assignment occurs on and after the first anniversary of the Closing Date and prior to the second anniversary of the Closing Date, 1.00% of the aggregate principal amount of the Term Loans so prepaid or assigned or subject to such acceleration. |
| **15.** | **Mandatory Prepayments:** | Only the following:  Unless the net cash proceeds are reinvested (or committed to be reinvested) in the business within 270 days and, if so committed to be reinvested, are actually reinvested within 90 days after the end of such initial 270 day period, after a non-ordinary course asset sale, other non-ordinary course disposition of property or any sale or disposition of an Owned Vessel of any Loan Party or any subsidiary (including in connection with casualty and condemnation events), 100% of the net cash proceeds in excess of (i) a fixed dollar amount to be mutually agreed for any individual transaction or series of transactions, and (ii) the greater of a percentage of EBITDA to be agreed and an equivalent fixed dollar amount in the aggregate per fiscal year for all such transactions, from such non-ordinary course asset sales, other non-ordinary course dispositions of property or sale or disposition of an Owned Vessel shall be applied to prepay the Term Loans, subject to exceptions to be set forth in the Exit Facilities |

Documentation in a manner consistent with the Documentation Principles.

In addition, beginning with the first full fiscal year of the Borrower after the Closing Date, 50% of Excess Cash Flow for such fiscal year (to be defined in a manner to be set forth in the Exit Facilities Documentation in a manner consistent with the Documentation Principles) of the Borrower and its subsidiaries (stepping down to 25% if the Total Net Leverage Ratio is less than or equal to 0.50x below the Closing Date Total Net Leverage Ratio and 0% if the Total Net Leverage Ratio is less than or equal to 1.00x below the Closing Date Total Net Leverage Ratio) shall be used to prepay the Term Loans; *provided* that (x) any voluntary prepayment of Term Loans or up to a ratable portion of such other *pari passu* indebtedness (including (i) loans under the Exit Revolving Credit Facility to the extent the commitments thereunder are permanently reduced by the amount of such prepayments at the time of such prepayment shall (to the extent not funded with the incurrence of long term indebtedness (other than revolving loans)) be credited against excess cash flow prepayment obligations for such fiscal year on a Dollar-for-Dollar basis and (ii) any buybacks or purchases thereof up to the amount of cash actually utilized) and (y) excess cash flow shall be reduced by, among other things, principal payments of indebtedness not captured by the preceding clause (x), any capital expenditures, certain permitted acquisitions or other permitted investments, and certain permitted restricted payments paid in cash (in each case, to the extent not funded with the incurrence of long-term indebtedness), in each case made during the relevant fiscal year or, without duplication, the next fiscal year and prior to the date of the relevant prepayment (such amount, the "Required Excess Cash Flow Amount"); *provided*, that no prepayment shall be required to the extent the Required Excess Cash Flow Amount is not greater than the greater of 10.0% of Consolidated EBITDA and an equivalent fixed dollar amount equal to 10.0% of Closing Date EBITDA, with only amounts in excess of such minimum threshold required to be prepaid.

In addition, (x) 100% of the net cash proceeds of issuances of debt obligations of Holdings, the Borrower and its subsidiaries after the Closing Date (other than debt permitted under the Exit Facilities Documentation) shall be used to prepay the Term Loans, and (y) if at any time the amounts outstanding under the Exit Revolving Credit Facility exceed the commitments thereunder, the Borrower shall immediately prepay Revolving Loans in an amount sufficient to eliminate such excess.

Notwithstanding the foregoing, each Lender under the Exit Term Loan Facility shall have the right to reject its pro rata share of any mandatory prepayments described above, in which case the amounts so rejected (the "Declined Proceeds") may be retained by the Borrower and used for any purpose not prohibited by the Exit

|   |   | Facilities Documentation and will be included in the calculation of the "Available Amount".

The above-described mandatory prepayments shall be applied to the Term Facility in direct order of maturity. There will be no prepayment premiums or penalties (except Adjusted Term SOFR breakage costs) for mandatory prepayments except for mandatory prepayments resulting from the issuance of debt obligations not permitted under the Exit Facilities Documentation.

Prepayments from Excess Cash Flow and asset sale proceeds of subsidiaries that that are organized outside of the United States are subject to permissibility under (i) applicable local law (e.g., financial assistance, corporate benefit, thin capitalization, capital maintenance and similar legal principles, restrictions on upstreaming of cash intragroup and the fiduciary and statutory duties of the directors of the relevant subsidiaries) and (ii) material organizational document restrictions (including as a result of minority or joint venture ownership) not created in contemplation hereof. Notwithstanding the foregoing, mandatory prepayments made pursuant to the first three paragraphs of this section shall be limited to the extent that the Borrower determines in good faith that such prepayment would result in material adverse tax consequences to the Borrower or its affiliates or equity partners (including imposition of withholding taxes) in each case, related to the repatriation or upstreaming of funds or would be prohibited, restricted or delayed by applicable law or any material agreement not entered into in contemplation hereof. The non-application of any such prepayment amounts as a result of the foregoing provisions will not constitute an event of default and such amounts shall be available for working capital purposes of the Borrower and its subsidiaries, and in any case, the Borrower may retain such amounts after a period of 365 days from the date such mandatory prepayment is triggered. |
|---|---|---|
| **16.** | **Covenants:** | Covenants to include, without limitation, the following, applicable to the Borrower and its subsidiaries (subject to exceptions to be set forth in the Exit Facilities Documentation in a manner consistent with the Documentation Principles):

•   prompt notice of any default event of default;

•   limitations on mergers, consolidations, sales of assets and acquisitions;

•   limitations on indebtedness;

•   limitations on liens;

•   limitations on sale and lease-back transactions;

•   limitations on investments, loans and advances, which shall include an exception for (i) investments made in reliance on the |

Available Amount described below, with usage thereof being subject to (I) no default or event of default having occurred or be continuing and (II) the Total Net Leverage Ratio on a pro forma basis not exceeding a Total Net Leverage Ratio that is 0.50x less than the Closing Date Total Net Leverage Ratio and (ii) Permitted Acquisitions in an amount not to exceed (x) an amount to be mutually agreed by the Borrower and the Commitment Party plus (y) additional amounts so long as the Total Net Leverage Ratio on a pro forma basis does not exceed the Closing Date Total Net Leverage Ratio, which in each case shall be subject to (i) such acquisition being permitted under the lines of business covenant, (ii) both immediately before and after giving effect to such acquisition, no event of default having occurred or be continuing, (iii) solely with respect to Permitted Acquisitions for consideration in excess of an aggregate amount to be agreed, receipt by the Administrative Agent (for distribution to the Lenders) of customary diligence materials to be mutually agreed by the Borrower and the Commitment Party, which shall include delivery of a quality of earnings report and (iv) any person or assets or division as acquired having generated EBITDA for the four quarter period most recently ended exceeding zero; *provided* that the aggregate amount of acquisitions made by Loan Parties in persons that do not become Loan Parties and assets that do not constitute Collateral shall not exceed at any time outstanding an amount to be mutually agreed by the Borrower and the Commitment Party;

• limitations on dividends, stock repurchases, distributions and other restricted payments which, (x) for the first twelve (12) months after the Closing Date, shall not include any exceptions and (y) thereafter shall include exceptions limited to (i) a general basket up to an aggregate amount not to exceed a fixed dollar amount equal to 25% of Closing Date EBITDA, with usage thereof subject to (A) no default or event of default and (B) pro forma compliance with a Total Net Leverage Ratio test set at the Closing Date Total Net Leverage Ratio, (ii) restricted payments in reliance on the Available Amount (to be defined in the Exit Facilities Documentation in a manner to be mutually agreed and, in any event, shall include a fixed dollar "starter basket" in an amount equal to 25% of EBITDA, which may only be utilized for investments), with usage thereof subject to (A) no default or event of default and (B) pro forma compliance with a Total Net Leverage Ratio test set at a Total Net Leverage Ratio that is 0.75x less than the Closing Date Total Net Leverage Ratio and (iii) unlimited restricted payments, with usage thereof subject to (A) no default or event of default and (B) pro forma compliance with a Total Net Leverage Ratio test set at a Total Net Leverage Ratio that is 1.25x less than the Closing Date Total Net Leverage Ratio;

|  |  | • limitations on payments and modifications of certain indebtedness; <br><br>• limitations on amendments or waivers of organizational documents and certain agreements; <br><br>• limitations on changes in fiscal year; <br><br>• limitations on affiliate and shareholder transactions; and <br><br>• other affirmative and negative covenants to be set forth in the Exit Facilities Documentation in a manner consistent with the Documentation Principles. |
|---|---|---|
| 17. | **Financial Covenant:** | The Exit Facilities Documentation will contain only the following financial covenant with respect to the Borrower and its subsidiaries on a consolidated basis, solely for the benefit of the Lenders and solely when required as set forth in this paragraph: <br><br>• a Total Net Leverage Ratio set at a single level equal to 5.75 to 1.00, with a step-down to 5.25 to 1.00 beginning with the fiscal quarter ending March 31, 2026 and a step-down to 4.75 to 1.00 beginning with the fiscal quarter ending September 30, 2027 (the "<u>Financial Covenant</u>"). <br><br>The Financial Covenant will be tested as of the last day of each fiscal quarter (with testing to commence, if applicable, as of the last day of the first full fiscal quarter commencing after the Closing Date). <br><br>The Exit Facilities Documentation will contain customary cure rights for the Financial Covenant; <u>provided</u> that (i) in each four (4) consecutive fiscal quarter period, there shall be no more than two (2) fiscal quarters in which such cure right is exercised and (b) such cure right shall not be exercised more than five (5) times in the aggregate. |
| 18. | **Events of Default:** | Customary events of default for secured indebtedness (which shall be subject to thresholds and grace periods to be set forth in the Exit Facilities Documentation in a manner set consistent with the Documentation Principles). |
| 19. | **Unrestricted Subsidiaries:** | For the avoidance of doubt, the Loan Parties shall not at any time have the ability to designate any subsidiary as an "Unrestricted Subsidiary" or any such similar term. |
| 20. | **Amendments:** | Usual for facilities and transactions of this type and consistent with the Documentation Principles; <u>provided</u> that, (a) amendments and waivers that affect only one class (or classes) of loans and commitments shall only require the consent of more than 50% of the Lenders holding loans and commitments of such class (or classes, as applicable) and (b) for the avoidance of doubt, any amendment or waiver relating to the waterfall or pro rata payments or sharing provisions, and any subordination of the obligations (or any portion |

| | | |
|---|---|---|
| | | thereof) in respect of the Exit Facilities, or the liens on the Collateral securing the Exit Facilities (or any portion thereof) to any other indebtedness shall, in each case, require the consent of each Lender adversely affected thereby. |
| 21. | **Letters of Credit/Surety Bonds** | The Exit Facilities Documentation shall contain arrangements for letters of credit or surety bonds to be mutually agreed. |
| 22. | **EBITDA** | Subject to the Documentation Principles, to be defined in a manner to be mutually agreed. |
| 23. | **Limited Conditions Transactions** | To be permitted on customary market terms. |
| 24. | **Expenses and Indemnification:** | Indemnification by the Borrower of the Administrative Agent, the Arranger, the Lenders, their respective successors and assigns and the officers, directors, employees, agents, advisors, controlling persons and members of each of the foregoing (each, an "Indemnified Person") for matters arising out of or in connection with the Exit Facilities or any related transaction or any claim, actions, suits, inquiries, litigation, investigation or other proceeding (regardless of whether such Indemnified Person is a party thereto and regardless of whether such matter is initiated by Holdings' equity holders, creditors or any other third party or by Holdings or any of its affiliates) in connection with the Exit Facilities or any transactions in connection therewith; *provided* that no Indemnified Person will be indemnified for any loss, claim, damage, cost, expense or liability (i) to the extent determined by a court of competent jurisdiction in a final, non-appealable judgment to have resulted from the gross negligence, bad faith or willful misconduct of such Indemnified Person or any of such Indemnified Person's controlled or controlling affiliates or any of its or their respective officers, directors, employees, agents, advisors, controlling persons or members (collectively, "Related Persons"), (ii) arising from a material breach of such Indemnified Person's (or any of its Related Persons) obligations under the Exit Facilities Documentation (as determined in a final, non-appealable judgment by a court of competent jurisdiction), or (iii) arising from any claim, actions, suits, inquiries, litigation, investigation or proceeding that does not involve an act or omission of the Borrower or any of its affiliates and that is brought by an Indemnified Person against any other Indemnified Person (other than any claim, actions, suits, inquiries, litigation, investigation or proceeding against the Administrative Agent or the Arranger, in its capacity as such).  In addition, all reasonable, documented out-of-pocket expenses (including, without limitation, fees, disbursements and other charges of one firm of counsel for all such persons, taken as a whole (and, if necessary, by a single firm of local counsel in each appropriate jurisdiction and a single firm of specialist counsel in each appropriate jurisdiction for all such persons, taken as a whole) (and, in the case of an actual or perceived conflict of interest where the Indemnified |

|  |  | Person affected by such conflict informs you of such conflict and thereafter retains its own counsel, of another firm of counsel (and another firm of local counsel or specialist counsel, if applicable) for such affected Indemnified Person)) of (x) each of the Administrative Agent and the Arranger and the Lenders (taken as a whole) for the enforcement costs (including in connection with any restructuring or workout) and documentary taxes associated with the Exit Facilities and (y) each of the Administrative Agent and the Lenders in connection with the preparation, execution and delivery of any amendment, waiver or modification of the Exit Facilities (whether or not such amendment, waiver or modification is approved by the Lenders) will in each case be paid by the Borrower. |
|---|---|---|
| 25. | **Governing Law:** | The State of New York. |
| 26. | **Counsel to Lead Arranger and Commitment Party:** | White & Case LLP |

## EXHIBIT B

### Form of Joinder

The undersigned ("Joinder Party") hereby acknowledges that it has read and understands the Restructuring Support Agreement, dated as of [●], 2024 (the "Agreement")[1] by and among Hornblower Holdings LP, Hornblower Holdings LLC, the other Company Parties, and the Consenting Stakeholders thereto, and agrees to be bound by the terms and conditions of the Agreement as a Consenting First Lien Lender, a Consenting Incremental Superpriority Lender, or a Consenting Equityholder, and shall be deemed a "Consenting Stakeholder" and a "Party" under the terms of the Agreement.

The Joinder Party specifically agrees to be bound by the terms and conditions of the Agreement and makes all representations and warranties contained in the Agreement as of the date of this Form of Joinder and any further date specified in the Agreement.

This joinder shall be governed by the governing law set forth in the Agreement.

Date Executed:

**[JOINDER PARTY]**

_____
Name:
Title:

Address:

E-mail address(es):

| Aggregate Amounts Beneficially Owned or Managed on Account of: | |
| --- | --- |
| First Lien Claims | |
| Incremental Superpriority Claims | |
| Revolver Claims | |
| JBIH Claims | |
| Interests in Hornblower | |

---

[1]   Capitalized terms not used but not otherwise defined in this joinder shall have the meanings ascribed to such terms in the Agreement.

## EXHIBIT C

**Form of Transfer Agreement**

The undersigned ("Transferee") hereby acknowledges that it has read and understands the Restructuring Support Agreement, dated as of [●], 2024 (the "Agreement")[1] by and among Hornblower Holdings LP, Hornblower Holdings LLC, the other Company Parties, and the Consenting Stakeholders thereto, and agrees to be bound by the terms and conditions of the Agreement as a Consenting First Lien Lender, a Consenting Incremental Superpriority Lender, or a Consenting Equityholder, as applicable, and shall be deemed a "Consenting Stakeholder" and a "Party" under the terms of the Agreement.

The Transferee specifically agrees to be bound by the terms and conditions of the Agreement and makes all representations and warranties contained in the Agreement as of the date of the Transfer, including the agreement to be bound by the vote of the transferor if such vote was cast before the effectiveness of the Transfer discussed in this Transfer Agreement.

This Transfer Agreement shall be governed by the governing law set forth in the Agreement.

Date Executed:

**[TRANSFEREE]**

_____

Name:
Title:

Address:

E-mail address(es):

| Aggregate Amounts Beneficially Owned or Managed on Account of: | |
|---|---|
| First Lien Claims | |
| Incremental Superpriority Claims | |
| Revolver Claims | |
| JBIH Claims | |
| Interests in Hornblower | |

---

[1] Capitalized terms not used but not otherwise defined in this joinder shall have the meanings ascribed to such terms in the Agreement.

## EXHIBIT D

## Company Parties

|     | **Debtor** |
| --- | --- |
| 1. | Walks, LLC (Texas) |
| 2. | Hornblower Holdings LLC |
| 3. | Alcatraz Cruises, LLC |
| 4. | Alcatraz Fleet, LLC |
| 5. | Alcatraz Freedom, LLC |
| 6. | Alcatraz Island Services, LLC |
| 7. | American Countess, LLC |
| 8. | American Duchess, LLC |
| 9. | American Queen Holdco, LLC |
| 10. | American Queen Holdings, LLC |
| 11. | American Queen Steamboat Operating Company, LLC |
| 12. | American Queen Sub, LLC |
| 13. | Anchor Mexico Holdings, LLC |
| 14. | Anchor Operating System LLC |
| 15. | ASG Advisors, LLC |
| 16. | Babarusa, LLC |
| 17. | Bay State, LLC |
| 18. | Booth Primary, LLC |
| 19. | Boston Harbor Cruises, LLC |
| 20. | Choi Advisory, LLC |
| 21. | City Cruises Café, LLC |
| 22. | City Cruises Limited |
| 23. | City Ferry Transportation Services, LLC |
| 24. | Colugo Liner, LLC |
| 25. | Cruising Excursions Limited |
| 26. | Cruising Excursions Transport Limited |
| 27. | EON Partners, LLC |
| 28. | Falls Mer, LLC |
| 29. | Ferryboat Santa Rosa, LLC |
| 30. | Gharian Holdings, LLC |
| 31. | Gourd Management, LLC |
| 32. | HBAQ Holdings, LLC |
| 33. | HBAQ Holdings, LP |
| 34. | HMS American Queen Steamboat Company, LLC |
| 35. | HMS Ferries, Inc. |
| 36. | HMS Ferries – Puerto Rico, LLC |
| 37. | HMS Global Maritime, Inc. |
| 38. | HMS Global Maritime, LLC |
| 39. | HMS Vessel Holdings, LLC |
| 40. | HMS-Alabama, Inc. |
| 41. | HMS-Oklahoma, Inc. |
| 42. | HMS-WestPac, Inc. |
| 43. | HNY Ferry Fleet, LLC |

|  | **Debtor** |
|---|---|
| 44. | HNY Ferry, LLC |
| 45. | HNY Ferry II, LLC |
| 46. | Hornblower Cable Cars, Inc. |
| 47. | Hornblower Canada Co. |
| 48. | Hornblower Canada Entertainment Limited |
| 49. | Hornblower Canadian Holdings, Inc. |
| 50. | Hornblower Consulting, LLC |
| 51. | Hornblower Cruise Holdings, LLC |
| 52. | Hornblower Cruises and Events, Inc. |
| 53. | Hornblower Cruises and Events, LLC |
| 54. | Hornblower Cruises and Events Canada Limited |
| 55. | Hornblower Development, LLC |
| 56. | Hornblower Energy, LLC |
| 57. | Hornblower Facility Operations, LLC |
| 58. | Hornblower Ferry Holdings, LLC |
| 59. | Hornblower Ferry Holdings II, LLC |
| 60. | Hornblower Fleet, LLC |
| 61. | Hornblower Freedom, LLC |
| 62. | Hornblower Group Holdco, LLC |
| 63. | Hornblower Group, Inc. |
| 64. | Hornblower Group, LLC |
| 65. | Hornblower Holdco, LLC |
| 66. | Hornblower Holdings LP |
| 67. | Hornblower Hospitality Services, LLC |
| 68. | Hornblower India Holdings, LLC |
| 69. | Hornblower Metro Ferry, LLC |
| 70. | Hornblower Metro Fleet, LLC |
| 71. | Hornblower Metro Holdings, LLC |
| 72. | Hornblower Municipal Operations, LLC |
| 73. | Hornblower New York, LLC |
| 74. | Hornblower Shipyard, LLC |
| 75. | Hornblower Sub, LLC |
| 76. | Hornblower UK Holdings, Limited |
| 77. | Hornblower Yachts, LLC |
| 78. | JJ Audubon, LLC |
| 79. | Journey Beyond Holdings, Limited |
| 80. | Journey Beyond Holdings, LLC |
| 81. | Journey Beyond Intermediate Holdings, LLC |
| 82. | Liberty Cruises, LLC |
| 83. | Liberty Fleet, LLC |
| 84. | Liberty Hospitality, LLC |
| 85. | Liberty Landing Ferries, LLC |
| 86. | Lyman Partners, LLC |
| 87. | Madison Union, LLC |
| 88. | Mission Bay Water Transit Fleet, LLC |
| 89. | Mission Bay Water Transit, LLC |
| 90. | Orane Partners, LLC |

|  | **Debtor** |
|---|---|
| 91. | San Francisco Pier 33, LLC |
| 92. | SEA Operating Company, LLC |
| 93. | Seaward Services, Inc. |
| 94. | Statue Cruises, LLC |
| 95. | Statue of Liberty IV, LLC |
| 96. | Statue of Liberty V, LLC |
| 97. | Statue of Liberty VI, LLC |
| 98. | TCB Consulting, LLC |
| 99. | Venture Ashore, LLC |
| 100. | Victory Holdings I, LLC |
| 101. | Victory Holdings II, LLC |
| 102. | Victory Operating Company, LLC |
| 103. | Walks, LLC (Delaware) |
| 104. | Walks of New York Tours, LLC |
| 105. | Yardarm Club (The) Limited |
| 106. | York River Boat Cruises Limited |