IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| HORNBLOWER HOLDINGS LLC, *et al.*,[1] | Case No. 24-90061 (MI) |
| Debtors. | (Jointly Administered) |

**STATEMENT OF THE OFFICIAL COMMITTEE OF
UNSECURED CREDITORS REGARDING:**

**(1) DEBTORS' EMERGENCY MOTION FOR ENTRY OF INTERIM AND
FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO (A) OBTAIN SENIOR
SECURED POSTPETITION FINANCING AND (B) USE CASH COLLATERAL;
(II) GRANTING ADEQUATE PROTECTION TO CERTAIN PREPETITION
SECURED PARTIES, (III) SCHEDULING A FINAL HEARING, AND (IV)
GRANTING RELATED RELIEF AND**

**(2) DISCLOSURE STATEMENT FOR JOINT CHAPTER 11 PLAN OF
REORGANIZATION OF HORNBLOWER HOLDINGS LLC AND
ITS DEBTOR AFFILIATES**

(Related Docket Nos. 35, 72 & 269)

The Official Committee of Unsecured Creditors (the "Committee") of the above-captioned debtors and debtors in possession (together, the "Debtors") files this statement (this "Statement") regarding: (1) *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Senior Secured Postpetition Financing and (B) Use Cash Collateral, (II) Granting Adequate Protection to Certain Prepetition Secured Parties, (III) Scheduling a Final Hearing, and (IV) Granting Related Relief* [Docket No. 35] (the "DIP Motion") and (2) *Disclosure Statement for Joint Chapter 11 Plan of Reorganization of Hornblower Holdings LLC and Its*

---

[1] The last four digits of Debtor Hornblower Holdings LLC's tax identification number are 6035. Due to the large number of debtor entities in these chapter 11 cases, a complete list of the debtor entities and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' proposed claims and noticing agent at https://omniagentsolutions.com/Hornblower. The location of the Debtors' service address for purposes of these chapter 11 cases is: Pier 3 on The Embarcadero, San Francisco, CA 94111.

*Debtor Affiliates* [Docket No. 269] (the "Disclosure Statement"). This Court entered an interim order approving the DIP Motion on February 22, 2024 [Docket No. 72] (the "Interim Order").[2] In support of this Statement, the Committee respectfully states as follows:

## THE PARTIES WORK TO SETTLE THE DIP MOTION

1. The Committee was appointed on March 5, 2024. Since soon after its appointment and the retention of its advisors, the Committee has been involved in negotiations with the Debtors, the DIP Lenders, and the Prepetition Secured Parties, primarily consisting of Strategic Value Partners LLC ("SVP") and funds managed by the Debtors' largest shareholder/insider, Crestview Advisors, L.L.C. (including any such funds, "Crestview"), regarding a resolution of the Committee's objections to the DIP Motion and the terms of a Final Order. After substantial arms' length negotiations, the parties reached a resolution on the DIP Motion and the Final Order that meaningfully improves the terms for general unsecured creditors. Namely, the resolution includes, among other points, certain requirements for the DIP Lenders and the Prepetition Secured Parties to marshal their recoveries away from all previously unencumbered assets of the estates, in addition to Avoidance Proceeds (as originally proposed).

## THE COMMITTEE'S EXTENSIVE ONGOING INVESTIGATION:
## WHERE THERE IS SMOKE …

2. With the DIP Motion and Final Order resolved, the Committee is now focused on its investigation into historical transactions and the broad releases proposed to be awarded to the lenders, equity holders, directors and officers of the Debtors under the terms of the proposed *Joint Chapter 11 Plan of Reorganization of Hornblower Holdings LLC and Its Debtor Affiliates* [Docket

---

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the DIP Motion or the Interim Order, as applicable.

4854-9926-7759.4 36999.00002

No. 268]. The Committee is concerned about AQV's precipitous and unusual shutdown immediately before the Petition Date and the consideration proposed to be paid to the Debtors' largest equity holder, Crestview, despite it having engaged in certain prepetition transactions that appear to have been undisclosed. Under the Plan, Crestview now stands to acquire Journey Beyond for a non-market tested or valued $50 million under the Restructuring Support Agreement (the "RSA"). It also appears that the Crestview transactions hurt the Debtors by eliminating the ability of the Debtors to monetize nearly $200 million of net operating loss tax attributes ("NOLs"), which could have been worth nearly $40 million to the estates – now, it preliminary appears that due to Crestview's actions, the NOLs may be worthless to the Debtors.

3. There are a variety of other areas that the Committee is investigating and this Statement informs the Court that the Committee is taking its fiduciary duties seriously. The Committee's investigations are critically important given that Debtors' co-counsel, Porter Hedges LLP, concurrently represents the Special Committee, which is supposed to be doing its own independent investigation. Based on this fact, the Committee is the only true independent investigative body in these cases and it intends to convey its findings to the Court at the conclusion of the Committee's investigation.

4. Pursuant to the RSA, the Debtors have reached agreement with SVP and Crestview, the Debtors' largest equity holder, to confirm the Plan, pursuant to which: (a) the bulk of the equity in the reorganized Debtors will be handed over to SVP and Crestview at a currently unsupported $725 million plan valuation negotiated without, as the Committee currently understands, any contemporaneous market test; (b) the non-Debtor Journey Beyond business division will be bestowed upon Crestview (possibly in consideration of a $50 million payment from Crestview, but whether that is fair value is unknown as Journey Beyond has not been valued

by either the market or otherwise); and (c) general unsecured creditors who may be owed tens of millions of dollars, if not more than a hundred million dollars of claims due to the precipitous and unnecessary prepetition shut down of AQV, will be left with potentially no recovery.

5.  The Committee believes (but continues to investigate) that, in the months ahead of the Debtors' bankruptcy filing, Crestview—an insider and the Debtors' largest equity holder—acquired over 25% of the aggregate amount of the Prepetition First Lien Obligations and all of the Prepetition Revolving Obligations at a distressed purchase price.[3]  It is not clear if this fact was disclosed to the Board, and it is not yet known if the majority of the Board members were, at the time of the acquisitions, related to Crestview, even if such fact was disclosed.  Certain additional assets also may have been pledged to the Prepetition Secured Parties during this same period.  As of the Petition Date, the Prepetition First Obligations total approximately $695 million in principal amount, and the Prepetition Revolving Obligations total approximately $26 million in principal amount.  The RSA, and now the proposed Plan, allocates the debt and equity positions of SVP and Crestview in connection with the restructuring transactions in these cases at 72.21% for SVP and 27.79% for Crestview.

6.  Although the Committee has just commenced its investigation of prepetition transactions, Crestview appears to have used its insider control over the Debtors and recently acquired position as prepetition secured lender to negotiate a deal with SVP to divide up the

---

[3]  As stated by Debtors' counsel at the first day hearing:

> Based on the values on which the RSA and restructuring term sheets are negotiated on, these two facilities are over secured. The fulcrum creditor in this case, under our view of the world, is the first lien term loans. That's the 650 plus about 75 of various revolver loans that's the junior secured piece of the structure. And that's where, today, 98 percent of it is held by either SVP or Crestview.

Transcript of Hearing dated February 21, 2024, at p. 39, ln. 6-13.

valuable assets of the Hornblower Debtors and take over the Journey Beyond division, all to the detriment of general unsecured creditors.

7. The Committee sees a lot of smoke. Whether there is fire down the various investigation paths is not yet known, but the current intended end of the path is clear from the proposed Plan: SVP and Crestview will essentially own 100% of the Reorganized Debtors' equity value following consummation of the Plan. More specifically, under the RSA (and now the proposed Plan), participants in the contemplated rights offering of up to $345 million (basically just SVP and Crestview) will receive 84% of the equity in the reorganized Hornblower Debtors due to a significant discount to the negotiated Plan value and as a result of a 10% backstop fee.[4] The vast majority of the remaining equity (save for a management incentive plan) also will go to SVP and Crestview on account of their Prepetition First Lien Obligations and Prepetition Revolving Obligations. In each case, the Committee is investigating how the Debtors' actual value may be different from the negotiated values.[5] The Committee is also evaluating, among other potential claims, whether any of Crestview's prepetition conduct rises to a level warranting recharacterization or equitable subordination of its asserted secured claims against these estates.

8. The Committee is informed (but continues to investigate) that, in the months prior to the Petition Date, the Debtors had an active outreach program to provide reassurance to trade partners, such as travel agents for the AQV business, with the aim of getting those partners to

---

[4] The proceeds of the rights offering are mostly a pass through to SVP and Crestview by paying off the Junior DIP Facility, which is funded by SVP and Crestview.

[5] The Committee's preliminary view is that there is substantial value in the go-forward Hornblower business. Among numerous valuable assets, the Hornblower business includes *billions* of dollars of long-term government contracts, such as operating the New York City ferry service, the Puerto Rico ferry service, and the NYC National Parks services (e.g., Ellis Island and the Statue of Liberty), in addition to other high-growth businesses such as a white label tour business and a recently launched ticketing technology platform. *See, e.g.*, https://www.traveldailynews.com/technology/anchor-operating-system-officially-becomes-independent-division-of-hornblower-group/

4854-9926-7759.4 36999.00002

continue supporting the business. Then, in February 2024, just before the Petition Date, the Debtors, and possibly Crestview, and SVP, made the unusual decision to precipitously shut down that division, leaving trade vendors and contract counterparties completely in the lurch.

9. In addition to the now many unpaid trade vendors and contract counterparties left holding the empty bag, hundreds of employees were terminated and hundreds of consumers who paid deposits were left without a cruise. Again, subject to a more fulsome investigation, it appears as though the Debtors actively sought to have consumers make "loans" (*i.e.*, deposits) to finance operations at a time that they knew they likely would not be able to perform, or potentially, intended not to perform. Notably, the Committee has been informed (but is still investigating) that the Debtors routinely swept cash from the AQV business, including tens of millions of customer deposits, to central Hornblower accounts.

10. In essence, it appears as though the lenders benefited by the deposits paid by customers that were generated from the travel agents who apparently received assurance that AQV was performing well and would continue operating in the future. The Committee is investigating the seeming buildup of customers' deposits because it appears as though the Debtors, and potentially with the support or involvement of SVP and Crestview, shifted what would have been their responsibility for paying customers' priority claims under 507(a)(7) of the Bankruptcy Code under the proposed Plan to the sureties to pay those claims, thereby potentially increasing the general unsecured claim pool by as much as $35 million.

11. If supported by the facts, this kind of behavior alone, and certainly in the aggregate, is potentially actionable against persons who encouraged vendors to deliver goods and services on credit under false pretenses and/or wrongly encouraged customers to make deposits and/or knowingly swept cash out of the AQV business for the benefit of the Hornblower business. The

6

Debtors and the Prepetition Secured Parties now seek to liquidate the assets of the AQV Debtors through an expedited sale process without the benefit of a going concern business (which, if it was an ongoing business, employees could have been employed by a third party and any potential employee liabilities would have been substantially reduced) and to distribute the proceeds thereof to the lenders. All the foregoing has led to a substantial increase in the potential pool of general unsecured claims that will be asserted against the estates, which is yet another area the Committee is investigating.

12. Lastly, and to add insult to injury, the Debtors paid their management team and other employees millions of dollars in prepetition retention bonuses on the eve of bankruptcy. Although there seems little doubt that these payments may be avoidable, the Committee is investigating and intends to pursue any appropriate relief against the recipients of those funds.

13. On March 18, 2024, the Debtors filed the Plan and Disclosure Statement, which seeks to implement the terms of the RSA, but the treatment of general unsecured claims is left blank. The Disclosure Statement is a nebulous document filed without financial projections, a liquidation analysis, or any detailed valuations. The Disclosure Statement (and the Plan) do contain broad-ranging releases for the directors, officers, lenders, and equity holders of the Debtors. The Disclosure Statement and Plan were not vetted with the Committee in advance of filing.

14. The Committee seeks no relief from the Court at this time and is encouraging the parties to cooperate in its investigation, but seeks with this Statement to be transparent with the Court and parties in interest about the Committee's serious concerns regarding the current path of these cases and the proposed Plan and its releases. Consistent with its efforts to be transparent,

the Committee intends to report its findings to the Court when its investigation concludes and will seek to redress any transactions that may have been inappropriate.

15. While all rights of the Committee are reserved pending the outcome of its ongoing investigations, the Committee also reserves the right to seek an extension of the milestones in these cases if its investigation receives resistance.

*[Remainder of Page Intentionally Left Blank]*

Dated: March 22, 2024

Respectfully submitted,

**PACHULSKI STANG ZIEHL & JONES, LLP**

*/s/ Michael D. Warner*
Michael D. Warner (TX Bar No. 00792304)
Benjamin L. Wallen (TX Bar No. 24102623)
Theodore S. Heckel (TX Bar No. 24133488)
700 Louisiana Street, Suite 4500
Houston, TX 77002
Telephone: (713) 691-9385
Facsimile: (713) 691-9407
Email: mwarner@pszjlaw.com
bwallen@pszjlaw.com
theckel@pszjlaw.com

-and-

Jeffrey N. Pomerantz (admitted *pro hac vice*)
Cia H. Mackle (admitted *pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email: jpomerantz@pszjlaw.com
cmackle@pszjlaw.com

-and-

Bradford J. Sandler (admitted *pro hac vice*)
780 Third Avenue, 34th Floor
New York, NY 10017
Telephone: (212) 561-7700
Facsimile: (212) 561-7777
Email: bsandler@pszjlaw.com

*Proposed Counsel to the Official Committee of Unsecured Creditors*

## **CERTIFICATE OF SERVICE**

      I certify that on March 22, 2024, I caused a copy of the foregoing document to be served via the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

                                            */s/ Michael D. Warner*
                                            Michael D. Warner

4854-9926-7759.4 36999.00002