## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| HORNBLOWER HOLDINGS LLC, *et al.*,[1] | ) Case No. 24-90061 (MI) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |

## SECOND AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF HORNBLOWER HOLDINGS LLC AND ITS DEBTOR AFFILIATES

**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
Paul M. Basta (admitted *pro hac vice*)
Jacob A. Adlerstein (admitted *pro hac vice*)
Kyle J. Kimpler (admitted *pro hac vice*)
Sarah Harnett (admitted *pro hac vice*)
Neda Davanipour (admitted *pro hac vice*)
Kyle R. Satterfield (admitted *pro hac vice*)
1285 Avenue of the Americas
New York, New York 10019
Telephone: (212) 373-3000
Facsimile: (212) 757-3990

*Counsel to the Debtors
and Debtors in Possession*

Dated:  April 11, 2024

**PORTER HEDGES LLP**
John F. Higgins (TX Bar No. 09597500)
M. Shane Johnson (TX Bar No. 24083263)
Megan Young-John (TX Bar No. 24088700)
1000 Main St., 36th Floor
Houston, Texas 77002
Telephone: (713) 226-6000
Facsimile: (713) 226-6248

*Co-Counsel to the Debtors
and Debtors in Possession*

---

[1]  The last four digits of Debtor Hornblower Holdings LLC's tax identification number are 6035.  Due to the large number of debtor entities in these chapter 11 cases, which are being jointly administered, a complete list of the debtor entities and the last four digits of their federal tax identification numbers is not provided herein.  A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://omniagentsolutions.com/Hornblower.  The location of the Debtors' service address for purposes of these chapter 11 cases is: Pier 3 on The Embarcadero, San Francisco, CA 94111.

# TABLE OF CONTENTS

**Page**

ARTICLE I. DEFINED TERMS, RULES OF INTERPRETATION,  COMPUTATION OF TIME, AND GOVERNING LAWS ......................................................................................................1
- A.     Defined Terms ...........................................................................................................1
- B.     Rules of Interpretation ............................................................................................20
- C.     Computation of Time ..............................................................................................21
- D.     Governing Laws ......................................................................................................21
- E.     Reference to Monetary Figures ...............................................................................22
- F.     Reference to the Debtors or the Reorganized Debtors .............................................22
- G.     Controlling Document .............................................................................................22
- H.     Consent Rights ........................................................................................................22

ARTICLE II. ADMINISTRATIVE, PRIORITY CLAIMS, AND STATUTORY FEES ......................22
- A.     Administrative Claims .............................................................................................22
- B.     DIP Claims..............................................................................................................24
- C.     Restructuring Expenses ...........................................................................................25
- D.     Professional Fee Claims..........................................................................................25
- E.     Priority Tax Claims .................................................................................................27
- F.     Payment of Statutory Fees.......................................................................................27

ARTICLE III. CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS...................27
- A.     Classification in General .........................................................................................27
- B.     Formation of Debtor Groups for Convenience Only................................................28
- C.     Summary of Classification.......................................................................................28
- D.     Treatment of Claims and Interests ...........................................................................29
- E.     Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code .................33
- F.     No Substantive Consolidation..................................................................................33
- G.     Special Provision Governing Unimpaired Claims or Interests...................................34
- H.     Elimination of Vacant Classes.................................................................................34
- I.      Acceptance by Impaired Classes..............................................................................34
- J.      Voting Classes; Presumed Acceptance by Non-Voting Classes ...............................34
- K.     Controversy Concerning Impairment.......................................................................34
- L.     Intercompany Interests ............................................................................................34
- M.     Relative Rights and Priorities..................................................................................35

ARTICLE IV. MEANS FOR IMPLEMENTATION OF THIS PLAN.................................................35
- A.     Sources of Consideration for Plan Distributions ......................................................35
- B.     AQV Wind Down ...................................................................................................40
- C.     General Settlement of Claims and Interests ..............................................................42
- D.     Restructuring Transactions.......................................................................................42
- E.     Reorganized Debtors and the AQV Wind Down Co................................................43
- F.     Corporate Existence ................................................................................................44
- G.     Exemption from Registration...................................................................................44
- H.     Vesting of Assets in the Reorganized Debtors or AQV Wind Down Co....................45
- I.      Cancellation of Existing Securities and Agreements ................................................45
- J.      Corporate Action.....................................................................................................46
- K.     New HB Organizational Documents .........................................................................47
- L.     Directors, Managers, and Officers of the Reorganized Hornblower Debtors .............47
- M.     Effectuating Documents; Further Transactions.........................................................48
- N.     Section 1146 Exemption..........................................................................................48
- O.     Preservation of Causes of Action.............................................................................49
- P.     MIP ........................................................................................................................50
- Q.     Employment and Retiree Benefits............................................................................50

R.      Dissolution of Certain Debtors...................................................................................50
S.      Private Company...........................................................................................................51
T.      Cashless Transactions...................................................................................................51

ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES .............................51
A.      Assumption, Assumption and Assignment, and Rejection of Executory Contracts and Unexpired Leases .......................................................................................................51
B.      Claims Based on Rejection of Executory Contracts and Unexpired Leases ...................53
C.      Cure of Defaults for Assumed Executory Contracts and Unexpired Leases..................53
D.      Preexisting Obligations to the Debtors under Executory Contracts and Unexpired Leases 55
E.      Indemnification Obligations..........................................................................................55
F.      Insurance Policies..........................................................................................................56
G.      Nonoccurrence of Plan Effective Date..........................................................................56
H.      Reservation of Rights....................................................................................................56

ARTICLE VI. PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS AND INTERESTS.............................................................................................57
A.      Allowance of Claims......................................................................................................57
B.      Estimation of Claims and Interests ...............................................................................57
C.      Adjustment to Claims....................................................................................................58
D.      Objections to Claims......................................................................................................58
E.      Disallowance of Claims or Interests...............................................................................58
F.      No Distributions Pending Allowance.............................................................................59
G.      Distributions After Allowance ......................................................................................59

ARTICLE VII. THE AQV WIND DOWN CO. ADMINISTRATOR ..........................................................59
A.      AQV Wind Down Co. Administrator Rights and Powers................................................59
B.      Tax Returns...................................................................................................................60

ARTICLE VIII. PROVISIONS GOVERNING DISTRIBUTIONS .............................................................60
A.      Timing and Calculation of Amounts to Be Distributed..................................................60
B.      Distribution Agent and AQV Wind Down Co. Administrator.........................................61
C.      Distribution Record Date ..............................................................................................61
D.      Rights and Powers of Distribution Agent ......................................................................61
E.      Delivery of Distributions and Undeliverable or Unclaimed Distributions......................62
F.      Manner of Payment.......................................................................................................63
G.      No Postpetition Interest on Claims................................................................................63
H.      Compliance with Tax Requirements..............................................................................63
I.      Allocations....................................................................................................................64
J.      Foreign Currency Exchange Rate ..................................................................................64
K.      Setoffs and Recoupment ...............................................................................................64
L.      Claims Paid or Payable by Third Parties........................................................................65
M.      Antitrust and Foreign Investment Approvals.................................................................66

ARTICLE IX. RELEASE, INJUNCTION, AND RELATED PROVISIONS .................................................66
A.      Discharge of Claims and Termination of Interests.........................................................66
B.      Release of Liens.............................................................................................................66
C.      Debtor Release...............................................................................................................67
D.      Third-Party Release.......................................................................................................69
E.      Exculpation....................................................................................................................70
F.      Injunction......................................................................................................................71
G.      Waiver of Statutory Limitations on Releases.................................................................73
H.      Protection against Discriminatory Treatment................................................................73
I.      Document Retention......................................................................................................74
J.      Reimbursement or Contribution....................................................................................74

ARTICLE X. CONDITIONS PRECEDENT TO CONSUMMATION OF THIS PLAN......................................74
    A.    Conditions Precedent to the Plan Effective Date ...........................................................74
    B.    Waiver of Conditions ...................................................................................................76
    C.    Substantial Consummation ...........................................................................................76
    D.    Effect of Nonoccurrence of a Condition ......................................................................76

ARTICLE XI. MODIFICATION, REVOCATION, OR WITHDRAWAL OF THIS PLAN............................76
    A.    Modification and Amendments.....................................................................................76
    B.    Effect of Confirmation on Modifications .....................................................................77
    C.    Revocation or Withdrawal of This Plan .......................................................................77

ARTICLE XII. RETENTION OF JURISDICTION...............................................................................77

ARTICLE XIII. MISCELLANEOUS PROVISIONS ..............................................................................80
    A.    Immediate Binding Effect............................................................................................80
    B.    Waiver of Stay .............................................................................................................81
    C.    Additional Documents ..................................................................................................81
    D.    Reservation of Rights ...................................................................................................81
    E.    Successors and Assigns.................................................................................................81
    F.    Notices .........................................................................................................................82
    G.    Term of Injunctions or Stays........................................................................................83
    H.    Entire Agreement .........................................................................................................83
    I.    Exhibits .......................................................................................................................83
    J.    Deemed Acts ................................................................................................................84
    K.    Severability of Plan Provisions ....................................................................................84
    L.    Votes Solicited in Good Faith ......................................................................................84
    M.    Request for Expedited Determination of Taxes.............................................................85
    N.    No Waiver or Estoppel.................................................................................................85
    O.    Dissolution of the Creditors' Committee and Cessation of Fee and Expense Payment...85
    P.    Closing of Chapter 11 Cases ........................................................................................85
    Q.    Creditor Default ...........................................................................................................85

## INTRODUCTION

Hornblower Holdings LLC and the other above-captioned debtors and debtors in possession (collectively, the "Debtors") propose this second amended joint chapter 11 plan of reorganization (as modified, amended, or supplemented from time to time, the "Plan") pursuant to section 1121(a) of the Bankruptcy Code. Although proposed jointly for administrative and distribution purposes, this Plan constitutes a separate plan for each Debtor and each Debtor is a proponent of the Plan within the meaning of section 1129 of the Bankruptcy Code. Capitalized terms used herein shall have the meanings set forth in Article I.A.

Reference is made to the accompanying *Disclosure Statement for the Second Amended Joint Chapter 11 Plan of Reorganization of Hornblower Holdings LLC and Its Debtor Affiliates* for a discussion of the Debtors' history, businesses, assets and operations, projections, risk factors, a summary and analysis of this Plan and the transactions contemplated thereby, and certain related matters.

ALL HOLDERS OF CLAIMS, TO THE EXTENT APPLICABLE, ARE ENCOURAGED TO READ BOTH THIS PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THIS PLAN.

## ARTICLE I.
## DEFINED TERMS, RULES OF INTERPRETATION,
## COMPUTATION OF TIME, AND GOVERNING LAWS

### A.   *Defined Terms*

As used in this Plan and the Confirmation Order, capitalized terms have the meanings set forth below.

1.      "Administrative Claim" means a Claim for costs and expenses of administration of the Debtors' Estates pursuant to sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred after the Petition Date and through the Plan Effective Date of preserving the Estates and operating the businesses of the Debtors; (b) Allowed Professional Fee Claims; (c) the Restructuring Expenses incurred after the Petition Date and through the Plan Effective Date; (d) the Backstop Commitment Premium; and (e) all fees and charges assessed against the Estates under chapter 123 of the Judicial Code.

2.      "Administrative Claims Bar Date" means, unless otherwise provided herein, the deadline for Filing proofs of or requests for payment of Administrative Claims, which (a) with respect to Administrative Claims other than Professional Fee Claims, the Restructuring Expenses, and the Backstop Commitment Premium, shall be thirty (30) days after the Plan Effective Date, and (b) with respect to Professional Fee Claims, shall be forty-five (45) days after the Plan Effective Date, unless otherwise ordered by the Bankruptcy Court.

3.      "Affiliate" means, with respect to any specified Entity, any other Entity directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Entity. For purposes of this definition, "control" (including, with correlative meanings,

the terms "controlling," "controlled by," and "under common control with") as used with respect to any Entity, shall mean the possession, directly or indirectly, of the right or power to direct or cause the direction of the management or policies of such Entity, whether through the ownership of voting securities, by agreement, or otherwise.

4.      "Agents" has the meaning ascribed to it in the RSA.

5.      "Allowed" means, with respect to any Claim or Interest, as applicable, except to the extent that this Plan provides otherwise, any portion thereof: (a) that is allowed under the Plan, by Final Order, or pursuant to a settlement; (b) that is evidenced by a Proof of Claim timely Filed by the applicable Claims Bar Date or a request for payment of an Administrative Claim Filed by the Administrative Claims Bar Date, as applicable (or that is not required to be evidenced by a Filed Proof of Claim under the Plan, the Bankruptcy Code, or a Final Order); or (c) that is scheduled by the Debtors as not disputed, contingent, or unliquidated, and for which no Proof of Claim has been timely Filed; *provided* that, with respect to a Claim or Interest described in clauses (b) and (c) above, such Claim or Interest shall be considered Allowed only if and to the extent that such Claim or Interest is not Disallowed and no objection to the allowance of such Claim or Interest is interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or such an objection is so interposed and the Claim or Interest has been Allowed by a Final Order. No Claim of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such Entity pays in full the amount that it owes such Debtor or Reorganized Debtor, as applicable. "Allow," "Allowing," and "Allowance" shall have correlative meanings.

6.      "Antitrust and Foreign Investment Approvals" means any notification, authorization, approval, consent, filing, application, non-objection, expiration, or termination of applicable waiting period (including any extension thereof), exemption, determination of lack of jurisdiction, waiver, variance, filing, permission, qualification, registration, or notification required under any Antitrust and Foreign Investment Laws applicable to receipt of the New HB Common Equity (or New Warrants).

7.      "Antitrust and Foreign Investment Laws" means any law governing foreign investment, agreements in restraint of trade, monopolization, merger or pre-merger notification, or the lessening of competition through merger, acquisition, or anti-competitive conduct, including the Sherman Act of 1890, the Clayton Act of 1914, the Federal Trade Commission Act of 1914, and the Hart-Scott-Rodino Antitrust Improvements Act of 1976 (each as amended and together with the rules and regulations promulgated thereunder).

8.      "AQV Bidding Procedures Order" means the *Order (A) Approving (I) Bidding Procedures for the Sale of the AQV Debtors' Assets, (II) Procedures Regarding Bid Protections, (III) the Scheduling of Certain Dates With Respect Thereto, (IV) the Form and Manner of Notice Thereof, (V) Contract Assumption, Assignment, and Rejection Procedures, and (VI) Certain Procedures to Otherwise Dispose of the AQV Assets, and (B) Authorizing the Debtors to Enter Into Agreements for the Sale of Their Assets Free and Clear of All Liens, Claims, and Encumbrances* [Docket No. 166].

9.    "AQV Cash Proceeds" means, collectively, the net proceeds of the AQV Sale Transaction and the net proceeds from the monetization of the AQV Remaining Assets.

10.    "AQV Debtors" means, collectively, American Queen Holdco, LLC and its direct and indirect subsidiaries.

11.    "AQV Net Cash Proceeds" means the remaining net proceeds of the AQV Cash Proceeds following the full and final satisfaction of (a) Administrative Claims, (b) Priority Tax Claims, (c) Other Secured Claims, (d) Other Priority Claims, and (e) Allowed DIP Claims asserted against the AQV Debtors.

12.    "AQV Purchaser" means the proposed purchaser or purchasers in the AQV Sale Transaction.

13.    "AQV Remaining Assets" means the assets of the AQV Debtors that are not acquired by the AQV Purchaser pursuant to the AQV Sale Transaction.

14.    "AQV Remaining Assets Wind Down" means the liquidation and monetization of the AQV Remaining Assets and the distribution of the AQV Cash Proceeds and AQV Net Cash Proceeds, consistent with the terms of the Plan, which shall be funded by the AQV Wind Down Amount contemplated by the AQV Wind Down Budget.

15.    "AQV Sale Order" means the Order or Orders of the Bankruptcy Court authorizing the AQV Debtors to implement and close the AQV Sale Transaction.

16.    "AQV Sale Transaction" means, in connection with the AQV Wind Down, a sale or multiple sales of the assets of the AQV Debtors to a purchaser or purchasers to be consummated pursuant to the AQV Sale Order pursuant to section 363 of the Bankruptcy Code.

17.    "AQV Wind Down" means a sale and/or wind down of the AQV Debtors.

18.    "AQV Wind Down Amount" means the amount of Cash, to be agreed between the Debtors and the Required Consenting HB First Lien Lenders, that shall fund the AQV Wind Down, including the AQV Remaining Assets Wind Down, including the reconciliation of Administrative Claims, Priority Tax Claims, and General Unsecured Claims, and the distributions to be made in accordance with the terms of the Plan.

19.    "AQV Wind Down Budget" means the budget with respect to the AQV Wind Down, including the AQV Remaining Assets Wind Down, as agreed upon between the Debtors and the Required Consenting HB First Lien Lenders, which shall provide for the AQV Wind Down Amount to fund the AQV Wind Down Co. Administrator's effectuation of the AQV Remaining Assets Wind Down.

20.    "AQV Wind Down Co." means the Entity or Entities to which the AQV Remaining Assets will be retained or distributed on the Plan Effective Date, to be administered by the AQV Wind Down Co. Administrator.

21.     "AQV Wind Down Co. Administrator" means the Reorganized Hornblower Debtors or such other Entity or Entities to be selected by the Reorganized Hornblower Debtors to administer the AQV Remaining Assets Wind Down.  All costs, liabilities, and expenses reasonably incurred by the AQV Wind Down Co. Administrator, and any personnel employed by the AQV Wind Down Co. Administrator, in the performance of the AQV Wind Down Co. Administrator's duties shall be paid from the AQV Wind Down Amount.

22.     "Backstop Commitment" means the commitment, on the terms set forth in the Backstop Commitment Agreement, of each Backstop Party to purchase (directly or through an Affiliate) a portion of the New HB Common Equity (or New Warrants) offered for sale in the Rights Offering to the extent that such Rights Offering is not fully subscribed pursuant to the terms and conditions thereof.

23.     "Backstop Commitment Agreement" means that certain backstop commitment agreement, dated as of February 21, 2024, among Hornblower Holdings LP, each of the other Debtors listed on Schedule 1 thereto, and the Backstop Parties party thereto, as may be amended, supplemented, or modified from time to time.

24.     "Backstop Commitment Premium" has the meaning ascribed to it in the Backstop Commitment Agreement.

25.     "Backstop Documents" means the Backstop Motion (as defined in the RSA), the Backstop Order, and the Backstop Commitment Agreement.

26.     "Backstop Order" means the Order entered by the Bankruptcy Court approving the relief requested in the Backstop Motion (as defined in the RSA), including the authorization for the Debtors to enter into the Backstop Commitment Agreement.

27.     "Backstop Parties" means each of the Consenting HB First Lien Lenders that are party to the Backstop Commitment Agreement as of the RSA effective date or their designees or transferees that will provide the Backstop Commitments.

28.     "Bankruptcy Code" means Title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as amended.

29.     "Bankruptcy Court" means the United States Bankruptcy Court for the Southern District of Texas.

30.     "Bankruptcy Local Rules" means the Bankruptcy Local Rules for the Southern District of Texas.

31.     "Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure promulgated under title 28 of the United States Code, 28 U.S.C. § 2075.

32.     "Business Day" means any day other than a Saturday, Sunday, or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, the state of New York.

33.      "Cash" means the legal tender of the United States of America and equivalents thereof, including bank deposits and checks.

34.      "Cash Collateral" has the meaning set forth in section 363(a) of the Bankruptcy Code.

35.      "Causes of Action" means any action, Claim, cause of action, controversy, demand, right, right of setoff, action, lien, indemnity, interest, guaranty, suit, obligation, liability, damage, judgment, account, defense, offset, power, privilege, or license of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Plan Effective Date, in contract or in tort, in law (whether local, state, or federal U.S. or non-U.S. law) or in equity, or pursuant to any other theory of local, state, or federal U.S. or non-U.S. law.  For the avoidance of doubt, "Cause of Action" includes: (a) any right of setoff, counterclaim, cross claim, contribution, or recoupment; (b) any Claim based on or relating to, or in any manner arising from, in whole or in part, tort, breach of contract, breach of fiduciary duty, fraudulent transfer or fraudulent conveyance or voidable transaction law, violation of local, state, or federal or non-U.S. law or breach of any duty imposed by law or in equity, including securities laws, negligence, and gross negligence; (c) any Claim pursuant to section 362 or chapter 5 of the Bankruptcy Code or similar local, state, or federal U.S. or non-U.S. law; (d) any Claim or defense including fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; (e) any state or foreign law pertaining to actual or constructive fraudulent transfer, fraudulent conveyance, or similar Claim; (f) any "lender liability" or equitable subordination Claims or defenses; and (g) the right to object to or otherwise contest any Claims or Interests.

36.      "CBAs" means (a) that certain Collective Agreement between Hornblower Canada Co. (d.b.a. Niagara City Cruises) and the Canadian Merchant Service Guild, effective January 27, 2023 to October 15, 2025; (b) that certain Agreement by and between HMS Ferries, Inc., Pierce County Project and International Organization of Masters, Mates & Pilots, United Inland Group, effective June 1, 2022 to March 31, 2027; (c) that certain Captains' Agreement between Statue Cruises, LLC and International Organization of Masters, Mates & Pilots, AFL-CIO, effective February 1, 2022 to January 31, 2025; and (d) that certain Deckhands' Agreement between Statue Cruises, LLC and International Organization of Masters, Mates & Pilots, AFL-CIO, effective February 1, 2022 to January 31, 2025.

37.      "CCAA Court" means the Ontario Superior Court of Justice (Commercial List).

38.      "Chapter 11 Cases" means (a) when used with reference to a particular Debtor, the case pending for that Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court and (b) when used with reference to all the Debtors, the procedurally consolidated chapter 11 cases pending for the Debtors in the Bankruptcy Court.

39.      "Claim" means any claim, as defined in section 101(5) of the Bankruptcy Code, against any of the Debtors.

40.     "Claims Bar Date" means the applicable deadline set by the Bankruptcy Court for filing Proofs of Claim with respect to Claims other than Administrative Claims or other Claims for which the Bankruptcy Court has entered an Order excusing the Holders of such Claims from the requirement to File Proofs of Claim in these Chapter 11 Cases.

41.     "Claims Objection Deadline" means the deadline for objecting to a Claim asserted against a Debtor, which shall be (a) with respect to Administrative Claims (other than Professional Fee Claims) and Claims subject to 11 U.S.C. § 503(b)(9), 90 days after the Administrative Claims Bar Date or (b) with respect to all other Claims (other than Professional Fee Claims), the later of (i) the first Business Day that is at least 180 days after the Plan Effective Date and (ii) such other period of limitation as may be specifically fixed by the Debtors, the Reorganized Debtors, or the AQV Wind Down Co., as applicable, or by an Order of the Bankruptcy Court for objecting to such Claims.

42.     "Claims Register" means the official register of Claims against the Debtors maintained by the Notice and Claims Agent.

43.     "Class" means a category of Holders of Claims or Interests classified together, as set forth in Article ARTICLE III pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.

44.     "Combined Hearing" means the hearing to be held by the Bankruptcy Court to consider Confirmation of this Plan and final approval of the Disclosure Statement pursuant to sections 1125 and 1129 of the Bankruptcy Code, as such hearing may be adjourned or continued from time to time.

45.     "Company" means, collectively, the Debtors and the Non-Debtor Affiliates.

46.     "Confirmation" means the Bankruptcy Court's entry of the Confirmation Order on the docket of the Chapter 11 Cases, within the meaning of Bankruptcy Rules 5003 and 9021.

47.     "Confirmation Date" means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases within the meaning of Bankruptcy Rules 5003 and 9021.

48.     "Confirmation Order" means an Order of the Bankruptcy Court confirming this Plan in the Chapter 11 Cases under section 1129 of the Bankruptcy Code.

49.     "Confirmation Recognition Order" means an Order of the CCAA Court recognizing the Confirmation Order.

50.     "Consenting HB First Lien Lenders" has the meaning ascribed to it in the RSA.

51.     "Consenting JBIH Lenders" has the meaning ascribed to it in the RSA.

52.     "Consenting Stakeholders" means the Consenting Lenders and the Consenting Equityholders (each as defined in the RSA).

53.     "Consummation" means the occurrence of the Plan Effective Date.

54.  "Creditors' Committee" means the statutory committee of unsecured creditors, appointed in the Chapter 11 Cases by the U.S. Trustee pursuant to the U.S. Trustee's *Notice of Appointment of Committee of Unsecured Creditors* [Docket No. 195], filed on March 5, 2024, and the *\*Corrected\* Notice of Appointment of Committee of Unsecured Creditors* [Docket No. 208], filed on March 6, 2024, as may be further reconstituted from time to time.

55.  "Crestview" means each of Crestview HB Holdings, L.P., Crestview IV HB Holdings, L.P., and, in each case, each Related Fund thereof.

56.  "Crestview Cash Contribution" means $50 million in Cash funded by Crestview or an Affiliate thereof (or, at Crestview's election, funded net of any amounts due to Crestview under this Plan including, but not limited to, on account of First Lien Claims or DIP Claims) on the Plan Effective Date in connection with, and subject to, consummation of the RSA Settlement and the other Restructuring Transactions and the occurrence of the Plan Effective Date.

57.  "Cure Claim" means any Claim (unless waived or modified by the applicable counterparty) based upon the Debtors' defaults under any Executory Contract or Unexpired Lease at the time such Executory Contract or Unexpired Lease is assumed by the Debtors pursuant to section 365 of the Bankruptcy Code, other than a default that is not required to be cured pursuant to section 365(b)(2) of the Bankruptcy Code.

58.  "Cure Notice" means a notice to parties to executory contracts or unexpired leases to be assumed or assumed and assigned reflecting the Debtors' intention to potentially assume or assume and assign the contract or lease in connection with the Plan and, where applicable, setting forth the proposed cure amount (if any).

59.  "D&O Liability Insurance Policies" means all insurance policies of any of the Debtors for current or former directors', managers', members', and officers' liability issued at any time to or providing coverage to, or for the benefit of, any Debtor Entity, and all agreements, documents, or instruments relating thereto (including any "tail policy") in effect or purchased on or prior to the Plan Effective Date.

60.  "Debtors" has the meaning set forth in the introduction hereof.

61.  "Debtor Release" means the release given on behalf of the Debtors and their Estates to the Released Parties as set forth in Article ARTICLE IX.C of the Plan.

62.  "Definitive Documents" has the meaning ascribed to it in the RSA.

63.  "DIP Agents" means GLAS Trust Company LLC and its permitted assigns, in its capacity as administrative agent and collateral agent under each of the Senior DIP Credit Agreement and the Junior DIP Credit Agreement (as the context may require), and any replacement or successor agent thereto.

64.  "DIP Claims" means any Claim on account of, arising under, or relating to the DIP Loans, the DIP Documents, or the DIP Orders, including Claims for all principal amounts outstanding, interest, fees, premiums, expenses, costs, and indemnification and other charges payable under and in accordance with the DIP Documents or the DIP Orders.

65.     "DIP Credit Agreements" means the Senior DIP Credit Agreement and the Junior DIP Credit Agreement.

66.     "DIP Documents" means the DIP Motion (as defined in the RSA), the DIP Orders, the DIP Credit Agreements and any amendments, modifications, or supplements thereto, and together with any related notes, certificates, agreements, security agreements, documents, and instruments (including any amendments, restatements, supplements, or modifications of any of the foregoing) related to or executed in connection therewith.

67.     "DIP Facilities" means the debtor-in-possession superpriority secured term loan financing facilities provided for under the DIP Credit Agreements and the DIP Orders.

68.     "DIP Lenders" means, collectively, the lenders from time to time under any of the DIP Facilities.

69.     "DIP Loans" means the loans outstanding under any of the DIP Credit Agreements.

70.     "DIP Orders" means, collectively, the Interim DIP Order, the Final DIP Order, the Interim DIP Recognition Order, and the Final DIP Recognition Order (each as defined in the RSA).

71.     "Disallowed" means, with respect to any Claim or Interest, a portion thereof that is (a) disallowed under the Plan, by Final Order, or pursuant to a settlement, (b) scheduled by the Debtors at zero dollars ($0) or as contingent, disputed, or unliquidated and as to which a Claims Bar Date has been established but no Proof of Claim was timely filed or deemed timely filed pursuant to either the Bankruptcy Code or any Final Order, or otherwise deemed timely filed under applicable law, or (c) not scheduled by the Debtors and as to which a Claims Bar Date has been established but no Proof of Claim has been timely filed or deemed timely filed pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court or otherwise deemed timely filed under applicable law.   "Disallow," "Disallowing," and "Disallowance" shall have correlative meanings.

72.     "Disclosure Statement" means the disclosure statement with respect to the Plan in accordance with, among other things, sections 1125, 1126(b), and 1145 of the Bankruptcy Code, Bankruptcy Rule 3018, and other applicable Law, including all exhibits, annexes, schedules, and supplements thereto, each as may be amended, supplemented, or modified from time to time.

73.     "Disclosure Statement Order" means the Order (and all exhibits thereto) entered by the Bankruptcy Court conditionally approving the adequacy of information in the Disclosure Statement and approving the Solicitation Materials and the solicitation of votes on the Plan and the Rights Offering Documents.

74.     "Disputed" means, as to a Claim or Interest, any Claim or Interest that is not yet Allowed or Disallowed.

75.     "Distribution Agent" means the Reorganized Hornblower Debtors or the Entity or Entities selected by the Reorganized Hornblower Debtors to make or facilitate distributions contemplated under the Plan, excluding distributions on account of the AQV Wind Down.

76.     "<u>Distribution Record Date</u>" means the record date for purposes of making distributions under the Plan on account of Allowed Claims, which date shall be the Confirmation Date or such other date that is selected by the Debtors and the Required Consenting HB First Lien Lenders.

77.     "<u>Entity</u>" means any person, individual, corporation, limited liability company, partnership, joint venture, association, joint stock company, trust, unincorporated organization, Governmental Body, any agency or political subdivision of any Governmental Body, or any other entity, whether acting in an individual, fiduciary, or other capacity.

78.     "<u>Estate</u>" means, as to each Debtor, the estate created for the Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code upon the commencement of its Chapter 11 Case.

79.     "<u>Exchange Act</u>" means the Securities Exchange Act of 1934, 15 U.S.C. § 78a, et seq., as amended from time to time.

80.     "<u>Exculpated Parties</u>" means, collectively, and in each case in its capacity as such: (a) each of the Debtors; (b) each of the Reorganized Debtors; and (c) the Debtors' Chief Restructuring Officer, Jonathan Hickman, or any successor to such position.

81.     "<u>Executory Contract</u>" means a contract to which one or more of the Debtors is a party and that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code, including any modifications, amendments, addenda, or supplements thereto or restatements thereof, but excluding any non-residential lease of real property.

82.     "<u>Exit Credit Documents</u>" means the Exit Term Loan Credit Documents and the Exit Revolver Credit Documents.

83.     "<u>Exit Revolver</u>" means the exit revolving credit facility obtained on the Plan Effective Date pursuant to the Exit Revolver Credit Documents.

84.     "<u>Exit Term Loans</u>" means the senior secured term loans incurred on the Plan Effective Date pursuant to the Exit Term Loan Credit Documents.

85.     "<u>Exit Revolver Credit Documents</u>" means the credit agreement pursuant to which the Reorganized Hornblower Debtors obtain the Exit Revolver on the Plan Effective Date, and that governs the terms of the Exit Revolver, including any amendments, modifications, or supplements thereto, and together with any related notes, certificates, agreements, security agreements, documents, and instruments (including any amendments, restatements, supplements, or modifications of any of the foregoing) related to or executed in connection therewith.

86.     "<u>Exit Term Loan Credit Documents</u>" means the credit agreement pursuant to which certain of the Reorganized Hornblower Debtors incur the Exit Term Loans on the Plan Effective Date, and that governs the terms of the Exit Term Loans, including any amendments, modifications, or supplements thereto, and together with any related notes, certificates, agreements, security agreements, documents, and instruments (including any amendments,

restatements, supplements, or modifications of any of the foregoing) related to or executed in connection therewith.

87. "<u>Federal Judgment Rate</u>" means 4.98%, which is the interest rate provided under 28 U.S.C. § 1961(a), calculated as of the Petition Date.

88. "<u>File</u>," "<u>Filed</u>," or "<u>Filing</u>" means file, filed, or filing with the Bankruptcy Court, the Clerk of the Bankruptcy Court, or any of its or their authorized designees in the Chapter 11 Cases, including, with respect to a Proof of Claim, the Notice and Claims Agent.

89. "<u>Final Order</u>" means, as applicable, an Order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter that has not been reversed, stayed, modified, or amended, and as to which the time to appeal or seek certiorari has expired and no appeal or petition for certiorari has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be filed has been resolved by the highest court to which the order or judgment could be appealed or from which certiorari could be sought or a new trial, reargument, or rehearing shall have been denied, resulted in no modification of such order; *provided, however*, that the possibility that a motion under rule 60 of the Federal Rules of Civil Procedure or any analogous Bankruptcy Rule may be Filed relating to such Order shall not cause an Order not to be a Final Order.

90. "<u>First Lien Claim</u>" means any Claim on account of any outstanding obligation under the First Lien Credit Agreement, including Claims on account of the Term Loans and Revolving Facility Loans (as each term is defined therein).

91. "<u>First Lien Credit Agreement</u>" means that certain First Lien Credit Agreement, dated as of April 27, 2018 (as amended, restated, modified, supplemented, or replaced from time to time in accordance with its terms), by and among Hornblower Sub, LLC and American Queen Sub, LLC, as borrowers, certain of the Debtors, as subsidiary loan parties, GLAS Trust Company LLC, as administrative agent and collateral agent, and the other parties thereto from time to time.

92. "<u>General Unsecured Claim</u>" means a Claim consisting of any unsecured prepetition Claim against any Debtor that is not an Administrative Claim, Priority Tax Claim, Other Priority Claim, Intercompany Claim, Section 510(b) Claim, or Unsecured Go-Forward Trade Claim. General Unsecured Claims include the HB First Lien Deficiency Claims.

93. "<u>Governmental Body</u>" means any U.S. or non-U.S. federal, state, municipal, or other government, or other department, commission, board, bureau, agency, public authority, or instrumentality thereof, or any other U.S. or non-U.S. court or arbitrator.

94. "<u>GUC Pool</u>" means Cash in an amount equal to $250,000.

95. "<u>HB First Lien Claims</u>" means, collectively, the First Lien Claims and the Revolver Claims.

96. "<u>HB First Lien Deficiency Claims</u>" means the total amount of the HB First Lien Claims less the value of the collateral securing the HB First Lien Claims.

97.    "<u>Holder</u>" means an Entity holding a Claim or Interest, as applicable.

98.    "<u>Hornblower</u>" means Hornblower Holdings LP, a limited partnership organized under the Laws of the State of Delaware.

99.    "<u>Hornblower Debtors</u>" means Hornblower Group HoldCo, LLC, and its direct and indirect Debtor Subsidiaries.

100.    "<u>Impaired</u>" means, with respect to any Class of Claims or Interests, a Class of Claims or Interests that is impaired within the meaning of section 1124 of the Bankruptcy Code.

101.    "<u>Incremental Superpriority Credit Agreement</u>" means that certain Incremental Superpriority Credit Agreement, dated as of November 17, 2023 (as amended pursuant to that certain *Incremental Assumption and Amendment Agreement No. 1*, dated as of December 28, 2023 and as further amended, restated, modified, supplemented, or replaced from time to time in accordance with its terms), by and among Hornblower Sub, LLC and American Queen Sub, LLC, as borrowers, certain of the Debtors, as subsidiary loan parties, Alter Domus (US) LLC, as administrative agent, collateral agent, and incremental term loan representative and the other parties thereto from time to time.

102.    "<u>Intercompany Claim</u>" means a Claim or a Cause of Action against a Debtor held by a Debtor or a Non-Debtor Affiliate.

103.    "<u>Intercompany Interest</u>" means an Interest in a Debtor, other than Hornblower, held by another Debtor or Non-Debtor Affiliate.

104.    "<u>Interests</u>" means, collectively, the shares (or any class thereof), common stock, preferred stock, limited partnership units, limited liability company interests, equity security (as defined in section 101(16) of the Bankruptcy Code), membership interests, and any other equity, ownership, or profits interests of any Debtor, and options, warrants, rights, stock appreciation rights, phantom units, incentives, commitments, calls, redemption rights, repurchase rights, or other securities or arrangements to acquire or subscribe for, or which are convertible into, or exercisable or exchangeable for, the shares (or any class thereof) of, common stock, preferred stock, limited partnership units, limited liability company interests, membership interests, or any other equity, ownership, or profits interests of any Debtor (in each case whether or not arising under or in connection with any employment agreement).

105.    "<u>JB Intercompany Loans</u>" means (i) that certain loan held by Journey Beyond Intermediate Holdings, LLC against American Queen Sub, LLC and (ii) that certain loan held by Journey Beyond Holdings, LLC against American Queen Sub, LLC.

106.    "<u>JBIH Claim</u>" has the meaning ascribed to it in the RSA.

107.    "<u>JBIH Credit Agreement</u>" means that certain Credit Agreement, dated as of November 18, 2022 (as amended, restated, modified, supplemented, or replaced from time to time in accordance with its terms), by and among Journey Beyond Intermediate Holdings, LLC, as borrower, Journey Beyond Holdings, Ltd., as parent, Hornblower Group, LLC and Hornblower

Group Holdco, LLC, as obligors, the lenders from time to time party thereto, and UBS AG, Stamford Branch, as administrative agent and collateral agent.

108.     "JBIH Intercompany Note" means that certain Fourth Amended and Restated Subordinated Intercompany Note issued by HB TopCo Pty Ltd to Journey Beyond Intermediate Holdings, LLC.

109.     "JBIH Loans" has the meaning ascribed to it in the RSA.

110.     "Journey Beyond Entities" means Journey Beyond Intermediate Holdings, LLC (or any direct or indirect subsidiary thereof designated by the Consenting JBIH Lenders) and each of its direct and indirect subsidiaries, together with any newly formed entity determined by the applicable Debtors and the Consenting JBIH Lenders to hold or receive the equity or assets of any of the foregoing.  For the avoidance of doubt, the Journey Beyond Entities shall not include the Hornblower Debtors.

111.     "Judicial Code" means title 28 of the United States Code, 28 U.S.C. §§ 1–4001, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder.

112.     "Junior DIP Credit Agreement" means that certain Junior Secured Superpriority Debtor-in-Possession Credit Agreement, dated as of February 22, 2024, among Hornblower Holdco, LLC and American Queen Holdco, LLC, as parents, Hornblower Sub, LLC and American Queen Sub, LLC, as borrowers, the lenders party thereto from time to time, and GLAS Trust Company LLC, as administrative agent and collateral agent.

113.     "Junior DIP Claim" means the loans and other "Obligations" under and as defined in the Junior DIP Credit Agreement, including any premium (including exit premium).

114.     "Key Executives" means the Debtors' Chief Executive Officer, President, Chief People Officer, Chief Financial Officer, and General Counsel.

115.     "Law" means any federal, state, local, or non-U.S. law (including, in each case, any common law), statute, code, ordinance, rule, regulation, decree, injunction, order, ruling, assessment, writ or other legal requirement, or judgment, in each case, that is validly adopted, promulgated, issued, or entered by a Governmental Body of competent jurisdiction (including the Bankruptcy Court and the CCAA Court).

116.     "Liabilities" means any and all Claims, obligations, suits, judgments, damages, demands, debts, rights, recovery actions, Causes of Action, and liabilities, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, arising in law, equity, or otherwise, that are based in whole or in part on any act, event, injury, omission, transaction, or agreement.

117.     "Lien" has the meaning set forth in section 101(37) of the Bankruptcy Code.

118.     "MIP" means the post-Plan Effective Date management equity incentive plan, to be established and implemented by the New Board, pursuant to which the MIP Equity shall be

reserved for grants to be made from time to time to directors, officers, consultants, and other management and employees of Reorganized Hornblower.

119.    "MIP Equity" means 8% of the New HB Common Equity, on a fully diluted basis, to be reserved to grant the awards contemplated by the MIP.

120.    "New Board" means the board of directors or managers, as applicable, of Reorganized Hornblower, as initially established on the Plan Effective Date in accordance with the terms of the Plan and the applicable New HB Organizational Documents.

121.    "New HB Common Equity" means the new common equity to be issued on the Plan Effective Date by Reorganized Hornblower.

122.    "New HB Organizational Documents" means the new Organizational Documents of Reorganized Hornblower and its direct and indirect subsidiaries (as applicable), including any shareholders agreement, registration agreement, or similar document, in each case in form and substance consistent in all respects with the RSA and the consent rights contained therein.

123.    "New JB Organizational Documents" means the new Organizational Documents of the Journey Beyond Entities, including any shareholders agreement, registration agreement, or similar document, as well as any Definitive Document effectuating the treatment of the JBIH Claims under this Plan.

124.    "New Stockholders' Agreement" means that certain shareholders' agreement, if any, effective as of the Plan Effective Date, addressing certain matters relating to the New HB Common Equity.

125.    "New Warrants" means the warrants, if any, to purchase New HB Common Equity in lieu thereof to be issued on the Plan Effective Date by Reorganized Hornblower.

126.    "Non-AQV Debtors" means the Debtors that are not AQV Debtors.

127.    "Non-Debtor Affiliate" means any subsidiary or Affiliate of a Debtor that is not a Debtor.

128.    "Notice and Claims Agent" means Omni Agent Solutions, Inc.

129.    "Order" means any judgment, order, award, injunction, writ, permit, license, or decree of any Governmental Body or arbitrator of applicable jurisdiction.

130.    "Organizational Documents" means, with respect to any Debtor, the documents by which such Debtor was organized or formed (such as a certificate of incorporation, certificate of formation, certificate of limited partnership, or articles of organization, and including, without limitation, any certificates of designation for preferred stock or other forms of preferred equity) or which relate to the internal governance of such Person (such as by-laws, a partnership agreement, or an operating, limited liability company, shareholders, or members agreement).

131. "Other Priority Claim" means any Claim entitled to priority in right of payment under section 507(a) of the Bankruptcy Code, to the extent such Claim has not already been paid during the Chapter 11 Cases, other than (a) an Administrative Claim or (b) a Priority Tax Claim.

132. "Other Secured Claim" means any Secured Claim other than a DIP Claim, First Lien Claim, or Revolver Claim.

133. "Person" has the meaning set forth in section 101(41) of the Bankruptcy Code.

134. "Petition Date" means February 21, 2024.

135. "Plan" has the meaning set forth in the introduction hereof.

136. "Plan Effective Date" means the first Business Day on which all conditions to Consummation of the Plan have been satisfied in full or waived pursuant to Article ARTICLE X.B, and the Plan becomes effective.

137. "Plan Supplement" means the compilation of documents and forms of documents, schedules, and exhibits to the Plan that will be filed by the Debtors with the Bankruptcy Court, which shall include (among other things) the form of term sheet or credit agreement for each of the Exit Term Loans and the Exit Revolver.

138. "Primary Concession Contract" means each of (i) that certain Concession Contract, effective as of March 1, 2024, by and between the United States of America, acting by the Director of the National Park Service, through the National Park Service Regional Director Interior Region 1, and Statue Cruises, LLC (DBA Statue City Cruises anchored by Hornblower); (ii) that certain Concession Contract, effective as of May 9, 2019, by and between the United States of America, acting by the Director of the National Park Service, through the Regional Director of the Pacific West Region, and Alcatraz Cruises, LLC; (iii) that certain Lease and Operating Agreement, effective as of February 11, 2012, by and among the Niagara Parks Commission, Hornblower Canada Co., and Hornblower Inc.; (iv) that certain Operating Agreement, effective as of August 4, 2023, by and between New York City Economic Development Corporation and HNY Ferry II LLC; and (v) that certain Maritime Transport Operations and Maintenance Agreement, effective as of October 27, 2020, by and among Puerto Rico and the Island Municipalities Maritime Transport Authority, HMS Ferries, Inc., and HMS Ferries – Puerto Rico, LLC.

139. "Priority Tax Claim" means any Claim of a Governmental Body against a Debtor entitled to priority as specified in section 507(a)(8) of the Bankruptcy Code.

140. "Pro Rata" means the proportion that the amount of an Allowed Claim in a particular Class bears to the aggregate amount of all Allowed and Disputed Claims (but excluding Disallowed Claims) in such Class.

141. "Professional" means any Entity (a) employed pursuant to an Order of the Bankruptcy Court in connection with these Chapter 11 Cases pursuant to sections 327, 328, or 1103 of the Bankruptcy Code and to be compensated for services pursuant to sections 327, 328, 329, 330, 331, or 363 of the Bankruptcy Code or (b) awarded compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

142.    "<u>Professional Fee Claim</u>" means a Claim by a Professional seeking an award by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Confirmation Date under sections 330, 331, 503(b)(2), 503(b)(3), 503(b)(4), or 503(b)(5) of the Bankruptcy Code to the extent such fees and expenses have not been previously paid.

143.    "<u>Professional Fee Escrow</u>" means an account, which may be interest-bearing, funded by the Debtors with Cash prior to the Plan Effective Date in an amount equal to the Professional Fee Escrow Amount.

144.    "<u>Professional Fee Escrow Amount</u>" means the aggregate amount of Professional Fee Claims and other unpaid fees and expenses that Professionals estimate in good faith they have incurred or will incur in rendering services to the Debtors up to and including the Confirmation Date.

145.    "<u>Proof of Claim</u>" means a written proof of Claim Filed against any of the Debtors in the Chapter 11 Cases by the applicable Claims Bar Date as established by the Bankruptcy Court.

146.    "<u>Reinstate</u>," "<u>Reinstated</u>," or "<u>Reinstatement</u>" means with respect to Claims and Interests, that the Claim or Interest shall be rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code.

147.    "<u>Related Fund</u>" means, with respect to a Consenting Stakeholder or other Holder, any Affiliates (including at the institutional level) of such Consenting Stakeholder or other Holder or any fund, account (including any separately managed accounts) or investment vehicle that is controlled, managed, advised or sub-advised by such Consenting Stakeholder or Holder, an Affiliate of such Consenting Stakeholder or Holder or by the same investment manager, advisor or subadvisor as such Consenting Stakeholder or Holder or an Affiliate of such Consenting Stakeholder or Holder.

148.    "<u>Released Parties</u>" means, collectively, and in each case in its capacity as such: (a) each Debtor; (b) each Reorganized Debtor and the AQV Wind Down Co.; (c) each Consenting Stakeholder; (d) each Agent; (e) each DIP Agent, each DIP Lender, and each Backstop Party; (f) with respect to each of the Entities in the foregoing clauses (a) through (e), each such Entity's current and former Affiliates (regardless of whether such interests are held directly or indirectly); (g) with respect to each of the Entities in the foregoing clauses (a) through (f), each such Entity's current and former predecessors, successors, subsidiaries, direct and indirect equityholders, funds, portfolio companies, and management companies; and (h) with respect to each of the Entities in the foregoing clauses (a) through (g), each such Entity's current and former directors, officers, managers, members, principals, partners, employees, independent contractors, agents, representatives, managed accounts or funds, management companies, fund advisors, investment advisors, advisory board members, financial advisors, partners (including both general and limited partners), consultants, financial advisors, attorneys, accountants, investment bankers, and other professionals; *provided* that, in each case, an Entity shall not be a Released Party if it elects to opt out of the releases contained in the Plan, if permitted to opt out; *provided, further*, that an Entity shall not be a Released Party if it files with the Bankruptcy Court an objection to the Plan

15

(including the releases) that is not consensually resolved before Confirmation or supports any such objection or objector.

149.    "Releasing Parties" means, collectively, and in each case in its capacity as such: (a) each Debtor; (b) each Reorganized Debtor and the AQV Wind Down Co.; (c) each Consenting Stakeholder; (d) each Agent; (e) each DIP Agent, each DIP Lender, and each Backstop Party; (f) all Holders of Claims that vote to accept the Plan and do not affirmatively opt out of the releases provided by the Plan by checking the box on the applicable ballot indicating that they opt not to grant the releases provided in the Plan; (g) all Holders of Claims that are deemed to accept the Plan who do not affirmatively opt out of the releases provided by the Plan by checking the box on the applicable notice of non-voting status indicating that they opt not to grant the releases provided in the Plan; (h) all Holders of Claims that abstain from voting on the Plan and who do not affirmatively opt out of the releases provided by the Plan by checking the box on the applicable ballot indicating that they opt not to grant the releases provided in the Plan; (i) all Holders of Claims or Interests that vote to reject the Plan or are deemed to reject the Plan and who do not affirmatively opt out of the releases provided by the Plan by checking the box on the applicable ballot or notice of non-voting status indicating that they opt not to grant the releases provided in the Plan; (j) with respect to each of the Entities in the foregoing clauses (a) through (i), each such Entity's current and former Affiliates (regardless of whether such interests are held directly or indirectly); (k) with respect to each of the Entities in the foregoing clauses (a) through (j), each such Entity's current and former predecessors, successors, subsidiaries, direct and indirect equityholders, funds, portfolio companies, and management companies; and (l) with respect to each of the Entities in the foregoing clauses (a) through (k), each such Entity's current and former directors, officers, managers, members, principals, partners, employees, independent contractors, agents, representatives, managed accounts or funds, management companies, fund advisors, investment advisors, advisory board members, financial advisors, partners (including both general and limited partners), consultants, financial advisors, attorneys, accountants, investment bankers, and other professionals; *provided* that, in each case, an Entity shall not be a Releasing Party if it elects to opt out of the releases contained in the Plan, if permitted to opt out; *provided, further*, that an Entity shall not be a Releasing Party if it files with the Bankruptcy Court an objection to the Plan (including the releases) that is not consensually resolved before Confirmation or supports any such objection or objector.

150.    "Reorganized Hornblower" means Hornblower Group Holdco, LLC or such other parent or subsidiary thereof or new entity as mutually determined by the Debtors and the Required Consenting HB First Lien Lenders to, among other things, directly or indirectly acquire substantially all of the assets and/or equity interests of the Hornblower Debtors and, on the Plan Effective Date, issue the New HB Common Equity (or New Warrants) (and in each case including any other newly formed Entity formed to, among other things, effectuate the Restructuring Transactions and issue the New HB Common Equity).

151.    "Reorganized Hornblower Debtors" means the Hornblower Debtors as reorganized pursuant to and under the Restructuring Transactions, and, to the extent not included in the foregoing, Reorganized Hornblower.

152.    "Reorganized Debtors" means the Debtors, other than the AQV Debtors, as reorganized pursuant to and under the Restructuring Transactions.

153.    "Required Consenting HB First Lien Lenders" has the meaning ascribed to it in the RSA.

154.    "Restructuring Expenses" means (a) the reasonable and documented fees and expenses, incurred in connection with the Restructuring Transactions, of (1) the Ad Hoc Group Advisors (as defined in the RSA), (2) Winston & Strawn LLP, as U.S. Coastwise Trade Laws counsel to SVP, and (3) the Crestview Advisors (as defined in the RSA) in accordance with the RSA; (b) the Prepetition Agent Fees and Expenses (as defined in the RSA); and (c) the Expense Reimbursement (as defined in the Backstop Commitment Agreement).

155.    "RSA" means that certain Restructuring Support Agreement, dated as of February 21, 2024, by and among the Debtors and the Consenting Stakeholders, including all exhibits and attachments thereto, and as amended, restated, and supplemented from time to time in accordance with its terms.

156.    "RSA Settlement" means the agreement described in the Disclosure Statement and incorporated in Article ARTICLE IV.C hereof, among the Debtors, Crestview, and the Consenting HB First Lien Lenders, which, among other things, provides for the separation of the Journey Beyond Entities from the Hornblower Debtors and for Crestview (or its designee), as holder of the JBIH Loans, to receive 100% of the equity in the Journey Beyond Entities or such other treatment acceptable to the Debtors and the Consenting JBIH Lenders and reasonably acceptable to the Required Consenting HB First Lien Lenders.

157.    "Restructuring Transactions" means any transaction and any actions as may be necessary or appropriate to effect a corporate restructuring of the Journey Beyond Entities, Debtors' and the Reorganized Debtors' respective businesses or a corporate restructuring of the overall corporate structure of the Debtors or the Journey Beyond Entities on the terms set forth in this Plan, the Definitive Documents, and the Restructuring Transactions Memorandum, including the issuance of all Securities, notes, instruments, certificates, and other documents required to be issued or executed pursuant to the Plan, one or more inter-company mergers, consolidations, amalgamations, arrangements, continuances, restructurings, conversions, dissolutions, transfers, liquidations, or other corporate transactions, as described in ARTICLE IV.D.

158.    "Restructuring Transactions Memorandum" means the summary of transaction steps to complete the Restructuring Transactions contemplated by this Plan, which may be included in the Plan Supplement.

159.    "Revolver Claim" has the meaning ascribed to it in the RSA.

160.    "Revolver Credit Agreement" means that certain Credit Agreement, dated as of May 13, 2020 (as amended, restated, modified, supplemented, or replaced from time to time in accordance with its terms), by and among Hornblower Sub, LLC and American Queen Sub, LLC, as borrowers, certain of the Debtors, as subsidiary loan parties, Wilmington Trust National Association, as successor to UBS AG, Stamford Branch, as administrative agent and collateral agent, and the other parties thereto from time to time.

161.    "Rights" means the subscription rights offered to Holders of Allowed HB First Lien Claims to purchase (directly, or through a Related Fund) each such Holder's Pro Rata share (based

on such Holder's relative share of the total amount of all Allowed HB First Lien Claims) of New HB Common Equity (or New Warrants) for an aggregate purchase price of the Rights Offering Amount (payable in cash or Junior DIP Claims, if applicable).

162. "<u>Rights Offering</u>" means the rights offering to be consummated by the Reorganized Hornblower Debtors on the Plan Effective Date in accordance with the Rights Offering Documents, pursuant to which Reorganized Hornblower shall issue New HB Common Equity.

163. "<u>Rights Offering Amount</u>" means an aggregate purchase price of $345 million payable for the New HB Common Equity (or New Warrants) issued pursuant to the Rights Offering, subject to reduction as described in the Rights Offering Procedures.

164. "<u>Rights Offering Documents</u>" means the documentation setting forth the terms, conditions, and procedures for the method to conduct the Rights Offering, any documentation necessary to effectuate the Rights Offering, and any amendments, modifications, or supplements thereto.

165. "<u>Rights Offering Procedures</u>" means the procedures governing the Rights Offering, as approved by the Bankruptcy Court.

166. "<u>Rules</u>" means Rule 501(a)(1), (2), (3), and (7) of the Securities Act.

167. "<u>Schedule of Rejected Executory Contracts and Unexpired Leases</u>" means the schedule of certain Executory Contracts and Unexpired Leases to be rejected by the Debtors pursuant to the Plan, as the same may be amended, modified, or supplemented from time to time by the Debtors, which shall be included in the Plan Supplement.

168. "<u>Schedule of Retained Causes of Action</u>" means the schedule of certain Causes of Action of the Debtors that are not released, waived, or transferred pursuant to the Plan, as the same may be amended, modified, or supplemented from time to time.

169. "<u>SEC</u>" means the United States Securities and Exchange Commission.

170. "<u>Section 510(b) Claim</u>" means a Claim subject to subordination under section 510(b) of the Bankruptcy Code.

171. "<u>Secured</u>" means, with respect to a Claim, (a) secured by a Lien on property in which any of the Debtors has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Final Order of the Bankruptcy Court, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the interest of the Holder of such Claim in the Debtors' interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) and any other applicable provision of the Bankruptcy Code or (b) Allowed, pursuant to the Plan, as a secured Claim.

172. "<u>Securities Act</u>" means the Securities Act of 1933, as amended.

173. "<u>Security</u>" means a security as defined in section 2(a)(1) of the Securities Act.

174. "<u>Senior DIP Claim</u>" means the loans and other "Obligations" under and as defined in the Senior DIP Credit Agreement, including any premium (including exit premium).

175. "<u>Senior DIP Credit Agreement</u>" means that certain Senior Secured Superpriority Debtor-in-Possession Credit Agreement, dated as of February 22, 2024, among Hornblower Holdco, LLC and American Queen Holdco, LLC, as parents, Hornblower Sub, LLC and American Queen Sub, LLC, as borrowers, the lenders party thereto from time to time, and GLAS Trust Company LLC, as administrative agent and collateral agent.

176. "<u>Solicitation Materials</u>" means any documents, forms, ballots, notices, and other materials provided in connection with the solicitation of votes on the Plan pursuant to sections 1125 and 1126 of the Bankruptcy Code.

177. "<u>Specified Employee Plans</u>" means all of the Debtors' employment agreements and severance policies, including all employment, compensation, and benefit plans, policies, and programs of the Debtors applicable to any of their employees and retirees, including without limitation, all workers' compensation programs, savings plans, retirement plans, healthcare plans, disability plans, incentive plans, life and accidental death and dismemberment insurance plans, but excluding all (i) equity or equity-based incentive plans and (ii) any such agreements, plans, policies, and programs that (a) the Company no longer requires as a result of the AQV Wind Down or (b) relate solely to the AQV Debtors.

178. "<u>Statutory Fees</u>" means all fees the Debtors are obligated to pay pursuant to 28 U.S.C. § 1930(a)(6), together with interest, if any, pursuant to 31 U.S.C. § 3717.

179. "<u>Superpriority Credit Agreement</u>" means that certain Superpriority Credit Agreement, dated as of November 10, 2020 (as amended, restated, modified, supplemented, or replaced from time to time in accordance with its terms), by and among Hornblower Sub, LLC and American Queen Sub, LLC, as borrowers, certain of the Debtors, as subsidiary loan parties, Alter Domus (US) LLC, as administrative agent and collateral agent, and the other parties thereto from time to time.

180. "<u>SVP</u>" means Strategic Value Partners LLC and its Affiliates.

181. "<u>Third-Party Releases</u>" means the releases described in <u>Article ARTICLE IX.D</u> of this Plan.

182. "<u>Unexpired Lease</u>" means a lease to which one or more of the Debtors is a party and that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code, including any modifications, amendments, addenda, or supplements thereto or restatements thereof.

183. "<u>Unimpaired</u>" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

184. "<u>Unsecured Go-Forward Trade Claims</u>" means General Unsecured Claims held by certain trade vendors that the Debtors have deemed crucial to the Reorganized Debtors' businesses,

which vendors are listed on Exhibit G to the Disclosure Statement, as may be amended from time to time.

185.     "<u>Unsubscribed Equity</u>" has means Unsubscribed Equity Interests (as defined in the Backstop Commitment Agreement).

186.     "<u>U.S. Citizen</u>" has the meaning set forth in <u>Article ARTICLE IV.A.1</u> of the Plan.

187.     "<u>U.S. Citizenship Affidavit</u>" has the meaning set forth in <u>Article ARTICLE IV.A.1</u> of the Plan.

188.     "<u>U.S. Coastwise Trade Laws</u>" means, collectively, the Passenger Vessel Services Act of 1886, 46 U.S.C. § 55103, section 27 of the Merchant Marine Act, 1920, 46 U.S.C. § 55102, the U.S. citizenship and cabotage laws principally contained in 46 U.S.C. § 50501(a), (b), and (d) and 46 U.S.C. Chapters 121 and 551 and any successor statutes thereto, together with the rules and regulations promulgated thereunder by the U.S. Coast Guard and the U.S. Maritime Administration, and their practices enforcing, administering, and interpreting such laws, statutes, rules, and regulations, in each case as amended or supplemented from time to time, relating to the ownership and operation of U.S.-flag vessels in the U.S. coastwise trade.

189.     "<u>U.S. Coastwise Restrictions</u>" has the meaning set forth in <u>Article ARTICLE IV.A.1</u> of the Plan.

190.     "<u>U.S. Trustee</u>" means the United States Trustee for the Southern District of Texas (Region 7).

## B.     *Rules of Interpretation*

For purposes of this Plan: (a) each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and neuter genders; (b) capitalized terms defined only in the plural or singular form shall nonetheless have their defined meanings when used in the opposite form; (c) unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions; (d) unless otherwise specified, any reference herein to an existing document, schedule, or exhibit shall mean such document, schedule, or exhibit, as it may have been or may be amended, restated, supplemented, or otherwise modified from time to time; (e) unless otherwise specified, all references herein to "Articles" are references to Articles of this Plan; (f) unless otherwise stated, the words "herein," "hereof," and "hereto" refer to this Plan in its entirety rather than to a particular portion of this Plan; (g) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (h) the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation, and shall be deemed to be followed by the words "without limitation"; (i) unless otherwise specified herein, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (j) any term used in capitalized form herein that is not otherwise defined, but that is used in the Bankruptcy Code or the Bankruptcy Rules, has the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may

be; (k) all references to statutes, regulations, Orders, rules of courts, and the like shall mean such statutes, regulations, Orders, rules of courts, and the like as amended from time to time, and as applicable to the Chapter 11 Cases, unless otherwise stated; (l) any reference to an Entity as a Holder of a Claim or Interest includes that Entity's successors and assigns; (m) any effectuating provisions may be interpreted by the Reorganized Hornblower Debtors, the Journey Beyond Entities, or the AQV Wind Down Co., as applicable, in a manner consistent with the overall purpose and intent of this Plan or the Confirmation Order, all without further notice to or action, Order, or approval of the Bankruptcy Court or any other Entity, subject, in the case of the Reorganized Hornblower Debtors or AQV Wind Down Co., to the consent of the Required Consenting HB First Lien Lenders which shall not be unreasonably withheld, delayed, or conditioned, and such interpretation shall control in all respects; (n) except as otherwise provided, any references to the Plan Effective Date shall mean on the Plan Effective Date or as soon as reasonably practicable thereafter; (o) all references to docket numbers of documents Filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (p) unless otherwise specified, all references herein to exhibits are references to exhibits in the Plan Supplement; (q) all references herein to consent, acceptance, or approval shall be deemed to include the requirement that such consent, acceptance, or approval be evidenced by a writing, which may be conveyed by counsel for the respective parties that have such consent, acceptance, or approval rights, including by electronic mail; (r) subject to the provisions of any contract, certificate of incorporation, bylaw, instrument, release, or other agreement or document entered into in connection with the Plan, the rights and obligations arising pursuant to the Plan shall be governed by, and construed and enforced in accordance with applicable federal law, including the Bankruptcy Code and Bankruptcy Rules; and (s) unless otherwise specified, any reference herein to the Plan or any provision thereof shall mean the Plan as it may have been or may be amended, restated, supplemented, or otherwise modified by the Confirmation Order.

**C.**   *Computation of Time*

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein. If any payment, distribution, act, or deadline under the Plan is required to be made or performed or occurs on a day that is not a Business Day, then the making of such payment or distribution, the performance of such act, or the occurrence of such deadline shall be deemed to be on the next succeeding Business Day, but shall be deemed to have been completed or to have occurred as of the required date.

**D.**   *Governing Laws*

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated herein (including in the Plan Supplement), the laws of the State of New York, without giving effect to the principles of conflicts of law (except for section 5-1401 and 5-1402 of the General Obligations Law of the State of New York), shall govern the rights, obligations, construction, and implementation of this Plan and the Confirmation Order, any agreements, documents, instruments, or contracts executed or entered into in connection with this Plan or the Confirmation Order (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control); *provided*, *however*, that corporate or limited liability company governance matters relating to the Debtors, the Reorganized Hornblower Debtors, the Journey Beyond Entities or the AQV Wind Down Co., as

applicable, shall be governed by the laws of the state of incorporation or formation (as applicable) of the applicable Debtor, Reorganized Hornblower Debtor, the Journey Beyond Entity, or the AQV Wind Down Co.

**E.**     *Reference to Monetary Figures*

All references in this Plan to monetary figures shall refer to the legal tender of the United States of America, unless otherwise expressly provided.

**F.**     *Reference to the Debtors or the Reorganized Debtors*

Except as otherwise specifically provided in this Plan or the Confirmation Order to the contrary, references in this Plan or the Confirmation Order to the Debtors, the Reorganized Debtors, or the AQV Wind Down Co. shall mean the Debtors, the Reorganized Debtors, and the AQV Wind Down Co., as applicable, to the extent the context requires.

**G.**     *Controlling Document*

In the event of an inconsistency between this Plan and the Disclosure Statement, the terms of this Plan shall control in all respects.  In the event of an inconsistency between this Plan and the Plan Supplement, the terms of the relevant document in the Plan Supplement shall control (unless otherwise provided in such Plan Supplement document or in the Confirmation Order).  In the event of an inconsistency between the Confirmation Order and this Plan, the Disclosure Statement, the Plan Supplement, or the Confirmation Recognition Order, the Confirmation Order shall control.

**H.**     *Consent Rights*

Notwithstanding anything herein to the contrary, any and all consultation, information, notice, and consent rights set forth in the RSA, the DIP Orders, the Backstop Order, or any Definitive Document with respect to the form and substance of the Plan, the Plan Supplement, and all other Definitive Documents, including any amendments, restatements, supplements, or other modifications to such documents, and any consents, waivers, or other deviations under or from any such documents, shall be incorporated herein by this reference (including to the applicable definitions in Article I.A) and fully enforceable as if stated in full herein.

## ARTICLE II.
## ADMINISTRATIVE, PRIORITY CLAIMS, AND STATUTORY FEES

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, DIP Claims, Professional Fee Claims, and Priority Tax Claims have not been classified, and thus are excluded from the Classes of Claims and Interests set forth in Article III.

**A.**     *Administrative Claims*

Unless otherwise agreed to by the Holder of an Allowed Administrative Claim and the Debtors, the Reorganized Debtors, or the AQV Wind Down Co., as applicable, or otherwise provided for under the Plan, to the extent an Allowed Administrative Claim has not already been paid in full or otherwise satisfied during the Chapter 11 Cases, each Holder of an Allowed

Administrative Claim (other than Holders of Professional Fee Claims and Claims for fees and expenses pursuant to section 1930 of chapter 123 of the Judicial Code) shall be paid in full in Cash an amount of Cash equal to the amount of the unpaid portion of such Allowed Administrative Claim in full and final satisfaction, compromise, settlement, release, and discharge of such Administrative Claim in accordance with the following: (1) if such Administrative Claim is Allowed on or prior to the Plan Effective Date, on the Plan Effective Date, or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (2) if such Administrative Claim is not Allowed on or prior to the Plan Effective Date, the first Business Day after the date that is thirty (30) days after the date such Administrative Claim is Allowed, or as soon as reasonably practicable thereafter; (3) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business, in accordance with the terms and conditions of the particular transaction or course of business giving rise to such Allowed Administrative Claim; (4) at such time and upon such terms as may be agreed upon by the Holder of such Allowed Administrative Claim and the Debtors, Reorganized Debtors, or the AQV Wind Down Co., as applicable; or (5) at such time and upon such terms as set forth in a Final Order of the Bankruptcy Court.

Except for Claims subject to 11 U.S.C. § 503(b)(9) (for which any Claims Bar Date applies), Claims for fees and expenses pursuant to section 1930 of chapter 123 of the Judicial Code, Professional Fee Claims, Restructuring Expenses, the Backstop Commitment Premium, and Cure Claims, and unless previously Filed or otherwise provided in this Article II.A, requests for payment of Administrative Claims must be Filed and served pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order no later than the Administrative Claim Bar Date.  Holders of undisputed Claims for unpaid invoices that arise in the ordinary course of the Debtors' businesses and which are not due and payable on or before the Plan Effective Date shall be paid in the ordinary course of business in accordance with the terms thereof and need not file requests for payment of Administrative Claims.  Objections to such requests must be Filed and served on the Hornblower Debtors or the AQV Wind Down Co., as applicable, and the requesting party by the Claims Objection Deadline.  After notice and a hearing in accordance with the procedures established by the Bankruptcy Code, the Bankruptcy Rules, and prior Bankruptcy Court Orders, the Allowed amounts, if any, of Administrative Claims shall be determined by, and satisfied in accordance with an order that becomes a Final Order of the Bankruptcy Court.

**HOLDERS OF ADMINISTRATIVE CLAIMS THAT ARE REQUIRED TO FILE AND SERVE A REQUEST FOR PAYMENT OF SUCH ADMINISTRATIVE CLAIMS THAT DO NOT FILE AND SERVE SUCH A REQUEST BY THE ADMINISTRATIVE CLAIM BAR DATE SHALL BE FOREVER BARRED, ESTOPPED, AND ENJOINED FROM ASSERTING SUCH ADMINISTRATIVE CLAIMS AGAINST THE DEBTORS, THE REORGANIZED DEBTORS, OR THE AQV WIND DOWN CO., AS APPLICABLE, OR THE PROPERTY OF ANY OF THE FOREGOING, AND SUCH ADMINISTRATIVE CLAIMS SHALL BE DEEMED DISCHARGED AS OF THE PLAN EFFECTIVE DATE WITHOUT THE NEED FOR ANY OBJECTION FROM THE REORGANIZED DEBTORS OR ANY NOTICE TO OR ACTION, ORDER, OR APPROVAL OF THE BANKRUPTCY COURT OR ANY OTHER ENTITY.**

B.      *DIP Claims*

     1.      <u>Allowance of DIP Claims</u>

All DIP Claims shall be deemed Allowed as of the Plan Effective Date in an amount equal to the aggregate amount of the DIP Obligations (as defined in the DIP Orders), including (i) the principal amount outstanding under the DIP Facilities on such date; (ii) all interest accrued and unpaid thereon through and including the date of payment; and (iii) all accrued and unpaid fees, premiums, expenses, and indemnification obligations payable under the DIP Documents.  For the avoidance of doubt, the DIP Claims shall not be subject to any avoidance, reduction, setoff, recoupment, recharacterization, subordination (equitable or contractual or otherwise), counterclaim, defense, disallowance, impairment, objection, or any challenges under applicable law or regulation.

     2.      <u>Treatment of DIP Claims</u>

Except to the extent that a Holder of an Allowed DIP Claim agrees to less favorable treatment, on the Plan Effective Date in full and final satisfaction, settlement, release, and discharge of, and in exchange for such Allowed DIP Claim, (i) with respect to Senior DIP Claims, each Holder of an Allowed Senior DIP Claim shall receive payment in full in Cash from the proceeds of the Exit Term Loans or (to the extent provided under the terms of the Senior DIP Credit Agreement) such Senior DIP Claims shall convert into Exit Term Loans in accordance with the terms of the Senior DIP Credit Agreement and the RSA and (ii) with respect to Junior DIP Claims, each Holder of an Allowed Junior DIP Claim shall receive payment in full in Cash from the proceeds of the Rights Offering; *provided* that such Junior DIP Claims may be applied as the purchase price to subscribe for New HB Common Equity in connection with the Rights Offering.

     3.      <u>Release of Liens and Discharge of Obligations</u>

Contemporaneously with the effectuation of the final of the foregoing payments, terminations, or otherwise, the DIP Facilities shall be deemed cancelled, all commitments under the DIP Documents shall be deemed terminated, all Liens on property of the Debtors, the Reorganized Debtors, or the AQV Wind Down Co., as applicable, arising out of or related to the DIP Facilities shall automatically terminate, all collateral subject to such Liens shall be automatically released, and all guarantees of the Debtors, the Reorganized Debtors, or the AQV Wind Down Co., as applicable, arising out of or related to the DIP Claims shall be automatically discharged and released, in each case without further action by the DIP Agents or the DIP Lenders. Upon the reasonable request of the Debtors, the Reorganized Debtors, or the AQV Wind Down Co., as applicable, and at such entity's sole cost and expense, the DIP Agents or the DIP Lenders shall take all actions reasonably requested by the Debtors to effectuate and confirm such termination, release, and discharge (in each case, all at the sole cost and expense of the Debtors, and without recourse, representation, or warranty of any kind).  The Debtors, the Reorganized Debtors, or the AQV Wind Down Co., as applicable, shall also be authorized to make any such filings contemplated by the foregoing sentence on behalf of the DIP Agents and/or the DIP Lenders, at the sole cost and expense of the Debtors, the Reorganized Debtors, or the AQV Wind Down Co., as applicable, and the DIP Agents and the DIP Lenders shall have no liabilities related thereto.  Notwithstanding anything to the contrary in the Plan (including <u>ARTICLE IX</u>), the

Confirmation Order, or the Confirmation Recognition Order, the DIP Facilities and the DIP Documents shall continue in full force and effect (other than, for the avoidance of doubt, any Liens or other security interests terminated pursuant to this paragraph) after the Plan Effective Date with respect to any unsatisfied or contingent obligations thereunder, as applicable, including any provisions relating to the rights of the DIP Agents and the DIP Lenders to expense reimbursement, indemnification, and other similar amounts (either from the Debtors (which rights shall be fully enforceable against the Debtors, the Reorganized Debtors, or the AQV Wind Down Co., as applicable) or the DIP Lenders), in each case, solely to the extent provided under the DIP Documents to the applicable party, and any provisions that may survive termination or maturity of the DIP Facilities in accordance with the terms thereof.

**C.**     *Restructuring Expenses*

The Restructuring Expenses incurred, or estimated to be incurred, up to and including the Plan Effective Date shall be paid in full in Cash on the Plan Effective Date (to the extent not previously paid during the course of the Chapter 11 Cases on the dates on which such amounts would be required to be paid under the DIP Credit Agreements, the DIP Orders, the Backstop Commitment Agreement, the Backstop Order, or the RSA) without the requirement to file a fee application with the Bankruptcy Court, without the need for time detail, and without any requirement for review or approval by the Bankruptcy Court or any other party.  All Restructuring Expenses to be paid on the Plan Effective Date shall be estimated prior to and as of the Plan Effective Date and such estimates shall be delivered to the Debtors at least two (2) Business Days before the anticipated Plan Effective Date; *provided* that such estimates shall not be considered to be admissions or limitations with respect to such Restructuring Expenses.  In addition, the Debtors and the Reorganized Hornblower Debtors (as applicable) shall continue to pay, when due, all Restructuring Expenses, whether incurred before, on, or after the Plan Effective Date. Any Restructuring Expenses that constitute DIP Obligations are entitled to all rights and protections of other DIP Obligations.

**D.**     *Professional Fee Claims*

    1.     Professional Fee Escrow

As soon as reasonably practicable after the Confirmation Date, and no later than one (1) Business Day prior to the Plan Effective Date, the Debtors shall establish the Professional Fee Escrow.  On the Plan Effective Date, the Debtors or Reorganized Hornblower Debtors, as applicable, shall fund the Professional Fee Escrow with Cash equal to the Professional Fee Escrow Amount.  The Professional Fee Escrow shall be maintained in trust for the Professionals and for no other Entities until all Allowed Professional Fee Claims have been irrevocably paid in full to the Professionals pursuant to one or more Final Orders of the Bankruptcy Court.  No Liens, Claims, or interests shall encumber the Professional Fee Escrow or Cash held on account of the Professional Fee Escrow in any way.  Such funds shall not be considered property of the Estates, the Debtors, or the Reorganized Hornblower Debtors, subject to the release of Cash to the Reorganized Hornblower Debtors from the Professional Fee Escrow in accordance with Article II.D.2; *provided*, *however*, that the Reorganized Hornblower Debtors shall have a reversionary interest in the excess, if any, of the amount of the Professional Fee Escrow over the aggregate amount of Allowed Professional Fee Claims of the Professionals to be paid from the

Professional Fee Escrow. When such Allowed Professional Fee Claims have been paid in full, any remaining amount in the Professional Fee Escrow shall promptly be paid to the Reorganized Hornblower Debtors without any further action or Order of the Bankruptcy Court.

       2.       Final Fee Applications and Payment of Professional Fee Claims

All final requests for payment of Professional Fee Claims incurred during the period from the Petition Date through the Confirmation Date shall be Filed no later than forty-five (45) calendar days after the Plan Effective Date. After notice (and opportunity for objections) and a hearing, if necessary, in accordance with the procedures established by the Bankruptcy Code, Bankruptcy Rules, and prior Bankruptcy Court Orders, the Allowed amounts of such Professional Fee Claims shall be determined by the Bankruptcy Court. The Reorganized Hornblower Debtors shall pay Professional Fee Claims in Cash in the amount the Bankruptcy Court allows from the Professional Fee Escrow, after taking into account any prior payments to such Professionals, as soon as reasonably practicable following the date when such Professional Fee Claims are Allowed by entry of an Order of the Bankruptcy Court.

To the extent that funds held in the Professional Fee Escrow are unable to satisfy the amount of Allowed Professional Fee Claims owing to the Professionals, each Professional shall have an Allowed Administrative Claim for any such deficiency, which shall be satisfied by the Reorganized Hornblower Debtors in the ordinary course of business in accordance with Article II.A and notwithstanding any obligation to File Proofs of Claim or requests for payment on or before the Administrative Claims Bar Date. After all Allowed Professional Fee Claims have been paid in full, the escrow agent shall promptly return any excess amounts held in the Professional Fee Escrow, if any, to the Reorganized Hornblower Debtors, without any further action or Order of the Bankruptcy Court.

       3.       Estimation of Fees and Expenses

To receive payment for unbilled fees and expenses incurred through the Confirmation Date, the Professionals shall reasonably estimate their Professional Fee Claims through and including the Confirmation Date, and shall deliver such estimate to the Debtors, the Crestview Advisors and the Ad Hoc Group Advisors (each as defined in the RSA) no later than five (5) days prior to the Plan Effective Date; *provided*, *however*, that such estimate shall not be considered a representation with respect to the fees and expenses of such Professional, and Professionals are not bound to any extent by the estimates. If any of the Professionals fails to provide an estimate or does not provide a timely estimate, the Debtors may estimate the unbilled fees and expenses of such Professional. The total amount so estimated shall be utilized by the Debtors to determine the Professional Fee Escrow Amount.

       4.       Post-Confirmation Date Fees and Expenses

Except as otherwise specifically provided in this Plan or the Confirmation Order, from and after the Confirmation Date, the Debtors or the Reorganized Hornblower Debtors, as the case may be, shall, in the ordinary course of business and without any further notice to or action, Order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses incurred by the Debtors or the Reorganized Hornblower Debtors, as

applicable. Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code, or any Order of the Bankruptcy Court governing the retention or compensation of Professionals in seeking retention or compensation for services rendered after such date, shall terminate, and the Debtors may employ and pay any Professionals in the ordinary course of business without any further notice to or action, Order, or approval of the Bankruptcy Court. For the avoidance of doubt, nothing in the foregoing or otherwise in the Plan shall modify or affect the Debtors' obligations under the DIP Orders, including in respect of the Approved Budget (as defined in the DIP Orders), prior to the Plan Effective Date.

**E.**    *Priority Tax Claims*

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for, each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall receive treatment in a manner consistent with section 1129(a)(9)(C) of the Bankruptcy Code. To the extent any Allowed Priority Tax Claim is not due and owing on the Plan Effective Date, such Claim shall be paid in accordance with the terms of any agreement between the Debtors and the Holder of such Claim, or as may be due and payable under applicable non-bankruptcy law, or in the ordinary course of business by the Reorganized Debtors or the AQV Wind Down Co., as applicable.

**F.**    *Payment of Statutory Fees*

All fees due and payable before the Plan Effective Date pursuant to section 1930(a) of the Judicial Code shall be paid by each of the Debtors, the Reorganized Debtors, or the AQV Wind Down Co., as applicable, for each quarter (including any fraction thereof), until the Chapter 11 Cases are converted, dismissed, or closed, whichever occurs first; *provided* that on and after the Plan Effective Date, the Reorganized Debtors or AQV Wind Down Co., as applicable, shall (1) pay in full in Cash when due and payable, and shall be responsible for paying, any and all such fees and interest with respect to any and all disbursements (and any other actions giving rise to such fees and interest) of the Debtors, the Reorganized Debtors, and the AQV Wind Down Co., as applicable, and (2) File in the Chapter 11 Cases (to the extent they have not yet been closed, dismissed, or converted) quarterly reports as required by the Bankruptcy Code, Bankruptcy Rules, and Bankruptcy Local Rules, as applicable, in connection therewith. The U.S. Trustee shall not be required to file any proof of claim or request for payment for quarterly fees.

### ARTICLE III.
### CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

**A.**    *Classification in General*

Except for the Claims addressed in ARTICLE II hereof, all Claims and Interests are classified in the Classes set forth below for all purposes, including voting, Confirmation, and distributions pursuant to this Plan and in accordance with sections 1122 and 1123(a)(1) of the Bankruptcy Code. A Claim or an Interest is classified in a particular Class only to the extent that such Claim or Interest qualifies within the description of that Class and is classified in other Classes

to the extent that any portion of such Claim or Interest qualifies within the description of such other Classes.  A Claim or an Interest is also classified in a particular Class for the purpose of receiving distributions pursuant to this Plan, but only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Plan Effective Date.

### B.     Formation of Debtor Groups for Convenience Only

This Plan is a separate plan of reorganization for each Debtor.  This Plan groups the Debtors together solely for the purpose of describing treatment under this Plan, Confirmation of this Plan, and making Plan distributions in respect of Claims against and Interests in the Debtors under this Plan.  Such groupings shall not affect any Debtor's status as a separate legal entity, change the organizational structure of the Debtors' business enterprise, constitute a change of control of any Debtor for any purpose, cause a merger or consolidation of any legal entities, or cause the transfer of any assets. Except as otherwise provided by or permitted under this Plan, all Debtors shall continue to exist as separate legal entities. The Plan is not premised on, and does not provide for, the substantive consolidation of the Debtors with respect to the Classes of Claims or Interests set forth in the Plan, or otherwise.

### C.     Summary of Classification

The classification of Claims against and Interests in each Debtor (as applicable) pursuant to this Plan is as set forth below.  All of the potential Classes for the Debtors are set forth herein. Certain of the Debtors may not have Holders of Claims or Interests in a particular Class or Classes, and such Classes shall be treated as set forth in Article III.H.

The following chart summarizes the classification of Claims and Interests pursuant to the Plan:

| Class | Claims and Interests | Status | Voting Rights |
|---|---|---|---|
| 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 3 | First Lien Claims | Impaired | Entitled to Vote |
| 4 | Revolver Claims | Impaired | Entitled to Vote |
| 5 | General Unsecured Claims | Impaired | Entitled to Vote |
| 6 | Unsecured Go-Forward Trade Claims | Impaired | Entitled to Vote |
| 7 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept / Deemed to Reject) |
| 8 | Intercompany Interests | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept / Deemed to Reject) |

| Class | Claims and Interests | Status | Voting Rights |
|---|---|---|---|
| 9 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 10 | Interests in Hornblower and Hornblower Holdings LLC | Impaired | Not Entitled to Vote (Deemed to Reject) |

### D.    *Treatment of Claims and Interests*

Subject to <u>ARTICLE IV</u> hereof, each Holder of an Allowed Claim or Interest, as applicable, shall receive under the Plan the treatment described below in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Holder's Allowed Claim or Interest, except to the extent less favorable treatment is agreed to by the Debtors, the Reorganized Debtors, or the AQV Wind Down Co., as applicable, and the Holder of such Allowed Claim or Interest.  Unless otherwise indicated, the Holder of an Allowed Claim or Interest shall receive such treatment on the later of the Plan Effective Date and the date such Holder's Claim or Interest becomes an Allowed Claim or Interest or as soon as reasonably practicable thereafter.

1.    <u>Class 1 – Other Secured Claims</u>

a.    *Classification*:  Class 1 consists of all Other Secured Claims.

b.    *Treatment*:  Each Holder of an Allowed Other Secured Claim shall receive, at the option of the Debtors, Reorganized Debtors, or AQV Wind Down Co., as applicable, either:

i.    payment in full in Cash of the unpaid portion of their Allowed Other Secured Claim, including any interest thereon required to be paid under section 506(b) of the Bankruptcy Code (or if payment is not then due, on the due date of such Allowed Other Secured Claim);

ii.    Reinstatement pursuant to section 1124 of the Bankruptcy Code;

iii.    the return or abandonment of the collateral securing such Claim to such Holder; or

iv.    such other treatment necessary to satisfy section 1124 of the Bankruptcy Code.

c.    *Voting*:  Class 1 is Unimpaired under this Plan.  Each Holder of an Other Secured Claim will be conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, each such Holder is not entitled to vote to accept or reject this Plan.

2.    <u>Class 2 – Other Priority Claims</u>

a.    *Classification*:  Class 2 consists of all Other Priority Claims.

b.   *Treatment*:  Each Holder of an Allowed Other Priority Claim shall receive payment in full, in Cash, of the unpaid portion of its Allowed Other Priority Claim on the Plan Effective Date or as soon thereafter as reasonably practicable (or, if payment is not then due, on the due date of such Other Priority Claim).

c.   *Voting*:  Class 2 is Unimpaired under this Plan.  Each Holder of an Other Priority Claim will be conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, each such Holder is not entitled to vote to accept or reject this Plan.

3.   <u>Class 3 – First Lien Claims</u>

a.   *Classification*:  Class 3 consists of all First Lien Claims.

b.   *Allowance*:  On the Plan Effective Date, the First Lien Claims shall be Allowed in an aggregate amount of not less than $726,548,687, representing the aggregate principal amount outstanding under the First Lien Credit Agreement, plus any accrued and unpaid interest, and all accrued and unpaid fees or premiums and other expenses payable under such credit agreement, accrued as of the Petition Date.

c.   *Treatment*:  On the Plan Effective Date or as soon thereafter as reasonably practicable, each Holder of an Allowed First Lien Claim shall receive its Pro Rata share of:

   i.   96% of the Rights;

   ii.   96% of the New HB Common Equity (or New Warrants) (subject to dilution on account of the New HB Common Equity (or New Warrants) issued in connection with (A) the Rights Offering, (B) the Backstop Commitment Premium, and (C) the MIP Equity);

   iii.   the Crestview Cash Contribution; *provided* that such Holder (or any Related Fund) may elect to use its Pro Rata share of the Crestview Cash Contribution as a credit towards the exercise of its Rights, in which case such portion of the Crestview Cash Contribution shall be retained by the Hornblower Debtors; and

   iv.   96% of the AQV Net Cash Proceeds.

d.   *Voting*:  Class 3 is Impaired under this Plan.  Each Holder of a First Lien Claim will be entitled to vote to accept or reject this Plan.

4.   <u>Class 4 – Revolver Claims</u>

a.   *Classification*:  Class 4 consists of all Revolver Claims.

b.     *Allowance*:  On the Plan Effective Date, the Revolver Claims shall be Allowed in an aggregate amount of not less than $26,688,288, representing the aggregate principal amount outstanding under the Revolver Credit Agreement, plus any accrued and unpaid interest, and all accrued and unpaid fees and other expenses payable under such credit agreement, accrued as of the Petition Date.

c.     *Treatment*:  On the Plan Effective Date or as soon thereafter as reasonably practicable, each Holder of an Allowed Revolver Claim shall receive its Pro Rata share of:

     i.     4% of the Rights;

     ii.     4% of the New HB Common Equity (or New Warrants) (subject to dilution on account of the New HB Common Equity (or New Warrants) issued in connection with (A) the Rights Offering, (B) the Backstop Commitment Premium, and (C) the MIP Equity); and

     iii.     4% of the AQV Net Cash Proceeds.

d.     *Voting*:  Class 4 is Impaired under this Plan.  Each Holder of a Revolver Claim will be entitled to vote to accept or reject this Plan.

5.     <u>Class 5 – General Unsecured Claims</u>

a.     *Classification*:  Class 5 consists of all General Unsecured Claims.

b.     *Treatment*:  Each Holder of an Allowed General Unsecured Claim shall receive, in full and final satisfaction of such Claim, its Pro Rata share of the GUC Pool.

c.     *Voting*:  Class 5 is Impaired under this Plan.  Each Holder of a General Unsecured Claim will be entitled to vote to accept or reject this Plan.

6.     <u>Class 6 – Unsecured Go-Forward Trade Claims</u>

a.     *Classification*:  Class 6 consists of all Unsecured Go-Forward Trade Claims.

b.     *Treatment*:  Each Holder of an Allowed Unsecured Go-Forward Trade Claim shall receive, in full and final satisfaction of such Claim, Cash in an amount equal to 70% of such Holder's Allowed Unsecured Go-Forward Trade Claim; *provided, however*, that each Unsecured Go-Forward Trade Claim that is Allowed in an amount greater than $50,000 shall be deemed a General Unsecured Claim unless each such Holder thereof irrevocably elects on its ballot to reduce the Allowed amount of such General Unsecured Claim to $50,000; *provided, further*, that if 70% of the aggregate amount of Allowed Unsecured Go-Forward Trade Claims is greater than $1,300,000,

each Holder of an Allowed Unsecured Go-Forward Trade Claim shall receive its Pro Rata share of $1,300,000.

c.  *Voting*:  Class 6 is Impaired under this Plan.  Each Holder of an Unsecured Go-Forward Trade Claim will be entitled to vote to accept or reject this Plan.

7.  <u>Class 7 – Intercompany Claims</u>

a.  *Classification*:  Class 7 consists of all Intercompany Claims.

b.  *Treatment*:  On the Plan Effective Date, all Intercompany Claims will be adjusted, Reinstated, or discharged in the Debtors' discretion, subject to the reasonable consent of, with respect to Intercompany Claims held by another Debtor or against a Hornblower Debtor, the Required Consenting HB First Lien Lenders and, with respect to Intercompany Claims held by any Journey Beyond Entity against Journey Beyond Holdings, LLC, the Consenting JBIH Lenders.  For the avoidance of doubt, on the Plan Effective Date, the JB Intercompany Loans shall be cancelled and discharged.

c.  *Voting*:  Class 7 is either deemed Unimpaired under this Plan, and each such Holder of an Intercompany Claim will be conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code, or is Impaired, and each such Holder of an Intercompany Claim is deemed to reject this Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, each such Holder is not entitled to vote to accept or reject this Plan.

8.  <u>Class 8 – Intercompany Interests</u>

a.  *Classification*:  Class 8 consists of all Intercompany Interests.

b.  *Treatment*:  All Intercompany Interests shall be Reinstated or cancelled in the Debtors' discretion, subject to the reasonable consent of, with respect to the Reorganized Hornblower Debtors, the Required Consenting HB First Lien Lenders, and, with respect to the Journey Beyond Entities, the Consenting JBIH Lenders.

c.  *Voting*:  Class 8 is either deemed Unimpaired under this Plan, and each such Holder of an Intercompany Interest will be conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code, or is Impaired, and each such Holder of an Intercompany Interest is deemed to reject this Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, each such Holder is not entitled to vote to accept or reject this Plan.

9.       <u>Class 9 – Section 510(b) Claims</u>

      a.       *Classification*:  Class 9 consists of all Section 510(b) Claims.

      b.       *Treatment*:  On the Plan Effective Date, all Section 510(b) Claims against the Debtors shall be discharged and released, and the Holders of Section 510(b) Claims shall not receive or retain any distribution, property, or other value on account of their Section 510(b) Claims.

      c.       *Voting*:  Class 9 is Impaired under this Plan.  Each Holder of a Section 510(b) Claim is deemed to reject this Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, each such Holder is not entitled to vote to accept or reject this Plan.

10.       <u>Class 10 – Interests in Hornblower and Hornblower Holdings LLC</u>

      a.       *Classification*:  Class 10 consists of all Interests in Hornblower and Hornblower Holdings LLC.

      b.       *Treatment*:  On the Plan Effective Date, all Interests in Hornblower and Hornblower Holdings LLC will be cancelled and the Holders of such Interests shall not receive or retain any distribution, property, or other value on account of their Interests in Hornblower or Hornblower Holdings LLC.

      c.       *Voting*:  Class 10 is Impaired under this Plan.  Each Holder of an Interest in Hornblower or Hornblower Holdings LLC is deemed to reject this Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, each such Holder is not entitled to vote to accept or reject this Plan.

**E.**       ***Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code***

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by at least one Impaired Class of Claims.  The Debtors shall seek Confirmation of this Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests.  The Debtors reserve the right to modify this Plan in accordance with <u>ARTICLE XI</u> to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

**F.**       ***No Substantive Consolidation***

Although this Plan is presented as a joint plan of reorganization for administrative purposes, this Plan does not provide for the substantive consolidation of the Debtors' Estates, and on the Plan Effective Date, the Debtors' Estates shall not be deemed to be substantively consolidated for any reason.  Except as expressly provided herein, nothing in this Plan, the Confirmation Order, or the Disclosure Statement shall constitute or be deemed to constitute a representation that any one or all of the Debtors is subject to or liable for any Claims or Interests

33

against or in any other Debtor. Notwithstanding the foregoing, in no case shall the aggregate value of all property received or retained under the Plan on account of any Allowed Claim exceed the amount of the Allowed Claim.

## G.  *Special Provision Governing Unimpaired Claims or Interests*

Except as otherwise set forth in this Plan or the Confirmation Order, nothing shall affect the Debtors', the Reorganized Debtors', or the AQV Wind Down Co.'s rights in respect of any Unimpaired Claims or Interests, including all rights in respect of legal and equitable defenses to or setoffs or recoupment against any such Unimpaired Claims or Interests.

## H.  *Elimination of Vacant Classes*

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court as of the date of the commencement of the Combined Hearing shall be considered vacant and deemed eliminated from this Plan for purposes of voting to accept or reject this Plan and for purposes of determining acceptance or rejection of this Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

## I.  *Acceptance by Impaired Classes*

An Impaired Class of Claims shall have accepted this Plan if, not counting the vote of any Holder designated under section 1126(e) of the Bankruptcy Code, (i) the Holders of at least two-thirds in amount of the Allowed Claims actually voting in the Class have voted to accept this Plan, and (ii) the Holders of more than one-half in number of the Allowed Claims actually voting in the Class have voted to accept this Plan.

## J.  *Voting Classes; Presumed Acceptance by Non-Voting Classes*

If a Class contains Claims eligible to vote and no Holders of Claims eligible to vote in such Class vote to accept or reject this Plan, the Holders of such Claims in such Class shall be deemed to have accepted the Plan.

## K.  *Controversy Concerning Impairment*

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired or is properly classified under the Plan, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

## L.  *Intercompany Interests*

To the extent Reinstated under the Plan, distributions on account of Intercompany Interests are not being received by Holders of such Intercompany Interests on account of their Intercompany Interests but for the purposes of administrative convenience and due to the importance of maintaining the prepetition corporate structure for the ultimate benefit of the Holders of New HB Common Equity, and in exchange for the Debtors', Reorganized Debtors', and AQV Wind Down Co.'s, as applicable, agreement under the Plan to make certain distributions to the Holders of

Allowed Claims. For the avoidance of doubt, any Intercompany Interest in Non-Debtor Affiliates owned by a Debtor shall continue to be owned by the applicable Reorganized Debtor unless provided otherwise by this Plan (including pursuant to the RSA Settlement), any Order of the Bankruptcy Court or the Restructuring Transactions Memorandum.

## M.   *Relative Rights and Priorities*

Unless otherwise expressly provided in this Plan or the Confirmation Order, the allowance, classification, and treatment of all Allowed Claims and Interests and the respective distributions and treatments under this Plan take into account and conform to the relative priority and rights of such Claims or Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510 of the Bankruptcy Code, or otherwise, and any other rights impacting relative lien priority and/or priority in right of payment, and any such rights shall be released pursuant to the Plan. Pursuant to section 510 of the Bankruptcy Code, the Debtors, the Reorganized Debtors, or the AQV Wind Down Co., as applicable, reserve the right to reclassify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

## ARTICLE IV.
## MEANS FOR IMPLEMENTATION OF THIS PLAN

From and after the Plan Effective Date, the Reorganized Debtors, subject to any applicable limitations set forth in any post-Plan Effective Date agreement, shall have the right and authority without further Order of the Bankruptcy Court to raise additional capital and obtain additional financing, subject to the New HB Organizational Documents or New JB Organizational Documents, as applicable, as the boards of directors of the applicable Reorganized Hornblower Debtors or Journey Beyond Entities deem appropriate.

## A.   *Sources of Consideration for Plan Distributions*

The Debtors, the Reorganized Debtors, and the AQV Wind Down Co., as applicable, shall fund distributions under the Plan (including the funding of the AQV Wind Down Co.) to their respective Holders of Claims and Interests with: (1) Cash on hand, including Cash from operations and the proceeds from the DIP Facilities, the Rights Offering, the AQV Cash Proceeds, the Exit Term Loans, and the Exit Revolver and (2) the New HB Common Equity.

### 1.   Issuance and Distribution of New HB Common Equity (or New Warrants)

On the Plan Effective Date, all Interests in Hornblower and Hornblower Holdings LLC shall be cancelled and Reorganized Hornblower shall issue or cause to be issued the New HB Common Equity (or New Warrants) (including the New HB Common Equity (or New Warrants) issued pursuant to the Rights Offering (including the Unsubscribed Equity issued pursuant to the Backstop Commitment Agreement) and in satisfaction of the Backstop Commitment Premium, and, to the extent applicable, the MIP Equity) in accordance with the terms of this Plan and the Confirmation Order. All of the New HB Common Equity (and New Warrants) issuable under this Plan and the Confirmation Order, when so issued, shall be duly authorized, validly issued, fully paid, and nonassessable. Each distribution and issuance referred to in ARTICLE IV hereof shall

be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the New HB Organizational Documents or, as applicable, pursuant to the Rights Offering Documents, the Backstop Documents, and other instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

Any Entity's acceptance of New HB Common Equity (or New Warrants) shall be deemed to constitute its agreement to the New HB Organizational Documents, as the same may be amended or modified from time to time following the Plan Effective Date in accordance with their respective terms, and each such Entity will be bound thereby in all respects. For the avoidance of doubt, all Holders of Allowed Claims entitled to distribution of New HB Common Equity (or New Warrants) hereunder, or, as applicable, pursuant to the Rights Offering (including in connection with the Backstop Commitment Agreement) shall be deemed to be a party to, and bound by, the New Stockholders' Agreement, if any, regardless of whether such Holder has executed a signature page thereto.

a.     *U.S. Coastwise Trade Limitations*

Certain of the Debtors' operations are conducted in the U.S. coastwise trade and are governed by the Passenger Vessel Services Act of 1886 and section 27 of the Merchant Marine Act, 1920. These U.S. Coastwise Trade Laws restrict waterborne transportation of passengers and goods between points in the U.S. to vessels owned and controlled by "citizens of the United States" within the meaning of the U.S. Coastwise Trade Laws (such a person, a "U.S. Citizen"). The Debtors could lose the privilege of owning and operating vessels in the U.S. coastwise trade if non-U.S. Citizens were to own or control, in the aggregate, more than 25% of any class or series of the equity interests in Reorganized Hornblower. In order to comply with the U.S. Coastwise Trade Laws, Reorganized Hornblower's certificate of incorporation (the "Certificate of Incorporation") will provide that non-U.S. Citizens in the aggregate may not own more than 24% of the New HB Common Equity to be issued and outstanding as of the Plan Effective Date (the "U.S. Coastwise Restrictions"). Therefore, as further described in this Plan and as mutually determined by the Debtors and the Required Consenting HB First Lien Lenders, in order to ensure at least 76% of Reorganized Hornblower's equity interests will be owned by U.S. Citizens, and solely to that extent, Holders of Allowed HB First Lien Claims that are non-U.S. Citizens will receive New Warrants in lieu of all or a portion of the shares of New HB Common Equity to which they would otherwise be entitled hereunder or pursuant to the Rights Offering in an amount such that, in the aggregate with all other non-U.S. Citizens entitled to receive New HB Common Equity under this Plan, the U.S. Coastwise Restrictions are satisfied. For the avoidance of doubt, any Eligible Holder (as defined in the Rights Offering Procedures) of Allowed HB First Lien Claims to which New Warrants are issued shall remain obligated to pay the same Purchase Price (as defined in the Rights Offering Procedures) therefor and to make such payment at the same time and otherwise on the same terms and conditions as if such holder were purchasing shares of New HB Common Equity pursuant hereto. Such New Warrants shall have the terms and be subject to the restrictions as are set forth in the Plan. Furthermore, for the avoidance of doubt, such Eligible Holders are eligible to receive New HB Common Equity subject to compliance with the U.S. Coastwise Restrictions.

In all cases, each Eligible Holder (or any applicable Designee (as defined in the Rights Offering Procedures)) shall be required to furnish an affidavit of U.S. citizenship (a "U.S. Citizenship Affidavit") in the form provided with the Subscription Form (as defined in the Rights Offering Procedures) and/or any other documentation as the Debtors reasonably deem advisable to fulfill the purpose or implement the provisions of the Certificate of Incorporation in order to maintain compliance with the U.S. Coastwise Trade Laws (together with the U.S. Citizenship Affidavit, the "Requisite Documentation").  If the Requisite Documentation is not completed properly in a manner reasonably acceptable to the Debtors, in consultation with the Backstop Parties, and timely provided by the Rights Offering Expiration Time in accordance with the Rights Offering Procedures, then the applicable rights offering subscription is incomplete and will be rejected by the Debtors.  To the extent a Holder of Allowed HB First Lien Claims is entitled to receive New HB Common Equity under this Plan, such Holder (or any applicable Designee) must either (i) furnish the Requisite Documentation in accordance with the Rights Offering Procedures or (ii) if such Holder (or any applicable Designee) elects not to participate in the Rights Offering, furnish the Requisite Documentation to the Debtors in a manner reasonably acceptable to the Debtors.

The Debtors shall treat all such documents and information provided by any Eligible Holder (or any applicable Designee), including any Requisite Documentation, as confidential and shall limit the distribution of such documents and information to the Debtors' personnel and counsel that have a "need-to-know" the contents thereof (which personnel and counsel shall be bound by the confidentiality obligations contained in this paragraph) and to the U.S. Coast Guard as may be necessary.  The Debtors shall (i) claim confidential treatment and exemption from Freedom of Information Act requests (a "FOIA Request") for any such documents and information submitted to the U.S. Coast Guard to the maximum extent legally possible, and (ii) notify the relevant Eligible Holder (or any applicable Designee) (x) if any such Eligible Holder/applicable Designee's documents and information, including Requisite Documentation, are submitted to the U.S. Coast Guard, and (y) if the Debtors subsequently receives notice from the U.S. Coast Guard that it has received a FOIA Request and that any such document that has been identified by the U.S. Coast Guard as responsive to such a FOIA Request, in which case the Debtors shall allow such Eligible Holder/applicable Designee an opportunity to redact any confidential commercial, financial, and proprietary business information exempt from Freedom of Information Act disclosure pursuant to 5 U.S.C. § 552(b)(4) that is in any such document, including any Requisite Documentation.

2.    Rights Offering

Pursuant to the Rights Offering Procedures, on the Plan Effective Date, the Reorganized Hornblower Debtors will offer and sell New HB Common Equity (or New Warrants) in an amount equal to the Rights Offering Amount for the Purchase Price (as defined in the Rights Offering Procedures).

Subject to the U.S. Coastwise Restrictions, the Debtors or Reorganized Hornblower Debtors, as applicable, shall distribute to each Holder of an Allowed HB First Lien Claim the Rights to purchase up to such Holder's Pro Rata share (based on such Holder's relative share of the total amount of all Allowed HB First Lien Claims) of the New HB Common Equity (or New Warrants) to be offered and sold in the Rights Offering, as set forth in this Plan, the Backstop

Commitment Agreement, and the Rights Offering Procedures. The Rights Offering will be backstopped, severally and not jointly, by the Backstop Parties pursuant to the Backstop Commitment Agreement. The Reorganized Hornblower Debtors will pay the Backstop Commitment Premium to the Backstop Parties on the Plan Effective Date in accordance with the terms and conditions set forth in the Backstop Commitment Agreement, the Backstop Order, and the Plan.

All New HB Common Equity (or New Warrants) issued pursuant to the Plan shall be issued based on a price of $10.00 per share; *provided, however*, that the New HB Common Equity (or New Warrants) issued pursuant to the Rights Offering shall be issued at a 30% discount to the foregoing price per share (i.e., $7.00 per share). The aggregate number of New HB Common Equity shares or New Warrants a recipient would otherwise receive shall be rounded down to the nearest whole number, and recipients shall not receive any compensation on account of such rounding. The proceeds from the Rights Offering, the Exit Term Loans, and the Exit Revolver shall be used to meet a Projected Minimum Liquidity amount of $25 million on the Plan Effective Date (the "Minimum Liquidity Amount"). "Projected Minimum Liquidity" shall mean (a) the total of the Hornblower Debtors' projected cash and customary cash equivalents (including from the proceeds of the Rights Offering, the Exit Term Loans, and the Exit Revolver, and availability under the Exit Revolver), *plus* (b) any permanent positive change in the projected cash flows of the Hornblower Debtors and their subsidiaries through March 31, 2026. Except as otherwise set forth in the Rights Offering Procedures, to the extent Projected Minimum Liquidity would exceed the Minimum Liquidity Amount, the Rights Offering Amount shall be reduced by the amount of such excess, and the Rights issued to each holder of an Allowed HB First Lien Claim shall be reduced on a Pro Rata basis. The Debtors shall forecast Projected Minimum Liquidity on the expected Plan Effective Date on a date that the Debtors reasonably believe to be no more than 25 days prior to the Plan Effective Date and no less than 20 days prior to the Plan Effective Date. The Debtors shall consult with the Backstop Parties and their advisors in preparing such Projected Minimum Liquidity forecast and shall give the Backstop Parties and their advisors at least two (2) full business days to review and comment on such forecast along with the relevant supporting material. The final determination of the Projected Minimum Liquidity shall be determined by the Debtors with the reasonable consent of the Required Consenting HB First Lien Lenders in consultation with Crestview. Notwithstanding anything herein to the contrary, the Rights Offering Amount shall be in an amount no greater than $345 million regardless of the Projected Minimum Liquidity.

The Rights that a Holder of an Allowed HB First Lien Claim has validly elected to exercise shall be deemed issued and exercised on or about (but in no event after) the Plan Effective Date. Upon exercise of the Rights pursuant to the terms of the Backstop Commitment Agreement and the Rights Offering Procedures, the Reorganized Hornblower Debtors shall be authorized to issue the number of shares of New HB Common Equity (or New Warrants) necessary to satisfy such exercise. Pursuant to the Backstop Commitment Agreement and Backstop Order (in each case, once approved), if after following the Rights Offering Procedures, there remain any unexercised Rights, the Backstop Parties shall purchase, severally and not jointly, their applicable portion of the shares (and/or New Warrants) of New HB Common Equity associated with such unexercised Rights in accordance with the terms and conditions set forth in the Backstop Commitment Agreement and the Rights Offering Procedures.

The Rights and the shares of New HB Common Equity (or New Warrants) that are issued in connection with the exercise of the Rights and that are purchased by the Backstop Parties in accordance with their backstop obligations under the Backstop Commitment Agreement will be issued in a private placement exempt from registration under Section 5 of the Securities Act pursuant to Section 4(a)(2) and/or Regulation D thereunder and will constitute "restricted securities" for purposes of the Securities Act.  The shares of New HB Common Equity (or New Warrants) issued in satisfaction of the Backstop Commitment Premium will be issued in reliance upon Section 1145 of the Bankruptcy Code to the extent permitted under applicable law.

Entry of the Backstop Order and the Confirmation Order shall constitute Bankruptcy Court approval of the Rights Offering (including the transactions contemplated thereby, and all actions to be undertaken, undertakings to be made, and obligations to be incurred by the Debtors and Reorganized Hornblower Debtors in connection therewith).  On the Plan Effective Date, as provided in the Restructuring Transactions Memorandum, the rights and obligations of the Debtors under the Backstop Commitment Agreement shall vest in the Reorganized Hornblower Debtors.

Each Holder of Rights that receives New HB Common Equity (or New Warrants) as a result of exercising its Rights shall be subject to the provisions applicable to the Holders of New HB Common Equity (or New Warrants) as set forth in Article IV.A.  The proceeds of the Rights Offering shall be used by the Debtors or Reorganized Hornblower Debtors, as applicable, to satisfy all outstanding Junior DIP Claims and make other distributions pursuant to the Plan, as well as fund the operations of the Reorganized Hornblower Debtors.

3.   Exit Term Loans and Exit Revolver

On the Plan Effective Date, the applicable Reorganized Hornblower Debtors shall enter into the Exit Credit Documents.  Confirmation of the Plan shall be deemed approval of the Exit Credit Documents, all transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred and fees and expenses to be paid by such Reorganized Hornblower Debtors in connection therewith, and authorization of the applicable Reorganized Hornblower Debtors to enter into, execute, and deliver the Exit Credit Documents, without further notice to or order of the Bankruptcy Court, act or action under applicable Law, regulation, order, or rule or the vote, consent, authorization, or approval of any Entity (other than as expressly required by the Exit Credit Documents).  The Exit Credit Documents shall constitute legal, valid, binding, and authorized indebtedness and obligations of the applicable Reorganized Hornblower Debtors, enforceable in accordance with their respective terms, and such indebtedness and obligations shall not be, and shall not be deemed to be, enjoined or subject to discharge, impairment, release, or avoidance under the Plan, the Confirmation Order, or on account of the Confirmation or Consummation of the Plan.  On the Plan Effective Date, all of the Liens and security interests to be granted by the applicable Reorganized Hornblower Debtors in accordance with the Exit Credit Documents (i) shall be deemed to be granted, (ii) shall be legal, binding, and enforceable Liens on, and security interests in, the collateral granted thereunder in accordance with the terms of the Exit Credit Documents (including the relevant rights and priorities of the secured parties thereunder), (iii) shall be deemed automatically perfected on the Plan Effective Date without the need for the taking of any further filing, recordation, approval, consent, or other action, and (iv) shall not be enjoined or subject to discharge, impairment, release, avoidance, recharacterization, or subordination (including equitable subordination) for any purposes

whatsoever and shall not constitute preferential transfers or fraudulent conveyances under the Bankruptcy Code or any applicable non-bankruptcy law.  The applicable Reorganized Hornblower Debtors and the Persons and Entities granted such Liens and security interests (or any designee thereof) shall be authorized to make all filings and recordings, and to obtain all governmental approvals, consents, and take any other actions necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, federal, or other law that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order and any such filings, recordings, approvals, and consents shall not be required), and the applicable Reorganized Hornblower Debtors shall thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

4.    AQV Cash Proceeds and Other Cash on Hand

The Debtors, the Reorganized Hornblower Debtors, or the AQV Wind Down Co., as applicable, shall use their respective Cash on hand, including the AQV Cash Proceeds, to fund distributions to their respective Holders of Claims, as applicable in accordance with this Plan.

**B.    *AQV Wind Down***

1.    AQV Wind Down

On the Plan Effective Date, one or more of the AQV Debtors shall be dissolved without further action under applicable law, regulation, Order, or rule, and the AQV Remaining Assets shall be transferred to, or retained by, the AQV Wind Down Co.  The AQV Wind Down Co. may be comprised of one or more of the Reorganized AQV Debtors.  Beginning on the Plan Effective Date, the AQV Wind Down Co. Administrator shall effectuate the AQV Remaining Assets Wind Down in accordance with the provisions of the Plan, Confirmation Order, and any other applicable Definitive Documents, including the AQV Sale Order.

2.    Vesting of AQV Wind Down Amount and AQV Remaining Assets in the AQV Wind Down Co.

On the Plan Effective Date, following the Consummation of the AQV Sale Transaction, if any, the AQV Remaining Assets shall vest in the AQV Wind Down Co.  On and after the Plan Effective Date, except as otherwise provided in the Plan, the AQV Wind Down Co., at the direction of the AQV Wind Down Co. Administrator, shall effectuate the AQV Remaining Assets Wind Down and compromise or settle the Claims, Interests, or Causes of Action remaining against the AQV Wind Down Co., if any, without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code, Bankruptcy Rules, or Bankruptcy Local Rules.

After the Plan Effective Date, pursuant to the Plan, and on behalf of the AQV Wind Down Co., the AQV Wind Down Co. Administrator, in its sole discretion, as part of the AQV Remaining Assets Wind Down, shall sell, liquidate, use, or dispose of any asset, property, right, liability, debt, or obligation of the AQV Debtors on terms consistent with the terms of the Plan without approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code, Bankruptcy Rules, or Bankruptcy Local Rules.

3.      The AQV Wind Down Co. Administrator Effectuating the AQV Remaining Assets Wind Down

On and after the Plan Effective Date, the AQV Wind Down Co. Administrator shall be authorized and directed to implement the Plan and any applicable orders of the Bankruptcy Court, solely in connection with effectuating the AQV Remaining Assets Wind Down.  On and after the Plan Effective Date, the AQV Wind Down Co. Administrator shall have any and all power and authority to take any action necessary to effectuate the AQV Remaining Assets Wind Down.

As soon as practicable after the Plan Effective Date, the AQV Wind Down Co. Administrator shall:  (a) cause the AQV Wind Down Co. to comply with, and abide by, the terms of the Plan, the Confirmation Order, and any other documents contemplated thereby, including the applicable Definitive Documents; and (b) take such other actions as the AQV Wind Down Co. Administrator may deem necessary or desirable to carry out the purposes of the Plan in connection with the AQV Remaining Assets Wind Down.

The AQV Wind Down Co. Administrator shall accede to such powers as would have been applicable to the AQV Debtors' officers, directors, managers, and equityholders, should those entities have been reorganized pursuant to the Plan, and the AQV Wind Down Co. shall be authorized to be (and, upon the conclusion of the AQV Wind Down, shall be) dissolved by the AQV Wind Down Co. Administrator, as applicable, in accordance with applicable state law.  The AQV Wind Down Co. Administrator shall act for the AQV Wind Down Co. in the same capacity and shall have the same rights and powers as are applicable to a manager, managing member, board of managers, board of directors, or equivalent governing body, as applicable, and to officers, subject to the provisions hereof (and all certificates of formation and limited liability company agreements and certificates of incorporation or by-laws, or equivalent governing documents and all other related documents (including membership agreements, stockholders agreements, or other similar instruments), as applicable, are deemed amended pursuant to the Plan to permit and authorize the same).  From and after the Plan Effective Date, the AQV Wind Down Co. Administrator shall be the sole representative of, and shall act for, the AQV Wind Down Co.

The AQV Wind Down Co. Administrator shall effectuate the AQV Remaining Assets Wind Down with the amounts reserved therefor in the AQV Wind Down Budget.

All costs, liabilities, and expenses reasonably incurred by the AQV Wind Down Co. Administrator following the Plan Effective Date, including any fees, costs, or expenses of the Notice and Claims Agent in connection with the administration of Administrative Claims, Priority Tax Claims, and/or General Unsecured Claims asserted against the AQV Debtors as requested by the AQV Wind Down Co. Administrator, and any personnel employed by the AQV Wind Down Co. Administrator in the performance of the AQV Wind Down Co. Administrator's duties, as set forth in ArticleARTICLE VII, shall be paid from the AQV Wind Down Amount in accordance with the AQV Wind Down Budget.

4.      Cooperation and Access

To the extent applicable with respect to this subsection, the AQV Purchaser shall cooperate in good faith with the AQV Wind Down Co., including by (i) affording the AQV Wind Down Co.

Administrator and its representatives reasonable access to its properties, books, and records in connection with the AQV Wind Down Co. Administrator's satisfaction of its duties and responsibilities under the Plan and (ii) using commercially reasonable efforts to make available to the AQV Wind Down Co. Administrator and its representatives the employees or representatives of the AQV Purchaser whose assistance, expertise, testimony, notes, recollections, or presence are reasonably necessary in connection with the AQV Wind Down Co. Administrator's satisfaction of its duties and responsibilities under the Plan.

## C.    *General Settlement of Claims and Interests*

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under this Plan and the Confirmation Order, upon the Plan Effective Date, the provisions of this Plan and the Confirmation Order shall constitute a good-faith compromise and settlement of all Claims and Interests and controversies relating to the contractual, legal, and subordination rights of Holders with respect to such Allowed Claims and Interests or any distribution to be made on account of such Allowed Claim or Interest, as well as, pursuant to the RSA Settlement, any and all actual and potential disputes between and among the Company (including, with respect to each Debtor, such Debtor's Estate), the Consenting Stakeholders, and each other Releasing Party and all other disputes that might impact creditor recoveries, including, without limitation, any and all issues relating to the JBIH Loans and the JBIH Intercompany Note.  For the avoidance of doubt, pursuant to the RSA Settlement, on the Plan Effective Date, in connection with, and subject to, consummation of the RSA Settlement and the other Restructuring Transactions, any and all Claims or Liens in respect of any guarantee under the JBIH Credit Agreement shall be released against any of the Debtors or the property of the Debtors.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise and settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise and settlement is in the best interests of the Debtors, their Estates, and Holders of Claims or Interests, and is fair, equitable, and within the range of reasonableness.  Subject to ARTICLE VIII, all distributions made to Holders of Allowed Claims or Interests in any Class are intended to be and shall be final.  In accordance with the provisions of the Plan, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, without any further notice to or action, Order, or approval of the Bankruptcy Court, after the Plan Effective Date, the Reorganized Debtors and the AQV Wind Down Co., as applicable, may compromise and settle Claims against, and Interests in, the Debtors and their Estates and Causes of Action against other Entities.

The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the RSA Settlement without any further notice to or action, Order, or approval of the Bankruptcy Court, as well as a finding by the Bankruptcy Court that such settlement is in the best interests of the Debtors, their Estates, and Holders of Claims or Interests, and is fair, equitable, and within the range of reasonableness.  The compromises and settlements described herein shall be non-severable from each other and from all other terms of this Plan.

## D.    *Restructuring Transactions*

On or after the Confirmation Date, the Debtors, the Reorganized Debtors, or the AQV Wind Down Co., as applicable, shall be authorized to enter into any transactions and take other

actions consistent with the Plan and the Confirmation Order as may be necessary or appropriate to effectuate the transactions described in, approved by, contemplated by, or necessary to, effectuate the Restructuring Transactions. The applicable Debtors, Reorganized Debtors, and the AQV Wind Down Co. will take any actions as may be necessary or advisable to effect a corporate restructuring of the overall corporate structure of the Debtors, in the Restructuring Transactions Memorandum, or in the Definitive Documents, including the issuance of all Securities, instruments, certificates, and other documents required to be issued pursuant to the Plan, one or more intercompany mergers, consolidations, amalgamations, arrangements, continuances, restructurings, conversions, dissolutions, transfers, liquidations, or other corporate transactions.

The actions to implement the Restructuring Transactions may include: (1) the execution and delivery of appropriate agreements or other documents of merger, consolidation, amalgamation, arrangement, continuance, restructuring, conversion, disposition, dissolution, transfer, liquidation, spinoff, sale, or purchase containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable law and any other terms to which the applicable Entities may agree; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable Entities agree; (3) the filing of the New HB Organizational Documents and any appropriate certificates or articles of incorporation, reincorporation, formation, merger, consolidation, conversion, amalgamation, arrangement, continuance, or dissolution pursuant to applicable state or provincial law; (4) the issuance of the New HB Common Equity (or New Warrants) (including the MIP Equity, any New HB Common Equity (or New Warrants) issued pursuant to the Rights Offering (including Unsubscribed Equity pursuant to the Backstop Commitment Agreement), and any New HB Common Equity (or New Warrants) issued in satisfaction of the Backstop Commitment Premium); (5) the execution and delivery of the New HB Organizational Documents and any certificates or articles of incorporation, bylaws, or such other applicable formation documents (if any) of each Reorganized Debtor (including all actions to be taken, undertakings to be made, and obligations to be incurred and fees and expenses to be paid by the Debtors and/or the Reorganized Debtors, as applicable); (6) the execution and/or delivery, as applicable, of the Rights Offering Documents and the Exit Credit Documents; (7) the AQV Sale Transaction and the AQV Wind Down; (8) the implementation and documentation of the RSA Settlement, including one or more Debtors transferring 100% of the equity in HB TopCo Pty Ltd, or otherwise effectuating the transfer of 100% of the equity in the Journey Beyond Entities, to Crestview's designee; (9) the settlement, reconciliation, repayment, cancellation, discharge, and/or release, as applicable, of Intercompany Claims consistent with the Plan; and (10) all other actions that the Debtors, the Reorganized Debtors, or the AQV Wind Down Co., as applicable, determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law in connection with the Plan. The Confirmation Order shall, and shall be deemed to, pursuant to sections 363 and 1123 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary to effect any transaction described in, contemplated by, or necessary to effectuate the Plan.

**E.   *Reorganized Debtors and the AQV Wind Down Co.***

The Reorganized Debtors and the AQV Wind Down Co. shall be authorized to adopt any other agreements, documents, and instruments and to take any other actions contemplated under

the Plan as necessary to consummate the Plan. Cash payments to be made pursuant to the Plan will be made by the Debtors, the Reorganized Debtors, or the AQV Wind Down Co., as applicable to their respective Holders of Claims and Interests.

## F.  *Corporate Existence*

Except as otherwise provided in this Plan or the Confirmation Order, any agreement, instrument, or other document incorporated in this Plan, the Confirmation Order, or the Plan Supplement, or as a result of the Restructuring Transactions, on the Plan Effective Date, each Debtor shall continue to exist after the Plan Effective Date as a Reorganized Debtor and as a separate corporation, limited liability company, or other form of Entity under governing law with all the powers of such corporation, limited liability company, or other form of Entity, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other analogous formation documents) in effect before the Plan Effective Date, except to the extent such certificate of incorporation and bylaws (or other analogous formation documents) are amended by this Plan, the Confirmation Order, or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to this Plan or the Confirmation Order, and require no further action or approval (other than any requisite filings required under applicable state, provincial, federal, or foreign law). For the avoidance of doubt, nothing in this Article IV.F prevents, precludes, or otherwise impairs the Reorganized Debtors, or any one of them, from amending or modifying their respective certificate of incorporation and bylaws (or other formation documents), merging, amalgamating, or otherwise restructuring their legal Entity form, without supervision or approval by the Bankruptcy Court and in accordance with applicable non-bankruptcy law after the Plan Effective Date.

## G.  *Exemption from Registration*

No registration statement will be filed under the Securities Act, or pursuant to any state securities laws, with respect to the offer and distribution of Securities under the Plan.

### 1.  Section 1145 Exemption

Pursuant to section 1145 of the Bankruptcy Code, the offering, issuance, and distribution of New HB Common Equity (or New Warrants) to (i) the Holders of Allowed HB First Lien Claims on account of their Allowed HB First Lien Claims and (ii) the Backstop Parties on account of the Backstop Commitment Premium under the Backstop Commitment Agreement (a) shall be exempt from, among other things, the registration requirements of section 5 of the Securities Act and any other applicable U.S. state or local law requiring registration for the offer or sale of a security or registration or licensing of an issuer of, underwriter of, or broker or dealer in, a security, (b)(i) are not "restricted securities" as defined in Rule 144(a)(3) under the Securities Act, and (ii) are freely tradable and transferable by any initial recipient thereof that (w) is not an "affiliate" of the Reorganized Hornblower Debtors as defined in Rule 144(a)(1) under the Securities Act, (x) has not been such an "affiliate" within ninety (90) calendar days of such transfer, (y) has not acquired the New HB Common Equity (or New Warrants) from an "affiliate" of the Reorganized Hornblower Debtors within one year of such transfer, and (z) is not an entity that is an "underwriter" as defined in subsection (b) of Section 1145 of the Bankruptcy Code, and (c) will

be freely tradable by the recipients thereof, subject to (i) the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act, (ii) compliance with applicable securities laws and any rules and regulations of the SEC, if any, applicable at the time of any future transfer of such securities or instruments, and (iii) the restrictions in the New HB Organizational Documents.

        2.       <u>Section 4(a)(2) of the Securities Act</u>

The offering, issuance, and distribution of (i)(a) the subscription rights to participate in the Rights Offering and (b) any New HB Common Equity (or New Warrants) upon exercise of such subscription rights, and (ii) any Unsubscribed Equity to the Backstop Parties in accordance with their Backstop Commitments shall be exempt (including with respect to an entity that is an "underwriter" as defined in subsection (b) of section 1145 of the Bankruptcy Code) from registration under the Securities Act pursuant to Section 4(a)(2) thereof and/or Regulation D thereunder. Therefore, such securities will be "restricted securities" subject to resale restrictions and may be resold, exchanged, assigned, or otherwise transferred only pursuant to registration or an applicable exemption from registration under the Securities Act and other applicable law. In that regard, each of the Holders of Allowed HB First Lien Claims participating in the Rights Offering will be required to make, and each Backstop Party has made, customary representations to the Debtors, including that each is an "accredited investor" (within the meaning of Rule 501(a) of the Securities Act) or a qualified institutional buyer (as defined under Rule 144A promulgated under the Securities Act).

**H.**     ***Vesting of Assets in the Reorganized Debtors or AQV Wind Down Co.***

Except as otherwise provided in this Plan or the Confirmation Order, any agreement, instrument, or other document incorporated in this Plan, the Confirmation Order, or the Plan Supplement, or pursuant to any other Final Order of the Bankruptcy Court, on the Plan Effective Date, all property (including all interests, rights, and privileges related thereto) in each Estate, all Causes of Action, and any property acquired by any of the Debtors pursuant to this Plan or the Confirmation Order, including Interests held by the Debtors in any Non-Debtor Affiliates, shall vest in each respective Reorganized Debtor or the AQV Wind Down Co., as applicable, free and clear of all Liens, Claims, charges, rights, or other encumbrances subject to and in accordance with the Plan. On and after the Plan Effective Date, except as otherwise provided in this Plan or the Confirmation Order, each Reorganized Debtor or the AQV Wind Down Co., as applicable, may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims or Interests or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules. Without limiting the foregoing, the Reorganized Debtors may pay the charges that they incur on or after the Plan Effective Date for professional fees, disbursements, expenses, or related support services without application to the Bankruptcy Court.

**I.**     ***Cancellation of Existing Securities and Agreements***

Except for the purpose of evidencing a right to a distribution under this Plan or as otherwise provided in this Plan, the Confirmation Order or any agreement, instrument, or other document incorporated in this Plan, the Confirmation Order, or the Plan Supplement, on the Plan Effective

Date, subject to Article ARTICLE II.B hereof, (1) any certificate, security, share, note, bond, partnership unit, credit agreement, indenture, purchase right, option, warrant, or other instrument or document directly or indirectly evidencing, relating to, or creating any indebtedness or obligation of or ownership interest in the Debtors or giving rise to any Claim or Interest or to any rights or obligations relating to any Claims against or Interests in the Debtors (except such certificates, notes, or other instruments or documents evidencing indebtedness or obligation of or ownership interest in the Debtors that are Reinstated pursuant to the Plan) and any rights of any Holder in respect thereof shall be cancelled without any need for a Holder to take further action with respect thereto, and the duties and obligations of all parties thereto, including the Debtors or the Reorganized Debtors, as applicable, and any Non-Debtor Affiliates, thereunder or in any way related thereto shall be deemed satisfied in full, cancelled, released, discharged, and of no force or effect; and (2) the obligations of the Debtors or the Reorganized Debtors pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificate or articles of incorporation or similar documents governing the shares, certificates, notes, bonds, indentures, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors (except such agreements, certificates, notes, or other instruments evidencing indebtedness or obligation of or ownership interest in the Debtors that are specifically Reinstated pursuant to the Plan) shall be released and discharged; *provided*, *however*, that notwithstanding the occurrence of the Confirmation Date or the Plan Effective Date, any such agreement that governs the rights of the Holder of a Claim shall continue in effect for purposes of: (a) enabling Holders of Allowed Claims and Allowed Interests to receive distributions under the Plan as provided herein; (b) allowing the Distribution Agent or the AQV Wind Down Co. Administrator, as applicable, to make distributions under the Plan as provided herein; and (c) preserving any rights of the Agents to payment of fees and expenses as against any money or property distributable to Holders under the relevant credit agreement.

On the Plan Effective Date, each Holder of a certificate or instrument evidencing a Claim or Interest that is discharged by the Plan shall be deemed to have surrendered such certificate or instrument in accordance with the applicable indenture or agreement that governs the rights of such Holder of such Claim or Interest. Such surrendered certificate or instrument shall be deemed cancelled as set forth in, and subject to the exceptions set forth in, this Article IV.I.

**J.**     *Corporate Action*

On the Plan Effective Date, all actions contemplated by this Plan or the Confirmation Order, regardless of whether taken before, on, or after the Plan Effective Date, shall be deemed authorized and approved by the Bankruptcy Court in all respects, including, as applicable: (1) the implementation of the Restructuring Transactions; (2) the adoption of the New HB Organizational Documents and any other new corporate governance documents; (3) the selection of the directors and officers for the Reorganized Hornblower Debtors; (4) the execution and delivery of the applicable Definitive Documents and any related instruments, agreements, guarantees, filings, or other related documents; (5) the issuance of the New HB Common Equity; (6) the incurrence of the Exit Term Loans and the Exit Revolver; (7) the AQV Wind Down; (8) the RSA Settlement; (9) the rejection, assumption, or assumption and assignment, as applicable, of Executory Contracts and Unexpired Leases; and (10) all other acts or actions contemplated or reasonably necessary or

46

appropriate to promptly consummate the Restructuring Transactions contemplated by the Plan (whether to occur before, on, or after the Plan Effective Date).

On the Plan Effective Date, all matters provided for in this Plan or the Confirmation Order involving the corporate structure of the Debtors, the Reorganized Debtors, or the AQV Wind Down Co., as applicable, and any corporate, limited liability company, or related action required by the Debtors, the Reorganized Debtors, or the AQV Wind Down Co., as applicable, in connection with this Plan or the Confirmation Order, shall be deemed to have occurred in accordance with the Plan and shall be in effect, without any requirement of further action by the security interest Holders, members, partners, directors, or officers of the Debtors, the Reorganized Debtors, or the AQV Wind Down Co., as applicable.  The authorizations and approvals contemplated by this Article IV.J shall be effective notwithstanding any requirements under non-bankruptcy law.

**K.**     *New HB Organizational Documents*

On the Plan Effective Date, the New HB Organizational Documents shall be adopted automatically by the applicable Reorganized Hornblower Debtors.  On or promptly after the Plan Effective Date, the Reorganized Hornblower Debtors may file their respective New HB Organizational Documents and other applicable agreements with the applicable Secretaries of State or other applicable authorities in their respective states, provinces, or countries of incorporation or formation in accordance with the corporate laws of the respective states, provinces, or countries of incorporation or formation.  Pursuant to section 1123(a)(6) of the Bankruptcy Code, to the extent applicable to these Chapter 11 Cases, the New HB Organizational Documents of the Reorganized Hornblower Debtors will prohibit the issuance of non-voting equity securities.

After the Plan Effective Date, each Reorganized Hornblower Debtor may amend and restate its limited liability company agreement, certificate of incorporation, limited partnership agreement, and other formation and constituent documents as permitted by the laws of its respective jurisdiction of formation and the terms of the New HB Organizational Documents, as applicable.

**L.**     *Directors, Managers, and Officers of the Reorganized Hornblower Debtors*

As of the Plan Effective Date, the term of the current members of the boards of directors or managers, as applicable, of each Debtor shall expire, and the initial boards of directors or managers, including the New Board and the officers of each of the Reorganized Hornblower Debtors, as applicable, shall be appointed in accordance with the respective New HB Organizational Documents.

The New Board shall consist of five (5) members, four of which shall be designated by SVP and one of which shall be designated by Crestview or its Related Funds.  Directors of the New Board shall be appointed in the manner set forth in the RSA. The identities of the members of the New Board shall be set forth in the Plan Supplement to the extent known at the time of filing.

Except as otherwise provided in the Plan, the Confirmation Order, the Plan Supplement, or the New HB Organizational Documents, the officers of the Debtors immediately before the Plan Effective Date, as applicable, shall serve as the initial officers of the Reorganized Debtors on the Plan Effective Date.

## M.   *Effectuating Documents; Further Transactions*

On and after the Plan Effective Date, the Reorganized Debtors, and their respective officers, directors, members, partners, or managers (as applicable), are authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, the Restructuring Transactions, the Exit Credit Documents, the New HB Organizational Documents, the New HB Common Equity (or New Warrants) issued pursuant to the Plan, and any and all other agreements, documents, securities, filings, and instruments relating to the foregoing in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorization, or consents except for those expressly required pursuant to the Plan.   The authorizations and approvals contemplated by this <u>ARTICLE IV</u> shall be effective notwithstanding any requirements under non-bankruptcy law.

## N.   *Section 1146 Exemption*

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers (whether from a Debtor to a Reorganized Debtor or to any other Person) of property pursuant to the Plan or the Confirmation Order (including under any of the Definitive Documents and related documents) shall not be subject to any stamp tax, document recording tax, conveyance fee, intangibles, or similar tax, mortgage tax, real estate transfer tax, personal property transfer tax, mortgage recording tax, sales or use tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment in the United States, and the Confirmation Order shall direct and be deemed to direct the appropriate state or local governmental officials or agents to forgo the collection of any such tax or governmental assessment and to accept for filing and recordation instruments or other documents pursuant to such transfers of property without the payment of any such tax or governmental assessment.  Such exemption specifically applies, without limitation, to (1) the creation, modification, consolidation, or recording of any mortgage, deed of trust, Lien, or other security interest, or the securing of additional indebtedness by such or other means, (2) the making or assignment of any lease or sublease, (3) any Restructuring Transaction authorized by the Plan, (4) the granting of collateral as security for the Reorganized Debtors' obligations under and in connection with the Exit Term Loans or Exit Revolver, and (5) the making or delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with the Plan, including (a) any merger agreements; (b) agreements of consolidation, restructuring, disposition, liquidation, or dissolution; (c) deeds; (d) bills of sale; (e) assignments executed in connection with any Restructuring Transaction occurring under the Plan; or (f) the other Definitive Documents.

All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(c) of the Bankruptcy Code, shall forgo the collection of any such tax or governmental

assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

O.    *Preservation of Causes of Action*

In accordance with section 1123(b) of the Bankruptcy Code, but subject to <u>ARTICLE IX</u> hereof, each Reorganized Debtor or the AQV Wind Down Co., as applicable, shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action of the Debtors, whether arising before or after the Petition Date, including any actions specifically enumerated in the Schedule of Retained Causes of Action, and the Reorganized Debtors' and AQV Wind Down Co.'s, as applicable, rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Plan Effective Date, other than the Causes of Action released (including, without limitation, by the Debtors) pursuant to the releases and exculpations contained in the Plan, including in <u>Article ARTICLE IX</u> hereof, which shall be deemed released and waived by, including, without limitation, the Debtors, the Reorganized Debtors, or the AQV Wind Down Co., as applicable, as of the Plan Effective Date.

The Reorganized Debtors or AQV Wind Down Co., as applicable, may pursue such Causes of Action, as appropriate, in accordance with their best interests, in their respective discretion.  **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors, the Reorganized Debtors, or the AQV Wind Down Co., as applicable, will not pursue any and all available Causes of Action of the Debtors against it.  The Debtors and the Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity.**  Unless any Causes of Action of the Debtors against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Final Order, the Reorganized Debtors and AQV Wind Down Co., as applicable, expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

The Reorganized Debtors and AQV Wind Down Co. reserve and shall retain such Causes of Action of the Debtors notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan.  In accordance with section 1123(b)(3) of the Bankruptcy Code, and except as expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or pursuant to a Final Order, any Causes of Action that a Debtor may hold against any Entity shall vest in the Reorganized Debtors or AQV Wind Down Co., as applicable, except as otherwise expressly provided in the Plan, including <u>ARTICLE IX</u> hereof.  The applicable Reorganized Debtors or the AQV Wind Down Co., through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action.  The Reorganized Debtors and the AQV Wind Down Co., as applicable, shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, Order, or approval of the Bankruptcy Court.

P.      *MIP*

The participants in the MIP, the allocations and form of the equity-based compensation to such participants (including the amount of the allocations and the timing of the grant of the equity-based compensation), and the terms and conditions of such equity-based compensation (including vesting, exercise prices, base values, hurdles, forfeiture, repurchase rights, and transferability, as applicable) shall be determined by the New Board within 60 days following the Plan Effective Date (the "Negotiation Period") as detailed in the RSA (*provided*, for the avoidance of doubt, that the New Board may make appropriate changes to such terms for future grants in accordance with the New HB Organizational Documents).  For the avoidance of doubt, the New Board will determine the allocation of the MIP Equity to the Key Executives within the Negotiation Period. The Key Executives' employment agreements shall be deemed amended on the Plan Effective Date to reflect the provisions of the RSA with respect to such persons' rights following the Negotiation Period.  The MIP Equity will dilute all other New HB Common Equity.

Q.      *Employment and Retiree Benefits*

Unless otherwise provided in this Plan or the Confirmation Order (including as modified by the MIP), the Specified Employee Plans in place as of the Plan Effective Date, shall be assumed by the Reorganized Hornblower Debtors and shall remain in place as of the Plan Effective Date, and the Reorganized Hornblower Debtors will continue to honor such agreements, arrangements, programs, and plans; and the Restructuring Transactions shall not constitute a change of control of any Debtor for any purpose under such agreements.

Notwithstanding the foregoing, and unless otherwise provided in the Plan Supplement, all plans or programs calling for stock grants, stock issuances, stock reserves, or stock options shall be deemed rejected with regard to such issuances, grants, reserves, and options.  For the avoidance of doubt, no provision in any agreement, plan, or arrangement to be assumed pursuant to the foregoing paragraph relating to the award of equity or equity-like compensation shall be binding on, or honored by, the Reorganized Hornblower Debtors.  Nothing in this Plan shall limit, diminish, or otherwise alter the Reorganized Hornblower Debtors' defenses, claims, Causes of Action, or other rights with respect to any such contracts, agreements, policies, programs, and plans.  For the avoidance of doubt, pursuant to section 1129(a)(13) of the Bankruptcy Code, from and after the Plan Effective Date, all retiree benefits (as such term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid in accordance with applicable law.

R.      *Dissolution of Certain Debtors*

On or after the Plan Effective Date, certain of the Debtors, including the AQV Debtors, may be dissolved without further action under applicable law, regulation, Order, or rule, including any action by the stockholders, members, the board of directors, or similar governing body of the Debtors, Reorganized Debtors, or the AQV Wind Down Co. Administrator, as applicable.  In accordance with the terms of the Plan, the Reorganized Debtors and the AQV Wind Down Co. Administrator, as applicable, shall have the power and authority to take any action necessary to wind down and dissolve the foregoing Debtors, including the AQV Debtors, and may, to the extent applicable: (1) file a certificate of dissolution for such entities, together with all other necessary corporate and company documents, to effect the dissolution of such entities under the applicable

laws of their states of formation; (2) complete and file all final or otherwise required federal, state, and local tax returns and pay taxes required to be paid for such Debtors, including the AQV Debtors, and pursuant to section 505(b) of the Bankruptcy Code, request an expedited determination of any unpaid tax liability of any of such Debtors, including the AQV Debtors, as determined under applicable tax laws; and (3) represent the interests of such Debtors, including the AQV Debtors, before any taxing authority in all tax matters, including any action, proceeding or audit.

**S.**     *Private Company*

The Reorganized Hornblower Debtors shall: (a) emerge from these Chapter 11 Cases as non-publicly reporting companies on the Plan Effective Date and not be subject to SEC reporting requirements under Sections 12 or 15 of the Exchange Act or otherwise; (b) not be voluntarily subjected to any reporting requirements promulgated by the SEC except, in each case, as otherwise may be required pursuant to the New HB Organizational Documents or applicable law; and (c) not be required to list the New HB Common Equity on a U.S. stock exchange.

**T.**     *Cashless Transactions*

Notwithstanding anything to the contrary set forth herein, the treatment of claims, distributions and other transactions contemplated hereby in respect of the DIP Lenders, Holders of HB First Lien Claims, and Rights Offering participants may, at the election of the applicable participating parties, be effectuated by netting or other form of cashless implementation in order to minimize the actual flows of funds between the relevant parties.

**ARTICLE V.**
**TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

**A.**     *Assumption, Assumption and Assignment, and Rejection of Executory Contracts and Unexpired Leases*

    1.     <u>Executory Contracts and Unexpired Leases of the Non-AQV Debtors</u>

On the Plan Effective Date, except as otherwise provided in the Plan or in any contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan, all Executory Contracts and Unexpired Leases of the Non-AQV Debtors, shall be deemed assumed, without the need for any further notice to or action, Order, or approval of the Bankruptcy Court, as of the Plan Effective Date under section 365 of the Bankruptcy Code, unless such Executory Contract or Unexpired Lease:  (1) was previously assumed or rejected by the Debtors, pursuant to an Order of the Bankruptcy Court; (2) previously expired or terminated pursuant to its terms; (3) is the subject of a motion to assume, assume and assign, or reject filed by the Debtors that is pending on or before the date of entry of the Confirmation Order; or (4) is specifically designated as a contract or lease to be rejected on the Schedule of Rejected Executory Contracts and Unexpired Leases.  For the avoidance of doubt, on the Plan Effective Date, each Primary Concession Contract shall be, and shall be deemed to have been, assumed.

All Executory Contracts and Unexpired Leases of the Non-AQV Debtors listed on the Schedule of Rejected Executory Contracts and Unexpired Leases will be deemed rejected as of the

51

Plan Effective Date, unless an alternative effective date of rejection is identified on the Schedule of Rejected Executory Contracts and Unexpired Leases and agreed upon by the Non-AQV Debtors and the applicable counterparties to the applicable Executory Contracts and Unexpired Leases. The Non-AQV Debtors reserve the right to alter, amend, modify, or supplement the Schedule of Rejected Executory Contracts and Unexpired Leases, including to add or remove any Executory Contracts and Unexpired Leases, at any time up to and including 45 days after the Plan Effective Date.

Subject to and upon the occurrence of the Plan Effective Date, entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of the assumptions, assumptions and assignments, or rejections of Executory Contracts and Unexpired Leases provided for in this Plan, the Confirmation Order, or the Schedule of Rejected Executory Contracts and Unexpired Leases, pursuant to sections 365(a) and 1123 of the Bankruptcy Code.  Except as otherwise provided for in the Confirmation Order, each Executory Contract and Unexpired Lease assumed (and not assigned) pursuant to this Plan, the Confirmation Order, or any other Order of the Bankruptcy Court shall re-vest in and be fully enforceable by the applicable contracting Reorganized Debtor in accordance with its terms.  Except as otherwise provided herein or agreed to by the Debtor and the applicable counterparty, each assumed Executory Contract or Unexpired Lease shall include all modifications, amendments, supplements, restatements, or other agreements related thereto, and all rights related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests.

To the maximum extent permitted by law, to the extent any provision in any Executory Contract or Unexpired Lease assumed pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption of such Executory Contract or Unexpired Lease (including any "change of control" provision), then such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other rights with respect thereto.

a.    Collective Bargaining Agreements

The CBAs shall be deemed to be, and shall be treated as if they were, Executory Contracts that are to be assumed under this Article V.A.1.  Each of the CBAs shall remain in full force and effect on and after the Plan Effective Date, subject to the respective terms thereof.  Cure obligations, if any, related to the assumption of the CBAs shall be satisfied in full by payment by the Debtors or the Reorganized Debtors, as applicable, in the ordinary course, of all of the Debtors' or the Reorganized Debtors' undisputed obligations under the assumed CBAs, including but not limited to grievances, grievance and other settlements, arbitration awards, and benefit fund contributions, to the extent payable, unless otherwise agreed between the Debtors or the Reorganized Debtors, as applicable, and the applicable counterparty to the CBA.  As a result, no proof of Claim, request for administrative expense, or Cure Claim need be filed with respect to such cure obligations, *provided*, however, that the Debtors' and the Reorganized Debtors' rights, defenses, claims, and counterclaims with respect to any such obligations are expressly preserved.

2.      Executory Contracts and Unexpired Leases of the AQV Debtors

On the Plan Effective Date, expect as otherwise provided in the Plan or in any contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan, all Executory Contracts and Unexpired Leases of the AQV Debtors shall be deemed rejected without the need for any further notice to or action, Order, or approval of the Bankruptcy Court as of the Plan Effective Date under section 365 of the Bankruptcy Code, unless such Executory Contract or Unexpired Lease: (1) was previously assumed by the Debtors and assigned to the AQV Purchaser, pursuant to an Order of the Bankruptcy Court; (2) is the subject of a proposed AQV Sale Order filed by the Debtors with the Bankruptcy Court that is pending on or before the date of entry of the Confirmation Order; or (3) previously expired or terminated pursuant to its terms.  For the avoidance of doubt, the assumption, assumption and assignment, and rejection of each Executory Contract and Unexpired Lease of the AQV Debtors shall be subject to the terms of the AQV Bidding Procedures Order and approved by the Bankruptcy Court pursuant to the AQV Sale Order.

**B.    *Claims Based on Rejection of Executory Contracts and Unexpired Leases***

In the event that the Debtors' rejection of an Executory Contract or Unexpired Lease results in damages to the counterparty or counterparties to such Executory Contract or Unexpired Lease, a Claim for such damages shall be Disallowed, forever barred, and shall not be enforceable against the Debtors, the Reorganized Debtors, the AQV Wind Down Co., or their respective properties or interests in property as agents, successors, or assigns, unless a Proof of Claim is Filed with the Notice and Claims Agent no later than fifteen (15) days after the date of entry of a Final Order of the Bankruptcy Court (including the Confirmation Order) approving such rejection of such Executory Contract or Unexpired Lease.  Any such Claims, to the extent Allowed, shall be classified as General Unsecured Claims, and shall be treated in accordance with Article ARTICLE III hereof.

**C.    *Cure of Defaults for Assumed Executory Contracts and Unexpired Leases***

The Debtors or the Reorganized Debtors, as applicable, shall pay undisputed Cure Claims, if any, on (1) the Plan Effective Date or as soon as reasonably practicable thereafter, as dictated by the Debtors' ordinary course of business, for Executory Contracts and Unexpired Leases assumed as of the Plan Effective Date, or (2) the assumption effective date, if different than the Plan Effective Date.  Any Cure Claim shall be deemed fully satisfied, released, and discharged upon payment by the Debtors or the Reorganized Debtors, as applicable, of the Cure Claim; *provided* that nothing herein shall prevent the Reorganized Debtors from paying any Cure Claim despite the failure of the relevant counterparty to File such request for payment of such Cure Claim. The Reorganized Debtors also may settle any Cure Claim without any further notice to or action, order, or approval of the Bankruptcy Court.  For the avoidance of doubt, any undisputed Cure Claim in connection with the assumption of any Executory Contracts or Unexpired Leases of the AQV Debtors shall be paid subject to the terms of the AQV Sale Order.

Any monetary defaults under each Executory Contract and Unexpired Lease to be assumed pursuant to the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the Cure Claim amount in Cash on the Plan Effective Date, subject to the limitation

described below, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree.  In the event of a dispute regarding (1) the amount of any payments to cure such a default, (2) the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" (within the meaning of Section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or (3) any other matter pertaining to assumption, the Cure Claim payments required by Section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order or orders of the Bankruptcy Court resolving the dispute and approving the assumption; *provided* that the Reorganized Debtors may settle any such dispute without any further notice to, or action, Order, or approval of the Bankruptcy Court or any other Entity.

At least 14 days prior to the Combined Hearing, the Debtors shall provide for notices of proposed assumption or assumption and assignment, including proposed Cure Claim amounts, for Executory Contracts and Unexpired Leases to be assumed or assumed and assigned pursuant to the Plan, to be remitted to third parties (with such Cure Claim being $0.00 if no amount is listed in the notice), which notices will include procedures for objecting thereto and resolution of disputes by the Bankruptcy Court.  Any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption or assumption and assignment under the Plan on any grounds or related amount of the Cure Claim must be Filed, served, and actually received by the Debtors no later than the date specified in the notice.  Any counterparty to an Executory Contract or Unexpired Lease that failed to timely object to the proposed assumption or assumption and assignment will be deemed to have assented to such assumption or assumption and assignment and any objection shall be Disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Reorganized Debtor or the AQV Wind Down Co., as applicable, without the need for any objection by the Reorganized Hornblower Debtors, the AQV Wind Down Co., or any other party in interest or any further notice to or action, Order, or approval of the Bankruptcy Court.

If there is a timely Filed objection regarding (1) the amount of any Cure Claim; (2) the ability of the Reorganized Debtors or any assignee, including the AQV Purchaser, to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed; or (3) any other matter pertaining to assumption or the cure amounts required by section 365(b)(1) of the Bankruptcy Code, such dispute shall be resolved by a Final Order of the Bankruptcy Court (which may be the Confirmation Order) or as may be agreed upon by the Debtors, the Reorganized Debtors, the AQV Wind Down Co., and/or the AQV Purchaser, as applicable, and the counterparty to the Executory Contract or Unexpired Lease.  The Debtors, Reorganized Debtors, as applicable, reserve the right to reject any Executory Contract or Unexpired Lease in resolution of any cure disputes. Notwithstanding anything to the contrary herein, if at any time the Bankruptcy Court determines that the Allowed Cure Claim with respect to any Executory Contract or Unexpired Lease is greater than the amount set forth in the applicable Cure Notice, the Debtors or Reorganized Debtors, as applicable, shall have the right, at such time, to add such Executory Contract or Unexpired Lease to the Schedule of Rejected Executory Contracts and Unexpired Leases, in which case such Executory Contract or Unexpired Lease shall be deemed rejected as the Plan Effective Date.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise, full payment of any applicable Cure Claim, and cure of any nonmonetary defaults pursuant to this Article V.C shall result in the full release and satisfaction of any Cure Claims, Claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption. **Any and all Proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed in the Chapter 11 Cases, including pursuant to the Confirmation Order, and for which any Cure Claim has been fully paid pursuant to this Article ARTICLE V.C, in the amount and at the time dictated by the Debtors' ordinary course of business, shall be deemed Disallowed and expunged as of the Plan Effective Date without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court.**

D.   *Preexisting Obligations to the Debtors under Executory Contracts and Unexpired Leases*

Notwithstanding any non-bankruptcy law to the contrary, the Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations on goods previously purchased, or services previously received, by the contracting Debtors from counterparties to rejected or repudiated Executory Contracts or Unexpired Leases. For the avoidance of doubt, the rejection of any Executory Contracts or Unexpired Leases pursuant to this Plan or otherwise shall not constitute a termination of preexisting obligations owed to the Debtors under such Executory Contracts or Unexpired Leases.

E.   *Indemnification Obligations*

All indemnification provisions in place as of the date of the RSA (whether in the by-laws, certificates of incorporation or formation, limited liability company agreements, limited partnership agreements, other organizational documents, board resolutions, indemnification agreements, employment contracts, or otherwise) for current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the Debtors, as applicable, shall (1) not be modified, reduced, discharged, impaired, or otherwise affected in any way, including by the Plan, the Plan Supplement, or the Confirmation Order, (2) remain intact, in full force and effect, and irrevocable, (3) not be limited, reduced or terminated after the Plan Effective Date, and (4) survive the effectiveness of the Plan on terms no less favorable to such current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the Debtors than the indemnification provisions in place prior to the Plan Effective Date irrespective of whether such indemnification obligation is owed for an act or event occurring before, on or after the Petition Date; *provided* that the Reorganized Debtors shall not indemnify directors of the Debtors for any claims or Causes of Action arising out of or relating to any act or omission resulting from gross negligence or willful misconduct. All such obligations shall be deemed and treated as Executory Contracts to be assumed by the Debtors under the Plan and shall continue as obligations of the Reorganized Hornblower Debtors. Any Claim based on the Debtors' indemnification obligations under the Plan shall not be a Disputed Claim or subject to any objection, in either case, for any reason, including by reason of section 502(e)(1)(B) of the Bankruptcy Code.

F.    *Insurance Policies*

Unless listed on the Scheduled of Rejected Executory Contracts and Unexpired Leases, all of the Debtors' insurance policies, including D&O Liability Insurance Policies, and any agreements, documents, or instruments relating thereto, are treated as and deemed to be Executory Contracts under the Plan.  On the Plan Effective Date, the Debtors shall be deemed to have assumed all insurance policies and any agreements, documents, and instruments related thereto (and the Debtors or Reorganized Hornblower Debtors, as applicable, shall purchase any related tail policies providing for coverage for at least a six-year period after the Plan Effective Date).  No D&O Liability Insurance Policies shall be listed on the Schedule of Rejected Executory Contracts and Unexpired Leases.

Notwithstanding anything to the contrary contained in this Plan or Confirmation Order, Confirmation of the Plan shall not discharge, impair, or otherwise modify any indemnity obligations assumed by the foregoing assumption of the D&O Liability Insurance Policies.  Coverage for defense and indemnity under the D&O Liability Insurance Policies shall remain available to all applicable individuals insured thereunder.

In addition, after the Plan Effective Date, none of the Reorganized Hornblower Debtors shall terminate or otherwise reduce the coverage under any D&O Liability Insurance Policies in effect on or after the Petition Date, with respect to conduct or events occurring prior to the Plan Effective Date, and all members, managers, directors, and officers of the Debtors who served in such capacity at any time prior to the Plan Effective Date or any other individuals covered by such policies shall be entitled to the full benefits of any such policy for the full term of such policy, to the extent set forth therein, regardless of whether such members, managers, directors, officers, or other individuals remain in such positions after the Plan Effective Date.

G.    *Nonoccurrence of Plan Effective Date*

In the event that the Plan Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming, assuming and assigning, or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

H.    *Reservation of Rights*

Neither the exclusion nor the inclusion by the Debtors of any contract or lease on any exhibit, schedule, or other annex to the Plan or in the Plan Supplement, nor anything contained in the Plan, shall constitute an admission by the Debtors or any other party that any contract or lease is in fact an Executory Contract or Unexpired Lease or that any Reorganized Debtor has any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors, the Reorganized Debtors, or the AQV Wind Down Co., as applicable, shall have forty-five (45) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

**ARTICLE VI.**
**PROCEDURES FOR RESOLVING**
**CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS AND INTERESTS**

**A.**      *Allowance of Claims*

Except as expressly provided in the Plan or in any Order entered in the Chapter 11 Cases before the Plan Effective Date (including the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed under the Plan or the Bankruptcy Code, or the Bankruptcy Court has entered a Final Order, including the Confirmation Order (when it becomes a Final Order), in the Chapter 11 Cases allowing such Claim.  The Debtors, the Reorganized Debtors, or the AQV Wind Down Co., as applicable, may affirmatively determine to deem Unimpaired Claims Allowed to the same extent such Claims would be allowed under applicable non-bankruptcy law.

**B.**      *Estimation of Claims and Interests*

Before, on, or after the Plan Effective Date, the Debtors, the Reorganized Debtors, or the AQV Wind Down Co., as applicable, may at any time request that the Bankruptcy Court estimate any Disputed Claim that is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party in interest previously has objected to such Claim or Interest or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim or Interest, including during the litigation of any objection to any Claim or Interest or during the appeal relating to such objection.  Notwithstanding any provision otherwise in this Plan, a Claim that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court.  In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim or Interest, that estimated amount shall constitute a maximum limitation on such Claim or Interest for all purposes under the Plan (including for purposes of distributions), and the relevant Reorganized Debtor or the AQV Wind Down Co., as applicable, may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim or Interest; *provided* that such limitation shall not apply to Claims against any of the Debtors requested by the Debtors to be estimated for voting purposes only.

Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such Holder has Filed a motion requesting the right to seek such reconsideration on or before fourteen (14) calendar days after the date on which such Claim is estimated.  All of the aforementioned Claims and objection, estimation, and resolution procedures are cumulative and not exclusive of one another.  Claims against any of the Debtors may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

C.      *Adjustment to Claims*

Any duplicate Claim or Interest, any Claim or Interest that has been paid or satisfied, or any Claim or Interest that has been amended or superseded, cancelled or otherwise expunged (including pursuant to the Plan or the Confirmation Order), may be adjusted or expunged (including on the Claims Register, to the extent applicable) by the Reorganized Debtors or the AQV Wind Down Co., as applicable, after providing notice and a period of at least thirty (30) days for any party in interest to object, without any further notice to or action, Order, or approval of the Bankruptcy Court.

D.      *Objections to Claims*

Except as otherwise specifically provided in this Plan or the Confirmation Order, the Debtors, and after the Plan Effective Date, the Reorganized Debtors or the AQV Wind Down Co., as applicable, shall have the sole authority to:  (a) File, withdraw, or litigate to judgment objections to Claims or Interests; (b) settle or compromise any Disputed Claim or Interest without any further notice to or action, Order, or approval by the Bankruptcy Court; and (c) administer and adjust the Debtors' Claims Register to reflect any such settlements or compromises without any further notice to or action, Order, or approval by the Bankruptcy Court.  For the avoidance of doubt, except as otherwise provided herein, after the Plan Effective Date, each of the Reorganized Debtors or the AQV Wind Down Co., as applicable, shall have the right to object to Claims and shall retain any and all rights and defenses that the Debtors had with respect to any Claim immediately before the Plan Effective Date, including the Causes of Action retained pursuant to <u>ARTICLE IV.O</u>.  Any motion to extend the Claims Objection Deadline shall automatically extend the deadline until the Court enters an order on such motion.

E.      *Disallowance of Claims or Interests*

Any Claims held by Entities from which property is recoverable under sections 542, 543, 550, or 553 of the Bankruptcy Code, or that is a transferee of a transfer avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed Disallowed pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims may not receive any distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court Order with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Reorganized Debtors or the AQV Wind Down Co., as applicable.  All Claims Filed on account of an indemnification obligation to a director, manager, officer, or employee of the Debtors as of the Plan Effective Date shall be deemed satisfied and expunged from the Claims Register as of the Plan Effective Date to the extent such indemnification obligation is assumed by the Reorganized Debtors or the AQV Wind Down Co., as applicable, or honored or reaffirmed, as the case may be pursuant to the Plan, without any further notice to or action, Order, or approval of the Bankruptcy Court.

Except as provided herein or otherwise agreed to by the Debtors, the Reorganized Debtors, or the AQV Wind Down Co., as applicable, any and all Proofs of Claim filed after the applicable Claims Bar Date shall be deemed Disallowed and expunged as of the Plan Effective Date without any further notice to or action, Order, or approval of the Bankruptcy Court, and Holders of such

Claims may not receive any distributions on account of such Claims, unless on or before the Combined Hearing such late Filed Claim has been deemed timely Filed by a Final Order.

**F.**     *No Distributions Pending Allowance*

Notwithstanding any other provision of this Plan, if any portion of a Claim is a Disputed Claim, as applicable, no payment or distribution provided hereunder shall be made on account of such Claim or Interest unless and until such Disputed Claim becomes an Allowed Claim.

**G.**     *Distributions After Allowance*

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions (if any) shall be made to the Holder of such Allowed Claim in accordance with the provisions of this Plan.  As soon as reasonably practicable after the date that the Order or judgment of the Bankruptcy Court Allowing any Disputed Claim becomes a Final Order, the Distribution Agent or the AQV Wind Down Co. Administrator, as applicable, shall provide to the Holder of such Claim the distribution (if any) to which such Holder is entitled under the Plan as of the Plan Effective Date, without any interest, dividends, or accruals to be paid on account of such Claim.

## ARTICLE VII.
## THE AQV WIND DOWN CO. ADMINISTRATOR

**A.**     *AQV Wind Down Co. Administrator Rights and Powers*

Upon and following the Plan Effective Date, the AQV Wind Down Co. Administrator shall have any and all powers and authority, without the need for Bankruptcy Court approval (unless otherwise indicated), to carry out and implement all provisions of the Plan and Confirmation Order, effectuate the AQV Remaining Assets Wind Down, and wind down the business and affairs of the AQV Wind Down Co., including:  (1) except to the extent Claims have been previously Allowed, controlling and effectuating the Claims reconciliation process, including objecting to, seeking to subordinate, compromising, or settling any and all Claims against the AQV Debtors or AQV Wind Down Co. (for the avoidance of doubt, the AQV Wind Down Co. Administrator shall be responsible for objecting to, reconciling, or settling (i) Administrative Claims and Priority Tax Claims asserted against the AQV Debtors or AQV Wind Down Co., as applicable, not otherwise Allowed and satisfied as of the Plan Effective Date and (ii) General Unsecured Claims asserted against the AQV Debtors or AQV Wind Down Co., as applicable, not otherwise Allowed and satisfied as of the Plan Effective Date); (2) liquidating the assets of the AQV Wind Down Co.; (3) making distributions to holders of Allowed Claims in accordance with the Plan and taking all steps to execute all instruments and documents necessary to effectuate the distributions to be made under the Plan, each in its capacity as AQV Wind Down Co. Administrator; (4) to the extent not released pursuant to the Plan, including pursuant to Article ARTICLE IV.J hereof, prosecuting all Causes of Action on behalf of the AQV Wind Down Co., electing not to pursue any Causes of Action, and determining whether and when to compromise, settle, abandon, dismiss, or otherwise dispose of any such Causes of Action, as the AQV Wind Down Co. Administrator may determine is in the best interests of the AQV Wind Down Co.; (5) establishing and maintaining bank accounts in the name of the AQV Wind Down Co.; (6) maintaining the books, records, and accounts of the AQV Wind Down Co.; (7) paying all reasonable fees, expenses, debts, charges, and liabilities of

the AQV Wind Down Co.; (8) administering and paying taxes of the AQV Wind Down Co., including filing tax returns; (9) representing the interests of the AQV Wind Down Co. before any taxing authority in all matters, including any action, suit, proceeding, or audit; and (10) exercising such other powers as may be vested in it pursuant to order of the Bankruptcy Court or pursuant to the Plan, or as it reasonably deems to be necessary and proper to carry out the provisions of the Plan.

The filing of the final monthly report (for the month in which the Plan Effective Date occurs) and all subsequent quarterly reports shall be the responsibility of the AQV Wind Down Co. Administrator, except as otherwise provided herein.

1.    AQV Wind Down Co. Administrator Expenses

All reasonable costs, expenses, and obligations incurred by the AQV Wind Down Co. Administrator in administering the Plan, the AQV Wind Down Co., or in any manner connected, incidental, or related thereto, shall be incurred and paid in accordance with the AQV Wind Down Budget.

B.    **Tax Returns**

After the Plan Effective Date, the AQV Wind Down Co. Administrator shall complete and file all final or otherwise required federal, state, and local tax returns for the AQV Wind Down Co. and, pursuant to section 505(b) of the Bankruptcy Code, may request an expedited determination of any unpaid tax liability of the AQV Wind Down Co., for any tax incurred during the administration of the Chapter 11 Cases of the AQV Debtors, as determined under applicable tax laws.

## ARTICLE VIII.
## PROVISIONS GOVERNING DISTRIBUTIONS

A.    **Timing and Calculation of Amounts to Be Distributed**

Unless otherwise provided in this Plan or the Confirmation Order, on the Plan Effective Date (or, if a Claim or Interest is not an Allowed Claim on the Plan Effective Date, on the date that such Claim or Interest becomes Allowed or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim shall be entitled to receive the full amount of the distributions that this Plan provides for Allowed Claims in each applicable Class and in the manner provided in this Plan; *provided* that any Holder of Allowed Claims may designate that its distributions are received by one or more of its Affiliates, designees or Related Funds.  If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims (which will only be made if and when they become Allowed Claims) shall be made pursuant to the provisions set forth in ARTICLE VI. Except as otherwise expressly provided in the Plan, Holders of Claims and Interests shall not be entitled to interest, dividends, or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Plan Effective Date.  The Debtors, Reorganized Debtors, or AQV Wind Down Co., as applicable, shall have no obligation to recognize any transfer of Claims against any Debtor, as applicable, or privately held Interests occurring on or after the Distribution Record Date.

**B.**     *Distribution Agent and AQV Wind Down Co. Administrator*

The Distribution Agent shall serve with respect to Claims against the Non-AQV Debtors and matters concerning the Reorganized Debtors.  The AQV Wind Down Co. Administrator shall serve the role of distribution agent solely with respect to Claims against the AQV Debtors and matters concerning the AQV Wind Down Co.  After the Plan Effective Date, distributions under the Plan shall be made by the Distribution Agent or the AQV Wind Down Co. Administrator, as applicable.  Neither the Distribution Agent nor the AQV Wind Down Co. Administrator shall be required to give any bond or surety or other security for the performance of their duties unless otherwise ordered by the Bankruptcy Court.

**C.**     *Distribution Record Date*

On the Distribution Record Date, the Claims Register shall be closed and the Distribution Agent or the AQV Wind Down Co. Administrator, as applicable, shall be authorized and entitled to recognize only those record Holders, if any, listed on the Claims Register as of the close of business on the Distribution Record Date.  Neither the Distribution Agent nor the AQV Wind Down Co. Administrator shall have any obligation to recognize any transfer of Claims occurring on or after the Distribution Record Date.  In addition, with respect to payment of any Cure Claims or disputes over any Cure Claims, neither the Debtors, the Distribution Agent, nor the AQV Wind Down Co. Administrator shall have any obligation to recognize or deal with any party other than the non-Debtor party to the applicable Executory Contract or Unexpired Lease as of the Plan Effective Date, even if such non-Debtor party has sold, assigned, or otherwise transferred its Cure Claim.

**D.**     *Rights and Powers of Distribution Agent*

1.     <u>Powers of Distribution Agent</u>

The Distribution Agent shall be empowered to: (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Distribution Agent by Order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Distribution Agent to be necessary and proper to implement the provisions hereof.

2.     <u>Expenses Incurred On or After the Plan Effective Date</u>

Except as otherwise provided herein or ordered by the Bankruptcy Court, the amount of any reasonable and documented fees and out-of-pocket expenses incurred by the Distribution Agent on or after the Plan Effective Date (including taxes) and any reasonable compensation and out-of-pocket expense reimbursement claims (including reasonable attorney fees and expenses) made by the Distribution Agent shall be paid in Cash by the Reorganized Hornblower Debtors in the ordinary course.

**E.**     *Delivery of Distributions and Undeliverable or Unclaimed Distributions*

1.     Delivery of Distributions

Except as otherwise provided herein, the Distribution Agent and the AQV Wind Down Co. Administrator shall make distributions to Holders of Allowed Claims (as applicable) as of the Distribution Record Date at the address for each such Holder as indicated on the Debtors' records as of the date of any such distribution; *provided* that (1) the manner of such distributions shall be determined at the discretion of the Distribution Agent and the AQV Wind Down Co. Administrator, as applicable and (2) any Holder as of the Distribution Record Date may send a written notice to the Distribution Agent and the AQV Wind Down Co. Administrator, as applicable, that the distributions in respect of such Holders' Allowed Claims shall be made to one or more of its Affiliates, designees or Related Funds, which notice shall be in form and substance reasonably satisfactory to the Distribution Agent and the AQV Wind Down Co. Administrator, as applicable.

2.     Minimum Distributions

No fractional shares of New HB Common Equity (or New Warrants) issued under the Plan shall be distributed and no Cash shall be distributed in lieu of such fractional amounts.  When any distribution pursuant to the Plan on account of an Allowed Claim would otherwise result in the issuance of a number of shares of New HB Common Equity (or New Warrants) that is not a whole number, the actual distribution of shares of New HB Common Equity (or New Warrants) shall be rounded as follows: (a) fractions of greater than one-half (1/2) shall be rounded to the next higher whole number and (b) fractions of one-half (1/2) or less than one-half (1/2) shall be rounded to the next lower whole number with no further payment therefor.  The total number of authorized shares of New HB Common Equity (or New Warrants) to be distributed to Holders of Allowed Claims hereunder may be adjusted by the Debtors, with the consent of the Required Consenting HB First Lien Lenders, as necessary to account for the foregoing rounding.

No payment of fractional cents shall be made pursuant to the Plan, including to Holders of General Unsecured Claims or Unsecured Go-Forward Trade Claims.  Whenever any payment of a fraction of a cent under the Plan would otherwise be required, the distribution shall reflect a rounding of such fraction to the nearest whole penny, rounded down to the next lower whole cent. Claimants whose aggregate distributions total less than $25 shall not be entitled to a distribution under this Plan.

3.     Undeliverable Distributions and Unclaimed Property

In the event that any distribution to any Holder of an Allowed Claim is returned as undeliverable, no further distributions shall be made to such Holder unless and until the Distribution Agent or the AQV Wind Down Co. Administrator, as applicable, is notified in writing of such Holder's then-current address or other necessary information for delivery, at which time such distribution shall be made to such Holder without interest; *provided* that such distributions on account of Allowed Claims shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of six (6) months from the later of (a) the Plan Effective Date and (b) the date of the distribution.  After such date, all unclaimed property or interests in property

shall revert to the Reorganized Hornblower Debtors or AQV Wind Down Co., as applicable, automatically and without need for a further Order by the Bankruptcy Court (notwithstanding any applicable federal, provincial, or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim or Interest of any Holder to such property or interest in property shall be discharged and forever barred.  The Reorganized Debtors, Distribution Agent, and the AQV Wind Down Co. Administrator, as applicable, shall have no obligation to attempt to locate any Holder of an Allowed Claim other than by reviewing the Debtors' books and records and the Bankruptcy Court's filings.

Checks issued on account of Allowed Claims shall be null and void if not negotiated within ninety (90) calendar days from and after the date of first issuance thereof.  Requests for reissuance of any check must be made directly and in writing to the Distribution Agent or the AQV Wind Down Co. Administrator, as applicable, by the Holder of the relevant Allowed Claim within the 90-calendar day period, as applicable.  After such date, the relevant Allowed Claim (and any Claim for reissuance of the original check), as applicable, shall be automatically discharged and forever barred, and such funds shall revert to the Reorganized Debtors or the AQV Wind Down Co. Administrator, as applicable (notwithstanding any applicable federal, provincial, state or other jurisdiction escheat, abandoned, or unclaimed property laws to the contrary).

**F.      *Manner of Payment***

At the option of the Distribution Agent or the AQV Wind Down Co. Administrator, as applicable, any Cash distribution to be made hereunder may be made by check, wire transfer, automated clearing house, or credit card, or as otherwise required or provided in applicable agreements.

**G.      *No Postpetition Interest on Claims***

Unless otherwise specifically provided for herein or by Order of the Bankruptcy Court, including the DIP Orders, postpetition interest shall not accrue or be paid on Claims, and no Holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim or right. Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any Disputed Claim with respect to the period from the Plan Effective Date to the date a final distribution is made on account of such Disputed Claim, if and when such Disputed Claim becomes an Allowed Claim.

**H.      *Compliance with Tax Requirements***

In connection with this Plan, to the extent applicable, the Debtors, the Reorganized Debtors, the Distribution Agent, or the AQV Wind Down Co. Administrator, as applicable, shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Body, and all distributions pursuant to this Plan shall be subject to such withholding and reporting requirements.  Notwithstanding any provision in this Plan to the contrary, such parties shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distributions to be made under this Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or

establishing any other mechanisms they believe are reasonable and appropriate. The Debtors, the Reorganized Debtors, the Distribution Agent, or the AQV Wind Down Co. Administrator, as applicable, reserve the right to allocate all distributions made under this Plan in compliance with applicable wage garnishments, alimony, child support, and other spousal awards, liens, and encumbrances.

Notwithstanding any other provision of the Plan to the contrary, each Holder of an Allowed Claim that is to receive a distribution under this Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed on such Holder by any Governmental Body, including income, withholding, and other tax obligations, on account of such distribution.

## I.    *Allocations*

Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest.

## J.    *Foreign Currency Exchange Rate*

Except as otherwise provided in a Bankruptcy Court Order, as of the Plan Effective Date, any Claim asserted in currency other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the exchange rate for the applicable currency as published in The Wall Street Journal, National Edition, as of the Petition Date.

## K.    *Setoffs and Recoupment*

Except as expressly provided in the DIP Orders, the Confirmation Order, and this Plan, each Debtor, Reorganized Debtor, or the AQV Wind Down Co., as applicable, may, pursuant to section 553 of the Bankruptcy Code, set off and/or recoup against any payments or distributions to be made pursuant to this Plan on account of any Allowed Claim, any and all claims, rights, and Causes of Action that such Reorganized Debtor or the AQV Wind Down Co., as applicable, may hold against the Holder of such Allowed Claim; *provided* that neither the failure to effectuate a setoff or recoupment nor the allowance of any Claim hereunder shall constitute a waiver or release by a Debtor, Reorganized Debtor, the AQV Wind Down Co., or its applicable successor of any and all claims, rights, and Causes of Action that such Debtor, Reorganized Debtor, the AQV Wind Down Co., or its applicable successor may possess against the applicable Holder; *provided, further*, that nothing herein shall limit any rights of setoff or recoupment under the Exit Credit Documents with respect to matters occurring after the Plan Effective Date. In no event shall any Holder of a Claim be entitled to set off any such Claim against any claim, right, or Causes of Action of the Debtors, Reorganized Debtors, or the AQV Wind Down Co., as applicable, unless such Holder has either obtained the consent of the Debtors, Reorganized Debtors, or the AQV Wind Down Co., as applicable, to such setoff, or has otherwise filed a motion with the Bankruptcy Court requesting the authority to perform such setoff on or before the Confirmation Date and a Final Order granting such motion has been entered, and notwithstanding any indication in any

Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to Section 553 of the Bankruptcy Code or otherwise.

**L.**   ***Claims Paid or Payable by Third Parties***

      1.    <u>Claims Paid by Third Parties</u>

The Debtors, Reorganized Debtors, or the AQV Wind Down Co., as applicable, shall reduce a Claim, and such Claim (or portion thereof) shall be Disallowed without a Claims objection having to be Filed and without any further notice to or action, Order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment on account of such Claim from a party that is not a Debtor, Reorganized Debtor, or the AQV Wind Down Co.  For the avoidance of doubt, Claims for the refund of customer deposits arising in connection with the AQV Wind Down will be satisfied from the proceeds of the AQV Debtors' surety bonds.  Subject to the last sentence of this paragraph, to the extent a Holder of a Claim receives a distribution on account of such Claim and also receives payment from a party that is not a Debtor, Reorganized Debtor, or the AQV Wind Down Co. on account of such Claim, such Holder shall, within fourteen (14) days of receipt thereof, repay or return the distribution to the applicable Reorganized Debtor or the AQV Wind Down Co., as applicable, to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan.  The failure of such Holder to timely repay or return such distribution shall result in the Holder owing the applicable Reorganized Debtor or the AQV Wind Down Co., as applicable, annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the fourteen (14) day grace period specified above until the amount is repaid.

      2.    <u>Claims Payable by Third Parties</u>

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' or Reorganized Debtors' insurance policies and/or surety bonds, until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy and/or surety bond.  To the extent that one or more of the Debtors' insurers or sureties agrees to satisfy in full or in part a Claim against any Debtor, then immediately upon such insurers' or sureties' agreement, the applicable portion of such Claim may be expunged without a Claims objection having to be Filed and without any further notice to or action, Order, or approval of the Bankruptcy Court.

      3.    <u>Applicability of Insurance Policies</u>

Except as otherwise provided in this Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy.  Except as otherwise provided in the Plan or Confirmation Order, nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

**M.**    *Antitrust and Foreign Investment Approvals*

Any New HB Common Equity (or New Warrants) to be distributed under this Plan to an Entity required to obtain any Antitrust and Foreign Investment Approval shall not be distributed until all Antitrust and Foreign Investment Approvals applicable to such Entity have been obtained.

## ARTICLE IX.
## RELEASE, INJUNCTION, AND RELATED PROVISIONS

**A.**    *Discharge of Claims and Termination of Interests*

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in this Plan, the Confirmation Order, or in any contract, instrument, or other agreement or document created pursuant to this Plan or the Confirmation Order, including the Plan Supplement and Definitive Documents, the distributions, rights, and treatments that are provided in this Plan and the Confirmation Order shall be in complete satisfaction, discharge, and release, effective as of the Plan Effective Date, of Claims (including Intercompany Claims that the Debtors resolve or compromise after the Plan Effective Date) against, Interests in, and Causes of Action against the Debtors, the Reorganized Debtors, or the AQV Wind Down Co., as applicable, of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against Liabilities of, Liens on, obligations of, rights against, and interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to this Plan or the Confirmation Order, on account of such Claims or Interests, including demands, Liabilities, and Causes of Action that arose before the Plan Effective Date, any contingent or non-contingent liability on account of representations or warranties issued on or before the Plan Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case, whether or not (1) a Proof of Claim based upon such debt or right is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code, (2) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code, or (3) the Holder of such a Claim or Interest has accepted this Plan.  Any default or "event of default" by the Debtors or Affiliates with respect to any Claim or Interest that existed immediately before or on account of the Filing of the Chapter 11 Cases shall be deemed cured (and no longer continuing) as of the Plan Effective Date.  The Confirmation Order shall be judicial determinations of the discharge of all Claims against, Causes of Action against, and Interests in the Debtors, the Reorganized Debtors, or the AQV Wind Down Co., as applicable, subject to the occurrence of the Plan Effective Date.

**B.**    *Release of Liens*

**Except as otherwise specifically provided in this Plan, in any Definitive Document, or in any other contract, instrument, release, or other agreement or document amended or created pursuant to the Plan, including the Exit Credit Documents (including, in each case, in connection with any express written amendment of any mortgage, deed of trust, Lien, pledge, or other security interest under the Exit Credit Documents), subject to the distribution of the Plan consideration on account of Allowed Claims, on the Plan Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and**

interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors or the AQV Wind Down Co., as applicable, and their successors and assigns, in each case, without any further approval or Order of the Bankruptcy Court and without any action or Filing being required to be made by the Debtors.  Any Holder of such a Secured Claim (and the applicable Agents for such Holder, if any) shall be authorized and directed, at the sole cost and expense of the Reorganized Debtors or the AQV Wind Down Co., as applicable, to release any collateral or other property of any Debtor (including any Cash Collateral and possessory collateral) held by such Holder (and the applicable Agents), and to take such actions as may be reasonably requested by the Reorganized Debtors or the AQV Wind Down Co., as applicable, (in each case, without recourse, representation, or warranty) to evidence the release of such Liens and/or security interests, including as required under the laws of other jurisdictions for non-U.S. security interests and including the execution, delivery, and filing or recording of such releases, and shall authorize the Reorganized Debtors or AQV Wind Down Co., as applicable, to file UCC-3 termination statements (to the extent applicable) with respect thereto.  The presentation or filing of the Confirmation Order or the Confirmation Recognition Order, as applicable, to or with any federal, state, provincial, or local agency, records office, or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.

To the extent that any Holder of a Secured Claim that has been satisfied or discharged in full pursuant to the Plan, or any Agent for such Holder, has filed or recorded publicly any Liens and/or security interests to secure such Holder's Secured Claim, then as soon as practicable on or after the Plan Effective Date, such Holder (or the Agent for such Holder) shall take any and all steps requested by the Debtors, the Reorganized Debtors, or the AQV Wind Down Co., as applicable, that are necessary or desirable to record or effectuate the cancellation and/or extinguishment of such Liens and/or security interests (at the sole cost and expense of the Reorganized Debtors and without any recourse, representation, or warranty of any kind), including the making of any applicable filings or recordings, and the Reorganized Debtors or AQV Wind Down Co., as applicable, shall (a) pay the reasonable and documented fees and expenses of the applicable Agents, in each case including local and foreign counsel, to the extent payable under the DIP Credit Agreements, the First Lien Credit Agreement, the Incremental Superpriority Credit Agreement, the JBIH Credit Agreement, the Revolver Credit Agreement, or the Superpriority Credit Agreement, as applicable, in connection with the foregoing and (b) be entitled to make any such filings or recordings on such Holder's behalf.

C.    *Debtor Release*

Notwithstanding anything else contained herein to the contrary, to the fullest extent permitted by applicable law, pursuant to section 1123(b) of the Bankruptcy Code and Bankruptcy Rule 9019 and in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, on and after the Plan Effective Date, each Released Party is deemed to be, and hereby is conclusively, absolutely, unconditionally, irrevocably, finally, and forever released and discharged by each and all of the Debtors, the Reorganized Debtors, their Estates, and the AQV Wind Down Co., including any successors to the Debtors or any Estate's representative appointed or selected pursuant to section 1123(b)(3) of the

Bankruptcy Code, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Claim or Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all Claims and Causes of Action, including any derivative Claims asserted or assertable on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, asserted or unasserted, matured or unmatured, liquidated or unliquidated, fixed or contingent, accrued or unaccrued, existing or hereafter arising, in law, equity, contract, tort, or otherwise, that the Debtors, the Reorganized Debtors, their Estates, or the AQV Wind Down Co. would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Cause of Action against, or Interest in, a Debtor or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Reorganized Debtors, or their Estates (including the Debtors' capital structure, management, ownership, assets, or operation thereof), the purchase, sale, or rescission of any Security of the Debtors or the Reorganized Debtors, the assertion or enforcement of rights and remedies against the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim, Causes of Action, or Interest that is treated in this Plan, the business or contractual arrangements between any Debtor and any Released Party, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions between or among a Debtor or an Affiliate of a Debtor and another Debtor or an Affiliate of a Debtor, the Chapter 11 Cases, the DIP Facilities, the First Lien Credit Agreement, the Incremental Superpriority Credit Agreement, the JBIH Credit Agreement, the Revolver Credit Agreement, the Superpriority Credit Agreement, the formulation, preparation, dissemination, negotiation, or Filing of the RSA, the Disclosure Statement, the Disclosure Statement Order, the Solicitation Materials, the Confirmation Order, the Confirmation Recognition Order, the Backstop Documents, the Rights Offering Documents, the DIP Documents, the Exit Credit Documents, the New HB Organizational Documents, the New JB Organizational Documents, the AQV Bidding Procedures Order, the AQV Sale Order, the Plan, the Plan Supplement, or any aspect of the Restructuring Transactions, including the AQV Sale Transaction and any contract, instrument, release, or other agreement or document created or entered into in connection with the RSA, the DIP Facilities, the Disclosure Statement, the Backstop Commitment Agreement, the Rights Offering, the Exit Credit Documents, the Plan, the Plan Supplement, the Confirmation Order, the Confirmation Recognition Order, the Chapter 11 Cases, the Filing of the Chapter 11 Cases, the AQV Sale Transaction, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of this Plan, any action or actions taken in furtherance of or consistent with the administration of this Plan, including the issuance or distribution of Securities pursuant to this Plan, or the distribution of property under this Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Plan Effective Date related or relating to any of the foregoing.

Notwithstanding anything contained herein to the contrary, the foregoing release does not release any post-Plan Effective Date obligations of any party or Entity under the Plan, any act occurring after the Plan Effective Date with respect to the Restructuring Transactions, the obligations arising under any Definitive Document to the extent imposing obligations arising after the Plan Effective Date (including those set forth in the Plan Supplement), or other document, instrument, or agreement executed to implement the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the terms by which matters are subject to a compromise and settlement, including the Debtor Releases in <u>Article IX.C</u>, which includes by reference each of the related provisions and definitions contained in this Plan, and, further, shall constitute the Bankruptcy Court's finding that the Debtor Releases in <u>Article IX.C</u> are: (1) essential to Confirmation of this Plan; (2) an exercise of the Debtors' business judgment; (3) in exchange for the good and valuable consideration provided by the Released Parties, including the Released Parties' contributions to facilitating the Restructuring Transactions and implementing this Plan; (4) a good-faith settlement and compromise of the Claims and Causes of Action released by the Debtor Releases in <u>Article IX.C</u>; (5) in the best interests of the Debtors, their Estates, and all Holders of Claims and Interests; (6) fair, equitable, and reasonably given and made after due notice and opportunity for a hearing; and (7) a bar to any of the Debtors, the Reorganized Debtors, the Debtors' Estates, or the AQV Wind Down Co. asserting any Claim or Cause of Action released pursuant to the Debtor Releases in <u>Article IX.C</u>.

D.    *Third-Party Release*

Except as otherwise expressly set forth in this Plan or the Confirmation Order, on and after the Plan Effective Date, pursuant to section 1123(b) of the Bankruptcy Code and Bankruptcy Rule 9019 and to the fullest extent permitted by applicable law, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is deemed to be, and hereby is conclusively, absolutely, unconditionally, irrevocably, finally, and forever released and discharged by each Releasing Party (in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Claim or Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities) from any and all Claims and Causes of Action, including any derivative Claims asserted or assertable on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, asserted or unasserted, matured or unmatured, liquidated or unliquidated, fixed or contingent, accrued or unaccrued, existing or hereafter arising, in law, equity, contract, tort, or otherwise that such Entity would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Cause of Action against, or Interest in, a Debtor based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the Debtors' capital structure, management, ownership, assets, or operation thereof), the purchase, sale, or rescission of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim, Causes of Action, or Interest that is treated in this Plan, the business or contractual arrangements between any Debtor and any Released Party, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions between or among a Debtor or an Affiliate of a Debtor and another Debtor or an Affiliate of a Debtor, the Chapter 11 Cases, the DIP Facilities, the First Lien Credit Agreement, the Incremental Superpriority Credit Agreement, the JBIH Credit Agreement, the Revolver Credit Agreement, the Superpriority Credit Agreement, the formulation, preparation, dissemination, negotiation, or Filing of the RSA, the Disclosure Statement, the Disclosure Statement Order, the Solicitation Materials, the Confirmation Order, the Confirmation Recognition Order, the Backstop Documents, the Rights Offering Documents, the DIP Documents, the Exit Credit Documents, the New HB

Organizational Documents, the New JB Organizational Documents, the AQV Bidding Procedures Order, the AQV Sale Order, the Plan, the Plan Supplement, or any aspect of the Restructuring Transactions, including the AQV Sale Transaction and any contract, instrument, release, or other agreement or document created or entered into in connection with the RSA, the DIP Facilities, the Disclosure Statement, the Backstop Commitment Agreement, the Rights Offering, the Exit Credit Documents, the Plan, the Plan Supplement, the Confirmation Order, the Confirmation Recognition Order, the Chapter 11 Cases, the Filing of the Chapter 11 Cases, the AQV Sale Transaction, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of this Plan, any action or actions taken in furtherance of or consistent with the administration of this Plan, including the issuance or distribution of Securities pursuant to this Plan, or the distribution of property under this Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Plan Effective Date related or relating to any of the foregoing.

Notwithstanding anything contained herein to the contrary, the foregoing release does not release (1) any post-Plan Effective Date obligations of any party or Entity under the Plan, any act occurring after the Plan Effective Date with respect to the Restructuring Transaction, the obligations arising under any Definitive Document to the extent imposing obligations arising after the Plan Effective Date (including those set forth in the Plan Supplement), or other document, instrument, or agreement executed to implement the Plan, (2) the rights of Holders of Allowed Claims to receive distributions under this Plan, (3) the rights of any current employee of the Debtors under any employment agreement or plan, or (4) the rights of the Debtors with respect to any confidentiality provisions or covenants restricting competition in favor of the Debtors under any employment agreement with a current or former employee of the Debtors.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the terms by which matters are subject to a compromise and settlement, including the Debtor Releases in Article IX.C, which includes by reference each of the related provisions and definitions contained in this Plan, and, further, shall constitute the Bankruptcy Court's finding that the Third-Party Releases in this Article IX.D are: (1) essential to Confirmation of this Plan; (2) in exchange for the good and valuable consideration provided by the Released Parties, including the Released Parties' contributions to facilitating the Restructuring Transactions and implementing this Plan; (3) a good-faith settlement and compromise of the Claims and Causes of Action released by the Third-Party Releases in this Article IX.D; (4) in the best interests of the Debtors and their Estates and all Holders of Claims and Interests; (5) fair, equitable, and reasonably given and made after due notice and opportunity for a hearing; and (6) a bar to any of the Releasing Parties asserting any Claim or Causes of Action released pursuant to the Third-Party Releases in this Article IX.D.

E.    *Exculpation*

Except as otherwise specifically provided in this Plan, no Exculpated Party shall have or incur liability for, and each Exculpated Party is hereby released and exculpated from, any Causes of Action or Claim whether direct or derivative related to any act or omission in

connection with, relating to, or arising out of the Chapter 11 Cases from the Petition Date to the Plan Effective Date, the formulation, preparation, dissemination, negotiation, or Filing of the RSA, the Disclosure Statement, the Disclosure Statement Order, the Solicitation Materials, the Confirmation Order, the Confirmation Recognition Order, the Backstop Documents, the Rights Offering Documents, the DIP Documents, the Exit Credit Documents, the New HB Organizational Documents, the New JB Organizational Documents, the AQV Bidding Procedures Order, the AQV Sale Order, the Plan, the Plan Supplement, or any transaction related to the Restructuring Transactions, including the AQV Sale Transaction and any contract, instrument, release, or other agreement or document created or entered into before or during the Chapter 11 Cases in connection with the Restructuring Transactions, any preference, fraudulent transfer, or other avoidance Claim arising pursuant to chapter 5 of the Bankruptcy Code or other applicable law, the Filing of the Chapter 11 Cases, the AQV Sale Transaction, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of this Plan, including the issuance of Securities pursuant to this Plan, or the distribution of property under this Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Plan Effective Date related or relating to any of the foregoing, except for Claims arising from any act or omission that is determined in a Final Order to have constituted willful misconduct, gross negligence, or actual fraud, but in all respects such Exculpated Parties shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to this Plan and the Confirmation Order.

The Exculpated Parties set forth above have, and upon Confirmation of this Plan shall be deemed to have, participated in good faith and in compliance with applicable law with respect to the solicitation of votes and distribution of consideration pursuant to this Plan and, therefore, are not and shall not be liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of this Plan or such distributions made pursuant to this Plan.

F.    *Injunction*

Upon entry of the Confirmation Order, all Holders of Claims and Interests and other parties in interest, along with their respective present or former employees, agents, officers, directors, principals, and Affiliates, and each of their successors and assigns, shall be enjoined from taking any actions to interfere with the implementation or Consummation of this Plan in relation to any Claim or Interest that is extinguished, discharged, or released pursuant to this Plan.

Except as otherwise expressly provided in this Plan or the Confirmation Order, or for obligations issued or required to be paid pursuant to this Plan or the Confirmation Order, all Entities who have held, hold, or may hold Claims, Interests, or Causes of Action that have been released, discharged, or are subject to exculpation pursuant to Article ARTICLE IX.E, are permanently enjoined, from and after the Plan Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, the AQV Wind Down Co., the Exculpated Parties, and/or the Released Parties:

(a)     **commencing, conducting, or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action;**

(b)     **enforcing, levying, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or Order against such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action;**

(c)     **creating, perfecting, or enforcing any Lien or encumbrance of any kind against such Entities or the property or the Estates of such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action;**

(d)     **except as otherwise provided under this Plan, asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action unless such Holder has Filed a motion requesting the right to perform such setoff on or before the Plan Effective Date, and notwithstanding an indication of a Claim or Interest or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and**

(e)     **commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action released or settled pursuant to this Plan or the Confirmation Order.**

**No Person or Entity may commence or pursue a Claim or Cause of Action of any kind against the Debtors, the Reorganized Debtors, the AQV Wind Down Co., the Exculpated Parties, or the Released Parties that relates to or is reasonably likely to relate to any act or omission in connection with, relating to, or arising out of a Claim or Causes of Action related to the Chapter 11 Cases prior to the Plan Effective Date, the formulation, preparation, dissemination, negotiation, or Filing of the RSA, the Disclosure Statement, the Backstop Commitment Agreement, the Rights Offering, the Exit Credit Documents, this Plan, the Plan Supplement, or any transaction related to the Restructuring Transactions, including the AQV Sale Transactions and any contract, instrument, release, or other agreement or document created or entered into before or during the Chapter 11 Cases in connection with the Restructuring Transactions, any preference, fraudulent transfer, or other avoidance Claim arising pursuant to chapter 5 of the Bankruptcy Code or other applicable law, the Filing of the Chapter 11 Cases, the AQV Sale Transactions, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of this Plan, including the issuance of Securities pursuant to this Plan, or the distribution of property under this Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Plan Effective Date related or relating to any of the foregoing, without regard to whether such Person or Entity is a Releasing Party, without the Bankruptcy Court (1) first determining, after notice and a**

hearing, that such Claim or Causes of Action represents a colorable Claim of any kind and (2) specifically authorizing such Person or Entity to bring such Claim or Causes of Action against any such Debtor, Reorganized Debtor, the AQV Wind Down Co., Exculpated Party, or Released Party.

The Bankruptcy Court will have sole and exclusive jurisdiction to adjudicate the underlying colorable Claim or Causes of Action.

Notwithstanding anything to the contrary in the foregoing, the injunction does not enjoin any party under this Plan, the Confirmation Order, or under any other Definitive Document or other document, instrument, or agreement (including those attached to the Disclosure Statement or included in the Plan Supplement) executed to implement this Plan or the Confirmation Order, from bringing an action to enforce the terms of this Plan, the Confirmation Order, or such document, instrument, or agreement (including those attached to the Disclosure Statement or included in the Plan Supplement) executed to implement this Plan or the Confirmation Order.  The injunction in this Plan shall extend to any successors and assigns of the Debtors, the Reorganized Debtors, and the AQV Wind Down Co. and their respective property and interests in property.

## G.     *Waiver of Statutory Limitations on Releases*

Each Releasing Party in each of the releases contained in this Plan expressly acknowledges that although ordinarily a general release may not extend to Claims that the Releasing Party does not know or suspect to exist in its favor, which if known by it may have materially affected its settlement with the party released, each Releasing Party has carefully considered and taken into account in determining to enter into the above releases the possible existence of such unknown losses or Claims.  Without limiting the generality of the foregoing, each Releasing Party expressly waives any and all rights conferred upon it by any statute or rule of law that provides that a release does not extend to Claims that the claimant does not know or suspect to exist in its favor at the time of executing the release, which if known by it may have materially affected its settlement with the Released Party.  The releases contained in this Plan are effective regardless of whether those released matters are presently known, unknown, suspected or unsuspected, or foreseen or unforeseen.

## H.     *Protection against Discriminatory Treatment*

Consistent with section 525 of the Bankruptcy Code and the Supremacy Clause of the U.S. Constitution, all Entities, including Governmental Bodies, shall not discriminate against the Reorganized Debtors or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, or discriminate with respect to such a grant against the Reorganized Debtors, or another Entity with whom the Reorganized Debtors have been associated, solely because each Debtor has been a debtor under chapter 11 of the Bankruptcy Code, may have been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases, but before the Debtors are granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

**I.**     *Document Retention*

On and after the Plan Effective Date, the Reorganized Debtors may maintain documents in accordance with their standard document retention policy, as may be altered, amended, modified, or supplemented by the Reorganized Debtors.

**J.**     *Reimbursement or Contribution*

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the time of Allowance or Disallowance, such Claim shall be forever Disallowed and expunged notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Confirmation Date: (1) such Claim has been adjudicated as non-contingent or (2) the relevant holder of a Claim has Filed a non-contingent Proof of Claim on account of such Claim and a Final Order has been entered prior to the Confirmation Date determining such Claim as no longer contingent.

# ARTICLE X.
# CONDITIONS PRECEDENT TO
# CONSUMMATION OF THIS PLAN

**A.**     *Conditions Precedent to the Plan Effective Date*

It shall be a condition to Consummation of this Plan that the following conditions shall have been satisfied or waived pursuant to the provisions of Article ARTICLE X.B:

(a)     the RSA shall not have terminated as to any of the Initial Consenting Stakeholders (as defined in the RSA) and shall continue to be in full force and effect;

(b)     the DIP Orders shall not have been vacated, stayed, or modified without the prior written consent of the Required Lenders (as defined in the DIP Credit Agreements);

(c)     no Default or Event of Default (each as defined in the DIP Credit Agreements or DIP Order, as applicable) shall have occurred and be continuing under the DIP Credit Agreements or the DIP Order, as applicable, that has not been waived by the DIP Agents or cured by the Debtors in a manner consistent with the DIP Documents;

(d)     all of the conditions precedent for consummation of the transactions contemplated by the Backstop Commitment Agreement shall have been satisfied or waived in accordance with the terms thereof;

(e)     the Bankruptcy Court shall have entered the Backstop Order in form and substance consistent in all material respects with the RSA and the consent rights contained therein, which shall not have been stayed, reversed, vacated, amended, supplemented, or otherwise modified, other than in accordance with the RSA;

(f)     the Backstop Commitment Agreement shall not have terminated as to all parties thereto and shall continue to be in full force and effect;

(g)     the Rights Offering shall have been consummated, including the issuance of all New HB Common Equity (or New Warrants) in accordance with the Plan;

(h)     all Restructuring Expenses, to the extent invoiced as provided herein at least two (2) Business Days before the Plan Effective Date, shall have been paid in full in cash in accordance with the terms and conditions set forth in the RSA, the DIP Orders, and the Backstop Order;

(i)     the Professional Fee Escrow shall have been established and funded with Cash in accordance with ARTICLE II.D.1;

(j)     the New HB Organizational Documents shall have been adopted in a manner consistent in all respects with the Plan and RSA and the consent rights contained therein;

(k)     all requisite filings with governmental authorities and third parties shall have become effective, and all such governmental authorities and third parties shall have approved or consented to the Restructuring Transactions, to the extent required;

(l)     the Debtors shall have implemented the Restructuring Transactions and all other transactions contemplated by the Plan and the RSA in a manner consistent in all material respects with the Plan and RSA;

(m)     the RSA Settlement and all actions contemplated thereby shall have been (or shall, contemporaneously with the occurrence of the Plan Effective Date, be) consummated in a manner consistent in all respects with the Plan and RSA;

(n)     all documents contemplated by the RSA to be executed and delivered on or before the Plan Effective Date shall have been executed and delivered;

(o)     the Exit Credit Documents shall have been executed and delivered and all conditions precedent to the effectiveness of the Exit Term Loans and Exit Revolver shall have been satisfied or waived in accordance with the Exit Credit Documents;

(p)     the final version of the Plan Supplement and all of the schedules, documents, and exhibits contained therein (and any amendment thereto) shall have been Filed in a manner consistent in all material respects with the RSA and the consent rights contained herein; and

(q)     the Bankruptcy Court shall have entered the Confirmation Order in form and substance consistent in all material respects with the RSA and the consent rights contained therein, which shall not have been stayed, reversed, vacated, amended, supplemented, or otherwise modified, other than in accordance with the RSA.

**B.**     *Waiver of Conditions*

Any condition to the Plan Effective Date set forth in Article X.A hereof may be waived, in whole or in part, by the Debtors, with the prior written consent of the Required Consenting HB First Lien Lenders and, to the extent required under the RSA, Crestview, without notice, leave, or Order of the Bankruptcy Court or any formal action other than proceedings to confirm or consummate this Plan; *provided* that the conditions to the Plan Effective Date contained in Articles ARTICLE X.A(j), ARTICLE X.A(l), and ARTICLE X.A(m) may only be waived with the prior written consent of the Consenting JBIH Lenders; *provided, further* that the condition set forth in Article ARTICLE X.A(i) may be waived only with the consent of the affected Professional(s).

**C.**     *Substantial Consummation*

"Substantial Consummation" of this Plan, as defined in 11 U.S.C. § 1101(2), shall be deemed to occur on the Plan Effective Date.

**D.**     *Effect of Nonoccurrence of a Condition*

If the Plan Effective Date does not occur, then: (1) this Plan will be null and void in all respects; and (2) nothing contained in this Plan, the Disclosure Statement, or the RSA shall: (a) constitute a waiver or release of any Claims, Interests, or Causes of Action by any Entity; (b) prejudice in any manner the rights of any Debtor or any other Entity; or (c) constitute an admission, acknowledgment, offer, or undertaking of any sort by any Debtor or any other Entity.

# ARTICLE XI.
# MODIFICATION, REVOCATION, OR WITHDRAWAL OF THIS PLAN

**A.**     *Modification and Amendments*

Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 (as well as those restrictions on modifications set forth in the Plan), the Debtors reserve the right to modify this Plan without additional disclosure pursuant to section 1125 of the Bankruptcy Code prior to the Confirmation Date and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not re-solicit votes on such modified Plan.  After the Confirmation Date and before substantial consummation of the Plan, the Debtors may initiate proceedings in the Bankruptcy Court pursuant to section 1127(b) of the Bankruptcy Code to remedy any defect or omission or reconcile any inconsistencies in the Plan, the Plan Supplement, the Disclosure Statement, or the Confirmation Order, relating to such matters as may be necessary to carry out the purposes and intent of the Plan.

After the Confirmation Date, but before the Plan Effective Date, the Debtors may make appropriate technical adjustments and modifications to the Plan (including the Plan Supplement) without further order or approval of the Bankruptcy Court; *provided* that such adjustments and modifications do not materially and adversely affect the treatment of Holders of Claims or Interests.

**B.** *Effect of Confirmation on Modifications*

Entry of the Confirmation Order shall mean that all modifications or amendments to this Plan since the solicitation thereof in accordance are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or re-solicitation under Bankruptcy Rule 3019.

**C.** *Revocation or Withdrawal of This Plan*

The Debtors reserve the right to revoke or withdraw the Plan before the Confirmation Date and to File subsequent plans of reorganization.  If the Debtors revoke or withdraw the Plan, or if Confirmation or Consummation does not occur, then, absent further order of the Bankruptcy Court: (1) the Plan shall be null and void in all respects; (2) any settlement or compromise not previously approved by Final Order of the Bankruptcy Court embodied in the Plan (including the fixing or limiting to an amount certain of the Claims or Interests or Classes of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan shall be deemed null and void; and (3) nothing contained in the Plan shall (a) constitute a waiver or release of any Claims or Interests; (b) prejudice in any manner the rights of such Debtor, any Holder, any Person, or any other Entity; or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by such Debtor, any Holder, any Person, or any other Entity.

# ARTICLE XII.
# RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Plan Effective Date, on and after the Plan Effective Date, the Bankruptcy Court shall retain jurisdiction over the Chapter 11 Cases and all matters arising out of, or related to, the Chapter 11 Cases, the Confirmation Order, and this Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

(a)     allow, disallow, determine, liquidate, classify, estimate, or establish the priority, Secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the Secured or unsecured status, priority, amount, or allowance of Claims or Interests;

(b)     decide and resolve all matters related to the granting and denying, in whole or in part, of any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code, the Confirmation Order, or this Plan;

(c)     resolve any matters related to:  (i) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is a party or with respect to which a Debtor may be liable in any manner and to hear, determine, and, if necessary, liquidate any Claims arising therefrom, including Cure Claims; (ii) any dispute regarding whether a contract or lease is or was executory, expired, or terminated; (iii) any potential contractual obligation under any

Executory Contract or Unexpired Lease that is assumed; (iv) any other issue related to any Executory Contracts and Unexpired Leases; or (v) any dispute regarding whether the Plan or any Restructuring Transactions trigger any cross-default or change of control provision in any contract or agreement;

(d)     resolve any disputes concerning whether an Entity had sufficient notice of the Chapter 11 Cases, the Disclosure Statement, any solicitation conducted in connection with the Chapter 11 Cases, any bar date established in the Chapter 11 Cases, or any deadline for responding or objecting to any Cure Claim, in each case, for the purpose of determining whether a Claim or Interest is discharged hereunder or for any other purpose;

(e)     ensure that distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of this Plan and adjudicate any and all disputes arising from or relating to distributions under this Plan or the Confirmation Order;

(f)     adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Plan Effective Date;

(g)     adjudicate, decide, or resolve any and all matters related to Causes of Action that may arise from or in connection with the Consummation, interpretation, or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

(h)     adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

(i)     enter and implement such Orders as may be necessary or appropriate to construe, execute, implement, or consummate the provisions of this Plan or the Confirmation Order and all contracts, instruments, releases, indentures, and other agreements or documents created or entered into in connection with this Plan, the Confirmation Order, or the Disclosure Statement;

(j)     enter and enforce any Order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

(k)     resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of this Plan or the Confirmation Order or any Entity's obligations incurred in connection with this Plan or the Confirmation Order and the administration of the Estates;

(l)     hear and determine disputes arising in connection with the interpretation, implementation, effect, or enforcement of this Plan, the Plan Supplement, including disputes arising under agreements, documents, or instruments executed in connection with the Plan;

(m)     issue injunctions, enter and implement other Orders, or take such other actions as may be necessary or appropriate in aid of execution, implementation, or Consummation of this Plan or to restrain interference by any Entity with Consummation or enforcement of this Plan or the Confirmation Order;

(n)     resolve any matters related to the issuance of the New HB Common Equity (or New Warrants) or the incurrence of the Exit Term Loans and the Exit Revolver;

(o)     adjudicate, decide, or resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the settlements, compromises, discharges, releases, injunctions, exculpations, and other provisions contained in Article IX, and enter such Orders as may be necessary or appropriate to implement such discharges, releases, injunctions, exculpations, and other provisions;

(p)     adjudicate, decide, or resolve any cases, controversies, suits, disputes or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim for amounts not timely repaid pursuant to ARTICLE VIII.L;

(q)     enter and implement such Orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

(r)     determine any other matters that may arise in connection with or relate to this Plan, the Disclosure Statement, the Confirmation Order, the Plan Supplement, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan, or the Disclosure Statement, including the RSA; *provided* that the Bankruptcy Court shall not retain jurisdiction over disputes concerning documents contained in the Plan Supplement that have a jurisdictional, forum selection, or dispute resolution clause that refers disputes to a different court or arbitration forum;

(s)     adjudicate any and all disputes arising from or relating to distributions under this Plan or any transactions contemplated thereby;

(t)     consider any modifications of this Plan to cure any defect or omission or to reconcile any inconsistency in any Bankruptcy Court Order, including the Confirmation Order;

(u)     determine requests for the payment of Claims entitled to priority pursuant to section 507 of the Bankruptcy Code;

(v)     adjudicate, decide, or resolve disputes as to the ownership of any Claim or Interest;

(w)     adjudicate, decide, or resolve all matters related to any subordinated Claim;

(x)     adjudicate, decide, or resolve matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

(y)     grant any consensual request to extend the deadline for assuming or rejecting unexpired leases pursuant to section 365(d)(4) of the Bankruptcy Code;

(z)     enforce all Orders entered by the Bankruptcy Court in connection with the Chapter 11 Cases;

(aa)     hear any other matter not inconsistent with the Bankruptcy Code;

(bb)     enter an Order concluding or closing any or all of the Chapter 11 Cases;

(cc)     enforce all orders, judgments, injunctions, releases, exculpations, indemnifications, and rulings entered in connection with the Chapter 11 Cases with respect to any Person or Entity, and resolve any cases, controversies, suits, or disputes that may arise in connection with any Person or Entity's rights arising from or obligations incurred in connection with the Plan; and

(dd)     hear and determine all disputes involving the existence, nature, scope, or enforcement of any exculpations, discharges, injunctions, and releases granted in this Plan, including under ARTICLE IX.

Nothing herein limits the jurisdiction of the Bankruptcy Court to interpret and enforce the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan, the Plan Supplement, or the Disclosure Statement, without regard to whether the controversy with respect to which such interpretation or enforcement relates may be pending in any state or other federal court of competent jurisdiction.

If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising in, arising under, or related to the Chapter 11 Cases, including the matters set forth in this ARTICLE XII, the provisions of this ARTICLE XII shall have no effect on and shall not control, limit, or prohibit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

Unless otherwise specifically provided herein or in a prior Order of the Bankruptcy Court, the Bankruptcy Court shall have exclusive jurisdiction to hear and determine disputes concerning Claims against or Interests in the Debtors that arose prior to the Plan Effective Date.

As of the Plan Effective Date, notwithstanding anything in this Article XII to the contrary, the Bankruptcy Court's retention of jurisdiction pursuant to the Plan shall not govern the enforcement or adjudication of any rights or remedies with respect to or as provided in the Exit Credit Documents, and the jurisdictional provisions of such documents shall control.

## ARTICLE XIII.
## MISCELLANEOUS PROVISIONS

### A.    *Immediate Binding Effect*

Subject to ARTICLE X.A and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Plan Effective Date, the terms of this Plan and the

final versions of the documents contained in the Plan Supplement shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors, and the AQV Wind Down Co., as applicable, any and all Holders of Claims or Interests (regardless of whether their Claims or Interests are deemed to have accepted or rejected this Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in this Plan or the Confirmation Order, each Entity acquiring property under this Plan or the Confirmation Order, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.  All Claims and Interests shall be as fixed, adjusted, or compromised, as applicable, pursuant to this Plan and the Confirmation Order, regardless of whether any such Holder of a Claim or Interest has voted on this Plan.

## B.    *Waiver of Stay*

The requirements under Bankruptcy Rule 3020(e) that an order confirming a plan is stayed until the expiration of fourteen days after entry of the order shall be waived by the Confirmation Order.  The Confirmation Order shall take effect immediately and shall not be stayed pursuant to the Bankruptcy Code, Bankruptcy Rules 3020(e), 6004(h), 6006(d), or 7062 or otherwise.

## C.    *Additional Documents*

On or before the Plan Effective Date, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of this Plan and the Confirmation Order.  The Debtors, the Reorganized Debtors, and the AQV Wind Down Co., as applicable, and all Holders of Allowed Claims receiving distributions pursuant to this Plan and the Confirmation Order and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of this Plan and the Confirmation Order.

## D.    *Reservation of Rights*

Except as expressly set forth in this Plan, this Plan shall have no force or effect unless the Bankruptcy Court enters the Confirmation Order, and the Confirmation Order shall have no force or effect if the Plan Effective Date does not occur.  None of the Filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Debtor or any other Entity with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor or any Entity unless and until the Plan Effective Date has occurred.

## E.    *Successors and Assigns*

The rights, benefits, and obligations of any Entity named or referred to in this Plan or the Confirmation Order shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign, Affiliate, officer, director, manager, agent, representative, attorney, beneficiary, or guardian, if any, of each Entity.

**F.**     *Notices*

To be effective, all notices, requests, and demands to or upon the Debtors shall be in writing (including by facsimile transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

1.     <u>If to the Debtors, the Reorganized Hornblower Debtors, or the AQV Wind Down Co.:</u>

Hornblower Holdings LLC
Pier 3 on The Embarcadero
San Francisco, CA 94111

Attention:     Jonathan Hickman, Chief Restructuring Officer
Email:          jhickman@alvarezandmarsal.com

With copies (which shall not constitute notice) to:

Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, NY 10019-6064

Attention:     Jacob A. Adlerstein, Kyle J. Kimpler, Sarah Harnett,
                and Neda Davanipour
Email:          jadlerstein@paulweiss.com; kkimpler@paulweiss.com;
                sharnett@paulweiss.com; ndavanipour@paulweiss.com

          - and -

Porter Hedges LLP
1000 Main St., 36th Floor
Houston, TX 77002

Attention:     John F. Higgins, M. Shane Johnson, and Megan Young-John
Email:          jhiggins@porterhedges.com; sjohnson@porterhedges.com;
                myoung-john@porterhedges.com

2.     <u>If to a Consenting Term Lender (as defined in the RSA), or a transferee thereof:</u>

To the address set forth below the Consenting Term Lender's signature page to the RSA (or as directed by any transferee thereof), as the case may be.

With copies (which shall not constitute notice) to:

Milbank LLP
55 Hudson Yards
New York, NY 10001

Attention:      Evan Fleck, Matthew Brod, and Justin Cunningham
Email:          efleck@milbank.com; mbrod@milbank.com; jcunnin1@milbank.com

3.      If to Crestview:

To the address set forth below Crestview's signature page to the RSA.

With copies (which shall not constitute notice) to:

Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, NY 10017

Attention:      Brian M. Resnick, Adam L. Shpeen, and David Kratzer
Email:          brian.resnick@davispolk.com; adam.shpeen@davispolk.com;
                david.kratzer@davispolk.com

After the Plan Effective Date, the Reorganized Debtors and the AQV Wind Down Co. have the authority to send a notice to Entities that, to continue to receive documents pursuant to Bankruptcy Rule 2002, they must File a renewed request to receive documents pursuant to Bankruptcy Rule 2002.  After the Plan Effective Date, the Debtors, the Reorganized Debtors, and the AQV Wind Down Co. are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have Filed such renewed requests.

**G.      *Term of Injunctions or Stays***

Unless otherwise provided in this Plan or the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to section 105 or 362 of the Bankruptcy Code or any Order of the Bankruptcy Court, and existing on the Confirmation Date (excluding any injunctions or stays contained in this Plan or the Confirmation Order) shall remain in full force and effect until the Plan Effective Date.  All injunctions or stays contained in this Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

**H.      *Entire Agreement***

Except as otherwise indicated, this Plan, the Confirmation Order, the applicable Definitive Documents, the Plan Supplement, and documents related thereto supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into this Plan, the Confirmation Order, the Definitive Documents, the Plan Supplement, and documents related thereto.

**I.      *Exhibits***

All exhibits and documents included in this Plan, the Confirmation Order, and the Plan Supplement are incorporated into and are a part of this Plan as if set forth in full in this Plan.  After the exhibits and documents are Filed, copies of such exhibits and documents shall be available

upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the website maintained by the Debtors' Notice and Claims Agent, at https://omniagentsolutions.com/Hornblower, or at the Bankruptcy Court's website at http://www.txs.uscourts.gov/.

**J.      *Deemed Acts***

Subject to and conditioned on the occurrence of the Plan Effective Date, whenever an act or event is expressed under this Plan to have been deemed done or to have occurred, it shall be deemed to have been done or to have occurred without any further act by any party by virtue of this Plan and the Confirmation Order.

**K.      *Severability of Plan Provisions***

If, prior to Confirmation, any term or provision of this Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Debtors, may alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted; *provided* that any such alteration or interpretation shall be consistent with the RSA and the remainder of the terms and provisions of this Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of this Plan, as it may have been altered or interpreted in accordance with the foregoing, is:  (1) valid and enforceable pursuant to its terms; (2) integral to this Plan and may not be deleted or modified without the consent of the Debtors, the Reorganized Debtors, or the AQV Wind Down Co., as applicable; and (3) non-severable and mutually dependent.

**L.      *Votes Solicited in Good Faith***

Upon entry of the Confirmation Order, each of the Released Parties and Exculpated Parties will be deemed to have acted in "good faith" within the meaning of section 1125(e) of the Bankruptcy Code and in compliance with the applicable provisions of the Bankruptcy Code and in a manner consistent with the Disclosure Statement, the Plan, the Bankruptcy Code, the Bankruptcy Rules, and all other applicable rules, laws, and regulations in connection with all of their respective activities relating to support and consummation of the Plan, including the negotiation, execution, delivery, and performance of the RSA and are entitled to the protections of section 1125(e) of the Bankruptcy Code and all other applicable protections and rights provided in the Plan.  Without limiting the generality of the foregoing, upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on this Plan in good faith and in compliance with the Bankruptcy Code and other applicable law, and, pursuant to section 1125(e) of the Bankruptcy Code, any person will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of Securities offered and sold under this Plan or the Rights Offering, and, therefore, none of such parties or individuals or the Reorganized Debtors or the AQV Wind Down Co., as applicable, will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on this Plan

or the offer, issuance, sale, or purchase of the Securities offered and sold under this Plan and the Rights Offering.

**M.**    *Request for Expedited Determination of Taxes*

The Debtors shall have the right to request an expedited determination under section 505(b) of the Bankruptcy Code with respect to tax returns filed, or to be filed, for any and all taxable periods ending after the Petition Date through the Plan Effective Date.

**N.**    *No Waiver or Estoppel*

Upon the Plan Effective Date, each Holder of a Claim or Interest shall be deemed to have waived any right to assert that its Claim or Interest should be Allowed in a certain amount, in a certain priority, be secured, or not be subordinated by virtue of an agreement made with the Debtors and/or their counsel, or any other Entity, if such agreement was not disclosed in this Plan, the Disclosure Statement, or papers filed with the Bankruptcy Court prior to the Confirmation Date.

**O.**    *Dissolution of the Creditors' Committee and Cessation of Fee and Expense Payment*

On the Plan Effective Date, the Creditors' Committee and any other statutory committee appointed in the Chapter 11 Cases shall dissolve automatically and the members thereof shall be released and discharged from all rights and duties arising from, or related to, the Chapter 11 Cases, except with respect to final fee applications of the Professionals.  The Reorganized Debtors shall not be responsible for paying any fees or expenses incurred by the members of or advisors to the Creditors' Committee or any other statutory committee appointed in the Chapter 11 Cases after the Plan Effective Date.

**P.**    *Closing of Chapter 11 Cases*

Upon the occurrence of the Plan Effective Date, the Reorganized Debtors shall be permitted to (1) close all of the Chapter 11 Cases except for one of the Chapter 11 Cases as determined by the Reorganized Debtors, and all contested matters relating to each of the Debtors, including objections to Claims, shall be administered and heard in such Chapter 11 Case and (2) change the name of the remaining Debtor and case caption of the remaining open Chapter 11 Case as desired, in the Reorganized Debtors' sole discretion.

**Q.**    *Creditor Default*

An act or omission by a Holder of a Claim or an Interest in contravention of the provisions of this Plan shall be deemed an event of default under this Plan.  Upon an event of default, the Reorganized Debtors or the AQV Wind Down Co. may seek to hold the defaulting party in contempt of the Confirmation Order and may be entitled to reimbursement for their reasonable attorneys' fees and costs incurred in remedying such default.  Upon the finding of such a default by a Holder of a Claim or Interest, the Bankruptcy Court may:  (1) designate a party to appear, sign, and/or accept the documents required under the Plan on behalf of the defaulting party, in accordance with Bankruptcy Rule 7070; (2) enforce the Plan by order of specific performance; (3) award judgment against such defaulting Holder of a Claim or Interest in favor of the

Reorganized Debtor or the AQV Wind Down Co., as applicable, in an amount, including interest, to compensate the Reorganized Debtors for the damages caused by such default; and (4) make such other Order as may be equitable that does not materially alter the terms of the Plan.

*[Signature pages follow]*

Respectfully submitted, as of the date first set forth above, by the Debtors.

Dated:   April 11, 2024                    Hornblower Holdings LLC (for itself and on behalf
                                           of each the other Debtors and Debtors in Possession)


                                           */s/ Jonathan Hickman*_____
                                           Name: Jonathan Hickman
                                           Title:   Chief Restructuring Officer