2024 WL 3034849
Only the Westlaw citation is currently available.
United States Court of Appeals, Seventh Circuit.

Mary RODGERS-ROUZIER, Plaintiff-Appellant,
v.
AMERICAN QUEEN STEAMBOAT OPERATING COMPANY, LLC and HMS Global Maritime LLC, Defendants-Appellees.

No. 23-1812
|
Argued January 23, 2024
|
Decided June 18, 2024

**Synopsis**
**Background:** Employee who worked as a bartender on riverboat cruises filed a putative collective action against employer, alleging that she and her coworkers had been denied overtime payments in violation of the Fair Labor Standards Act (FLSA). Employer filed motion to dismiss, or alternatively, to stay litigation and compel arbitration under the Federal Arbitration Act (FAA). The United States District Court for the Southern District of Indiana, Sarah Evans Barker, J., 525 F.Supp.3d 926, denied the motion, finding that employee was a "seaman" not subject to the FAA. Employer renewed its motion to dismiss, or alternatively, to stay and compel arbitration, this time on state-law grounds. and Barker, J., 2023 WL 2742377, granted the motion and dismissed the case. Employee appealed.

**Holdings:** The Court of Appeals, Rovner, Circuit Judge, held that:

[1] under Indiana law, district court had the authority to enforce parties' arbitration agreement to the extent granted to the Indiana state court system;

[2] Indiana law governed the validity of parties' arbitration agreement, including clause stating that the FAA applied;

[3] under Indiana law, FAA's terms applied to arbitration agreement such that employer could not compel employee to arbitrate her claims; and

[4] employee had standing to argue that the case should be allowed to proceed as a collective action after remand.

Reversed and remanded.

**Procedural Posture(s):** Motion to Dismiss for Lack of Subject Matter Jurisdiction; Motion to Compel Arbitration.

West Headnotes (21)

[1] **Federal Civil Procedure**
Generally only a single motion to dismiss is permitted, and any defense listed in the rule governing motions to dismiss, other than lack of subject-matter jurisdiction, is waived if it is omitted from that single motion. Fed. R. Civ. P. 12(g)(2), 12(h)(1).

[2] **Alternative Dispute Resolution**
A motion to dismiss for improper venue is not the proper means of enforcing an arbitration agreement. Fed. R. Civ. P. 12(b)(3).

[3] **Federal Civil Procedure**
Venue is determined solely by reference to federal law, not the parties' contractual agreements. 28 U.S.C.A. § 1391.

[4] **Federal Civil Procedure**
Common-law doctrines like forum non conveniens are the preferred mechanism by which to dismiss a suit brought in the wrong forum, if it cannot be transferred to the right one. 28 U.S.C.A. § 1391.

[5] **Federal Civil Procedure**
The questions of who decides an issue and what evidence they may use to do so are located nowhere in the text of the rule governing motions to dismiss, which just permits certain defenses to

be presented by motion; these questions are instead governed by general common-law principles. Fed. R. Civ. P. 12.

[6] **Alternative Dispute Resolution**

Employer preserved its opportunity to seek to compel arbitration under the Indiana Uniform Arbitration Act (IUAA) in employee's putative FLSA collective action, although employer sought to do so in a second motion to dismiss for improper venue; a motion to dismiss for improper venue was not the proper means of enforcing an arbitration agreement, and whether employer had waived the right to enforce arbitration was not controlled by the rule governing motions to dismiss. Fair Labor Standards Act of 1938 § 16, 29 U.S.C.A. § 216(b); Ind. Code § 34-57-2-1 et seq.; Fed. R. Civ. P. 12.

[7] **Alternative Dispute Resolution**

The Federal Arbitration Act (FAA) is a substantive federal law that, through the Supremacy Clause, generally preempts conflicting state law within its sphere; typically, this preemption invalidates state law that discriminates against arbitration agreements relative to other contracts. U.S. Const. art. 6, cl. 2; 9 U.S.C.A. § 2.

[8] **Alternative Dispute Resolution**

The Federal Arbitration Act (FAA) does not preempt state laws that favor arbitration in means different from the FAA or beyond the FAA's own scope; in doctrinal terms, the FAA does not occupy the field of arbitration. 9 U.S.C.A. § 2.

[9] **Alternative Dispute Resolution**

It the Indiana Uniform Arbitration Act (IUAA) renders an arbitration agreement valid and enforceable as a matter of substantive Indiana law, then, under *Erie*, a federal court must give that clause the same effect an Indiana court would, even if neither the IUAA nor the Federal Arbitration Act (FAA) authorizes the federal court to do so in their texts. 9 U.S.C.A. § 1 et seq.; Ind. Code § 34-57-2-1 et seq.

[10] **Federal Civil Procedure**

For *Erie* purposes, the categorization of a given law as substantive or only procedural, and the typically more important question whether there is a conflict between state law and a federal rule of procedure, is itself a matter the court assesses under federal law.

[11] **Alternative Dispute Resolution**

The procedural and remedial obligation to stay or dismiss litigation in contravention of an arbitration agreement is part of the substantive federal law that makes the agreement valid.

[12] **Alternative Dispute Resolution**

In employee's putative FLSA collective action against employer, district court had the authority to enforce the parties' arbitration agreement under the Indiana Uniform Arbitration Act (IUAA) to the extent and by means substantially equivalent to those that Indiana law granted to the Indiana state court system, including the ability to dismiss the litigation based on the arbitration agreement; state laws favoring arbitration in means different from the Federal Arbitration Act (FAA) were not preempted. Fair Labor Standards Act of 1938 § 16, 29 U.S.C.A. § 216(b); Ind. Code § 34-57-2-1 et seq.

[13] **Alternative Dispute Resolution**

An arbitration agreement is just a type of contract, and the Federal Arbitration Act (FAA) does not itself provide a substantive law governing the formation or general interpretation of contracts, so ordinary state contract law always fills in crucial gaps in any arbitration agreement. 9 U.S.C.A. § 1 et seq.

[14] **Alternative Dispute Resolution**

In employee's putative FLSA collective action against employer, the validity of the parties' arbitration agreement was governed by Indiana law, including the Indiana Uniform Arbitration Act (IUAA), even though a provision in the agreement stated that the Federal Arbitration Act (FAA) governed, where employee was a

"seaman" not subject to the FAA, state law governed the agreement regardless of the FAA's application, and the omission of an express reference to the IUAA in the agreement was immaterial. 9 U.S.C.A. § 1 et seq.; Ind. Code § 34-57-2-1 et seq.

[15]    Contracts

Ordinary contracts are entered every day under state law without the contract recognizing as much.

[16]    Alternative Dispute Resolution

In employee's putative FLSA collective action against employer, Indiana law governed the validity of the clause in the parties' arbitration agreement stating that the Federal Arbitration Act (FAA) applied, even though as a "seaman" employee was not subject to the FAA; the contract provision was in essence a choice-of-law clause, the enforceability of which was subject to Indiana law. 9 U.S.C.A. § 1 et seq.

[17]    Contracts

Indiana law generally favors enforcement of contractual stipulations to the choice of law.

[18]    Alternative Dispute Resolution

Under Indiana law, employer could not compel employee to arbitrate her claims against employer for unpaid overtime under the Fair Labor Standards Act (FLSA), where the provision of the parties' arbitration agreement providing that arbitration would be governed by the terms of the Federal Arbitration Act (FAA) operated as a valid and enforceable choice-of-law clause, and employee's work as a bartender on a river cruise made her a "seaman" not subject to compelled arbitration under the FAA. 9 U.S.C.A. § 1; Fair Labor Standards Act of 1938 § 16, 29 U.S.C.A. § 216(b).

[19]    Alternative Dispute Resolution

Indiana's strong public policy in favor of arbitration agreements is only to enforce the agreements that the parties themselves have reached.

[20]    Labor and Employment

The FLSA is unique in that it is designed to defeat rather than implement contractual arrangements; n matter how voluntarily they purport to do so, parties may not generally waive the statutory wages the FLSA promises, whether directly or indirectly, such as by agreeing to settle a wage claim for less than the amount to which the worker is entitled. Fair Labor Standards Act of 1938, 29 U.S.C.A. § 201 et seq.

[21]    Labor and Employment

Employee's interest in her individual claim against employer for alleged violations of the FLSA's overtime requirements gave her standing to argue that the case should be allowed to proceed as a collective action after remand, where the Court of Appeals reversed district court's order dismissing the claim and holding that the opt-in plaintiffs were not parties to the case because it had never been conditionally certified as a collective action. Fair Labor Standards Act of 1938 § 16, 29 U.S.C.A. § 216(b).

Appeal from the United States District Court for the Southern District of Indiana, New Albany Division. No. 4:20-cv-00004 — Sarah Evans Barker, *Judge*.

**Attorneys and Law Firms**

Leah M. Nicholls, Shelby Hannah Leighton, Attorneys, Public Justice, Washington, DC, Douglas M. Werman, Attorney, Chicago, IL, Sarah Jean Arendt, Maureen Ann Salas, Attorneys, Werman Salas P.C., Chicago, IL, for Plaintiff-Appellant.

Dennis D. Murrell, Matthew Philip Dearmond, Augustus S. Herbert, Attorneys, Gray Ice Higdon, PLLC, Louisville, KY, for Defendants-Appellees.

Summer H. Murshid, Attorney, Hawks Quindel, S.C., Milwaukee, WI, for Amicus Curiae National Employment Lawyers Association.

Dean A. Romhilt, Attorney, Department of Labor, Office of the Solicitor, Washington, DC, for Amicus Curiae Julie A. Su.

Before Rovner, Brennan, and Pryor, Circuit Judges.

**Opinion**

Rovner, Circuit Judge.

*1 Mary Rodgers-Rouzier alleges that she and her coworkers who entertained guests on steamboat cruises were denied overtime payment to which they were entitled under the Fair Labor Standards Act. Over one hundred of her coworkers filed consent forms to join her proposed collective action. Meanwhile, their employer, American Queen Steamboat Operating Company, moved to dismiss the case for improper venue because Rodgers-Rouzier had agreed to arbitration. The arbitration agreement and American Queen's motion invoked the Federal Arbitration Act (FAA) exclusively, and the district court denied the motion on those terms. American Queen then moved again to dismiss based on the arbitration agreement, this time invoking Indiana state law. The district court granted this motion, over Rodgers-Rouzier's objections that American Queen had waived its argument and the court lacked authority to apply Indiana law in this context. The court further determined that all the workers who had filed consent forms were not parties to the action.

We reverse. Although we conclude American Queen's arguments are not waived and the court had authority to enforce the arbitration agreement under Indiana law just as an Indiana court would, we believe that Indiana law would hold American Queen to its bargain that its arbitration agreement was governed by the FAA. Rodgers-Rouzier's case may therefore continue in federal court. We do not decide now whether it may do so as a collective action and leave that question for further litigation.[1]

**I.**

Rodgers-Rouzier worked as a bartender on steamboats operated by American Queen. She alleged that she and her coworkers were wrongly denied overtime wages. While working for American Queen, she signed an arbitration agreement as a condition of her continued employment. The parties represent that her coworkers entered similar, but not necessarily identical, agreements at various times during their own employment with American Queen.

The agreement is only three short pages, split into six sections, several of which are relevant to this appeal. Section one contains the main agreement that the parties will settle all claims arising out of Rodgers-Rouzier's employment exclusively by binding arbitration, except for certain claims related to unemployment benefits, worker's compensation, and labor relations. The procedures for the arbitration are specified in section two, which provides that the arbitration "shall be conducted under the rules and procedures of the American Arbitration Association, Judicial Arbitration and Mediation Services or another arbitration service selected by the company." It also specifies that arbitration should generally be conducted in the county where Rodgers-Rouzier was last employed. Section four operates as a waiver of any statute of limitations, requiring each party to commence a claim no more than six months after it accrues.

*2 Section six addresses the interpretation of the Agreement and provides that "[t]his Agreement and the applicability/construction of any arbitration decision shall be governed by the Federal Arbitration Act." The section also includes severability rules: "The provisions of this Agreement shall be severable. If any portion of this Agreement is held to be invalid or unenforceable, it shall not affect the remaining portions of this Agreement. This Agreement may be modified by a court or an arbitrator to render it enforceable."

After Rodgers-Rouzier filed this suit as a putative collective action, see 29 U.S.C. § 216(b), American Queen moved to compel arbitration under the FAA. Specifically, it sought to dismiss the complaint in its entirety for improper venue under Rule 12(b)(3) of the Federal Rules of Civil Procedure. The district court denied this motion because § 1 of the FAA provides that "nothing" in the Act "shall apply to contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce," and it concluded that Rodgers-Rouzier was a "seaman" within the meaning of the FAA.

After filing its answer, American Queen moved again to either dismiss or stay the litigation based on the arbitration agreement. Accepting that the FAA did not apply to Rodgers-Rouzier, it instead invoked the Indiana Uniform Arbitration Act (IUAA), Ind. Code §§ 34-57-2-1 to-22. Rodgers-Rouzier objected that American Queen had already moved to dismiss once under Rule 12(b)(3), and so was not permitted to do so again. Fed. R. Civ. P. 12(g)(2), (h)(1). She also argued that the court was not permitted to enforce the contract under Indiana law, when the FAA did not apply and section six specified that the agreement was governed by the FAA. Assuming the court could enforce the agreement, though, she contended that section two improperly gave American Queen unilateral authority to "select" any potentially biased arbitration service and section four's waiver of the statute of limitations violated the FLSA and rendered the whole agreement unconscionable.

The district court granted the motion and dismissed Rodgers-Rouzier's case. Although the court agreed that American Queen had waived its opportunity to file another motion under Rule 12(b)(3), the court concluded that American Queen had not waived its right to compel arbitration as a substantive matter. The court further determined that, in the absence of the FAA, some law had to apply to the agreement, and so it applied Indiana law, including the IUAA. It next concluded that neither section two nor section four was unconscionable, because it concluded the provision regarding selection of another arbitrator in the former was not integral to the agreement and the waiver of the statute of limitations in the latter was not contrary to federal or state law. It therefore compelled Rodgers-Rouzier to arbitrate by dismissing her suit.

Meanwhile, the parties had also been litigating whether court-approved notice should be sent to other American Queen workers so that they could opt into the case as a collective action. See *Hoffmann-La Roche Inc. v. Sperling*, 493 U.S. 165, 171, 110 S.Ct. 482, 107 L.Ed.2d 480 (1989). The court concluded that any notice was premature because it had not yet certified the case to proceed as a collective action. Yet, even without notice from the court, 127 other American Queen employees filed consent forms to opt into the action under 29 U.S.C. § 216(b). In light of its dismissal of Rodgers-Rouzier's case, the district court concluded that these employees were not parties to the litigation. Rodgers-Rouzier and the other 127 employees appeal.

II.

**\*3** On appeal, Rodgers-Rouzier renews her three arguments against dismissal of her suit. First, she argues that Rule 12 of the Federal Rules of Civil Procedure prohibited American Queen from seeking enforcement of the arbitration agreement on its state-law theory. Second, she maintains the district court had no authority to apply Indiana law to compel arbitration. And third, she contends that she could not be compelled to arbitrate as a matter of Indiana law. Reviewing each of these questions of law de novo, *see A.D. v. Credit One Bank, N.A.*, 885 F.3d 1054, 1059 (7th Cir. 2018), we reject her first two arguments and conclude that the district court had the authority to consider American Queen's motion and could have potentially compelled arbitration under Indiana law. But we agree with her that in this case Indiana law would not compel her to arbitrate, for the simple reason that the agreement expressly states that it is governed by the FAA.

A.

[1] We start with waiver. Rodgers-Rouzier contends that the only means of seeking dismissal based on an arbitration clause is a motion to dismiss for improper venue under Rule 12(b)(3). Rule 12(g)(2) generally permits only a single motion to dismiss, and Rule 12(h)(1) establishes that any defense listed in 12(b)(2)–(5) is waived if it is omitted from that single motion. See *Ennenga v. Starns*, 677 F.3d 766, 772–73 (7th Cir. 2012). So, Rodgers-Rouzier logically concludes, American Queen waived its IUAA theory for dismissal by omitting it from its initial motion to dismiss under Rule 12(b)(3). The district court accepted that American Queen had waived its right to move again under Rule 12(b)(3) but concluded that it had not waived its right to compel arbitration generally.

[2] [3] [4] We think the distinction drawn by the district court is sound, but there is a more fundamental flaw with Rodgers-Rouzier's argument. Rule 12(h)(1) does not govern the question of waiver because a motion to dismiss under Rule 12(b)(3) is not the proper means of enforcing an arbitration agreement in the first place. We had concluded that it was in

*Continental Casualty Co. v. American National Insurance Co.*, 417 F.3d 727, 733 (7th Cir. 2005), by comparing an arbitration agreement to a forum-selection clause. See also *Faulkenberg v. CB Tax Franchise Sys., LP*, 637 F.3d 801, 807 (7th Cir. 2011); *Auto. Mechs. Loc. 701 Welfare & Pension Funds v. Vanguard Car Rental USA, Inc.*, 502 F.3d 740, 746 (7th Cir. 2007). But that analogy has since broken down. The Supreme Court has squarely held that forum-selection clauses do not make venue "improper" within the meaning of Rule 12(b)(3). *Atl. Marine Const. Co. v. U.S. Dist. Ct. for W. Dist. of Tex.*, 571 U.S. 49, 55, 134 S.Ct. 568, 187 L.Ed.2d 487 (2013). Venue is determined solely by reference to federal law—generally 28 U.S.C. § 1391—not the parties' contractual agreements. *Atlantic Marine*, 571 U.S. at 55–56, 134 S.Ct. 568. Common-law doctrines like *forum non conveniens* are the preferred mechanism by which to dismiss a suit brought in the wrong forum, if it cannot be transferred to the right one. *Id.* at 60, 134 S.Ct. 568.

Although we have, on occasion, repeated litigants' understanding that a motion to enforce an arbitration agreement is brought under Rule 12(b)(3), even after *Atlantic Marine*, we have grown increasingly critical of that assumption. See *Rock Hemp Corp. v. Dunn*, 51 F.4th 693, 701 (7th Cir. 2022); *Dr. Robert L. Meinders, D.C., Ltd. v. United Healthcare Servs., Inc.*, 7 F.4th 555, 560 (7th Cir. 2021). The Supreme Court has clarified that Rule 12(b)(3) is limited to challenges to statutory venue, *Atlantic Marine*, 571 U.S. at 55–56, 134 S.Ct. 568, so it follows that the Rule is no longer a permissible means of enforcing arbitration agreements.

[5] This recognition changes little of substance. The concerns that prompted us to rely on Rule 12(b)(3) related to the scope of the record, the standard of review, and a judge's power to resolve evidentiary disputes. See *Faulkenberg*, 637 F.3d at 808–10; *Cont'l Cas.*, 417 F.3d at 733. Rodgers-Rouzier insists that our obeying *Atlantic Marine* will leave these questions in flux. But as we explained in *Pavey v. Conley*, 544 F.3d 739, 741 (7th Cir. 2008), the questions of who decides an issue and what evidence they may use to do so are located nowhere in the text of Rule 12, which "just permits certain defenses ... to be presented by motion." These questions are instead governed by general common-law principles. *Id.* Those principles remain the same, despite a change in nomenclature.

*4 [6] From our conclusion that Rule 12(b)(3) does not govern American Queen's motion it follows that Rule 12(h)(1) does not control the question of waiver. Indeed, like the district court did here, we have typically resolved whether a litigant has waived the right to enforce arbitration clauses based not on the Federal Rules, but on precisely those sorts of general common-law principles we discussed in *Pavey*—both before and after *Atlantic Marine*. See *Brickstructures, Inc. v. Coaster Dynamix, Inc.*, 952 F.3d 887, 891–93 (7th Cir. 2020); *Faulkenberg*, 637 F.3d at 807–08; *Halim v. Great Gatsby's Auction Gallery, Inc.*, 516 F.3d 557, 562 (7th Cir. 2008). Rodgers-Rouzier, however, has explicitly declined to argue that American Queen waived its argument in these terms. We think that is a prudent concession and conclude that American Queen preserved its opportunity to seek to compel arbitration under the IUAA.

### B.

Rodgers-Rouzier next argues that even if American Queen preserved its argument, the district court lacked the authority to dismiss the case as a matter of both state and federal law. Regarding Indiana law, she maintains that the IUAA applies on its own terms only to state courts. Her federal law theory relies on what has been called the "equitable remedial rights doctrine." Unpacking her theories requires a bit of background on the interaction of state and federal law as well as a good dose of history.

[7] [8] It is now understood that the FAA is a substantive federal law that, through the Supremacy Clause, generally preempts conflicting state law within its sphere. See *Southland Corp. v. Keating*, 465 U.S. 1, 15–16, 104 S.Ct. 852, 79 L.Ed.2d 1 (1984). Typically, this preemption invalidates state law that discriminates against arbitration agreements relative to other contracts. E.g., *Viking River Cruises, Inc. v. Moriana*, 596 U.S. 639, 650–51, 142 S.Ct. 1906, 213 L.Ed.2d 179 (2022). Those state laws conflict with § 2 of the FAA, which specifies that a "written provision in any ... contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of

such contract or transaction ... shall be valid, irrevocable, and enforceable." 9 U.S.C. § 2. But it does not follow that the FAA preempts state laws that *favor* arbitration in means different from the FAA or beyond the FAA's own scope—say, to oral contracts, a contract that does not involve commerce, or (as relevant here) the types of contracts of employment expressly excluded by § 1. To put the point in doctrinal terms, the FAA does not occupy the field of arbitration. *See Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ.*, 489 U.S. 468, 477, 109 S.Ct. 1248, 103 L.Ed.2d 488 (1989); *Sherwood v. Marquette Transp. Co.*, 587 F.3d 841, 843 (7th Cir. 2009).

The district court concluded that Rodgers-Rouzier was a seaman, so that means the FAA does not apply to her contract of employment. 9 U.S.C. § 1. (American Queen does not dispute these questions on appeal.) The IUAA, though, does not have its own exemption for seamen. Its § 1 tracks § 2 of the FAA, providing generally that "[a] written agreement to submit to arbitration ... an existing controversy or a controversy thereafter arising is valid and enforceable" and further specifying that the IUAA "applies to arbitration agreement between employers and employees" without additional qualification about the types of employment. Ind. Code § 34-57-2-1(a).[2] For Supremacy Clause purposes there is no conflict because the FAA does not prohibit arbitration in a seaman's contract of employment, it says nothing whatsoever about that question, leaving it for the states to resolve as they see fit. *See Sherwood*, 587 F.3d at 843. So far, the parties agree: in principle, state law can render an arbitration agreement in a seaman's contract of employment valid and enforceable, despite the FAA exemption. Where they disagree is on what it means for an agreement to be "valid" under state law and how a federal court can "enforce" such an agreement. That dispute requires a history lesson.

**\*5** Congress passed the FAA in 1925 "in response to widespread judicial hostility to arbitration agreements" that had "manifested itself in 'a great variety' of 'devices and formulas.' " *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339, 342, 131 S.Ct. 1740, 179 L.Ed.2d 742 (2011). *See generally Kulukundis Shipping Co., S/A, v. Amtorg Trading Corp.*, 126 F.2d 978 (2d Cir. 1942) (tracing hostility back to the 1600s in England); *U.S. Asphalt Ref. Co. v. Trinidad Lake Petroleum Co.*, 222 F. 1006 (S.D.N.Y. 1915) (collecting and criticizing several doctrines disfavoring arbitration); Paul L. Sayre, *Development of Commercial Arbitration Law*, 37 Yale L.J. 595 (1928) (expanding on *U.S. Asphalt*'s criticism). Often that hostility took the obvious form—deeming executory arbitration agreements invalid and utterly "illegal and void," *Home Ins. Co. of N.Y. v. Morse*, 87 U.S. 445, 450–51, 20 Wall. 445, 22 L.Ed. 365 (1874), or at least freely revocable, *see, e.g., Tobey v. County of Bristol*, 23 F. Cas. 1313, 1321 (C.C.D. Mass. 1845) (No. 14,065) (Story, J.); *see also Viking River Cruises*, 596 U.S. at 650 n.3, 142 S.Ct. 1906 (describing the doctrines of ouster and revocability); Wesley A. Sturges, Treatise on Commercial Arbitrations and Awards §§ 15–25 (1930) (summarizing the enforceability of arbitration agreements at common law and in equity).[3]

In the lead-up to the FAA, however, the federal courts' hostility was often showing in a different device. By that time some states had started to pass their own arbitration acts declaring arbitration agreements to be valid. *See, e.g.*, Arbitration Law, ch. 275, 1920 N.Y. Laws 803. Even under the standards of *Swift v. Tyson*, 41 U.S. 1, 16 Pet. 1, 10 L.Ed. 865 (1842)—which permitted federal courts then to interpret the general substantive common law, rather than apply the law as determined by the relevant state courts—any substantive statutory rights this legislation created would have been presumptively entitled to recognition in federal court. But courts at the time concluded these laws were not substantive at all. Rather arbitration acts were deemed to govern only procedure or remedies, both of which were exclusively the subject of the law of the forum, making the ability to compel arbitration turn almost entirely on the court in which the dispute was brought. *See Red Cross Line v. Atl. Fruit Co.*, 264 U.S. 109, 118, 124, 44 S.Ct. 274, 68 L.Ed. 582 (1924); *Alexandria Canal Co. v. Swann*, 46 U.S. (5 How.) 83, 87–88, 12 L.Ed. 60 (1847); *U.S. Asphalt*, 222 F. at 1007, 1011; *Berkovitz v. Arbib & Houlberg*, 230 N.Y. 261, 130 N.E. 288, 289–90 (1921) (Cardozo, J.).

Because of this understanding, federal courts before the FAA could conceivably accept that an arbitration agreement was both valid and enforceable as a mere contract but refuse to compel arbitration, stay litigation, or dismiss a suit that breached the agreement. *See Red Cross Line*, 264 U.S. at 122–23, 44 S.Ct. 274. This was in part because those remedies were deemed equitable in nature, essentially ordering specific

performance of the arbitration agreement, and thus they were beyond the powers of a non-equity court and contrary to historical equitable principles. *Id.* at 123, 44 S.Ct. 274; *Hayes v. Allstate Ins. Co.*, 722 F.2d 1332, 1339 (7th Cir. 1983) (Posner, J., dissenting); *see Viking River Cruises*, 596 U.S. at 650 n.3, 142 S.Ct. 1906 (noting this approach as another facet of the courts' hostility towards arbitration); *Tobey*, 23 F. Cas. at 1321–22 (describing how the refusal to compel arbitration evolved out of general principles limiting the remedy of specific performance). The federal courts' preferred *legal* remedy when a party brought a suit despite a valid arbitration agreement was the typical one for breach of any contract—money damages—often only nominal in amount. *E.g.*, *Munson v. Straits of Dover, S.S. Co.*, 102 F. 926, 928 (2d Cir. 1900). And that this outcome was based on principles of equity meant it could not be affected by contrary state law. The Conformity Act—which governed procedure in federal court prior to the Federal Rules of Civil Procedure—directed federal courts to adopt the procedures and remedies of the local state courts, but only for "common-law causes" as opposed to "equity and admiralty causes." Rev. Stat. §§ 914–915 (1878).

**\*6** Although the era of *Swift* and the Conformity Act ended in 1938 with the enactment of the Federal Rules of Civil Procedure and the decision in *Erie R.R. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), some vestiges of those policies remain to this day. *Erie* holds that federal courts must apply the substantive laws of the states, as interpreted by those states' courts, on matters not otherwise controlled by federal law. *See Houben v. Telular Corp.*, 309 F.3d 1028, 1032 (7th Cir. 2002) (noting *Erie* applies both in diversity cases and when state-law questions arise from supplemental jurisdiction). Questions of procedure remain governed by the law of the forum under this rule. *See Hanna v. Plumer*, 380 U.S. 460, 471, 85 S.Ct. 1136, 14 L.Ed.2d 8 (1965). As, perhaps, do some questions of remedy. Under what has been called the "equitable-remedial-rights doctrine," the Supreme Court has suggested that the equitable remedies available in federal court for the violation of state substantive rights might continue to depend on federal law, even after *Erie*. *See Guar. Tr. Co. of N.Y. v. York*, 326 U.S. 99, 105, 65 S.Ct. 1464, 89 L.Ed. 2079 (1945); *Fid. & Deposit Co. of Md. v. Edward E. Gillen Co.*, 926 F.3d 318, 326 & n.11 (7th Cir. 2019) (collecting authorities); *Sonner v. Premier Nutrition Corp.*, 971 F.3d 834, 844 (9th Cir. 2020) (denying relief under this doctrine); *see also Pusey & Jones Co. v. Hanssen*, 261 U.S. 491, 497–98, 43 S.Ct. 454, 67 L.Ed. 763 (1923) (stating rule before *Erie*). Those equitable remedies are, in turn, based on "the principles of the system of judicial remedies which had been devised and was being administered by the English Court of Chancery at the time of the separation of the two countries," *Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 318, 119 S.Ct. 1961, 144 L.Ed.2d 319 (1999) (quoting *Atlas Life Ins. Co. v. W.I.S., Inc.*, 306 U.S. 563, 568, 59 S.Ct. 657, 83 L.Ed. 987 (1939)), except as those principles may be altered by Congress, *e.g., United States v. Oakland Cannabis Buyers' Co-op.*, 532 U.S. 483, 496–97, 121 S.Ct. 1711, 149 L.Ed.2d 722 (2001). At the time of independence, of course, the equitable principles hostile to arbitration were well settled in both American and English courts. *See Tobey*, 23 F. Cas. at 1320–21.

Although Congress changed things by passing the FAA in 1925, what is important for Rodgers-Rouzier's argument is how, precisely, it did so. In her telling, Congress abrogated the federal courts' hostility to arbitration only to the extent that the FAA applies, and not a jot further. So, she insists, federal courts were forced to abandon their centuries-old equitable principles to obey the FAA's directions in cases where the FAA governs, but where it does not apply, the federal courts can, should, and must continue the tradition of denying specific enforcement of arbitration agreements through stay or dismissal. Thus, she maintains, breach of an arbitration agreement that is rendered valid only by state law can be remedied solely by an award of damages on a counterclaim in federal court, or perhaps an injunction sought in state court. *But see Donovan v. City of Dallas*, 377 U.S. 408, 412–13, 84 S.Ct. 1579, 12 L.Ed.2d 409 (1964) (prohibiting state courts from enjoining federal litigation).

And even if state law *could* authorize a federal court to stay or dismiss a lawsuit based on an arbitration agreement, in the abstract, Rodgers-Rouzier further argues that the IUAA itself does not do so. Section 3 of the IUAA authorizes a "court with jurisdiction" to compel arbitration and to stay litigation pending that arbitration, and section 17 clarifies that "court" means only an Indiana *state* court and that "jurisdiction" extends only to agreements providing for arbitration in Indiana. Ind. Code §§ 34-57-2-3,-17. Because this suit is in

federal court, and the agreement would obligate her to arbitrate in Tennessee (where she was last employed), Rodgers-Rouzier contends that the IUAA's stay and dismissal remedies do not apply to her agreement on the IUAA's own terms.

[9] Although Rodgers-Rouzier presents her arguments forcefully, we decline to turn back the clock and adopt rules that were considered "an anachronism" a century ago, see *Kulukundis*, 126 F.2d at 985 (citing legislative history), and in tension with the developments of "modern times" during the presidency of James K. Polk, *Tobey*, 23 F. Cas. at 1321. In the past century, the Supreme Court has consistently understood the specific enforcement of an arbitration agreement to be implied by its substantive validity. As a matter of federal law, then, we have abandoned any distinction between the validity of an arbitration clause as a substantive matter and its enforceability by stay or dismissal as a remedial or procedural matter. See *Southland*, 465 U.S. at 17, 104 S.Ct. 852 (Stevens, J., concurring in part and dissenting in part) (suggesting that "intervening developments in the law" have supplanted the view that arbitration is "procedural in nature"). If § 1 of the IUAA renders this agreement "valid and enforceable" as a matter of substantive Indiana law, then, under *Erie*, a federal court must give that clause the same effect an Indiana court would, even if neither the IUAA nor the FAA authorizes the federal court to do so in their texts.

*7 The collapse of the distinction between the validity of an arbitration agreement and the remedies available for its enforcement is most easily seen in the Supreme Court's caselaw addressing the mirror image of this case: an arbitration clause that § 2 of the FAA renders valid, but that a state court would otherwise refuse to enforce. As we have already noted, the Supreme Court has been clear that § 2 is a rule of substantive law that preempts contrary state law, even in state court. See *Viking River Cruises*, 596 U.S. at 650, 142 S.Ct. 1906; *Southland*, 465 U.S. at 12, 104 S.Ct. 852. Yet the Court has consistently left open the related question whether §§ 3 and 4 of the FAA apply in state courts. See *Badgerow v. Walters*, 596 U.S. 1, 8 n.2, 142 S.Ct. 1310, 212 L.Ed.2d 355 (2022); *Volt*, 489 U.S. at 477 n.6, 109 S.Ct. 1248; *Southland*, 465 U.S. at 16 n.10, 104 S.Ct. 852. Much like § 3 of the IUAA, it is those two sections of the FAA that specify *how* a court may enforce an arbitration agreement by staying litigation or compelling the parties to arbitrate based on the agreements that § 2 of the FAA makes valid and enforceable. Yet the plain text of these sections refers exclusively to "the courts of the United States" and a "United States district court." 9 U.S.C. §§ 3–4.

[10] Tracing much of the history described above, several Justices have taken the view that the explicit references to only federal courts in §§ 3 and 4 implicitly suggests that § 2 also applies only in federal court as a rule of procedure or remedy. And even if that were not the case, these Justices argued, that state courts fall outside the textual scope of §§ 3 and 4 suggests they should be permitted to decide themselves what procedures and remedies to offer when enforcing those agreements that § 2 might make substantively valid. But, decisive for our purposes, these Justices offered their views only in dissent. See *Allied-Bruce Terminix Cos. v. Dobson*, 513 U.S. 265, 284, 115 S.Ct. 834, 130 L.Ed.2d 753 (1995) (Scalia, J., dissenting); *id.* at 286–97, 115 S.Ct. 834 (Thomas, J., dissenting); *Southland*, 465 U.S. at 24–33, 104 S.Ct. 852 (O'Connor, J., dissenting). Indeed, Justice Thomas has been steadfast in his opposition to the Court's rulings in this area. E.g., *Viking River Cruises*, 596 U.S. at 665, 142 S.Ct. 1906 (Thomas, J., dissenting) (collecting cases). Unless he persuades four of his colleagues, though, we remain compelled to follow the reasoning of the majority opinions that have rejected this procedural or remedial interpretation of arbitration in favor of a substantive one. See *Savory v. Cannon*, 947 F.3d 409, 421 (7th Cir. 2020) (en banc).[4]

[11] That majority of the Court, when confronted with an Alabama law expressly prohibiting specific enforcement as a remedy for the breach of an arbitration agreement, Ala. Code § 8-1-41(3), held that this law was preempted by § 2 of the FAA just as much as state decisional law deeming arbitration agreements utterly void. *Allied-Bruce*, 513 U.S. at 272–73, 115 S.Ct. 834; *id.* at 294, 115 S.Ct. 834 (Thomas, J., dissenting) (distinguishing these grounds for an Alabama court's refusing to compel arbitration). The Court gave no credence to any distinction between the validity of an arbitration agreement and its enforcement and deemed them both to be controlled by § 2's substantive rule. Likewise in *Southland*, though the Court left open the question

whether §§ 3 and 4 applied in state courts, the majority emphasized that § 2 established a policy that would not allow "one party to ignore the contract and resort to the courts," thereby requiring state courts to specifically enforce the agreement through a stay or order compelling arbitration. 465 U.S. at 7, 104 S.Ct. 852; *accord Badgerow*, 596 U.S. at 8 n.2, 142 S.Ct. 1310 ("We have made clear that Section 2 'carries with it' a duty for States to provide certain enforcement mechanisms equivalent to the FAA's."); *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 447, 126 S.Ct. 1204, 163 L.Ed.2d 1038 (2006) (explaining that *Southland*'s interpretation of § 2 necessarily incorporates caselaw regarding § 4). The procedural and remedial obligation to stay or dismiss litigation in contravention of an arbitration agreement is part of the substantive federal law that makes the agreement valid.

**\*8** Although less often litigated, the Court's discussion of state arbitration law also confirms that the remedies for violation of arbitration agreements fall on the substantive line of *Erie*'s substance-procedure divide. The leading case is *Bernhardt v. Polygraphic Company of America*, 350 U.S. 198, 76 S.Ct. 273, 100 L.Ed. 199 (1956). The Court there addressed another arbitration agreement that had seemingly fallen outside the scope of the FAA (for lack of a connection to interstate commerce). The Second Circuit had nevertheless compelled arbitration on the theory that §§ 3 and 4 of the FAA provided procedural rules that governed in federal court, regardless of the nature of the underlying arbitration agreement. *Id.* at 201, 76 S.Ct. 273. The Court reversed, holding first that §§ 3 and 4 applied only to those agreements identified in § 2, and second, that compelling arbitration in these circumstances would conflict with *Erie.* The Court conceptualized the right to compel arbitration as a substantive right that should have received equal treatment in state and federal courts. *Id.* at 202–04, 76 S.Ct. 273. Because Vermont law deemed arbitration agreements to be freely revocable, the Court concluded that the Second Circuit had erred in compelling arbitration as it had, though the Court left it for the district court on remand to decide whether Vermont or the more arbitration-friendly New York law governed the litigation. *Id.* at 205, 76 S.Ct. 273.

Although Rodgers-Rouzier emphasizes that the *Bernhardt* Court did not consider what would happen if state law had favored enforcement of an arbitration agreement that fell outside the scope of § 2 of the FAA, its reasoning provided a strong hint. Rather than stop at the observation that §§ 3 and 4 of the FAA were limited to those agreements identified in § 2, which would have been sufficient to reverse the Second Circuit even assuming the FAA were procedural, the Court held that the question of arbitration enforcement was decidedly substantive and left open the possibility that on remand the district court might compel arbitration under state law (albeit that of a different state). Standing alone, *Bernhardt* might not foreclose Rodgers-Rouzier's arguments, but over countless decisions in the last 70 years the Supreme Court has consistently framed the enforcement of arbitration agreements to be inherent in the agreement's validity under the relevant substantive law, whatever its source. This conclusion was based, in no small part, on a fundamental goal of uniformity in outcome between claims litigated in state and federal court. *See Southland*, 465 U.S. at 15, 104 S.Ct. 852; *Bernhardt*, 350 U.S. at 203, 76 S.Ct. 273. We therefore decline Rodgers-Rouzier's invitation to travel back in time before these developments, destroy that uniformity, and provoke direct conflicts between state and federal courts.

[12] We instead conclude that the district court had the authority to enforce this arbitration agreement under Indiana law to the extent and by means substantially equivalent to those that Indiana law grants to the Indiana state court system. Rodgers-Rouzier does not contend that an Indiana court would be prohibited from dismissing litigation based on an arbitration agreement, so we conclude the district court here had authority to do the same through the functional equivalent of *forum non conveniens. Cf. Mason-Dixon Lines, Inc. v. Loc. Union No. 560, Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am.*, 443 F.2d 807, 809 (3d Cir. 1971) (holding federal court has inherent authority under Labor-Management Relations Act to stay litigation when FAA does not apply).[5]

### C.

The next question we must answer is whether American Queen is entitled to compel arbitration under Indiana law.

Rodgers-Rouzier continues to press three theories for why Indiana law would not compel her to arbitrate. First, and most prominently, she argues that the agreement has a choice-of-law clause in section six specifying that the agreement is governed by the FAA, and so compelling arbitration under state law violates the terms of the agreement. Second, she contends that section two is unconscionable because it gives American Queen complete freedom to select a biased arbitrator. Third, she insists that the waiver of the statute of limitations in section four of the agreement violates the FLSA and, either alone or in combination with the other asserted problems, renders the whole agreement unconscionable. Ultimately, we are persuaded by the first of these arguments and therefore have no need to resolve the other two, though we offer some observations about the waiver of the statute of limitations to clarify issues that may arise again in this case.

**\*9** Rodgers-Rouzier's first argument is simply presented: section six of the agreement says that the agreement is "governed by the Federal Arbitration Act," not the IUAA. And nothing in the FAA "shall apply to contracts of employment of seamen," such as herself. 9 U.S.C. § 1. She therefore argues she cannot be compelled to arbitrate under the agreement's own terms.

[13] The district court agreed that under the FAA it could not compel arbitration, but it was persuaded that if the FAA does not apply, then some law must. See *Harper v. Amazon.com Servs., Inc.*, 12 F.4th 287, 294 (3d Cir. 2021). This observation that some law must govern the agreement is true as far as it goes. But by framing this analysis in terms of causation—that the FAA's exclusion for seamen leads to the application of Indiana law—the court overlooked some critical nuance. Even if the court *were* compelling arbitration under the FAA, § 2 of the FAA would affect only the substantive validity and enforceability of the provisions governing the arbitration itself, not any other provision "that happens to appear in a contract that features an arbitration clause." *Viking River Cruises*, 596 U.S. at 653 n.5, 142 S.Ct. 1906. An arbitration agreement is just a type of contract, and the FAA does not itself provide a substantive law governing the formation or general interpretation of contracts, so ordinary state contract law always fills in crucial gaps in any arbitration agreement. See *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 630–31, 129 S.Ct. 1896, 173 L.Ed.2d 832 (2009); *Druco Restaurants, Inc. v. Steak N Shake Enterprises, Inc.*, 765 F.3d 776, 781–82 (7th Cir. 2014). State law thus had always governed this agreement. Accord *Harper*, 12 F.4th at 295. If the FAA applied, it would have preempted state law only to the extent necessary to overcome a conflict, without ever displacing state law entirely.

[14] [15] We therefore agree with the district court's premise that we must assess the agreement under Indiana law, including the IUAA, even despite section six stating that the FAA governs. State law always governed the agreement in the background, regardless of the FAA's application, and the omission of an express reference to the IUAA is immaterial. Ordinary contracts are entered every day under state law without the contract recognizing as much, and we can safely assume that the IUAA demands no more specificity before an agreement to arbitrate may be entered. Cf. *Arafa v. Health Express Corp.*, 243 N.J. 147, 233 A.3d 495, 506 (2020) ("[T]here has been no need to express an intent that the [New Jersey Arbitration Act] would apply because its application has been automatic, absent preemption."). But see Ind. Code § 34-57-2-1(a) ("This chapter also applies to arbitration agreement between employers and employees or between their respective representatives (*unless otherwise provided in the agreement*)" (emphasis added)). Section 1 of the IUAA may well make this agreement "valid and enforceable." Ind. Code § 34-57-2-1(a). If the agreement stopped at section one—the promise to settle any dispute by arbitration—then American Queen might be entitled to compel arbitration under the IUAA.

[16] [17] But the agreement does not stop at section one. Sections two through six are just as much a part of the agreement that the IUAA and ordinary Indiana contract law would render valid and enforceable, and this includes section six's statement that the agreement is governed by the FAA. That section is, in essence, a choice-of-law clause. The enforceability of that clause must itself be assessed under Indiana law. See *Harper*, 12 F.4th at 295. And Indiana law generally favors enforcement of contractual stipulations to the choice of law. See, e.g., *Allen v. Great Am. Rsrv. Ins. Co.*, 766 N.E.2d 1157, 1162 (Ind. 2002); *Champlain Cap. Partners, L.P. v. Elway Co.*, 58 N.E.3d 180, 201 (Ind. Ct. App. 2016) (enforcing clause providing that contract "shall be governed under Delaware law").

**\*10** Put another way, when Rodgers-Rouzier and American Queen agreed to arbitrate, they did not agree to arbitrate in the abstract but agreed to arbitrate subject to the FAA. The Supreme Court's decision in *Volt Information Sciences* is instructive. In *Volt*, the California Court of Appeal had interpreted an agreement's choice-of-law clause to specify California laws on arbitration and the Supreme Court explained that despite the FAA's preemptive power, this interpretation of the choice-of-law clause remained an ordinary question of state contract law. 489 U.S. at 474–77, 109 S.Ct. 1248. The only question of *federal* law before the Court was whether the FAA preempted certain features of the California rules of arbitration, but the Court saw no conflict because the FAA's primary purpose was "ensuring that private agreements to arbitrate are enforced according to their terms," including there the term that the arbitration agreement would be governed by California law. *Id.* at 479, 109 S.Ct. 1248. The FAA may have rendered the agreement valid as a substantive matter, but the valid agreement was to arbitrate subject to California law on arbitration procedures. Although the Indiana courts have seemingly not addressed this fact pattern under the IUAA (as opposed to the FAA), the signs available suggest that they would approach the issue in much the same way and treat the choice of law as part of the agreement here. *See Albright v. Edward D. Jones & Co.*, 571 N.E.2d 1329, 1333 (Ind. Ct. App. 1991) (relying on *Volt* to enforce choice-of-law clause selecting Missouri law and refusing to compel arbitration under Missouri law).

[18] [19] One difference between *Volt* and this case is the result after enforcement of the choice-of-law clause. The California law in *Volt* merely altered the procedural incidents surrounding arbitration and did not stop a party from compelling arbitration entirely. In another case, the Court relied on this distinction to hold that, despite a choice of Montana law, the FAA squarely preempted a Montana statute requiring special notice in an arbitration agreement before arbitration could be compelled in court. *Doctor's Assocs., Inc. v. Casarotto*, 517 U.S. 681, 688, 116 S.Ct. 1652, 134 L.Ed.2d 902 (1996); *accord Earley v. Edward Jones & Co.*, 105 N.E.3d 1094, 1101 (Ind. Ct. App. 2018) (recognizing that *Casarotto* abrogated *Albright*). We see no corresponding principle of Indiana law that would invalidate this choice-of-law clause. Although it is conceptually possible for this choice-of-law clause to be the rare exception that the Indiana courts deem void for public policy reasons, *see, e.g., Sullivan Corp. v. Rabco Enters.*, 160 N.E.3d 1124, 1127 (Ind. Ct. App. 2020) (refusing to enforce forum-selection and choice-of-law provisions that were expressly prohibited by statute), American Queen has provided no basis for us to conclude that would be true here. Just like in *Volt*, Indiana's strong public policy in favor of arbitration agreements does not do this work, because the policy is only to enforce the agreements that the parties themselves have reached. *See Land v. IU Credit Union*, 218 N.E.3d 1282, 1286–87 (Ind. 2023), *aff'd on reh'g*, 226 N.E.3d 194 (Ind. 2024); *Norwood Promotional Prod., Inc. v. Roller*, 867 N.E.2d 619, 626 (Ind. Ct. App. 2007). Because the parties agreed that arbitration would be governed by the FAA, which would not permit American Queen to compel arbitration, we conclude that Indiana law also would not compel Rodgers-Rouzier to arbitrate under this agreement.

The lack of a ground on which to invalidate the choice-of-law clause also scuttles American Queen's primary argument for discounting the effect of that choice of law. American Queen relies on the severability clause: "The provisions of this Agreement shall be severable. If any portion of this Agreement is held to be invalid or unenforceable, it shall not affect the remaining portions of this Agreement. This Agreement may be modified by a court or an arbitrator to render it enforceable." But we cannot sever the choice-of-law clause on these terms (or as a matter of general Indiana contract law, *e.g., Lee v. State*, 816 N.E.2d 35, 39 (Ind. 2004)) because we have no reason to say that the choice-of-law clause is "invalid or unenforceable." To the contrary, we think the choice-of-law clause is both valid and enforceable. The result of enforcing that valid clause is just that American Queen's request to compel arbitration must be denied. *Cf. Rittmann v. Amazon.com, Inc.*, 971 F.3d 904, 920 n.10 (9th Cir. 2020) (noting defendant had not explained why "choice-of-FAA" clause was unconscionable, and thus subject to severability analysis, before rejecting severability argument on different grounds). Nor can we take the invitation to modify the agreement to render the agreement enforceable. Absent a yawning void in the contract or reason to deem a particular part of the agreement invalid, that language is essentially circular—the agreement we would be tasked with rendering enforceable includes the agreement to the choice of law. If all modifications were to favor compelling arbitration,

regardless of the other terms of the agreement, we would have no limiting principle. We could just as easily modify the agreement to compel arbitration of the worker's compensation claims that the parties expressly excluded from the agreement. We will not rewrite the contract from scratch to avoid an outcome to which the agreement itself leads.

**\*11** Perhaps we would need to address the severability of sections two and four of the agreement, if we were to agree with Rodgers-Rouzier's arguments that they were void for unconscionability. But given our conclusion that the choice-of-law clause means that Rodgers-Rouzier may not be compelled to arbitration, we do not decide whether either section is unconscionable today, let alone whether any unconscionability would preclude an order compelling arbitration. Critically, American Queen has not yet asked us or the district court to enforce the waiver of the statute of limitations in section four directly; instead, it has appropriately contended only that the arbitration issue came first and that it was for the arbitrator to decide the validity of that waiver in the first instance (assuming arbitration could be compelled).

But in response to Rodgers-Rouzier's contention that arbitration could not be compelled because the waiver was unconscionable, the district court went beyond sending the question of the waiver's validity to arbitration and instead rejected her argument's premise, suggesting that the waiver was entirely lawful. *Contra Boaz v. FedEx Customer Info. Servs., Inc.*, 725 F.3d 603, 606 (6th Cir. 2013). For this proposition, the court relied primarily on our decision in *Taylor v. Western & Southern Life Insurance Co.*, 966 F.2d 1188 (7th Cir. 1992). That was error. *Taylor* involved a claim under 42 U.S.C. § 1981, which we noted had no federal statute of limitations and so borrowed the state-law limitations period, including any state-law exceptions subject only to potential federal policy limits. 966 F.2d at 1203. The FLSA, in contrast, has its own federal statute of limitations—two years, or three, if the violation is shown to be willful, 29 U.S.C. § 255(a)—and that federal law would preempt any state law to the contrary, if there were a conflict. The validity of this waiver has nothing to do with the question whether the court was compelling arbitration under the FAA or IUAA, as the district court thought, because again the FAA could at most govern the agreement to arbitrate itself, not every other provision that happens to be in the same contract. *Viking River Cruises*, 596 U.S. at 653 n.5, 142 S.Ct. 1906.

[20] More importantly, the district court's reliance on § 1981 precedent overlooked what makes the FLSA unique—it is "designed to defeat rather than implement contractual arrangements." *Brant v. Schneider Nat'l, Inc.*, 43 F.4th 656, 662 (7th Cir. 2022) (quoting *Sec'y of Labor v. Lauritzen*, 835 F.2d 1529, 1544–45 (7th Cir. 1987) (Easterbrook, J., concurring)). No matter how voluntarily they purport to do so, parties may not generally waive the statutory wages the FLSA promises, whether directly or indirectly, such as by agreeing to settle a wage claim for less than the amount to which the worker is entitled. *See, e.g.*, *Brooklyn Sav. Bank v. O'Neil*, 324 U.S. 697, 707, 65 S.Ct. 895, 89 L.Ed. 1296 (1945); *Walton v. United Consumers Club, Inc.*, 786 F.2d 303, 306 (7th Cir. 1986). It would be equally unlawful for an employer and employee to agree to a pay rate of $1 per hour as it would be to agree to submit all wage claims to an arbitrator and waive any arbitration award more than $1 per hour.

We do not mean to suggest that the statute-of-limitations waiver in section four of this agreement is necessarily equivalent to such a blatant run around of the minimum wage, nor to prejudge the enforceability of this waiver or the power to compel arbitration under a hypothetical agreement that contains a term that violates the FLSA. Again, no one has asked yet to enforce the waiver here and we are not required now to decide whether it would be lawful to do so. Nor do we need to opine on whether, if the waiver were unlawful, it would be severable or render the entire agreement void. We have merely confirmed—as American Queen recognized at oral argument—that the district court's decisions so far do not close the book on the legality of the waiver and thought it prudent to highlight some of the questions that will need to be explored, should that issue arise again.

### D.

**\*12** Likewise, our resolution of Rodgers-Rouzier's arbitration agreement means we do not need to separately decide anything with respect to the 127 other employees who sought to opt into her suit before the district court sent notice to them and who later joined her appeal. The district court relied on

our decision in *Hollins v. Regency Corp.*, 867 F.3d 830, 834 (7th Cir. 2017), to conclude that because it had dismissed Rodgers-Rouzier's individual suit without "conditionally certifying" a collective action, the opt-ins were not parties to the case. Rodgers-Rouzier and the Secretary of Labor, as amicus curiae, contend that this interpretation of the collective-action mechanism in 29 U.S.C. § 216(b) conflicts with the interpretation of every other circuit to consider the question. *See, e.g., Waters v. Day & Zimmermann NPS, Inc.*, 23 F.4th 84, 90 (1st Cir. 2022) (collecting cases). They urge us to distinguish *Hollins* and hold that employees become parties to a FLSA case as soon as they opt-in, regardless of whether a collective has been certified (conditionally or otherwise). American Queen, for its part, contends that because these employees were not parties to the district court litigation under *Hollins*, they are prohibited from appealing the judgment. *See Halle v. W. Penn Allegheny Health System Inc.*, 842 F.3d 215, 227 (3d Cir. 2016) (holding that any opt-ins are *no longer* parties after *decertification* of a collective action and therefore cannot appeal from a later final judgment to challenge decertification).

[21] We have undone the premise of the district court's ruling and concluded that Rodgers-Rouzier's individual case may proceed in federal court. That reopens the possibility that the case will proceed as a collective action. At the very least, her interest in continuing her own case provides her standing to argue on appeal that the case should be allowed to proceed collectively, too, after remand. *See Espenscheid v. DirectSat USA, LLC*, 688 F.3d 872, 877 (7th Cir. 2012). Her presence in this appeal suffices to distinguish *Halle*, 842 F.3d at 228–29 (noting that original plaintiff did not appeal), and avoids any need to address any other potential appellant's ability to bring this appeal before us. *Cf., e.g., Tierney v. Advoc. Health & Hosps. Corp.*, 797 F.3d 449, 451 (7th Cir. 2015) (one party's standing with respect to a given claim provides the court with jurisdiction regardless of any other person's standing). We thus need go no further to restore the 127 employees to the position they were in before the dismissal of Rodgers-Rouzier's case. What, precisely, that position is or may become in the future are questions to be resolved in further litigation.

## III.

We reverse the district court's dismissal of this case and remand for further proceedings consistent with this opinion.

**All Citations**

--- F.4th ----, 2024 WL 3034849

# Footnotes

1    On February 21, 2024, American Queen and its affiliates filed for bankruptcy in the Southern District of Texas. The bankruptcy court lifted the automatic stay for purposes of this appeal on April 15, 2024, but it directed that if the case resulted in a favorable decision for Rodgers-Rouzier and the other employees, then they could pursue their claims only in the bankruptcy proceedings.

2    The text of § 1 contains a scrivener's error and includes the phrase "valid and enforceable" twice. See *Sch. City of E. Chicago. v. E. Chicago Fed'n of Tchrs., Loc. No. 511, A.F.T.*, 422 N.E.2d 656, 658 n.1 (Ind. Ct. App. 1981).

3    As many of these sources note, different authorities governed arbitration agreements that were entered in court or that merely sought to have an arbitrator decide the value of a contractual promise as a condition precedent to performance of the contract. We gloss over this distinction because those scenarios are not implicated here.

4    The limitations to Indiana courts in §§ 3 and 17 of the IUAA could also imply that the Indiana Legislature and the Uniform Law Commission (which recommends similar language for all state uniform arbitration acts) understood arbitration to be purely procedural or remedial in nature. But that possibility need not detain us, because, for *Erie* purposes, the categorization of a given law as substantive or only procedural (and the typically more important question whether there is a conflict between state law and a federal rule of procedure) is itself a matter we assess under federal law. See *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 404–05, 410, 130 S.Ct. 1431, 176 L.Ed.2d 311 (2010); *Hahn v. Walsh*, 762 F.3d 617, 633 (7th Cir. 2014).

5    American Queen briefly contends that the district court might have better stayed the litigation, rather than dismissed it. The Supreme Court recently held that the FAA requires a court to stay, not dismiss, litigation when it compels arbitration. *Smith v. Spizzirri*, ––– U.S. ––––, 144 S. Ct. 1173, 1178, ––– L.Ed.2d –––– (2024). But Indiana courts have interpreted the IUAA to give discretion to dismiss or stay as may be appropriate in a given case. See *Destination Yachts, Inc. v. Pierce*, 113 N.E.3d 645, 653–54 (Ind. Ct. App. 2018). No one contends that the district court abused its discretion on the terms established by Indiana caselaw, so we do not consider that question.

---

End of Document    © 2024 Thomson Reuters. No claim to original U.S. Government Works.